


**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AUSTIN FENNER,

Plaintiff,

vs.

NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a THE NEW YORK POST, MICHELLE GOTTHELF and DANIEL GREENFIELD, in their official and individual capacities,

Defendants.

Civil Action No. ________

**Complaint**

**Jury Trial Demanded**

RECEIVED NOV 30 2009 U.S.D.C. S.D. N.Y. CASHIERS

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Austin Fenner ("Mr. Fenner" or "Plaintiff"), by and through his undersigned counsel, Thompson Wigdor & Gilly LLP, as and for his Complaint in this action against Defendants News Corporation ("News Corp."), NYP Holdings, Inc., d/b/a the New York Post (the "Post"), (together, the "Company"), Michelle Gotthelf ("Gotthelf") and Daniel Greenfield ("Greenfield") (collectively, "Defendants"), hereby alleges as follows:

## NATURE OF THE CLAIMS

1. This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices and retaliation committed against Plaintiff, including Defendants' discriminatory treatment, harassment and/or unlawful retaliation of Plaintiff, due to his race, color and complaints of and/or opposition to discrimination, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, New York

Executive Law §§ 290 et seq. (the "NYSHRL") and the New York City Human Rights Law, New York Administrative Code §§ 8-101 et seq. (the "NYCHRL").

**PRELIMINARY STATEMENT**

2. The New York Post, owned and operated by businessman and media magnate Rupert Murdoch, is the sixth largest newspaper in the country, employing more than one hundred employees. Despite employing such a large number of employees in the most diverse city in the world, virtually all of the members of the Post's management team, including its editors, are White males. In fact, there has not been a single Black editor on the Post's Metro Desk in almost 10 years. Moreover, practically all of the news reporters at the Post are White.

3. The severe lack of diversity in the management and editorial ranks and throughout the entire newsroom at the Post is evidence of the racial discrimination committed against employees of color. In fact, the Post, and its parent company, News Corp., have fostered a racially hostile work environment, which is permeated with racist conduct and comments towards people of color in and outside of the Company.

4. By way of example only, White editors at the Post routinely humiliated and openly cursed at Plaintiff Austin Fenner, who is African-American, by, among other things, yelling at him "What the fuck are you doing?" "What's wrong with your ass?" and "You better get your fucking ass over there," issuing him unfair performance reviews and even banning him from the newsroom for over five months based on his race and/or color.

5. The racial animus at the Post was further exemplified on February 18, 2009, when Defendants published a patently racist cartoon depicting two White police officers shooting to death a crazed chimpanzee meant to represent President Barack

Obama. As an African-American man familiar with the history in this country of Black people being portrayed as gorillas, apes and monkeys, Mr. Fenner recognized the racist nature of the cartoon and was deeply offended that his employers would publish a cartoon implicitly approving of the assassination of the first Black President of the United States while likening him to a dead monkey. *See* Exhibit A.

6. The Company fostered an environment such that any employee with the courage to complain about the discrimination that pervades the workplace, whether directly to management or in a public forum, would be subjected to unlawful retaliation by, among other things, stripping them of their job duties, openly and unfairly criticizing their work performance, denying them necessary tools to successfully perform their job and unlawfully terminating their employment.

7. True to form, after Mr. Fenner publicly opposed the racist cartoon about President Obama on an online website, he was repeatedly retaliated against and ultimately terminated by Defendants on November 9, 2009.

8. Defendants' discriminatory and retaliatory conduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for Plaintiff's rights, warranting an award of punitive damages. Such conduct has caused, and continues to cause, Plaintiff to suffer substantial monetary damages, permanent harm to his professional and personal reputations and severe mental anguish and emotional distress.

**JURISDICTION AND VENUE**

9. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

**PARTIES**

11. Plaintiff Austin Fenner, an African-American reporter with nearly 20 years of experience, is a resident of the State of New Jersey, Bergen County. At all relevant times, he met the definition of an "employee" under all applicable statutes.

