UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

AUSTIN FENNER and
IKIMULISA LIVINGSTON,

:
:
:
:

                              Plaintiffs,     :        Civil Action No: 09 CV 9832

                                              :

          vs.                                 :        **AMENDED COMPLAINT**

                                              :

                                              :

NEWS CORPORATION, NYP HOLDINGS,               :
INC., d/b/a THE NEW YORK POST,                :        **JURY TRIAL DEMANDED**
MICHELLE GOTTHELF and DANIEL                  :
GREENFIELD, in their official and individual  :
capacities,                                   :

                                              :

                              Defendants.     :

                                              :

---------------------------------------------------------------X

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Austin Fenner ("Mr. Fenner") and Ikimulisa Livingston ("Ms. Livingston") (together, "Plaintiffs"), by and through their undersigned counsel, Thompson Wigdor & Gilly LLP, as and for their Amended Complaint in this action against Defendants News Corporation ("News Corp."), NYP Holdings, Inc., d/b/a the New York Post (the "Post"), (together, the "Company"), Michelle Gotthelf ("Gotthelf") and Daniel Greenfield ("Greenfield") (collectively, "Defendants"), hereby allege as follows:

## NATURE OF THE CLAIMS

1.      This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices and/or retaliation committed against Plaintiffs, including Defendants' discriminatory treatment, harassment and/or unlawful retaliation of Plaintiffs, due to their race and/or color and/or

their complaints of and/or opposition to discrimination, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, New York Executive Law §§ 290 et seq. (the "NYSHRL") and the New York City Human Rights Law, New York Administrative Code §§ 8-101 et seq. (the "NYCHRL").

## PRELIMINARY STATEMENT

2.        The New York Post, owned and operated by businessman and media magnate Rupert Murdoch, is the sixth largest newspaper in the country, employing more than one hundred employees.  Despite employing such a large number of employees in the most diverse city in the world, virtually all of the members of the Post's management team, including its editors, are White males.  In fact, there has not been a single Black editor on the Post's Metro Desk in almost 10 years.  Moreover, practically all of the news reporters at the Post are White.

3.        The severe lack of diversity in the management and editorial ranks and throughout the entire newsroom at the Post is evidence of the racial discrimination committed against employees of color.  In fact, the Post, and its parent company, News Corp., have fostered a racially hostile work environment, which is permeated with racist conduct and comments toward people of color both inside and outside of the Company.

4.        By way of example only, White editors at the Post routinely humiliated and openly cursed at Plaintiff Austin Fenner, who is African-American, by, among other things, yelling at him "What the fuck are you doing?" "What's wrong with your ass?" and "You better get your fucking ass over there!," issuing him unfair performance reviews and even banning him from the newsroom for over five months based on his race and/or color.

5.      Similarly, White Editors removed Plaintiff Ikimulisa Livingston from covering the Queens State Supreme Court, which was her beat for years, without any justification and on the basis of her race and/or color, and replaced her with a White employee who had been demoted from his previous position for poor performance. Since her discriminatory removal from the Queens State Supreme Court assignment, Ms. Livingston has been subjected to a ban from the newsroom for over one year, where she has been denied a desk, work computer, telephone or even an office telephone number, which are basic resources that the Company provides to its White reporters.

6.      Upon information and belief, Plaintiffs were discriminatorily paid, and Ms. Livingston is continuing to be discriminatorily paid, less compensation than similarly-situated White reporters at the Post, and even White reporters with less experience and qualifications than them.

7.      Plaintiffs were also discriminatorily denied certain assignment opportunities based on their race and/or color.

8.      The racial animus at the Post was further exemplified on February 18, 2009, when Defendants published a patently racist cartoon depicting two White police officers shooting to death a crazed chimpanzee meant to represent President Barack Obama. As African-Americans familiar with the history in this country of Black people being portrayed as gorillas, apes and monkeys, Mr. Fenner and Ms. Livingston recognized the racist nature of the cartoon and were deeply offended that their employer would publish a cartoon implicitly approving of the assassination of the first Black President of the United States while likening him to a dead monkey. *See* Exhibit A.

9.      The Company fostered an environment such that any employee with the courage to complain about the discrimination that pervades the workplace, whether directly to management or in a public forum, would be subjected to unlawful retaliation by, among other things, stripping them of their job duties, openly and unfairly criticizing their work performance, giving them unfair performance evaluations, denying them necessary tools to successfully perform their job and unlawfully terminating their employment.

10.     True to form, after Mr. Fenner publicly opposed the racist cartoon about President Obama on an online website, he was repeatedly retaliated against and ultimately terminated by Defendants on November 9, 2009.

11.     Similarly, after Ms. Livingston complained about the cartoon, the Company retaliated against her by, among other things, continuing her ban from the newsroom and issuing her a baseless and unfair performance review and written warning.

