**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X

AUSTIN FENNER and                :
IKIMULISA LIVINGSTON,      :

                       :
               Plaintiffs,    :     Civil Action No. 09 CV 9832
                       :
    vs.                    :
                       :
                       :
NEWS CORPORATION, NYP HOLDINGS,  :
INC., d/b/a THE NEW YORK POST,     :
MICHELLE GOTTHELF and DANIEL    :
GREENFIELD, in their official and individual  :
capacities,                    :
                       :
            Defendants.   :
                       :

------------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

THOMPSON WIGDOR & GILLY LLP
85 Fifth Avenue
New York, NY 10003
Telephone:    (212) 257-6800
Facsimile:     (212) 257-6845

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS .................................................................................2

     A.  Austin Fenner ....................................................................................2

     B.  Ikimulisa Livingston ........................................................................3

     C.  Racism Towards Other People of Color ..........................................4

     D.  The Publication of the Cartoon ........................................................5

     E.  Defendants' Retaliatory Conduct Towards Plaintiffs ......................6

ARGUMENT ....................................................................................................7

  I.  STANDARD FOR A MOTION TO DISMISS .........................................7

  II.  THE AMENDED COMPLAINT STATES A CAUSE OF ACATION
     FOR RETALIATION ...............................................................................9

     A.  Plaintiffs Have Alleged That They Engaged in Protected Activity ............9

     B.  The First Amendment Does Not Immunize Defendants'
        Retaliatory Conduct ..........................................................................11

     C.  Plaintiffs Had A Good Faith Belief That Their Complaints
        Constituted Protected Activity ..........................................................14

     D.  Plaintiffs Have Alleged That Defendants Had Notice of Their
        Protected Complaints of Discrimination ..........................................16

     E.  Ms. Livingston Has Established A Causal Connection Between
        Her Complaints of Discrimination And Defendants' Adverse
        Employment Actions .........................................................................20

  III.  PLAINTIFFS' CLAIMS AGAINST NEWS CORP. ARE PROPERLY
      PLED..........................................................................................................21

CONCLUSION..................................................................................................22

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bazile v. City of New York,*
21 F. Supp. 2d 354 (S.D.N.Y. 2002)..................................................................18

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 554 (2007)...............................................................................................7, 8

*Brightman v. St. Vincent's Hospital,*
2000 U.S. Dist. LEXIS 9781 (S.D.N.Y. July 13, 2000) ...................................17

*CBOCS West, Inc. v. Humphries,*
128 S. Ct. 1951 (2008).........................................................................................10

*Cioffi v. Averill Park Central Sch. District Board of Education,*
444 F.3d 158 (2d Cir. 2006)................................................................................17

*Collette v. St. Luke's Roosevelt Hospital,*
2002 U.S. Dist. LEXIS 18164 (S.D.N.Y. Sept. 24, 2002)...........................19, 20

*Conley v. Gibson,*
355 U.S. 41 (1947)...................................................................................................7

*Conway v. Microsoft Corp.,*
414 F. Supp. 2d 450 (S.D.N.Y. 2006)................................................................17

*Davis v. City of New York,*
2000 U.S. Dist. LEXIS 18520 (S.D.N.Y. Dec. 26, 2000) ...............................18

*Dawson v. Delaware,*
503 U.S. 159 (1992)...............................................................................................12

*Doe v. City of New York,*
583 F. Supp. 2d 444 (S.D.N.Y. 2008).................................................................13

*EEOC v. Thomas Dodge Corp.,*
524 F. Supp. 2d 227 (E.D.N.Y. 2007) ...............................................................19

*Erickson v. Pardus,*
551 U.S. 89 (2007)....................................................................................................8

*Eugenio v. Walder,*
2009 U.S. Dist. LEXIS 56450 (S.D.N.Y. July 2, 2009) ...................................10

*Friends of Falun Gong v. Pac. Cultural Enterprise*,
288 F. Supp. 2d 273 (E.D.N.Y. 2003) .............................................................11

*Hubbard v. Total Communs. Inc.*,
2009 U.S. App. LEXIS 21419 (2d Cir. Sept. 30, 2009) ...................................14

*Kunzler v. Canon, USA, Inc.*,
257 F. Supp. 2d 574 (E.D.N.Y. 2003) .............................................................11

*Leavitt v. Bear Sterns & Co.*,
340 F.3d 94 (2d Cir. 2007)................................................................................8

*McMenemy v. City of Rochester*,
241 F.3d 279 (2d Cir. 2001)............................................................................15

*Miami Herald Public Co., Division of Knight Newspapers, Inc. v. Tornillo*,
418 U.S. 241 (1974)........................................................................................11

*Moncrief v. New York Public Library*,
2009 U.S. App. LEXIS 15994 (2d Cir. July 21, 2009) ...................................18

*New York County Board of Ancient Order of Hibernians v. Dinkins*,
814 F. Supp. 358 (S.D.N.Y. 1993) ..................................................................11

*Palkovic v. Johnson*,
No. 06 Civ. 12600, 2008 U.S. App. LEXIS 12600 (2d Cir. June 13, 2008) ......................8

*Panzarino v. Deloitte & Touche LLP*,
2009 U.S. Dist. LEXIS 101209 (S.D.N.Y. Oct. 29, 2009) ...............................18

*Patterson v. County of Oneida*,
375 F.3d 206 (2d Cir. 2004)............................................................................10

*Quinn v. Green Tree Credit Corp.*,
159 F.3d 759 (2d Cir. 1998).............................................................................17

*R. A. V. v. St. Paul*,
505 U.S. 377 (1992).........................................................................................13

*Roberts v. United States Jaycees*,
468 U.S. 609 (1984).........................................................................................13

