# EXHIBIT 1

1                    JORDAN LIPPNER

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

3   ---------------------------------------X

    AUSTIN FENNER and IKIMULISA LIVINGSTON,

4

5                    Plaintiffs,

6                    -against-

                              09 CIV 9832 (BSJ)(RLE)

7

    NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a

8   THE NEW YORK POST and DAN GREENFIELD and

    MICHELLE GOTTHELF,

9

                     Defendants.

10  ---------------------------------------X

    SANDRA GUZMAN,

11                   Plaintiff,

12              vs.        09 CIV 9323 (BSJ)(RLE)

13  NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a

    THE NEW YORK POST, and COL ALLAN, in his

14  official and individual capacities,

15

                     Defendants.

16  ---------------------------------------X

17

18       VIDEOTAPED DEPOSITION OF JORDAN LIPPNER

19                  New York, New York

20             Wednesday, February 29, 2012

21

22  REPORTED BY:  BARBARA R. ZELTMAN

                  (BOBBIE)

23                Professional Stenographic Reporter

24

25  Job Number:  46779

Page 18

```
1          JORDAN LIPPNER
2     Q    As you sit here now, you can't
3  recall any other documents that they showed
4  you beyond the ones that we produced this
5  week?
6     A    No.
7     Q    Did you do anything else to prepare
8  for your deposition today?
9     A    No.
10    Q    Are you employed by News Corp.?
11    A    No.
12    Q    Who is your employer?
13    A    News America Incorporated.
14    Q    What's the difference between News
15 America Incorporated and News Corp.?
16        MR. LERNER:  Objection.
17    A    They're two different corporations.
18    Q    Well, describe what is News
19 Corporation.
20        MR. LERNER:  Objection.
21    A    I don't understand the question.
22    Q    Okay.
23        There is a company called News
24 Corporation, correct?
25    A    Agreed.
```

Page 19

```
1          JORDAN LIPPNER
2     Q    Describe that company, Mr. Lippner.
3        MR. LERNER:  Objection.
4     A    It's a company that -- it's a
5  multi -- it's a company that owns various
6  media entities throughout the world in the
7  newspaper industry, television, movies,
8  in-store advertising, various online visual
9  properties.
10        I think worldwide News Corp. has
11 about 50-, 60,000 employees among all the
12 different subsidiaries that it owns.  It's
13 headquartered in New York.  It's a Delaware
14 corporation.
15        I don't know how else to answer
16 your question.
17    Q    Is there a chairman of News
18 Corporation?
19    A    Yes.
20    Q    Who is that?
21    A    Chairman of the Board of News
22 Corporation is K. Rupert Murdoch.
23    Q    So there is a board of directors at
24 News Corporation?
25    A    That is correct.
```

Page 20

```
1          JORDAN LIPPNER
2     Q    Now, what is News America
3  Incorporated?
4     A    It is a --
5        MR. LERNER:  Objection.
6        You've asked in your 30(b)(6)
7  Deposition Notice, Mr. Thompson, to
8  explain how the operations of the
9  defendants are interrelated, how labor
10 relations are managed at the defendants,
11 common management of the defendants, and
12 common ownership and control of the
13 defendants.  The defendants are News
14 Corporation and NYP Holdings.
15        That's what Mr. Lippner is here to
16 testify about.
17        Those are the entities which you've
18 directed the witness to be prepared to
19 speak about and that is what he's
20 prepared to speak about.
21        MR. THOMPSON:  Mr. Lerner,
22 we'll just bring him back.
23        Are you instructing him not to
24 answer this question?
25        MR. LERNER:  Yes.
```

Page 21

```
1          JORDAN LIPPNER
2  (Directive to witness.)
3        MR. THOMPSON:  Okay.
4  BY MR. THOMPSON:
5     Q    Mr. Lippner, are you going to
6  answer my last question?
7     A    I'm following my attorney's advice.
8        MR. THOMPSON:  Will you please
9  mark that again for another ruling.
10 BY MR. THOMPSON:
11    Q    How long have you worked for News
12 America Incorporated?
13    A    Ten years.
14    Q    What is your title?
15    A    Senior vice president, deputy
16 general counsel.
17    Q    Now you are appearing here as a
18 30(b)(6) witness, correct?
19    A    That's correct.
20    Q    And you also appeared at every
21 other deposition in this case, correct?
22    A    I've been present, yes.
23    Q    And you've also represented a
24 witness who was deposed in this case -- in
25 Ms. Guzman's case, correct?
```

1           JORDAN LIPPNER
2    to Mr. Lippner while this question is
3    pending, whispering in his ear while
4    this question is pending, which is
5    improper.
6         MR. LERNER:  The record can so
7    reflect.
8         MR. THOMPSON:  The record will
9    not only reflect, the video will
10   reflect that while a question is
11   pending, you leaned over and
12   whispered something in his ear, which
13   was improper.
14       Please conduct yourself
15   professionally here.
16       MR. LERNER:  Mr. Thompson,
17   we're trying to proceed with the
18   deposition without further
19   interruption.
20       (Requested portion of record read:
21       "Q.  So my question to you is
22   different.  I will ask it to you this
23   way:  Were you serving as in-house
24   counsel for NYP Holdings at Sandra
25   Guzman's deposition on October 13,

1           JORDAN LIPPNER
2    2011?")
3         (End of read-back.)
4    A    No.
5    Q    What capacity were you serving that
6    day?
7    A    Deputy general counsel for News
8    America Incorporated.
9    Q    What role does News America
10   Incorporated have with The New York Post?
11   A    News America Incorporated is the
12   parent company of NYP Holdings which is the
13   company that owns and publishes The Post.
14   Q    And both News America Incorporated
15   and The New York Post are subsidiaries of
16   News Corporation, correct?
17   A    They are indirect subsidiaries.
18   Q    What do you mean "indirect
19   "subsidiaries"?
20   A    They are not directly owned by News
21   Corporation.
22   Q    How do you know that?
23   A    Because I'm familiar with the
24   corporate structure.
25   Q    Well, who actually owns The New

1           JORDAN LIPPNER
2    York Post?
3    A    I just told you who does.
4    Q    Okay.
5         Who owns News America Incorporated?
6    A    News Publishing Australia Holdings
7    Limited.
8    Q    Isn't it fair to say, Mr. Lippner,
9    that Rupert Murdoch owns News Corporation,
10   News America Incorporated. and The New York
11   Post?
12       MR. LERNER:  Objection.
13   A    No.
14   Q    Is it your testimony that Rupert
15   Murdoch does not own The New York Post?
16       MR. LERNER:  Objection.
17   A    Correct.
18   Q    Now, do you know how many employees
19   work at The New York Post?
20   A    Hundreds.
21   Q    How many?
22   A    I don't know for sure.
23   Q    Mr. Lippner, you are testifying
24   today as the 30(b)(6) witness for The New
25   York Post.

1           JORDAN LIPPNER
2         Is it your testimony that you
3    have -- you do not know how many employees
4    work for The Post?
5    A    That's exactly what I just said,
6    Mr. Thompson.
7         MR. LERNER:  And he answered
8    you with a rough number.
9    Q    Mr. Lippner, how is it possible
10   that you came here today as 30(b)(6) witness
11   for News Corporation but yet you don't know
12   how many employees work for News
13   Corporation?  And yet you came here also as
14   a 30(b)(6) witness for New York Post and you
15   don't know how many employees work for
16   The New York Post?
17       MR. LERNER:  Objection.
18   A    Mr. Thompson, you served a 30(b)(6)
19   Notice.  You wrote the 30(b)(6) Notice in
20   the manner that you did.  Nowhere in the
21   30(b)(6) Notice that you personally wrote
22   does it say anywhere that the 30(b)(6)
23   witness is supposed to be prepared to
24   testify exactly how many employees each
25   corporate defendant employs.

Page 46

1  JORDAN LIPPNER
2  That's my answer.
3  Q  How many employees work at News
4  America Incorporated?
5  A  I don't know.
6  Q  You don't even know how many
7  employees work at the company that employs
8  you?
9  MR. LERNER:  Objection.
10  Mr. Thompson, again, you have not
11  asked him to come and testify as a
12  30(b)(6) witness on the number of
13  employees of these companies.
14  If you had wanted him to prepare to
15  tell you how many employees certain
16  companies have, your Notice could have
17  said that.
18  You could ask him hundreds of
19  questions about the characteristics of
20  each of these companies that are not
21  listed in the 30(b)(6) Deposition Notice.
22  He is not clairvoyant and neither
23  am I.  We do not know in advance, we did
24  not have your list of questions that your
25  were going to ask at this deposition.

Page 47

1  JORDAN LIPPNER
2  What we have is your 30(b)(6) Notice.
3  That specifies what Mr. Lippner
4  prepared for and that specifies what he
5  will testify to today.
6  MR. THOMPSON:  Mr. Lerner, I
7  state again you are unduly
8  restricting the scope of the 30(b)(6)
9  Deposition Notice.
10  We will take it up with the Court.
11  BY MR. THOMPSON:
12  Q  Mr. Lippner, I want you to identify
13  the subsidiaries of News Corporation.
14  A  I couldn't possibly identify all of
15  them.
16  Q  Identify as many as you can.
17  A  News Publishing Australia Holdings,
18  News America Incorporated, NYP Holdings,
19  News Marketing America, HarperCollins
20  Publishers, FOX Television Stations.
21  There are hundreds and hundreds of
22  subsidiaries.
23  Q  Where are the corporate
24  headquarters of News Corp. located?
25  A  In Manhattan, 1211 Avenue of the

Page 48

1  JORDAN LIPPNER
2  Americas.
3  Q  Where are the corporate and
4  editorial offices of The New York Post
5  located?
6  A  The editorial offices of The New
7  York Post are located on the tenth floor and
8  a little bit of the ninth floor of that
9  address.
10  The corporate offices, I'm not sure
11  what you mean by the "corporate offices of
12  The New York Post."
13  Q  Where are the business offices of
14  The New York Post located?
15  A  Business offices of The New York
16  Post are now located at 1185 Avenue of the
17  Americas.
18  Q  How long had the business offices
19  of The New York Post been located at
20  1185 Avenue of the Americas?
21  A  I think around a year.  About a
22  year.
23  Q  About a year.
24  Before the business offices of
25  The New York Post were located at

Page 49

1  JORDAN LIPPNER
2  1185 Avenue of the Americas, where were they
3  located?
4  A  They were located in a couple of
5  spots.
6  Some part of the ninth floor.
7  Q  At 1211 Avenue of the Americas?
8  A  Correct.  And some part of the
9  15th floor of that same building.
10  Q  Okay.
11  So is it fair to say that -- strike
12  that.
13  How long were the business offices
14  of The New York Post located at 1211 Avenue
15  of the Americas?
16  MR. LERNER:  Objection.
17  If you know.
18  A  There was a time when they were
19  located down on South Street.  I don't
20  believe that they've been located down on
21  South Street since the early '90s.
22  Q  So is it fair to say that as far as
23  you know, the business offices of The New
24  York Post have been located at 1211 Avenue
25  of the Americas since the early '90s?

Page 50

JORDAN LIPPNER

1
2     A    I can certainly say that since the
3  entire time that Ms. Guzman has -- was
4  employed by The Post, they were located on
5  the ninth floor at The Post.
6     Q    What about since the entire time
7  that Ms. Livingston has been employed?
8     A    I don't recall when Ms. Livingston
9  began her employment.  But I think to use
10  your word, it's probably a fair statement to
11  say that certainly the overwhelming majority
12  of the time Ms. Livingston was employed, the
13  business offices were located at 1211 Avenue
14  of the Americas.
15     Q    So is it fair to say that during
16  Ms. Guzman's employment, News Corp. and
17  The New York Post shared office space at
18  1211 Avenue of the Americas?
19         MR. LERNER:  Objection.
20     A    No.
21     Q    Is it fair to say that during
22  Ms. Guzman's employment, News Corp. and
23  The New York Post had office space in
24  1211 Avenue of the Americas?
25         MR. LERNER:  Objection.

