# **EXHIBIT 2**

```
                                                              Page 1
 1
 2            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF NEW YORK
 3            Case No. 09-CIV-9832 (BSJ)(RLE)
              Case No. 09-CIV-9323 (BSJ)(RLE)
 4
 5   ----------------------------------------x
     AUSTIN FENNER and IKIMULISA LIVINGSTON,
 6
 7                        Plaintiffs,
 8       v.
 9   NEWS CORPORATION, NYP HOLDINGS, INC.,
10   d/b/a THE NEW YORK POST and DAN GREENFIELD
11   and MICHELLE GOTTHELF,
12                        Defendants.
     ----------------------------------------x
13   SANDRA GUZMAN,
14                        Plaintiff,
15       v.
16   NEWS CORPORATION, NYP HOLDINGS, INC.,
17   d/b/a THE NEW YORK POST and COL ALLAN, in
18   his official and individual capacities,
19                        Defendants.
     ----------------------------------------x
20                   CONFIDENTIAL
21       VIDEOTAPED DEPOSITION OF AMY SCIALDONE
22       New York, New York
23       Thursday, June 28, 2012
24   Reported by:
     Amy A. Rivera, CSR, RPR, CLR
25   JOB NO. 51053
```

Page 6

1  AMY SCIALDONE - CONFIDENTIAL
2  truthfully?
3      A.  No.
4      Q.  Have you consumed or taken anything
5  today that would affect your ability to think
6  clearly?
7      A.  No.
8      Q.  Is there any other reason that you
9  might not be able to testify fully and truthfully
10 today?
11     A.  No.
12     Q.  Now, I want to go over some basic
13 ground rules for the deposition.
14         The first thing is you need to answer
15 verbally so we have a clear record.  Is that
16 clear?
17     A.  Yes.
18     Q.  If you want to take any breaks, that's
19 fine, let me know when you'd like to take one for
20 whatever reason.  The only thing I would ask you
21 if there's a question pending, that we answer the
22 question before we take a break.  Is that clear?
23     A.  Yes.
24     Q.  And please wait until I finish the
25 question.  A lot of times in conversation people

Page 7

1  AMY SCIALDONE - CONFIDENTIAL
2  will jump in, but it's important that I finish my
3  question completely before you answer.  Is that
4  clear?
5      A.  Yes.
6      Q.  The same token, I will try not to cut
7  you off, but you might pause for a reason and you
8  might not be done with your answer and I may begin
9  to ask another question.  So please let me know if
10 you're not done with your answer and I start to
11 ask something else, please let me know.  Stop me
12 and say, wait, I'm not done with my answer.  I
13 need to complete it."  Is that clear?
14     A.  Yes.
15     Q.  If -- if -- if you stop and then I go
16 on and you don't stop me, I'll have to assume that
17 was -- that was your full answer.  Is that
18 understood?
19     A.  Yes.
20     Q.  Now, if you don't understand the
21 question, it's no problem, just ask me to repeat
22 it.  I'll try and repeat it or rephrase it, or if
23 you just need to have a question read back, we can
24 have the question repeated.  Is that clear?
25     A.  Yes.

Page 8

1  AMY SCIALDONE - CONFIDENTIAL
2      Q.  If -- if you answer a question, it
3  will be assumed that you understand it.  So, it's
4  important that you understand the question before
5  you answer.  Okay?  Is that clear?
6      A.  Yes.
7      Q.  Now, could you describe your
8  educational background after high school?
9      A.  I went to University -- University of
10 Florida and received a bachelor of science in
11 advertising and a minor in marketing.
12     Q.  Did you do any postgraduate work?
13     A.  No.
14     Q.  Have you received any other degrees
15 other than the bachelor of science from the
16 University of Florida?
17     A.  No.
18     Q.  Now, what is your current job
19 assignment?
20     A.  Vice president of human resources for
21 the New York Post.
22     Q.  And how long have you been vice
23 president of human resources for the New York
24 Post?
25     A.  Six and a half years.

