# **EXHIBIT 4**

Page 1

```
 1                    JENNIFER JEHN
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ------------------------------------------X
      SANDRA GUZMAN,
 4                   Plaintiff,
 5                   -against-      09CIV9323 (BSJ)(RLE)
 6    NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
      THE NEW YORK POST, and COL ALLAN, in his
 7    official and individual capacities,
 8
                     Defendants.
 9    ------------------------------------------X
      AUSTIN FENNER and IKIMULISA LIVINGSTON,
10
11                   Plaintiffs,
12                   -against-      09CIV9832 (BSJ)(RLE)
13    NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
      THE NEW YORK POST and DAN GREENFIELD and
14    MICHELLE GOTTHELF,
15                   Defendants.
      ------------------------------------------X
16
17
18        VIDEOTAPED DEPOSITION OF JENNIFER JEHN
19                  New York, New York
20               Tuesday, June 26, 2012
21
22    REPORTED BY:  BARBARA R. ZELTMAN
                    (BOBBIE)
23              Professional Stenographic Reporter
24
25    Job Number:  51052
```

Page 14

```
 1        JENNIFER JEHN
 2    Q   How long have you worked for Dow
 3  Jones?
 4    A   Over two years.
 5    Q   What's your current position with
 6  them?
 7    A   I'm the head of circulation.
 8    Q   What does it mean being head of
 9  circulation; in other words, what are your
10  job duties as head of circulation?
11    A   I'm responsible for acquisition and
12  retention and marketing to acquire
13  subscriptions to The Wall Street Journal and
14  all of the products of The Wall Street
15  Journal.
16    Q   And prior to two years ago, that
17  is, prior to coming to The Wall Street
18  Journal, what was your employer -- who was
19  your employer?
20        MR. LERNER: Objection.
21    A   The New York Post.
22    Q   And what was your last position at
23  The New York Post?
24    A   I was the Senior Vice President of
25  Marketing, Digital Media and Human
```

Page 15

```
 1        JENNIFER JEHN
 2  Resources.
 3    Q   Senior Vice President of Marketing
 4  and Human Resources.
 5        Is that one job title or did you
 6  actually have two job titles?
 7        MR. LERNER: Objection.
 8        Go ahead.
 9    A   I was Senior Vice President of
10  Marketing, Digital Media and Human
11  Resources.
12    Q   Okay. So that was just one job
13  title?
14    A   Yes.
15    Q   And how long were you senior vice
16  president of Marketing and Human Resources?
17        MR. LERNER: Objection.
18    Q   For the New York Post?
19    A   Over five years.
20    Q   So as senior vice president of
21  Human Resources, did you basically run the
22  Human Resources Department?
23        MR. LERNER: Objection.
24        You can answer.
25    A   I was responsible for Human
```

Page 16

```
 1        JENNIFER JEHN
 2  Resources reporting to me.
 3    Q   Was there anyone in the Human
 4  Resources Department at The Post that was
 5  senior to you?
 6    A   No.
 7    Q   So you were the highest-ranking
 8  human resources executive at The Post?
 9    A   Yes.
10    Q   And as senior vice president of
11  Human Resources, who did you report to?
12    A   Paul Carlucci.
13    Q   And who is Paul Carlucci?
14    A   Paul Carlucci is the publisher of
15  the New York Post.
16    Q   Do you know who Paul Carlucci works
17  for?
18        MR. LERNER: Objection.
19    A   I do not.
20    Q   Have you ever been an employee of
21  News Corporation?
22    A   No.
23    Q   Who hired you -- actually, other
24  than being senior vice president of
25  Marketing and Human Resources, did you have
```

Page 17

```
 1        JENNIFER JEHN
 2  any other positions at The New York Post?
 3    A   No.
 4    Q   So you said you were senior vice
 5  president for about five years. That was
 6  the entire time that you were at The New
 7  York Post; is that correct?
 8    A   Yes.
 9    Q   And who hired you to work for The
10  New York Post?
11    A   Paul Carlucci.
12    Q   And you were never promoted during
13  your time at The Post; you were just at the
14  same position?
15        MR. LERNER: Objection.
16        Do you understand the question?
17        THE WITNESS: I don't
18  understand the question.
19    Q   Your job title -- was your job
20  title the same the entire five years you
21  worked for The New York Post?
22    A   Yes.
23    Q   So would it be fair to say you were
24  never promoted? You came in at a position
25  and you left at the same position, correct?
```

