# **EXHIBIT 6**

Contains Confidential Portions

Page 1

```
 1                    JESSE ANGELO
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------X
     SANDRA GUZMAN,
 4                  Plaintiff,
 5                  -against-    09CIV9323 (BSJ)(RLE)
 6   NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
     THE NEW YORK POST, and COL ALLAN, in his
 7   official and individual capacities,
 8
                    Defendants.
 9   ------------------------------------X
     AUSTIN FENNER and IKIMULISA LIVINGSTON,
10
11                  Plaintiffs,
12                  -against-    09CIV9832 (BSJ)(RLE)
13   NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
     THE NEW YORK POST and DAN GREENFIELD and
14   MICHELLE GOTTHELF,
15                  Defendants.
     ------------------------------------X
16
17
18         VIDEOTAPED DEPOSITION OF JESSE ANGELO
19                    New York, New York
20                 Wednesday, April 25, 2012
21
22   REPORTED BY:  BARBARA R. ZELTMAN
                   (BOBBIE)
23                 Professional Stenographic Reporter
24
25   Job Number:  48821
```

Contains Confidential Portions

Page 26

JESSE ANGELO

         MR. LERNER:  Objection.
   A     Again, I don't know the ins and
outs of the corporate structure.
   Q     So the answer is no, you don't know
if that's a Rupert Murdoch newspaper?
         MR. LERNER:  Objection.
   A     Again, ultimately, it is part of
News Corporation.  I do not know precisely
which entity owns The Daily Telegraph.
   Q     So actually -- so The Daily
Telegraph is part of News Corporation?
   A     Again, I don't know the ins and
outs of corporate structure.
   Q     That's not the question.
         Is The Daily Telegraph a News
Corporation entity?
         MR. LERNER:  Objection.
   A     Again, I don't know exactly what
the name of the entity that owns The Daily
Telegraph is.
   Q     So your answer is you have no idea
if Rupert Murdoch is involved with The Daily
Telegraph?
         MR. LERNER:  Objection.

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 27

JESSE ANGELO

That's not the question you've been
asking.
   A     Right.  You asked me before is it
part of News Corporation as a whole and I
said yes.
         I don't know who precisely owns
that entity.  I don't know the corporate
structure.
   Q     And by "that entity" you mean
The Daily Telegraph?
   A     Correct.
   Q     But Rupert Murdoch is involved with
The Daily Telegraph in some way, shape or
form?
         MR. LERNER:  Objection.
   A     I don't know.
   Q     And you don't know if Rupert
Murdoch is involved with The Sun in any way?
         MR. LERNER:  Objection.
   A     Don't know.
   Q     How long were you at The Daily
Telegraph?
   A     About two and a half years, little
less than that.

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 28

JESSE ANGELO
   Q     So what year would you have
finished up with The Daily Telegraph?
   A     Late 1998.
   Q     And why did you leave The Daily
Telegraph?
   A     To move back to New York.
   Q     Did you have a job offer in New
York?
   A     No.
   Q     And what did you do when you came
back to New York.  When you first arrived in
New York, what was your job or did you have
a job?
   A     I was a freelance journalist.
   Q     For whom did you do freelance
journalism?
   A     I did freelance journalism for Gear
Magazine, for a Website name which escapes
me -- New Style Business, and for The New
York Post.
   Q     Did you subsequently begin working
for anyone in any capacity other than as a
freelance journalist?
         MR. LERNER:  Objection.

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 29

JESSE ANGELO
   Q     Does that make sense?
   A     No.
   Q     At some point did you stop being a
freelance journalist?
   A     Yes.
   Q     When did that occur?
   A     In 1999.
   Q     And how did that occur?
         MR. LERNER:  Objection.
   A     I was offered a full-time job.
   Q     By whom?
   A     The New York Post.
   Q     Who hired you?
         MR. LERNER:  Objection.
   A     Stu Marks.
   Q     What position were you in when you
were first hired?
   A     Sunday news reporter.
   Q     Do you know Stu Moss {sic.} title
at that time?
         MR. LERNER:  Objection.
   A     That's not his name.
   Q     I'm sorry.  What was the name of
the gentleman that hired you?

