UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
                                     :

AUSTIN FENNER and             :
IKIMULISA LIVINGSTON,       :
                                       :
                    Plaintiffs,     :
                                         :
                  vs.               :      Civ. No.: 09 CV 9832 (LGS)
                                         :

NEWS CORPORATION, NYP HOLDINGS,   :
INC., d/b/a THE NEW YORK POST,      :
MICHELLE GOTTHELF and , DANIEL    :
GREENFIELD, in their official and individual   :
capacities,                           :
                                         :
                    Defendants.    :
---------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS NYP HOLDINGS, INC., MICHELLE GOTTHELF and DANIEL GREENFIELD'S <u>MOTION FOR SUMMARY JUDGMENT</u>

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
Marc E. Kasowitz (mkasowitz@kasowitz.com)
Mark W. Lerner (mlerner@kasowitz.com)
Blythe E. Lovinger (blovinger@kasowitz.com)
Garrett D. Kennedy (gkennedy@kasowitz.com)
1633 Broadway
New York, New York 10019
Tel.:    (212) 506-1700

Attorneys for Defendants NYP Holdings, Inc.,
d/b/a the New York Post, Michelle Gotthelf and
Daniel Greenfield

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 3

    A.  Facts Relating to Austin Fenner's Employment ................................................. 3

        1.  Fenner's Hire as a Highly-Paid "Senior Reporter" and His Poor 2008 Performance Evaluation and Warning ................................................................. 3

        2.  Fenner's 2009 Performance Evaluation and Warning ................................. 5

        3.  Fenner's Employment is Terminated For Poor Performance ...................... 7

        4.  No Evidence of Discriminatory Animus ..................................................... 8

    B.  Facts Relating to Ikimulisa Livingston's Employment ................................... 8

        1.  Livingston's Different Reporting Assignments ........................................... 8

        2.  The Termination of Livingston's Employment ......................................... 12

    C.  Plaintiffs Were Not Banned from the Post's Newsroom ................................ 13

    D.  Facts Relating to Plaintiffs' Alleged Hostile Work Environment ................... 14

    E.  Plaintiffs' Retaliation Claims Relating to the Stimulus Cartoon ................... 14

ARGUMENT ....................................................................................................................... 15

I.   SUMMARY JUDGMENT STANDARD ..................................................................... 15

II.  PLAINTIFFS' CLAIMS OF DISPARATE TREATMENT BASED ON RACE AND/OR COLOR MUST BE DISMISSED .......................................... 16

    A.  Fenner's Claim of Discriminatory Termination and Livingston's  Claim of Discriminatory Reassignment are Without Merit ....................... 16

    B.  Plaintiffs Were Not "Banned" ......................................................................... 19

III. PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT THEY EXPERIENCED A HOSTILE WORK ENVIRONMENT ....................................................................................................... 20

IV. PLAINTIFFS' CLAIMS OF RETALIATION MUST BE DISMISSED ............................... 21

V. GOTTHELF AND GREENFIELD ARE NOT INDIVIDUALLY LIABLE .......................... 24

CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Albuja v. Nat'l Broad. Co. Universal, Inc.,
   2012 WL 983566 (S.D.N.Y. Mar. 16, 2012) .................................................................16

Albuja v. Nat'l Broad. Co. Universal, Inc.,
   851 F. Supp. 2d 599 (S.D.N.Y. 2012) .....................................................................20

Amna v. N.Y. Dept. of Health,
   2011 WL 4592787 (E.D.N.Y. Sept. 30, 2011) ..........................................................18

Beachum v. AWISCO New York,
   785 F. Supp. 2d 84 (S.D.N.Y. 2011),
   aff'd, 459 Fed. Appx. 58 (2d Cir. 2012) ............................................................18, 22

Bennett v. Health Mgmt. Sys., Inc.,
   92 A.D.3d 29 (1st Dept. 2011) ...............................................................................16

Campbell v. Cellco Partnership,
   2012 WL 400959 (S.D.N.Y. 2012) .....................................................................20, 21

Carter v. New Venture Gear, Inc.,
   310 Fed. Appx. 454 (2d Cir. 2009) ........................................................................16

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986) .........................................................................................15, 16

Contemp. Mission v. U.S. Postal Serv.,
   648 F.2d 97 (2d Cir. 1981) ....................................................................................16

Davis v. Oyster Bay–East,
   No. 03 Civ. 1372, 2006 WL 657038 (E.D.N.Y. Mar. 9, 2006),
   aff'd, 220 Fed. Appx. 59 (2d Cir. 2007) .................................................................20

Dotson v. City of Syracuse,
   2009 WL 2176127 (N.D.N.Y. July 21, 2009) ..........................................................18

Durkin v. Verizon New York, Inc.,
   678 F. Supp. 2d 124 (S.D.N.Y. 2009) ....................................................................25

Eichler v. Am. Intern. Group, Inc.,
   2007 WL 963279 (S.D.N.Y. Mar. 30, 2007) ..........................................................21

Emmons v. City Univ. of New York,
   715 F. Supp. 2d 394 (E.D.N.Y. 2010) ...................................................................25

Foxworth v. Am. Bible Soc.,
   2005 WL 1837504 (S.D.N.Y. July 28, 2005),
   aff'd, 180 Fed. Appx. 294 (2d Cir. 2006) ............................................................22

Freedman v. MCI Telecomm. Corp.,
   255 F.3d 840 (D.C. Cir. 2001) ............................................................................20

Garrett v. Garden City Hotel, Inc.,
   2007 WL 1174891 (E.D.N.Y. April 19, 2007) .....................................................22

Greaves v. St. Luke's/Roosevelt Hosp. Ctr.,
   2005 WL 627635 (S.D.N.Y. Mar. 17, 2005) ........................................................19

Hauptman v. Concord Fabrics, Inc.,
   1999 WL 527970 (S.D.N.Y. July 22, 1999) .........................................................18

HealthCare Exch., Inc. v. Global Healthcare Exch., LLC,
   470 F. Supp. 2d 345 (S.D.N.Y. 2007) .................................................................24

Hollander v. Amer. Cyanamid Co.,
   895 F.2d 80 (2d Cir. 1990) ..................................................................................23

Hussein v. Hotel Employees & Rest. Union, Local 6,
   2002 WL 10441 (S.D.N.Y. Jan. 3, 2002),
   aff'd, 50 Fed. Appx. 473 (2d Cir. 2002) ..............................................................23

Kelly v. Howard I. Shapiro & Assocs. Consulting Eng., P.C.,
   2012 WL 3241402 (E.D.N.Y. 2012) ....................................................................20

Kelly v. Howard I. Shapiro Assocs.,
   2013 WL 1776646 (2d Cir. Apr. 26, 2013) ..........................................................22

Lindner v. IBM,
   2010 WL 308725 (S.D.N.Y. Jan. 21, 2010) .........................................................22

Little v. New York,
   1998 WL 306545 (E.D.N.Y. June 8, 1998),
   aff'd, 173 F.3d 845 (2d Cir. 1999) ......................................................................19

McPhatter v. New York City,
   2009 WL 2412980 (E.D.N.Y. 2009) ....................................................................24

Monterroso v. Sullivan & Cromwell, LLP,
   591 F. Supp. 2d 567 (S.D.N.Y. 2008) .................................................................20

Murphy v. Am. Home Prods. Corp.,
  58 N.Y.2d 293 (1983) ...........................................................................17

Murray v. VNS of N.Y.,
  528 F. Supp. 2d 257 (S.D.N.Y. 2007)...............................................22, 24

Negron v. Rexam Inc.,
  104 Fed. Appx. 768 (2d Cir. 2004)........................................................21

Patterson v. Cnty. of Oneida,
  375 F.3d 206 (2d Cir. 2004).............................................................24, 25

Philippeaux v. Fashion Inst. of Tech.,
  1996 WL 164462 (S.D.N.Y. Apr. 9, 1996),
  aff'd, 104 F.3d 356 (2d Cir. 1996)..........................................................22

Ponticelli v. Zurich Am. Ins. Group,
  16 F. Supp. 2d 414 (S.D.N.Y. 1998).......................................................22

Powell v. Nat'l Bd. of Med. Exam'rs,
  364 F.3d 79 (2d Cir. 2004)....................................................................16

