KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Marc E. Kasowitz (mkasowitz@kasowitz.com)
Mark W. Lerner (mlerner@kasowitz.com)
Blythe E. Lovinger (blovinger@kasowitz.com)
Garrett D. Kennedy (gkennedy@kasowitz.com)
1633 Broadway
New York, New York 10019
Tel.:    (212) 506-1700

*Attorneys for Defendants*
NYP Holdings, Inc., d/b/a the New York Post,
Michelle Gotthelf and Daniel Greenfield

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                           :
AUSTIN FENNER and                                          :
IKIMULISA LIVINGSTON,                                      :
                                                           :
                              Plaintiffs,        :        Civ. No.: 09 CV 9832 (LGS)
                                                           :
              vs.                                          :
                                                           :
NEWS CORPORATION, NYP HOLDINGS,                            :
INC., d/b/a THE NEW YORK POST,                             :
MICHELLE GOTTHELF and , DANIEL                             :
GREENFIELD, in their official and individual              :
capacities,                                                :
                                                           :
                              Defendants.        :
-------------------------------------------------------------x

## <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

        Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the

Southern District of New York, Defendants NYP Holdings, Inc., d/b/a the New York Post (the

"Post"), Michelle Gotthelf and Daniel Greenfield (collectively, the "Defendants"), by their

attorneys Kasowitz, Benson, Torres & Friedman LLP, respectfully submit this Statement of

Undisputed Material Facts in support of their Motion for Summary Judgment against Plaintiffs

Austin Fenner ("Fenner") and Ikimulisa Livingston ("Livingston") (together "Plaintiffs").

A.      **Reporters for the Post's Metro Desk**

1.      The Post's Metropolitan Desk (the "Metro Desk") is responsible for reporting on and writing stories about news events.  (Gott. Aff. ¶¶ 1, 2.)[1]  Michelle Gotthelf is the Editor of the Metro Desk and has been since December 2007.  (Id.)  Daniel Greenfield is the Deputy and Morning Assignment Editor for the Metro Desk, and has been employed by the Post since October 2006.  (Green. Aff. ¶ 1, 2.)[2]

2.      Approximately 50 reporters and seven editors report to the Metro Desk.  (Gott. Aff. ¶ 2.)

3.      Reporters for the Metro Desk generally have one of three assignments:  "runner" (or "street" or "field" reporter); "rewrite"; or "beat reporter."  (Gott. Aff. ¶ 3.)  Reporters of all seniority levels work each assignment, although specific duties may vary by reporter, and more senior and/or highly compensated reporters are expected to produce at a higher level than more junior reporters.  (Id.)

4.      Reporters are moved between these three assignments as needed by the Metro Desk.  (Id. ¶ 4.)

5.      Reassignment between runner, rewrite and/or beat reporter is neither a promotion nor demotion, and is not accompanied by any change to a reporter's pay, seniority or benefits. (Gott. Aff. ¶ 4; Angelo at 280 [Day 1] ["[Runner and court reporter are] both reporters.  They're just different roles.  It's not a demotion."].)[3]

---

[1] The affidavit of Michelle Gotthelf, dated May 9, 2013, submitted in support of Defendants motion for summary judgment, is herein designated "Gott. Aff."
[2] The affidavit of Daniel Greenfield, dated May 8, 2013, submitted in support of Defendants motion for summary judgment, is herein designated "Green. Aff."
[3] The declaration of Mark W. Lerner, Esq., submitted in support of Defendants motion for summary judgment and dated May 10, 2013, 2013, to which all exhibits are attached, unless otherwise noted, is herein designated "Lern. Dec."  True and correct copies of referenced excerpts of the deposition of Jesse Angelo, dated April 25, 2012 and April 5, 2013 ("Angelo at [page] [Day 1 or Day 2]"), are attached to the Lern. Dec. as Exhibit 14.

6.      Reassignments are not communicated to the Post's human resources department ("HR"), nor are they processed by HR.  (Id. ¶ 4.)

7.      Runners work almost exclusively from the field, i.e. away from the Post's offices, and receive story assignments from the Post's editors and/or rewrites.  (Id. ¶ 5; Green. at 116-19.)[4]  Runners do not work from the Post's offices and rarely come into the Post's newsroom during a shift; rather, they call the newsroom to receive an assignment.  (Gott. Aff. ¶ 5.)  Runners typically report from news scenes, prepare notes, and provide them to a rewrite via telephone or e-mail.  (Id.)

8.      Rewrites work in the newsroom and receive draft notes and/or draft language from runners and prepare a story based on these notes. (Green. at 132-34; Gott. at 83-85; Gott. Aff. ¶ 6.)[5]  They additionally report from the newsroom and coordinate runners in the field. (Gott. Aff. ¶ 6.)  Rewrites may work on multiple stories in a day.  (Green. at 132-34.)

9.      Beat reporters have a specific topical area of focus (as opposed to rewrites and runners, who thus are called "general assignment reporters").  (Gott. Aff. ¶ 8; Green. at 245.) Beat reporters, which includes court reporters, must have a strong knowledge of their beat, including the subject matter, and have good sources.  (Gott. Aff. ¶ 8.)  They must also be able to write stories on deadline and produce "clean copy," i.e. not needing significant rewriting. (Green. at 167; Gott. Aff. ¶ 9.)

