# EXHIBIT 1

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3

     AUSTIN FENNER and IKIMULISA      )
4    LIVINGSTON,                      )
                                      )
5               Plaintiffs,           )
                                      )
6          vs.                        ) 09CIV9832
                                      ) (BSJ(RLE)
7    NEWS CORPORATION, NYP HOLDINGS,)
     INC., d/b/a THE NEW YORK POST, )
8    and DAN GREENFIELD and MICHELLE)
     GOTTHELF,                        )
9                                     )
                Defendants.           )
10   ------------------------------)
11
12
13       (CONTAINS CONFIDENTIAL and
14       ATTORNEYS' EYES ONLY PORTIONS)
15
16   VIDEOTAPED DEPOSITION OF DAN GREENFIELD
17            New York, New York
18         Thursday, April 5, 2012
19
20
21
22
23   Reported by:
24   Philip Rizzuti
25   JOB NO. 47782

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 114

```
1              Greenfield
2  a bi-line in the New York Post?
3       A.   You know, that is more art than it
4  is a science, because there are a lot of
5  considerations that go into it --
6            MR. LERNER: He asked you who?
7            THE WITNESS: Well that is --
8       A.   I will explain.  It could be the
9  person who actually did the physical writing
10 of the story.  It could be the editor who was
11 primarily responsible for the story.
12      Q.   If there are two reporters working
13 on a story does it mean anything that one
14 reporter's name is listed first in a bi-line?
15      A.   Not really, no.  Not today, no.
16      Q.   Who determines which reporter's
17 name is listed first if there are multiple
18 reporters on a story?
19      A.   The person who actually did the
20 physical writing of the story will send the
21 story over to the desk with the names on it in
22 whatever order they send it over in, that is
23 the first line.  The editor may change that if
24 new information comes for example, or maybe
25 the editor is aware of a certain amount of
```

Page 115

```
1              Greenfield
2  information that was added by somebody else.
3  Sometimes people don't want a bi-line.
4       Q.   You mentioned earlier the term
5  enterprise story.  What is an enterprise
6  story?
7       A.   Enterprise is a story that breaks
8  news, it informs the reader of something that
9  perhaps they did not know before.  Gives
10 context to major stories.  Investigates
11 topics.  It can be a trend piece.  A piece
12 based on statistics.  Stories that reporters
13 use their sources to develop to give a -- to
14 give a lot of impact on a story.  Its in broad
15 terms.
16      Q.   Can you describe an enterprise
17 story that was published in the New York Post
18 when Austin Fenner worked as a reporter for
19 the paper?
20      A.   Mr. Thompson, that was years ago,
21 off the top of my head, I can't off the top of
22 my head.
23      Q.   Well he worked at the paper
24 between 2007 and 2009; correct?
25      A.   Correct.
```

Page 116

```
1              Greenfield
2       Q.   How important are enterprise
3  stories?
4       A.   They are important.
5       Q.   So tell us about any enterprise
6  story that appeared in the New York Post
7  between 2007 and 2009 during Mr. Fenner's
8  employment?
9            MR. LERNER: Objection.
10      A.   I would need to go back through
11 the stacks to see what ran when.  Off the top
12 of my head I can't give you examples.
13      Q.   Are there different types of
14 reporters at the New York Post?
15      A.   Reporters; no.  No, there are
16 reporters who have different duties, different
17 responsibilities, but they are all reporters.
18      Q.   Have you heard the term street
19 reporter?
20      A.   I have.
21      Q.   What is a street reporter?
22      A.   A street reporter or a field
23 reporter is a reporter who works primarily but
24 not exclusively in the field.
25      Q.   Have you heard the term runner?
```

Page 117

```
1              Greenfield
2       A.   Yes.
3       Q.   Does a runner differ from a street
4  reporter?
5       A.   These are terms of art, they are
6  not titles, they are interchangeable terms.
7       Q.   So a street reporter is the same
8  as a runner at the New York Post?
9       A.   Same as a field reporter generally
10 speaking.
11      Q.   And what is a general assignment
12 reporter?
13      A.   Any reporter who does not have a
14 specific beat.
15      Q.   But is a general assignment
16 reporter the same as a street reporter?
17      A.   Yes, if that -- yes, because you
18 work -- the term general assignment means you
19 are working on general assignments, not -- you
20 don't have a specific beat like education.  So
21 yes, if you are a field reporter, yes, that is
22 also a general assignment reporter.
23      Q.   Isn't it fair to say that field
24 reporters work out in the field mostly?
25      A.   Yes.
```

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 118

1          Greenfield
2       Q.   And general assignment reporters
3   work in the field as well as in the news room;
4   correct?
5       A.   No.  General assignment reporters
6   are reporters who do not have a beat.  So some
7   general assignment reporters are primarily
8   based in the news room, some general
9   assignment reporters are basically based in
10  the field, but they are all general assignment
11  reporters.
12      Q.   So what is the difference between
13  a general assignment reporter and a runner?
14          MR. LERNER:  Objection.
15      A.   It is an issue of exclusivity.
16  Not all general assignment reporters are
17  runners, but all runners are general
18  assignment reporters.
19      Q.   Okay.  So tell us the difference
20  between a runner and a general assignment
21  reporter, what distinguishes the two?
22      A.   There is no distinction, a runner,
23  field reporter, whatever, and a rewrite, they
24  are both general assignment reporters.  The
25  term general assignment is descriptive.

Page 119

1          Greenfield
2       Q.   Is a field reporter or runner
3   expected to be in the news room carrying out
4   the duties?
5          MR. LERNER:  Objection.
6       A.   I am sorry, the question again
7   please.
8       Q.   Is a runner expected to be in the
9   news room in performing their duties for the
10  paper?
11          MR. LERNER:  Objection.  Go ahead.
12      A.   Not routinely, but it is not
13  exclusive.
14      Q.   Is a general assignment reporter
15  expected to perform their duties in the news
16  rooms on occasion?
17      A.   As I explained a general
18  assignment reporter could be either in the
19  news room or primarily based in the field.
20      Q.   What role is Ikimulisa Livingston
21  currently serving as a reporter for the New
22  York Post?
23      A.   She is a general assignment
24  reporter.
25      Q.   Is she a runner?

Page 120

1          Greenfield
2       A.   As a term of art she does run on
3   stories, you can call her a field reporter,
4   you know, I mean -- that is a term of art, but
5   she is general assignment reporter.
6       Q.   Is she a general assignment
7   reporter that works in the news room most
8   times or in the field?
9          MR. LERNER:  Objection.
10      A.   Primarily in the field.
11      Q.   And are there any current white
12  reporters at the New York Post who also work
13  in the field primarily like Ms. Livingston?
14      A.   I don't think of people in the
15  terms of the color of their skin and their
16  assignments, but there are reporters who
17  happen to be Caucasian or white who work in
18  the field as they are other ethnicities.
19      Q.   I want you to identify the other
20  Caucasian white reporters who work -- strike
21  that.
22          I want you to identify the other
23  Caucasian reporters who work in the field like
24  Ms. Livingston?
25      A.   Reporters who happen to be

Page 121

1          Greenfield
2   Caucasian?
3       Q.   Yes.
4          MR. LERNER:  Objection to the
5   question.  Go ahead if you can answer.
6       A.   I can give you a list of all of
7   the reporters who work in the fashion, that
8   might actually be the easiest thing to do.
9   Kevin Fasick.  Georgette Roberts is
10  African-American.  Reuven Fenton.
11      Q.   Ruben Fenton?
12      A.   Reuven Fenton.  Rebecca Rosenberg.
13  Amber Sutherland.  Frank Rosario, although I
14  am not sure of his ethnicity.  Those are some
15  of the full-timers I am trying to remember.
16      Q.   I am only asking you about -- I
17  want to focus your attention only on the
18  full-time Caucasian reporters who work in the
19  field like Ms. Livingston?
20      A.   I am trying to think if there is
21  anybody else.  Celim Algar is similar, not
22  precisely the same, but very similar.  Same
23  with Kieran Crowley.  There may be others,
24  those are names that I can think of off the
25  top of my head.

