# **EXHIBIT 2**

Confidential Attorneys' Eyes Only

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
AUSTIN FENNER and IKIMULISA LIVINGSTON,

                    Plaintiffs,

    vs.

NEWS CORPORATION, NYP HOLDINGS, INC.,
d/b/a THE NEW YORK POST and DAN GREENFIELD
and MICHELLE GOTTHELF,

                    Defendants.
------------------------------------x


       C O N F I D E N T I A L
        ATTORNEYS' EYES ONLY


VIDEOTAPED DEPOSITION OF MICHELLE GOTTHELF
         New York, New York
       Thursday, March 29, 2012




Reported by:  David Henry
JOB NO. 47779

Confidential Attorneys' Eyes Only

Page 82

Gotthelf - CONFIDENTIAL
 1  for reporters?
 2       MR. LERNER:   Objection to form.
 3       A.  Well, we went -- ask me the
 4  question again.
 5       Q.  Would these associate metro
 6  editors ever rewrite stories for reporters?
 7       A.  On occasion, but they were more
 8  responsible for editing stories.
 9       Q.  Okay, describe to me, what is the
10  difference between rewriting and editing?
11       A.  I'm sorry, it's so complicated.
12  Editing is you get a story in and you edit
13  it.  It doesn't need restructuring,
14  additional information, you edit it.
15  Rewriting is more intensive work,
16  restructuring, adding or taking away facts
17  or making sure facts are clear, it's a more
18  painstaking process, more extensive.
19       Q.  Would stories ever be reduced in
20  size by you and/or these other associate
21  editors or deputy editors?
22       MR. LERNER:   Objection.
23       A.  On occasion.
24       Q.  In other words was that part of

Page 83

Gotthelf - CONFIDENTIAL
 1  the job, what the different editors would
 2  do if say a story came in and it was too
 3  long for the space you had, would it be
 4  unusual to come in and cut some out or
 5  shrink it?
 6       MR. LERNER:   Objection.
 7       A.  Not unusual at all.
 8       Q.  Now, you also had rewriters, is
 9  that correct?
10       A.  Yes.
11       Q.  And who were they?  In other
12  words what was their job?  Or there's two
13  questions there.  What was the job of the
14  rewriters?
15       A.  They were -- they are, they're
16  still there, they are assigned to come into
17  the office and work on stories from the
18  office and write those stories.  Basically
19  they take news feeds from a number of
20  reporters and they craft the story.  They
21  also report on them as well, to boil it
22  down to its basic.
23       Q.  Now, when you have a story come
24  in, you have to reduce it in size.  Does

Page 84

Gotthelf - CONFIDENTIAL
 1  that mean it was a bad story?
 2       MR. LERNER:   Objection.
 3       A.  Not necessarily.
 4       Q.  So in other words you might get a
 5  good story, you just don't have room for a
 6  longer piece and you need to shrink it?
 7       MR. LERNER:   Objection.
 8       A.  Sure, it can happen.
 9       Q.  The next name on the chart, and
10  I'm going to go through the reporters now.
11  I'll start with this.  When we have
12  something that says reporter, what does
13  that mean?  Not necessarily on this chart,
14  but when we talk about a reporter at the
15  paper, what does that mean to you?
16       A.  A reporter, well, how would I
17  answer this.  No -- I'm sorry, I want to
18  give you the clearest answer.  A reporter
19  is responsible for gathering facts at its
20  most basic term.
21       Q.  Okay, so a reporter is basically
22  someone that you send out to gather facts?
23       MR. LERNER:   Objection.
24       A.  Well, I'm talking about at its

Page 85

Gotthelf - CONFIDENTIAL
 1  most basic term.  The reporters -- I'll let
 2  you ask the questions.
 3       Q.  Well, in other words, I see at
 4  least a few different titles here, we have
 5  editor, we have reporter and we have
 6  rewrite.  So what is the difference between
 7  those three things?
 8       A.  A rewrite is predominantly a
 9  writer in the office.  A reporter can be
10  anywhere reporting on stories.
11       Q.  Okay.
12       A.  That's -- I mean, that's the
13  basic distinction.
14       Q.  Okay.  And actually I notice I
15  actually skipped, there is one other
16  editor.  Murray Weiss, is Murray
17  Weiss black?
18       A.  I'm sorry, where do you --
19       Q.  It says criminal justice, it's
20  actually underneath -- I missed it, so --
21  underneath Michael Hechtman, it says
22  criminal justice editor.
23       A.  Under Michael Hechtman, that
24  is -- it's just a title, criminal justice

Confidential Attorneys' Eyes Only

Page 150

Gotthelf - CONFIDENTIAL
2  A.  No, I know how they make the
3  determinations.
4  Q.  How do they make the
5  determinations?
6  A.  The people who do the most on the
7  story get bylines and the people who have
8  done the least get taglines, and people who
9  haven't done anything don't get anything.
10  Q.  Would it ever be true that
11  someone who contributed to a story got
12  neither a byline nor a tagline?
13  A.  There are circumstances that a
14  person will think they contributed to a
15  story but didn't and didn't get a byline or
16  a tagline.
17  Q.  Okay, give me an example of that
18  happening.
19      MR. LERNER:  Objection.
20  A.  You have a news story, there is a
21  reporter sent to an address and sits
22  outside the address the whole day, doesn't
23  get anything, didn't really contribute to
24  the story, thinks they've done a day's
25  work, wants a tagline on the story, didn't

Page 151

Gotthelf - CONFIDENTIAL
2  really do anything.
3  Q.  Okay.  If the person provided
4  information that was used in the story,
5  would they always get a tagline?
6      MR. LERNER:  Objection.
7  A.  If the person provided
8  information would they always get a
9  tagline?  Most of the time they would.
10  Q.  So would you consider bylines to
11  be important?
12      MR. LERNER:  Objection.
13  A.  What do you mean by important?  I
14  think a paycheck is important.
15  Q.  Why is a paycheck important?
16  A.  Because you feed your family with
17  a paycheck.  A byline is an added bonus.
18  Q.  So a byline is a good thing?
19  A.  A byline is a good thing, yeah, a
20  byline is a good thing.
21  Q.  And do people generally like to
22  have bylines?
23      MR. LERNER:  Objection.
24  A.  Some reporters don't want their
25  bylines on stories.

