# EXHIBIT 3

Page 1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   ------------------------------x

5   AUSTIN FENNER and

6   IKIMULISA LIVINGSTON,

7

8           Plaintiffs,

9       v.                    09 Civ. 9832

10                            (BSJ)(RLE)

11  NEWS CORPORATION, NYP HOLDINGS,

12  INC. d/b/a THE NEW YORK POST

13  and DAN GREENFIELD and

14  MICHELLE GOTTHELF,

15          Defendants.

16  ------------------------------x

17

18          DEPOSITION OF AUSTIN FENNER

19              New York, New York

20              January 11, 2012

21

22  Reported by:

23  MARY F. BOWMAN, RPR, CRR

24  JOB NO. 45411

25

Page 34

FENNER

1
2  chance to provide whatever information you
3  want to provide into this lawsuit.  Right now
4  is an opportunity for me to ask you questions
5  and to get the answers that I need from you
6  to the questions that I need you to answer.
7        So my question is, did they or did
8  they not criticize you?  That is a yes or no
9  question.
10       A.   They wrote unfair and racially
11  discriminating evaluating evaluations against
12  me.
13       Q.   Mr. Fenner, the deposition will
14  not --
15       A.   Can I finish my statement?
16       Q.   No.
17       A.   I can't finish my statement?
18       Q.   No, Mr. Fenner, because the format
19  of this deposition is that I ask questions
20  and you provide answers.  OK.  You are not
21  entitled to provide whatever information on
22  any subject that you want to in response to
23  your question.
24       MR. THOMPSON:  He answered your
25  question, objection.

Page 35

FENNER

1
2        Q.   You need to respond to the
3  question.  We can take this up with the court
4  if need be, but the question was they
5  criticized you while you were there, correct?
6        A.   They wrote unfair evaluations.
7        Q.   Mr. Fenner, this deposition is not
8  going to work --
9        MR. THOMPSON:  It is going to work.
10       Q.   -- if that's what we are going to
11  do. So let's go off the record and take a
12  break.
13       MR. THOMPSON:  Let's take a break.
14  Thanks.  We will take a break.
15       THE VIDEOGRAPHER:  The time is
16  10:20 a.m.
17       (Recess)
18       THE VIDEOGRAPHER:  The time is
19  10:33 a.m.  We are on the record.
20       (Exhibit 1, document Bates stamped
21  NYPFL 610 marked for identification, as
22  of this date.)
23       Q.   Mr. Fenner, I am handing you a
24  document that has been marked as Fenner
25  Exhibit 1.  It is an e-mail dated May 2, 2008

Page 36

FENNER

1
2  from Michelle Gotthelf to you.  Have you ever
3  seen this e-mail before?
4        A.   I have.
5        Q.   And it was an e-mail you received
6  on or about May 2 of 2008?
7        A.   That is correct.
8        Q.   What story did this e-mail concern?
9        A.   This is when Barack Obama was
10  running for the presidency of the United
11  States, a big media story hovering over his
12  pastor, Jeremiah Wright, and the issue was we
13  were trying to obtain an interview with
14  Jeremiah Wright because he was alleged to
15  have made controversial remarks and Barack
16  Obama was being tied to his pastor's remarks.
17       Q.   Besides trying to get an interview
18  with Wright, what other stories or angles
19  were your editors looking for from you in
20  sending you to Chicago?
21       A.   They wanted a hot story.
22       Q.   You did not get a hot story,
23  correct?
24       A.   I produced a solid, great story
25  about the congregation.

Page 37

FENNER

1
2        Q.   Would you call it a hot story?
3        A.   I wouldn't call it a hot story.
4        Q.   Ms. Gotthelf sent you an e-mail on
5  May 2 in which she said you failed us, right?
6        A.   She sent that e-mail.
7        Q.   And how long were you in Chicago?
8        A.   Several days.
9        Q.   And the story that you wrote was a
10  story in which you interviewed a few members
11  of Reverend Wright's church and reported what
12  they said about it, right?
13       A.   Right.
14       Q.   Did you get an interview with
15  Reverend Wright?
16       A.   No.
17       Q.   Did you review any of the -- did
18  you report about any of the church's
19  financial dealings?
20       A.   I can't recall.  I don't think so.
21       Q.   Did you interview any of candidate
22  Obama's political adversaries while you were
23  there?
24       A.   You mean Hillary Clinton?  Who are
25  you referring to?

FENNER

1
2    Q.   Any of Obama's political
3    adversaries, either as a local politician or
4    national one.
5        A.   Well, the scope of the story was he
6    was running for the presidency of the United
7    States.
8        Q.   My question was, did you interview
9    any of Obama's political adversaries while
10   you were in Chicago?
11       A.   I don't recall.  If I had a copy of
12   my story, it would refresh my recollection.
13       Q.   You would -- would you agree with
14   me that this e-mail of May 2, Fenner
15   Exhibit 1, is a highly critical e-mail?
16       A.   Michelle Gotthelf criticized my
17   work, yes.
18       Q.   What is the basis, do you believe
19   that her criticism in this e-mail was an
20   example of Ms. Gotthelf discriminating
21   against you?
22       A.   No.
23       Q.   Did you write a response to
24   Ms. Gotthelf to this e-mail?
25       A.   I don't recall if I did.

FENNER

1
2        Q.   Did you disagree with Ms. Gotthelf
3    in that e-mail?
4        A.   The story I wrote was a solid
5    story.  It wasn't -- it was not a sensational
6    story.  It wasn't a -- it was a tale of what
7    was happening.  It was not a hot story.
8        Q.   So you agreed with Ms. Gotthelf
9    that you did not get what she sent you to
10   Chicago to get?
11       A.   Can I elaborate?
12       Q.   No.  It is a simple question.  Did
13   you agree with her or not?
14       A.   The story I produced -- my goal was
15   to get an interview with Jeremiah Wright.  I
16   didn't get that.
17           Ms. Gotthelf is saying that she
18   wanted a -- she wanted a sensational story,
19   the story I produced was not that.
20       Q.   The Post is a tabloid newspaper,
21   correct?
22       A.   That's correct.
23       Q.   Its goal is to uncover and run
24   sensational stories, correct?
25       A.   That's correct.

FENNER

1
2        Q.   And you did not do that on that
3    trip, correct?
4        A.   Correct.
5            MR. LERNER:  I am going to mark
6    Fenner Exhibit 2, AF 561 through 563.
7            For the record, Fenner Exhibit 1 is
8    Bates number NYPFL 610.
9            (Exhibit 2, document Bates stamped
10       AF561 through 563 marked for
11       identification, as of this date.)
12       Q.   Take a look at Fenner Exhibit 2.
13   We will get some other copies going around.
14           Fenner Exhibit 2 is an e-mail dated
15   Monday, May 19, 2008.  Mr. Fenner, do you
16   recognize this e-mail?
17       A.   I'm still reading it.
18           I recognize it.
19       Q.   The e-mail was written by Neil
20   Sloane to you --
21       A.   That is correct.
22       Q.   -- on that date?
23           Who is Neil Sloane?
24       A.   He is an editor.
25       Q.   Does he work for the city desk?

FENNER

1
2        A.   That is correct.
3        Q.   And what story does this e-mail
4    concern?
5        A.   There is a singer, a crooner named
6    R. Kelly and he was being charged in Chicago
7    criminal court for sexual abuse of an
8    under-age girl.
9        Q.   That was a story of national
10   interest, is that fair to say?
11       A.   Yes.
12       Q.   Were you sent to Chicago to get
13   that story?
14       A.   That's correct.
15       Q.   And Mr. Sloane, in his e-mail to
16   you, was critical of the story that you
17   wrote, correct?
18       A.   Correct.
19       Q.   And he showed you actually two
20   versions of the story, a version number 1 and
21   version number 2, and asked you to compare
22   the two, right?
23       A.   That's correct.
24       Q.   Just for the record, an e-mail
25   version number 1 was the story that you

FENNER

1   submitted and version number 2 was the story
2   that was rewritten by somebody at the Post,
3   right?
4       A.    They added copy to the story, yes.
5       Q.    And Mr. Fenner, you did not list
6   Mr. Sloane as up with of the people who
7   discriminated against you at the Post when I
8   asked you that question earlier.  Do you
9   recall that?
10      A.    I recall that.
11      Q.    And do you stand by that answer?
12  In other words, was Mr. Sloane somebody who
13  discriminated against you?
14      A.    No.
15      Q.    And do you consider this e-mail to
16  be an example of discrimination against you?
17      A.    No.
18      Q.    In the two versions, do you recall
19  or did you determine from reading it today
20  what the difference is between the two
21  versions of these stories?
22      A.    The second version is longer.  It
23  has like three more sentences to it.
24      Q.    Did you, do you know what piece of

FENNER

1   information is in the second version, the
2   version that was rewritten, that wasn't in
3   the first version?
4       MR. THOMPSON:  Objection, document
5   speaks for itself.
6       Q.    Mr. Fenner, I would like to direct
7   you --
8       A.    I'm reading the copy.
9       Q.    I am going to direct your
10  attention -- you can read it -- but I am
11  going to draw your attention to the paragraph
12  in the second story, "They face one
13  significant roadblock."
14      A.    I see that.
15      Q.    Mr. Fenner, would you agree that
16  the fact that the victim of the child
17  pornography crime denied being involved and
18  that that fact is in the rewritten story but
19  it was not in your story?
20      A.    That's correct.
21      Q.    Would you agree that that is an
22  interesting and unique aspect to the story
23  involving R. Kelly?
24      MR. THOMPSON:  Objection.

FENNER

1       A.    Yes.
2       Q.    And that was not in your original
3   story, correct?
4       MR. THOMPSON:  Objection.
5       A.    No, I don't have it here.
6       Q.    Did you know that fact when you
7   wrote your story?
8       A.    Yes.
9       Q.    And you chose to leave it out?
10      A.    I didn't choose to leave it out.
11      Q.    Did you forget to include it?
12      A.    I was under incredible deadline
13  pressure that day.  I had to obtain press
14  credentials to get into the courtroom;
15  otherwise, I would not have been able to
16  cover the case and that's why I was sent to
17  Chicago.
18      The story I wrote is a preview
19  story, a curtain raiser, as they call it, and
20  I was under the gun to try to find the
21  sheriff's office for Cook County, get my
22  credentials and file by the 5 o'clock
23  deadline in New York.
24      Q.    So my question was, did you forget

FENNER

1   to include it?
2       A.    I would have wanted to put that in
3   the story, yes.
4       Q.    Have you ever covered a criminal
5   case in which the person that the prosecutor
6   said is the victim of the crime actually
7   comes forward in the trial and says that's
8   not me?
9       A.    I've covered many criminal court
10  cases.
11      Q.    Have you ever, have you ever
12  covered a case in which the person the
13  prosecutors say is the victim actually comes
14  forward and says I'm not the victim of this
15  crime, this didn't happen to me?
16      A.    I've covered cases where the victim
17  has denied, has denied those cases, like a
18  domestic violence case.
19      Q.    Have you ever covered a case in
20  which the victim says I wasn't even there?
21      A.    I recall covering cases where the
22  victim denies that the crime was committed
23  against them.
24      Q.    You would agree that it is a unique

FENNER

1  fact that in a child pornography case, that
2  the victim who the prosecutors say is
3  portrayed in an pornographic video says,
4  comes forward and says that's not me in the
5  video. Have you ever seen that situation
6  before?
7      A.  A child pornography case?
8      Q.  Yes.
9      A.  Have I covered other child
10 pornography cases, is that what you are
11 asking me?
12     Q.  No, I am asking have you ever seen
13 this situation before?
14     A.  Repeat the question.
15     Q.  Have you ever seen a situation
16 where the victim says that's not me in the
17 tape?
18     A.  I'm sure I have.
19     Q.  You have? Can you think of any
20 right now?
21     A.  No.
22     Q.  You would agree that both the
23 Reverend Wright story and the R. Kelly story
24 were important stories?

FENNER

1      A.  Without a doubt.
2      Q.  R. Kelly is, is regarded as
3  probably, if not the most, one of the most
4  accomplished important R&B artists in
5  American history, correct?
6          MR. THOMPSON:  Objection.
7      A.  In American history?
8      Q.  Yes, he did win Billboard's most
9  important R&B artist of the last 25 years
10 award?
11         MR. THOMPSON:  Objection.
12     A.  I recall him singing at the Super
13 Bowl.
14     Q.  Thank you. So he is a major
15 American artist?
16     A.  He is a singer of note.
17     Q.  Mr. Fenner, I am going to hand you
18 what has been marked as Fenner Exhibit 3. It
19 is Bates number NYPFL523.
20         (Exhibit 3, document Bates stamped
21     NYPFL 523 marked for identification, as
22     of this date.)
23     Q.  Mr. Fenner, were you glad that you
24 were assigned to cover the R. Kelly and

FENNER

1  Reverend Wright stories?
2      A.  I was doing my job.
3      Q.  Did you consider those to be good
4  assignments?
5      A.  To go out on those stories?
6      Q.  Yes.
7      A.  Those are important stories for the
8  paper.
9      Q.  And were they -- were you happy to
10 get those assignments?
11     A.  I want to work on important
12 stories, yes.
13     Q.  So you were happy to get those
14 assignments?
15     A.  Yes.
16         MR. THOMPSON:  We need an extra
17     copy of this document you put before the
18     witness.
19     Q.  And who gave you those assignments?
20     A.  Michelle Gotthelf.
21     Q.  Mr. Fenner, take a look at Exhibit
22 3, please, NYPFL 523. There is a number of
23 stories referred to in this exhibit. At the
24 top of the page, withdrawn. Let me back up.

FENNER

1      Have you reviewed this document
2  before today?
3      A.  I'm reading it.
4      Yes.
5      Q.  You have reviewed it before today?
6      A.  Yes.
7      Q.  Directing your attention to the
8  last paragraph in the document, do you
9  recognize the story referred to about the
10 Bowery Wine Company?
11     A.  Yes.
12     Q.  And do you see, do you see the
13 paragraph that was quoted there?
14     A.  I see the paragraph that was quoted
15 there.
16     Q.  Did you write that paragraph?
17     A.  I believe I did.
18     Q.  And do you agree that there were
19 both factual and grammatical errors in that
20 paragraph?
21     A.  Yes.
22     Q.  Did you hear something from your
23 editors about that at the time that you filed
24 that story?

Page 50

FENNER

1
2    A.   I can't recall that.
3    Q.   Did Mr. Hechtman rewrite that
4  story?
5    A.   I don't know.
6    Q.   Do you know if that story ever ran?
7    A.   I don't know.  I can't recall.
8    Q.   Did you do anything to correct the
9  factual and grammatical errors in that story?
10    A.   I worked on many, many stories for
11  the New York Post, well over 150.  I can't
12  recall exactly what I did in this particular
13  instance.
14    Q.   Do you believe that Mr. Hechtman
15  discriminated against you while you were at
16  the Post?
17    A.   No.
18    Q.   And who was Mr. Hechtman?
19    A.   He was the night editor.
20    MR. LERNER:  All right, it is 5 to
21  11.  We have a 11 o'clock call with the
22  court so we will take a break now.
23    THE VIDEOGRAPHER:  The time is
24  10:55 a.m.  We are off the record.
25    (Recess)

Page 51

FENNER

1
2    THE VIDEOGRAPHER:  The time is
3  11:23 a.m.  We are on the record.
4    Q.   Mr. Fenner, do you recall being
5  assigned a story about a radio personality
6  named Wendy Williams?
7    A.   I wasn't assigned that story.  It
8  was an enterprise story I wrote and pitched
9  and produced for the New York Post.
10    Q.   And where was that story based out
11  of?
12    A.   New York City.
13    Q.   And how did you come to develop
14  that story?
15    MR. THOMPSON:  Objection.
16    A.   I was working as a journalist for
17  the Post and I have many sources for stories.
18  At that time, Ken Thompson was a practicing
19  attorney in New York and I had developed a
20  relationship with him and I had learned about
21  the Wendy Williams story through him.
22    Q.   This was in or about June of 2008?
23    A.   I can't recall the date right now.
24    Q.   Do you recall -- did you write that
25  story?

