# **EXHIBIT 14**

Contains Confidential Portions

1                      JESSE ANGELO
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ---------------------------------------X
     SANDRA GUZMAN,
4                      Plaintiff,
5                      -against-      09CIV9323 (BSJ)(RLE)
6    NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
     THE NEW YORK POST, and COL ALLAN, in his
7    official and individual capacities,
8
                       Defendants.
9    ---------------------------------------X
     AUSTIN FENNER and IKIMULISA LIVINGSTON,
10
11                     Plaintiffs,
12                     -against-      09CIV9832 (BSJ)(RLE)
13   NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
     THE NEW YORK POST and DAN GREENFIELD and
14   MICHELLE GOTTHELF,
15                     Defendants.
     ---------------------------------------X
16
17
18          VIDEOTAPED DEPOSITION OF JESSE ANGELO
19                  New York, New York
20                Wednesday, April 25, 2012
21
22   REPORTED BY:  BARBARA R. ZELTMAN
                   (BOBBIE)
23                 Professional Stenographic Reporter
24
25   Job Number:  48821

Contains Confidential Portions

Page 210

**JESSE ANGELO - CONFIDENTIAL**
1   you have ever supervised William Gorta?
2   A   Yes.
3   Q   I skipped over him because I want
4   to talk about him a little more.
5       I guess to start, was William Gorta
6   a good writer?
7   A   Yes.
8   Q   Did William Gorta have any
9   problems, from your point of view, as a
10  writer?
11  A   My main recollection of working
12  with Billy Gorta was him as an editor.  I
13  don't have strong recollections of him as
14  a writer.
15      I don't recall him having problems
16  as a writer.
17  Q   What about him as an editor.  Did
18  you have any problems with him as an editor?
19  A   Yes.
20  Q   What kind of problems did you have?
21  A   Lack of leadership.  Bad attitude.
22  Not giving enough effort.
23      (Whereupon, this marks the end of
24  Confidential testimony.)
25
TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 211

JESSE ANGELO
1   MR. CLARK:  Could you mark this
2   next one as 13.
3       (Angelo Exhibit 13, E-mail
4   dated Wednesday, February 13, 2008,
5   7:16 p.m., Bates Number
6   NYP-FL-003926, was marked for
7   Identification.)
8   BY MR. CLARK:
9   Q   This is Bates-stamped NYP-FL-3926.
10      Have you had a chance to look at
11  it?
12  A   Yes.
13  Q   Do you recognize the e-mail that is
14  reproduced in Angelo 13?
15  A   Yes.
16  Q   Did you write this e-mail?
17  A   Yes.
18  Q   Can you just -- let's go through it
19  sentence by sentence.
20      Can you read that first sentence
21  for me.
22  A   "As we discussed yesterday, I'm
23  concerned about your attitude in the
24  newsroom and do not want to see it become a
25
TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 212

JESSE ANGELO
1   major issue."
2   Q   So is that accurate, what you
3   stated there?  In other words, was there a
4   discussion in the newsroom with Billy Gorta
5   the day before this e-mail went out?
6   A   I don't recall where the discussion
7   occurred.
8   Q   Do you remember having a discussion
9   with Billy Gorta?
10  A   Yes.
11  Q   What did you discuss with --
12  A   Actually, I'll clarify the earlier
13  question.  I do remember where the
14  discussion was.  It was in my office which
15  is off the newsroom.
16  Q   Fair enough.
17      So did you call him into the
18  office?
19  A   I don't recall how the conversation
20  was initiated.
21  Q   Was the conversation specifically
22  to address his behavior or did it just come
23  up in some other context?
24  A   Again, I don't recall if I
25
TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 213

JESSE ANGELO
1   initiated it to discuss his behavior or if
2   we were having another discussion and I also
3   discussed that.  I don't recall the
4   initiation of the discussion.
5   Q   Could you go on and read the second
6   sentence for me, please.
7   A   "Being rude and abusive to
8   colleagues, unnecessary negativity, lack of
9   leadership.  I and the rest of your
10  colleagues expect better and you are capable
11  of better."
12  Q   So is it accurate that Mr. Gorta
13  was rude and abusive to colleagues?
14  A   He could be on occasion.  That is
15  why I am giving him this warning.
16  Q   How often do you recall him in the
17  early part of 2008 being rude and abusive to
18  colleagues?
19  A   I wouldn't want to quantify it now,
20  but obviously it had become enough of an
21  issue.  It was something that I had seen
22  that I wanted to speak to him about it and
23  warn him about it and tell him that I was
24  concerned that it can become a major issue,
25
TSG Reporting - Worldwide    877-702-9580

| Contains Confidential Portions | Contains Confidential Portions |
|---|---|
| Page 258 | Page 259 |

JESSE ANGELO

1
2  develop and refine his editing skills?
3      A   I can't speak to that.
4          (Angelo Exhibit 18, APA, FY
5      2009, Bates Numbers NYP-FL-001322
6      through NYP-FL-001325, was marked
7      for Identification.)
8          THE WITNESS:  Okay.
9  BY MR. CLARK:
10     Q   Have you seen this document before?
11     A   Not that I recall.
12     Q   This appears to be a performance
13  evaluation for Billy Gorta for 2009,
14  correct?
15     A   Yes.
16     Q   Do you have any reason to think
17  that this is not his final performance
18  evaluation?
19     A   No.
20     Q   Where it says "Position" it says
21  "Reporter, Queens Court."
22     Is that accurate?
23     A   I'm sorry.  Which page are you on?
24     Q   On the first page.
25     A   Yes.

TSG Reporting - Worldwide    877-702-9580

JESSE ANGELO

1
2      Q   So in 2009, Bill Gorta was the
3  Queens Courthouse reporter, correct?
4          MR. LERNER:  Objection.
5  Foundation.
6      A   I know that for some period of time
7  after he was demoted from being an associate
8  Metropolitan editor back to being a
9  reporter, there was a portion of time where
10 he was assigned to the Queens Courthouse.  I
11 don't know the duration or when exactly that
12 was.  So again, this performance appraisal
13 would imply that it was in some portion of
14 2009.
15     Q   Did you have any role in
16 supervising Billy Gorta when he was Queens
17 County Courthouse?
18     A   No.
19     Q   Do you have any direct firsthand
20 knowledge of his performance as Queens
21 Courthouse reporter?
22     A   No.
23     Q   I want to refer you to again the
24 Areas of Focus Improvement.
25     It says "William needs to work on

TSG Reporting - Worldwide    877-702-9580

| Contains Confidential Portions | Contains Confidential Portions |
|---|---|
| Page 260 | Page 261 |

JESSE ANGELO

1
2  his writing so he doesn't immediately need
3  rewrite for major trials."
4      Do you see that?
5      A   Yes.
6      Q   In your experience as an editor,
7  would it be unusual for court reporters to
8  need rewriting for trials?
9          MR. LERNER:  Objection.
10     A   Yes.
11     Q   So this was an area where William
12 really would have been deficient?
13         MR. LERNER:  Objection.
14     A   I can't say that.  I have
15 absolutely no knowledge of his performance
16 when he worked as Queens Courthouse
17 reporter.
18     Q   I understand that.  Do you have any
19 reason to doubt if Michelle Gotthelf wrote
20 in an APA that "William needs to work on his
21 writing so he doesn't immediately need to
22 rewrite for trials," would you expect that
23 be to a true statement?
24         MR. LERNER:  Objection.
25     A   Yes.

