**<u>EXHIBIT 20</u>**

1              IKIMULISA LIVINGSTON

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    --------------------------------------X
     AUSTIN FENNER and IKIMULISA LIVINGSTON,
4
5                    Plaintiffs,

6                    -against-
                                09 Civ. 9832
7                                (BSJ)(RLE)

8    NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
     THE NEW YORK POST and DAN GREENFIELD and
9    MICHELLE GOTTHELF,

10
                     Defendants.
11   --------------------------------------X

12

13

14       VIDEOTAPED DEPOSITION OF IKIMULISA LIVINGSTON

15                 New York, New York

16               Friday, January 13, 2012

17

18   REPORTED BY:  BARBARA R. ZELTMAN
                   (BOBBIE)
19                 Professional Stenographic Reporter

20

21   Job Number:  45412

22

23

24

25

IKIMULISA LIVINGSTON

1           IKIMULISA LIVINGSTON
2  day.
3    Q    Then how is it that you are
4  testifying under oath what the employees who
5  were working in the Police Shack on that day
6  were instructed to do?
7    A    Because the person I spoke to in
8  the Police Shack told me that no one had
9  assigned anyone to work on that story in the
10  Police Shack.
11    Q    And who did you speak with in the
12  Police Shack?
13       MR. THOMPSON:  Objection.
14    A    I don't recall who I spoke to at
15  that time.
16    Q    Do you recall when the time was
17  that you spoke to the person?
18       MR. THOMPSON:  Objection.
19    A    Do you mean the time of day?
20    Q    I mean was it contemporaneously,
21  was it the day this was happening?
22    A    It was the day I was assigned to
23  the story, yes.
24    Q    But you don't recall who it was?
25    A    No, I don't.

1           IKIMULISA LIVINGSTON
2    Q    Okay.
3       So you were telling me that -- we
4  just got sidetracked a bit -- that Dan
5  Greenfield gave you assignments to stories
6  that were not going to appear in the paper.
7       Is there anything else that you
8  believe demonstrates how Dan Greenfield
9  discriminated against you on the basis of
10  race that you didn't already describe in
11  connection with how you think Ms. Gotthelf
12  discriminated against you?
13    A    Dan Greenfield spoke to me in a
14  very demeaning, disrespectful, demoralizing
15  way.
16       He speaks to me in a very
17  dismissive way, in a callus way.
18       He talks to me like I don't matter
19  and my distributions don't matter.  And he's
20  intimidating and is a bully.
21    Q    How often do you speak to
22  Mr. Greenfield?
23    A    Almost daily.  Almost daily when
24  I'm working.
25    Q    Are these conversations in person

1           IKIMULISA LIVINGSTON
2  or over the telephone?
3    A    They're over the telephone, for the
4  most part.
5    Q    When did Mr. Greenfield start
6  speaking to you in this manner which you
7  think is discriminatory?
8    A    He's always pretty much spoken to
9  me that way.
10    Q    How many years have you worked with
11  Mr. Greenfield?
12    A    I worked with him for I believe as
13  long as he's been an employee at the Post.
14    Q    Do you know how many years that is?
15    A    I don't know how long he's been an
16  employee of the Post.
17    Q    Have you ever complained to anyone
18  at the Post about the way Mr. Greenfield
19  speaks to you?
20    A    I complained of racial -- excuse
21  me.
22       I've complained about racial
23  discrimination.
24    Q    Who did you complain to about
25  racial discrimination at the Post?

1           IKIMULISA LIVINGSTON
2    A    I complained to Michelle.  I've
3  complained to the HR Department, and I've
4  complained in my evaluations.
5    Q    I'm sorry?
6    A    In my evaluations.
7    Q    In your evaluation.
8       And these are the times that you
9  complained about how Mr. Greenfield speaks
10  to you?
11    A    Those are the times that I have
12  complained about racial discrimination
13  against me.
14    Q    But my question was:  Have you ever
15  complained to anyone at the Post about the
16  way Mr. Greenfield speaks to you?
17    A    Have I specifically?
18    Q    Correct.
19       Have you specifically complained to
20  anyone at the Post about how Mr. Greenfield
21  speaks to you?  That was the question.
22    A    I have not specifically stated to
23  anyone at the Post about how he spoke to me.
24    Q    Are you aware of the complaint
25  procedure at the New York Post?

Page 42

1        IKIMULISA LIVINGSTON
2     A    Yes, I am.
3     Q    When did you first become aware of
4   the New York Post Human Resources
5   Department?
6     A    I don't recall.
7     Q    Well, did you become aware of the
8   New York Post Human Resources Department in
9   the last five years?
10    A    I don't recall.
11    Q    Well, do you know who currently is
12  the head of the New York Post HR Department?
13    A    No.  I'm not one hundred percent
14  sure on that.
15    Q    Well, you mentioned a short while
16  ago that you complained about race
17  discrimination to HR.
18         Can you tell me when you first
19  complained to the HR Department at the Post
20  about race discrimination?
21    A    That would have been in December of
22  2009.
23    Q    And was December 2009 the first
24  time you complained to the HR Department
25  about race discrimination at the Post?

Page 43

1        IKIMULISA LIVINGSTON
2     A    To the Human Resources Department,
3   yes.
4     Q    And so it's true that in
5   December 2009 when you complained about race
6   discrimination, you didn't mention that you
7   thought the way Mr. Greenfield spoke to you
8   was discrimination or discriminatory; is
9   that correct?
10    A    At that time, no.
11    Q    Since December 2009, have you
12  spoken to anyone at the New York Post about
13  how you believe the way Mr. Greenfield
14  speaks to you is discriminatory?
15    A    Have I've spoken to someone at the
16  New York Post about --
17    Q    Human Resources Department.
18    A    -- Human Resources Department about
19  the way Mr. Greenfield speaks to me?
20    Q    Yes.
21    A    Is that your question.
22         No.
23    Q    When did you complain to Michelle
24  Gotthelf about race discrimination?
25         You mentioned that a few minutes

Page 44

1        IKIMULISA LIVINGSTON
2   ago.
3     A    I complained to her about the
4   cartoon.  And I complained to her about the
5   cartoon the day the cartoon ran in the
6   newspaper.
7     Q    Was that an in-person conversation?
8     A    No, it was not.
9     Q    How did you communicate with
10  Ms. Gotthelf about the cartoon?
11    A    I called and I got her voice-mail
12  and I left a message.
13         And some time passed, she called me
14  back and we spoke.
15    Q    And Ms. Gotthelf apologized to you
16  about the cartoon; is that correct?
17    A    I don't recall if she apologized to
18  me.  I don't recall her apologizing.
19    Q    What do you recall about the
20  conversation?
21    A    I recall telling her that that
22  cartoon was very, very offensive to myself
23  and to the people of color, and she told me
24  that she agreed.
25    Q    So Ms. Gotthelf told you that she

Page 45

1        IKIMULISA LIVINGSTON
2   agreed that the cartoon was offensive; is
3   that correct?
4         MR. THOMPSON:  Objection.
5     A    It was my impression from what she
6   said to me that she agreed.
7         I believe she said, "I know."
8     Q    And Ms. Gotthelf told you that she
9   thought the cartoon was disgusting; isn't
10  that right?
11    A    I don't recall if she said
12  "disgusting."
13    Q    Ms. Gotthelf told you that she was
14  sorry that you had to go through this; isn't
15  that right?
16    A    I don't recall her saying that at
17  all.
18    Q    Ms. Gotthelf told you that you
19  could take some time off if you wanted to;
20  isn't that right?
21    A    No, she did not.
22    Q    You don't recall her telling you
23  that you could take time off?
24    A    I'm not saying I don't recall her
25  saying that.  I'm saying she did not tell me

12 (Pages 42 to 45)

Page 46

IKIMULISA LIVINGSTON

1   that.
2      Q   So your testimony is Ms. Gotthelf
3   did not offer that you could take some time
4   off if you wished in light of the cartoon?
5      A   Ms. Gotthelf did not tell me I
6   could take some time off, no.
7      Q   Did you work that day?
8      A   Yes, I did.
9      Q   Do you recall if you worked a full
10  day?
11     A   If I worked that day, it was a full
12  day, yes.
13     Q   You don't recall coming to work
14  late that day?
15     A   No, I don't believe so, no.
16     Q   You don't think so but it's
17  possible that you came to work late that
18  day?
19     A   Sorry.  I didn't mean to cut you
20  off.
21        No, I did not go to work late that
22  day.
23     Q   Did you complain to anyone in Human
24  Resources about the cartoon?

Page 47

IKIMULISA LIVINGSTON

1      A   No.
2      Q   Did you complain to any other
3   editor at the New York Post about the
4   cartoon?
5      A   No.
6      Q   Do you know if Ms. Gotthelf was
7   aware of the cartoon prior to publication?
8      A   I don't know.
9      Q   You didn't know then or you don't
10  know now?
11     A   I didn't know then and I don't know
12  now.
13     Q   So sitting here today, you think
14  Ms. Gotthelf was possibly responsible for
15  the selection of the cartoon?
16     A   Was responsible for the selection
17  of the cartoon?
18     Q   That's the question, yes.
19     A   I don't know if she was responsible
20  for the selection of the cartoon.
21     Q   You've never spoken with Jesse
22  Angelo about the cartoon; is that right?
23     A   No, I have not.
24     Q   What's the basis for your belief

Page 48

IKIMULISA LIVINGSTON

1   that Jesse Angelo approved the cartoon?
2      A   I spoke to others who said they
3   speak to Jesse about the cartoon and that he
4   saw it beforehand and didn't see anything
5   wrong with it.
6      Q   Who did you speak with?
7      A   I spoke to Leonard Greene.
8      Q   So Leonard Greene told you that
9   Mr. Angelo approved the cartoon in advance?
10     A   Leonard told me that he'd spoken to
11  Jesse about the cartoon.  Jesse said he saw
12  the cartoon before it was published and that
13  he didn't see anything wrong with it.
14     Q   Did you discuss the cartoon with
15  any other employees?
16     A   Yes.
17     Q   By the way, when did you have this
18  conversation with Leonard Greene?
19     A   Might have been that day.
20     Q   So you took what Leonard Greene
21  told you as a fact?
22     A   I understood -- I don't think
23  Leonard lied to me about that, so, yes, I
24  believe Leonard, what he said.

Page 49

IKIMULISA LIVINGSTON

1      Q   So in your court Complaint, based
2   on what Leonard told you, you felt
3   comfortable stating "In fact, Jesse Angelo
4   admitted to others that he had reviewed and
5   approved the publication of the cartoon
6   before it appeared in the newspaper"; is
7   that right?
8      A   I'm sorry.  Could you read that
9   again?
10     Q   In your court Complaint, based on
11  what Leonard Greene told you, you felt
12  comfortable stating "In fact, Jesse Angelo
13  admitted to others that he had reviewed and
14  approved the publication of the cartoon
15  before it appeared in the newspaper"?
16     A   Yes.
17     Q   Yeah.  Who were the "others"?
18     A   The others in terms of that spoke
19  to Jesse about it?
20     Q   Well, I don't know.  In your
21  Complaint in Paragraph 69 it says "In fact,
22  Jesse Angelo, the white managing editor at
23  the Post, admitted to others."
24        So I'm asking you who are the

13 (Pages 46 to 49)

Page 50

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2    "others" referenced in that paragraph?
3        A    I don't recall.
4        Q    Is it possible that it was just
5    Leonard Greene?
6        A    Is it possible?  I think anything
7    is possible.  But if I said "others," then I
8    think there were probably others that also
9    heard him, so ...
10       Q    But sitting here today, you can't
11   identify anyone other than Leonard Greene
12   who heard that Jesse Angelo had reviewed and
13   approved the publication of the cartoon
14   before it appeared in the newspaper; is that
15   correct?
16       A    Right now, I can't think of anyone
17   else.
18       Q    Is there anything that you haven't
19   told me that supports your belief that Dan
20   Greenfield discriminated against you based
21   on your race at the New York Post?
22       A    Well, I mentioned that he had
23   something to do with me being demoted from
24   my beat.
25       Q    Wait.  I'm sorry.  When you say

Page 51

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2    "demoted from your beat."
3        Are you referring to the Queens
4    Courthouse position?
5        A    That's correct.
6        Q    When were you demoted from the
7    Queens Courthouse position?
8        A    In December 2008.
9        Q    Do you know what Dan Greenfield's
10   position was in December 2008?
11       A    I don't exactly know what the
12   titles are for the editors or for Dan
13   Greenfield specifically.
14       Q    Do you know what Dan Greenfield's
15   position is today at the New York Post?
16       A    I don't know exactly what his title
17   is.
18       Q    Do you know that Dan Greenfield
19   wasn't the deputy editor back in
20   December 2008?
21       A    I do not know if he was or he was
22   not.
23       Q    But you just said that he played a
24   role in your demotion, right?
25       A    Yes.

Page 52

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2        Q    So if he wasn't in his current
3    position, how do you know that he had any
4    authority to demote you back in 2008?
5        A    I think regardless of his title, I
6    think he played a role in my demotion.
7        Q    Tell me the factual basis for that
8    belief.
9        A    Dan Greenfield was an editor at the
10   Post.  I believe he was a confidante of
11   Michelle Gotthelf.  And I believe he played
12   a role in my demotion.
13       Q    Confidante.
14       Why do you believe he was
15   confidante of Michelle Gotthelf back in
16   December 2008?
17       A    She was the Metro editor and he was
18   an editor.
19       Q    So you do remember the titles of
20   some people at the New York Post?
21       A    I'm not specific on exactly what
22   all the titles are for all of the editors.
23       Q    Okay.
24       Tell me, how long did you hold the
25   Queens Courthouse position?

Page 53

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2        A    I was there from winter of 2006
3    until I was removed, wrongly, in 2008 of
4    December.
5        Q    Okay.  Winter of 2006 through
6    December 2008; is that right?
7        A    That is correct.
8        Q    So when you were the Queens
9    Courthouse reporter, where did you report to
10   work every day?
11       A    I'm sorry?
12       Q    I didn't mean to cut you off.
13       A    When I was the Queens Courthouse
14   reporter, I went to work at the Queens
15   Courthouse.
16       Q    What time did you report to the
17   Queens Courthouse, generally?
18       A    It varied.
19       Q    Was it sometime between 9 and
20   10 a.m.?
21       A    It varied.
22       Q    What did it vary on?  When did it
23   change?
24       A    It depended on the cases I was
25   working on.

14 (Pages 50 to 53)

Page 110

IKIMULISA LIVINGSTON

1
2   A    When I was asked by someone with
3   HR, Lisa, to no longer do that.
4   Q    Is that Lisa Sweberg you are
5   referring to?
6   A    I believe that's her name.
7   Q    When you tape-recorded
8   conversations, did you use an induction
9   coil?
10  A    Since I don't really know what an
11  induction coil is, no.
12  Q    You said that you used a digital
13  recorder.
14       Is that something that you hold up
15  to your phone?
16  A    I used a digital recorder that's a
17  handheld digital recorder.
18  Q    So do you hold it up to your
19  telephone when you record?
20  A    When I was recording those
21  conversations, I would either -- I don't
22  know if I would hold it to my phone, but I
23  would have to next to -- near my phone.
24  Q    Did you only record phone
25  conversations?

