UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
:
AUSTIN FENNER and IKIMULISA                     :
LIVINGSTON,                                     :
                                                :
                            Plaintiffs,         :
                                                :
             vs.                                :     09 CV 9832 (LGS)
                                                :
NEWS CORPORATION, NYP HOLDINGS,                 :
INC., d/b/a THE NEW YORK POST,                  :
and MICHELLE GOTTHELF and DANIEL                :
GREENFIELD, in their official and individual    :
capacities,                                     :
                                                :
                            Defendants.         :
------------------------------------------------------------x

## AFFIDAVIT OF MICHELLE GOTTHELF

**STATE OF NEW YORK**       )
                            ) ss.:
**COUNTY OF NEW YORK**      )

  MICHELLE GOTTHELF, being duly sworn, deposes and says:

  1.  I am the Editor of the Metropolitan Desk ("Metro Desk") for Defendant NYP Holdings, Inc., d/b/a the New York Post (the "Post"). I have personal knowledge of the facts set forth herein, except where otherwise indicated. I submit this Affidavit in support of the Post's, Daniel Greenfield's, and my motion for summary judgment. This Affidavit does not include all facts and circumstances known to me that relate to this matter.

  2.  I have been employed as the Metro Desk Editor since December 2007. I oversee the Metro Desk, which reports on news stories, and I supervise the approximately 50 reporters and seven editors who report to the Metro Desk. My duties also include, among other things,

determining stories for publication and editing and rewriting stories prior to publication. Previously, I served as the Deputy Metro Desk Editor for approximately five years.

3. Reporters for the Metro Desk generally have one of three assignments: (i) runner (or "street" or "field" reporter); (ii) "rewrite"; or (iii) "beat reporter." Reporters of all seniority levels work on each assignment, although specific duties may vary by reporter. More senior and/or highly compensated reporters are expected to produce at a higher level than more junior reporters.

4. Reassignment between runner, rewrite and beat reporter is neither a promotion nor demotion, and reporters are moved between assignments as needed by the Metro Desk. When reassigned between these three assignments, there is no accompanying change in pay, seniority, or benefits. Reassignments are not communicated to the Post's Human Resources Department ("HR"), nor are they processed by HR.

5. Runners work almost exclusively from the field – i.e. away from the Post's office out in the City and the surrounding areas – and receive story assignments from the Post's editors and/or rewrites. They do not work from the Post's offices and rarely come into the newsroom, which is located at 1211 Avenue of the Americas, during a shift; rather, they call the newsroom to receive assignments. Runners typically report from a news scene, prepare notes and/or draft story language, and provide such to a rewrite via telephone or e-mail.

6. Rewrites work in the newsroom. They will receive notes and/or draft language from runners and prepare a story based on these notes. Additionally, they conduct reporting from the newsroom and coordinate the runner(s) on a story.

7. Runners and rewrites are sometimes termed "general assignment reporters" because they do not have a specific topical focus.

8. Beat reporters are assigned to cover a specific topical area. Beat reporters must have a strong knowledge of their beat, including of the subject matter, and have good sources. Beat reporters must be able to write stories on deadline, and their copy (draft language for a story) must be "clean," or stated otherwise should not need significant rewriting or editing after it is submitted. Court reporters are "beat reporters."

9. All Post reporters, be they runners, rewrites or beat reporters, are required as part of their job to look for and/or generate investigative, enterprise and exclusive story ideas, and must possess sources. Senior reporters are expected to perform this part of their job with a high level of quality and productivity.

10. Austin Fenner ("Fenner") was hired by the Post in 2007 as a senior reporter, at a high salary that put him in the top ten reporters in terms of compensation. He reported to the Metro Desk. Fenner never had a contract for a term of employment with the Post, but remained at all times an at-will employee.

11. Fenner was initially assigned to work as a rewrite from the Post's offices. However, he proved to be a poor writer as he often submitted work that had grammatical errors, including syntax errors, and frequently contained factual errors. In addition, an essential requirement of his job was to find, develop, and propose to his editors (or "pitch," in the parlance of the newsroom) exclusive, enterprise, or investigative stories that would be suitable for publication in the Post. Fenner also performed poorly in this aspect of his job (among others).

