UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
AUSTIN FENNER and
IKIMULISA LIVINGSTON,

                            Plaintiffs,        No. 09 CV 9832 (LBS)

        v.

NEWS CORPORATION, NYP HOLDINGS,
INC., d/b/a THE NEW YORK POST,
MICHELLE GOTTHELF and DANIEL
GREENFIELD, in their official and individual
capacities,

                            Defendants.
------------------------------------------------------------ X

## AFFIDAVIT OF AUSTIN FENNER

STATE OF NEW YORK   )
                              ) ss.:
COUNTY OF NEW YORK )

      AUSTIN FENNER, being duly sworn, deposes and says:

      1.    I am a Plaintiff in the above-captioned action. I have personal knowledge of the facts set forth herein and submit this affidavit in opposition to the motion for summary judgment of the Defendants NYP Holdings, Inc., d/b/a the New York Post (the "Post"), Michelle Gotthelf ("Gotthelf") and Daniel Greenfield ("Greenfield") (together, with News Corporation ("News Corp."), the "Defendants").

      2.    I am a Black and/or African-American male.

      3.    I worked as a reporter at the Post from May 2007 until I was unlawfully terminated on or around November 9, 2009.

      4.    After I joined the Post from the New York Daily News ("Daily News"), I continued to do award-winning reporting work. For example, I was the first Post reporter dispatched to the scene of the "Miracle on the Hudson" involving US Airways Flight 1549

landing on the Hudson River on January 15, 2009. My byline for my coverage was the lead byline on the two main stories run by the Post on the Miracle on the Hudson. After my termination, I learned that the 2010 New York Press Club award was presented to the Post for my contributions to coverage of President Obama's first inauguration, which chronicled a bus caravan from a Harlem church whose congregants had listened to Dr. Martin Luther King, Jr. deliver a sermon at their church ten days before his assassination. The coverage of the congregants' pilgrimage to Washington, DC drew a deep connection between Dr. King's vision and the Obama presidential victory, with the latter signifying the fulfillment of an American dream.

5. I also produced stories of social significance and broad scope while at the Post. For example, I was praised by the editorial page of the Post for getting a jailhouse interview with a mentally disturbed man who was in a fight with an off-duty police officer, which was included in a story I wrote about mental health issues and government's responsibility and accountability for care of the mentally ill.

6. In or around June 2008, I sent Defendant Gotthelf an email requesting permission to take some days off using paid vacation days. I had not taken any paid time off for the previous six months. Defendant Gotthelf responded curtly that, "All we get from you" is requests for time off. Defendant Gotthelf's statement was unequivocally false and indicative of the discriminatory, derogatory and demeaning treatment to which I was subjected, even as an experienced reporter, and a Black employee at the Company.

7. In or around the summer of 2008, I met with Defendant Gotthelf, who was one of my supervisors, and Amy Scialdone of Human Resources about my performance evaluation. In that meeting, I told them that my rating and other statements in the evaluation did not reflect the

hard work I had put in and my accomplishments over the previous year. I also told them that I believed I was being unfairly set up to be fired. Defendant Gotthelf offered only that I "still [had] a chance to turn things around" in response.

8. During my employment with the Company, I did not witness nor was I told about any instance in which Defendants Gotthelf or Greenfield subjected any White employee to derogatory, demeaning and insulting treatment, such as being berated, cursed at or excluded from the newsroom.

9. I also was paid less than my White coworkers, such as Jeanne MacIntosh, and other experienced reporters at the Post. Of the approximately one dozen senior-level reporters on the Post's Metro desk in 2009, I was among the lowest-paid.

10. On February 18, 2009, the Company displayed its racially discriminatory attitudes in a revolting and hateful political cartoon published in the Post on February 18, 2009, which depicted President Obama as a bloodied, bullet-riddled chimpanzee that had been shot by police officers. On or around February 20, 2009, I was quoted in a piece written by Richard Prince for his blog, *Journal-isms*, about the Post's highly offensive chimpanzee cartoon and its illustration of the discriminatory environment and corrosive racial insensitivity at the Company. I allowed Mr. Prince to include my name with my quote on his blog because I understood that the statement would be much more powerful and meaningful when attached to the identity of a minority reporter working at the Post at that time. I did this despite the risk that it would expose me to even worse discriminatory treatment and also retaliation, a fear expressed in that same piece by some of the anonymous minority Post employees who did not wish to be identified by Mr. Prince, but who also provided quotes about the political cartoon and racially hostile environment at the Company.

11. Mr. Prince observes a basic protocol, evidenced by his stories, of speaking with a representative of organizations discussed in his stories. The piece in which I was quoted confirmed that Mr. Prince spoke with a spokeswoman for the Post, who declined to comment in connection with the piece, thus demonstrating the Company's awareness that it would be published. Furthermore, the Post routinely sets up Google alerts and uses its public relations staff and outside professionals to collect all online material concerning the Post, particularly during a controversy like the one that followed the publication of the February 2009 chimpanzee political cartoon. Various Company employees, including Ikimulisa Livingston and Doug Montero, also told me that they had seen the *Journal-isms* blog post in which I was quoted.

12. Shortly after my comments appeared in print online in late February 2009, Defendants Gotthelf and Greenfield expressly excluded me from the newsroom. Defendants Gotthelf and Greenfield instructed me that I was required to ask permission in advance in order to come to the Post's newsroom. The only explanation they offered for this new and unusual restriction was that things were "going to be done differently" from that point forward. I objected that this new condition and restriction would make doing my job much more difficult. I raised this objection with and expressed my belief that this restriction on my access to basic reportorial resources was inappropriate to Defendants Gotthelf and Greenfield several times, but they declined to alter their instruction. That same day, I spoke with Leonard Greene, a long-time Black columnist for the Post about this new restriction. Mr. Greene commented on my exclusion from the newsroom, saying "That's pretty bad, how are you supposed to do your job if you can't get into the newsroom?," and indicated that requiring someone to call ahead in order to come to the newsroom was unusual and inappropriate. My exclusion from the newsroom was unlawfully

discriminatory and retaliatory based upon my race and opposition to the Company's unlawful employment practices.

13. The discrimination and hostile work environment I experienced during my employment culminated in my discriminatory and retaliatory termination by Defendants Gotthelf and Greenfield on November 9, 2009 based on my race and color, as well as because of my opposition to the Company's and Defendants' discriminatory practices.

14. The terms and conditions of my employment included employment policies and procedures, as well as employee benefits plans, administered and created by News Corp.

15. On at least two occasions, in 2008 and 2009, I attended a seminar with around twenty other employees regarding the performance evaluation process and how to fill out a self-evaluation. The seminars were led by a human resources employee who each time identified herself as from News Corp.

16. The Third Amended Complaint does not contain every discriminatory, harassing, retaliatory, offensive, degrading and/or improper comment or act that I witnessed, experienced and/or had described to me during my employment with Defendants.

17. I also have not described in this affidavit every discriminatory, harassing, retaliatory, offensive, degrading and/or improper comment or act that I witnessed, experienced and/or had described to me during my employment with the Defendants.

18. I also rely on the allegations made in my Third Amended Complaint and upon the affidavit submitted by the other Plaintiff in the above-captioned case, Ikimulisa Livingston, as well as any other affidavits submitted by current and former employees of the Defendants in support of my Third Amended Complaint.

_____
Austin Fenner

Sworn to before me on
May 23, 2013

_____
Notary Public

LAWRENCE MICHAEL PEARSON
Notary Public, State of New York
No. 02PE6225600
Qualified in New York County
Commission Expires July 26, 2014