UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                               :

AUSTIN FENNER and               :
IKIMULISA LIVINGSTON,      :
                               :

             Plaintiffs,   :      Civil No. 09 CV 9832 (LGS)
                               :

             vs.               :

NEWS CORPORATION, NYP HOLDINGS, :
INC., d/b/a THE NEW YORK POST,    :
MICHELLE GOTTHELF and, DANIEL   :
GREENFIELD, in their official and individual :
capacities,                       :
                               :

             Defendants.  :
-------------------------------------------------------------x

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS NYP HOLDINGS, INC., MICHELLE GOTTHELF and DANIEL GREENFIELD'S MOTION FOR SUMMARY JUDGMENT

THOMPSON WIGDOR LLP

85 Fifth Avenue
New York, NY 10003
Phone: (212) 257-6800
Facsimile: (212) 257-6845

*Counsel for Plaintiff*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 2

    I.    RACISM AT THE COMPANY ..................................................................... 3

          A.  Racism Permeates The Work Environment At The Company ................................ 3

          B.  Hostile Work Environment And Discrimination Directed Towards Plaintiffs ....... 5

          C.  Livingston's Discriminatory Demotion ................................................................... 6

    II.    LIVINGSTON AND FENNER ENGAGE IN PROTECTED ACTIVITY ................. 8

    III.    FENNER'S DISCRIMINATORY AND RETALIATORY TERMINATION ............ 9

    IV.    LIVINGSTON'S DISCRIMINATORY AND RETALIATORY TERMINATION .. 10

ARGUMENT ............................................................................................................. 12

    I.    LEGAL STANDARD .................................................................................... 12

    II.    NUMEROUS ISSUES OF FACT PRECLUDE DISMISSAL OF PLAINTIFFS' DISPARATE TREATMENT CLAIMS ................................................................ 12

          A.  The Evidence Supports Fenner's Claim of Discriminatory Termination ............. 13

          B.  The Evidence Supports Livingston's Claim of Discriminatory Demotion .......... 17

          C.  Plaintiffs Were Banned From The Newsroom ...................................................... 19

    III.    NUMEROUS ISSUES OF FACT PRECLUDE DISMISSAL OF PLAINTIFFS' HOSTILE WORK ENVIRONMENT CLAIMS ................................................... 19

    IV.    NUMEROUS ISSUES OF FACT PRECLUDE DISMISSAL OF PLAINTIFFS' RETALIATORYTERMINATION CLAIMS ...................................................... 20

          A.  The Evidence Supports Fenner's Retaliation Claim ............................................. 20

              i.   Knowledge of Fenner's Complaint Can Be Inferred By The Jury ............. 20

              ii.  Fenner's Complaints Concerning the Cartoon Are Protected .................... 21

iii.   The Purported Lack Of Temporal Proximity Is Irrelevant ........................22

iv.   The Evidence Establishes Pretext ...............................................22

B.   The Evidence Supports Livingston's Retaliation Claim ......................................23

i.   The Evidence Establishes a prima facie Case With Regard to Livingston's Retaliatory Termination Claim ..................................................23

ii.   The Evidence Establishes Pretext ...............................................24

V.   GOTTHELF AND GREENFIELD ARE INDIVIDUALLY LIABLE ......................24

CONCLUSION ............................................................................................................25

## TABLE OF AUTHORITIES

### CASES

Ackerman v. Oryx Communications, Inc.,
    810 F.2d 336 (2d. Cir. 1987) ......................................................................... 18

Adams v. City of New York,
    837 F.Supp.2d 108, 126 (2d Cir. 2011) ........................................................ 20

Alston v. New York City Transit Authority,
    14 F.Supp.2d 308 (S.D.N.Y. 1998) ............................................................... 20

Anderson v. City of New York,
    817 F. Supp. 2d 77 (E.D.N.Y. 2011) ............................................................. 13

Bennett v. Health Mgmt. Sys., Inc.,
    92 A.D.3d 29, 43-44 (1st Dept. 2011) ........................................... 15, 19, 20, 23

Brown v. American Honda Motor Co.,
    939 F.2d 946, 949 (11th Cir. 1991) ............................................................... 24

Byrnie v. Town of Cromwell, Bd. of Educ.,
    243 F.3d 93, 106 (2d Cir. 2001) .................................................................... 18

Collins v. State of Ill.,
    830 F.2d 692, 704 (7th Cir. 1987) ................................................................. 18

De La Cruz v. New York City Human Resources Admin. Dept. of Soc. Svcs.,
    82 F.3d 16, 20 (2d Cir. 1996) ........................................................................ 18

Durkin v. Verizon New York, Inc.,
    678 F. Supp. 2d 124, 133 (S.D.N.Y. 2009) .............................................. 19, 24

EEOC v. Ethan Allen, Inc.,
    44 F.3d 116, 120 (2d Cir.1994) ..................................................................... 18

Fanning v. Gold Sys., Inc.,
    No. 05 Civ. 1202(JCH), 2007 WL 795098 at *5 (D. Conn. Mar. 14, 2007) .... 16

Feingold v. New York,
    366 F.3d 138, 152 (2d Cir. 2004) ............................................................ 12, 13

Galdieri-Ambrosini v. National Realty & Development Corp.,
    136 F.3d 276 (2d Cir. 1998) .......................................................................... 21

Gordon v. New York City Bd. of Educ.,
  232 F.3d 111, 116 (2d Cir. 2000) ........................................................20, 21, 22

Graham v. Long Island R.R.,
  230 F.3d 34, 39 (2d Cir. 2000) ....................................................................13

Harper v. Hunter Coll.,
  No. 95 Civ. 10388(JFK), 1999 WL 147698 at *2 (S.D.N.Y. Mar. 15, 1999)..................17

Hinton v. City College of New York,
  No. 05 Civ. 08951(GEL), 2008 WL 591802 (S.D.N.Y. Feb. 29, 2008) ..........................22

Holmes v. Brentwood Union Free Sch. Dist.,
  No. 03 Civ. 1084(TCP)(AKT), 2006 WL 1581434, *6 (E.D.N.Y. May 25, 2006) ..........21

Howe v. Town of Hempstead,
  No. 04 Civ. 0656(DRH)(ETB), 2006 WL 3095819 at *7 (E.D.N.Y. Oct. 30, 2006)........14

Ifill v. United Parcel Service,
  No. 04 Civ. 5963(LTS), 2005 WL 736151, at *3 (S.D .N.Y. Mar. 29, 2005) .................28

Jute v. Hamilton Sundstrand Corp.,
  F.3d 166, 175 (2d Cir. 2005) ......................................................................20

Kalp v. Kalmon Dolgin Affiliates of Long Island Inc.,
  No. 11 Civ. 4000(JG), 2013 WL 1232308 (E.D.N.Y. Mar. 27, 2013)............................18

Keeley v. Citibank, N.A.,
  711 F. Supp. 157, 160 (S.D.N.Y. 1989) ........................................................16

Kline v. Marine Midland Bank, N.A..,
  No. 88 Civ. 1125E, 1990 WL 112287 (W.D.N.Y. July 26, 1990) ...................................16

Klings v. New York State Office of Court Admin.,
  No. 04 Civ. 3400(KAM)(LB), 2010 WL 1292256 at *15 (E.D.N.Y. April 5, 2010) .......16

Leibowitz v. Cornell Univ.,
  584 F.3d 487, 502 (2d Cir. 2009) .............................................................13, 17

Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't,
  510 F.3d 681, 693 (7th Cir. 2007) ...................................................................24

Reeves v. Sanderson Plumbing Products, Inc.,
  530 U.S. 133, 147-149 (2000) ....................................................15, 19, 20, 23

Rose v. New York City Bd. of Educ.,
    257 F.3d 156, 162 (2d Cir.2001) ............................................................................14

Santos v. Costco Wholesale, Inc.,
    271 F.Supp.2d 565, 571 (S.D.N.Y. 2003) ..............................................................12

Saridakis v. S. Broward Hosp. Dist.,
    681 F. Supp. 2d 1338, 1353 (S.D. Fla. 2009) ........................................................21

Saulpaugh v. Monroe Cmty. Hosp.,
    4 F.3d 134 (2d Cir. 1993) .......................................................................................22

Tomassi v. Insignia Financial Group, Inc.,
    478 F.3d 111, 116 (2d Cir. 2007) ...........................................................................12

Trachtenberg v. Dep't of Ed.,
    No. 12 Civ. 7964(PAE), 2013 WL 1335651, at *5 (S.D.N.Y. April 3, 2013) ..................18

Wallengren v. Samuel French, Inc.,
    39 F. Supp. 2d 343, 344-45 (S.D.N.Y. 1999) ..................................................22, 23

Weiss v. JPMorgan Chase & Co.,
    332 F. App'x 659, 663 (2d Cir. 2009)......................................................................18

Williams v. Regus Mgmt. Group, LLC,
    836 F.Supp.2d 159, 173 (S.D.N.Y.2011) ...............................................................15

Zubulake v. UBS Warburg LLC.,
    382 F. Supp. 2d 536, 544 (S.D.N.Y. 2005) ...........................................................17

## STATUTES

Fed. R. Civ. P. 56 (c) ..........................................................................................................12

42 U.S.C. § 1981 .......................................................................................................passim

42 U.S.C. § 2000e (Title VII)........................................................................................13, 21

N.Y. Exec. Law § 296(1) (NYSHRL) ............................................................................passim

N.Y.C. Admin. Code § 8-107 (NYCHRL).......................................................................passim

Plaintiffs submit this Memorandum of Law in Opposition to the Motion for Summary Judgment of NYP Holdings, Inc., d/b/a The New York Post (the "Post") (together with Defendant News Corporation ("News Corp."), the "Company"), Michelle Gotthelf and Daniel Greenfield (collectively, "Defendants") (the "Motion").

## PRELIMINARY STATEMENT

In this case undisputed facts are few and far between, and the Motion blithely omits or distorts the substantial evidence supporting Plaintiffs' claims.   Indeed, review of the record confirms the Court's impression at the recent conference that "it sounds like there are many facts that are in dispute." Guzman v. News Corporation, No. 1:09 Civ. 09323(LGS), Dkt. No. 121 at 13:24-25.  Defendants subjected Plaintiffs to years of unremitting and hostile discrimination, including being subjected to verbal and profane tirades, demotions, revocation of resources and being banned from a reporters' lifeline: the newsroom.  Other Black employees were treated similarly, while White employees were permitted to freely use hateful racist terms such as "nigger" and "nigga" without consequences and deride Plaintiffs' story ideas of minority interest as "low rent."  In February 2009, about a month into the first term of our first African-American President, Barack Obama, the Post published a political cartoon showing a chimpanzee laying in a pool of blood, having been shot dead by two police officers, who refer to the animal as the author of the 2009 economic stimulus bill (the "Cartoon").  This Cartoon depicted President Obama as a dead chimpanzee, consistent with the historical racist depiction of Black persons as primates.  Fenner, Livingston and others complained about this racist Cartoon and Defendants' other discriminatory employment practices (a fact completely ignored in Defendants' Motion).

Defendants, motivated by discriminatory and retaliatory animus, subsequently terminated Fenner.  Defendants assert Fenner's performance as their stated reason for firing this highly

1

experienced and award-winning reporter. However, this pretext does not stand up in the face of his record and evidence of Defendants' animus against and disparate treatment of him. Fenner was praised routinely by same individuals who now claim he was incompetent, and the purported deficiencies cited by Defendants to justify his termination are false. Defendants, again motivated by discriminatory and retaliatory animus, terminated Livingston as well. The pretextual nature of their stated reason (her engagement in mystery shopping) is apparent: the mystery shopping had no known effect on her performance, violated no Company policy and was known to Defendants for more than a year before they purportedly acted on it.

## STATEMENT OF FACTS

Livingston began her career with Defendants in 1997. (Lern. Dec. Ex. 13 at NYP-FL000330).[1] In early-2006, after making repeated requests, Livingston was assigned to the cover the Queens County courts. (Liv. at [day 1] 85:19-87:20).[2] At the end of 2008, Livingston was demoted on account of her race and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Infra Facts § I.C. Livingston also was subjected to a race-based hostile work environment and disparate treatment, and was ultimately terminated in February 2013 because of her race and in retaliation for opposing Defendants' discriminatory practices. Infra Facts § I.B, IV. Fenner was hired as a Senior Reporter on the Metro Desk in May 2007. (Fenn. at 77;[3] Green. at 105:17-25[4]). Fenner also was subjected to a hostile work environment and disparate treatment because of his race, and was terminated in November 2009 because of his race and in retaliation for voicing opposition to Defendants' discriminatory practices. (Fenn. at 276:7-9).

---

[1] "Lern. Dec." citations are to the Declaration of Mark Lerner in support of Defendants' Motion.
[2] True and correct copies of referenced excerpts of the deposition of Ikimulisa Livingston dated January 13, 2012, February 20, 2013 and May 6, 2013 are attached to the Pear. Dec. as Exhibit 1 ("Liv. at [day __] [page __].").
[3] True and correct copies of referenced excerpts of the deposition of Austin Fenner dated January 11, 2012 are attached to the Pear. Dec. as Exhibit 2 ("Fenn. at [page].").
[4] True and correct copies of referenced excerpts of the deposition of Daniel Greenfield, dated April 5, 2012, are attached to the Pear. Dec. as Exhibit 3 ("Green at [page].").

I.      **RACISM AT THE COMPANY**

A.      **Racism Permeates The Work Environment At The Company**

In 2001, Col Allan terminated the only Black editor on the Metro desk, and since then

there has not been a single Black editor in the Post's newsroom.  (Gott. at 39:2-9, 77[5]; Fenn. at

227; Liv. at [day 1] 300:24-301:11).  As of November 6, 2009, there was only one non-White

editor.  Pear. Dec., Ex. 5, ¶¶ 6-7.  Black employees of Defendants have been denied

advancement, mistreated and terminated, including Leonard Greene (only Black reporter in

newsroom, denied advancement, subjected to derogatory remarks), Neil Graves (harassed and

terminated on account of race), Doug Montero (column revoked), Leonardo Blair (terminated

after challenging the NYPD's racist application of stop-and-frisk), Ebony Clark (denied

promotion and yelled at by Allan), Shari Logan (denied promotion) and Sandra Guzman (racially

harassed and ultimately terminated).  (Fenn. at 269:13-271:7, 277:14-17; Liv. at [day 1] 31:19-

20; 62:22-63:4; 87:24-90:2; 204:15-22; Gott. at 142:10-143:17; Pear. Dec., Exhs. 5, 6).

In contrast, White employees: (i) dominate the editor and reporter ranks; (ii) were not

harassed or screamed at in the manner as Black employees;[6] (iii) were not denied promotion

opportunities, career advancement or resources; (iv) were provided with more favorable story

assignments; and (v) were paid more than Black reporters with similar positions and experiences.

