**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X

AUSTIN FENNER and              :
IKIMULISA LIVINGSTON,      :
                                  :

                Plaintiffs,     :     No. 09 CV 9832 (LGS)

          v.                  :

NEWS CORPORATION, NYP HOLDINGS,  :
INC., d/b/a THE NEW YORK POST,    :
MICHELLE GOTTHELF and DANIEL     :
GREENFIELD, in their official and individual  :
capacities,                        :
                                  :

              Defendants.   :
-------------------------------------------------------------- X

## PLAINTIFFS' RULE 56.1 COUNTERSTATEMENT

      Pursuant to Local Civil Rule 56.1(b) of the Local Civil Rules of the Unites States District

Court for the Southern District of New York and  in response to the Local Rule 56.1 Statement

of Material Facts of Defendants News Corporation, NYP Holdings, Inc., d/b/a the New York

Post (the "Post"), Michelle Gotthelf ("Defendant Gotthelf") and Daniel Greenfield ("Defendant

Greenfield") (collectively, "Defendants"), Plaintiffs Austin Fenner ("Fenner") and Ikimulisa

Livingston ("Livingston") (together, "Plaintiffs"), submits the following statement of material

facts, and as to which they contend there are genuine issues of material facts to be tried with

respect to each of their claims:

## RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT

A.      **Reporters for the Post's Metro Desk**

      1.     The Post's Metropolitan Desk (the "Metro Desk") is responsible for reporting on

and writing stories about news events. (Gott. Aff. ¶¶ 1, 2.)[1] Michelle Gotthelf is the Editor of

---

[1] The affidavit of Michelle Gotthelf, dated May 9, 2013, submitted in support of Defendants motion for summary
judgment, is herein designated "Gott. Aff."

the Metro Desk and has been since December 2007. (Id.) Daniel Greenfield is the Deputy and

Morning Assignment Editor for the Metro Desk, and has been employed by the Post since

October 2006. (Green. Aff. ¶ 1, 2.)[2]

**Response**

Admit[3] the first and second sentence. However, dispute the third sentence in part, as it is

a legal conclusion and Defendant Greenfield is not only an employee of the Post but an

employee of News Corporation in its capacity as a "single" or "joint" employer.[4]

    2.    Approximately 50 reporters and seven editors report to the Metro Desk. (Gott.

Aff. ¶ 2.)

**Response**

    Admit.

    3.    Reporters for the Metro Desk generally have one of three assignments: "runner"

(or "street" or "field" reporter); "rewrite"; or "beat reporter." (Gott. Aff. ¶ 3.) Reporters of all

seniority levels work each assignment, although specific duties may vary by reporter, and more

senior and/or highly compensated reporters are expected to produce at a higher level than more

junior reporters. (Id.)

**Response**

    Admit the first sentence. However, dispute the second sentence in part, as the evidence

provides that, in general, senior reporters are not assigned as "runners," and because these

positions are not interchangeable, with no distinctions in prestige and desirably. Lern. Ex. 9

---

[2]    The affidavit of Daniel Greenfield, dated May 8, 2013, submitted in support of Defendants motion for summary judgment, is herein designated "Green. Aff."
[3]    All statements admitted herein are admitted without prejudice and solely for the purpose of responding to Defendant's Statement of Undisputed Material Facts pursuant to rule 56.1 of the Local Civil Rules of the U.S. District Court for the Southern District of New York and responding to Defendant's motion for summary judgment.
[4]    All statements admitted herein are admitted without prejudice and solely for the purpose of responding to Defendant's Statement of Undisputed Facts Pursuant to Rule 56.1 of the Local Civil Rules of the U.S. District Court for the Southern and Eastern Districts of New York and responding to Defendant's motion for summary judgment.

NYP-FL000518. In December 2008, Plaintiff Livingston was demoted from the Queens County courts beat to a general assignment reporter. Liv. [Day 1] at 51, 53, 56, 114, 119-20, 124; Green. at 216-17, 218:16-25. The demotion directly affected Plaintiff Livingston's ability to earn income, and her compensation decreased as a result. Liv. [Day 1] at 121, 124-25. The Queens court position also provided resources, including a desk and telephone, that the general assignment position did not (Liv. [Day 1] at 187), and a steady stream of big story opportunities. Liv. [Day 1] at 121. Defendant Greenfield explicitly notes that a "runner" is "the type of work typically handled by an entry level reporter." Lern. Ex. 9 at NYP-FL000518. Dispute, as well, any implication that Plaintiff Fenner or Plaintiff Livingston were not performing at acceptable levels in relation to their seniority, as both produced numerous exclusive stories and were praised for their work, as set forth infra at ¶¶ 10, 12, 18, 45, 46, 49, 60, 78, 80, 88, 92, 106.

4. Reporters are moved between these three assignments as needed by the Metro Desk. (Id. ¶ 4.)

**Response**

Dispute. Discrimination plays a role in the placement of reporters. White employees dominate the editor and reporter ranks and receive favorable treatment as compared with the minority reporters: they were not harassed or yelled or screamed at in the manner that Black employees were; they were not denied promotional opportunities, career advancement or resources; and they were provided with more favorable story assignments. See, e.g., Liv. [Day 1] at 31, 62-63, 65, 112:8-15, 178-79, 187, 189, 191, 194, 205; Liv. [day 3] at 22; Guzman deposition excerpts ("Guz.") [Day 2] at 579, 582, 592; Fenner deposition excerpts ("Fenn.") at 66, 124-25, 177, 214-16, 237-38, Pear. Dec., Exhs. 5, 6.

3

5.      Reassignment between runner, rewrite and/or beat reporter is neither a promotion nor demotion, and is not accompanied by any change to a reporter's pay, seniority or benefits. (Gott. Aff. ¶ 4; Angelo at 280 [Day 1] ["[Runner and court reporter are] both reporters. They're just different roles. It's not a demotion."].)[5]

<u>Response</u>

Dispute insofar as reassignment from a Senior or stationary position, such as a court reporter to a "runner" position constitutes a demotion where a reporter, such as Plaintiffs Livingston or Plaintiff Fenner, is stripped of his/her resources and opportunities, including, but not limited to, his/her desk, phone, and access to the newsroom library, archives, and editors, is expected to travel extensively, and/or is prevented from obtaining overtime work, and given dead-end assignments, as set forth, <u>infra</u> at ¶¶ 33, 4, 10, 62, 69, 77, 80, 89, 93-94, 96, 102 132-34, 136, 139, 142-43, 145-46, 151-152; <u>see also</u> Ikimulisa Livingston deposition excerpts ("Liv.") [Day 1] at 77, 121, 124-25, 192-96, 201-202, 206-09; [day 3] at 17, 19:10-25, 21-24, 36-40, 45-48; Fenn. at 121, 208-214, 216:16-20, 223-24; Livingston Affidavit ("Liv. Aff.") at ¶¶ 10-13, 13, 16.

6.      Reassignments are not communicated to the Post's human resources department ("HR"), nor are they processed by HR.  (<u>Id</u>. ¶ 4.)

<u>Response</u>

Admit.  However, dispute insofar as reassignments and/or demotions need not be processed by HR.

---

[5] The declaration of Mark W. Lerner, Esq., submitted in support of Defendants motion for summary judgment and dated May 10, 2013, 2013, to which all exhibits are attached, unless otherwise noted, is herein designated "Lern. Dec."  True and correct copies of referenced excerpts of the deposition of Jesse Angelo, dated April 25, 2012 and April 5, 2013 ("Angelo at [page] [Day 1 or Day 2]"), are attached to the Lern. Dec. as Exhibit 14.

7.      Runners work almost exclusively from the field, i.e., away from the Post's offices, and receive story assignments from the Post's editors and/or rewrites. (Id. ¶ 5; Green. at 116-19.)[6] Runners do not work from the Post's offices and rarely come into the Post's newsroom during a shift; rather, they call the newsroom to receive an assignment. (Gott. Aff. ¶ 5.) Runners typically report from news scenes, prepare notes, and provide them to a rewrite via telephone or e-mail. (Id.)

**Response**

Admit.  However, runners are also permitted to work in the newsroom.  Liv. Aff. at ¶ 10.

8.      Rewrites work in the newsroom and receive draft notes and/or draft language from runners and prepare a story based on these notes. (Green. at 132-34; Gott. at 83-85; Gott. Aff. ¶ 6.)[7] They additionally report from the newsroom and coordinate runners in the field. (Gott. Aff. ¶ 6.)  Rewrites may work on multiple stories in a day.  (Green. at 132-34.)

**Response**

Admit.

9.      Beat reporters have a specific topical area of focus (as opposed to rewrites and runners, who thus are called "general assignment reporters").  (Gott. Aff. ¶ 8; Green. at 245.) Beat reporters, which includes court reporters, must have a strong knowledge of their beat, including the subject matter, and have good sources.  (Gott. Aff. ¶ 8.)  They must also be able to write stories on deadline and produce "clean copy," i.e. not needing significant rewriting. (Green. at 167; Gott. Aff. ¶ 9.)

---

[6] True and correct copies of referenced excerpts of the deposition of Daniel Greenfield, dated April 5, 2012 ("Green. at [page]"), are attached to the Lern. Dec. as Exhibit 1.
[7] True and correct copies of referenced excerpts of the deposition of Michelle Gotthelf, dated March 29, 2012 ("Gott. at [page]"), are attached to the Lern. Dec. as Exhibit 2.

**Response**

Admit the first and second sentence.  However, dispute the third sentence in part, because rewrites are not only assigned to reporters as a matter of course, but may be expected to do more substantial work where a journalist is working on a high-profile case, requiring them to produce multiple stories a day while still on assignment.  *See, e.g.* Green. at 167:20-168:6.  For example, both Plaintiff Livingston and William Gorta required assigned rewrites when covering exclusive stories and "major trial[s]"such as the Sean Bell police shooting trial.  Id.; Green. at 201:4; Liv. [day 1] at 222:3-12.

10.     Reporters in all three assignments are required as part of their job to look for and/or generate investigative, enterprise and exclusive story ideas, and they must possess sources.  (Gott. Aff. ¶ 8.)  An enterprise story is one generated by the reporter and not assigned by an editor; it is original and exclusive reporting resulting from investigative work, usually longer than average and with in-depth analysis.  (Gott. at 152-53; Fenn. at 79.)[8]

**Response**

Admit.  However, dispute any implication that Plaintiffs Fenner and Livingston did not generate investigative, enterprise or exclusive story ideas, as is demonstrated by significant evidence, including Fenner's five pieces about the Columbia extension and Livingston's extensive coverage of the Sean Bell police shooting trial, among many other stories.  See, e.g. Fenn. at 72-74, 78-79, 131-39, 149-151; Ang. [Day 1] at 326:24-327:5; Liv. [Day 1] at 122-123, [Day 2] 428, Ex. 23; Gotthelf at 163-164; Green. 197-198, 200, 203-205.

---

[8] True and correct copies of referenced excerpts of the deposition of Austin Fenner, dated January 11, 2012 ("Fenn. at [page]"), are attached to the Lern. Dec. as Exhibit 3.

A.    **Facts Relating to Austin Fenner**

11.    Fenner, who is African-American, was hired in May 2007 as an at-will employee to the position of "Senior Reporter" for the Metro Desk.  (Gott. Aff. ¶ 10.)

**Response**

Admit.

12.    Fenner was hired at a salary of $92,000 per year, making him the ninth highest paid reporter out of 71 reporters on the Post's Metro Desk.  (Gott. Aff. ¶¶ 10, 27.)  Because he "was very highly paid," he was expected to perform at a "[v]ery high level."  (Green. at 319.)

**Response**

Admit the accuracy of Plaintiff Fenner's salary.  However, dispute in part that Plaintiff Fenner "was very highly paid," because Plaintiff Fenner's salary was diminished where he was not given raises due to his discriminatory and baseless performance reviews.  Fenn. at 237. Plaintiff Fenner believes that Jeanne MacIntosth, Dan Mangan and a few other White reporters with the same level of experience were paid more.  Fenn. at 237-38; Fenn. Aff. at ¶ 9.  In addition, disputes any implication that Fenner did not perform at a high level, as set forth in ¶¶ 10, 16, 18, 45-46, 49, 80.  Fenner's performance was actually praised by his supervisors.  Lern. Dec. Ex. 4 NYP-FL000479; Gott. at 161:4-11; Fenn. at 101, ; Green. at 335-37, 339:16-340:4; Ang. at 327:2-5).

13.    As a highly-compensated senior reporter, Fenner was expected to develop a lot of sources and new information, discovery unique story angles, perform investigative work, or otherwise produce exclusive stories when he was sent on assignment.  (Gott. Aff. ¶¶ 3, 13; Green. at 319.)  In other words, Fenner was expected to be "sneaky," which is a term Gotthelf

uses to describe a good reporter who "breaks away from the pack . . . to go their separate way and break a news line." (Gott. at 294.)

**Response**

Admit.  However, dispute the implication that Plaintiff Fenner did not satisfy the requirements of a senior reporter, including discovering unique story angles and producing exclusive stories, as set forth in ¶¶ 10, 12, 16, 18, 45-46, 49, 80.

14.    Fenner was initially assigned to work as a rewrite.  (Green. at 319; Gott. Aff. ¶ 11.)

**Response**

Dispute.  Contrary to Defendants' assertion, Defendant Greenfield's testimony, does not state that he was a rewrite.  Green. at 319.  In fact, Defendant Greenfield expressly states that Plaintiff Fenner "was hired to . . . break enterprise stories.  Do investigations.  He was brought in to -- a lot of sources, break exclusive.   He was supposed to be able to do rewrite.   He was hired to be -- to do all of those things.   Very high level."  Green. at 319: 8-14.

15.    Fenner did not live up to the expected level of performance as he did not break stories, was not generating enterprise pieces, and lacked sources.  (Gott. at 157, 253.)

**Response**

Dispute.  Many pieces of evidence exist that challenge and raise an issue of fact regarding Plaintiff Fenner's performance level, as set forth, <u>infra</u> at ¶¶ 10, 12, 16, 18, 45-46, 49, 80.

16.    Also, Fenner's writing was poor as it often needed significant editing, contained junior-level factual, grammatical and spelling errors, failed to discern the "lede," or most interesting aspect, of a story, and contained holes or information gaps.  (<u>Id</u>. at 156-57, 253; Gott. Aff. ¶ 11.)

**Response**

   Dispute.  Many pieces of evidence exist that challenge and raise an issue of fact regarding whether Plaintiff Fenner's writing required significant editing.  All employees' writing is reviewed, cut, and edited by rewrites regardless of the quality of their writing.  as set forth, infra at at ¶ 9.  Moreover, Defendants' assertion that Plaintiff Fenner failed to discern the "lede" is colored by their discriminatory animus towards Plaintiff Fenner as evidenced by Defendants' refusal to allow him to cover the ledes and stories he found to be most significant.  Fenn. 104:21-105:3; as set forth, infra at ¶ 9.  Furthermore, Defendants point to just one example of a missed lede, obscuring the fact that Plaintiff Fenner, in fact, published numerous quality stories, as set forth, infra at ¶¶ 10, 12, 16, 18, 45-46, 49, 80.

