UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
AUSTIN FENNER and                                            :
IKIMULISA LIVINGSTON,                                        :
                                                             :
                              Plaintiffs,                    :        Civil No. 09 CV 9832 (LGS)
                                                             :
              vs.                                            :
                                                             :
NEWS CORPORATION, NYP HOLDINGS,                              :
INC., d/b/a THE NEW YORK POST,                               :
MICHELLE GOTTHELF and, DANIEL                                :
GREENFIELD, in their official and individual                 :
capacities,                                                  :
                                                             :
                              Defendants.                    :
-------------------------------------------------------------x


### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT NEWS CORPORATION'S MOTION FOR SUMMARY JUDGMENT


THOMPSON WIGDOR LLP

85 Fifth Avenue
New York, NY 10003
Phone: (212) 257-6800
Facsimile: (212) 257-6845

*Counsel for Plaintiff*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................iii

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS ....................................................................................2

    I.    THE POST AND NEWS CORP. ACT AS A SINGLE ENTITY .................................2

        A.  The Post and News Corp. Share Common Management, Personnel Function and Resources, and Have Interrelated Operations.........................................................2

        B.  News America, Inc. (NAI) is Indistinguishable from News Corp. Demonstrating Additional Corporate Integration and Multiplying the Contacts Between the Post and News Corp. ...................................................................................................6

    II.   MS. LIVINGSTON AND MR. FENNER WERE EMPLOYEES OF AND WAS DISCRIMINATED AGAINST BY THE POST AND NEWS CORP.........................8

ARGUMENT.........................................................................................................9

    I.    SUMMARY JUDGMENT STANDARD .................................................................9

        A.  Ms. Livingston and Mr. Fenner Were an "Employees" of the Company Under Title VII ......................................................................................................10

        B.  News Corp. and The Post Are a "Single Employer" ...........................................11

             1.   Interrelation of Operations........................................................................12

             2.   Centralized Control of Labor Relations....................................................14

             3.   Common Management .............................................................................17

             4.   Common Ownership or Financial Control ...............................................18

    II.   DEFENDANT AND THE POST ALSO QUALIFY AS JOINT EMPLOYERS.......18

III.   MS. LIVINGSTON AND MR. FENNER HAVE PRODUCED EVIDENCE
       DEMONSTRATING THAT THEY WERE DISCRIMINATED AGAINST BY
       NEWS CORP. EMPLOYEES ......................................................................................20

CONCLUSION ............................................................................................................................20

## TABLE OF AUTHORITIES

### CASES

Arculeo v. On–Site Sales & Mktg., LLC,
    425 F.3d 193, 198 (2d Cir.2005) .................................................................... 12

Armbruster v. Quinn,
    711 F.2d 1332, 1337 (6th Cir. 1983) ............................................................. 11

Bourgal v. Robco Contracting Enterprises, Ltd.,
    969 F.Supp. 854, 863 (E.D.N.Y.1997) .......................................................... 12

Cook v. Arrowsmith Shelburne, Inc.,
    69 F.3d 1235, 1241 (2d Cir. 1995) ...................................................... 14, 15, 16

E.E.O.C. v. Grace Episcopal Church of Whitestone, Inc.,
    2007 WL 6831007, at *4 (E.D.N.Y. July 3, 2007) ......................................... 14

Fowler v. Scores Holding Co., Inc.,
    677 F. Supp. 2d 673, 681 (S.D.N.Y. 2009) .................................................... 19

Fried v. LV Servs., Inc.,
    No. 10 Civ. 9308(JSR), 2011 WL 2119748, at *5 (S.D.N.Y. May 23, 2011) ............ 17, 18

Gulino v. New York State Educ. Dept.,
    460 F.3d 361, 370 (2d Cir. 2006) .................................................................. 10

Haavistola v. Community Fire Co. of Rising Sun, Inc.,
    6 F.3d 211(4th Cir.1993) .............................................................................. 10

Herman v. Blockbuster Ent. Grp.,
    18 F. Supp. 2d 304, 309 (S.D.N.Y) 1998) ..................................................... 13

Jasco Tools, Inc. v. Dana Corp.,
    574 F.3d 129, 152 (2d Cir. 2009) .................................................................... 9

Kern v. City of Rochester,
    93 F.3d 38, 45 (2d Cir.1996) ........................................................................ 19

Knowlton v. Teltrust Phones, Inc.,
    189 F.3d 1177 (10th Cir.1999) ..................................................................... 11

Kulak v. City of New York,
    88 F.3d 63, 71 (2d Cir. 1996) ......................................................................... 9

Labarbera v. Cretty Enterprises, Inc.,
    Nos. 03-6112, 04-5178(DRH)(ARL), 2007 WL 4232765, at *5 (E.D.N.Y. Nov. 28, 2007)
    ...................................................................................................................... 12, 18
Laurin v. Pokoik,
    No. 02-CV-1938 (LMM), 2004 WL 513999, at *8 (S.D.N.Y. Mar. 15, 2004) ................. 19

Levine v. Reader's Digest Ass'n, Inc.,
    No. 06-CV-590 (CLB), 2007 WL 4241925, at *11 (S.D.N.Y. Nov. 30, 2007) ............... 15

Lihli Fashions Corp., Inc. v. N.L.R.B.,
    80 F.3d 743, 747 (2d Cir. 1996) ................................................................................ 11

Lima v. Addeco,
    634 F.Supp.2d 394, 400 (S.D.N.Y.2009), aff'd, 375 F. App'x 54 (2d Cir.2010) ............. 12

N.L.R.B. v. Al Bryant, Inc.,
    711 F.2d 543, 551 (3rd Cir. 1983) .............................................................................. 11

Parker v. Columbia Pictures Indus.,
    204 F.3d 326, 341 (2d Cir.2000) ................................................................. 10, 12, 14, 16