12. Defendant News Corporation is one of the largest media conglomerates in the world and owns HarperCollins, the New York Post, the Wall Street Journal, the Weekly Standard, Fox News Channel and 20th Century Fox Television. At all relevant times, Defendant News Corporation has had its principal place of business located at 1211 Avenue of the Americas, New York, New York and regularly transacts business in this district.

13. Defendant NYP Holdings, Inc., d/b/a the New York Post, is a subsidiary of Defendant News Corporation and is widely viewed as one of the Company's most valuable print assets. At all relevant times, Defendant NYP Holdings, Inc. has had its principal place of business located at 1211 Avenue of the Americas, New York, New York and regularly transacts business in this district.

14. At all relevant times, Defendants News Corporation and NYP Holdings, Inc., d/b/a the New York Post, have met the definition of an "employer" under all applicable statutes.

15. Upon information and belief, Defendants News Corporation and NYP Holdings, Inc., d/b/a the New York Post, share common ownership, common premises, common directors and/or officers, and common financial control.

16. Defendant Michelle Gotthelf is the Metropolitan Editor of the Post and currently resides in Hillsdale, New Jersey. At all relevant times, she has actively and directly participated in the discrimination, harassment and unlawful retaliation committed against Plaintiff.

17. At all relevant times, Defendant Gotthelf had authority to make personnel decisions concerning Plaintiff's work schedule, assignments, salary and other employment benefits. Defendant Gotthelf also had, and continues to have, authority to discipline, including the right to terminate, Plaintiff and other Company employees.

18. Defendant Daniel Greenfield is the Assignment Editor and Deputy Metropolitan Editor of the Post and currently resides in White Plains, New York. At all relevant times, he has actively and directly participated in the discrimination, harassment and unlawful retaliation committed against Plaintiff.

19. At all relevant times, Defendant Greenfield had authority to make personnel decisions concerning Plaintiff's work schedule, assignments, salary and other employment benefits. Defendant Greenfield also had, and continues to have, authority to discipline, including the right to terminate, Plaintiff and other Company employees.

**PROCEDURAL REQUIREMENTS**

20. Mr. Fenner has filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII, 42 U.S.C. §§ 2000e et seq. The charge arises out of the same facts alleged herein.

21. When the EEOC completes its investigation of the charge and issues Plaintiff's notice of right to sue, Plaintiff will seek leave to amend this Complaint to add claims that Defendants News Corp. and the Post violated Title VII in addition to the statutes and laws alleged herein.

22. Prior to the commencement of this action, a copy of this Complaint was served on both the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

23. Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

### I. Austin Fenner

24. Until recently, Plaintiff Austin Fenner was a Black Senior Reporter at the Post.

25. Since graduating from the prestigious Newhouse School of Communication at Syracuse University, Mr. Fenner has enjoyed a successful career in journalism, including spending 15 years as a full-time and highly regarded reporter for the New York Daily News ("Daily News").

26. While at the Daily News, Mr. Fenner authored numerous prominent news stories, including the coverage of the September 11th terrorist attacks and the collapse of the Twin Towers, as well as the final moments of John F. Kennedy, Jr. before his tragic airplane crash.

27. After establishing himself at the Daily News, Mr. Fenner was offered the position of Senior Reporter by the Post.

28. Specifically, Mr. Fenner was hired by Daniel Colarusso as a Senior Reporter on the Post's City Desk in a dual capacity, which required him to both cover breaking news stories and come up with ideas for "enterprise" stories for the City Desk.

29. However, Mr. Colarusso left the Post unexpectedly shortly after Mr. Fenner joined the Company, at which point Defendant Gotthelf became Mr. Fenner's direct supervisor.

30. Throughout his employment with the Company, Mr. Fenner continuously performed quality work commensurate with his extensive experience and record of journalistic success. By way of example only, Mr. Fenner covered breaking news for the Post, such as the landing of a US Airways airplane in the Hudson River in January 2009, known as the "Miracle on the Hudson."

31. He also obtained much sought after exclusive interviews for the Post, including an interview with then incoming Archbishop of New York Timothy Dolan, as well as an interview with William Ayers, the co-founder of the radical Weather Underground organization, who was the subject of intense media interest last year during the Democratic Presidential Primary for his prior contacts with President Obama.