12.     Defendants' discriminatory and retaliatory conduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for Plaintiffs' rights, warranting an award of punitive damages.  Such conduct has caused, and continues to cause, Plaintiffs to suffer substantial monetary damages, permanent harm to their professional and personal reputations and/or severe mental anguish and emotional distress.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiffs' rights under Section 1981.  The Court has supplemental jurisdiction over Plaintiffs' related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

4

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

**PARTIES**

15.     Plaintiff Austin Fenner, an African-American reporter with nearly 20 years of experience, is a resident of the State of New Jersey, Bergen County.  At all relevant times, he met the definition of an "employee" under all applicable statutes.

16.     Plaintiff Ikimulisa Livingston, an African-American female reporter with over 20 years of experience, is a resident of the State of New York, Queens County.  At all relevant times, she met the definition of an "employee" under all applicable statutes.

17.     Defendant News Corporation is one of the largest media conglomerates in the world and owns, *inter alia*, HarperCollins, the New York Post, the Wall Street Journal, the Weekly Standard, Fox News Channel and 20th Century Fox Television.  At all relevant times, Defendant News Corporation has had its principal place of business located at 1211 Avenue of the Americas, New York, New York and regularly transacts business in this district.

18.     Defendant NYP Holdings, Inc., d/b/a the New York Post, is a subsidiary of Defendant News Corporation and is widely viewed as one of the Company's most valuable print assets.  At all relevant times, Defendant NYP Holdings, Inc. has had its principal place of business located at 1211 Avenue of the Americas, New York, New York and regularly transacts business in this district.

19.     At all relevant times, Defendants News Corporation and NYP Holdings, Inc., d/b/a the New York Post, have met the definition of an "employer" under all applicable statutes.

5

20.     Upon information and belief, Defendants News Corporation and NYP Holdings, Inc., d/b/a the New York Post, share common ownership, common premises, common directors and/or officers, and common financial control.

21.     Defendant Michelle Gotthelf is the Metropolitan Editor of the Post and currently resides in Hillsdale, New Jersey.  At all relevant times, she has actively and directly participated in the discrimination, harassment and unlawful retaliation committed against Plaintiffs.

22.     At all relevant times, Defendant Gotthelf had authority to make personnel decisions concerning Plaintiffs' work schedules, assignments, salary and other employment benefits.  Defendant Gotthelf also had, and continues to have, authority to discipline, including the authority to terminate, Plaintiffs and other Company employees.

23.     Defendant Daniel Greenfield is the Assignment Editor and Deputy Metropolitan Editor of the Post and currently resides in White Plains, New York.  At all relevant times, he has actively and directly participated in the discrimination, harassment and unlawful retaliation committed against Plaintiffs.

24.     At all relevant times, Defendant Greenfield had authority to make personnel decisions concerning Plaintiffs' work schedules, assignments, salary and other employment benefits.  Defendant Greenfield also had, and continues to have, authority to discipline, including the authority to terminate, Plaintiffs and other Company employees.

## PROCEDURAL REQUIREMENTS

25.     Mr. Fenner has filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII, 42 U.S.C. §§ 2000e et seq. ("Title VII").  His charge arises out of the same facts alleged herein.

26.     Ms. Livingston has also filed a charge of discrimination with the EEOC alleging violations of Title VII.  Her charge also arises out of the same facts alleged herein.

27.     When the EEOC completes its investigation of the charges and issues Plaintiffs' notices of right to sue, Plaintiffs will seek leave to amend this Complaint to add claims that Defendants News Corp. and the Post violated Title VII in addition to the statutes and laws alleged herein.

28.     Prior to the commencement of this action, a copy of this Complaint was served on both the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

29.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

**I.      Austin Fenner**

30.     Until recently, Plaintiff Austin Fenner was a Black Senior Reporter at the Post.

31.     Since graduating from the prestigious Newhouse School of Communication at Syracuse University, Mr. Fenner has enjoyed a successful career in journalism, including spending 15 years as a full-time and highly regarded reporter for the New York Daily News ("Daily News").

32.     While at the Daily News, Mr. Fenner authored numerous prominent news stories, including the coverage of the massive terrorist attacks on New York City and other parts of the country on September 11, 2001 and the collapse of the Twin Towers, as well as the final moments of John F. Kennedy, Jr. before his tragic airplane crash.

33.    After establishing himself at the Daily News, Mr. Fenner was offered the position of Senior Reporter by the Post.

34.    Specifically, Mr. Fenner was hired by Daniel Colarusso as a Senior Reporter on the Post's City Desk in a dual capacity, which required him to both cover breaking news stories and come up with ideas for "enterprise" stories for the City Desk.

35.    However, Mr. Colarusso left the Post unexpectedly shortly after Mr. Fenner joined the Company, at which point Defendant Gotthelf became Mr. Fenner's direct supervisor.

36.    Throughout his employment with the Company, Mr. Fenner continuously performed quality work commensurate with his extensive experience and record of journalistic success.  By way of example only, Mr. Fenner covered breaking news for the Post, such as the emergency landing of a US Airways airplane in the Hudson River in January 2009, known as the "Miracle on the Hudson."

37.    He also obtained much sought after exclusive interviews for the Post, including an interview with then incoming Archbishop of New York Timothy Dolan, as well as an interview with William Ayers, the co-founder of the radical Weather Underground organization, who was the subject of intense media interest last year during the Democratic Presidential Primary for his prior contacts with President Obama.