*Rodriguez v. International Leadership Charter School*,
2009 U.S. Dist. LEXIS 26487 (S.D.N.Y. Mar. 30, 2009) ...............................10

*Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*,
183 F.3d 155 (2d Cir. 1999)................................................................................14

*Saxe v. State College Area Sch. District*,
240 F.3d 200 (3d Cir. 2001)................................................................................12

*Stanley v. Lawson Co.*,
993 F. Supp. 1084 (N.D. Ohio 1997)..................................................................11

*Wimmer v. Suffolk County Police Department*,
176 F.3d 125 (2d Cir. 1999)................................................................................10

## FEDERAL STATUTES

Fed. R. Civ. P. 8................................................................................................19

## PRELIMINARY STATEMENT

Plaintiffs Austin Fenner ("Mr. Fenner") and Ikimulisa Livingston ("Ms. Livingston") (together, "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion for partial dismissal of the Amended Complaint filed by Defendants News Corporation ("News Corp."), NYP Holdings, Inc. d/b/a the New York Post (the "Post"), Michelle Gotthelf ("Defendant Gotthelf") and Daniel Greenfield ("Defendant Greenfield")[1].  In seeking dismissal of Plaintiffs' meritorious claims of retaliation, Defendants mischaracterize the nature of Plaintiffs' complaints of discrimination, as well as the applicable case law, in a misleading attempt to convince this Court that Plaintiffs did not engage in protected activity under Section 1981, the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").

Specifically, despite Defendants' claims to the contrary, Plaintiffs' complaints in this case were not limited to the content of the racist and discriminatory cartoon published by the Post depicting President Obama as a chimpanzee who had been shot to death by two White police officers (the "Cartoon").  Rather, in expressing their complaints about the discrimination they were subjected to at the Post, both publicly and to members of management at the Company, Plaintiffs were complaining about the discriminatory working environment they were subjected to as employees of the Post, discrimination that overtly manifested itself in the publication of the Cartoon itself.  As is made clear by the allegations in the Amended Complaint, Plaintiffs were not complaining about the content of the Cartoon itself, but the discriminatory attitudes of the managers who permitted such a facially discriminatory image to be published, which adversely affected them everyday of their employment.  It was these complaints about the unlawful *employment* practices at the Post that served as the basis for Defendants' subsequent retaliatory conduct, including, but not

---

[1] For the purposes of this motion, Defendants News Corp. and the Post together are hereinafter referred to as the "Company."  The Company and Defendants Gotthelf and Greenfield are hereinafter referred to its "Defendants."

limited to, their decision to ban both Plaintiffs from the newsroom and their decision to terminate Mr. Fenner's employment.

Similarly, despite Defendants' arguments that Plaintiffs cannot prove that the Post was aware of Mr. Fenner's complaint of discrimination or that the Post took adverse actions against Ms. Livingston because of her complaints of discrimination, both Plaintiffs have alleged sufficient facts in their Amended Complaint to withstand a motion to dismiss and are entitled to take discovery to address the purely factual concerns Defendants posit in their motion. For these reasons, as well as those explained below, Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

### I.   Austin Fenner

Mr. Fenner is an African-American former Senior Reporter who was hired by the Company in or around May 2007 to serve as a Senior Reporter. Am. Compl. ¶ 30. Prior to being hired by the Post, Mr. Fenner had a long and successful career in journalism, including having spent 15 years as a full time reporter for the New York Daily News. *Id.* ¶ 31. As a result of his stellar reputation within the journalistic community, Mr. Fenner was recruited by Daniel Colarusso, the former Metropolitan Editor at the Post, to report on breaking news stories for the Company. *Id.* ¶ 34. During his employment with the Post, Mr. Fenner consistently performed his job with the utmost professionalism and commitment. Among his many successes at the Company, Mr. Fenner obtained exclusive interviews with the then-incoming Archbishop of New York, Timothy Dolan, and William Ayers, the co-founder of the radical Weather Underground organization who had achieved notoriety at the time for his prior contacts with President Obama. *Id.* ¶ 37.

Shortly after Mr. Fenner joined the Company, his previous supervisor, Mr. Colarusso, unexpectedly left the Post and was replaced by Defendant Gotthelf as the Post's Metropolitan

Editor. *Id.* ¶ 35.  Almost immediately after Defendant Gotthelf assumed her position as Mr.

Fenner's supervisor, she and Defendant Greenfield, the Deputy Metropolitan Editor of the Post,

began subjecting him to pervasive discrimination on the basis of his race and/or color.  By way of

example only, they, and other White editors at the Company, singled Mr. Fenner out for

unwarranted criticism, claiming that his performance was unsatisfactory despite continuing to

assign him to high-profile assignments such as the coverage of President Obama's presidential

campaign, demonstrating the high quality of his work and his importance to the Company.  *Id.* ¶¶

51-53.  Mr. Fenner was forced to travel more than other similarly-situated White employees, forcing

him to spend substantial time away from his family and from the newsroom, while being denied the

necessary tools and assistance that Defendants provided to those same White reporters.  *Id.* ¶¶ 55-

57.

## II.   Ikimulisa Livingston

Ms. Livingston is an African-American female who was hired by the Post in 1996 and

currently serves in the position as General Assignment Reporter for the Post.  *Id.* ¶ 39.  Prior to

commencing her employment with the Post, Ms. Livingston worked for several years as a reporter

for various prominent newspapers throughout the country, including the *Des Moines Register* and

the *Oakland Tribune*. *Id.* ¶ 40.  Like Mr. Fenner, Ms. Livingston was also a dedicated and

successful employee for the Company, who had been responsible for covering the prominent

Queens State Supreme Court beat.  *Id.* ¶ 41.  In this capacity, Ms. Livingston reported on numerous

high-profile trials for the Post, including the recent Sean Bell trial, in which three police officers

were charged with manslaughter in the shooting death of an unarmed African-American male.  *Id.* ¶

42.