Page 51

JORDAN LIPPNER

1
2     A    News Corp. and The New York Post
3  each had their own offices at 1211 Avenue of
4  the Americas during Ms. Guzman's employment.
5     Q    During Ms. Guzman's employment,
6  what floors did News Corp. occupy at
7  1211 Avenue of the Americas?
8         And just for the record, Ms. Guzman
9  worked at the company from 2003 to almost
10  the end of 2009.
11     A    Right.
12         The eighth floor was occupied by
13  News Corp.
14     Q    What offices did News Corp. have on
15  the eighth floor at 1211 Avenue of the
16  Americas during that time?
17     A    That's where the senior executives
18  are housed.
19     Q    Was Rupert Murdoch's office located
20  on the eighth floor during that time frame?
21     A    It was.
22     Q    Is it still located on that floor?
23     A    It is.
24     Q    What other executives of News Corp.
25  had offices on the eighth floor at

Page 52

JORDAN LIPPNER

1
2  1211 Avenue of the Americas during
3  Ms. Guzman's employment?
4     A    The chief financial officer.
5     Q    Who was that?
6     A    David Devoe.  D-E-V-O-E.
7         The deputy chief financial officer.
8     Q    Who was that?
9     A    John Nallen, N-A-L-L-E-N.
10         The group general counsel.
11     Q    Who was that during Ms. Guzman's
12  employment?
13     A    During her employment there were
14  two group general counsels.
15         The first was Arthur Siskind.  And
16  he was succeeded by Lawrence Jacobs.
17     Q    Who is the current group general
18  counsel for News Corp.?
19     A    A gentleman by the name of Gerson
20  Zweifach, Z-W-E-I-F-A-C-H.
21     Q    When did he become the general
22  counsel of News Corp.?
23     A    About three/four weeks ago.
24     Q    And before he became general
25  counsel, was Lawrence Jacobs the general

Page 53

JORDAN LIPPNER

1
2  counsel for News Corp.?
3     A    There was an interim acting general
4  counsel.
5     Q    Who was that?
6     A    Janet Nova.
7     Q    Do you know if the current general
8  counsel of News Corp. also has an office on
9  the eighth floor at 1211 Avenue of the
10  Americas?
11     A    I do.
12     Q    Are there any other officers or
13  executives who occupy offices on the eighth
14  floor of 1211 Avenue of the Americas who
15  work for News Corp.?
16     A    Yes.
17     Q    Who else?
18     A    Joel Klein.
19     Q    What position does Joel Klein have
20  with News Corp.?
21     A    He heads the company's education
22  division.
23         He's also, I believe he's a member
24  of the Office of the Chairman.
25     Q    Do you know if anyone else has an

Page 54

```
1              JORDAN LIPPNER
2   office on the eighth floor of 1211 Avenue of
3   the Americas who works for News Corp.?
4       A    Are we talking presently?
5       Q    Yeah.  Tell me presently.
6       A    I believe Jeff Mook.
7       Q    Who is Jeff Mook?
8       A    He is head of human resources for
9   News Corporation.
10      Q    Was the head of human resources for
11  News Corp. also located on the eighth floor
12  when Sandra Guzman was employed?
13      A    Correct.
14      Q    And who was that at the time?
15      A    There were a couple of different
16  people.
17           The first was Ian Moore and the
18  second was a woman named Beryl, B-E-R-Y-L,
19  Cook.
20      Q    Do you know if any other News Corp.
21  executives occupied office on the eighth
22  floor at 1211 Avenue of the Americas?
23      A    There may be a few others, but
24  those are the ones that come to mind.
25      Q    What about during Ms. Guzman's
```

Page 55

```
1              JORDAN LIPPNER
2   employment, can you think of anyone else?
3       A    At the --
4            MR. LERNER:  Objection.  These
5       are the people that presently occupy
6       that space.  So when you say can you
7       think of anyone else --
8            MR. THOMPSON:  I just said
9       during Ms. Guzman's employment.
10           MR. LERNER:  Understood.  But
11      when you said can you think of anyone
12      else, to me the question supposes
13      that these people occupied that space
14      during Ms. Guzman's employment which
15      is not his testimony.
16           MR. THOMPSON:  Then I'll make
17      it crystal clear.
18      Q    Can you think of any other News
19  Corp. executive that occupied the eighth
20  floor during Ms. Guzman's employment?
21      A    While Ms. Guzman was employed,
22  Mr. Murdoch, Mr. Nallen, Mr. Devoe,
23  Mr. Siskind, Mr. Jacobs, Mr. Moore, Ms. Cook
24  had office space up there.
25           There were others such as -- there
```

Page 56

```
1              JORDAN LIPPNER
2   was a gentleman by the name of Andrew
3   Butcher.
4       Q    Who was Andrew Butcher?
5       A    He was head of our communications
6   department at one point.
7            There was a gentleman by the name
8   of Gary Ginsburg.  He was also in
9   communications.
10           A woman by the name of Rachel
11  Webber.
12           Gentleman by the name of Leon
13  Hertz.
14           Those are all the names that I
15  think of.
16           MR. THOMPSON:  Can you go back
17      to his statements just now.
18      Q    You testified, Mr. Lippner, when I
19  asked you who Andrew Butcher was, you said
20  he was head of our communications department
21  at one point.
22           What do you mean by "head of our
23  communications department at one point"?
24      A    I mean he was head of News
25  Corporation.
```

Page 57

```
1              JORDAN LIPPNER
2            I thought that that was what we
3   were talking about, who were the News
4   Corporation employees on the eighth floor.
5       Q    So when you say "our," do you
6   consider yourself to be part of News
7   Corporation?
8       A    In a global sense.
9       Q    What do you mean by "in a global
10  sense"?
11      A    Well, I work for a company that's
12  owned by News Corporation.
13      Q    But do you believe you work for
14  News Corporation?
15      A    No.
16      Q    Now, during Ms. Guzman's employment
17  from 2003 to 2009, did News Corporation
18  occupy any of the floors at 1211 Avenue of
19  the Americas, that you know of?
20      A    There were News Corp. employees on
21  the fourth floor and there were News Corp.
22  employees at some point on the seventh
23  floor.
24           That's it.
25      Q    Identify the News Corp. employees
```

Page 70

JORDAN LIPPNER

1
2    scope of the 30(b)(6) Deposition
3    Notice.
4        MR. THOMPSON: It's not. It's
5    not, Mr. Lerner. If you instruct him
6    not to answer, that's your right but
7    it's not.
8        MR. LERNER: He's already told
9    you he can't answer.
10    Q    Well, my question is why can't you
11    answer?
12       MR. LERNER: Hold on. Since
13    it's not part of the 30(b)(6)
14    Deposition Notice --
15       MR. THOMPSON: It is.
16       MR. LERNER: -- he's not
17    prepared to answer the names of
18    employees of News America Marketing
19    which is not a defendant in the case.
20       The 30(b)(6) Deposition Notice asks
21    questions about the defendants in the
22    case.
23       MR. THOMPSON: Well,
24    Mr. Lerner, what you fail to
25    understand is that News Corporation,

Page 71

JORDAN LIPPNER

1
2    based on his testimony and the
3    testimony of Col Allan, is one
4    company that has different division.
5    You can call them subsidiaries. It's
6    clearly one company that's
7    interrelated.
8    BY MR. THOMPSON:
9    Q    My question, sir, is why can't you
10    tell me us the identities of those News
11    America Marketing employees?
12    A    There's a few reasons.
13    Q    Okay. Tell us.
14    A    There's never been a point in my
15    life where I've learned the identity of all
16    the employees for News America Marketing.
17    Q    I'm not asking you to identify all
18    of them. Identify some.
19       MR. LERNER: Hold on. I don't
20    think he was finished with the answer
21    to the question that you asked him,
22    which is why can't he name all the
23    people from News America Marketing
24    that occupied the fifth floor of
25    1211 Avenue of the Americas at a time

Page 72

JORDAN LIPPNER

1
2    before Paul Carlucci became publisher
3    of The Post.
4    A    It's also not information that was
5    covered by the 30(b)(6) Notice, so I did not
6    prepare to be able to testify as to who did
7    or did not work for News America Marketing
8    in 2003, for example.
9    Q    Well, do you know who Les Goodstein
10    is?
11    A    I do.
12    Q    Who is he?
13    A    He is an employee of News America
14    Incorporated.
15    Q    How long has he been an employee of
16    News America Incorporated?
17    A    I think he joined us around 2006.
18    Q    And what position did he join the
19    company as?
20    A    He joined us I think in a marketing
21    capacity and also to work on the small
22    community newspapers that the company had
23    acquired or was intending to acquire.
24    Q    What company acquired the community
25    newspapers?

Page 73

JORDAN LIPPNER

1
2    A    News America Incorporated.
3    Q    Do you know the specific title
4    Mr. Goodstein assumed when he joined News
5    America Incorporated?
6    A    I did at one point. I don't know
7    his specific title today.
8    Q    Is Mr. Goodstein still an employee
9    of News America Incorporated?
10    A    Yes.
11    Q    Has he ever worked for News
12    Corporation?
13    A    No.
14    Q    When Ms. Guzman worked at the
15    company, was there like an employee
16    cafeteria at 1211 Avenue of the Americas?
17    A    Yes.
18    Q    What floor was that cafeteria
19    located on?
20    A    The third floor.
21    Q    Who occupied the third floor in
22    terms of companies?
23       MR. LERNER: Objection.
24    A    Nobody occupies the third floor.
25    Q    Well, do you know if the third

Page 78

JORDAN LIPPNER

1
2     A    My understanding is that the
3  conference rooms were available for use by
4  any employees of any subsidiary of News
5  Corporation.
6        So News America Marketing
7  employees, HarperCollins employees, FOX
8  television employees, New York Post
9  employees.
10        You just had to sign up and request
11  them.
12     Q    Now, when Ms. Guzman worked at the
13  company -- and she worked at 1211 Avenue of
14  the Americas, correct?
15     A    When Ms. Guzman worked for The New
16  York Post, she worked -- started on the
17  tenth floor and for most of the time was on
18  the 9th floor.
19     Q    At 1211 Avenue of the Americas,
20  correct?
21     A    That's correct.
22     Q    Now, when she worked at the
23  company, were there other organizations,
24  separate and apart from News Corporation and
25  its subsidiaries, located at 1211 Avenue of

Page 79

JORDAN LIPPNER

1
2  the Americas?
3     A    Yes.
4        MR. LERNER: Objection.
5        Hold on.
6        You said when she worked at the
7  company.
8        There are two corporate defendants
9  here.  So we'll take it to mean when you
10  say "the company," she was employed by
11  The New York Post, we'll take it to mean
12  The New York Post.
13        MR. THOMPSON: No, I don't mean
14  that.
15        MR. LERNER: Then you should
16  state what corporate entity you mean.
17        MR. THOMPSON: When I say "the
18  company" I mean News Corporation and
19  The New York Post.
20     A    Let me clarify my answer.  As I
21  stated in my prior answer to your prior
22  question, Ms. Guzman worked for The New York
23  Post.
24        So if -- I don't know what your
25  last question was.

Page 80

JORDAN LIPPNER

1
2     Q    Well, I'll have it read back since
3  you forgot it.
4        MR. THOMPSON: Will you read it
5  back, please.
6        (Requested portion of record read:
7        "Q. Now, when she worked at the
8        company, were there other organizations,
9        separate and apart from News Corporation
10        and its subsidiaries, located at 1211
11        Avenue of the Americas?")
12        (End of read-back.)
13     A    When Ms. Guzman worked for The New
14  York Post, there were and are other
15  companies that have nothing to do whatsoever
16  with News Corporation and its subsidiaries
17  that have their offices located at 1211
18  Avenue of the Americas.
19     Q    Now when she worked at the company,
20  did employees of those organizations that
21  had nothing to do with News Corporation, did
22  they have access to the employee cafeteria?
23        MR. LERNER: Objection.
24     A    They could have gained access if
25  they wanted to.

Page 81

JORDAN LIPPNER

1
2     Q    Why do you say that?
3     A    Well --
4     Q    Well, let me ask it differently.
5        When you walk into 1211 Avenue of
6  the Americas, do you have to use some type
7  of electronic security pass to get up to the
8  floors occupied by News Corp. or The New
9  York Post?
10     A    You have to use an ID card to get
11  access to -- I believe there are four
12  different elevator banks.  Once you gain
13  access to that general area, you do not need
14  your ID card to go up in the elevator.
15     Q    Do you know if there's one type of
16  ID card that all the employees who work at
17  the various subsidiaries of News Corp. use
18  at that building?
19     A    I know that employees of the
20  different companies have different ID cards.
21     Q    Okay.
22        Now, when you -- I believe you said
23  that the cafeteria was on the fifth floor?
24     A    The cafeteria is on the third
25  floor.