Page 9

1  AMY SCIALDONE - CONFIDENTIAL
2      Q.  Are you currently head of human
3  resources for the New York Post?
4         MR. PIESCO:  Objection.
5         You can answer.
6      A.  Yes.
7      Q.  So, there's no one in human resources
8  that would be above you, correct?
9      A.  Correct.
10     Q.  Now, at one point was there a senior
11 vice president of human resources that you
12 reported to?
13     A.  Yeah, there was a senior vice
14 president of human resources, marketing and
15 digital media.
16     Q.  And you were vice president for a
17 period of time when there was also a senior vice
18 president that you reported to?
19        MR. PIESCO:  Objection.
20        You can answer.
21     A.  Yes.
22     Q.  And who was that senior vice
23 president?
24     A.  Jennifer Jehn.
25     Q.  Have your job responsibilities --

Page 10

```
 1        AMY SCIALDONE - CONFIDENTIAL
 2   well, actually, strike that.
 3          When did Jennifer Jehn cease being
 4   senior vice president at New York Post?
 5          MR. PIESCO:  Objection.
 6          You can answer.
 7      A.  In 2010.
 8      Q.  Did your job responsibilities change
 9   in 2010 when Jennifer Jehn left?
10      A.  Yes.
11      Q.  How did they change?
12      A.  I had more broad responsibility and
13   decision making.
14      Q.  So, at that point, you became the head
15   of HR for the New York Post?
16      A.  Yes.
17      Q.  And did you take over all of
18   Ms. Jehn's responsibilities with respect to human
19   resources?
20      A.  Yeah, that's my understanding.
21      Q.  So, you've been vice president for
22   human resources you said about six and a half
23   years.  Is that right?
24      A.  Yes.
25      Q.  Did you work for The Post prior to
```

Page 11

```
 1        AMY SCIALDONE - CONFIDENTIAL
 2   becoming senior -- I'm sorry, strike that.
 3          Did you work for The Post prior to
 4   becoming vice president for human resources about
 5   six and a half years ago?
 6      A.  Yes.
 7      Q.  What position did you have with the
 8   New York Post prior to becoming vice president for
 9   human resources?
10      A.  I was a director of training and
11   development.
12      Q.  Director of training and development
13   for what aspect of the company?
14          MR. PIESCO:  Objection.
15          You can answer.
16      A.  In HR, for all aspects of the company.
17      Q.  So, you conducted HR training prior to
18   becoming vice president of human resources?
19      A.  Yes.
20      Q.  And how long were you director of
21   training for the New York Post?
22      A.  Approximately a year.
23      Q.  One year?
24          Did you have any other position with
25   the New York Post other than the two we've already
```

Page 12

```
 1        AMY SCIALDONE - CONFIDENTIAL
 2   discussed?
 3          MR. PIESCO:  Objection.
 4          You can answer.
 5      A.  Yes, several.
 6      Q.  Okay.  What was the next most recent
 7   position you had with the New York Post before
 8   being director of training?
 9      A.  Director of sales training and
10   development within the sales organization.
11      Q.  And how long were you director of
12   sales training?
13      A.  About a year.
14      Q.  And what was your position -- next
15   most recent position with the New York Post before
16   you became director of sales training?
17      A.  I was an advertising sales manager.
18      Q.  How long were you an advertising sales
19   manager?
20      A.  Approximately 10, 11 years.
21      Q.  Did you have a position with the New
22   York Post before you were advertising sales
23   manager?
24      A.  Yes.
25      Q.  What was that position?
```

Page 13

```
 1        AMY SCIALDONE - CONFIDENTIAL
 2      A.  Advertising account executive.
 3      Q.  How long were you an advertising
 4   account executive?
 5      A.  A couple years.
 6      Q.  Did you have any other positions with
 7   the New York Post other than those we've just
 8   covered?
 9      A.  No.
10      Q.  So, how long in total have you been
11   working for the New York Post?
12      A.  Twenty-one years.
13      Q.  Have you worked for any companies
14   other than the New York Post?
15      A.  Can you clarify -- during the 21
16   years?
17      Q.  Well, sure.  During the 21 years, has
18   there been any other employers you've worked for
19   other than the New York Post?
20      A.  No.
21      Q.  Prior to coming to the New York Post,
22   did you have any other employment?
23      A.  Yes.
24      Q.  What was the most recent company you
25   worked for before you came to the New York Post?
```

Page 14

AMY SCIALDONE - CONFIDENTIAL

A. Festival Productions.
Q. What is Festival Productions.
A. An entertainment company.
Q. Is Festival Productions associated with News Corporation in any way?
A. No.
Q. How long were you at Festival Productions?
A. A one-year assignment.
Q. Who did you work for just prior to coming to Festival Productions?
A. Scali, McCabe, Sloves Advertising Agency.
Q. How long did you work for Scali, McCabe Advertising?
A. Two years.
Q. Did you work for anyone else prior to Scali, McCabe Advertising?
A. Grey Advertising.
Q. Grey Advertising?
A. Yes.
Q. Did you work for anyone prior to Grey Advertising?
A. No.