Page 34

```
1       JENNIFER JEHN
2       MR. LERNER: Objection.
3   A   I don't know.
4   Q   Did she work for News America?
5       MR. LERNER: Objection.
6   A   I don't know.
7   Q   Does Jordan Lippner work for News
8 America?
9   A   I don't know.
10  Q   Has Jordan Lippner ever told you
11 who he works for?
12      MR. LERNER: Objection.
13      Don't answer that.
14    (Directive to witness.)
15      MR. LERNER: It's privileged.
16      MR. CLARK: Who Jordan Lippner
17 works for is privileged?
18      Could you explain that one?
19      MR. THOMPSON: Let's take a
20 moment. Let's call the Court.
21      MR. CLARK: Can we go off the
22 record.
23      THE VIDEOGRAPHER: The time is
24 10:50 a.m. Going off the record.
25      (A brief recess was
```

Page 35

```
1       JENNIFER JEHN
2 taken.)
3       THE VIDEOGRAPHER: The time is
4 11:00 a.m. We're back on the record.
5       MR. LERNER: The witness is
6 going to answer the same question
7 about Mr. Lippner.
8       MR. CLARK: Could you read back
9 the last question, please.
10      (Requested portion of record read:
11 "Q. Has Jordan Lippner ever told
12 you who he works for?")
13      (End of read-back.)
14  A   No.
15  Q   Has Jan Constantine ever told you
16 who she worked for in 2009?
17      MR. LERNER: Objection.
18  A   No.
19  Q   And there were no other lawyers
20 that assisted you in learning how to conduct
21 an investigation into an allegation of
22 employment discrimination?
23      MR. LERNER: Objection.
24  A   I don't recall any others.
25  Q   You mentioned earlier that you had
```

Page 36

```
1       JENNIFER JEHN
2 a number of jobs in HR; is that correct?
3   A   I worked in HR.
4   Q   What was the first job you had in
5 HR?
6   A   I worked in HR for News America
7 FSI.
8   Q   And that's News America
9 Freestanding Inserts?
10  A   Yes.
11  Q   What year did you begin working for
12 News America FSI?
13  A   I don't remember the exact date.
14  Q   Do you know the year?
15  A   Around 1994 or '5.
16  Q   Is News America FSI a subsidiary of
17 News Corporation?
18  A   I don't know.
19  Q   What was your title at News America
20 FSI?
21  A   I don't remember.
22  Q   Can you describe any training you
23 received while conducting an investigation
24 into an allegation of employment
25 discrimination while you were at News
```

Page 37

```
1       JENNIFER JEHN
2 America FSI?
3       MR. LERNER: Objection.
4   A   I received training and support and
5 guidance from our lawyers and employment
6 lawyers.
7   Q   Can you describe what that training
8 consisted of?
9       MR. LERNER: Objection.
10  A   I don't recall.
11  Q   Do you recall the names of any of
12 these employment lawyers that helped train
13 you at News America FSI?
14  A   The lawyer would be Jan
15 Constantine.
16  Q   Earlier when you spoke about Jan
17 Constantine, were you referring to training
18 you received when you were at News America
19 FSI?
20      MR. LERNER: Objection.
21  A   Could you repeat that question?
22  Q   Did Jan Constantine provide you
23 training when you were anyplace other than
24 during your position at News America FSI?
25      MR. LERNER: Objection.
```

Page 38

JENNIFER JEHN

A   I still don't understand what you are asking me.
Q   Did Jan Constantine help to train you when you were an employee of The New York Post regarding the conducting of an investigation of employment discrimination?
A   Could you repeat it again?
Q   Did Jan Constantine help to train you in any HR matters when you worked for The New York Post?
A   I don't remember.
Q   So Ms. Constantine may have trained you both at The New York Post and at News America FSI?
       MR. LERNER: Objection.
A   I don't recall.
Q   Were there any other attorneys who helped train you in HR matters when you were at News America FSI?
A   I don't recall.
Q   Was there anyone else who helped to train you in HR when you were at News America FSI?
       MR. LERNER: Objection.

Page 39

JENNIFER JEHN

A   I don't recall.
Q   Do you recall any other training that you received in how to conduct an investigation into an allegation of employment discrimination when you were at News America FSI?
       MR. LERNER: Objection.
A   I don't recall.
Q   How long were you at News America FSI?
A   Could you repeat that question?
Q   How long were you employed by News America FSI?
A   I don't remember the specific number of years. Around five.
Q   And did you have any HR positions other than your position at News America FSI and The New York Post?
A   Yes.
Q   What was the next HR position you had after News America FSI.
       Strike that last question.
       News America FSI was the first HR job you ever had, correct?