TSG Reporting - Worldwide    877-702-9580

JESSE ANGELO

A   Stu Marks.
Q   Oh, Stu Marks.
    So Stu Marks, do you know what his job title was when he hired you?
A   I believe he was managing editor of news.
Q   And how long did you work -- let me make sure.
    You said you were hired as a Sunday news reporter?
A   Correct.
Q   How long did you work as a Sunday news reporter?
A   About a year.
Q   And what did you do -- so this would be approximately the year 2000?
A   It was 1999.
Q   And were you subsequently promoted from news reporter?
    MR. LERNER: Objection.
A   After I was a news reporter, I was a business reporter.
Q   When did you become a business reporter?

TSG Reporting - Worldwide    877-702-9580

JESSE ANGELO

A   Probably late 1999. I don't know precisely the date.
Q   Who was your editor as a business reporter?
A   John Auerbach.
Q   How long were you a business reporter?
A   Maybe six months to a year.
Q   So this would take us to the year 2000?
A   About that. Probably maybe halfway through the year 2000.
Q   And what did you do after you finished as business reporter?
A   I became deputy business editor.
Q   How long were you deputy business editor?
A   About a year.
Q   What did you do after you were deputy business editor?
A   I was a City editor.
Q   So this was approximately 2001 you became City editor?
A   Correct.

TSG Reporting - Worldwide    877-702-9580

JESSE ANGELO

Q   How long were you City editor?
A   About six years.
Q   Do you recall the date that you stopped being City editor?
A   I don't recall the exact date.
Q   Do you know the year?
A   I think it was 2007 or end of 2006, around there.
Q   And what did you do after you finished being -- after you were finished with your assignment as City editor?
A   I became managing editor.
Q   Are you still managing editor?
A   No.
Q   How long were you managing editor?
A   About two years.
Q   And after managing editor, what was your position?
A   Executive editor.
Q   Are you still executive editor?
A   Yes.
Q   Just briefly, what are your job responsibilities as executive editor?
    MR. LERNER: Objection.

TSG Reporting - Worldwide    877-702-9580

JESSE ANGELO

A   I look after the digital products of The New York Post.
Q   What does that mean?
A   The Website and the digital applications.
Q   Do you supervise any employees as executive editor?
A   Yes.
Q   How many employees do you supervise, approximately?
    MR. LERNER: Objection.
A   Four or five.
Q   Who are those four or five employees?
A   Jim Delchapo, who is the digital applications editor. Clemente Lisi, who is the deputy editor of the nypost.com.
    Tom Hinton, who I'm not sure what his exact title is right now.
    Arishal Mabisho Albany (ph.).
Q   What was the name again?
A   Arishal Mabisho Albany.
Q   Anyone else?
A   I believe those are all the direct

TSG Reporting - Worldwide    877-702-9580

## Page 282

Contains Confidential Portions

```
 1   JESSE ANGELO
 2   2004 for the position?
 3        MR. LERNER: Objection.
 4     A   No, I don't recall investigating
 5   whether she -- the truth of the statement
 6   she had applied in 2004.
 7     Q   Do you have any reason to believe
 8   that she had not applied in 2004 for the
 9   Queens Courthouse position?
10        MR. LERNER: Objection.
11     A   No.
12        MR. CLARK: Mark this as 21.
13        (Angelo Exhibit 21, E-mail
14        dated Thursday, February 16, 2006,
15        5:51 p.m., Bates Number
16        NYP-FL-001947, was marked for
17        Identification.)
18   BY MR. CLARK:
19     Q   It's very short, so take a minute
20   and read it.
21        This is Bates-stamped NYP-FL-1947.
22        And as you can see, this appears to
23   be an e-mail from Michelle Gotthelf to you,
24   Mr. Angelo, dated February 16, 2006.
25        Could you read that for me?
```
TSG Reporting - Worldwide    877-702-9580

## Page 283

Contains Confidential Portions

```
 1   JESSE ANGELO
 2     A   "Might as well give Kim Queens.
 3   She's shown she can write pretty well off
 4   press releases."
 5     Q   So obviously, this was what
 6   Michelle said to you, correct?
 7     A   It is an e-mail from Michelle to
 8   me, yes. Or appears to be a facsimile
 9   thereof, yes.
10     Q   Do you remember receiving this
11   e-mail from Michelle Gotthelf?
12     A   No, I do not.
13     Q   Do you agree with the statement
14   that Kim had shown she can write pretty well
15   off press releases?
16     A   I wanted to put Kim into Queens
17   Court, I recall, because I wanted to give
18   her a new role and give her a chance to
19   succeed.
20     Q   Why did you specifically want her
21   for the role of Queens Courthouse reporter?
22        MR. LERNER: Objection.
23     A   She had been doing a role in the
24   newsroom where she had not been successful,
25   and as an editor, you're constantly trying
```
TSG Reporting - Worldwide    877-702-9580