Ragin v. East Ramapo Cent. School Dist.,
  2010 WL 1326779 (S.D.N.Y. Mar. 31, 2010) .........................................20

Reeves v. Sanderson Plumbing Prods., Inc.,
  530 U.S. 133 (2000)...............................................................................16

Ricks v. Conde Nast Publications, Inc.,
  6 Fed. Appx. 74 (2d Cir. 2001).........................................................17, 18

Rios v. Buffalo and Fort Eric Pub. Bridge Auth.,
  2008 WL 657121 (W.D.N.Y. Mar. 7, 2008),
  aff'd, 326 Fed. Appx. 612 (2d Cir. 2009) ...............................................21

Romero v. City of New York,
  839 F. Supp. 2d 588 (E.D.N.Y. 2012) ....................................................25

Rozenfeld v. Dept. of Design and Const. of the City of N.Y.,
  2012 WL 2872157 (E.D.N.Y. July 12, 2012).........................................20

Sharpe v. MCI Comm. Svcs., Inc.,
  684 F. Supp. 2d 394 (S.D.N.Y. 2010).....................................................21

Short v. Deutsche Bank Secs., Inc.,
  79 A.D.3d 503 (N.Y. App. Div. 2010) ....................................................21

Sicular v. N.Y.C. Dept. of Homeless Srvs.,
   2010 WL 423013 (S.D.N.Y. Feb. 4, 2010)................................................17

Sotomayor v. City of New York,
   862 F. Supp. 2d 226 (E.D.N.Y. 2012),
   aff'd, 2013 WL 1458839 (2d Cir. Apr. 11, 2013)...........................................17, 18

Stembridge v. City of New York,
   88 F. Supp. 2d 276 (S.D.N.Y. 2000)....................................................21

Sundaram v. Brookhaven Nat'l Labs.,
   424 F. Supp. 2d 545 (E.D.N.Y. 2006) ...................................................22

Sutherland v. N.Y. State Dept. of Law,
   216 F.3d 1073 (2d Cir. 2000)........................................................17

Taneus v. Brookhaven Mem. Hosp. Med. Ctr.,
   99 F. Supp. 2d 262 (E.D.N.Y. 2000)....................................................22

Washington v. City of New York,
   2009 WL 1585947 (S.D.N.Y. June 5, 2009) .............................................23

Wimmer v. Suffolk Cnty Police Dep't,
   176 F.3d 125 (2d Cir. 1999).........................................................22

Woodman v. WWOR-TV, Inc.,
   411 F.3d 69 (2d Cir. 2005).........................................................22

Woods v. Enlarged City School Dist. of Newburgh,
   473 F. Supp. 2d 498 (S.D.N.Y. 2007),
   aff'd, 288 Fed. Appx. 757 (2d Cir. 2008) ..............................................21

Zambrano–Lamhaouhi v. NYC Bd. of Educ.,
   2011 WL 5856409 (E.D.N.Y. 2011)....................................................20

## RULES, RELGUATIONS AND STATUTES

42 U.S.C. § 1981 .................................................................... *passim*

42 U.S.C. § 2000e ................................................................... *passim*

FED. R. CIV. P. 56(c)(2) ................................................................15

N.Y.C. Admin. Code § 8-107 ............................................................ *passim*

N.Y. EXEC. § 296 .................................................................... *passim*

Defendants NYP Holdings, Inc., d/b/a the New York Post (the "Post"), Michelle Gotthelf and Daniel Greenfield (collectively, the "Defendants") submit this memorandum of law in support of their motion for summary judgment dismissing the Third Amended Complaint ("TAC") of plaintiffs Austin Fenner and Ikimulisa Livingston as a matter of law.[1]

## PRELIMINARY STATEMENT

Plaintiffs Austin Fenner and Ikimulisa Livingston, former reporters for the Post who are African American, bring this employment discrimination, retaliation and hostile work environment action under Title VII, the New York State and City Human Rights Laws (respectively, "NYSHRL" and "NYCHRL"), and 42 U.S.C. § 1981 ("Section 1981") against the Post, editors Michelle Gotthelf and Dan Greenfield, and the Post's ultimate parent company, News Corporation.  For the reasons set forth herein, these claims should be dismissed.

Fenner objects to the termination of his employment, but he was terminated for well-documented underperformance and no other reason.  Fenner was hired in May 2007 as a "Senior Reporter" at a salary that made him one of the Post's highest paid reporters, and he was expected to perform at a commensurate level.  His job was to cultivate and maintain valuable sources, break news, generate original "enterprise" reporting, and to write stories.  However, he failed to meet those expectations and requirements time and again.  He received unfavorable annual performance reviews in 2008 and 2009, as well as formal performance warnings in both years, and his accomplishments in print were few.  Despite being given opportunities to improve, he never raised the level of his performance to that of a senior reporter with a very high salary, and

---

[1] Submitted herewith in support of the motion are the affidavits of Michelle Gotthelf, dated May 9, 2013 ("Gott. Aff."), Daniel Greenfield, dated May 8, 2013 ("Green. Aff."), and Jeanne Macintosh, dated May 9, 2013 ("Mac. Aff."), as well as the declarations of Mark W. Lerner, dated May 10, 2013 ("Lern. Dec."), to which certain exhibits referenced herein are attached, and of Garrett D. Kennedy, dated May 10, 2013 ("Kenn. Dec."), to which other exhibits referenced herein are attached.

for this reason his employment was terminated on November 9, 2009.  Neither race nor retaliation played any role in this decision.

Livingston objects to being reassigned in 2008 from covering the Queens courthouses to receiving daily assignments to cover the breaking news.  She was reassigned because of her consistent failure to generate interesting stories from the Queens courthouses, and her supervisors' belief that her skills would be better utilized covering on-scene news events.  This reassignment was within the same job classification and came with no diminution in pay or benefits, or change in title.

Additionally, in February 2013, Livingston's employment was terminated for gross misconduct.  The Post discovered that Livingston secretly worked for two other employers *during her scheduled Post shift* on more than 400 occasions from 2005 to 2010.  This secondary employment routinely took her away from locations to which she was assigned by the Post and prevented her from performing her job duties, and she never notified the Post of this other employment.  Of course, this explained, at least in part, Livingston's poor performance in the courthouses, as she worked for these other employers while assigned there, notwithstanding repeated instructions to more constructively use her time.  As with Fenner, neither racial nor retaliatory animus played any role in her reassignment or termination.

The balance of plaintiffs' TAC distorts routine and lawful employment decisions through inflammatory accusations unsupported by fact and/or of no legal moment.  A claim they were "banned" from the Post's newsroom is revealed as false by their own testimony.  Claims of abusive language dissolve amidst admissions that such related solely to work performance issues and never invoked race.  And claims of retaliation collapse under evidence that neither plaintiff *ever* complained of discrimination, much less suffered a retaliatory action.

This case should be dismissed in its entirety.

2

## STATEMENT OF FACTS

The facts supporting this motion are set forth in Defendants' Rule 56.1 Statement of

Undisputed Facts and the Affidavits and other evidence submitted in support of Defendants'

motion for summary judgment.  (See fn. 1, supra.)  Those facts may be summarized as follows:

**A.    Facts Relating to Austin Fenner's Employment**

       1.    Fenner's Hire as a Highly-Paid "Senior Reporter" and His
           Poor 2008 Performance Evaluation and Warning

Fenner, who is African-American, was hired in May 2007 as an at-will employee to the

position of a "Senior Reporter" for the Post's Metro Desk, which covers breaking news, at a

salary that instantly placed him among the Post's highest paid reporters.  (Gott. Aff.  ¶¶ 10, 27.)

Given this, he was expected to perform at a "[v]ery high level" by generating breaking stories,

writing enterprise stories (original and exclusive reporting resulting from investigative work,

usually lengthy and in-depth), and working as a "rewrite."[2]  (Green. at 319; Gott. at 152-53;

Fenn. at 79.)[3]  He was to be "sneaky" in his reporting, a high compliment Gotthelf gives to a

reporter who "breaks away from the pack . . . to go their separate way and break a news line."

(Gott. at 294.)  Finally, he was expected to have and develop "a lot of sources."  (Green. at 319.)