10.     Reporters in all three assignments are required as part of their job to look for and/or generate investigative, enterprise and exclusive story ideas, and they must possess sources.  (Gott. Aff. ¶ 8.)  An enterprise story is one generated by the reporter and not assigned

---

[4] True and correct copies of referenced excerpts of the deposition of Daniel Greenfield, dated April 5, 2012 ("Green. at [page]"), are attached to the Lern. Dec. as Exhibit 1.
[5] True and correct copies of referenced excerpts of the deposition of Michelle Gotthelf, dated March 29, 2012 ("Gott. at [page]"), are attached to the Lern. Dec. as Exhibit 2.

by an editor; it is original and exclusive reporting resulting from investigative work, usually longer than average and with in-depth analysis.  (Gott. at 152-53; Fenn. at 79.)[6]

**B.**     **Facts Relating to Austin Fenner**

11.     Fenner, who is African-American, was hired in May 2007 as an at-will employee to the position of "Senior Reporter" for the Metro Desk.  (Gott. Aff. ¶ 10.)

12.     Fenner was hired at a salary of $92,000 per year, making him the ninth highest paid reporter out of 71 reporters on the Post's Metro Desk.  (Gott. Aff. ¶¶ 10, 27.)  Because he "was very highly paid," he was expected to perform at a "[v]ery high level."  (Green. at 319.)

13.     As a highly-compensated senior reporter, Fenner was expected to develop a lot of sources and new information, discovery unique story angles, perform investigative work, or otherwise produce exclusive stories when he was sent on assignment.  (Gott. Aff. ¶¶ 3, 13; Green. at 319.)  In other words, Fenner was expected to be "sneaky," which is a term Gotthelf uses to describe a good reporter who "breaks away from the pack . . . to go their separate way and break a news line."  (Gott. at 294.)

14.     Fenner was initially assigned to work as a rewrite.  (Green. at 319; Gott. Aff. ¶ 11.)

15.     Fenner did not live up to the expected level of performance as he did not break stories, was not generating enterprise pieces, and lacked sources.  (Gott. at 157, 253.)

16.     Also, Fenner's writing was poor as it often needed significant editing, contained junior-level factual, grammatical and spelling errors, failed to discern the "lede," or most interesting aspect, of a story, and contained holes or information gaps.  (Id. at 156-57, 253; Gott. Aff. ¶ 11.)

---

[6] True and correct copies of referenced excerpts of the deposition of Austin Fenner, dated January 11, 2012 ("Fenn. at [page]"), are attached to the Lern. Dec. as Exhibit 3.

17.     Starting in 2008, Fenner was increasingly sent to cover news from the field, as opposed to working rewrite, as Gotthelf hoped his performance might improve if less writing was required of him.  (Gott. Aff. ¶ 12.)

18.     Fenner's FY[7] 2008 annual performance appraisal ("APA"), dated July 28, 2008, rated his overall performance as:  "Must Improve, Rarely Meets Standards." (Lern. Dec., Exh. 4.)

19.     Fenner's FY 2008 APA states that because of his poor writing and lack of enterprise stories, Fenner was assigned less "rewrite" work (see ¶ 8, supra) and, "within his first year [] slid into the role of street runner."  (Id.)  It further stated:

> [Fenner] does not initiate or produce top-notch enterprise [stories] for the Post.  He has pitched a few stories that are not a good fit for the Post.  Now all of his assignments come from editors, who find his work, at best, lacking.

(Id.)

20.     Fenner received a written performance warning, also dated July 28, 2008, from his editors.  (Id.)  The warning states that it is due to Fenner's:  (i) "Poor basic writing skills"; (ii) "Lack of fact checking"; (iii) failure to "produc[e] enterprise stories"; and (iv) and "Not being able to discern what the news line [lede] is . . . ."  (Id.)

21.     Fenner's warning required "an immediate and consistently sustained improvement . . . ." (Id.)

22.     Certain instances highlight Fenner's poor performance in FY 2008.  In May 2008, Fenner was sent to Chicago to report on Reverend Jeremiah Wright, the former pastor of then-presidential candidate Obama, with the expectation that Fenner would produce exclusive, investigative or enterprise stories.  (Gott. at 265; Gott. Aff. ¶ 14.)

---

[7] The Post's fiscal year ("FY") runs from July to June.

23.     Gotthelf sent Fenner to cover Wright because he "wasn't doing a great job" as a rewrite, was "not a strong writer," "wasn't pitching story ideas," and "wasn't discerning news lines on story ideas," so, because she "had an idea of something [she] wanted," she assigned Fenner to cover Wright.  (Gott. at 269-70.)  Fenner was expected to provide exclusive, investigative, or enterprise stories regarding Wright.  (Gott. Aff. ¶ 14.)

24.     When in Chicago, the only story produced by Fenner was based on interviews of Wright's congregation members.  (Gott. at 264-65; Gott. Aff. ¶14.)  Fenner produced no exclusive, investigative or enterprise pieces and, as a result, was called back to New York early.  (Gott. Aff. ¶14.)

25.     Fenner admitted he failed to perform on this assignment:  "They wanted a hot story . . . .  I wouldn't call [the story produced] a hot story."  (Fenn. at 36-39.)

26.     Fenner testified that this criticism of him was not discriminatory.  (Id. at 38.)

27.     Also in May 2008, Fenner was sent to Chicago to cover the trial of singer R. Kelly, who allegedly videotaped sex acts with a minor.  (Id. at 40.)

28.     In preparing a draft story on the opening of the trial, Fenner omitted that the alleged victim, by then 23 years old, recanted her allegations, but the trial would go on.  (Id. at 43-44.)  Fenner was aware of this fact when he prepared the story.  (Id.)

29.     Fenner admitted that he "would have wanted to put that [omitted fact] in the story, yes," and that the omitted fact was "interesting and unique."   (Id. at 43-45.)