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 130

1    Greenfield - confidential - attorneys eyes' only
2         A.   Any employee?
3         Q.   Any reporter?
4         A.   I don't know.
5         Q.   Do you know if editors receive
6    bonuses?
7              MR. LERNER:  When?
8         A.   When?
9         Q.   Oh, I ask the question, your
10   lawyer asked when, and then you repeat what
11   your lawyer says?
12             MR. LERNER:  Objection.
13        Q.   You did not understand the
14   question before your lawyer told you or said
15   when and you repeated it?
16             MR. LERNER:  Hold on, you don't
17        need to answer that.  Objection to the
18        question.
19        A.   What was the question?
20        Q.   I will ask it differently.
21             During your tenure as a deputy
22   metro desk editor do you know if any editor
23   assigned to that desk ever received a bonus?
24        A.   I don't know.
25             (Continued in nonconfidential,

Page 131

1    Greenfield - confidential - attorneys eyes' only
2         attorneys' eyes portion of
3         transcript.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 132

1              Greenfield
2         Q.   Do you know when Ms. Livingston
3    was hired at The Post what specific role she
4    was hired in?
5         A.   I don't.
6         Q.   Well do you know if her duties
7    have changed during her employment at the New
8    York Post?
9         A.   Well in -- specific -- yes, some
10   of her duties have changed, not all of them.
11        Q.   How have her duties changed?
12        A.   She used to cover a court, she is
13   now a field reporter.
14        Q.   Do you know what position she had
15   at The Post before she was assigned to that
16   court position?
17        A.   I don't.
18        Q.   What is a rewrite reporter?
19        A.   It is actually not a rewrite
20   reporter, it is not called a rewrite reporter,
21   it is whether someone is working rewrite.
22        Q.   What does that mean?
23        A.   It is a, again a term of art
24   because it can depend on a given story.  But
25   people who do rewrite on a daily basis in

Page 133

1              Greenfield
2    broad strokes because there are always going
3    to be exceptions, what the people who do
4    rewrite do is that they are assigned specific
5    stories to work on.  It may be one story, it
6    may be four stories.  And what they do, it can
7    be any number of things.  They -- when you are
8    doing a rewrite you are actually doing the
9    physical crafting of the story that goes in
10   the newspaper.  You are doing the actual
11   writing of that story.
12             It can be as broad as doing --
13   doing your own reporting.  Being part of an
14   investigative story.  Doing a document
15   searches.  Doing research.  All of those
16   elements.  Of working your sources.
17   Developing story ideas and I mean it is -- it
18   can be all of those things, but on a --
19   writing the story.  Working with reporters in
20   the field.
21             As I mentioned earlier when the
22   stories are parceled out after the meeting
23   among metro editors, the rewrite, people are
24   assigned as rewrite on specific stories.  And
25   it could be as simple as taking a wire story

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 134

Greenfield

1 and rewriting it, recrafting it.  Maybe the
2 Associated Press can be pretty dry, so you
3 want to maybe make it a little bit more
4 numerous.
5        It may be as simple as taking
6 dictation in the field from a field reporter
7 and who was at the scene and you type it up
8 and then you send it through.  It may be as
9 broad as I described earlier where you are
10 doing -- I mean you are really, really deeply
11 involved in the reporting and you are also
12 writing the story and you are directing the
13 field reporters.  Collaborating with your
14 editors.  Talking with the photo department.
15 I mean it is...
16       Q.    How does rewriting differ from
17 editing at The Post?
18       A.    Editing is a management position,
19 okay.  Rewrite is sort of your front line
20 editors are the next line.  Rewrite take
21 direction from editors.  This is how I want
22 you to approach the story.  There is a lot of
23 collaboration.  Should we do this or do that.
24 Should we move one person from point A to

Page 135

Greenfield

1 point B.  Sometimes a rewrite can make that
2 determination on their own and just change
3 horses as it wore in broad strokes.  Change
4 direction.  Change locations.
5        And then we -- then there is a lot
6 of -- there is interplay between the two.  But
7 the editor is responsible for directing the
8 rewrite on that story and by extension the
9 reporters in the field.
10      Q.    And what duties does a columnist
11 at The Post perform as opposed to someone who
12 works for the newspaper as a field reporter or
13 a rewrite reporter?
14      A.    I don't deal with the columnists
15 really, but they provide commentary on a
16 topic.
17      Q.    Do you know any of the current
18 columnists for the New York Post?
19      A.    Do I know who they are or do I
20 know --
21      Q.    Yes.  Can you identify them?
22      A.    All of them?
23      Q.    As many as you can recall?
24      A.    Well there are -- there are

Page 136

Greenfield

1 columnist in every department.  There are
2 columnists, editorial columnists, business
3 columnists, sports columnist.  I am not
4 sure -- I am not sure what you are asking.
5      Q.    Are there any black columnists at
6 the New York Post currently?
7            MR. LERNER: Objection.
8      A.    I never thought about it in those
9 terms and I couldn't give you a comprehensive
10 list of everyone who has a column or writes
11 columns for the New York Post.
12     Q.    I am not asking you to give me a
13 comprehensive list.  I am asking you whether
14 there are any African-American columnists
15 working currently at the New York Post?
16     A.    In all departments?
17     Q.    In any department?
18     A.    You know again I am kind of going
19 through my mind, but -- I seem to think that
20 there are -- sometimes if I may, sometimes
21 people write columns, but they are not
22 necessarily full-time columnist.
23     Q.    I am only asking about full-time
24 columnists working at the New York Post.  Can

Page 137

Greenfield

1 you identify any African-American full-time
2 columnist who currently works at the New York
3 Post?
4            MR. LERNER: Objection.
5      A.    I can only really speak to the
6 columnists who write in the front section,
7 because I don't know the job titles or all of
8 the job -- all of the titles and the
9 responsibilities of everybody in other
10 departments.  For example I know Robert George
11 writes editorials.
12     Q.    Is he African-American?
13     A.    He is.
14     Q.    Is he a columnist at The Post?
15     A.    Pardon me?
16     Q.    Is he a columnist at The Post?
17     A.    This goes to what my question.  I
18 don't know what his exact title or his exact
19 role would be.  I don't know if he is an
20 editor.  I know that he has written columns.
21     Q.    Okay.
22     A.    And the same with George Willis in
23 sports I believe.  But the same thing, I
24 really don't know if he is considered a

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 162

1          Greenfield
2   it as review because I wasn't the editor on
3   that story.  I saw the copy, but I didn't
4   review it.  It was being reviewed by a
5   different editor, but like I said I did see
6   it.  But I believe that was when she -- I
7   don't remember whether that was when she was a
8   Queens court reporter or whether she was a
9   general assignment reporter at that time.
10      Q.   What is the difference,
11  Mr. Greenfield, between seeing a reporter --
12  strike that.
13          What is the difference between
14  seeing Ms. Livingston's story that day as
15  opposed to reviewing it?
16      A.   Oh, it is an issue of how active
17  you are.  I didn't have -- editors on the desk
18  who handle stories when they come in, they are
19  called line editors.  That is just another
20  term of art, assistant associate -- associate
21  metro editors are also called line editors.
22  Its again jargon, a term of art, just another
23  word for the same job.  And those are the
24  editors who actually review the story insofar
25  as getting it ready for print.