Page 152

Gotthelf - CONFIDENTIAL
2  Q.  When would that occur?
3  A.  When they want to protect
4  sources.
5  Q.  So how would the rewrite person
6  decide not to put the byline of the person?
7  A.  If the person would ask, please
8  don't put my byline on the story, the
9  byline doesn't go on the story.
10  Q.  Are there any other criteria --
11  A.  There are no absolutes here.
12  Q.  Are there any other criteria that
13  you know of that's used to determine who
14  gets a byline?
15  A.  No, that's -- I've pretty much
16  covered it.
17  Q.  So a person who gets a byline as
18  opposed to a tagline, would that be a sign
19  the person has made an important
20  contribution to the story?
21  A.  Yes.
22  Q.  What is an enterprise story?
23  A.  Something that you create on your
24  own that isn't off of a news event, that
25  hasn't been in the paper, where you're

Page 153

Gotthelf - CONFIDENTIAL
2  breaking your own news.
3  Q.  Are there certain reporters who
4  are expected to do enterprise stories?
5  A.  All of the reporters are expected
6  to do enterprise stories.
7  Q.  Are there reporters who you have
8  criticized for not doing enough enterprise
9  stories?
10  A.  Yes.
11  Q.  Is this a common complaint?
12      MR. LERNER:  Objection.
13  Q.  In other words are there --
14  A.  I would like to get more
15  enterprise stories out of everyone every
16  day.
17  Q.  Are there any reporters that you
18  can point to that you say this person gives
19  me enough enterprise stories that you're
20  happy with their performance?
21      MR. LERNER:  Objection.
22  A.  Sure.
23  Q.  Who would those people be?
24  A.  Who give me enough enterprise
25  stories?

Confidential Attorneys' Eyes Only

Page 154

Gotthelf - CONFIDENTIAL
2  Q. Yes, that you're happy with the
3  number of enterprise stories.
4  A. We have -- some reporters are
5  better at it than others, but sure. Do you
6  want me to go through my list?
7  Q. Sure. And again, just the ones
8  who you think have given you sufficient
9  enterprise stories.
10         MR. LERNER:   Objection, form.
11  A. Maggie Haberman, Jeane Macintosh,
12  Dan Mangan, Tom Topousis back then, Todd
13  Venezia, Jeremy Olshan, William Gorta,
14  Murray Weiss, Yoav Gonen, Larry Celona.
15  Those are the best of the best enterprise
16  people who pitch.
17  Q. So would it be fair to say that
18  most of your reporters are not pitching you
19  enough enterprise stories?
20         MR. LERNER:   Objection.
21  A. Enough to me is never ending.
22  Everybody should pitch more, but there are
23  people who are better at it than others.
24  Q. Can you give me an example of a
25  good enterprise story that was published

Page 155

Gotthelf - CONFIDENTIAL
2  say while Austin Fenner was working?
3  A. While Austin Fenner was working,
4  I can give you a good enterprise story just
5  off the top of my head.
6  Q. Okay, let's start with that.
7  A. I'm thinking when Austin -- well,
8  give me a few seconds to think about it.
9  Q. Okay, take your time.
10  A. I just want to note, I look after
11  200 stories a week.
12  Q. I understand.
13  A. I don't you know the time. I can
14  give you a good example of a enterprise
15  story.
16  Q. Okay, give me a good example of
17  an enterprise story.
18  A. One of our field reporters had a
19  source who found that a teacher was
20  blogging about being a part-time stripper.
21  That's a great story.
22  Q. When was that story uncovered?
23  A. Only a few months ago.
24  Q. Who was the reporter that covered
25  it?

Page 156

Gotthelf - CONFIDENTIAL
2  A. Kevin Fasick. He is a field
3  reporter.
4  Q. But you can't recall any good
5  enterprise stories from 2008, 2009?
6         MR. LERNER:   Objection.
7  A. It's so long ago. If you have
8  newspapers, I can point to them.
9  Q. What's your opinion of Austin
10  Fenner as a writer?
11  A. He was not a strong writer.
12  Q. Tell me what you mean by that.
13  A. Mr. Fenner, his writing wasn't
14  clear, it wasn't focused, there were
15  spelling errors. He often couldn't
16  determine the news line out of the story,
17  couldn't find the right news line out of
18  the story. He sometimes, well, often
19  actually, didn't fill in all the holes,
20  represent all the sides, he wouldn't fact
21  check.
22  Q. Anything else?
23  A. For now that's what I recall.
24  Q. Would you say being a good writer
25  and a good reporter are the same thing?

Page 157

Gotthelf - CONFIDENTIAL
2  A. No.
3  Q. In other words is it possible to
4  be a good reporter but not be a good
5  writer?
6  A. Absolutely.
7  Q. So my last question was do you
8  think he was a good writer. Now I want to
9  ask you then, do you think he was a good
10  reporter?
11  A. I think he was not a good
12  reporter, no. No. He was -- if we sent
13  him out on a specific task, he would get --
14  sometimes he would get what we needed for
15  him to get, but overall he was not a good
16  reporter. He wasn't finding news lines, he
17  wasn't breaking stories, he wasn't
18  developing sources, he wasn't thinking
19  about following stories he worked on. A
20  good reporter will find a good story on
21  their way to work. Mr. Fenner wasn't
22  thinking that everything could be a story.
23  Q. What about Ms. Livingston, would
24  you say she was a good writer?
25  A. She is not a strong news writer.

Confidential Attorneys' Eyes Only

Page 166

Gotthelf - CONFIDENTIAL

1  
2  else present at that meeting?  
3  A. No.  
4  Q. It was just you and  
5  Ms. Livingston?  
6  A. Yes.  
7  Q. Describe for me what took place  
8  during that meeting.  
9  A. I told her I was reassigning her  
10 from Queens to field reporting because I  
11 wasn't getting what I wanted out of her in  
12 that beat.  
13 Q. What was her response?  
14 A. She was -- she seemed sad.  
15 Q. What led you to believe that she  
16 was sad?  
17 A. Her facial expression.  
18 Q. She was sad, disappointed with  
19 being moved?  
20 A. Yes, sad, disappointed.  
21 Q. Did she say anything to you about  
22 it?  
23 A. Meaning?  
24 Q. Did she complain that she thought  
25 it was unfair or anything like that?  

Page 167

Gotthelf - CONFIDENTIAL

1  
2  A. No.  
3  Q. Did she ask you any questions  
4  about her new assignment?  
5  A. She -- from what I recall, she  
6  asked me what her new assignment would be  
7  and I said it's equally an important job.  
8  She would be in the street, field reporter.  
9  Q. Was this a demotion?  
10 A. No. Absolutely not.  
11 Q. Why not? Could someone look at  
12 it as a demotion?  
13 A. Someone can look at anything as a  
14 demotion.  
15 Q. Well, was the Queens courthouse  
16 reporter a good assignment?  
17 A. For some, for others, not.  
18 Q. Are courthouse assignments among  
19 the people you work with considered  
20 prestigious?  
21   MR. LERNER:  Objection.  
22 A. I don't know how people interpret  
23 them. I would consider maybe some  
24 prestigious, maybe others not. It's all in  
25 perception.  