Page 52

FENNER

1
2    A.   I did.
3    Q.   Do you recall your editors
4  criticizing you for missing the lead in that
5  story?
6    A.   I can't recall right now.  If you
7  can show me something, it would refresh my
8  recollection.
9    Q.   Take a look at Fenner Exhibit 3.
10  There is a -- the fourth paragraph down,
11  under the handwritten note "Sloane."
12    Do you see that paragraph?  We
13  permitted him to write a story that he did
14  pitch on WBLS Shock Jock Wendy Williams and
15  Austin actually missed the whole point of the
16  story.  Do you see that?
17    A.   I read that.
18    Q.   Was that a criticism that was
19  communicated to you at the time?
20    A.   I can't recall.
21    Q.   Did Mr. Sloane tell you that the
22  lead of the story was buried in the middle of
23  what you wrote?
24    A.   My editor and I collaborated on the
25  story.  I wrote the story and he made a

Page 53

FENNER

1
2  suggestion that we go with another element
3  that was in the story.
4    Q.   What was that element?
5    A.   If I had the story in front of me,
6  I could tell you.
7    Q.   Was it that Wendy Williams' husband
8  had planned to assassinate a rival DJ of
9  Wendy Williams?
10    A.   I think that's what he wanted to go
11  with as the lead.
12    Q.   As the lead.  Do you remember what
13  you had as the lead?
14    A.   No.
15    Q.   Did you agree with him that that
16  was the best lead for that story?
17    A.   Well, you know, you could write a
18  story in many different ways.  I've written
19  stories and the lead has been changed --
20    Q.   I understand that.  My question
21  is --
22    A.   I'm not finished.
23    MR. THOMPSON:  Mr. Lerner, you have
24  to let him finish answering your
25  question.  You can't just cut him off and

FENNER

1  he wasn't finished.
2  Q.   The question was, did you agree?
3  MR. THOMPSON:  No, no.  He wasn't
4  finished.  Mark, you have cut him off
5  repeatedly.
6  MR. LERNER:  Of course I have.
7  MR. THOMPSON:  It is improper.  You
8  have to let the witness finish answering
9  your question.  If you don't, this
10  deposition is not going to work.
11  MR. LERNER:  I agree with that,
12  Ken.  It is not going to work if the
13  witness doesn't answer the question.
14  MR. THOMPSON:  Please let him
15  answer the question that you posed.
16  MR. LERNER:  I know he is going to
17  try.
18  Q.   This is the question.  The question
19  was, did you agree that the lead that
20  Mr. Sloane ultimately put on the story was
21  the better lead for the story?
22  A.   I don't have the story in front of
23  me.  I need to read the whole story.
24  Q.   Let's put it in front of you.

FENNER

1  Mr. Fenner, I am putting in front
2  of you a document that has been marked as
3  Fenner Exhibit 4, which is a binder of
4  stories that carry your byline, and the Bates
5  numbers are NYPFL 2633 through 3214.  And I
6  have opened it to NYPFL 3196.
7  (Exhibit 4, document Bates stamped
8  NYPFL 2633 through 3214 marked for
9  identification, as of this date.)
10  MR. THOMPSON:  What was that Bates
11  number again?
12  MR. LERNER:  3196.
13  MR. THOMPSON:  Thanks.
14  Q.   Mr. Fenner, do you recall the lead
15  as you have written the story?
16  A.   This is the published story.
17  Q.   Agreed.  Do you recall the lead on
18  the story that you submitted?
19  A.   I wrote many, many stories during
20  my tenure at the New York Post.  I wrote over
21  150 stories.  I worked on over 150 stories
22  for the paper.  I don't recall the lead
23  before it was -- before we came to this one.
24  Q.   Do you have any reason to believe

FENNER

1  that Mr. Sloane did not take the piece of the
2  story that you had placed in the middle and
3  turned it into the lead?
4  A.   No, I believe that he wanted to go
5  with this lead.
6  Q.   And in your opinion today, did his
7  making this the lead improve the story?
8  A.   Many reporters write stories and
9  the leads are always changed.  The editor is
10  the final arbiter --
11  Q.   Was this a better lead?
12  A.   I wasn't finished.
13  Q.   Was this a better lead?
14  A.   I wasn't finished my comment.
15  Q.   That's the problem.  It was a
16  comment.  You need to provide an answer.
17  MR. THOMPSON:  He was providing an
18  answer.
19  Q.   And the question was, did this lead
20  improve the story?
21  A.   I like his lead.  It is a good
22  lead.  You can go with -- you can go with
23  many different leads on a story.  The New
24  York Times is going to write a story with a

FENNER

1  different lead than the New York Post.  The
2  Daily News is going to write a story with a
3  different lead.  Sometimes they are the same,
4  sometimes they are different.
5  Q.   Was this the best lead for the New
6  York Post?
7  A.   I like his lead, I agree with it.
8  Q.   You do not believe Mr. Sloane's
9  actions with respect to the story were
10  discriminatory, do you?
11  A.   His actions being changing the lead
12  on a story?
13  Q.   Yes.
14  A.   No.
15  Q.   Having discussed this now, do you
16  recall Mr. Sloane being critical of you at
17  the time for not adopting the lead that he
18  ultimately went with in your original story?
19  A.   He suggested we go with a different
20  lead.  That happens.
21  Q.   Was he critical of you?
22  A.   He suggested we go with this lead.
23  He said next time -- he wanted to go with
24  this lead.

Page 62

FENNER

1
2     A.   They sent me back because I
3  couldn't get the interview with the
4  individual who we are talking about because
5  his wife was there.  She said he was in a
6  rehab facility.
7           He had fallen 47 stories.  He was
8  trying to get his life back together.  I
9  interviewed the wife probably three times,
10  and she was not there.  So the reason why I
11  went back because he was not physically in
12  the home, he was in a rehab facility in New
13  Jersey, near South Orange.
14     Q.   And where did you eventually get
15  the interview?
16     A.   At his home.
17     Q.   Did the story run?
18     A.   Yes, it did.
19     Q.   Was it a good story?
20     A.   Yes.
21     Q.   Did you agree with your editors
22  that you should go back to try to persist and
23  try to get that interview?
24     A.   Yeah, why not.  It is a great
25  story.

Page 63

FENNER

1
2     Q.   How long did it take you to get
3  that interview?
4     A.   Like I said a moment ago, I went to
5  his house several times.  I interviewed his
6  wife on at least three different occasions, I
7  attempted to have her trust me with their
8  family story and take me to the rehab
9  facility where her husband was staying.
10           And through the course of time, I
11  was building a relationship and trust.  It
12  doesn't happen overnight.  Sometimes it
13  happens that day.  But you have to work
14  people to gain their trust and this woman was
15  relaying as she told me --
16     Q.   Mr. Fenner, I understand that --
17     A.   I wasn't finished my sentence.
18     Q.   My question is how long did it take
19  you to get that interview?
20     A.   Can I finish my statement?
21     Q.   I'm afraid you can't.  The question
22  is, how long did it take you to get that
23  interview?
24           MR. THOMPSON:  He can finish
25  answering your question.

Page 64

FENNER

1
2     A.   I don't understand your question
3  when you said how long did it take.
4     Q.   How many days did it take?
5     A.   I just told you, he was not home.
6     Q.   So I understand.  Did it take a
7  week?  Did it take more than a week?
8     A.   He was away from the home --
9     Q.   How long between --
10     A.   For probably weeks.  He had fallen
11  47 stories.
12     Q.   What is the basis of your opinion
13  that Mr. Greenfield's criticism of you was
14  discriminatory?
15     A.   It is untrue and it is unfair.  He
16  says we had to constantly hound -- where are
17  we -- Austin to get the window washer story.
18  And I just explained where the window washer
19  was.
20     Q.   Did he hound you?
21     A.   Greenfield?
22     Q.   Yes.
23     A.   When you say -- what do you mean
24  hound me?  Did he --
25     Q.   Did Greenfield or your editors

Page 65

FENNER

1
2  hound you --
3     A.   They dispatched me-
4     Q.   -- hound you to get that story?
5     A.   They dispatched me to the window
6  washer's house.
7     Q.   Multiple times?
8     A.   We had to go back because he wasn't
9  there.
10     Q.   Did they send you back multiple
11  times to keep trying?
12     A.   He was not there every time we
13  arrived at his home.
14     Q.   Did they send you back?
15     A.   I had been traveling on other
16  stories and working on other stories.
17     Q.   Did you receive --
18     A.   I --
19     Q.   Did you receive instructions --
20     A.   I wasn't finished my statement.
21     Q.   -- instructions from your editors
22  to go back?
23     A.   I was juggling multiple
24  assignments.  I had to do enterprise work.  I
25  was traveling on out-of-town assignments.  I

FENNER

1  was covering breaking news.
2      Q.   Did they send you back multiple
3  times?
4      A.   Yes.
5      Q.   And what is the basis for your
6  belief that the criticism was based on your
7  race?
8      A.   Because this was eventually used in
9  my evaluations which were discriminatory and
10 unfair in assessing my work. I had done
11 great work for the paper. I had done
12 award-winning work for the paper.
13     Q.   Did Mr. --
14         MR. THOMPSON: He is answering your
15 question, Mr. Lerner. You cannot cut him
16 off.
17         Please continue, Mr. Fenner.
18     A.   And I had gotten exclusives for the
19 paper. This was used to discriminate me
20 because I am black. They used this in
21 treating me different than my white
22 colleagues with those evaluations and this
23 was part of the tool they used when I had
24 done incredible work for the paper.

FENNER

1      Q.   And did Mr. Greenfield ever use a
2  racial epithet?
3      A.   He was a loose cannon.
4      Q.   Did he ever use a racial epithet?
5      A.   He cursed at me. He yelled at me.
6  He said what the fuck are you doing.
7      Q.   Did he ever --
8      A.   He said to me, you better get your
9  fucking ass over there. He went off on me.
10     Q.   Did he ever use a racial epithet?
11     A.   He cursed at me.
12     Q.   This is a yes or no answer,
13 Mr. Fenner?
14     A.   He debased me.
15     Q.   Did he ever use a racial epithet?
16     A.   He --
17     Q.   Mr. Fenner. If you can't answer
18 the question, we will get a court order
19 requiring you to answer the question, because
20 that is a requirement.
21         Did he ever use a racial epithet?
22     A.   No.
23         MR. THOMPSON: We are going to take
24 a break.

FENNER

1          MR. LERNER: Let's take a break.
2          MR. THOMPSON: Sure.
3          THE VIDEOGRAPHER: The time is
4  11:43 a.m. We are off the record.
5          (Recess)
6          THE VIDEOGRAPHER: The time is
7  11:59 a.m., we are on the record.
8          MR. LERNER: Mr. Thompson, I know
9  you had a discussion with your client
10 outside of the room. We need to have the
11 questions that I ask answered directly.
12 Otherwise, we are not going to finish the
13 deposition in seven hours.
14         MR. THOMPSON: Mr. Lerner, he has
15 answered your question directly.
16         MR. LERNER: I understand that's
17 your opinion.
18         MR. THOMPSON: It is a fact. The
19 record will reflect that.
20         MR. LERNER: It is not my opinion?
21         MR. THOMPSON: It doesn't matter.
22 The record is what it is.
23         MR. LERNER: My point is not to
24 argue with you whether or not he is doing

FENNER

1  it. My point is to let you know if it
2  persists, we will call the court.
3          MR. THOMPSON: You can call the
4  court any time you want. The purpose for
5  us being here is to ask him questions, so
6  ask him.
7      Q.   Mr. Fenner, are you ready to
8  proceed?
9      A.   I'm ready.
10     Q.   On the -- with respect to the
11 window washer, Mr. Greenfield's criticism of
12 you was that you did not take the initiative
13 to return to the window washer each time to
14 try to get that interview, is that correct?
15     A.   I did on my own.
16     Q.   I am asking you if that was his
17 criticism of you?
18     A.   I made several attempts. I took
19 the initiative. I knew it was a great story
20 and I got a great story.
21     Q.   Was that Mr. Greenfield's criticism
22 of you, that you failed to take the
23 initiative?
24     A.   I don't recall if he told me that.

Page 70

FENNER

1
2     Q.    Did somebody tell you that?
3     A.    I can't recall right now.
4     Q.    Did -- was there, when you were
5     sent back by your editors, did they express
6     annoyance to you that they were having to
7     tell you to go back?
8     A.    I can't recall.
9     Q.    Who told you to go back?
10    A.    My editors dispatched me to the
11    window washer's house.
12    Q.    When you say dispatched, it means
13    they instructed you to go back there and try
14    to get that interview?
15    A.    That's correct.
16    Q.    Do you recall how many times they
17    dispatched you back to the house?
18    A.    When I went to the house and I said
19    he wasn't there and we are not going to get
20    anything --
21    Q.    My question is, do you recall how
22    many times they instructed to you to go back?
23    A.    We visited the house at least three
24    or four times.
25    Q.    And was there an instruction from

Page 71

FENNER

1
2     your editor prior to each of those times?
3     A.    Yes, we were working in
4     collaboration.
5     Q.    Over what period of time between
6     your first contact with the house trying to
7     get the story and the time that you got the
8     story, how much time elapsed?
9     A.    Between the first time we visited
10    his home?
11    Q.    Yes.
12    A.    And the publication of the story?
13    Q.    Yes.
14    A.    How many times had we gone there?
15    Q.    No, how much time elapsed?  How
16    many days or weeks?
17    A.    I don't know exactly how many days.
18    But like I said, the man was recuperating in
19    the facility.
20    Q.    So you don't remember how long it
21    was?
22    A.    I said I don't recall right now.
23    Q.    Was it more or less than one week?
24    A.    Yes.
25    Q.    So it was more than one week?

Page 72

FENNER

1
2     A.    It was more than one week.
3     Q.    Was it more than --
4     A.    He was in a rehab facility.
5     Q.    Was it more than two weeks?
6     A.    What's the question?
7     Q.    How much time elapsed between your
8     first attempt to get the interview and the
9     time the story ran?  All I am trying to get a
10    sense of is how long did it take.
11    A.    It wasn't a week.  I don't think --
12    it wasn't a week.  And I don't recall exactly
13    how long.  It might have been two, could have
14    been three, but I don't know.
15    Q.    OK.  Were you assigned to cover the
16    Columbia expansion, Columbia University
17    expansion?
18    A.    No, I worked with Dan Colarusso and
19    told him this was an area that needed
20    attention, that there were no newspapers
21    paying attention to the Columbia expansion
22    and we should own it.
23    Q.    Did you have a source inside
24    Columbia University regarding the Columbia
25    expansion?