TSG Reporting - Worldwide    877-702-9580

JESSE ANGELO

1
2      Q   So needing to have stories
3  rewritten as a reporter, is that a serious
4  problem?
5          MR. LERNER:  Objection.
6      A   Not necessarily.
7      Q   Do lots of reporters need to have
8  their stories rewritten?
9          MR. LERNER:  Objection.
10     Q   Let me rephrase it.
11     Is it unusual for reporters to need
12 to have their stories rewritten?
13         MR. LERNER:  Objection.
14     A   No.
15     Q   How frequently in your experience
16 do reporters need to have their stories
17 rewritten?
18         MR. LERNER:  Objection.
19     A   A reporter that's functioning as
20 rewrite can serve a number of roles.
21     So a reporter that is covering a
22 story that may be out of the office would
23 often, can -- and it happens with
24 regularity -- feed notes to a rewrite
25 person.

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 278

JESSE ANGELO

1   JESSE ANGELO
2   A   No, I'm not.  Sorry.
3   Q   United States Supreme Court is not
4   an important beat?
5        MR. LERNER:  Objection.
6   A   Once again --
7        MR. LERNER:  His testimony was
8   there was no Supreme Court beat.
9        MR. CLARK:  His testimony is
10  all beats are equal, which is clearly
11  not true.
12       MR. LERNER:  Hold on.  There's
13  no question pending.
14  Q   Is your testimony all beats are
15  equal.
16       The United States Supreme reporter
17  and runner reporter, one beat is just as
18  good as the next.
19       Is that your testimony?
20       MR. LERNER:  Objection.
21  A   I don't believe that is an accurate
22  description of my testimony.
23  Q   So a reporter assigned to the
24  United States Supreme Court would have a
25  more important beat than a runner reporter?

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 279

1   JESSE ANGELO
2        MR. LERNER:  Objection.
3   A   Again, this hypothetical position
4   covering the United States Supreme Court for
5   The New York Post does not exist.  I've
6   never heard of that beat occurring at
7   The New York Post.
8        So making a hypothetical comparison
9   between something that doesn't exist and
10  another job that you are describing in
11  incredibly broad terms, I don't feel
12  comfortable making that comparison.
13  Q   Would it be reasonable for someone,
14  for a reporter who would cover a courthouse
15  and then sent to be a runner reporter to
16  consider that to be a demotion?
17       MR. LERNER:  Objection.
18  A   It is not a demotion.  It is a
19  reassignment to a different role.
20  Q   Well, Mr. Gorta was reassigned,
21  right?
22  A   Mr. Gorta was demoted from being an
23  associate Metropolitan editor to being a
24  reporter.
25       That was the demotion.

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 280

1   JESSE ANGELO
2   Q   So why isn't it a demotion to go
3   from courthouse reporter to runner reporter?
4        MR. LERNER:  Objection.
5   Argumentative.
6   A   They're different roles.  They're
7   both reporters.  They're just different
8   roles.  It's not a demotion.
9        MR. CLARK:  Could we mark this
10  as 20.
11       (Angelo Exhibit 20, E-mail
12  dated Monday, January, 30, 2006,
13  3:52 p.m., Bates Number IL-597, was
14  marked for Identification.)
15       THE WITNESS:  Yes.
16  BY MR. CLARK:
17  Q   This appears to be another e-mail
18  dated a few days later from Ms. Livingston
19  to you, correct?
20  A   Yes.
21  Q   And she asks again about the Queens
22  Courthouse position?
23  A   Yes.
24  Q   Do you recall or does this refresh
25  your recollection you had any discussions or

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 281

1   JESSE ANGELO
2   e-mails with Ms. Livingston between the
3   first e-mail on Friday and the next e-mail
4   on Monday?
5   A   I don't recall any discussions with
6   Ms. Livingston in the time frame that you
7   described.
8   Q   But you don't know if you did or
9   you didn't.  You just don't recall?
10  A   I don't recall having those
11  conversations.
12  Q   In her e-mail dated the 30th,
13  which is 20, she references that in 2004 she
14  asked to be considered for the Queens
15  Courthouse position.
16       Do you know if that's a true
17  statement?
18  A   I don't recall.
19  Q   Do you remember if you ever
20  investigated whether that was a true
21  statement?
22  A   Do I recall if I investigated if
23  that was a true statement.
24  Q   In other words, do you recall if
25  you investigated whether she had applied in

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 282

```
 1          JESSE ANGELO
 2  2004 for the position?
 3          MR. LERNER:  Objection.
 4      A   No, I don't recall investigating
 5  whether she -- the truth of the statement
 6  she had applied in 2004.
 7      Q   Do you have any reason to believe
 8  that she had not applied in 2004 for the
 9  Queens Courthouse position?
10          MR. LERNER:  Objection.
11      A   No.
12          MR. CLARK:  Mark this as 21.
13          (Angelo Exhibit 21, E-mail
14      dated Thursday, February 16, 2006,
15      5:51 p.m., Bates Number
16      NYP-FL-001947, was marked for
17      Identification.)
18  BY MR. CLARK:
19      Q   It's very short, so take a minute
20  and read it.
21          This is Bates-stamped NYP-FL-1947.
22          And as you can see, this appears to
23  be an e-mail from Michelle Gotthelf to you,
24  Mr. Angelo, dated February 16, 2006.
25          Could you read that for me?
```

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 283

```
 1          JESSE ANGELO
 2      A   "Might as well give Kim Queens.
 3  She's shown she can write pretty well off
 4  press releases."
 5      Q   So obviously, this was what
 6  Michelle said to you, correct?
 7      A   It is an e-mail from Michelle to
 8  me, yes.  Or appears to be a facsimile
 9  thereof, yes.
10      Q   Do you remember receiving this
11  e-mail from Michelle Gotthelf?
12      A   No, I do not.
13      Q   Do you agree with the statement
14  that Kim had shown she can write pretty well
15  off press releases?
16      A   I wanted to put Kim into Queens
17  Court, I recall, because I wanted to give
18  her a new role and give her a chance to
19  succeed.
20      Q   Why did you specifically want her
21  for the role of Queens Courthouse reporter?
22          MR. LERNER:  Objection.
23      A   She had been doing a role in the
24  newsroom where she had not been successful,
25  and as an editor, you're constantly trying
```