Page 111

IKIMULISA LIVINGSTON

1
2   A    Did I only record telephone
3   conversations?
4   Q    Yeah.  Did you record any in-person
5   meetings with Post employees?
6   A    Oh, okay.  No.
7   Q    Did you edit any of the tapes that
8   you produced?
9   A    No, I did not.  I don't know how to
10  edit them.
11  Q    And let me ask you:  Why did you
12  tape-record conversations with your
13  supervisors?  Did somebody tell you to make
14  these recordings?
15  A    No.
16       I knew that Zach Haberman was
17  discriminating against me.
18       I knew that the yelling, the
19  screaming, the tone, the cursing, I knew all
20  of these things were wrong and I didn't know
21  what to do about what was going on with him.
22       So at one point I thought -- I just
23  thought I needed proof and at one point I
24  thought, well, maybe I'll tell Michelle, but
25  I just did this so that I could have a

Page 112

IKIMULISA LIVINGSTON

1
2   record of what he was doing to me.
3   Q    Were you contemplating a lawsuit?
4   A    No.
5   Q    You just said that you knew that
6   Zach Haberman was discriminating against
7   you.
8       What's the basis for your belief
9   that Zach Haberman was discriminating
10  against you?
11  A    Because he was yelling and
12  screaming and cursing at me, to me, and I
13  don't think he treated -- certainly not
14  white male reporters that way that he
15  interacted with.
16       He treated me that way.
17  Q    But Zach Haberman did yell at other
18  reporters; isn't that right?
19  A    I don't know if he yelled.
20       I know that Denise Buffa had very
21  difficult times with him as well.
22  Q    Is Denise Buffa African-American?
23  A    No.  Denise Buffa is a white woman.
24  Q    So you know for sure that Zach
25  Haberman yelled at white women; is that

Page 113

IKIMULISA LIVINGSTON

1
2   right?  At least one white woman?
3   A    I know he yelled at me and he
4   yelled at Denise.
5       I don't know that he yelled.  I
6   know that he spoke to her in an abusive way
7   as well.
8   Q    Do you believe that Mr. Haberman
9   was more critical of your work than he was
10  of other reporters?
11  A    I don't know if he was more
12  critical of my work.  I just know that he
13  was abusive and treated me in a
14  discriminatory way.
15  Q    And Mr. Haberman's employment with
16  the New York Post was terminated, correct?
17  A    As far as I know, he lost his job.
18       MS. LOVINGER:  Let's go off the
19  record for one minute.
20       THE VIDEOGRAPHER:  The time is
21  12:28 p.m.  We're now off the record.
22       (A brief recess was
23  taken.)
24       THE VIDEOGRAPHER:  The time is
25  12:34 p.m.  We're now back on the

29 (Pages 110 to 113)

Page 114

IKIMULISA LIVINGSTON

1        IKIMULISA LIVINGSTON
2        record.
3    BY MS. LOVINGER:
4        Q    Ms. Livingston, when were you
5    removed from the Queens Courthouse position?
6        A    December 2008.
7        Q    Who told you you were being
8    removed?
9        A    Michelle Gotthelf.
10       Q    Did she call you?
11       A    Did she call me to tell me I was
12   being removed?  Is that your question?
13       Q    Yeah.  How did she convey the
14   message?
15       A    She called me, told me to come in
16   to the office the next day, and at that
17   time, the next day, she told me that they
18   were making a change in the Queens
19   courtroom, in the Queens Courthouse.
20       Q    Do you remember how long before you
21   stopped working in the Queens Courthouse she
22   had this conversation with you?
23       A    How long -- are you saying that I
24   was not in the Queens Courthouse when she
25   removed me?

Page 115

IKIMULISA LIVINGSTON

1        IKIMULISA LIVINGSTON
2        Q    No.  I'm saying that.
3        I'm saying did you continue to work
4    in the Queens Courthouse after Michelle
5    Gotthelf told you that would no longer be
6    your personal assignment?
7        A    When she told me I was being
8    demoted; that they were making a change, she
9    never told me when, so I thought I was out
10   the next day.
11       So the next day I called in to the
12   office, which is what you do on your general
13   assignment, and I spoke to Greenfield,
14   telling them him that I'm available.  I'm
15   not sure exactly what my words were.  And he
16   told me, no, that's not going to start until
17   next week.
18       Q    So you stayed in the Queens
19   Courthouse for one additional week?
20       A    I don't think it was a full week.
21   It was three, maybe four days.
22       Q    Billy Gorta is the reporter who
23   replaced in you the Queens Courthouse; is
24   that right?
25       A    Yes.  Billy Gorta, a white male,

Page 116

IKIMULISA LIVINGSTON

1        IKIMULISA LIVINGSTON
2    replaced me in my Queens Courthouse beat.
3        Q    When did you find out that Billy
4    Gorta would be assigned to the Queens
5    Courthouse position?
6        A    I don't remember when I found out.
7        Q    You allege in your Complaint that
8    Mr. Gorta had been demoted due to
9    performance issues; is that right?
10       A    Yes.
11       Q    What's the basis for this belief?
12       A    I heard that he was disciplined and
13   he was removed from his position as an
14   editor.
15       Q    So Mr. Gorta was an editor before
16   he was assigned to the Queens Courthouse
17   position; is that correct?
18       A    Yes.
19       Q    Who told you that Mr. Gorta had
20   been disciplined?
21       A    I don't recall.
22       Q    Do you have personal knowledge of
23   Mr. Gorta's job performance at the New York
24   Post?
25       A    No.  I worked with him on occasion,

Page 117

IKIMULISA LIVINGSTON

1        IKIMULISA LIVINGSTON
2    but other than that, I don't know -- I don't
3    have personal knowledge of all of his work
4    at the New York Post, no.
5        Q    Is it your belief that Mr. Gorta
6    was not qualified to be the Queens
7    Courthouse reporter position?
8        A    Is it my belief he's not qualified?
9    I don't think at any time I said he wasn't
10   qualified.  I just said I was removed from
11   my beat discriminatorily and replaced by a
12   white male.
13       Q    Could it be that Mr. Gorta is more
14   qualified than you are to hold the Queens
15   Courthouse reporter position?
16       A    I don't know if he's more qualified
17   or less qualified.  I know that I did a good
18   job in my position at the Queens County
19   Courthouse.
20       And I was summarily removed, told
21   me they were just making a change and then I
22   heard Billy Gorta, who was demoted from his
23   position as an editor, was being placed in
24   the beat that I had had.
25       Q    But it's possible that Mr. Gorta is

30 (Pages 114 to 117)

IKIMULISA LIVINGSTON

1
2  more qualified for the Queens Courthouse
3  position; is that correct?
4       MR. THOMPSON:  Objection.
5       A   I don't know if he's more qualified
6  or less qualified.
7       Q   You never had an employment
8  agreement at the New York Post, did you?  An
9  employment contract with the New York Post?
10      A   I was hired by the Post.  I don't
11  know of any contract.
12      Q   Well, did you ever have an
13  employment contract for a fixed period of
14  time to work for the New York Post?
15      A   No, I did not.
16      Q   Did you ever have an employment
17  contract in connection with a Queens
18  Courthouse reporter position?
19      A   No, no one ever gave me a contract
20  for that position.
21      Q   Were you ever promised that you
22  would be at the Queens Courthouse reporter
23  position for any specific period of time?
24      A   No.
25      Q   Do you know that Mr. Gorta was an

IKIMULISA LIVINGSTON

1
2  adjunct professor at Columbia School of
3  Journalism?
4       A   I know he taught a class, yes.
5       Q   Do you know that Mr. Gorta never
6  required a rewrite in the Queens Courthouse
7  position?
8       A   I don't know that to be true.
9       Q   Do you know that Mr. Gorta has a
10 master's in journalism?
11      A   I don't know whether he has a
12 master's or not.
13      Q   To the best of your knowledge, who
14 was responsible for removing you from the
15 Queens Courthouse position?
16      A   Michelle Gotthelf, Jesse Angelo,
17 Dan Greenfield, Col Allan.
18      Q   And what's the basis for your
19 understanding of how the decision was made
20 to remove you from the courthouse?
21      A   What's the basis?
22      Q   Uh-huh.
23           Did someone tell you how the
24 decision was made to remove you from the
25 Queens Courthouse position?

IKIMULISA LIVINGSTON

1
2       A   No, no one told me.
3       Q   But you know that Michelle Gotthelf
4  and Jesse Angelo were involved in that
5  decision, correct?
6       A   Yes.  I know the two of them were
7  involved in that decision, and I know that
8  one day I heard about Billy Gorta being
9  demoted from his position as an editor after
10 something about Plaxico Burress coverage.
11          And then the next day, I believe it
12 was I was, demoted from my beat.
13      Q   Who told you who made the decision
14 to remove you from the Queens Courthouse
15 position?
16      A   No one specifically told me who
17 made the decision.
18          Michelle told me that they were
19 making a change.  So, to me, "they" are the
20 editors of the New York Post.
21      Q   So to be clear, Ms. Gotthelf and
22 Mr. Angelo, the people who assigned you to
23 the Queens Courthouse position, were also
24 responsible for removing you; is that right?
25      A   And as I stated earlier, I think

IKIMULISA LIVINGSTON

1
2  Dan Greenfield also had something to do with
3  that.  He was part of the decision-making on
4  that.
5       Q   Was your salary decreased --
6       A   I'm sorry.  Could I just state, I
7  think Zach Haberman would also have
8  something to do with me being removed from
9  the Queens County Courthouse, since he was
10 my immediate supervisor.
11          I just wanted to add that.
12      Q   Okay.
13          Was your salary decreased when you
14 were removed from the Queens Courthouse
15 position?
16      A   My set salary?  No, it did not
17 change.  However, my overtime did change.  I
18 made a lot of overtime covering the Sean
19 Bell trial.  And high-profile trials require
20 more time and attention and, therefore, I
21 did make lots of money.
22      Q   But the Sean Bell trial was over
23 before you were removed from the Queens
24 Courthouse position; is that right?
25      A   That's correct.

Page 130

IKIMULISA LIVINGSTON

1  IKIMULISA LIVINGSTON
2  reporter?
3      A    At no time did anyone make me aware
4  that I can request an additional shift to
5  work an extra day to make more money.
6      Q    Well, maybe no one affirmatively
7  told you, but is it your testimony that you
8  were unaware that you could request
9  additional shifts?
10          It's a yes or no question,
11 Ms. Livingston.
12     A    I didn't know that other general
13 assignment reporters were doing that.  I
14 think I was aware that sometimes rewrite
15 people would work a shift in the office an
16 extra day or something like that, but at no
17 time was I aware that that was an option for
18 a general assignment reporter.
19     Q    So is it your testimony that you
20 are learning about the opportunity for
21 additional shifts for the first time right
22 now at this deposition?
23          MR. THOMPSON:  Objection.
24     Q    Is that your testimony?
25     A    I'm saying that at no time did

Page 131

IKIMULISA LIVINGSTON

1  IKIMULISA LIVINGSTON
2  anyone tell me I could work an additional
3  day or a shift as a general assignment
4  reporter to make extra money, no.
5      Q    In your last performance
6  evaluation, your 2011 APA, did your
7  supervisors not tell you that you can work
8  additional shifts and additional hours?
9      A    Is that something that's in the
10 APA?
11     Q    I'm asking your recollection.
12          Did they not tell you that?
13     A    Offhand, I do not recall them
14 telling me that, no.
15     Q    Did you ever ask anyone if you
16 could work additional shifts?
17     A    No, I didn't ask anyone if I could
18 work additional shifts.
19     Q    Austin Fenner worked a lot of
20 overtime.
21          Are you claiming that you were
22 unaware of that?
23          MR. THOMPSON:  Objection.
24     A    I don't know what hours Austin
25 worked.

Page 132

IKIMULISA LIVINGSTON

1  IKIMULISA LIVINGSTON
2      Q    Are you unaware of the fact that
3  Austin Fenner worked a lot of overtime at
4  the New York Post?
5      A    I know that Austin was essentially
6  sent on the road, traveled a lot for the job
7  which would incur more overtime.
8          So if that answers that question,
9  then, yes.
10     Q    Ms. Livingston, this morning you
11 described a long list of things that
12 Michelle Gotthelf and Dan Greenfield did
13 that you believe were acts of
14 discrimination, and nowhere in -- not once
15 in your testimony or in your sworn EEOC
16 charge or in your federal lawsuit do you
17 allege that you ever heard Michelle
18 Gotthelf, Dan Greenfield or any other editor
19 at the Post say something offensive about
20 your race, for example, a racial epithet;
21 isn't that true?
22          MR. THOMPSON:  Objection.
23     A    There was not an occasion when
24 Michelle used a racial slur with me,
25 although I have to say the fact that they

Page 133

IKIMULISA LIVINGSTON

1  IKIMULISA LIVINGSTON
2  would always consider black stories and
3  Latino stories or stories about black and
4  Latinos as "low rent" or "ghetto" or however
5  you want -- that right there is offensive in
6  and of itself.
7          But no, she never used the N-word
8  with me or -- and Greenfield never said
9  those things.  However, I do know
10 that Frankie Edozien was called a nigger by
11 Steve Dunleavy, and Dunleavy would write his
12 columns and refer to Hispanic people as
13 "Spics."
14          And there was also an occasion
15 when -- there was a smoking room in the Post
16 and there was one occasion when Andrea
17 Esposito, she was in there with some people
18 and she was talking about the Giants -- or
19 just talking about football and she referred
20 to Lawrence Taylor as "that big nigga."
21     Q    Who is Andrea Esposito?
22     A    She works at the Post.
23     Q    Is she an editor?
24     A    No, she is not an editor.
25     Q    Going back to my question for a

34  (Pages 130 to 133)

Page 134

IKIMULISA LIVINGSTON

1    minute.
2         Have you ever heard any editor or
3    executive at the New York Post say any
4    racist comments?
5         MR. THOMPSON: Objection.
6    A    I stated that I didn't hear
7    Michelle to me personally using racial
8    epithets or Greenfield, except for the fact
9    that they constantly call stories about
10   black people or Latino people "low rent"
11   which is tantamount to saying they're
12   ghetto. And that itself is offensive.
13   Q    So you haven't heard Michelle
14   Gotthelf or Dan Greenfield make any comments
15   or say something offensive about race --
16        MR. THOMPSON: Objection.
17   Q    Have you heard any other editor or
18   executive at the New York Post ever say
19   something offensive about your race?
20        MR. THOMPSON: Objection.
21   A    The fact that Col Allan and Jesse
22   Angelo would approve a racist cartoon
23   depicting President Obama, a black man, as a
24   chimpanzee, that is offensive.

Page 135

IKIMULISA LIVINGSTON

1    Q    Anything else?
2    A    I think the fact they're calling
3    black people monkeys is --
4    Q    Have you ever --
5         MR. THOMPSON: Wait, wait. She
6    is not finished, Ms. Lovinger.
7    Please let her finish.
8    A    I think that's extremely offensive.
9    In addition to the fact that they didn't
10   apologize. They wouldn't apologize to me.
11   They didn't apologize to Leonard. They
12   didn't apologize to the other few black
13   reporters and black people that worked
14   there.
15        And on top of that, for Nicole Alan
16   and for the executives to say things like
17   oh, those people outside protesting, they're
18   uneducated anyway. That is all extremely
19   offensive.
20   Q    There is still a pending question
21   that remains unanswered and I asked you the
22   question and you --
23        MR. THOMPSON: Objection.
24   Q    -- and you mentioned this low rent

Page 136

IKIMULISA LIVINGSTON

1    reference which we can address and we will
2    pursue it.
3         But other than the fact that
4    Ms. Gotthelf or Mr. Greenfield you claim
5    referred to certain stories as low rent,
6    have you heard Michelle Gotthelf, Dan
7    Greenfield or any other editor or executive
8    at the New York Post say anything that's
9    offensive about your race?
10   A    I thought I clearly said I did not
11   hear Michelle or Dan Greenfield say anything
12   beyond the low rent remarks about story
13   pitches about blacks and Latinos.
14        As for others, I just mentioned
15   Steve Dunleavy. He's a columnist. Other
16   than that, I can't say.
17   Q    You can't say you've ever heard
18   anyone else make a comment about your race?
19        MR. THOMPSON: Objection.
20   A    About me as a black woman?
21   Q    Yes.
22   A    I thought I answered that. I said
23   I can't say.
24   Q    I'm just rereading your testimony.

Page 137

IKIMULISA LIVINGSTON

1         And I understand that you just
2    testified that you never heard Michelle
3    Gotthelf or Dan Greenfield make any
4    offensive comment about your race, but my
5    question is --
6         MR. THOMPSON: Objection.
7    Objection.
8    Q    -- was about other editors and
9    executives at the Post.
10        MR. THOMPSON: Mistakes the
11   testimony.
12        MS. LOVINGER: The testimony is
13   pretty clear. You can look back in
14   the record.
15   Q    Ms. Livingston, have you ever heard
16   any editor or executive at the New York Post
17   make any offensive comment about your race?
18        MR. THOMPSON: Objection.
19   A    I thought I was clear. I did not
20   hear Michelle say the N-word.
21   Q    No, you're not hearing the
22   question.
23        We're going beyond Michelle
24   Gotthelf and Dan Greenfield.

35 (Pages 134 to 137)

Page 138

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2         Have you heard -- and you were
3    clear on that answer.  You are right.
4         But have you heard any other editor
5    or executive at the New York Post make any
6    offensive comment about your race?
7         MR. THOMPSON:  Objection.
8    A    When you say "executive," who do
9    you mean?
10    Q    Any executive.
11         Have you -- well, you tell me.
12         I mean, do you not know what an
13    executive is?
14    A    Do you mean editors?
15    Q    It could be someone other than an
16    editor.  Anyone -- have you heard -- have
17    you heard any editor or executive at the New
18    York Post or News Corp. make any offensive
19    comment about your race?
20         MR. THOMPSON:  Objection.
21    Asked and answered.
22         MS. LOVINGER:  It hasn't been
23    answered.
24         MR. THOMPSON:  Asked and
25    answered.  Repeatedly.