12. Starting in 2008, Fenner was increasingly sent to cover news events from the field as a runner, as opposed to working as a rewrite in the newsroom. By sending Fenner to report from the field, I hoped his performance would improve as this would require less writing and

might give him the opportunity to break news lines and do investigative pieces from the field. However, Fenner did not improve.

13.     Like other runners, Fenner was assigned stories to cover, including some that could be considered high profile and/or national stories. All reporters, whether junior or senior, are expected to cover assigned stories and/or conduct assigned interviews. However, as a highly-compensated senior reporter, Fenner was expected to develop sources and new information, discover unique angles, perform investigative work, or otherwise produce exclusive stories when he was assigned a story. Fenner failed to do this.

14.     By way of example, in May 2008 Fenner was assigned to cover Reverend Jeremiah Wright, the former pastor of then-presidential candidate Barack Obama, in Chicago. Fenner was expected to provide exclusive, investigative or enterprise stories regarding Wright that other news outlets did not have. Instead, Fenner produced one story based on interviews of Wright's congregation members. After being in Chicago for days, Fenner was called back early because he was not generating any exclusive, investigative or enterprise work.

15.     Similarly, in January 2009, a plane crashed into the Hudson River in the "Miracle on the Hudson." I assigned Fenner, along with approximately a dozen other Post reporters, to cover this story. Fenner's only contribution was to interview a passenger, Bill Zuhoski, who was also being interviewed by other news outlets at the same time, including *The New York Times*, *The New York Daily News*, and *The Today Show*. Fenner's interview was not a significant aspect of the Post's coverage, and he provided no information not reported by other news outlets.

16.     Also, in February 2009, Fenner was assigned to interview Timothy Dolan, recently appointed Archbishop of the New York, in Milwaukee, which he did. Fenner's interview was a routine assigned interview, and competently performing such an interview is a

4

basic requirement of a reporter at any level. While in Milwaukee, Fenner was also expected to provide investigative or exclusive content. The only story that Fenner pitched from Milwaukee concerned an adoption arranged by Dolan, which was previously published in another media outlet.

17.     I also supervised Ikimulisa Livingston ("Livingston"), either directly or indirectly, from February 2006 through the termination of her employment in February 2013. Livingston reported to the Metro Desk and likewise was an at-will employee with no contract for a term of employment. Up until early 2006, Livingston was a general assignment reporter.

18.     From early 2006 to November 2008, she was assigned to the Queens courthouses beat. She worked a scheduled reporting shift that began at 9:00 am and ended at 5:00 pm. In or about September 2007, the days of her shift changed from Sunday through Thursday to Monday through Friday.

19.     After November 2008, she was a runner. I made the decision to take her off the Queens courthouses beat because she was not generating publishable stories of sufficient quality or frequency from that beat. She kept her more sought-after shift of Monday through Friday.

20.     In December 2008, I assigned William Gorta to the Queens courthouses beat. Gorta was highly qualified for the position: he was an experienced reporter, was an adjunct professor of journalism at Columbia University, and had been a police captain for many years, among other things. In or about November 2010, I replaced Gorta (when he was assigned to a federal courthouse) in the Queens courthouses with another reporter, Christina Carrega, who is African-American.

21.     Desks in the Post's newsroom are assigned on the basis of need. For instance, rewrites are assigned desks because they work in the newsroom. For the same reason, I have not

assigned and do not assign desks to runners, as they are based in the field. In all of the time I have been the Metro Desk Editor at the Post, I have never assigned a desk to a runner. On occasion, a reporter reassigned from a newsroom job to runner might temporarily keep his/her desk following reassignment. For instance, Austin Fenner was assigned a desk when he was a rewrite, but kept it after he was assigned to runner until his employment ended. I understand that Ms. Livingston claims that her not having a desk assigned to her in the newsroom after December 2008 when she became a runner is discriminatory, but this is false, as I have never assigned a desk to *any* runner at the Post.