(See, e.g., Liv. [day 1] at 28-29, 31:19-20, 62-63, 65, 74-75, 112:9-15, 178-79, 187, 189, 191,

205; Liv. [day 3] at 22; Guzman at 579, 582, 592;[7] Fenn. at 66, 124-25, 177, 214-15, 237-38,

Pear. Dec., Exhs. 5, 6).   White employees also were permitted to utter racial epithets, including

---

[5] True and correct copies of referenced excerpts of the deposition of Michelle Gotthelf, dated March 29, 2012, are attached to the Pear. Dec. as Exhibit 4 ("Gott. at [page].").
[6] Defendants challenge this fact, but the testimony and affidavits cited to in support of it, based on the personal knowledge of the deponents and affiants, unquestionably establish a factual dispute regarding race-based hostility.
[7] True and correct copies of referenced excerpts of the deposition of Sandra Guzman dated October 13, 2011 and February 13, 2012 are attached to the Pear. Dec. as Exhibit 7 ("Guzman at [day __] [page].").

"nigger." (Allan at [Day 1] 252:22-254:8[8]; Liv. [day 1] at 133:7-22)   Allan failed to reprimand an employee he overheard refer to a Black employee as the Post's "token nigger." Id.   Jesse Angelo also heard the comment, but did not report it to Human Resources ("HR"), nor did he agree that calling an African-American a "nigger" is racial harassment.  (Ang. at [Day 1] 359:24-363:13[9]).  Another employee referred to a Black athlete as "nigga."  (Liv. [Day 1] at 133:7-22).

On February 18, 2009, the Post published a racist monkey cartoon that depicted President Barack Obama as a dead chimpanzee shot by police officers.  (Pear. Dec., Ex. 10).  Company management failed to remedy the concerns of employees who complained about the Cartoon. (Fenn. at 183-186; Jehn [day 1] at 67, 68, 75, 82, 132-33;[10] Ang. [day 1] at 139-42, 158-59). Allan referred to individuals protesting the Cartoon as follows: "most of them are minorities and the majority of them are uneducated."  (Pear. Dec., Ex. 6 at ¶ 25).  Allan testified to being "disappointed" at Guzman's public complaints concerning the Cartoon.  (Allan [day 1] at 63:21-64:12).  Allan also has also stated that all Latinos look alike while referring to a Black-Latino employee, and once asked a Post editor whether a Latino interviewee was brandishing a machete or gun during an interview.  (Guzman [day 1] at 114:21-115:3, 119:9-122:17).  Although Gotthelf and Greenfield were not overheard using racial epithets, both "constantly called stories about [B]lack people or Latino people 'low rent' which is tantamount to saying they're ghetto," and did not make similar comments concerning stories about Whites.  (Liv. 249:4-23).

---

[8] True and correct copies of referenced excerpts of the deposition of Col Allan dated February 14, 2012 and February 21, 2013 are attached to the Pear. Dec. as Exhibit 8 ("Allan at [day ___] [page].").
[9] True and correct copies of referenced excerpts of the deposition of Jesse Angelo dated April 25, 2012 and April 5, 2013 are attached to the Pear. Dec. as Exhibit 9 ("Ang. at [day ___] [page].").
[10] True and correct copies of referenced excerpts of the deposition of Jennifer Jehn dated June 26, 2012 and February 14, 2013 are attached to the Pear. Dec. as Exhibit 11 ("Jehn. at [day ___] [page].").

**B.**     **Hostile Work Environment And Discrimination Directed Towards Plaintiffs**

Gotthelf gave Livingston false performance reviews (Liv. [day 1] at 29, 67, 185-187) and denied Livingston bylines; actions not taken against White reporters. (Liv. [day 1] at 29, 69-70, 170-72, 181). For example, Livingston's August 2009 performance evaluation, which she refused to sign, (Lern. Dec., Ex. 16 NYP-FL000375), stated that she did not pitch enough stories and listed deficiencies that were due to the fact that she had been denied resources such as a desk, telephone, access to archives, librarians, or wire service. (Pear. Dec., Ex. 13, IL_275; Liv. [day 1] at 185-89). In contrast to Defendants' assertions, Livingston did pitch stories, but Gotthelf and Greenfield rejected them out of hand, (Lern. Dec. Ex. 10 at IL_590; Liv. [day 1] 173, 186-187, 203) dismissing her story pitches regarding minority communities as "low rent" or "ghetto" – a term not used for pitches involving Whites. (Liv. [day 1] at 83-84, 132:23-133:6). Greenfield also gave Livingston assignments with no chance of being published, while White employees were given priority pieces. (Liv. [day 1] at 29, 33, 69-70). Greenfield, Gotthelf and Haberman spoke to Livingston and other Black employees in a demeaning and demoralizing way, and screamed and cursed at her. (Liv. [day 1] at 39-40, 62-63, 104, 202-203, 205, 257-58; Gott. at 174, 309, 310:15-17, 311:6-8). White employees were not treated this way. (Id.). The cursing and screaming occurred on "a nearly daily basis." (Liv. [day 1] at 104).

Fenner likewise experienced a hostile work environment, including by being routinely subjected to screaming fits of profanity directed at him by Gotthelf and Greenfield. (Fenn. 67, 98, 139, 143, 170-171, 177-89, 209-210, 214-15, 226). Greenfield recalls raising his voice and using obscenities, such as "fuck" with Fenner. (Green. at 328:11-12, 331-332). Gotthelf yelled at Fenner (Fenn. at 98) on an "ongoing" basis (Fenn. at 187-88), and her and Greenfield "were screaming at [Fenner], and yelling at [Fenner], throughout [his career]" (Fenn. at 170). Starting

in 2008, Gotthelf increasingly sent Fenner to cover news events from the field, despite the fact that he was a Senior Reporter.  (Gotthelf Dec. ¶12; Green. at 320-21).  Fenner also was sent on more travel assignments than his White counterparts and denied vital resources provided to White colleagues.  (Fenn. at 221-224, 315-316).  A mid-2008 fabricated written warning further evidences Gotthelf's withering disparate treatment.  (Lern. Ex. 4.; Fenn. at 188).

Plaintiffs also were banned from Defendants' newsroom.  (Liv. [day 1] at , 192, 194-195, 201-202, 206-08; Fenn. at 208-211, 214, 216:16-20).  Livingston had to call for approval before entering the newsroom.  (Liv. [day 1] 194).  When picking up supplies from the newsroom, Greenfield addressed her with surprise and hostility, asking "what are you doing here?"  (Liv. [day 1] at 195:5-11, 203:2-10, 208; Green. at 257, 263).  Greenfield told Fenner, "we don't want you coming into the newsroom" without calling ahead.  (Fenn. At 208-211, 214, 216:16-20).