   17.   Starting in 2008, Fenner was increasingly sent to cover news from the field, as opposed to working rewrite, as Gotthelf hoped his performance might improve if less writing was required of him.  (Gott. Aff. ¶ 12.)

**Response**

   Admit only insofar as Fenner was increasingly sent to cover stories in the field (Gotthelf Dec. ¶12; Green. at 320-21), but dispute in part, as he was entrusted with covering numerous high profile stories, as set forth, infra at ¶¶ 10, 12, 16, 18, 45-46, 49, 80.

   18.   Fenner's FY[9] 2008 annual performance appraisal ("APA"), dated July 28, 2008, rated his overall performance as:  "Must Improve, Rarely Meets Standards."  (Lern. Dec., Exh. 4.)

**Response**

   Admit only as to contents of the document.  However, Plaintiff Fenner strongly disagreed with this appraisal, which he believed to be discriminatory and which did not reflect his record of

_____

[9] The Post's fiscal year ("FY") runs from July to June.

success.   In fact, the appraisal states that "he scored a jailhouse interview with the man at the center of a police shooting in Westchester and secured a small interview with the man who survived a 47-story plunge from a skyscraper."  Lern. Dec. Ex.4 NYP-FL000479.

19.   Fenner's FY 2008 APA states that because of his poor writing and lack of enterprise stories, Fenner was assigned less "rewrite" work (see ¶ 8, supra) and, "within his first year [] slid into the role of street runner."  (Id.)  It further stated:

> [Fenner] does not initiate or produce top-notch enterprise [stories] for the Post.  He has pitched a few stories that are not a good fit for the Post.  Now all of his assignments come from editors, who find his work, at best, lacking.

(Id.)

**Response**

Admit insofar as the quotations excerpted appear in Plaintiff Fenner's FY 2008 performance evaluation.   However, Plaintiff Fenner was not assigned to be a "rewrite."  Green. at 319.  Furthermore, Plaintiff Fenner strongly disagreed with this appraisal, and met with Defendant Gotthelf and Amy Scialdone of Human Resources about his performance evaluation, where he told them that his rating and other statements in the evaluation did not reflect the hard work he had put in and his accomplishments over the previous year.  (Lern. Ex. 4; Fenn. at 188; Fenn. Aff ¶ 7),  and its reflection on his work product, which was of high quality, as set forth, infra at ¶¶ 10, 12, 16, 18, 45-46, 49, 80.

20.   Fenner received a written performance warning, also dated July 28, 2008, from his editors.  (Id.)  The warning states that it is due to Fenner's:  (i) "Poor basic writing skills"; (ii) "Lack of fact checking"; (iii) failure to "produc[e] enterprise stories"; and (iv) and "Not being able to discern what the news line [lede] is . . . ."  (Id.)

**Response**

Admit insofar as the quotations excerpted appear in Plaintiff Fennner's written performance warning. However, Plaintiff Fenner strongly disputes Defendant's contention that the warning reflected the quality of his work, as set forth, <u>infra</u> at ¶¶ 10, 12, 16, 18, 45-46, 49, 80.

21.     Fenner's warning required "an immediate and consistently sustained improvement . . . ." (<u>Id.</u>)

**Response**

Admit insofar as the quotations excerpted appear in Plaintiff Fennner's written performance warning. However, Plaintiff Fenner disputes the contention that his work required any improvement, because it was already of high quality, but, realizing that he faced the possibility of termination, he worked harder and "had to triple-cross [his] Is and [his] Ts, [he] had to watch [his] back." Fenn. at 107:21-111:22.

22.     Certain instances highlight Fenner's poor performance in FY 2008. In May 2008, Fenner was sent to Chicago to report on Reverend Jeremiah Wright, the former pastor of then-presidential candidate Obama, with the expectation that Fenner would produce exclusive, investigative or enterprise stories. (Gott. at 265; Gott. Aff. ¶ 14.)

**Response**

Dispute that this instance evidenced poor performance, as he did produce a solid story. Fenn. at 39:4-5.

23.     Gotthelf sent Fenner to cover Wright because he "wasn't doing a great job" as a rewrite, was "not a strong writer," "wasn't pitching story ideas," and "wasn't discerning news lines on story ideas," so, because she "had an idea of something [she] wanted," she assigned

Fenner to cover Wright.  (Gott. at 269-70.)  Fenner was expected to provide exclusive, investigative, or enterprise stories regarding Wright.  (Gott. Aff. ¶ 14.)

**Response**

Admit insofar as the quotations excerpted appear in the email, but dispute because as the selected quotations were not representative of Plaintiff Fenner's performance, as he produced a "solid" story.  Id.

24.    When in Chicago, the only story produced by Fenner was based on interviews of Wright's congregation members.  (Gott. at 264-65; Gott. Aff. ¶14.)  Fenner produced no exclusive, investigative or enterprise pieces and, as a result, was called back to New York early.  (Gott. Aff. ¶14.)

**Response**

Admit insofar as Plaintiff Fenner interviewed congregation members.  However, dispute in because Plaintiff Fenner's produced a "solid" story.  Id.

25.    Fenner admitted he failed to perform on this assignment:  "They wanted a hot story . . . .  I wouldn't call [the story produced] a hot story."  (Fenn. at 36-39.)

**Response**

Admit insofar as the Plaintiff Fenner stated that "They wanted a hot story."  However, dispute that this assignment contributed to the decision to terminate Mr. Fenner as this single example is not representative of Plaintiff Fenner's talents and body of work, as set forth, infra at ¶¶ 10, 12, 16, 18, 45-46, 49, 80.

26.    Fenner testified that this criticism of him was not discriminatory.  (Id. at 38.)

**Response**

     Admit.  However, dispute in part to the extent that this statement is intended to support an

inference that Plaintiff Fenner did not believe that he faced discriminatory treatment and a hostile

work environment, as set forth, <u>infra</u> at ¶¶ 3, 4, 5, 69, 132-34, 141-43, 149, 151-52

     27.     Also in May 2008, Fenner was sent to Chicago to cover the trial of singer R.

Kelly, who allegedly videotaped sex acts with a minor.  (<u>Id.</u> at 40.)

**Response**

     Admit.

     28.     In preparing a draft story on the opening of the trial, Fenner omitted that the

alleged victim, by then 23 years old, recanted her allegations, but the trial would go on.  (<u>Id.</u> at

43-44.)  Fenner was aware of this fact when he prepared the story.  (<u>Id.</u>)

**Response**

     Admit that Plaintiff Fenner did not report that R. Kelly's victim recanted.  However,

dispute in part, because the story that Plaintiff Fenner wrote was merely a preview story written

under a tight deadline, and was not intended to be the final story.  Fenn. at 44.

     29.     Fenner admitted that he "would have wanted to put that [omitted fact] in the story,

yes," and that the omitted fact was "interesting and unique."  (<u>Id.</u> at 43-45.)

**Response**

     Admit.

     30.     Neil Sloane, the editor overseeing the story, was critical of Fenner's failure to

include this in the story.  (<u>Id.</u> at 41.)

**Response**

     Admit.

31.     Fenner testified that this criticism of him was not discriminatory.  (Id. at 42.)

**Response**

Admit.  However, dispute in part to the extent that this statement is intended to reflect that Plaintiff Fenner did not believe that he faced discriminatory treatment, as set forth, at ¶¶ 3, 4, 5, 69, 132-34, 141-43, 149, 151-52.

32.     In June 2008, Fenner drafted a story on a sexual harassment lawsuit against the husband of disc jockey Wendy Williams, but failed to identify the most interesting aspect of the story:  Williams' husband allegedly tried to hire a hit man to kill her rival.  (See id. at 56.)

**Response**

Dispute in part because of the attempt to characterize this part of the story as objectively "the most interesting aspect," and the evidence does not support that Fenner stated that Wendy Williams's husband trying to hire a hit man to kill Ms. William's rival was a better lead, and merely stated that it was "a good lead."  Fenn. at 56:22-23.

33.     Sloane rewrote this story with the hit man aspect as the lede, and Fenner admitted about the edited story, "I like [Sloane's] lead, I agree with it."  (Id. at 57.)

**Response**

Admit.

34.     Fenner could not even recall developing a single confidential source for this assignment with respect to his standing assignment to cover the expansion of Columbia University.  (Fenn. at 73-74.)

**Response**

Dispute in part, because Plaintiff Fenner did recall developing sources at Columbia, but he could not recall with specificity if any were confidential.  Fenn. at 73-74.

14

35.     Fenner's writing was also poor, including poor syntax and grammatical and factual errors. (Gott. at 156.) For instance, Fenner submitted the following to his editors:

> The protesters also plan to continue their late night demonstrate [*sic*] to Bowery Wine Company on First St., which movie action star Bruce Willis is reportedly a co-owner and [*sic*] then on to a New York University dormitories [*sic*] on Bowery St.

(Lern. Dec., Exh. 5; Fenn. at 49.) Besides clear poor syntax and grammatical errors, this contained factual errors, as it wrongly identifies Bruce Willis as a co-owner of the wine company, and "Bowery St." does not exist. (Lern. Dec., Exh. 5.)

**Response**

Admit only as far as the contents of this document and dispute the characterizations regarding Fenner's skills. These errors are not reflective of Fenner's exemplary work product, including his work on well over 150 articles at the Post. Fenn. at 50.

36.     Fenner admitted at deposition that he committed these errors. (Fenn. at 49.)

**Response**

Admit.

37.     Michael Hechtman, the editor who brought these errors to Gotthelf's attention (Lern. Dec., Exh. 5), never discriminated against Fenner (Fenn. at 50).

**Response**

Admit.

38.     In another instance, Fenner's editors had to repeatedly instruct him to conduct an assigned interview (Lern. Dec., Exh. 5), which he managed to do only after the passage of "weeks" and being sent back "multiple times" by his editors. (Fenn. at 64-67.)

**Response**

Admit, but dispute regarding any implication that it reflects poor performance. It took Plaintiff Fenner weeks to obtain the interview at the location at which he was repeatedly sent because the subject was in rehabilitation. Fenn. at 62. Moreover, he was traveling and juggling multiple assignments, but still managed to conduct several interviews with the subject's wife during his visits, and he believed Defendant Greenfield's criticism of him was discriminatory in that the interview was impossible to obtain given the sate of the proposed interviewee. Fenn. at 61-65.

39.     Fenner was increasingly assigned to report from the field throughout FY 2009 until, in or about May 2009, he was reassigned to work as a runner, when Greenfield informed him that he would work from the field and should call the newsroom to receive assignments. (Id. at 207-08; Green. at 320.)

**Response**

Admit that Plaintiff Fenner was increasingly assigned to the field, but dispute, because he was never informed that he would be assigned to work as a runner--in fact, his position was intended to be temporary. ¶ 102, Fenn. at 119-20, 209, 271-72; Lerner Ex. 4.

40.     Fenner's performance did not improve and his FY 2009 APA rated his overall performance as "Unacceptable, Does Not Meet Standards." (Lern. Dec., Exh. 7.)

**Response**

Admit as to the written rating of Plaintiff Fenner's 2009 performance evaluation performance. However, Plaintiff Fenner squarely disputes this rating as discriminatory and not reflective of his performance. Fenn. at 96-97.

41.    Fenner's May 2009 self-evaluation states that he needed to "produce more exciting-hard hitting [*sic*] enterprise stories" (Id., Exh. 6), an essential aspect of his job and a prime criticism of his supervisors.  (See Id., Exh. 7.)

**Response**

Admit insofar as the quotations excerpted appear in the 2009 performance evaluation. However, Plaintiff Fenner squarely disputes this rating as discriminatory and not reflective of his performance.  Id.  In fact, the evaluation praises his stories from the Miracle on the Hudson, an interview with a passenger pulled from the waters wearing just his underwear, and a story on Archbishop Dolan.  Lern. Dec. Ex. 7 NYP-FL000474.

42.    His 2009 self-evaluation highlights three stories from FY 2009, none of which are notable for a senior reporter:  (1) an interview of a passenger on the plane that landed in the Hudson River, (2) an assigned interview of Timothy Dolan, and (3) an article about a church group attending the Obama inauguration.  (Id., Exh. 6.)

**Response**

Admit that Plaintiff Fenner's self-evaluation highlights three stories.  However, dispute Defendants' assertion that his stories are not notable for a senior reporter, and, furthermore, Defendants cite no evidence to suggest the quality of stories expected of a senior reporter.  The quality of Plaintiff Fenner's performance is an issue of fact.

43.    Fenner's 2009 self-evaluation identifies no enterprise stories by him.  (Id.)

**Response**

Dispute.  The evaluation states that Plaintiff Fenner had a "lack of enterprise stories"  was not intended to denote that he had zero enterprise stories, nor does the fact that none of the listed

stories were called "enterprise" stories mean that they were not, in fact, "enterprise" stories. Lern. Dec. Ex. 7 NYP-FL000474.

44.   In January 2009, Gotthelf assigned Fenner to cover the plane crash, along with approximately a dozen other Post reporters; he interviewed the same passenger as at least three other news outlets; his interview was not a significant aspect of the Post's coverage of the landing; and he provided no information not found in other publications.  (Fenn. at 132-37; Gott. Aff. ¶ 15.)

**Response**

Admit as to the fact that Plaintiff Fenner interviewed the same passenger in the plane crash as other papers.  However, dispute that it was not a significant aspect of the Post's coverage, because it was a "great" and "unique" story for the Post.  Fenn. at 132:25-133:12.

45.   In February 2009, Fenner interviewed Cardinal Dolan in Milwaukee; he was assigned to conduct this interview, the story was written by another reporter, and it involved no investigative work by Fenner.  (Green. at 338.)  Competently conducting an assigned interview is routine and not a notable accomplishment for a senior reporter.  (Gott. Aff. ¶16.)

**Response**

Dispute, because Plaintiff Fenner contributed notes to the Dolan story and was given a bi-line in recognition of his contributions.  Green. at 338.  Mr. Greenfield considered it a "good" story.  Green. at 339.  Moreover, Plaintiff Fenner's prior story on Dolan was an exclusive, front page story, as set forth, infra at ¶¶ 46, 49.

46.   The only story Fenner pitched while in Milwaukee concerned Dolan arranging for the adoption of a disabled child; this story had previously run in another media outlet.  (Fenn. at 153; Gott. Aff. ¶ 16.)

**Response**

Admit that the Dolan story regarding the adoption of a disabled child was previously run by another media outlet. However, dispute insofar as Defendants assert that Plaintiff Fenner obtained the idea for the story from an online article and not through a source, or any implication that the story did not require investigative work, as Plaintiff Fenner spent hours with the woman to get the story. Fenn. at 140-41, 153. The record does not contain sufficient facts to confirm or deny whether this was the only article Plaintiff Fenner pitched regarding Archbishop Dolan. Regardless, it is immaterial, because Plaintiff Fenner was praised for his work on the Dolan story, as Defendant Gotthelf stated that Plaintiff Fenner's "nailed" his coverage, which she, Defendant Greenfield and Mr. Angelo considered to be an exclusive story that gained considerable attention in the New York Area. Gott. at 161:4-11; Green. at 333-334; Ang. at 327:2-5. Plaintiff Fenner's first Dolan piece was an exclusive story considered for the front page and another exclusive piece, which Defendant Greenfield considered a ""very good story . . . I am glad we have it," appeared on the front page. Green. at 336-337, 339:16-340:4.