Perez v. Westchester Foreign Autos, Inc.,
    2013 WL 749497 (S.D.N.Y. 2013) .............................................................................. 16

Powell v. Nat'l Bd. Of Med. Exam'rs,
    364 F.3d 79, 84 (2d Cir. 2004) ..................................................................................... 9

Saleh v. Pretty Girl, Inc.,
    No. 09–CV–1769 (ENV)(RER), 2012 WL 4511372, at *9 (E.D.N.Y. Sept. 28 2012) .... 11

Salemi v. Boccador, Inc.,
    No. 02 Civ. 06648(GEL), 2004 WL 943869, at *4 (S.D.N.Y. Apr. 29, 2004) ........... 10, 11

Tomassi v. Insignia Financial Group, Inc.,
    478 F.3d 111, 116 (2d Cir. 2007) .................................................................................. 9

Wali v. Chelsea Plastics,
    No. 07 Civ. 7549(DAB)(THK), 2010 WL 2710763 (S.D.N.Y. 2010) ....................... 11, 15

## STATUTES

Fed. R. Civ. P. 56 (c) ...................................................................................................9

42 U.S.C. § 2000e (Title VII) ..............................................................................*passim*

Plaintiffs Kim Livingston and Austin Fenner ("Ms. Livingston and Mr. Fenner") submit this memorandum of law in opposition to Defendant News Corporation's motion for summary judgment to dismiss Ms. Livingston and Mr. Fenner's Amended Complaint ("AC") against it as a matter of law.[1]

## PRELIMINARY STATEMENT

Plaintiffs Kim Livingston and Austin Fenner were employed by News Corporation, Inc. ("News Corp.") and NYP Holdings, Inc. d/b/a the New York Post (the "Post" or "Newspaper") (together, the "Company" or "Defendant"), as reporters from 1997 to 2012 and from 2007 to 2009, respectively.  Faced with substantial liability for its unlawful discrimination and retaliation against Ms. Livingston and Mr. Fenner, News Corp. now attempts to obscure the record on the issue of its single-employer status with the Post with self-serving representations about its corporate structure. Substantial evidence shows that the Post, a wholly owned subsidiary, is sufficiently integrated into the Company to impute an employer-employee relationship between Ms. Livingston and Mr. Fenner and both News Corp. and the Post.  The evidence collected satisfies Plaintiffs' modest burden on this motion: a reasonable jury could find that the Post and News Corp. are a "single employer" or, in the alternative, "joint employers."  Accordingly, the law requires that a fact-finder have the opportunity to determine the nature of the Post's relationship to News Corp. at trial.

Despite Defendant's attempt to characterize the Post and News Corp.'s human resources departments as distinct, the two departments are interrelated and not separate and autonomous. During all relevant times, News Corp. promulgated the Post's Equal Employment Opportunity (EEO) policies and Standards of Business Conduct and adopted those policies on behalf of the Post.

---

[1] Submitted in support of Plaintiffs' opposition to the motion are the affidavit of Kim Livingston, dated  May 23, 2013 ("Liv. Aff."), Austin Fenner, dated May 23, 2013 ("Fenn. Aff.") and Sandra Guzman, dated May 23, 2013 ("Guz. Aff."),, as well as the declaration of Lawrence M. Pearson, dated May 24, 2013 ("Pear. Dec."), to which all other exhibits referenced herein, unless otherwise specified, are attached.  Exhibits attached to the declaration of Mark W. Lerner, dated May 10, 2013 and attached to Defendants' motion ("Lern. Dec.") also will be referenced.

Moreover, hiring and firing decisions were made and discussed by the Post's Executive Committee in consultation with and in the presence of at least one News Corp. employee, Les Goodstein, and Rupert Murdoch, News Corp.'s top executive, makes the hiring decisions for the Post's top positions.  Furthermore, News Corp. and the Post share common management (two of the Post's four Board Members are News Corp. employees), share in-house and outside counsel, common employee benefits plans, occupy the same offices, and have interrelated operations, including News Corp.'s regular involvement in the Post's advertising and marketing.  Both Mr. Fenner and Ms. Livingston also received benefits through programs administered by News Corp., their employment was governed by policies promulgated by News Corp., and they worked, before they were discriminatorily excluded from the newsroom, in a building in which News Corp. and the Post share space.

## STATEMENT OF FACTS

### I.      THE POST AND NEWS CORP. ACT AS A SINGLE ENTITY

#### A.      The Post and News Corp. Share Common Management, Personnel Functions and Resources, and Have Interrelated Operations

During the relevant time period, Rupert Murdoch, the Chairman of News Corp., had the power to hire and fire Post employees.  (Allan at 20, 457;[2] Carl. at 13[3]).  Specifically, Mr. Murdoch regularly appointed high-level executives to the Post, including, but not limited to: Paul Carlucci and Jesse Angelo, to the position of the Post's Publisher in 2005 and 2012, respectively.  (Carl.at 13; Allan at 457; Pear. Dec. Ex. 6 at IL 8702-04).  Rupert Murdoch personally offered the Publisher position to Mr. Carlucci and later relieved him of his duties.  (Carl. at 13; Pear. Dec. Ex. 6 at IL

---

[2] True and correct copies of referenced excerpts of the deposition of Col Allan, dated February 14, 2012 and February 21, 2013 ("Allan at [page]"), are attached to the Pear. Dec. as Exhibit .1
[3] True and correct copies of referenced excerpts of the deposition of Paul Carlucci, dated June 22, 2012 ("Carl. at [page]"), are attached to the Pear. Dec. as Exhibit 2.

8702-04).  Lachlan Murdoch, Rupert Murdoch's son and also a News Corp. executive, hired Col Allan as Editor-in-Chief of the Post.  (Allan at 19).