32. As a result of Mr. Fenner's unflagging commitment to his job, he was credited with hundreds of bylines during his employment at the Post, ranking him among the top producing reporters at the Company.

## II. <u>The Racially Hostile Work Environment at the Post</u>

33. However, despite Mr. Fenner's exemplary work performance, his experiences at the Company were marred by the pervasive discrimination and harassment to which he and other employees of color at the Post were subjected throughout their employment based on their race and/or color.

34. For example, despite the great diversity throughout New York City, not a single person of color has held the position of editor on the Post's Metro desk since 2001

when African American Deputy Metro Editor Lisa Baird was fired as she was dying of cancer. In fact, there is currently only one non-White Editor throughout the entire editorial staff at the Post, and he edits the Business section of the newspaper.

35. Similarly, the Post currently employs only one Black reporter who is in the newsroom on a regular basis.

36. There are also no Black, Hispanic or Asian reporters covering the news department's high-profile beats, such as City Hall or any of the federal or state courts.

37. As further evidence of the blatant racism committed against employees of color, White editors at the Post have repeatedly discriminatorily denied the requests for a promotion made by a highly-qualified and very accomplished Black reporter based on his race and/or color, despite that reporter's substantial experience and enormous contributions to the Company.

38. Additionally, during Mr. Fenner's employment, White editors at the Post have used offensive and discriminatory headlines, columns and cartoons to mock, insult and/or humiliate people of color.

39. By way of example only, on November 1, 2009, White editors ran an article that disparaged Jamaicans by suggesting that the people of Jamaica were "high" on drugs when their country recently bestowed an honor on Congressman Charles Rangel. In the article, entitled "Are They High? Jamaica Dubs Rangel Knight," the Post ran a demeaning computer-generated picture of Congressman Rangel that made him look like a buffoon by depicting him with long dreadlocks, wearing a crown and holding up a peace sign with his hand. The article also stated that "Jamaican authorities insist that they weren't high" when they gave the honor to the Congressman, who was described by the

author of the article as "the Gallant Knight of 125th Street," which was a racist reference to a commercial strip in Harlem where many Blacks work and shop.

40. In this racially discriminatory environment at the Company, Mr. Fenner was subjected to discrimination throughout his employment. For example, after joining the Post, and despite his history of success, Mr. Fenner's White editors discriminatorily began singling him out for unwarranted criticism, falsely claiming that his story ideas and work product were subpar.

41. White editors at the Post also discriminated against Mr. Fenner with respect to his first performance review, which claimed, without basis, that his performance was unsatisfactory.

42. The Company's criticisms of Mr. Fenner's work performance, however, were completely belied by the fact that it continually sent him out to cover prominent and breaking news stories, such as President Obama's presidential campaign.

43. His reviews were also completely inconsistent with the satisfactory performance reviews he received during his many years at the Daily News and the praise he received from some of his editors at the Post that he was writing "great" stories.

44. As further evidence of discrimination, the Post also required Mr. Fenner to travel more than any White reporter on the City Desk. Specifically, despite being a Senior Reporter on the City Desk, Mr. Fenner was forced to travel to different states on business for the Post on more than 20 occasions during his two years of employment at the Company, which resulted in him having to spend substantial time away from his family and the newsroom, covering stories in distant locations such as Pascagoula, Mississippi and Lincoln, Nebraska.

45. In addition, not only did the Post force Mr. Fenner to travel extensively to cover stories, but they refused to provide him with the necessary tools and assistance to succeed while covering those stories.

46. For instance, before traveling to Washington, D.C. for the inauguration of President Obama, Mr. Fenner made repeated requests to his White supervisor, Defendant Gotthelf, to have a photographer assigned to travel with him to document the inauguration.

47. However, Mr. Fenner's numerous requests for a photographer for this historic occasion were denied by Defendant Gotthelf, without explanation, despite the fact that White reporters were regularly assigned photographers to assist them in covering important news events.