38.    As a result of Mr. Fenner's unflagging commitment to his job, he was credited with hundreds of bylines during his employment at the Post, ranking him among the top producing reporters at the Company.

## II.    Ikimulisa Livingston

39.    Plaintiff Ikimulisa Livingston has worked as a reporter at the Post for over 13 years, and she is currently a General Assignment Reporter for the newspaper.

40.    Prior to joining the Post, Ms. Livingston worked throughout the country as a news reporter, including at the Des Moines Register in Iowa and the Oakland Tribune in California.

41.    After demonstrating hard work, professionalism and outstanding work performance at the Post for many years, Ms. Livingston, who lives in Queens, learned that there was an open position covering the Queens State Supreme Court. Despite the quality of her work performance, tenure at the Post and past experience covering trials as a reporter, Ms. Livingston had to repeatedly ask her supervisors to allow her to cover the Queens court beat. After being forced to effectively beg for that position, for which she was eminently qualified, she was finally given that assignment in March 2006.

42.    While assigned to the Queens State Supreme Court, Ms. Livingston covered a number of trials in that courthouse and produced outstanding work for the Post. For example, last year she covered the controversial Sean Bell trial, one of the most high-profile police shooting trials in the history of New York City, in which three police officers were charged with manslaughter and/or assault of an unarmed African-American man shot and killed by police in November 2006. Due to Ms. Livingston's excellent coverage of the Sean Bell trial, the Post ran daily articles about that closely followed trial, many of them front page stories.

III.    **The Racially Hostile Work Environment at the Post**

43.    Despite the exemplary work performance by Mr. Fenner and Ms. Livingston, their experiences at the Company were marred by the pervasive discrimination and harassment to which they and other employees of color at the Post were subjected throughout their employment based on their race and/or color.

44.    For example, despite the great diversity throughout New York City, not a single person of color has held the position of editor on the Post's Metro desk since 2001, when African American Deputy Metro Editor Lisa Baird was fired as she was dying of cancer.  In fact, there is currently only one non-White Editor throughout the entire editorial staff at the Post.

45.    Similarly, the Post currently employs only one Black reporter who works in the newsroom on a regular basis.

46.    There are also no Black, Hispanic or Asian reporters covering the news department's high-profile beats, such as City Hall or any of the federal or state courts.

47.    As further evidence of the blatant racism committed against employees of color, White editors at the Post have repeatedly discriminatorily denied the requests for promotion made by a highly-qualified and very accomplished Black reporter based on his race and/or color, despite that reporter's substantial experience and enormous contributions to the Company.

48.    Additionally, upon information and belief, during Ms. Livingston's employment at the Post, Steve Dunleavy – a White columnist at the Post and a close friend of its owner, Rupert Murdoch – openly referred to a Black employee as a "Nigger" in the workplace.  Upon further information and belief, Mr. Dunleavy also repeatedly described

10

Hispanics as "Spics" in drafts of the news stories he submitted to the editors at the Post.
Mr. Dunleavy, however, was never terminated or even disciplined for engaging in such
ugly acts of racism at the Company. In fact, when Mr. Dunleavy left the Post in October
2008, he was given a farewell tribute dinner by executives and his colleagues at the
Company, during which Mr. Murdoch, Col Allan, the Editor-in-Chief at the Post, and
others lavished praise on and honored Mr. Dunleavy, despite his reportedly racist conduct
in the workplace.

49.    During Plaintiffs' employment, White editors at the Post also used
offensive and discriminatory headlines, columns and cartoons to mock, insult and/or
humiliate people of color.

50.    By way of example only, on November 1, 2009, White editors ran an
article that disparaged Jamaicans by suggesting that the people of Jamaica were "high" on
drugs when their country recently bestowed an honor on African-American Congressman
Charles Rangel. In the article, entitled "Are They High? Jamaica Dubs Rangel Knight,"
the Post ran a demeaning computer-generated picture of Congressman Rangel that made
him look like a buffoon by depicting him with long dreadlocks, wearing a crown and
holding up a peace sign with his hand. The article also stated that "Jamaican authorities
insist that they weren't high" when they gave the honor to the Congressman, who was
described by the author of the article as "the Gallant Knight of 125th Street," which was a
racist reference to a commercial strip in Harlem where many Blacks work and shop.

## IV.    Racial Discrimination Committed Against Mr. Fenner

51.    In this racially discriminatory environment at the Company, Mr. Fenner
was also specifically subjected to discrimination throughout his employment. For example,

11

after joining the Post, and despite his history of success, Mr. Fenner's White editors discriminatorily began singling him out for unwarranted criticism, falsely claiming that his story ideas and work product were subpar.

52.    White editors at the Post also discriminated against Mr. Fenner with respect to his first performance review, which claimed, without basis, that his performance was unsatisfactory.

53.    The Company's criticisms of Mr. Fenner's work performance, however, were completely belied by the fact that it continually sent him out to cover prominent and breaking news stories, such as President Obama's presidential campaign.