However, as was also the case with Mr. Fenner, Ms. Livingston was continually subjected

to discriminatory treatment by Defendants throughout her employment.  For example, during her employment, her direct supervisor repeatedly called Ms. Livingston to scream and curse at her without justification.  *Id.* ¶ 59.  Defendants also demonstrated their discriminatory animus towards people of color when they continually rejected Ms. Livingston's ideas for stories that depicted minorities in a positive light, with Defendant Gotthelf even going so far as to describe such stories as being "low rent" and unworthy of publication, despite the fact that the Post's main competitor, the Daily News, repeatedly published the same stories that Defendants discriminatorily rejected.  *Id.* ¶ 60.  Defendants also impeded Ms. Livingston's ability to perform her job successfully by continually rejecting her story ideas and instead allowing White reporters to publish the same stories, without providing Ms. Livingston with any credit for generating the idea, despite her repeated complaints about this issue.  *Id.* ¶¶ 61-63.

## III.     Racism Towards Other People of Color

The Company's racist attitude was not limited to Plaintiffs themselves.  Rather, the entire work environment at the Post was permeated with racial hostility, making all of the Company's employees of color cognizant of their perceived status as inferior employees.  For example, despite the substantial diversity in New York, the Post employs only one Black reporter in its newsroom and has not had a single non-White editor since 2001.  *Id.* ¶¶ 43-46.  Despite the obvious qualifications of its minority employees, the Company has repeatedly denied the requests made by such employees to be promoted to higher level positions.  In one instance, despite the numerous requests by a senior Black reporter to be promoted to a columnist position, the Company instead chose to fill open columnist positions, and even create new columnist positions, for less qualified White individuals.  *Id.* at ¶ 47.

4

## IV.     The Publication of the Cartoon

The Company further demonstrated the discriminatory animus motivating its management employees with its decision to publish the Cartoon on February 18, 2009.  The Cartoon depicted two police officers standing over a dead chimpanzee, depicted lying in a pool of blood with bullet holes covering its torso, with one police officer saying to the other, "Looks like they'll have to find someone else write the stimulus bill."  *Id.* ¶ 66.  Any potential doubt as to the Company's motivations in publishing the Cartoon can be quickly disposed of in light of the fact that the Cartoon immediately followed a page in the newspaper containing a large photograph of President Obama signing the stimulus bill into law and the prominent coverage the February 18, 2009 edition of the Post allotted to "President Obama's $787 billion stimulus plan."  *Id.* ¶ 67.

Even more than the obvious racist vitriol expressed by the Cartoon itself, Plaintiffs were especially troubled by the attitude of members of the Post's management to the publication of the Cartoon and the ensuing public outrage the publication generated.  For example, Jesse Angelo, the White Managing Editor at the Post, admitted to other employees at the Post that he both reviewed and approved of the Cartoon prior to its publication, and that he had no problem with the message it sent.  *Id.* ¶¶ 69, 73.  Defendant Greenfield similarly admitted that he knew the cartoon was in "poor taste."  *Id.* ¶ 72.

As a result of the approval expressed by the Company's management employees to the overtly racist message sent by the Cartoon, as well as the pervasive discrimination they had both been subjected to throughout their employment, Plaintiffs felt compelled to complain about the racially discriminatory atmosphere at the Post.  Mr. Fenner thereafter publicly complained about the Company's racist attitudes in a widely read online article chastising the Company for its discriminatory practices, including its practices towards its employees.  *Id.* ¶¶ 79-80.  Similarly, Ms.

5

Livingston complained directly to Defendant Gotthelf and others about the discrimination that occurred at the Post. *Id.* ¶ 78.

## V.    Defendants' Retaliatory Conduct Towards Plaintiffs

Rather than address, or even investigate, Plaintiffs' legitimate, good-faith complaints of racial discrimination that they experienced in their job, Defendants opted instead to unlawfully retaliate against them in reprisal for their protected complaints.  Two days after Mr. Fenner voiced his complaint of discrimination, Defendant Greenfield cursed and screamed at Mr. Fenner without provocation, yelling, "What the fuck are you doing?" "What's wrong with your ass?" and "You better get your fucking ass over there." *Id.* ¶¶ 82-83.  Incredibly, when Defendant Gotthelf learned about Defendant Greenfield's unprovoked tirade in response to his complaint of discrimination, she blamed Mr. Fenner for somehow instigating Defendant Greenfield's inappropriate conduct, without even asking Mr. Fenner for his explanation of the events. *Id.* ¶ 85.

Defendants further retaliated against Plaintiffs by banning them both from the newsroom, thereby denying them access to the desks, telephones and computers that all reporters found necessary to adequately perform their jobs. *Id.* ¶¶ 89-92; 95-97.  Although Defendants provided both Plaintiffs with purported "explanations" for being banned from the newsroom, the factual circumstances made clear that Defendants' decision was motivated by a discriminatory and retaliatory animus against Plaintiffs.  Specifically, Mr. Fenner was told that he was being banned as a result of a restructuring within the newsroom that caused the Company to lack sufficient space for him, an explanation completely belied by the fact that no White reporter was similarly banned and that Mr. Fenner was permitted to maintain a desk and computer in the newsroom; he was simply not permitted to enter the newsroom to use them. *Id.* ¶¶ 89-90.