Page 106

JORDAN LIPPNER

1
2     MR. LERNER: Objection.
3     A     On the days that The New York Post
4  security guards are not at 1211, they are
5  providing security for New York Post
6  employees at 900 East 132nd Street.
7     Q     So I'm going to ask the question
8  differently.
9         When there are no New York Post
10  security officers at 1211 Avenue of the
11  Americas, who provides security for The New
12  York Post employees at 1211 Avenue of the
13  Americas?
14     A     The building owner -- and I don't
15  know who the building owner is but it is not
16  News Corp. or any of its subsidiaries --
17  provides security for the tenants of the
18  building.
19     Q     Okay.
20        So what role does the Security
21  Department for News Corp. play differently
22  than the security that the building owner
23  provides?
24     MR. LERNER: Objection. Beyond
25     the scope of 30(b)(6) Deposition

Page 107

JORDAN LIPPNER

1
2  Notice.
3     MR. THOMPSON: It's not.
4     MR. LERNER: Instructing the
5  witness not to answer the question.
6     (Directive to witness.)
7     Q     Mr. Lippner, are you going to
8  answer that question?
9     A     I'm going to follow the advice of
10  my counsel.
11     Q     Isn't it fair to say that the
12  Security Department for News Corp. also
13  provides security for The New York Post
14  employees at 1211 Avenue of the Americas?
15     A     No.
16     Q     Do you have an e-mail address at
17  work?
18     A     Yes.
19     Q     What is it?
20     A     Jlippner@newscorp.com.
21     Q     Do you have a -- strike that.
22        Has that been your e-mail address
23  for the past several years?
24     A     It has.
25     Q     Was it your e-mail address when

Page 108

JORDAN LIPPNER

1
2  Ms. Guzman worked at the company?
3     A     Absolutely.
4     Q     Now, do you also have an e-mail
5  address that is specifically tied to News
6  America Incorporated?
7     MR. LERNER: Objection.
8     A     I only have one address and it is
9  jlippner@newscorp.com and that is my News
10  America Incorporated e-mail address.
11     Q     So is it fair to say, Mr. Lippner,
12  that employees who work for The New York
13  Post have a different e-mail address than a
14  News Corp. e-mail address?
15     MR. LERNER: Objection.
16     A     Employees who work for The New York
17  Post do not have a News America Incorporated
18  e-mail address or a News Corporation e-mail
19  address. They have a New York Post e-mail
20  address.
21     Q     Do you know why you have a newscorp
22  e-mail address if you work for News America
23  Incorporated?
24     MR. LERNER: Object to form.
25     A     I do not have a News Corporation

Page 109

JORDAN LIPPNER

1
2  e-mail address. I have a News America
3  Incorporated e-mail address.
4     Q     Okay.
5        Is it fair to say, Mr. Lippner,
6  that your e-mail address is
7  jlippner@newscorp.com?
8     A     My work e-mail is that e-mail, yes.
9     Q     And I'm only talking about your
10  work e-mail. I'm not talking about private
11  e-mail right now or personal e-mail.
12        Why, Mr. Lippner, do you have a
13  newscorp.com e-mail address if you work for
14  News America Incorporated?
15     MR. LERNER: Objection.
16        Mr. Thompson, the reason for
17  Mr. Lippner's e-mail address has nothing
18  to do with the relationship between
19  The New York Post and News Corp.
20        Mr. Lippner does not work for
21  The New York Post. He doesn't have an
22  office at The New York Post and he's
23  testified to that.
24     MR. THOMPSON: Yes. But,
25  Mr. Lerner, as you know, Mr. Lippner

Page 110

```
 1          JORDAN LIPPNER
 2    has maintained an office at
 3    1211 Avenue of the Americas for
 4    years.
 5          The same address where the
 6    editorial and business offices of The New
 7    York Post are located.
 8          I have a right to probe this
 9    witness regarding the e-mail addresses
10    used by News Corp. employees and The New
11    York Post employees, and I'm asking him
12    why does he have a newscorp e-mail
13    address if he works for News America
14    Incorporated.
15          It is a fair area to inquire to
16    determine if News Corp. and News America
17    Incorporated are the same company.
18          MR. LERNER: It's beyond the
19    scope.
20          MR. THOMPSON: It is not.
21          MR. LERNER: I'm directing the
22    witness not to answer that question.
23          (Directive to witness.)
24    BY MR. THOMPSON:
25      Q    Mr. Lippner, do you know if there
```

Page 111

```
 1          JORDAN LIPPNER
 2    is one computer server for News Corp.
 3    employees and New York Post employees?
 4          MR. LERNER: Objection.
 5      A    I know there is not one computer
 6    server.
 7      Q    Tell us -- describe the different
 8    computer servers for The New York Post
 9    employees and -- as opposed to the computer
10    server for the News Corp. employees?
11          MR. LERNER: As best you can
12    and understanding that you are not an
13    IT specialist.
14          MR. THOMPSON: Mr. Lerner, he
15    doesn't have to be an IT specialist.
16    He has to be prepared to answer the
17    questions that are relevant to the
18    30(b)(6) Dep Notice.
19          MR. LERNER: I'm not even sure
20    what a server is. And Mr. Lippner
21    and I are both lawyers, as are you.
22    So he can answer that question as
23    best he can with that understanding.
24      A    I am not what you would call a
25    computer geek or very IT savvy.
```

Page 112

```
 1          JORDAN LIPPNER
 2          What I can tell you is that The New
 3    York Post maintains separate and distinct
 4    computer databases, computer servers from
 5    News Corporation.
 6          They have nothing to do with each
 7    other. Each company has separate IT
 8    departments.
 9          I don't know how else to answer
10    your question.
11      Q    Do you know anyone who has a
12    newsamerica.com e-mail address?
13      A    Yes.
14      Q    Who?
15      A    Every employee of News America
16    Marketing.
17      Q    News America Marketing?
18      A    Yes.
19      Q    So what's the e-mail address for
20    employees at News America Marketing?
21          MR. LERNER: Objection.
22      A    Something to do with their name,
23    @newsamerica.com.
24      Q    Is it fair to say, Mr. Lippner,
25    that you and other attorneys for News
```

Page 113

```
 1          JORDAN LIPPNER
 2    America Incorporated have a newscorp.com
 3    e-mail address at work?
 4      A    I'm sorry, can you repeat the
 5    question.
 6          (Requested portion of record read:
 7    "Q. Is it fair to say,
 8    Mr. Lippner, that you and other attorneys
 9    for News America Incorporated have a
10    newscorp.com e-mail address at work?")
11          (End of read-back.)
12      A    Yes. My and my News America
13    Incorporated legal colleagues, our e-mail
14    addresses end with newscorp.com.
15      Q    Do you know why your e-mail
16    addresses end with newscorp.com as opposed
17    to newsamerica.com?
18          MR. LERNER: Objection. This
19    is exactly the same question in which
20    we already had a colloquy and we have
21    objected to the question, and I
22    instruct the witness not to answer
23    beyond the scope of this Deposition
24    Notice.
25          (Directive to witness.)
```

Page 134

JORDAN LIPPNER

1  JORDAN LIPPNER
2  But let me move on because you read
3  one part of the 30(b)(6) Deposition
4  Notice, and you forgot to read the most
5  important part that goes to this area of
6  inquiry.
7  "One:  Explain how, if at all, the
8  operations of the Defendants are
9  interrelated."
10  Now, we've established, Mr. Lerner,
11  through this witness that News Corp. has
12  a board of directors, and we've
13  established through this witness that
14  The New York Post has a board of
15  directors, so we need to probe and we
16  have a right to probe whether there is
17  any interrelated activity between the
18  board of directors or any members of the
19  board of directors of News Corp. with the
20  board of directors at The New York Post.
21  It is improper for you to suggest
22  that this is not a fair area of inquiry.
23  It is completely fair and dead on in
24  terms of the Dep Notice.
25  BY MR. THOMPSON:

Page 135

1  JORDAN LIPPNER
2  Q    Mr. Lippner, I just want the record
3  to be clear, as a 30(b)(6) witness for
4  The New York Post, is it your testimony that
5  all you know about The New York Post board
6  of directors is that one exists?
7  A    That's not my testimony.
8  Q    So tell us what you know about the
9  board of directors at The New York Post.
10  For example, how often does it
11  meet?
12  A    Paul Carlucci, Dave Devoe, Rupert
13  Murdoch and Lon Jacobs sat on the board of
14  directors for The New York Post as of the
15  date of Ms. Guzman's employment termination.
16  Q    How often did the board of
17  directors at The New York Post meet during
18  Ms. Guzman's employment?
19  A    I do not know.
20  Q    How often does the board of
21  directors at The New York Post meet today?
22  A    I don't know.
23  Q    Did you seek to get that
24  information before your deposition today?
25  A    No.

Page 136

1  JORDAN LIPPNER
2  Q    Why not?
3  A    Because it's not part of the scope
4  of the Notice that you sent.
5  Q    So you don't believe that finding
6  out more information about the board of
7  directors is relevant to the Dep Notice that
8  we sent; is that your testimony?
9  MR. LERNER:  Objection.
10  A    I think my prior statement stands
11  on its own.
12  Q    Okay.
13  Where do the board of directors of
14  The New York Post meet?
15  A    I do not know.
16  Q    Where does the board of directors
17  of News Corp. meet?
18  A    I do not know.
19  Q    How often does the board of
20  directors of News Corp. --
21  MR. LERNER:  Mr. Thompson,
22  there is clear case law that the
23  boards of directors and memberships
24  of the boards of directors and the
25  operations of boards in which members

Page 137

1  JORDAN LIPPNER
2  wear different hats has no relevance
3  to the questions that of where this
4  is all going, which is, as I
5  understand it, joint employment,
6  joint control.
7  MR. THOMPSON:  You don't
8  understand it.
9  If that's your belief, you are
10  mistaken.  Okay.  Because that's not --
11  MR. LERNER:  It's not even
12  relevant to the subject matter.
13  MR. THOMPSON:  These questions
14  are relevant.
15  I'm going to continue.
16  MR. LERNER:  Excuse me one
17  second.
18  (Lippner Exhibit 2, Defendant
19  NYP Holdings, Inc. d/b/a The New
20  York Post, Objections and Responses
21  to Plaintiffs' First Set of
22  Interrogatories, was marked for
23  Identification.)
24  BY MR. THOMPSON:
25  Q    Mr. Lippner, I'm now showing you

Page 146

JORDAN LIPPNER

1
2 ten-year employment at News America
3 Incorporated.
4       And during that ten-year period, I
5 have not once had a discussion with any
6 executive at The New York Post about a
7 policy that they were implementing or a new
8 policy that was handed down.  Period.
9       And no new policies have been
10 handed down in that regard.
11       So I'm basing that as my statement
12 that I don't believe a single policy has
13 been handed down by the board of directors
14 of The New York Post on New York Post
15 employees.
16   Q   Do you know if Paul Carlucci ever
17 set policy for The New York Post employees?
18   A   Yes.
19   Q   How do you know that?
20   A   Because I do.
21   Q   What's the basis besides "I do"?
22   A   The New York Post a few years ago
23 implemented a formal annual performance
24 appraisal system.  It was the first time in
25 The Post history that they were implementing

Page 147

JORDAN LIPPNER

1
2 such a procedure, and they were implementing
3 it because Paul Carlucci wanted to implement
4 it.
5   Q   Do you know if Paul Carlucci
6 discussed that particular policy during any
7 board meeting?
8   A   I do not.
9   Q   Strike that.
10       Do you know if Paul Carlucci
11 discussed that particular policy during any
12 meeting of the board of directors of The New
13 York Post?
14   A   I do not.
15   Q   Mr. Lippner, who has final
16 authority over personnel decisions at News
17 Corporation?
18   A   It would depend on the employee
19 that we're talking about.
20   Q   Well, is there one person who had
21 final authority over personnel decisions at
22 News Corp.?
23   A   No.
24   Q   Is there one person who has final
25 authority over personnel decisions at The

Page 148

JORDAN LIPPNER

1
2 New York Post?
3   A   I mean every situation stands on
4 its own.
5   Q   I understand that.  My question is
6 different.
7       My question is:  Is there a person
8 at The New York Post who has final authority
9 over personnel decisions affecting New York
10 Post employees?
11       MR. LERNER:  Objection.
12   A   You know, I think I don't then
13 really understand your question.
14   Q   I'll ask it differently.
15       Does Paul Carlucci have final say
16 over personnel decisions at The New York
17 Post?
18       MR. LERNER:  Objection.
19   A   No.
20   Q   Does Rupert Murdoch have final say
21 over personnel decision at The New York
22 Post?
23   A   No.
24   Q   Who has final say over personnel
25 decisions at The New York Post?