Page 15

AMY SCIALDONE - CONFIDENTIAL

Q. Is either Scali, McCabe Advertising or Grey Advertising associated with News Corp. in anyway?
A. No.
Q. Do you remember who first hired you to work for the New York Post?
A. Gilda Hicks.
Q. And is Gilda Hicks still with The Post?
A. No.
Q. Do you recall who promoted you from advertising account executive to advertising sales manager?
A. Bob Scott.
Q. Bob Stott?
A. Bob Scott.
Q. Scott?
A. Yeah, Scott.
Q. S-C-O-T-T?
A. Yes.
Q. And do you recall who promoted you to director of sales training?
A. John Ancona.
Q. Who is John Ancona?

Page 16

AMY SCIALDONE - CONFIDENTIAL

A. The vice president of advertising.
Q. For the New York Post?
A. Yes.
MR. PIESCO: At the time?
THE WITNESS: At the time.
Q. So, he's no longer vice president of advertising?
A. Correct.
Q. Is he -- John Ancona still with the New York Post?
A. No.
Q. And do you recall who promoted you to director of training?
A. I don't.
Q. Okay. Would it have been Jennifer Jehn?
A. No.
Q. Could you describe for me your basic job responsibilities when you were director of training for the New York Post?
A. In the HR department?
Q. Right.
A. Right. I was looking at the entire organization and how we can implement training

Page 17

AMY SCIALDONE - CONFIDENTIAL

initiatives, similar things we did in the sales team, to expand them out through the organization.
Q. What kind of training initiatives are you talking about?
A. It began with management essentials training.
Q. Okay. Anything else?
A. I was doing assessments on what the needs were at that point.
Q. When you were director of training for HR at the New York Post, did you conduct any training on harassment in the workplace?
MR. PIESCO: Objection.
You can answer.
A. No.
Q. When you were director of training in HR for the New York Post, did you conduct any training with respect to discrimination in the workplace?
MR. PIESCO: Objection.
You can answer.
A. No, not personally.
Q. When you were director of training, did you conduct any training of employees with

Page 18

1  AMY SCIALDONE - CONFIDENTIAL
2  respect to retaliation in the workplace?
3      MR. PIESCO: Objection.
4      You can answer.
5   A.  No, I didn't personally.
6   Q.  When you were director of training, do
7  you know if anyone conducted training of New York
8  Post employees with respect to The Post policy
9  towards harassment in the workplace?
10     MR. PIESCO: Objection.
11     You can answer.
12  A.  Yes.
13  Q.  Who was that person or persons?
14  A.  My legal counsel, Jordan Lippner.
15  Q.  Was there anyone else?
16  A.  No.
17  Q.  Just to clarify, was there anyone also
18 you know of or do you know if there was anyone
19 else other than Jordan Lippner who conducted
20 training on harassment in the workplace?
21     MR. PIESCO: Objection.
22     You can answer.
23  A.  While I was the director?
24  Q.  Right, when you were the director.
25  A.  When I was the director, Jordan

Page 19

1  AMY SCIALDONE - CONFIDENTIAL
2  conducted the training for harassment.
3   Q.  Who promoted you to vice president of
4  human resources?
5   A.  Jennifer Jehn.
6   Q.  And who do you report to now?
7   A.  Paul Carlucci.
8   Q.  Do you know if there were any
9  discussions when Jennifer Jehn left as to whether
10 or not there would be another senior vice
11 president appointed to take over her role in HR?
12     MR. PIESCO: Objection.
13  A.  No.
14  Q.  Was there ever any discussion as far
15 as you know of promoting you to senior vice
16 president of HR?
17     MR. PIESCO: Objection.
18  A.  No.
19  Q.  And do you currently report to Paul
20 Carlucci?
21  A.  Yes.
22  Q.  Who is Paul Carlucci?
23  A.  The publisher of the New York Post.
24  Q.  And who does Paul Carlucci report to?
25  A.  I don't know.