Page 40

JENNIFER JEHN

A   Yes.
Q   So after you left News America FSI, what was the next HR job you had after that?
A   I had HR responsibilities at TV Guide.
Q   What is the name of the corporation that owns TV Guide?
A   I don't know.
Q   Are they a subsidiary of News Corporation?
A   I do not know.
Q   What was your job title at TV Guide?
A   I don't recall.
Q   Describe any training you received when you were at TV Guide regarding how to conduct an investigation into an allegation of employment discrimination.
       MR. LERNER: Objection.
       You can answer.
A   I had training and advice and support from employment lawyers and legal counsel.
Q   What were the names of the lawyers

Page 41

JENNIFER JEHN

who gave you this training at TV Guide?
A   I don't remember.
Q   Was Linda Babajko one of them?
    I'm sorry. Strike that.
    Was Jan Constantine one of them?
A   Yes.
Q   Did Jan Constantine work for TV Guide during the time that you worked for TV Guide?
A   No.
Q   So why was Jan Constantine giving you advice about how to conduct an investigation into employment discrimination when you were an employee of TV Guide?
       MR. LERNER: Objection.
A   Jan Constantine was a lawyer in employment who was a resource available to me.
Q   Why was Jan Constantine a resource available to you as an employee of TV Guide?
       MR. LERNER: Objection.
A   She was a resource available to me.
Q   Wasn't she available to you because TV Guide is a subsidiary of NewsCorp. and

Page 42

```
1        JENNIFER JEHN
2  Jan Constantine works for NewsCorp.?
3        MR. LERNER:  Objection.
4     A   You need to repeat that question.
5  Please, will you repeat that.
6        MR. CLARK:  Read it back.
7        (Requested portion of record read:
8        Q.  Wasn't she available to you
9  because TV Guide is a subsidiary of
10 NewsCorp. and Jan Constantine works for
11 NewsCorp.?")
12       (End of read-back.)
13       MR. LERNER:  Objection.
14    A   No.
15    Q   What's the basis for you saying no?
16       MR. LERNER:  Objection.
17    A   I don't know who Jan Constantine
18 works for.
19    Q   So how can you possibly say she's
20 not an employee of NewsCorp.?
21       MR. LERNER:  Objection.
22    A   I don't know who Jan Constantine
23 worked for.
24    Q   Isn't it true that when you worked
25 for News America FSI, Jan Constantine was a
```

Page 43

```
1        JENNIFER JEHN
2  resource available to you because News
3  America FSI is a subsidiary of NewsCorp. and
4  Jan Constantine works for NewsCorp.?
5        MR. LERNER:  Objection.
6     A   That's not true.
7     Q   What's your basis for saying it's
8  not true?
9     A   I don't know who Jan Constantine
10 works for.
11    Q   So what's your basis for saying
12 it's not true?
13    A   I don't know who Jan Constantine
14 works for.
15    Q   After TV Guide, did you have any
16 other HR jobs other than New York Post?
17    A   I don't recall.
18    Q   What year did you -- what was your
19 last year that you worked for TV Guide?
20    A   I don't remember the exact year.
21    Q   You don't recall if you worked --
22 had any employment between TV Guide and The
23 New York Post?
24    A   I was employed between TV Guide and
25 The New York Post, yes.
```

Page 44

```
1        JENNIFER JEHN
2     Q   So you don't recall if any of those
3  jobs involved HR?
4     A   I don't recall.
5     Q   Who did you work for directly after
6  you left TV Guide?
7     A   News America Marketing.
8     Q   Is News America Marketing a
9  subsidiary of NewsCorp.?
10       MR. LERNER:  Objection.
11    A   I don't know.
12    Q   Did you work for anyone between
13 News America Marketing and The New York
14 Post?
15    A   Yes.
16    Q   Who did you work for directly after
17 News America Marketing?
18    A   Liquidmetal Technologies.
19    Q   Where are they located?
20    A   At the time, Tampa Florida.
21    Q   And did your job with Liquidmetal
22 involve human resources?
23    A   No.
24    Q   Did you work for anyone else
25 between Liquidmetal and The New York Post?
```