## Page 284

Contains Confidential Portions

```
 1   JESSE ANGELO
 2   to find the right role for a reporter
 3   wherein they're going to contribute to the
 4   newspaper and be successful.
 5        She hadn't been successful in the
 6   role she was doing in the newsroom.
 7        Again, I don't recall these e-mails
 8   of her putting her head up for the beat, but
 9   when the beat came open, I remember thinking
10   and discussing with Michelle that it might
11   be a really good role for Kim, that perhaps
12   she would work well in the Queens
13   Courthouse.
14        So that was my recollection of how
15   she came to be given the role of Queens
16   Courthouse.
17     Q   Why do you think she might work
18   well in the Queens Courthouse?
19     A   Because when she was a reporter in
20   the newsroom, one of the key things that she
21   was supposed to be doing was generating
22   story ideas, and she was not having success
23   doing that.
24        And one of the things about the
25   role of a courthouse reporter is that there
```
TSG Reporting - Worldwide    877-702-9580

## Page 285

Contains Confidential Portions

```
 1   JESSE ANGELO
 2   are a lot of stories that are occurring in
 3   front of you.
 4        There are filings in civil cases,
 5   there are criminal cases that are moving
 6   through a courthouse. Therefore, the burden
 7   of trying to come up with story ideas out of
 8   thin air, so to speak, is less, so I thought
 9   that maybe having -- as well as having
10   ownership of a patch, ownership of a
11   physical area, might help her to be more
12   successful in her role as reporter.
13     Q   So you felt this was a good fit for
14   Kim?
15        MR. LERNER: Objection.
16     A   I wanted to try and see if we could
17   find a role for Kim wherein she could be
18   successful.
19        And I thought this might be a role
20   where she would be successful.
21        MR. CLARK: We're out of tape,
22   so let's take five to change things.
23        THE VIDEOGRAPHER: The time is
24   5:15. We're going of the record.
25        (A brief recess was
```
TSG Reporting - Worldwide    877-702-9580

Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------)
AUSTIN FENNER and                 )
IKIMULISA LIVINGSTON,             )
                                  )
             Plaintiff,           )09 CV 9832
                                  )(BSJ)(RLE)
       vs.                        )
                                  )
NEWS CORPORATION, NYP HOLDINGS,   )
INC., d/b/a THE NEW YORK POST     )
and DAN GREENFIELD and MICHELLE   )
GOTTHELF,                         )
                                  )
             Defendants.          )
----------------------------------)
```

DEPOSITION OF JESSE ANGELO
New York, New York
Friday, April 5, 2013

Reported by:
JOMANNA DeROSA, CSR
JOB NO. 59957

Page 14

```
 1                J. ANGELO
 2       Q.   Apart from counsel, did you discuss
 3   today's deposition with anyone else?
 4       A.   No.
 5       Q.   And apart from counsel, following
 6   Ms. Livingston's termination from her employment,
 7   did you discuss that termination with anyone else?
 8       A.   No, not that I recall.
 9       Q.   Did you discuss the termination
10   with Amy Scialdone since then?
11       A.   I don't believe so.
12       Q.   Okay.  Did you conduct a -- did you
13   personally conduct a search for any documents
14   following Ms. Livingston's termination, in
15   connection with that termination?
16       A.   As I said previously, there was a
17   discovery order, and I looked through all of my
18   e-mails, and searched on all of the search terms
19   that were specified, and I looked in my hard drive
20   and searched under the specified terms.
21       Q.   Right.  And so, apart from that
22   e-mail search, did you conduct any other search
23   for documents?
24       A.   Again, I also searched my hard
25   drive for documents.
        TSG Reporting - Worldwide    877-702-9580
```

Page 15

```
 1                J. ANGELO
 2       Q.   Okay.  But any -- did you search
 3   any hard copy files?
 4       A.   I don't have any hard copy files
 5   related to the matter.
 6       Q.   Okay.  You mentioned your business
 7   addresses as being offices of The New York Post.
 8   Are you currently employed by The New York Post?
 9       A.   Yes.
10       Q.   Okay.  Are you currently employed,
11   in any capacity, by News Corp.?
12       A.   No.
13       Q.   Are you currently employed, in any
14   capacity, by any other affiliate of News Corp.,
15   apart from The New York Post?
16            MR. LERNER:  Like when you say
17       "capacity," does he work for any other entity?
18            MR. PEARSON:  Currently.  Not in
19       the past.
20       Q.   But currently are you employed by
21   any other affiliate?
22       A.   No.
23       Q.   Okay.  And what is your current
24   position at The New York Post?
25       A.   I'm the publisher.
        TSG Reporting - Worldwide    877-702-9580
```

Page 16