---

[2] Metro reporters generally have one of three assignments:  "runner" (or "street" or "field" reporter); "rewrite"; or "beat reporter."  They are given these assignments based on the Metro Desk's needs, and reassignments are not accompanied by changes in pay, seniority or benefits, are not processed by the Post's human resources ("HR") department, and are not promotions or demotions.  (Gott. Aff.  ¶¶ 3-4.)

Runners receive assignments from the newsroom directing them to report on stories from the field, and are rarely present in the Post's offices.  (Id. at 5; Green. at 116-19.)  They telephone or e-mail quotes and notes to a rewrite who writes an article from the newsroom, and do not have desks in the newsroom.  (Gott. Aff. ¶ 5.)  Rewrites, based in the newsroom, write stories, conduct investigations, and report, coordinate the runner(s), and may handle more than one story per day.  (Green. at 132-34; Gott. at 83-85.)  Beat reporters "have a specific [topical] area of focus" (as opposed to rewrites and runners, who thus are called "general assignment reporters").  (Gott. Aff. ¶ 8; Green. at 245.)  Beat reporters, including court reporters, must have a strong knowledge of their beat, possess and develop related sources, and write without needing their work to be rewritten.  (Green. at 167; Gott. Aff.  ¶ 8.)

[3] True and correct copies of referenced excerpts of the deposition of Daniel Greenfield, dated April 5, 2012 ("Green. at [page]"), are attached to the Lern. Dec. as Exhibit 1.  True and correct copies of referenced excerpts of the deposition of Michelle Gotthelf, dated March 29, 2012 ("Gott. at [page]"), are attached to the Lern. Dec. as Exhibit 2.  True and correct copies of referenced excerpts of the deposition of Austin Fenner, dated January 11, 2012 ("Fenn. at [page]"), are attached to the Lern. Dec. as Exhibit 3.

Not long after his hire, it became apparent Fenner could not break stories, was not generating enterprise pieces, and lacked sources.  (Gott. at 157, 253.)  Equally apparent, his writing was poor.  It often needed significant editing, contained junior-level factual, grammatical and spelling errors, failed to discern the "lede" (the most interesting aspect) of a story, and contained notable information gaps.  (Id. at 156-57, 185, 253; Gott. Aff. ¶ 11.)

As a result, Fenner was assigned less "rewrite" work (i.e., drafting stories in the newsroom) and, "within his first year [] slid into the role of street runner," as stated in his July 2008 annual performance appraisal ("APA").[4]  (Lern. Dec., Exh. 4.)  It further stated he:  "does not initiate or produce top-notch enterprise [stories] for the Post.  He has pitched a few stories that are not a good fit for the Post.  Now all of his assignments come from editors, who find his work, at best, lacking."  (Id.)  His overall performance was rates as: "Must Improve, Rarely Meets Standards."  (Id.)

Fenner also received a written warning due to his (i) "Poor basic writing skills," (ii) "Lack of fact checking," (iii) failure to "produc[e] enterprise stories," and (iv) "[n]ot being able to discern what the news line [lede] is . . . ."  (Id.)  It required "an immediate and consistently sustained improvement . . . ."  (Id.)

Several instances underscore Fenner's banal FY 2008 performance.  In May 2008, Fenner was sent to Chicago to report on Reverend Jeremiah Wright, the former pastor of President Obama.  He was expected to break investigative news lines, but instead interviewed church congregants and did little else until called back to New York early because he was not generating stories.  (Gott. at 264-65; Gott. Aff.  ¶ 14.)  Fenner admitted he failed:  "They wanted a hot story . . . .  I wouldn't call [the story produced] a hot story."  (Fenn. at 36-39.)  He acknowledged this criticism was non-discriminatory.  (Id.  at 38.)

---

[4] The Post's APAs are based around the Post's fiscal year ("FY"), which runs from July to June.

In covering the trial of singer R. Kelly, alleged to have videotaped sex acts with a minor, Fenner omitted from his story the most critical fact:  the "victim," by then 23 years old, had recanted her allegations, yet the trial would go on.  (Id. at 43-44.)  When questioned, Fenner said he knew this fact and that he "would have wanted to put that in the story, yes."  (Id. at 43-45.)

On another occasion, Fenner drafted a story on a sexual harassment lawsuit against the husband of disk jockey Wendy Williams, but he buried in the middle of the story its most sensational element:  Williams' husband allegedly tried to hire a hit man to kill a rival disk jockey.  (See id. at 56.)  Fenner admitted his editor rewrote the story with this fact as the new lede, stating, "I like his lead, I agree with it."  (Id. at 57.)

With respect to his standing assignment to cover the expansion of Columbia University, Fenner could not recall developing even a single confidential source.  (Fenn. at 73-74.)

And Fenner's writing was poor, often containing basic factual and grammatical errors.  By way of example, Fenner submitted a piece which read in unedited form:

> The protesters also plan to continue their late night demonstrate [sic] to Bowery Wine Company on First St., which movie action star Bruce Willis is reportedly a co-owner and [sic] then on to a New York University dormitories [sic] on Bowery St.

(Lern. Dec., Exh. 5; Fenn. at 49.)  This has poor syntax, grammatical errors, wrongly identifies Bruce Willis as a co-owner of the wine company, and "Bowery St." does not exist.  (Lern. Dec., Exh. 5.)  Fenner admitted to making these errors.  (Fenn. at 49.)

2.    Fenner's 2009 Performance Evaluation and Warning

Fenner was increasingly assigned to runner reporting in the hope he would distinguish himself in that role, but he did not.  (Fenn. at 207-08; Gott. Aff.  ¶ 12.)  He still generated no enterprise pieces or otherwise meet the requirements of a highly-paid senior reporter.

In his May 2009 self-evaluation, Fenner acknowledged his need to "produce more exciting hard hitting enterprise stories," citing three unremarkable stories as his highlights for the year.  (Lern. Dec., Exh. 6.)  These included:  (1) an interview of a passenger on the jet that landed in the Hudson River, (2) an interview of Timothy Dolan about his selection to head the New York Catholic Diocese, and (3) an article about a church group attending the Obama inauguration.  (Id.)  He was assigned to the plane crash with a dozen other reporters, and his interview was non-exclusive and far from the paper's lead story on the event.  (Fenn. at 132-37; Gott. Aff. ¶ 15.)  The Dolan interview was also assigned, the story was written by another reporter, and it involved no investigative work.  (Green. at 338.)  An assigned interview is routine and not notable for a senior reporter.  (Gott. Aff. ¶ 16.)  Fenner's follow-up story about Dolan arranging an adoption had previously run as an article on an unrelated web site.  (Id.; Fenn. at 153.)  And the Obama inauguration story ran as "sidebar" on page 30 of the Post's inauguration coverage.  (Id. at 133, 138-39.)  None of these stories rates as significant for a highly-paid senior reporter, yet Fenner touted them as his finest.  (Lern. Dec. Exh. 6.)

Beyond this, Fenner failed to offer any notable pitches.  For instance, one pitch concerned a high-end car dealership opening in Harlem; however, as he admitted, "The New York Times . . . had written the story earlier in the year."  (Fenn. at 113-17, 167.)  Pitching a previously printed story, while offering no new elements, is unacceptable for an experienced reporter.  (Gott. at 238-40.)

Fenner's FY 2009 APA rated his performance as "Unacceptable," explaining:

> As discussed at the last APA, including a written warning, Austin
> was hired to be a senior reporter but was underperforming in his
> basic writing skills, lack of fact checking, lack of producing
> enterprise stories and not being able to discern the news line in a
> story.  These areas have not improved.  His writing continues to be
> terrible and he often has little knowledge of the subject matter he is
> covering, to the point where he is no longer asked to write his own

6

> stories.  He seldom, if ever, pitches stories or calls in with ideas
> which is necessary as a senior reporter.  Nearly every assignment
> he works on has been given to him by the city desk.  This year he
> did not bring his work up to par, despite the discussions with
> management and warning, and he continues to work down as a
> running reporter vs. a senior reporter because he can't meet
> standards necessary to cut it in the newsroom. . . .  (Lern. Dec.,
> Exh. 7.)

Fenner also received a final performance warning on September 17, 2009 that specified,

"You rarely pitch story ideas that make it into the newspaper and you do not appear to be focused

on producing enterprise stories . . . developed from your own ideas," and it reiterated his

continuing need to improve "poor basic writing skills" and discerning the lede of a story.  (Id.)[5]

### 3.   Fenner's Employment is Terminated For Poor Performance

The 2009 APA and warning did not lead to improved performance.  (Green. Aff. ¶ 5.)