30.     Neil Sloane, the editor overseeing the story, was critical of Fenner's failure to include this in the story.  (Id. at 41.)

31.     Fenner testified that this criticism of him was not discriminatory.  (Id. at 42.)

32.     In June 2008, Fenner drafted a story on a sexual harassment lawsuit against the husband of disc jockey Wendy Williams, but failed to identify the most interesting aspect of the story:  Williams' husband allegedly tried to hire a hit man to kill her rival.  (See id. at 56.)

33.     Sloane rewrote this story with the hit man aspect as the lede, and Fenner admitted about the edited story, "I like [Sloane's] lead, I agree with it."  (Id. at 57.)

34.     Fenner could not even recall developing a single confidential source for this assignment with respect to his standing assignment to cover the expansion of Columbia University.  (Fenn. at 73-74.)

35.     Fenner's writing was also poor, including poor syntax and grammatical and factual errors.  (Gott. at 156.)  For instance, Fenner submitted the following to his editors:

> The protesters also plan to continue their late night demonstrate
> [*sic*] to Bowery Wine Company on First St., which movie action
> star Bruce Willis is reportedly a co-owner and [*sic*] then on to a
> New York University dormitories [*sic*] on Bowery St.

(Lern. Dec., Exh. 5; Fenn. at 49.)  Besides clear poor syntax and grammatical errors, this contained factual errors, as it wrongly identifies Bruce Willis as a co-owner of the wine company, and "Bowery St." does not exist.  (Lern. Dec., Exh. 5.)

36.     Fenner admitted at deposition that he committed these errors.  (Fenn. at 49.)

37.     Michael Hechtman, the editor who brought these errors to Gotthelf's attention (Lern. Dec., Exh. 5), never discriminated against Fenner (Fenn. at 50).

38.     In another instance, Fenner's editors had to repeatedly instruct him to conduct an assigned interview (Lern. Dec., Exh. 5), which he managed to do only after the passage of "weeks" and being sent back "multiple times" by his editors.  (Fenn. at 64-67.)

39.     Fenner was increasingly assigned to report from the field throughout FY 2009 until, in or about May 2009, he was reassigned to work as a runner, when Greenfield informed

him that he would work from the field and should call the newsroom to receive assignments.  (Id. at 207-08; Green. at 320.)

40.    Fenner's performance did not improve and his FY 2009 APA rated his overall performance as "Unacceptable, Does Not Meet Standards."  (Lern. Dec., Exh. 7.)

41.    Fenner's May 2009 self-evaluation states that he needed to "produce more exciting-hard hitting [*sic*] enterprise stories" (Id., Exh. 6), an essential aspect of his job and a prime criticism of his supervisors.  (See Id., Exh. 7.)

42.    His 2009 self-evaluation highlights three stories from FY 2009, none of which are notable for a senior reporter:  (1) an interview of a passenger on the plane that landed in the Hudson River, (2) an assigned interview of Timothy Dolan, and (3) an article about a church group attending the Obama inauguration.  (Id., Exh. 6.)

43.    Fenner's 2009 self-evaluation identifies no enterprise stories by him.  (Id.)

44.    In January 2009, Gotthelf assigned Fenner to cover the plane crash, along with approximately a dozen other Post reporters; he interviewed the same passenger as at least three other news outlets; his interview was not a significant aspect of the Post's coverage of the landing; and he provided no information not found in other publications.  (Fenn. at 132-37; Gott. Aff. ¶ 15.)

45.    In February 2009, Fenner interviewed Cardinal Dolan in Milwaukee; he was assigned to conduct this interview, the story was written by another reporter, and it involved no investigative work by Fenner.  (Green. at 338.)  Competently conducting an assigned interview is routine and not a notable accomplishment for a senior reporter.  (Gott. Aff. ¶16.)

46.     The only story Fenner pitched while in Milwaukee concerned Dolan arranging for the adoption of a disabled child; this story had previously run in another media outlet.  (Fenn. at 153; Gott. Aff. ¶ 16.)

47.     In January 2009, Fenner's coverage of a bus ride of church congregants was a small "sidebar" to the Post's broader coverage of President Obama's inauguration coverage and ran on page 30 of the Post.  (Id. at 133, 138-39.)

48.     Fenner did not pitch any notable enterprise stories in FY 2009; by way of example, he pitched a story about a high-end car dealership opening in Harlem, but "The New York Times . . . had written the story earlier in the year."  (Fenn. at 113-17, 166-67.)  Reporters should not pitch stories previously published in other newspapers unless they can offer new elements, which Fenner did not do.  (Gott. at 238-40.)

49.     Fenner also failed to maintain contact with his editors in FY 2009.  By way of example, in February 2009, when in Milwaukee, Fenner was out of contact for 40 minutes and failed to inform the Metro Desk about a news conference.  (Green. at 325-27.)

50.     On this occasion, Greenfield raised his voice at Fenner and asked Fenner, "Where the fuck are you?" and other questions related to the fact that Fenner "couldn't be reached," hadn't communicated with the desk about his reporting, and was unreachable "for about 40 minutes which is unacceptable for a reporter on the road [i.e., on a travel assignment]."  (Id.)

51.     On another occasion, in June 2009, Fenner was deployed to an assignment but, when called a half-hour later, he was still at home.  (Fenn. at 145-46; Lern. Dec., Exh. 8.)

52.     Again, in August 2009, Fenner was deployed to an assignment but, when called a period of time later, Fenner was still at home.  (Id.)