Page 163

1          Greenfield
2      Q.   So what did you do with respect to
3   Ms. Livingston's story?
4      A.   I just saw the copy, I wasn't
5   directly involved in -- in doing the line edit
6   on it.  I know it was Mike Hechtman that
7   reviewing the story with her.  I don't even
8   remember necessarily why I was in the loop on
9   that, but I saw -- there was an E-mail that I
10  was included on I think from Kim in sending it
11  back to Mike Hechtman, and I know that -- I
12  remember even instructing her work with Mike
13  to make sure that all of the, you know, the
14  holes are filled.
15      Q.   Let me ask you this.  Did you read
16  the story that Ms. Livingston had drafted that
17  day?
18      A.   What I saw was a -- I don't know
19  if she actually drafted it that day or sent it
20  in earlier, but I know that it was put up for
21  publication on a Sunday.  I don't work
22  Sundays.  And what I saw was a copy that had
23  the editor's notes in the copy with -- it is
24  not uncommon when a line editor is going over
25  a story, maybe you put it in all caps or bold

Page 164

1          Greenfield
2   or something that distinguishes it from the
3   rest of the copy, basically asking a lot of
4   questions.  That is just the basics of it.  So
5   what I saw was a piece of copy that had a lot
6   of those questions in it.
7      Q.   Who raised those questions in her
8   copy?
9      A.   Mike Hechtman.
10      Q.   Do you recall what questions he
11  raised?
12      A.   Not even in broad terms.  I know
13  that he raised questions.
14      Q.   Did Ms. Livingston send you a copy
15  of that story by E-mail?
16      A.   I don't recall who sent me the --
17  let me be clear.  I don't recall who sent me
18  the copy of that story.
19      Q.   Did you ever speak to Ms.
20  Livingston about that story?
21      A.   Only to the extent of saying make
22  sure you answer Mike's questions.  Just a very
23  in passing type of conversation.
24      Q.   Did you ever have any conversation
25  with Michelle Gotthelf about why Ikimulisa

Page 165

1          Greenfield
2   Livingston was assigned to the Queens
3   courthouse?
4      A.   Why she was assigned to the
5   Queens; no.
6      Q.   Did you ever speak to Jesse Angelo
7   about why Ms. Livingston was assigned to the
8   Queens courthouse?
9      A.   No.
10      Q.   Did you ever speak to any editor
11  at the New York Post about why Ms. Livingston
12  was assigned to that particular beat?
13      A.   No.
14      Q.   Are there any special
15  qualifications a reporter must have in order
16  to serve -- in order to cover a courthouse for
17  the New York Post?
18      A.   Special qualifications, can you be
19  more specific?
20      Q.   Are there any qualifications
21  needed in order for a reporter to be assigned
22  to a courthouse for the New York Post?
23      A.   You have to be a good reporter.
24      Q.   What makes a good reporter?
25      A.   A good reporter is someone who --

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 166

1        Greenfield
2    let me think that one over.  It is again a
3    contextual answer.  The person has to at least
4    show promise that we believe that this is an
5    appropriate place, a place where they can
6    succeed and do well.  Sometimes maybe you know
7    someone fills in on courts on occasion.  But
8    its like any position, you are filling a
9    position with speculation, you want -- you
10   figure this might be a good fit.
11        So I am sorry, what was the
12   question?
13        Q.   What makes a good reporter?
14        A.   A good reporter --
15        MR. LERNER:  Objection.
16        A.   A good reporter is someone who in
17   the editor's judgment provides good story
18   ideas.  Story pitches.  Is able to handle
19   their own copy.  In very broad strokes.
20        Q.   When you the reporter has to
21   handle his own copy, what do you mean by that?
22        A.   Court reporters are expected to in
23   large measure write their own material for
24   deadline.  It is not exclusive or absolute,
25   but it is expected.

Page 167

1        Greenfield
2        Q.   So a court reporter is not
3    expected to have his or her article rewritten?
4        A.   Not on a regular basis, and not on
5    a -- not like having someone dedicated to
6    someone.  Sometimes deadlines are looming and
7    maybe you have got one story, if you are
8    working in a court maybe you have got five.
9    Sometimes that happens.  Maybe a couple of
10   briefs, a couple of short stories.  And you
11   are banging away and it is deadline and
12   deadline is looming.  So sometimes if that is
13   the case that reporter would work with a
14   rewrite -- that is why rewrite really exists.
15   This is all done in terms of -- not all done,
16   but a lot of this is done because it is a
17   matter of speed.  Making deadlines and getting
18   a paper out.  Everything is very time and
19   deadline driven.
20        So you have -- so if you are in a
21   court and you have got a number of things
22   going on the idea is if it is coming up to
23   deadline you might pass your notes off to a
24   rewrite, or call your notes into rewrite, they
25   will craft it and send it through.  Sometimes

Page 168

1        Greenfield
2    if the court portion of a larger story, then
3    that court reporter would then ostensibly also
4    work with rewrite because it is only one piece
5    of the larger story, maybe an arrangement in a
6    bigger story, that sort of thing.
7        But on a routine basis if you are
8    writing a story on a daily basis, a page lead,
9    you are expected to be able to write your
10   stories with speed and flare.
11        Q.   Do you know how Ms. Livingston
12   performed when she was assigned to the Queens
13   courthouse?
14        A.   Can you be more specific?
15        Q.   You are an editor at the New York
16   Post; correct?
17        A.   Yes.
18        Q.   You judge the performance of your
19   reporters; correct?
20        A.   Yes.
21        Q.   So I want you to tell us as an
22   editor at the New York Post how -- strike
23   that.
24        Based on your experience as an
25   editor at the New York Post do you know how

Page 169

1        Greenfield
2    Ms. Livingston performed when she was assigned
3    to the Queens courthouse?
4        MR. LERNER:  Objection.
5        A.   I think its a matter of looking at
6    different parts of her performance.
7        Q.   Well describe any parts of her
8    performance that you are aware of?
9        A.   Well I am aware that --
10        Q.   Let me ask you differently.  Let
11   me rephrase it.  Tell us did Ms. Livingston
12   show good performance with respect to any of
13   her duties when she covered the Queens
14   courthouse?
15        A.   Did she show any good performance;
16   yes.
17        Q.   Describe the good performance she
18   demonstrated when she was in that position?
19        A.   You know, this is a couple of
20   years ago now, I don't remember everything
21   that she did --
22        Q.   I am not asking you whether you
23   remember everything that she did
24   Mr. Greenfield.  My question is relatively
25   straightforward.  Describe the good

43

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 170

1     Greenfield
2 performance demonstrated by Ms. Livingston
3 when she was assigned to the Queens
4 courthouse?
5     A.   My recollection based on my
6 observations with fellow editors is that she
7 usually was able to provide accurate quotes on
8 what went on in a court.
9     Q.   Did she demonstrate any good
10 performance in connection with her duties at
11 the Queens courthouse in any other way that
12 you know of?
13     A.   I would have to see individual
14 stories from that period to determine she did
15 a really good job on this one, maybe not such
16 a good job on that one.  The area that I
17 covered is an area that I know that she was
18 okay in.
19     Q.   What area was that?
20     A.   The area of providing quotes.
21     Q.   Do you know anything else about
22 her work performance when she was assigned to
23 the Queens courthouse?
24     A.   When she was assigned; you mean at
25 the time she was assigned or during --

Page 171

1     Greenfield
2     Q.   When she worked there?
3     A.   I am sorry, please ask the
4 question again.
5     Q.   Do you know anything else about
6 Ms. Livingston's work performance when she
7 worked in the Queens courthouse for the New
8 York Post?
9     A.   I am aware that she did not
10 provide a lot of quality enterprise.  She did
11 not provide a lot of quality weekend stories.
12 She did not routinely break stories out of her
13 court of a, you know, of a major nature.  I
14 know that there was a lot of frustration on
15 our desk because when she was covering the
16 Sean Bell trial for example she needed a
17 dedicated rewrite to make her deadlines.
18     I don't think that is necessarily
19 an exhaustive list, but those are the things
20 that come to mind.
21     Q.   Well did you have firsthand
22 personal knowledge of these things?
23     A.   Some of them, yes.
24     Q.   Well tell us what did you have
25 firsthand personal knowledge of?