Page 168

Gotthelf - CONFIDENTIAL

1  
2  Q. Well, the Queens courthouse  
3  allowed Ms. Livingston to have a number of  
4  front page stories, correct?  
5  A. It allowed her to have a number  
6  of front page stories?  
7  Q. You said that she had a number of  
8  front page stories on the Sean Bell string  
9  of stories, correct?  
10 A. She covered a trial while she was  
11 in Queens Supreme Court that resulted  
12 in front page stories. I don't think it  
13 allowed her.  
14 Q. Well, she was able to have  
15 numerous front page stories in that  
16 position as Queens court reporter, correct?  
17   MR. LERNER:  Objection.  
18 A. She could have numerous front  
19 page stories in any position at the New  
20 York Post.  
21 Q. Is it more likely to have a front  
22 page story as a courthouse reporter as  
23 opposed to a beat reporter?  
24 A. Absolutely not. Absolutely not.  
25 Q. So you would expect that beat  

Page 169

Gotthelf - CONFIDENTIAL

1  
2  reporters, if we were to go through and  
3  look at all the front page bylines, that  
4  beat reporters would have no less incidence  
5  of front page bylines than the court  
6  reporters?  
7  A. Yes.  
8  Q. What is the basis for you  
9  thinking that?  
10 A. Because I have run the newsroom  
11 for a significant period of time and I know  
12 what stories make the front page.  
13 Q. Has Ms. Livingston had any front  
14 page stories since she was taken off the  
15 Queens reporter job?  
16 A. I don't believe so, but that's on  
17 her as a reporter that she hasn't developed  
18 a front page story.  
19 Q. Okay, so is she a better or a  
20 worse reporter now than she was when she  
21 was working Queens?  
22 A. I think she's doing better as a  
23 field reporter.  
24 Q. So she's improved as a reporter  
25 since being on the Queens courthouse?

Page 194

1  Gotthelf - CONFIDENTIAL
2       MR. LERNER:  Objection.
3       A.  I'm sorry, I was being flip, that
4  I would be spending my entire day writing
5  people up for cursing and yelling and not
6  being able to put out a newspaper.  I'm
7  sorry, that was me being flip.
8       Q.  That's fine.  So when you finally
9  fired Mr. Haberman, you said it was for two
10 reasons, that he missed a story and he had
11 been shouting at people, but in a
12 non-abusive way, correct?
13      A.  He had been shouting at people
14 and it became a distraction.
15      Q.  If you had to assign values for
16 each of those two reasons, in other words
17 was it 50/50 percent, or 90/10?
18      MR. LERNER:  Objection.  Go
19 ahead.
20      A.  The news story was the straw that
21 broke the camel's back.
22      Q.  So what's the percentage?
23      MR. LERNER:  Objection.
24      A.  I can't determine a percentage.
25      Q.  Well, give me a percentage.

Page 195

1  Gotthelf - CONFIDENTIAL
2       MR. LERNER:  Objection.
3       A.  How am I going to determine a
4  percentage?
5       Q.  Why not?
6       MR. LERNER:  Objection.
7       A.  As I said, the news story was the
8  straw that broke the camel's back, meaning
9  it was at the point where Zach -- I
10 couldn't work with Zach any more.
11      Q.  So if Zach had not missed this
12 news story, he might still be working there
13 today?
14      MR. LERNER:  Objection.
15      A.  No.
16      Q.  Why do you say that?
17      A.  Because I would have fired him
18 anyway, just because I couldn't work with
19 him any more.
20      Q.  I want to direct your attention,
21 again, this is on 831.  It says, Michelle
22 stated that there were several
23 months between the time Kim was moved and
24 when Billa Rota was placed into the
25 position.  Do you see that?

Page 196

1  Gotthelf - CONFIDENTIAL
2       A.  I do.
3       Q.  Okay, would you agree that Billy
4  Rota is supposed to Billy Gorta?
5       A.  Yes.  This thing is filled with
6  errors, yes.
7       Q.  Other than that, is that a
8  correct statement of what you discussed
9  with Ms. Kelly and Ms. Jehn at the meeting?
10      MR. LERNER:  Objection.
11      Q.  In other words did you tell them
12 that there were several months between the
13 time Kim was moved and when Billy Gorta was
14 placed in the position?
15      MR. LERNER:  Objection.
16      A.  No.
17      Q.  You did not tell them that?
18      A.  There wasn't several months.
19      Q.  Okay, so when was Kim relieved?
20      A.  Kim was reassigned in early
21 November of 2008.
22      Q.  And when did Billy Gorta take
23 over?
24      A.  Early December of 2008.
25      Q.  Okay.  And the next sentence, you

Page 197

1  Gotthelf - CONFIDENTIAL
2  see it says when Michelle moved Kim she did
3  not have a permanent plan and just had
4  temporary people in the role for a while.
5  Do you see that?
6       A.  Yes.
7       Q.  Is that an accurate statement?
8       A.  Part of it is.  I did not have a
9  permanent plan and I was going to put
10 temporary people in there.
11      Q.  So you told Ms. Kelly and
12 Ms. Jehn that you did not have a permanent
13 plan and you were going to put temporary
14 people in there?
15      A.  Yes, I was going to try people
16 out in that position to see how it worked
17 out.
18      Q.  When Ms. Livingston was taken off
19 the courthouse beat you did not know who
20 was going to take over for her?
21      A.  Absolutely not.
22      Q.  Is it important to have personal
23 connections on a news beat?
24      A.  Sure.  Absolutely.
25      Q.  Why?