Page 73

FENNER

1
2     A.    I was developing sources, yes.
3     Q.    Did you develop a source inside
4     Columbia University?
5     A.    Yes.
6     Q.    Who -- how did you develop that
7     source?
8     A.    We were working the story and going
9     to community board meetings and going to
10    protests where people who were angry about
11    the expansion plan had a vested interest in
12    the issue.
13    Q.    Did you quote that source in your
14    stories?
15    A.    I quoted several sources in my -- I
16    quoted several sources in my stories.
17    Q.    Was that -- were those sources
18    named in the stories?
19    A.    They might have been.
20    Q.    Did you have any confidential
21    sources within Columbia University?
22    A.    I would have to see the work that
23    we produced to see if it says source or not.
24    Q.    As you sit here today, can you
25    think of any confidential source that you had

FENNER

1  within Columbia University on those stories?
2  
3      A.   I can't recall right now.
4      Q.   Did your editors assign you stories
5  relating to the Columbia University
6  expansion?
7      A.   No, I pitched a series of stories.
8  One of those stories was about the Cotton
9  Club business, and through our work, through
10  doing great work on that story, we helped
11  this man save his business from the imminent
12  domain issue that was hovering over many of
13  the businesses in Columbia, in the Columbia
14  expansion plan.
15     Q.   How many stories did you pitch
16  relating to the Columbia University
17  expansion?
18     A.   Many.
19     Q.   How many ran?
20     A.   Maybe five.  I can't recall the
21  exact number right now.
22     Q.   Do you know how many you pitched?
23     A.   I can't recall the exact number
24  right now.
25     Q.   Were any of your stories turned

FENNER

1  down by the city desk?
2  
3      A.   Yes.
4      Q.   How many?
5      A.   I can't recall the exact number.
6      Q.   Were you ever criticized by your
7  editors for your reporting on the Columbia
8  University expansion?
9      A.   I can't recall right now.
10     Q.   Did your editors tell you that you
11  were not pitching enough stories relating to
12  the Columbia University expansion?
13     A.   I can't recall that right now.
14     Q.   Were there any stories about the
15  Columbia University expansion that were
16  developed by the city desk and assigned to
17  you?
18     A.   I can't recall if -- I can't recall
19  if you're talking about a particular story
20  that they might have assigned.  I know I
21  pitched many stories, that was part of my
22  enterprise week.
23     Q.   By -- you were hired in
24  approximately the middle of 2007, right?
25     A.   May 2007.

FENNER

1  
2      Q.   May of '07.  By May of '08, you had
3  been at the Post about a year, correct?
4      A.   Correct.
5      Q.   And what were your -- what were
6  your reporting duties by May of 2008?  In
7  other words, were you in the street most of
8  the time or were you in the office most of
9  the time?
10     A.   I was hired as an enterprise
11  reporter which required me to pitch stories,
12  cover breaking news, and cover out of town
13  assignments for the paper.  So it was a mix.
14     Q.   Did that group of responsibilities
15  put you in the street most of the time or in
16  the office?  What was the --
17         MR. THOMPSON:  Objection.
18     Q.   -- what was the balance of your
19  time?
20     A.   It was a mix.
21     Q.   Would you agree that about a year,
22  just using about a year in May of 2008, that
23  you were primarily working as a street
24  reporter?
25     A.   No.

FENNER

1  
2      Q.   What were you -- what does the term
3  "street reporter" mean to you?
4      A.   You mean someone who is not in the
5  office?
6      Q.   Yes.  Is that what you were
7  primarily were by mid '08?
8      A.   Not at all.
9      Q.   You were in the office?
10     A.   I was a senior reporter working at
11  the paper.
12     Q.   Where were you performing your job?
13     A.   I just said it was a mix.
14     Q.   So sometimes you were in the
15  office, sometimes you were out?
16     A.   Sometimes I was in the office,
17  sometimes I was out on breaking news
18  assignments, sometimes I was traveling on
19  behalf of the paper.
20     Q.   Approximately what percentage of
21  your time by May of '08 -- you had been at
22  the Post for one year -- were you in the
23  office?
24     A.   I can't give you a percentage or
25  breakdown right now.

FENNER

1
2      Q.   Was it 10 percent, 20 percent?
3          MR. THOMPSON:  Objection.
4      A.   I think it was a mix.  It might
5  have been 33 percent on all -- I was -- it
6  might have been a third on each one.  I don't
7  know.
8      Q.   A third in the office, a third on
9  the street in New York, and a third on the
10  road traveling?  Is that what you mean by 33
11  percent each?
12      A.   I don't have an exact mathematical
13  breakdown to give you.
14      Q.   I understand that.  By May of 2008,
15  how much of your work was -- what percentage
16  of your work was the work of a street
17  reporter?
18      A.   I couldn't tell you that number.
19      Q.   How much of your work was producing
20  enterprise stories?
21      A.   Like I said, it was a mix.  And I
22  can't give you a mathematical breakdown.
23      Q.   What enterprise stories did you
24  produce during the first year of your
25  employment at the Post?

FENNER

1
2      A.   I did several.  I did many.  I
3  wrote stories about an identity theft story.
4  It was a military burial -- it was a -- it
5  was an identity theft story.
6      Q.   Got it.  Identity theft in a
7  military burial?
8      A.   Right.
9      Q.   What else?
10      A.   It was a man who had been convicted
11  of murder in Connecticut who had mistakenly
12  assumed his neighbor had molested his child
13  and I was able to get this man to send a
14  handwritten, handwritten letter about why he
15  did this and what went wrong.
16      Q.   A letter to whom?
17      A.   It was addressed to me at the New
18  York Post.
19      Q.   Can you define an enterprise story?
20      A.   An enterprise story is an story
21  that's off the radar, a story that is
22  original reporting and of interest to the
23  public.
24      Q.   Does it involve more research and
25  more reporting than a nonenterprise story?

FENNER

1
2      A.   It can.
3      Q.   But it is original, off the radar
4  and it is of interest to the public?
5      A.   Those are some of the elements.
6      Q.   Can you think of any other
7  enterprise story that you wrote in your first
8  year at the Post?
9      A.   The Columbia expansion stories, the
10  Wendy Williams story.  And there were others.
11      Q.   Can you tell me what the others
12  were?
13      A.   If I had a list, I could refresh my
14  recollection.
15      Q.   Did you ever decline a request to
16  stay late to cover a breaking news story?
17      A.   Did I ever decline a request to
18  stay late?
19      Q.   Yes, to cover a breaking news
20  story?
21      A.   I think you're referring to a story
22  where I had child care issues and I had to
23  pick up my daughter from my mother's house
24  and my wife was out of town.
25          My mother, at that time, would have

FENNER

1
2  been about 86.  So I think that's what you
3  might be referring to.
4      Q.   So the answer is yes, you did?
5      A.   Can you repeat the question?
6      Q.   Did you ever decline a request to
7  stay late to cover a breaking news story?
8      A.   I had child care issues.  I had
9  to -- I called my editors to see if they
10  could send someone to relieve me.  So the
11  answer is I never declined a request to stay
12  late, no.  The answer is no.
13      Q.   The answer is ---
14      A.   I didn't decline a request.  I
15  called in to get relief on a story.  I never
16  declined a request to stay late on a story.
17      Q.   And what happened after you made
18  that call?
19      A.   The editors looked to see if there
20  were any other reporters who were starting
21  their shifts and who could relieve me.
22      Q.   Did they find any?
23      A.   I can't recall in this particular
24  one.  I would assume that happened.
25      Q.   You did not cover that story?

FENNER

1
2    Q.   Mr. Fenner, it is a yes or no
3    question.  Did they tell you that it was
4    because of your race?
5    A.   No, they didn't have to say it was
6    because I'm black.
7    Q.   So the answer is no, they didn't?
8    A.   I said no, they didn't have to say
9    it was because I'm black.
10   Q.   But they -- OK.  And did anybody
11   else at the New York Post tell you that the
12   reason for this negative performance
13   evaluation was because you're African
14   American?
15   A.   There is many people that work at
16   the New York Post.  I was presented this
17   review by my supervisor and Amy Scialdone.
18   Q.   Did Ms. Gotthelf ever use racially
19   derogatory language with you that referenced
20   the fact that you are an African American?
21   A.   She was outright nasty to me.  She
22   was constantly yelling at me and giving me
23   unfair criticisms about my work.
24   Q.   Did she ever say anything that used
25   a racial epithet or referred to the fact that

FENNER

1
2    you are African American?
3    A.   Not to my knowledge.  I didn't hear
4    her use a racial epithet.
5    Q.   And same question about
6    Ms. Scialdone, did she ever do that?
7    A.   Not to my knowledge, I didn't hear
8    her use a racial epithet.
9    Q.   Did Michelle Gotthelf or Dan
10   Greenfield ever raise their voice at white
11   reporters?
12   A.   Not to my knowledge.  If they did,
13   I wasn't around.
14   Q.   Do you know for a fact that
15   Michelle Gotthelf and Dan Greenfield did not
16   yell at white reporters?
17   A.   They did not yell at white
18   reporters?
19   Q.   Yeah, do you know that for a fact?
20   A.   I don't know -- I don't know it for
21   a fact.
22   Q.   Do you have any reason to believe
23   that Michelle Gotthelf and Dan Greenfield
24   never yelled at white reporters working on
25   the city desk?

FENNER

1
2    A.   Repeat your question.
3    Q.   Do you have any reason to believe
4    that --
5    MR. LIPPNER:  Mark.
6    Q.   Withdrawn.
7    One of the criticisms in this
8    performance evaluation is that during your
9    first year at the Post, you did not initiate
10   or produce top notch enterprise stories for
11   the Post?
12   A.   Your question is?
13   Q.   Is that criticism, was that
14   criticism of you factually based?
15   A.   It is unfair.  It is unfair --
16   Q.   Why is it unfair?
17   A.   Because I did -- I did great work
18   as a journalist, as a reporter for the New
19   York --
20   Q.   Did you produce top notch --
21   A.   Yes.
22   MR. THOMPSON:  Mr. Lerner, don't
23   cut off the witness.  You have to let the
24   witness finish answering his question.
25   Q.   -- for the New York Post?

FENNER

1
2    A.   I did great work, award-winning
3    work.
4    Q.   What award did you win for your
5    work at the Post during the first year?
6    A.   The New York Post covered the Obama
7    inauguration and they won the coveted New
8    York Press Club Award in 2010.  I wrote a
9    story, enterprise story about a Harlem
10   congregation that Martin Luther King visited
11   ten days before his assassination and this
12   congregation was attending.
13   Q.   Mr. Fenner, --
14   A.   I wasn't finished.
15   Q.   I don't need to know all the
16   details about the story.  My question is what
17   award did you win and you said the New York
18   Post won an award.
19   A.   I was part of a team, the
20   inauguration team that won the New York Press
21   Club Award.
22   Q.   And how many people were reporting
23   on Obama's inauguration for the New York
24   Post?
25   A.   There were several people on the

Page 110

FENNER

1  warning, did you change the way you did your
2  job, yes or no?
3      A.   I continued to work hard.  And if
4  you're -- I'm always working to improve
5  myself, so I'm not exactly sure what you're
6  asking me.
7      Q.   Mr. Fenner, it is -- the question
8  is simple and it is clear.  In response to
9  receiving this warning, did you change the
10  way you did your job?
11         You need to provide an answer in
12  your deposition for the record.  Is the
13  answer yes, or no?
14     A.   The answer is I am -- yes, I am
15  always working to improve myself, but this
16  document, this review was shocking to me.  It
17  made me -- I couldn't believe I was
18  getting -- this -- I found it discriminatory.
19     Q.   Mr. Fenner, is the answer yes or
20  no?
21     A.   All I can tell you is I worked
22  hard.  It is not -- if you are asking me if
23  this document caused me to work harder,
24  caused me to -- I realized that --

Page 111

FENNER

1      Q.   I am asking you, did it cause you
2  to work harder or change the way you did your
3  job?
4      A.   It made me pause because I realized
5  I was being set up for termination, so yes is
6  the answer.
7      Q.   Did it change the way you did your
8  job?
9      A.   Yes.
10         MR. THOMPSON:  Objection.
11     Q.   How so?
12     A.   It made me pause because I realized
13  that there was a picture being created for my
14  termination.
15     Q.   So what did you do differently
16  after receiving the warning?
17     A.   I had to triple-cross my Is and my
18  Ts, I had to watch my back, I had to watch
19  what Dan Greenfield and Michelle Gotthelf
20  were saying.  I had to watch my back.  That's
21  what happened.
22     Q.   Did you pitch a story about a
23  Harlem car dealership that Mr. Greenfield
24  told you not to write unless you could

Page 112

FENNER

1  advance the story forward?
2      A.   Yes.
3      Q.   And did you pitch a story that had
4  been covered by the New York Times earlier?
5      A.   The New York Times had written a
6  story, that --
7      Q.   It is a yes or no question.  Did
8  you pitch a story that had been covered by
9  the New York Times?
10     A.   The New York Times had also
11  written -- had written the story earlier in
12  the year.
13     Q.   And they had cited celebrities that
14  had purchased cars there?
15     A.   No, it was a preview.  The place
16  hadn't opened up at that point.
17     Q.   Did Mr. Greenfield tell you that
18  the story you were mentioning mentions the
19  same celebrities as the New York Times story?
20     A.   Yes, because they had purchased
21  cars at the dealership.  Those facts didn't
22  change.
23     Q.   Did the story that you pitched
24  advance the story in Mr. Greenfield's view?

Page 113

FENNER

1      MR. THOMPSON:  Objection.
2      A.   He didn't want to go with the
3  story.
4      Q.   He didn't want to go with the story
5  that you pitched?
6      A.   That I wrote.
7      Q.   Because you -- that you wrote
8  because it did not advance the story,
9  correct?
10     A.   He felt that it didn't advance the
11  story.
12     Q.   Did you think that what you had
13  submitted, you had advanced the story?
14     A.   The story was about the -- that
15  this place had opened up and people were
16  coming in, and it was the mood, the place of
17  business was actually happening.
18     Q.   Other than that, did you think you
19  had advanced the story?
20     A.   It was a good story.
21     Q.   Did you think you had advanced it?
22     A.   I thought it was a good story and
23  we could have gone with it in the paper.
24     Q.   But you got Mr. Greenfield's point

Page 114

FENNER

1  that it did not advance it beyond what the
2  times had published?
3     A.   I was waiting for him to offer up
4  suggestions so we could work and collaborate
5  to get in the paper.
6     Q.   Did you have go back to try to
7  advance the story, represent it with a new
8  angle?
9     A.   I did.
10    Q.   Did you ever get that angle?  And
11 publish the story?
12    A.   The paper publishes the story.  I
13 write the story.
14    Q.   Did you ever get that angle and was
15 that story ever published?
16    A.   The story was not published.
17    Q.   Did you ever get that angle?
18    A.   I would need to look at a copy of
19 the story.
20    Q.   As best as you can recall, did you
21 get that angle?
22    A.   It would refresh my recollection if
23 I read the story.
24    Q.   As you sit here today, do you

Page 115

FENNER

1  recall any angle that you could obtain to
2  advance the story?
3     A.   I can't answer your question --
4     Q.   Because you don't recall?
5     A.   Because I would need to read the
6  story.
7     Q.   Did you feel that Mr. Greenfield's
8  criticism of what you presented in that
9  instance was unfair?
10    A.   Yes, he was blocking the story to
11 getting in the paper.
12    Q.   Did you think it was unfair?
13    A.   Yes.  Everything that he did during
14 that time to me was blocking my success at
15 the paper.
16    Q.   Did Mr. Greenfield suggest to you
17 to go back to the dealership and be there
18 while a celebrity was buying a car?
19    A.   You can't manufacture a celebrity
20 walking in a car dealership --
21    Q.   Was that suggestion made to you?
22    A.   I believe I did return to the
23 dealership to see if we could see, at the
24 time we had visited the dealership on the

Page 116

FENNER

1  second occasion, to see if there was any high
2  profile people buying the car that day.
3     Q.   And did you get that story?
4     A.   If I had a copy of the story in
5  front of me, it would refresh my
6  recollection.
7     Q.   The story wasn't published, right?
8     A.   That's correct.
9     Q.   Was Mr. Greenfield's reaction to
10 your story, to this story that you wrote, do
11 you believe that that was based on race
12 discrimination?
13    A.   Mr. Greenfield was on a campaign to
14 get me out the paper.
15    Q.   Any specific information, sir,
16 relating to the conversations you had with
17 Mr. Greenfield about this Harlem dealership
18 story that causes you to believe or conclude
19 that his decision was based on race
20 discrimination?
21    A.   Yes, because he used this fact in
22 my evaluation which was then used against me
23 as a tool -- he was trying to paint me as
24 incompetent.