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 284

```
 1          JESSE ANGELO
 2  to find the right role for a reporter
 3  wherein they're going to contribute to the
 4  newspaper and be successful.
 5          She hadn't been successful in the
 6  role she was doing in the newsroom.
 7          Again, I don't recall these e-mails
 8  of her putting her head up for the beat, but
 9  when the beat came open, I remember thinking
10  and discussing with Michelle that it might
11  be a really good role for Kim, that perhaps
12  she would work well in the Queens
13  Courthouse.
14          So that was my recollection of how
15  she came to be given the role of Queens
16  Courthouse.
17      Q   Why do you think she might work
18  well in the Queens Courthouse?
19      A   Because when she was a reporter in
20  the newsroom, one of the key things that she
21  was supposed to be doing was generating
22  story ideas, and she was not having success
23  doing that.
24          And one of the things about the
25  role of a courthouse reporter is that there
```

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 285

```
 1          JESSE ANGELO
 2  are a lot of stories that are occurring in
 3  front of you.
 4          There are filings in civil cases,
 5  there are criminal cases that are moving
 6  through a courthouse.  Therefore, the burden
 7  of trying to come up with story ideas out of
 8  thin air, so to speak, is less, so I thought
 9  that maybe having -- as well as having
10  ownership of a patch, ownership of a
11  physical area, might help her to be more
12  successful in her role as reporter.
13      Q   So you felt this was a good fit for
14  Kim?
15          MR. LERNER:  Objection.
16      A   I wanted to try and see if we could
17  find a role for Kim wherein she could be
18  successful.
19          And I thought this might be a role
20  where she would be successful.
21          MR. CLARK:  We're out of tape,
22  so let's take five to change things.
23          THE VIDEOGRAPHER:  The time is
24  5:15.  We're going of the record.
25          (A brief recess was
```

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 286

```
1             JESSE ANGELO
2     taken.)
3          THE VIDEOGRAPHER:  The time is
4     5:26.  We're back on the record.
5  BY MR. CLARK:
6     Q    Mr. Angelo, did Kim Livingston ever
7  pitch stories to you?
8     A    Yes.
9     Q    How frequently did she pitch
10 stories to you?
11         MR. LERNER:  Objection.
12    Q    Obviously -- well, let me clarify.
13         When you were Metropolitan editor
14 and she worked for you, how frequently did
15 she pitch stories to you?
16    A    I don't recall the frequency.
17    Q    So you're not suggesting she never
18 pitched stories?
19    A    No.
20    Q    She did pitch some stories,
21 correct?
22    A    Yes.
23    Q    But your view was she was not
24 pitching enough stories?
25         MR. LERNER:  Objection.
```

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 287

```
1             JESSE ANGELO
2     A    She was not having success in
3  generating enough stories, of enterprise
4  stories that were making it to the paper.
5     Q    Tell me what you mean by "an
6  enterprise story."
7     A    An enterprise story is a story that
8  you're not assigned by an editor but where
9  you are generating an idea.  It could be
10 an avenue that's worth pursuing on a news
11 story.  It could be a feature.  It could be
12 an investigation.  It could be anything.
13         It's coming up with an idea for a
14 story that you're not being assigned that's
15 sort of the news of that day particularly.
16 Just trying to generate something that is
17 different from what you might see in other
18 news outlets.
19    Q    Was your criticism of
20 Ms. Livingston that she was not pitching
21 enough stories or that she was not pitching
22 stories that made it into the paper?
23         MR. LERNER:  Objection.
24    Q    Or both?
25         MR. LERNER:  Can you just give
```

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 288

```
1             JESSE ANGELO
2  us a time frame?
3     Q    While you were Metro Desk editor.
4         MR. LERNER:  That's a long
5  time.
6     Q    Let's start with 2006.
7         Would this criticism that you just
8  announced -- let me back up.
9         You just had a criticism of
10 Ms. Livingston was not pitching enough
11 enterprise stories.
12         What time are you talking about?
13    A    I think that's a
14 mischaracterization of what I said.  It was
15 not a criticism for not pitching enough.  It
16 was for not having enough success in coming
17 up with ideas, getting them approved and
18 having them executed and appear in the
19 newspaper.
20         She was not having enough success
21 in generating ideas that were then okayed
22 and then executed and put into the
23 newspaper.
24    Q    So was it the case that she was
25 pitching ideas but they were not ideas that
```

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 289

```
1             JESSE ANGELO
2  made it into final print?
3         MR. LERNER:  Objection.
4         (Requested portion of record read:
5         "Q.  So was it the case that she
6  was pitching ideas but they were not
7  ideas that made it into final print?")
8         (End of read-back.)
9     A    Again, what time --
10    Q    I'm trying to understand what your
11 criticism is.  Your criticism is she was not
12 pitching enough story ideas, or was your
13 criticism that the story ideas she was
14 pitching were not good enough to make it
15 into print?
16         MR. LERNER:  Again, this is in
17 2006?
18         MR. CLARK:  In the period that
19 Mr. Angelo just testified about?
20         MR. LERNER:  I'm sorry.  I
21 think you defined the period by
22 responding to my question, and I
23 believe you said, "Let's start with
24 2006."
25         And I just want to clarify that
```

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 334

JESSE ANGELO

1
2 Michelle Gotthelf, Col Allan, any employee
3 of The New York Post talk to you about the
4 decision to fire Austin Fenner prior to the
5 filing of the lawsuit?
6     A    Yes.
7     Q    Who talked to you about that
8 decision?
9     A    Michelle.
10     Q    Other than the conversation with
11 Michelle, is there anyone else?
12     A    No, not that I recall.
13     Q    So during the conversation when she
14 said she was not satisfied, she indicated
15 she wanted to fire him?
16         MR. LERNER:  Objection.
17     A    My recollection is that Michelle
18 was not satisfied with Austin's performance
19 for a period of time, and then I remember
20 her saying that she was going to let him go.
21         I don't recall the sequence -- how
22 long that process was.  I just remember
23 being vaguely aware of her dissatisfaction
24 and then decision to terminate his
25 employment.

TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 335

1         JESSE ANGELO
2     Q    These were two different
3 conversations, correct?
4     A    Again, I don't have specific
5 recollections of specific conversations, but
6 I know that it wasn't one conversation where
7 both of those things occurred.  I remember
8 that it was a period of time.  But I don't
9 recall specific conversations I had with
10 her.
11     Q    You have "Three things that need
12 fixing at The New York Post" published by
13 Journalisms.
14         You never read that article before?
15     A    No.
16         MR. CLARK:  Mark this as 28.
17 And again, this is a long article.  I
18 don't want you to read the whole
19 thing.  I just want you to glance at
20 the cover and tell me if it refreshes
21 your recollection.  It's not worth
22 reading the whole thing.
23         (Angelo Exhibit 28, Article,
24 Bates Numbers AF-34 through AF-44,
25 was marked for Identification.)

TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 336

1         JESSE ANGELO
2 BY MR. CLARK:
3     Q    Again, I don't want you to read the
4 whole thing.
5         Does this refresh your recollection
6 of ever having seen this before?
7     A    No.
8     Q    Okay.  That's fine.
9         Did you ever directly supervise
10 Sandra Guzman?
11     A    No.
12     Q    When did you first meet Sandra
13 Guzman -- let me take a step back.
14         Had you ever met Sandra Guzman?
15     A    Yes.
16     Q    When did you first meet her?
17     A    I don't recall.
18     Q    Do you know an approximate year?
19         Did you ever meet her prior to her
20 coming to work for The New York Post?
21     A    No.
22     Q    So you first met her during her
23 employment?
24     A    Yes.  Or around the time of.
25     Q    Do you remember what your position

TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 337

1         JESSE ANGELO
2 at the paper was when you met her?
3     A    I was City editor.
4     Q    Did you -- and were you still City
5 editor when she left?  Or had you been
6 promoted at that time?
7     A    When did she leave?
8     Q    She left in 2009.  September 2009,
9 I believe.
10     A    No, I was not City editor.
11     Q    Did you or any of your reporters
12 ever contribute to the Tempo section.  I
13 mean, not you directly but did you have
14 reporters that were contributing articles to
15 the Tempo section while you were City
16 editor?
17     A    I think some may have.  I don't
18 recall any specific examples of it.
19     Q    Were you in a position to formulate
20 an opinion about the Tempo section and how
21 it was done?
22     A    Yes, I saw it.
23     Q    What was your view of it?  Did you
24 think it was a well done section?
25         MR. LERNER:  Objection.

TSG Reporting - Worldwide    877-702-9580

Page 1

```
 1
 2     UNITED STATES DISTRICT COURT
 3     SOUTHERN DISTRICT OF NEW YORK
       ------------------------------)
 4     AUSTIN FENNER and             )
       IKIMULISA LIVINGSTON,         )
 5                                   )
                       Plaintiff,    )09 CV 9832
 6                                   )(BSJ)(RLE)
           vs.                       )
 7                                   )
       NEWS CORPORATION, NYP HOLDINGS,)
 8     INC., d/b/a THE NEW YORK POST )
       and DAN GREENFIELD and MICHELLE)
 9     GOTTHELF,                     )
                                     )
10                     Defendants.   )
       ------------------------------)
11
12
13
14
15
16              DEPOSITION OF JESSE ANGELO
17                 New York, New York
18               Friday, April 5, 2013
19
20
21
22
23
24     Reported by:
       JOMANNA DeROSA, CSR
25     JOB NO. 59957
```

Page 18

```
1              J. ANGELO
2      Q.   Right.  After Mr. Murdoch
3  approached you about that position, did you talk
4  with anyone else at The Post, News Corp. or any of
5  their affiliates, before assuming your duties as
6  publisher?
7      MR. LERNER:  About taking that
8  position?
9      MR. PEARSON:  Yes.
10     A.   Before I accepted the position?
11     Q.   Yes.
12     A.   Not that I recall.  I mean, I don't
13 have any specific memory of speaking to anybody
14 else at The Post after that.
15     Q.   Okay.  And you began work as
16 publisher at The Post in or around mid-December of
17 2012.  Is that right?
18     A.   That is correct, yes.
19     Q.   Okay.  And what are your duties as
20 publisher at The Post?
21     A.   I run the business.
22     Q.   Okay.  What does that mean, if you
23 could elaborate?
24     A.   The publisher of a newspaper is
25 akin to the Chief Executive Officer of a business.
```
TSG Reporting - Worldwide   877-702-9580

Page 19

```
1              J. ANGELO
2      Q.   Okay.  As part of your duties as
3  publisher, do you evaluate the performance of The
4  Post's reporters?
5      A.   No.
6      Q.   Okay.
7      A.   Not as a standard, not as a matter
8  of course, no.
9      Q.   Okay.  Do you have the authority to
10 hire and fire reporters at The Post?
11     MR. LERNER:  Objection.  You can
12 answer.
13     A.   As CEO of the business I have the
14 authority to hire and fire anybody I like.
15     Q.   And do you know who Ikimulisa or
16 Kim Livingston is?
17     A.   Yes.
18     Q.   Okay.  And who is she?
19     A.   She was a reporter at The New York
20 Post.
21     Q.   Okay.  How long have you known
22 Ms. Livingston, if you know her at all?
23     A.   Over a decade.
24     Q.   Okay.  How did you first become
25 acquainted with her?
```
TSG Reporting - Worldwide   877-702-9580

Page 20

```
1              J. ANGELO
2      A.   I worked with her at The New York
3  Post.
4      Q.   And are you aware of what
5  Ms. Livingston's last position with The New York
6  Post was?
7      A.   Yes.
8      Q.   And what was that?
9      A.   She was a reporter.
10     Q.   Okay.  Was she a particular kind of
11 reporter or assigned to a particular beat?
12     A.   I believe she was a general
13 assignment reporter.
14     Q.   Okay.  And at the time of -- well,
15 actually, let's start here.
16          Approximately when, if at any time,
17 did Ms. Livingston's employment with The New York
18 Post, as a general assignment reporter, end?
19     A.   Kim was dismissed for gross
20 misconduct in -- I believe it was the end of
21 February.
22     Q.   Okay.  At the time of her
23 termination, how would you describe
24 Ms. Livingston's skill level as a general
25 assignment reporter?
```
TSG Reporting - Worldwide   877-702-9580

Page 21

```
1              J. ANGELO
2      A.   Again, I didn't supervise or
3  evaluate her.  I'm not in a position to say.
4      Q.   Okay.  So, is it your testimony
5  that since you became publisher of The Post you're
6  not aware of Ms. Livingston's performance level as
7  a general assignment reporter?
8      A.   That is correct.  I'm not aware of
9  how she was performing.
10     Q.   Do you know who Ms. Livingston's
11 supervisor was at the time of her termination?
12     A.   I believe it was Dan Greenfield
13 and/or Michelle Gotthelf.  I don't know exactly
14 who she directly reported to, though.
15     Q.   Okay.  And do you know who made the
16 decision to terminate Ms. Livingston's employment?
17     A.   Yes.
18     Q.   And who is that?
19     A.   Me.
20     Q.   And did you make that decision
21 unilaterally?
22     MR. LERNER:  Objection to form.
23     A.   Okay.  Can you be more specific
24 about "unilaterally?"
25     Q.   Sure.  Did you alone make the
```
TSG Reporting - Worldwide   877-702-9580

Page 22

J. ANGELO

1
2  decision to Ms. Livingston's employment?
3        A.   Yes.
4        Q.   Did you meet with Ms. Livingston
5  about her termination at any time?
6        A.   Yes.
7        Q.   Okay.  And when was that?
8        A.   On the day she was terminated.
9        Q.   Okay.  We'll talk about the
10 termination meeting in a little while.  But prior
11 to that termination meeting, and since you became
12 publisher at The Post, did you have any
13 discussions or correspondence with Ms. Livingston?
14       A.   No, not that I recall.
15       Q.   Since the time you became publisher
16 at The Post, up until Ms. Livingston's
17 termination, did you have any discussions with
18 anybody else at The Post about Ms. Livingston's
19 job performance?
20       A.   No, not that I recall.
21       Q.   Do you know what mystery shopping
22 is?
23       A.   I have a vague understanding of it.
24       Q.   Okay.  What's your understanding of
25 what mystery shopping is?