Page 139

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2         MS. LOVINGER:  Repeatedly asked
3    but not answered yet.
4         MR. THOMPSON:  Asked and
5    answered.  Objection.
6    A    I said I can't say.
7    Q    Well, that's really a yes or no
8    question.
9         When you say you can't say --
10    A    I can't say that I've heard any
11    other editors or executives for the New York
12    Post or News Corp. use a racial epithet in
13    my presence.
14         MS. LOVINGER:  Okay.  It's 1:00
15    so we'll go off the record for lunch.
16         MR. THOMPSON:  Okay.
17         THE VIDEOGRAPHER:  That is the
18    end of Tape Number 2.  The time is
19    1:02 p.m.  We're off the record.
20         (A luncheon recess was
21    taken at 1:02 p.m. to 2:10 p.m.)
22    A F T E R N O O N  S E S S I O N
23    IKIMULISA LIVINGSTON,
24    resumed, having been previously
25    duly sworn, was examined

Page 140

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2    and testified further as follows:
3    CONTINUED EXAMINATION BY MS. LOVINGER:
4         THE VIDEOGRAPHER:  This is the
5    start of Tape Number 3.  The time is
6    now 2:10 p.m.  We're now back on the
7    record.
8    BY MS. LOVINGER:
9    Q    Ms. Livingston, this morning you
10    testified that you complained once to Human
11    Resources and that was back in December of
12    2009; is that correct?
13    A    Yes.
14    Q    And specifically on December 3,
15    2009, you sent an e-mail to Amy Scialdone of
16    Human Resources which stated the following:
17    "As a reporter at the New York Post, I've
18    been discriminated against due to my race
19    and my gender.  For example, I was removed
20    from my beat as the Queens Court's reporter
21    because I'm a black woman.  I was told I
22    would have a desk at the office and there
23    would be opportunities to write.  That has
24    not happened."
25         Was that the e-mail you sent to Amy

Page 141

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2    Scialdone?
3    A    Yes, I believe that's correct.
4    Q    After you sent that e-mail, Amy
5    Scialdone responded the following day
6    suggesting that you set up a meeting to
7    discuss your concerns.
8         Do you remember that?
9    A    Yes, I remember that.
10    Q    And do you recall meeting with HR
11    to discuss your e-mail complaint?
12    A    Yes, I do.
13    Q    On December 9, 2009, you met with
14    Jennifer Jayne, Kristin Kelly, who were also
15    in Human Resources at the New York Post
16    during this time.
17         Do you remember that meeting?
18    A    I thought -- I believe Jennifer
19    Jane told me her title was with News Corp.
20    Q    That her title was with News Corp.?
21    A    With News Corp.  She was like HR
22    for News Corp.
23    Q    Do you know who Kristin Kelly was?
24    A    She was the young woman who typed
25    up the notes.

Page 190

IKIMULISA LIVINGSTON

1
2   Q    Did you have a desk in January
3  2009?
4   A    No, I did not.
5   Q    Did you have a desk in the early
6  part of February 2009?
7   A    No, I didn't.
8   Q    But the reason why you didn't have
9  a desk was because you complained to
10  Michelle Gotthelf, who agreed with you, in
11  mid February 2009; that's your testimony?
12   A    I'm saying, my testimony, I'm
13  telling you that I was told I would have a
14  desk in December of 2008.
15       When Michelle demoted me, she said
16  I would get a desk and I would get a phone
17  thereby getting all the resources that my
18  white counterparts would have.  I would be
19  in the office sometimes, I would not always
20  be out in the street or in the field.
21       So that didn't happen in December
22  and didn't happen in January.
23       I still thought at some point there
24  would be a desk forthcoming, but after I
25  complained about the cartoon being racist,

Page 191

IKIMULISA LIVINGSTON

1
2  none of that was forthcoming.  I continue to
3  be denied that.  And I also received this
4  letter of warning, this written warning as
5  well as the evaluation that I believe is
6  also discriminatory against me.
7   Q    Did Michelle Gotthelf tell you when
8  you would get a desk in the newsroom?
9   A    No, she didn't.
10   Q    Tell me who are your white
11  counterparts who have desks.
12       I want to hear the names of
13  everyone who is a general assignment
14  reporter who has a desk at 1211.
15   A    I know that at times Lorena has
16  been at the office working at a desk and
17  having access to a telephone.  Amber
18  Sutherland had a desk.  Rich Calder had a
19  desk.  Ed Robinson had a desk.
20   Q    When you say "had a desk," what
21  time period are you talking about, because
22  you once had a desk; isn't that right?
23   A    Well, yes.  Once I did have a desk
24  and that was taken away and given to a white
25  woman.

Page 192

IKIMULISA LIVINGSTON

1
2       But Ed Robinson, I referred to him
3  as having had a desk because he no longer
4  works for the Post.
5   Q    So when you say "they're working at
6  a desk," does that mean that they have a
7  desk exclusively assigned to them?  Is that
8  your understanding?
9   A    I don't know if it was exclusively
10  assigned to them.
11       I just know that there were periods
12  when I know that they were in the office
13  working at a desk and I was denied a desk.
14  And in fact, I was essentially banned from
15  the newsroom because I was not allowed in
16  the newsroom.  And the one period of time
17  when I did come into the newsroom,
18  Greenfield saw me and asked me a hostile
19  way, "What are you doing here?"
20   Q    Okay.  Let's talk about the
21  banned --
22       But one question: isn't it the fact
23  that many white general assignment reporters
24  do not have desks or phones?
25   A    I don't know.  I know that some do

Page 193

IKIMULISA LIVINGSTON

1
2  have desks and phones.
3       And as a senior reporter who's been
4  at the Post for nearly 15 years, who was
5  promised a desk, who was told at the time of
6  my demotion in December 2008 by Michelle
7  Gotthelf, the Metropolitan editor of the New
8  York Post, that I would have a desk and I
9  would have telephone and I would sometimes
10  be in the office writing stories and not
11  always in the street, in the field, I took
12  that to mean that I would receive a desk and
13  that I would receive a telephone and that
14  sometimes I would be in the office.
15   Q    Did Ms. Gotthelf ever tell you that
16  you would have a desk that no one else could
17  sit in but you?
18   A    She told me I would have a desk and
19  she told me I would have a telephone.
20   Q    Tell me when you came to the office
21  and were denied a seat.
22       Let's review the dates that
23  happened.
24       MR. THOMPSON:  Objection.
25   A    I can't give you an exact date of

IKIMULISA LIVINGSTON

1
2    when I went into the office, and I can't
3    say -- well, I can say that I do not have a
4    desk in the office and I do not have a
5    telephone.
6        Q    You do not have a desk that's
7    exclusively assigned to you, but has there
8    ever been a time when you showed up at the
9    newsroom and you were denied a place to sit?
10       A    I'm essentially not allowed in the
11   newsroom.  And the very infrequent times
12   when I have been permitted to go into the
13   newsroom after having called in advance to
14   say that I'm done with my notes, can I come
15   into the newsroom and write the story, I was
16   provided with a space, a desk and a computer
17   to write the story that I was working on.
18       Q    So you are allowed in the newsroom;
19   isn't that right?
20       A    I had to call and basically be
21   permitted into the newsroom.
22       Q    When you say you are essentially
23   not allowed in the newsroom, has any editor
24   ever told you that you were not allowed to
25   come into the newsroom?

IKIMULISA LIVINGSTON

1
2        A    Michelle did not tell me I was not
3    allowed to come into the newsroom; Dan
4    didn't tell me I wasn't allowed to come into
5    the newsroom.  However, when I show up in
6    the newsroom and Dan looks at me and says in
7    a hostile way, "What are you doing here,"
8    that's both humiliating and demoralizing and
9    degrading.  And as someone who worked at the
10   Post longer than Michelle and longer than
11   Dan Greenfield, it's incredulous.
12       Q    So the answer to my pending
13   question is no?
14           The question is:  When you say you
15   were essentially not allowed in the
16   newsroom, has any editor ever told you that
17   you were not allowed to come into the
18   newsroom?
19           MR. THOMPSON:  Objection.  What
20   question are you asking?  You just
21   asked her two questions.  Which one
22   do you want her to answer?
23           MS. LOVINGER:  There's one
24   question.
25           MR. THOMPSON:  No.  There's two

IKIMULISA LIVINGSTON

1
2    questions you just asked her.
3        Q    The question is:  Has any editor,
4    Ms. Livingston, ever told you that you were
5    not allowed to come into the newsroom?
6        A    I stated that Michelle and Dan,
7    neither of them actually came out and told
8    me, "No, do not come into the newsroom."
9        Q    Has any other editor ever told you
10   that you were not allowed to come into the
11   newsroom?
12       A    I have not been directly told by
13   an editor not to come into the newsroom.
14       Q    Are you aware of any New York Post
15   policy with respect to who gets a desk and a
16   telephone?
17       A.   No.
18       Q    Michelle Gotthelf told you that she
19   tried to get you a desk but she had to look
20   into it; isn't that right?
21       A.   No.
22       Q    Do you think you are entitled to a
23   desk because you've been working at the New
24   York Post for almost 15 years?
25       A    It's not about entitlement.

IKIMULISA LIVINGSTON

1
2           Michelle told me that I would have
3    a desk.
4        Q    But you referenced a few minutes
5    ago that you've been working at the Post for
6    almost 15 years, so I'm asking if you think
7    you are entitled to have a desk exclusively
8    for your use and no one else's use because
9    you've been working at the Post for almost
10   15 years.
11       A    I did not say that.
12       Q    So is the answer no?
13       A    I said that Michelle told me I
14   would have a desk and a phone and that I
15   would sometimes be in the newsroom, not
16   always out in the street or in the field
17   reporting.  I would have opportunities to
18   write.
19           She told me this.  I had no other
20   reason but -- no other -- why wouldn't I
21   believe her when she told me that.
22       Q    Is it your testimony that you don't
23   have other opportunities to write as a
24   general assignment reporter?
25       A    If the Post editors didn't on a

Page 198

IKIMULISA LIVINGSTON

1
2  very frequent -- if the Post editors didn't
3  frequently turn down or simply ignore a
4  story idea that I pitched, then I suppose
5  there would be an opportunity to write news
6  stories from my home.
7      Q    Explain to me how having a desk
8  that's exclusively for your use would give
9  you more opportunities to write as a general
10  assignment reporter.
11      A    Having a desk -- and I'm not saying
12  exclusively for me, but having a desk,
13  having the desk that I was promised, would
14  enable me to be in the office sometimes and
15  to have access to the library, to the
16  archives, the library personnel, to my
17  colleagues, to the wire services, to the
18  atmosphere of generating news and writing
19  news stories.
20          Those things would help in my
21  ability to pitch stories.  I would be able
22  to pitch more story ideas.
23      Q    Did you ever try to come in on the
24  weekend?
25      A    Would I try to come in on the

Page 199

IKIMULISA LIVINGSTON

1
2  weekend on my own time.
3      Q    On your own time.
4      A    And what would I be doing on the
5  weekends?
6      Q    I'm asking you if you ever -- do
7  you ever come in to the newsroom on the
8  weekends?
9          MR. THOMPSON:  Objection.
10      A    Would this be my donating time to
11  the New York Post?
12      Q    I'm asking the questions.  It's yes
13  or no.
14          Do you ever come into the newsroom
15  on the weekends?
16      A    I have occasionally come through
17  the newsroom on the weekends.
18      Q    Do you ever come into the newsroom
19  in the evening hours?
20      A    I have on occasion come into the
21  newsroom during evening hours.
22      Q    When you work outside of your
23  normal 40 hours, do you put in for overtime?
24      A    Yes, I do.
25      Q    So when you say that you would be

Page 200

IKIMULISA LIVINGSTON

1
2  "donating time to the New York Post," what
3  do you mean by that?
4          You don't get paid if you were
5  working extra hours?
6      A    You didn't ask me if I would be
7  working on weekends and on the evenings.
8      Q    Isn't it true that the New York
9  Post librarian will get you any story you
10  ask for as an employee of the New York Post?
11      A    I've called the librarian and I've
12  had them send me information on my
13  cellphone.
14          Sometimes I can open a pdf file on
15  my cellphone, sometimes I cannot.
16      Q    You testified earlier you have a
17  laptop computer.
18          Why do you need to open up files
19  exclusively on your cellphone?
20      A    My laptop computer is my laptop
21  computer.  I don't necessarily take it with
22  me all the time.
23      Q    Isn't it true that you can come in
24  and use the New York Post library whenever
25  you want?

Page 201

IKIMULISA LIVINGSTON

1
2      A    I can use the library on my own
3  time?  Is that what you are asking me, if I
4  can use the library on my own time?
5      Q    Can you come in and use the New
6  York Post library when you need resources
7  that the library can provide?
8      A    So this would be me coming in to
9  the office on my own time to access -- to
10  just sit at a desk and ask someone for a
11  logon for the computer and then access the
12  archives, all on unpaid time?
13      Q    I'm not sure what you mean by
14  "unpaid time."  Most people have a job, they
15  want to get it done and they get it done.
16          I don't know what you mean your own
17  time versus -- I'm not sure what other time
18  you are referring.
19          But the question is:  Isn't it true
20  that you are free to come use the library at
21  the New York Post whenever you want?
22      A    When I'm on the clock for the New
23  York Post, no, I'm not free to come in to
24  the newsroom and go to the library and not
25  access the library.

51 (Pages 198 to 201)

Page 206

IKIMULISA LIVINGSTON

1  before the break that when you came into the
2  newsroom on one occasion Dan Greenfield
3  asked you what you were doing there.
4         Can you tell me when that took
5  place?
6      A   I don't know the date that that
7  took place.
8      Q   Do you know what year?
9      A   I don't recall which year exactly.
10 It wasn't this last year.
11     Q   Was it in 2010?
12     A   I believe it was before I filed the
13 lawsuit.
14     Q   Tell me what Dan Greenfield said to
15 you.
16     MR. THOMPSON:  Objection.
17     A   I think I said a number of times
18 what he said to me.
19     Q   Well, you testified earlier that
20 Ms. Gotthelf confronted you and asked you
21 what you were doing in the newsroom.
22         Do you remember what time of day
23 this conversation took place?
24     A   It would have been in the

Page 207

IKIMULISA LIVINGSTON

1  afternoon, I believe.
2      Q   Do you remember if you had just
3  finished an assignment?
4      A   I had had an assignment somewhere
5  in the area.
6      Q   Do you know if it was the early
7  afternoon?
8      A   I don't know if it was early
9  afternoon or late afternoon.
10     Q   Could it have been late in the day?
11     A   I don't know.
12     Q   Do you recall why you were coming
13 in to the newsroom on that particular day?
14     A   I think I was just stopping in to
15 pick up my mail, since if I do have any mail
16 no one actually sends it to me, and pick up
17 notepads and supplies.  And those things
18 aren't sent to me either.
19     Q   Had you finished your assignment
20 when you came into the newsroom?
21     A   I think I stated that I had had an
22 assignment in the area, so yes, if I was in
23 the newsroom, it would have been after I had
24 finished whatever reporting I needed to do.

Page 208

IKIMULISA LIVINGSTON

1      Q   I know you had testified you had
2  an assignment somewhere in the area, but it
3  wasn't clear if it was before -- if you had
4  come before it was complete.
5      A   It would have been afterwards, yes.
6      Q   Did you tell Dan Greenfield that
7  you had already finished your assignment?
8      A   I told him I was just picking up
9  supplies.
10     Q   And then what did he say?
11     A   I don't remember -- I don't
12 remember if he said anything at all.
13     Q   So basically he asked what you were
14 doing in the newsroom and you said you were
15 picking up supplies.  That was the extent of
16 the conversation?
17     A   From what I remember, yes.
18     Q   Was that the only time that Dan
19 Greenfield confronted you when you were in
20 the newsroom, when you came into the
21 newsroom?
22     A   That was the only time I recall
23 where he -- yes, where he asked me in a
24 hostile way, "What are you doing here?"