22.    It is also the case that, as a runner, Ms. Livingston had no need for an assigned desk in the newsroom at any time while I have been Metro Editor. As her supervisor, I can state that the job duties of runners simply do not require it, and, to answer her claim that her not having a desk was discriminatorily motivated, I can say that the following is an exemplary, but not exhaustive, list of reporters who are not African-Americans who do not have desks in the newsroom: Jennifer Bain, Erin Calabrese, Kevin Fasick, Reuven Fenton, Lorena Mongelli, Rebecca Rosenberg and Frank Rosario.

23.    Leonard Greene, who is an African-American rewrite reporter for the Metro Desk, has been assigned in the Post's newsroom at all times relevant to Fenner and Livingston's claims. Greene has had a desk assigned to him in the newsroom at all relevant times.

24.    During Zach Haberman's employment as an editor for the Post, I worked with him frequently. I have heard Haberman raise his voice and criticize the work of the reporters whom he supervised, including white reporters. By way of example, I heard Haberman raise his voice to Denise Buffa, Alex Ginsberg, Stephanie Cohen, Kieran Crowley, and Selim Algar in

connection with their work. All of them are white. I have never heard Haberman use any racial epithets or make any derogatory comments at any Post employee.

25. I understand that Mr. Fenner asserts that my Deputy Metro Editor, Dan Greenfield, raised his voice to him on certain occasions and claims that it was discriminatory, although he admits that at no time did Dan use any type of racially offensive language, epithet, or even make any reference to race in any way. I have worked with Dan Greenfield for years, sitting at a desk in the same open space only a few feet from Dan's desk, and have heard him raise his voice in the pressure of the newsroom many times to reporters who are white. I have heard him use curse words in conversations with reporters who are white. At no time has he ever used a racially offensive term to any reporter.

26. The Defendants in this matter produced documents that had been Bates numbered NYP-FL01716 through NYP-FL01857 (the "Payforce documents"). The Payforce documents are true and correct copies of screen shots from the Payforce electronic record keeping system used by HR to record employee compensation. The Payforce documents accurately reflect the highest salary of each of the 71 reporters who reported to my Metro Desk from 2007 through November 2009. The Payforce documents were created and maintained during each reporter's employment with the Post, and are kept in the ordinary course of business by a Post employee in HR with knowledge and charged with the task of maintaining these records.

27. Based on my review of the Payforce documents, the average Metro Desk reporter earned an annual salary of $67,674.53 from 2007 through November 2009. Fenner earned an annual salary of $92,000.00 and was the ninth highest paid reporter. Livingston earned an annual salary of $70,442.40, which was above average for a reporter.

28.     In 2009, plaintiffs each received performance warnings at or about the time that they received their fiscal year 2009 performance evaluation. I understand plaintiffs claim that they received their 2009 performance warnings because of their race and/or color. This is untrue; both received warnings because of their poor performance. In 2009 I gave white reporters performance warnings as well, documentation of which defendants have produced confidentially with the Bates Nos. NYP-FL3833 through NYP-FL3841 and NYP-FL3876. Below are the positions and hire dates of white reporters who received warnings in 2009, as well as the specific bases for underperformance set forth in the warnings. Plaintiffs have been informed through discovery of the full identities of these reporters:

| **Position** | **Hire Date** | **Reason for Warning** |
|---|---|---|
| Reporter | 1/12/98 | "Lack of ideas; lack of creativity; unreliable news coverage, missed facts in stories" |
| Reporter | 3/14/94 | "Copy that needs extensive editing; Pitching stories that are suited to the newspaper" |
| Reporter | 4/16/956 | "Lack of basic writing skills needs excessive rewrite; Pitching more pop culture slice of life stories" |
| Reporter | 5/19/08 | "Lack of ideas; Poor basic writing skills, which require extensive rewrite" |
| Reporter | 10/29/01 | "Poor communication with editors; Unprofessional conduct; Unreliable news coverage" |
| Reporter | 3/17/96 | "Anger and attitude issues; Lack of ideas" |

_____
Michelle Gotthelf

Sworn to before me this
9th day of May 2013

_____
NOTARY PUBLIC

JOSHUA D. FULOP
NOTARY PUBLIC-STATE OF NEW YORK
No. 02FU6208919
Qualified in Queens County
My Commission Expires July 13, 20_13_

8