### C.   Livingston's Discriminatory Demotion

In December 2008, Ms. Livingston was demoted from the Queens County courts' beat to a general assignment reporter.  (Liv. at [Day 1] at 51, 53, 56, 114, 119-20, 124; Green. at 216-17, 218:16-25).  The demotion resulted directly in decreased compensation.  (Liv. at [Day 1] at 121, 124-25).  The court position also provided resources, including a desk, telephone and story opportunities, that the general assignment position did not (Liv. at 121, 187).  The purported reason for this action was that Defendants had decided to "mak[e] a change" – nothing concerning Livingston's performance was communicated to her.  (Liv. at [Day 1] 114-15).  Defendants now contend that Livingston was reassigned because she "miss[ed] parts and/or all of stories, fail[ed] to generate story ideas, and fail[ed] to develop sources."  (Def. Br. at 18).  This newly-minted performance-related justification is demonstrably false.  Gotthelf actually testified with regard to Livingston's ability to pitch good story ideas. Gott. at 159:14-15, 18-19,

6

160:4, 14, 222:24-233:7, 223:25-224:18, 228:9-10; 229:20-230:7.   Gotthelf also praised

Livingston's interviewing abilities, and her reviews state that she "can always be counted on to

make deadlines," "calls in accurate quotes" and "works . . . in a timely fashion."   (Id.; Lern. Dec.

Ex. 13 at NYP-FL000330, Ex. 15 at NYP-FL000334).

   In 2008 (just prior to her demotion), the Post ran daily articles of Livingston's coverage

of the Sean Bell trial, many of which were exclusive front-page stories.   (Liv. at [day 1] 122-123,

[day 2] 428; Gotthelf at 163-164; Green. 197-198, 200, 203-204).   Gotthelf noted that she did "a

great job" and "relied heavily on [her] quotes."   (Lern Dec. Ex.13 NYP-FL000330).   The news

desk also thought highly of her work and Zach Haberman, Associate Metro Editor, characterized

one article as follows: "*Once again* hell of a story." (Green. at 198:8-11; 207:3-5) (emphasis

added).   Whereas Defendants claim Livingston was beaten to stories by Nicole Bode, Livingston

testified that "I wasn't being beat consistently by Nicole" and actually "beat" Bode and the Daily

News to exclusive stories on numerous occasions   (Liv. 297:23-24; Liv. Aff. at ¶ 4).   Any claim

that Livingston's work required serious revision is false given that the majority of her stories

were published with only routine cuts or minor revision.   (Liv. at [Day 1] 222-23).   Finally,

Defendants' criticisms with regard to Livingston's performance ring completely hollow given

that Livingston had never produced as many front-page stories as she did in 2008, and believes

she produced more than any other reporter that year (which is not disputed).   (Liv. [Day 1] at

295; Lern. Dec. Ex. 21 at NYP-FL000821). ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████

---

[11] True and correct copies of referenced excerpts of the deposition of Amy Scialdone dated June 28, 2012 are attached to the Pear. Dec. as Exhibit 13 ("Scial." at [day __] [page].").

## II.    LIVINGSTON AND FENNER ENGAGE IN PROTECTED ACTIVITY

Livingston made numerous complaints concerning discrimination and retaliation, including to Gotthelf and HR.  (Liv. [Day 1] at 40:20-41:4).  She reported to HR in December 2009 that she had "been discriminated against due to [her] race . . . ."  (Liv. [Day 1] at 140; Lern. Dec. Ex. 21, IL_274-75).  She also complained that, *inter alia*, (i) her demotion was discriminatory, (ii) she was given fewer opportunities than White reporters, and (iii) she had not received a desk and phone despite Gotthelf's promises.  (Lern Dec. Ex. 21 NYP-FL000819).  Previously, on the day the Cartoon was published, Livingston told Gotthelf that it was "very, very offensive," "racist and discriminatory."(Liv. [Day 1] at 44-45, 318).  Shortly afterward, she received a warning letter.  (Id. at 190-91).  Livingston then complained by filing this action.

Fenner was quoted in an online publication called "Journal-isms," under the heading "Lack of Newsroom Diversity," as stating that the Cartoon "churned [his] stomach."  (Fenn. at 189; Pear. Dec., Ex. 14).  Fenner was named, but other minority staffers "asked Journal-isms not to identify them even in the broadest terms, because it would be easy to determine who they are." (Id.).  The author of the article, "spoke to a spokeswoman for News Corp." about the article (Id.; Fenn. at 185:16-24), and the Company used public relation firms and clipping services to track all online material about it (Aff. of A. Fenner at ¶ 11).  Just days after the article was published, Fenner was loudly rebuked and subjected to foul language by Greenfield.  (Fenn. at 186:9-13).

Fenner also objected to the discriminatory employment practices to which he was subjected, including his ban from the newsroom:  "I told [Gotthelf and Greenfield] it was outrageous that they were banning me from the newsroom.  I felt like I was being treated differently than my White colleagues at the paper . . . I did raise my objections to them about getting banned from the newsroom."  (Fenn. at 124:14-125:15).

### III.     FENNER'S DISCRIMINATORY AND RETALIATORY TERMINATION

The Company retaled against Fenner for engaging in protected activities, including by effectively demoting him, assigning him the duties of a "junior reporter," changing his schedule, banning him from the newsroom, giving him a poor performance review and warning to set up his termination and, ultimately, terminating him.  (Fenn. at 121:5-23, 125, 194-96, 205:6-9, 207-08, 212-13, 286).  After his termination, Fenner was told to give his notes to a White employee and suffered the humiliation of being escorted out of the building. (Fenn. at 261-262).

The Company contends that it terminated Fenner for a variety of scattered purported performance deficiencies.  The evidence suggests otherwise.  By way of example only, Gotthelf praised Fenner for his work in obtaining a number of interviews, as well as for his piece on a Confederate flag at a hunting lodge used by Dick Cheney.  (Lern. Dec. Ex. 4 NYP-FL000479). Gotthelf also stated that Fenner "nailed" his coverage of an exclusive Cardinal Dolan piece. (Gott. at 161:4-16).  Contrary to Defendants' contentions, Fenner demonstrated great initiative in covering and producing at least a dozen enterprise stories, *inter alia*, (i) the Columbia University expansion (ii) the appointment of Archbishop Dolan (iii) a plane landing on the Hudson and (iv) an historic bus ride traveling to watch the inauguration of President Barack Obama, among others.  (Fenn. at 51, 72-74, 78-80, 101, 131-35 138, 152-53, 158-59, 198:17-20, 200:15-202:18, 221, 224; Green. at 324:16-21, 332-333, 335-337, 377-378; Ang. at 327:2-5).  Fenner's first Dolan piece was an exclusive story considered for the front page and another exclusive piece, which Greenfield considered a "good story . . . I am glad we had it," did appear on the front page.  (Green at 336-337, 339:16-340:4).  Fenner was relied on to cover some of the most significant events in recent New York history, and Defendants' claim that his performance necessitated his termination is incredible.

The negative evaluation relied on Defendants to support Fenner's termination is mere pretext, including supposed failure to secure impracticable interviews, such as an injured window washer in rehabilitation. (Fenn. at 32-33, 59-66, 69, 83-84, 96, 105-106). While Defendants seem to contend that Fenner's performance was not satisfactory because he did not pitch enough stories or produce sufficient exclusive stories, Defendants do not provide any figures regarding the productivity of Fenner's peers. (Def. Mem. p. 7; Fenn. 195-96). Fenner's misleadingly poor evaluations prevented him from receiving annual increases, and he believes that Jeanne MacIntosth, Dan Mangan and other White reporters with the same level of experience were paid more. (Fenn. at 237-38). Finally, claims regarding a need to edit Fenner's writing bolster the claim that Defendants are stretching to come up with a false justification for his termination, as reporters in the field almost always have their writing edited by dedicated in-house staff. (Fenn. at 90-91). Fenner also faced greater obstacles getting his stories published than White reporters, as his story proposals were continuously and summarily dismissed. (Fenn. at 104-105, 115-17). Nevertheless, and contrary to Defendants' claim that Fenner's writing was unsatisfactory, to his knowledge the Post published every single one of the stories he wrote. (Fenn. at 90:10-11).