47.     In January 2009, Fenner's coverage of a bus ride of church congregants was a small "sidebar" to the Post's broader coverage of President Obama's inauguration coverage and ran on page 30 of the Post. (Id. at 133, 138-39.)

**Response**

Dispute. Obama's inauguration was a significant historic event that involved many stories as part of the Post's "inauguration package." Fenn. at 133. Furthermore, the Post won an award in connection with Fenner's piece. Fenn. Aff. ¶ 4.

48.     Fenner did not pitch any notable enterprise stories in FY 2009; by way of example, he pitched a story about a high-end car dealership opening in Harlem, but "The New

York Times . . . had written the story earlier in the year." (Fenn. at 113-17, 166-67.) Reporters should not pitch stories previously published in other newspapers unless they can offer new elements, which Fenner did not do. (Gott. at 238-40.)

**Response**

Dispute. Plaintiff Fenner's story highlighted different aspects of the car dealership's opening, including the mood of the customers, which advanced the story, and he believed that Defendant Greenfield unjustly and discriminatorily blocked the story from being published because he had no mention of a celebrity sighting, even though it would be difficult to "manufacture a celebrity walking into a car dealership." Id. at 113:15-115:21.

49.    Fenner also failed to maintain contact with his editors in FY 2009. By way of example, in February 2009, when in Milwaukee, Fenner was out of contact for 40 minutes and failed to inform the Metro Desk about a news conference. (Green. at 325-27.)

**Response**

Dispute. Defendant Greenfield's testimony materially misrepresents his interaction with Plantiff Fenner while he was in Milwaukee, wherein he both informs Defendant Greenfield that he was five minutes away from the press conference Defendant Greenfield wanted him to attend, that the conference had not started, and would commence in 30-40 minutes, and that he was waiting for the photographer whom he had contacted. Fenn. at 168-175. Moreover, Plaintiff Fenner did not plan to skip the press conference—he was merely attempting to get a word in edgewise so that he could tell Defendant Greenfield that he had obtained an interview with the bishop after the press conference, which he had planned to attend. Fenn. at 175-77. In retrospect, Defendant Greenfield stated that the Dolan piece was an exclusive story considered for the front page and another exclusive piece, which Defendant Greenfield considered a ""very

good story . . . I am glad we have it," appeared on the front page.  Green at 336-337, 339:16-340:4.

50.     On this occasion, Greenfield raised his voice at Fenner and asked Fenner, "Where the fuck are you?" and other questions related to the fact that Fenner "couldn't be reached," hadn't communicated with the desk about his reporting, and was unreachable "for about 40 minutes which is unacceptable for a reporter on the road [i.e., on a travel assignment]."  (Id.)

**Response**

Dispute.  Plaintiff Fenner was not criticized for being out of contact, as set forth, supra at ¶ 49.

51.     On another occasion, in June 2009, Fenner was deployed to an assignment but, when called a half-hour later, he was still at home.  (Fenn. at 145-46; Lern. Dec., Exh. 8.)

**Response**

Admit, but dispute any legal or factual implications.

52.     Again, in August 2009, Fenner was deployed to an assignment but, when called a period of time later, Fenner was still at home.  (Id.)

**Response**

Admit, but dispute any legal or factual implications.

53.     On or about September 17, 2009, Fenner received his FY 2009 APA, which states in part:

> As discussed at the last APA, including a written warning, Austin was hired to be a senior reporter but was underperforming in his basic writing skills, lack of fact checking, lack of producing enterprise stories and not being able to discern the news line in a story.  These areas have not improved.  His writing continues to be terrible and he often has little knowledge of the subject matter he is covering, to the point where he is no longer asked to write his own stories.  He seldom, if ever, pitches stories or calls in with ideas

which is necessary as a senior reporter.  Nearly every assignment
he works on has been given to him by the city desk.  This year he
did not bring his work up to par, despite the discussions with
management and warning, and he continues to work down as a
running reporter vs. a senior reporter because he can't meet
standards necessary to cut it in the newsroom. . . .

(Lern. Dec., Exh. 7.)

**Response**

Admit that the quote reflects the text of the September 17, 2009 performance evaluation.

However, dispute that the performance evaluation accurately reflects his performance, as set

forth, supra at ¶ 40.

54.    On September 17, 2009, Fenner was issued a final written warning.  (Id.)

**Response**

Admit.

55.    This final written warning outlined ongoing performance issues, such as poor

writing skills, his failure to pitch stories, failure to produce enterprise stories and failure to be

able to discern the lede, and expressly cautioned Fenner that:

Working as a runner for someone with your experience and at your
level as a senior reporter is simply unacceptable and cannot
continue any longer.  It is critical that we see an immediate and
consistently sustained improvement in your job performance.  We
have outlined for you the areas in which you need to demonstrate
improvement, yet you have failed to heed these warnings.  This is
your final warning.  We want to see you succeed, but that is up to
you, we cannot do it for you. If you fail to raise the level of your
job performance to an acceptable standard, you will, regrettably,
leave the Post with no choice but to terminate your employment at
The New York Post.  We certainly hope that it does not come to
that.  But then, this is something only you can control.  Please do
not let us down.

(Id.)

**Response**

Admit that the quote reflects the text of the September 17, 2009 warning.  However,
Plaintiff Fenner strongly disputes the veracity of the warning, as it did not accurately reflect his
performance, as set forth, supra at ¶ 40.

56.     Fenner signed that written warning acknowledging receipt of it.  (Id.)

**Response**

Admit.

57.     It is undisputed that the sole reason that Fenner believed that his 2009 warning
was discriminatory was "[b]ecause [he] disagree[d] strongly with the points" criticizing his
performance. (Fenn. at 195.)

**Response**

Dispute.  Plaintiff Fenner believed that his 2009 warning was a further discriminatory
action intended as a "tool to [fire] him."  Fenn. at 195.  Moreover, neither Defendant could
provide him any examples of what an "enterprise story" that ran in the past 2-3 months looked
like.  Id.

58.     Following receipt of his final warning, Fenner was afforded more than seven
weeks to improve his job performance.  (See Lern. Dec., Exh. 9 [e-mail on November 4, 2009,
advising that Fenner had not improved since receipt of his final warning].)

**Response**

Admit, but dispute any legal and factual implications.

59.     Fenner's performance did not improve following his final written warning.
(Green. Aff. ¶5.)[10]

_____

[10] The affidavit of Daniel Greenfield, dated May 8, 2013, submitted in support of Defendants motion for summary
judgment, is herein designated "Green. Aff."

**Response**

Admit.  However, Plaintiff Fenner was already confident in his talents as a Senior Reporter, understood that his warning was discriminatory and intended as a "tool to [fire] him," and his work did not need any improvement, as set forth, supra at ¶ 21.  Fenn. at 195.

60.      Between receipt of the warning and early November 2009, Fenner contributed reporting to 15 stories, but was assigned to 14 of them, and only pitched three stories.  (Id. ¶ 5.)

**Response**

Dispute.  Defendants rely entirely on the newly introduced affidavit of a Company employee for its self-serving representations about Plaintiff Fenner's lack of pitches.  Plaintiff Fenner was not asked any questions regarding the number of total pitched between the date of his warning letter and November 2009, nor was he questioned regarding the number of stories he wrote that were assigned to him.  Plaintiff Fenner testified concerning at least a dozen specific enterprise stories that he produced, including stories produced in that timeframe, and testified that he had produced several more, inter alia, (i) the Columbia University expansion (ii) the appointment of Archbishop Dolan (iii) a plane landing on the Hudson and (iv) an historic bus ride traveling to watch the inauguration of President Barack Obama, among others.  Fenn. at 51, 72-74, 78-80, 101, 131-35 138, 152-53, 158-59, 198:17-20, 200:15-202:18, 221, 224; Green. at 324:16-21, 332-333, 335-337, 377-378; Ang. at 327:2-5.

61.      One pitch, about a Brooklyn youth football team dedicating its season to its former coach, a slain police officer, ran as a "brief," which is a short story (it was only 149 words) of minor interest found near the back of the newspaper (it ran on page 20).  (Id. ¶ 6.)

**Response**

Admit that the Brooklyn youth football team ran as a brief. However, dispute in part, as there is nothing in the record to demonstrate that an article on page 20 was near the back of the paper, nor is there anything in the record to demonstrate that an enterprise story that was cut down in length no longer constitutes an enterprise story or that it is of minor interest.

62.    Another pitch concerned a man living in an old bank building; Fenner's editors rejected this because *New York Magazine* had previously run the same story, and Fenner presented no new facts advancing it. (Fenn. at 166; Green. Aff. ¶ 7.)

**Response**

Admit that a story about a man living in an old bank building ran in New York Magazine a year prior. However, dispute in part, because Plaintiff Fenner could have developed new angles for the story and Defendant Greenfield did not permit him to do so because he was "not interested in advancing [Plaintiff Fenner's] career." Fenn. at 165:16-169:12.

63.    Lastly, Fenner pitched a general story about economic hardships facing military personnel on their return from active duty; this topic had extensively covered by many news outlets, and Fenner offered nothing new or different to distinguish his idea from prior publication. (Green. Aff. ¶8; Lern. Dec., Exh. 9.)

**Response**

Admit that Plaintiff Fenner pitched a story about the economic hardships facing military personnel on their return from active duty. However, dispute that Plaintiff Fenner offered nothing new to distinguish his idea from prior publications, as there is no evidence this was the case, and Defendant Greenfield merely stated that "it was well trod turf and not really

compelling," without providing any information as to Plaintiff Fenner's specific ideas.  Lern. Dec. Ex. 9 NYP-FL000518.

      64.     On November 4, 2009, Greenfield e-mailed Gotthelf, advising her that Fenner's performance had not improved and recommending termination.  (Lern. Dec., Exh. 9.)  On November 7, 2009 Gotthelf notified the Post's HR department that Fenner's performance had not improved and that his employment should be terminated.  (Id.)

**Response**

     Admit that Defendant Greenfield emailed Defendant Gotthelf, advising her that Plaintiff Fenner's performance had not improved and that Defendant Gotthelf emailed HR recommending termination.  However, dispute in part that Ms. Greenfield recommended termination – rather, she stated that she had been using him as a "simple runner--the type of work typically handled by an entry level reporter."  Lern. Dec. Ex. 9 NYP-FL000518.  In addition, Defendant Gotthelf notified HR on November 4, 2009, not November 7, 2009.  Id.

      65.     Fenner's employment with the Post was terminated on November 9, 2009. (Plaintiffs' Third Amended Complaint ["TAC"] ¶ 112.)

**Response**

     Admit.

      66.     Fenner never heard any-race based comment by Gotthelf or Greenfield.  (Id. at 67, 98-99.)  Fenner never heard or overheard anyone at the Post make a racist comment.  (Id. at 231-32.)  Fenner never heard anyone "call any African-American by a derogatory name."  (Id. at 231.)  Fenner was not aware of any instance of a Post employee using a racially derogatory term while he was an employee of the Post.  (Id. at 233.)

**Response**

Dispute.  Plaintiff Fenner never heard any race-based or racist comments by Defendants. However, dispute the implication that Plaintiff Fenner was not subjected to racially discriminatory treatment, including continuous harsh and offensive language from his supervisors, diminished opportunities, and a racially offensive cartoon, altogether constituting a hostile work environment, as set forth, infra at ¶¶ 3, 4, 5, 10, 62, 69, 77, 80, 89, 93-94, 96, 102 132-34, 136, 139, 142-43, 145-46, 151-152.

67.     It is undisputed that white reporters traveled to report on stories more frequently than Fenner.  (See Gott. at 300-01.)  Fenner considered travel stories he was sent on "important" and he was "glad" to be assigned to them.  (Fenn. at 159-164.)

**Response**

Dispute.  Plaintiff Fenner worked on "important" stories that required travel that he was "glad" to be assigned to.  However, dispute whether White reporters traveled more frequently, as whether or not there were certain white reporters who were dispatched in the field more often than Plaintiff Fenner is a genuine issue of material fact and Defendant Gotthelf's testimony that he dispatched two white reporters an unknown number of times within a "time period" is not accompanied by any documentary evidence, nor does it contain any information regarding the reporter's seniority or quality of assignment.  Gott.  At 300-01.  Moreover, Plaintiff Fenner disputes this assertion, he was sent on more assignments involving travel than his White counterparts, but was denied vital resources provided to White colleagues.  Fenn. at 221-24, 315-16.

68.     In Spring 2009, Fenner's editors asked him to move one shift a week from 11 a.m. to 7 p.m. to a shift at 2 p.m. to 10 p.m. because "they needed me to help out on a certain shift

because they were short on manpower . . . ." (<u>Id.</u> at 209.)  This proved beneficial for his personal

schedule.  (<u>Id.</u> at 122.)

**Response**

      Admit the first sentence.  However, dispute that the shift was beneficial to Plaintiff

Fenner's schedule, because he always worked past 5 p.m. and, on Thursdays, his shift ended at

10 p.m., making it difficult for him to help his teenage daughter with college preparation.  Fenn.

121-23.  Moreover, Defendant Greenfield's email stating that Plaintiff Fenner was working as a

"simple runner--the type of work typically handled by an entry level reporter" demonstrates that

his schedule change was not made merely because "they were short on manpower."  Lern. Dec.

Ex. 9 NYP-FL000518.

      69.    It is undisputed that the only time Fenner did not receive a resource was when the

Post did not send a photographer he requested for a story.  (<u>Id.</u> at 219-21, 236.)  This request was

denied by the Post's Photography Desk.  (<u>Id.</u> at 221-23.)  This did not prevent Fenner from doing

his job.  (<u>Id.</u> at 221.)

**Response**

      Dispute.  Plantiff Fenner was banned from the newsroom shortly after the publication of

Journal-isms and was, therefore, denied access to a desk, phone, library, archives, among other

resources.  Fenn. Aff. at ¶ 12.  Dispute in part that the Photography desk is the only party that

denied Plaintiff Fenner's request for a photographer as Plaintiff Fenner also requested a

photographer from Defendant Gotthelf several times.  Fenn. at 221.  Dispute that the denial of a

photographer did not prevent Plaintiff Fenner from executing his job to the fullest extent, as he

was unable to obtain a prominent place in the paper and "make a bigger splash" without an

accompanying photograph.  Fenn. at 224:2-9.

B.      **Facts Relating to Ikimulisa Livingston's Employment**

70.      The Post hired Livingston, who is African-American, as a reporter in 1997.  (TAC ¶ 40.)

**Response**

Dispute in part, as it is a legal conclusion and Plaintiff Livingston was not only hired by the Post, but by News Corporation in its capacity as a "single" or "joint" employer.

71.      Livingston was employed at-will by the Post.  (Gott. Aff. at ¶ 17.)

**Response**

Dispute in part, as it is a legal conclusion and Plaintiff Livingston is not only an employee of the Post but an employee of News Corporation in its capacity as a "single" or "joint" employer.