Rupert Murdoch also involved himself in the day-to-day activities of the Post, including directing editorial content, and was "ultimately responsible" for the final printed product.  (Allan at 500).  Paul Carlucci and Col Allan, the Editor-in-Chief of the Post, reported to Rupert Murdoch regarding their Post duties.  (Allan at 21; Lipp. at 149-50).[4]  Mr. Angelo, who was Mr. Carlucci's successor as Publisher of the Post, confirmed, despite his elliptical answers, that Mr. Murdoch was involved in the Post's business decisions, including advertising.  (Ang. at.50-51).[5]  In fact, in his Post Editorial apology for the political cartoon that appeared in the Post on February 18, 2009, depicting President Obama as a bullet-riddled chimpanzee, Mr. Murdoch acknowledged that, "The buck stops here."  (Pear. Dec. Ex. 6. at IL 8705).  Furthermore, Defendants concede that two of the four members of the Post's Board of Directors are News Corp. employees who also sit on the News Corp. Board.  (Def.'s Mem. p. 6).

As Publisher of the Post, Mr. Carlucci, who oversaw all business and non-editorial aspects of the newspaper, reported to Chase Carey, the COO and Deputy Chairman of News Corp., and his predecessor, Peter Chernin.  (Carl. at 12, 20-25, 28-29).  Michael Racano, the Post's CFO, and Amy Scialdone, the Head of Human Resources at the Post, reported, in turn, to Mr. Carlucci.  (Scial. at 19,[6] Carl. at 17-18).  Moreover, News Corp. and the Post shared facilities at 1211 Avenue of the Americas in New York, New York.  (Allan at 21).  News Corp. and Post employees shared office space on the 8th floor as well as a cafeteria.  (Id. at 10, 12).  Rupert Murdoch and other high-level News Corp. executives sat on the 8th Floor.  (Lipp. at 55).  It is undisputed that the conference

---

[4] True and correct copies of referenced excerpts of the deposition of Jordan Lippner, dated Feb. 29, 2012 and ("Lipp. at [page]"), are attached to the Pear. Dec. as Exhibit 4.
[5] True and correct copies of referenced excerpts of the deposition of Jesse Angelo, dated June 25, 2012 and April 5, 2013 ("Ang. at [page]"), are attached to the Pear. Dec. as Exhibit 5
[6] True and correct copies of referenced excerpts of the deposition of Amy Scialdone, dated June 28, 2012 and April 16, 2013 ("Scial. at [page]"), are attached to the Pear. Dec. as Exhibit 7.

rooms on the 3rd Floor were available for use by both News Corp. and Post employees. (Def. Mem. at 16 n. 22). Meetings of the Post's Executive Committee meetings have taken place in these shared conference rooms. (Lipp. at 191).

News Corp. also controlled the Post's human resources department. During all relevant times, News Corp.'s Standards of Business Conduct Manual, which included the EEO Policy, applied to Post employees and was in place because it was "adopted by the News Corp.'s Board of Directors." (Lipp. at 224:17-20). News Corp. also "enforced" the EEO Policy, and all Company employees were at least purportedly subject to dismissal and/or discipline for violations thereof. (Pear. Dec. Ex. at NYP 0186; Lipp. at 229). News Corp. required all entry-level employees, including Post employees, to complete an online business ethics course called COMPASS. (Pear. Dec. Ex. 8 at NYP 0057; Scial. at 197). Amy Scialdone was the contact person listed for "HR" regarding an online training program for COMPASS that "will focus on News Corp. Standards of Business Conduct." (Pear. Dec. Ex. 8 at NYP 0057). Moreover, News Corp. maintained an "alert line," which provided a means for all employees of the Company, including those at the Post, to complain about "anything under the sun," including claims of discrimination or harassment. (Lipp. at 258:24-259:23). Post employees also could lodge complaints with Jordan Lippner, a News Corp. attorney who participated in the investigation of employee complaints at the Post. Indeed, for these and other personnel-related purposes, Mr. Lippner, who is associated with News Corp. and News America, Inc. and not the Post, served as a "resource to Human Resources at The New York Post." (Jehn at. 59-61;[7] Lipp. at 92:10-12).

Moreover, Post employees received and were required to abide by News Corp.'s electronic communications policy, and could be terminated and/or disciplined for any violations thereof. (Pear. Dec. Ex. 10 at 0077-0081; NYP; Lipp. at 310). Significant evidence documents the fact that

---

[7] True and correct copies of referenced excerpts of the deposition of Jennifer Jehn, dated June 26, 2012 ("Jehn at [page]"), are attached to the Pear. Dec. as Exhibit 9.

personnel decisions, including Sandra Guzman's termination, were discussed and decided at Post Executive Committee meetings, where other non-Post Company employees were present. (Lipp. at 197; Pear. Dec. Ex. 11 at 487; Carl. at 86). The Post's Cell-Phone Usage Policy was created in consultation with and under the direction of Mr. Lippner. (Lipp. at 318). News Corp.'s Record Management Policy applied to all Post employees as well. (Lipp. at 329).

In addition to this evidence of shared administrative, business and human resources policies and procedures, News Corp. provided healthcare and benefit plans for Post employees. (Lipp. at 310). Employees of the Post receive their benefits statement in a folder marked "News Corporation" and performance evaluations are delivered in a "News Corp." envelope. (Liv. at 306: 17-21;[8] Liv. Aff. ¶¶ 17, 18; Guz. Aff. ¶ 21; Fenn. Aff. ¶14). Members of News Corp.'s personnel functions also engage in recruiting for the Post, and Post employees serve on various Company-wide initiatives along with News Corp. employees, such as diversity and environmental committees. (Guz. Aff. ¶¶ 18, 20). Post employees also were required to attend seminars led by News Corp. Human Resources personnel, further demonstrating the interrelated nature of the Post and News Corp.'s personnel functions, regarding the performance evaluation process. (Fenn. Aff. ¶ 15). Post employees also are eligible for membership in the Fox Credit Union, in which Ms. Livingston had accounts, and which offers employees favorable interest rates and terms on financial services, as well as discounts on goods and services that were offered to employees across the Company. (Liv. Aff. at ¶¶ 17, 19). Moreover, News Corp.'s press releases referred to the Post as being among the various "News Corporation divisions." (Pear. Dec. Ex. 13 at SG 6788). News Corp. also hosted a