### III. <u>The Racist Cartoon Depicting President Obama as a Dead Chimpanzee</u>

48. The pervasive racism at the Company was made clear to all of its employees on February 18, 2009, when Defendants published the cartoon depicting the shooting death of a crazed chimpanzee by two White police officers and containing the caption, "They'll have to find someone else to write the next stimulus bill."

49. The racist message that Defendants sought to send through the cartoon was made evident by the fact that the page immediately preceding the cartoon contained a prominent picture of President Obama signing the stimulus bill into law. Moreover, the editorial page in that same day's edition of the Post referred to the stimulus bill as "President Obama's $787 billion stimulus plan." Accordingly, there is no doubt that the chimpanzee pictured shot to death and lying in a pool of blood with three bullet holes was intended to represent President Obama.

50. Upon information and belief, White editors at the Post were given several cartoons to choose from to run in the February 18, 2009 edition of the newspaper but instead chose the cartoon depicting President Obama as a crazed, dead chimpanzee. In fact, Jesse Angelo, the White Managing Editor at the Post, admitted to others that he had approved the publication of the cartoon before it appeared in the newspaper.

51. As an African-American, Mr. Fenner understood the long and sad history in America of African-Americans being depicted as primates. As a result, Mr. Fenner and other employees of color were deeply offended by the Post's decision to publish the racist and dangerous cartoon about the President.

52. Mr. Fenner's objections to the racist cartoon were further solidified by comments made by some of his White editors evincing a callous disregard to the offensive nature of the image approved by Defendants.

53. For example, Defendant Greenfield admitted that the cartoon was in "poor taste" and that he was "not surprised" that the cartoon led to a storm of protests.

54. In response to the complaints made by another African-American reporter about the obviously racially degrading imagery in the cartoon, Jesse Angelo dismissed those complaints, telling the reporter that he had no problem with the cartoon. The fact that Mr. Angelo, who is one of the highest-ranking editors at the Post, had no problem with the publication of such a racist, offensive and dangerous cartoon that could easily be interpreted as calling for the assassination of President Obama speaks volumes about the rampant racism at the Post.

55. Understandably, the patently offensive nature of the cartoon sparked protests both inside and outside the Company's offices, with various media outlets criticizing the Post's decision to publish such a despicable cartoon.

56. The callous indifference by the White editors at the Post to the racist cartoon and the prevalent racism in the newsroom that spawned it was also evident when they refused a request by Governor David Patterson, the first Black Governor of the State of New York, to be interviewed about the cartoon. Specifically, after Governor Patterson made it known that he wanted to be interviewed about the nature of that cartoon and had also agreed to be interviewed about any other subject, the White editors at the Post summarily refused to interview him, despite the fact that he is the highest elected official in the State and such a rejection of a sitting Governor is unprecedented and practically unheard of in journalism. Upon information and belief, the Post has never rejected the request for an interview made by any other White Governor of the State of New York.

**IV. <u>Mr. Fenner's Protected Opposition to Racial Discrimination</u>**

57. After the racist and oppressive cartoon was published in the Post, journalist Richard Prince published an article on his online media website, *Journal-isms*, on February 20, 2009, condemning the Post for its history of racist practices, including towards its employees.

58. In light of his disgust at the Company's decision to publish such a blatantly racist cartoon, Mr. Fenner consented to be interviewed by Mr. Prince as part of the article in *Journal-isms*. Because *Journal-isms* is a widely read and well-respected publication covering issues in the media, Mr. Fenner believed that the interview would be

an effective outlet to make his complaints about the cartoon known to both management at the Post and to the general public.

59. In the article published in *Journal-isms*, entitled "3 Things that Need Fixing at the N.Y. Post," Mr. Fenner was quoted as saying that the cartoon "churned my stomach when I saw it."

60. Notably, Mr. Fenner was the only then-employee at the Post that consented to publicly condemn the Company's discriminatory practices in that article.

## V. Defendants' Continued Racial Discrimination and Unlawful Retaliation Against Mr. Fenner

61. Two days later, while Mr. Fenner was on assignment in Milwaukee, Wisconsin to cover the highly-publicized appointment of Archbishop Dolan as the new Archbishop of New York, Defendant Greenfield called Mr. Fenner on his cellular telephone and cursed and screamed at him without any provocation.