54.    His reviews were also completely inconsistent with the satisfactory performance reviews he received during his many years at the Daily News and the praise he received from some of his editors at the Post that he was writing "great" stories.

55.    As further evidence of discrimination, the Post also required Mr. Fenner to travel more than any White reporter on the City Desk.  Specifically, despite being a Senior Reporter on the City Desk, Mr. Fenner was forced to travel to different states on business for the Post on more than 20 occasions during his two years of employment at the Post, which resulted in him having to spend substantial time away from his family and the newsroom, covering stories in distant locations such as Pascagoula, Mississippi and Lincoln, Nebraska.

56.    In addition, the Post not only forced Mr. Fenner to travel extensively to cover stories, but also refused to provide him with the necessary tools and assistance to succeed while covering those stories.

57.    For instance, before traveling to Washington, D.C. for the inauguration of President Obama, Mr. Fenner made repeated requests to his White supervisor, Defendant Gotthelf, to have a photographer assigned to travel with him to document the inauguration.

58.    However, Mr. Fenner's numerous requests for a photographer for this historic occasion were denied by Defendant Gotthelf, without explanation, despite the fact that White reporters were regularly assigned photographers to assist them in covering important news events.

## V.    Racial Discrimination Committed Against Ms. Livingston

59.    Similarly, White editors at the Post also subjected Ms. Livingston to discrimination based on her race and/or color during her employment at the Company. For example, when she covered the Queens State Supreme Court, a White editor who was her direct supervisor routinely called her up to scream and curse at and/or berate her over the telephone for no valid reason. That supervisor also sent her hostile and threatening emails. Upon information and belief, White reporters at the Company were not demeaned and treated in such a manner.

60.    White editors also repeatedly rejected positive articles that Ms. Livingston had written about people of color while covering the Queens State Supreme Court, summarily dismissing them as not being newsworthy. Incredibly, Defendant Gotthelf even told Ms. Livingston that positive stories about minorities were "low rent" and not worth publishing in the newspaper. However, the Daily News, the chief competitor of the Post, actually published stories on some of the same subjects that Ms. Livingston had proposed to her editors, conclusively demonstrating their newsworthiness to the people of New York.

61.     White editors at the Post also repeatedly credited and/or attempted to credit White reporters for stories that Ms. Livingston had authored.  For example, Ms. Livingston wrote a story about a particular lawsuit that was pending in Queens State Supreme Court, but her White editors rejected that story three weeks in a row, despite the fact that she had re-written and strengthened the story after she obtained additional quotes from the attorneys and/or litigants in that case.  However, after her story had been repeatedly rejected, her editors finally ran a story on the same lawsuit (but without any of the quotes that Ms. Livingston had worked hard to obtain) and gave the byline to a White reporter, without crediting Ms. Livingston.

62.     When Ms. Livingston complained to her editors about the fact that the Post published a watered down version of the story she had repeatedly submitted and gave the byline to a White reporter, Defendant Greenfield, who has constantly and openly treated Ms. Livingston with hostility and disdain, dismissed her complaint and further disparaged Ms. Livingston by sending her an e-mail that told her in substance that she had no basis to be complain about the Post's discriminatory decision and noted, "Most of your stories aren't published anyway."

63.     As further evidence of the longstanding discrimination committed against Ms. Livingston, on another occasion she covered the funeral of slain rap musician Jason Mizell, widely known as "Jam Master Jay" of the popular rap group Run DMC.  Prior to writing a story on the funeral, Ms. Livingston was told by her White editors to give her notes to Bridget Harrison, a White reporter with less experience and qualifications than Ms. Livingston, so that Ms. Harrison could write the story instead.  Realizing that she was again

being discriminated against based on her race and color, Ms. Livingston refused and had to fight to keep the story.

64.     In addition to these forms of disparate treatment, upon information and belief, Plaintiffs were discriminatorily paid, and Ms. Livingston continues to be discriminatorily paid, less compensation than similarly-situated White employees, and even White employees with less experience and qualifications than them.

65.     They have also been discriminatorily denied certain assignment opportunities based on their race and/or color.

## VI.     The Racist Cartoon Depicting President Obama as a Dead Chimpanzee

66.     The pervasive racism at the Company was made clear to all of its employees on February 18, 2009, when Defendants published the cartoon depicting the shooting death of a crazed chimpanzee by two White police officers and with the caption, "They'll have to find someone else to write the next stimulus bill."

67.     The racist message that Defendants sought to send through the cartoon was made evident by the fact that the page immediately preceding the cartoon contained a prominent picture of President Obama signing the stimulus bill into law.  Moreover, the editorial page in that same day's edition of the Post referred to the stimulus bill as "President Obama's $787 billion stimulus plan."  Accordingly, there is no doubt that the chimpanzee pictured shot to death and in a pool of blood with three bullet holes was intended to represent President Obama.

68.     Upon information and belief, White editors at the Post were given several alternative cartoons for potential publication in the February 18, 2009 edition of the

15

newspaper, but nevertheless selected a cartoon depicting President Obama as a crazed, dead chimpanzee for publication.