Similarly, when Ms. Livingston was initially denied the use of a telephone, desk and computer, Defendant Gotthelf implied this was a temporary circumstance, informing Ms. Livingston that she would be provided with this equipment shortly. *Id.* ¶ 95. However, upon making her protected complaints of discrimination, Ms. Livingston was officially banned from the newsroom and permanently denied this necessary equipment, with Defendant Greenfield going so far as to openly question her right to enter the newsroom even for the purpose of picking up necessary work supplies. *Id.* ¶¶ 95-96.

Defendants' retaliatory conduct towards Plaintiffs continued in August 2009, when they issued negative performance reviews to both. *Id.* ¶¶ 105-108. The claim that Plaintiffs had failed to perform their jobs in a satisfactory manner was particularly insupportable due to the fact that Plaintiffs were banned from the newsroom, and therefore denied essential equipment and resources necessary to perform their jobs. Defendants' retaliation culminated in the Company terminating Mr. Fenner's employment in November 2009. *Id.* ¶¶ 113-115.

## ARGUMENT

## I.   STANDARD FOR A MOTION TO DISMISS

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief," a standard that merely requires that a complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1947); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007). However, in seeking to dispel any doubts about the applicability of the kind of heightened pleading standard that Defendants in this case seek to apply, the Supreme Court clarified its holding in *Twombly* by explaining that the Rule 8(a) continues to "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief'" and that "[s]pecific facts

are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 91-93 (2007) (citing *Twombly*, 550 U.S. at 555). Further, when deciding a motion to dismiss pursuant to Rule 12(b)(6), "[t]he appropriate inquiry is not whether a plaintiff is likely to prevail, but whether the plaintiff is entitled to offer evidence to support her claims." *Palkovic v. Johnson*, 2008 U.S. App. LEXIS 12600, at *5 (2d Cir. June 13, 2008).

Accordingly, the Court's task in this case is, accepting all of the allegations in the Amended Complaint as true, "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Leavitt v. Bear Sterns & Co.*, 340 F.3d 94, 101 (2d Cir. 2007). As set forth below, under this standard, the Amended Complaint sets forth sufficient allegations to defeat Defendants' motion to dismiss Plaintiffs' retaliation claims.

## II.    THE AMENDED COMPLAINT STATES A CAUSE OF ACTION FOR RETALIATION

### A. Plaintiffs Have Alleged That They Engaged in Protected Activity

Defendants' motion to dismiss Plaintiffs' retaliation claims is largely premised on their misplaced argument that Plaintiffs' complaints of discrimination did not constitute protected activity under the law because these complaints were limited to the content of the Cartoon itself, which, Defendants posit, do not constitute opposition to any rights protected by Section 1981. The fatal flaw in Defendants' argument is their underlying assumption that Plaintiffs' complaints were limited to the discrimination that the Company expressed towards members of the public alone. To support this argument, Defendants quote two isolated sentences in the Amended Complaint, thereby attempting to strip Plaintiffs' protected activity from the context in which it occurred. *See* Def. Br. at 5. However, viewed in their entirety without Defendants' mischaracterizations, the allegations in the Amended Complaint make clear that Plaintiffs' complaints about the Cartoon were not intended

8

to object to the Post's discriminatory attitude towards the general public, but rather, to the pervasive discrimination that was the hallmark of the *working* environment at the Post, an environment that Plaintiffs, as employees, were forced to endure on a daily basis in contravention of Section 1981, the NYSHRL and the NYCHRL. As a result, there is no question that Plaintiffs engaged in protected activity under each of these statutes in this case.

As clearly alleged in the Amended Complaint, both Mr. Fenner and Ms. Livingston were repeatedly subjected to racial discrimination throughout their employment with the Company. Am. Compl. ¶¶ 51-66. Notably, all of this discriminatory behavior occurred *before* the publication of the Cartoon. In this context, it is apparent that the Company's decision to publish the cartoon was not an isolated incident, but rather, a very public culmination of the racism that had become the hallmark of Plaintiffs' work environment at the Post. *Id.* ¶ 8. Moreover, and contrary to Defendants' misleading arguments, the Amended Complaint does not claim that Plaintiffs complained solely in response to the Cartoon. Instead, Plaintiffs' complaints of discrimination were spurred by the fact that high-ranking members of the Company expressed acceptance of the racist message communicated by the Cartoon, both publicly and to Plaintiffs themselves. *Id.* ¶¶ 69, 71-74. It was, therefore, management's embrace of the underlying racist message of the Cartoon and what those attitudes expressed towards the Post's non-White *employees* that prompted Plaintiffs' objections. *See id.* ¶ 71 ("Plaintiffs' objections to the racist cartoon were further solidified by comments made by some of their White editors evincing a callous disregard to the offensive nature of the image approved by Defendants").

As a result, the Amended Complaint makes clear that Plaintiffs' complaints of discrimination were not based on the Post's discrimination towards the general public, but the Company's continued and unapologetic discrimination towards its employees. *See id.* ¶ 78

9

(alleging that Ms. Livingston sought to have Company "apologize to its *employees* of color for

engaging in such blatant racism") (emphasis added).  Because the Amended Complaint clearly

alleges that Plaintiffs' complaints were directed at Defendants' unlawful employment practices, and

not their general racist attitudes, there is no question that Plaintiffs engaged in protected activity

under the applicable anti-discrimination statutes.  *See, e.g., CBOCS West, Inc. v. Humphries*, 128 S.

Ct. 1951, 1957 (2008) (explaining that 1991 Congressional amendments to Section 1981 intended

for statute to encompass retaliation claims in employment context); *Patterson v. County of Oneida*,

375 F.3d 206, 224 (2d Cir. 2004) (explaining that Section 1981 "outlaws discrimination with

respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship,

such as employment").

    Furthermore, because Plaintiffs' complaints of discrimination were focused on Defendants'

discriminatory attitudes and actions towards their employees, rather than simply the racism they

expressed towards the general public, the cases relied upon by Defendants are readily distinguished.