Page 149

JORDAN LIPPNER

1
2   A   Your question has a faulty premise.
3 You are suggesting that such a person
4 exists.
5   Q   I'll ask it differently then.
6       Does any person or group have final
7 say over personnel decisions at The New York
8 Post?
9       MR. LERNER:  Objection.
10   A   As I said before, each situation
11 will stand on its own.
12       If you are talking about, for
13 example, Bob Smith, random employee who
14 works in the sales department, is going to
15 get fired and the manager in the sales
16 department is go going to be handling that.
17       If you are talking about one in
18 editorial, some senior editor will be
19 handling that.
20       There is no mandatory policy or
21 procedure that dictates at The New York Post
22 how someone gets fired.
23   Q   Who is the highest ranking person
24 at The New York Post?
25   A   Paul Carlucci.

Page 150

JORDAN LIPPNER

1       JORDAN LIPPNER
2   Q   Who does he report to?
3   A   He reports to the chairman of the
4 board of directors.
5   Q   Who is that?
6   A   Rupert Murdoch.
7   Q   So at any time isn't it fair to say
8 that Rupert Murdoch has final authority over
9 The New York Post?
10     MR. LERNER: Objection.
11   A   No.
12   Q   Is it your testimony, Mr. Lippner,
13 that Paul Carlucci has more authority over
14 The New York Post than Rupert Murdoch?
15     MR. LERNER: Objection.
16   A   Yes. Paul Carlucci runs the
17 day-to-day operations of The Post. He is
18 the senior-most executive at The Post.
19   Q   So if Paul Carlucci wanted to fire
20 someone in sales at The New York Post, he
21 had final authority to do that?
22     MR. LERNER: Objection.
23   A   I don't know what you mean by
24 "final authority."
25   Q   It is your testimony that Paul

Page 151

1       JORDAN LIPPNER
2 Carlucci is the highest ranking person at
3 The New York Post, correct?
4   A   It's my testimony that he is the
5 highest ranking executive of The New York
6 Post.
7   Q   Okay.
8     And who is the highest ranking
9 editor at The New York Post?
10   A   Col Allan.
11   Q   And who does Col Allan report to?
12   A   He also reports in to, as I
13 understand it, he reports in to the chairman
14 of the board of The New York Post, Rupert
15 Murdoch.
16   Q   So is it your testimony that Paul
17 Carlucci would have more authority over
18 firing an employee at The New York Post than
19 Rupert Murdoch?
20     MR. LERNER: Objection.
21   A   Yes.
22   Q   Is it also your testimony that Col
23 Allan would have more authority in firing
24 someone who works in the Editorial
25 Department at The New York Post over Rupert

Page 152

1       JORDAN LIPPNER
2 Murdoch?
3     MR. LERNER: Objection.
4   A   Mr. Murdoch does not get involved
5 with employee terminations at The New York
6 Post.
7   Q   That's not my question.
8 Can you answer my question.
9   A   I just answered it.
10   Q   No you have not.
11     (Requested portion of record read:
12     "Q. Is it also your testimony that
13 Col Allan would have more authority in
14 firing someone who works in the Editorial
15 Department at The New York Post over
16 Rupert Murdoch?")
17     (End of read-back.)
18   A   Yes. Mr. Murdoch does not get
19 involved in employee terminations at The New
20 York Post.
21     MR. THOMPSON: Move to strike
22 the last part of his answer as
23 nonresponsive.
24     Don't worry, Bobbie, we'll take a
25 break.

Page 153

1       JORDAN LIPPNER
2     MR. LERNER: Ken, it's five
3 after 1.
4     MR. THOMPSON: Want to take a
5 break now?
6     MR. LERNER: It's -- I actually
7 have 1:10 on my watch.
8     MR. THOMPSON: Do you want to
9 take a lunch break?
10     MR. LERNER: Yes.
11     MR. THOMPSON: What time do you
12 want to resume?
13     MR. LERNER: 2:00.
14     THE VIDEOGRAPHER: The time is
15 1:09 p.m. We're off the record.
16     (A luncheon recess was
17 taken at 1:09 p.m. 2:15 p.m.)
18   A F T E R N O O N  S E S S I O N
19     JORDAN LIPPNER,
20 resumed, having been previously
21   duly sworn, was examined
22 and testified further as follows:
23     THE VIDEOGRAPHER: The time is
24 2:15 p.m. We're on the record.
25 CONTINUED EXAMINATION BY MR. THOMPSON:

JORDAN LIPPNER

1
2  Page 4 of your position statement, which is
3  Bates stamped NYP-7.
4      A   Yes.
5      Q   Now, isn't it correct, Mr. Lippner,
6  that the information you put in this EEOC
7  statement was accurate at the time, correct?
8      A   I believe so.
9      Q   You would not want to mislead the
10 EEOC, would you?
11     A   I believe in being accurate,
12 Mr. Thompson.
13     Q   And as far as you know today,
14 everything contained in this EEOC position
15 statement is accurate, correct?
16     A   I believe so.
17     Q   You reviewed it before you
18 submitted it to the EEOC, correct?
19     A   Yes.
20     Q   Direct your attention to Page 4.
21         There is a headline you had there,
22 "The Post Commitment to Equal Opportunity."
23         Do you see that?
24     A   Yes.
25     Q   You state "During the course of

JORDAN LIPPNER

1
2  charging party's employment, The Post has
3  maintaining equal employment policy which is
4  distributed to all employees."
5      Do you see that?
6      A   I do.
7      Q   Now, for the record, "charging
8  party" refers to Sandra Guzman, correct?
9      A   Yes, sir.
10     Q   So you are stating in this
11 particular EEOC statement on Page 4 that
12 during Ms. Guzman's employment, The Post
13 maintained an equal employment policy,
14 correct?
15     A   That is correct.
16     Q   And that policy was distributed to
17 all employees, right?
18     A   That is correct.
19     Q   How is that policy distributed to
20 all employees?
21     A   It's part of the new hire packet.
22 Any time an employee gets hired.
23     Q   What do you mean "part of the new
24 hire packet"?
25     A   When an employee gets hired, there

JORDAN LIPPNER

1
2  are all kinds of documents and forms that
3  they are provided with.
4      Everything from filling out their
5  healthcare elections to giving them
6  different policy documents of the company,
7  whether it's The New York Post travel
8  reimbursement policy or the Standards of
9  Business Conduct or any other document that
10 The Post provides to its employees.
11     Q   In that paragraph, top paragraph on
12 Page 4, you state "The company's Equal
13 Employment Opportunity philosophy applies to
14 all aspects of employment with the company."
15     Do you see that?
16     A   I do.
17     Q   What company were you referring to?
18     A   The New York Post.
19     Q   And then you write "including but
20 not limited to recruiting, hiring, training,
21 transfer, promotion, employee benefits,
22 compensation, termination, educational
23 assistance, leave of absence, and social and
24 recreation activities."
25     Do you see that?

JORDAN LIPPNER

1
2      A   I absolutely do.
3      Q   Now, you also made it a point to
4  the EEOC to let them know that you say "In
5  addition, through this policy The Post
6  informs its employees how they may make
7  complaints about any perceived unlawful
8  treatment."
9      Do you see that?
10     A   I do.
11     Q   How did The New York Post inform
12 its employees how to make complaints about
13 any perceived unlawful treatment?
14     MR. LERNER:  Objection.
15     Q   When Ms. Guzman worked at the
16 company.
17     MR. LERNER:  Objection.
18     I don't believe this question is
19 within the scope of the 30(b)(6).
20     MR. THOMPSON:  I'm not going to
21 fight you on that.  I have a more
22 pressing matter.
23     Q   I want to direct your attention to
24 the statement -- you actually attached a
25 copy of The Post EEOC policy in Exhibit 1,

Page 218

JORDAN LIPPNER

1
2 correct?
3     A    I did.
4     Q    In fact, on Page 4 you say "A true
5 and correct copy of The Post's EEO policy is
6 attached as Exhibit 1," correct?
7     A    That's correct.
8     Q    Let's look at Exhibit 1 of this
9 EEOC position statement.
10         And you will find that on
11 Page NYP-20.
12         You see where it says "Exhibit 1"?
13     A    I do.
14     Q    And then you go on, you included
15 this exhibit which is entitled Equal
16 Employment Opportunity, Unlawful Harassment,
17 correct?
18     A    That is correct.
19     Q    Now, so when you were referring to
20 a true and correct copy of The Post EEO
21 policy, the EEO policy is actually contained
22 in Exhibit 1, correct?
23     A    Yes.
24     Q    Now, is this the policy that New
25 York Post employees were expected to follow

Page 219

JORDAN LIPPNER

1
2 when Ms. Guzman worked there?
3     A    It is one of the policies, yeah.
4     Q    One of the policies that New York
5 Post employees were expected to follow,
6 correct?
7     A    Correct.  Absolutely.
8     Q    Is this a policy of News
9 Corporation?
10     A    It's a policy that was originally
11 promulgated by News Corporation.
12     Q    How do you know that this is a
13 policy originally promulgated by News
14 Corporation?
15     A    Because I know where it comes from.
16     Q    Where does it come from?
17     A    It comes from the News Corporation
18 Standards of Business Conduct.
19     Q    So the record is clear, when you
20 were describing this policy to the EEOC,
21 this EEO policy, you were talking about a
22 policy that was created by News Corporation,
23 correct?
24     A    I was talking about a policy that
25 The New York Post uses as its fair work

Page 220

JORDAN LIPPNER

1
2 environment policy.
3     Q    Yes.  But that policy was created
4 by News Corporation, correct?
5         MR. LERNER:  Objection.
6     A    I mean, I've already stated that
7 that's the case.
8     Q    Okay.
9         So is it fair to say that when
10 Ms. Guzman worked at The New York Post, she
11 was expected to follow the EEOC policy
12 created by News Corporation?
13         MR. LERNER:  Objection.
14     A    When Ms. Guzman worked at The New
15 York Post, she was expected to comply with
16 the Standards of Business Conduct, among
17 other policy documents which were provided
18 to her by The Post.
19         The Post uses the News Corporation
20 Standards of Business Conduct which among
21 other things contains a fair work
22 environment policy or as the section is
23 called Equal Opportunity and Unlawful
24 Harassment.
25         There's no factual dispute that the

Page 221

JORDAN LIPPNER

1
2 document Standards of Business Conduct
3 originates from the parent company.
4         (Lippner Exhibit 10, Standards
5     of Business Conduct, Bates Numbers
6     NYP-58 through NYP-75, was marked
7     for Identification.)
8 BY MR. THOMPSON:
9     Q    Mr. Lippner, I'm now showing you
10 what's been marked Lippner Deposition
11 Exhibit 10.  It's Bates stamped NYP-58
12 through NY-P75.
13         And I'll represent to you that the
14 defendant, The New York Post, produced this
15 document in discovery.
16         Please take a moment and look it
17 and tell us if you recognize it.
18         Do you recognize it?
19     A    I do.
20     Q    What is it?
21     A    It is one of the versions of the
22 Standards of Business Conduct.
23     Q    And this is News Corporation's
24 Standards of Business Conduct, correct?
25     A    It is both News Corporation's and

Page 230

JORDAN LIPPNER

1       JORDAN LIPPNER
2  to these News Corp. Standards of Business
3  Conduct, if an employee violated these
4  standards, they could be terminated?
5       A    As I said, you are asking a
6  hypothetical question whether or not someone
7  could be disciplined.  Whether they could be
8  disciplined at this point can result in
9  their discharge, you know, is a
10 determination that could only be made by
11 that employee's supervisor in conjunction
12 likely with that company's HR Department.
13      It's not -- there's no answer -- if
14 we flip through every page of the Standards
15 of Business Conduct, we are not going to
16 find anywhere where it states, for example,
17 if you do X, you'll be disciplined in this
18 way, if you do Y, you'll be disciplined in
19 that way.  That's not what this document
20 means.
21      Q    Let me ask you this:  Where it says
22 in this document "board of directors of the
23 company," as the 30(b)(6) witness for News
24 Corporation and The New York Post, what
25 board of directors is referred to there?