Page 20

1  AMY SCIALDONE - CONFIDENTIAL
2   Q.  Do you know who Paul Carlucci works
3  for?
4      MR. PIESCO: Objection.
5   A.  No.
6   Q.  Do you know if he is an employee of
7  some division or subsidiary of News Corporation?
8      MR. PIESCO: Objection.
9   A.  I don't know exactly.
10  Q.  I didn't ask you exactly, I'm merely
11 asking you do you know if he works for some
12 company affiliated with News Corporation?
13     MR. PIESCO: Objection.
14  A.  I know he works for the New York Post
15 and News America Marketing.
16  Q.  So, Paul Carlucci works for News
17 America Marketing?
18     MR. PIESCO: Objection.
19  A.  Yes.
20  Q.  And is News America Marketing
21 affiliated with News Corporation in any way?
22     MR. PIESCO: Objection.
23  A.  It's my understanding they're a
24 subsidiary.
25  Q.  Do you have any idea why Paul

Page 21

1  AMY SCIALDONE - CONFIDENTIAL
2  Carlucci, the publisher of The Post, is employed
3  by News America Marketing?
4      MR. PIESCO: Objection.
5   A.  I don't know who Paul's employed by.
6   Q.  I thought you just said that Paul
7  Carlucci works for News America Marketing?
8      MR. PIESCO: Objection.
9   A.  Paul's the publisher of the New York
10 Post and oversees News America Marketing.
11  Q.  And he --
12  A.  That's my understanding --
13  Q.  -- he oversees --
14  A.  -- if I misspoke.
15  Q.  He oversees News America Marketing.
16     MR. CLARK: Now, could you read back
17 the -- the answer about -- about two
18 questions ago on News America Marketing?
19     (Record read.)
20 BY MR. CLARK:
21  Q.  Okay. So, you testified a minute ago
22 that Paul Carlucci works for News America
23 Marketing. Is that correct?
24  A.  That's my understanding.
25  Q.  Okay.

Page 22

1  AMY SCIALDONE - CONFIDENTIAL
2       And do you have any understanding as
3  to why the publisher of the New York Post works
4  for News America Marketing?
5       MR. PIESCO: Objection.
6       A.  No.
7       Q.  Do you know what Paul Carlucci's role
8  at the paper is?
9       MR. PIESCO: Objection.
10      A.  At the New York Post?
11      Q.  Right. Actually, let me rephrase
12 that.
13      As the publisher, what -- what is the
14 role of publisher at the New York Post?
15      MR. PIESCO: Objection.
16      If you know.
17      A.  I don't know.
18      Q.  You don't know any of his job
19 responsibilities?
20      MR. PIESCO: Objection.
21      Don't guess.
22      A.  No.
23      Q.  Does Paul Carlucci ultimately oversee
24 human resources decisions made at The Post?
25      MR. PIESCO: Objection.

Page 23

1  AMY SCIALDONE - CONFIDENTIAL
2       A.  I don't know.
3       Q.  Have you ever gone to Paul Carlucci
4  for a decision about human resources?
5       MR. PIESCO: Objection.
6       A.  Yes.
7       Q.  So, at least in some instances, Paul
8  Carlucci had a say after you about human resources
9  decision, correct?
10      MR. PIESCO: Objection.
11      Mischaracterization of the testimony.
12      Q.  Would you agree with that?
13      A.  Can you repeat the question, please?
14      MR. CLARK: Could you read that back?
15      (Record read.)
16      MR. PIESCO: Please note my objection.
17      A.  Yes.
18      Q.  Now, in your -- when you became --
19 when -- I'm sorry.
20      When you were vice president of human
21 resources but before Ms. Jehn left, could you
22 describe your job responsibilities during that
23 period of time?
24      A.  I was overseeing the HR team. We had
25 created a sales development program and