Page 45

```
1        JENNIFER JEHN
2     A   Yes.
3     Q   What was your next job after
4  Liquidmetal?
5     A   Fortress Technologies.
6     Q   And did that job involve human
7  resources?
8     A   No.
9     Q   Who did you work for directly after
10 Fortress Technologies?
11    A   The New York Post.
12    Q   At any of your HR positions, did
13 you ever receive training with respect to
14 how to conduct an investigation with respect
15 to sexual harassment in the workplace?
16       MR. LERNER:  Objection.
17    A   Could you repeat that question?
18       MR. CLARK:  Could you read it
19 back, please.
20       (Requested portion of record read:
21       "Q.  At any of your HR positions,
22 did you ever receive training with
23 respect to how to conduct an
24 investigation with respect to sexual
25 harassment in the workplace?")
```

### Page 54

```
 1        JENNIFER JEHN
 2     "Q.  What other ways would be a way
 3   to retaliate against an employee other
 4   than losing their job?")
 5        (End of read-back.)
 6     A   If an employee had responsibilities
 7   taken away from them because they filed a
 8   complaint against their supervisor.
 9     Q   Any other ways?
10         MR. LERNER:  Objection.
11     A   I don't remember.
12     Q   When you were head of HR in 2009,
13   were employees advised about how to file a
14   complaint of harassment or discrimination?
15         MR. LERNER:  Objection.
16         You can answer if you understand
17     the question.
18     A   Employees were advised that they
19   can make a complaint to New York Post Human
20   Resources, they can complain to their
21   manager, they can report it to an alert
22   line.
23     Q   What is Alert Line?
24     A   An alert line is made available to
25   New York Post employees that they can file a
```

### Page 55

```
 1        JENNIFER JEHN
 2   complaint or grievance.
 3     Q   Who runs this alert line that New
 4   York Post employees can call to complain
 5   about a complaint?
 6         MR. LERNER:  Objection.
 7     Q   To complain about a grievance.
 8     A   I don't know who runs it.
 9     Q   Does The New York Post run it?
10         MR. LERNER:  Objection.
11     A   I don't know.
12     Q   Is there one alert line for all of
13   the NewsCorp. subsidiaries?
14     A   I don't know.
15     Q   From what you described, are there
16   any other ways that an employee can complain
17   about employment discrimination?
18     A   An employee can complain to their
19   manager, to Human Resources, anyone in Human
20   Resources, and to the alert line.
21     Q   Could an employee of The New York
22   Post complain to an attorney?
23     A   Employees at The New York Post can
24   complain to HR, their manager, the alert
25   line.  That's who they know they can
```

### Page 56

```
 1        JENNIFER JEHN
 2   complain to.
 3     Q   Suppose an employee of The New York
 4   Post wanted to make a complaint to Jordan
 5   Lippner?  Would that be acceptable, in your
 6   experience as head of HR for The New York
 7   Post?
 8         MR. LERNER:  Objection.
 9         Do you understand the question?
10         THE WITNESS:  Actually, I don't
11     understand the question.
12   BY MR. CLARK:
13     Q   Would it be an acceptable way to
14   complain about employment discrimination for
15   an employee of The New York Post to complain
16   to Jordan Lippner?
17         MR. LERNER:  Objection.
18     A   New York Post employees can
19   complain to HR, their manager, an alert
20   line.  That's who they can complain to.
21     Q   So your answer is no, it would
22   not -- complaining to Jordan Lippner would
23   not be an acceptable way in your view to
24   make a complaint about employment
25   discrimination as an employee of The New
```

### Page 57

```
 1        JENNIFER JEHN
 2   York Post?
 3         MR. LERNER:  Objection.
 4     A   Can you repeat the question?
 5         MR. CLARK:  Could you read it
 6     back?
 7         (Requested portion of record read:
 8     "Q.  So your answer is no, it would
 9     not -- complaining to Jordan Lippner
10     would not be an acceptable way in your
11     view to make a complaint about employment
12     discrimination as an employee of The New
13     York Post?")
14         (End of read-back.)
15     A   Jordan Lippner, as a resource to
16   Human Resources at The New York Post, a New
17   York Post employee could make a complaint to
18   him.
19     Q   So it would be an acceptable way to
20   make a complaint if you were an employee of
21   The New York Post?
22         MR. LERNER:  Objection.  I
23     think the issue is the word
24     "acceptable."
25         I don't know what it means but I
```