```
 1                J. ANGELO
 2       Q.   Okay.  Did you hold that position
 3   in April of 2012?
 4       A.   No.
 5       Q.   Okay.  When did you assume that
 6   position?
 7       A.   Mid-December 2012, the end of last
 8   year.
 9       Q.   Okay.  And how did you obtain that
10   position?
11            MR. LERNER:  Objection.  You can
12       answer, if you understand it.
13       A.   I don't quite understand it.
14       Q.   Sure.  Were you recruited by The
15   New York Post to become publisher or did you
16   independently apply for that position, or some
17   other way?
18            MR. LERNER:  Objection.  You can
19       answer.
20            THE WITNESS:  I'm sorry.  I can or
21       I cannot?
22            MR. LERNER:  You can.
23       A.   I was approached with an offer for
24   the job.
25       Q.   Okay.  By whom?
        TSG Reporting - Worldwide    877-702-9580
```

Page 17

```
 1                J. ANGELO
 2       A.   By the chairman of The New York
 3   Post.
 4       Q.   And who is that?
 5       A.   Rupert Murdoch.
 6       Q.   Did you talk with anyone else at
 7   The New York Post, or any of its affiliates, prior
 8   to assuming duties as publisher?
 9            MR. LERNER:  Objection.  I think
10       you need to rephrase that question.
11            MR. PEARSON:  That's fine.  I can
12       clarify that.
13       Q.   So, apart from Mr. Murdoch, did you
14   talk with any other employees of The New York
15   Post, News Corp. or any of their affiliates, prior
16   to assuming your position as publisher at The
17   Post?
18       A.   That's a strange time frame.  Prior
19   to me becoming publisher of The New York I spoke
20   to, over a decade, many people at The New York
21   Post.  I don't get the question at all.
22       Q.   Fair enough.  After Mr. Murdoch
23   approached you about the position -- understand
24   these questions follow from one another --
25       A.   Okay.
        TSG Reporting - Worldwide    877-702-9580
```

5 (Pages 14 to 17)

Page 18

J. ANGELO
Q. Right. After Mr. Murdoch approached you about that position, did you talk with anyone else at The Post, News Corp. or any of their affiliates, before assuming your duties as publisher?
MR. LERNER: About taking that position?
MR. PEARSON: Yes.
A. Before I accepted the position?
Q. Yes.
A. Not that I recall. I mean, I don't have any specific memory of speaking to anybody else at The Post after that.
Q. Okay. And you began work as publisher at The Post in or around mid-December of 2012. Is that right?
A. That is correct, yes.
Q. Okay. And what are your duties as publisher at The Post?
A. I run the business.
Q. Okay. What does that mean, if you could elaborate?
A. The publisher of a newspaper is akin to the Chief Executive Officer of a business.

Page 19

J. ANGELO
Q. Okay. As part of your duties as publisher, do you evaluate the performance of The Post's reporters?
A. No.
Q. Okay.
A. Not as a standard, not as a matter of course, no.
Q. Okay. Do you have the authority to hire and fire reporters at The Post?
MR. LERNER: Objection. You can answer.
A. As CEO of the business I have the authority to hire and fire anybody I like.
Q. And do you know who Ikimulisa or Kim Livingston is?
A. Yes.
Q. Okay. And who is she?
A. She was a reporter at The New York Post.
Q. Okay. How long have you known Ms. Livingston, if you know her at all?
A. Over a decade.
Q. Okay. How did you first become acquainted with her?

Page 20

J. ANGELO
A. I worked with her at The New York Post.
Q. And are you aware of what Ms. Livingston's last position with The New York Post was?
A. Yes.
Q. And what was that?
A. She was a reporter.
Q. Okay. Was she a particular kind of reporter or assigned to a particular beat?
A. I believe she was a general assignment reporter.
Q. Okay. And at the time of -- well, actually, let's start here.
Approximately when, if at any time, did Ms. Livingston's employment with The New York Post, as a general assignment reporter, end?
A. Kim was dismissed for gross misconduct in -- I believe it was the end of February.
Q. Okay. At the time of her termination, how would you describe Ms. Livingston's skill level as a general assignment reporter?

Page 21

J. ANGELO
A. Again, I didn't supervise or evaluate her. I'm not in a position to say.