Between the warning's receipt and early November 2009, Fenner contributed reporting to 15

stories, but was assigned to 14 of these; the other story, based on a pitch he made, was a brief

149-word piece about a youth football team.  (Id. ¶ 6.)  Fenner had only two other pitches during

this time, one about a man living in an old bank building – rejected because *New York Magazine*

had run it earlier and Fenner did not advance the story (Fenn. at 166), and another on economic

hardships facing veterans, a topic well-trod by news outlets (Green. Aff.  ¶¶ 4-8; Lern. Dec.,

Exh. 9).  He produced no investigative, exclusive or enterprise stories during this time.  (Id.)

On November 7, 2009, two months after being placed on final warning, Gotthelf told the

Post's Human Resources department ("HR") that Fenner's performance had not improved and

that his employment should be terminated (Lern. Dec., Exh. 9), which it was two days later.

---

[5] Fenner also failed to maintain contact with his editors.  In February 2009, when in Milwaukee, Fenner was out of contact for 40 minutes and failed to inform the Metro Desk about a news conference.  (Green. at 326-27.)  In June 2009, Fenner was deployed to an assignment but, when called a half-hour later, he was still at home.  (Fenn. at 145-46; Lern. Dec., Exh. 8.)  This happened again in August 2009.  (Id.)

4.        No Evidence of Discriminatory Animus

Not only were there legitimate reasons for the termination of Fenner's employment, as set

forth above, but there is also no evidence that Gotthelf or Greenfield harbored any discriminatory

animus, much less that Fenner's employment was impacted by such.  Indeed, his sole basis for

asserting a discriminatory termination was "[b]ecause [he] disagree[d] strongly with the points"

criticizing his work performance.  (Fenn. at 195.)  Fenner explicitly admits he never heard any-

race based comment by Gotthelf (the decision-maker) or Greenfield (her deputy):

> Q:  Did [Gotthelf] ever say anything that used a racial epithet or
>       referred to the fact that you are African American?
> A:  Not to my knowledge.  I didn't hear her use a racial epithet.

> *    *    *

> Q:  Did [Greenfield] ever use a racial epithet?
> A:  No.

(Id. at 67, 98-99.)  In fact, he never heard or overheard anyone at the Post make such a remark:

> Q:  Did anybody ever say anything to you that . . . you felt was a
>       racist comment?
> A:  Say?
> Q:  Yes.  To you.
> A:  You mean the "N" word?
> Q:  That, or anything else similar that you would consider racist?
> A:  No.

(Id. at 231-32.)  Fenner also testified no one ever "call[ed] any African-American by a deroga-

tory name," (id. at 231), and that he was not even *aware* of any instance of any Post employee

using a racially derogatory term while he was an employee.  (Id. at 233.)

**B.        Facts Relating to Ikimulisa Livingston's Employment**

1.        Livingston's Different Reporting Assignments

The Post hired Livingston, who is African-American, as a reporter in 1997.  She was

employed at-will and, except for a stint covering the Queens courthouses from February 2006 to

November 2008, always worked as a general assignment reporter, and primarily a runner, until she was fired for gross misconduct.  (Living. at 53; Gott. Aff.  ¶¶ 17-19.)[6]

In February 2006, then-Metro Editor Jesse Angelo and then-Deputy Metro Editor Gotthelf assigned Livingston to cover the Queens courthouses in hopes that she might improve her story pitching through the ready supply of stories in courtrooms and filings.  (Angelo at 283-85, 287 [Day 1]; see also Lern. Dec., Exh. 10 at IL_590.)  In this new assignment, she was required to generate daily story ideas, and not be assigned them, and to do so by developing sources in the courthouses, looking through court filings, and watching proceedings, among other things.  (See Living. at 451; Kenn. Dec., Exh. 8 [Aud.] [recording of Haberman instructing Livingston, "I have asked you repeatedly to check other case files."; "check[] court files every day"; and "You could have got that story from the Court officers . . . [or] a court clerk."], Exh. 7 [Aud.] [recording of Greenfield instructing Livingston to "Find civil cases, find other cases."].)[7] She was also expected to write on breaking news out of the courthouses with "speed and flare" and on deadline, and without her draft stories needing to be rewritten by another reporter.  (See Green. at 165-67.)

She did not satisfy these requirements even the most high-profile case of her Queens court tenure, the eight-week trial of three police officers who fatally shot Sean Bell the night before his wedding (the "Bell Trial"), which story fell to her "automatically" by virtue of her assignment.  (Green. at 213-14.)  During the Bell Trial, the Post criticized Livingston, including

---

[6] True and correct copies of referenced excerpts of the deposition of Ikimulisa Livingston, dated January 13, 2012, February 20, 2013, and May 6, 2013 [Day 3] ("Living. at [page]"), are attached to the Lern. Dec. as Exhibit 20.
[7] In 2008, Livingston began surreptitiously tape recording her editors.  No recording contains any race-based remark.  In discovery, she produced 92 audio recordings (Kenn. Dec.  ¶ 14), but has never offered one as an exhibit to any deposition or otherwise referred to them in this litigation.  The entire body of recordings is too voluminous to attach, but we have selected six conversations which are offered for reasons cited in the text.  True and correct copies of these audio recordings made by Livingston are attached to the Kenn. Dec. as Exhibits 3 through 8, and are referred to as "Kenn. Dec., Exh. [No.] [Aud.]."  To aid the court with this motion, we have prepared transcripts of these six, attached to the Kenn. Dec. as Exhibits 3 through 8.

in conversations she secretly recorded (see note 7), for, among other things, failing to report critical information that a competitor got (Kenn. Dec., Exh. 3 [Aud.]), not thinking about what information the Post might need (Id., Exh. 4 [Aud.]), and not producing cleanly-written copy in a timely manner (see, e.g., Lern. Dec., Exhs. 12, 13).  This latter flaw forced her editors to assign a dedicated rewrite – a *second reporter* – for the duration of the trial, which was an "unusual" need.  (Living. at 222; Angelo at 260 [Day 1].)[8]  In sum, as one editor told, Livingston was not "thinking bigger picture" or taking the "next step" in her reporting.  (Kenn. Dec., Exh. 4 [Aud.].)

After the trial, Livingston's performance was still subpar (Green. at 171).  For instance, she was criticized for missing entire stories that *The Daily News* reported, including one that related to the Bell Trial.  (Id., Exh. 8 [Aud.])  As an editor told her, "Constantly getting beat is not fun . . . .  It's happened a lot in the last week and a half."  (Id.)  She also was critiqued for not following through on "basic" fact-checking (id., Exh. 6 [Aud.]), and needed instruction on core job functions, such as finding a story's "hook" (id., Exh. 5 [Aud.]), among other things.

In May 2008, Gotthelf, by this time the Metro Editor, e-mailed Livingston, stating:

> Col [Allan, Post Editor-in-Chief,] had a fit over the story you missed this morning.  He also wondered why we're keeping you in that court when Nicole Bode [*The Daily News'* Queens Court reporter], who is not a fantastic reporter, is managing to beat you consistently.  He also brought up how labor intensive it was to assign you a dedicated rewrite for the Sean Bell trial when court reporters need to be able to write clear copy on the fly.
>
> One thing's clear, Kim, you're on Col's radar and that's a very dangerous place to be. It means you could be plucked from that court very soon.  You have to step it up.

(Lern. Dec., Exh. 12.)  Livingston's subsequent 2008 APA echoed these concerns:

> Ikimulisa needs to improve her ability to fully grasp the goings on in her court.  While she was perfectly capable of providing good notes from the Sean Bell trial, she was mostly unable to add any

---

[8] True and correct copies of referenced excerpts of the deposition of Jesse Angelo, dated April 25, 2012 and April 5, 2013 ("Angelo at [page] [Day 1 or Day 2]"), are attached to the Lern. Dec. as Exhibit 14.

> legal foresight to the coverage, which is expected . . . .  While
> Ikimulisa files her share of stories, they often need to be re-written
> and rate no longer than a brief [a short story] . . . .
>
> Ikimulisa . . . needs work [*sic*] developing sources that will provide
> stories for the paper that are longer than briefs . . . .