53.     On or about September 17, 2009, Fenner received his FY 2009 APA, which states in part:

> As discussed at the last APA, including a written warning, Austin was hired to be a senior reporter but was underperforming in his basic writing skills, lack of fact checking, lack of producing enterprise stories and not being able to discern the news line in a story.  These areas have not improved.  His writing continues to be terrible and he often has little knowledge of the subject matter he is covering, to the point where he is no longer asked to write his own stories.  He seldom, if ever, pitches stories or calls in with ideas which is necessary as a senior reporter.  Nearly every assignment he works on has been given to him by the city desk.  This year he did not bring his work up to par, despite the discussions with management and warning, and he continues to work down as a running reporter vs. a senior reporter because he can't meet standards necessary to cut it in the newsroom. . . .

(Lern. Dec., Exh. 7.)

54.     On September 17, 2009, Fenner was issued a final written warning.  (Id.)

55.     This final written warning outlined ongoing performance issues, such as poor writing skills, his failure to pitch stories, failure to produce enterprise stories and failure to be able to discern the lede, and expressly cautioned Fenner that:

> Working as a runner for someone with your experience and at your level as a senior reporter is simply unacceptable and cannot continue any longer.  It is critical that we see an immediate and consistently sustained improvement in your job performance.  We have outlined for you the areas in which you need to demonstrate improvement, yet you have failed to heed these warnings.  This is your final warning.  We want to see you succeed, but that is up to you, we cannot do it for you. If you fail to raise the level of your job performance to an acceptable standard, you will, regrettably, leave the Post with no choice but to terminate your employment at The New York Post.  We certainly hope that it does not come to that.  But then, this is something only you can control.  Please do not let us down.

(Id.)

56.     Fenner signed that written warning acknowledging receipt of it.  (Id.)

10

57.     It is undisputed that the sole reason that Fenner believed that his 2009 warning was discriminatory was "[b]ecause [he] disagree[d] strongly with the points" criticizing his performance.  (Fenn. at 195.)

58.     Following receipt of his final warning, Fenner was afforded more than seven weeks to improve his job performance.  (See Lern. Dec., Exh. 9 [e-mail on November 4, 2009, advising that Fenner had not improved since receipt of his final warning].)

59.     Fenner's performance did not improve following his final written warning. (Green. Aff. ¶5.)[8]

60.     Between receipt of the warning and early November 2009, Fenner contributed reporting to 15 stories, but was assigned 14 of them, and only pitched three stories.  (Id. ¶ 5.)

61.     One pitch, about a Brooklyn youth football team dedicating its season to its former coach, a slain police officer, ran as a "brief," which is a short story (it was only 149 words) of minor interest found near the back of the newspaper (it ran on page 20).  (Id. ¶ 6.)

62.     Another pitch concerned a man living in an old bank building; Fenner's editors rejected this because *New York Magazine* had previously run the same story, and Fenner presented no new facts advancing it.  (Fenn. at 166; Green. Aff. ¶ 7.)

63.     Lastly, Fenner pitched a general story about economic hardships facing military personnel on their return from active duty; this topic had extensively covered by many news outlets, and Fenner offered nothing new or different to distinguish his idea from prior publication.  (Green. Aff. ¶8; Lern. Dec., Exh. 9.)

64.     On November 4, 2009, Greenfield e-mailed Gotthelf, advising her that Fenner's performance had not improved and recommending termination.  (Lern. Dec., Exh. 9.)  On

---

[8] The affidavit of Daniel Greenfield, dated May 8, 2013, submitted in support of Defendants motion for summary judgment, is herein designated "Green. Aff."

November 7, 2009 Gotthelf notified the Post's HR that Fenner's performance had not improved and that his employment should be terminated.  (Id.)

65.     Fenner's employment with the Post was terminated on November 9, 2009. (Plaintiffs' Third Amended Complaint ["TAC"] ¶ 112.)

66.     Fenner never heard any-race based comment by Gotthelf or Greenfield.  (Id. at 67, 98-99.)  Fenner never heard or overheard anyone at the Post make a racist comment.  (Id. at 231-32.)  Fenner never heard anyone "call any African-American by a derogatory name."  (Id. at 231.)  Fenner was not aware of any instance of a Post employee using a racially derogatory term while he was an employee of the Post.  (Id. at 233.)

67.     It is undisputed that white reporters traveled to report on stories more frequently than Fenner.  (See Gott. at 300-01.)  Fenner considered travel stories he was sent on "important" and he was "glad" to be assigned to them.  (Fenn. at 159-164.)

68.     In Spring 2009, Fenner's editors asked him to move one shift a week from 11 a.m. to 7 p.m. to a shift at 2 p.m. to 10 p.m. because "they needed me to help out on a certain shift because they were short on manpower . . . ."  (Id. at 209.)  This proved beneficial for his personal schedule.  (Id. at 122.)

69.     It is undisputed that the only time Fenner did not receive a resource was when the Post did not send a photographer he requested for a story.  (Id. at 219-21, 236.)  This request was denied by the Post's Photography Desk.  (Id. at 221-23.)  This did not prevent Fenner from doing his job.  (Id. at 221.)

## C.     Facts Relating to Ikimulisa Livingston's Employment

70.     The Post hired Livingston, who is African-American, as a reporter in 1997.  (TAC ¶ 40.)

71.     Livingston was employed at-will by the Post.  (Gott. Aff. at ¶ 17.)

72.     Livingston was assigned to work in the Queens courthouses in February 2006. (Living. at 53.)[9]

73.     Prior to her assignment to the Queens courthouses, Livingston worked as a general assignment reporter for the Post.  (Gott. Aff. at ¶ 18; Living. at 229.)