Page 172

1     Greenfield
2     A.   As the assignment editor I am
3 aware of story pitches that did or did not
4 come to me.  I can't remember specific ones
5 these years later, but I do know that certain
6 reporters who you work with are people you
7 know who routinely break stories, pitch story
8 ideas to you, pitch exclusives to you, pitch
9 angles to you, and pitch -- and also as my
10 role, in that role, they will pitch weekend
11 stories as well.  And in my dealing working
12 with Kim I don't recall much of that from her.
13     Q.   Well when Ms. Livingston was
14 working at the Queens courthouse were you her
15 direct supervisor?
16     A.   As I testified earlier I was
17 involved in -- I was working with her and as
18 editors, reporters work with direct -- work
19 with different editors on different times and
20 different stories.  But I did not do her
21 evaluation if that is what you are asking.
22     Q.   Was she one of your direct reports
23 when she worked in the Queens courthouse?
24     MR. LERNER:  Objection.
25     A.   Only insofar as how I have

Page 173

1     Greenfield
2 outlined that all reporters, you know, almost
3 all reporters, I can't say all of them because
4 that would be absolute.  When you are dealing
5 with the editor on the desk they are
6 supervising you at that moment.
7     Q.   I understand.  But isn't it true
8 that Ms. Livingston had a direct supervisor
9 when she worked in the Queens courthouse?
10     A.   Someone who she dealt with when
11 the stories came in and did her evaluations,
12 yes.
13     Q.   That was Zach Haberman at one
14 point; is that correct?
15     A.   Yes.  For part of the time.
16     Q.   And who else was Ms. Livingston's
17 direct supervisor when she worked at the
18 Queens courthouse other than Zach Haberman?
19     A.   I can't speak to prior to my,
20 prior to my hiring.  I am trying to think back
21 to when I was hired and it may have been -- it
22 may have been Michelle Gotthelf at that time,
23 but it might have been Neil Sloane.  I don't
24 really remember, it was early days.
25     Q.   So the only direct supervisor you

44

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 210

1          Greenfield
2       A.   He might be talking about the
3   story in general, maybe five different people,
4   I don't know.
5       Q.   That is fine.
6          I am now showing you what is
7   marked as Deposition Exhibit 5.  Please take a
8   moment and look at it and tell us after you
9   have had a chance to review it.
10          Have you had a chance to review
11   it?
12       A.   Yes.
13       Q.   For the record Bates stamp IL 188.
14   Mr. Greenfield, this document reflects an
15   exchange of E-mails between Ikimulisa
16   Livingston and Zach Haberman, correct, as well
17   as Neil Sloane on March 14, 2008?
18       A.   That is what it says here.
19       Q.   And Neil Sloane was an editor on
20   the metro desk at the time; is that correct?
21       A.   Correct.
22       Q.   The subject is Sun4Mon stories.
23   What does that mean?
24       A.   Again term of art.  It is
25   basically a story that would run in the Monday

Page 211

1          Greenfield
2   paper.
3       Q.   But you would prepare for Sunday;
4   right?
5       A.   Because it has to be filed on a
6   Sunday and then it goes into Monday.  So
7   Sunday for Monday.
8       Q.   Because Sunday is typically a slow
9   news day; correct?
10       A.   Yes.
11       Q.   What did Ms. Livingston say with
12   respect to the Sean Bell trial, can you read
13   that into the record?
14       A.   Her Bell cop's trial?
15       Q.   Yes.
16       A.   Bell cop's trial.  The prosecution
17   is three weeks into his case and more than
18   halfway through its witness list.  This coming
19   week and beyond we will get into the meat of
20   the case with the scientific and medical
21   evidence being presented and the star
22   witnesses, Trent Benefield and Joseph Guzman,
23   coming up in the weeks to come.
24       Q.   And how did Mr. Haberman respond
25   to her E-mail on that day?

Page 212

1          Greenfield
2       A.   Great.  We might need to focus a
3   bit more on science because it is what is
4   happening next week.
5       Q.   Do you see he also asked do we
6   have the second exclusive, do you see that?
7       A.   Yes, I do.  Do we have the second
8   exclusive.
9       Q.   Did you know what he was talking
10   about when he asked Ms. Livingston whether she
11   had the second exclusive?
12       A.   Well I don't know for sure.
13       Q.   If you don't know don't guess?
14       A.   I am not going to guess then.
15          MR. LERNER:  I am going to put on
16      the record that there are typos and other
17      quirks in the typing in this that didn't
18      come out in the reading.
19          MR. THOMPSON:  That is correct.
20      Mr. Greenfield was very generous to the
21      typographical errors that Zach Haberman
22      put in this E-mail.
23       A.   Some from Ikimulisa Livingston as
24   well.
25       Q.   Yes.  Now --

Page 213

1          Greenfield
2          MR. THOMPSON:  You guys find that
3      funny, is that why you are laughing
4      Ms. Lovinger during this deposition?
5       Q.   Mr. Greenfield, I want to ask you
6   now, how would you describe Ms. Livingston's
7   work performance during her coverage of the
8   Sean Bell trial when she was at the Queens
9   courthouse, if you know?
10       A.   Please ask the question again.
11          MR. THOMPSON:  Read it back.
12          (Record read.)
13       A.   I have only seen a few documents
14   that you have presented, big picture, my
15   opinion hasn't changed.  My -- these are very
16   select E-mails about a very specific
17   situations.  I mean --
18       Q.   But you would agree would you not
19   that Ikimulisa Livingston was given the
20   responsibility to cover one of the biggest
21   trials in the city?
22       A.   She covered the Queens courthouse.
23       Q.   I understand.
24          MR. LERNER:  Hold on, please?
25       A.   That would fall to her

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 214

1          Greenfield
2    automatically.  If someone else were covering
3    the Queens courthouse that person would be
4    covering it.
5         Q.   Is it fair to say that Ms.
6    Livingston covered that trial from beginning
7    to end for the New York Post?
8         A.   I believe she was still assigned
9    to the courthouse at that time.  I would have
10   to look at the dates, but that is my
11   recollection.
12        Q.   Isn't it fair to say that that
13   Sean Bell trial was a big story for the New
14   York Post?
15        A.   Fair to say, yes.
16        Q.   In fact you guys put a lot of
17   emphasis on that trial because you wanted to
18   have more readers buy the New York Post and
19   learn about that trial as opposed to buying
20   your competitors newspapers?
21        MR. LERNER:  Objection.
22        A.   I am sorry, was there a question
23   there.
24        Q.   Do you have trouble hearing?
25        A.   No, I don't, and that is a pretty

Page 215

1          Greenfield
2    hostile question.
3         Q.   You have asked me to read back
4    questions several times today and I am right
5    here?
6         MR. LERNER:  The question was very
7    confusing.
8         MR. THOMPSON:  I am going to
9    rephrase it.
10        Q.   Now isn't it fair to say
11   Mr. Greenfield that Ikimulisa Livingston wrote
12   many stories for the New York Post on the Sean
13   Bell trial?
14        A.   No.
15        Q.   How many stories did she write on
16   the Sean Bell trial when she was at that
17   courthouse?
18        A.   Clemente Lisi was the writer on
19   most of those stories I believe.  She provided
20   notes, in fact that is what Mr. Lisi said in
21   the E-mail that you provided, good notes.  She
22   didn't write these stories, she had a
23   dedicated rewrite on this trial.
24        Q.   Were you with Lisi when she
25   allegedly wrote these articles?