Confidential Attorneys' Eyes Only

Page 198

Gotthelf - CONFIDENTIAL
1
2    A.  To develop story ideas, develop
3  confidence in people. I mean, sure.
4    Q.  Do you think that a person who
5  was simply temporarily in the job would
6  have a good opportunity to develop those
7  sorts of sources?
8    A.  Eventually. It also depends on
9  how good the person is.
10    Q.  You say eventually, so in other
11  words it takes time to develop that, right?
12    A.  Sure, or a really good reporter
13  can develop it immediately. It all
14  depends.
15    Q.  But did you have a really good
16  reporter in mind to take over from
17  Ms. Livingston when she was taken off?
18    A.  I did not. I eventually put a
19  very good reporter in there, but at this
20  time I was wondering what I was go to do
21  with it.
22    Q.  So why would you remove her when
23  you didn't have someone to replace her
24  immediately?
25    MR. LERNER:  Objection. Go

Page 199

Gotthelf - CONFIDENTIAL
1
2  ahead.
3    A.  Because she wasn't doing well at
4  it. I've overseen courts at the New York
5  Post for 11 years. I have had a number of
6  reporters in Queens court. Ms. Livingston
7  was not doing a great job at Queens court.
8  I was figuring out what my next step was.
9  It's my job. I reassign people.
10    Q.  Did Ms. Livingston know people at
11  the Queens courthouse?
12    MR. LERNER:  Objection.
13    A.  I would assume she did, since she
14  was based in the Queens courthouse.
15    Q.  But you don't know for certain?
16    A.  No, you don't know for certain.
17    Q.  All right, let me direct your
18  attention to the next paragraph. It's the
19  paragraph beginning Michelle stated that
20  there are other runner reporters who don't
21  have desks or phones because there are not
22  enough for everyone. Do you see that?
23    A.  Yes.
24    Q.  Is that accurate, what you said
25  to Ms. Kelly and Ms. Jehn?

Page 200

Gotthelf - CONFIDENTIAL
1
2    MR. LERNER:  Objection.
3    A.  I said from what I recall two
4  things. There are not enough for everyone
5  and field reporters, runner reporters don't
6  have assigned desks. Ms. Livingston can
7  come into the office and use a desk
8  whenever she needs to use a desk. It's
9  desk assignment -- there's only a number of
10  them.
11    Q.  Okay, but did you tell Ms. Kelly
12  and Ms. Jehn that you don't have, quote,
13  have desks or phones?
14    MR. LERNER:  Objection.
15    A.  I'm sorry, say that again?
16    Q.  Is this correct, it says here,
17  Michelle stated that there are other runner
18  reporters who don't have desks and phones
19  because there are not enough for everyone.
20  Did you tell them that you did not have
21  enough desks or phones for all of your
22  runner reporters?
23    A.  I'm sure that was one. I may
24  have.
25    Q.  You may have, but you're not

Page 201

Gotthelf - CONFIDENTIAL
1
2  sure?
3    A.  I'm not sure. Yeah, I'm not
4  sure.
5    Q.  The bottom sentence says Michelle
6  said Kim never asked for a phone number at
7  the office. If she had it would have been
8  an easy request because you can have a
9  phone number without being assigned a
10  phone. Do you see that?
11    A.  Sure.
12    Q.  So was the issue that she didn't
13  have a phone or that she did not have a
14  phone number?
15    MR. LERNER:  Objection.
16    A.  I only remember an issue about a
17  desk.
18    Q.  Okay, did Kim ever ask you -- and
19  again, this is going back to your meeting
20  with Ms. Livingston. Did Kim ever ask you
21  for a desk at that meeting where you told
22  her she was being taken off the Queens
23  courthouse?
24    A.  No, she asked me to see if she
25  can get a desk. I don't remember a phone.

Confidential Attorneys' Eyes Only

Page 202

Gotthelf - CONFIDENTIAL
Q. Okay, so you do recall she asked you if she could have a desk?
A. Yes, I do.
Q. And what was your response?
A. I'll look into it. So then I soon realized that she's in the field, there is no need to have a desk. She's not writing in the office every day. She has exactly what everybody else in her position has. And she also can use a desk any time she needs to use a desk. So I don't understand the issue.
Q. You don't understand why Ms. Livingston might want to have her own desk?
MR. LERNER: Objection.
A. No, no, I don't actually, I don't. Plenty of people, field reporters want to be out on the street and never see the inside of the newsroom.
Q. And what about the phone number?
A. Ms. Livingston didn't ask me for a phone number. She has a cell phone. We pay two thirds of it.

Page 203

Gotthelf - CONFIDENTIAL
Q. And if you look at last sentence there, it says Michelle would have been happy to get that for her.
A. Yes.
Q. That meaning a phone?
A. A phone number, not an actual physical phone, but a voice-mail.
Q. Does Ms. Livingston have a phone number at Post today?
A. I don't believe so. She uses her cell phone, of which the company pays two thirds.
Q. So is it your position that Ms. Livingston does not need an assigned phone number at the company?
A. At the office, she does not need an assigned phone number at the office, no.
Q. And is it your position that she has never requested to have an assigned phone number at the office?
A. I don't recall her requesting to have an assigned phone at the office.
Q. After you had this meeting with Ms. Kelly and Ms. Jehn, was it your

Page 204

Gotthelf - CONFIDENTIAL
understanding that Kim was complaining that she didn't have an assigned phone number at the paper?
A. I didn't take that from this meeting, but I'm not responsible for assigning people phones. We have an administrative editor. Ms. Livingston has been working at the New York Post for 15 years. She knows that. Go to the administrative editor and see if you can get a voice-mail.
Q. So at any time after this meeting did you ever go to Ms. Livingston and ask her would you like a phone number at the company?
A. I don't recall.
Q. So your testimony is you might have gone and asked her, but you don't recall?
A. I might have, I don't recall.
Q. But you have no recollection of any conversation in which you discussed a phone with Ms. Livingston?
A. I don't recall. I remember the

Page 205

Gotthelf - CONFIDENTIAL
desk, I don't recall the phone.
Q. It says here in the middle of the paragraph, Michelle doesn't remember if she offered Kim a desk or not.
A. Yes.
Q. Did you tell Ms. Kelly and Ms. Jehn that you don't remember if she offered Kim a desk or not?
A. Well, actually I said to them I would look into it. I don't remember if I said yes or no. I remember saying I would look into it. That's what HR took from it. She doesn't remember yes or no. I said I'd look into it and then realized that A, there is only a finite number of desks in the newsroom and they're for rewrite, people who are assigned to come in and get a desk for rewrite. Ms. Livingston can come in and use a desk, she just, much like everyone else in her position, won't have one assigned to her.
Q. Was Ms. Livingston ever told she needed permission to come into the newsroom?

Confidential Attorneys' Eyes Only

Page 238

Gotthelf - CONFIDENTIAL
exhibit Gotthelf 12. Could you just take a quick look at this, and this is Bates stamped NYP-FL 609.
   (Gotthelf Exhibit 12, NYP-FL 609, marked for identification.)
   What is this document?
   A. This is a story pitch from Mr. Austin Fenner.
   Q. And what is the date on it?
   A. This is September 22, 2008.
   Q. And could you just read what you have in the text here?
   A. That's a good story. Can you say urban renewal? I want more.
   Q. Okay, so was this a good story idea that Austin was pitching?
   A. If it didn't appear word for word in the New York Times, it would have been.
   Q. What do you mean it appeared word for word in the New York Times?
   A. This is a New York Times -- a story that he pitched that had previously appeared with all of this information in the New York Times.