Page 117

FENNER

1     Q.   So do you know of any acts that
2  occurred at the time this story was being
3  pitched and written that demonstrate that
4  Mr. Greenfield was motivated by race?
5     A.   Repeat the question.
6     Q.   Were there any facts that you know
7  of that occurred at the time the story was
8  being pitched and written that demonstrate
9  that Mr. Greenfield was motivated by race?
10    A.   At the time?
11    Q.   Yes.
12    A.   I can't -- at the time, I can't
13 discern that, but what I do now know or what
14 I knew then when I saw it in my evaluation
15 cast --
16    Q.   My question was at the time.
17    A.   No, I don't believe so.
18        MR. THOMPSON:  Mark, what time do
19 you want to break for lunch?  It is 1
20 now.
21        MR. LERNER:  Let's go about another
22 ten minutes.
23        MR. THOMPSON:  Let's take a break.
24        MR. LERNER:  I'm almost done with

Page 122

FENNER

1
2    A.   On Thursday.
3    Q.   Did they move your other shifts
4  to -- from 11 to 7 to 9 to 5?
5    A.   That's correct.
6    Q.   And did you -- were you agreeable
7  to the shift change from 11 to 7 to 9 to 5?
8    A.   No.
9    Q.   Did you tell them you didn't want
10  to do that?
11    A.   I told them that the schedule I had
12  was working great for me.  I have a teenage
13  daughter who I am getting ready for college
14  and I use my time in the evenings to get her
15  ready and prep her for college life.
16    Q.   Well, wasn't it -- didn't it assist
17  you to get home at 5 p.m. or have your shift
18  end at 5 p.m. as opposed to 7 p.m. which
19  worked four out of your five days when they
20  made that change?
21    A.   If you are a New York journalist,
22  you are never, ever, ever work 9 to 5.
23    Q.   So are you saying that that wasn't
24  your schedule?
25    A.   What I am saying is there is always

Page 123

FENNER

1
2  demands that you have to tackle.  There is
3  always an extended assignment, there is
4  always breaking news and if you want to be a
5  part of that team, you have to be highly
6  motivated, you have to be tenacious and you
7  have to be relentless in getting those
8  stories, I worked -- I never, I never ever
9  finished a shift at 5.  That's deadline.
10    Q.   Did you, after you performed the 2
11  to 10 shift for a month, did you tell
12  Michelle Gotthelf or Dan Greenfield that you
13  wanted to be taken off that shift?
14    A.   Yes.
15    Q.   Did you put that in writing?
16    A.   Did I put it in writing?
17    Q.   Yes.
18    A.   We had a meeting where they
19  presented me with a change.  And I verbally
20  told them -- I verbally told them my
21  objections to it.
22    Q.   After doing it for four or five
23  weeks, did you then go back and say this is
24  not working out, I want to be -- I want to go
25  back to an earlier shift?

Page 124

FENNER

1
2    A.   I asked them if they had hired
3  someone else for the junior position, if they
4  had found someone.
5    Q.   What did they say?
6    A.   I can't recall at this time exactly
7  what they said, but I remained working in
8  that position from May until my date of
9  termination.
10    Q.   Other than -- did you -- did you
11  have any other conversations with them about
12  that shift other than asking them if they had
13  hired somebody?
14    A.   I told them it was outrageous that
15  they were banning me from the newsroom.  I
16  felt like I was being treated differently
17  than my white colleagues at the paper.  I was
18  told I needed to call in and get permission
19  to enter the NewsCorp. building.
20    Q.   You didn't tell Dan Greenfield and
21  Michelle Gotthelf that you believed you were
22  being treated differently from white
23  reporters, correct?  You didn't say that to
24  them, right?
25    A.   I couldn't -- I told them I thought

Page 125

FENNER

1
2  it was unfair.
3    Q.   You were sent out in the street?
4    A.   I was being banned from the
5  newsroom.
6    Q.   But you didn't say I think you're
7  doing this to me because I'm black and you're
8  not doing it to my white colleagues?  You
9  didn't say that, right?
10    A.   I can't recall if I said that or
11  not at the time.
12    Q.   You -- you never said that to Dan
13  Greenfield or Michelle Gotthelf?
14    A.   But I did raise my objections to
15  them about getting banned from the newsroom.
16    Q.   OK, but you didn't say -- you
17  didn't raise your objection and say you are
18  doing this to me because of my race, correct?
19    A.   I can't recall exactly everything
20  that I said and what transpired in that
21  meeting.  But I raised my objections to them.
22    Q.   You never put in any complaint or
23  EEOC charge or your affidavit that you said
24  that to them, right?  You have never alleged
25  in this lawsuit that you told Dan Greenfield

FENNER

1
2      A.   I believe I did.
3      Q.   Is this written in your
4   handwriting?
5      A.   Yes.
6      Q.   Did you write it yourself?
7      A.   Yes.
8      Q.   What rating did you give yourself?
9      A.   A 5.
10      Q.   That's the highest rating
11   available?
12      A.   That's right.
13      Q.   And in the overall performance
14   summary section, you wrote, "Fenner needs to
15   sharpen his time management skills so he can
16   produce more exciting, hard-hitting
17   enterprise stories."  Do you see that?
18      A.   I do.
19      Q.   And did you believe that to be
20   correct at the time that you wrote this?
21      A.   Yes.
22      Q.   So if your editors believed that
23   you needed to produce more hard-hitting
24   enterprise stories, you would agree with that
25   criticism, correct?

FENNER

1
2      A.   I had produced --
3      Q.   Mr. Fenner, would you agree with
4   that criticism, that you needed to produce
5   more hard-hitting enterprise stories?
6      A.   That was my job, to produce
7   hard-hitting enterprise stories.
8      Q.   Mr. Fenner, if your editors had
9   that criticism of you, you agreed with it?
10   You wrote it in this self-evaluation, right?
11      A.   I did.
12      Q.   You also listed in the
13   self-evaluation three stories that you
14   believed represented your overall
15   achievements at the Post during this review
16   period; a story about the appointment of
17   Archbishop Dolan, an interview of a passenger
18   that came out of the plane in a landed in the
19   Hudson River, and the story you did on the
20   church bus that went to watch the Obama
21   inauguration, right?
22      A.   Yes.
23      Q.   Those are the three stories that
24   you listed under "overall achievements,"
25   right?

FENNER

1
2      A.   That's correct.
3      Q.   And in citing them, you were
4   seeking to indicate what you thought were the
5   highlights of your year, fiscal year 2009
6   working for the Post, right?
7      A.   Yes, this was representative of my
8   work.
9      Q.   Well, it was representative of your
10   best work, right?
11      A.   Some of my best work.
12      Q.   The story about the gentleman who
13   was on the plane that landed in the Hudson
14   River, that was an interview of a guy who
15   came out of the water in his underwear,
16   right?
17      A.   Correct.
18      Q.   Isn't it true that both the New
19   York Times and the Associated Press
20   interviewed the same guy on the same day as
21   you interviewed him?
22      A.   They probably did.
23      Q.   So there was nothing unique or
24   extraordinary about that story, right?
25      A.   It was a great story.  It was

FENNER

1
2   unique.  That's why I put it on my
3   self-evaluation.  To get that story --
4      Q.   Why was it unique if the New York
5   Times interviewed the same individual and the
6   Associated Press interviewed the same
7   individual?
8      A.   It was unique because all of New
9   York media was there.  Everyone was trying to
10   get that story.  I don't know who else got
11   it, but it was my job to get it for the New
12   York Post.
13      Q.   The coverage of the bus ride to
14   Washington DC to watch the Obama
15   inauguration, that was a single story,
16   correct?
17      A.   That was a sidebar that was part of
18   the inauguration package that the Post
19   produced when Obama took the office, the oath
20   of office.  And when I had -- when I was
21   working on the Miracle on the Hudson story, I
22   was the lead reporter for the paper.  That
23   was the day when the airplane crashed into
24   the ocean and Michelle Gotthelf called my
25   name across the newsroom and dispatched me as

Page 134

FENNER

1  the first reporter.  It was her knee-jerk
2  reaction to make sure she could send her best
3  reporter to this big event that happened in
4  New York.
5      Q.   But you did not write the news
6  story on the "Miracle on the Hudson,"
7  correct?
8      A.   I worked with many -- there was
9  probably like 15 to 20 reporters who worked
10  on that story.  I don't have the exact
11  number --
12     Q.   Your byline went on the story of
13  the interview of one of the passengers,
14  right?
15          MR. THOMPSON:  Mr. Lerner, please
16  don't interrupt the witness when he is
17  testifying and trying to answer.
18     Q.   Correct?
19     A.   What was your question?
20     Q.   Your byline went on the story of
21  the interview of one passenger, right?
22     A.   No, I believe my byline was on the
23  main body of a --
24     Q.   You believe it was?

Page 135

FENNER

1      A.   I don't have it in front of me, but
2  I believe my byline was the lead byline in
3  the story.
4      Q.   If we looked at the paper's
5  archives, we could determine whether or not
6  your byline was on there, right?
7      A.   I guess we could.
8      Q.   What did you report with respect to
9  your work that was other than the interview
10  of the guy who came out of the water in his
11  underwear?
12     A.   I was writing about the emergency
13  services -- the emergency -- the first
14  responders who were rushing to save the
15  people who were trapped on the plane as it
16  was slowly submerging into the icy waters of
17  the Hudson.
18     Q.   Did you get any interviews of any
19  of those emergency responders?
20     A.   I got many interviews and I filled
21  my notebook up that day.
22     Q.   Did you interview any of the
23  emergency responders?
24     A.   If I had the story in front of me,

Page 136

FENNER

1  it would refresh my recollection.
2      Q.   You don't have a recollection now
3  of having done that though, right?
4      A.   If I interviewed any of the first
5  responders?
6      Q.   Yes.
7      A.   I interviewed probably more than 20
8  people that day, so.
9      Q.   Did you interview the ferry boat
10  captain that was first on the scene?
11     A.   I can't recall exactly -- I can't
12  recall if I interviewed the ferry boat
13  captain.
14     Q.   How many other reporters were sent
15  by the New York Post to the scene that day?
16     A.   Many.
17     Q.   A dozen?
18     A.   I don't have an exact number.
19     Q.   Could be a dozen?
20     A.   I would assume that it was all
21  hands on deck.
22     Q.   And what does that mean in terms of
23  a number?
24     A.   That means this, this was the --

Page 137

FENNER

1      Q.   What does that mean in terms of the
2  number of reporters?
3      A.   That people would have been just
4  rushing to the scene.
5      Q.   How many reporters is all hands on
6  deck?
7      A.   I don't have an exact number for
8  you.
9      Q.   Is it more than a dozen?
10     A.   It could be.
11     Q.   Is it more than 20?
12     A.   It could be.
13     Q.   In the story about the bus ride to
14  Obama's inauguration, you met a church group
15  at -- in the wee hours of the morning,
16  correct, about 2 o'clock in the morning?
17     A.   That sounds right.  It was
18  midnight.
19     Q.   And you rode on the bus -- and the
20  buses departed New York and drove to
21  Washington DC to participate in the Obama
22  inauguration events, correct?
23     A.   Correct.
24     Q.   And when did you file the story on

Page 138

FENNER

1  that bus ride?
2      A.   Later on that afternoon.  It was --
3  I can't recall the exact hour.  But there
4  were like 2 or 3 million people packed into
5  that area.
6      Q.   What was extraordinary about your
7  reporting of that bus ride that caused you to
8  list it as one of your main achievements for
9  2009?
10     A.   We were able to show how New
11 Yorkers who were connected to King were able
12 to see King -- were able to see Obama become
13 president.  There were people on that bus who
14 were members of the congregation at the time
15 that King was assassinated and they -- they
16 were making almost this sacred pilgrimage to
17 DC to connect King's dream and the actuality
18 of the United States had voted in Barack
19 Obama as president.
20     Q.   Did you cover any other aspects of
21 the Obama inauguration?
22     A.   My job was that sidebar I just
23 mentioned, the Canaan congregation from
24 Harlem, being one of scores of buses that

Page 139

FENNER

1  made this massive caravan, and this bus, at a
2  unique place in American history.
3      Q.   You also indicated in this
4  self-evaluation your coverage of Archbishop
5  Dolan's arranging for a family to adopt an
6  severely handicapped child.  Did you consider
7  that to be one of your best achievements in
8  that year?
9      A.   That would rank as one of the best
10 achievements I have had as a journalist in my
11 career.  During this trip, this is when I was
12 treated to a racially --
13     Q.   Mr. Fenner --
14     A.   -- hostile tirade.
15     Q.   Mr. Fenner, the question was, the
16 question was, was that one of your best
17 achievements?
18     A.   Yes.
19     Q.   OK.  Which story are you referring
20 to with respect to Dolan?  Is it the story
21 about the adoption of the handicapped child?
22     A.   Specifically, the entire package
23 was top notch.
24     Q.   How did you obtain the interview?