Page 23

J. ANGELO

1
2        A.   My understanding is that is when
3  somebody is paid to go into a store or interact
4  with a business, I guess, telephonically or via
5  the Internet, and test out what the customer
6  service is like, what kind of reactions they get,
7  how the people perform in their duties at the
8  shop.
9        Q.   Have you ever done any mystery
10 shopping yourself?
11       A.   My wife might think I have with
12 some of the gifts I give her, but, no, I have not
13 done any mystery shopping.
14       Q.   Okay.  And are you aware of anyone
15 else among your acquaintances, or anyone among
16 your acquaintances who have done mystery shopping?
17       A.   No.
18       Q.   Okay.  Are you aware of whether or
19 not Ms. Livingston has ever mystery shopped?
20       A.   Yes.
21       Q.   Okay.  And are you aware of whether
22 or not she's ever mystery shopped for TD or
23 Commerce Bank?
24       A.   Yes.
25       Q.   Okay.  And are you aware that she

Page 24

J. ANGELO

1
2  has, in fact, done that?
3        A.   Yes.
4        Q.   Okay.  And are you aware of whether
5  or not Ms. Livingston has ever mystery shopped for
6  a company called Shop 'n Chek?
7        A.   Yes.
8        Q.   And has she done that?
9        A.   Yes.
10       Q.   Okay.  Do you know what the mystery
11 shopping that Ms. Livingston did for TD or
12 Commerce Bank entailed; how it worked?
13       MR. LERNER:  Objection.  Form.
14       A.   I know that while she was being
15 employed by The New York Post and turning in time
16 sheets that she was working for The New York Post
17 she was, in fact, doing paid work on hundreds and
18 hundreds of occasions for these mystery shopping
19 outfits.  I don't know what they're -- companies I
20 guess they're called.
21       Q.   Are you aware of whether or not
22 Ms. Livingston received payments in connection
23 with her mystery shopping on a W-2 or 1099 basis?
24       A.   Can you repeat the question,
25 please?

Page 25

J. ANGELO

1
2       MR. PEARSON:  Sure.  Could the
3  question be read back?
4       (The requested portion of the
5  record was read.)
6       A.   No, I'm not aware of that.
7        Q.   Okay.  And are you able to describe
8  for me what Ms. Livingston actually did when she
9  would perform or conduct mystery shops for TD or
10 Commerce Bank?
11       MR. LERNER:  Objection.
12       MR. PEARSON:  You may answer.
13       THE WITNESS:  Can you read the
14 question back, please?
15       (The requested portion of the
16 record was read.)
17       A.   No, I never witnessed it, but I
18 know she wasn't working for The New York Post as
19 she was supposed to be doing.
20       (Recess taken.)
21       Q.   Are you aware of what was entailed
22 in Ms. Livingston's mystery shopping for Shop 'n
23 Chek?
24       A.   The very fact that she was doing
25 mystery shopping, a paid job for somebody else

Page 26

J. ANGELO

1
2  when she was supposed to be working for The New
3  York Post, is a huge problem.
4          MR. PEARSON:  All right.  I'd like
5      that marked as nonresponsive.
6      Q.   Mr. Angelo, are you aware of what
7  was entailed in Ms. Livingston's mystery shopping
8  for Shop 'n Chek?
9          MR. LERNER:  Objection.
10         MR. PEARSON:  You may answer.
11         MR. LERNER:  On each occasion, on a
12     particular occasion?  I mean, she went into
13     different stores?
14         MR. PEARSON:  Does he have any
15     knowledge of what was entailed in mystery
16     shopping for Shop 'n Chek by Ms. Livingston.
17         MR. LERNER:  You can answer however
18     you want.  You can answer as generally or as
19     specifically as you can, because it's an open
20     question.
21     A.   What precisely she did when she was
22  being paid by somebody else while she was
23  dishonestly saying that she was working for me on
24  hundreds and hundreds of occasions is the point.
25     What precisely she did when she
           TSG Reporting - Worldwide    877-702-9580

Page 27

J. ANGELO

1
2  walked into a store, being paid by somebody to do
3  it when she was being paid by me, I don't know
4  precisely what she did there, but I don't find it
5  relevant.  Any paid employment that she was doing
6  somewhere else is a problem.
7      Q.   All right.  So, Mr. Angelo, you're
8  not aware specifically what she did for Stop 'n
9  Chek then?  Is that your testimony then?
10         MR. LERNER:  Objection.
11     A.   Correct.
12     Q.   How did you become aware of
13  Ms. Livingston's mystery shopping?
14     A.   From reading the transcript of her
15  deposition.
16     Q.   Okay.  Which transcript or
17  transcripts were those?
18     A.   I don't know if there's multiple --
19  I read the transcript of the deposition she gave
20  about mystery shopping.
21     Q.   Okay.  So, the transcript you read,
22  was that for a deposition taken this year of
23  Ms. Livingston?
24     A.   I believe so, yes.
25     Q.   Okay.  Did you ever view any
           TSG Reporting - Worldwide    877-702-9580

Page 28

J. ANGELO

1
2  portion of a deposition taken of Ms. Livingston
3  from early in 2012?
4      A.   Not that I recall.
5      Q.   Are you aware that Ms. Livingston
6  was deposed in early 2012?
7      A.   No.  I mean, not really.
8      Q.   Were you aware that Ms. Livingston
9  had given any deposition in connection with this
10  case prior to the one that she gave this year
11  concerning her mystery shopping?
12         MR. LERNER:  Was he aware when?
13     Q.   Were you aware, prior to
14  Ms. Livingston's termination, at any time that she
15  had previously been deposed in connection with
16  this matter?
17     A.   I don't recall any specific
18  awareness of her having given a deposition
19  previous to that.
20     Q.   Okay.  So, you didn't know that she
21  had been deposed, other than her deposition
22  regarding mystery shopping?
23     A.   Again, not that I recall.  I mean,
24  is it possible that I knew that and forgot?  I
25  don't know.  I have no recollection of her having
           TSG Reporting - Worldwide    877-702-9580