Page 209

IKIMULISA LIVINGSTON

1  Yeah, that was the only time.
2         But, mind you, I haven't been in
3  the newsroom that often.
4      Q   When you say you haven't been in
5  the newsroom that often, do you mean since
6  you returned to being a general assignment
7  reporter?
8      A   That means since I had been demoted
9  from my Queens Courthouse beat, yes.
10     Q   And is that the same time when you
11 became a general assignment reporter?
12     A   That was when I was reassigned to
13 being a GA.
14     Q   And that was back in December 2008?
15     MR. THOMPSON:  Objection.
16     A   Yes.
17     Q   So it's your testimony that you
18 haven't come into the newsroom very often
19 since December 2008; is that right?
20     A   That's correct.  In my -- working,
21 yes.
22     Q   What was your job title in the
23 calendar year 2009?
24     A   2009?  General assignment reporter.

Page 210

IKIMULISA LIVINGSTON

1
2   Q    And how about in 2010?
3   A    GA.
4   Q    Is that how -- by the way, is that
5   the lingo, is it called GA?
6   A    "GA" is short for general
7   assignment.
8   Q    Is that the same thing as a runner
9   reporter?
10   A    I don't know where this term
11   "runner reporter" came from, but I'm a
12   general assignment reporter.  I go out and I
13   report on things going on in the street, in
14   the field, and if there is occasion for me
15   to write up my story or write my notes or to
16   send my notes, that's what I do.
17   Q    Well, I've heard the term used
18   "runner reporter."
19       Do you know what that is?
20   A    I know in the evaluations I
21   received, in at least one of them they have
22   referred to me as a "runner," but I know
23   that I wrote in my rebuttal to that that I'm
24   a reporter.  I'm a general assignment
25   reporter.  I'm not runner.

Page 211

IKIMULISA LIVINGSTON

1
2   Q    Okay.  So you were a general
3   assignment reporter in 2009 and 2010.  Were
4   you also a GA in 2011?
5   A    That's correct.  I'm doing the same
6   thing.
7   Q    And when you say that since 2008
8   you haven't been in the newsroom that often,
9   how many times a month on average would you
10   say you come into the newsroom?
11   A    A month?
12   Q    Yes.  Like on average, any given
13   month.
14   A    While I'm working?  There certainly
15   have been months when I don't come into the
16   newsroom at all.
17   Q    And then what's the most times
18   you'd say you've come into the newsroom
19   since your return to the general assignment
20   reporter position?
21       MR. THOMPSON:  Objection.
22   A    I don't really know.  You are
23   saying on a monthly basis?  Are you saying
24   overall.
25   Q    Yeah.  In any given month, would

Page 212

IKIMULISA LIVINGSTON

1
2   you say you come in five times a month, ten
3   times a month?
4   A    Certainly less than ten times a
5   month.
6   Q    On average, how many bylines do you
7   have in the paper on any given month?
8   A    I do not know.
9   Q    Do you ever calculate how many
10   bylines you have per quarter, per year?  Is
11   that something you look at?
12   A    At one point, I did do a search and
13   my byline has appeared thousands of times in
14   the New York Post.
15   Q    During your 15 years of employment?
16   A    That's correct.
17   Q    So would you agree that you have a
18   lot of stories that do get printed in the
19   New York Post if you had thousands of
20   bylines?
21   A    I had a lot of stories that did get
22   printed in the New York Post.
23       Certainly not as many in the last
24   few years.
25       Not counting 2008 when I had more

Page 213

IKIMULISA LIVINGSTON

1
2   front-page stories than certainly I ever had
3   before and more stories than I think I've
4   written in previous years.
5       I did a lot of work in 2008.  I
6   worked on a lot of stories.
7   Q    And was that the year you covered
8   the Sean Bell trial?
9   A    That's correct.
10   Q    How many front pages did you get --
11   did you have in 2008?
12   A    I don't know exactly how many front
13   pages I had, but for the most part just
14   about every day of the trial, the story was
15   on the front page.  With the exception of
16   Eliot Spitzer, I think.
17   Q    Do you know how many front pages
18   you've had at the New York Post?
19   A    No, I don't.
20   Q    That's not something you count, I
21   guess?
22   A    I really -- I framed my first front
23   page story that I did.  It was on Darryl
24   Strawberry.  And I did some other stories
25   that I was very proud of that I framed that

54  (Pages 210 to 213)

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2  were front-page stories that were generated
3  by me early on.
4        But since then I haven't framed any
5  front pages.
6     Q    Can you tell me what your day is
7  like as a general assignment reporter?
8        MR. THOMPSON:  Objection.
9     Q    Do you understand the question?
10    A    My days vary.
11    Q    Okay.  Well, you wake up and where
12  do you go on a workday?
13        MR. THOMPSON:  Objection.
14    A    It really depends.
15        Some days I have an overnighted, so
16  I get up and I go to whatever assignment I
17  was overnighted to.
18        Other days I call in and check in
19  with the desk and I'm either assigned
20  something and I go or and I'm told they will
21  call me back and give me an assignment.
22    Q    What does it mean -- what do you
23  mean when you say you were overnighted?
24    A    Overnighted is when someone calls
25  me the night before my shift begins.  Let's

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2  say a Sunday when I'm off, someone will call
3  me in the evening or early afternoon, you
4  know, sometime during the day or evening,
5  and give me an assignment for the next day.
6     Q    How often does that happen?
7     A    Happens pretty frequently.
8     Q    What area would you say you cover,
9  if there was a particular area?
10        MR. THOMPSON:  Objection.
11    Q    Geographically.
12        So let me withdraw that and
13  rephrase the question.
14        Do you cover any particular
15  geographic area as a general assignment
16  reporter with the New York Post?
17    A    I am mostly sent on stories that
18  are in Queens, Brooklyn, The Bronx,
19  Manhattan.  Sometimes I'm sent to New
20  Jersey.  Sometimes I'm sent to Connecticut.
21        I've been sent to Pennsylvania.
22  I've been sent to Texas, Mississippi, New
23  Orleans.
24    Q    Have you reported in any stories
25  that require air travel in the last year?

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2     A    In the last year, no.
3     Q    Do you seek out stories that
4  require air travel?
5        MR. THOMPSON:  Objection.
6     A    Have I asked to fly somewhere for a
7  story?
8     Q    Yes.
9     A    No.
10    Q    Do you enjoy travel for work?
11        MR. THOMPSON:  Objection.
12    A    There was a time when I did -- the
13  times I did travel for work, I enjoyed.
14    Q    Have you expressed an interest in
15  traveling to your supervisors?
16    A    Are you saying recently?
17    Q    Recently, in the last two years.
18    A    I have not come to my supervisors
19  and said I want to travel, no.
20    Q    You work 9 to 5, correct?
21    A    Correct.
22    Q    And you don't work weekends now; is
23  that correct?
24    A    I do not work weekends now.
25    Q    And you wanted this schedule; is

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2  that right?
3     A    This is the schedule that was given
4  to me when I was moved from the
5  Sunday-through-Thursday shift so I can cover
6  the Sean Bell trial, so it was 9 to 5 and it
7  was Monday through Friday.
8     Q    And you are happy with that
9  schedule, though; isn't that right?
10    A    Yes, I like that schedule.
11    Q    Are you aware of the fact that you
12  are the only full-time general assignment
13  reporter at the New York Post who doesn't
14  work weekends and works daylight hours?
15    A    No.  I'm not really privy to other
16  people's schedules.
17    Q    You're not privy to what other
18  people are doing as general assignment
19  reporters at the Post?
20        MR. THOMPSON:  Objection.
21    A    I'm not privy to other reporters'
22  schedules.
23    Q    Prior to assignment to the Queens
24  Courthouse, you were also a general
25  assignment reporter; is that right?

55 (Pages 214 to 217)

Page 226

IKIMULISA LIVINGSTON

1  IKIMULISA LIVINGSTON
2  the story and I would turn in that length.
3  And some time after I turned the story in,
4  they would decide on numerous occasions that
5  they wanted a shorter story, and therefore
6  they would either cut it down and rewrite it
7  in the process of cutting.
8      MS. LOVINGER:  Can the court
9  reporter just read back the last
10  question because I don't think we
11  have an answer still.
12      (Requested portion of record read:
13      "Q. Ms. Livingston, is it your
14  testimony that the majority of the
15  stories you wrote while you were a Queens
16  Courthouse reporter were not rewritten by
17  one of your editors?")
18      (End of read-back.)
19  A   I thought I answered that.
20  Q   Well, I don't want to summarize
21  your testimony, but your last answer was
22  basically in the end you said, "They would
23  decide on numerous occasions that they
24  wanted a shorter story and therefore they
25  would cut it down and rewrite it in the

Page 227

IKIMULISA LIVINGSTON

1  IKIMULISA LIVINGSTON
2  process of cutting."
3      So are you saying that the majority
4  of your stories were rewritten, for whatever
5  reason, while you were a Queens Courthouse
6  reporter?
7      MR. THOMPSON:  Objection.
8  A   I'm saying that on occasions --
9  Q   It's a yes or no question.
10      I mean, you could explain the
11  process and you've actually already done
12  that, but you're not answering the question.
13      And this is a yes or no question.
14      MS. LOVINGER:  Do you want to
15  read it back.
16      MR. THOMPSON:  Objection.  Are
17  you asking does she want it read
18  back?
19      MS. LOVINGER:  I'm asking for
20  it to be read back because we're
21  wasting ten minutes on one question.
22      MR. THOMPSON:  That's fine.
23      MS. LOVINGER:  It's
24  frustrating.
25      MR. THOMPSON:  It's frustrating

Page 228

IKIMULISA LIVINGSTON

1  IKIMULISA LIVINGSTON
2  you keep asking the same question.
3      MS. LOVINGER:  Get an answer,
4  it's yes or no, and we can move on.
5  We don't care what the answer is,
6  just we want the question answered.
7      MR. THOMPSON:  She's answered
8  it.
9      MS. LOVINGER:  Okay.  I didn't
10  hear the yes or no.
11      Could the court reporter please
12  read back the last question.
13      (Requested portion of record read:
14      "Q. Ms. Livingston, is it your
15  testimony that the majority of the
16  stories you wrote while you were a Queens
17  Courthouse reporter were not rewritten by
18  one of your editors?")
19      (End of read-back.)
20  A   I'm not saying that they were
21  rewritten.  I said that they were cut and in
22  the process of cutting them, they would make
23  changes to the story.
24      And cutting them means you have to
25  essentially condense all of the information

Page 229

IKIMULISA LIVINGSTON

1  IKIMULISA LIVINGSTON
2  there to a shorter story.
3  Q   Well, do they condense it by
4  reducing the font or do they have to
5  actually rewrite it?
6  A   I'm not aware of them reducing the
7  font.
8  Q   So basically, the stories do have
9  to be rewritten; is that your testimony?
10  A   If they are cutting the stories
11  from 12 inches down to 3 inches, then, yes,
12  you are rewriting what was in 12 inches down
13  to 3 because obviously you can't run
14  12 inches in a 3-inch space.
15  Q   Ms. Livingston, you testified
16  earlier that when your assignment was
17  changed from the Queens Courthouse reporter
18  position to a general assignment reporter,
19  your salary did not change; is that right?
20  A   Yes.  When I went from going GA to
21  the Queens Courthouse, my salary did not
22  change.
23  Q   And when you went from Queens
24  Courthouse reporter back to a general
25  assignment reporter in December 2008, your

58  (Pages 226 to 229)

IKIMULISA LIVINGSTON
1
2 salary also didn't change; is that right?
3 A That's correct. My base salary did
4 not change.
5 Q So why do you believe that Billy
6 Gorta's salary should have been reduced when
7 he went from being an editor to the Queens
8 Courthouse reporter?
9 A I just stated that Billy Gorta
10 doing the same job, actually doing less, but
11 in the same job that I was in in the same
12 position, he was making an editor's salary
13 while I was not. And I know that an
14 editor's salary is more than mine.
15 Q And are you aware of the fact that
16 your Queens Courthouse reporter salary is
17 higher than the salary of other general
18 assignment reporters?
19 MR. THOMPSON: Objection.
20 A I don't have a list of what other
21 reporters make.
22 Q You were never an editor at the New
23 York Post; is that right?
24 A No, no. I know there are occasions
25 when -- never mind. No, I was never an

1 IKIMULISA LIVINGSTON
2 editor at the New York Post.
3 Q Are you unhappy with the terms and
4 conditions of your employment at the New
5 York Post?
6 A I'm unhappy about the hostile and
7 racial environment that I work in, yes.
8 Q In the last five years, have you
9 sought employment elsewhere?
10 A Last five years, yes.
11 Q Where have you applied for other
12 jobs?
13 A I've applied at universities. I've
14 applied at The New York Times. I've applied
15 for public relations jobs. That sort of
16 thing.
17 Q And what was the last one? Public
18 relation job?
19 A That's correct.
20 Q Someone told me recently you don't
21 apply for jobs at The New York Times.
22 But how did you find out about
23 an opening at The New York Times?
24 A I didn't find out about an opening.
25 I attended a job conferences and The New

1 IKIMULISA LIVINGSTON
2 York Times had a booth there, a recruiter
3 there, and I submitted my resume.
4 Q For what type of position did you
5 submit your resume?
6 A For a reporter position.
7 Q When was this job conference?
8 A I don't remember which conference
9 it was. It was an NABJ conference.
10 Q NABJ?
11 A NABJ stands for National
12 Association of Black Journalists.
13 Q Where was this NABJ conferences
14 held?
15 A NABJ has conferences in different
16 cities every year.
17 Q Well, when was the last time you
18 went to the NABJ conference?
19 A I attended the conference last
20 year.
21 Q Where was it held last year?
22 A Philadelphia.
23 Q So that was in 2011. What month
24 was that?
25 MR. THOMPSON: Objection.

1 IKIMULISA LIVINGSTON
2 Which question are you asking? What
3 year or what month?
4 MS. LOVINGER: Well, she said
5 it was 2011.
6 Q Do you know what month in 2011 you
7 attended the NABJ conference in
8 Philadelphia?
9 A It's in the summer, so it's usually
10 July -- either in July or August. I'm not
11 sure which one right now. July or August, I
12 believe.
13 Q Did you apply to any other news
14 organization other than The New York Times
15 at the NABJ conference in 2011?
16 A I didn't say I applied for The New
17 York Times at the 2011 conference.
18 Q You submitted a resume?
19 A Not at that conference.
20 Q Oh, not at that conference.
21 Well, okay. We'll back up in a
22 minute but in 2011, did you submit a resume
23 or application for any positions either
24 during or after the NABJ conference?
25 A During the conference I attended

Page 246

IKIMULISA LIVINGSTON

1
2    A    What other reason?
3    Q    Yeah.
4    A    Wanted to talk to them.
5    Q    About story ideas or just social
6    reasons?
7    A    It depends.
8    Q    And you do communicate with other
9    New York Post employees during the day,
10   isn't that right?
11   A    Not on a daily basis unless it's a
12   story that we're working on together.  And a
13   lot of times I don't actually know who the
14   other reporters are working on a story, on
15   the same story I'm working on.
16   Q    But you are free to call any New
17   York Post employee you want during the day,
18   right?
19       MR. THOMPSON:  Objection.
20   A    Is this the way I'm supposed to be
21   speaking with my colleagues, is just by
22   randomly calling someone?  Because that
23   doesn't really seem like an organic way
24   to --
25   Q    Are you asking me a question?

Page 247

IKIMULISA LIVINGSTON

1
2    A    I apologize if I'm asking you a
3    question.  I don't understand the context of
4    your question.
5    Q    Are you not free to call the
6    newsroom at any point during the day?
7       MR. THOMPSON:  Objection.
8    Q    Is that right?
9    A    I'm free to call (212)930-8500
10   whenever I'd like, yes.
11   Q    And someone will answer the phone,
12   right?
13   A    And someone will answer the phone,
14   yes.  Sometimes someone will answer the
15   phone.
16   Q    Now, doesn't the New York Post
17   reimburse a part of your cellphone bill?
18   A    Yes.  They reimburse me two-thirds
19   of the bill.  However, I actually paid for
20   the device.
21   Q    Well, you also use the device for
22   personal reasons; isn't that right?
23   A    The device is my phone, yes.
24   Q    So it's contemplated that you'll
25   use your phone for work-related reasons,

Page 248

IKIMULISA LIVINGSTON

1
2    correct?
3    A    Yes, in order to give my notes to a
4    rewrite person, yeah.  I use my phone to
5    relay those notes.
6    Q    And your phone enables you to be
7    contacted when you are out running on
8    assignments, correct?
9    A    That's correct.  It allows the
10   editors to reach out to me.
11   Q    And it's your cellphone; therefore,
12   you can be reached immediately.  Is that
13   right?
14   A    Yeah, usually.
15   Q    And other general assignment
16   reporters also use personal cellphones;
17   isn't that right?
18   A    I think most people in this day and
19   age have cellphones, yeah, including other
20   general assignment reporters.
21   Q    But the question was:  Other
22   general assignment reporters also use their
23   personal cellphones to carry out their
24   reporting responsibilities; isn't that
25   right?