## IV.   LIVINGSTON'S DISCRIMINATORY AND RETALIATORY TERMINATION

After complaining about the discriminatory Cartoon, Gotthelf promptly issued Livingston an undeserved and discriminatory warning letter. (Liv. at 185-86, 188-89). Discrimination and retaliation against Livingston continued in the form of her continued banishment from the newsroom despite being promised otherwise, being given dead-end assignments, subjected to verbal abuse and, ultimately, terminated. (Liv. [day 3] at 17, 19:10-25, 21-24, 32-33, 34, 36-39, 45-48). Livingston's termination occurred on February 26, 2013 in a meeting with Angelo, who was not her direct supervisor, without any prior written or verbal warning. (Liv. [day 3] at 8;

Ang. [day 2] at 22:4-8;).  Defendants assert that Livingston was terminated for engaging in

"mystery shopping" without notifying her supervisors.  (Lerner Dec. Ex. 17).

    The falsity of Defendants' justification is confirmed by the fact that they were aware of

the "mystery shopping," and that she had not notified her supervisors regarding same, for more

than one year prior to her termination.  (Liv. 321:9-323:8; see also, Liv. [Day 1] at 3 (Gotthelf

and Defendants' in-house counsel present)).  Defendants even obtained the documents

purportedly supporting their claims regarding Livingston's mystery shopping well before

December 2012, when they first attempted to introduce such material into the evidentiary record.

(Kennedy Dec. Ex. 1).  Therefore, Defendants cannot plausibly claim that Livingston's mystery

shopping caused great concern, was contrary to Company policy, or was viewed as inevitably

harming her performance sufficient to justify her termination, as they failed to act on this

information for more than a year, and her supervisors never even discussed it with her.  (Ang.

[day 2] at 12-13; Lern. Dec. Ex. 17 (termination letter with no mention of policies violated)).

    There is a plethora of evidence disputing Defendants' speculative contention that

Livingston improperly "left her post" to mystery shop.  (Def. Mem. pp. 11-12).  Livingston

explained unequivocally that she only mystery shopped on brief breaks during downtime, such as

during lunch, or after finishing an assignment, and never prioritized mystery shopping activities

over her work.  (Liv. [day 1] at 322, 324, [day 2] at 419-20, 430, 432, 436, 445, 451-453, 456).

These excursions could take as little as two minutes, and included routine tasks such as making a

bank withdrawal of $20.  (Liv. [day 1] at 322, [day 2] at 378, 385, 387, 415-16, 454).

Defendants fail to provide any evidence to support their disputed factual assertion that

Livingston's performance was impacted by mystery shopping (Def. Mem. pp. 11-12), nor do

they generally understand the short time this activity entailed.  (Ang. [day 2] at 26-27, 102-106;

Sci. at [Day 2] 33-34, 41-43; Allan. at [Day 2] 531-533). To the contrary, as described supra Facts § III.C, Livingston's performance was stellar throughout her employment with Defendants. Moreover, Livingston received a rating of "Meets Standards" in 2012, which was higher than her rating of previous years. (Pear. Dec., Ex. 16, IL 8684). Her evaluation also states that she is a "competent field reporter" who "isn't usually beaten by the competition," suggesting that her mystery shopping was not a hindrance to the capable performance of her job. (Id.).

**ARGUMENT**

## I.   LEGAL STANDARD

Summary judgment must be denied unless "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view all facts in the light most favorable to Plaintiffs, resolving all ambiguities and drawing all inferences in their favor. See Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 116 (2d Cir. 2007). Summary judgment is "***ordinarily inappropriate in the context of a workplace discrimination case*** because the allegations usually require an exploration into an employer's true motivation and intent for making a particular employment decision . . . [and] [e]mployers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law." Santos v. Costco Wholesale, Inc., 271 F.Supp. 2d 565, 571 (S.D.N.Y. 2003) (emphasis added).

## II.   NUMEROUS ISSUES OF FACT PRECLUDE DISMISSAL OF PLAINTIFFS' DISPARATE TREATMENT CLAIMS

A *prima facie* case of disparate treatment is established by showing that Plaintiffs: "[1] belonged to a protected class; [2] [were] qualified for the position[s] [they] held; [3] suffered [ ] adverse employment action[s]; and [4] the adverse employment action[s] occurred under circumstances giving rise to an inference of discriminatory intent." Feingold v. New York, 366

12

F.3d 138, 152 (2d Cir. 2004).  Under Title VII and the NYSHRL, the "inference" prong is met if the employer "treated [the employee] less favorably than a similarly situated employee outside his protected group."  Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).  Under the more liberal NYCHRL, the "inference" prong is met "by showing that 'a member of a protected class was treated differently than a worker who was not a member of that protected class.'"  Anderson v. City of New York, No. 06 Civ. 5726(RRM)(RER), 2012 WL 6720694 at *8 (E.D.N.Y. Dec. 27, 2012).  The employer must then offer a nondiscriminatory reason for the adverse action.  If the employer does so, "to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole *or in part* on discrimination."  Feingold, 366 F.3d at 152 (emphasis added).

Defendants challenge the following claims of disparate treatment: (i) Fenner's claim of discriminatory termination; (ii) Livingston's demotion from covering the Queens courthouses to being a "runner;" and (iii) Plaintiffs being banned from the Post's newsroom.[12]

### A.    The Evidence Supports Fenner's Claim of Discriminatory Termination

It is "well-established that an inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to . . . the more favorable treatment of employees not in the protected group."  Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009).  The evidence shows that issues of fact exist as to whether Fenner, along with other Black employees, was treated less favorably than White individuals.

---

[12]    The First, Third, Fifth and Eighth Causes of Action of the operative Complaint allege that Defendants' decision to terminate Livingston was motivated by her race and/or color.  Defendants do not advance any argument whatsoever in support of dismissing this aspect of her claims, and this case must proceed to trial on those claims regardless of the outcome of the rest of the Motion.

13

Fenner was: (i) "constantly" subjected to screaming fits of hateful and humiliating profanity (often featuring the word "fuck") by Gotthelf and Greenfield that went far beyond any harsh treatment meted out to non-minority employees; (ii) given assignments that a junior reporter would receive, despite the fact that he was a Senior Reporter; (iii) sent on more assignments involving travel than his White counterparts (simultaneously showing his supervisors' trust in his abilities and willingness to force to shoulder a disproportionate burden), (iv) subjected to fabricated performance criticism; (v) forced to face greater obstacles getting his stories published than White reporters, as his story proposals were continuously and summarily dismissed; and (vi) denied vital resources provided to Whites, including by being banned from Defendants' newsroom while White employees were not. See supra Facts § III. Many other Black employees experienced similar disparate treatment. Supra Facts § I.A.

Black employees were subjected to the term "nigger," and managers and supervisors (including Allan and Angelo) took little to no action in response. Supra Facts § I.A. Gotthelf and Greenfield "constantly called stories about [B]lack people or Latino people 'low rent' which is tantamount to saying they're ghetto," while not making similar comments concerning stories about White individuals. Supra Facts § I.A. These expressly racial and hateful comments support an inference of discrimination. See, e.g., Howe v. Town of Hempstead, No. 04 Civ. 0656(DRH)(ETB), 2006 WL 3095819 at *7 (E.D.N.Y. Oct. 30, 2006) ("Racist comments may constitute evidence of an intent to discriminate . . . if the comments were made by the decision-maker or by someone who had great influence over the decision-maker."); Rose v. New York City Bd. of Educ., 257 F.3d 156, 162 (2d Cir.2001) (discriminatory comments of individual who "had enormous influence in the decisionmaking process," constituted direct evidence).