72.      Livingston was assigned to work in the Queens courthouses in February 2006. (Living. at 53.)[11]

**Response**

Admit.

73.      Prior to her assignment to the Queens courthouses, Livingston worked as a general assignment reporter for the Post.  (Gott. Aff. at ¶ 18; Liv. at 229.)

**Response**

Admit.

74.      On January 27 and 30, 2006, Livingston e-mailed Gotthelf and Jesse Angelo, then the Post's Metro Editor, asking that she be assigned to cover the Queens courthouses.  (Lern. Dec., Exh. 10.)

---

[11] True and correct copies of referenced excerpts of the deposition of Ikimulisa Livingston, dated January 13, 2012, February 20, 2013, and May 6, 2013 ("Living. at [page]"), are attached to the Lern. Dec. as Exhibit 20.

**Response**

Admit.

75.    In February 2006, Angelo assigned Livingston to cover the Queens courthouses. (Angelo at 283-85 [Day 1].)  Gotthelf agreed with and encouraged the reassignment.  (See Lern. Dec., Exh. 10.)

**Response**

Admit that the first sentence is correctly cited.  However, deny in part as to the fact that Defendant Gotthelf "encouraged" the assignment, as her email stated "might as well give Kim Queens.  She's shown that she can write pretty well off press releases."  Lern. Dec. Ex. 10 NYP-FL001947 (emphasis added).

76.    Angelo assigned Livingston to this beat because "she was not having success [generating story ideas]" as a general assignment reporter, and, as courthouse reporter, the "burden of trying to come up with story ideas out of thin air . . . is less" because a reporter can rely on "filings in civil cases" and criminal cases, which Angelo thought "might help her to be more successful . . . ."  (Angelo 283-85, 287 [Day 1]; see also Lern. Dec., Exh. 10 at IL_590.)

**Response**

Dispute.  Defendant Gotthelf simply told Mr. Angelo that Plaintiff Livingston could write pretty well off press releases, and did not list any deleterious attributes, such as difficulty pitching story ideas.  Lern. Aff. Ex. 10 NYP-FL001947.

77.    Livingston worked a scheduled reporting shift that began at 9:00 am and ended at 5:00 pm from early 2006 until the termination of her employment.  (Gott. Aff. ¶ 18, Living. at 216-17.)  She worked Sunday through Thursday until September 2007, then worked Monday through Friday.  (Gott. Aff. ¶ 18.)

30

**Response**

Admit as to Plaintiff Livingston's assigned reporting shift.   However, dispute insofar as her listed schedule did not account for the hours that she worked overtime while at the Queens courthouse. Liv. [page 1] at 121, 124-25.   Furthermore, Plaintiff Livingston, like all employees, took breaks for lunch in addition to other brief respites, as set forth, infra at ¶¶ 111, 112, 113.

78.     In the Queens courthouses, Livingston was required to find and generate stories and story ideas, not be assigned them, by, among other things, looking through court filings, watching court proceedings, and speaking with individuals at the courthouses.  (See Lern. Dec., Exh. 13; Living. at 451; Kenn. Dec., Exh. 8 [Aud.] [recording of Haberman instructing Livingston, "I have asked you repeatedly to check other case files." and "check[] court files every day"], Exh. 7 [Aud.] [recording of Greenfield instructing Livingston, "Find civil cases, find other cases."].)[12]

**Response**

Admit that Plaintiff Livingston was required to find and generate stories.  However, dispute any implication that Ms. Livingston did not generate story ideas or was otherwise not performing well.  Gott. at 159:14-15, 18-19, 160:4, 14, 222:24-233:7, 223:25-224:18, 228:9-10; 229:20-230:7.

79.     Livingston's duties when covering the Queens courthouses also required her to develop sources within the courthouses, and to write on the breaking news "speed and flare" on deadline and without needing to be rewritten.  (See Green. at 165-67; Kenn. Dec., Exh. 8 [Aud.] ["You could have got that story from the Court officers . . . [or] a court clerk."].)

---

[12] The declaration of Garrett D. Kennedy, Esq., submitted in support of Defendants motion for summary judgment and dated May 10, 2013, 2013, to which cited exhibits are attached is herein designated "Kenn. Dec."  Certain exhibits attached to the Kenn. Dec. are audio recordings, with transcripts of these recordings prepared by counsel for the court's use; these exhibits are designated herein "Kenn. Dec., Exh. [No.] [Aud.]."

**Response**

       Admit that Plaintiff Livingston was required to develop sources in the courthouse and to write on deadline.  Dispute in part the contention that articles need not be rewritten, especially on high-profile cases with multiple daily deadlines.  See, e.g. Green. at 167:20-168:6.   Dispute as well the implication that Plaintiff Livingston did not meet deadlines and did not develop sources within the courthouse, as she affirms, "[p]eople in Queens Courts talk to me" and "[the court officers are] my best friends."  Kenn. Dec. Ex. 8, p.1, 4; Lern. Dec. Ex. 13 at NYP-FL000330; NYP-FL000334.

       80.     Livingston did not satisfy her duties while at the Queens courthouses.  Generally, Livingston:

> did not provide a lot of quality enterprise.  She did not provide a lot of quality weekend stories.  She did not routinely break stories out of her court of a . . . major nature. . . .  [T]here was frustration . . . because she was covering the Sean Bell Trial [and] needed a dedicated rewrite to make her deadlines.

(Green. at 171.)

**Response**

       Dispute.  Plaintiff Livingston provided a great deal of quality enterprise, produced a "numerous stories that [Defendants] just don't run," in addition to many pitches, but Defendants commonly and unjustly disparaged them, sometimes calling them "low rent" or "ghetto."  Kenn. Dec. Ex. 7, Ex. 8, pp. 1-2; Liv. [day 1] at 83-84, 132:23-133:6, 173, 186-187, 203;, Lern. Dec. Ex. 10 at IL_590; , as set forth, infra at ¶ 78, 80.  Dispute that the assignment of a rewrite at the Sean Bell police shooting trial reflected poorly on Plaintiff Livingston's skill as a reporter, given that it was a high-profile case with numerous deadlines throughout the day.  The majority of her stories were published with only routine cuts or minor revision.  Liv. at 222-23.

81.     The eight-week trial of three police officers who fatally Sean Bell the night before his wedding (the "Bell Trial") was held in the Queens criminal courthouse from February 25 through April 14, 2008.  (Kenn. Dec. ¶ 9.)

**Response**

Admit.

82.     Livingston covered the Bell Trial because she "covered the Queens courthouse" and covering the trial "would fall to her automatically.  If someone else were covering the Queens courthouse that person would be covering it."  (Green. at 213-14.)

**Response**

Admit.

83.     Livingston struggled in her coverage of the Bell Trial.  For instance, her editor, Zachary Haberman, criticized her for missing critical information, such as parts of the 911-call transcript that were played in court that *The Daily News* had published.  (Kenn. Dec., Exh. 3 [Aud.] [stating that Livingston got "four lines" while *The Daily News* got "15 to 20 lines"].)

**Response**

Dispute in part.  Admit Plaintiff Livingston was criticized for not purchasing the 9-11 call transcript that played in court at the Sean Bell police shooting trial.  However, dispute that Plaintiff Livingston struggled in her coverage, as she published multiple exclusive pieces for which she was praised and obtained front page coverage, as set forth, infra at ¶ 92.

84.     Livingston was unable to write clean copy in a timely manner during the Bell Trial; as a result, her editors assigned a "dedicated rewrite" – a second reporter – to receive her notes and draft them into stories.  (Green. at 215-16; Lern. Dec. Exh. 12.)  Assigning a dedicated

rewrite for the duration of the trial was an "unusual" need for a court reporter.  (Angelo at 260 [Day 1].)  Her writing while in the courthouses had previously been criticized by her editors. (See, e.g., Lern. Dec., Exh. 11.)

**Response**

Dispute in part.  Admit that Plaintiff Livingston was assigned a dedicated rewrite during the Sean Bell police shooting trial and that the clarity of her writing was once questioned. However dispute that assigning a dedicated rewrite for the duration of a long, complex, and highly deadline intensive trial was "unusual," as set forth, supra at ¶ 79.  Dispute, as well, any assertion that her writing in the courthouse was routinely criticized, as she received high praise for her work on the Sean Bell police shooting trial, as set forth, infra at ¶ 92.

85.     Haberman told Livingston generally during the Bell Trial that she needed to be "thinking bigger picture" and taking the "next step" in her reporting.  (Kenn. Dec., Exh. 4 [Aud.].)

**Response**

Dispute in part.  Admit that while Mr. Haberman once berated Plaintiff Livingston due to his dissatisfaction with an arranged picture she took of a row of guns, and once told her to be "thinking bigger picture."  However, dispute that Mr. Haberman repeatedly told her to be "thinking bigger picture," as Defendants cite no evidence beyond this single instance.  Kenn. Dec. Ex. 4, p. 1.  Moreover, the evidence cited does not support the contention that Mr. Haberman told Plaintiff Livingston to take the "next step" in her reporting.  Rather, he told her, "I appreciate you arranging that, but we needed the next step to be taken," meaning that he wanted her to take a photo that better displays the gun that killed Sean Bell."  Kenn. Dec. Ex. 4, p. 2.

86.     Livingston struggled with her performance beyond the Bell Trial.  For instance, she missed stories that were reported by *The Daily News*; as Haberman told her, "Constantly getting beat is not fun . . . .  It's happened a lot in the last week and a half."  (Id., Exh. 8 [Aud.].)  This was particularly egregious because the missed story was follow-up to the Bell Trial.  (Id.)

**Response**

Admit insofar as the Haberman quotations excerpted appear in the transcript and that Plaintiff Livingston occasionally did not obtain facts picked up by the Daily News.  However, Ms. Livingston missed those facts because the parents of Sean Bell refused to talk to her because they did not trust the Post, which Mr. Haberman stated that he understood.  Kenn. Dec. Ex. 8, pp. 1-4.

87.     Livingston admitted to Haberman that she missed a story about an individual named Bonelli.  (Id.)

**Response**

Dispute.  The factual significance of Plaintiff Livingston's conversation with Mr. Haberman remains in dispute, as Plaintiff Livingston did pitch a story about the indictment of Joseph Bonnelli, a small town mobster.  Liv. Aff. at ¶ 6.  On or around this time, Plaintiff Livingston also pitched a story about a meeting between Judge Arthur Cooperman, who presided over the Sean Bell police shooting trial, and court officers following the trial at which the trial was to be discussed, which would have been an exclusive.  Id. ¶ 5.

88.     Haberman criticized her for not having sources or being diligent in her reporting.  (Id. ["You could have got that story from the Court officers.  You could have gotten that story from a court clerk.  You could have gotten that story a lot of different ways. . . .  It doesn't seem

like you're talking to these people.  It really seems like you're just sitting there waiting for somebody to drop something in your lap. . . ."].)

**Response**

Admit that the Haberman quote appears in the transcript.  However, dispute that Mr. Haberman did not believe that Plaintiff Livingston was diligent as well as the implication that she was not diligent in general, as set forth, <u>infra</u> at ¶ 92. Defendant Gotthelf also praised Plaintiff Livingston's interviewing abilities, and her reviews state that she "can always be counted on to make deadlines," "calls in accurate quotes" and "works . . . in a timely fashion." <u>Id.</u>; Lern. Dec. Ex. 13 at NYP-FL000330; FL000334.

89.    Livingston was criticized for not doing "basic" fact-reporting, such as running a license plate following an accident, requiring her editor to do so for her.  (<u>Id.</u>, Exh. 6 [Aud.].)

**Response**

Dispute that Mr. Haberman criticized Plaintiff Livingston for "basic" fact-reporting. After Plaintiff Livingston attempted to call Mr. Haberman four times to ask him whether he was interested in a car crash involving a police officer outside the courthouse, he objected that, while she got the cars' license plates and a description of the event, she had not run the plates, which he considered to be "basic stuff," even though she had not followed up simply because she was waiting to confirm his interest.  Kenn. Dec. Ex. 6, p. 2.   Mr. Haberman often rejected her story pitches, (Kenn. Dec. Ex. 8, pp.1-2; Lern. Dec. Ex. 10 at IL_590), dismissing her news story pitches regarding minority communities as "low rent" or "ghetto" – a term not used for pitches involving White individuals. Liv. [day 1] at 83-84, 132:23-133:6.

90.    Livingston also pitched stories to her editors without first finding the "hook," or most interesting element, in a story.  (<u>See id.</u>, Exh. 5 [Aud.].)

**Response**

      Dispute, as the factual significance of Mr. Haberman's statement remains in dispute.

The cited example is merely a casual conversation where Plaintiff Livingston is checking in with

Mr. Haberman.  Kenn. Dec. Ex. 5, pp. 1-2.  She begins her call with "[i]nitially, not a lot going

on here," and then relates the details of an upcoming case.  Mr. Haberman indicates his interest

in the story, posing multiple questions, which Plaintiff Livingston ably answers.  Id.  Finally,

Mr. Haberman merely indicates that he would be interested in hearing if she learns anything

further about the case.  Id.

     91.    On May 22, 2008, Gotthelf, by this time the Metro Editor, e-mailed Livingston:

> Col [Allan, Post Editor-in-Chief,] had a fit over the story you
> missed this morning.  He also wondered why we're keeping you in
> that court when Nicole Bode [*The Daily News'* Queens Court
> reporter], who is not a fantastic reporter, is managing to beat you
> consistently.  He also brought up how labor intensive it was to
> assign you a dedicated rewrite for the Sean Bell trial when court
> reporters need to be able to write clear copy on the fly.
>
> One thing's clear, Kim, you're on Col's radar and that's a very
> dangerous place to be. It means you could be plucked from that
> court very soon.  You have to step it up.

(Lern. Dec., Exh. 12.)

**Response**

      Admit that the May 22, 2008 email from Gotthelf is correctly quoted and that Mr. Allan

was monitoring Plaintiff Livingston's performance, which might result in her being "plucked

from court."   However, dispute both the implication that Ms. Bodde of The Daily News was

"beating" Plaintiff Livingston on stories because of any deficiencies in her reporting skills,

which were routinely complimented over the course of the trial," see, as set forth, infra at ¶ 92.

In fact, Plaintiff Livingston "beat" Ms. Bode and the Daily News to exclusive stories on

numerous occasions.  Liv. 297:23-24; Liv. Aff. at ¶ 4.  Moreover, Ms.  Livingston was only

unable to get certain facts that Ms. Bodde obtained because Sean Bell's parents were distrustful

of the Post.  Kenn. Dec. Ex. 8, pp. 1-4.  Dispute also the implication that Plaintiff Livingston's

assignment of a dedicated rewrite was unusual or grounds for reassignment, as set forth, <u>supra</u> at

¶ 9; Green. at 167:20-168:6.  Moreover, Defendant Gotthelf, in Plaintiff Livingston's 2008

performance review, admits that the Bell police shooting trial was "one of the biggest police

trials ever to take place in the city." Lern. Dec. Ex. 13 NYP-FL000330.