---

[8] True and correct copies of referenced excerpts of the deposition of Kim Livingston, dated Jan. 13, 2012, February 20, 2013 and May 6, 2013 ("Liv. at [page]"), are attached to the Pear. Dec. as Exhibit 12.

holiday party for all Company employees, which included employees of the Post. (McLough. at 17).[9]

**B. News America, Inc. (NAI) is indistinguishable from News Corp., Demonstrating Additional Corporate Integration and Multiplying the Contacts Between the Post and News Corp.**

As was typical of the Company's corporate structure, Jordan Lippner ("Mr. Lippner"), Deputy General Counsel of the Company's wholly owned subsidiary News America, Inc., for all intents and purposes worked for News Corp. Mr. Lippner reported to a News Corp. attorney, Genie Gavenchak and shared office space with News Corp. attorneys. (Lipp. at. 91:17, 85: 17-20). In fact, Mr. Lippner authored the Company's EEOC position statement in the present case, which was submitted on behalf of both the Post and News Corp. and serves as the basis for many of the arguments advanced in this very motion, and attended nearly all of the depositions on behalf of all corporate Defendants. (Pear. Dec. Ex. 15 at NYP 0004). No position statement was submitted by a separate in-house counsel for News Corp. Although News Corp., the Post, and other Company subsidiaries had "distinct email address domain names," Mr. Lippner had an email address under News Corp.'s domain name. (Lipp. at 107: 20). In fact, all attorneys who purportedly work for NAI had email addresses that "end with newscorp.com." (Lipp. at 113: 12-14). In his deposition, Mr. Lippner conceded that he was a part of News Corp. when he referred to "our" head of communications in reference to Andrew Butcher, who held that position for News Corp., and testified that he "provide[s] legal services to lots of different companies that fall under the News Corp. umbrella." (Lipp. at 56-57: 8, 408).

Indeed, though News Corp. and the Post could have produced separate representatives in response to Plaintiffs' 30(b)(6) notice, the Company produced only one representative, Mr. Lippner, who was produced as a witness knowledgeable about the "labor relations of both Defendants,"

---

[9] True and correct copies of referenced excerpts of the deposition of Mary McLoughlin, dated April 30, 2013("McLough. at [page]"), are attached to the Pear. Dec. as Exhibit 14.

performance review process, [and] application of [the Post and the Company's] employment policies to their employees," and able to explain how "hiring and termination decisions" were made across the Company (i.e., at both the Post and News Corp). (Pear. Dec. Ex. 15 (30(b)(6) Deposition Notice). Mr. Lippner also provided services as an intermediary between News Corp. and the Post on proper employment practices and quality assurance matters. (Lipp. at 82-83). Specifically, Mr. Lippner advised the Post "on employment and labor-related matters," in addition to "civil litigation matter [and] ... business and contract matters." (Lipp. at 83: 6-8). He also trains members of the Post's management on how to "be ... good supervisor[s]," as well as matters relating to promoting a "fair work environment." (Lipp. at 83:11-19).

Defendant also suggests that Les Goodstein was not an employee of News Corp. However, in his deposition, Mr. Goodstein admitted that he approved a News Corp. press release in which he was quoted as saying that could not "imagine a more exciting time to join News Corporation." (Good. at 43).[10]   Mr. Goodstein's title with the Company was Senior Vice President, News Corporation. (Id. at 14-15). Moreover, Mr. Goodstein's email address has a News Corp. domain name and his business card says "News Corp." at the top, not NAI. (Id. at 15, 51)

During all relevant times Mr. Carlucci held a dual role at the Company as both Publisher of the New York Post and Chairman and CEO of NAI Marketing. (Pear. Dec. Ex. 1 at 6961). Mr. Carlucci was appointed to this dual-role by Mr. Murdoch. (Pear. Dec. Ex. 1 at Article). Mr. Carlucci hired and supervised Mr. Goodstein throughout the entirety of his tenure with News Corp. (Good. at 24.). As mentioned above, Mr. Carlucci reported directly to the COO of News Corp, including in his capacity as the Post's Publisher. (Carlucci at 28-29).

As the record extensively documents, Mr. Goodstein, whose formal titles labeled him as an employee of News Corp., attended most of the Post's executive committee meetings. (Good. at 87-

---

[10] True and correct copies of referenced excerpts of the deposition of Les Goodstein, dated June 12, 2012 ("Good. at [page]"), are attached to the Pear. Dec. as Exhibit 16.

88, 100, 111, 112).  Meeting minutes made no distinction between him and any Post employees. (Pear. Dec. Ex. X at NYP 0488).  Significantly, in 2006, when the Post initially moved to discontinue the Hispanic-interest section Tempo, Mr. Goodstein took a leading role in reviving its advertising sales.  (Good. at 90-91; Pear. Dec. 17 at NYP 0426).  After doing so, Mr. Goodstein exercised day-to-day control in managing the content and production of the section.  (Guz. at 201).[11]