62. Specifically, Defendant Greenfield cursed at Mr. Fenner in connection with an interview that the Post had hoped to get with Archbishop Dolan, yelling "What the fuck are you doing?" "What's wrong with your ass?" and "You better get your fucking ass over there." Upon information and belief, Defendant Greenfield never used such vulgarity and demeaning terms in speaking with White reporters under his supervision.

63. Despite being humiliated by Defendant Greenfield, Mr. Fenner, who had earlier arranged to conduct an exclusive interview with Archbishop Dolan, went through with his interview of the archbishop that day and his exclusive interview later received prominent coverage in the Post.

64. Incredibly, when Defendant Gotthelf learned of Defendant Greenfield's inappropriate conduct towards Mr. Fenner, she refused to admonish Defendant Greenfield,

even though she was his boss, or even to ask Mr. Fenner about his version of events. Instead, she blamed Mr. Fenner alone, stating that he had brought on himself the cursing tirade.

## VI. Defendants' Racially Discriminatory and Retaliatory Ban of Mr. Fenner from the Newsroom

65. Thereafter, in May 2009, Defendants Greenfield and Gotthelf banned Mr. Fenner from entering the Post's newsroom. Specifically, they told Mr. Fenner that he was forbidden from coming into the newsroom anymore unless he got their permission in advance.

66. Although these White editors claimed that Mr. Fenner was being banned from the newsroom as a result of a restructuring at the Post, this explanation was completely undermined by the fact that Mr. Fenner continued to maintain a desk, phone, and computer in the newsroom, as did all other Post reporters, but he alone was prohibited from using them.

67. Upon information and belief, no White reporter was ever banned from the newsroom and required to seek approval from a member of management prior to entering the Company's premises.

68. Mr. Fenner's ban from the newsroom was an act of utter humiliation designed to strip him of his dignity and self-respect as a reporter and as a man and was based on his race and/or color and implemented to punish him for his opposition to Defendants' discriminatory practices. It was also a throwback to the days of Jim Crow segregation.

69. As a result of Defendants' discriminatory and retaliatory decision to ban Mr. Fenner from the newsroom, which lasted until his unlawful termination on November

9, 2009, Mr. Fenner's ability to successfully and effectively perform his job as a Senior Reporter at the Post was completely undermined.

70. For example, as a result of being banned from the newsroom, Mr. Fenner was left without a telephone, computer, printer, and other necessary newsroom resources.

71. The ban also prevented Mr. Fenner from taking advantage of the same leads and wire services that other White reporters relied upon in coming up with ideas and drafting their stories. He was further discriminatorily denied the opportunity to interact with his colleagues and editors and exchange story ideas with his peers in the newsroom. Notably, these benefits were given to White reporters at the Post without restriction, none of whom had been similarly banned.

72. During his ban from the newsroom, Mr. Fenner received calls at night from his White editors and given assignments for the next day. After he covered those assignments, he was often forced to go to Starbucks and other local coffee shops to write his news stories for the Post.

73. Clearly, Defendants' discriminatory and retaliatory decision to ban Mr. Fenner from the newsroom adversely affected his job and severely undermined his ability to effectively perform his job duties. Rather than having a network of computers, office resources and colleagues to enable him to create ideas and write his stories, Mr. Fenner was left to fend for himself, deprived of these basic tools of his trade, and had to suffer the shame and indignity of having to write his news stories in coffee shops and other public venues.

74. In an additional act of discrimination and retaliation, Defendants changed Mr. Fenner's work schedule from an 11 a.m. to 7 p.m. shift to a work schedule in which he

worked from 9 a.m. to 5 p.m. on four days of the week, and from 2 p.m. to 10 p.m. on the 5th day, which is a shift normally reserved for junior reporters.

75. Defendants initially told Mr. Fenner that he was being given the later shift as a temporary measure that would only be in place for a month. However, Mr. Fenner was required to work that late shift until his unlawful termination.