69.    In fact, Jesse Angelo, the White Managing Editor at the Post, admitted to others that he had reviewed and approved the publication of the cartoon before it appeared in the newspaper.

70.    As African-Americans, Mr. Fenner and Ms. Livingston understood the long and sad history in America of African-Americans being depicted as primates.  As a result, they and other employees of color were deeply offended by the Post's decision to publish the racist and dangerous cartoon about the President and voiced their objections to it.

71.    Plaintiffs' objections to the racist cartoon were further solidified by comments made by some of their White editors evincing a callous disregard to the offensive nature of the image approved by Defendants.

72.    For example, Defendant Greenfield admitted that the cartoon was in "poor taste" and that he was "not surprised" that the cartoon led to a storm of protests.

73.    In response to the complaints made by another African-American reporter about the obviously racially degrading imagery in the cartoon, Jesse Angelo dismissed those complaints, telling the reporter that he had no problem with the cartoon.

74.    The fact that Mr. Angelo, who is one of the highest-ranking editors at the Post, had no problem with the publication of such a racist, offensive and dangerous cartoon that could easily be interpreted as calling for the assassination of President Obama speaks volumes about the racism rampant at the Post.

16

75.     Understandably, the patently offensive nature of the cartoon sparked protests both inside and outside the Company's offices, with various media outlets criticizing the Post's decision to publish such a despicable cartoon.

76.     The callous indifference by the White editors at the Post to the racist cartoon and the prevalent racism in the newsroom that spawned it was also evident when they refused a request by Governor David Patterson, the first Black Governor of the State of New York, to be interviewed about the cartoon.  Specifically, after Governor Patterson made it known that he wanted to be interviewed about the nature of that cartoon, and had also agreed to be interviewed about any other subject, the White editors at the Post inexplicably rejected his request to be exclusively interviewed, despite the fact that he is the highest elected official in the State.  Rejection of such a request from a sitting Governor is unprecedented and practically unheard of in journalism.  Upon information and belief, the Post has never rejected the request for an interview made by any then current White Governor of the State of New York.

**VII.    Plaintiffs' Protected Opposition to Racial Discrimination**

77.     Both Ms. Livingston and Mr. Fenner objected to the cartoon about President Obama.

78.     By way of example only, Ms. Livingston told her supervisor Defendant Gotthelf that the cartoon was very offensive to people of color -- and Defendant Gotthelf *agreed* with Ms. Livingston.  However, Defendant Gotthelf did absolutely nothing to get the Company to apologize to its employees of color for engaging in such blatant racism.

79.     Moreover, after the racist and oppressive cartoon was published in the Post, journalist Richard Prince published an article on his online media website, *Journal-*

*isms*, on February 20, 2009, condemning the Post for its history of racist practices, including toward its employees.

80.       In light of his disgust at the Company's decision to publish such a blatantly racist cartoon, Mr. Fenner consented to be interviewed by Mr. Prince as part of the article in *Journal-isms*. Because *Journal-isms* is a widely read and well-respected publication covering issues in the media, Mr. Fenner believed that the interview would be an effective outlet to make his complaints about the cartoon known to management at the Post as well as to the general public.

81.       In the article published in *Journal-isms*, entitled "3 Things that Need Fixing at the N.Y. Post," Mr. Fenner was quoted as saying that the cartoon "churned my stomach when I saw it."

## VIII.    Defendants' Continued Racial Discrimination and Unlawful Retaliation Against Mr. Fenner

82.       Two days later, while Mr. Fenner was on assignment in Milwaukee, Wisconsin to cover the highly-publicized appointment of Archbishop Dolan as the new Archbishop of New York, Defendant Greenfield called Mr. Fenner on his cellular telephone and cursed and screamed at him without any provocation.

83.       Specifically, Defendant Greenfield cursed at Mr. Fenner in connection with an interview that the Post had hoped to arrange with Archbishop Dolan, yelling "What the fuck are you doing?" "What's wrong with your ass?" and "You better get your fucking ass over there!" Upon information and belief, Defendant Greenfield never used such vulgar and demeaning terms in speaking with White reporters under his supervision.

84.       Despite being humiliated by Defendant Greenfield, Mr. Fenner, who had earlier arranged to conduct an exclusive interview with Archbishop Dolan, went through

with his interview of the Archbishop that day, and his exclusive interview later received prominent coverage in the Post.

85.    Incredibly, when Defendant Gotthelf learned of Defendant Greenfield's inappropriate conduct towards Mr. Fenner, she refused to admonish Defendant Greenfield, even though she was his boss, or even to ask Mr. Fenner about his version of events. Instead, she blamed Mr. Fenner and stated that he alone was responsible for provoking the cursing tirade.

86.    In an additional act of discrimination and retaliation, Defendants changed Mr. Fenner's work schedule from a daily 11 a.m. to 7 p.m. shift to a work schedule in which he worked from 9 a.m. to 5 p.m. on four days of the week, and from 2 p.m. to 10 p.m. on the 5th day, which is a shift normally reserved for junior reporters.