Specifically, all of the cases cited by Defendants involve situations where the plaintiffs complained

about racism directed solely at non-employee third parties, rather than discrimination that they

themselves experienced.  In *Eugenio v. Walder*, 2009 U.S. Dist. LEXIS 56450 (S.D.N.Y. July 2,

2009), for example, the court dismissed the plaintiffs' Section 1981 retaliation claim because the

plaintiffs did not dispute that they "did not complain about a violation of their contract-related rights

on account of their race."  *Id.* at *48.  Similarly, in *Rodriguez v. Int'l Leadership Charter Sch.*, 2009

U.S. Dist. LEXIS 26487 (S.D.N.Y. Mar. 30, 2009), the plaintiff, a teacher, limited her complaints to

claims that the defendants were discriminating against her students rather than against her as an

employee.  *Id.* at *18-19.  *See also Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125 (2d Cir.

1999) (holding that police officer's complaints that department discriminated against general public,

10

rather than officers themselves, did not constitute protected activity); *Kunzler v. Canon, USA, Inc.*, 257 F. Supp. 2d 574 (E.D.N.Y. 2003) (holding that plaintiff engaging in protected activity need only complain about discrimination in employment).

In contrast to each of these cases, and despite Defendants' false attempt to recast Plaintiffs' protected activity as solely addressed to the Post's racism towards the general public, the complaints that Plaintiffs made to Defendants in this case were made protected under the law because they addressed the Company's unlawful discriminatory treatment of non-White employees such as themselves.  Accordingly, the Amended Complaint sufficiently alleges that Plaintiffs engaged in legally cognizable protected activity.

## B.  The First Amendment Does Not Immunize Defendants' Retaliatory Conduct

Defendants next contend that Plaintiffs' retaliation claims must fail because the Cartoon itself is protected by the First Amendment.  In nominal support of their argument, Defendants cite to a host of inapplicable cases standing for the proposition that the First Amendment protects certain speech.[2]  Plaintiffs, however, have never disputed the proposition that the First Amendment protects the content of certain speech, but this proposition has no affect on the claims at issue here.  Indeed, it is telling that, despite citing to several cases explaining the nature of the protections provided for by the First Amendment, Defendants do not cite to *any* cases standing for the broad proposition that they seek to advance in the instant case, namely that the First Amendment's protections provide

---

[2] In most of the cases cited by Defendants, the courts ruled that laws and regulations targeting the *content* of the defendants' protected speech ran afoul of the First Amendment. *See, e.g., Miami Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo*, 418 U.S. 241 (1974) (striking law requiring newspaper to post politician's speech); *Stanley v. Lawson Co.*, 993 F. Supp. 1084 (N.D. Ohio 1997) (finding employer's decision to stock adult magazines protected by First Amendment); *New York County Bd. of Ancient Order of Hibernians v. Dinkins*, 814 F. Supp. 358 (S.D.N.Y. 1993) (finding government could not force parade organizers to include competing views in parade).  These inapposite cases have no applicability to the claims here.  In fact, the only case cited by Defendants that even discusses the First Amendment as it applies to claims under the anti-discrimination laws, *Friends of Falun Gong v. Pac. Cultural Enter.*, 288 F. Supp. 2d 273 (E.D.N.Y. 2003), dismissed the claims at issue there not on First Amendment grounds, but rather, because the court found the plaintiff failed to satisfy a *prima facie* showing of discrimination unrelated to any First Amendment considerations.

blanket immunity for Defendants' race-based retaliation in this case. To the contrary, since

Plaintiffs' complaints of discrimination were not rooted in the content of the Cartoon itself, but

rather, in the racial animus they experienced in their employment, which also contributed to

Defendants' publication (and subsequent defense) of the Cartoon, there is simply no support for

Defendants' attempts to shoehorn their conduct within the ambit of the protections provided by the

First Amendment.

Here, as explained above, Plaintiffs did not complain about the content of the Cartoon itself,

but rather, Plaintiffs focused on the racially discriminatory intent that underlay the publication of

the Cartoon and motivated the adverse employment actions that Plaintiffs suffered on the job. Am.

Compl. at ¶¶ 68-69, 71-74. Defendants have failed to cite any cases supporting their overbroad

contention that the First Amendment bars the use of evidence surrounding the publication of the

Cartoon to demonstrate that the employer's adverse employment actions occurred under situations

giving rise to an inference of discriminatory animus.

Defendants' notable failure to cite authority on point is attributable to the fact that *no* court

has held that the First Amendment's protections are as broad and far-reaching as Defendants claim.

To the contrary, courts that have considered the issue have held that, even where the content of

certain speech is afforded protection by the First Amendment, the speech may nevertheless be

admitted for other, non-content based reasons, including demonstrating discriminatory intent. *See,*

*e.g., Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 208 (3d Cir. 2001) (Alito, C. J.) (holding

that there is "no constitutional problem with using an employer's offensive speech as evidence of

motive or intent in a case involving an allegedly discriminatory employment action"); *Dawson v.*

*Delaware*, 503 U.S. 159, 165 (1992) ("the Constitution does not erect a *per se* barrier to the

admission of evidence concerning one's beliefs and associations . . . simply because those beliefs

12

and associations are protected by the First Amendment").

Moreover, Defendants' mischaracterization of First Amendment jurisprudence as somehow

overriding important anti-discrimination laws is both inaccurate and of no relevance to their motion

to dismiss. While courts have found that certain overbroad anti-discrimination laws may run afoul

of the First Amendment, *no* court has so held in the context of the established anti-discrimination

statutes that provide the basis for Plaintiffs' claims here. Indeed, this Court has itself recognized

that the First Amendment does not provide protection against an employer's discriminatory

conduct, holding:

> Any restraints on speech stemming from these anti-discrimination provisions are
> merely incidental to the statutes' objective of remedying racial discrimination . . .
> where the government does not target conduct on the basis of its expressive content,
> acts are not shielded from regulation merely because they express a discriminatory
> idea or philosophy.