Page 231

1       JORDAN LIPPNER
2       A    I don't know.
3       Based on the way the Standards is
4  written, I would take that to mean the board
5  of directors of that particular company, but
6  I don't know.  It could be either.  But then
7  I already said that to you.
8       Q    Mr. Lippner, we don't want you to
9  guess.
10      A    I don't want to guess either.  And
11 as I said to you, I don't know what it
12 refers to.
13      Q    Mr. Lippner, you are here as the
14 30(b)(6) witness for News Corp. and The New
15 York Post.  Is it your testimony that you
16 have no idea what board of directors it
17 referred to when it states "These standards
18 have been adopted by the board of directors
19 of the Company"?
20      MR. LERNER:  Objection.  Asked
21 and answered twice already.
22      MR. THOMPSON:  Not this
23 question, Mr. Lerner.
24      MR. LERNER:  No.  Yeah.  This
25 question is just said in a more

Page 232

1       JORDAN LIPPNER
2  combative and obstructive way.
3       MR. THOMPSON:  It's not said in
4  a more combative way.  It's said in a
5  more specific way to make it clear.
6       A    Mr. Thompson, you can add a
7  different word or two to your question or
8  change your tone of voice, as you have.  I
9  can't answer your question in any other way
10 than the way I already have.
11      Q    Well, Mr. Lippner, you knew you had
12 to provide testimony at this deposition
13 today in these federal lawsuits against the
14 company.
15      Did you endeavor in preparing for
16 your deposition today to determine which
17 board of directors is referred to when it
18 says "board of directors of the Company"?
19      A    No.
20      Q    Why not?
21      A    I didn't deem it part of my
22 preparation for the 30(b)(6) Notice.
23      Q    So Mr. Lippner, is it correct that
24 as you sit here today as a 30(b)(6) witness
25 for the News Corp. and The New York Post,

Page 233

1       JORDAN LIPPNER
2  that you do not know the identity of any
3  members of the board of directors referred
4  to in this particular Standards of Business
5  Conduct?
6       MR. LERNER:  Objection.
7       A    Ken, I don't know what you expect
8  me to answer.  I've given you my answer.
9       Q    And the answer is you don't know?
10      A    I think four or five times I've
11 said that.
12      Q    Mr. Lippner, I want to direct your
13 attention to the page Bates stamped NYP-68.
14      A    Okay.
15      Q    Do you see where it stays "Fair
16 Work Environment"?
17      A    I do.
18      Q    Now, when you did training of New
19 York Post employees regarding fair work
20 environment, did you use this particular
21 policy as part of your training?
22      A    It depends what particular training
23 session we're talking about, what documents
24 were used.
25      If you are asking me have I ever

Page 234

```
1              JORDAN LIPPNER
2   used it, I'm sure I've used it.
3      Q    Where it says "B, Fair Work
4   Environment."  It says "the Company."
5      A    Yes.
6      Q    Is it your understanding that the
7   company referred to there is News
8   Corporation?
9      A    No.  It would depend on who I was
10  doing the training for.  If I was doing the
11  training for The New York Post, "the
12  Company" would refer to The New York Post.
13     Q    Wait.  Let me ask it differently.
14         Is it your testimony, Mr. Lippner,
15  that the policies stated in the Fair Work
16  Environment section on NYP-68 are News Corp.
17  policies?
18     A    No -- well, again it depends on the
19  situation.
20     Q    What do you mean "it depends on the
21  situation"?
22     A    Well, as I've already testified,
23  these policies -- and it states quite
24  clearly, I think it was the third page of
25  this exhibit, that the use of the word
```

Page 235

```
1              JORDAN LIPPNER
2   "Company" refers to interchangeably News
3   Corporation as well as the particular -- you
4   know, the various individual companies that
5   the company -- that News Corporation owns
6   throughout the world.
7          So if I am, for example, a -- I'm a
8   News America Incorporated employee, when I
9   read this document and I read the words "the
10  Company," I could replace the words "the
11  Company" each time that appears with the
12  words "News America Incorporated."
13         Likewise, if I'm a New York Post
14  employee, I could replace the words "the
15  Company" with "The New York Post maintains a
16  strong equal employment."  Et cetera.
17     Q    Okay, the policy reflected in the
18  Fair Work Environment is a policy
19  promulgated by News Corporation, correct?
20         MR. LERNER:  Objection.
21     A    The entire document was originally
22  adopted, as we've discussed, by the News
23  Corporation staff, board of directors.
24         I don't know what you by
25  "promulgate."
```

Page 236

```
1              JORDAN LIPPNER
2      Q    Well, earlier you mentioned
3   "promulgate," did you not?
4          MR. LERNER:  He's not finished.
5      A    I'm not finished with my answer.
6      Q    Okay.
7      A    Since we're dealing with
8   Ms. Guzman, Mr. Fenner, Ms. Livingston, all
9   of whom are New York Post employees, I will
10  tailor my answer accordingly.
11         This document, Standards of
12  Business Conduct, is utilized and
13  disseminated by The New York Post for its
14  employees, and The New York Post requires
15  its employees to comply with the policies
16  set forth herein.
17         These policies are New York Post
18  policies.
19     Q    Okay.
20         My question is different now:  Is
21  the policy set forth in the Fair Work
22  Employment section a policy that was adopted
23  by the board of directors of News
24  Corporation?
25     A    The entire document, the entire
```

Page 237

```
1              JORDAN LIPPNER
2   Standards of Business Conduct, was
3   originally adopted by News Corp.'s board of
4   directors.
5      Q    So News Corp.'s board of directors
6   adopted a policy reflected in the Fair Work
7   Environment section that New York Post
8   employees had to abide by during
9   Ms. Guzman's employment, correct?
10     A    New York Post employees had to
11  abide by the Fair Work Environment section
12  because The New York Post requires its
13  employees to do so.
14     Q    Can The New York Post adopt its own
15  policies regarding Fair Work Environment
16  separate and apart from any policy
17  promulgated by News Corporation?
18     A    It can.
19     Q    Has it done so, as far as you know?
20     A    I believe The New York Post used
21  to -- I don't know if it's still does --
22  have a stand-alone fair work environment
23  policy that was not a policy that was
24  contained in the Standards of Business
25  Conduct.
```

JORDAN LIPPNER

1
2  Q   When did that occur?
3  A   I know such policy existed while
4  Ms. Guzman was employed.
5      The Post has adopted lots of
6  policies on its own for its employees.
7      You know, News Corporation doesn't
8  get involved on a micro level with how
9  The New York Post polices its own employees.
10  Q   When you see the term "The Company
11  will endeavor to keep the workplace free of
12  any conduct that creates an intimidating,
13  hostile or abusive work environment," is it
14  your understanding that the company referred
15  there includes News Corporation?
16  A   No.
17  Q   I want to direct your attention to
18  Page 60, NYP-60, again at the top.
19  A   Okay.
20  Q   Can you read into the record the
21  first sentence of these Standards of
22  Business Conduct?
23  A   Sure.  "News Corporation, the
24  Company, has a firmly established policy of
25  conducting its affairs in compliance with

JORDAN LIPPNER

1
2  all applicable laws and regulations and
3  observing the highest standards of business
4  ethics."
5  Q   Now, Mr. Lippner, as someone who
6  has worked as an attorney for News America
7  Incorporated for many years, would you agree
8  that the term "Company" in that sentence
9  means News Corporation?
10  MR. LERNER:  Objection.
11  A   What I would agree is that in this
12  document, the word "the Company" changes
13  depending on where you are employed.
14      If you are a New York Post
15  employee, the word "the Company" means
16  The New York Post.  If you are a News
17  Corporation employee, it means the News
18  Corporation.
19  Q   I want you to show us, Mr. Lippner,
20  and take your time, where it says that
21  anywhere in this document, that the term
22  "company" changes depending on where you
23  work within the family of the News Corp.
24  companies.
25      I want you to show us.  Take your

JORDAN LIPPNER

1
2  time.  Don't rush.  Show us anywhere where
3  it says that in this document.
4  A   Sure.  I believe it says that in
5  the next sentence of the next paragraph.
6  Q   Okay.
7      Point us to the language that says
8  that.
9  A   First the paragraph states that the
10  standards apply to all the subs, and then it
11  specifically says "References to the Company
12  include its subsidiaries and divisions."
13      So that is why I say to you, Ken,
14  that when the word "the company" appears
15  here, if you are a New York Post employee,
16  it means The New York Post.
17      If you are a HarperCollins
18  employee, it means the HarperCollins.  If
19  you are a News America Marketing employee,
20  the phrase "the company" means America
21  Marketing, and so on.
22  Q   But at the end of the day, whether
23  you work for The New York Post or Harpers
24  Collins, the bottom line is these policies
25  were created by News Corporation, correct?

JORDAN LIPPNER

1
2  A   These policies, for the umpteenth
3  time, were as it states adopted by the board
4  of directors of News Corporation.
5  Q   So is it fair to say, Mr. Lippner,
6  that the board of directors at News
7  Corporation adopted policies that affect the
8  workplace at The New York Post?
9  A   It's fair to say that the board of
10  directors of News Corporation adopted
11  policies that when accepted by the various
12  divisions, and more specifically in this
13  case The New York Post, and disseminated to
14  its employees, that policy affects those
15  employees.
16  Q   And the term "the Company" includes
17  all subsidiaries of News Corporation,
18  correct?
19  A   The term "the Company" means
20  whichever company you are employed by.
21  Q   Show me where it says that in the
22  document, Mr. Lippner.  Take your time.
23  A   Ken, Paragraph 2, "References to
24  the Company include its subsidiaries."
25  Q   I understand that.  It says "it

Page 302

JORDAN LIPPNER

1
2     Q    How do you know she was involved in
3  putting out the Electronic Communications
4  Policy that's reflected in this particular
5  deposition exhibit?
6     A    Because I discussed it with her.
7     Q    Were there any other News Corp.
8  employees or lawyers who were involved for
9  putting out the Electronic Communications
10  Policy?
11     A    Yes.
12     Q    Who else?
13     A    The head of -- the then head of
14  News Corporation's Information Technology
15  Department was involved.  I was involved.
16     Q    Who was the head --
17     A    I'm sure that general counsel was
18  involved.
19        I don't remember who else may have
20  been involved.
21     Q    I want you to identify the person
22  you referred to as being a part of the
23  technical -- I think you said technical --
24     A    I said Information Technology
25  Department.

Page 303

JORDAN LIPPNER

1
2     Q    Who was that?
3     A    I don't recall who that was at the
4  time.
5     Q    Was he a News Corp. or she a News
6  Corp. employee?
7     A    I don't recall if he or she was a
8  News Corp. employee or News America
9  Incorporated employee.
10     Q    So when you and the other attorney
11  from News Corp. discussed the Electronic
12  Communications Policy, was it your
13  understanding that New York Post employees
14  had to comply with it?
15     A    It was my understanding that when
16  the policy was finalized, with one exception
17  that I'll state, all employees around the
18  world and including The New York Post and
19  every subsidiary of News Corporation would
20  have to comply with the policy.  The
21  exception being that it was -- we couldn't
22  draft the policy that would take into
23  account all the restrictions or requirements
24  under different laws around the world.
25        And so to the extent that there was

Page 304

JORDAN LIPPNER

1
2  something in the policy that a particular
3  jurisdiction would have made unlawful, that
4  part of the policy would not have applied to
5  those employees working at a particular
6  company in that location.
7     Q    Did News Corporation disseminate
8  this Electronic Communications Policy to New
9  York Post employees?
10        MR. LERNER:  Objection.
11     A    No.  New York Post disseminated
12  that policy to its own employees.
13     Q    Did News Corp. disseminate the
14  Electronic Communications Policy to anyone
15  at The New York Post to forward on to New
16  York Post employees?
17     A    Yes.
18     Q    Who at News Corp. disseminated the
19  Electronic Communications Policy to someone
20  at The New York Post to distribute to New
21  York Post employees?
22     A    I don't know.
23     Q    When did the Electronic
24  Communications Policy get disseminated to
25  New York Post employees?