Page 24

1  AMY SCIALDONE - CONFIDENTIAL
2  implemented it. We had created and implemented
3  performance appraisals. We delivered training.
4  We did recruiting.
5       Q.  Anything else?
6       A.  Those are the major pieces.
7       Q.  Who made the decision to implement
8  performance appraisals?
9       A.  Paul.
10      Q.  Paul Carlucci?
11      A.  Yes.
12      Q.  And when was that decision made to
13 implement performance appraisals?
14      A.  I don't know.
15      Q.  When you were involved in recruiting
16 in the period we just talked about, that is when
17 you were vice president but before Ms. Jehn left,
18 were you involved in any attempt to recruit
19 minorities for the paper?
20      MR. PIESCO: Objection.
21      You can answer.
22      A.  All the recruiting we do, we follow
23 our equal opportunity -- we're an equal
24 opportunity employer, so we follow that guideline.
25 And when we advertise, we advertise en masse

Page 25

1  AMY SCIALDONE - CONFIDENTIAL
2  locations to make sure that we're reaching people
3  who are interested in our jobs and the best
4  qualified candidates.
5       Q.  Have you made -- again, though, when
6  you were in this position and involved in
7  recruiting, do you know of any efforts
8  specifically to recruit minorities to work for the
9  paper?
10      MR. PIESCO: Objection.
11      A.  We also attended -- I had someone on
12 my team attend the National Association of Black
13 Journalists Convention. We hosted interns from
14 high school who could further stay in touch and
15 develop.
16      MR. PIESCO: You need to speak up
17 because I can't --
18      THE WITNESS: Okay.
19      MR. PIESCO: -- with the nose outside.
20 I'm having trouble.
21      I'm sorry, Paul.
22      MR. CLARK: That's fine. It does tend
23 to get noisy here.
24      Q.  But please continue. You were talking
25 you hosted interns?

```
                                    Page 58
 1       AMY SCIALDONE - CONFIDENTIAL
 2    A.  I don't know that.
 3    Q.  Okay.  Col Allan -- "he" being Col
 4  Allan.
 5       Do you know if Dan Greenfield has
 6  taken COMPASS?
 7    A.  I don't recall.
 8    Q.  Do you know if Dan Greenfield has
 9  reviewed the standards of business conduct?
10    A.  I don't know.
11    Q.  Do you know if Michelle Gotthelf has
12  taken COMPASS?
13    A.  I don't recall.
14    Q.  Do you know if Michelle Gotthelf has
15  reviewed the standards of business conduct?
16    A.  I don't know.
17    Q.  Have you ever personally trained New
18  York Post employees about how to file a complaint
19  of employment discrimination?
20       MR. PIESCO:  Objection.
21       Paul -- Paul, you want to read that
22  one and try it again?
23       MR. CLARK:  Can you read it back?
24       (Record read.)
25
```

```
                                    Page 59
 1       AMY SCIALDONE - CONFIDENTIAL
 2  BY MR. CLARK:
 3    Q.  Go ahead.
 4       MR. PIESCO:  Objection.
 5       MR. CLARK:  I don't know what your
 6  objection is.
 7    A.  Can you define "trained," "personally
 8  trained"?
 9       MR. PIESCO:  Can you define
10  "complaint."
11       I mean, train them to go file a
12  corporate complaint against The Post?
13       MR. CLARK:  No.  There are other
14  types -- there are other types of
15  complaints.
16       MR. PIESCO:  I -- I get that.  I'm
17  just -- I will object to the question.
18       I'm sorry.  Answer it, if you
19  understand it.
20    Q.  You said -- you said you provided
21  training, correct, ma'am?
22    A.  Yes.
23    Q.  All I want to know is have you
24  provided training to employees on how to make a
25  complaint or an allegation of harassment in the
```

```
                                    Page 60
 1       AMY SCIALDONE - CONFIDENTIAL
 2  workplace?
 3       MR. PIESCO:  Objection.
 4       You can answer.
 5    A.  In training, we let people know they
 6  should be coming to HR if they have a complaint of
 7  any kind, in the standards of business conduct, in
 8  the policies, it states the same thing, and that
 9  there's an alert line.
10    Q.  Have you personally provided that
11  training to New York Post employees?
12       MR. PIESCO:  Objection.
13       You can answer.
14    A.  In the -- in the management training,
15  I have.
16    Q.  Describe for me what you tell
17  employees about how they should make the complaint
18  about discrimination in the workplace.
19       MR. PIESCO:  Objection.
20    A.  In the training for the managers, we
21  tell them if they are aware of a complaint, that
22  they should call us, call our legal counsel, or
23  the alert line, and make us aware of it.
24    Q.  And when you say, "our legal counsel,"
25  are you referring to Jordan Lippner?
```

```
                                    Page 61
 1       AMY SCIALDONE - CONFIDENTIAL
 2    A.  Yes.
 3    Q.  Would there be other attorneys other
 4  than Jordan Lippner they could complain to?
 5       MR. PIESCO:  Objection.
 6    A.  I don't know.
 7    Q.  And what is the "alert line"?
 8    A.  It's a confidential number that
 9  employees are made aware of if they have any
10  complaints.
11    Q.  How are employees made aware of this
12  confidential number?
13    A.  It's listed in the standards of
14  business conduct.
15    Q.  So, if an employee wanted to know what
16  number to call, they would look in the standards
17  of business conduct?
18    A.  Yes.
19    Q.  Is this alert line operated by the New
20  York Post?
21    A.  No.
22    Q.  Who is it operated by?
23    A.  I don't know who it's operated by.
24    Q.  Is it operated by News Corporation?
25       MR. PIESCO:  Objection.
```