Q. Okay. So, is it your testimony that since you became publisher of The Post you're not aware of Ms. Livingston's performance level as a general assignment reporter?
A. That is correct. I'm not aware of how she was performing.
Q. Do you know who Ms. Livingston's supervisor was at the time of her termination?
A. I believe it was Dan Greenfield and/or Michelle Gotthelf. I don't know exactly who she directly reported to, though.
Q. Okay. And do you know who made the decision to terminate Ms. Livingston's employment?
A. Yes.
Q. And who is that?
A. Me.
Q. And did you make that decision unilaterally?
MR. LERNER: Objection to form.
A. Okay. Can you be more specific about "unilaterally"?
Q. Sure. Did you alone make the

TSG Reporting - Worldwide    877-702-9580

Page 22

J. ANGELO
decision to terminate Ms. Livingston's employment?
 A. Yes.
 Q. Did you meet with Ms. Livingston about her termination at any time?
 A. Yes.
 Q. Okay. And when was that?
 A. On the day she was terminated.
 Q. Okay. We'll talk about the termination meeting in a little while. But prior to that termination meeting, and since you became publisher at The Post, did you have any discussions or correspondence with Ms. Livingston?
 A. No, not that I recall.
 Q. Since the time you became publisher at The Post, up until Ms. Livingston's termination, did you have any discussions with anybody else at The Post about Ms. Livingston's job performance?
 A. No, not that I recall.
 Q. Do you know what mystery shopping is?
 A. I have a vague understanding of it.
 Q. Okay. What's your understanding of what mystery shopping is?

TSG Reporting - Worldwide    877-702-9580

Page 23

J. ANGELO
 A. My understanding is that is when somebody is paid to go into a store or interact with a business, I guess, telephonically or via the Internet, and test out what the customer service is like, what kind of reactions they get, how the people perform in their duties at the shop.
 Q. Have you ever done any mystery shopping yourself?
 A. My wife might think I have with some of the gifts I give her, but, no, I have not done any mystery shopping.
 Q. Okay. And are you aware of anyone else among your acquaintances, or anyone among your acquaintances who have done mystery shopping?
 A. No.
 Q. Okay. Are you aware of whether or not Ms. Livingston has ever mystery shopped?
 A. Yes.
 Q. Okay. And are you aware of whether or not she's ever mystery shopped for TD or Commerce Bank?
 A. Yes.
 Q. Okay. And are you aware that she

TSG Reporting - Worldwide    877-702-9580

Page 24

J. ANGELO
has, in fact, done that?
 A. Yes.
 Q. Okay. And are you aware of whether or not Ms. Livingston has ever mystery shopped for a company called Shop 'n Chek?
 A. Yes.
 Q. And has she done that?
 A. Yes.
 Q. Okay. Do you know what the mystery shopping that Ms. Livingston did for TD or Commerce Bank entailed; how it worked?
  MR. LERNER: Objection. Form.
 A. I know that while she was being employed by The New York Post and turning in time sheets that she was working for The New York Post she was, in fact, doing paid work on hundreds and hundreds of occasions for these mystery shopping outfits. I don't know what they're -- companies I guess they're called.
 Q. Are you aware of whether or not Ms. Livingston received payments in connection with her mystery shopping on a W-2 or 1099 basis?
 A. Can you repeat the question, please?

TSG Reporting - Worldwide    877-702-9580

Page 25

J. ANGELO
  MR. PEARSON: Sure. Could the question be read back?
  (The requested portion of the record was read.)
 A. No, I'm not aware of that.
 Q. Okay. And are you able to describe for me what Ms. Livingston actually did when she would perform or conduct mystery shops for TD or Commerce Bank?
  MR. LERNER: Objection.
  MR. PEARSON: You may answer.
  THE WITNESS: Can you read the question back, please?
  (The requested portion of the record was read.)
 A. No, I never witnessed it, but I know she wasn't working for The New York Post as she was supposed to be doing.
  (Recess taken.)
 Q. Are you aware of what was entailed in Ms. Livingston's mystery shopping for Shop 'n Chek?
 A. The very fact that she was doing mystery shopping, a paid job for somebody else

TSG Reporting - Worldwide    877-702-9580