(Id., Exh. 13.)  Her rating was "Occasionally Meets Standards, Needs Improvement."  (Id.)

Given her poor performance, Gotthelf reassigned Livingston from the courthouses to runner in or about November 2008.  (Gott. at 166, 196-97, 199.)  Her compensation, benefits, and title did not change (just as they had not when she was assigned to the courthouses), and this was not a demotion.  (Living. at 229-30; see also Gott. Aff.  ¶ 4; Angelo at 280 [Day 1] ["[Runner and court reporter are] both reporters.  They're just different roles.  It's not a demotion."].)

This reassignment was not discriminatory.  Livingston relies on the fact that William Gorta, who happens to be white, was later assigned to the Queens courthouses (TAC ¶ 95), but he was eminently qualified as an experienced reporter, an adjunct professor at Columbia University Graduate School of Journalism, and a former NYPD police captain (Lern. Dec., Exh. 15; Gott. Aff. ¶ 20), and he had served so well as a reporter that he was once promoted to editor, although he was later returned to reporter as it better suited his strengths.  (Angelo at 210 [Day 1].)  Livingston does not dispute his qualifications.  (Living. at 117-18.)[9]

Livingston's poor performance can at least in part be explained by facts learned during discovery:  while assigned to the courthouses, she performed mystery shopping services for two other companies on 171 occasions *during her scheduled Post reporting shift*, including 19 times during the weeks of the Bell Trial.  (Kenn. Dec.  ¶ 9; Living. at 321, 323.)  In so doing, she would leave the courthouses, drive to a retail location, interact with sales representatives,

---

[9] Gotthelf has since replaced Gorta in the Queens courthouses with an African American reporter/  (Gott. Aff. ¶ 20.)

perform a transaction, prepare a report of her experience, and drive back to the courthouse. (Living. at 378-79.)  Livingston often spent more than an hour mystery shopping, and conducted multiple mystery shops on some days or trips.  (Id. at 383, 390-93; Kenn. Dec.  ¶ 10, Exh. 9.) When shopping, she could not perform the basic elements of her reporting job for the Post: generating court-related story ideas by, among other things, searching court filings or meeting with attorneys and court personnel; attending courthouse events; writing stories; and being at her assigned location to cover breaking news.  (Living. at 390-92, 417-19, 426, 434, 451; see Kenn. Dec., Exh. 8 [Aud.] [instructing Livingston to "check other case files" when she has "nothing going on"].)

Perhaps most striking about her shopping is that she did so notwithstanding serious criticism from her supervisors about her performance, and specifically that she needed to spend more time looking for stories, that her writing needed to improve, and that she might be removed from the courthouse if she did not improve.  (See, e.g., Lern. Dec., Exh. 12, 13; Kenn. Dec., Exh. 8 [Aud.].)  And she continued to mystery shop during her Post shift for years notwithstanding continued criticism of her performance, subsequent poor APAs and a 2009 performance warning. (Living. at 430-31; Lern. Dec., Exh. 16.)

2.      The Termination of Livingston's Employment

On February 26, 2013, Livingston's employment with the Post was terminated days after the Post's publisher learned that she had engaged in mystery shopping *during her reporting shift on more than 400 occasions* (including those referenced in § B.1, supra) from 2005 to 2010, and that she further mystery shopped on days on which she took paid sick and/or bereavement leave from the Post.  (Angelo at 61-62, 80-81 [Day 2]; Lerner Dec., Exh. 17.)  This had become known late during discovery.  As Angelo explained:

> [Livingston] was terminated for gross misconduct, dereliction of
> duty, dishonesty, on hundreds and hundreds of occasions going
> and doing paid work for another employer, [and] not telling her
> supervisors about [her mystery shopping] . . . .
>
>                     *   *   *
>
> We have a lot of employees who work incredibly hard, and they
> don't leave their post in the middle of the day and go do paid
> employment for somebody else when they should be reporting . . .
> I couldn't justify keeping [Livingston] on my staff.

(Id. at 61-63 [Day 2].)  These same reasons are reflected in correspondence provided to

Livingston by Angelo at the time of her termination.  (See Lern. Dec., Exh. 17.)

Angelo decided to terminate her employment in late February 2013, shortly after learning

of her misconduct and based on his review of records of Livingston's mystery shopping and the

transcript of her February 20, 2013 deposition (Angelo at 21-22, 27-28, 31, 74-76 [Day 2]),

which was "limited to questions on the topic of her 'mystery shopping" (TAC ¶ 121).  At this

deposition, Livingston for the first time admitted to mystery shopping during her reporting shift,

did not dispute doing so on paid sick days or bereavement leave, and admitted that she never

advised her supervisors of her misconduct.  (Living. at 400-01, 407, 411, 413-14, 432, 451.)

## C.  Plaintiffs Were Not Banned from the Post's Newsroom

Plaintiffs' claim they were "banned" from the newsroom is false.  Fenner's "ban," his

deposition revealed, was an innocuous instruction in 2009 to call into the Metro Desk in the

morning for assignments, as runners do, rather than come into the office, as rewrites do; this

simply reflects his reassignment from rewrite to runner.  (Green. at 320.)  As Fenner testified:

> A:  I was instructed to call the city desk in the morning
> Q:  And await instructions regarding an assignment, correct?
> A:  Correct.
> Q:  Isn't that what a runner reporter does?
> A:  A runner reporter does those things, yes.
> Q:  Did Greenfield tell you to work out in the field and that the city
>      was your office?

A:  Yes, that was part of the ban from the newsroom.

(Fenner at 208.)  Fenner acknowledged this was routine for runners (id. at 212); that he

never asked to leave the newsroom; that was never told he was "banned" or not to enter the

newsroom (id. at 215-16); that he came into the newsroom after the purported "ban" (id. at 217);

and admitted that he had no basis to believe race played a role in this instruction (id. at 210-11).

Livingston's claim of a "ban" rests entirely on Greenfield once asking her in the news-

room, "What are you doing here?" – asked because he believed her to be on an assignment at

that time.  (Living. at 206-09; Green. at 116, 256-57.)  This is a question he has posed to white

runners.  (Mac. Aff.  ¶ 4.)  She admits she had "not been directly told by an editor not to come

into the newsroom" and that she had often visited the newsroom during the purported "ban," up

to ten times per month, and was never denied entrance or told to leave.  (Living. at 194-96, 199,

212.)

**D.**     **Facts Relating to Plaintiffs' Alleged Hostile Work Environment**

Plaintiffs allege a hostile work environment based solely on their editors having allegedly

raised their voices at them.  Fenner recalls only two instances, each involving performance

issues, and neither invoking race and/or color, and he admits neither Gotthelf nor Greenfield ever

made any racially derogatory remark.  (Fenn. at 67, 98-99, 171, 176-77; Facts, p. 8 supra)

Livingston recalled no specific instance of discriminatory voice-raising (Living. at 136),

instead generally claiming that junior editor Haberman spoke harshly to her, though admitting he

never spoke of race and all episodes concerned performance issues.  (Id. at 111, 113.)  Haberman

has raised his voice at numerous white reporters whom he supervised.  (Gott. Aff. ¶ 24.)

**E.**     **Plaintiffs' Retaliation Claims Relating to the Stimulus Cartoon**

On February 18, 2009, the Post published a political cartoon by Sean Delonas (the

"Stimulus Cartoon").  (See TAC, Exh. A.)  Fenner told a blogger that the cartoon "churned my

14

stomach when I saw it," and the blogger quoted him in an online article.  (Fenn. at 189.)  None of

Fenner's supervisors saw the article, was aware of the quote, or knew he had made the statement.

(Gott. at 338-39; Green. at 394-95; Allan at 533; Angelo at 335-36 [Day 1].)[10]  Fenner never

complained internally about the Stimulus Cartoon or any employment practice.  (Fenn. at 184.)

Livingston claims that on the day the Stimulus Cartoon was published, she told Gotthelf

that "the cartoon was very offensive to people of color," and Gotthelf agreed with her sentiment.

(TAC ¶ 80.)  That was Livingston's only "complaint," and she admits to saying nothing that day

about working conditions at the Post.  (Living. at 44-47.)[11]  Livingston admits that following this

"complaint," she was not subject to any new alleged "mistreatment."  (Living. at 36-57 [Day 3].)