74.     On January 27 and 30, 2006, Livingston e-mailed Gotthelf and Jesse Angelo, then the Post's Metro Editor, asking that she be assigned to cover the Queens courthouses.  (Lern. Dec., Exh. 10.)

75.     In February 2006, Angelo assigned Livingston to cover the Queens courthouses. (Angelo at 283-85 [Day 1].)  Gotthelf agreed with and encouraged the reassignment.  (See Lern. Dec., Exh. 10.)

76.     Angelo assigned Livingston to this beat because "she was not having success [generating story ideas]" as a general assignment reporter, and, as courthouse reporter, the "burden of trying to come up with story ideas out of thin air . . . is less" because a reporter can rely on "filings in civil cases" and criminal cases, which Angelo thought "might help her to be more successful . . . ."  (Angelo 283-85, 287 [Day 1]; see also Lern. Dec., Exh. 10 at IL_590.)

77.     Livingston worked a scheduled reporting shift that began at 9:00 am and ended at 5:00 pm from early 2006 until the termination of her employment.  (Gott. Aff. ¶ 18, Living. at 216-17.)  She worked Sunday through Thursday until September 2007, then worked Monday through Friday.  (Gott. Aff. ¶ 18.)

78.     In the Queens courthouses, Livingston was required to find and generate stories and story ideas, not be assigned them, by, among other things, looking through court filings, watching court proceedings, and speaking with individuals at the courthouses.  (See Lern. Dec.,

---

[9] True and correct copies of referenced excerpts of the deposition of Ikimulisa Livingston, dated January 13, 2012, February 20, 2013, and May 6, 2013 ("Living. at [page]"), are attached to the Lern. Dec. as Exhibit 20.

Exh. 13; Living. at 451; Kenn. Dec., Exh. 8 [Aud.] [recording of Haberman instructing Livingston, "I have asked you repeatedly to check other case files." and "check[] court files every day"], Exh. 7 [Aud.] [recording of Greenfield instructing Livingston, "Find civil cases, find other cases."].)[10]

79.    Livingston's duties when covering the Queens courthouses also required her to develop sources within the courthouses, and to write on the breaking news "speed and flare" on deadline and without needing to be rewritten.  (See Green. at 165-67; Kenn. Dec., Exh. 8 [Aud.] ["You could have got that story from the Court officers . . . [or] a court clerk."].)

80.    Livingston did not satisfy her duties while at the Queens courthouses.  Generally, Livingston:

> did not provide a lot of quality enterprise.  She did not provide a lot of quality weekend stories.  She did not routinely break stories out of her court of a . . . major nature. . . .  [T]here was frustration . . . because she was covering the Sean Bell Trial [and] needed a dedicated rewrite to make her deadlines.

(Green. at 171.)

81.    The eight-week trial of three police officers who fatally Sean Bell the night before his wedding (the "Bell Trial") was held in the Queens criminal courthouse from February 25 through April 14, 2008.  (Kenn. Dec. ¶ 9.)

82.    Livingston covered the Bell Trial because she "covered the Queens courthouse" and covering the trial "would fall to her automatically.  If someone else were covering the Queens courthouse that person would be covering it."  (Green. at 213-14.)

---

[10] The declaration of Garrett D. Kennedy, Esq., submitted in support of Defendants motion for summary judgment and dated May 10, 2013, 2013, to which cited exhibits are attached is herein designated "Kenn. Dec."  Certain exhibits attached to the Kenn. Dec. are audio recordings, with transcripts of these recordings prepared by counsel for the court's use; these exhibits are designated herein "Kenn. Dec., Exh. [No.] [Aud.]."

83.     Livingston struggled in her coverage of the Bell Trial.  For instance, her editor,

Zachary Haberman, criticized her for missing critical information, such as parts of the 911-call

transcript that were played in court that *The Daily News* had published.  (Kenn. Dec., Exh. 3

[Aud.] [stating that Livingston got "four lines" while *The Daily News* got "15 to 20 lines"].)

84.     Livingston was unable to write clean copy in a timely manner during the Bell

Trial; as a result, her editors assigned a "dedicated rewrite" – a second reporter – to receive her

notes and draft them into stories.  (Green. at 215-16; Lern. Dec. Exh. 12.)  Assigning a dedicated

rewrite for the duration of the trial was an "unusual" need for a court reporter.  (Angelo at 260

[Day 1].)  Her writing while in the courthouses had previously been criticized by her editors.

(See, e.g., Lern. Dec., Exh. 11.)

85.     Haberman told Livingston generally during the Bell Trial that she needed to be

"thinking bigger picture" and taking the "next step" in her reporting.  (Kenn. Dec., Exh. 4

[Aud.].)

86.     Livingston struggled with her performance beyond the Bell Trial.  For instance,

she missed stories that were reported by *The Daily News*; as Haberman told her, "Constantly

getting beat is not fun . . . .  It's happened a lot in the last week and a half."  (Id., Exh. 8 [Aud.].)

This was particularly egregious because the missed story was follow-up to the Bell Trial.  (Id.)

87.     Livingston admitted to Haberman that she missed a story about an individual

named Bonelli.  (Id.)

88.     Haberman criticized her for not having sources or being diligent in her reporting.

(Id. ["You could have got that story from the Court officers.  You could have gotten that story

from a court clerk.  You could have gotten that story a lot of different ways. . . .  It doesn't seem

like you're talking to these people.  It really seems like you're just sitting there waiting for somebody to drop something in your lap. . . ."].)