Page 216

1          Greenfield
2         A.   When he, Clemente is a man.
3         I was around when he was crafting
4    some of them, yes.
5         Q.   Isn't it fair to say that Ms.
6    Livingston played a key role in one of the
7    biggest stories ever covered by the New York
8    Post?
9         MR. LERNER:  Objection.
10        A.   She provided information from that
11   trial, yes.
12        Q.   And that information was necessary
13   in order for the New York Post to be able to
14   write any story on the Sean Bell trial; is
15   that correct?
16        MR. LERNER:  Objection.
17        A.   I mean she was assigned to the
18   courthouse, of course.
19        Q.   Why was -- strike that.
20        Did there come a time when Ms.
21   Livingston was removed from the Queens
22   courthouse?
23        A.   Yes, she was reassigned.
24        Q.   Did you have any role with her
25   reassignment?

Page 217

1          Greenfield
2         A.   Only tangentially.
3         Q.   What do you mean by tangentially?
4         A.   I didn't have any direct role.  I
5    remember I was asked my opinion.
6         Q.   Who asked for your opinion?
7         A.   Michelle Gotthelf.
8         Q.   What did you say when Ms. Gotthelf
9    asked you for your opinion as to whether she
10   should be reassigned?
11        A.   My response was if it is the right
12   move for the metro desk, then it should be
13   done.
14        Q.   Did Ms. Gotthelf express to you
15   why she was considering removing Ms.
16   Livingston from that position?
17        A.   I don't remember the exact term.
18   You know, removing her from the position, she
19   was reassigned.  I don't remember exactly what
20   she said in any specific conversation.  But I
21   was aware.
22        Q.   In substance what did Michelle
23   Gotthelf say to you about whether Ms.
24   Livingston should be reassigned from the
25   Queens courthouse?

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 222

```
1              Greenfield
2      Q.   Did anyone ever tell you that Ms.
3  Livingston complained about Mr. Haberman
4  cursing at her before he was terminated?
5      A.   Nobody told me anything like that
6  prior to her termination.
7      Q.   Who immediately --
8      A.   His termination. Her
9  reassignment, his termination. Sorry I need
10 to hear the question --
11     Q.   Before his termination?
12     A.   Before his termination. I am
13 sorry, could you read back the question,
14 please.
15         (Record read.)
16     A.   Before he was terminated; no, I
17 was, I only became aware of that during, you
18 know, during the preparation of this trial. I
19 was not aware that she had said anything to
20 anybody about that.
21     Q.   Do you know --
22         MR. LERNER:  When you say this
23 trial what do you mean?
24     A.   I mean this lawsuit. Not this
25 trial, this lawsuit.
```

Page 223

```
1              Greenfield
2      Q.   Do you know who replaced Ms.
3  Livingston in the Queens courthouse?
4      A.   For a while we had some fill ins,
5  I am not sure, I can't remember. I mean we
6  were -- there was a period of time there where
7  we had different people in there on a daily
8  basis. Later Billy Gorta assumed the role and
9  it is currently held by Christina Carrega.
10     Q.   When did Billy Gorta take over the
11 position at the Queens courthouse?
12     A.   Again I am not sure of the exact
13 dates or times, but it was at the, maybe
14 the -- either the end of December of '08 or
15 the beginning of January of '09. Sometime in
16 that period.
17     Q.   Billy Gorta is Caucasian; correct?
18     A.   Yes.
19     Q.   Prior to replacing Ms. Livingston
20 at the Queens courthouse what position did he
21 have at the New York Post?
22     A.   I am sorry, read that -- I would
23 like to hear that question again.
24         (Record read.)
25     A.   I don't, I wouldn't characterize
```

Page 224

```
1              Greenfield
2  it as him replacing her because they were
3  separate issues and, you know, that job was
4  actually opened for a little while, other
5  people filled it on a temporary basis. But if
6  you are asking what Billy did prior to being
7  assigned to the Queens courthouse, he had been
8  an associate metro editor.
9      Q.   Who made the decision to assign
10 Billy Gorta to the Queens courthouse after Ms.
11 Livingston was taken out of that position?
12     A.   Again I don't conflate the two,
13 the two occurrences. I mean Kim's situation
14 and Billy's situation were separate. In terms
15 of who made the decision to move Billy to that
16 spot it was Michelle Gotthelf with -- she
17 spoke with Jesse Angelo I believe, and I
18 believe Col Allan.
19     Q.   Why do you believe Ms. Gotthelf
20 spoke to Jesse Angelo and Col Allan about
21 putting Billy Gorta in the Queens courthouse
22 position that Ms. Livingston previously had
23 occupied?
24     A.   Again I don't conflate the two --
25 RG   Q.   Move to strike. I am not asking
```

Page 225

```
1              Greenfield
2  you whether you conflate the two. I am asking
3  you only to answer the question. I am not
4  asking you whether you conflate the two. Can
5  we mark this for another ruling.
6          Can you answer the question I just
7  asked you?
8      A.   Yes with the proviso that they
9  were separate incidents in terms of Billy, you
10 know, making the decision about who, you know,
11 about Billy being moved to the Queens
12 courthouse. Michelle told me that she had
13 spoken with Jesse and Col.
14     Q.   In substance what did Michelle
15 Gotthelf tell you when she described speaking
16 to Jesse Angelo and Col Allan about the
17 decision to put Billy Gorta in the Queens
18 courthouse position?
19     A.   I don't remember.
20     Q.   Well in substance what did she
21 say?
22     A.   I mean they -- I really don't
23 remember. They gave the okay. I don't
24 remember. You are asking me to guess. I
25 don't remember.
```

57

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 242

1           Greenfield
2      4:53, we are back on the record.
3      Q.   Mr. Greenfield, earlier you
4  testified that there were some other
5  individuals who filled in at the Queens
6  courthouse after Ms. Livingston was reassigned
7  from that position.  Do you recall that
8  testimony?
9      A.   Yes, I do.
10     Q.   Who actually filled in at the
11 Queens courthouse between Ms. Livingston being
12 reassigned from that position until Mr. Gorta
13 was placed in that position?
14     A.   I don't remember.
15     Q.   Can you tell us a single person
16 who actually covered that beat?
17         MR. LERNER:  Objection.  Just
18     answer that.
19     Q.   During that timeframe?
20     A.   I don't remember.
21     Q.   Were they permanent New York Post
22 employees or free-lancers?
23         MR. LERNER:  Objection.
24     A.   I don't remember.
25     Q.   How long did those individuals

Page 243

1           Greenfield
2  cover the beat after Ms. Livingston was
3  reassigned and Mr. Gorta was put in it?
4      A.   I don't remember.
5      Q.   Do you know if Billy Gorta's
6  salary was reduced after he was demoted from
7  editor to reporter?
8      A.   I don't have any firsthand
9  knowledge of that.
10     Q.   Do you have any knowledge of
11 whether his salary was reduced after he was
12 demoted from editor to reporter and assigned
13 to Queens courthouse?
14     A.   I don't recall us ever reducing
15 anybody's salary.  I don't have direct
16 knowledge of that.  I believe that it was not.
17     Q.   Did you have any discussion with
18 anyone at the New York Post about whether
19 Billy Gorta's salary should be reduced after
20 he was demoted from editor to reporter?
21     A.   About whether it should be
22 reduced?
23     Q.   Yes.
24     A.   No.
25     Q.   Did you ever have any

Page 244

1           Greenfield
2  conversations with anybody at the New York
3  Post about whether it was reduced after he was
4  demoted from editor to reporter?
5      A.   You know I seem to recall Michelle
6  mentioning it, but --
7      Q.   What do you recall Ms. Gotthelf
8  mentioning to you about Mr. Gorta's salary
9  being reduced or not after he was demoted?
10     A.   I don't recall.
11     Q.   Do you recall anything that Ms.
12 Gotthelf said to you about that issue?
13     A.   I don't.
14     Q.   When Ms. Livingston was reassigned
15 from the Queens courthouse was that a
16 demotion?
17     A.   I am sorry, please ask the
18 question again.
19         (Record read.)
20     A.   No.
21     Q.   What position was she given after
22 she was reassigned from the Queens courthouse?
23     A.   She was a reporter, she was a
24 reporter.
25     Q.   She was always a reporter?