Page 239

Gotthelf - CONFIDENTIAL
   Q. Okay, so it didn't appear word for word in the New York Times?
   A. No, it did not. Every piece of viable information that is in this line appeared in the New York Times.
   Q. And when did it appear in the New York Times?
   A. Only a few weeks before -- or I'm sorry -- yes, I believe a few weeks before, I believe.
   Q. You don't know for certain?
   A. I don't know for certain.
   Q. Could it have been a year before?
   A. Yes, it could have been five years before, but he didn't do a clip search at the library to determine that these facts were not new.
   Q. Does the Post ever run followup stories on stories that appeared in other papers?
   A. Yes, but they would have to have a new angle.
   Q. Okay, how do you know --
   A. I'm sorry, the fact that a new

Page 240

Gotthelf - CONFIDENTIAL
car dealership was opening its doors in Harlem had appeared in the New York Times. That was the story he was pitching.
   Q. How do you know he didn't have a new angle on it?
   A. Because I have follow up e-mails with him where he didn't have a new angle. This is one in a chain of many, of several.
   Q. So you don't believe there could be a new angle on the Lamborghini dealership in Harlem?
   MR. LERNER: Objection.
   A. Yes, there could have been a new angle and he should have worked on it and pitched it to me instead of pitching me an old story.
   Q. I'm going to mark the next exhibit Gotthelf 13.
   (Gotthelf Exhibit 13, NYP-FL 2277, marked for identification.)
   And what is this, ma'am?
   A. This is a story pitch from Mr. Austin Fenner.
   Q. And what is the date on it?

Page 241

Gotthelf - CONFIDENTIAL
   A. November 20, 2008.
   Q. And can you read what you wrote in your text of your e-mail?
   A. Sure. I wrote I really like this one.
   Q. Okay, was this a good story that Mr. Fenner pitched?
   A. On the surface, yes.
   Q. Marking Gotthelf 14, if you could take a look at that, please.
   A. Certainly.
   (Gotthelf Exhibit 14, NYP-FL 2276, marked for identification.)
   Q. For the record, this is NYP-FL 2276. And can you tell me what this is?
   A. This is an e-mail correspondence between me and one of my rewrite reporters, Lucas Alpert.
   Q. And can you read what you have written there.
   A. Also Austin Fenner has an extensive interview with the whistleblower. Please give him a call. We sent Schilling to the mansion on the -- and UWS means

Page 250

Gotthelf - CONFIDENTIAL

recall. I don't recall.
Q. But you don't recall that Austin ever complaining about Dan's treatment of him?
A. Oh, I don't recall.
Q. If you look at the third article called Red Cross Mama, and this is marked AF 129. Okay, do you remember this story?
A. I do.
Q. Was this a good story?
A. This was not a good story.
Q. Why do you say that?
A. Mr. Fenner was sent to Mississippi to -- this existing story was out in the press. Nothing exclusive was broken on it. And he -- the first quote in the story is him speaking to -- about the affairs of an anchorwoman. This was not one of his -- this was not a good effort.
Q. Is one of your reporters being attacked or threatened by a guy with an axe handle? Is that the kind of story that the paper likes to run?
MR. LERNER: Objection.

Page 251

Gotthelf - CONFIDENTIAL

A. No, we would prefer all of our reporters are safe.
Q. So why did you run this story then?
MR. LERNER: Objection.
A. This was an ongoing news story.
Q. Austin Fenner being attacked by a guy with an axe handle was an ongoing news story?
MR. LERNER: Objection.
A. I'm sorry, may I direct your attention to the cut line, that's what this is, the cut line, a man armed with an axe handle shoos away a Post reporter. Shoos away, attacked, sounds very different to me.
Q. Well, who made the decision to put this photograph of a guy with an axe handle and Austin Fenner?
MR. LERNER: Objection, if you know.
A. One of the photo editors.
Q. And why do you think they put this photograph of Austin Fenner and a guy

Page 252

Gotthelf - CONFIDENTIAL

with an axe handle?
MR. LERNER: Objection.
A. It's a good photo. It's dramatic.
Q. It's a dramatic photo but it's not a good story?
MR. LERNER: Objection.
A. The story is not about Austin Fenner getting shooed away, it's about this woman who is pregnant.
Q. So why do you have the picture at all then?
MR. LERNER: Objection. She testified she didn't put the picture.
A. It's a good picture.
Q. If you could look at the next page, the part that's marked AF135.
A. Yes.
Q. And actually a quick step back. In the Red Cross story Austin was sent to Mississippi, is that right?
A. Yes.
Q. Is this a national story?
A. Yes.

Page 253

Gotthelf - CONFIDENTIAL

Q. Why did you send Austin on this national story?
A. Mr. Fenner got a lot of good assignments.
Q. Why did you give him a lot of good assignments?
A. Because he was a highly compensated reporter and he was expected to produce on these assignments.
Q. Were these important assignments?
A. He was put on some important assignments, yes. Every opportunity to succeed.
Q. So you're telling me then that you had a reporter who was not a good reporter but was sent on important national assignments?
A. He wasn't pitching stories, his writing wasn't -- was pretty poor, he -- yes. I needed to assign him to something, so he went out on stories.
Q. On important national stories?
A. Sure. Every opportunity to succeed.

Confidential Attorneys' Eyes Only

Page 262

Gotthelf - CONFIDENTIAL

A. Because he was the, basically the last person in the newsroom who wasn't doing any writing because he wasn't a very good writer that I had to send out to the scene.

Q. So you had 15 different people you sent?

A. I did. We sent -- it was all hands on deck that day.

Q. Did all 15 of them have stories that made it into the paper about that Miracle on the Hudson?

A. All 15 contributed to the stories that were in the paper that day, yes.

Q. Did Austin have a byline on those stories?

A. He may have.

Q. Did all 15 have bylines?

A. It was a significant story, so I'd have to look at the clip to see who had what.

Q. But you don't know if all 15 had bylines?

A. I don't know.

Page 263

Gotthelf - CONFIDENTIAL

Q. Do you remember a story about Obama's church in Chicago and a controversy with the pastor of the church?

A. I do.

Q. Was that a national story?

A. It was a national story.

Q. Was it an important story?

MR. LERNER: Objection.