Page 140

FENNER

1      A.   I wasn't finished.
2      Q.   The piece about him -- you answered
3  me.  It was the entire package.
4      A.   I was trying to finish my sentence.
5      Q.   I need to move.  I have a lot of
6  questions to get through.
7          MR. THOMPSON:  You may have a lot
8  of questions --
9          MR. LERNER:  We are going to call
10 the court to get more time.
11         MR. THOMPSON:  You can call the
12 court.  You wanted to get more time
13 before you started this deposition.  You
14 have repeatedly interrupted Mr. Fenner.
15 You have to let him answer your
16 questions.
17         MR. LERNER:  I need to have him
18 answer the questions.
19         MR. THOMPSON:  He is answering your
20 questions, Mr. Lerner.  Let him.
21     Q.   Do you recall the question?
22     A.   This piece that you are referring
23 to showed Dolan to be a miracle worker, the
24 fact that this woman was pro life and needed

Page 141

FENNER

1  the bishop's hand to help her find a safe
2  home for her disabled child who suffered
3  many, many disabilities.
4      Q.   Mr. Fenner, the question was, did
5  you consider this to be one of your best
6  achievements in that year?  The answer is
7  either yes or no.  OK.
8          How did you get the interview of
9  Archbishop Dolan?
10     A.   Which one?  I did many.
11     Q.   The one -- your first interview of
12 Dolan?
13     A.   I interviewed him at the parish.
14     Q.   Were you assigned by your editors
15 to go to Milwaukee to try to get that
16 interview?
17     A.   I was dispatched there.
18     Q.   You were dispatched there.  Was the
19 interview set up before you left?
20     A.   No.
21     Q.   So you didn't have a source within
22 the parish that enabled you to get that
23 interview assignment, right?
24     A.   I developed a source.  That's why I

Page 142

```
 1            FENNER
 2  was able to come up with the miracle story.
 3      Q.   And how did you get that interview
 4  once you were out there in Milwaukee?
 5      A.   I asked if there were any recent
 6  articles Cord covered in the Catholic Weekly
 7  that mentioned Dolan and what kind of work he
 8  did.
 9      Q.   Who did you ask that of?
10      A.   I was asking a source in Milwaukee.
11      Q.   Did they supply you with an article
12  about his arranging of the adoption of the
13  child?
14      A.   No.
15      Q.   So how did asking that question get
16  you the interview?
17      A.   We had a back and forth.  We were
18  talking and one question led to another.
19      Q.   Did somebody come up with the idea
20  at the Post, come up with the idea of
21  providing, giving Dolan some gifts?
22      A.   That was -- I made three trips to
23  Milwaukee on behalf of the New York Post and
24  I think this was after -- at some point, we
25  were bringing him Yankee and -- Yankee items
```

Page 143

```
 1            FENNER
 2  and New York items.
 3      Q.   Whose idea was it to bring him
 4  those items?
 5      A.   I'm not sure.  You're asking if it
 6  was the editor's or mine, is that your
 7  question?
 8      Q.   Yes.
 9      A.   I guess we collaborated and came up
10  with that suggestion.
11      Q.   And you regard the Dolan stories to
12  be some of your -- well, withdrawn.
13           Do you regard those assignments as
14  good assignments?
15      A.   It was really difficult for me to
16  do my best work because what had happened to
17  me during that trip.  Dan Greenfield --
18      Q.   Were they good assignments, sir?
19      A.   Dan Greenfield hit me --
20           MR. LIPPNER:  Mark, let's call the
21  court.
22      A.   -- with a whole load of curses.
23      Q.   Mr. Fenner, excuse me.  We are
24  going to need to call the court.
25           MR. THOMPSON:  You can call the
```

Page 144

```
 1            FENNER
 2  court.
 3           MR. LIPPNER:  Off the record.
 4           MR. LERNER:  Let's go off the
 5  record.
 6           THE VIDEOGRAPHER:  The time is 2:30
 7  p.m.  We are off the record.
 8           (Exhibit 8, document Bates stamped
 9  NYPFL 261 marked for identification, as
10  of this date.)
11           (Exhibit 9, document Bates stamped
12  NYPFL 248 marked for identification, as
13  of this date.)
14           (Recess)
15           THE VIDEOGRAPHER:  The time is 3
16  p.m., we are on the record.
17      Q.   Mr. Fenner, did you consider the
18  assignment to cover the appointment of
19  Timothy Dolan to be -- the Archbishop of New
20  York, to be an assignment you were glad to
21  receive?
22      A.   Yes.
23      Q.   It was an important story for New
24  York, right?
25      A.   That is correct.
```

Page 145

```
 1            FENNER
 2      Q.   Were you -- did you consider the
 3  story of the bus trip that went to Washington
 4  DC an important story?
 5      A.   Yes.
 6      Q.   You were glad to have gotten that
 7  assignment?
 8      A.   Yes.
 9      Q.   Do you recall being reprimanded by
10  Dan Greenfield on two occasions for still
11  being in Teaneck, where you reside, in the
12  morning after being instructed to go to
13  another location?
14      A.   Is that what this e-mail is?
15      Q.   Exhibits 8 and 9, which are NYPFL
16  261 and 248 relate to such incidents.
17      A.   Yes.
18      Q.   And in one of the incidents, you
19  had spoken to him and he had directed you to
20  Brookdale Hospital in Brooklyn for a story,
21  and when he called you sometime after that,
22  you were still in Teaneck and you told him
23  that, correct?
24      A.   I believe so, yes.
25      Q.   And you told him that you had had
```

Page 146

FENNER

1  to run an errand before heading into the city
2  and you felt that you told him the truth
3  about that when he called you and you were
4  still in Teaneck.
5      On the other occasion, you had
6  been overnighted to Lanoka Harbor and you
7  called in that morning, you were in Teaneck
8  and he called you back a half an hour later
9  and you were still in Teaneck, correct?
10     A.   This is true.
11     Q.   And Dan was annoyed at you in both
12 instances and let you know that, correct?
13     A.   Yes.
14     Q.   And those incidents were in June
15 and August of 2009, right?
16     A.   Correct.
17     Q.   In the case of the August 2009
18 incident, you said that you were getting gas,
19 correct?
20     A.   Yes, I might -- yes, I mentioned
21 that during the conversation.
22     Q.   I would like to show you a document
23 called APA fiscal year 2009, it is NYPFL 472
24 through 475, and it will be marked as Fenner

Page 147

FENNER

1  Exhibit 10.
2      (Exhibit 10, document Bates stamped
3  NYPFL 472 through 475 marked for
4  identification, as of this date.)
5      Q.   Do you recognize this document,
6  sir?
7      A.   Yes.
8      Q.   Is this the APA that Michelle
9  Gotthelf and Dan Greenfield gave you in
10 September of 2009?
11     A.   Yes.
12     Q.   Is that your signature on the last
13 page?
14     A.   Yes.
15     Q.   And you did not respond to it with
16 employee comments, correct?   At least no
17 written comments in the employee comment
18 section on the last page, correct?
19     A.   No.
20     Q.   So it is correct that you did not
21 write anything in that section, right?
22     A.   That's correct.
23     Q.   And did you read this APA when you
24 received it?

Page 148

FENNER

1      A.   I did read it.
2      Q.   It rated you a 1 which is the
3  lowest possible rating that you can receive
4  which stands for unacceptable, does not meet
5  standards, correct?
6      A.   That's correct.
7      Q.   Do you allege that this performance
8  evaluation was a negative performance
9  evaluation because you are African American?
10     A.   Yes.
11     Q.   What is the basis of that
12 allegation?
13     A.   Because the points in here are
14 false and untrue.
15     Q.   And specifically what is false and
16 untrue?
17     A.   It says he -- "but continues to
18 under perform at this level and is working as
19 a street runner at best."
20     Q.   So you would agree you were hired
21 as a senior reporter, right?
22     A.   Yes.
23     Q.   And do you -- you believe that you
24 were not under-performing as a senior

Page 149

FENNER

1  reporter?
2      A.   I did great work that year.
3      Q.   Were you -- go ahead.
4      A.   I could enumerate many of the
5  stories that I worked on if you want.
6      Q.   What are the stories that you feel
7  highlight yourself as a reporter for the Post
8  in the 2009?
9      A.   During the course of the year, I
10 got an exclusive interview with William
11 Ayers, who was one of the founders of the
12 Weather Underground and it was linked to
13 Barack Obama as a friend or associate at --
14 during the Democratic nomination.
15     Also during that time, Hillary
16 Clinton was on the record for talking about a
17 mom in Ohio who was pregnant, she was
18 pregnant, a woman who was pregnant and she
19 had lost her baby because she didn't have
20 healthcare.  I was able to obtain an
21 interview with her.
22     Gregg Birnbaum, who is an editor on
23 the desk, he covers the political, politics
24 for the paper, said I was doing good work and

Page 150

FENNER

1  knew I was doing good work on that
2  assignment.
3        That was also the year I wrote the
4  inauguration story, the sidebar piece.  It
5  was also the year in which I wrote about
6  Bishop Dolan coming to New York as a next
7  bishop.
8        I wrote a piece in November of '08
9  when Barack Obama had won the nomination, and
10  I was able to find some people who were at,
11  in Washington DC during the time King had
12  delivered the "I Have The Dream" speech and
13  it was also watching on television in Harlem
14  Barack Obama make this historic move by
15  winning the Democratic nomination.  And there
16  is other stories, but those are several of
17  them.
18     Q.   What was the piece that you wrote
19  about William Ayers?
20     A.   He was -- I was in Chicago and
21  William Ayers was the center of the story and
22  people were trying to find out if Barack
23  Obama, who was then running for the
24  presidency, was a friend of William Ayers who

Page 151

FENNER

1  was one of the founders of the Weather
2  Underground.  And in addition to that, there
3  was another story --
4     Q.   Did you break that story or had it
5  been -- the connection between Obama and the
6  Weather Underground been already reported on?
7     A.   I didn't break the story, but I was
8  able to get William Ayers to speak while the
9  national media was focused on this issue.
10     Q.   Were any of the stories that you
11  listed as in your 2009 year, were any of them
12  stories in which you broke news?
13     A.   To have William Ayers speak on the
14  record is to break news.  To get the widow
15  of -- the widower of a woman who died in Ohio
16  who had no health insurance talk for the
17  first time about this issue was breaking
18  news.
19     Q.   These are, aren't these follow-ups
20  to news stories, but not breaking news?
21     A.   William -- it was a follow-up, but
22  it was also breaking news.
23     Q.   Because Ayers was interviewed?
24     A.   That's news.

Page 152

FENNER

1     Q.   Did he say anything in that story
2  that had previously been not revealed?
3     A.   I would need to read the story and
4  the story that was published didn't contain
5  all the facts from the interview that I
6  obtained with William Ayers.
7     Q.   What is the definition of
8  breaking -- of when a reporter breaks news?
9  What does that mean, to break news?
10     A.   You reveal new information about an
11  issue.
12     Q.   Well, is merely revealing new
13  information, is that necessarily breaking the
14  news?  Doesn't breaking news, breaking a news
15  story mean more than that?
16     MR. THOMPSON:  Objection.
17     Q.   It means bringing something to the
18  public attention that the public didn't know
19  about previously?
20     A.   If the subject of the story is
21  speaking about an issue for the first time,
22  that would be breaking news.
23     Q.   Was the trip to DC on the bus, was
24  that breaking news?

Page 153

FENNER

1     A.   That was an enterprise story.
2     Q.   It was not breaking news though,
3  was it?  It was a sidebar, right?
4     A.   It was news.  We were revealing and
5  telling the story about a community of people
6  who live in New York.
7     Q.   Isn't it the fact that the Dolan
8  story involving the arrangement of the
9  adoption of a disabled child had been written
10  on in a Catholic online publication?
11     A.   It could have been.  I'm not
12  exactly sure.
13     Q.   Isn't that where you got the story
14  from?
15     A.   I had asked the source if there was
16  a Catholic weekly that was tracking the
17  efforts of Bishop Dolan.  I didn't get the
18  information from the online.  I had to locate
19  this woman, find her, spend hours to trust me
20  with her story.
21     Q.   The fact of that adoption that
22  Dolan arranged, that adoption was already
23  online by the time you wrote the story for
24  the Post, correct?

Page 158

FENNER

1
2  public, you are telling them new information.
3  There is no reason not -- there isn't a
4  reason to publish information that people
5  don't need to know.
6      Q.   So if they need to know it, in your
7  mind, it is breaking news?
8      A.   So there is two kinds of breaking
9  news.
10      Q.   It is one kind of breaking news?
11      A.   No, I said -- there is breaks news
12  like an emergency, and then there is also
13  publishing new information.  You wouldn't
14  publish information if it had no merit to be
15  printed.
16      Q.   Were you gratified to be assigned
17  to the stories that you listed in 2009?
18      A.   Those were important stories, yes.
19      Q.   And they were good stories to get
20  assigned as a reporter, right?
21      A.   Yes.
22      Q.   That includes the story about
23  William Ayers, the story about Clinton
24  talking about the woman who lost her baby,
25  the piece on Obama's inauguration being

Page 159

FENNER

1
2  watched by people who had seen the "I Have A
3  Dream" speech, right?
4      A.   Yes.
5      Q.   Do you -- do you, did you regard
6  the assignment to cover the David Letterman
7  affair to be a desirable assignment?
8      A.   That was a big story of the paper,
9  yes.
10      Q.   What about the story about the
11  Craig's list killer?  That was a story --
12  that was a story of national interest, right?
13      A.   Correct.
14      Q.   Were you assigned to cover that?
15      A.   Correct.
16      Q.   And were you pleased to be assigned
17  that story?
18      A.   I was glad to be working for the
19  paper and contributing on that piece.
20      Q.   You also could have had a story
21  regarding an affair that led to the
22  resignation of the head of the Red Cross.  Do
23  you recall that story?
24      A.   Yes.
25      Q.   That was a national -- story of

Page 160

FENNER

1
2  national interest, right?
3      A.   Yes.
4      Q.   Were you glad to be assigned to
5  cover that story?
6      A.   Yes, it was a prominent story and I
7  was glad to work on that story.
8      Q.   Did you cover a story involving
9  David Copperfield, the illusionist?
10      A.   I did.
11      Q.   What was that story about?
12      A.   There was allegations that he had
13  drugged a woman, I believe it was on a
14  private island he owned, and he might have
15  sexually abused this woman.  And the goal of
16  that story basically was to find the
17  magician, David Copperfield.
18      Q.   And in fact, the cops found 2
19  million dollars in a Las Vegas warehouse that
20  he owned, right?
21      A.   That sounds familiar.
22      Q.   It was a warehouse that had like a
23  concealed entrance, right?
24      A.   I was at that warehouse.
25      Q.   You traveled to Vegas to see that

Page 161

FENNER

1
2  warehouse?
3      A.   I saw that warehouse.
4      Q.   Were you satisfied to be assigned
5  to cover that story?
6      A.   Yes.
7      Q.   You covered a story about A-Rod
8  dating a stripper behind his wife's back.  Do
9  you recall that?
10      A.   I do.
11      Q.   That was a big story for New York,
12  right?
13      A.   Very big.
14      Q.   A-Rod was already playing for the
15  Yankees when you covered that?
16      A.   Correct.
17      Q.   Was that a good story for you to be
18  assigned to when you were a reporter?
19      A.   Yes, it was.
20      Q.   You covered a story in which a
21  woman stole the identity of an Ivy League
22  graduate and pretended to be that person?
23      A.   Yes, that was a very difficult
24  story and I did very well on it.
25      Q.   Do you consider that story to be a

FENNER

1
2   good story to have covered?
3       A.   Yes, it was an important story for
4   the paper and I was able to obtain an
5   exclusive interview with Esther Reed while
6   she was -- while she was under arrest by U.S.
7   Marshals in a federal facility.
8       Q.   You covered the stories about the
9   murders of Jennifer Hudson's family members,
10  right?
11      A.   I did.
12      Q.   That was a big national story as
13  well, right?
14      A.   Yes.
15      Q.   Good story to be assigned to?
16      A.   That was an important story, yes.
17      Q.   You covered the arrest of Joba
18  Chamberlain for DWI when he was out in
19  Nebraska, correct?
20      A.   Yes, I did great work on that
21  story.  We were able to find out that he had
22  been drinking.  He was at a strip club.  And
23  it caused him to fall into a fight with a
24  patron because he was being taunted that the
25  Red Sox were in the playoffs.