Page 29

J. ANGELO

1
2  given depositions before or having looked at them.
3  I don't know.
4      Q.   To your knowledge, is anyone else
5  at The New York Post aware that Ms. Livingston
6  mystery shopped during her employment at the
7  paper?
8      A.   I don't know.
9      Q.   Is Amy Scialdone aware of it?
10     A.   Yes.
11     Q.   Okay.  Anyone else?
12     A.   I don't know.
13     Q.   Have you discussed Ms. Livingston's
14  mystery shopping with anyone else at The New York
15  Post?
16     A.   No.
17     Q.   Apart from Ms. Scialdone or did you
18  discuss it with Ms. Scialdone?
19     A.   Can you define "discuss"?
20     Q.   What does the word "discuss" mean
21  to you, Mr. Angelo?
22     A.   I informed Ms. Scialdone that this
23  behavior had occurred and, therefore, I was
24  terminating Ms. Livingston.  I did not discuss
25  with her the matter.
           TSG Reporting - Worldwide    877-702-9580

Page 30

J. ANGELO

1
2     MR. LERNER:  And all of these
3  answers are premised by other than with
4  counsel?
5     THE WITNESS:  Of course.
6     MR. PEARSON:  That's correct.
7     THE WITNESS:  Yes.
8     Q.   At no time am I asking for the
9  substance of any communication you've had with
10 legal counsel.
11    A.   Okay.
12    Q.   That is not how I roll.
13        Are you aware of what period of
14 time -- actually, let's do this.
15        Are you aware of when
16 Ms. Livingston began mystery shopping for any of
17 the -- you know, for the first time?  I'm sorry.
18 When she began mystery shopping for the first
19 time.
20    A.   I know when she began mystery
21 shopping while she was supposed to be working for
22 The New York Post.  I don't know if she previously
23 mystery shopped to that in her life.  I don't know
24 if she previously mystery shopped to when she was
25 doing it for -- while she should have been working

TSG Reporting - Worldwide   877-702-9580

Page 31

J. ANGELO

1
2  for The New York Post.  I don't know if she did it
3  in some previous time in her life.
4     Q.   Do you know when she first began
5  mystery shopping during her employment at The
6  Post?
7     A.   Yes.
8     Q.   Okay.  When was that?
9     A.   My understanding is that it was
10 2005.
11    Q.   Okay.  And, again, apart from
12 substantive discussions with counsel, what is that
13 understanding based upon?
14    A.   The transcript of her deposition,
15 and records that I saw of times that she mystery
16 shopped when she should have been, and in fact was
17 telling The New York Post that she was working for
18 The New York Post.
19    Q.   Okay.  During the time that
20 Ms. Livingston was mystery shopping, was she, in
21 fact, performing work for The New York Post?
22    A.   Can you repeat the question,
23 please?
24    Q.   Certainly.  During the period of
25 time that Ms. Livingston was mystery shopping

TSG Reporting - Worldwide   877-702-9580

Page 32

J. ANGELO

1
2  during her employment at The New York Post, was
3  she also performing duties and work for The New
4  York Post?
5     MR. LERNER:  Objection.
6     A.   Yeah, I'm sorry.  That's very
7  vague.
8     MR. LERNER:  It's not clear if
9  you're asking about -- when you say "when she
10 was mystery shopping," if you're talking about
11 a span of months or years, or if you're
12 talking about particular hours in a day.
13    MR. PEARSON:  That's fine.  I can
14 rephrase.  I understand the objection now.
15    Q.   Okay.  So, from, say, 2005 to 2013
16 did Ms. Livingston perform duties as an employee
17 of The New York Post?
18    A.   Yes.
19    Q.   Okay.  Were any stories written by
20 Ms. Livingston published in The New York Post?
21    MR. LERNER:  Objection.
22    A.   Ever?
23    Q.   From 2005 to 2013.
24    A.   I assume so, yes.
25    MR. LERNER:  Don't guess.

TSG Reporting - Worldwide   877-702-9580

Page 33

J. ANGELO

1
2     Q.   Did Ms. Livingston have stories
3  published in The New York Post since you became
4  publisher in mid-December 2012?
5     A.   I don't know.
6     Q.   Did you ever discuss, since you
7  became publisher at The Post, any freelance work
8  done by Ms. Livingston for any other company or
9  publication?
10    A.   No.
11    Q.   And who is the previous publisher
12 of The New York Post before you?
13    A.   Paul Carlucci.
14    Q.   And do you know whether
15 Mr. Carlucci had any knowledge of Ms. Livingston's
16 mystery shopping?
17    A.   I don't know.
18    Q.   Did you ever discuss Ms. Livingston
19 in any capacity with Mr. Carlucci?
20    A.   No.
21    Q.   Did you ever discuss
22 Ms. Livingston, in any capacity, with Michelle
23 Gotthelf?
24    MR. LERNER:  At any time?
25    MR. PEARSON:  At any time.  Let's

TSG Reporting - Worldwide   877-702-9580

Page 58

```
1              J. ANGELO
2         Ms. Livingston wasn't terminated
3    for moonlighting.  And I'm not even sure we
4    have a definition of "moonlighting."
5         MR. PEARSON:  Let's revise it.
6    Well, the witness always testifies according
7    to his understanding.
8         Q.   Are you aware of any New York Post
9    employees having been terminated for moonlighting?
10        MR. LERNER:  What is moonlighting?
11        A.   Again, can you define
12   "moonlighting" for me, please?
13        Q.   Well, do you have an understanding
14   of the term "moonlighting" and what that means?
15        MR. LERNER:  I'm an employment
16   lawyer and I don't even know what it means.
17        A.   Again, I know what it could mean.
18        Q.   Okay.  And what's your belief or
19   understanding as to what the term "moonlighting"
20   refers to?
21        A.   It can refer to doing paid work for
22   another employer.
23        Q.   Okay.  At the same time as working
24   for another company?
25        A.   Correct.
```

TSG Reporting - Worldwide    877-702-9580

Page 59

```
1              J. ANGELO
2         Q.   And could it refer to performing
3    paid services for one entity or employer, apart
4    from your primary employment?
5         A.   It could, yes.
6         Q.   Okay.  Are you aware of -- and so,
7    just for clarity of the record, with that, are you
8    aware of any New York Post employees having been
9    terminated for moonlighting?
10        A.   No.
11        Q.   Are you aware of any New York Post
12   employees having been terminated, and specifically
13   reporters having been terminated for dereliction
14   of duty?
15        A.   Not that I recall.
16        Q.   Are you aware of any New York Post
17   reporters having been terminated for not spending
18   enough time on their reporting duties?
19        A.   Not that I recall.
20        Q.   Are you aware of any New York Post
21   employees having been terminated for or in
22   connection with any freelance work that they have
23   done?
24        A.   Not that I recall.
25        (Recess taken.)
```