Page 249

IKIMULISA LIVINGSTON

1
2    A    I believe other reporters use their
3    cellphones, yes.
4    Q    Ms. Livingston, you testified
5    earlier that you've heard Ms. Gotthelf and
6    Mr. Greenfield use the term "low rent"; is
7    that right?
8    A    That's correct.
9    Q    Now, Ms. Gotthelf and
10   Mr. Greenfield never said that stories about
11   African-Americans and Latinos are low rent;
12   isn't that right?
13   A    No, not at any time did they come
14   right out and say, "Stories about black
15   people and Latinos are low rent."  They just
16   refer to stories about African-Americans and
17   Latinos as low rent.
18   Q    So Ms. Livingston, you are saying
19   that Ms. Gotthelf and Mr. Greenfield
20   described some stories that happened to be
21   about African-Americans and/or Latinos as
22   low rent; is that right?
23   A    On a frequent basis, yes.
24   Q    Are these stories that Ms. Gotthelf
25   and Mr. Greenfield referred to as low rent

63  (Pages 246 to 249)

Page 298

```
 1        IKIMULISA LIVINGSTON
 2   for them to remove me and further
 3   demonstrates the pattern of racism that
 4   continues to exist at the New York Post.
 5        Q    Did you do anything different in
 6   terms of your performance after you received
 7   this e-mail from Ms. Gotthelf?
 8        MR. THOMPSON:  Objection.
 9        A    Did I do anything different -- I'm
10   not quite sure I understand.
11        Q    Did you do anything different in
12   terms of how you performed your job at the
13   Queens Courthouse after you received this
14   e-mail from Michelle Gotthelf?
15        A    I continued to look for good and
16   interesting, newsworthy lawsuits in the
17   civil courthouse.
18        I continued to cover whatever
19   criminal cases that were ongoing at the
20   Queens County Courthouse.  I continued to
21   check the files for various defendants.  I
22   continued to work on whatever stories were
23   ongoing in the courthouse.
24        I was consistent in terms of being
25   persistent in looking for good stories for
```

Page 299

```
 1        IKIMULISA LIVINGSTON
 2   the Post and pitching good stories.
 3        Q    Well, you know, you just described
 4   everything you continued doing.
 5        But my question is:  Did you do
 6   anything different in terms of how you
 7   performed your job at the Queens Courthouse
 8   after you received this e-mail from Michelle
 9   Gotthelf?
10        That's a yes/no question.
11        Did you do anything different?
12        A    I continued to do my job.
13        Q    Is that a no?
14        A    I did my job.
15        Q    So did you do --
16        MS. LOVINGER:  I'll ask
17        Mr. Thompson if he can instruct the
18        witness to answer the question.
19   BY MS. LOVINGER:
20        Q    Did you do anything different in
21   terms of how you performed your job at the
22   Queens Courthouse after you received this
23   e-mail from Michelle Gotthelf?
24        A    I spent more time at the Sutphin
25   Courthouse look for lawsuits.
```

Page 300

```
 1        IKIMULISA LIVINGSTON
 2        Q    The what courthouse?
 3        A    Sutphin.
 4        Q    The what courthouse?
 5        A    Sutphin.
 6        Q    Okay.  Is that the Queens
 7   Courthouse?
 8        A    It's the civil -- where civil
 9   lawsuits are filed.
10        Q    Did you do anything else different?
11        A    And I pitched them good story
12   ideas.
13        Q    When you pitched stories to
14   Michelle Gotthelf and Dan Greenfield, was it
15   your practice to tell them the race of the
16   individuals involved in the stories?
17        A    I'm not sure I put in race for
18   certain individuals or for certain story
19   pitches that I presented.
20        Q    So when Ms. Gotthelf and
21   Mr. Greenfield rejected --
22        MS. LOVINGER:  I'm going to
23        withdraw that question.
24        Q    Shortly after Col Allan became
25   editor in chief in 2001, he fired six
```

Page 301

```
 1        IKIMULISA LIVINGSTON
 2   editors at the Post; isn't that correct?
 3        A    I don't know the exact number of
 4   editors but I know he fired a number of
 5   editors including Lisa Baird, who had been
 6   the only African-American editor on the
 7   Metro desk.
 8        And no one has filled her position
 9   in terms of being an African-American on the
10   Metro desk.  And soon after she was fired
11   she died of cancer.
12        Q    And he also fired Stuart Marks?
13        A    Yes.
14        Q    And Col Allan also fired Jack
15   Newfield?
16        A    I believe that's correct.
17        Q    Col Allan also fired Jerry
18   Schmetterer.
19        A    Yes, he fired Jerry Schmetterer,
20   too.
21        Q    Col Allan also fired Michael Lewis
22   and Col Allan also fired Mark Kalish?
23        A    I remember Mark, yes.  I don't know
24   about the other guy.  I'm not really sure
25   about him.
```

76 (Pages 298 to 301)

1                    I. Livingston

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK
     ---------------------------------------x
4    AUSTIN FENNER and IKIMULISA LIVINGSTON,

5              Plaintiffs,

6         vs.                    09 CV 9832
                                 (BSJ)(RLE)
7
     NEWS CORPORATION, NYP HOLDINGS, INC.,
8    d/b/a THE NEW YORK POST and DAN
     GREENFIELD and MICHELLE GOTTHELF,
9
              Defendants.
10   ---------------------------------------x

11              CONTINUED VIDEOTAPED

12        DEPOSITION OF IKIMULISA LIVINGSTON

13              New York, New York

14              February 20, 2013

15

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 57653

Page 366

I. Livingston

1    wait in the line for the general public.
2    Q.   Okay.  But you might have to wait in a
3    line for people who had went through a separate
4    entrance?
5        Let me withdraw that.  Was there a
6    separate press entrance?
7    A.   No, there wasn't a separate press
8    entrance.
9    Q.   Okay.  But there was an entrance for
10   the -- for people other than the general public?
11   A.   Yes.
12   Q.   And sometimes there was a line at that
13   entrance?
14   A.   Usually there wasn't much of a line.
15   Sometimes there would be people in front of me.
16   Q.   When you worked at the Queens courts,
17   how -- how would you research cases about civil
18   filings?
19   A.   I would go to the Sutphin Boulevard
20   courthouse and look up -- look through -- look
21   through their filings on the computer system.
22   Q.   And --
23   A.   That would be the usual way to -- to
24   go about looking for stories, in general.

Page 367

I. Livingston

1        Sometimes I would have a lawyer source
2    who would present me with a story, with a case
3    that he had or she had.
4    Q.   And how often did you go to the civil
5    courthouse to review civil filings in say 2008?
6    A.   Oh, I -- I couldn't tell you.  I don't
7    know.  I don't remember.
8    Q.   How often did you go to the civil
9    courthouse during your time as a -- as the
10   Queens court reporter generally to research
11   civil filings?
12   A.   How many times?  I don't recall how
13   many times I would go.
14   Q.   Was it more or less than once a week?
15   A.   Sometimes it was more than once a
16   week.  Sometimes it was less than once a week.
17   Q.   So there were weeks that you didn't go
18   to the civil courthouse at all to research
19   filings?
20   A.   I don't recall if there were -- if
21   there was a single week that went by that I
22   didn't go to the courthouse.  However -- to the
23   Sutphin courthouse.  However, if there was --
24   actually, I just don't recall.

Page 368

I. Livingston

1    Q.   Do you have a TD Bank account?
2    A.   Yes, I do.
3    Q.   How long have you had a TD Bank bank
4    account?
5    A.   For several years.
6    Q.   Do you know what year you took that
7    out?
8    A.   I'm not 100 percent sure when I opened
9    that account.
10   Q.   Do you have any loans with TD Bank?
11   A.   No, I do not.
12   Q.   Did you say "no" or "now, I do not"?
13   A.   No, I do not.
14   Q.   Have you ever?
15   A.   No, I've never had a loan with TD
16   Bank.
17   Q.   Now, on your first day of deposition,
18   you testified that you had done mystery shopping
19   for companies called Shop 'n Chek and
20   Contemporary Staffing Solutions, do you recall
21   that?
22   A.   Yes, I do.
23   Q.   And when you mystery shopped for
24   Contemporary Staffing Solutions, you were

Page 369

I. Livingston

1    mystery shopping at TD Bank branches, correct?
2    A.   Yes, that's correct.
3    Q.   Did you mystery shop for any other
4    businesses when you were working for
5    Contemporary Staffing Solutions through that
6    company?
7    A.   Oh, yes.  Before TD Bank was TD Bank,
8    it used to be Commerce.
9    Q.   Other than TD Bank and Commerce Bank,
10   did you mystery shop at any other businesses
11   through your employment with Contemporary
12   Staffing Solutions?
13   A.   No.
14   Q.   You also mystery shopped for Shop 'n
15   Chek.  What companies did you mystery shop at
16   when you were working for Shop 'n Chek?
17   A.   For the most part, those would be
18   the -- the businesses would be mobile phone
19   locations and other locations.
20   Q.   What -- so did that include Verizon?
21   A.   Yes.
22   Q.   T Mobile?
23   A.   Yes.
24   Q.   AT&T?

Page 378

I. Livingston
1
2  go to the branch and go in and speak to the
3  personnel at the branch, correct?
4     A.   That's -- that's -- basically, what I
5  would do is I would perform a -- a shop.  So I
6  would either speak to a teller, do a teller
7  transaction, or perhaps speak to a customer
8  service representative.
9     Q.   And when you did a transaction, did
10 you do a real transaction?  In other words, did
11 you carry out an entire transaction at TD Bank?
12    A.   Such as making a withdrawal?
13    Q.   Correct.
14    A.   Yes.
15    Q.   So you would go to a teller and maybe
16 take out $20, and that would be the transaction?
17    A.   That's correct.
18    Q.   Did you always do a transaction when
19 you mystery shopped?
20    A.   No, not always.
21    Q.   When you didn't do a transaction, what
22 would you do in the bank?
23    A.   I would speak to a customer service
24 representative.
25    Q.   Well, what would you speak about?

Page 379

I. Livingston
1
2     A.   I -- it depended on the kind of shop,
3  but I would ask them about perhaps their credit
4  cards, their credit card rates; I would ask them
5  about mortgages, what kinds of mortgages they
6  had, what kind of rates they had; I would ask
7  them about their savings accounts, what kinds of
8  interest rates they offered; maybe I would ask
9  them about a checking account, those sort of
10 things; auto loan.
11    Q.   And had you been instructed by
12 Contemporary Staffing Solutions on what kinds of
13 topics they wanted you to raise with customer
14 service representatives?
15    A.   There were a list -- there would
16 usually be a list of topics to discuss.
17    Q.   And these weren't necessarily topics
18 that you personally, Ms. Livingston, wanted to
19 do business with the bank on, right?
20       MR. PEARSON:  Objection.
21    Q.   You weren't looking for a mortgage
22 from TD Bank at the time that you talked about
23 mortgages, right?
24       MR. PEARSON:  Objection.
25    A.   Well, actually, there -- there was a

Page 380

I. Livingston
1
2  time when I did ask them about mortgages because
3  I was interested in a mortgage.
4     Q.   But there were times when you asked
5  them about mortgages when your sole purpose was
6  to do research at the banks, right, mystery
7  shop?
8        MR. PEARSON:  Objection.
9     A.   My sole purpose -- I'm sorry, what was
10 the question again?
11    Q.   There were times you talked to them
12 about mortgages when your sole purpose was to
13 mystery shop, right?
14       MR. PEARSON:  Objection.
15    A.   My purpose as a mystery is shop was to
16 evaluate the employee, so that's --
17    Q.   When you spoke to them about
18 mortgages, there were many times when you spoke
19 to them about mortgages with no intention of
20 taking out a mortgage, right?
21       MR. PEARSON:  Objection.
22    A.   I was evaluating them on their work,
23 so, no, there may not be -- I wasn't necessarily
24 interested in taking out a mortgage.
25    Q.   So you were posing as somebody who was

Page 381

I. Livingston
1
2  interested in taking out a mortgage, right?
3        MR. PEARSON:  Objection.
4     A.   I was performing a mystery shop.
5     Q.   You were pretending to be somebody who
6  was interested in a mortgage, but you weren't,
7  right?
8        MR. PEARSON:  Objection.
9     A.   I was simply performing a mystery
10 shop, which was the requirements of the mystery
11 shopping program.
12    Q.   And the requirements were that you
13 pretend to be something, to be interested in
14 something that you weren't actually interested
15 in, right?
16       MR. PEARSON:  Objection.
17    A.   I guess I'm not really sure how to --
18 how to answer that since I do bank at TD Bank,
19 so there are times when I am interested in the
20 things that they're telling me about.
21    Q.   But there are times that you were not
22 interested in the things that you were asking
23 about, correct?
24       MR. PEARSON:  Objection.
25    A.   For the most part, I was interested in

Page 382

1        I. Livingston
2   learning more about the topics that
3   I did ask them about.
4       Q.   You weren't interested in your -- for
5   your own -- you were interested in it because
6   your employer had assigned you to mystery shop,
7   right?  You weren't interested in it because you
8   wanted that -- that service at the time,
9   correct?
10      MR. PEARSON:  Objection as to
11  "employer."  Objection, asked and answered.
12      A.   I was doing a mystery shop, and I
13  didn't ever really look at them as my employer.
14  My employee is The New York Post.  Or, my
15  employer, I'm sorry, is The New York Post.
16      Q.   As part of your mystery shopping, you
17  were also required to look at different areas in
18  the interior of the bank, correct?
19      A.   I'm sorry, I was -- I was to observe
20  the premises, yes.
21      Q.   You were to look at the penny arcade
22  machine, correct?
23      A.   That's correct.
24      Q.   The display, correct?
25      A.   The display monitors, yes.

Page 383

1        I. Livingston
2       Q.   The condition of the premises for
3   cleanliness, correct?
4       A.   That's correct.
5       Q.   And you would report back to your --
6   to Contemporary Staffing Solutions about what
7   you saw, right?
8       A.   That's correct.
9       Q.   Sometimes you would do more than one
10  mystery shop in a given day, correct?
11      A.   Yes.
12      Q.   Sometimes you did, in fact, as many as
13  four mystery shops in a given day, right?
14      MR. PEARSON:  Objection.
15      A.   I don't recall.
16      Q.   Even more?
17      MR. PEARSON:  Objection.
18      Q.   Right?
19      A.   I don't recall.
20      Q.   Okay.  When you mystery shopped at
21  multiple banks on a given day, did you take
22  notes so that when you filed your reports, you
23  could remember which experiences you had at
24  which banks?
25      A.   Sometimes I would jot down information

Page 384

1        I. Livingston
2   right afterwards, yes.
3       Q.   You did that -- you did that on a
4   notepad?
5       A.   No.
6       Q.   How did you do that?
7       A.   It would be on the -- on the
8   transaction slip, if I did that at all.
9       Q.   When you mystery shopped for Shop 'n
10  Chek, you would go to mobile phone stores and
11  you would also go to Office Depot and McDonald's
12  as well, right?
13      MR. PEARSON:  Objection.
14      A.   There were -- when I performed mystery
15  shops for Shop 'n Chek, I did perform mystery
16  shops for them for some McDonald's and -- and an
17  office supply store.
18      Q.   And you would make purchases at those
19  stores?
20      A.   At McDonald's and the office supply
21  store?
22      Q.   Yes.
23      A.   Yes.
24      Q.   Did Shop 'n Chek reimburse you for
25  purchases you made during mystery shops?