14

By contrast, White employees: (i) dominated the editor and reporter ranks (there were no African-American editors on the Metro Desk and, as of November 2009, only one non-white editor); (ii) were not harassed or yelled, screamed and cursed at as were Black employees; (iii) were not denied career advancement or resources as were Black employees; and (iv) were provided with more favorable story assignments. See supra Facts § I.A. The overwhelming amount of evidence suggesting racial bias at the highest levels of management, including by the decision-makers herein, supports an inference of discriminatory intent.

The evidence also presents fact disputes as to the truth of the non-discriminatory reason asserted by Defendants for Fenner's termination — poor performance. A plaintiff may rely on the same evidence supporting a *prima facie* case to show that a defendant's proffered reasons for the discharge are pretextual. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147-149 (2000) ("a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). Under the NYCHRL, summary judgment must be denied (except in the "most extreme and unusual circumstances") where there is "some evidence that at least one of the [non-discriminatory] reasons proffered by defendant is false, misleading, or incomplete." Bennett v. Health Mgmt. Sys., Inc., 92 A.D.3d 29, 43-44 (1st Dept. 2011).

Defendants selectively cite criticism received in certain performance reviews and warnings, but ignore greater evidence showing that he performed his job very well, including, *inter alia*: (a) numerous examples of praise concerning his performance by Gotthelf, who now claims his performance merited termination; (ii) Gotthelf's statement that Fenner "nailed" certain vital news stories; (iii) being assigned to some of the Post's most important stories, such as (a) the Columbia University expansion, (b) the appointment of Archbishop Dolan, (c) a plane

landing on the Hudson; (d) an historic church bus ride traveling to watch the inauguration of

President Barack Obama, (e) an exclusive interview with William Ayers, and (f) a story about

the Craigslist killer, among others; (iv) Greenfield's praise of one of Fenner's front-page stories;

and (v) Fenner's belief that the Post published all of the stories he wrote.  See supra Facts § III.

The negative evaluation used to support Fenner's termination included fabricated

criticism, such as a supposed failure to secure interviews that Defendants knew were impossible

to secure (the subject of the interview was in rehabilitation after suffering a nearly fatal fall).

(Fenn. at 32-33, 58-62, 64-66, 83-84, 96, 105-106).  Defendants' criticism that Fenner failed to

produce "enterprise stories" also is disputed, as Fenner testified that he produced at least a dozen

specific enterprise stories, as well as several other enterprise stories.  (Fenn. at 51, 78-80, 101,

152-53, 198:17-20, 200:14-20).  Moreover, during Fenner's termination meeting, neither

Greenfield and Gotthelf nor Scialdone could identify a single enterprise story written by another

reporter in the months prior.  (Fenn. at 195:13-196:23).

As such, the record is replete with evidence disputing Defendants' purported reasons for

terminating Fenner, which, along with Fenner's *prima facie* case, is sufficient to permit a jury to

determine that Fenner was terminated, at least in part, because of his race and/or color.  See, e.g.,

Keeley v. Citibank, N.A., 711 F. Supp. 157, 160 (S.D.N.Y. 1989) (summary judgment

inappropriate where the parties "present two differing accounts of the relevant events"

surrounding plaintiff's purported unsatisfactory job performance, as "the state of mind and intent

of defendants is very much in dispute.").[13]  Disparate treatment suffered by other Blacks at the

---

[13] See also Kline v. Marine Midland Bank, N.A.., No. 88 Civ. 1125E, 1990 WL 112287 (W.D.N.Y. July 26, 1990)
(summary judgment denied where plaintiff was admonished for actions that other employees were not contributed to
raising issue of fact as to "whether the plaintiff's performance was being subjected to more exacting standards
because of her [protected characteristic]."); Klings v. New York State Office of Court Admin., No. 04 Civ.
3400(KAM)(LB). 2010 WL 1292256 at *15 (E.D.N.Y. April 5, 2010) (summary judgment denied where plaintiff
raised an issue of fact concerning her performance); Fanning v. Gold Sys.. Inc., No. 05 Civ. 1202(JCH), 2007 WL

Post (supra Facts § I.A) also supports a finding of pretext and inference of discrimination.  See,

Zubulake v. UBS Warburg., 382 F. Supp. 2d 536, 544 (S.D.N.Y. 2005) ("prior discriminatory

treatment of a plaintiff or other employees is relevant and admissible … to establish whether a

defendant's employment action … was motivated by invidious discrimination.").

### B.     The Evidence Supports Livingston's Claim of Discriminatory Demotion

The evidence supporting an inference of discriminatory intent regarding Fenner's

termination supports the same inference with regard to Livingston's demotion.  It also is

sufficient that Livingston was replaced by a White individual.  See, e.g., Harper v. Hunter Coll.,

No. 95 Civ. 10388(JFK), 1999 WL 147698 at *2 (S.D.N.Y. Mar. 15, 1999), aff'd, 199 F.3d 1322

(2d Cir. 1999).  Moreover, the disparate treatment suffered by Livingston serves to add to the

inference of discrimination, including: (i) being given inaccurate performance reviews; (ii) being

denied bylines not denied to White reporters; (iii) withholding resources such as a desk, phone,

archives/librarian access, or wire services that White reporters (not banned from the newsroom)

had; (iv) being told that stories concerning minorities were "low rent" or "ghetto," a term not

used for pitches involving White individuals; (v) given assignments with no chance of being

published while White reporters were given higher priority pieces; (vi) being subjected to a

hostile work environment; and (vii) being banned from the newsroom.  See, e.g., Leibowitz, 584

F.3d at 502 ("well-settled that an inference of discriminatory intent may be derived from . . . the

more favorable treatment of employees not in the protected group.").

Defendants also argue that Livingston's demotion was not "adverse" without a change to

her title, compensation, benefits, a "material" loss of prestige, mismatch with her skills or

expertise, or loss of career advancement.  (Def. Mem. p. 18).  Defendants misstate the law and

---

795098 at *5 (D. Conn. Mar. 14, 2007) (issues of fact precluding summary judgment existed where plaintiff and
defendant presented differing views as to plaintiff's performance record).

facts, as Livingston's removal to a field-based "runner" was materially adverse.  See, e.g., De La Cruz v. New York City Human Resources Admin. Dept. of Soc. Svcs., 82 F.3d 16, 20 (2d Cir. 1996) (transfer to less prestigious position with no pay cut an adverse action).[14]  Livingston also testified that her compensation was affected by the demotion.  See supra Facts § I.C.  Further, under the NYCHRL, Livingston is not required to "show a materially adverse employment action, [but] only that she was treated less well than other employees because of her membership in a protected class."  Kalp v. Kalmon Dolgin Affiliates of Long Island Inc., No. 11 Civ. 4000(JG), 2013 WL 1232308 (E.D.N.Y. Mar. 27, 2013).  Reassignment to a less-favored position (Livingston sought the courts position repeatedly) constitutes being treated "less well."