> 92.    Livingston's subsequent FY 2008 APA, dated July 9, 2008, stated:
>
>> Ikimulisa needs to improve her ability to fully grasp the goings on
>> in her court.  While she was perfectly capable of providing good
>> notes from the Sean Bell trial, she was mostly unable to add any
>> legal foresight to the coverage, which is expected . . . .  While
>> Ikimulisa files her share of stories, they often need to be re-written
>> and rate no longer than a brief [a short story] . . . .
>>
>> Ikimulisa . . . needs work [*sic*] developing sources that will provide
>> stories for the paper that are longer than briefs . . . .

(<u>Id.</u>)  This APA rated her performance as "Occasionally Meets Standards, Needs Improvement."

(<u>Id.</u>)

**Response**

Admit that Plaintiff Livingston's 2008 performance evaluation is correctly quoted.

However, dispute that Plaintiff Livingston was unable to fully grasp the goings on in court or

provide legal foresight.  In fact, her record demonstrates he had no problem handling her court

cases, and, in 2008 (just prior to her demotion) the Post ran daily articles of Plaintiff Livingston's

coverage of the Sean Bell shooting trial, many of which were exclusive front-page stories.  Liv.

[day 1] at 122-123, 428; Gotthelf at 163-164; Green. 196-198, 200-201, 203-207.  Defendant

Gotthelf noted that Plaintiff Livingston did "a great job" and that the Post "relied heavily on

[her] quotes."  Lern Dec. Ex.13 NYP-FL000330.  The news desk also thought highly of her

work, and Zach Haberman, Associate Metro Editor, characterized one article as follows: "*Once*

*again* hell of a story." Green. at 198:8-11; 207:3-5 (emphasis added).  In addition, Defendant

Gotthelf admits that Plaintiff Livingston's files her share of stories and the fact that they must be

rewritten is typical as is the fact that they are often cut short, because even Mr. Haberman

admits, "You're not the only person whose stories are getting cut down to shit.  Other people's

are."  Kenn. Dec. Ex. 8, p. 4.  Defendant Greenfield also acknowledged, "You pitch stories every

day that don't make the paper" and then referred to her stories as "low rent."  Kenn. Dec. Ex. 7.

Dispute, also, that Plaintiff Livingston's rating of "Occasionally Meets Standards" is reflective of

her general performance or full body of excellent work for the Post, as set forth, infra at ¶¶ 10,

78, 80, 88, 92, 106; see also Liv. Aff. at ¶ 4.

       93.     Because of Livingston's poor performance, Gotthelf reassigned her from the

Queens courthouses to runner in late 2008.  (Gott. at 166, 196-97, 199.)

**Response**

      Dispute.  Plaintiff Livingston was not reassigned to a runner position because of poor

performance, but rather because of her race.  She was told that Defendants had decided to

"mak[e] a change" – nothing concerning Plaintiff Livingston's performance was communicated

to her at the time of the decision.  Liv. at 114-15.  Defendants now contend that Plaintiff

Livingston was reassigned because she "miss[ed] parts and/or all of stories, fail[ed] to generate

story ideas, and fail[ed] to develop sources."  Def. Br. at 18.  ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

39

94.     It is undisputed that Livingston was reassigned from the Queens courthouse no later than early December 2008.  (Id.)

**Response**

Dispute.  Plaintiff Livingston was not "reassigned" from the Queens court beat; she was demoted to a "runner," a less prestigious position with fewer opportunities for overtime, as set forth, infra at ¶¶ 3, 5.

95.     When reassigned to runner, Livingston was not assigned a desk in the newsroom, but used an open desk when and if she was present in the newsroom.  (Living. at 191-92.)

**Response**

Dispute in part.  Admit that Plaintiff Livingston, after calling in to gain permission, was able to use a desk in the newsroom in a few occasions.  However dispute in part that she was welcome to do so.  She was told that she was required to call in advance to even enter the newsroom, meaning that she needed to call even to pick up supplies.  Liv. [day 1] at 28-29, 74-75, 194, 196.  On one such occasion, upon entering the newsroom without calling for permission, she was greeted with surprise and hostility by Mr. Greefield, who exclaimed, "What are you doing here?" Liv. [day 1] at , 195:5-11; 203:2-10, 208; Green. at 257, 263.

96.     Gotthelf assigns Desks in the Post's newsroom on the basis of need.  (Gott. Aff. ¶ 21.)  For this reason, Gotthelf assigns desks to rewrites because they work in the newsroom, and does not assign desks to runners, as they are based in the field.  (Id.)

**Response**

Dispute in part, as Defendant Gotthelf also assigns desks on the basis of color. Furthermore, it stands to reason that Defendant Gotthelf would not have promised Plaintiff Livingston a desk and telephone, (a promise she does not deny), if runners were never assigned

to desks.  Pear. Dec., Exh. 13, IL_275; Liv. [day 1] at 187-89; Lern Dec. Ex. 21 NYP-FL000819;

Liv. Aff ¶ 10.  Moreover, it is not true that runners are not assigned desks, as Amber Sutherland,

Rich Calder, and Ed Robinson, who are all White, had desks and Lorena Mongelli had ready

access to a desk.  Liv. at 191:10-14; Liv. Aff. at ¶¶ 7, 10.

97.    A reporter reassigned from a newsroom job may temporarily keep his/her desk

following reassignment prior to the desk being reassigned.  (Id.)  By way of example, Fenner

was assigned a desk when he was a rewrite and, after being reassigned to runner, his desk

remained assigned to him until his employment ended.

**Response**

Dispute in part.  Admit that Plaintiff Fenner's desk was never reassigned, but dispute that

he was reassigned to a runner position, as he was never informed that his position had been

altered, and that his desk "remained assigned" to him following his exclusion from the

newsroom.  Fenn. at 119-20, ,192-195, 209, 315; Lerner Ex. 4.  There is also insufficient

evidence in the record to confirm or deny whether reporters who are reassigned to runner

positions only temporarily keep their desks.

98.    Gotthelf has never assigned a desk to a runner (id.), and she did not assign

Livingston a desk because her job duties as a runner do not require it.  (Id. ¶ 22.)

**Response**

Dispute.  Defendant Gotthelf has assigned desks to runners, including Amber Sutherland,

Rich Calder, and Ed Robinson.  Liv. at 191:10-14.  Liv. Aff. at ¶¶ 7, 10.  The fact that other more

junior white runners do not have desks is immaterial.  In addition, Plaintiff Livingston clearly

did have a need for a desk, as she was relegated to working in her car or at home when she

preferred to be working in the office where she had access to a telephone, archives, the library

41

and coworkers with whom she could collaborate on story ideas, as set forth, infra at ¶ 3; Pearson

Dec., Exh. __, IL_275; Liv. at 77, 187-89.  Moreover, the fact that Defendant Gotthelf promised

Plaintiff Livingston a desk and phone is proof positive that she did not believe that runners had

no need for a desk in the office.

      99.      Runners who are not African-American do not have desks in the newsroom,

including Jennifer Bain, Erin Calabrese, Kevin Fasick, Reuven Fenton, Lorena Mongelli,

Rebecca Rosenberg, and Frank Rosario.  (Id.)

**Response**

      Admit that the listed runners do not have desks; however these runners are more junior

than Plaintiff Livingston.  Green. at 122-23.  However, Defendant Gotthelf's affidavit raises

more questions than it answers, as it only lists non-African American runners who do not have

desks, rather than confirming or denying that any White, African American, or other minority

runners had desks.  Furthermore, Defendant Gotthelf, knowing full well that Plaintiff Livingston

had been demoted to a runner, nonetheless promised her a desk and phone, which were never

provided, as set forth, supra at ¶¶ 96, 98.

      100.    At all relevant times, Leonard Greene, an African-American rewrite reporter for

the Metro Desk, had a desk assigned to work in the newsroom at all times relevant to this

litigation, and has had a desk assigned to him.  (Gott. Aff. ¶ 23.)

**Response**

      Admit.  However, the fact that an African-American rewrite reporter had a desk is

immaterial, because "Defendant Gotthelf assigns desks to rewrites because they work in the

newsroom." Gott. Aff. at ¶ 21.  Moreover, Defendants list only one African American with a

desk, the implication being that there were no others.

101.    Livingston, like other runners, was partially reimbursed for her cell-phone per post policy. (Living. at 247-49; Gott. at 202-03.)

**Response**

Admit.

102.    Livingston's reassignment to runner was not a demotion.  (See, ¶ 5, supra.) Livingston's salary and title did not change after the reassignment to runner, as they did not when she was first assigned to the courthouses.  (Living. at 229-30.)

**Response**

Dispute.  Plaintiff Livingston's "reassignment" to runner was demotion, which consisted of both a position and title change, as well as a reduction in annual salary due to her lost opportunities to obtain overtime, as set forth, infra at ¶¶ 3, 5.   She was taken off her prestigious post as the "Queens Courthouse reporter" and demoted to a runner – an assignment generally given to more junior reporters, as set forth, supra at ¶¶ 3, 5, 68.  Moreover, her demotion resulted in a net salary loss because her new position provided far fewer opportunities to obtain overtime pay, whereas, at the Queens court, she had a steady stream of assignments, in addition to her own enterprise stories. Liv. [page 1] at 59, 121, 124-25.

103.    William Gorta was assigned to report from the Queens courthouses after Livingston had been reassigned.  (Green. at 223.)  Gorta was qualified for the position:  he was an experienced reporter, an adjunct professor at Columbia University Graduate School of Journalism, and a former Captain in the New York Police Department (Lern. Dec., Exh. 15; Gott. Aff. ¶ 20), and had served so well as a reporter that he was promoted to editor, although he was later returned to reporter as it better suited his strengths.  (Angelo at 210 [Day 1].)

43

**Response**



When Plaintiff Livingston came in to the office, Ms. Gottfeld merely said that Defendants had decided to "mak[e] a change" and nothing concerning Plaintiff Livingston's performance was communicated to her at the time of the decision. Liv. at 114-15. Moreover, Mr. Gorta received higher compensation than Plaintiff Livingston for performing the same work. Liv. [day 1] at 219-21, 230.

104.    Livingston cannot dispute Gorta's qualifications relative to her. (Living. at 117-18 ["I don't know if he's more qualified or less qualified"; "I don't think at any time I said he wasn't qualified."].)

**Response**

Dispute. The factual significance of Plaintiff Livingston's statement remains in dispute, as Plaintiff Livingston neither confirmed nor denied Mr. Gorta's qualifications relative to her own, and no evidence exist to support that he was any more qualified that Plaintiff Livingston. Liv. at 117-18; Gott. Aff. at ¶ 20.

105.    In or about November 2010, Gotthelf replaced Gorta in the Queens courthouses with Christina Carrega, a reporter who is African-American. (Gott. Aff. ¶ 20.)

**Response**

Admit. However, ███████████████████████████████████████ ██████████████████████████████████████████████ ███████████ Gott. Aff. at ¶ 20; Green. at 241:12-15, Ex. 8.

106.    As a runner, Livingston received an APA for FY 2009 that rated her as "Needs Improvement" and stated, "Kim rarely suggests story ideas and must do a better job of this. . . . Monday enterprise is very important and Kim never pitches or develops her own stories." (Lern. Dec., Exh. 16.)

**Response**

Dispute in part. Admit that Plaintiff Livingston's 2009 performance evaluation is correctly quoted. However, Plaintiff Livingston strongly disputes the accuracy of this rating as well as Defendant Gotthelf's statements regarding her performance. Plaintiff Livingston, did, in fact, pitch and suggest a number of excellent stories, including some that would have been

45

exclusive, that were dismissed out of hand. Gott. at 159:14-15, 18-19, 160:4, 14, 222:24-233:7, 223:25-224:18, 228:9-10; 229:20-230:7. (documenting numerous specific story pitches praised by Defendant Gotthelf). Liv Aff. at¶ 4. Gotthelf also praised Plaintiff Livingston's interviewing abilities, and her reviews state that she "can always be counted on to make deadlines," "calls in accurate quotes" and "works . . . in a timely fashion." Id.; Lern. Dec. Ex. 13 at NYP-FL000330; NYP-FL000334. Moreover, Defendants often derided her suggestions, particularly when calling her stories about minority communities "low rent" or "ghetto," terms not used regarding stories about White individuals, as set forth, supra at ¶ 10, 80.

107.    At or about the time of her FY 2009 APA, Livingston also received a performance warning which states that she: "Does not pitch stories, investigative ideas, or weekend pieces . . . which is a job requirement." (Id.)

**Response**

Admit that Plaintiff Livingston's 2009 performance evaluation is correctly quoted. However, the factual significance remains squarely in dispute, as Plaintiff Livingston strongly disputes the assertion that she did not pitch stories and ideas, and, in fact, she pitched many stories that were repeatedly rejected. Id.

108.    Six white reporters for the Metro Desk received performance warnings in connection with their 2009 APAs for like reasons (names have been withheld due to confidentiality demarcations, but were previously produced to Plaintiffs):

| Position | Hire Date | Reason for Warning |
|----------|-----------|--------------------|
| Reporter | 1/12/98 | "Lack of ideas; lack of creativity; unreliable news coverage, missed facts in stories" |
| Reporter | 3/14/94 | "Copy that needs extensive editing; Pitching stories that are suited to the newspaper" |
| Reporter | 4/16/956 | "Lack of basic writing skills needs excessive rewrite; Pitching more pop culture slice of life stories" |
| Reporter | 5/19/08 | "Lack of ideas; Poor basic writing skills, which require extensive rewrite" |
| Reporter | 10/29/01 | "Poor communication with editors; Unprofessional conduct; Unreliable news coverage" |
| Reporter | 3/17/96 | "Anger and attitude issues; Lack of ideas" |

(Gott. Aff. ¶ 28.)

**Response**

Admit that six White reporters received performance evaluations in 2009. However this record provides no substantive information, as there is nothing in the record to indicate: 1) the races of all reporters at the Company in 2009, 2) the precise circumstances underlying these performance warnings, 3) the number of performance warnings given to minorities that year, 4) whether these or other individuals received repeated performance warnings, 5) whether their performance improved or declined, or 6) whether they were demoted or terminated. Gott. Aff ¶ 28. By contrast, there is there is ample evidence of racial discrimination and disparate treatment of minorities by the Company, as set forth, infra at ¶¶ 3, 4, 5, 10, 62, 69, 77, 80, 89, 93-94, 96, 102 132-34, 136, 139, 142-43, 145-46, 151-153.

109.    Starting in 2005, Livingston began working as a "mystery shopper" for Shop'n Chek, Inc., n/k/a MarketForce, Inc. ("Shop'n Chek"). (Kenn. Dec., Exh. 2.) Additionally, in March 2008, Livingston began working as a "mystery shopper" for Contemporary Staffing Solutions, Inc. ("CSS"), for whom she mystery shopped at T.D. Bank and Commerce Bank branches. (Id., Exh. 1; Living., 368-69.)

**Response**

Dispute in part.  Admit that Plaintiff Livingston began "mystery shopping" at the listed companies in 2005 and 2008.  Dispute in part, as Plaintiff Livingston's mystery shopping pastime did not constitute work or employment, as she was never an employee of any mystery shopping company and only received fees or reimbursements on a 1099 basis.  Liv. [day 1] at 323, [day 2] 371-373.