## II.   MS. LIVINGSTON AND MR. FENNER WERE EMPLOYEES OF AND DISCRIMINATED AGAINST BY THE POST AND NEWS CORP.

As reporters for the Post, Ms. Livingston and Mr. Fenner were employed by News Corp. (Liv. at 306, Fenn. at 18).  Rupert Murdoch exercised editorial control over the Post and accepted direct responsibility for an outrageous racist political cartoon appearing in the Post in February 2009, which triggered complaints by both Plaintiffs about the Company's racially discriminatory practices and environment, for which they were ultimately terminated in discriminatory and retaliatory fashion.  See § A, supra.  Ms. Livingston and Mr. Fenner received remuneration from News Corp in the form of benefits packages and access to a specialized credit union available to Post and News Corp. employees, and they received their performance reviews in News Corp. envelopes (further evidencing the commingling of personnel functions).  (Liv. at 306; Liv. Aff. ¶¶ 17-19).  All of their supervisors were ultimately subject to the control of News Corp. employees, including Lachlan Murdoch and Rupert Murdoch.  (Liv. at 310).  Both were banned from the Post's newsroom located in 1211 Avenue of the Americas, where News Corp. is also located, and subject to News Corp. EEO and electronic communications policies, the violation of which, as mentioned, could result in their termination.  (Liv. at 192, Fenn. at 121, 124, 125, 205, 208, 210, 213, 226, 269). It is undisputed that Mr. Fenner was hired by Amy Scialdone, Vice President of Human Resources,

---

[11] True and correct copies of referenced excerpts of the deposition of Sandra Guzman, dated October 13, 2011 and February 13, 2012 ("Guz. at [page]"), are attached to the Pear. Dec. as Exhibit 18.

who worked for The Post's HR apparatus, which was ultimately under the control of the COO of News Corp. (Def. Mem. at 6).   Upon commencement of his employment, Mr. Fenner signed a form acknowledging that he had read and received News Corp.'s Standards of Business Conduct, Electronic Communications Policy and Family and Medical Leave Policy. (Scial. at 249-250; Pear. Dec. Ex. 8 at NYP-FL 0485).  Ms. Livingston was also subject to the News Corp. Standards of Business Conduct. (Scial. at 249-250).  Ms. Livingston and Mr. Fenner were also subject to Post policies formulated in consultation with and under the direction of a News Corp. attorney.  During their employment, Ms. Livingston and Mr. Fenner understood the Post and News Corp. to be a single entity that employed them. (Liv. at 306; Fenn. at 18).

## ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c)(2), summary judgment must be denied for any claims about which a "genuine issue as to any material fact" exists. Fed. R. Civ. P. 56(c)(2). Defendants must establish that, based upon the evidence, they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  Moreover, the Court must view all facts in the light most favorable to Ms. Livingston and Mr. Fenner, resolving all ambiguities and drawing all inferences in her favor.  See Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 116 (2d Cir. 2007); Jasco Tools, Inc. v. Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009) ("a jury is free to believe part and disbelieve part of any witness's testimony . . . the court considering a summary judgment motion must disregard all evidence favorable to the moving party that the jury is not required to believe"). As detailed below, Ms. Livingston and Mr. Fenner are able to support all of her claims against News Corp. with factual evidence that rises well above a mere "scintilla" of evidence or "conclusory" assertions.  See Powell v. Nat'l Bd. Of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004); Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).

**A.    Ms. Livingston and Mr. Fenner Were "Employees" of the
Company Under Title VII**

At the outset, a court's finding that an issue of fact exists as to the single employer status

between a parent and subsidiary renders application of the "employer-employee" test of Title VII

unnecessary. See, e.g., Salemi v. Boccador, Inc., No. 02 Civ. 06648(GEL), 2004 WL 943869, at *4

(S.D.N.Y. Apr. 29, 2004) (denying summary judgment as to single employer status between a

parent and a subsidiary without engaging in separate analysis to determine whether plaintiff was an

"employee" of the parent company); see also Parker v. Columbia Pictures Indus., 204 F.3d 326, 341

(2d Cir.2000) ("To prevail in an employment action against a defendant who is not the plaintiff's

direct employer, the plaintiff must establish that the defendant is part of an 'integrated enterprise'

with the employer, thus making one liable for the illegal acts of the other."). Defendant's argument

that Ms. Livingston and Mr. Fenner are not "employees" for purposes of Title VII is, therefore,

inapplicable.

Even assuming arguendo that the standard set forth by Defendant applies, which it does not,

Ms. Livingston and Mr. Fenner still would qualify as employees for purposes of Title VII. Ms.

Livingston and Mr. Fenner can demonstrate aspects of an employee-employer relationship with

News Corp. through evidence that News Corp. administered their employment and provided them

with "indirect or direct" remuneration. Gulino v. New York State Educ. Dept., 460 F.3d 361, 370

(2d Cir. 2006). Ms. Livingston and Mr. Fenner received benefits through News Corp, which

constitutes remuneration. (Living. Aff ¶17; Fenner Aff ¶14); Haavistola v. Community Fire Co. of

Rising Sun, Inc., 6 F.3d 211(4th Cir.1993) ("benefits [can] represent indirect but significant

remuneration"). Moreover, the News Corp.-Post HR apparatus administered the hiring of Mr.

Fenner and exercised control over the terms and conditions of Ms. Livingston's employment.

(Scial. at 249-250; Pear. Dec. Ex. 8 at NYP-FL 0485; Liv. Aff. ¶¶ 17-19; Def. Mem. p. 6). As such,

Mr. Fenner and Ms. Livingston easily meet the "employee-employer" test articulated in Gulino.

**B.**     **News Corp. and The Post Are a Single Employer**

To determine whether a single employer relationship exists between two entities, the Second Circuit has adopted a "flexible four-part test, which looks to: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." Saleh v. Pretty Girl, Inc., No. 09–CV–1769 (ENV)(RER), 2012 WL 4511372, at *9 (E.D.N.Y. Sept. 28 2012) (emphasis added). Contrary to Defendant's representations, no single factor is "fatal" on this issue, as "not every factor need be present, and no particular factor is controlling." Lihli Fashions Corp., Inc. v. N.L.R.B., 80 F.3d 743, 747 (2d Cir. 1996); see also Wali v. Chelsea Plastics, No. 07 Civ. 7549(DAB)(THK), 2010 WL 2710763 (S.D.N.Y. 2010) ( "all four factors are not required"). "The policy underlying the single employer doctrine is the fairness of imposing liability for labor infractions where two nominally independent entities do not act under an arm's length relationship." See Armbruster v. Quinn, 711 F.2d 1332, 1337 (6th Cir. 1983). Here, as News Corp. employees were intimately involved in decisions and policies that materially affected Ms. Livingston and Mr. Fenner's employment, the Company should be held fully liable for its discriminatory actions.