## VII. Mr. Fenner's September 2009 Performance Review

76. Incredibly, despite the fact that Mr. Fenner was banned from the newsroom for months, thereby denying him access to important resources necessary to allow him to perform his job, Defendants presented him with yet another discriminatory and retaliatory performance review in or around September 2009.

77. Obviously concerned with the unfairness of this evaluation, Mr. Fenner questioned the validity of his review, and was told by Defendant Gotthelf that Mr. Fenner's review reflected his purported failure to produce "enterprise" stories.

78. However, when Mr. Fenner pressed Defendant Gotthelf to give him an example of an enterprise story that the Post had published, she could not identify a single one, revealing the pretextual nature of this alleged justification for his discriminatory and retaliatory performance review.

## VIII. The Unlawful Termination of Mr. Fenner's Employment

79. Defendants' campaign of unlawful racial discrimination and retaliation against Mr. Fenner culminated on November 9, 2009.

80. That same day, former-Post Associate Editor Sandra Guzman filed a federal civil Complaint in the Southern District of New York against the Company, alleging a hostile work environment based on race, color, gender and/or national origin as

well as unlawful retaliation and condemning the racist and offensive cartoon about President Obama.

81. On that day, while working on a story in Williamsburg, Brooklyn, Mr. Fenner was summoned back to the office, from which he remained banned during the workday, to meet with Defendants Greenfield and Gotthelf, as well as Amy Levine Scialdone, Vice President of Human Resources at the Post.

82. Before the meeting began, Mr. Fenner was told that he was required to immediately hand over his notes on the Williamsburg story to another reporter, who was White, which he did.

83. Mr. Fenner was then informed that Defendants had decided to terminate his employment, and that decision was made, upon information and belief, by Defendant Gotthelf.

84. Ms. Levine then handed Mr. Fenner a separation and release agreement, and falsely told him that he had to sign the agreement in order to receive his 401K funds to attempt to intimidate him coercively into signing away his legal rights. Mr. Fenner, however, refused to sign the separation and release agreement because he knew that his termination was unlawfully based on his race and/or color and due to his opposition to the Company's discriminatory practices, including Defendants' belief that Mr. Fenner would be a supportive witness in Sandra Guzman's discrimination case.

**<u>AS AND FOR A FIRST CAUSE OF ACTION</u>**

**(Discrimination and Harassment in Violation of Section 1981)**

85. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

86. Defendants have discriminated against Plaintiff on the basis of his race and/or color in violation of Section 1981 by denying him the same terms and conditions of employment available to employees who are White, including but not limited to, subjecting him to disparate working conditions and unfair discipline, denying him terms and conditions of employment equal to that of employees who are White, and unlawfully terminating his employment.

87. Defendants have discriminated against Plaintiff on the basis of his race and/or color, in violation of Section 1981 by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive discrimination and harassment committed against Plaintiff.

88. As a direct and proximate result of the Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including but not limited to, loss of future income, compensation and benefits for which he is entitled to an award of damages.

89. As a direct and proximate result of the Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of damages.

90. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR A SECOND CAUSE OF ACTION**

**(Retaliation in Violation of Section 1981)**

91. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

92. Defendants have retaliated against Plaintiff by, inter alia, subjecting him to obscenities and unfair performance evaluations, banning him from the newsroom and otherwise interfering with the performance of his job, and by ultimately terminating his employment, all in violation of Section 1981 for his opposition to discriminatory practices directed toward himself and other people of color, and/or his participation in lodging complaints about such discriminatory practices, as well as Defendants' suspicions that Plaintiff was and/or would be assisting a former co-worker who was suing them for race discrimination and retaliation.

93. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

94. As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain

and suffering, as well as physical injury, for which he is entitled to an award of monetary damages and other relief.

95. Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR A THIRD CAUSE OF ACTION**

**(Discrimination and Harassment in Violation of New York State Human Rights Law)**

96. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

97. Defendants have discriminated against Plaintiff on the basis of his race and/or color in violation of the New York State Human Rights Law by denying to him the equal terms and conditions of employment, including but not limited to subjecting him to disparate working conditions and denying him the opportunity to work in an employment setting free of unlawful discrimination and harassment.