87.    Defendants initially told Mr. Fenner that he was being given the later shift as a "temporary" measure that would only be in place for a month.  However, Mr. Fenner was required to work that late shift until his unlawful termination.

## IX.    Defendants' Racially Discriminatory and Retaliatory Ban of Plaintiffs from the Newsroom

88.    Thereafter, in May 2009, Defendants Greenfield and Gotthelf banned Mr. Fenner from entering the Post's newsroom.  Specifically, they told Mr. Fenner that he was forbidden from coming into the newsroom ever again unless he got their permission in advance.

89.    Upon information and belief, no White reporter was ever banned from the newsroom and required to seek approval from a member of management prior to entering the Company's premises.

90.     Although these White editors claimed that Mr. Fenner was being banned from the newsroom as a result of a "restructuring" at the Post, this explanation was completely belied by the fact that Mr. Fenner continued to maintain a desk, telephone, and computer in the newsroom, as did most other Post reporters, but he alone was prohibited from using them.

91.     Indeed, Mr. Fenner's ban from the newsroom continued for over five months, until the unlawful termination of his employment on November 9, 2009.

92.     Similarly, Ms. Livingston has been subjected to a ban from the newsroom on the basis of her race and/or color. Specifically, in December 2008, without warning or justification, Defendant Gotthelf called Ms. Livingston into the Post's offices and told her that she was being taken off of the Queens Supreme Court beat and made a General Assignment Reporter again, which was a demotion in substance and prestige and constituted a loss of potential overtime pay.

93.     At no point did Defendant Gotthelf ever tell Ms. Livingston that she was being removed from her beat because of any performance issues. To the contrary, Defendant Gotthelf merely stated that management was making "changes" in the Queens court without further explanation.

94.     To Ms. Livingston's dismay, she later learned that her White editors had replaced her in the Queens State Supreme Court with a White employee, who had been demoted from his prior position as editor, apparently because of performance issues. Moreover, that same employee is still working the Queens court beat for the Company. The decision to replace Ms. Livingston as the reporter covering the Queens State Supreme

Court with a White employee who had reportedly demonstrated poor work performance was clearly an act of discrimination based on her race and/or color.

95.     Meanwhile, even though Ms. Livingston's editors at the Post unjustly stripped from her responsibilities for covering the Queens State Supreme Court, Defendant Gotthelf falsely promised Ms. Livingston that she would have a desk, computer and telephone in the newsroom to carry out her duties as a reporter at the Post.  However, ever since her Queens court beat was taken away in December 2008, Ms. Livingston has been discriminatorily denied such necessary resources that are routinely given without restriction to White reporters at the Company.  This overt discrimination has prevented Ms. Livingston from having access to resources that are critical for her to effectively work as a reporter.

96.     Equally troubling, weeks and months pass without Ms. Livingston ever stepping foot inside the newsroom.  On one occasion, when she did stop by the newsroom to pick up supplies, Defendant Greenfield asked Ms. Livingston, "What are you doing here?" Defendant Greenfield's question was totally humiliating and is evidence that the White editors know that Ms. Livingston is being subjected to a ban from the newsroom because of her race and/or color.

97.     As of the date of the filing of this Complaint, Ms. Livingston is still being discriminatorily denied a desk, work computer, telephone and telephone number at the Company, despite the fact that she is a current employee who has worked as a dedicated reporter at the Post for over 13 years.

98.     Defendants' decision to ban Mr. Fenner and Ms. Livingston from the newsroom was an act of utter humiliation designed to strip them of their dignity and self-

respect, was based on their race and/or color and implemented to punish them for their opposition to Defendants' discriminatory practices, and a throwback to the days of Jim Crow segregation.

99.      Defendants' discriminatory and retaliatory decision to ban Plaintiffs from the newsroom completely undermined Plaintiffs' ability to successfully and effectively perform their jobs as reporters at the Post.

100.      For example, as a result of being banned from the newsroom, they were left without the use of a telephone, computer, printer, and other necessary newsroom resources.

101.      In fact, since she does not even have an office telephone number, Ms. Livingston has been forced to give news sources and complete strangers her cellular telephone number while performing her duties as a reporter for the Company.  Moreover, when she complained to Defendant Greenfield that she was getting calls from people on her cell phone as late as 2 a.m., Defendant Greenfield merely asked "Who is calling you that late?" while continuing to deny her an office telephone number.

102.      During their ban from the newsroom, Plaintiffs were forced to write their stories without ever coming into the newsroom to do so.  For example, Mr. Fenner often wrote his stories from Starbucks and other local coffee shops while Ms. Livingston wrote her stories from her car or home.  In fact, like Mr. Fenner, Ms. Livingston has been forced to perform virtually all of her work as a reporter outside of the newsroom, which is a racially segregated environment predominated by White males.

103.      The ban also prevented Plaintiffs from taking advantage of the same leads and wire services that other White reporters relied upon to help generate ideas and draft

their stories.  They were further discriminatorily denied the opportunity to interact with their colleagues and editors and exchange story ideas with their peers in the newsroom. Notably, these benefits were given without restriction to White reporters at the Post, none of whom had been similarly banned.