*Doe v. City of New York*, 583 F. Supp. 2d 444, 448 (S.D.N.Y. 2008) (Jones, J.) (internal citations

and quotations omitted).

In the instant case, because Plaintiffs were not complaining about the "expressive content"

of the speech itself, but instead, about the discriminatory working atmosphere at the Company,

which the circumstances surrounding the publication of the Cartoon evince, it is clear that Plaintiffs'

complaints are, as this Court held in *Doe*, incidental to the content of the speech. *See also R. A. V.

v. St. Paul*, 505 U.S. 377, 389 (1992) ("sexually derogatory "fighting words," among other words,

*may produce a violation of Title VII's general prohibition against sexual discrimination* in

employment practices") (emphasis added); *Roberts v. United States Jaycees*, 468 U.S. 609, 623

(1984) ("we are persuaded that Minnesota's compelling interest in eradicating discrimination against

its female citizens justifies the impact that application of the [Minnesota Human Rights Act] . . .

may have on the male members'" First Amendment rights). Accordingly, even if Defendants were

13

correct in arguing that the First Amendment gives the Company license to publish racist speech, there is simply no support for their claim that this Court must take the additional step of finding that the discriminatory animus that is reflected by this speech, and the facts and circumstances surrounding its publication, are afforded absolute immunity.

In light of the long line of cases, including this Court's own prior decision, holding both that the First Amendment does not act as a shield to allow employers to discriminate against employees with impunity and that even protected speech is admissible to demonstrate discriminatory intent, Plaintiffs' protected complaints of discrimination and Defendants' acts of retaliation taken in response are actionable under the law.  To the extent that Defendants attempt to argue in their motion that the publication of the Cartoon was not intended to be discriminatory, this is a purely factual issue that is properly addressed at a later stage in this litigation, after the parties have been afforded the opportunity to engage in discovery.

### C. Plaintiffs Had A Good Faith Belief That Their Complaints Constituted Protected Activity

Even if, during the course of discovery in this case, Defendants were able to adduce sufficient evidence to demonstrate that the decision to publish the Cartoon did not reflect any racial animus towards the Post's employees, this fact, standing alone, would be insufficient to defeat Plaintiffs' retaliation claims.  As courts have consistently explained, "to demonstrate participation in a protected activity, a plaintiff in a retaliation case need not prove that the conditions she protested amounted to an actual Title VII violation; she need only establish that she had a good faith, reasonable belief that a violation occurred." *Hubbard v. Total Communs. Inc.*, 2009 U.S. App. LEXIS 21419, *3 (2d Cir. Sept. 30, 2009); *see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) (same).  Accordingly, to demonstrate that their complaints constituted protected activity under Section 1981, the NYSHRL and the NYCHRL,

14

Plaintiffs need only set forth allegations demonstrating "nonfrivolous arguments" supporting their belief. *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001). The allegations in the Amended Complaint satisfy this lenient standard.

As the Amended Complaint explains, Plaintiffs' complaints of discrimination were not spurred by the publication of the Cartoon itself, but rather, by the admissions of certain high-ranking management employees within the Company made to Plaintiffs and other employees that Defendants not only knew the Cartoon was facially discriminatory prior to its publication, but that they had no problem with the racist message communicated by the Cartoon. Am. Compl. ¶¶ 69, 71-74. Notably, and contrary to Defendants' claims that the discriminatory message of the Cartoon was directed solely to the general public and did not affect the employees themselves, these statements adopting and approving of the racist message published by the Post were made directly to the Company's employees. *Id.* ¶¶ 69, 73. The Company continued to demonstrate its discriminatory animus towards its employees of color when it informed its reporters that the Post had no interest in conducting an exclusive, sit-down interview with Governor David Patterson, the first Black Governor of the State of New York, when the Post had never before rejected such an invitation to interview a White governor. *Id.* ¶ 74. As a result of Defendants' decision to openly flaunt to employees their decision to publish a cartoon they knew expressed a racist message, Plaintiffs reasonably believed in good faith that their complaints addressed discriminatory conduct towards the Company's employees, not the public at large. At a minimum, the issue of whether Plaintiffs had a good faith belief as to whether their complaints addressed a discriminatory employment practice is a question of fact that can only be resolved after discovery.

Defendants further argue that Plaintiffs could not possibly have had a good faith belief that they were complaining about an unlawful employment practice because Plaintiffs must have known

15

that the decision to publish the Cartoon alone did not create a hostile work environment. However, this argument similarly mischaracterizes the nature of Plaintiffs' complaints as limited solely to the Cartoon. Rather, in complaining about discrimination occurring at the Company, Plaintiffs were expressing their belief that the Cartoon was a notorious culmination of the pervasive racism that they themselves had suffered throughout their employment with the Company. As the Amended Complaint makes clear, Plaintiffs were repeatedly discriminated against with respect to their terms and conditions of employment, including by being denied equal opportunities given to White reporters, equal assistance and access to resources necessary to perform their jobs, and equal pay as that provided to White employees. The Amended Complaint also alleges Plaintiffs were being singled out for unwarranted criticism based upon their race and/or color. Am. Compl. ¶¶ 51-52; 55-57; 59-65. Defendants also discriminated against other employees of color by, among other things, refusing to promote non-White employees to management level positions, celebrating White employees who openly used racially derogatory slurs, and denying qualified Black reporters the opportunity to hold columnist positions. *Id.* ¶¶ 44-48. Thus, contrary to Defendants' arguments in this motion, Plaintiffs' complaints were not about the single incident of publication of the Cartoon, but were instead expressions of their wide-ranging opposition to all of the racial discrimination to which the Company subjected them and other non-White employees.[3]