Page 305

JORDAN LIPPNER

1
2     A    I don't recall when it was first
3  promulgated, first created.
4     Q    Well, is it still in effect to this
5  day?
6     A    Yes.
7     Q    Was it in effect during Sandra
8  Guzman's employment?
9     A    Perhaps not at the start, but
10  certainly during her employment, yes.
11     Q    Was she expected to comply with
12  that policy during her employment?
13     A    I would imagine The New York Post
14  expected her to comply.  That's what this
15  document says.
16     Q    Was Austin Fenner expected to
17  comply with this policy when he worked at
18  the company?
19     A    Same answer.
20     Q    Was Irkimulisa Livingston expected
21  to comply with this policy?
22     A    Same answer.
23     Q    Were News Corporation employees
24  expected to comply with the Electronic
25  Communications Policy when Ms. Guzman worked

Page 318

JORDAN LIPPNER

1
2   this deposition, can you tell us anything
3   that The New York Post E-mail Policy states?
4       A    No.
5           MR. LERNER:  Objection.
6       Q    Mr. Lippner, the next policy listed
7   is New York Post Cellphone Policy.
8           You see that?
9       A    I do.
10      Q    When did that go into effect?
11      A    I cannot tell you.
12      Q    Is it still in effect?
13      A    It is.
14      Q    Who created that policy?
15      A    The New York Post.
16      Q    Who at The New York Post?
17      A    I cannot tell you.
18      Q    Did any News Corp. employee have
19  any role in creating The New York Post
20  Cellphone Policy?
21      A    No.
22      Q    How do you know that someone at
23  The New York Post created The New York Post
24  Cellphone Policy?
25      A    Because I reviewed it with New York

Page 319

JORDAN LIPPNER

1
2   Post HR.
3       Q    Who in New York Post HR did you
4   review The New York Post Cellphone Policy
5   with?
6       A    I believe it was Amy Saldone.
7       Q    When did you review The New York
8   Post Cellphone Policy with Ms. Saldone?
9       A    I can't tell you that.
10      Q    What year?
11      A    I just said I can't tell you that.
12      Q    Tell us what The New York Post
13  Cellphone Policy says.
14      A    I already told you I can't tell you
15  what it says.
16      Q    No, you didn't tell me that.  We
17  talked about The New York Post E-mail
18  Policy, and that's a different policy.
19      A    And that was one of the first
20  questions, Mr. Thompson, to me when you
21  moved on was what does it say, and I
22  said to you I don't recall what it says.
23          And I will reiterate, if you would
24  like to provide me with copy of the
25  document, I'd be happy to discuss what it

Page 320

JORDAN LIPPNER

1
2   says.
3       Q    Mr. Lippner, you are the 30(b)(6)
4   witness who knows these policies very well,
5   correct?
6           MR. LERNER:  Objection.
7       Q    Yes.
8       A    Is there a question?
9       Q    Yes.
10      A    What's the question?
11          MR. THOMPSON:  Can you read it
12  back.
13          (Requested portion of record read:
14          "Q.  Mr. Lippner, you are the
15          30(b)(6) witness who knows these policies
16          very well, correct?")
17          (End of read-back.)
18      A    Mr. Thompson, what I'm is a
19  30(b)(6) witness who can tell you which
20  policies apply to The New York Post
21  employees and which policies apply to News
22  Corporation employees.
23          That is why I'm here today.  I'm
24  not here so that I can give you a recital of
25  the substance of each such policy.

Page 321

JORDAN LIPPNER

1
2       Q    I'm not asking you to give me a
3   recital of the substance of each such
4   policy.  I'm asking you as 30(b)(6) witness
5   to tell us one thing The New York Post
6   Cellphone Policy says.
7           MR. LERNER:  And what is the
8   relevance of what the cellphone
9   policy says to this matter?
10          MR. THOMPSON:  Because the
11  relevance, Mr. Lerner, this witness
12  was supposed to come here with
13  knowledge of employee policies, and
14  he is completely clueless.
15          MR. LERNER:  No, that's not an
16  answer to what the relevance is.
17          MR. THOMPSON:  I'm answering
18  your question.  You may not like my
19  answer.
20          This is a witness who has an
21  obligation to sit here and answer
22  questions about the application of
23  The New York Post employment policies.
24  He's got to know what those policies say.
25          MR. LERNER:  I disagree with

JORDAN LIPPNER

1
2    A    I do.  And he did.
3    Q    Who was if at the time?
4    A    Lon Jacobs.
5    Q    Do you know if anyone at News
6  Corporation approved The New York Post
7  E-mail Policy before it was put into effect?
8    A    No one at News Corporation had
9  anything to do with The New York Post E-mail
10  Policy.
11    Q    Do you know if anyone at News
12  Corporation approved The New York Post
13  Cellphone Policy before it was put into
14  effect?
15    A    No one at News Corporation had
16  anything to do with The New York Post
17  Cellphone Policy.
18    Q    Do you know if anyone at News
19  America Incorporated approved The New York
20  Post E-mail Policy before it was put into
21  effect?
22    A    Same answer.  No one at News
23  America Incorporated had anything to do with
24  The New York Post E-mail Policy.
25    Q    Same question regarding The New

JORDAN LIPPNER

1
2  York Post Cellphone Policy.
3    A    No one at News America Incorporated
4  had any approval -- involvement with The New
5  York Post Cellphone Policy.
6    Q    Do you know if there had been
7  different versions of The New York Post
8  Cellphone Policy distributed to New York
9  Post employees?
10    A    I do not.
11    Q    Now, looking at this Exhibit Bates
12  stamped NYP-97, it also states "News
13  Corporation Records Management Policy."
14        Do you know if that policy was ever
15  put into effect?
16    A    I do.
17    Q    Do you know when the News
18  Corporation Records Management Policy became
19  effective?
20    A    I don't.
21    Q    Do you know if any News Corporation
22  employee approved the News Corporation
23  Records Management Policy before it became
24  effective?
25    A    I know the News Corporation Record

JORDAN LIPPNER

1
2  Management Policy was created by News
3  Corporation.
4        I know that Genie Gavenchak, Ellen
5  Agress, the group general counsel were
6  involved in creating and finalizing the
7  policy.  There may have been other people.
8        I know that, for example -- I
9  believe I contributed, for example, to
10  giving them reference for how long you need
11  to keep employment-related documents based
12  on relevant stats at issue.
13        Whether there is a business
14  executive at News Corp. who had the final
15  say or it was the group general counsel's
16  final say, I can't answer that question.
17    Q    Besides your involvement, do you
18  know if any other News America Incorporated
19  employee was involved in the creation of the
20  News Corporation Records Management Policy?
21    A    I do not.
22    Q    Do you know if that particular
23  policy is still in effect today?
24    A    It is.
25    Q    And does that policy apply to New

JORDAN LIPPNER

1
2  York Post employees?
3    A    I believe that the News Corporation
4  Records Management Policy applies to News
5  Corporation as well as to all of its wholly
6  owned subsidiaries.
7    Q    Do you know if this News
8  Corporation Records Management Policy was in
9  effect during Ms. Guzman's employment as an
10  associate editor?
11    A    When Ms. Guzman was employed by
12  The Post as an associate editor, I believe
13  that this policy -- I'm not a hundred
14  percent positive.  I believe that it was
15  promulgated towards the end of her
16  employment at The Post but I'm not positive.
17        I'd be happy to give you a
18  supplemental answer on that if you would
19  like.
20    Q    Who has responsibility for
21  enforcing News Corporations Record
22  Management Policy?
23    A    Again, that's a company-by-company
24  thing.
25        For News Corporation itself, News

Page 330

JORDAN LIPPNER

1   JORDAN LIPPNER
2   Corp. people do.  If it was The New York
3   Post it would be somebody at The New York
4   Post or multiple people.  It's up to each
5   company to designate people who are in
6   charge of the records management.
7       Q    You see where it says "New York
8   Post Travel and Entertainment Policy"?
9       A    I do.
10      Q    Is that a policy currently in
11  effect?
12      A    It is.
13      Q    How long has it been in effect?
14      A    I couldn't tell you.
15      Q    Was it in effect during
16  Ms. Guzman's employment as an associate
17  editor?
18      A    Yes.  Ms. Guzman was employed at
19  The New York Post as an associate editor
20  when The New York Post T & E Policy was
21  definitely in effect.
22      Q    Do you know who approved the Travel
23  and Entertainment Policy before it went into
24  effect?
25      A    No, I don't, but I can say that

Page 331

JORDAN LIPPNER

1   JORDAN LIPPNER
2   News Corporation had no role in its
3   approval.
4       Q    Can you describe what The New York
5   Post Travel and Entertainment Policy states,
6   in substance?
7       A    In general terms, it speaks to what
8   kind of expenses The Post will approve and
9   procedures for submitting expenses and
10  getting reimbursed by The Post for incurring
11  expenses on the company's behalf in the
12  course of performing one's job duties.
13      Talks about acquiring certain kinds
14  of documentation.
15      It's a fairly detailed policy.
16  Generally speaking, that's what it speaks
17  to.
18      Q    Did you review The New York Post
19  Travel and Entertainment Policy before it
20  was put into effect?
21      A    I don't believe so.
22      Q    Did anyone at News America
23  Incorporated review The New York Post Travel
24  and Entertainment Policy before it became
25  effective?

Page 332

JORDAN LIPPNER

1   JORDAN LIPPNER
2       A    Not to my knowledge.
3       Q    And can you describe, going back to
4   the prior policy, what News Corporation
5   Records Management Policy states, in
6   substance?
7       A    It provides time frames for how
8   long different types of documents are to be
9   kept and procedures following the expiration
10  of such documents, of, you know, getting rid
11  of them.
12      Q    Do you see, Mr. Lippner, where it
13  says Standards of Business Conduct and there
14  appears to be an asterisk there?
15      A    I do.
16      Q    Do you see where it says Electronic
17  Communications Policy and it also appears to
18  have an asterisk?
19      A    I do.
20      Q    You see where it says New York Post
21  Code of Conduct and there is an asterisk?
22      A    I do.
23      Q    Do you know what that means?
24      A    I believe, according to this piece
25  of paper, employees were supposed to sign a

Page 333

JORDAN LIPPNER

1   JORDAN LIPPNER
2   form that was attached to those three
3   documents and return it to Human Resources.
4       Q    Do you know who in Human Resources
5   would have had responsibility for collecting
6   those forms from employees?
7       A    At The New York Post?
8       Q    Yes.
9       A    I don't know which Human Resources
10  professional had that responsibility, no.
11      Q    I want to direct your attention to
12  the next document listed, New York Post Code
13  of Conduct.
14      Do you see that?
15      A    I do.
16      Q    What is that particular document?
17      A    It's a -- I believe it's a one-page
18  document that -- it's not all inclusive, but
19  it purports to describe a bunch of different
20  kinds of misconduct that an employee can
21  engage in, and if that employee engages in
22  such conduct, it's informing that employee
23  that they will be subject to discipline.
24      Q    Is that the same one-page document
25  that you testified earlier that was created

84

Page 334

```
1            JORDAN LIPPNER
2  for New York Post employees?
3      A    It's possible I was confusing the
4  two.  I certainly was starting to feel faint
5  at that point in time.  But I don't know.
6          Because the other thing I was
7  saying, too, is that I know that one of the
8  other companies, FOX Television Stations,
9  for example, I know that they have a
10 stand-alone also and I don't know if I was
11 confusing The Post with them or not.
12         But FOX Television is one of my
13 clients as well.
14     Q    So as you are sitting here now with
15 your head clearing, I want you to tell us if
16 The New York Post Code of Conduct is the
17 one-page document that you were referring to
18 earlier?
19     A    It may have been.  You know, and if
20 you would like I'm happy to provide you a
21 supplemental interrogatory answer on that
22 after tonight.  I'm just not a hundred
23 percent positive.
24         MR. THOMPSON:  Mr. Lerner, we
25 don't believe that we have been given
```

Page 335

```
1            JORDAN LIPPNER
2  The New York Post Code of Conduct,
3  the one-page document.
4          If you have, can you just tell us
5  the Bates Number so we can double-check.
6          MR. LERNER:  We have.
7          MR. THOMPSON:  That's fine.
8  BY MR. THOMPSON:
9      Q    When did The New York Post Code of
10 Conduct go into effect?
11     A    That I'm not entirely sure.
12         The Post has a couple of different
13 codes of conduct.  I believe the one that's
14 referenced on is this page is referring to
15 one that's is given to employees who work in
16 The New York Post offices at 1211.
17         I know that the plant where The New
18 York Post newspaper is actually produced,
19 that there are a bunch of different codes of
20 conduct depending on which union you are in.
21         So -- and I know that they've
22 evolved over time, so I'm not exactly sure
23 when this particular one was created.
24     Q    How many different New York Post
25 codes of conduct are there?
```

Page 336

```
1            JORDAN LIPPNER
2      A    For the folks that are -- the
3  employees at The Post that work at 1211, I
4  think there's only one.  But then for the
5  employees who work up at the plant in
6  The Bronx, there are a few different ones
7  and it depends which union you are in which
8  code of conduct applies to you.
9      Q    Do you know who approved The New
10 York Post Code of Conduct before it was
11 disseminated to employees?
12     A    I don't know for a fact as I sit
13 here tonight.  I know that it was developed
14 by Human Resources at The New York Post.
15         I believe it was given final
16 signoff by Paul Carlucci, the publisher of
17 The Post.
18         And once that final signoff
19 occurred, it was then put into use.
20     Q    Do you know if any lawyer at News
21 Corporation played any role in the creation
22 of The New York Post Code of Conduct?
23     A    I don't think any News Corporation
24 lawyer played a role in the Code of Conduct.
25     Q    But do you know if any News
```