Page 62

AMY SCIALDONE - CONFIDENTIAL
1
2   A.   I don't know who it's operated by.
3   Q.   Is it operated by an entity associated
4 with News Corporation?
5        MR. PIESCO:  Objection.
6   A.   I don't know who it's operated by.
7   Q.   You don't know whether it's operated
8 by any entity associated with News Corporation?
9        MR. PIESCO:  Objection.
10  A.   I don't know who it's operated by.
11  Q.   That's not the question.  I mean, I
12 assume what you're saying is you don't know
13 specifically.
14  A.   I don't know.
15  Q.   So, you don't know if it is operated
16 by a company associated with News Corporation?
17       MR. PIESCO:  Objection.
18       How many times do you want her to
19  answer?
20       MR. CLARK:  That's a yes-or-no
21  question.  She answered it --
22       MR. PIESCO:  She did.  She said, I
23  don't know three times.  I'm looking at it.
24  I don't know, I don't know, I don't know.
25

Page 63

1        AMY SCIALDONE - CONFIDENTIAL
2  BY MR. CLARK:
3    Q.  So, your answer is no, you don't know
4  whether it's associated with News Corporation?
5        MR. PIESCO:  Objection.
6        Either you know or you don't know.
7    A.  I don't know.
8    Q.  It's a yes or a no, either you know or
9  you don't?
10   A.  I don't know.
11       MR. PIESCO:  Would you mind if we take
12  a break?
13       MR. CLARK:  No, that's fine.
14       How long do you need?
15       MR. PIESCO:  Two minutes?  Five
16  minutes?  I just need to use the restroom.
17       VIDEOGRAPHER:  The time is 11:10 a.m.
18       We're off the record.
19       (Recess.)
20       VIDEOGRAPHER:  The time is 11:17 a.m.
21       We're on the record.
22  BY MR. CLARK:
23   Q.  Ms. Scialdone, when --
24   A.  Yeah.
25   Q.  -- we took our break, we were

Page 64

1        AMY SCIALDONE - CONFIDENTIAL
2  discussing ways employees could complain about
3  harassment in the workplace, and I want to make
4  sure we've covered all of those.
5        I think you mentioned a couple.  You
6  mentioned calling alert line, speaking to legal
7  counsel.  Are there any other ways consistent with
8  the New York Post policy that employees could
9  complain about harassment in the workplace?
10       MR. PIESCO:  Objection.
11       She -- she also testified coming to
12  HR.
13       THE WITNESS:  Yeah, I was going to
14  clarify that.
15       MR. PIESCO:  That's okay.
16       Go ahead.
17   Q.  Okay, good.  So -- so, coming to -- to
18  human resources department would be another way?
19   A.  Yes, and their manager directly, or a
20  supervisor.
21   Q.  Or their -- have -- it would have to
22  be their direct supervisor or would coming to any
23  supervisor be appropriate?
24   A.  They could go to any supervisor --
25  supervisor.