## ARGUMENT

### I.

### SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c)(2).

Summary Judgment is "properly regarded . . . as an integral part of the Federal Rules as a whole,

which are designed to secure the just, speedy and inexpensive determination of every action."

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

If a party fails to produce evidence "sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial," then

---

[10] True and correct copies of referenced excerpts of the deposition of Col Allan, dated February 14, 2012 and February 21, 2013 ("Allan at [page]"), are attached to the Lern. Dec. as Exhibit 18.

[11] Five days before filing her federal lawsuit, on December 3, 2009, Livingston e-mailed Amy Scialdone in the Post's HR department stating she had "been discriminated against due to [her] race and gender" on the grounds that she was "removed from [her] beat as the Queens Courts reporter," and that she did not have a desk.  (Living. at 140; Lern. Dec., Exh. 21 at IL_274-75.)  Although the Post investigated her complaint, Livingston was represented by counsel and would not discuss the claims she was asserting.  (Id. at NYP-FL819-21.)  Plaintiff does not allege retaliation for this e-mail.

summary judgment is proper.  Id. at 322.  Thus, to defeat summary judgment, the non-moving

party "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come

forward with 'specific facts showing that there is a genuine issue for trial.'"  Powell v. Nat'l Bd.

of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d

1067, 1072 (2d Cir. 1993)).  The nonmovant's facts "must be material and of a substantial

nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural,

speculative, nor merely suspicions."  Contemp. Mission v. U.S. Postal Serv., 648 F.2d 97, 107

n.14 (2d Cir. 1981).

## II.

### PLAINTIFFS' CLAIMS OF DISPARATE TREATMENT BASED ON RACE AND/OR COLOR MUST BE DISMISSED

### A.    Fenner's Claim of Discriminatory Termination and Livingston's Claim of Discriminatory  Reassignment are Without Merit

To establish a *prima facie* claim of disparate treatment, a plaintiff must show:  "(1) she is

a member of a protected class; (2) she is qualified to perform the job in question; (3) there was

an adverse employment action; and (4) the employment action . . . occurred under circumstances

supporting an inference of discrimination."  Carter v. New Venture Gear, Inc., 310 Fed. Appx.

454, 456 (2d Cir. 2009) (citations omitted).[12]  If a *prima facie* case is established, Defendants

may offer a legitimate, non-discriminatory reason for the conduct.  Id.  Plaintiffs must then show

that this reason is false under the NYCHRL, see Bennett v. Health Mgmt. Sys., Inc., 92 A.D.3d

29, 43-44 (1st Dept. 2011), and, additionally under Title VII, Section 1981, and NYSHRL, that

the act was motivated by discriminatory animus.  Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. 133, 148 (2000) (falsity alone does not defeat summary judgment).

---

[12] Claims of disparate treatment under the NYSHRL, NYCHRL and Section 1981 are analyzed in the same manner as those under Title VII.  See Albuja v. Nat'l Broad. Co. Universal, Inc., 2012 WL 983566, at *4 (S.D.N.Y. Mar. 16, 2012) (citations omitted).

Fenner and Livingston were at-will employees and could be lawfully terminated "at any time for any reason or even for no reason."  Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 300 (1983).  Here, however, all employment actions were taken for good reason.

Initially, Fenner cannot state a *prima facie* claim of discriminatory termination, which he must establish (i) through direct evidence, or (ii) circumstantially, "by showing that [the plaintiff] was treated differently than similarly situated employees outside his protected group." Sicular v. N.Y.C. Dept. of Homeless Srvs., 2010 WL 423013, at *18 (S.D.N.Y. Feb. 4, 2010). There is no direct evidence of any reference to race whatsoever in connection with Fenner's termination.  (Statement of Facts ["Facts"], § A.5, supra)  Nor is there circumstantial evidence that race was the reason for the termination.  Sicular, 2010 WL 435013, at *18.

Further, the Post had a well-recognized legitimate, non-discriminatory reason for terminating Fenner's employment, namely his poor performance.  See, e.g., Sutherland v. N.Y. State Dept. of Law, 216 F.3d 1073 (2d Cir. 2000).  Fenner was hired as a senior reporter and expected to perform at a "[v]ery high level" (Green. at 319), but never did this.  This was well-documented in APAs, in two warnings, and in his own testimony, which all detail, among other things, a failure to produce investigative or enterprise stories and subpar writing skills.  (See Facts, §§ A.2-3, supra.)  "Whether job performance was satisfactory depends on the employer's criteria," and by the Post's criteria, Fenner's was woefully unsatisfactory.  Sotomayor v. City of New York, 862 F. Supp. 2d 226, 253 (E.D.N.Y. 2012), aff'd, 2013 WL 1458839 (2d Cir. Apr. 11, 2013).  That Fenner disagrees with his supervisors' evaluations of his performance is of no moment as it "is insufficient to establish discriminatory intent."  Ricks v. Conde Nast Publications, Inc., 6 Fed. Appx. 74, 78 (2d Cir. 2001).

Livingston similarly cannot establish a *prima facie* claim that her November 2008 reassignment from the Queens courthouses was discriminatory.  She can offer no direct or

circumstantial evidence that race played any role in her reassignment, instead admitting that no editor or executive made any racially derogatory comments.  (Living. at 132-33, 139.)

But Livingston faces another hurdle:  being reassigned from the courthouses to runner is not an "adverse employment action," as there was no change to her title, compensation, or benefits, and runner was not "materially less prestigious . . . less suited to [her] skills and expertise, or . . . less conducive to career advancement."  Amna v. N.Y. Dept. of Health, 2011 WL 4592787, at *5-6 (E.D.N.Y. Sept. 30, 2011) (quoting Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000)).  Her subjective disappointment with this is changes nothing. Dotson v. City of Syracuse, 2009 WL 2176127, at *10 (N.D.N.Y. July 21, 2009) (citations omitted).

But most of all, she was reassigned for a legitimate non-discriminatory reason, namely underperforming by, among other things, missing parts and/or all of stories, failing to generate story ideas, and failing to develop sources (Facts, § B.1, 4), plainly not "satisfactory" under by the Post's standards.  Sotomayor, 862 F. Supp. 2d at 253.  Her belief that she performed well is irrelevant, Ricks, 6 Fed. Appx. at 77, and the mere fact that a white reporter, Gorta, succeeded her in the courthouses does not save her claim, as his "not [being] a member of [plaintiff's] protected class . . . is insufficient to create a triable issue of fact."  Beachum v. AWISCO New York, 785 F. Supp. 2d 84, 97-98 (S.D.N.Y. 2011), aff'd, 459 Fed. Appx. 58 (2d Cir. 2012).  In fact, Gorta was supremely qualified for the position, a fact Livingston does not dispute.  (See Facts, § B.1.)  Finally, the "same actor" inference undercuts Livingston's claim, as Gotthelf recommended assigning her to the courthouses and reassigned her to runner.  Hauptman v.

Concord Fabrics, Inc., 1999 WL 527970 (S.D.N.Y. July 22, 1999) (applying inference after two and a half years).[13]

## B.    Plaintiffs Were Not "Banned"

Plaintiffs' claim that they were "banned" from the Post's newsroom because they are black is false.  This is a specious distortion of their duties as runner reporters, and they cannot carry their burden to show that they were treated any differently than white runners.  They, *like all other runners*, were required to call in from the field to obtain assignments and remain in the field to report throughout the day; like other runners, they rarely came into the Post's offices. (Gott. Aff. ¶ 5; Green. at 116-17, 119, 132.)  "[E]mployees do not always have the option to work in the location they desire" but "must often go where the employer determines they are needed most."  Little v. New York, 1998 WL 306545, at *5 (E.D.N.Y. June 8, 1998), aff'd, 173 F.3d 845 (2d Cir. 1999).  Such is the case here.