89.     Livingston was criticized for not doing "basic" fact-reporting, such as running a license plate following an accident, requiring her editor to do so for her.  (Id., Exh. 6 [Aud.].)

90.     Livingston also pitched stories to her editors without first finding the "hook," or most interesting element, in a story.  (See id., Exh. 5 [Aud.].)

91.     On May 22, 2008, Gotthelf, by this time the Metro Editor, e-mailed Livingston:

> Col [Allan, Post Editor-in-Chief,] had a fit over the story you missed this morning.  He also wondered why we're keeping you in that court when Nicole Bode [*The Daily News'* Queens Court reporter], who is not a fantastic reporter, is managing to beat you consistently.  He also brought up how labor intensive it was to assign you a dedicated rewrite for the Sean Bell trial when court reporters need to be able to write clear copy on the fly.
>
> One thing's clear, Kim, you're on Col's radar and that's a very dangerous place to be. It means you could be plucked from that court very soon.  You have to step it up.

 (Lern. Dec., Exh. 12.)

92.     Livingston's subsequent FY 2008 APA, dated July 9, 2008, stated:

> Ikimulisa needs to improve her ability to fully grasp the goings on in her court.  While she was perfectly capable of providing good notes from the Sean Bell trial, she was mostly unable to add any legal foresight to the coverage, which is expected . . . .  While Ikimulisa files her share of stories, they often need to be re-written and rate no longer than a brief [a short story] . . . .
>
> Ikimulisa . . . needs work [*sic*] developing sources that will provide stories for the paper that are longer than briefs . . . .

(Id.)  This APA rated her performance as "Occasionally Meets Standards, Needs Improvement." (Id.)

93.     Because of Livingston's poor performance, Gotthelf reassigned her from the Queens courthouses to runner in late 2008.  (Gott. at 166, 196-97, 199.)

94.     It is undisputed that Livingston was reassigned from the Queens courthouse no later than early December 2008.  (Id.)

95.     When reassigned to runner, Livingston was not assigned a desk in the newsroom, but used an open desk when and if she was present in the newsroom.  (Living. at 191-92.)

96.     Gotthelf assigns Desks in the Post's newsroom on the basis of need.  (Gott. Aff. ¶ 21.)  For this reason, Gotthelf assigns desks to rewrites because they work in the newsroom, and does not assign desks to runners, as they are based in the field.  (Id.)

97.     A reporter reassigned from a newsroom job may temporarily keep his/her desk following reassignment prior to the desk being reassigned.  (Id.)  By way of example, Fenner was assigned a desk when he was a rewrite and, after being reassigned to runner, his desk remained assigned to him until his employment ended.

98.     Gotthelf has never assigned a desk to a runner (id.), and she did not assign Livingston a desk because her job duties as a runner do not require it.  (Id. ¶ 22.)

99.     Runners who are not African-American do not have desks in the newsroom, including Jennifer Bain, Erin Calabrese, Kevin Fasick, Reuven Fenton, Lorena Mongelli, Rebecca Rosenberg, and Frank Rosario.  (Id.)

100.     At all relevant times, Leonard Greene, an African-American rewrite reporter for the Metro Desk, had a desk assigned to work in the newsroom at all times relevant to this litigation, and has had a desk assigned to him.  (Gott. Aff. ¶ 23.)

101.     Livingston, like other runners, was partially reimbursed for her cell-phone per post policy. (Living. at 247-49; Gott. at 202-03.)

102.    Livingston's reassignment to runner was not a demotion.  (See, ¶ 5, supra.)
Livingston's salary and title did not change after the reassignment to runner, as they did not
when she was first assigned to the courthouses.  (Living. at 229-30.)

103.    William Gorta was assigned to report from the Queens courthouses after
Livingston had been reassigned.  (Green. at 223.)  Gorta was qualified for the position:  he was
an experienced reporter, an adjunct professor at Columbia University Graduate School of
Journalism, and a former Captain in the New York Police Department (Lern. Dec., Exh. 15;
Gott. Aff. ¶ 20), and had served so well as a reporter that he was promoted to editor, although he
was later returned to reporter as it better suited his strengths.  (Angelo at 210 [Day 1].)

104.    Livingston cannot dispute Gorta's qualifications relative to her.  (Living. at 117-
18 ["I don't know if he's more qualified or less qualified"; "I don't think at any time I said he
wasn't qualified."].)

105.    In or about November 2010, Gotthelf replaced Gorta in the Queens courthouses
with Christina Carrega, a reporter who is African-American.  (Gott. Aff. ¶ 20.)

106.    As a runner, Livingston received an APA for FY 2009 that rated her as "Needs
Improvement" and stated, "Kim rarely suggests story ideas and must do a better job of this. . . .
Monday enterprise is very important and Kim never pitches or develops her own stories."  (Lern.
Dec., Exh. 16.)

107.    At or about the time of her FY 2009 APA, Livingston also received a
performance warning which states that she: "Does not pitch stories, investigative ideas, or
weekend pieces . . . which is a job requirement."  (Id.)

108.   Six white reporters for the Metro Desk received performance warnings in connection with their 2009 APAs for like reasons (names have been withheld due to confidentiality demarcations, but were previously produced to Plaintiffs):

| Position | Hire Date | Reason for Warning |
|---|---|---|
| Reporter | 1/12/98 | "Lack of ideas; lack of creativity; unreliable news coverage, missed facts in stories" |
| Reporter | 3/14/94 | "Copy that needs extensive editing; Pitching stories that are suited to the newspaper" |
| Reporter | 4/16/956 | "Lack of basic writing skills needs excessive rewrite; Pitching more pop culture slice of life stories" |
| Reporter | 5/19/08 | "Lack of ideas; Poor basic writing skills, which require extensive rewrite" |
| Reporter | 10/29/01 | "Poor communication with editors; Unprofessional conduct; Unreliable news coverage" |
| Reporter | 3/17/96 | "Anger and attitude issues; Lack of ideas" |

(Gott. Aff. ¶ 28.)