Page 245

1           Greenfield
2      A.   Right.
3      Q.   But my question is what type of
4  reporter did she become after she was
5  reassigned from the Queens courthouse?
6      A.   What type; she was still a
7  reporter, she became a general assignment
8  reporter.
9      Q.   Does the general assignment
10 position have less responsibilities as the
11 Queens court position?
12     A.   No, just different
13 responsibilities.
14     Q.   Describe the different
15 responsibilities between the two positions?
16     A.   Okay.  A general assignment
17 reporter, I mean there are certain things that
18 all reporters need to do.  More specifically
19 to a general assignment reporter it means you
20 are working on a wider array of stories.
21 Stories -- you are working on breaking news
22 stories.  You are doing enterprise on
23 different topics.  You are dispatched to
24 scenes or to different locations.  This is
25 specifically if we are talking about a field

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 254

1          Greenfield
2    you call her in connection with her job?
3        A.   The process is the answer, and I
4    was answering your question because it is not
5    as simple as it sounds --
6        Q.   Yes or no, do you call Ms.
7    Livingston in connection with her job, yes or
8    no?
9            MR. LERNER:  No, it can't be
10        answered yes or no?
11       A.   Actually can't.
12       Q.   Do you ever call Ms. Livingston in
13   connection with her job, yes or no?
14           MR. LERNER:  No, I know the
15        subject matter here, and I can tell you
16        Ken that this can't be answer yes or no.
17       Q.   Answer it any way your can
18   Mr. Greenfield?
19       A.   The switchboard operators, the
20   desk people as I mentioned earlier, sometimes
21   it is desk assistants, sometimes it is people
22   who run that part, that department as I
23   mentioned.  Deadlines being what they are and
24   as hectic as it can be in a news room we
25   actually as editors a lot of the time, and me

Page 255

1          Greenfield
2    more so than others because of the nature of
3    my job, don't actually dial the phone that
4    often.
5            So I will call out can you get me
6    so and so, can you get me Kim, can you get me
7    Kevin, can you get me Rebecca, that sort of
8    thing.  So that is usually on a rare occasion
9    there is a speed dial list that you will hit a
10   two digit number, but I don't usually use
11   that.
12       Q.   Would you expect Ms. Livingston
13   who has worked at The Post for fifteen years
14   to have a telephone number at The Post?
15       A.   As I testified earlier I don't
16   know who has got numbers and who doesn't.
17       Q.   I am not asking that.  Can you
18   answer my question please?
19       A.   Then please ask the question
20   again.
21           MR. THOMPSON:  Read it back.
22           (Record read.)
23           MR. LERNER:  Objection.
24       A.   I can't say because people use
25   their phones for work, they get reimbursed, I

Page 256

1          Greenfield
2    don't know.  It is not a value judgment that I
3    can make.
4        Q.   Do you know if Amber Sutherland
5    has a telephone number at the New York Post?
6        A.   I don't.
7        Q.   How often have you seen Ms.
8    Livingston in the news room after she was
9    reassigned from the Queens courthouse?
10       A.   Maybe a handful of times.  It is
11   not typical to see field reporters in the
12   newer.
13       Q.   When she worked in the Queens
14   courthouse she had a telephone number in the
15   courthouse; correct?
16       A.   I don't know.
17       Q.   Did you ever see Ms. Livingston in
18   the news room and ask her what are you doing
19   here?
20       A.   I believe I may have.
21       Q.   Describe the time that you saw her
22   in the news room and asked what was she doing
23   there?
24       A.   I read this in the complaint, it
25   jarred my memory of you know that, that

Page 257

1          Greenfield
2    conversation.  Kim at this point had been, you
3    know, she was working as a field reporter.
4    Field reporters are not routinely in the news
5    room, and when you are supposed to be out on
6    assignments and certainly in communication
7    with your desk as far as your whereabouts.
8    And I remembered that she came in the office
9    and I was surprised to see her there because
10   she had not let us know that she had changed
11   locations, and I was, well, I was what are you
12   doing here.
13       Q.   What location was she supposed to
14   be at at that time?
15       A.   I can't tell you specifically.
16   Field reporters --
17       Q.   I am asking you where was Ms.
18   Livingston supposed to be on that day when you
19   asked her what are you doing here?
20       A.   I don't recall.
21       Q.   What assignment was she supposed
22   to be covering when you approached her in the
23   news room and asked her what she was doing
24   there?
25       A.   Two things there. A, I don't

TSG Reporting - Worldwide   877-702-9580

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 318

Greenfield

1
2  Q.   In an APA?
3  A.   You know I don't know because I
4  know that there is a committee and there is a
5  number of voices.  So I don't know if that is
6  the case.
7  Q.   I want to ask you, focus your
8  attention on Austin Fenner.  Did you have a
9  role in his hiring at the New York Post?
10  A.   I did not.
11  Q.   Do you know who interviewed Austin
12  Fenner for a position at the New York Post?
13  A.   I do know, I don't know if this is
14  exclusive, I know Dan Callaruso did.
15  Q.   Who is Dan Callaruso?
16  A.   Dan Callaruso used to be the
17  metropolitan editor of the New York Post.
18  Q.   Was he the metropolitan editor of
19  the New York Post before Michelle Gotthelf?
20  A.   Yes, he was.
21  Q.   Do you know anyone else who
22  participated in the decision to hire
23  Mr. Fenner?
24  A.   I don't.
25  Q.   What position was Mr. Fenner hired

Page 319

Greenfield

1
2  to fill at the New York Post?
3  A.   He was a reporter.
4  Q.   What type of reporter was he hired
5  to -- what role was he hired to play as a
6  reporter at the New York Post when he was
7  first hired?
8  A.   He was hired to -- he was very
9  highly paid.  He was brought in to break
10  enterprise stories.  Do investigations.  He
11  was brought in to -- a lot of sources, break
12  exclusive.  He was supposed to be able to do
13  rewrite.  He was hired to be -- to do all of
14  those things.  Very high level.
15  Q.   What was Mr. Fenner's last
16  position at the newspaper?
17  A.   He was a reporter.
18  Q.   Was he an enterprise reporter or a
19  runner?
20  A.   He was a -- in both cases he was a
21  general -- a general assignment reporter.
22  Q.   Was he hired to be a field
23  reporter?
24  A.   He was hired to be a reporter I
25  believe, you know -- I don't know -- I think

Page 320

Greenfield

1
2  there was -- that he was going to be doing
3  some travel, that sort of thing.  And doing
4  some reporting from the field, yes.
5  Q.   Was he hired to work in the field
6  as a reporter the way Kim Livingston is
7  currently working in the field as a reporter?
8  MR. LERNER:  Objection.
9  A.   He was hired to be a, you know, a
10  big time reporter, but he was initially based
11  in the news room at 1211.
12  Q.   Did there come a time when there
13  was a change in terms of how often Mr. Fenner
14  was in the news room at The Post?
15  A.   Did there come a time when there
16  was a change?
17  Q.   Yes.
18  A.   By the end of his tenure a couple
19  of years later, by that time he had been
20  reassigned to do more field work.
21  Q.   Who reassigned him to do more
22  field work?
23  A.   Michelle Gotthelf.
24  Q.   Did you have any role in his
25  reassignment to do more field work?