A. It was an important story.

Q. Was Mr. Fenner dispatched to work on that story?

A. Mr. Fenner was dispatched to work on that story and he failed at the assignment.

Q. Move to strike the second half of that answer. That was non-responsive. Were you the one who dispatched him to the story?

A. I don't recall.

Q. So you have no recollection of how Mr. Fenner ended up assigned to that story?

A. I know he was assigned -- well, he was working with the political editor on

Page 264

Gotthelf - CONFIDENTIAL

the story.

Q. So the political editor may have assigned it?

MR. LERNER: Objection.

A. Yes, but since Austin reported to me, I may have told the political editor to use Mr. Fenner for the assignment.

Q. Who was the political editor?

A. Greg Birnbaum.

Q. What was Mr. Birnbaum's opinion of Mr. Fenner?

A. On one occasion on that story he was livid that Mr. Fenner didn't do a good job on that story.

Q. He was livid? Why was he livid?

A. Because Mr. Fenner was dispatched to -- to break a story on the Reverend Wright, on his financials, on his friends, and Mr. Fenner merely went to a church and talked to some of the congregants about Mr. Wright and Greg was very upset about it.

Q. And what was Mr. Fenner expected to do?

Page 265

Gotthelf - CONFIDENTIAL

A. He spent three days in Chicago, he was expected to break an investigative news line on that story because that's what he was hired to do. He's highly compensated, he's hired to go out and break an investigative news story.

Q. Did you have any confidence in Mr. Fenner to break an investigative news story when you sent him on this story?

MR. LERNER: Objection.

A. Mr. Fenner was highly compensated. He came to the New York Post with a lot of experience. He would often claim that he could break investigative stories and he could tease lines out of stories, so yes, I gave him an assignment in hopes that he would break a line.

Q. Did you have confidence that he would be able to break a line?

MR. LERNER: Objection.

A. I hoped he would.

Q. That's not the question. You said in reference to other stories that you sent him on important national stories even

Confidential Attorneys' Eyes Only

Page 266

Gotthelf - CONFIDENTIAL

2 though you thought he was a poor reporter,
3 right?
4   A.  Yes, I gave him every
5 opportunity, yes.
6   Q.  So are you saying that again with
7 the incidence of the Reverend Wright and
8 Obama's church, it was an important
9 national story, but you sent Mr. Fenner
10 even though you thought he was a poor
11 reporter?
12        MR. LERNER:  Objection.
13   Q.  Is that what your testimony is?
14   A.  No, I sent a highly
15 compensated -- I'm sorry --
16   Q.  Finish your answer, but I'm going
17 to move to strike as soon as you're done.
18 That's not the question.
19        MR. LERNER:  She needs to finish
20   her answer.  Go ahead.
21   A.  I sent a highly compensated
22 reporter with many years of news experience
23 who came to the New York Post claiming to
24 have sources and investigative skills and
25 writing abilities to high profile

Page 267

Gotthelf - CONFIDENTIAL

2 assignments in hopes that he would break
3 stories out of them.  So yes, I was hopeful
4 that Mr. Fenner would break a news line out
5 of this story.
6   Q.  Okay, move to strike.  That's not
7 the question.  The question is, did you
8 send him on these important national
9 stories even though you believed he was a
10 poor reporter?
11        MR. LERNER:  Objection.
12   A.  Yes, but I didn't always believe
13 he was a poor reporter.  I was giving him
14 every available opportunity to prove to us
15 that he was a good reporter.
16   Q.  When you sent him on this story
17 to cover the Reverend Wright, did you think
18 he was a good reporter or a bad reporter?
19   A.  I don't recall the time frame, so
20 I don't know.
21   Q.  And what about the Dolan story
22 that we showed you a few minutes ago?  Do
23 you still have that in front of you?
24   A.  I do.
25   Q.  What was the date on that?  Do

Page 268

Gotthelf - CONFIDENTIAL

2 you see it's February, 2009?
3   A.  Yes.  Hang on.
4   Q.  By February of 2009 when he did
5 these two stories we referred to earlier,
6 did you think he was a good reporter or a
7 bad reporter?
8        MR. LERNER:  Objection.
9   A.  I thought at this point that -- I
10 don't recall at the time.  I don't.
11   Q.  So when did you come to the
12 conclusion that he was a bad reporter?
13   A.  It took -- you give someone every
14 opportunity to do what they're hired to do,
15 and over time when there's no consistency
16 to his good assignments, you realize
17 they're not very good.  But to be a good
18 boss, I had to give him every opportunity.
19 I wanted to give him every opportunity to
20 shine.
21   Q.  Okay.  So the question was did
22 you think he was a good reporter or a bad
23 reporter in February when you sent him on
24 this assignment?  So when did you determine
25 he was a bad reporter?

Page 269

Gotthelf - CONFIDENTIAL

2        MR. LERNER:  Objection.
3   A.  I don't recall.  I do want to add
4 something.  He had gotten performance
5 warnings on his lack of writing abilities
6 and story pitches before this assignment.
7        MR. LERNER:  Indicating
8   Exhibit 16.
9   A.  Well, he wasn't working out.  He
10 wasn't doing a great job, dating back to
11 early 2008.  I mean, along the way he got
12 the opportunities, he didn't do well at
13 them.  He was highly compensated.  He said
14 he had the skills to produce good stories,
15 and he wasn't, and it was -- it was
16 probably a few months into my position that
17 I really -- we gave him enough assignments
18 to determine that he was not very good.
19   Q.  So a few months into his
20 employment you decided he was not very
21 good, is that what you're saying?
22   A.  No, I didn't say that.  I said a
23 few months into my job as metropolitan
24 editor.
25   Q.  Okay, so what time are we talking

Confidential Attorneys' Eyes Only

Page 270

1   Gotthelf - CONFIDENTIAL
2   about then? Can you give me a month and a
3   year?
4       A. We're talking definitely by his
5   APA in 2008, he got a final performance --
6   a final warning in his APA that he was
7   failing at the job and that he needed to
8   step it up.
9       Q. But you sent him to Chicago
10  anyway on an important national story?
11      A. I did, because at this point
12  Mr. Fenner could no longer write. He is
13  not a strong writer. He wasn't pitching
14  story ideas. He wasn't discerning news
15  lines on story ideas, and I had an idea of
16  something I wanted, so I sent him.
17      Q. Well, actually you said he did an
18  excellent job on that Cardinal Dolan --
19      A. He did, he did.
20      Q. I'm going to provide you what's
21  marked Gotthelf 17, if you can take a look
22  at that, please.
23      A. Sure.
24      (Gotthelf Exhibit 17, NYP-FL
25      774-775 and attachments, marked for