FENNER

1
2       Q.   Were you glad to get the assignment
3   to cover that story?
4       A.   I did great work on that story.
5   Yes, I was glad to get that assignment.  It
6   was a difficult assignment and I was able to
7   do good work on it.
8       Q.   You covered a story involving a
9   dispute between candidates in Alabama who
10  argued over whether one of them should keep a
11  contribution that they had gotten from
12  Charles Rangel's fund raising.  Do you recall
13  that story?
14      A.   Yes.
15      Q.   Was that a good story for you to
16  cover for New York?
17      A.   That was an important story for the
18  paper.
19      Q.   Was it a good assignment for you?
20      A.   Yes.
21      Q.   Did you cover a story involving an
22  engineer that was killed on the day of his
23  graduation?
24      A.   That was in Buffalo, New York, yes.
25      Q.   Why was that story an important

FENNER

1
2   story?
3       A.   This young man had grown up in a
4   housing project in the Bronx, and despite all
5   the challenges in his life, was able to get
6   to college, study engineering and make his
7   family proud, and on his graduation day, he
8   was killed at a party the day before he
9   graduated.
10      Q.   Were you gratified to be assigned
11  to cover that story?
12      A.   Yes.  That was an important story
13  for the paper.  I was glad to contribute.
14      Q.   You covered Plaxico Burress
15  shooting himself in a nightclub, correct?
16      A.   Yes, I was in Pittsburgh,
17  Pennsylvania for that story.
18      Q.   Was that a story of national
19  interest?
20      A.   Oh, yes.
21      Q.   Was that a good story to be
22  assigned to cover as a reporter?
23      A.   It was another one of the front
24  page stories that I covered during my tenure,
25  yes.

FENNER

1
2       Q.   You covered a story about the
3   Olympic swimmer, Michael Phelps, getting
4   reported for smoking marijuana?
5       A.   Yes, that was in Baltimore,
6   Maryland.
7       Q.   That was a national scandal, right?
8       A.   It could be worldwide.
9       Q.   That was a good story to cover,
10  right?
11      A.   It was an important story for the
12  paper and I was glad to contribute.
13      Q.   You were glad to be assigned to
14  cover that?
15      A.   Yes.
16      Q.   Do you recall pitching a story to
17  Dan Greenfield about a man living in an old
18  bank building?
19      A.   Yes.
20      Q.   What was Dan's reaction to that
21  pitch?
22      A.   He criticized me and shot it down.
23      Q.   Why did he tell you he was shooting
24  it down?
25      A.   I recall he didn't like the story.

Page 166

FENNER

1
2     Q.   Do you recall him telling you that
3  it was because you told him that it had been
4  covered by New York Magazine a year ago?
5     A.   That sounds familiar.
6     Q.   Did you disagree with his opinion
7  that the story should be -- that the paper
8  should take a pass on that story?
9     A.   I strongly disagreed with his
10 opinion.
11    Q.   And why, if the story had been
12 covered by New York Magazine a year ago, why
13 isn't Dan's -- why wouldn't Dan's position
14 that the paper should pass on it be a
15 justified one?
16    A.   Because you could always find new
17 angles, new developments, new changes in a
18 story.  And you don't know that unless you do
19 the reporting and find out these new facts.
20    Q.   Did you do any of that work and
21 present him with the new facts before you
22 pitched it?
23    A.   He shot me down before I had a
24 chance to dig and find out what we could.
25    Q.   So that's a no?

Page 167

FENNER

1
2     A.   What's the question?
3     Q.   Did you dig up any new act facts to
4  make the pitch more attractive?
5     A.   No, I wasn't able to because I
6  wasn't allowed to report on the story.
7     Q.   But a lot of times, you dig up
8  facts and angles to stories before you pitch
9  them to your editors, right, to get them
10 interested?
11    A.   Sometimes.
12    Q.   But you didn't do that in this
13 case?
14    A.   I needed the time to be freed up
15 from other work that the paper would have had
16 me to do.  In order to do the reporting on
17 that story, I would have to not do or not
18 cover any other assignments that the paper
19 might have been interested in.
20    Q.   Why do you think that Dan's
21 decision not to assign you to cover a story
22 about a man living in a bank that had been
23 written on by a magazine that's published in
24 New York, why do you think that decision was
25 the incorrect decision?

Page 168

FENNER

1
2     A.   Because it would not have hurt to
3  find out that if there was new information in
4  it, new discoveries.  You play with angles
5  and you find new ways to get into a story.
6     Q.   Dan is entitled to his opinion and
7  judgment as a senior editor at the Post,
8  isn't he?
9     A.   He is and I'm also entitled to my
10 opinion as a senior reporter, an experienced
11 reporter who has a record of doing great
12 work.
13    Q.   But between the two of you, he is
14 the ranking person in the paper, right?
15    A.   He is the editor.
16    Q.   The responsibility to make the
17 decision falls on him, right?
18    A.   Correct.
19    Q.   So you disagreed with his decision?
20    A.   That's right.
21    Q.   But did you think that his decision
22 was unjustified or outrageous?
23    A.   Yes.
24    Q.   Did you think his decision was
25 based on race?

Page 169

FENNER

1
2     A.   Yes.
3     Q.   Why?  What's the factual basis for
4  your opinion that his decision not to cover
5  that -- to have you not cover that story was
6  based on race?
7     A.   They had already established a
8  history with me and -- of being racially --
9  of him discriminating against me because I'm
10 black and he had no interest of advancing my
11 career or me doing good work because he
12 wanted me out of the paper.
13    Q.   Mr. Fenner, we went through a
14 litany of several dozen big stories of
15 national and regional interest, all of which
16 were stories that you were pleased to be
17 assigned to and gratified and you said did
18 good work.
19         So how can you say he wasn't
20 interested in advancing your career when he
21 and Michelle Gotthelf assigned you to all of
22 these extremely high profile stories?  And
23 the one he didn't want to send you on was the
24 one about a guy living in an old bank
25 building?

Page 170

FENNER

1        MR. THOMPSON:  Objection.
2     Q.   How do you justify that statement,
3  sir?
4     A.   The question is what?
5     Q.   How do you justify saying that Dan
6  Greenfield didn't want to advance your career
7  by not sending you on a story to cover a man
8  living in an old bank building when he, in
9  fact, along with Michelle Gotthelf, sent you
10  on some of the biggest breaking stories in
11  the country during the time you worked at the
12  Post?
13     A.   They both were openly hostile to me
14  during my tenure at the paper.  They both
15  were screaming at me, and yelling at me,
16  throughout the course of my career.
17     Q.   They were trying to get the best
18  work out of you, weren't they?
19     A.   Yelling at me and cursing at me is
20  not getting the best work out of me.
21     Q.   How many times did they yell at you
22  or curse at you?
23     A.   Several.
24     Q.   Several?  How many?  You testified

Page 171

FENNER

1  that they cursed at you -- Dan Greenfield
2  cursed at you while you were in Milwaukee on
3  the Dolan matter.  What other occasion do you
4  remember Dan Greenfield or Michelle Gotthelf
5  cursing or yelling at you?
6     A.   During the Heath Ledger story, Dan
7  Greenfield was screaming and yelling at me.
8  He was berating me about my work.
9     Q.   Was he trying to get better work
10  out of you?
11        MR. THOMPSON:  Objection.
12     A.   That wasn't getting better work out
13  of me, no.
14     Q.   Was he trying to get you to do
15  something to cover the story more
16  aggressively?
17     A.   I couldn't have covered the story
18  any more aggressively.
19     Q.   In the Dolan incident, wasn't he
20  yelling at you, telling you to get yourself
21  to a location where Dolan was speaking that
22  morning?
23     A.   He was cursing and yelling
24  obscenities at me.

Page 172

FENNER

1     Q.   But he was directing you to go to a
2  location where Dolan was speaking that
3  morning, right?
4     A.   We were yelling about --
5     Q.   Sir, I need you to answer this
6  question.
7     A.   Question is again?
8     Q.   He was directing you to go to a
9  location where Dolan was speaking that
10  morning, correct?
11     A.   He wasn't directing me.  He was
12  screaming and yelling at me and cursing at me
13  and yelling profanities at me.  Like if you
14  want to hear those profanities, I can tell
15  you them.
16     Q.   Where were you when that
17  conversation was going on?
18     A.   I was five minutes away from the
19  Catholic parish.
20     Q.   And where was Mr. -- where was
21  Archbishop Dolan speaking that morning?
22     A.   At the parish.
23     Q.   What was the event that he was
24  speaking at?

Page 173

FENNER

1     A.   There was a press conference that
2  morning.
3     Q.   Are you sure of that?
4     A.   Yes.
5     Q.   And how did Mr. Greenfield, to your
6  knowledge, learn about that press conference?
7     A.   It might have been through the
8  photo desk.
9     Q.   He didn't learn about it from you?
10     A.   I called the reporter.  They had
11  hired a freelance photographer out of Chicago
12  and I called him to tell him he needed to get
13  to Milwaukee as soon as he could because
14  there was a press conference at a certain
15  hour.  He informed me that he was an hour
16  away.  And I believe he then in turn, after I
17  spoke to him, called the photo desk.
18     Q.   And until you spoke to
19  Mr. Greenfield that morning, isn't it the
20  case that you were not planning to attend
21  that press conference?
22     A.   That's false.
23     Q.   Where were you -- you said you were
24  five minutes from the Catholic parish when

Page 174

FENNER

1 you spoke to him?  Did you tell him that?
2     A.   I didn't get a chance to tell him
3 that because he was yelling and cursing at
4 me.
5     Q.   Well, where were you going at
6 that -- during that conversation?  Were
7 you --
8     A.   I was waiting for the photographer
9 to get closer to the city, to Milwaukee.  I
10 was going to be attending the press
11 conference.
12     Q.   But you were waiting for the
13 photographer to show up?
14     A.   That's correct.
15     Q.   And Mr. Greenfield was concerned
16 that if you continued to wait for the
17 photographer, the press conference might
18 begin without you being there, right?
19     A.   We were in Milwaukee on central
20 time.  Dan was in New York at eastern
21 standard time.  There was plenty of time for
22 me to get to the press conference.
23     Q.   Why were you waiting for the
24 photographer?  You could cover the press

Page 175

FENNER

1 conference without a photographer there,
2 right?
3     A.   That's correct.
4     Q.   So you could have gone -- you could
5 have gone to that press conference?
6     A.   I did go.
7     Q.   Without waiting?
8     A.   I did go to the press conference.
9     Q.   So why were you waiting before you
10 went until the photographer showed up?
11     A.   I wanted to go together with him so
12 we could work as a team.
13     Q.   And you could have -- you didn't
14 need the photographer there to do your job
15 which would be to report on what happened at
16 the press conference, right?
17     A.   I did do my job.
18     Q.   The question is you didn't need to
19 wait for the photographer to cover the press
20 conference, right?
21     A.   If he had failed to show up, I
22 could have -- I would have reported on the
23 story without him there.
24     Q.   Or you could cover the story with

Page 176

FENNER

1 him arriving at a different time?
2     A.   I could have.  But it is better to
3 work in tandem.
4     Q.   And --
5         THE VIDEOGRAPHER:  I am sorry to
6     interrupt.  There is a cell phone.  It is
7     interrupting testimony.
8         (Pause)
9     Q.   Mr. Fenner, what was Dan Greenfield
10 angry at during the conversation?
11     A.   He was cursing and yelling at me
12 because I was not at the press conference and
13 it wasn't scheduled to start for another 30,
14 40 minutes.
15     Q.   Did you tell him that you didn't
16 need to attend the press conference because
17 you had done an exclusive interview with him?
18     A.   I told him that I had made
19 arrangements to get personal time with the
20 monsignor -- with the bishop after the press
21 conference.
22     Q.   Did Mr. Greenfield take that to
23 mean that you were going to skip the press
24 conference and rely on the personal time you

Page 177

FENNER

1 had with the archbishop?
2         MR. THOMPSON:  Objection.
3     A.   I didn't get it a chance to fully
4 explain what was going on.
5     Q.   Because he got angry?
6     A.   He was more than angry.  He was
7 yelling and cursing at me and berating me.
8     Q.   During the course of that
9 conversation, did he ever use a racial
10 epithet?
11     A.   No.
12     Q.   Did he ever say anything that
13 referred to the fact that you are African
14 American?
15     A.   No.
16     Q.   And what is your factual basis for
17 an assertion that that episode was caused by
18 Mr. Greenfield's animosity towards you based
19 on race?
20     A.   He had never cursed at any other
21 white reporters, from my white colleagues at
22 the paper.
23     Q.   And how would you -- but you're not
24 in a position to know all the conversations

Page 182

FENNER

1  during the session.
2      Q.   And you were aware that complaints
3  of discrimination at the Post under the Post
4  policies can be brought to the human
5  resources department and/or the legal
6  department, correct?
7      A.   Can you -- if you say that's so, I
8  believe that's true.
9      Q.   Did you understand when you worked
10 at the Post that complaints of discrimination
11 or harassment could be brought to the HR or
12 legal departments?
13     A.   I think that's true.
14     Q.   Did you understand that complaints
15 of discrimination or harassment under the
16 policies should be reported to HR and legal?
17     A.   I understand that, yes.
18     Q.   Yet, at no time during your
19 employment at the Post did you go to HR or
20 legal and notify them that you believed you
21 were the victim of discrimination, correct?
22     A.   That's correct.  I didn't contact
23 HR or legal, but I did find another mechanism
24 to enforce my complaint.

Page 183

FENNER

1      Q.   And what mechanism was that?
2      A.   I had an interview with a media
3  outlet called Journalisms and in that --
4  during that interview, it was regarding a
5  cartoon, a racist monkey cartoon that the
6  Post published under the editors -- under Col
7  Allan, the editor-in-chief that depicted
8  Barack Obama, the president of the United
9  States, as a dead chimpanzee.
10     Q.   And you -- who did you actually
11 speak to at that interview?
12     A.   The reporter's name was Richard
13 Prince.
14     Q.   And Richard Prince is not
15 associated with the New York Post, right?
16     A.   No.
17     Q.   He is an independent journalist who
18 has a blog?
19     A.   I believe he is connected to the
20 Washington Post and the Maynard Institute and
21 he runs a media column called Journalisms.
22     Q.   And he is not associated with
23 NewsCorp., correct?
24     A.   No.

Page 184

FENNER

1      Q.   Correct, right?
2      A.   He is not associated with
3  NewsCorp., that is correct.
4      Q.   And Journalisms is an online blog,
5  is that correct?
6      A.   They publish on the internet.
7      Q.   And did you ever speak to Dan
8  Greenfield about your interview at
9  Journalisms?
10     A.   I didn't speak to Dan Greenfield
11 about my interview with Journalisms.
12     Q.   Did you ever speak to Michelle
13 Gotthelf about your interview with
14 Journalisms?
15     A.   I did not speak to Michelle
16 Gotthelf about my interview with Journalisms.
17     Q.   Did you ever speak to anybody in
18 human resources or legal department about
19 your interview with Journalisms?
20     A.   I did not.
21     Q.   Did you ever tell any of the senior
22 managing editors or the editor-in-chief at
23 the Post about your interview at Journalisms?
24     A.   No.

Page 185

FENNER

1      Q.   Do you have any basis for asserting
2  that Dan Greenfield, Michelle Gotthelf or Col
3  Allan ever read your interview with
4  Journalisms?
5      A.   Yes.
6      Q.   And what is that?
7      A.   After the Post published the racist
8  monkey cartoon, they had hired Howard
9  Rubinstein, who was a top notch PR firm in
10 New York City.  He was to mitigate and do
11 crisis communications for the Post.  People
12 were literally taking to the streets to
13 protest this cartoon because it was so
14 racially offensive.
15         In that article that was published
16 by Richard Prince, he says that he spoke to a
17 spokeswoman for NewsCorp. and I believe that
18 spokeswoman declined to give him a comment on
19 the record.
20     Q.   So Richard Prince sought a quote
21 from the Post and the Post declined, is
22 that --
23     A.   He wanted an interview, yes.
24     Q.   Other than that, do you have any

FENNER

1 further reason for the assertion or your
2 belief, if you have this belief, that Dan
3 Greenfield or Michelle Gotthelf or Col Allan
4 had read or were aware of your interview with
5 Journalisms?
6     A.   Yes.
7     Q.   What else?
8     A.   Days after the cartoon was
9 published, and then after Richard Prince's
10 story was published, I was in Milwaukee and
11 then I was cursed at and yelled at by Dan
12 Greenfield.
13    Q.   Did Dan Greenfield mention the
14 interview you gave to Richard Prince during
15 your conversations with him when you were in
16 Milwaukee?
17    A.   No.
18    Q.   Have you ever asked Dan Greenfield
19 if he knew about your conversation with
20 Richard Prince?
21    A.   No.
22    Q.   Did you ever ask Michelle Gotthelf
23 that?
24    A.   No.