TSG Reporting - Worldwide    877-702-9580

Page 60

```
1              J. ANGELO
2         Q.   Mr. Angelo, are there any rules or
3    guidelines regarding when New York Post reporters
4    are to take lunch during the workday?
5         MR. LERNER:  Wait a minute.  Go
6    ahead and answer that question and then I want
7    to bring up something from the prior segment.
8         Q.   Mr. Angelo, if you could respond to
9    the previous question.
10        A.   Can you repeat it?  I'm sorry.
11        MR. PEARSON:  It can be read back,
12   yes.
13        (The requested portion of the
14   record was read.)
15        A.   Again, different reporters work
16   different shifts.  So, some people work 3:00 to
17   midnight, so it's not always lunch.
18        Q.   So, I mean, are you aware of any
19   restrictions on when a reporter who would, say,
20   work a 9:00 to 5:00 shift would take lunch?
21        A.   I don't know.
22        MR. LERNER:  Just before the break
23   there were a couple of questions and answers
24   that Mr. Angelo wanted to clarify his answers
25   on.
```

TSG Reporting - Worldwide    877-702-9580

Page 61

```
1              J. ANGELO
2         The two questions were:
3         "QUESTION:  Are you aware of any
4    New York Post employees having been
5    terminated, and specifically reporters, for
6    material dereliction of duty?
7         "ANSWER:  "Not that I recall.
8         "QUESTION:  Are you aware of any
9    New York Post employees having been terminated
10   for not spending enough time on their
11   reporting duties?
12        "ANSWER:  Not that I recall."
13        And Mr. Angelo just wanted to
14   clarify his understanding of the question when
15   he answered.
16        MR. PEARSON:  Okay.  Mr. Angelo?
17        THE WITNESS:  I understood that
18   question to mean not including Kim Livingston.
19        Q.   That's fine.
20        A.   Okay.
21        Q.   Okay.  Understood.  So, is it then
22   your testimony that Ms. Livingston was terminated
23   for material dereliction of duty?
24        A.   In part.  She was terminated for
25   gross misconduct, dereliction of duty, dishonesty,
```

TSG Reporting - Worldwide    877-702-9580

Page 62

```
1              J. ANGELO
2   on hundreds and hundreds of occasions going and
3   doing paid work for another employer, not telling
4   her supervisors about it.
5          MR. PEARSON:  Okay.  I believe the
6      witness said that gross misconduct,
7      dereliction of duty, dishonesty, and then he
8      went into the part about --
9          MR. LERNER:  Yeah.
10      Q.   Okay.  After you learned about
11  Ms. Livingston's mystery shopping, did you ever
12  consider asking her to stop doing that, rather
13  than terminating her employment?
14      A.   No.
15      Q.   Did you consider any other
16  discipline, apart from termination?
17      A.   It was clear to me, given the scope
18  of her misdeeds, that termination was the right
19  course of action.
20      Q.   Okay.  How did you reach that
21  conclusion?
22          MR. LERNER:  Objection.  You can
23      answer.
24      A.   Again, the pattern of her behavior,
25  what she did, the dishonesty that she showed to
        TSG Reporting - Worldwide    877-702-9580
```

Page 63

```
1              J. ANGELO
2   the organization was -- left me no choice but to
3   terminate her.  We have a lot of employees who
4   work incredibly hard, and they don't leave their
5   post in the middle of the day and go do paid
6   employment for somebody else when they should be
7   reporting for The New York Post.  I couldn't
8   justify keeping that person on my staff.
9      Q.   Are you aware of Ms. Livingston
10  having done any freelance writing?
11      A.   I don't have any awareness of that.
12      Q.   Ms. Livingston has testified that
13  during her employment at The Post at times she did
14  freelance writing for, among other outlets, Heart
15  and Soul Magazine, BET.com.
16          If that is a fact that
17  Ms. Livingston performed that freelance work,
18  would you consider that a dereliction of duty?
19          MR. LERNER:  Objection.
20      A.   Any freelance work needs to be
21  cleared with a supervisor.  So, if she did it, she
22  should have asked for permission to do it.
23          Just like any other outside
24  employment, such as mystery shopping, would have
25  to be cleared with the supervisor, especially when
        TSG Reporting - Worldwide    877-702-9580
```

Page 64

```
1              J. ANGELO
2   you're doing it during the hours when you're
3   supposed to be writing for The New York Post.
4      Q.   So, that is current New York Post
5   policy, that any freelance work must be cleared
6   with the reporter's direct supervisor?
7      A.   Yes.
8      Q.   Okay.  How long has that policy
9   been in effect?
10      A.   As long as I can remember.
11      Q.   So, has it been in effect for more
12  than ten years, do you believe -- or excuse me --
13  has it been in effect for more than, say, five
14  years?
15      A.   Yes.
16      Q.   Are you aware of any reporters who
17  do freelance work at The Post?  Excuse me.  Do you
18  know any New York Post reporters who do freelance
19  work for other outlets or publications?
20          MR. LERNER:  Freelance writing?
21          MR. PEARSON:  Yes, freelance
22      writing.
23      A.   No.
24      Q.   Are you aware of any New York Post
25  reporters at any time having done freelance
        TSG Reporting - Worldwide    877-702-9580
```

Page 65

```
1              J. ANGELO
2   writing for other outlets?
3      A.   Yes.
4      Q.   Okay.  Who are they?
5      A.   I don't have a recollection of
6   specific reporters doing it, but from time to time
7   when I was city editor someone would ask if they
8   could write a freelance piece, and we would
9   determine whether or not we thought it was
10  appropriate.
11      Q.   Are you aware of any New York Post
12  reporters having done freelance work for other
13  outlets without asking for permission?
14      A.   Not that I can recall.
15      Q.   Are you aware of any New York Post
16  employee having been disciplined for violation of
17  the policy regarding asking a supervisor
18  permission before engaging in outside work or
19  writing?
20      A.   I'm not aware of that, no.
21      Q.   Apart from Ms. Livingston, of
22  course.
23      A.   Yes.  Thank you.
24      Q.   Was anyone other than legal
25  counsel -- I'll rephrase that question in general.
        TSG Reporting - Worldwide    877-702-9580
```

## Page 74

J. ANGELO

2  THE WITNESS: Can you repeat it,
3  please?
4  (The requested portion of the
5  record was read.)
6  MR. LERNER: Answer, if you know.
7  A.  I don't know.
8  Q.  When did you make the decision to
9  terminate Ms. Livingston's employment?
10  A.  February 2013.
11  Q.  About how many days before her
12  termination did you make that decision?
13  A.  It was the weekend. I made the
14  decision on a weekend, and we contacted her on the
15  Monday.
16  Q.  So, just a day or two before her
17  termination you made that decision?
18  A.  Yes. It was that weekend.
19  Q.  Did you prepare a letter to
20  Ms. Livingston in connection with her termination?
21  A.  A letter was drafted in connection
22  with her termination.
23  Q.  Did you draft that letter?
24  A.  The letter was drafted, and in
25  conjunction with counsel I reviewed it.