Page 385

1        I. Livingston
2       A.   Most of the time, yes.
3       Q.   And a single mystery shop could take
4   half an hour, right?
5       MR. PEARSON:  Objection.
6       A.   Mystery shops normally didn't take a
7   half hour, no.
8       Q.   But it could take a half an hour,
9   right?
10      MR. PEARSON:  Objection.
11      A.   I don't recall doing any mystery shops
12  that took a half hour.
13      (Livingston Exhibit 18, Shop History
14  of Ikimulisa Livingston, bearing Bates Nos.
15  NYP-FL00380 through 3998, marked for
16  identification, as of this date.)
17  BY MR. LERNER:
18      Q.   Ms. Livingston, I'm putting in front
19  of you a document marked Exhibit 18, which was
20  produced to you in this litigation.  Do you see
21  that?
22      A.   I do see that document in front of me,
23  yes.
24      Q.   And this is a record of the mystery
25  shopping that you did through Contemporary

Page 390

I. Livingston

1          I. Livingston
2    shopping at TD Bank, you weren't at the
3    courthouse, right?
4        A.   If I was in a store doing a mystery
5    shop, I was not at the courthouse.
6        Q.   Right.  You were -- you would be at a
7    TD Bank, right?
8        A.   I would have been, for an in-person
9    shop, I would have been at the bank.
10       Q.   Right.  And if you were at the bank,
11   you weren't in a courtroom observing a courtroom
12   proceeding, right?
13           MR. PEARSON:  Objection.
14       A.   If I'm at the bank, I'm not actually
15   in the courthouse, no.
16       Q.   If you're at the bank, you're not
17   meeting with a source talking about a court
18   case, right?
19           MR. PEARSON:  Objection.
20       Q.   Is that correct?
21           MR. PEARSON:  Objection.
22       A.   I actually could be talking to a
23   source if I'm at the bank, yes.
24       Q.   Did you ever talk to a source during a
25   mystery shop at a TD Bank?

Page 391

I. Livingston

1          I. Livingston
2        A.   I can't say I did or did not.  I could
3    have.
4        Q.   Well, you mystery shopped at TD Bank
5    hundreds of times, Ms. Livingston.  How many of
6    those times do you think you actually met a
7    source at the bank while you were mystery
8    shopping?
9            MR. PEARSON:  Objection.  Not her
10   testimony.
11       A.   I didn't say I met a source at the
12   bank, but I could have certainly and probably
13   was on the phone with someone.
14       Q.   You were on the phone with somebody --
15           Ms. Livingston, can I remind you
16   you're under oath?
17           Yes or no, Ms. Livingston?
18       A.   Yes, you may remind me, yes.
19       Q.   You're in a bank mystery shopping,
20   doing research for Contemporary Staffing
21   Solutions by speaking with tellers, speaking
22   with customer service representatives, and your
23   testimony is that you'd be on the phone talking
24   to a source during that time period?
25       A.   I could have been.

Page 392

I. Livingston

1          I. Livingston
2            MR. PEARSON:  Objection.
3        A.   There were certainly times, I'm sure,
4    that the telephone rang and I answered the call.
5        Q.   And how many times did that happen
6    when you were in a TD Bank doing mystery
7    shopping?
8        A.   I can't recall how many times it
9    happened.
10       Q.   Can you recall any specific times?
11       A.   Offhand right now, I don't recall any
12   specific times.
13       Q.   Okay.  All right.  How long, Ms.
14   Livingston, would it take you to drive from the
15   Queens Criminal Courthouse to the TD Bank branch
16   in Corona, Queens?
17       A.   I'm not really sure exactly how long
18   it would take.  It would take a few minutes.
19       Q.   Would it take more than five minutes?
20       A.   It would probably take more than five
21   minutes, yes.
22       Q.   Would it take more than 15 minutes?
23       A.   It would depend, but 15 minutes sounds
24   like a -- I'm not really sure exactly how long
25   it would take, but it wouldn't take very long.

Page 393

I. Livingston

1          I. Livingston
2        Q.   All right.  Sometimes during the day
3    you shopped at multiple TD Bank branches,
4    correct?
5        A.   Yes.
6        Q.   So you would drive from the courthouse
7    to the first TD Bank branch, then to the next TD
8    Bank branch, and then to any subsequent TD Bank
9    branches that you shopped at, correct?
10           MR. PEARSON:  Objection.  Foundation.
11       A.   That would depend on the day.
12       Q.   Okay.  Well, take a look at, on this
13   page, take a look at August the 8th, 2008.  Do
14   you see those dates?
15       A.   Yes, I do.
16       Q.   This indicates that you shopped at --
17   in Kew Gardens at 2:40 P.M., Forest
18   Hills/Metropolitan Avenue at 2:54 P.M., and
19   Ridgewood Metro at 3:15 P.M., right?
20       A.   Yes, I see that there.
21       Q.   And when you entered your reports of
22   your mystery shops, you would enter the time
23   that you went into the bank, correct?
24       A.   That's correct.
25       Q.   So, at least on August 8, 2008, you

Page 398

1          I. Livingston
2          MR. PEARSON:  Objection.
3     A.   Because --
4          MR. LERNER:  What's the objection?
5          MR. PEARSON:  Argumentative is the
6     objection.
7          MR. LERNER:  I think you're coaching
8     the witness.  I would ask that you not
9     engage in speaking objections and that you
10    not interpose frivolous objections that are
11    done -- that have no basis in law.
12         MR. PEARSON:  There's no coaching
13    going on.
14    BY MR. LERNER:
15    Q.   Why don't you know what hours you
16    worked that day, Ms. Livingston?
17    A.   I -- I think I said I worked 8 to 5.
18    I'm sorry, eight and a half hours for that day.
19    Q.   You claim to have worked eight and a
20    half hours for The New York Post that day,
21    right?
22    A.   Yes.  I worked eight and a half hour
23    days that --
24    Q.   Do you know as you sit here today what
25    hours, what actual times during the day you were

Page 399

1          I. Livingston
2     working for The New York Post?
3     A.   It was October 2, 2008.  I don't
4     remember exactly what I did on October 2, 2008.
5     Q.   Do you know if you had any story
6     published on October 3, 2008?
7     A.   I can't recall if I had a story
8     published that day.
9     Q.   Why didn't you -- why did you leave
10    the courthouse on October 2, 2008 to start
11    mystery shopping at 1:30 P.M.?
12    A.   Why --
13    Q.   Yes.
14    A.   -- did I?
15         Well, I believe that time would have
16    been the time I was taking my lunch break and I
17    performed a mystery shop --
18    Q.   Okay.  But your lunch --
19    A.   -- at that time.
20    Q.   Your lunch break you indicated was
21    half an hour long, right?
22    A.   Lunch -- lunch would be about a
23    half-hour sometimes, yes.
24    Q.   And your -- from this record of your
25    mystery shopping times, you're out of the

Page 400

1          I. Livingston
2     courthouse for longer than half an hour, right?
3     A.   Yes, that's correct.
4     Q.   Do you -- do you know if you even went
5     back to the courthouse that day after you left?
6     A.   I don't remember what I did that day.
7     Q.   Did you ask your supervisors for
8     permission to leave the courthouse to go mystery
9     shopping on that day?
10         MR. PEARSON:  Objection.
11    A.   I did not ask my supervisors for
12    permission, no.
13    Q.   Did you at any time inform your
14    supervisors in the year 2008 that you were
15    leaving the courthouse to go mystery shopping?
16    A.   No.
17    Q.   Did you at any time during 2008 inform
18    your supervisors that you were employed by
19    Contemporary Staffing Solutions?
20         MR. PEARSON:  Objection.
21    A.   Did I ever tell my --
22    Q.   Supervisors that you were employed by
23    Contemporary Staffing Solutions?
24    A.   I did not tell my bosses at The Post
25    that I mystery shopped.

Page 401

1          I. Livingston
2     Q.   Either for Contemporary Staffing
3     Solutions or for Shop 'n Chek, right?
4     A.   That would be correct.
5     Q.   And you never told them that you had
6     obligations for another employer that would
7     require you to leave the courthouses during the
8     day, right?
9          MR. PEARSON:  Objection.
10    A.   I didn't have obligations.
11    Q.   You never told them that you were
12    leaving the courthouse to make money from
13    another source, correct?
14    A.   I did not tell them I was leaving the
15    courthouse to go do a mystery shop.
16    Q.   And the courthouse -- withdrawn.
17         October 2, 2008 was not the only day
18    you left the courthouse, right, to go to do
19    mystery shopping, right?
20    A.   No.
21    Q.   You did it on many other days that you
22    were employed and working for The Post at the
23    Queens courthouses, right?
24    A.   During my downtime, my lunchtime, I
25    would go and do a mystery shop.

Page 406

I. Livingston

1          I. Livingston
2    Q.   You see the week starting Saturday,
3  August 8; you see that?
4    A.   Yes.
5    Q.   On Monday, August 10, you recorded
6  zero hours worked and eight hours of sick time,
7  do you see that?
8    A.   It's hard to make out, but I -- yeah.
9    Q.   It's not hard on my copy.  Would you
10  like my copy?  Can you see the 8.0 under -- for
11  sick time on that day?
12    A.   I see -- it doesn't really look like
13  an 8, but --
14    Q.   Well, my copy is as plain as day.
15  Could I get you a copy that you can read?
16    A.   Okay.
17    Q.   Do you have any trouble seeing that?
18    A.   No, I can see that.  It's much better.
19    Q.   And that's on August -- August 10,
20  2009, right?
21    A.   I see August 10.
22    Q.   Uh-huh.
23    A.   And 2009, yes.
24    Q.   Well, Ms. Livingston, you mystery
25  shopped on August 10, 2009.  Do you recall that?

Page 407

I. Livingston

1          I. Livingston
2    A.   No, can you point that out?
3    Q.   Sure.  If you go back to the
4  spreadsheet from Contemporary Staffing Solutions
5  and you look at August the 10th, 2009, it's on
6  page FL3991.
7    A.   399?
8    Q.   1.
9    A.   1?
10    Q.   The records indicate on that page on
11  August 10, 3991, mystery shopping at 3:12 P.M.
12  in Hillcrest, Fresh Meadows, 3:42 at
13  Ridgewood/Downtown Branch and 4 P.M. at the
14  Ridgewood Metro Branch.  Do you see that?
15    A.   I do see that.
16    Q.   Do you have any reason to dispute that
17  you mystery shopped at those branches on those
18  dates?
19    A.   No.
20    Q.   So on a day that you called in sick
21  with The New York Post, you actually were
22  performing services through Contemporary
23  Staffing Solutions by mystery shopping at TD
24  Bank, right?
25    MR. PEARSON:  Objection.

Page 408

I. Livingston

1          I. Livingston
2    A.   I must have felt better.
3    Q.   Did you call in to your supervisors at
4  The New York Post and tell them that you felt
5  better and that you were ready, willing and able
6  to work as a reporter that day?
7    A.   I'm not aware that we can work a half
8  day.
9    Q.   Did you -- did you make any
10  notification to your supervisors that you were
11  feeling better and could work the rest of the
12  day if they needed you?
13    You don't have any memory of doing
14  that, do you?
15    A.   Well, no, but --
16    Q.   Okay.
17    A.   -- then I only have a couple of hours
18  left on my shift.
19    Q.   And on Ms. -- Ms. Livingston, your
20  grandmother passed on in January of 2010,
21  correct?
22    A.   I had two grandmothers that passed
23  away.  I don't remember which one passed away
24  then.
25    Q.   Your grandmother Bland?

Page 409

I. Livingston

1          I. Livingston
2    A.   Yes.
3    Q.   And --
4    A.   That's about right.
5    Q.   -- in January of 2010, you traveled
6  and you took bereavement leave, right?
7    A.   I did take bereavement time, yes.
8    Q.   Okay.  I would like to put in front of
9  you a document we'll mark as Exhibit 21, which
10  you produced in this litigation as your work
11  calendars, and I would ask you to turn to page
12  IL_415 of this document.
13    (Livingston Exhibit 21, Work
14    Calendars, bearing Bates Nos. IL-314 through
15    1678, marked for identification, as of this
16    date.)
17  BY MR. LERNER:
18    Q.   Ms. Livingston, it's well into the
19  document.  If you go a page at a time, we're
20  going to need to go off the record.
21    A.   I'm sorry, 4?
22    MR. PEARSON:  415.
23    THE WITNESS:  415?
24    Q.   Yeah.  Actually, I'm going to direct
25  you to 416.

Page 410

I. Livingston

1          I. Livingston
2      A.   416.
3      Q.   Could you tell me when you're there?
4      A.   414.  4 --
5          MR. PEARSON:  416.
6          THE WITNESS:  416.  Okay.
7  BY MR. LERNER:
8      Q.   And 416 reflects Wednesday, January
9  27, 2010 as a -- you indicated that it's a
10 bereavement day, correct?
11     A.   On Wednesday, January 27?
12     Q.   Yes.
13     A.   What day?
14     Q.   Yes.
15     A.   Yes.
16     Q.   Did you write "Bereavement day 5"?
17     A.   Yes, I believe I did.
18     Q.   And was that when -- when -- in the
19 immediate aftermath of your grandmother Bland
20 passing away?
21     A.   That was, yeah, that was some days
22 after she died.
23     Q.   Okay.  And in fact, her funeral was on
24 the 22nd of January, right?  It's at the top of
25 the page.

Page 411

I. Livingston

1          I. Livingston
2      A.   Yes.  If that's what I indicated yes.
3      Q.   So you didn't work on the 27th because
4  you took it as a bereavement day, right?
5      A.   That's correct.
6      Q.   But, Ms. Livingston, that didn't stop
7  you from mystery shopping on January 27, did it?
8          MR. PEARSON:  Objection.
9      A.   I don't know if I mystery shopped that
10 day or not.
11     Q.   Well, turn in the Contemporary
12 Staffing Solutions spreadsheet to page 3994,
13 please.
14     A.   Okay.
15     Q.   This indicates that on January 27,
16 2010, you mystery shopped at the TD Bank at
17 Ridgewood Metro at 3:45 P.M. and then at the TD
18 Bank in Middle Village at 4:05 P.M.  Do you see
19 that?
20     A.   I do see that.
21     Q.   And you have no reason to doubt the
22 accuracy of those dates and times and branches,
23 correct?
24     A.   No.
25     Q.   When you -- after you mystery shopped,

Page 412

I. Livingston

1          I. Livingston
2  the observations that you made during the
3  mystery shop had to be entered into a computer,
4  right?
5      A.   Yes.
6      Q.   Or to a Website, right?
7      A.   Yes.
8      Q.   And you did that yourself, correct?
9      A.   Yes.
10     Q.   Nobody entered that information for
11 you, correct?
12     A.   That's correct.
13     Q.   Did -- and did you have a password to
14 get onto the Contemporary Staffing Solutions TD
15 Bank Website to do that?
16     A.   Yes.
17     Q.   And did anybody else have that
18 password, to your knowledge?
19     A.   I don't think so.
20     Q.   And did you use the computer that was
21 located in the courthouse in the Queens
22 courthouse to enter those reports from time to
23 time?
24     A.   Oh, I'm sorry.  You're not talking
25 about this day?

Page 413

I. Livingston

1          I. Livingston
2      Q.   I'm talking about at any time.  Did
3  you use the computer in the Queens courthouse to
4  put in your reports after mystery shopping?
5      A.   I think on occasion.  I think mostly I
6  did it from home, but on occasion, I may have
7  done it when I was at the courthouse.
8      Q.   On May 4, 2010, you had another death
9  in your family and you took bereavement leave.
10 Do you recall that?
11     A.   I don't recall the exact date, but,
12 yeah, I did have another death in the family.
13     Q.   Your cousin Joeran?
14     A.   Joeran, yes.
15     Q.   And you took bereavement leave on May
16 13 and 14.  Do you recall that?
17     A.   Is there a page I should look at?
18     Q.   Yes.  Could you turn to page IL_445 of
19 your own calendar, please?
20     A.   445?
21     Q.   Yes.
22     A.   Okay.
23     Q.   And do you see on 445 that on May 13
24 and May 14 of 2010 you indicate bereavement day
25 for each day; you see that?