There also is evidence showing Defendants' current purported reason for the demotion, her performance, is a pretext.  Defendants have articulated conflicting reasons for the demotion, supra Facts § I.C, which supports a finding of pretext.  See Weiss v. JPMorgan Chase & Co., 332 F. App'x 659, 663 (2d Cir. 2009) ("[i]nconsistent or even post-hoc explanations for a termination decision may suggest discriminatory motive;" denying summary judgment where plaintiff not informed of currently proffered reason for termination, even though supported by the record).[15]

Pretext also is established by evidence demonstrating the falsity of Defendants' justification, including: (i) Gotthelf's testimony about Livingston's ability to pitch good stories; (ii) Gotthelf praising Livingston's interviewing skills; (iii) reviews saying Livingston "can always be counted on to make deadlines," "calls in accurate quotes" and "works . . . in a timely fashion;" (iv) in the year she was demoted, the Post ran daily articles of Livingston's coverage of

---

[14] See also Trachtenberg v. Dep't of Ed., No. 12 Civ. 7964(PAE), 2013 WL 1335651, at *5 (S.D.N.Y. April 3, 2013) (negative evaluations triggering adverse consequences may be adverse action; issue for trier of fact) and Collins v. State of Ill., 830 F.2d 692, 704 (7th Cir. 1987) (loss of phone/desk adverse actions).

[15] See also Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 106 (2d Cir. 2001) (denying summary judgment where factfinder could conclude that a second explanation for the decision was an attempt to salvage an earlier explanation that was collapsing during civil discovery); EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir.1994) (reversing trial court's grant of Rule 50(b) motion because a juror could infer shifting and inconsistent explanations were pretextual).

the Sean Bell trial, many of which were exclusive front-page stories; (v) Gotthelf noted that Livingston did "a great job" and that the Post "relied heavily on [her] quotes;" (vi) the news desk thought highly of Livingston's work; (vii) Livingston "beat" other reporters to stories on numerous occasions; and  (viii) Livingston believes she had the most front page stories of any Post employee in 2008 (and the most she has ever had), the year she was demoted.  Supra Facts § I.C.; see also Reeves, 530 U.S. at 149; Bennett, 92 A.D.3d at 43-44.  Under the circumstances, the same actor inference (weakened after two years) does not defeat pretext because Gotthelf was reluctant to give her the Queens County courts position to begin with (Liv. at 85:19-90:2), subjected Livingston to discrimination throughout and replaced her with a White employee.

### C. <u>Plaintiffs Were Banned From The Newsroom</u>

Defendants' contention that there is no material issue of fact concerning Plaintiffs' ban from the newsroom is perplexing given that both Fenner and Livingston testified that they had to request permission before entering the newsroom.  See Facts § I.B.  The fact that Defendants did permit a single Black employee to enter the newsroom does not somehow cancel the inference of discriminatory intent raised by all of the aforementioned disparate treatment.

## III. <u>NUMEROUS ISSUES OF FACT PRECLUDE DISMISSAL OF PLAINTIFFS' HOSTILE WORK ENVIRONMENT CLAIMS</u>

Defendants argue only that there is no evidence that the yelling, screaming and cursing that Plaintiffs were routinely subjected to was the result of their membership in a protected class.  However, an inference of racial intent is raised because White employees were not subjected to the same negative treatment as was directed at Plaintiffs and other Black employees.  See Durkin v. Verizon New York, Inc., 678 F. Supp. 2d 124, 133 (S.D.N.Y. 2009) (denying summary judgment where "a jury could find that men as a group were treated differently than women as a group.").  The evidence provides a sufficient basis for a jury to find that Black employees,

including Plaintiffs, were treated differently from White employees as a group.  See Facts § I.A,

B.  Hostile environment claims must be "evaluated on the basis of the cumulative effect of [ ]

abusive conduct."  Adams v. City of New York, 837 F.Supp.2d 108, 126 (2d Cir. 2011).

Plaintiffs and other Black employees were subjected to myriad discriminatory actions,

contributing to a finding that the hostility directed towards Plaintiffs was racially motivated.

## IV.  NUMEROUS ISSUES OF FACT PRECLUDE DISMISSAL OF PLAINTIFFS' RETALIATORY TERMINATION CLAIMS

Retaliation claims are subject to the same analysis as disparate treatment claims.  A

"prima facie case, combined with sufficient evidence to find that the employer's asserted

justification is false, may permit the trier of fact to conclude that the employer unlawfully

discriminated," defeating summary judgment.  Reeves, 530 U.S. at 149.  Under the NYCHRL,

summary judgment must be denied (except in the "most extreme and unusual circumstances")

where there is "some evidence that at least one of the [non-discriminatory] reasons proffered by

defendant is false, misleading, or incomplete."  Bennett, 92 A.D.3d at 43-44.

### A.  The Evidence Supports Fenner's Retaliation Claim

#### i.  Knowledge of Fenner's Complaint Can Be Inferred By The Jury

In order to establish knowledge that a Plaintiff engaged in protected activity, all that is

required is "general corporate knowledge that the plaintiff has engaged in a protected activity."

Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000).  As such, "Plaintiff

need not show that individual decision-makers within the [Company] knew that [plaintiff] had

…complain[ed]," in order to maintain an action.  Alston v. New York City Transit Authority, 14

F.Supp.2d 308 (S.D.N.Y. 1998).  The Second Circuit has further held that corporate knowledge

can be inferred through circumstantial evidence. See Jute v. Hamilton Sundstrand Corp., F.3d

166, 175 (2d Cir. 2005) (absent direct evidence of plaintiff's knowledge, "[t]his chain of events

would allow a jury to infer that [defendant] knew about" plaintiff's protected activity); <u>Gordon</u>, 232 F.3d at 117 (employer's knowledge can be inferred from circumstantial evidence).  In the instant case, an inference of knowledge can easily be supported: (i) the article containing Fenner's quotation was public; (ii) the author of the article contacted a News Corp. spokesperson about the article; (iii) the Company uses public relation firms to track all online material about the Post; (iv) other quoted minority staffers asked to remain anonymous because "it would be easy to determine who they [were];" and (v) just days after the article was published, Fenner was particularly loudly rebuked and subjected to foul language by Greenfield.  <u>See</u> <u>supra</u> Facts § II.

Defendants completely ignore Fenner's other complaints about the disparate treatment to which he was subjected, including complaints regarding his discriminatory ban from the newsroom.  <u>Supra</u> Facts § II.  Though Fenner did not explicitly say "discrimination" when complaining about this, protected activity need not use "buzzwords."  <u>See</u> <u>e.g.</u>, <u>Galdieri-Ambrosini v. National Realty & Development Corp.</u>, 136 F.3d 276 (2d Cir. 1998); <u>Saridakis v. S. Broward Hosp. Dist.</u>, 681 F. Supp. 2d 1338, 1353 (S.D. Fla. 2009) (employee need not use "magic words" to put employer on notice of discrimination, as such a complaint "may be *inferred or implied* from the surrounding facts.") (emphasis in original).

      ii.    <u>Fenner's Complaints Concerning the Cartoon Are Protected</u>

Defendants also argue that Fenner's complaint concerning the Cartoon did not concern an unlawful employment activity.  This completely ignores (i) that Fenner's comments came in a piece about the Post's lack of diversity and discriminatory environment; *and* (ii) Fenner's additional complaints as described above.  Pear. Dec. Ex. 14 at AF_34-35.  Moreover, a protected complaint must concern unlawful employment activity only under Title VII, the

NYSHRL and NYCHRL.  Section 1981 does not limit its protection against discrimination to

employment.  Therefore, Fenner's complaints are protected activity at least under Section 1981.