110.    Livingston mystery shopped for these companies during her scheduled reporting shift for the Post.  (Living. at 401; Kenn. Dec. ¶¶ 8, 10.)

**Response**

Dispute in part.  Admit that Plaintiff Livingston occasionally shopped between the timeframe of 9 a.m. and 5 p.m., but dispute the implication that Plaintiff Livingston improperly neglected her job duties or mystery shopped for extended periods of time, as set forth, infra at ¶¶ 111-112.

111.    While in the Queens courthouses, Livingston mystery shopped 171 times during her reporting shift, including 19 times during the weeks of the Bell Trial.  (Kenn. Dec. at ¶ 9.)

**Response**

Admit.  However, dispute the implication that Plaintiff Livingston missed any part of the Sean Bell police shooting trial in order to mystery shop, as there is a plethora of evidence to support that she only mystery shopped during lunch, breaks, and after work.  Liv. [day 1] at 322, 324, [day 2] at 419-20, 432, 436, 445, 451-53, 456.  These excursions could take as little as two minutes, and included routine tasks such as making a bank withdrawal of $20.  Liv. [day 1] at 322, [day 2] at 378, 385, 387, 415-16, 454.  Moreover, the Sean Bell police shooting trial was

eight weeks long, meaning that Plaintiff Livingston mystery shopped, on average, 2.3 times a week during the trial.  Kenn. Dec. ¶ 9.

112.    To mystery shop, Livingston left the courthouses, drove to a location, interacted with sales representatives, performed a transaction, prepared a report of her experience, and drove back to the courthouse.  (Living. at 378-79.)

**Response**

Dispute in part.  Livingston's sometimes mystery-shopped after leaving the courthouse, driving to a location, interacting with sales representatives, performing a transaction, and driving back to the courthouse, and admit that she would prepare a report. However, dispute in part, as Plaintiff Livingston did not always need to leave the courthouse because she "didn't always perform in-person . . . shopping."  Liv. at 388:6-388:14.   Dispute also the assertion that Plaintiff Livingston prepared her reports on her shopping experience before returning to the courthouse, as she either took minor notes on her transaction slip or wrote nothing at all.  Liv. [day 2] at 383-84.

113.    Livingston did not inform her supervisors that she was mystery shopping during her scheduled Post reporting shift (id. at 442-43, 451), nor did she tell her supervisors that she was leaving the courthouse to mystery shop (id. at 400-01).

**Response**

Admit.  However, Plaintiff Livingston's mystery shopping was not a secret and the only reason that she did not tell her supervisors was because she did not think it was pertinent to the Post, as it was not secondary employment.  Liv. [day 2] at 323, 371-73, 444-45.  Plaintiff Livingston explained unequivocally that she only mystery shopped on brief breaks during downtime, such as during lunch, or after finishing an assignment, and never prioritized mystery

shopping activities over her work.  Liv. at 322, 324, 419-20, 432, 436, 445-446, 448, 451-453, 456.

114.    Livingston had been instructed that when the courthouses were quiet, she should look through court filings for potential story ideas.  (See, e.g., Kenn. Dec., Exh. 7 [Aud.] [instructing Livingston to "check[] court files every day . . . . ."].)

**Response**

Admit to the extent that part of Plaintiff Livingston's job is checking court files for stories ideas.  However, it appears that Defendants have miscited this quotation and we were unable to locate the portion of transcript referenced.  In addition, dispute insofar as Defendants infer that Plaintiff Livingston did not perform this aspect of her job capably or with the frequency required.  Liv. at 366:17-22, 438:16-21.

115.    Livingston often spent more than an hour mystery shopping, and conducted multiple mystery shops at a time.  (Kenn. Dec., ¶10; Living. at 383)

**Response**

Dispute in part.  While Plaintiff Livingston did, on occasion, shop multiple times a day, the record does not reflect that she often spent more than an hour mystery shopping.  Rather, it presents that she mystery shopped for substantially shorter intervals of time.  Kenn. Dec. Ex. 9.  These excursions could take as little as two minutes, and included routine tasks such as making a bank withdrawal of $20.  Liv. [day 2] at 322, 378, 385, 387, 415-16, 454.  Defendants, including Mr. Angelo, who presumably thought mystery shopping was "gross misconduct," generally did not understand the short time mystery shopping entailed, nor could they distinguish it from other break time activities, or state applicable policies relating to downtime.  Ang. [day 2] at 26-27, 102-106; Sci. [day 2] 33-34, 41-43; Allan. at 531-533.

116.    When Livingston mystery shopped during her shift, she was incapable of performing necessary elements of her reporting job for the Post, which included searching for story ideas by, among other things, reviewing court filings and/or meeting with attorneys and court personnel; developing sources; writing stories; and being at her assigned location in case a breaking news event were to occur.  (Living. at 390-92, 417-19, 426, 434, 451)

**Response**

Dispute.  Plaintiff Livingston's performance was in no way hindered by her mystery shopping, which she did primarily on her lunch breaks and after her shift had ended.  (Liv. [day 2] at 322, 324, 419-20, 432, 436, 445-446, 448, 451-453, 456.)  Defendants have not pointed to a single instance in which Plaintiff Livingston's performance was directly hindered by mystery shopping, have not distinguished the difference between mystery shopping and other downtime activities, and, furthermore, Defendants have known about her activities since her 2012 deposition.  Liv. [day 2] 321:9-323:8; see also, Liv. [day 2] at 351 (noting presence of Defendant Gotthelf and Defendants' in-house counsel at the deposition.)

117.    Livingston did not stop mystery shopping during her reporting shift even after her performance was criticized and she was told that she might be removed from the Queens courthouses for her failing performance.  (See Lern. Dec., Exh. 12, 13.)

**Response**

Admit.  However, Plaintiff Livingston's brief mystery shopping excursions at no time had any adverse impact on her performance.  Liv. at 322, 324, 419-20, 432, 436, 445-446, 448, 451-453, 456.

118.    Livingston did not stop mystery shopping during her scheduled reporting shift after she was reassigned to runner.  (See Kenn. Dec. ¶ 10.)

**Response**

Admit in part, except as to the characterization that Livingston was "reassigned" and not demoted.

119.    Livingston did not stop mystery shopping during her scheduled reporting shift after receiving her FY 2009 APA and performance warning.  (Living. at 430-31.)

**Response**

Admit.  However, Plaintiff Livingston's 2009 performance evaluation was in no way reflective of her skills, and, furthermore, her mystery shopping in no way impinged on the quality of her work. as set forth, infra at ¶¶ 105, 88, 92, 111-13; Liv. at 322, 324, 419-20, 432, 436, 445-446, 448, 451-453, 456.

120.    As a runner, Livingston was instructed to use any time during her work day when she was not specifically assigned to a story to work on generating potential stories for publication.  (Living. at 450.)

**Response**

Dispute in part, because the evidence cited fails to support the contention that Defendant Gotthelf believed that Plaintiff Livingston should spend the entirety of her downtime, including lunch breaks. combing the internet for stories or cruising neighborhoods.

121.    From 2005 to 2010, Livingston conducted 450 mystery shops, and additionally prepared and submitted 77 reports to CSS and/or T.D. Bank regarding her mystery shopping experiences, during her scheduled Post reporting shift.  (Kenn. Dec. ¶ 8, 10.)

**Response**

Admit.  However, dispute any implication that Plaintiff Livingston was shopping when she was needed at the courthouse, as opposed to using her lunch break and other downtime to

mystery shop.  Liv. at 322, 324, 378, 385, 387, 415-16, 419-20, 432, 436, 445-446, 448, 451-454, 456.

122.    Of the 450 total mystery shops that she conducted during her reporting shift, only 22 were telephonic.  (Id. ¶ 11.)

**Response**

Admit.

123.    Additionally, Livingston mystery shopped on days that she took paid sick and/or bereavement leave from the Post.  (Id. ¶ 13; Living. at 407-14.)

**Response**

Admit.  However, Plaintiff Livingston's mystery shopping on days on which she took sick days or bereavement leave is immaterial.  Employees need not be confined to their home to take such paid time off, and Defendants were unable to identify any Company policies that would be violated by such activity.  Ang. at 61-62, 80-81; Lern. Dec. Ex. 17 (termination letter with no mention of policies violated).

124.    Livingston was deposed regarding her mystery shopping on February 20, 2013 (Living. at 349), at which time she admitted to mystery shopping during her Post shift (see, e.g., Living. at 401).

**Response**

Admit.  However, dispute the implication that Plaintiff Livingston was shopping when she was needed at the courthouse, as opposed to using her lunch break and other downtime to mystery shop.  Liv. at 322, 324, 378, 385, 387, 415-16, 419-20, 432, 436, 445-446, 448, 451-454, 456.

125.    The February 2013 deposition was "limited to questions on the topic of her 'mystery shopping." (TAC ¶ 121.)

**Response**

Admit.

126.    Angelo, now the Post's Publisher, learned of her mystery shopping following her February 2013 deposition. (Angelo at 21-22, 27-28, 31, 74-76 [Day 2].)

**Response**

Dispute.  Defendants' pretextual justification for Plaintiff Livingston's termination is belied by the fact that they were aware of the "mystery shopping," and the fact that she had not notified her supervisors regarding same, for more than one year prior to the date she was terminated because she testified to this information in her January 2012 deposition. Liv.[day 1] at 321:9-323:8; see also, Liv. [day 2] at 351 (noting presence of Defendant Gotthelf and Defendants' in-house counsel at the deposition.).  Defendants even obtained all of the documents introduced to support their factual claims regarding Plaintiff Livingston's mystery shopping well before December 10, 2012, when they first attempted to produce and/or introduce such material into the evidentiary record.  Kennedy Dec. Ex. 1.  Defendants failed to act on this information for more than a year, and her supervisors never even discussed it with her.  Ang. [day 2] at 11-13; Jehn [day 2] at 31-32; Lern. Dec. Ex. 17 (termination letter with no mention of policies violated).

127.    Angelo made the decision to terminate Livingston's employment on February 25, 2013, and her employment was terminated the following day. (Lern. Dec., Exh. 17.)

54

**Response**

Dispute in part. Admit as to the date of her termination. However, dispute the assertion that Mr. Angelo "alone" made the decision to terminate Plaintiff Livingston, as it is wholly implausible. Ang. at 21. As stated above, Defendants have been aware of Plaintiff Livingston's mystery shopping since her deposition in January of 2012, which they attended, and they obtained full documentation of her activities as of December 2012. Liv. 321:9-323:8; see also, Liv. at 351 (noting presence of Defendant Gotthelf and Defendants' in-house counsel at the deposition); Kennedy Dec. Ex. 1. Despite this, she was not terminated by Defendants, but by their direct supervisor, Mr. Angelo, who himself admits that he did not have any knowledge of Plaintiff Livingston's performance level, seemingly indicating that this was in no way a relevant factor. Ang. at 21-22. He further suggests that he is not even aware that Defendants, the employees that he supervises, are Plaintiff Livingston's supervisors, even though he claims to have read her deposition, and, clearly, must be aware that they are the named Defendants. Ang. at 27. He claims that he only discussed Plaintiff Livingston's pending termination with Ms. Scialdone, at which time, he approached her, insinuating he somehow obtained this transcript through a disinterested party. Ang. at 29. He failed to consult with Plaintiff Livingston's supervisors, nor did her supervisors even warn her to stop mystery shopping. Liv. at 6-7 [day 3]; Ang. at 366:6-10 [day 3]; Jehn at 33-35 [day 3]. Defendants assert that Plaintiff Livingston was terminated for "gross misconduct," but this explanation is transparently pretextual. Lerner Dec. Ex. 17.

128. The reasons for Livingston's termination are as follows:

> [Livingston] was terminated for gross misconduct, dereliction of duty, dishonesty, on hundreds and hundreds of occasions going and doing paid work for another employer, [and] not telling her supervisors about [her mystery shopping] . . . .

* * *

> We have a lot of employee who work incredibly hard, and they
> don't leave their post in the middle of the day and go do paid
> employment for somebody else when they should be reporting . . .
> I couldn't justify keeping [Livingston] on my staff.

(Angelo at 61-63 [Day 2]; see also Lern. Dec., Exh. 17.)  Angelo also considered that Livingston

mystery shopped during days on which she was on paid sick leave from the Post.  (Angelo at 80-

81 [Day 2]; see also Lern. Dec. Exh. 17.)

**Response**

Dispute.  As stated above, this explanation is entirely pretextual, as set forth supra at ¶

127.  Moreover, Plaintiff Livingston's mystery shopping on days on which she took sick days or

bereavement leave is immaterial.  Ang. at 61-62, 80-81; Lern. Dec. Ex. 17 (termination letter

with no mention of policies violated).

129.    Livingston claims that her termination was in retaliation for her testifying in

January 2012.  (Living. at 19 [Day 3].)  Livingston was treated in the same manner following her

reassignment from the Queens courthouse in 2008 through the termination of her employment.

(Id. at 36-37 [Day 3].)

**Response**

Dispute in part.  Admit as to the first sentence to the extent that her testimony and

participation in the lawsuit constitutes one factor for which Plaintiff Livingston was retaliated.

However, dispute that her participation in the lawsuit constituted the only complaint she made

that was met with retaliation.   Dispute the second sentence, as it materially misrepresents the

testimony.  Plaintiff Livingston merely reflecting that, since her demotion, he had been treated

poorly, especially in that she was given "dead-end assignments."  Liv. [day 3] at 37.  Plaintiff

Livingston was retaliated against not only because of the filing of the instant lawsuit but because

of her complaints of discrimination and retaliation.   Plaintiff Livingston made numerous complaints concerning discrimination and retaliation, including to her supervisor Defendant Gotthelf and HR.  Liv. [day 1] at 40:20-41:4.  She reported *via* e-mail to Ms. Scialdone of HR in December 2009 that she had "been discriminated against due to [her] race . . . ."  Liv. [day 1] at 140; Lern. Dec. Ex. 21, IL_274-75.  She also complained that, *inter alia*, (i) her demotion was discriminatory, (ii) she was given fewer opportunities than white reporters, and (iii) while Defendant Gotthelf had promised her a desk and phone, she had not received them.  Lern Dec. Ex. 21 NYP-FL000819; Liv. Aff ¶ 10.

130.    It is undisputed that Livingston could not recall any story pitch which was referred to by the Post's editors as being "low rent" (Living. at 132, 134), but she admitted that that no editor told her stories about minorities were "low rent" (id. at 249), and testified that she did not mention race when pitching stories (id. at 300; see, e.g., Kenn. Dec., Exh. 5 [Aud.] [failing to mention race when pitching story that was declined]).