As a threshold matter, "Whether related entities qualify as a single employer is an issue of fact." Salemi, 2004 WL 943869, at *4 (denying summary judgment against parent where plaintiff worked for wholly-owned subsidiary); Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177 (10th Cir.1999) ("Whether a parent and subsidiary meet the standard for integration under Title VII is ultimately an issue of fact for the jury."); N.L.R.B. v. Al Bryant, Inc., 711 F.2d 543, 551 (3rd Cir. 1983) ( "The single employer question is primarily factual."). Accordingly, this issue is only proper for dismissal at the summary judgment stage where "no reasonable trier of fact could disagree as to the outcome of the case." Salemi, 2004 WL 943869, at *4.

Courts have routinely recognized that a single employer relationship can exist between a parent company and wholly owned subsidiary. See Lima v. Addeco, 634 F.Supp.2d 394, 400 (S.D.N.Y.2009), aff'd, 375 F. App'x 54 (2d Cir.2010) ("Single integrated enterprises can include parent and wholly-owned subsidiary corporations or separate corporations that operate under common ownership and management"); see also Parker v. Columbia Pictures Indus., 204 F.3d 326, 341 (2d Cir.2000) (finding single employer status between parent and subsidiary where plaintiff provided several documents listing the parent as his employer); Arculeo v. On–Site Sales & Mktg., LLC, 425 F.3d 193, 198 (2d Cir.2005) ("There is well-established authority under this theory that, in appropriate circumstances, an employee, who is technically employed on the books of one entity, which is deemed to be part of a larger "single-employer" entity, may impose liability for certain violations of employment law not only on the nominal employer but also on another entity comprising part of the single integrated employer.").

1.     **Interrelation of Operations**

Courts consider a number of factors when deciding whether two entities' operations are sufficiently related to establish a single employer relationship, but weigh shared office space heavily in a plaintiff's favor. See Labarbera v. Cretty Enterprises, Inc., Nos. 03-6112, 04-5178(DRH)(ARL), 2007 WL 4232765, at *5 (E.D.N.Y. Nov. 28, 2007) (sharing office space sufficient to meet the element of interrelationship of operations); Bourgal v. Robco Contracting Enterprises, Ltd., 969 F.Supp. 854, 863 (E.D.N.Y.1997) ("This is significant circumstantial evidence of ... single employer ... status ... Both [the parent] and [subsidiary] had the same address.").

The Post and News Corp. unquestionably share office space. Defendant's suggestion that the two entities' cohabitation is serendipitous strains credulity. The two entities share office space because News Corp. owns the Post, and their operations and management are interrelated. Indeed,

the Post and News Corp. share a cafeteria, conference rooms and space on the 8th floor, where Rupert Murdoch and other high-level News Corp. executives sit. See Facts § I (A). An abundance of additional evidence shows that the Post and News Corp. are sufficiently interrelated to be characterized as a single employer for the purposes of Title VII.

Courts also look to a list of several non-exclusive factors to determine interrelatedness, including, "whether the parent was involved directly in the subsidiary's daily decisions relating to production, distribution, marketing and advertising" or "whether the two entities shared employees, services, records, and equipment." Herman v. Blockbuster Ent. Grp., 18 F. Supp. 2d 304, 309 (S.D.N.Y) 1998). Contrary to Defendant's self-serving representations and conclusory assertions regarding its own corporate structure, ample evidence demonstrates that News Corp. is involved in the Post's production operations and marketing.

To that end, in his role of Publisher, Mr. Angelo checked in regularly with Rupert Murdoch regarding business decisions, including advertising and marketing. See Facts § I (A). Mr. Allan, the Editor-in-Chief, also testified that Rupert Murdoch involved himself with editorial matters. Id. Both Publishers also reported directly to News Corp.'s COO. Id. Nevertheless, Defendant makes bald assertions such as, "News Corp. is not involved the Post's production operations," and "[t]he Post also is responsible for advertising its product, The New York Post newspaper." (Def. Mem. at 15). However, the record demonstrates the opposite – that News Corp.'s highest-ranking executives had a significant role in all of these matters.

Defendant also points out that the Company has separate computer resources and domain names for different entities (the barest demonstration of any separation of resources), but ignores the significance of these separate web domains in light of the fact that various individuals worked at the Post (including Les Goodstein, Lachlan Murdoch, Mr. Lippner) have News Corp. email addresses. During the relevant time period, Mr. Lippner and Mr. Goodstein moved fluidly between

13

various roles within the Company, including substantial roles at the Post, yet both maintained News Corp. email addresses all along. See Facts § I (B). Rupert Murdoch also spoke on behalf of the Post when he issued an apology for the Cartoon and involved himself in various other day-to-day activities. See Facts § I (A).

### 2. Centralized Control of Labor Relations

Whether a parent controls a subsidiary's labor relations is a "crucial element" in determining whether a parent and a subsidiary qualify as a single employer. Parker, 204 F.3d at 341. The centralized control prong may be satisfied "by a showing that there is an amount of participation [that] is sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions." Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1241 (2d Cir. 1995) (citation and internal quotations omitted) (emphasis added); E.E.O.C. v. Grace Episcopal Church of Whitestone, Inc., 2007 WL 6831007, at *4 (E.D.N.Y. July 3, 2007) (same). In particular, courts look to whether parent established "operating practices and management practices" for its subsidiary. Cook, 69 F.3d. at 1241.