98. Defendants have discriminated against Plaintiff on the basis of his race and/or color, in violation of the New York State Human Rights Law by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive discrimination and harassment of Plaintiff.

99. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and other relief.

100. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which he is entitled to an award of monetary damages and other relief.

**AS AND FOR A FOURTH CAUSE OF ACTION**

**(Retaliation in Violation of New York State Human Rights Law)**

101. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

102. Defendants have retaliated against Plaintiff by, inter alia, subjecting him to obscenities and unfair performance evaluations, banning him from the newsroom and otherwise interfering with the performance of his job, and by ultimately terminating his employment, all in violation of the New York State Human Rights Law for his opposition to discriminatory practices directed toward himself and other people of color, and/or his participation in lodging complaints about such discriminatory practices, as well as Defendants' suspicions that Plaintiff was and/or would be assisting a former co-worker who was suing them for race discrimination and retaliation.

103. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

104. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered, and

continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which he is entitled to an award of monetary damages and other relief.

**AS AND FOR A FIFTH CAUSE OF ACTION**

**(Aiding and Abetting Violations of New York State Human Rights Law)**

105. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

106. Defendant Gotthelf and Defendant Greenfield knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against Plaintiff in violation of the New York State Human Rights Law.

107. As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to, loss future income, compensation and benefits for which he is entitled to an award of damages.

108. As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of damages.

**AS AND FOR A SIXTH CAUSE OF ACTION**

**(Discrimination and Harassment in Violation of New York City Human Rights Law)**

109. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

110. Defendants have discriminated against Plaintiff on the basis of his race and/or color in violation of the New York City Human Rights Law by denying him equal terms and conditions of employment, including but not limited to subjecting him to disparate working conditions and denying him the opportunity to work in an employment setting free of unlawful discrimination and harassment.

111. Defendants have discriminated against Plaintiff on the basis of his race and/or color in violation of the New York City Human Rights Law by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive discrimination and harassment committed against Plaintiff.

112. As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including but not limited to, loss of future income, compensation and benefits for which he is entitled to an award of damages.

113. As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety,

loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of damages.

114. Defendants' unlawful discriminatory actions and harassment constitute malicious, willful and wanton violations of New York City Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR A SEVENTH CAUSE OF ACTION**

**(Retaliation in Violation of New York City Human Rights Law)**

115. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

116. Defendants have retaliated against Plaintiff by, inter alia, subjecting him to obscenities and unfair performance evaluations, banning him from the newsroom and otherwise interfering with the performance of his job, and by ultimately terminating his employment, all in violation of the New York City Human Rights Law for his opposition to discriminatory practices directed toward himself and other people of color, and/or his participation in lodging complaints about such discriminatory practices, as well as Defendants' suspicions that Plaintiff was and/or would be assisting a former co-worker who was suing them for race discrimination and retaliation.

117. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including but not limited to loss of future income, compensation and benefits for which he is entitled to an award of damages.

118. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited

to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of damages.

119. Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of New York City Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**

**(Aiding and Abetting Violations of New York City Human Rights Law)**

120. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

121. Defendant Gotthelf and Defendant Greenfield knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against Plaintiff in violation of the New York City Human Rights Law.

122. As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to, loss future income, compensation and benefits for which he is entitled to an award of damages.

123. As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of damages.

124. Defendant Gotthelf's and Defendant Greenfield's unlawful actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B. An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C. An order directing Defendants to place Plaintiff in the position he would have occupied but for Defendants' discriminatory and retaliatory treatment and otherwise unlawful conduct, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect his employment and personal life;

D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, seniority and other benefits of employment;

E. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for his mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

F. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation and loss of career fulfillment;

G. An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

H. An award of punitive damages;

I. An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

J. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: New York, New York
November 30, 2009

Respectfully submitted,

THOMPSON WIGDOR & GILLY LLP

By: ______________________
Kenneth P. Thompson (KT-6026)

85 Fifth Avenue, Fifth Floor
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845

COUNSEL FOR PLAINTIFF

# Exhibit A

**New York Post**
February 18, 2009