104.    Clearly, Defendants' discriminatory and retaliatory decision to ban Plaintiffs from the newsroom adversely affected their job and severely undermined their ability to effectively perform their job duties.  Rather than having a network of computers, office resources and colleagues to enable them to generate ideas and write their stories, Mr. Fenner and Ms. Livingston were left to fend for themselves, deprived of these basic tools of their trade, and had to suffer the shame and indignity of having to write their news stories in coffee shops, other public venues, their car or from home.

## X.    **Plaintiffs' Unfair and Baseless Performance Reviews**

105.    Incredibly, despite the fact that Ms. Livingston has been banned from the newsroom for over one-year and denied the resources given to White reporters, she received a poor performance review and written warning in August 2009 from Defendants Gotthelf and Greenfield.

106.    The baseless review and written warning were given to Ms. Livingston based on her race and/or color and in retaliation for her opposition to discrimination at the Company.

107.    Similarly, despite the fact that Mr. Fenner was banned from the newsroom for five months, thereby denying him access to important resources necessary to allow him to perform his job, Defendants presented him with yet another discriminatory and retaliatory performance review in or around September 2009.

23

108.    Obviously concerned with the unfairness of this evaluation, Mr. Fenner questioned the validity of his review, and was told by Defendant Gotthelf that the review reflected his purported failure to produce "enterprise" stories.

109.    However, when Mr. Fenner pressed Defendant Gotthelf to give him an example of an enterprise story that the Post had published, she could not identify a single one, revealing the pretextual nature of this alleged justification for his discriminatory and retaliatory performance review.

## XI.  The Unlawful Termination of Mr. Fenner's Employment

110.    Defendants' campaign of unlawful racial discrimination and retaliation against Mr. Fenner culminated on November 9, 2009.

111.    That same day, former-Post Associate Editor Sandra Guzman filed a federal civil Complaint in the Southern District of New York against the Company, alleging a hostile work environment based on race, color, gender and/or national origin as well as unlawful retaliation, and condemning the racist and offensive cartoon about President Obama.

112.    On that day, while working on a story in Williamsburg, Brooklyn, Mr. Fenner was summoned back to the office, from which he remained banned during the workday, to meet with Defendants Greenfield and Gotthelf, as well as Amy Levine Scialdone, Vice President of Human Resources at the Post.

113.    Before the meeting began, Mr. Fenner was ordered to immediately hand over his notes on the Williamsburg story to another reporter, who was White, which he did.

114.    Mr. Fenner was then informed that Defendants had decided to terminate his employment. That decision was made, upon information and belief, by Defendant Gotthelf.

115.    Ms. Levine then handed Mr. Fenner a separation and release agreement, and falsely told him that he had to sign the agreement in order to receive his 401K funds, which was a false representation made in an attempt to intimidate him into coercively signing away his legal rights. Mr. Fenner, however, refused to sign the separation and release agreement because he knew that his termination was unlawfully based on his race and/or color and due to his opposition to the Company's discriminatory practices, including Defendants' belief that Mr. Fenner would be a supportive witness in Sandra Guzman's discrimination case.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Discrimination and Harassment in Violation of Section 1981)

116.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

117.    Defendants have discriminated against Plaintiffs on the basis of their race and/or color in violation of Section 1981 by denying them the same terms and conditions of employment available to employees who are White, including but not limited to, subjecting them to disparate working conditions, obscenities and unfair performance reviews and discipline, denying them terms and conditions of employment equal to that of employees who are White, and unlawfully terminating Plaintiff Fenner's employment.

118.    Defendants have also discriminated against Plaintiffs on the basis of their race and/or color, in violation of Section 1981 by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has

included, among other things, severe and pervasive discrimination and harassment committed against Plaintiffs.

119.    As a direct and proximate result of the Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm, including but not limited to, loss of future income, compensation and benefits for which they are entitled to an award of damages.

120.    As a direct and proximate result of the Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

121.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiffs are entitled to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Retaliation in Violation of Section 1981)

122.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

123.    Defendants have retaliated against Plaintiffs by, inter alia, subjecting them to unfair performance evaluations, banning them from the newsroom and otherwise interfering with the performance of their jobs, and by ultimately terminating Plaintiff

Fenner's employment, all in violation of Section 1981 for their opposition to discriminatory practices directed toward themselves and other people of color, and/or their participation in lodging complaints about such discriminatory practices, as well as Defendants' suspicions that Plaintiffs were and/or would be assisting a former co-worker who was suing them for race discrimination and retaliation.

124.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

125.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

126.    Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiffs are entitled to an award of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Discrimination and Harassment in Violation of New York State Human Rights Law)

127.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

128.     Defendants have discriminated against Plaintiffs on the basis of their race and/or color in violation of the New York State Human Rights Law by denying to them the equal terms and conditions of employment, including but not limited to subjecting them to disparate working conditions and denying them the opportunity to work in an employment setting free of unlawful discrimination and harassment.