### D. Plaintiffs Have Alleged That Defendants Had Notice of Their Protected Complaints of Discrimination

Defendants next argue that the substance of Plaintiffs' complaints were insufficient to place the Company on notice about the discrimination perpetrated against both themselves and other employees at the Post. However, this argument, as with the other theories posited by Defendants in

---

[3] Indeed, the fact that Defendants are aware that Plaintiffs' hostile work environment claims do not stem solely from the publication of the Cartoon is amply revealed by the fact that Defendants have chosen not to move to dismiss those claims in the Amended Complaint. This further undermines Defendants' contradictory arguments in this partial motion to dismiss.

support of their motion to dismiss, provides an insufficient basis for dismissal of Plaintiffs'
retaliation claims.

Courts have held that a plaintiff has satisfied her obligations under Title VII's retaliation
provision where "the complainant . . . put the employer on notice that the complainant believes that
discrimination is occurring." *Conway v. Microsoft Corp.*, 414 F.Supp.2d 450, 466 (S.D.N.Y.
2006). Contrary to Defendants' claim that Plaintiffs' complaints of discrimination lacked sufficient
detail, the Second Circuit has specifically held that, to prove that she engaged in protected activity,
a plaintiff "need not establish that she successfully described in that complaint conduct amounting
to a violation of Title VII." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998).
Rather, the complaint must simply inform the employer that the plaintiff is objecting to unfair
treatment based on her membership in a protected class. *Id.* at 768-769; *Brightman v. St. Vincent's
Hosp.*, 2000 U.S. Dist. LEXIS 9781, *9 (S.D.N.Y. July 13, 2000) (holding that plaintiff engaged in
protected activity when she notified employer of unlawful conduct, even if plaintiff never explicitly
stated she was "complaining about discrimination").

In this case, Plaintiffs' complaints were sufficient to demonstrate that they were objecting to
the racially discriminatory practices that were the hallmark of the Company's treatment of its
employees of color. Specifically, Mr. Fenner's complaints were published in the context of an
article objecting to the discriminatory practices at the Post, including its discriminatory treatment of
its non-White employees. Am. Compl. ¶ 79. As the only employee of the Company who consented
to be interviewed for this article, Mr. Fenner's objections to the discriminatory employment
practices at the Post constituted protected conduct. *See, e.g., Cioffi v. Averill Park Cent. Sch. Dist.
Bd. of Educ.*, 444 F.3d 158, 160 (2d Cir. 2006) (finding that statements made during public press
conference objecting to defendants' conduct constituted protected activity); *Davis v. City of New*

17

*York*, 2000 U.S. Dist. LEXIS 18520, at *19-20 (S.D.N.Y. Dec. 26, 2000) (holding that public statements constituted protected activity).

Although Defendants argue that Mr. Fenner cannot prove that Defendants were aware of his protected activity, the Complaint clearly alleges that Mr. Fenner made these statements publicly, in a widely read media website, for the express purpose of informing Defendants about his opposition to their discriminatory employment practices.[4]  Am. Compl. ¶ 80.  The Amended Complaint also alleges the profanity-laden rebukes of Mr. Fenner's managers that followed within days of this article, including, "What the fuck are you doing?" and "What's wrong with your ass?" Am Compl. ¶¶ 4, 83. This evidence alone, particularly its temporal proximity to Mr. Fenner's public comments, sufficiently establishes a *prima facie* showing that Defendants had knowledge of his protected conduct.

Indeed, whether Defendants were actually aware of these complaints is a factual issue that cannot be resolved absent discovery.  Notably, the court's decision in *Bazile v. City of New York*, 21 F. Supp.2d 354 (S.D.N.Y. 2002), which Defendants rely upon purportedly in support of their motion to dismiss, was decided at the summary judgment stage, *after* the plaintiff had an opportunity to prove the defendant's awareness through discovery.  Moreover, the court in *Bazile* explained that the plaintiff's statements to the newspaper would have constituted protected activity had the plaintiff been able to demonstrate, through discovery, that he made other, more specific complaints to the reporter that were unpublished or that the decision makers were aware of his complaints, an opportunity that Mr. Fenner should be afforded in the instant case.  *Id.* at 385.

---

[4] Because the context of Mr. Fenner's complaint makes clear that he was complaining about the Company's discriminatory employment practices towards non-White employees, the facts in this case are clearly distinguished from this Court's ruling in *Panzarino v. Deloitte & Touche LLP*, 2009 U.S. Dist. LEXIS 101209 (S.D.N.Y. Oct. 29, 2009), a case in which the plaintiff admitted that she never complained about discrimination. *Id.* at *35.  *See also Moncrief v. New York Pub. Library*, 2009 U.S. App. LEXIS 15994 at *4-5 (2d Cir. July 21, 2009) (holding that complaint that indisputably did not make reference to discrimination did not constitute protected activity).

Clearly, absent discovery, it would be impossible for Mr. Fenner to make this showing, nor does the case law support the proposition that Mr. Fenner must make such a showing at this threshold stage of the litigation in order to survive a motion to dismiss.