Page 337

```
1            JORDAN LIPPNER
2  Corporation employee played any role with
3  respect to The New York Post Code of
4  Conduct?
5      A    No News Corporation employee played
6  a role with The New York Post Code of
7  Conduct.
8      Q    How about any News America
9  Incorporated employee?
10     A    Yes.
11     Q    Who was that person?
12     A    That would be me.
13     Q    What role did you play with respect
14 to New York Post Code of Conduct?
15     A    Well, I'm a lawyer and The Post is
16 one of my clients, and I provided The Post
17 with advice with respect to how the Code of
18 Conduct was worded and what was listed
19 there.
20     Q    Did you provide that advice to
21 The New York Post during Ms. Guzman's
22 employment?
23     A    I may have.  I don't remember
24 exactly when the Code of Conduct was
25 implemented.
```

Page 342

```
1              JORDAN LIPPNER
2   when you drafted that policy?
3       A    No.
4       Q    Did anyone at News Corp. play any
5   role in the creation or approval of the
6   Family Medical Leave Policy that you
7   created?
8       A    No.
9       Q    Was there ever any other versions
10  of the Family Medical Leave Policy
11  distributed to New York Post employees
12  during your employment?
13      A    Not that I recall.
14      Q    So there's only one version of the
15  Family Medical Leave Policy that you know of
16  that's been distributed to The New York Post
17  employees?
18      A    I believe that's correct.
19      Q    And is that policy still in effect?
20      A    I believe so.
21      Q    And does it still apply to current
22  New York Post employees?
23      A    I would think so, yes.
24          (Lippner Exhibit 13, Family
25      and Medical Leave Policy, Bates
```

Page 343

```
1              JORDAN LIPPNER
2       Number NYP-87, was marked for
3       Identification.)
4   BY MR. THOMPSON:
5       Q    I'm now showing you what's been
6   marked as Lippner Exhibit 13, Bates stamped
7   NYP-87.
8           It's been provided to us by New
9   York Post in discovery.
10          Take a moment to look at it and
11  tell us if you recognize it.
12          Is this a document you drafted
13  for The New York Post employees?
14      A    It's the document I drafted for
15  News America Incorporated and then I
16  distributed it to, among other the wholly
17  owned subsidiaries, The New York Post.
18      Q    Is this the Family and Medical
19  Leave Policy that governs the employment of
20  New York Post employees?
21      A    If this is the one they're still
22  using, the answer is yes.
23      Q    Do you know if this particular
24  Family Medical Leave Policy is still in
25  effect or not?
```

Page 344

```
1              JORDAN LIPPNER
2       A    I would have no reason to believe
3   that it's not.
4       Q    So based on your belief that this
5   policy is likely still in effect, are New
6   York Post employees covered by this policy?
7           MR. LERNER:  Objection to form.
8       A    As I stated, if The Post is still
9   using this policy, then this is the one that
10  covers The New York Post employees.
11      Q    Well, is this the policy that you
12  recall drafting?
13      A    It definitely is because it says
14  "News America Incorporated" in it.
15          The reason I'm just giving you a
16  slight hesitation in my answer or caveat is
17  that when I distributed it to the various
18  wholly owned subsidiaries, my expectation
19  was that they would use it but they would
20  actually take off the name News America
21  Incorporated and put, for example
22  HarperCollins Publishers or New York Post or
23  something else on it.
24          Because News America Incorporated
25  has nothing to do with whether or not a New
```

Page 345

```
1              JORDAN LIPPNER
2   York Post employee takes family medical
3   leave and has nothing to do with the
4   approval of that or the denial of that or
5   the administration of it.
6           So that's the only reason I'm
7   giving you a hesitation.
8          (Lippner Exhibit 14, New York
9       Post document, Bates Number
10      NYP-495, was marked for
11      Identification.)
12  BY MR. THOMPSON:
13      Q    Mr. Lippner, I'm now going to show
14  you what is marked as Lippner Deposition
15  Exhibit 14, Bates stamped NYP-495.
16          It's a document that The New York
17  Post produced in discovery in this case.
18  Please take a moment to look at it and tell
19  us if you recognize it.
20          Do you recognize this document?
21      A    I don't.
22      Q    You see at the top says "New York
23  Post," correct?
24      A    I do.
25      Q    And it says "This is to acknowledge
```

Page 358

```
            JORDAN LIPPNER
1
2    with her in connection with any revisions or
3    changes to the Electronic Communications
4    Policy after she became a News Corp. lawyer?
5        A    When we did the second iteration, I
6    was mostly out of the loop.  I don't recall
7    whether or not I may have read it before it
8    was finalized, but I was not involved in the
9    editing and drafting of it.
10       Q    Who was involved in editing and
11   drafting of the second version of this
12   electronic --
13       A    Ellen Agress.
14       Q    Do you know if she was a News Corp.
15   attorney at the time?
16       A    I believe she was.
17       Q    Do you see the language in bold
18   that states "It is imperative and mandatory
19   that you sign the receipt page and return
20   that signed receipt page to your HR
21   representative for placement in your
22   personnel file"?
23       A    I do.
24       Q    So employees at The New York Post
25   were required to sign the receipt page
```

Page 359

```
            JORDAN LIPPNER
1
2    acknowledging that they got a copy of this
3    Electronic Communications Policy, correct?
4        A    Well, they were supposed to.
5        Q    And it also goes on to say
6    "Violations of the policy may result in
7    disciplinary action up to and including
8    immediate discharge."
9            Do you see that?
10       A    I don't.  Can you tell me where
11   you're reading?
12       Q    It's in the fourth paragraph.
13       A    I do, okay.  I see that.
14       Q    Do you know who -- strike that.
15           Do you know who would make the
16   determination about whether disciplinary
17   action should be taken against an employee
18   who violated this policy?
19       A    Well, if, for example, we're
20   speaking about a New York Post employee who
21   violated the policy, the decision-makers
22   would be New York Post employees.
23           We don't -- there is no
24   intercompany decision-making process.
25       Q    Okay.
```

Page 360

```
            JORDAN LIPPNER
1
2        Turn to the second page of this
3    document which is Bates stamped NYP-115.
4        A    Sure.
5        Q    Do you see where it says "News
6    Corporation and affiliated companies"?
7        A    Yes.
8        Q    And it says "October 1, 2002,
9    Electronic Communications Policy"?
10       A    Yes, sir.
11       Q    So is it your understanding that
12   when it states "News Corporation and
13   affiliated companies" that this Electronic
14   Communications Policy is a News Corporation
15   policy?
16       A    No.  It's my understanding that
17   this is a policy that applies to -- well, at
18   the time the company was technically called
19   News Corporation Limited and that it applied
20   to the News Corporation Limited as well as
21   all of its US subsidiaries and affiliates,
22   as it goes on to say in the first sentence
23   there.  And then it lists a bunch of them
24   that it applied to in a nonexclusive list.
25       Q    At one point News Corporation was
```

Page 361

```
            JORDAN LIPPNER
1
2    called News Corporation Limited?
3        A    Yes.  Back when it was an
4    Australian corporation.
5        Q    How long -- strike that.
6            Did there come a time when News
7    Corporation was no longer considered News
8    Corporation Limited?
9        A    Yes.
10       Q    When did that happen?
11       A    I'm going to venture to say around
12   2004.  It was approximately 2004.
13           The company -- News Corporation
14   Limited reincorporated as a US corporation
15   and eventually the name was changed to just
16   News Corporation.
17       Q    If an employee saw another employee
18   using the electronic communications system
19   in an improper manner, could they complain
20   to Jan Constantine at the time?
21       MR. LERNER:  Objection.
22       A    I don't believe that that's --
23   before I answer it, let me take a look at
24   the policy.
25       Q    Look at Page Bates stamp NYP-1154
```

91

JORDAN LIPPNER

1
2  Q    When she was a lawyer for News
3  Corporation?
4  A    Exactly.
5  Q    Do you know if anyone in News
6  Corporation approved this document before it
7  was disseminated to New York Post employees?
8  A    No one at News Corporation
9  disseminated this policy to New York Post
10 employees.
11      It was distributed to New York Post
12 employees by The New York Post.
13 Q    But my question is: Do you know if
14 there was any News Corp. employee who
15 approved this document before it was
16 disseminated to New York Post employees?
17 A    I don't know who at News
18 Corporation would have given the final
19 signoff, but I do know that Ellen Agress was
20 heading up the revisions on it.
21 Q    What role did Ellen Agress play
22 with respect to this particular version of
23 News Corporation's Electronic Communications
24 Policy?
25 A    My recollection is she was the one

JORDAN LIPPNER

1
2  who was streamlining the policy and making
3  the changes to it.
4      And as you can see, I believe it's
5  shorter, more concise than the previous
6  policy we had looked at, and I think that
7  was one of the goals she had set out to edit
8  it was to -- I think I had testified earlier
9  today about cutting down duplication and
10 there had been some duplication.
11 Q    Since Ms. Guzman worked as an
12 associate editor for The Post in July 2006,
13 was this Electronic Communications Policy
14 applicable to her employment?
15 A    If The Post distributed to its
16 employees, then yes.
17 Q    Do you know if The Post distributed
18 this policy to its employees?
19 A    I don't.  I know that The Post was
20 supposed to have done so.  I can't testify
21 for sure that it did.
22 Q    Tell us as a 30(b)(6) witness for
23 The New York Post what electronic
24 communications policy applied to New York
25 Post employees in 2006.

JORDAN LIPPNER

1
2  A    I believe it's this one.
3      But again, it would have been that
4  Amy Saldone or somebody else at The New York
5  Post distributed it to New York Post
6  employees.
7      No one at News Corporation took it
8  upon themselves to distribute it to New York
9  Post employees.
10 Q    As you sit here today as a 30(b)(6)
11 witness for The New York Post, what
12 electronic communications policy applies to
13 current New York Post employees?
14 A    I believe it's this one.
15 Q    Now, Mr. Lippner, do you know if
16 The New York Post and News Corp. used the
17 same travel agency when employees had to
18 travel for business at any point during your
19 employment?
20 A    I believe for economies of scale,
21 yes, News Corp. has arranged for a travel
22 company -- one travel company where we get
23 increased buying power because more people
24 are using it through the different wholly
25 owned subsidiaries, and I think it's called