Page 65

1        AMY SCIALDONE - CONFIDENTIAL
2    Q.  Okay.  Are that any other ways that an
3  employee -- that -- strike that.
4        Are there any other ways available
5  under the New York Post policies for an employee
6  to make a complaint about harassment in the
7  workplace?
8        MR. PIESCO:  Objection.
9        You can answer.
10   A.  Those are the ones we discussed.
11   Q.  There's no others -- no others you can
12  think of today?
13       MR. PIESCO:  Objection.  Asked and
14  answered.
15   A.  No.
16   Q.  Now, would that same -- those same
17  paths apply to complaints of retaliation in the
18  workplace?
19       MR. PIESCO:  Objection.
20       You can answer.
21   A.  Yes.
22   Q.  So, in 2009, was Jennifer Jehn one of
23  the people that it would be appropriate to
24  complain to about discrimination in the workplace?
25       MR. PIESCO:  Objection.

```
                                              Page 66
 1         AMY SCIALDONE - CONFIDENTIAL
 2        You can answer.
 3    A.  If an employee had any complaint, they
 4   could go to Jennifer Jehn, yes.
 5    Q.  And would -- would you have been
 6   another person that an employee could complain to
 7   about discrimination in the workplace?
 8        MR. PIESCO:  Objection.
 9        You can answer.
10    A.  Yes.
11        MR. CLARK:  I'd like to mark this as
12   Exhibit 1 -- Scialdone 1.
13        (Exhibit Scialdone 1, a newspaper
14        cartoon printout dated February 18, 2009,
15        was marked for identification at this time.)
16   BY MR. CLARK:
17    Q.  Ms. Scialdone, we've just marked as
18   Exhibit 1 a page that has a cartoon on it, and the
19   page is dated February 18, 2009.
20        Do you see that?
21    A.  Yes.
22    Q.  Have you ever seen this cartoon
23   before?
24    A.  Yes.
25    Q.  Is this a cartoon that ran in the New
```

```
                                              Page 67
 1         AMY SCIALDONE - CONFIDENTIAL
 2   York Post in February 2009?
 3    A.  That's what the date states, yes.
 4    Q.  Do you have any reason to think that
 5   date's not correct?
 6    A.  I can't hear you with the trucks.  I'm
 7   sorry --
 8    Q.  I'm sorry --
 9    A.  -- can you repeat that?
10    Q.  -- do you have any reason to think
11   that date is incorrect?
12    A.  No.
13    Q.  When was the first time you saw this
14   cartoon?
15    A.  I don't recall.
16    Q.  Did you see it before it was published
17   in the paper?
18    A.  No.
19    Q.  Do you recall if you saw it the day it
20   was published?
21    A.  I don't recall.
22    Q.  What was your reaction the first time
23   you saw the cartoon?
24        MR. PIESCO:  Objection.
25    A.  I don't recall.  I was on vacation.  I
```

```
                                              Page 68
 1         AMY SCIALDONE - CONFIDENTIAL
 2   can't -- I don't recall the first time I saw it or
 3   what my reaction was.
 4    Q.  Okay.  So, you were on vacation on
 5   February 18, 2009?
 6    A.  Yes.
 7    Q.  When did you come back from vacation?
 8    A.  The following week.
 9    Q.  And did you learn about the cartoon
10   before you returned from vacation?
11    A.  Yes.
12    Q.  How did you learn about the cartoon
13   being published?
14    A.  On the radio.
15    Q.  Do you recall when that was?
16    A.  It may have been that afternoon that
17   it ran.
18    Q.  And what did you hear on the radio
19   that -- that first time when you learned about the
20   cartoon?
21    A.  I don't recall exactly, but that there
22   was concern about it.
23    Q.  What kind of concern?
24    A.  I don't recall exactly.
25    Q.  As you sit here today, do you find
```

```
                                              Page 69
 1         AMY SCIALDONE - CONFIDENTIAL
 2   this cartoon to be personally offensive to you?
 3        MR. PIESCO:  Objection.
 4        You can answer.
 5    A.  No.
 6    Q.  You don't believe this cartoon is
 7   offensive --
 8        MR. PIESCO:  Objection.
 9    Q.  -- in your opinion?
10        MR. PIESCO:  Asked and answered.
11    A.  No.
12    Q.  Are you aware of the history of
13   African Americans being depicted as chimpanzees
14   and apes?
15        MR. PIESCO:  Objection.
16    A.  No.
17    Q.  No, you're not aware of that?
18    A.  No.
19    Q.  As you sit here today, you do not know
20   that African Americans have been depicted as
21   chimpanzees?
22        MR. PIESCO:  Objection.  Asked and
23        answered.
24    A.  No.
25    Q.  Prior to returning from vacation, did
```