Further belying their claim, both plaintiffs admit to coming into the newsroom after the "ban," and neither was ever prohibited from entering, told to leave, *or told they were banned*. (Facts, § C.)  That Greenfield *once* asked Livingston why she was in the newsroom is of no moment:  he asked this because he thought she was assigned to a story at that time, not because of her race (id.), and has asked the same question of white reporters.  (Mac. Aff. ¶ 4.)  And Leonard Greene, a black *rewrite*, has been stationed in the Post's office at all relevant times, "negat[ing] any inference of discrimination."  Greaves v. St. Luke's/Roosevelt Hosp. Ctr., 2005 WL 627635, at *5 n.88 (S.D.N.Y. Mar. 17, 2005) (citations omitted).[14]

---

[13] In fact, Gotthelf later replaced Gorta in the Queens court with an African American reporter.  (Gott. Aff. ¶ 20.)  If Livingston is also asserting a claim for discriminatory termination, it, too, is devoid of merit, as there is no evidence of racial animus by the decision-maker, Jesse Angelo, (not to mention by any other supervisor) and because the Post had a legitimate non-discriminatory reason to terminate her employment – her mystery shopping during her reporting shifts.  Facts, pp 11-13 supra.  See also Argument § IV infra.

[14] Plaintiffs make other unsubstantiated claims.  For instance, they claim to have been paid less than white reporters, but Fenner was one of the highest-paid reporters, and Livingston's pay was above average.  (Gott. ¶ 27.)

## III.

### PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT
### THEY EXPERIENCED A HOSTILE WORK ENVIRONMENT

Under Title VII, Section 1981, and the NYSHRL, a plaintiff claiming a hostile work

environment must show "she was harassed because of her membership in a protected class,"

Monterroso v. Sullivan & Cromwell, LLP, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008), and the

conduct was "objectively severe or pervasive."  Kelly v. Howard I. Shapiro & Assocs. Consult-

ing Eng., P.C., 2012 WL 3241402, at *6 (E.D.N.Y. 2012).[15]  Under the NYCHRL, a plaintiff

must show "she has been treated less well than other employees because of her [protected

class]."  Zambrano–Lamhaouhi v. NYC Bd. of Educ., 2011 WL 5856409, at *9 (E.D.N.Y. 2011)

(citations omitted).  None of these statutes is "a general civility code, and petty slights and trivial

inconveniences are not actionable."  Campbell v. Cellco Partnership, 2012 WL 400959, at *8

(S.D.N.Y. 2012).

These claims must be dismissed.  First, there is no evidence that Gotthelf, Greenfield or

Haberman, whom plaintiffs allege occasionally raised their voices (Facts, § D), did so "because

---

Fenner claims his shift time was changed one day a week, he was required to travel on national stories, and he was once denied a photographer.  None of these acts changed his pay or status or interfered with his performance, and each is not actionable.  Albuja v. Nat'l Broad. Co. Universal, Inc., 851 F. Supp. 2d 599, 608 (S.D.N.Y. 2012) (schedule change "a 'mere inconvenience'"); Freedman v. MCI Telecomm. Corp., 255 F.3d 840, 847 (D.C. Cir. 2001) (denial of requests not adverse where "the interference with [plaintiff's] work was minimal"); Ragin v. East Ramapo Cent. School Dist., 2010 WL 1326779, at *21 (S.D.N.Y. Mar. 31, 2010) ("being assigned a task well within [his] job responsibilities," such as travel, is not actionable).

Livingston complains about her 2009 warning and APA, not being assigned a desk and telephone in the newsroom when she became a runner, and that certain story pitches were called "low rent."  Besides being accurate, Livingston's 2009 APA and warning are inactionable as they did not affect her "responsibilities, benefits, salary, or anything else" since the Post was on a salary freeze that year (Lern. Dec., Exh. 23), and many white reporters received warnings that year (Gott. Aff.0020 28.).  Rozenfeld v. Dept. of Design and Const. of the City of N.Y., 2012 WL 2872157, at *8 (E.D.N.Y. July 12, 2012).  Livingston, like other runners, did not have an assigned desk in the newsroom (Gott. Aff. ¶21), but used an open desk as needed, and was partially reimbursed for her cell-phone per Post policy (Living. at 247-49; Green. at 256).  Livingston could not recall any story pitch called "low rent" (Living. at 132, 134), admitted that no editor told her stories about minorities were "low rent" (id. at 249), and testified she did not mention race when pitching stories (id. at 300).

[15]  See Davis v. Oyster Bay–East, No. 03 Civ. 1372, 2006 WL 657038, at *8 n. 12 (E.D.N.Y. Mar. 9, 2006), aff'd, 220 Fed. Appx. 59 (2d Cir. 2007) ("[D]iscrimination claims under Title VII, 42 U.S.C. §§ 1981 . . . and NYHRL § 296 are analyzed together, as the same analytic framework applies to each").

of" their protected class – a threshold issue.  Both testified that no epithets or race-based

comments were directed at them, and any yelling related to work performance.  (Id.)  Being

"treated harshly" for performance without "racial motivate[ion]" is not actionable under the

NYCHRL or any other relevant statute.  Sharpe v. MCI Comm. Svcs., Inc., 684 F. Supp. 2d 394,

400-01 (S.D.N.Y. 2010); Short v. Deutsche Bank Secs., Inc., 79 A.D.3d 503 (N.Y. App. Div.

2010) (affirming dismissal of NYCHRL claim based on brusque management style).  Further,

white reporters have been yelled at by the same supervisors for like reasons.  (Facts, § D.)  And

courts routinely reject claims even where the conduct does have racist elements.[16]

**IV.**

**PLAINTIFFS' CLAIMS OF
RETALIATION MUST BE DISMISSED**

Plaintiffs claim they were retaliated against for complaining about the Stimulus Cartoon.

To establish a *prima facie* claim of retaliation, a plaintiff must show (1) she engaged in protected

activity known to her employer; (2) the employer took an adverse action; and (3) a causal

connection between the protected activity and the adverse action.  Woods v. Enlarged City

School Dist. of Newburgh, 473 F. Supp. 2d 498, 527 (S.D.N.Y. 2007), aff'd, 288 Fed. Appx. 757

(2d Cir. 2008).   If a *prima facie* case is established, the employer must proffer a legitimate, non-

retaliatory reason, whereupon the plaintiff bears the burden to show pretext for her claim to

survive.  Eichler v. Am. Intern. Group, Inc., 2007 WL 963279, at *17 (S.D.N.Y. Mar. 30, 2007).

Initially, it is *undisputed* that no Post editor was aware that Fenner commented about the

Cartoon to a blogger.  (Facts, § E.)  This alone requires dismissal.  Philippeaux v. Fashion Inst.

---

[16] See Rios v. Buffalo and Fort Eric Pub. Bridge Auth., 2008 WL 657121, at *4 (W.D.N.Y. Mar. 7, 2008), aff'd, 326
Fed. Appx. 612 (2d Cir. 2009) (dismissing claims where plaintiff told to either not "speak Puerto Rican" or go back
to her own country, shown multiple offensive cartoons, had coffee spit on her, and had "Puerto Rican scum" written
on her car, among other things); Negron v. Rexam Inc., 104 Fed. Appx. 768, 770 (2d Cir. 2004) (employee called a
racial epithet "a handful of times," including over a loudspeaker, insufficient); Stembridge v. City of New York, 88
F. Supp. 2d 276, 286 (S.D.N.Y. 2000) (granting summary judgment where plaintiff was referred to as an "uppity
n*gger" and a "boy," harasser called other African-American "animals" and "washroom attendant," and hung a
black doll).

of Tech., 1996 WL 164462, at *6 (S.D.N.Y. Apr. 9, 1996), aff'd, 104 F.3d 356 (2d Cir. 1996)

(absence of evidence that decision-makers were aware of statement fatal to retaliation claim).[17]

Moreover, Fenner's statement to the blogger that the Stimulus Cartoon "churned [his] stomach"

cannot be the basis of a retaliation claim because Fenner could not have reasonably believed that

he was objecting to an unlawful employment practice and thus it was not a protected activity.

See Taneus v. Brookhaven Mem. Hosp. Med. Ctr., 99 F. Supp. 2d 262, 266 (E.D.N.Y. 2000)

(complaint about discriminatory manual directing hospital care of patients not protected).[18]

There also is no causal connection between his statement and termination *nine months

later*. There is no direct evidence of retaliatory animus, nor is there circumstantial evidence as

his statement was not "followed closely by discriminatory treatment . . . ." Beachum, 785 F.

Supp. at 98 (quoting Gordan, 232 F.3d at 117.)  Courts "have consistently held that the passage

of two to three months between the protected activity and the adverse employment action does

not allow for an inference of causation." Murray v. VNS of N.Y., 528 F. Supp. 2d 257, 275

(S.D.N.Y. 2007).[19]  Finally, Fenner's termination was for legitimate, non-discriminatory reasons,

i.e., his failure to meet the requirements of senior reporter.  (See § II.A.1.)