109.   Starting in 2005, Livingston began working as a "mystery shopper" for Shop'n Chek, Inc., n/k/a MarketForce, Inc. ("Shop'n Chek").  (Kenn. Dec., Exh. 2.)  Additionally, in March 2008, Livingston began working as a "mystery shopper" for Contemporary Staffing Solutions, Inc. ("CSS"), for whom she mystery shopped at T.D. Bank and Commerce Bank branches.  (Id., Exh. 1; Living., 368-69.)

110.   Livingston mystery shopped for these companies during her scheduled reporting shift for the Post.  (Living. at 401; Kenn. Dec. ¶¶ 8, 10.)

111.   While in the Queens courthouses, Livingston mystery shopped 171 times during her reporting shift, including 19 times during the weeks of the Bell Trial.  (Kenn. Dec. at ¶ 9.)

112.   To mystery shop, Livingston left the courthouses, drove to a location, interacted with sales representatives, performed a transaction, prepared a report of her experience, and drove back to the courthouse.  (Living. at 378-79.)

113.    Livingston did not inform her supervisors that she was mystery shopping during her scheduled Post reporting shift (id. at 442-43, 451), nor did she tell her supervisors that she was leaving the courthouse to mystery shop (id. at 400-01).

114.    Livingston had been instructed that when the courthouses were quiet, she should look through court filings for potential story ideas.  (See, e.g., Kenn. Dec., Exh. 7 [Aud.] [instructing Livingston to "check[] court files every day . . . . ."].)

115.    Livingston often spent more than an hour mystery shopping, and conducted multiple mystery shops at a time.  (Kenn. Dec., ¶10; Living. at 383)

116.    When Livingston mystery shopped during her shift, she was incapable of performing necessary elements of her reporting job for the Post, which included searching for story ideas by, among other things, reviewing court filings and/or meeting with attorneys and court personnel; developing sources; writing stories; and being at her assigned location in case a breaking news event were to occur.  (Living. at 390-92, 417-19, 426, 434, 451)

117.    Livingston did not stop mystery shopping during her reporting shift even after her performance was criticized and she was told that she might be removed from the Queens courthouses for her failing performance.  (See Lern. Dec., Exh. 12, 13.)

118.    Livingston did not stop mystery shopping during her scheduled reporting shift after she was reassigned to runner.  (See Kenn. Dec. ¶ 10.)

119.    Livingston did not stop mystery shopping during her scheduled reporting shift after receiving her FY 2009 APA and performance warning.  (Living. at 430-31.)

120.    As a runner, Livingston was instructed to use any time during her work day when she was not specifically assigned to a story to work on generating potential stories for publication.  (Living. at 450.)

121.    From 2005 to 2010, Livingston conducted 450 mystery shops, and additionally prepared and submitted 77 reports to CSS and/or T.D. Bank regarding her mystery shopping experiences, during her scheduled Post reporting shift.  (Kenn. Dec. ¶ 8, 10.)

122.    Of the 450 total mystery shops that she conducted during her reporting shift, only 22 were telephonic.  (Id. ¶ 11.)

123.    Additionally, Livingston mystery shopped on days that she took paid sick and/or bereavement leave from the Post.  (Id. ¶ 13; Living. at 407-14.)

124.    Livingston was deposed regarding her mystery shopping on February 20, 2013 (Living. at 349), at which time she admitted to mystery shopping during her Post shift (see, e.g., Living. at 401).

125.    The February 2013 deposition was "limited to questions on the topic of her 'mystery shopping." (TAC ¶ 121.)

126.    Angelo, now the Post's Publisher, learned of her mystery shopping following her February 2013 deposition.  (Angelo at 21-22, 27-28, 31, 74-76 [Day 2].)

127.    Angelo made the decision to terminate Livingston's employment on February 25, 2013, and her employment was terminated the following day.  (Lern. Dec., Exh. 17.)

128.    The reasons for Livingston's termination are as follows:

> [Livingston] was terminated for gross misconduct, dereliction of duty, dishonesty, on hundreds and hundreds of occasions going and doing paid work for another employer, [and] not telling her supervisors about [her mystery shopping] . . . .
>
> * * *
>
> We have a lot of employee who work incredibly hard, and they don't leave their post in the middle of the day and go do paid employment for somebody else when they should be reporting . . . I couldn't justify keeping [Livingston] on my staff.

21

(Angelo at 61-63 [Day 2]; see also Lern. Dec., Exh. 17.)  Angelo also considered that Livingston mystery shopped during days on which she was on paid sick leave from the Post.  (Angelo at 80-81 [Day 2]; see also Lern. Dec. Exh. 17.)

129.   Livingston claims that her termination was in retaliation for her testifying in January 2012.  (Living. at 19 [Day 3].)  Livingston was treated in the same manner following her reassignment from the Queens courthouse in 2008 through the termination of her employment.  (Id. at 36-37 [Day 3].)

130.   It is undisputed that Livingston could not recall any story pitch which was referred to by the Post's editors as being "low rent" (Living. at 132, 134), but she admitted that that no editor told her stories about minorities were "low rent" (id. at 249), and testified that she did not mention race when pitching stories (id. at 300; see, e.g., Kenn. Dec., Exh. 5 [Aud.] [failing to mention race when pitching story that was declined]).