Page 321

Greenfield

1
2  A.   Yes and no.  By the time I became
3  the deputy metro editor he had already been
4  doing a lot of that.  I mean it was kind of a
5  progression.  But I am sorry, your original
6  question, I am sorry, what was the question.
7  Q.   You need the question read back
8  again?
9  A.   Please.
10  (Record read.)
11  A.   Yes, he had already been doing a
12  lot of field work --
13  Q.   Move to strike.  Can you just
14  answer that question.  I didn't ask you
15  whether he had been doing field work.  I asked
16  you whether you had any role in his
17  reassignment to do field work?
18  A.   Well I thought I was answering the
19  question.
20  RG   Q.   Okay.  Please mark this one for a
21  ruling from the court.
22  Mr. Greenfield, do you not
23  understand the questions that I am asking you?
24  A.   No, I think context is important.
25  Q.   Well it is not about context, you

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 322

1          Greenfield
2   have to answer the question I ask you if you
3   understand the question.  Do you understand
4   the question --
5          MR. LERNER:  He was answering the
6   question.
7      Q.   And if I ask you for context you
8   can provide the context, do you understand
9   that Mr. Greenfield?
10     A.   What was the question?
11     Q.   Let's move on.
12     A.   Okay.
13     Q.   Did you ever scream at Austin
14  Fenner?
15         MR. LERNER:  Objection.
16     A.   I think scream would be an
17  overstatement.
18     Q.   Did you ever yell at him?
19     A.   I raised my voice.
20     Q.   How many times did you raise your
21  voice with Austin Fenner?
22     A.   I can think of one occasion.
23     Q.   Did you ever curse at Austin
24  Fenner?
25     A.   No.  But I used profanity during

Page 323

1          Greenfield
2   the conversation.  But I didn't curse at him.
3      Q.   So you used profanity while
4   speaking to Austin Fenner?
5      A.   Yes, during that conversation I
6   used profanity.
7      Q.   During this conversation were you
8   also raising your voice at Mr. Fenner?
9      A.   I believe I was.
10     Q.   Describe -- strike that.
11         Where was Mr. Fenner when you
12  raised your voice and uttered profanity when
13  speaking to him?
14     A.   When I raised my voice, actually
15  when I called him I didn't know where he was
16  specifically.
17     Q.   Did you learn where he was?
18     A.   I knew that he was in the City of
19  Milwaukee.
20     Q.   Was he on business --
21     A.   Or environs.
22  RG  Q.   Was he on business for the New
23  York Post in Milwaukee when you raised your
24  voice and uttered profanities while speaking
25  to him?

Page 324

1          Greenfield
2          MR. LERNER:  Objection.
3      A.   Can I hear the question again
4   please.
5          MR. THOMPSON:  I want this marked
6      for another ruling, then you can read it
7      back.
8          (Record read.)
9      A.   Yes, he was working for the paper
10  when we spoke.
11     Q.   In fact, Mr. Greenfield, Austin
12  Fenner was in Milwaukee covering a story on
13  Archbishop Timothy Dolan; correct?
14     A.   Yes, we had sent him to Milwaukee.
15  Yes.
16     Q.   The story he was asked to cover
17  was the fact that Archbishop Dolan was just
18  named to become the Archbishop of New York;
19  correct?
20     A.   He was assigned to a number of
21  things related to that, yes.
22     Q.   When you spoke to Mr. Fenner that
23  day I want you to describe the conversation
24  you had with Austin Fenner when you raised
25  your voice and uttered profanities during that

Page 325

1          Greenfield
2   conversation?
3      A.   I don't remember my exact quotes,
4   but it was -- I had been trying to reach him
5   for a lengthy period of time, and when I
6   finally did I think it was where the fuck are
7   you, something to that effect.
8      Q.   Did you utter any other
9   profanities during that conversation?
10     A.   I may have, I don't remember
11  specifically.
12     Q.   Isn't it true, Mr. Greenfield,
13  that you said to Mr. Fenner what the fuck is
14  wrong with you?
15     A.   No.  That is not true.
16     Q.   Isn't it also true that you said
17  what is wrong with your ass?
18     A.   No.  You said also true and no,
19  neither are true.
20     Q.   Didn't you also say to Mr. Fenner
21  you better get your ass over there?
22     A.   No.  I don't believe that to be
23  true.
24     Q.   How many profanities did you utter
25  when you were talking to him with your raised

Greenfield

voice during that call?
A. I could not say.
Q. Did Mr. Fenner utter profanity toward you during that call?
A. I don't recall if he did or didn't.
Q. What else did you say to Mr. Fenner during that call?
A. All right, well, I asked him why it was that he had not been in contact with the desk. I asked him why -- whether he was going to an event where Archbishop Dolan was going to be. I asked him where he was. I asked him whether he had planned on going to this event. I asked him whether or not he had been in touch with the photo desk. I asked him a number of questions about where he was, why he was where he was. You know, it was all related to a couple of different issues.
And I raised with him the fact that he couldn't be reached, and I pointed that out to him that he couldn't be reached for about 40 minutes which is unacceptable for a reporter on the road. I raised the issue

Greenfield

that he was at a -- you know, I wanted to know if he even knew about a press conference or an event. That I had to learn from the photo desk as opposed to him in the field.
I had to ask him why he had not contacted me this morning. Why he didn't let me know what he was up to. I wanted to confirm whether he knew there was this event, I had to direct him to go to the event. There may have been other elements that I discussed, but I remember those topics.
Q. What did Mr. Fenner say to you during that call?
A. Well I don't remember specifically what he said, but he said that he had not planned on going to the event. He didn't -- I remember that. I remember him pointing out that he was going to be talking with Dolan at some point during the day. But I had to explain to him why it was important to go to this event where Dolan was, and we discussed that as well.
Q. Isn't it true that Mr. Fenner had told you that he had planned on attending that

Greenfield

event?
A. No.
Q. Isn't it true that you yelled and cursed at him and didn't even let him get a word in?
A. Again I did not curse at him.
Q. You uttered profanity during that call?
A. Yes.
Q. You uttered the word fuck when you spoke to him; correct?
A. Yes, I believe I did.
Q. Do you normally utter the word fuck when you speak to people Mr. Greenfield?
MR. LERNER: Objection.
A. Do I often?
Q. Yes.
A. Yes. I have to say it is not uncommon. It is the way that people speak in the news room. You hear it a lot.
Q. It is the way people speak in the news room at the New York Post?
A. Well every news room that I worked in. But yes, I mean it is not uncommon to

Greenfield

hear profanity in the workplace.
Q. Have you ever heard Austin Fenner utter profanity?
A. You know --
Q. Have you ever heard him utter profanity, please answer that question?
A. Please let me finish. I don't know.
Q. Have you ever heard Kim Livingston utter profanity?
A. I don't know.
Q. And the only person who uttered profanity during that phone call with you and Austin Fenner was you; is that correct?
A. I didn't say that.
Q. I am asking. Did Austin Fenner utter profanity during that phone call?
MR. LERNER: Objection. Asked and answered.
A. I don't remember exactly whether he did or didn't.
Q. As you sit here now do you recall Austin Fenner uttering profanity during that phone call on that day?