Page 271

1   Gotthelf - CONFIDENTIAL
2   identification.)
3       Are you ready?
4       A. No, I'm sorry, I'd like to read
5   this.
6       Q. Go ahead. Let's start at the
7   back, because these are in order. For the
8   record this is NYP-FL 2269 and 2270. What
9   are these two pages, ma'am?
10      A. This is e-mail correspondence
11  between me and my political editor Greg
12  Birnbaum.
13      Q. And if you could look at the very
14  last one, the one dated 9/29/2008,
15  1:28 p.m., could you read what that says
16  for me.
17      A. Col is understandably upset that
18  the story he had requested that we sent
19  Austin to do in Chicago was hacked and run
20  downpage as six graphs. Frank was aware
21  that this was a Col project. I have been
22  yelled at about this so I have to let the
23  boss know exactly what happened. Why Frank
24  would make a Col story that we go all the
25  way to Chicago to do a downpage brief is

Page 272

1   Gotthelf - CONFIDENTIAL
2   beyond me. He did the same thing last
3   week. I have sent Col an e-mail explaining
4   why his stories are getting treated like
5   shit. In any event, Col wants to go back
6   to Chicago to work on the story about
7   Obama's pork rant being investigated by the
8   AG. Who can go besides Austin?
9       Q. Okay, so what does it mean that
10  the story was hacked and run downpage as
11  six graphs?
12      A. That means the editor on the news
13  desk cut the story, made it shorter.
14      Q. And it was run downpage even
15  though Col wanted it to be a bigger
16  priority?
17      MR. LERNER: Objection.
18      A. According to this e-mail.
19      Q. Well, other than the e-mail, do
20  you recall whether Col had thought this was
21  an important story?
22      A. I don't.
23      Q. Okay. Can you look at -- if you
24  go up two and look at the one that's marked
25  1:31 p.m. that same day, can you read that?

Page 273

1   Gotthelf - CONFIDENTIAL
2       A. Just from to report?
3       Q. Yes.
4       A. Now Col has asked me why we sent
5   Austin when he says you are trying to fire
6   him. If we don't send someone who he
7   respects, we might as well not send anyone.
8       Q. Do you agree with that?
9       A. I'm sorry?
10      Q. Okay, let's break it up. Were
11  you trying to fire Austin in September of
12  2008?
13      A. I was not.
14      Q. Do you have any idea why Greg
15  Birnbaum was under the impression that you
16  were trying to fire him?
17      MR. LERNER: Objection to form.
18      A. I gave Mr. Fenner a performance
19  warning at that point.
20      Q. Did you respond to Mr. Birnbaum
21  and say no, you have it all wrong, I'm not
22  trying to fire Austin?
23      A. That wasn't the issue here. The
24  issue was the story, not Mr. Birnbaum's
25  dealing with, you know, interpretations of

Page 294

Gotthelf - CONFIDENTIAL
2   A.   Yes.
3   Q.   Could you read your e-mail to
4   Jessie dated 4:24 p.m.
5   A.   Yes. Nichole Bodie is better,
6   but people like Austin, he's apparently
7   very sneaky, plus always good to hire an
8   African-American.
9   Q.   What did you mean apparently he's
10  very sneaky?
11  A.   I was told that Mr. Fenner was a
12  very sneaky reporter which made me very
13  happy. That is -- sneaky reporters are
14  great reporters.
15  Q.   And what does sneaky mean in this
16  context?
17  A.   Sneaky means sort of a reporter
18  who breaks away from the pack of other
19  reporters to go their separate way and
20  break a news line. I can give examples of
21  it. A person who is online at Rikers to
22  interview someone but has already had it
23  set up with a lawyer to go in but just
24  hangs out with the other reporters to
25  pretend like nothing is going on and then

Page 295

Gotthelf - CONFIDENTIAL
2   gets the exclusive interview. Sneaky is a
3   high compliment.
4   Q.   Was Austin ever sneaky in his
5   employment with the Post?
6   A.   I wish he was a lot sneakier.
7   I'm trying to recall. I don't recall.
8   Q.   And the final sentence, always
9   good to hire an African-American. Why did
10  you write that?
11  A.   I was saying Mr. Fenner was well
12  liked, which is a good attribute, he was
13  very sneaky, which is a good attribute, and
14  plus it's, you know, always good to hire an
15  African America for diversity in the
16  newsroom.
17  Q.   So is it fair to say that the
18  vast majority in the newsroom are not
19  African-American?
20  A.   The newsroom is --
21  Q.   I'm sorry, is it fair to say the
22  vast majority of the reporters at the metro
23  desk are not African-American?
24  A.   At the metro desk, I'm sorry, I
25  just --

Page 296

Gotthelf - CONFIDENTIAL
2   Q.   The reporters that you manage,
3   the vast majority are white, correct?
4   A.   Yes, the vast majority are white.
5   Q.   And was this that you were aware
6   that you needed more diversity in the
7   newsroom?
8   A.   I'm a huge advocate of diversity.
9   If we have a chance to diversify, that's
10  great.
11  Q.   So you're a huge advocate of
12  diversity but you currently only have three
13  -- or actually how many do you have
14  currently?
15       MR. LERNER:   How many what?
16       Objection.
17  Q.   How many African-American
18  reporters do you have?
19  A.   Well, since I've been metro
20  editor, I've hired two new African-American
21  reporters.
22  Q.   How many do you have now?
23       MR. LERNER:   I don't think she
24       was finished with her answer.
25  A.   Just going back to diversity,

Page 297

Gotthelf - CONFIDENTIAL
2   I've hired three Hispanic reporters. I can
3   -- if you want to give me some time I could
4   count how many I have now.
5   Q.   I'm not asking you about
6   Hispanic. I just want to know how many
7   African-American reporters do you have that
8   you supervise right now?
9   A.   Just give me one more minute.
10  Full-time?
11  Q.   Yes, full-time.
12  A.   I count four.
13  Q.   So in that e-mail, clearly you
14  were taking Austin's race into account as a
15  criteria for him working for you, right?
16  A.   No, I was laying out his
17  attributes from what I heard that he is
18  likeable, sneaky, and plus since I'm a fan
19  of diversity, he's African-American.
20  Q.   And if you're such a fan of
21  diversity, why are there no black editors
22  on the metro desk?
23       MR. LERNER:   Objection.
24  A.   I take the most qualified
25  applicants and many people on my desk I've