FENNER

1     Q.   Was that the first time Dan
2 Greenfield screamed at you?
3     A.   No.
4     Q.   What was the -- so the other -- so
5 there were times before you got an
6 interview -- you gave an interview with
7 Richard Prince that he screamed at you?
8     A.   He would hang the phone up on me
9 during conversations.
10    Q.   You mean he would hang up on you?
11    A.   That's right.  During the Heath
12 Ledger story, he was yelling and screaming at
13 me on the phone during that time.
14    Q.   So if he screamed at you before you
15 gave the interview with Journalisms and he
16 screamed at you after you gave the interview
17 with Journalisms, what causes you to --
18 withdrawn.
19         How did Ms. Gotthelf's behavior
20 change after you published the article --
21 after you gave the interview in Journalisms?
22    A.   Before the Journalisms interview
23 and after, she was nasty to me, yelling at
24 me, complaining about my story ideas, being

FENNER

1 dismissive of the stories I was pitching.
2 This was an ongoing -- after she assumed the
3 metro editor's job.  This was an ongoing
4 situation I found myself in.
5     Q.   You had received a bad performance
6 warning, a bad performance appraisal and a
7 performance warning in mid 2008, correct?
8     A.   Yes, that's when I said I'm -- I
9 think I'm being set up.
10    Q.   So you didn't get bad performance
11 reviews on account of the cartoon -- on
12 account of your comments about the cartoon,
13 right, because you had been getting those
14 prior to the cartoon?
15    A.   You mean the first --
16    Q.   The first ones were prior to the
17 cartoon?
18    A.   That's correct.
19    Q.   So you had already been yelled at
20 by Dan Greenfield, you had already gotten a
21 negative performance review and you already
22 had a performance warning long before the
23 cartoon was ever published, correct?
24    A.   That's correct.

FENNER

1     Q.   What was the statement that you
2 made that was published in the Journalisms
3 article?  Do you recall it?
4     A.   I recall a quote that was printed
5 in the Journalisms article was that it
6 churned my stomach.  But if you have a copy
7 of it, it would refresh my recollection.
8     Q.   That sounds right.  Do you have any
9 reason to believe that Dan Greenfield was
10 offended by your saying that the cartoon
11 churned your stomach?
12    A.   Can you repeat the question.
13    Q.   Yeah, how do you know that Dan
14 Greenfield was upset at all by your statement
15 that the cartoon churned your stomach?
16    A.   It seemed to me retaliation against
17 me for speaking out against the company about
18 the racist monkey cartoon.
19    Q.   How do you know that Dan Greenfield
20 was offended by your statement that the
21 cartoon churned your stomach?
22    A.   He had already been -- I had
23 already been subjected to a hostile work
24 environment by him, by Michelle Gotthelf and

Page 194

```
                FENNER
1
2      Q.   In September of 2009, after you
3  received that performance evaluation, the
4  Post issued you a second final written
5  warning, correct?
6      A.   Correct.
7      Q.   And we are going to mark NYPFL 500
8  as Fenner Exhibit 11.
9          (Exhibit 11, document Bates stamped
10     NYPFL 500 marked for identification, as
11     of this date.)
12     Q.   Do you recognize Fenner Exhibit 11?
13     A.   I recognize it.
14     Q.   Did you receive this final written
15  warning in September of 2009?
16     A.   Yes.
17     Q.   And is that your signature at the
18  bottom?
19     A.   Yes.
20     Q.   And is it your position that this
21  final written warning was issued to you on
22  the basis of your race?
23     A.   That's correct.
24     Q.   And what is your factual basis for
25  that assertion?
```

Page 195

```
                FENNER
1
2      A.   Because I disagree strongly with
3  the points made in here and this was used as
4  a tool to fire me.
5      Q.   Did you -- were you given this
6  during a meeting?
7      A.   Yes.
8      Q.   Who was in the meeting?
9      A.   Michelle Gotthelf, Amy Scialdone,
10  Dan Greenfield.
11     Q.   During that meeting, what did they
12  say to you?
13     A.   They said many things.  One of the
14  things they said was you're not pitching
15  enough enterprise stories, and during that
16  conversation, I had asked for their guidance
17  to describe a story that had recently run in
18  the New York Post over the last two, three
19  months, that they feel would merit an
20  enterprise story.
21          Neither Michelle nor Dan nor Amy
22  could give me an answer.  They sat silent and
23  were unable to tell me or give me an example
24  of a story that was an enterprise story
25  published in the paper that they -- I should
```

Page 196

```
                FENNER
1
2  use as a guideline for my work.
3      Q.   Isn't it a fact that you were
4  arguing with them during that meeting about
5  the content of this warning?
6      A.   I was strongly disagreeing with
7  them about the contents enumerated here.
8      Q.   And you asked repeatedly, did you
9  not, for an example of an enterprise story?
10     A.   I asked once and they were unable
11  to give me one.
12     Q.   Didn't -- together, didn't you look
13  at the, that day's paper, and didn't they
14  show you stories that no other paper had that
15  day?
16     A.   No.  I asked them to give me an
17  example of an enterprise story that ran over
18  the last several months that they felt I
19  should use as a guideline as an example of an
20  enterprise story, and they -- I was
21  dumbfounded and surprised that the three of
22  them weren't able to give me one solid --
23  were unable to point to one solid story.
24     Q.   Was there a copy of the New York
25  Post there that was used during the course of
```

Page 197

```
                FENNER
1
2  that meeting?
3      A.   I think there was a newspaper in
4  the room.
5      Q.   Did anybody open it up and show it
6  around and point to things inside the paper?
7      A.   I can't recall exactly if they did
8  that, but I asked them straight ahead to name
9  a story during the course of several months,
10  not that paper -- it could have been in that
11  paper and they could have cited that story.
12  But I asked over a span of time and they
13  weren't able to give me one solid story.
14     Q.   But weren't they calling your
15  attention to stories in that day's paper
16  during the meeting?
17     A.   We were talking about enterprise
18  stories and I had asked them to cite an
19  example of a story.  They were unable, they
20  were unable to cite one.
21     Q.   My question is narrower than that.
22  During the course of the meeting, were they
23  calling to your attention stories in that
24  day's newspaper?
25     A.   I can't recall.  If you have some
```

Page 206

FENNER

1
2      A.   No, I was still working and
3  expected to work to produce enterprise
4  stories and my supervisors have the ultimate
5  say on my shift and what I do.  I was still
6  required to cover out-of-town assignments,
7  breaking news, and produce enterprise
8  stories.
9      Q.   But you -- your work was primarily
10  the work of a runner reporter, correct?
11      A.   No, that's not true.  I did a
12  variety of assignments.
13      Q.   In the performance warning, it
14  says, in the last paragraph, "Working as a
15  runner for someone with your experience and
16  at your level as a senior reporter is simply
17  unacceptable and cannot continue any longer."
18      My question is, is it accurate when
19  they said you were working as a runner?
20      A.   I disagree with the critiques in
21  this final written warning.
22      Q.   Do you agree that you had been
23  demoted into working as a runner?
24      A.   No, the expectation and the work I
25  did was that of a senior reporter.

Page 207

FENNER

1
2      Q.   Did you ever get demoted to runner?
3      A.   No.
4      Q.   When, after the cartoon ran and you
5  said you had a conversation with Dan
6  Greenfield about not coming into the
7  newsroom, was that a demotion to runner?
8      A.   That was a -- I was being banned
9  from the newsroom.  I had to ask for
10  permission from my white editors to enter the
11  NewsCorp. building.
12      Q.   Was it -- were you demoted to
13  runner?
14      A.   No.  The expectation was that I was
15  a senior reporter and the expectation that I
16  produce the work of a senior reporter was
17  still there.
18      Q.   What did you do each morning when
19  you began your shift?
20      A.   I was required --
21      MR. THOMPSON:  Objection.
22      Q.   You can answer.
23      A.   What did I do each morning what?
24      Q.   Starting in May 2009, what did you
25  do each morning when you began your shift?

Page 208

FENNER

1
2      A.   I was instructed to call the city
3  desk in the morning.
4      Q.   And await instructions regarding an
5  assignment, correct?
6      A.   That's correct.
7      Q.   Isn't that what a runner reporter
8  does?
9      A.   A runner reporter does those
10  things, yes.
11      Q.   Did Greenfield tell you to work out
12  in the field and that the city was your
13  office?
14      A.   Yes, that was part of the ban from
15  the newsroom.
16      Q.   So as best as you can recall, what
17  did Dan Greenfield say to you during the
18  conversation in which he told you that you
19  should be -- you should not be coming into
20  the newsroom?
21      A.   He told me he didn't want me in the
22  newsroom and that I had to ask for permission
23  before entering the building.
24      Q.   Anything else?
25      A.   He said many things but that was

Page 209

FENNER

1
2  one of the things he said.
3      Q.   My question is for you to tell us
4  everything that he said during that
5  conversation that you recall.
6      A.   I can't recall all the facts and
7  all the things he said, but that was the big
8  theme.
9      Q.   So he did not want you in the
10  newsroom and call before coming in?
11      MR. THOMPSON:  Objection.
12      A.   Yes.
13      Q.   Did he tell you why he did not want
14  you in the newsroom?
15      A.   He and Michelle Gotthelf said that
16  they were doing things differently and they
17  needed me to help out on a certain shift
18  because they were short on manpower and they
19  said that they needed me to work this shift
20  temporarily and that we will replace you by
21  the end of the month.
22      Q.   Was the conversation in which you
23  were -- Dan said that he did not want you in
24  the newsroom the same conversation as when
25  you were told that your shift would change?

Page 210

FENNER

1
2    A.   Yes.
3    Q.   Other than that one conversation,
4 were there any other conversations in which
5 you were told by Greenfield or Gotthelf that
6 they did not want you coming into the
7 newsroom?
8    A.   It was at that meeting when they
9 issued the ban.
10    Q.   My question is, were there any
11 other meetings or conversations in which they
12 communicated the same thing?
13    A.   I can't recall right now if there
14 were any other meetings besides that one.
15    Q.   Did they tell you they didn't want
16 you in the newsroom because of your race
17 being African American?
18    A.   They didn't use that language, no.
19    Q.   Did anyone tell you they didn't
20 want you in the newsroom because you were
21 African American?
22    A.   No, they didn't say that, but it
23 was consistent from the hostile treatment I
24 had been experiencing at the workplace.
25    Q.   But they didn't say that?

Page 211

FENNER

1
2    A.   That is correct.
3    Q.   Did they say that the reason they
4 wanted you to call for permission before
5 coming to the building was because you're
6 African American?
7    A.   They didn't say that.
8    Q.   Did anybody tell you that that was
9 the reason for them requiring that?
10    A.   No.
11    Q.   Did they tell you why they wanted
12 you to call for -- to get permission before
13 coming into the office?
14    A.   They told me they were doing things
15 differently and that they were short of
16 manpower and they needed me to cover this
17 particular shift.
18    Q.   Did they ever say to you that the
19 reason they were requiring this of you was
20 because of comments that you made to
21 Journalisms about the cartoon?
22    A.   They didn't say that but I believe
23 it was retaliation for that act.
24    Q.   But they didn't say it and nobody
25 else told you that either, right?

Page 212

FENNER

1
2    A.   No.
3    Q.   It is typical for reporters
4 covering events in the field to get their
5 assignment from the street or from their car,
6 do the reporting from the street, and call
7 the story in or file it by e-mail without
8 ever coming into the office, right?
9    A.   Can you repeat the question.
10    Q.   Yeah, it is typical for reporters
11 covering events in the field to get their
12 assignment when they are on the street or in
13 their car and to do the reporting in the
14 street and call the story in or e-mail it in
15 without ever coming into the office, right?
16    A.   There are many reporters who do
17 that.
18    Q.   There are reporters that can go
19 weeks without ever stepping foot in the
20 office, right?
21    A.   They call those runners, yes.
22    Q.   There are reporters that don't even
23 have desks in the New York Post offices,
24 right?
25    A.   Yes, but they are not black senior

Page 213

FENNER

1
2 reporters.
3    Q.   But they are reporters writing
4 stories, covering stories and covering
5 important stories that don't need to come
6 into the office to do that and don't have
7 desks, right?
8    A.   Ikimulisa Livingston was also
9 banned from the newsroom and she is a senior
10 reporter and she is African American.
11    Q.   That is not my question.
12    A.   Can you repeat your question.
13    Q.   Yeah, there are reporters covering
14 stories, covering important stories, that do
15 that without coming into the office and
16 without having desks, correct?
17    A.   I believe -- yes.
18    Q.   And some of those reporters are
19 white reporters, correct?
20    A.   Yes, they are white reporters, but
21 they are not senior reporters.
22    Q.   Do you know if Dan Greenfield or
23 Michelle Gotthelf ever told any reporters
24 other than you not to come into the office?
25    A.   Yes.

54

Page 214

FENNER

1
2    Q.    To be out in the field?
3    A.    Yes.
4    Q.    You do know that?
5    A.    Ikimulisa Livingston was a reporter
6    who they told not to come in into -- who they
7    told not to come into the newsroom.
8    Q.    Do you know if they have given that
9    instruction to any white reporters?
10   A.    Not to my knowledge, no.
11   Q.    How did you -- what knowledge do
12   you have on that question as to whether or
13   not they have given that instruction to white
14   reporters?
15   A.    I know they treated me differently
16   than my white colleagues.  I don't know of
17   other white reporters who were at my level
18   who they gave the same treatment.
19   Q.    But you also don't know if there
20   are white reporters at your level who were
21   also told to be out in the field, right?
22        MR. THOMPSON:  Objection.
23   Q.    You don't know the conversations
24   that Mr. Greenfield and Ms. Gotthelf had with
25   every one of the white reporters, correct?