TSG Reporting - Worldwide   877-702-9580

## Page 75

J. ANGELO

2  Q.  So, did you write the original
3  draft of that letter?
4  A.  No.
5  Q.  Did you revise that letter?
6  A.  Yes.
7  Q.  Did you revise multiple versions of
8  that letter?
9  MR. LERNER: Objection.
10  A.  I don't recall.
11  Q.  And how did you revise the letter?
12  MR. LERNER: Objection. That would
13  get into attorney-client privileged
14  information.
15  MR. PEARSON: I mean, is the
16  witness instructed not to answer? What's the
17  situation?
18  MR. LERNER: I mean, Larry, do you
19  think that that question how he revised that
20  letter that was being written in conjunction
21  with counsel is an appropriate question?
22  MR. PEARSON: I don't know. I'm
23  trying to determine whether -- let's see if we
24  can get the information I'm looking for this
25  way.

TSG Reporting - Worldwide   877-702-9580

## Page 76

J. ANGELO

2  Q.  So, Mr. Angelo, at any point did
3  you change your mind regarding whether or not
4  Ms. Livingston should, in fact, be terminated?
5  MR. LERNER: Objection.
6  A.  No.
7  Q.  Okay. And when did you first learn
8  about her mystery shopping?
9  A.  At the end of that week. I can't
10  remember if it was the Thursday or the Friday.
11  And then I made the decision over the weekend, and
12  did the termination -- well, we initiated it on
13  the Monday.
14  Q.  Have you provided termination
15  letters similar to the one given to Ms. Livingston
16  to any other employee terminated at The New York
17  Post?
18  MR. LERNER: Objection.
19  A.  I don't recall.
20  Q.  Have you had termination meetings,
21  similar to the one you had with Ms. Livingston,
22  with any other employee terminated from The Post?
23  MR. LERNER: Objection.
24  A.  Yes.
25  Q.  Okay. Did you have such

TSG Reporting - Worldwide   877-702-9580

## Page 77

J. ANGELO

2  termination meetings with all of the other nine
3  employees that you mentioned earlier who were
4  terminated?
5  A.  I'm sorry. When I answered the
6  first question, forgive me, I was talking about
7  terminations in the newsroom. So, I thought you
8  were referring to the one reporter I had referred
9  to previously. So, now you've changed it to this
10  other thing, so I've just -- can I look at my
11  answer to the -- I don't know if my answer to the
12  first thing covers -- do you follow what I'm
13  saying?
14  Q.  Well, I'll give you a chance to
15  clarify.
16  MR. LERNER: I think the problem
17  was the question contained the word "similar,"
18  which I don't think anybody actually knows
19  what "similar" means in this context.
20  So, let's start with a new
21  question.
22  Q.  Have you had termination meetings
23  with other employees terminated from The New York
24  Post?
25  A.  Yes.

TSG Reporting - Worldwide   877-702-9580

Page 78

1          J. ANGELO
2      Q.   Okay. Did you have termination
3  meetings with the other nine employees who you
4  mentioned who were terminated in connection with
5  the restructuring?
6      A.   Some of them.
7      Q.   Okay. Was there a reason you met
8  with some and not others?
9      A.   Yes.
10      Q.   What was that reason or reasons?
11      A.   There were a number of terminations
12  that were being done at the same time as part of
13  this restructuring, and I just physically couldn't
14  be in all nine of them. And some of the people I
15  didn't know, and it was just the way we handled
16  it.
17      Q.   Okay. What's your understanding
18  regarding the period of time during which
19  Ms. Livingston performed mystery shopping while
20  employed at The Post?
21      A.   I don't understand. My
22  understanding of a time period? What does that
23  mean?
24      Q.   Sure. Do you know during which
25  years Ms. Livingston performed mystery shopping
         TSG Reporting - Worldwide    877-702-9580

Page 79

1          J. ANGELO
2  while she was employed at The Post at the same
3  time?
4      A.   Yes.
5      Q.   Okay. Which years were those?
6      A.   My understanding is that it was
7  from 2005 to 2010.
8      Q.   So, is it your belief that
9  Ms. Livingston did not conduct any mystery
10  shopping from 2011 through the present?
11      A.   I don't know.
12      Q.   So, you're not aware of whether or
13  not Ms. Livingston still mystery shops?
14      A.   No, I'm not aware if she does or
15  doesn't.
16      Q.   Are you aware of any other New York
17  Post employee being terminated for conduct they
18  engaged in as much as three years prior to their
19  termination?
20      MR. LERNER: Objection.
21      A.   I think very clearly had this
22  five-year pattern of misconduct been revealed at
23  any time, that employee would be terminated. Had
24  anyone known -- I mean, obviously, Kim took great
25  lengths to deceive her supervisors to the
         TSG Reporting - Worldwide    877-702-9580

Page 80

1          J. ANGELO
2  extracurricular work she was doing while she
3  should have been working for The New York Post.
4  Had they known, obviously, she would have been
5  terminated.
6      Q.   Did you review Ms. Livingston's
7  entire deposition transcript?
8      A.   I read the whole thing, yes.
9      Q.   Was Ms. Livingston's termination
10  approved by anybody else at The New York Post or
11  News Corporation?
12      A.   No.
13      Q.   Was Ms. Livingston's termination
14  based, in part, on her writing skills?
15      A.   No.
16      Q.   Was her termination based, in part,
17  on the number of stories that she had appear in
18  The New York Post?
19      A.   No.
20      Q.   Was it based, in part, on the
21  number of story ideas that she pitched to editors
22  of The Post?
23      A.   No. It was based on her spending
24  many hours, hundreds and hundreds of occasions,
25  leaving her post when she was supposed to be
         TSG Reporting - Worldwide    877-702-9580

Page 81

1          J. ANGELO
2  working for The Post, even on paid sick leave,
3  three occasions on paid sick leave, leaving and
4  going and doing paid employment for somebody else
5  without telling her supervisors about it.
6      Q.   New York Post employees who take
7  paid time off for sick days, are they prohibited
8  from engaging in any other gainful activity on the
9  days that they take a paid sick day?
10      A.   I'm not aware of any policy that
11  speaks to that. I think the expectation of any
12  employer is that if an employee says they're sick,
13  and they're going to take a paid sick day, that
14  they're not going to go work for somebody else for
15  money.
16      Q.   Is it the expectation of The Post
17  that when an employee takes a paid sick day, that
18  they are confined to their home, due to their
19  illness?
20      MR. LERNER: Objection.
21      A.   You're asking me about hypothetical
22  situations of somebody's hypothetical sick day.
23      Q.   I'm asking about your expectation
24  as a supervisor at The Post?
25      A.   My expectation is they're sick.
         TSG Reporting - Worldwide    877-702-9580