Page 414

```
1              I. Livingston
2      A.   Yes, I do.
3      Q.   On the Contemporary Staffing Solutions
4   spreadsheet on page 3996, it indicates that you
5   mystery shopped with the South Flushing TD Bank
6   branch by telephone at 1:50 P.M.  Do you see
7   that?
8      A.   On May 13?
9      Q.   May 14.
10     A.   May 14?  Yes, I see that.
11     Q.   Ms. Livingston, it is the case that on
12  days that you were working for The Post, it was
13  not always on your lunch hour or even at
14  lunchtime that you went mystery shopping; isn't
15  that correct?
16         MR. PEARSON:  Objection.
17     A.   I can take my lunch whenever I like.
18     Q.   Can you take your lunch at 10:30 in
19  the morning?
20     A.   Actually, I can.
21     Q.   So if you mystery shopped at 10:30 in
22  the morning on a -- on a New York Post workday,
23  it's your testimony that that was your lunch
24  break?
25     A.   If that's what time I took it, yeah,
```

Page 415

```
1              I. Livingston
2   that can be my lunch break, yes.
3      Q.   So anytime -- essentially, anytime you
4   mystery shopped on a day you were working for
5   The Post was your lunch break?
6         MR. PEARSON:  Objection.
7      Q.   Is that your testimony?
8      A.   When I would take my lunch, I could
9   take my lunch at any time.  I didn't know that
10  we had -- or I was never told that we needed to
11  take our lunch at a specific time, but if time
12  permitted --
13     Q.   Can you turn in the spreadsheet --
14     A.   I'm sorry.  I -- I was still talking.
15     Q.   Oh, I'm sorry.
16     A.   I was just saying if time permitted
17  and that was a convenient time for me to take my
18  lunch, and I could do a mystery shop, if that's
19  what I chose to do, then -- then I would do it,
20  but my priority was always doing my job.
21     Q.   And was -- was it -- was it the case
22  that mystery shops were on your lunch break even
23  when they happened one after another on the same
24  day and spanned a period of 90 minutes?
25     A.   Well, it would depend.  If I was
```

Page 416

```
1              I. Livingston
2   driving between shop locations, then I could
3   easily be on the phone or calling someone or
4   reaching out doing my job as a Queens court
5   reporter.
6         So mystery shops would take two
7   minutes, five minutes, you know, but in between
8   there, I was always doing my job.
9      Q.   You don't have any specific
10  recollection of phone calls that you made during
11  drives in between TD Banks, do you?
12     A.   I don't have any specific recollection
13  of -- of specific phone calls with specific
14  people, but I know that my job -- my priority
15  was always my job as a reporter for The New York
16  Post.  So if I was -- if I needed to talk to
17  someone at the DA's Office, that's what I would
18  do.
19     Q.   And if you were out of the courthouse
20  doing mystery shop and someone came to your desk
21  in the courthouse to come and talk to you, they
22  wouldn't be able to speak to you because you
23  would be out mystery shopping, right?
24         MR. PEARSON:  Objection.
25     Q.   That's a yes or no question.
```

Page 417

```
1              I. Livingston
2      A.   If I am not in the Queens courthouse
3   office, New York Post office, then obviously if
4   someone did walk in there, I wouldn't have been
5   there for them to see me, but --
6      Q.   And that would include lawyers, court
7   personnel, or other sources that would not be
8   able to find you if they wanted to speak to you
9   while you were out mystery shopping, right?
10         MR. PEARSON:  Objection.
11     A.   While I was out mystery shopping, it
12  did not impede my job as a reporter for The New
13  York Post.
14     Q.   Well, if somebody -- how would you
15  even know if someone had come to find you and
16  knocked on the door of your office and left
17  because you weren't there?  You wouldn't even
18  know that, would you?
19     A.   If someone wanted to reach me and I
20  wasn't there, then they're -- they would have
21  reached out to me and I would -- I would have
22  found out and I would have been able to talk to
23  them, if that was the case.
24     Q.   But you're speculating about that,
25  right?
```

Page 418

I. Livingston

1          I. Livingston
2     MR. PEARSON:  Objection.
3     A.   I don't know if -- if that ever
4  happened.  If it did happen, then -- then
5  obviously I wasn't -- my job did not pertain to
6  me being in that office throughout the entire --
7  all the hours that I worked.  Sometimes I did
8  work for The Post and I wasn't in the Queens
9  courthouse, in that office or even in the
10 building.
11       So that could happen at any time.
12    Q.   And you actually -- you wouldn't know
13 if it happened because you weren't there to
14 receive the person, right?
15    A.   If I wasn't there, obviously I could
16 not have spoken to that person.
17    Q.   And -- and if the phone rang at your
18 desk in the courthouse, you wouldn't be there to
19 pick it up, right?
20    A.   No, I would not be there to pick it
21 up, but there is voice mail on the machine.  But
22 a lot of times people contacted me via my cell
23 phone.
24    Q.   And could you access that voice mail
25 from your cell phone?

Page 419

I. Livingston

1          I. Livingston
2    A.   Yes.
3    Q.   Your office at the Queens courthouse
4 was shared with reporters from other newspapers,
5 correct?
6    A.   That's correct.
7    Q.   So there was a desk in that office for
8 the Daily News reporter, right?
9    A.   Yes.
10    Q.   And there was a desk in that office
11 for the Newsday reporter?
12    A.   Yes.
13    Q.   And do you know if anybody ever came
14 to the office to give you information or give
15 you a scoop on a story and, in your absence,
16 they decided to give it to the Daily News or the
17 Newsday reporter?
18    A.   I don't believe that ever happened.
19    Q.   How -- how -- what's the basis of your
20 belief that that never happened?
21    A.   Because I was a good -- I am a good
22 reporter.  I was a very good reporter at the
23 Queens courthouse, and I pretty much knew
24 everyone in the court -- in the courts, from the
25 court officers to the court clerks, and if

Page 420

I. Livingston

1          I. Livingston
2  someone wanted to give me a story -- first of
3 all, if someone wanted to give me a story and
4 they walked into the -- the office there, we
5 couldn't talk there because of the -- the fact
6 that the Daily News may or may not have been
7 present.  So I --
8    Q.   Wasn't it --
9    A.   I don't believe that ever happened.
10    Q.   Wasn't it your job to be a good
11 reporter from 9 to 5, Monday through Friday, at
12 the Queens courthouse?
13    A.   My job --
14       MR. PEARSON:  Objection.
15    A.   -- was to be a good reporter.
16    I'm sorry.
17       My job was to be a good reporter, not
18 just between 9 to 5, but my job didn't just
19 encompass being a reporter between 9 and 5.
20 Sometimes I worked before 9.  Sometimes I worked
21 after 9.  Sometimes well after 9.  Sometimes in
22 the middle of the night.
23    Q.   Were you being a good reporter when
24 you were inside a TD Bank talking to a customer
25 service representative and getting paid to do

Page 421

I. Livingston

1          I. Livingston
2  mystery shopping?
3       MR. PEARSON:  Objection.
4    A.   Are you asking if I was a good
5 reporter when I was in TD Bank?
6    Q.   I'm asking if you were being a good
7 reporter when you were mystery shopping at TD
8 Bank?
9       MR. PEARSON:  Objection.
10    Q.   Yes or no?
11    A.   I was still being a good reporter, of
12 course, yes.
13    Q.   Were you -- and were you being a good
14 reporter when you left the courthouse while
15 court was in session during the hours of 9 to 5
16 and you were not there in the courtroom to watch
17 the proceedings?
18       MR. PEARSON:  Objection.  Foundation.
19    A.   I think you're assuming that there was
20 something going on in the courtroom -- in the
21 courthouse or in a courtroom that I needed to be
22 there for, and if I needed to be there, I was
23 there; I wasn't out mystery shopping.  I didn't
24 mystery shop during times that was pertinent to
25 my job.

Page 426

I. Livingston

1        I. Livingston
2       A.   If I'm not in the court building, then
3  I am not meeting with those people, but that
4  does not mean I am not talking to people that I
5  still need to be talking to.
6       Q.   But you can't testify here with any
7  specific recollection that you spoke to a source
8  when you were traveling to mystery shop, right?
9       A.   I can't recall on any particular day.
10  This was years ago.
11       Q.   Thank you.
12       And when you were traveling to go
13  mystery shopping at a TD Bank location in
14  Queens, you weren't at the civil courthouse
15  either, right?
16       A.   If I was at a -- a bank, then no, I
17  wasn't at the Sutphin courthouse, no.
18       Q.   Ms. Livingston, I'm going to show you
19  what has been marked as Exhibit 22 -- sorry, 23.
20       (Livingston Exhibit 23, Shop History
21       of Ikimulisa Livingston, bearing Bates Nos.
22       NYP-FL003980 through 3986, marked for
23       identification, as of this date.)
24  BY MR. LERNER:
25       Q.   Ms. Livingston, Exhibit 23 is a copy

Page 427

I. Livingston

1  of Exhibit -- is a copy of Exhibit 18, the TD
2  Bank spreadsheet, with one difference, which is
3  that we've highlighted in yellow those mystery
4  shops that occurred on days when you were
5  working for The New York Post, according to your
6  time sheets.  Do you understand that?
7       A.   Yes.
8       Q.   Okay.  Can you just take a minute to
9  turn the pages of Exhibit 23.  Do you see how
10  we've highlighted certain mystery shops?
11       A.   Yes, I see.  I see the highlights.
12       Q.   Do you have any reason to dispute that
13  you mystery shopped on this -- you had --
14  withdrawn.
15       The highlighted mystery shops number
16  roughly a hundred or more in 2008 alone, do you
17  see that?
18       A.   I haven't counted them, but if you say
19  so.
20       Q.   But you don't dispute that it's --
21  it's a significant number of mystery shops,
22  right?
23       A.   I'm sorry, I don't -- I don't know
24  what that means.
25

Page 428

I. Livingston

1        I. Livingston
2       Q.   Okay.  Let me show you -- we're going
3  to mark a document Bates-numbered NYP-FL328
4  through 331 as Exhibit 24.
5       (Livingston Exhibit 24, Self-Appraisal
6       for Ikimulisa Livingston, bearing Bates Nos.
7       NYP-FL000328 through 331, marked for
8       identification, as of this date.)
9  BY MR. LERNER:
10       Q.   This is your 2008 Performance
11  Evaluation, do you see that?
12       A.   I do see it.
13       Q.   And you got a rating of Occasionally
14  Meets Standards in this performance evaluation,
15  right?  You see that?
16       A.   I see that.
17       Q.   And in the overall performance
18  summary, you were told that you did a great job
19  providing day-to-day notes for the Sean Bell
20  trial, but you needed work developing sources
21  that would provide stories for the paper that
22  are longer than briefs and have a better
23  disposition when your stories get cut.
24       Do you see that?
25       A.   I do see that.

Page 429

I. Livingston

1        I. Livingston
2       Q.   I'm going to mark your -- okay.  I'm
3  also placing before you what has been previously
4  marked as Exhibit 10 to your deposition, and if
5  you could turn to page 334 of this exhibit,
6  which is your 2009 APA, it states under Areas
7  For Focus: "Kim rarely suggests story ideas and
8  must do a better job at this.  The key to a good
9  newspaper and Website is variety.  In addition,
10  Monday enterprise is very important and Kim
11  never pitches or develops her own stories.
12       "Overall Performance Summary:  Kim
13  needs to be more diligent about generating her
14  own story ideas, slice of life pieces,
15  investigations.  This is a rapidly changing news
16  culture and Kim has to keep up with it."  And
17  your rating was 2, "Needs Improvement."
18       Do you see that?
19       A.   I see it.
20       Q.   So your supervisors in 2009 criticized
21  you for not generating your own story ideas or
22  slice of life pieces or investigations or
23  pitching or developing your own stories,
24  correct?
25       A.   That's what's written here.

Page 430

1            I. Livingston
2       Q.   And your supervisors when they wrote
3   this in 2009 had not been told by you that you
4   were engaged in a mystery shopping, right?
5       A.   Had I told them I was mystery
6   shopping? No.
7       Q.   So you're receiving criticisms in --
8   in '08 and '09 that you need to develop sources
9   and provide more in-depth stories and you needed
10  to generate more of your own story ideas at a
11  time when, during the day on multiple occasions,
12  you've been leaving the courthouse to do mystery
13  shopping, correct?
14      A.   I'm sorry, are you referring to 2009
15  or 2008?
16      Q.   2008 and 2009.
17      A.   Well, 2009 I -- I wasn't in the
18  courthouse.
19      Q.   Okay. But your 2009 APA covered the
20  last six months of 2008 when you were still in
21  the courthouse, correct?
22      A.   I believe, yeah, it may -- yeah, it
23  covered part of that, yes.
24      Q.   So, Ms. Livingston, when you received
25  this criticism, did you -- did you discontinue

Page 431

1            I. Livingston
2   your mystery shopping?
3       A.   Are you asking if I continued mystery
4   shopping after receiving these evaluations?
5       Q.   Yes.
6       A.   Yes, I continued mystery shopping.
7       Q.   And you continued that even though
8   your supervisors were pressing you to do more
9   investigations and develop more of your own
10  story ideas and your own sources, right?
11      A.   Throughout my time at the Queens
12  courthouse, and even afterwards, I gave them
13  story ideas as well as -- actually, yeah, I gave
14  them a lot of story ideas, and none of them were
15  good enough for the editors.
16      Q.   And if you look at Exhibit 23, which
17  is the highlighted document?
18      A.   Yes.
19      Q.   You will see that on days throughout
20  2008, you were going mystery shopping during the
21  afternoon hours, sometimes at more than one bank
22  on a given day; that's correct, isn't it?
23      A.   I haven't gone through the entire
24  list, but I did do mystery shops during my
25  downtime or during lunchtime.

Page 432

1            I. Livingston
2       Q.   You did mystery shops during the day
3   between 9 and 5 when you were working at The
4   Post, right?
5       A.   As I said, my job just wasn't 9 to 5,
6   but I did do mystery shops between 9 -- 9 and 5.
7       Q.   And it never occurred to you to stop
8   doing the mystery shopping and focus your energy
9   instead on developing sources and developing
10  investigative pieces in the courthouse?
11          MR. PEARSON:  Objection.
12      A.   One had nothing to do with the other.
13  I continued to mystery shop, but I was also very
14  dedicated to my job. Mystery shopping was
15  basically -- my priority was my job.
16      Q.   And you used the term "downtime," Ms.
17  Livingston. How would you define "downtime"
18  between the hours of 9 and 5 when you're working
19  as a reporter for The New York Post?
20      A.   I would describe downtime as when it's
21  a slow day.
22      Q.   Isn't that the time that you're
23  supposed to be working on your own investigative
24  ideas, developing sources, and trying to further
25  stories?

Page 433

1            I. Livingston
2       A.   And I do that.
3       Q.   Well, you didn't do it when you were
4   mystery shopping at TD Bank --
5       A.   I'm sorry, I --
6       Q.   -- or for Shop 'n Chek, correct?
7       A.   -- disagree --
8           MR. PEARSON:  Objection.
9       A.   I disagree with you. I did do that.
10      Q.   You did -- your testimony is that
11  while you're mystery shopping at TD Bank or at
12  Shop 'n Chek, you're also working for The New
13  York Post developing story ideas and developing
14  sources; is that correct?
15          MR. PEARSON:  Objection.
16      A.   As I stated, my priority was my job at
17  The New York Post.
18      Q.   How many stories did you develop at TD
19  Bank? Name one.
20      A.   How many stories did I develop at TD
21  Bank?
22      Q.   While you were mystery shopping at TD
23  Bank?
24      A.   I don't know.
25      Q.   How many stories did you develop while

Page 434

```
 1              I. Livingston
 2    you were mystery shopping at Office Depot?
 3        A.    I don't know.  I don't recall.
 4        Q.    How many sources did you develop by
 5    mystery shopping at TD Bank?
 6        A.    Oh, I don't know.
 7        Q.    Did a lawyer ever accompany you in the
 8    car to mystery shop at TD Bank?
 9        A.    No.
10        Q.    How many civil filings did you go
11    through while you were mystery shopping at TD
12    Bank?
13        A.    I -- I don't know.
14        Q.    How many trials or arraignments or
15    sentencings did you attend while you were
16    mystery shopping at TD Bank?
17        A.    If I am at TD Bank, I am -- obviously
18    I'm not in another place at the same time.
19        Q.    So that's none, right?
20             MR. PEARSON:  Objection.
21        A.    If there was an arraignment I needed
22    to attend, I was at the arraignment.  If there
23    was a court proceeding I needed to be at, I was
24    at the court proceeding.  If there were
25    witnesses to something for a story that was of
```

Page 435

```
 1              I. Livingston
 2    interest to The New York Post, I was
 3    interviewing those witnesses.  If there was a
 4    lawyer I needed to speak to regarding a case, I
 5    was speaking to that lawyer.
 6        Q.    Ms. Livingston, there was no question
 7    pending so I'm going to move to strike that.
 8             MR. PEARSON:  Objection to the strike.
 9        Q.    How would you know --
10             MR. PEARSON:  There was a question.
11        Q.    How would you know if there was an
12    arraignment in an arraignment part that you
13    needed to attend in advance?
14        A.    How would I know?
15        Q.    Yes.
16        A.    If there was a breaking story or a --
17    a story about -- a newsworthy story going on in
18    arraignments, then I would know about it because
19    of my contacts within the courthouse.
20             During the course of --
21        Q.    Would --
22        A.    I'm sorry.
23        Q.    You know about it --
24        A.    I'm sorry, I --
25        Q.    -- in advance before you even got to
```