### iii.    The Purported Lack Of Temporal Proximity Is Irrelevant

Defendants argue that Fenner has failed to establish temporal proximity, but this is not

required.  See Gordon, 232 F.3d at 117 (causation can be established by temporal proximity or

circumstantial evidence, such as disparate treatment of coworkers).  Livingston and Guzman,

both of whom engaged in protected activity, also were terminated, which provides evidence of

causation like that contemplated in Gordon, 232 F.3d at 117; see also Saulpaugh v. Monroe

Cmty. Hosp., 4 F.3d 134 (2d Cir. 1993) (referring to evidence of other retaliation as a "smoking

gun"); Hinton v. City College of New York, No. 05 Civ. 08951(GEL), 2008 WL 591802

(S.D.N.Y. Feb. 29, 2008) (other acts of retaliation probative of intent).  Other Black employees

also were terminated after supporting civil rights, including Mr. Blair.  Supra Facts § I.A.

Independently, where a plaintiff is subject to a campaign of worsening treatment after

engaging in protected activity, even a yearlong delay is sufficiently proximate to raise an

inference of intent.  See Wallengren v. Samuel French, Inc., 39 F. Supp. 2d 343, 344-45

(S.D.N.Y. 1999) (denying summary judgment despite one-year gap between disclosure of

disability and termination where, inter alia, relationship with supervisor diminished over time

after disclosure).  After Fenner's complaints, he was demoted, assigned duties of a junior

reporter, had his schedule changed, was banned from the newsroom and its resources, given a

pretextual performance review and warning before being terminated.

### iv.    The Evidence Establishes Pretext

As described supra, the record contains many factual disputes as to the truth of the non-

discriminatory reason advanced by Defendants for Fenner's termination, his poor performance.

This, in conjunction with Fenner's *prima facie* case, is sufficient to withstand summary

judgment.  <u>Reeves</u>, 530 U.S. at 149; <u>Bennett</u>, 92 A.D.3d at 43-44.

     **B.**      **<u>The Evidence Supports Livingston's Retaliation Claim</u>**

         i.     <u>The Evidence Establishes a *prima facie* Case With Regard to Livingston's</u>
                  <u>Retaliatory Termination Claim</u>

Defendants bizarrely claim that Livingston complained only about the Cartoon, and not

any employment practice, despite the existence of an e-mail from Livingston to Scialdone of HR

on December 3, 2009 stating that she had "been discriminated against due to [her] race . . . ."

<u>Supra</u> Facts § II.  It is also documented that Livingston complained in a meeting with HR that,

*inter alia*, (i) her demotion was discriminatory, (ii) she was given fewer opportunities to write

than White reporters, and (iii) while Gotthelf had promised her a desk and phone, she had not

received them.  <u>Id.</u>  Livingston also filed the instant lawsuit.  <u>Id.</u>  Defendants' failure to address

these complaints is characteristic of their disingenuous attempts to hide the ball from the Court.

After complaining about the discriminatory Carton, Gotthelf promptly issued Livingston

an undeserved and discriminatory warning letter stating that her work needed improvement.

<u>Supra</u> Facts § II.  Additional immediate retaliation against Livingston also included a continued

banishment from the newsroom, being given dead-end assignments and being subjected to verbal

abuse.  <u>Supra</u> Facts § IV.  Defendants' argument that Livingston cannot recover on these claims

of retaliation because some of the actions were already being taken prior to her complaints is

without merit because, prior to her complaints, Livingston was promised that she would be

receiving a desk and telephone in the newsroom.  <u>Supra</u> Facts § II.  It is not as though things

stayed status quo; instead, Defendants ceased making such promises and they were never

fulfilled.  These facts also defeat Defendants' arguments concerning temporal proximity and

serve to support an inference of discrimination.  <u>See</u> <u>e.g.</u>, Wallengren, 39 F. Supp. 2d at 344.

An inference is also established because, as with Fenner, the record supports a finding that numerous other individuals who were retaliated against by Defendants.  Supra Facts § I.A.

ii.   The Evidence Establishes Pretext

The falsity of Defendants' justification for Livingston's termination is confirmed by the fact that they were aware of the "mystery shopping," and the fact that she had not notified her supervisors regarding same, for more than one year prior to the date she was terminated because she testified to this information in her January 2012 deposition.  Supra Facts § IV.  Defendants obtained all of the documents introduced to support their factual claims regarding Livingston's mystery shopping well before December 10, 2012, when they first attempted to produce and/or introduce such material into the evidentiary record.  Id.  Defendants' failure to act on this information for more than one year demonstrates the falsity of Defendants' purported justification and requires denial of the instant motion.  See, e.g., Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't, 510 F.3d 681, 693 (7th Cir. 2007) (denying summary judgment where employer's two month delay in addressing purported concerns about plaintiff's behavior created question of fact concerning the legitimacy of non-discriminatory explanation).[16]

**V.   GOTTHELF AND GREENFIELD ARE INDIVIDUALLY LIABLE**

Defendants incorrectly argue that Gotthelf and Greenfield cannot be liable under the NYSHRL, NYCHRL, or Section 1981.  All that is required under the NYSHRL and NYCHRL to establish aiding and abetting liability is that Gotthelf and Greenfield participated in discriminatory or retaliatory conduct by "encouraging, condoning or approving" of it.  Durkin v.

---

[16] Defendants' speculative contention that Livingston could not perform her job due to the mystery shopping she engaged in is disputed.  Livingston explained that she only mystery shopped on brief breaks during downtime, such as during lunch, after finishing an assignment, and never prioritized mystery shopping over work.  Supra Facts § IV.  Defendants fail to provide any evidence to support the disputed factual assertion that Livingston's performance was impacted by mystery shopping during breaks.  To the contrary, Livingston received a rating of "Meets Standards" in 2012, which was higher than her rating of previous years, and produced numerous front page stories for Defendants, suggesting that mystery shopping was not a hindrance to the capable performance of her job.  (Id.).

Verizon N.Y. 678 F. Supp. 2d 124, 136 (S.D.N.Y. 2007); see also N.Y. Exec. Law § 296(1).

Similarly, Section 1981 requires an individual defendant to be "personally involved in the

discrimination" for liability to attach.   Ifill v. United Parcel Service, No. 04 Civ. 5963(LTS),

2005 WL 736151, at *3 (S.D .N.Y. Mar. 29, 2005).  Here, Gotthelf and Greenfield can be held

liable as an aider or abettor under Section 1981, the NYSHRL and NYCHRL because they made

or participated in making all of the discriminatory and/or retaliatory decisions at issue (including

Livingston's termination, given that Gotthelf was present at Livingston's depositions when she

first revealed more than a year prior to her firing that she engaged in mystery shopping, and her

second deposition, which Livingston was compelled by Defendants to sit for on the exclusive

subject of mystery shopping).  (Liv. [day 1] 3, 321:9-323:8, [day 2] at 351).

## CONCLUSION

 For the foregoing reasons, Plaintiffs respectfully request that the Motion be denied.


Dated: May 24, 2013
  New York, New York

         Respectfully submitted,

         THOMPSON WIGDOR LLP


        By: _____
          Douglas H. Wigdor
          Lawrence M. Pearson

         85 Fifth Avenue
         New York, NY 10003
         Telephone: (212) 257-6800
         Facsimile: (212) 257-6845
         dwigdor@thompsonwigdor.com
         lpearson@thompsonwigdor.com

         *Counsel for Plaintiffs*