**Response**

Dispute.  Defendants' statement materially misrepresents Plaintiff Livingston's testimony, as Plaintiff Livingston was not even asked to provide an example of a story that was "low rent."  Liv. 132-33.  In fact, Defendants have kindly provided an exhibit where Defendant Greenfield describes Plaintiff Livingston's story pitches as "Mickey Mouse sentencings and . . . low rent crime stories."  Kenn. Dec. Ex. 7.  Disputed as well that Plaintiff Livingston claimed that no editor stated, "'Stories about black people and Latinos are low rent.'"  Rather, Plaintiff Livingston stated, "[t]hey just refer to stories about African-Americans and Latinos as low-rent," and did so on a frequent basis.  Liv at 249:4-23.  Disputed as to the contention that Plaintiff Livingston did not mention race when pitching stories by merely citing to one example in which

Plaintiff Livingston did not mention race.  Moreover, such allegations are irrelevant to the point of whether Defendants, knowing the context of Plaintiff Livingston's stories, understood that they related to minority communities.

131.    Allan does not believe that Greene would be qualified to be a regular columnist because, among other reasons, Greene does not express "strong opinions" in his writings.  (Allan at 373-81.)

**Response**

Dispute insofar as Mr. Allan has exhibited racial animus.  Mr. Allan also believes that "Leonard is an excellent reporter, and excellent writer," but that he was "too nice."  Allan at 373:14-22.  He further stated that he believed that a good columnist need not have any journalistic experience, for example, "being a hooker" was sufficient experience.  Id. at 374:15-377:9.

**C.    Plaintiffs Were Not Banned from the Post's Newsroom**

132.    Fenner admits that his claim of a ban is based on an instruction that he should "call the city [or Metro] desk in the morning" to receive an assignment, which is what "[a] runner reporter does" and is "routine" for runners.  (Fenn. at 208, 212.)

**Response**

Dispute in part.  Admit that being asked to call in to await instructions and being treated like a runner are one of the means by which that Plaintiff Fenner was banned from the newsroom.  Dispute in part that this instruction was the only reason that Plaintiff Fenner was banned, as Defendant Greenfield told him that "he didn't want me in the newsroom and that I had to ask for permission before entering the building."  Fenn. at 208:21-217, .  "[He] told [Defendants Gotthelf and Greenfield] it was outrageous that they were banning me from the newsroom.  I felt like I was being treated differently than my white colleagues at the paper . . . I

58

did raise my objections to them about getting banned from the newsroom." Fenn. at 124:14-125:15.

133.    Fenner was never told he was "banned" or not to enter the newsroom.  (Id. at 215-16.)

**Response**

Dispute.  Mr Fenner was told that he was not wanted in the newsroom, as set forth, supra at ¶ 132.

134.    Fenner came into the newsroom after the start of the purported "ban," and he was never asked to leave the newsroom.  (Id. at 217.)

**Response**

Admit, however, Plaintiff Fenner only came in on a few occasions, because he felt humiliated, and had to wait until very late in the evening to get supplies.  Fenn. at 217.

135.    Fenner had no specific basis to believe race was the reason that he was told to call into the newsroom to receive assignments.  (Id. at 210-11.)

**Response**

Dispute.  Plaintiff Fenner was discriminated against because of his race over the course of his employment at the Company, as set forth, infra at ¶¶ 3, 4, 5. 69, 132-34, 141-43, 149, 151-52. Moreover, the Company presented a hostile work environment for people of color, as set forth, infra at ¶¶ 3, 4, 5, 10, 62, 69, 77, 80, 89, 93-94, 96, 102 132-34, 136, 139, 142-43, 145-46, 151-153

136.    Livingston claims that she was banned after she was reassigned to runner because Greenfield once asked her in the newsroom, "What are you doing here?"  (Liv. at 206-09.)

**Response**

Dispute.  Plaintiff Livingston <u>felt</u> that she was banned from the newsroom in part because of the quoted hostile question.  Dispute that Defendant Greenfield's question was the only reason why she believed she was banned, because Defendant Gotthelf specifically told her that she, like Plaintiff Fenner, must call for approval before entering the newsroom.  Liv. at 194-196; Fen. at 213-217.

137.    Greenfield believed that she was supposed to be on assignment at the time, and thus not in the newsroom.  (Green. at 256-57.)

**Response**

Dispute.  Admit that Defendant Greenfield's testimony is that he thought she was supposed to be on assignment.  However, dispute because his tone indicated that he did not expect her to be in the newsroom without calling for permission, as Defendant Gotthelf told her she must.  Liv. at, 194-196.

138.    Greenfield has asked this question of white runners who were in the newsroom. (Mac. Aff. at ¶ 4.)

**Response**

Dispute.  Plaintiff Livingston has no knowledge of any white runners who have been asked what they were doing in the newsroom, and, furthermore, Defendants merely rely on an affidavit in order to rebut the presumption that Defendant Greenfield asked Plaintiff Livingston this question because she was not to be in the office without calling for approval.  Liv. at 194-96; Fen. at 213-217.

139.    Livingston has "not been directly told by an editor not to come into the newsroom." (Living. at 195-96.)

**Response**

Admit in part.  No editor used Defendant's exact quoted language to describe Plaintiff

Livingston's ban from the courtroom.  Dispute because, Plaintiff Livingston is required to call

for permission to enter the newsroom and she was harshly questioned by Defendant Greenfield

when she did so.  Liv. at 194-196.

140.    During the purported "ban," she came into the newsroom, up to ten times per

month, and was never denied entrance or told to leave.  (Id. at 194, 199, 212.)

**Response**

Admit in part.  Plaintiff Livingston, when being asked if she comes in to the newsroom

ten times a month, testified that she came into the newsroom "less than ten times a month."

However, dispute in part as to any implication that she came in close to ten times a month.

Admit in part that Plaintiff Livingston was not denied entry or told to leave, but dispute in part,

as Plaintiff Livingston was discouraged from entering by both Defendants.  Liv. at 28-29, 74-75,

194, 196, 206-09; Fen. at 213-217.

**D.     Facts Relating to Plaintiffs' Alleged Hostile Work Environment**

141.    Fenner claims that Greenfield raised his voice at him twice, and each instance

concerned Fenner's work performance.  (Fenn. at 171, 176-77.)

**Response**

Dispute.  Defendant Greenfield raised his voice at Plaintiff Fenner on more than two

occasions, and, moreover, both of Defendants' citations refer to the same incident.  Fenn. at 171-

17.  While Plaintiff Fenner was in Milwaukee, Defendant Greenfield was "cursing and yelling

obscenities at [Plaintiff Fenner]" regarding a press conference without allowing Plaintiff Fenner

to explain that he was five minutes away from the parish where Archbishop Dolan was to speak

that morning.  Fenn at 171:24-172:25.  Defendant Greenfield was convinced that Plaintiff

Fenner, who was waiting for a photographer, would be late, because he did not realize Plaintiff Fenner was in a different time zone and that the press conference would not be starting for another 30 to 40 minutes.  Fenn. at 173-176.   Plaintiff Fenner also relates the fact that both Defendants "were screaming at [Plaintiff Fenner], and yelling at [Plaintiff Fenner], throughout the course of [his career]," and that Defendant Greenfield was a "loose cannon."  Fenn. at 67:4, 170.  The racially motivated hostile environment was "continuous[]."  Fenn. at 225-226.

142.   Fenner has never heard Greenfield or Gotthelf make reference to Fenner's race and/or color, or use any racial epithets, and Fenner has never heard Gotthelf or Greenfield use a racial epithet or made any reference to his race and/or color.  (Fenn. at 67, 98-99.)

**Response**

Dispute in part.  Admit insofar as Plaintiff Fenner has not heard Greenfield or Gotthelf use racial epithets.  However, dispute insofar as Defendants suggest that he was not subjected to discriminatory and hostile treatment.   Plaintiff Livingston plainly states that she "did not hear [Defendants] say anything beyond the low rent remarks about story pitches about blacks and Latinos." Liv. at 134:7-13, 136:11-15 (emphasis added).   Defendant Gotthelf also "constantly" yelled at Plaintiff Fenner (Fenn. at 98) on an "ongoing" basis.  Fenn. at 187-88; see also Fenn. 67, 98, 139, 143, 170-171, 177-89, 187-188, 209-210, 214-15, 226).

143.   Greenfield has raised his voice at white reporters under pressure that is inherent in the newsroom, and he has also used curse words in conversations with white reporters.  (Gott. Aff. ¶ 25; Mac. Aff.  ¶ 5.)[13]

---

[13] The affidavit of Jeane Macintosh, dated May 9, 2013, submitted in support of Defendants motion for summary judgment, is herein designated "Mac. Aff."

**Response**

Dispute.  Plaintiff Fenner experienced a hostile work environment, including by being routinely subjected to screaming fits of profanity directed at him by Defendants Gotthelf and Greenfield that went far above and beyond any harsh treatment meted out to non-minority employees.  Fenn. 67, 98, 139, 143, 170-71, 177-89, 187-88, 209-10, 214-15, 225-26.  Defendant Greenfield recalls raising his voice and using obscenities, such as "fuck" with Plaintiff Fenner.  Green. at 331-32; 328:11-12.  Defendant Gotthelf "constantly" yelled at Plaintiff Fenner (Fenn. at 98) on an "ongoing" basis (Fenn. at 187-88), and her and Mr. Greenfield "were screaming at [Plaintiff Fenner], and yelling at [Plaintiff Fenner], throughout [his career]."  Fenn. at 170:14-17..  Moreover, Defendants merely rely on an affidavit due to the fact that there exists no relevant facts in the record to uphold the assertion that White reporters were subjected to screaming and explosive profanity rather than a "raised voice."

144.    Greenfield raised his voice at Jeane MacIntosh in connection with her work performance once for being late getting to a story, and on another occasion when she did not inform him that she was taking a vacation day.  (Mac. Aff. ¶ 6.)

**Response**

Admit.  However, Defendants rely entirely on the newly introduced affidavit of a Company employee for its self-serving representations about Defendant Greenfield's negative treatment of White employees.  Plaintiffs have not had any opportunity to examine this employee previously and therefore submit that the testimony given in the affidavit should be afforded little or no weight.

145.    It is undisputed that Livingston recalled no specific instance of discriminatory voice-raising by Gotthelf or Greenfield (Living. at 39-40.)

**Response**

Dispute.  Defendants citations do not refer to transcript pages in which Plaintiff Livingston was asked to recount any "specific instances of discriminatory voice raising." However, with regard to the cited pages alone, Plaintiff Livingston states that "Dan Greenfield spoke to me in a very demeaning, disrespectful, demoralizing way . . . he talks to me like my distributions don't matter.  And he's intimidating and a bully." Liv. at 39:13-20.  She also states that she complained of racial discrimination to Defendant Gotthelf and the HR department.  Liv. at 40-41.  Moreover, although Defendants Gotthelf and Greenfield were not overheard using racial epithets themselves, both "constantly called stories about [B]lack people or Latino people 'low rent' which is tantamount to saying they're ghetto," while not making similar comments concerning stories about White individuals.  Liv. at 134:7-13.

146.    Livingston has not heard Gotthelf or Greenfield or any other Post editor or executive use a racial epithet or otherwise make any racially derogatory statement.  (Id. at 136, 139.)

**Response**

Dispute.  Plaintiff Livingston plainly states that she "did not hear [Defendants] say anything beyond the low rent remarks about story pitches about blacks and Latinos."  Liv. at 134:7-13, 136:11-15 (emphasis added).  Dispute additionally insofar as Defendants claim that Defendants and other superiors did not display animus towards minority employees, including herself.  Defendants Greenfield and Gotthelf, and Mr. Haberman, spoke to Plaintiff Livingston and other Black employees in a demeaning and demoralizing way, and screamed and cursed at her.  Liv. [day 1] at 39-40, 62-63, 104, 202-203, 205, 257-58; Gott. at 174; 309, 310:15-17, 311:6-8.  White employees were not treated this way.  (Id.).  The cursing and screaming was

64

"constant[]" and occurred on "a nearly daily basis." Liv. [day 1] at 104. Defendant Gotthelf gave Plaintiff Livingston inaccurate and discriminatory performance reviews. Liv. at 29, 67, 185-187; Lern. Dec. Ex. 16 NYP-FL000375 and denied Plaintiff Livingston bylines, which are actions not taken against White reporters. Liv. at 29, 69-70, 170-72, 181. Defendant Gotthelf also denied her resources, such as a desk, telephone, access to archives, librarians, or wire service (Pearson Dec., Exh. __, IL_275; Liv. at 187-89) even though Plaintiff Livingston is much more senior than any other "runner" without a desk that Defendant Greenfield could identify. Green. at 122-23.

147.    Livingston claims that Haberman spoke harshly to her. (Id. at 111, 113.) Zachary Haberman spoke harshly to white reporters whom he supervised, including Denise Buffa, Alex Ginsberg, Stephanie Cohen, Kieran Crowley, and Selim Algar, in connection with their work. (Id. ¶ 24.)

**Response**

Admit that Mr. Haberman spoke harshly to Plaintiff Livingston and Denise Buffa. However, defendant relies almost entirely on the newly introduced affidavit of a Post employee for its self-serving representations about Mr. Haberman's similarly harsh treatment of White employees. Plaintiffs have not had any opportunity to examine this employee previously and therefore submit that the testimony given in the affidavit should be afforded little or no weight.

**E.    Plaintiffs' Retaliation Claims Relating to the Stimulus Cartoon**

148.    On February 18, 2009, the Post published a political cartoon by Sean Delonas (the "Stimulus Cartoon"). (See TAC, Exh. A.)

**Response**

Admit.

149.    Fenner never complained to anyone at the Post about the Stimulus Cartoon or any employment practice.  (Fenn. at 184.)

**Response**

Dispute.  Defendants purport that the Company had no knowledge of his objection to the discriminatory Cartoon depicting President Barack Obama as a dead chimpanzee.  In an interview for an online publication called "Journal-isms," Plaintiff Fenner was quoted in the article, under the heading "Lack of Newsroom Diversity," as stating that the Cartoon "churned my stomach."  Fenn. at 189; Pearson Dec., Exh. __ (AF_34-39).  Plaintiff Fenner was named, and the blog post noted that other minority staffers "asked Journal-isms not to identify them even in the broadest terms, because it would be easy to determine who they are."  Id.  Richard Prince, the author of the article, also actually "spoke to a spokeswoman for News Corp." about the article (Id.; Fenn. at 185:16-24), and the Company uses public relation firms and clipping services to track all online material about the Post, particularly in a crisis such as the one triggered by this cartoon.  Fenn. Aff. at ¶ 10-11.  Just days after the article containing Plaintiff Fenner's quotation was published, he was was loudly rebuked and subjected to foul language by Defendant Greenfield.  Fenn. at 186:9-13.

150.    Fenner told Richard Prince, a blogger who is unconnected to the Post, that the cartoon "churned my stomach when I saw it," and the blogger quoted him in an on-line article.  (Fenn. at 189.)

**Response**

Admit.  Dispute, however, any implication that the Company lacked knowledge of Plaintiff Fenner's complaint on the blog, as set forth, supra at ¶ 149.

151.    None of Fenner's supervisors saw the article, was aware of the quote, or knew Fenner had made the statement.  (Gott. at 338-39; Green. at 394-95; Allan at 533; Angelo at 335-36 [Day 1].)[14]  The first they learned of the statement was after Fenner's employment ended and he filed this lawsuit.  (Id.)