News Corp.'s policies and its employees' unlawful conduct were a major part of the discriminatory and retaliatory acts Ms. Livingston and Mr. Fenner endured throughout their tenure at the Post, including the breakdown of the employee complaint investigation process which is administered by the Company's commingled HR and legal functions. News Corp. indisputably shaped the Post's human resources department and employment policies, such as the Standards of Business Conduct and the Electronic Communications Policy, by creating its own employment-related policies, imposing those policies on the Post and enforcing them on its behalf. Specifically, News Corp. "promulgated" the Post's EEO policy, which was in place at the Post because it was adopted by the News Corp. Board of Directors. (Lipp. at 224: 17-20). Post employees received their performance reviews in News Corp. envelopes and had access to shared healthcare and

retirement plans, as well as the Fox Credit Union, which had special interest rates.  See Facts § II; (Liv. Aff. ¶¶ 17-18).  News Corp. also had an electronic communications policy – the violation of which could result in termination – that applied to all employees of the Post.  (Pear. Dec. Ex. X at NYP 0077).  What is more, the News Corp. established a complaint line for reporting any and all issues, including incidents of discrimination and harassment, and made its attorney, Mr. Lippner, available to receive and investigate such complaints.  See Facts § I (A).  Mr. Lippner, moreover, provided management training to Post employees.  News Corp. issued the policy pertinent to this litigation, enforced complaints received by Post employees, and had the power to terminate Post employees for breaches of News Corp. policies. See Facts § I (B).  Thus, News Corp. established the Post's operating and management practices for employment-related policies. See Cook, 69 F.3d. at 1241.

Notwithstanding Defendant's attempt to eschew the full scope of Lachlan Murdoch's role at the Company, he was the third-highest ranking News Corp. employee while he was Publisher (Pear. Dec. Ex. 19 SG6951-6957).  While serving in this dual role, Lachlan Murdoch hired Col Allan. (Allan at 19). Moreover, another News Corp. employee, Mr. Goodstein, stepped in to take control of a special section at the Post in 2006.  Moreover, Mr. Goodstein sat on the Post Executive Committee.  (Pear. Dec. Ex. 11 at 487).  See Levine v. Reader's Digest Ass'n, Inc., No. 06-CV-590 (CLB), 2007 WL 4241925, at *11 (S.D.N.Y. Nov. 30, 2007) (denying summary judgment on issue of a single employer relationship and finding that high degree of involvement by employee of non-employer entity raised inference that the entity oversaw and managed employer's operations). Indeed, Mr. Carlucci, who, in addition to his Post responsibilities, filled a role overseeing all advertising for all News Corp. media and publishing holdings, played a very prominent role in all Post business decisions.  See Facts § I (A).  Indeed, Rupert Murdoch, who hired Mr. Carlucci (and subsequently relieved him of his duties) and Mr. Angelo, certainly, by the same token,

demonstrated his power to "exercis[e] veto power over major employment decisions" by hiring and removing employees from their Post positions. Cook, 69 F.3d at 1241. See Facts § I (B); Pear. Dec. Ex. 3 at IL 8702-04).

Furthermore, courts do not generally rely on the unilateral characterizations about the structure of human resources departments in the testimony of parent-company employees in deciding summary judgment on the single employer issue. Parker, 204 F.3d at 341 ("Although [the parent company] points to testimony indicating that the two companies' Human Resources departments were separate, which reasonably might suggest that [the parent] was not an integrated enterprise with [the subsidiary], this testimony merely strengthens rather than forecloses the conclusion that factual issues remain for trial.") (emphasis added). This is particularly applicable here, as Defendant relies primarily on the newly introduced affidavits of two Post employees for its self-serving representations about the structure of the two human resources departments. Such reliance only underscores the disputes of fact that must be resolved at trial. See Perez v. Westchester Foreign Autos, Inc., 2013 WL 749497 (S.D.N.Y. 2013) ("[W]hether a particular defendant can be considered a plaintiff's 'employer' is a fact-specific inquiry"). This is particularly applicable here, as Defendant relies on the newly introduced affidavits of two employees of the Post, Michael Racano and Amy Scialdone, for its self-serving representations about the structure of the two human resources departments. Such reliance only underscores the disputes of fact that must be resolved at trial. See Perez v. Westchester Foreign Autos, Inc., No. 11-civ-7091 (ER), 2013 WL 749497 (S.D.N.Y. Feb. 28, 2013) ("[W]hether a particular defendant can be considered a plaintiff's employer is a fact-specific inquiry.").

News Corp. controlled Ms. Livingston and Mr. Fenner's employment through its policies and its executives' participation in the most important employment decisions regarding their

employment. Therefore, centralized control of employment functions is strongly demonstrated between News Corp. and the Post.

### 3.    Common Management

News Corp. and the Post also have various common members of management, as high-ranking officials of both entities moved interchangeably between roles with both companies. First, Defendant attempts to hold Ms. Livingston and Mr. Fenner's claims to a higher standard than applies on this motion. Specifically, Defendant cites to a case involving a motion to dismiss case (and not summary judgment), Fried v. LV Servs., Inc., No. 10 Civ. 9308(JSR), 2011 WL 2119748, at *5 (S.D.N.Y. May 23, 2011), to support the notion that a plaintiff must produce evidence to overcome the purported presumption that directors and officers "change hats." (Def. Mem. at 17). This case is inapposite. In Fried, the plaintiff had "plead no facts" to rebut the "presumption" that directors and officers change hats, whereas Ms. Livingston and Mr. Fenner have produced specific evidence that News Corp.'s management "exercised control over the operations and employment practices" of the Post. The shared positions between the Post and News Corp. were permanent and long-term, and the involvement of News Corp. executives in the business and management of the Post was ongoing, signifying the integrated nature of the two entities. As discussed supra, News Corp. appoints the top Post officials and half of the Post's board consists of News Corp. executives.