129.     Defendants have also discriminated against Plaintiffs on the basis of their race and/or color in violation of the New York State Human Rights Law by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive discrimination and harassment of Plaintiffs.

130.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the New York State Human Rights Law, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm, for which they are entitled to an award of monetary damages and other relief.

131.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the New York State Human Rights Law, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Retaliation in Violation of New York State Human Rights Law)

132.     Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

133.    Defendants have retaliated against Plaintiffs by, <u>inter alia</u>, subjecting them to unfair performance evaluations, banning them from the newsroom and otherwise interfering with the performance of their job, and by ultimately terminating Plaintiff Fenner's employment, all in violation of the New York State Human Rights Law for their opposition to discriminatory practices directed toward themselves and other people of color, and/or their participation in lodging complaints about such discriminatory practices, as well as Defendants' suspicions that Plaintiffs were and/or would be assisting a former co-worker who was suing them for race discrimination and retaliation.

134.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York State Human Rights Law, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

135.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York State Human Rights Law, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Aiding and Abetting Violations of New York State Human Rights Law)

136.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

137.    Defendant Gotthelf and Defendant Greenfield knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against Plaintiffs in violation of the New York State Human Rights Law.

138.    As a direct and proximate result, Plaintiffs have suffered, and continue to suffer, monetary and/or economic damages, including but not limited to, loss of future income, compensation and benefits for which they are entitled to an award of damages.

139.    As a direct and proximate result, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

## AS AND FOR A SIXTH CAUSE OF ACTION

### (Discrimination and Harassment in Violation of New York City Human Rights Law)

140.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

141.    Defendants have discriminated against Plaintiffs on the basis of their race and/or color in violation of the New York City Human Rights Law by denying them equal terms and conditions of employment, including but not limited to subjecting them to

disparate working conditions and denying them the opportunity to work in an employment setting free of unlawful discrimination and harassment.

142.    Defendants have also discriminated against Plaintiffs on the basis of their race and/or color in violation of the New York City Human Rights Law by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive discrimination and harassment committed against Plaintiffs.

143.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of the New York City Human Rights Law, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm, including but not limited to, loss of future income, compensation and benefits for which they are entitled to an award of damages.

144.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of the New York City Human Rights Law, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

145.    Defendants' unlawful discriminatory actions and harassment constitute malicious, willful and wanton violations of New York City Human Rights Law for which Plaintiffs are entitled to an award of punitive damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### (Retaliation in Violation of New York City Human Rights Law)

146.     Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

147.     Defendants have retaliated against Plaintiffs by, inter alia, subjecting them to unfair performance evaluations, banning them from the newsroom and otherwise interfering with the performance of their job, and by ultimately terminating Plaintiff Fenner's employment, all in violation of the New York City Human Rights Law for their opposition to discriminatory practices directed toward themselves and other people of color, and/or their participation in lodging complaints about such discriminatory practices, as well as Defendants' suspicions that Plaintiffs were and/or would be assisting a former co-worker who was suing them for race discrimination and retaliation.

148.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York City Human Rights Law, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm, including but not limited to loss of future income, compensation and benefits for which they are entitled to an award of damages.

149.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York City Human Rights Law, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

150.     Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of New York City Human Rights Law for which Plaintiffs are entitled to an award of punitive damages.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### (Aiding and Abetting Violations of New York City Human Rights Law)

151.     Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

152.     Defendant Gotthelf and Defendant Greenfield knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against Plaintiffs in violation of the New York City Human Rights Law.

153.     As a direct and proximate result, Plaintiffs have suffered, and continue to suffer, monetary and/or economic damages, including but not limited to, loss future income, compensation and benefits for which they are entitled to an award of damages.

154.     As a direct and proximate result, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

155.     Defendant Gotthelf's and Defendant Greenfield's unlawful actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which Plaintiffs are entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendants, containing the following relief:

A.   A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B.   An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.   An order directing Defendants to place Plaintiffs in the position they would have occupied but for Defendants' discriminatory and retaliatory treatment and otherwise unlawful conduct, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect their employment and personal life;

D.   An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, seniority and other benefits of employment;

E.   An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all non-monetary and/or compensatory damages, including but not limited to, compensation for their mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

34

F.    An award of damages in an amount to be determined at trial, plus

prejudgment interest, to compensate Plaintiffs for harm to their

professional and personal reputation and loss of career fulfillment;

G.    An award of damages for any and all other monetary and/or non-monetary

losses suffered by Plaintiffs in an amount to be determined at trial, plus

prejudgment interest;

H.    An award of punitive damages;

I.    An award of costs that Plaintiffs have incurred in this action, as well as

Plaintiffs' reasonable attorneys' fees to the fullest extent permitted by law;

and

J.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated

herein.

Dated: New York, New York
      December 8, 2009

Respectfully submitted,

THOMPSON WIGDOR & GILLY LLP

By: _____
    Kenneth P. Thompson (KT-6026)

85 Fifth Avenue, Fifth Floor
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845

COUNSEL FOR PLAINTIFFS

35

# Exhibit A



New York Post
February 18, 2009