Similarly, Defendants' claim that Ms. Livingston's complaint failed to put them on notice that she was complaining about an unlawful employment practice cannot be supported in light of the allegations in the Amended Complaint. The Amended Complaint clearly states that Ms. Livingston's complaint of discrimination was only one example of a number of her complaints of discrimination made to management at the Post. Am. Compl. ¶ 78. As a result, Defendants' motion to dismiss is premature and the parties should be permitted to take discovery to determine the nature of Ms. Livingston's other complaints. *See, e.g., EEOC v. Thomas Dodge Corp.*, 524 F. Supp. 2d 227, 234 (E.D.N.Y. 2007) (holding that allegation in complaint that plaintiff complained to manager about harassment, without addressing substance of complaints, alleged sufficient detail to satisfy notice requirements of Fed. R. Civ. P. 8(a)).

Moreover, it is clear that the discrimination complaint made by Ms. Livingston that is outlined in the Amended Complaint was also independently sufficient to put Defendants on notice about her protected activity. As explained above, Ms. Livingston specifically complained about the discrimination that was occurring at the Company, which manifested itself in the circumstances surrounding the publication of the Cartoon. This complaint is sufficient under the law to constitute a valid allegation of protected activity, especially under the low standards that a plaintiff must meet to survive a motion to dismiss.

*Collette v. St. Luke's Roosevelt Hosp.*, 2002 U.S. Dist. LEXIS 18164 (S.D.N.Y. Sept. 24, 2002) is particularly instructive on this point. In *Collette*, the plaintiff made "extremely general assertions" that the defendant had failed to comply with equal employment opportunity guidelines

in the manner in which it had posted a job. *Id*. at *19. In fact, the plaintiff in *Collette* made no specific reference to the fact that she felt she was being discriminated against by virtue of such conduct. *Id*. The defendant contended, as Defendants do here, that even if the plaintiff reasonably thought that she was complaining about Title VII violations, nothing in the complaint would have put the defendant itself on notice that the complaint was intended to be protected activity. *Id*. at *19-20.

The court rejected this argument in its entirety. First, the court noted that there was no precedent requiring such an expansive reading of the notice requirement of a retaliation claim and that to assert such a reading would be "ultimately inconsistent with the purposes of Title VII's prohibition on retaliation." *Id*. at *20. The court, emphasizing that the plaintiff's burden in establishing her *prima facie* case was "*de minimis*," stated that "the awareness requirement should relate only to the employer's knowledge of plaintiff's activities," that is, the fact that she made the complaint itself. *Id*. The court concluded that the ultimate issue with regard to the notice requirement was whether the employer knew that the "employee was complaining of behavior that she reasonably believed violated Title VII, and that the employer was aware of that activity." *Id*.

Here, Ms. Livingston properly made an internal complaint to a management employee about discrimination. As a result, the allegations in the Amended Complaint are sufficient to establish, at this stage of the proceeding, that Defendants were on notice about Ms. Livingston's protected activity.

### E. Ms. Livingston Has Established A Causal Connection Between Her Complaints of Discrimination And Defendants' Adverse Employment Actions

Finally, Defendants claim that Ms. Livingston's retaliation claim should be dismissed because she failed to plead a causal connection between her complaints of discrimination and the

adverse employment actions taken by Defendants.  Specifically, Defendants contend that because Ms. Livingston was banned from the newsroom in December 2008, this ban cannot, by itself, constitute a retaliatory employment action.  However, in making this argument, Defendants once again mischaracterize the nature of Ms. Livingston's claims in this case.

As the Amended Complaint makes clear, Ms. Livingston was not initially banned from the newsroom in December 2008.  Rather, at the time she was stripped of her responsibilities for covering the Queens State Supreme Court, she was not told that she was absolutely prohibited from entering the newsroom.  Am. Compl. ¶ 95.  Rather, Defendant Gotthelf told Ms. Livingston that she would provide her at some future time with a desk, computer and telephone in the newsroom to permit her to continue carrying out her duties as a reporter.  *Id.*  However, after Ms. Livingston expressed her complaints of discrimination, Ms. Livingston was never given the necessary equipment that had been promised to her and was in fact absolutely banned permanently from the newsroom.  *Id.*  Indeed, after Ms. Livingston complained about discrimination, Defendant Greenfield made it clear to her that she was not permitted in the newsroom by openly questioning her right to be there even to pick up supplies.  *Id.* ¶ 96.  These allegations, demonstrating that Ms. Livingston's complaints of discrimination spurred Defendants decision to explicitly ban her from the newsroom and otherwise deprive her permanently of the equipment and resources vital to a reporter's job, despite having previously been promised to her, are clearly sufficient to establish a causal connection between her complaints of discrimination and Defendants' subsequent decision to ban her from the newsroom.

## III.   PLAINTIFFS' CLAIMS AGAINST NEWS CORP. ARE PROPERLY PLED

Incredibly, despite the explicit allegations in the Amended Complaint, Defendants argue that "Plaintiff [*sic*] does not and cannot allege" that Defendants News Corp. and the Post are a joint

employer.  Def. Br. at 17.  However, the Complaint clearly states that Defendants News Corp. and the Post "share common ownership, common premises, common directors and/or officers, and common financial control."  Am. Compl. ¶ 20.  Under the precedent that Defendants themselves cite, these allegations are sufficient to survive a motion to dismiss.  *See* Def. Br. at 16-17.  At the very least, Plaintiffs are entitled to take discovery to substantiate their explicit allegations that the Company operates as a joint employer.  Accordingly, as with Defendants other arguments, Defendants' claim that News Corp. should be dismissed as a defendant in this case cannot be resolved at this stage of the litigation and should be denied.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that Defendants' motion to dismiss be denied in its entirety.


Dated: New York, New York
      February 16, 2010

          Respectfully submitted,

          THOMPSON WIGDOR & GILLY LLP

          By: _____
              Kenneth P. Thompson
              Renan F. Varghese


          85 Fifth Avenue
          New York, NY  10003
          Telephone:  (212) 257-6800
          Facsimile:  (212) 257-6845

          COUNSEL FOR PLAINTIFFS