JORDAN LIPPNER

1
2  HRG Worldwide.
3  Q    How long has HRG Worldwide been the
4  travel company for News Corp. and The New
5  York Post?
6  A    I don't know the answer to that
7  question.
8  Q    Was it the travel company for the
9  News Corp. and The New York Post when Sandra
10 Guzman worked as an associate editor?
11 A    I think so.
12 Q    Do you know which entity, News
13 Corp. or The New York Post -- strike that.
14      Do you know which entity paid this
15 travel agency for the services it performed
16 for News Corp. and New York Post employees?
17 A    Yes.
18 Q    What entity paid?
19 A    News Corp. pays for the travel of
20 its employees, and The New York Post pays
21 for the travel of its employees.
22 Q    So is it your testimony that News
23 Corporation provides separate -- pays
24 separate invoices from this travel agency
25 than The New York Post?

```
1          JORDAN LIPPNER
2      MR. LERNER: Objection.
3    A   I'm not sure I understand the
4  question.
5    Q   I'll rephrase it.
6        As you testified, there's one
7  travel agency that News Corp. employees and
8  The New York Post employees use, correct?
9    A   I did.
10   Q   Now my question to you is: Do you
11 know if that travel agency sends its bills
12 for its travel-related services to News
13 Corp. or The New York Post?
14   A   It depends on what services we're
15 talking about.
16       If it's for services that were
17 provided to New York Post employees, then
18 The New York Post pays those bills.
19       If it was for services that News
20 Corporation employees were provided with,
21 then News Corporation pays those bills.
22   Q   How do you know that The New York
23 Post pays this travel agency directly for
24 services provided for New York Post
25 employees?
```

```
1          JORDAN LIPPNER
2    A   I'm sorry.  Can you repeat that?
3    Q   Well, you said that The New York
4  Post pays the invoices it receives from this
5  travel agency for travel that it helped
6  arrange for New York Post employees,
7  correct?
8    A   Uh-huh.
9    Q   How do you know that?
10   A   Because The New York Post maintains
11 a separate financial operation than News
12 Corporation.
13       New York Post operates as -- you
14 know, it's an independent company that
15 ultimately is wholly owned by News
16 Corporation.  But The New York Post gets
17 bills for all of the expenses that it incurs
18 in the course of its operations and it pays
19 for those bills.
20   Q   Have you ever seen a bill from this
21 travel agency sent to The New York Post?
22   A   No.
23   Q   Have you ever seen a bill from this
24 travel agency sent to News Corp.?
25   A   I probably have for my own
```

```
1          JORDAN LIPPNER
2  traveling.
3    Q   I'm asking you as you sit here, do
4  you know for a fact that you've seen a bill
5  from this travel agency sent to News
6  Corporation?
7    A   As I sit here, I can't a hundred
8  percent say yes.
9    Q   So is it your testimony, then, when
10 you travel News Corporation pays the travel
11 agency for your travel?
12   A   No.  News America Incorporated
13 does.
14   Q   I'm asking about News Corporation.
15 As you sit here today, have you ever seen a
16 bill from the travel agency sent to News
17 Corporation for any travel arrangement that
18 it arranged for News Corp. employees?
19   A   No.
20   Q   Who made the decision to use one
21 travel agency for News Corp. and The New
22 York Post employees?
23       MR. LERNER: Objection.
24   A   I have no idea when or how the
25 arrangement originally started, but also as
```

```
1          JORDAN LIPPNER
2  I testified earlier it's not just for
3  The New York Post but it's for a lot of
4  different companies that News Corporation
5  wholly owns.
6    Q   Do you know who made the decision
7  to use this travel agency for any of News
8  Corporation's companies?
9    A   I don't know who selected it.
10      (Lippner Exhibit 18, Travel
11    document, Bates Numbers NYP-3894
12    through NYP-3900, was marked for
13    Identification.)
14   Q   Mr. Lippner, I'm showing you now
15 what's been marked as Lippner Deposition
16 Exhibit 18, NYP-3894 through 3900.
17      I'll represent to you this is a
18 document that was produced by New York Post
19 in discovery in this case.
20      Please take a moment to review it
21 and tell us if you recognize it.
22      MR. LERNER: There's some
23 handwritten notations on this
24 document.
25      I'd like to consult with my client
```

Page 382

JORDAN LIPPNER

1
2       about them, make sure that I
3       understand --
4           MR. THOMPSON:  Go ahead.  Let's
5       take a break.  Sure.
6           MR. LERNER:  Very short break.
7           MR. THOMPSON:  Okay.
8           THE VIDEOGRAPHER:  The time is
9       7:16 p.m.  Off the record.
10          (A brief recess was
11      taken.)
12          THE VIDEOGRAPHER:  The time is
13      7:27 p.m.  We're on the record.
14      BY MR. THOMPSON:
15          Q    Mr. Lippner, does News Corporation
16      maintain a business bank account?
17          A    I don't understand the question.
18          Q    News Corporation, does it maintain
19      a business bank account as a corporation?
20          A    It has its own bank account.
21          Q    Where, in what bank does News Corp.
22      maintain its business bank account?
23          A    I don't know which bank it is.
24          Q    Does New York Post have a business
25      bank account?

Page 383

JORDAN LIPPNER

1
2           A    Yes.
3           Q    What bank does The New York Post
4       maintain its business bank account?
5           A    I don't know the name of the bank.
6           Q    Mr. Lippner, as the 30(b)(6)
7       witness for News Corp. and The New York
8       Post, why don't you know where News Corp.
9       maintains its business bank account?
10          MR. LERNER:  Objection.
11          Your 30(b)(6) Deposition Notice
12      states, on 4, if that's the one are focus
13      on --
14          MR. THOMPSON:  No, I'm not.
15      I'm focused on Item 1,
16      Interrelatedness of the companies.
17          MR. LERNER:  How the operations
18      of the companies are related.
19          MR. THOMPSON:  That's right and
20      banking is part of the operations.
21          MR. LERNER:  I would disagree.
22          MR. THOMPSON:  You can disagree
23      all you want.  It's clear in terms of
24      the Dep Notice.
25      BY MR. THOMPSON:

Page 384

JORDAN LIPPNER

1
2           Q    Mr. Lippner, is it your testimony
3       that you have absolutely no idea --
4           MR. LERNER:  Objection.  You
5       are not going to harass and badger
6       the witness with terms like "you have
7       absolutely no idea" and as the
8       30(b)(6) witness, which you have done
9       repeatedly during the course of this
10      deposition.
11          If you have a question to ask him
12      about the scope of his knowledge, please
13      ask it to him in a professional and even
14      manner.
15          MR. THOMPSON:  I asked you to
16      lower your voice, Mr. Lippner.  I
17      know it's late, but just remain calm.
18          MR. LERNER:  My voice wasn't
19      raised.
20          MR. THOMPSON:  State your
21      objection.  Don't raise your voice.
22          MR. LERNER:  My voice wasn't
23      raised.
24          Q    Mr. Lippner, does News Corporation
25      have a system in place for paying employees

Page 385

JORDAN LIPPNER

1
2       their salaries?
3           MR. LERNER:  Objection.
4           A    News Corporation pays its employees
5       salaries.
6           I'm not -- I don't really
7       understand the question.
8           Q    Let me ask it differently.
9           How does News Corporation go about
10      paying salaries of its employees?
11          MR. LERNER:  Objection.
12          A    It issues paychecks from its
13      Payroll Department.
14          Q    Do you know or are you guessing?
15          A    I'm telling you that there's a
16      Payroll Department and Payroll Department
17      pays paychecks.
18          I'm not really sure what you are
19      asking me.
20          Q    Do you know if News Corp. pays
21      employees their salaries by making direct
22      deposit to an employee's bank account?
23          A    If an employee signs up for direct
24      deposit.
25          Q    What company does News Corp. use to

Page 386

JORDAN LIPPNER
1
2  make the direct deposit payments to
3  employees' bank accounts?
4      A    I don't understand the question.
5      Q    Well, do you know if News Corp.
6  makes direct deposit payments to employees
7  when they pay them their salary?
8      A    What I know is that a company
9  called ADP is used.
10     Q    Okay.
11     A    And people will get either hard
12 copy paychecks or they will get direct
13 deposit paychecks if they have signed up for
14 direct deposit.
15     Q    And do you know if this company ADP
16 also makes -- strike that.
17         Do you know if The New York Post
18 also uses ADP to pay its employees their
19 salaries?
20     A    I believe that The New York Post
21 does use ADP.
22     Q    How long has News Corp. and The New
23 York Post both used ADP to pay employees
24 their salaries?
25     A    I don't know the answer to that

Page 387

JORDAN LIPPNER
1
2  question.
3      Q    When did News Corp. first start
4  using ADP to start paying its employees
5  their salaries?
6      A    I don't know the answer to that
7  question.
8      Q    When did The New York Post first
9  start using ADP to pay its employees their
10 salaries?
11     A    I don't know the answer to that
12 question.
13     Q    Who made the decision to use ADP to
14 pay the salaries of News Corp. employees?
15         MR. LERNER:  Objection.
16     A    I don't know specifically who, but
17 I can tell you it would have been a News
18 Corporation employee.  And likewise, I can
19 tell you that when The New York Post decided
20 to go with ADP, it would have been The New
21 York Post making that decision.
22     Q    I want you to identify The New York
23 Post employee who made the decision to use
24 ADP to pay The New York Post salaries.
25     A    I can't.

Page 388

JORDAN LIPPNER
1
2      Q    Well, do you know if there's one
3  individual at ADP who is responsible for
4  paying the salaries to News Corp. and
5  salaries to New York Post employees?
6          MR. LERNER:  Objection.
7      A    No, I don't.
8      Q    Do News Corp. and The New York
9  Post -- strike that.
10         Do you know if News Corp. and
11 The New York Post use any companies in
12 common with respect to health benefits given
13 to their employees?
14     A    Yes.
15     Q    What companies do News Corp. and
16 The Post share in common with respect to
17 employee health benefits?
18     A    News America Incorporated has on
19 behalf of News Corporation, News America
20 Incorporated, FOX Television -- I believe
21 FOX Television, I'm pretty sure it's FOX
22 Television, HarperCollins Publishers, News
23 America Marketing -- there may be others --
24 has gone out and purchased health insurance
25 plans using the economy of scale for

Page 389

JORDAN LIPPNER
1
2  bringing in the purchasing power of all of
3  the employees of all these wholly owned subs
4  to lower the costs of getting health
5  insurance for everybody.
6          And that News America Incorporated
7  purchases and sets up these plans, and then
8  they are then available for the different
9  subsidiaries, and in one case the parent
10 company, to participate either exactly as
11 News America Incorporated has set it up for
12 its own employees or to modify the plan.
13 You know, whether it's tweaking what the
14 plan offers or adjusting what the rates are
15 for the employee to participate and purchase
16 that health insurance.
17         But that what's done, so there's a
18 couple health insurance plans that News
19 America Incorporated has purchased.  In
20 these schemes that I've discussed I think
21 there's a United Healthcare plan.
22         There may be more but that's
23 generally how it works.
24     Q    So is it your understanding,
25 Mr. Lippner, that News Corp. employees and

Page 390

JORDAN LIPPNER

1
2  New York Post employees share the same
3  healthcare company with respect to some of
4  their benefits?
5      A    I believe that Aetna plans and
6  United Healthcare plans are available to
7  News Corp. employees, to News America
8  employees, HarperCollins employees, yes.
9      Q    How long have News Corp. and New
10 York Post employees been allowed to use the
11 same health plans, as far as you know?
12     A    News America Incorporated has been
13 purchasing on behalf of others, meaning
14 other companies that are wholly owned by
15 News Corp., for many years.
16          Definitely dating back to the time
17 when your clients were employed.
18          And again, it's up to each
19 individual company if they just want to
20 participate in the same way that News
21 America Incorporated does or if they want to
22 alter the plan and set it up for themselves.
23     Q    Do you know if News Corp. employees
24 share the same life insurance company with
25 New York Post employees?

Page 391

JORDAN LIPPNER

1
2      MR. LERNER:  Objection.
3      A    I don't.
4      Q    Now, when Ms. Guzman worked at the
5  company, did News Corp. employees and New
6  York Post employees also share the same
7  healthcare plans with Aetna and United
8  Healthcare?
9      A    Well, again, I'm not sure what you
10 mean when you say "share."
11         You know, these are plans that
12 exist that Aetna offers to millions of
13 people.
14         News America Incorporated has
15 purchased plans that offer, for example,
16 News America Incorporated employees a
17 handful of choices, different choices of
18 benefits at different costs, and News
19 America Incorporated for its employees,
20 which includes me, sets the rates of
21 participation.
22         The New York Post can choose to
23 take that exact plan and offer it to its
24 people, it can modify it if it wants to and
25 it can change the rates.

Page 392

JORDAN LIPPNER

1
2          And that structure has been going
3  on for years.
4      Q    Was that structure in place before
5  Ms. Guzman started working as an associate
6  editor?
7      A    I can't say for sure that it was in
8  place before she started.  I believe -- I'm
9  not exactly positive when it began.  I know
10 that it definitely was in place while she
11 was employed.
12     Q    Is that structure still in place to
13 this day?
14     A    Yes.
15     Q    Do you know who made the decision
16 to have News America Incorporated purchase
17 these health benefit plans for News Corp.
18 and its subsidiaries?
19     MR. LERNER:  Object to form.
20     A    I don't -- I believe that decision
21 was made before I started.  And assuming I'm
22 correct about that, that would actually
23 answer your prior question which means it
24 did start before your client started.
25         But again, it was a decision that

Page 393

JORDAN LIPPNER

1
2  was based on economies of scale, that the
3  buying power for lots and lots of employers
4  would lower the cost for everybody.
5          And that's why it was done as
6  opposed to just letting each individual
7  wholly owned subsidiary fend for itself and
8  purchase on the phone health insurance which
9  would have in the end cost each individual
10 company more money, cost all the employees
11 more money, and in the end put a drain on
12 the whole company going up to News
13 Corporation as a whole.
14     Q    I want to now direct your attention
15 to Deposition Exhibit 18.
16     A    Yes, sir.
17     Q    Do you see where it says Section 2,
18 Designated Agency?
19     A    I do.
20     Q    It says "All employees are required
21 to use the News Travel online booking system
22 or, as a second choice, the corporate travel
23 agents listed blow to handle all business
24 travel arrangements."
25         Do you see that?