---

[17] See also Lindner v. IBM, 2010 WL 308725, at *4 (S.D.N.Y. Jan. 21, 2010) (granting summary judgment where "retaliator" unaware of protected activity); Sundaram v. Brookhaven Nat'l Labs., 424 F. Supp. 2d 545, 584 (E.D.N.Y. 2006) ("[T]he plaintiff has failed to establish a prima facie case of retaliation because there is no evidence that any of the decisionmakers was aware of the plaintiff's protected activity . . . ."). See also, Woodman v. WWOR-TV, Inc., 411 F.3d 69, 83 (2d Cir. 2005) (quoting Raytheon Co. v. Hernandez, 540 U.S. 44, 55, n.7 (2003)) ("if an employer 'were truly unaware that such a disability existed, it would be impossible for her hiring decision to have been based, even in part, on respondent's disability.").

[18] See also Kelly v. Howard I. Shapiro Assocs., 2013 WL 1776646 (2d Cir. Apr. 26, 2013) (dismissing were complaint not aimed at unlawful employment practice); Wimmer v. Suffolk Cnty Police Dep't, 176 F.3d 125, 135 (2d Cir. 1999) (complaint about discriminatory conduct aimed at public not a protected activity); Foxworth v. Am. Bible Soc., 2005 WL 1837504 (S.D.N.Y. July 28, 2005), aff'd, 180 Fed. Appx. 294 (2d Cir. 2006) (complaint of discriminatory marketing practices not protected).

[19] See also Garrett v. Garden City Hotel, Inc., 2007 WL 1174891, at *21 (E.D.N.Y. April 19, 2007) (no causal connection after two and a half months); Ponticelli v. Zurich Am. Ins. Group, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (two and a half months); Hollander v. Amer. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (three and a half months); Hussein v. Hotel Employees & Rest. Union, Local 6, 2002 WL 10441 (S.D.N.Y. Jan. 3, 2002), aff'd, 50 Fed. Appx. 473 (2d Cir. 2002) (two months defeats).

Livingston illogically claims the Post retaliated against her for her negative view of the cartoon by reassigning her from the Queens courthouse beat, "banning" her from the newsroom, and denying her a desk.  But she was reassigned to be a runner in November 2008, and she claims that the "ban" and desk denial started then, i.e., months before the cartoon was published in February 2009.  (Facts, §§ B.1, E.)  The "mere continuation of an [alleged] adverse employment condition initiated long before the protected activity . . . does not . . . support an inference that the protected activity prompted retaliation."  Washington v. City of New York, 2009 WL 1585947, at *8 (S.D.N.Y. June 5, 2009).  Of course, there was no "ban" and the other decisions were legitimate and non-actionable.  As with Fenner, Livingston complained only about the cartoon, and not any employment practice, which, as noted above, is not a protected act.  And all decisions had legitimate, non-retaliatory reasons.  (Facts, §§ B.1, E.)

Finally, Livingston claims that her employment was terminated in retaliation for her January 2012 deposition, more than a year prior to her termination.  (Living. at 19 [Day 3] ["[S]ince [Gotthelf] sat across from me during my [January 2012] deposition . . . this is the reason a year later that I'm terminated."].)  This claim fails on many grounds, most notably the Post's unassailable legitimate, non-discriminatory reason:  Livingston mystery shopped for pay for two other employers on 450 occasions, over a five-year span, during her Post shift, simultaneously abandoning her assigned work location and being incapable of performing her assigned duties, all without notifying her supervisors.  She was terminated within days of her admitting to this fact in February 2013.  (Facts, § B.2; Kenn. Dec. Exh. 9.)  This is gross misconduct of the most severe kind and it is hard to imagine a more legitimate reason for termination.

Additionally, the passage of more than one year from her January 2012 deposition is too long to permit an inference of retaliation.  See Murray, 528 F. Supp. 2d at 275; McPhatter v. New York City, 2009 WL 2412980 (E.D.N.Y. 2009) (dismissing claim where plaintiff

suspended one-year after lawsuit).  Second, she alleges no intervening retaliatory conduct,

admitting that she had continually been treated in the same manner since her 2008 reassignment.

(Living. at 36-37 [Day 3].)  Third, Livingston cites Gotthelf's presence at the 2012 deposition,

but Angelo alone made the termination decision.  (Angelo at 21-22 [Day 2].)[20]

## V.

## GOTTHELF AND GREENFIELD ARE NOT INDIVIDUALLY LIABLE

Finally, this action should also be dismissed against the individuals, Gotthelf and

Greenfield.  First, "individuals are not subject to liability under Title VII."  Patterson v. Cnty. of

Oneida, 375 F.3d 206, 221 (2d Cir. 2004).  Second, the individuals cannot be liable as "aidor or

abettor" under the other statutes relied upon (NYSHRL, NYCHRL and Section 1981) where

there is no primary act of discrimination, retaliation, or harassment, which we have proved

above.  HealthCare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345, 363

(S.D.N.Y. 2007) ("accessory liability may only be found where a primary violation has been

established") (citation omitted).  Third, with respect to claims of a hostile work environment,

Gotthelf and Greenfield have not each engaged in conduct amounting to a hostile environment

and, likewise, neither had any role in Livingston's termination.  Thus, under the NYSHRL and

NYCHRL,[21] where a supervisory employee may only be liable to the extent they "actually

participate[] in the [discriminatory] conduct," Emmons v. City Univ. of New York, 715 F. Supp.

2d 394, 420 (E.D.N.Y. 2010) (quoting Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004)),

---

[20] Plaintiffs' counsel appears prepared to argue pretext because Livingston admitted to mystery shopping in January 2012, but was not terminated until February 2013.  This would be a distortion of fact.  Livingston admitted to mystery shopping in January 2012, but not to doing so *during her scheduled reporting shift*, as she testified that she shopped "around [her Post] schedule," and no documents reflecting the times that she shopped had been produced until Defendants subpoenaed them later in 2012.  (Living. at 324.)  Only in February 2013 did she admit to mystery shopping *during her scheduled reporting shift*; Angelo thereafter learned of this misconduct and promptly terminated her employment.  (Angelo at 21 [Day 2].)

[21] Section 8-107 of the NYCHRL uses "virtually identical language" to § 296 of the NYSHRL and thus courts such are "subject to the same analysis."  See Emmons, 715 F. Supp. 2d at 421 (citation omitted).

by "encouraging, condoning, or approving it," <u>Durkin v. Verizon New York, Inc.</u>, 678 F. Supp.

2d 124, 136 (S.D.N.Y. 2009) (citation omitted), and not on a theory of *respondeat superior*,

<u>Romero v. City of New York</u>, 839 F. Supp. 2d 588, 635 (E.D.N.Y. 2012) (citation omitted), they

cannot be liable for the purported hostile work environment claims, and/or Livingston's

termination.  Analogous requirements under Section 1981 require the same result.  <u>Patterson</u>, 375

F.3d at 229) (requiring "direct participation . . . negligent supervision of those violating

Plaintiff's rights or a failure to take" preventative action.").

<u>**CONCLUSION**</u>

Based on the foregoing, Defendants NYP Holdings, Inc., d/b/a the New York Post, and

Michelle Gotthelf and Daniel Greenfield respectfully request that the Court grant summary

judgment dismissing with prejudice Plaintiffs Fenner and Livingston's Third Amended

Complaint in its entirety.

Dated: May 10, 2013
      New York, New York

                               Respectfully submitted,

                               KASOWITZ, BENSON, TORRES
                                 & FRIEDMAN LLP

                               By:  /s/ Mark W. Lerner
                                   Marc E. Kasowitz (mkasowitz@kasowitz.com)
                                   Mark W. Lerner (mlerner@kasowitz.com)
                                   Blythe E. Lovinger (blovinger@kasowitz.com)
                                   Garrett D. Kennedy (gkennedy@kasowitz.com)

                               1633 Broadway
                               New York, New York 10019
                               Tel.:  (212) 506-1700
                               Fax:  (212) 506-1800
                               Attorneys for Defendant Defendants
                               NYP Holdings, Inc., d/b/a the New York Post,
                               Michelle Gotthelf and Daniel Greenfield

25