131.   Allan does not believe that Greene would be qualified to be a regular columnist because, among other reasons, Greene does not express "strong opinions" in his writings.  (Allan at 373-81.)

**D.**   **Plaintiffs Were Not Banned from the Post's Newsroom**

132.   Fenner admits that his claim of a ban is based on an instruction that he should "call the city [or Metro] desk in the morning" to receive an assignment, which is what "[a] runner reporter does" and is "routine" for runners.  (Fenn. at 208, 212.)

133.   Fenner was never told he was "banned" or not to enter the newsroom.  (Id. at 215-16.)

134.   Fenner came into the newsroom after the start of the purported "ban," and he was never asked to leave the newsroom.  (Id. at 217.)

135.    Fenner had no specific basis to believe race was the reason that he was told to call into the newsroom to receive assignments.  (Id. at 210-11.)

136.    Livingston claims that she was banned after she was reassigned to runner because Greenfield once asked her in the newsroom, "What are you doing here?"  (Living. at 206-09.)

137.    Greenfield believed that she was supposed to be on assignment at the time, and thus not in the newsroom.  (Green. at 256-57.)

138.    Greenfield has asked this question of white runners who were in the newsroom.  (Mac. Aff. at ¶ 4.)

139.    Livingston has "not been directly told by an editor not to come into the newsroom."  (Living. at 195-96.)

140.    During the purported "ban," she came into the newsroom, up to ten times per month, and was never denied entrance or told to leave.  (Id. at 194, 199, 212.)

**E.      Facts Relating to Plaintiffs' Alleged Hostile Work Environment**

141.    Fenner claims that Greenfield raised his voice at him twice, and each instance concerned Fenner's work performance.  (Fenn. at 171, 176-77.)

142.    Fenner has never heard Greenfield or Gotthelf make reference to Fenner's race and/or color, or use any racial epithets, and Fenner has never heard Gotthelf or Greenfield use a racial epithet or made any reference to his race and/or color.  (Fenn. at 67, 98-99.)

143.    Greenfield has raised his voice at white reporters under pressure that is inherent in the newsroom, and he has also used curse words in conversations with white reporters.  (Gott. Aff. ¶ 25; Mac. Aff.  ¶ 5.)[11]

---

[11] The affidavit of Jeane Macintosh, dated May 9, 2013, submitted in support of Defendants motion for summary judgment, is herein designated "Mac. Aff."

144.     Greenfield raised his voice at Jeane MacIntosh in connection with her work performance once for being late getting to a story, and on another occasion when she did not inform him that she was taking a vacation day.  (Mac. Aff. ¶ 6.)

145.     It is undisputed that Livingston recalled no specific instance of discriminatory voice-raising by Gotthelf or Greenfield (Living. at 39-40.)

146.     Livingston has not heard Gotthelf or Greenfield or any other Post editor or executive use a racial epithet or otherwise make any racially derogatory statement.  (Id. at 136, 139.)

147.     Livingston claims that Haberman spoke harshly to her.  (Id. at 111, 113.)  Zachary Haberman spoke harshly to white reporters whom he supervised, including Denise Buffa, Alex Ginsberg, Stephanie Cohen, Kieran Crowley, and Selim Algar, in connection with their work.  (Id. ¶ 24.)

## F.     Plaintiffs' Retaliation Claims Relating to the Stimulus Cartoon

148.     On February 18, 2009, the Post published a political cartoon by Sean Delonas (the "Stimulus Cartoon").  (See TAC, Exh. A.)

149.     Fenner never complained to anyone at the Post about the Stimulus Cartoon or any employment practice.  (Fenn. at 184.)

150.     Fenner told Richard Prince, a blogger who is unconnected to the Post, that the cartoon "churned my stomach when I saw it," and the blogger quoted him in an on-line article.  (Fenn. at 189.)

151.     None of Fenner's supervisors saw the article, was aware of the quote, or knew Fenner had made the statement.  (Gott. at 338-39; Green. at 394-95; Allan at 533; Angelo at 335-

36 [Day 1].)[12]  The first they learned of the statement was after Fenner's employment ended and he filed this lawsuit.  (<u>Id.</u>)

153.    Livingston claims that on the day the Stimulus Cartoon was published, she told Gotthelf that "the cartoon was very offensive to people of color," and Gotthelf agreed with her sentiment.  (TAC ¶ 80.)

153.    Livingston did not complain about the working conditions at the Post in February 2009.  (Living. at 44-47.)


Dated: May 10, 2013
        New York, New York

                                        Respectfully submitted,

                                        KASOWITZ, BENSON, TORRES
                                          & FRIEDMAN LLP


                                        By:  ____/s/ Mark W. Lerner_____
                                            Marc E. Kasowitz (mkasowitz@kasowitz.com)
                                            Mark W. Lerner (mlerner@kasowitz.com)
                                            Blythe E. Lovinger (blovinger@kasowitz.com)
                                            Garrett D. Kennedy (gkennedy@kasowitz.com)

                                        1633 Broadway
                                        New York, New York 10019
                                        Tel.: (212) 506-1700
                                        Fax: (212) 506-1800

                                        Attorneys for Defendant Defendants
                                        NYP Holdings, Inc., d/b/a the New York Post,
                                        Michelle Gotthelf and Daniel Greenfield

---

[12] True and correct copies of referenced excerpts of the deposition of Col Allan, dated February 14, 2012 and February 21, 2013 ("Allan at [page]"), are attached to the Lern. Dec. as Exhibit 21.