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 338

1      Greenfield
2  been marked as Deposition Exhibit 13, it is
3  Bates numbered 775.  Please take a moment and
4  look at it and tell us if you recognize it.
5      (Greenfield Exhibit 13, Bates
6      numbered 775, marked for
7      identification, as of this date.)
8      Q.   In fact for the record it is Bates
9  stamped NYP-FL 775.  Mr. Greenfield, this was
10 another article that Austin Fenner wrote on
11 Archbishop Dolan while he was out in
12 Milwaukee; is that correct?
13     A.   No.  He didn't write this story.
14     Q.   Well he contributed to this story
15 while he was out in Milwaukee?
16     A.   Yes, he did contribute notes from
17 Milwaukee, yes.
18     Q.   In fact he was given a bi-line on
19 this story?
20     A.   Yes.
21     Q.   Would you also consider this to be
22 an important story that ran in the New York
23 Post?
24     A.   You know, it was a -- not as good
25 as the first day.

Page 339

1      Greenfield
2      Q.   I am not asking you whether it was
3  as good as the first day.  Can you answer the
4  question?
5      A.   It is a good story.
6      Q.   In fact it appears with a picture
7  of Archbishop Dolan holding up covers of the
8  New York Post that say God Send; right?
9      A.   Yes, it does.
10     Q.   And in fact that cover story, God
11 Send, was actually the story that Austin
12 Fenner got exclusive for the New York Post;
13 right?
14     A.   Yes, that is the story from the
15 day before, yes.
16     Q.   So Austin Fenner was not only able
17 to get an exclusive story for the New York
18 Post regarding Archbishop Dolan, the story
19 actually appeared on the front page of the
20 newspaper; is that correct?
21     A.   Yes, it did.
22     Q.   Because it was that big of a
23 story?
24     A.   It was a good story.
25     Q.   It was not just a good story, it

Page 340

1      Greenfield
2  was a big story, wasn't it?
3      A.   I saw it as the same, yes, I am
4  glad we had it.
5      Q.   So did you raise your voice and
6  utter profanity to Austin Fenner before or
7  after this second story on Timothy Dolan was
8  published as reflected in Deposition Exhibit
9  13?
10     A.   It was before this was published.
11     Q.   So despite the fact that you
12 raised your voice and uttered profanities, Mr.
13 Fenner still did his job in Milwaukee; right?
14     A.   No.
15     Q.   Did Mr. Fenner after you raised
16 your voice and uttered profanities at him do
17 any work for the New York Post in Milwaukee?
18     A.   Again uttered profanities at, I
19 did use profanity in the conversation, but he
20 did continue to work in Milwaukee for another
21 couple of days, yes.
22     Q.   He not only continued to work in
23 Milwaukee, he was working for the New York
24 Post; correct?
25     A.   Yes.

Page 341

1      Greenfield
2      Q.   Did you have any other
3  conversations with Mr. Fenner while he was out
4  in Milwaukee on assignment in connection with
5  the Dolan, Archbishop Dolan stories?
6      A.   I don't remember.
7      Q.   Didn't Austin Fenner tell you when
8  you were yelling and cursing at him not to do
9  so?
10     A.   I did not curse at Austin.  I used
11 profanity in the conversation.  Yelling, I
12 certainly raised my voice.  But I don't
13 remember him saying not to do that.  I don't
14 remember anything like that.
15     Q.   When you said where the fuck are
16 you, you were talking about Mr. Fenner;
17 correct?
18        MR. LERNER:  Objection to the
19     form.
20     A.   Where the hell are you --
21     Q.   Are you changing your testimony
22 now?
23     A.   No, I am not.  I am not changing
24 my testimony.  So yes, that was during the
25 conversation with Austin, yes.

86

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 394

```
1              Greenfield
2    about the monkey cartoon?
3        A.   I don't know -- no.  I don't know
4    that, no.
5        Q.   Do you know who Sandra Guzman is?
6        A.   Yes, I remember Sandra.
7        Q.   Do you know if Sandra Guzman ever
8    complained about that monkey cartoon during
9    her employment at the paper?
10       A.   I don't know that she did.
11       Q.   Isn't it a fact that Austin Fenner
12   complained about that monkey cartoon?
13       A.   I -- can you specify please?
14       Q.   What do you mean specify; do you
15   understand my question?
16       A.   Complain to who?
17       Q.   To anyone?
18       A.   You know I didn't know that he had
19   until this complaint was filed.
20       Q.   Isn't it true that you knew Austin
21   Fenner complained to an on line publication
22   that wrote a news article about that monkey
23   cartoon?
24       A.   Not until this complaint was
25   filed, no, I did not know that.
```

Page 395

```
1              Greenfield
2        Q.   Do you know who Richard Prince is?
3        A.   Not prior to this complaint, no.
4        Q.   Have you ever heard of the on line
5    web-site called Journalisms?
6        A.   Not until this complaint, no.
7        Q.   Have you ever heard of an article
8    before this lawsuit was filed entitled Three
9    Things That Need Fixing at the New York Post?
10       A.   Not prior to this complaint being
11   filed, no.
12       Q.   Did there come a time Mr.
13   Greenfield when you told Austin Fenner that he
14   needed your permission to come to the news
15   room?
16       A.   No.
17       Q.   Did you ever have any
18   conversations with Austin Fenner about when he
19   could come to the news room?
20       A.   At some point during his tenure
21   Austin was reassigned, he was not going to be
22   rewrite any more, so we wanted to use him more
23   in the field and I remember having
24   conversations with him about the mechanics of
25   that.
```

Page 396

```
1              Greenfield
2        Q.   Well tell us in substance what did
3    you say to him about the mechanics of him no
4    longer coming into the news room as often as
5    he had?
6        A.   I don't remember the exact words,
7    but in substance I was explaining, you know,
8    call in in the morning, see if there is an
9    assignments for you.  You know, as always the
10   thing with Austin, he was one of our top paid
11   guys.  I need you to bring me stories.  I need
12   story ideas.  I need enterprise.  I need you
13   to break stories.  Get into the city and see
14   what we can do here.  Because rewrite and some
15   of the other issues were not working out.
16            So I told him, I said listen, this
17   is basically how it works.  Check in in the
18   morning, if we have got something, we will get
19   you moving on something.  And if not then
20   work -- work enterprise, find me stories.
21       Q.   Did you say anything to him about
22   whether he should come into the news room in
23   the mornings to check with you?
24       A.   I don't recall -- I am sorry, I
25   don't want to guess.  Can I hear the question
```

Page 397

```
1              Greenfield
2    again please.
3            (Record read.)
4        A.   You know I think I just simply
5    explained the same way that we handled, you
6    know, all reporters who are working in the
7    field as a matter of course, check in.  Field
8    reporters are people who are working primarily
9    in the field, they don't routinely come into
10   the office, they are assigned to be in the
11   field.
12       Q.   Did you say anything to Mr. Fenner
13   about whether he should come into the news
14   room after that day?
15       A.   I don't remember exactly what I
16   said, but I did make the point about checking
17   for your assignments, hit the streets, you
18   know, go find us some good stories.  Get
19   sources, meet up with sources, that sort of
20   thing.  Come up with enterprise pieces.  But I
21   mean at that point I mean that is -- field
22   reporters don't come into the office.  I think
23   I probably explained this is, you know, this
24   is the mechanics of the job.
25       Q.   Did you say anything to Mr. Fenner
```