**Page 298**

Gotthelf - CONFIDENTIAL

1. inherited.
2. Q. But there have been openings for editors on the metro desk, have there not?
3. A. Yes, and I've put applications and I've hired highly qualified people for my desk.
4. Q. And have you ever tried to hire an African-American for one of those positions?
5. MR. LERNER: Objection.
6. A. I don't base anything on race. I look for the best candidate.
7. Q. So that's a no?
8. MR. LERNER: Objection.
9. A. Sorry, restate the question.
10. Q. Have you ever tried to hire an African-American for one of the vacant editorial positions?
11. MR. LERNER: Objection. What is tried to hire?
12. A. I don't understand that. I'm sorry, if you could explain.
13. Q. Have you ever put forward any African-American candidates for the

**Page 299**

Gotthelf - CONFIDENTIAL

positions that have opened up on the editorial or the -- on the editorial staff?
   MR. LERNER: Objection.
   A. I have tried out an African-American on my city desk.
   Q. Who was that?
   A. Leonard Green.
   Q. When was this?
   A. Right before I made my -- I was going to say my most recent hire, but give me a second, I can -- when I had an opening.
   Q. And why wasn't he hired full-time?
   A. Mr. Green didn't want the job and wanted to continue writing.
   Q. Mr. Green turned it down?
   A. Mr. Green tried out on the desk for several days and when I asked him if he liked it, he said he wanted to continue writing.
   Q. Are you familiar with the travel patterns of your various employees?
   MR. LERNER: Objection.

**Page 300**

Gotthelf - CONFIDENTIAL

   A. I don't understand familiar with travel patterns.
   Q. Well, you dispatch your reporters to stories, correct?
   A. Me and my associate metro editors.
   Q. So if someone goes out of town on a story, would you know about that, right?
   MR. LERNER: Objection.
   A. Oftentimes.
   Q. Can you name any reporter who was dispatched on out of town stories more frequently than Austin Fenner during the two years that he was employed there?
   A. Yes.
   Q. Who are they?
   A. Lorena Mangeli and Rebecca Rosenberg.
   Q. And how often were Lorena and Rebecca sent out of town?
   A. I don't know.
   Q. So how do you know that they were sent out of town more often than Austin?
   A. Because I looked at my travel

**Page 301**

Gotthelf - CONFIDENTIAL

assignments to determine who was sent out the most and Mr. Fenner during his time period was not.
   Q. You looked at travel assignments, you have a record of all the assignments that people were sent out of town?
   A. Yes. We paid for these assignments.
   Q. Okay. Do you know if that -- those documents have been produced in this case?
   MR. LERNER: Objection.
   A. I don't know.
   (Gotthelf Exhibit 20, NYP-FL 797-798, marked for identification.)
   Q. I'd like to give you a document marked Gotthelf 20. Take a look at that, please. This is an e-mail from you on November 9, 2009, is that correct?
   A. Yes.
   Q. And for the record, this is Bates stamped NYP-FL 797. Could you read what it says there on the text?
   A. Yes. Make sure you have

Confidential Attorneys' Eyes Only

Page 338

Gotthelf - CONFIDENTIAL
2    MR. LERNER: You've answered it
3  five times already, so go ahead and
4  answer it again.
5    A.  I don't know.
6       (Gotthelf Exhibit 23, NYP-FL
7    34-44, marked for identification.)
8    Q.  Okay, I'd like to show you what's
9  marked Gotthelf 23. Just take a quick look
10 at that. I'm not going to go through it in
11 detail. I basically just want to ask you
12 if you've ever seen this before.
13   A.  I have never seen this before.
14   Q.  Okay, do you know what
15 journalisms is?
16   A.  I do not.
17   Q.  Have you ever heard of
18 journalisms?
19   A.  I have never heard of
20 journalisms.
21   Q.  Have you ever heard of this
22 article Three Things That Need Fixing in
23 the New York Post?
24   A.  I never heard of it before
25 Mr. Fenner filed his complaint.

Page 339

Gotthelf - CONFIDENTIAL
2    MR. LERNER: Can we just take a
3  minute, because we have different
4  things. All right. I received
5  something different.
6    Q.  So you just said a minute ago you
7  had never seen this article before the
8  lawsuit was filed, is that correct?
9    A.  Yes, that is absolutely correct.
10   Q.  Do you recall anyone discussing
11 this article before the lawsuit was filed?
12   A.  I do not -- well, absolutely not.
13 No-one discussed it in front of me.
14      (Gotthelf Exhibit 24, NYP-FL
15   907-910, marked for identification.)
16   Q.  Ms. Gotthelf, I'm going to hand
17 you what's been marked Gotthelf 24. If you
18 could take a look at this, please.
19   A.  Yes.
20   Q.  Are you familiar with this
21 document?
22   A.  Yes.
23   Q.  For the record, this is NYP-FL
24 907 through 910. I'd like to direct your
25 attention to the third page of this. It's

Page 340

Gotthelf - CONFIDENTIAL
2  the page marked 909. And -- well, I guess
3  first, what is this document I've just
4  given you?
5    A.  This is Billy Gorta's 2008 APA.
6    Q.  And did you help prepare this?
7    A.  I did.
8    Q.  And you're marked here as the
9  supervisor, right? On the first page? It
10 says supervisor Michelle Gotthelf?
11   A.  Yes.
12   Q.  If you could look on the page
13 909, could you read me that, where it says
14 areas for focus and improvement?
15   A.  Yes. Billy has a temper that he
16 needs to keep this check. He's been warned
17 numerous times and has officially been
18 written up by M-E Jessie Angelo. He is
19 reluctant to oversee stories outside of his
20 areas of expertise and has on occasion
21 inflicted a negative attitude on the
22 newsroom.
23   Q.  Do you know when he was written
24 up by Jessie Angelo?
25   A.  I don't recall.

Page 341

Gotthelf - CONFIDENTIAL
2    Q.  Was it around the same time as
3  this or would it have been earlier?
4    A.  It would have been earlier.
5    Q.  In other words much earlier?
6       MR. LERNER: Objection.
7    A.  Probably much, much earlier.
8    Q.  And is this true, did you write
9  that, in this areas for improvement, for
10 areas of focus and improvement?
11   A.  Yes, I noted that he needed to
12 keep his temper in check.
13   Q.  And is what you wrote there, is
14 that true?
15      MR. LERNER: Objection.
16   A.  Yes. Billy yells. He's also an
17 exceptional journalist.
18   Q.  Was there a decision made at some
19 point to transfer him to Queens courthouse?
20   A.  Yes, there was.
21   Q.  What was the basis for that
22 decision?
23   A.  Mr. Gorta was being demoted from
24 his assignment as an associate metro editor
25 to the Queens courthouse.