Page 215

FENNER

1
2    A.    No, I don't know every conversation
3    they had with all the white reporters.  But
4    none of the white reporters who I spoke with
5    told me they had the same treatment.
6    Q.    Were you ever, did you ever call
7    Mr. Greenfield and ask for permission to come
8    into the office?
9    A.    I might have.
10   Q.    And was that permission granted?
11   A.    Yes.
12   Q.    Do you remember how many times?
13   A.    I can't recall how many times.
14   Q.    Were you ever -- you had a swipe
15   card or identification that allowed you
16   entrance into the building, correct?
17   A.    Correct.
18   Q.    Was that ever shut off prior to the
19   time you were terminated by the Post?
20   A.    Before I was terminated?
21   Q.    Yes.
22   A.    No.
23   Q.    Were you ever -- did you ever show
24   up at the office and were told to leave the
25   offices, get out, after the instruction that

Page 216

FENNER

1
2    Mr. Greenfield gave you?
3    A.    No.
4    Q.    Did you ever tell anybody about
5    Mr. Greenfield's instruction to you to be out
6    in the field and not come into the office
7    without permission?
8    A.    Yes.
9    Q.    Who did you tell?
10   A.    I told Ikimulisa Livingston, Jeane
11   MacIntosh.
12   Q.    Anybody else?
13   A.    It might have been Dan Mangan, Len
14   Green, and there were others, but I can't
15   think of who those people are right now.
16   Q.    Did Mr. Greenfield ever use the
17   word "banned"?  Or is that word to describe
18   what occurred?
19   A.    He said we don't want you coming
20   into the newsroom.
21   Q.    OK.  Ban was not his word?
22   A.    He said we don't want you coming
23   into the newsroom.
24   Q.    And he was -- he told you he wanted
25   you out in the field ready to go, ready to be

Page 217

FENNER

1
2    dispatched to a story at 9 a.m., right?
3    A.    Correct.
4    Q.    How often did you come into the
5    office after Mr. Greenfield told you that he
6    wanted you out of the -- out in the field?
7    A.    I can't give you an exact number,
8    but it was very, very few and I was so
9    humiliated, I had to wait until late in the
10   evening before coming into the newsroom so I
11   could get supplies and other things I might
12   have needed to do my job.
13   Q.    On those occasions when you came in
14   late in the evening, did you call for
15   permission or did you feel at those times you
16   could come and go as you pleased?
17   A.    I didn't call for permission, no.
18   Q.    Did anybody ever turn you away from
19   the office on those occasions?
20   A.    No.
21   Q.    Mr. Greenfield never told you that
22   you had to come in after hours if you needed
23   supplies, did he?
24   A.    No.
25   Q.    Did you ever ask Mr. Greenfield for

Page 218

FENNER

1  supplies, to come in for supplies during the
2  day?
3      A.   I can't recall.
4      Q.   Did Ms. Greenfield ever tell you --
5  I am sorry, did Ms. Gotthelf ever tell that
6  you you needed permission to come in, if you
7  came after hours?
8      A.   No.
9      Q.   Did Mr. -- did you ever ask
10 Ms. Gotthelf to come in for supplies?
11     A.   I can't recall.  It's possible.
12     Q.   Did you ever call and ask
13 Ms. Gotthelf for permission to enter the
14 office?
15     A.   The answer is no because it was so
16 humiliating and disrespectful, I didn't want
17 to put myself through that.
18     Q.   Did you have a computer, a laptop
19 at the time?
20     A.   Yes.
21     Q.   Did it have wi-fi or 3G
22 capabilities?
23     A.   No, I had -- I would have to search
24 and hunt for a free wi-fi at a Starbucks to

Page 219

FENNER

1  do my job.
2      Q.   And how would that work?  So would
3  you write stories on your laptop at a
4  Starbucks or a cafe?
5      A.   I would write it up, send it in as
6  an e-mail, or I would call it in for my
7  notes.
8      Q.   When you were reporting stories
9  from the field, prior to Mr. Greenfield
10 instructing you not to come into the office,
11 didn't you file your stories the same way;
12 you would file them from the field from your
13 laptop, whether you were traveling in other
14 cities, traveling out in the boroughs, New
15 Jersey, Westchester, Brooklyn?  You didn't
16 come into the office in the afternoon to
17 write your stories, right?
18     A.   Not all the time, no.
19     Q.   So you were filing stories from the
20 field prior to Mr. Greenfield's instruction
21 not to come in, right?
22     A.   Correct.
23     Q.   And you were able to do that using
24 a laptop computer, cell phone, and a wi-fi

Page 220

FENNER

1  connection, right?
2      A.   Right.
3      Q.   And that's what runner reporters
4  that work for the Post frequently do to file
5  their stories, right?
6      A.   Senior reporters do it also.  The
7  answer is yes.
8      Q.   Did you receive a car allowance
9  from the Post?
10     A.   Yes.
11     Q.   How much was that?
12     A.   I forget what the mileage rate was,
13 but for every mile I drove, there was a
14 mileage rate attached to it.
15     Q.   Do you know if other runners
16 received that allowance?
17     A.   I believe all reporters received
18 that.
19     Q.   Were you able to successfully
20 perform your job in spite of Mr. Greenfield's
21 requirement that you not come into the office
22 without permission?
23     A.   It was difficult but I did.
24     Q.   You were a successful reporter

Page 221

FENNER

1  despite that, right?
2      A.   Yes.
3      Q.   You were successful in covering the
4  story that -- of the bus trip to the
5  Washington inauguration of Obama even without
6  a photographer with you, right?
7      A.   That was a very, very difficult day
8  to work.  There were several million people
9  within a seven block radius of capital and
10 the monument.  It was tough, but I did it.
11     Q.   Did you call the photo desk for a
12 photographer to go with you on that bus ride?
13     A.   I made several calls to the photo
14 desk, I put in written requests and I asked
15 Michelle Gotthelf several times to have a
16 photographer accompany me on that trip.
17     Q.   And this was the bus, the bus trip
18 that left at midnight?
19     A.   I arrived, did we -- it was in the
20 middle of the night.
21     Q.   And what did you want a
22 photographer to take pictures of?
23     A.   The event.
24     Q.   Which event?

Page 222

FENNER

1
2      A.    The New Yorkers who were heading to
3  DC.
4      Q.    What exactly did you think would be
5  the images the photographer would capture?
6      A.    You never know what's going to
7  happen.  Once we got there, we didn't know
8  what events might unfold, would unfold.  So
9  we have to be open and just be ready.
10     Q.    Well, so you wanted -- did you want
11 them to take pictures of the bus ride in the
12 middle of the night?
13     A.    You could have done a photo montage
14 of people sleeping and partying and saying
15 prayers.  It could have been an incredible
16 photo montage.  I don't know.  We will never
17 know unless you make the effort to try to see
18 what you can find out.
19     Q.    Do you know who made the decision
20 at the New York Post not to assign a
21 photographer to that trip?
22     A.    I was requesting from photo -- and
23 I was seeking the aid of my editor, Michelle
24 Gotthelf to get a photographer.  Ultimately,
25 the photo desk, the editors at the photo desk

Page 223

FENNER

1
2  have to decide, but she is one of the most
3  powerful people in the newsroom.  So she has
4  the power to influence to make it happen.
5      Q.    Ultimately, the photo desk editors
6  decide what stories get a photographer
7  assigned, right?
8      A.    I don't know who would make that
9  ultimate determination.  Normally they do.
10 This was a historic event.  Clearly a
11 once-in-a-lifetime in the history of the
12 country event.  They could have.
13     Q.    Did the Post have photographers
14 covering other aspects of the Obama
15 inauguration?
16     A.    I believe so.
17     Q.    Aren't stories published in the
18 Post every day without photos?
19     A.    Some stories.
20     Q.    Didn't stories about the
21 inauguration get published with photos?
22     A.    My story didn't have a photo.
23     Q.    But there were many stories about
24 the Obama inauguration that ran during those
25 several days, right?

Page 224

FENNER

1
2      A.    Yes, if you want your story to get
3  good play, to have a prominent position in
4  the paper, you want to work hard to make sure
5  there is a photographer accompanying your
6  story, it is going to take up more real
7  estate.  It is going to have a bigger splash,
8  a bigger look.  It is going to heighten the
9  strength of the story.
10     Q.    My question is, there were many
11 stories that ran during those several days
12 about the inauguration, right?
13     A.    There are many stories that ran.
14     Q.    And many of them had photographs,
15 right?
16     A.    Yes.
17     Q.    So the Post was taking and
18 publishing photos from the Obama
19 inauguration, right?
20     A.    Yes.
21     Q.    In fact, the Post's coverage of the
22 Obama inauguration got an award, right?
23     A.    Yes, with my help.
24     Q.    And with the help of the editors --
25     A.    I wasn't finished.  Yes, with my

Page 225

FENNER

1
2  help, they won the New York Press Club Award
3  that year.
4      Q.    After the conversation in which
5  Mr. Greenfield told you to work out in the
6  field and call for permission if you were
7  going to come in, did Mr. Greenfield or
8  Ms. Gotthelf ever yell at you?
9      A.    It was a -- it was continuously a
10 hostile environment.  They would --
11     Q.    My question is --
12            MR. THOMPSON:  He is not finished,
13 he is not finished answering your
14 question, Mr. Lerner.  Please let him --
15            MR. LERNER:  He paused,
16 Mr. Thompson.
17            MR. THOMPSON:  He was in the middle
18 of answering.  You interrupted him again.
19            MR. LERNER:  He paused and I
20 thought he was finished.
21            MR. THOMPSON:  You were wrong.
22     Q.    Mr. Fenner, go ahead.
23            MR. THOMPSON:  Let the witness
24 answer the question, please.
25     A.    I found it to be a hostile

Page 230

FENNER

2    A.   Yes.
3    Q.   Do you know Luiz Ribiero, a photo
4  editor?
5    A.   What was the name you said before.
6    Q.   David Rentas?
7    A.   Before that.
8    Q.   Juan Arellano?
9    A.   I know David Rentas and last name
10 you mentioned was Luiz who?
11   Q.   Ribeiro.
12   A.   Yes, I know him.
13   Q.   Ribeiro, Rentas, Arellano and
14 Cordon are all Hispanics, correct?
15   A.   I don't know what David -- is it
16 Prentas, was that his last name?
17   Q.   Rentas, R-E-N-T-A-S?
18   A.   I don't know his ethnicity.
19   Q.   The others you know to be
20 Hispanics?
21   A.   Luiz is Hispanic.
22   Q.   Evelyn?
23   A.   I don't know who Evelyn is and I'm
24 unsure of the other name you mentioned.
25   Q.   Do you know Thomas Ko, K-O?

Page 231

FENNER

2    A.   No.
3    Q.   A deputy management editor?
4    A.   Of the news, of sports?
5    Q.   You don't know him.
6         While you were working in the Post
7  offices, did you ever hear anybody call an
8  African American by a derogatory name?
9    A.   I didn't hear that, but I had
10 learned that --
11   Q.   But I'm asking you if you heard it.
12   A.   I didn't hear anyone --
13   Q.   That's my question.
14   A.   I was trying to answer your
15 question.
16   Q.   You did, thanks.
17        Did anybody ever say anything to
18 you that was -- that you felt was a racist
19 comment?
20   A.   Say?
21   Q.   Yes.  To you.
22   A.   You mean the "N" word?
23   Q.   That, or anything else similar that
24 you would consider racist?
25   A.   No.

Page 232

FENNER

2    Q.   Leaving aside what was said
3  directly to you, did you overhear any
4  conversations fitting that description?
5    A.   No, but I had learned about that
6  kind of conduct within the newsroom.
7    Q.   But you didn't overhear it going on
8  in your presence, right?
9    A.   No, I didn't hear it in my presence
10 but I had learned about it.
11   Q.   Did you ever complain to anybody
12 about racist comments or racist statements
13 while you were employed at the Post?
14   A.   No.
15   Q.   And you were going to say that you
16 heard about something what went on.  Can you
17 tell us what that is?
18   A.   There was a columnist who worked at
19 the paper and he was there when I was there.
20 His name is Steve Dunleavy and I heard that
21 he had referred to another newsroom colleague
22 who was of African descent -- as a matter of
23 fact, I believe he was born in Nigeria -- his
24 name is Frankie Endozien, I believe,
25 E-N-D-O-Z-I-E-N. I think that's it, and I had

Page 233

FENNER

2  learned from several people that Steve
3  Dunleavy had called him a nigger.
4         And I also learned that Steve
5  Dunleavy had wrote articles where he referred
6  to Latino people as spics.  And Steve
7  Dunleavy would appear intoxicated and
8  sometimes sleep off the alcohol in the
9  newsroom.
10   Q.   Have you personally spoken with
11 Frankie Endozien about what you just
12 described?
13   A.   I believe I was on assignment when
14 I was at the Daily News and I would ask
15 Frankie about his tenure at the paper and
16 this is when he was telling me about the
17 climate at the paper.
18   Q.   You still decided to go work for
19 the Post, notwithstanding your knowing that?
20   A.   Well, I'm a fighter and I believe
21 in change.  And I felt I could do that at the
22 Post.
23   Q.   What year did you have that
24 conversation with Frankie Endozien?
25   A.   I can't remember the exact year.

FENNER

1
2  Q.   Have you ever met Steve Dunleavy?
3  A.   Yes.
4  Q.   How many times?
5  A.   Many.
6  Q.   Where did you meet him?
7  A.   As a competitor at the New York
8  Daily News and we worked together at the New
9  York Post.
10  Q.   When you say you worked together,
11  do you mean you actually worked together on a
12  story or just that you worked at the same
13  company?
14  A.   I would see him in the newsroom and
15  I would see him on assignment.
16  Q.   Did you ever speak to him?
17  A.   Yes.
18  Q.   Did he ever say anything racist to
19  you?
20  A.   He never said anything racist to
21  me, but I'm trying to recall if he would make
22  any racist remarks in my presence while we
23  were both at the story, on a story.  That's
24  what I am trying to recall as you mentioned
25  right now.

FENNER

1
2  Q.   Anything to add to that answer?
3  A.   No.
4  Q.   So you don't recall any racist
5  stories he made in your presence or any
6  racist remarks that he made in your presence,
7  right?
8  A.   No.
9  Q.   Did Endozien -- did you and
10  Endozien work at the Post at the same time?
11  A.   I don't think so, no.
12  Q.   So whatever comments Dunleavy made
13  to Endozien, and Endozien told you about when
14  you worked at the Daily News, happened before
15  you came to the Post and didn't continue to
16  Endozien after you came to the Post, right?
17  A.   I believe that's correct.
18  Q.   Are you aware of any racist
19  comments made by Dunleavy that were made
20  during the two years you were working for the
21  Post?  Or two and a half years?
22  A.   I can't recall.
23  Q.   Are you aware of any other person
24  at the Post making racist remarks?
25  A.   I can't recall.

FENNER

1
2  Q.   In your affidavit, you stated that
3  when you were traveling, the Post did not
4  provide you with the necessary tools to
5  succeed in your job, and you cited a denial
6  of a photographer on the trip to DC.  Can you
7  think of any other tools that were denied to
8  you when you were traveling?
9  A.   No.
10  Q.   In paragraph 7 of your complaint,
11  you state that you were denied assignment
12  opportunities, specifically it reads,
13  "Plaintiffs were also discriminatorily denied
14  certain assignment opportunities based on
15  their race and/or color."
16  A.   It says plaintiffs.
17  Q.   Yes.
18  A.   Can I see it?
19  Q.   Sure.  It is paragraph 7.  I just
20  need that back when you're done.  You may
21  have a copy of the complaint in front of you.
22      What assignment opportunities were
23  you discriminatorily denied based on race?
24  A.   Think that line is referring to
25  Ikimulisa Livingston.

FENNER

1
2  Q.   OK, so you don't believe that you
3  were denied any assignment opportunities
4  based on race, correct?
5  A.   Correct.
6  Q.   There is also an allegation that
7  you suffered discrimination in pay.  Do you
8  believe that that refers to you?
9  A.   Yes.
10  Q.   In what respect did you suffer
11  discrimination in pay?
12  A.   Well, I believe some of my
13  colleagues who had the same level of
14  experience that I had were earning more and
15  also if you had a poor evaluation, you could
16  not receive an increase in pay.
17      So the fact that I got poor
18  evaluations meant that I didn't get an annual
19  increase.
20  Q.   What white reporters were paid more
21  than you with the same experience and
22  position?
23  A.   I don't have the whole list, but I
24  believe Jeane MacIntosh earned more than I
25  did, Dan Mangan, and there were others, but I