Page 436

```
 1              I. Livingston
 2    the courthouse?
 3        A.    I'm sorry, I would like to -- I was
 4    saying --
 5        Q.    The question was how would you know if
 6    you needed to be in an arraignment part?  That
 7    was the question.
 8        A.    And I stated that my contacts would
 9    let me know if there was a newsworthy story
10    going on in the arraignments.  My job was not
11    sitting in arraignments all day watching various
12    arraignments happen.
13        Q.    And isn't it the case that sometimes
14    your contacts wouldn't know or wouldn't advise
15    you that there was an important arraignment that
16    was going to happen in the courtroom?
17        A.    I -- I didn't miss any arraignments
18    because of mystery shopping.
19        Q.    Did you ever miss sentencings?
20        A.    No.
21        Q.    Did you ever miss a sentencing?
22        A.    I'm sorry, did I ever miss a
23    sentencing?
24        Q.    Yes.
25        A.    Any sentencing?
```

Page 437

```
 1              I. Livingston
 2        Q.    Yes, because of mystery shopping?
 3        A.    No.
 4        Q.    Did you ever get scooped by the Daily
 5    News while you were working at the courthouse?
 6        A.    Did I ever get scooped?  Did I have a
 7    story that the Daily News did not have?
 8        Q.    Uh-huh.  Yes.
 9        A.    That happened, but it also happened in
10    the reverse.  I also had stories that the Daily
11    News did not have.
12        Q.    Is that because Nicole Bode at the
13    Daily News was mystery shopping?
14        A.    I don't know if --
15             MR. PEARSON:  Objection.
16        A.    I don't know if Nicole was mystery
17    shopping or not.
18        Q.    Did you ever bump into her during
19    mystery shopping?
20        A.    Did I bump into Nicole at TD Bank?
21        Q.    Yes.
22        A.    No.
23        Q.    So if -- if Nicole Bode got scooped,
24    it wasn't because, to your knowledge, it wasn't
25    because she was out mystery shopping, right?
```

Page 442

I. Livingston
1
2     MR. PEARSON:  Objection.
3     Q.   They weren't personal conversations,
4  they were work conversations, right?
5     A.   They were conversations -- I wouldn't
6  have a conversation with Zach unless I was -- it
7  was related to work.
8     Q.   Did you ever tell Zach during any of
9  those conversations that you had a job that
10  required you to leave the courthouse during the
11  regular workday?
12     A.   I didn't have a job.
13     MR. PEARSON:  Objection.
14     Q.   Did you ever tell Zach Haberman that
15  you had a job doing mystery shopping that
16  required you to leave the courthouse during the
17  day?
18     A.   I did not have another job, but I
19  didn't tell Zach that I mystery shopped, no.
20     Q.   You did not tell Mr. Haberman that you
21  did mystery shopping, correct?
22     A.   I think I answered that.
23     Q.   So --
24     A.   Yes.
25     Q.   So -- and you didn't tell him even

Page 443

I. Livingston
1
2  though he got upset with you on the phone from
3  time to time, right?
4     A.   I don't understand what one has to do
5  with the other.
6     Q.   Well, if he was complaining to you
7  about the amount of sources you had or the
8  effort you were putting in or whether or not you
9  had gotten a story, and you were outside the
10  courthouse on that day doing mystery shopping,
11  did you ever offer that up as an explanation for
12  why you had not lived up to his expectations?
13     MR. PEARSON:  Objection.
14     A.   Our conversations were not about those
15  things that you described.
16     Q.   You never told him that you were
17  mystery shopping, correct?
18     A.   I think I have stated twice that I
19  have -- I did not tell him that I mystery
20  shopped.
21     Q.   And you didn't tell Mr. Haberman or
22  your other editors, for that matter, that you
23  were mystery shopping because you didn't think
24  that they would approve of mystery shopping,
25  right?

Page 444

I. Livingston
1
2     MR. PEARSON:  Objection.
3     A.   No.
4     Q.   Well, you --
5     A.   That's not why I didn't tell them.
6     Q.   You kept it a secret for five years
7  while you were mystery shopping, right?
8     MR. PEARSON:  Objection.
9     A.   I -- I didn't tell my -- my bosses at
10  The Post, no, but it wasn't a secret.
11     Q.   You didn't tell them because you
12  didn't think that they would approve mystery
13  shopping during the day, right?
14     A.   I didn't think they would --
15     MR. PEARSON:  Objection.  Asked and
16  answered.
17     Q.   Did you think that they would approve
18  your mystery shopping multiple times during a
19  The New York Post workday if you had asked them
20  for permission?
21     A.   I did not tell them because I
22  thought they would approve or disapprove.
23     Q.   So why did you not tell them?
24     A.   Why did I not tell them?
25     Q.   That's the question.

Page 445

I. Livingston
1
2     A.   It wasn't pertinent to The New York
3  Post.
4     Q.   Even though you left the courthouse
5  where your job duty station was to go do mystery
6  shopping during the days you worked for The
7  Post, you didn't think that it was pertinent to
8  your job at The New York Post?
9     A.   As I stated, my job was not just
10  necessarily at the Queens courthouse. I worked
11  outside of the Queens courthouse doing my job.
12  During hours that were outside of 9 to 5, it did
13  not seem relevant to me, no.
14     Q.   So your explanation is that because
15  some of your duties as a Queens court reporter
16  could be done outside the courthouse, that doing
17  mystery shopping outside the courthouse, which
18  is not a New York Post duty, was consistent with
19  your job for The New York Post?
20     MR. PEARSON:  Objection.
21     A.   My explanation is that my mystery
22  shopping was not -- I'll rephrase that.  My job
23  priority, as I stated before, was working for
24  The New York Post, was being a reporter for The
25  New York Post and covering everything that I

Page 450

I. Livingston

1
2     Q.   Yes?  The answer is yes?
3     A.   Yes.
4     Q.   All right.  What was that
5  conversation?
6     A.   During one of the APA evaluations, I
7  think Michelle actually said that during --
8  during time when things are slow, that I
9  should -- and Greenfield maybe as well -- that I
10 should comb the Internet looking for stories, go
11 to various Websites.  Michelle specifically said
12 I should go out and cruise neighborhoods looking
13 for neighborhood stories, that sort of thing.
14    Q.   And what about Zach Haberman, did you
15 ever have that conversation with him?
16    A.   I don't recall having a specific
17 conversation with him.
18    Q.   And did you ever have a conversation
19 with a supervisor about downtime while you were
20 working in the Queens courthouse?
21    A.   I don't recall a specific
22 conversation.
23    Q.   Did you ever tell Michelle or Dan or
24 Haberman that during your downtime you thought
25 you could go mystery shopping?

Page 451

I. Livingston

1
2     A.   As I've stated before, I never told
3  them about my mystery shopping.
4     Q.   When they told you about downtime
5  being to be used for looking for stories and
6  looking through the Internet, was that a
7  surprise to you or was that advice consistent
8  with your understanding of what your job was as
9  a reporter?
10    A.   I understand that to be what you --
11 that you're -- you're basically always looking
12 for a story.  Even if you're not working, you're
13 looking for stories.
14    Q.   And that included when you were in the
15 Queens courthouse, right?
16    A.   Yes.
17    Q.   Ms. Livingston, you stated earlier
18 that The New York Post was your priority.  If
19 you could be meeting with a source or going
20 mystery shopping, in your view, which should you
21 be doing?
22    A.   If there was a source that I needed to
23 meet with, obviously I would meet with the
24 source.  I, as I stated, I didn't -- I didn't
25 need to mystery shop.

Page 452

I. Livingston

1
2     Q.   My question was if you could be
3  meeting with a source or mystery shopping, which
4  should you be doing?
5          MR. PEARSON:  Objection.
6     A.   I thought I answered the question.
7     Q.   So what is the answer?
8     A.   I said that if -- if there was a
9  source, someone that I needed to meet with, then
10 I would meet with that person.  I didn't need to
11 do a mystery shop.
12    Q.   And if you could be meeting with an
13 assistant district attorney in the Queens
14 criminal court or go mystery shopping, which
15 should you choose to do?
16         MR. PEARSON:  Objection.
17    A.   If I had a meeting with an ADA, I
18 would have had a meeting with the -- with the
19 assistant district attorney rather than going
20 mystery shopping.  As I said, my priority was my
21 job, and if there was --
22    Q.   If you could be --
23    A.   If there was a source that I needed to
24 meet with, I would meet with that person.
25    Q.   And if you could be working to set up

Page 453

I. Livingston

1
2  a meeting with a source or an assistant district
3  attorney or a court officer on the one hand or
4  mystery shopping on the other hand, which should
5  you do as a New York Post Queens courthouse
6  reporter?
7          MR. PEARSON:  Objection.
8     A.   As I -- as I stated, that there are
9  many times that I would be on the phone reaching
10 out to someone and sometimes you had to wait
11 till people called you back.
12    Q.   So would you agree that your priority
13 should be working to set up meetings with
14 sources in the courthouse over and above going
15 mystery shopping?
16    A.   My priority was my job, was -- was
17 setting up meetings, was meeting with people.
18 Those were my priorities at all times.
19    Q.   My question was:  Should your priority
20 be working to set up meetings with sources or
21 should it be mystery shopping?
22    A.   That was my priority.
23    Q.   Setting up meetings to meet with
24 sources?
25    A.   Certainly.  Yes.

27  (Pages 450 to 453)

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ------------------------------x

5  AUSTIN FENNER and

6  IKIMULISA LIVINGSTON,

7

8              Plaintiffs,

9        v.                    09 Civ. 9832

10                            (BSJ)(RLE)

11  NEWS CORPORATION, NYP HOLDINGS,

12  INC. d/b/a THE NEW YORK POST

13  and DAN GREENFIELD and

14  MICHELLE GOTTHELF,

15              Defendants.

16  ------------------------------x

17

18       DEPOSITION OF IKIMULISA LIVINGSTON

19              New York, New York

20                May 6, 2013

21

22  Reported by:

23  MARY F. BOWMAN, RPR, CRR

24  JOB NO. 61106

25

LIVINGSTON

Q.   OK.  You mentioned that you noticed
a gentleman that seemed to be with the two of
you when you got up to the elevator on the
third floor in the 1211 Avenue of the
Americas building.  Is that correct?

A.   I don't remember what floor we
exited from the elevator, but he was on the
elevator with us.

Q.   Whichever floor was -- whichever
floor the credit union was on, right?

A.   Whichever floor the credit union
was on, I noticed him when he was on the
elevator with us when he came down from
whatever floor we were on, the building
across the street, he came out of the
elevator, he followed us as we walked across
the street, got in the same elevator we did.
And after we stepped out of the elevator, I
asked Amy about the guy who is following us.

Q.   OK.  Do you know who he is?

A.   No, I don't.

Q.   Did you speak to him at all?

A.   No, I did not.

Q.   And when was the last time you saw

LIVINGSTON

him that day?

A.   I don't recall seeing him anymore
after I exited the building.

Q.   Now, you stated earlier and you
state in your third amended complaint that
you believe that the termination of your
employment was retaliatory.  What do you
believe that was in retaliation for?

A.   I believe that I was discriminated
against when I was demoted from my Queens
courthouse beat, and I believe every, every
day after that, I have been discriminated
against, and I believe my termination, in
essence, since the Post -- since my
supervisor -- since my editor at the Post sat
across from me during my deposition, I think
it was January of last year, and heard
everything that went on in that deposition,
including questions and answers in relation
to any mystery shopping I did, and then this
is the reason a year later that I'm
terminated, I believe this is all
retaliatory, related to, related to the
lawsuit.

LIVINGSTON

Q.   Who is the editor you are referring
to in your last answer?

A.   The editor who sat across from me
during my deposition?

Q.   Yes.

A.   That would have been, in January,
that would have been Michelle Gotthelf.

Q.   Was Jesse Angelo at your
deposition?

A.   No.  Jesse Angelo was not at the
January deposition or the deposition I just
had in February.

Q.   In fact, at the time, Jesse Angelo
wasn't -- was running the daily, he wasn't
actually involved in the New York Post,
correct?

MR. PEARSON:  Objection.

A.   I don't know what Jesse Angelo's
duties would have been during my deposition.

Q.   So it is your testimony that your
termination was in retaliation for what
exactly?

MR. PEARSON:  Objection.

A.   I thought I answered that a moment

LIVINGSTON

ago.

Q.   Was it in retaliation for the
filing of your lawsuit?

MR. PEARSON:  Objection.

A.   From the time I was demoted from my
beat at Queens courthouse, I have been
discriminated against by the New York Post by
the editors there.  I have been discriminated
against since that time, and I believe this
termination was as a result of the
discrimination as well as retaliatory in
regards to the lawsuit that was filed.

Q.   And in what way have you been
discriminated against at the New York Post
since your deposition in January of 2012?

A.   I am sorry, repeat that again.

Q.   In what way were you discriminated
against at the Post since your deposition in
January of 2012?

A.   As I stated, every day since my
demotion from the Queens courthouse beat, I
have been discriminated against.  Every day
that I was sent out on stories that my
editors knew had no likelihood of making the

LIVINGSTON

1
2  2012 to the present, other than the meeting
3  you described with Jesse Angelo, have you had
4  any other contact with Jesse Angelo?
5      A.  Yes.
6      Q.  When was that?
7      A.  I think it was in January, there
8  was a going away party for Michael Hechtman,
9  who was a long-time editor at the Post, and
10  during the festivities, there was an occasion
11  where Jesse and I, I guess we were passing
12  one another, and Jesse Angelo intentionally
13  looked away so he didn't have to say anything
14  to me, which kind of reminds me of another
15  black employee that was fired by the Post who
16  told me about -- it just reminded me of Neil
17  Graves, another black employee who had been
18  fired by the Post who told me about -- he was
19  walking down the street one day and saw Jesse
20  Angelo and Jesse intentionally looked away so
21  he wouldn't have to say anything to him.
22      Q.  Do you know if Jesse looked away
23  from you at the party because you're black?
24      MR. PEARSON:  Objection.
25      A.  I couldn't really tell you what his

LIVINGSTON

1
2  reasoning for looking away was.  I just know
3  what he looked away when he could have just
4  as easily said hello.
5      Q.  Do you know if he looked away from
6  white people at the party as well?
7      MR. PEARSON:  Objection.
8      A.  I wasn't watching him at the party.
9  I just know that when there was an occasion
10  when he and I passed near one another, he
11  looked away.
12      Q.  And did you say anything to him or
13  did he say anything to you at the party?
14      A.  As I just said, he looked away, so
15  no, he didn't say anything to me.
16      Q.  And is that the only occasion since
17  January of 2012 other than your termination
18  meeting where you have had any contact with
19  Jesse Angelo?
20      A.  Right now, I don't recall any other
21  contact.  Right now, I don't recall that.
22      Q.  What month and year was the
23  Hechtman party?
24      A.  I believe that was in January of
25  this year.

LIVINGSTON

1
2      Q.  January 2013?
3      A.  Yes.
4      Q.  Other than what you have testified
5  to here today, so far, is there any other
6  change, are there any changes in how you were
7  treated since your last -- since your January
8  2012 deposition at the New York Post?  Let me
9  rephrase that.
10      Since January of 2012, when you
11  were first deposed in this case, have there
12  been any changes at the New York Post in the
13  way you have been treated other than any of
14  the things you have testified to here today
15  so far?
16      A.  Right now, I don't recall --
17  nothing else comes to mind right now in
18  regards to that question.
19      Q.  Do you think you were treated worse
20  after January of 2012 or was it simply
21  consistent treatment both before and after
22  January of 2012?
23      MR. PEARSON:  Objection.
24      A.  As I stated, there was a
25  continuation from the demotion from the

LIVINGSTON

1
2  Queens courthouse beat and every day was just
3  a, pretty much a dead-end assignment that had
4  little or no chance of making the paper.
5      Q.  OK.  Since January of 2012, have
6  you had any conversations or communications
7  with any editor or New York Post executive
8  about your lawsuit?
9      A.  I am sorry, what was the question
10  again?
11      Q.  Since January of 2012, have you had
12  any conversations with any editor or New York
13  Post executive about your lawsuit?
14      A.  Not that I recall, no.
15      Q.  Was the -- was the white reporter
16  on the Williams story that was sent to
17  another location, did that reporter get an
18  interview of Williams?
19      A.  I'm pretty sure -- I'm pretty sure
20  I mentioned to you that I didn't know what
21  that reporter got.
22      Q.  So you don't know if that reporter
23  was sent to a location that didn't bear fruit
24  either, right?
25      MR. PEARSON:  Objection.