**Response**

Dispute.  Despite Defendants' and other editors' assertions, the Company had clear knowledge of the publication of an article that featured several of its employees, including Plaintiff Fenner, the one complainant quoted in the article, as set forth, supra ¶ 149.  It is simply inconceivable that the Post spokeswoman, given this knowledge, would not advise Human Resources and the supervisors of this employee of his complaint.  Plaintiff Fenner also objected to the discriminatory employment practices to which he was subjected, including his ban from the newsroom, stating: "I told [Defendants Gotthelf and Greenfield] it was outrageous that they were banning me from the newsroom.  I felt like I was being treated differently than my white colleagues at the paper . . . I did raise my objections to them about getting banned from the newsroom."  Fenn. at 124:14-125:15.  Plaintiff Fenner also objected to a discriminatory written warning and 2008 performance evaluation, telling both Defendant Gotthelf and Amy Scialdone that he believed he was being "set-up."  Fenn. at 105:10-107:13.  The Company retailed against Plaintiff Fenner, a Senior reporter, in various ways following his engagement in protected activities, including by effectively demoting him to a "runner," changing his schedule to that of a junior reporter, banning him from the newsroom, giving him a poor performance review and final warning to set up his termination and, ultimately, terminating his employment.  Fenn. at 121:5-23, 125, 194-96, 205:6-9, 207-08, 212-13, 286; Fenn. Aff. at ¶ 7.  Just after his

---

[14] True and correct copies of referenced excerpts of the deposition of Col Allan, dated February 14, 2012 and February 21, 2013 ("Allan at [page]"), are attached to the Lern. Dec. as Exhibit 21.

termination, Plaintiff Fenner was told to give his notes to a White employee and suffered the humiliation of being escorted out of the building by security guards. (Fenn. at 261-63).

152.    Livingston claims that on the day the Stimulus Cartoon was published, she told Gotthelf that "the cartoon was very offensive to people of color," and Gotthelf agreed with her sentiment.  (TAC ¶ 80.)

**Response**

Admit.  Dispute, however, insofar Defendant Gotthelf's acknowledgment of the clear racist nature of the cartoon is not determinative on the issue of whether there existed a hostile work environment engendered by such a patently offensive cartoon in conjunction with the general atmosphere of racial animus perpetuated by Company management.  Further dispute any factual or legal implication that Ms. Livingston's complaint was not statutorily protected.  Company management generally derided the concerns of employees who voiced their opinion that the Cartoon was racist.  Fenn. at 183; Jehn at 67, 68, 75, 82, 132-33; Sci. at 70-71; Ang. at 138-42, 158-59.  For instance, Mr. Allan referred to individuals protesting the Cartoon as follows: "most of them are minorities and the majority of them are uneducated."  Pearson Dec., Exh. __ at ¶ 25; Clark Dep. at 146:23-25.  Mr. Allan also testified that he was "disappointed" by Ms. Guzman's public complaints concerning the Cartoon.  Allan at 63:21-64:12.

153.    Livingston did not complain about the working conditions at the Post in February 2009.  (Living. at 44-47.)

**Response**

Dispute.  Defendant Gotthelf, in complaining about the cartoon and her perception that it was "very, very offensive to herself and people of color," was ultimately complaining about the working conditions at the Company, as the Post, which was already a racially hostile working

environment, published the cartoon, thus reflecting its editorial views on all of its employees. Liv. at 29:23-30:17, 43:23-44:24.  Moreover, shortly after Plaintiff Livingston told Defendant Gotthelf that the cartoon was "very, very offensive to people of color (Liv. [day 1] at 44-45) and that it was "racist and discriminatory," Plaintiff Livingston received a warning letter stating that her work needed improvement.  (Id. at 190-91, 185-86, 188-89).  Discriminatory disparate treatment and retaliation against Plaintiff Livingston continued in the form of her discriminatory demotion to runner, banishment from the office, being given dead-end assignments, being subjected to verbal abuse and, ultimately, her baseless termination. Liv. at 17, 19:10-25, 21-24, 32-33, 34, 36-40, 45-48.  Plaintiff Livingston's was terminated on February 26, 2013 in a meeting with Post Publisher Jesse Angelo, who was not her direct supervisor, without any prior written or verbal warning.  Liv. at 6-7; Ang. at 366:6-10; Jehn at 33-35.  Defendants assert that Plaintiff Livingston was terminated for "gross misconduct" in connection with engaging in "mystery shopping" without notifying her supervisors, but this explanation is transparently pretextual.  Lerner Dec. Ex. 17.

## ADDITIONAL MATERIAL FACTS

1.    Plaintiff Livingston is a Black and/or African-American Female.  Liv. Aff. at ¶ 1.

2.    Plaintiff Livingston worked as a reporter for the Post from 1997 until she was unlawfully terminated on or around February 26, 2013.    Liv. Aff. at ¶ 2.

3.    Plaintiff Livingston's performance was stellar throughout her employment and she received a rating of "Meets Standards" in 2012, which was higher than her rating of previous years.  IL 8684.

4.      Plaintiff Livingston's 2012 evaluation states that she is a "competent field reporter" who "isn't usually beaten by the competition," suggesting that her mystery shopping was not a hindrance to the capable performance of her job. Id..

5.      Defendant Greenfield gave Plaintiff Livingston assignments with no chance of being published, while White employees were given priority pieces. Liv. [day 1] at 29, 33, 69-70.

6.      In June of 2008, Plaintiff Livingston, while speaking to Mr. Haberman stated that "[she has] had numerous stories that you all just don't run."   She further stated, "I don't understand why it is I wrote a very nice story about that lawsuit that turned into three inches . . . It's a good story about that lawsuit, that Delta thing, but this woman died and they just messed up the 80th birthday party.  I mean I don't understand why these things don't make it."  Kenn. Dec. Ex. 8, pp.1-2.

7.      In June of 2008, Mr. Haberman noted that Plaintiff Livingston published an Essence story that was unrelated to the Queens court, which Mr. Haberman said was "good." Kenn. Dec. Ex. 8, p. 3.

8.      In June of 2008, Plaintiff Livingston explained the way in which she sought out new stories that were routinely dismissed, explaining, "I roam around this courthouse all day long or I go to the Sutphin court house to look for lawsuits that you all don't run, if I do come up with something that isn't a slip and fall.  So, you know, I'm working hard to find something." Kenn. Dec. Ex. 8, p. 2.

9.      Mr. Haberman testified that rewrites are commonly used during busy periods. He stated, "So you have -- so if you are in a court and you have got a number of things going on the idea is if it is coming up to deadline you might pass your notes off to a rewrite, or call your notes

into rewrite, they will craft it and send it through. Sometimes if the court portion of a larger story, then that court reporter would then ostensibly also work with rewrite because it is only one piece of the larger story, maybe an arrangement in a bigger story, that sort of thing." Green. at 167:20-168:6.

10.     Mr. Gorta required a rewrite on more than one case.  Green at. 241:12-15, Ex. 8.  His 2009 performance evaluation, which reflects the start of his time at the Queens courthouse, states, ███████████████████████████████████████████

███████████████████████████

11.     ████████████████████████████████████████████████████████

████████████████████████████████ Sci. at 366:4-11; Ang. at 240-41, 279:20-25.

12.     Plaintiff Fenner is a Black and/or African-American male.  Fenn. Aff at ¶ 2.

13.     Plaintiff Fenner worked as a reporter at the Post from May 2007 until he was unlawfully terminated on or around November 9, 2009.  Fenn. Aff. at ¶ 3.

14.     Plaintiff Fenner was hired as a Senior Reporter on the Metro Desk in May 2007. Fenn. at 77; Green. at 105:17-25.

15.     On January 12, 2007, Defendant Gotthelf wrote an email to Mr. Angelo, stating "[P]eople like Austin, he's apparently very sneaky, plus always good to hire an African-American.  Gott. 294:6-8, Ex. 19.

16.     Defendant Gotthelf praised Plaintiff Fenner for his work in obtaining a number of interviews, as well as for his piece on a Confederate flag at a hunting lodge used by Dick Cheney.  Lern. Dec. Ex. 4 NYP-FL000479.

17.     Defendant Gotthelf stated that Plaintiff Fenner's "nailed" his coverage of an exclusive Cardinal Dolan piece that gained considerable attention in the New York Area.  Gott. at 161:4-11.

18.     Plaintiff Fenner generated a number of excellent stories that appeared in the Post. Fenn. at 78-79, 130-39, 149, including at least a dozen enterprise stories, *inter alia*, (i) the Columbia University expansion (Fenn. at 74, 78-79, 130-39, 149-151; Green. at 335-37,339:16-340:4; Ang. at 327:2-5); (ii) the appointment of Archbishop Dolan (Green. at 16-17; Ang. at 327:2-5); (iii) a plane landing on the Hudson; and (iv) an historic bus ride traveling to watch the inauguration of President Barack Obama.  Fenn. at 130-39; see also Fenn. at 51, 78-80, 101, 152-53, 198:17-20, 200:14-20; Fenn Aff ¶¶ 4, 5.

19.     Plaintiff Fenner's first piece on Archbishop Dolan piece was an exclusive story considered for the front page and another exclusive piece, which Defendant Greenfield considered a ""very good story . . . I am glad we have it," appeared on the front page.  Green at 336-337, 339:16-340:4.

20.     Defendants, in their evaluation of Plaintiff Fenner's performance, claim he failed to secure impracticable interviews, such as an injured window washer in rehabilitation.  Fenn. at 32-33, 59-66, 69, 83-84, 96, 105-106.

21.     While Defendants do not provide any figures regarding the productivity of Plaintiff Fenner's peers, including the number or stories pitched and the number of exclusive stories.  Def. Mem. p. 7; Fenn. 195-96.

22.     White employees dominate the editor and reporter ranks; they were not harassed or yelled or screamed at in the manner that Black employees were; (they were not denied promotional opportunities, career advancement or resources; and they were provided with more

favorable story assignments.  See, e.g., Liv. [day 1] at 28-29, 31:19-20, 62-63, 65, 74-75, 112:9-

15, 178-79, 187, 189, 191, 205; Liv. [day 3] at 22; Guzman at 579, 582, 592; Fenn. at 66, 124-

25, 177, 214-15, 237-38, Pear. Dec., Exhs. 5, 6; Fenn. Aff. at ¶ 8.

      23.     Shortly after Col Allan became Editor-in-Chief of the Post in 2001, he terminated

the only African-American editor on the Metro desk, and since that time there has not been a

single Black editor in the Post's newsroom.  Gott. at 77; Fenn. at 227; Liv. at [day 1] 300:24-

301:11.

      24.     As of November 6, 2009, there was only one non-White editor in the entire

Company, and the vast majority of the news staff are White.  Pear. Dec., Exh. 5, ¶¶ 6-7.

      25.     Of the few Black employees at the Post, a number of have been denied

opportunities for advancement, mistreated, and terminated, including, but not limited to, Leonard

Green (only Black reporter in newsroom, denied numerous requests for advancement, yelled,

screamed, cursed at and subjected to derogatory remarks by his supervisors), Neil Graves

(harassed and terminated on account of race), Doug Montero (column revoked because he

wanted to write an article to "mend fences" with respect to the Cartoon), Leonardo Blair

(terminated after filing a lawsuit challenging the NYPD's racist application of stop-and-frisk),

Ebony Clark (denied promotion to reporter position, screamed at and called a "damn girl" by Mr.

Allan), Shari Logan (denied promotion to reporter position) and Sandra Guzman (subjected to

racially derogatory language and ultimately terminated).  Fenn. at 269:13-271:7, 277:14-17; Liv.

at [day 1] 31:19-20; 62:22-63:4; 87:24-90:2; 204:15-22; Gott. at 142:10-143:17; Pear. Dec.,

Exhs. 5, 6.

      26.     Both Plaintiff Livingston and Plaintiff Fenner also were banned from Defendants'

newsroom.  Liv. [day 1] at , 192, 194-195, 201-202, 206-08; Fenn. at 208-211, 214, 216:16-20.

27.    Plaintiff Livingston heard Steve Dunleavy, a columnist, called Frankie Edozien a "nigger" and would write his columns and refer to Hispanic people as 'Spics.'" Liv. at 122:9-13; 136:15-17.  Moreover, she heard Andrea Esposito, a Post employee refer to Lawrence Taylor, a football player for the Giants, as "that big nigga." Liv. at 133:14-22.

28.    White employees also were permitted to commonly utter offensive racial epithets, including "nigger" and "nigga." Allan at 252:22-254:8; Liv. [day 1] at 133:7-22.

29.    Mr. Allan, Editor and Chief of the Post, overheard an employee refer to an African-American employee as the Post's "token nigger," and testified that he failed to respond or reprimand this colleague in any manner.  Id.

30.    Jesse Angelo heard Mr. Allan call an African-American a "token nigger," but failed to report it to Human Resources ("HR") and did not agree that calling an African-American a "nigger" is a form of racial harassment.  Ang. at 359:24-363:13.

31.    A Post employee referred a Black athlete as "that big nigga." Liv. [day 1] at 133:7-22.

32.    Col Allan stated that all Latinos look alike while referring to a Black Latino employee, and once asked a Post editor whether a Latino interviewee was brandishing a machete or gun during her interview of him.  Guzman [day 1] at 114:21-115:3, 119:9-122:17.

33.    On February 18, 2009, the Post published a racist monkey cartoon that depicted Barack Obama as a dead chimpanzee shot by police officers.  Pear. Dec., Exh.10.

34.    Plaintiffs' supervisors disagree as to the Cartoon's level of offense, and Ms. Scialdone of Human Resources denied knowledge of the history of African-Americans being depicted as subhuman, apes, or chimpanzees. Ang. at 17:22-25, 18; Gott. at 318:11-13; Sci.at 69; Jehn at 67, 68, 75.

74

35.     Mr. Angelo, who purports to have made the decision to terminate Plaintiff Livingston, "approved the cartoon" and "didn't see anything wrong with it." Liv. at 47:25-48:14.

36.     On February 18, 2009, the day the cartoon was published, Ms. Jehn of Human Resources, spoke to employees to determine how many thought the Cartoon was racist, but was not concerned as to which employees were upset, nor did she conduct an investigation on the subject. Jehn at 113, 128.

37.     Company management generally failed to remedy the concerns of employees who voiced their opinion that the Cartoon was racist. Fenn. at 183-186; Jehn [day 1] at 67, 68, 75, 82, 132-33;[15] Ang. [day 1] at 139-42, 158-59.

Dated: May 24, 2013
        New York, New York

                                        Respectfully submitted,

                                        THOMPSON WIGDOR LLP

                                        By: _____
                                              Douglas H. Wigdor
                                              Lawrence M. Pearson

                                        85 Fifth Avenue
                                        New York, NY 10003
                                        Telephone: (212) 257-6800
                                        Facsimile: (212) 257-6845
                                        dwigdor@thompsonwigdor.com
                                        lpearson@thompsonwigdor.com

                                        *COUNSEL FOR PLAINTIFFS*

---

[15]     True and correct copies of referenced excerpts of the deposition of Jennifer Jehn dated June 26, 2012 and February 14, 2013 are attached to the Pear. Dec. as Exhibit 11 ("Jehn. at [day __] [page].").