Nevertheless, Defendant states that "no senior executive or employee of the Post has held a position with News Corp." (Def. Mem at 16). This is patently false. For example, Lachlan Murdoch served as both the Deputy COO of News Corp. and the Publisher of the Post from 2002 until 2005. See Facts § II. Moreover, Mr. Carlucci oversaw advertising for all of News Corp.'s media and publishing holdings while working as the Post's Publisher and reporting directly to News Corp.'s COO. See Facts § I (A). Mr. Angelo and Mr. Carlucci also reported to Rupert Murdoch regarding their various duties at the Post, as Rupert Murdoch was involved in many the day-to-day business

17

decisions of the Post.  Id.  Furthermore, Mr. Lippner and Mr. Goodstein both had various roles for News Corp., as evidenced by their News Corp. email addresses and job duties assisting in the direction of the day-to-day operations of a Post special section and the Post's HR department, respectively.  See Facts § I (B).

This commonality of high-level executives alone establishes common management.  However, as Defendant concedes, the Post and News Corp. shared two common board members as well.  (Def. Mem. p. 6).  Rupert Murdoch, News Corp.'s highest ranking executive, had daily input into the various business decisions required to run the Post.  See Facts § I (A).  Rupert Murdoch would also frequent the Post newsroom.  (Ang. at 37, 38, 61).  Thus, Defendant and the Post easily meet the threshold required for establishing that they shared common management.

### 4.      Common Ownership or Financial Control

The fourth factor of the single employer test is uncontested.  Defendant does not deny that the Post is a wholly owned subsidiary of News Corp.  (Def. Memo. at 18) ("News Corp. ultimately owns the Post").   The satisfaction of this prong of the single employer test weighs in Ms. Livingston and Mr. Fenner's favor.  See Labarbera, 2007 WL 4232765, at *5.  As discussed exhaustively above, contrary to Defendant's complete misrepresentation of the factual record, News Corp. meaningfully, and even heavily, participated in the Post's employment and labor decisions.  (Def. Mem. at 18). Accordingly, News Corp.'s ownership of the Post is relevant to the present case, and myriad material facts and disputes reasonably support a single employer relationship in the instant case.

## II.     DEFENDANT AND THE POST ALSO QUALIFY AS JOINT EMPLOYERS

As a threshold matter, contrary to Defendant's representations that the joint employer analysis must only apply to "temporary employment or staffing agencies and their clients" or "contractors or subcontractors," the list provided in Fried is by no means exhaustive.  2011 WL

2119748, at *6.  The situations outlined in that case in which joint employer analysis is applicable also include "where two separate entities have control over an employee's employment." Id.  As such, this Court could certainly apply the "joint employer" test in the event the single employer test is not found to be appropriate for the facts in this case.  As Defendant points out, joint employers are merely "two employers [that] handle certain aspects of their employer-employee relationship jointly." Fowler v. Scores Holding Co., Inc., 677 F. Supp. 2d 673, 681 (S.D.N.Y.  2009). Moreover, as Defendant concedes, "the joint employer analysis tracks the single employer analysis." (Def.' Mem. at 10 n.13).  Thus, because News Corp. and its employees controlled and participated in many aspects of Ms. Livingston and Mr. Fenner's employment, they would also succeed under a joint employer theory.

In this context, the definition of employer is "sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities," Laurin v. Pokoik, No. 02-CV-1938 (LMM), 2004 WL 513999, at *8 (S.D.N.Y. Mar. 15, 2004) (quoting Kern v. City of Rochester, 93 F.3d 38, 45 (2d Cir.1996)), and courts weigh "factors such as commonality of hiring, firing, discipline, pay, insurance, records, and supervision." Id.  (citations omitted).  The Post's Publisher, i.e., Lachlan Murdoch and Mr. Carlucci during Ms. Livingston and Mr. Fenner's employment, also had approval power over Ms. Livingston and Mr. Fenner's rate of pay throughout their employment.  (Pear. Dec. Ex. 3 at NYP 0206, NYP 0210).  Ms. Livingston and Mr. Fenner received employee benefits under News Corp. plans, and the employee policies they were required to follow were promulgated by News Corp. See Facts § II.  Finally, News Corp. utilizes a recordkeeping policy that applies to all of its subsidiaries. See Facts § I (A).  Accordingly, to the extent a "joint employer" analysis is necessary or more appropriate for the interrelated operations, management and relationship shared by the Post and News Corp., the evidence in the record satisfies the "joint employer" test as well.

### III.    MS. LIVINGSTON AND MR. FENNER HAVE PRODUCED EVIDENCE DEMONSTRATING THAT THEY WERE DISRCIMINATED AGAINST BY NEWS CORP. EMPLOYEES

As set forth in the Memorandum of Law in Opposition to Defendants NYP Holdings, Inc., d/b/a the New York Post and Col Allan's Motion for Summary Judgment, Ms. Livingston and Mr. Fenner have demonstrated that (i) they were a terminated as a result of their race and color; (ii) they were terminated in retaliation for their protected complaints of discrimination and; (iii) they experienced a hostile work environment on the basis of their race and color.  As such, material issues of fact remain as to all of Ms. Livingston and Mr. Fenner's claims against News Corp. and Defendant's motion for summary judgment should be denied.

### CONCLUSION

For the foregoing reasons, the record strongly demonstrates that material issues of fact exist regarding whether the Post and News Corp. were a single employer or, in the alternative, joint employers. Accordingly, Defendant's motion for summary judgment should be denied.

Dated: May 24, 2013
     New York, New York

          Respectfully submitted,

          **THOMPSON WIGDOR LLP**

          By:_____
              Douglas H. Wigdor
              Lawrence M. Pearson

          85 Fifth Avenue
          New York, NY  10003
          Telephone:  (212) 257-6800
          Facsimile:  (212) 257-6845
          dwigdor@thompsonwigdor.com
          lpearson@thompsonwigdor.com

          *Counsel for Plaintiffs*

20