# Exhibit 4

JORDAN LIPPNER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

AUSTIN FENNER and IKIMULISA LIVINGSTON,

Plaintiffs,

-against-

09 CIV 9832 (BSJ)(RLE)

NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a THE NEW YORK POST and DAN GREENFIELD and MICHELLE GOTTHELF,

Defendants.

---------------------------------------X

SANDRA GUZMAN,

Plaintiff,

vs. 09 CIV 9323 (BSJ)(RLE)

NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a THE NEW YORK POST, and COL ALLAN, in his official and individual capacities,

Defendants.

---------------------------------------X

VIDEOTAPED DEPOSITION OF JORDAN LIPPNER

New York, New York

Wednesday, February 29, 2012

REPORTED BY: BARBARA R. ZELTMAN (BOBBIE)
Professional Stenographic Reporter

Job Number: 46779

JORDAN LIPPNER

office on the eighth floor of 1211 Avenue of the Americas who works for News Corp.?

A Are we talking presently?

Q Yeah. Tell me presently.

A I believe Jeff Mook.

Q Who is Jeff Mook?

A He is head of human resources for News Corporation.

Q Was the head of human resources for News Corp. also located on the eighth floor when Sandra Guzman was employed?

A Correct.

Q And who was that at the time?

A There were a couple of different people.

The first was Ian Moore and the second was a woman named Beryl, B-E-R-Y-L, Cook.

Q Do you know if any other News Corp. executives occupied office on the eighth floor at 1211 Avenue of the Americas?

A There may be a few others, but those are the ones that come to mind.

Q What about during Ms. Guzman's

JORDAN LIPPNER

employment, can you think of anyone else?

A At the --

MR. LERNER: Objection. These are the people that presently occupy that space. So when you say can you think of anyone else --

MR. THOMPSON: I just said during Ms. Guzman's employment.

MR. LERNER: Understood. But when you said can you think of anyone else, to me the question supposes that these people occupied that space during Ms. Guzman's employment which is not his testimony.

MR. THOMPSON: Then I'll make it crystal clear.

Q Can you think of any other News Corp. executive that occupied the eighth floor during Ms. Guzman's employment?

A While Ms. Guzman was employed, Mr. Murdoch, Mr. Nallen, Mr. Devoe, Mr. Siskind, Mr. Jacobs, Mr. Moore, Ms. Cook had office space up there.

There were others such as -- there

JORDAN LIPPNER

was a gentleman by the name of Andrew Butcher.

Q Who was Andrew Butcher?

A He was head of our communications department at one point.

There was a gentleman by the name of Gary Ginsburg. He was also in communications.

A woman by the name of Rachel Webber.

Gentleman by the name of Leon Hertz.

Those are all the names that I think of.

MR. THOMPSON: Can you go back to his statements just now.

Q You testified, Mr. Lippner, when I asked you who Andrew Butcher was, you said he was head of our communications department at one point.

What do you mean by "head of our communications department at one point"?

A I mean he was head of News Corporation.

JORDAN LIPPNER

I thought that that was what we were talking about, who were the News Corporation employees on the eighth floor.

Q So when you say "our," do you consider yourself to be part of News Corporation?

A In a global sense.

Q What do you mean by "in a global sense"?

A Well, I work for a company that's owned by News Corporation.

Q But do you believe you work for News Corporation?

A No.

Q Now, during Ms. Guzman's employment from 2003 to 2009, did News Corporation occupy any of the floors at 1211 Avenue of the Americas, that you know of?

A There were News Corp. employees on the fourth floor and there were News Corp. employees at some point on the seventh floor.

That's it.

Q Identify the News Corp. employees

Page 82

JORDAN LIPPNER

Q The third floor.
In order to get access to the third floor, wouldn't an employee have to have one of those IDs issued by one of the companies that are part of the News Corp. family?
A No.
Q So anyone in the building can just come on the third floor?
A They probably could.
Q But in order to get to the elevator bank, they would have to use a News Corp. or New York Post ID, correct?
MR. LERNER: Objection.
A Incorrect.
I said incorrect.
Q Now, in terms of your position as deputy general counsel and senior vice president of News America Incorporated, do you have responsibility over legal affairs at The New York Post?
A Certain legal affairs, yes.
Q What legal affairs?
A I am -- I advise The New York Post on employment and labor-related matters.

Page 83

JORDAN LIPPNER

I do some training for The New York Post and --
Q What type of training do you do for The New York Post?
A And I also work with The Post on some civil litigation matters as well as some business and contract matters.
Q What type of training do you do for The New York Post?
A I've assisted with management training, with fair work environment training. I think that's it.
Q When you say management training, what do you mean?
A How to work with managers, supervisors. How to be a good supervisor, how to be a good managers, things of that nature.
Q What do you mean by "fair work environment training"?
A In making the employees familiar with The New York Post's fair work environment policies and what their obligations are and things to avoid and how

Page 84

JORDAN LIPPNER

to conduct themselves in an appropriate manner.
Q Did you provide training regarding fair work environment when Ms. Guzman worked at the company?
A I did.
THE WITNESS: Is this an okay time to go to the bathroom, Counsel.
MR. THOMPSON: Yes, yes.
THE VIDEOGRAPHER: The time is 11:31 a.m. Going off the record.
(A brief recess was taken.)
THE VIDEOGRAPHER: The time is 11:50 a.m. We're on the record.
BY MR. THOMPSON:
Q Mr. Lippner, when you had an office on the same floor as Gavenchak, Nova, how would you actually get access to their offices?
A Walk over to them.
Q Did you have to use any security pass to get over to them?
A To Genie Gavenchak's office?

Page 85

JORDAN LIPPNER

Q Yes.
A No, I just had to knock on the door and say hello.
Q Is it fair to say that when you were on the fifth floor and I believe the 13th and then the 28th floor that the lawyers who worked for the various companies were located in the same area?
A That's not correct.
Q Describe how the lawyers were situate when you worked on the fifth floor together?
A I never worked on the fifth floor.
Q The 13th floor.
A We are -- most of us -- actually there are lawyers -- I am -- I sit on a floor with lawyers who work for News Corporation and lawyers who work for News America Incorporated. There are other lawyers that work for other companies that are fully owned by News Corporation that don't sit on the 13th floor. The general counsel sits on the eighth floor who is a News Corporation lawyer. Joel Klein is a

JORDAN LIPPNER

York Post, myself and a number of my colleagues, meaning people who are News America Incorporated lawyers as well as News Corporation lawyers did work on behalf of our client The New York Post.

Q I want you to identify the individuals, the individual News Corp. attorneys who handled legal matters for The New York Post during Ms. Guzman's employment.

A Genie Gavenchak is -- she would have done some work for The Post and she is a News Corporation lawyer.

She might be the only News Corporation lawyer who has done some work, and I think her work would have been part of -- her expertise is on the First Amendment and she may have done some First Amendment work for them.

Q Do you know if she still does legal work for The New York Post?

A Yes.

Q And identify the attorneys who work for News America Incorporated who also

JORDAN LIPPNER

provided legal services for The New York Post during Ms. Guzman's employment.

A That would be myself, Michelle Francis, Jim Markovitz, Jan Constantine and Michael Cameron.

Q When Ms. Guzman worked at the company, who did you report to as senior vice president and deputy general counsel of News America Incorporated?

A For the initial few years of my employment at News America Incorporated, I reported to Jan Constantine and after she left, I reported to Genie Gavenchak.

Q How long did you report to Genie Gavenchak?

A I still do.

Q So is it fair to say you've reported to Genie Gavenchak for a number of years?

A That is fair to say.

Q So is Genie Gavenchak -- strike that.

Do you know if any other attorneys who work for News America Incorporated also

JORDAN LIPPNER

reported to Genie Gavenchak during Ms. Guzman's employment?

A Yes.

Q Can you identify those attorneys who also reported to Ms. Gavenchak?

A Yes.

Michelle Francis, Louis Manzo, Michael Cameron.

That might be it.

Q Do you know if you and those other attorneys are still reporting to Genie Gavenchak?

A Yes, I'm aware of that.

Q Now, Genie Gavenchak is an attorney for News Corporation, correct?

A That's correct.

Q So why is it that you and other attorneys for News America Incorporated would have to report to an attorney for News Corporation in carrying out your duties?

MR. LERNER: Objection.

A That's how it's been set up by -- I don't know the rhyme or reason. I'm just an employee. It hasn't been explained to me

JORDAN LIPPNER

why I report or to whom I report.

Q Did you ever ask why do we have to report to a News Corp. attorney if they are different attorneys?

A No, I never asked that question.

Q Well, in preparing for your testimony as a 30(b)(6) witness for News Corp., did you ever ask anyone why are lawyers for News America Incorporated reporting to the attorney for News Corp.?

A No, never asked that because it's not part of the scope of the 30(b)(6) Notice.

Q Well, you would agree, would you not, Mr. Lippner, that you claim that News America Incorporated is the parent company of NYP Holdings, correct?

A I don't claim, Mr. Thompson, anything.

I have sworn under oath that that is a fact.

Q You've also sworn under oath that Les Goodstein is not an employee of News Corp., right?

JORDAN LIPPNER

MR. LERNER: Objection.

A On the days that The New York Post security guards are not at 1211, they are providing security for New York Post employees at 900 East 132nd Street.

Q So I'm going to ask the question differently.

When there are no New York Post security officers at 1211 Avenue of the Americas, who provides security for The New York Post employees at 1211 Avenue of the Americas?

A The building owner -- and I don't know who the building owner is but it is not News Corp. or any of its subsidiaries -- provides security for the tenants of the building.

Q Okay.

So what role does the Security Department for News Corp. play differently than the security that the building owner provides?

MR. LERNER: Objection. Beyond the scope of 30(b)(6) Deposition

JORDAN LIPPNER

Notice.

MR. THOMPSON: It's not.

MR. LERNER: Instructing the witness not to answer the question.

(Directive to witness.)

Q Mr. Lippner, are you going to answer that question?

A I'm going to follow the advice of my counsel.

Q Isn't it fair to say that the Security Department for News Corp. also provides security for The New York Post employees at 1211 Avenue of the Americas?

A No.

Q Do you have an e-mail address at work?

A Yes.

Q What is it?

A Jlippner@newscorp.com.

Q Do you have a -- strike that.

Has that been your e-mail address for the past several years?

A It has.

Q Was it your e-mail address when

JORDAN LIPPNER

Ms. Guzman worked at the company?

A Absolutely.

Q Now, do you also have an e-mail address that is specifically tied to News America Incorporated?

MR. LERNER: Objection.

A I only have one address and it is jlippner@newscorp.com and that is my News America Incorporated e-mail address.

Q So is it fair to say, Mr. Lippner, that employees who work for The New York Post have a different e-mail address than a News Corp. e-mail address?

MR. LERNER: Objection.

A Employees who work for The New York Post do not have a News America Incorporated e-mail address or a News Corporation e-mail address. They have a New York Post e-mail address.

Q Do you know why you have a newscorp e-mail address if you work for News America Incorporated?

MR. LERNER: Object to form.

A I do not have a News Corporation

JORDAN LIPPNER

e-mail address. I have a News America Incorporated e-mail address.

Q Okay.

Is it fair to say, Mr. Lippner, that your e-mail address is jlippner@newscorp.com?

A My work e-mail is that e-mail, yes.

Q And I'm only talking about your work e-mail. I'm not talking about private e-mail right now or personal e-mail.

Why, Mr. Lippner, do you have a newscorp.com e-mail address if you work for News America Incorporated?

MR. LERNER: Objection.

Mr. Thompson, the reason for Mr. Lippner's e-mail address has nothing to do with the relationship between The New York Post and News Corp.

Mr. Lippner does not work for The New York Post. He doesn't have an office at The New York Post and he's testified to that.

MR. THOMPSON: Yes. But, Mr. Lerner, as you know, Mr. Lippner

JORDAN LIPPNER

has maintained an office at 1211 Avenue of the Americas for years.

The same address where the editorial and business offices of The New York Post are located.

I have a right to probe this witness regarding the e-mail addresses used by News Corp. employees and The New York Post employees, and I'm asking him why does he have a newscorp e-mail address if he works for News America Incorporated.

It is a fair area to inquire to determine if News Corp. and News America Incorporated are the same company.

MR. LERNER: It's beyond the scope.

MR. THOMPSON: It is not.

MR. LERNER: I'm directing the witness not to answer that question.

(Directive to witness.)

BY MR. THOMPSON:

Q Mr. Lippner, do you know if there

JORDAN LIPPNER

is one computer server for News Corp. employees and New York Post employees?

MR. LERNER: Objection.

A I know there is not one computer server.

Q Tell us -- describe the different computer servers for The New York Post employees and -- as opposed to the computer server for the News Corp. employees?

MR. LERNER: As best you can and understanding that you are not an IT specialist.

MR. THOMPSON: Mr. Lerner, he doesn't have to be an IT specialist. He has to be prepared to answer the questions that are relevant to the 30(b)(6) Dep Notice.

MR. LERNER: I'm not even sure what a server is. And Mr. Lippner and I are both lawyers, as are you. So he can answer that question as best he can with that understanding.

A I am not what you would call a computer geek or very IT savvy.

JORDAN LIPPNER

What I can tell you is that The New York Post maintains separate and distinct computer databases, computer servers from News Corporation.

They have nothing to do with each other. Each company has separate IT departments.

I don't know how else to answer your question.

Q Do you know anyone who has a newsamerica.com e-mail address?

A Yes.

Q Who?

A Every employee of News America Marketing.

Q News America Marketing?

A Yes.

Q So what's the e-mail address for employees at News America Marketing?

MR. LERNER: Objection.

A Something to do with their name, @newsamerica.com.

Q Is it fair to say, Mr. Lippner, that you and other attorneys for News

JORDAN LIPPNER

America Incorporated have a newscorp.com e-mail address at work?

A I'm sorry, can you repeat the question.

(Requested portion of record read:

"Q. Is it fair to say, Mr. Lippner, that you and other attorneys for News America Incorporated have a newscorp.com e-mail address at work?")

(End of read-back.)

A Yes. My and my News America Incorporated legal colleagues, our e-mail addresses end with newscorp.com.

Q Do you know why your e-mail addresses end with newscorp.com as opposed to newsamerica.com?

MR. LERNER: Objection. This is exactly the same question in which we already had a colloquy and we have objected to the question, and I instruct the witness not to answer beyond the scope of this Deposition Notice.

(Directive to witness.)

JORDAN LIPPNER

ten-year employment at News America Incorporated.

And during that ten-year period, I have not once had a discussion with any executive at The New York Post about a policy that they were implementing or a new policy that was handed down. Period.

And no new policies have been handed down in that regard.

So I'm basing that as my statement that I don't believe a single policy has been handed down by the board of directors of The New York Post on New York Post employees.

Q Do you know if Paul Carlucci ever set policy for The New York Post employees?

A Yes.

Q How do you know that?

A Because I do.

Q What's the basis besides "I do"?

A The New York Post a few years ago implemented a formal annual performance appraisal system. It was the first time in The Post history that they were implementing

JORDAN LIPPNER

such a procedure, and they were implementing it because Paul Carlucci wanted to implement it.

Q Do you know if Paul Carlucci discussed that particular policy during any board meeting?

A I do not.

Q Strike that.

Do you know if Paul Carlucci discussed that particular policy during any meeting of the board of directors of The New York Post?

A I do not.

Q Mr. Lippner, who has final authority over personnel decisions at News Corporation?

A It would depend on the employee that we're talking about.

Q Well, is there one person who had final authority over personnel decisions at News Corp.?

A No.

Q Is there one person who has final authority over personnel decisions at The

JORDAN LIPPNER

New York Post?

A I mean every situation stands on its own.

Q I understand that. My question is different.

My question is: Is there a person at The New York Post who has final authority over personnel decisions affecting New York Post employees?

MR. LERNER: Objection.

A You know, I think I don't then really understand your question.

Q I'll ask it differently.

Does Paul Carlucci have final say over personnel decisions at The New York Post?

MR. LERNER: Objection.

A No.

Q Does Rupert Murdoch have final say over personnel decision at The New York Post?

A No.

Q Who has final say over personnel decisions at The New York Post?

JORDAN LIPPNER

A Your question has a faulty premise. You are suggesting that such a person exists.

Q I'll ask it differently then.

Does any person or group have final say over personnel decisions at The New York Post?

MR. LERNER: Objection.

A As I said before, each situation will stand on its own.

If you are talking about, for example, Bob Smith, random employee who works in the sales department, is going to get fired and the manager in the sales department is go going to be handling that.

If you are talking about one in editorial, some senior editor will be handling that.

There is no mandatory policy or procedure that dictates at The New York Post how someone gets fired.

Q Who is the highest ranking person at The New York Post?

A Paul Carlucci.

JORDAN LIPPNER

Q Who does he report to?

A He reports to the chairman of the board of directors.

Q Who is that?

A Rupert Murdoch.

Q So at any time isn't it fair to say that Rupert Murdoch has final authority over The New York Post?

MR. LERNER: Objection.

A No.

Q Is it your testimony, Mr. Lippner, that Paul Carlucci has more authority over The New York Post than Rupert Murdoch?

MR. LERNER: Objection.

A Yes. Paul Carlucci runs the day-to-day operations of The Post. He is the senior-most executive at The Post.

Q So if Paul Carlucci wanted to fire someone in sales at The New York Post, he had final authority to do that?

MR. LERNER: Objection.

A I don't know what you mean by "final authority."

Q It is your testimony that Paul

JORDAN LIPPNER

Carlucci is the highest ranking person at The New York Post, correct?

A It's my testimony that he is the highest ranking executive of The New York Post.

Q Okay.

And who is the highest ranking editor at The New York Post?

A Col Allan.

Q And who does Col Allan report to?

A He also reports in to, as I understand it, he reports in to the chairman of the board of The New York Post, Rupert Murdoch.

Q So is it your testimony that Paul Carlucci would have more authority over firing an employee at The New York Post than Rupert Murdoch?

MR. LERNER: Objection.

A Yes.

Q Is it also your testimony that Col Allan would have more authority in firing someone who works in the Editorial Department at The New York Post over Rupert

JORDAN LIPPNER

Murdoch?

MR. LERNER: Objection.

A Mr. Murdoch does not get involved with employee terminations at The New York Post.

Q That's not my question.

Can you answer my question.

A I just answered it.

Q No you have not.

(Requested portion of record read:

"Q. Is it also your testimony that Col Allan would have more authority in firing someone who works in the Editorial Department at The New York Post over Rupert Murdoch?")

(End of read-back.)

A Yes. Mr. Murdoch does not get involved in employee terminations at The New York Post.

MR. THOMPSON: Move to strike the last part of his answer as nonresponsive.

Don't worry, Bobbie, we'll take a break.

JORDAN LIPPNER

MR. LERNER: Ken, it's five after 1.

MR. THOMPSON: Want to take a break now?

MR. LERNER: It's -- I actually have 1:10 on my watch.

MR. THOMPSON: Do you want to take a lunch break?

MR. LERNER: Yes.

MR. THOMPSON: What time do you want to resume?

MR. LERNER: 2:00.

THE VIDEOGRAPHER: The time is 1:09 p.m. We're off the record.

(A luncheon recess was taken at 1:09 p.m. 2:15 p.m.)

A F T E R N O O N S E S S I O N

JORDAN LIPPNER,

resumed, having been previously duly sworn, was examined and testified further as follows:

THE VIDEOGRAPHER: The time is 2:15 p.m. We're on the record.

CONTINUED EXAMINATION BY MR. THOMPSON:

JORDAN LIPPNER

Resources on that day, correct?
A That is correct.
Q What was her title in September of 2008?
A I believe it was vice president of Human Resources.
Q Who did Amy Saldone report to in September 2008?
A Jennifer Jane.
Q And who did Jennifer Jane report to at that time?
A Paul Carlucci.
Q You see Les Goodstein was also present for The New York Post executive committee meeting on September 22, 2008, correct?
A I do.
Q Do you know why Mr. Goodstein was present for that meeting?
A I do not.
Q You see that Col Allan was also present, correct?
A I do.
Q And you see Jennifer Jane was

JORDAN LIPPNER

present, correct?
A Correct.
Q I want you now to look at NYP2059.
Do you have that in front of you?
A I do.
Q Do you see it says "New York Post executive committee agenda from November 17, 2008?"
A Yup.
Q And it also states that the meeting occurred in the Leonard French Conference Room on the third floor at 1211 Avenue of the Americas, correct?
A Yes.
Q And it states Paul Carlucci, the publisher of The New York Post, was present, correct?
A It does.
Q And it also states that the vice president of Human Resources, Amy Saldone, was present?
A It does.
Q And it states that Les Goodstein was present, as well, correct?

JORDAN LIPPNER

A It does.
Q And it also states that Col Allan, the editor in chief for The New York Post, was present, correct?
A Correct.
Q And it states that Jennifer Jane was also present, correct?
A Yes.
Q Why was Les Goodstein present for this meeting of The New York Post executive committee on November 17, 2008?
A You would have to ask Mr. Goodstein.
Q I want to direct your attention to NYP-2011.
You see it says "New York Post executive committee agenda from December 1, 2008"?
A Correct.
Q And that particular meeting also occurred in the Leonard French Conference Room on the third floor at 1211 Avenue of the Americas, correct?
A That is correct.

JORDAN LIPPNER

Q And in attendance was the publisher of The Post, Paul Carlucci, correct?
A Correct.
Q And the vice president of Human Resources, Amy Saldone, correct?
A Correct.
Q In addition, Col Allan, editor in chief of The New York Post, was present, correct?
A Yes.
Q And Jennifer Jane was also present, correct?
A That is correct.
Q Now, at the time, Jennifer Jane was an employee of -- strike that.
Was Jennifer Jane at the time an employee of News Corporation or The New York Post?
A Jennifer Jane was a New York Post employee.
Q Was Col Allan an employee of News Corporation or New York Post at that time?
A The New York Post.
Q Was Amy Saldone an employee of News

Page 194

JORDAN LIPPNER

Corporation or The New York Post?
A The New York Post.
Q And was Paul Carlucci an employee of News Corporation or The New York Post?
A I believe The New York Post.
Q And you see it says "Les Goodstein"?
A I do.
Q Why was Les Goodstein in this meeting of The New York Post executive committee on December 1, 2008?
A You would need to ask Mr. Goodstein.
Q Well, do you know whether Mr. Goodstein worked for News Corporation or New York Post on December 1, 2008?
MR. LERNER: Objection.
A I'll stick to my prior answers on this question, that I believe Mr. Goodstein is a News America Incorporated employee.
Q I want to direct your attention to NYP-2067.
You see it says "New York Post executive committee agenda for February 2,

Page 195

JORDAN LIPPNER

2009"?
A I do.
Q And you see that The New York Post executive committee met again in the Leonard French Conference Room on the third floor at 1211 Avenue of the Americas, correct?
A I do.
Q And you see the people in attendance for that meeting was, again, the publisher of The New York Post, Paul Carlucci, correct?
A That's what it says.
Q And the vice president of Human Resources for New York Post, Amy Saldone, was also present, correct?
A The document says that, yes.
Q And Col Allan, editor in chief for The New York Post, was also present on that day, correct?
A According to the document.
Q And so was Jennifer Jane, correct?
A Same answer.
Q Now, it also states that Les Goodstein was also present for that meeting

Page 196

JORDAN LIPPNER

of The New York Post executive committee, correct?
A That's what the document states.
Q Why was Les Goodstein present for The New York Post executive committee meeting on February 2, 2009?
A You would need to ask Mr. Goodstein.
Q Do you know?
A No.
Q Now I want to turn your attention to the next page, NYP-2068.
A What number did you say?
Q NYP-2068.
A Okay.
Q Do you see where it states "Page 6 Magazine. Jennifer reported the transition of Page 6 Magazine from a weekly to a quarterly magazine was announced last Thursday, that the last weekly issue will be February 13th with the staff's last day on Thursday, February 5th."
Do you see that?
A I do.

Page 197

JORDAN LIPPNER

Q And it goes on to state "Some employees will be retained on with the paper."
Do you see that?
A I do.
Q Now, is it still your testimony, Mr. Lippner, that personnel matters affecting New York Post employees were not discussed at New York Post executive committee meetings?
MR. LERNER: Objection.
A Yes. As far as I know, there was no discussion between committee members as to what was happening with particular employees.
There may have been an announcement, as there appears to have been on 2068 here, of what was happening to certain employees, but to my knowledge, the committee did not meet to decide the fate of a particular employee or not.
Q But that's not my question, whether the committee met to decide a particular fate.

JORDAN LIPPNER

The New York Post's as well as hundreds of other companies' standards of business conduct.

Q I understand.

Look at the first page.

You see at the top left-hand corner it says "News Corporation."

A Are you referring to Page 60?

Q No. Page NYP-58.

A And what is the question, sir?

Q Look at the top left-hand corner.

A Yes.

Q You see where it says "News Corporation"?

A I do.

Q What does that signify to you?

MR. LERNER: Objection.

A That the page says "News Corporation."

Q Does it signify anything other than just saying News Corporation?

A No.

Q Does it signify to you this is a News Corporation document?

JORDAN LIPPNER

A Among other things.

Q Let's look at the page Bates stamp NYP60.

A Okay.

Q You see at the top it says "Introduction"?

A I do.

Q And it says "News Corporation, the Company," correct?

A I do.

Q So when you see the word "company," is it your understanding that that means News Corporation in this document?

A No.

Q So when it says "company," what does that mean to you?

A The Standards of Business Conduct has been promulgated by News Corporation and adopted for use by every company that it wholly owns.

The New York Post is a wholly owned subsidiary of News Corporation; therefore, The New York Post also uses this document as if it itself had drafted the document, and

JORDAN LIPPNER

it applies to each New York Post employee.

Q Did it apply to each New York Post employee during Ms. Guzman's employment?

A Absolutely.

Q Does it still apply to each New York Post employee?

A This document, no.

Q How long was this document in effect?

A I don't remember when it was subsequently changed.

Q Who at News Corp. actually promulgated these Standards of Business Conduct?

MR. LERNER: Objection.

A Well, the second paragraph on Page 60 states that the standards were adopted by the News Corporation board of directors.

Q So is it your understanding that the board of directors at News Corp. created these Standards of Business Conduct?

A I don't know what you mean by the word "create" but --

JORDAN LIPPNER

Q What do you mean by the word "promulgate"?

MR. LERNER: Objection.

A This document says it was adopted by the board. I take that to mean that the News Corporation board of directors met and during such a meeting adopted these Standards of Business Conduct for use by News Corporation, as it says, "its subsidiaries, divisions and their directors, officers and employees."

And as it further goes on to say, "References to the Company include its subsidiaries." And that furthers my point that when this document states the word "the Company" it means The New York Post, among other things.

Q "Among other things" also including News Corporation, correct?

A Including News Corporation, HarperCollins, FOX Television, et cetera, et cetera, et cetera.

Q So you would agree, would you not, Mr. Lippner, that these Standards of

Page 226

JORDAN LIPPNER

Business Conduct that were in effect during Ms. Guzman's employment applied to every New York Post employee at the time?

A Haven't I already answered that like four times.

Q You can answer it again.

A These standards apply to every New York Post employee.

Q And is it your testimony that these standards that were in effect during Ms. Guzman's employment also apply to every News Corp. employee and executive?

MR. LERNER: Objection.

A Every News Corp. employee, every FOX Television employee, every HarperCollins employee, every News Marketing employee. I mean the list goes on and on.

Q These standards that were in effect during Ms. Guzman's employment also applied to Les Goodstein, correct?

A A hundred percent.

Q So is it fair to say that the only way an executive or director can get a waiver from these Standards of Business

Page 227

JORDAN LIPPNER

Conduct was if the board of directors granted that waiver?

MR. LERNER: Objection.

A I have no idea.

Q Let's look at the document.

You are familiar with this document, correct?

A I'm familiar with the document.

Q In fact, when you did the training at The Post, you trained based on this document in part, right?

A In part, yes.

Q So let's look at the document that you used to train New York Post employees.

Look at the paragraph that says "Application of these standards to executive officers and directors may only be waived by the board of directors of the company or committee of the board."

Do you see that?

A I don't.

Q It's four paragraphs down.

A Okay.

Q What is your understanding of that

Page 228

JORDAN LIPPNER

statement that I just read?

A My understanding of the statement is that everyone is bound by this who is an employee of a News Corporation company or News Corporation itself and that if somebody wants to be excused from complying, that person needs to obtain a waiver from the board of directors.

And I'm not sure if that reference means the board of directors of that individual's company or if it means the board of directors of News Corporation.

Q If an employee violated these Standards of Business Conduct promulgated by News Corporation, could that employee be terminated?

MR. LERNER: Objection.

A It's a hypothetical question and I wouldn't be able to answer it without knowing all the facts.

Q Let's look at the last paragraph on Page Bates stamp NYP-60.

A Okay.

Q Do you see where it states "The

Page 229

JORDAN LIPPNER

company may regard any employee's act in violation of these standards to be outside the course and scope of that employee's employment. Any employee who shall be found to have violated these standards may be subject to immediate disciplinary action including reassignment, demotion or, when appropriate, dismissal."

Do you see that?

A I do.

Q What is your understanding about what that particular statement in these Standards of Business Conduct means?

MR. LERNER: Objection.

A My understanding is that it means that employees should expect that if they do something bad, bad things might happen to them.

Q Including termination, correct?

A Anything is possible, sir.

Q Well, isn't it fair to say that according to these Standards of Business Conduct -- strike that.

Isn't it fair to say that according

JORDAN LIPPNER

that he is expected to have. So now we're going to have to make a motion, and we will. So we don't have to argue.

BY MR. THOMPSON:

Q Now, Mr. Lippner, I want to direct your attention to Bates stamp NYP-69 again.

Do you see where it says "Handling Complaints"?

A I do.

Q Now, it says "It is the Company's policy to investigate thoroughly in remedying any incidence of harassment or discrimination."

Do you see that?

A I do.

Q When Ms. Guzman's worked there as an associate editor, who handled complaints at The New York Post?

A The Human Resources Department.

Q For The New York Post or for News Corp.?

A For The New York Post.

Q And was there any other complaint procedure in place for New York Post

JORDAN LIPPNER

employees to use if they wanted to complain about discrimination or harassment during Ms. Guzman's employment?

MR. LERNER: Objection to form.

A There was.

Q What other complaint procedures were in place?

A As part of News Corporation's compliance with Sarbanes-Oxley, the company -- and when I say "the company" I mean News Corporation -- was required to establish what's called an alert line. And what Sarbanes-Oxley requires is there be an anonymous way for people, including employees, to complain about financial improprieties.

News Corporation, in setting up the alert line, made the decision to open up the alert line to complaints about anything under the sun, and that would include employee complaints if employees wanted to use that as an avenue to complain.

Q Who actually mans the complaint hotline you just testified about? Is it a

JORDAN LIPPNER

News Corp. employee or a New York Post employee?

MR. LERNER: Objection to form.

A The alert line is managed by a third party, independent -- wholly independent of News Corporation and any of its subs or affiliates.

And if complaints are made, various different people can get an e-mail that a complaint has been made and depending on what the Complaint is, one of that group of people handles it by working with a particular -- wherever that complaint is focused on, if it's focused at 20th Century Films or FOX Searchlight or The New York Post, and have that company's people investigate it. And that's how it's handled.

Q Is it your understanding that News Corporation established this alert line?

A Yes, it is.

Q When did News Corporation establish the alert line for employees to use who wanted to complain about discrimination or

JORDAN LIPPNER

harassment in the workplace?

A Either '05 or '06.

Q During Ms. Guzman's employment?

A Absolutely.

Q And so News Corporation established the alert line in 2005 or 2006 and that's one of the complaint procedures that New York Post employees at the time were expected to follow, correct?

A They were not expected to follow. It was an avenue if employees wanted to make an anonymous complaint that they could avail themselves of.

Q So News Corporation created an avenue of complaints for The New York Post employees to use if they wanted to?

A News Corporation complied with its requirements under Sarbanes-Oxley which required it to set up an anonymous complaint line for all employees in all of its subsidiaries.

Q Do you know which employees of News Corporation were involved in setting up this alert line for The New York Post employees

Page 310

JORDAN LIPPNER

A I believe it states and stated that employees could be subject to discipline for violations.

I don't recall whether or not it specifically said that they would be subject to termination.

Q Do you know if only one version of the communications -- strike that.

Do you know if only one version of the Electronic Communications Policy was disseminated to New York Post employees during your employment?

A During whose employment?

Q Your employment.

A During my employment there have been I believe two iterations of the Electronic Communications Policy.

Q Okay.

Do you know when the first version of the Electronic Communications Policy came out?

A I want to say roughly 2004.

Q And when did the second version of the Electronic Communications Policy come out?

Page 311

JORDAN LIPPNER

A I'm not exactly sure.

Q Do you have any idea as the 30B -- do you have any idea as a 30(b)(6) witness for News Corp. and The New York Post when the second version of the Electronic Communications Policy was disseminated?

A I think it came out about three to four years ago.

Q How did the second version of the Electronic Communications Policy differ from the first version?

A There were word cleanups. It was streamlined a bit. The original version had been repetitive in the sense of employees being cautioned about the same kind of thing not to do in multiple sections of the document.

I think those were the principal changes.

Q Do you know if any News Corporation attorneys were involved in creating the second version of the Electronic Communications Policy?

Page 312

JORDAN LIPPNER

A I do.

Q I want you to identify the News Corporation attorneys who were involved in creating the second version of that document?

A Ellen Agress.

Q Anyone else?

A Not to my knowledge.

Q Do you know if any other News Corporation employees were involved in creating the second version of the Electronic Communications Policy?

A I do not.

Q Were you involved in that?

A I was not.

Q How do you know that Ms. Agress was involved in creating the second version of the Electronic Communications Policy?

A I remember talking to her about it.

Q What did she say about it?

A She told me how she was working on it.

Q Do you know how that second version of the company's Electronic Communications

Page 313

JORDAN LIPPNER

Policy was disseminated to employees at The New York Post?

A I don't know if it was e-mailed to them, handed to them. No, I don't know the method that was used.

Q The next document listed in this Exhibit Bates stamped NYP-97 is entitled New York Post E-mail Policy.

Do you see that?

A I do.

Q When did that policy go into effect?

A I don't know.

Q Is that policy still in effect?

A I don't know.

Q What does that policy say?

A I have no idea.

Q Mr. Lippner, you are here as a 30(b)(6) witness to cover the areas that we set forth in our Deposition Notice, correct?

A Correct.

Q And in our Deposition Notice that we sent, it states that "The 30(b)(6) witness should be prepared to explain how

Page 318

JORDAN LIPPNER

this deposition, can you tell us anything that The New York Post E-mail Policy states?

A No.

MR. LERNER: Objection.

Q Mr. Lippner, the next policy listed is New York Post Cellphone Policy.

You see that?

A I do.

Q When did that go into effect?

A I cannot tell you.

Q Is it still in effect?

A It is.

Q Who created that policy?

A The New York Post.

Q Who at The New York Post?

A I cannot tell you.

Q Did any News Corp. employee have any role in creating The New York Post Cellphone Policy?

A No.

Q How do you know that someone at The New York Post created The New York Post Cellphone Policy?

A Because I reviewed it with New York

Page 319

JORDAN LIPPNER

Post HR.

Q Who in New York Post HR did you review The New York Post Cellphone Policy with?

A I believe it was Amy Saldone.

Q When did you review The New York Post Cellphone Policy with Ms. Saldone?

A I can't tell you that.

Q What year?

A I just said I can't tell you that.

Q Tell us what The New York Post Cellphone Policy says.

A I already told you I can't tell you what it says.

Q No, you didn't tell me that. We talked about The New York Post E-mail Policy, and that's a different policy.

A And that was one of the first questions, Mr. Thompson, to me when you moved on was what does it say, and I and said to you I don't recall what it says.

And I will reiterate, if you would like to provide me with copy of the document, I'd be happy to discuss what it

Page 320

JORDAN LIPPNER

says.

Q Mr. Lippner, you are the 30(b)(6) witness who knows these policies very well, correct?

MR. LERNER: Objection.

Q Yes.

A Is there a question?

Q Yes.

A What's the question?

MR. THOMPSON: Can you read it back.

(Requested portion of record read:

"Q. Mr. Lippner, you are the 30(b)(6) witness who knows these policies very well, correct?")

(End of read-back.)

A Mr. Thompson, what I'm is a 30(b)(6) witness who can tell you which policies apply to The New York Post employees and which policies apply to News Corporation employees.

That is why I'm here today. I'm not here so that I can give you a recital of the substance of each such policy.

Page 321

JORDAN LIPPNER

Q I'm not asking you to give me a recital of the substance of each such policy. I'm asking you as 30(b)(6) witness to tell us one thing The New York Post Cellphone Policy says.

MR. LERNER: And what is the relevance of what the cellphone policy says to this matter?

MR. THOMPSON: Because the relevance, Mr. Lerner, this witness was supposed to come here with knowledge of employee policies, and he is completely clueless.

MR. LERNER: No, that's not an answer to what the relevance is.

MR. THOMPSON: I'm answering your question. You may not like my answer.

This is a witness who has an obligation to sit here and answer questions about the application of The New York Post employment policies. He's got to know what those policies say.

MR. LERNER: I disagree with

Page 326

JORDAN LIPPNER

A I do. And he did.

Q Who was if at the time?

A Lon Jacobs.

Q Do you know if anyone at News Corporation approved The New York Post E-mail Policy before it was put into effect?

A No one at News Corporation had anything to do with The New York Post E-mail Policy.

Q Do you know if anyone at News Corporation approved The New York Post Cellphone Policy before it was put into effect?

A No one at News Corporation had anything to do with The New York Post Cellphone Policy.

Q Do you know if anyone at News America Incorporated approved The New York Post E-mail Policy before it was put into effect?

A Same answer. No one at News America Incorporated had anything to do with The New York Post E-mail Policy.

Q Same question regarding The New York Post Cellphone Policy.

Page 327

JORDAN LIPPNER

A No one at News America Incorporated had any approval -- involvement with The New York Post Cellphone Policy.

Q Do you know if there had been different versions of The New York Post Cellphone Policy distributed to New York Post employees?

A I do not.

Q Now, looking at this Exhibit Bates stamped NYP-97, it also states "News Corporation Records Management Policy."

Do you know if that policy was ever put into effect?

A I do.

Q Do you know when the News Corporation Records Management Policy became effective?

A I don't.

Q Do you know if any News Corporation employee approved the News Corporation Records Management Policy before it became effective?

A I know the News Corporation Record Management Policy was created by News Corporation.

I know that Genie Gavenchak, Ellen Agress, the group general counsel were involved in creating and finalizing the policy. There may have been other people.

I know that, for example -- I believe I contributed, for example, to giving them reference for how long you need to keep employment-related documents based on relevant stats at issue.

Whether there is a business executive at News Corp. who had the final say or it was the group general counsel's final say, I can't answer that question.

Page 328

Q Besides your involvement, do you know if any other News America Incorporated employee was involved in the creation of the News Corporation Records Management Policy?

A I do not.

Q Do you know if that particular policy is still in effect today?

A It is.

Q And does that policy apply to New York Post employees?

Page 329

JORDAN LIPPNER

A I believe that the News Corporation Records Management Policy applies to News Corporation as well as to all of its wholly owned subsidiaries.

Q Do you know if this News Corporation Records Management Policy was in effect during Ms. Guzman's employment as an associate editor?

A When Ms. Guzman was employed by The Post as an associate editor, I believe that this policy -- I'm not a hundred percent positive. I believe that it was promulgated towards the end of her employment at The Post but I'm not positive.

I'd be happy to give you a supplemental answer on that if you would like.

Q Who has responsibility for enforcing News Corporations Record Management Policy?

A Again, that's a company-by-company thing.

For News Corporation itself, News

JORDAN LIPPNER

(Directive to witness.)

MR. THOMPSON: Can we have that marking for a ruling.

MR. THOMPSON: Mr. Lerner, let me just tell you the reason why this is relevant. This goes to whether News Corporation and The New York Post are interrelated.

He just testified that there is a Website that is todaynewscorp.com. That is for senior executives at News Corp. and he believes Mr. Carlucci as well. We believe this also is evident of interrelatedness of the companies, but we'll get a ruling about that.

(Marked for a ruling.)

(Lippner Exhibit 21, E-mail dated Friday, February 20, 2009, 9:56 a.m., Bates Number NYP-3853, was marked for Identification.)

BY MR. THOMPSON:

Q Mr. Lippner, I'm showing you now what has been marked as Deposition Exhibit 21.

JORDAN LIPPNER

Please take a moment and look at it. It's Bates stamped NYP-3853.

It is a document produced by The New York Post.

Tell us if you recognize it.

MR. LERNER: The question is "tell us if you recognize it."

THE WITNESS: I'm reading the document.

A I do recognize the document.

Q What is this document?

A It's an e-mail that went out to different people in our different companies.

Q Who sent the e-mail?

A It came from the Internal Communications Department.

Q Of News Corporation?

A Of News Corporation.

Q So this particular e-mail was sent on Friday, February 20, 2009, correct?

A That is correct.

Q And one of the people that it was sent to was Jennifer Jane at the News Corp., correct?

JORDAN LIPPNER

A That is correct.

Q It says "News Corporation Corporate Security," correct?

A That is correct.

Q So that is an e-mail from the Internal Communications Department regarding a protest by the Reverend Al Sharpton and the National Action Network that was scheduled to take place in front of the building at 1211 Avenue of Americas, correct?

A Yeah. It's along the same lines of how I provide legal services to lots of different companies that fall under the News Corp. umbrella.

This is an e-mail that was put together by Corporate Security and the Internal Communications Department as a service to make sure that everyone was aware. Because the local police had alerted our head of Security that there was going to be a protest, and our head of Security in conjunction with Internal Communications wanted people to be aware so people weren't

JORDAN LIPPNER

taken by surprise.

They wanted to give people some best practices that they could employ for their own safety, such as if there were people who were going to be out front who were angry at The New York Post and other companies, don't display your ID because that could make you a potential victim.

(Lippner Exhibit 22, E-mail dated Friday, February 20, 2009, 11:24 a.m., Bates Number NYP-3851, was marked for Identification.)

BY MR. THOMPSON:

Q I'm showing you now what's been marked as Lippner Deposition Exhibit 22, Bates stamp NYP-3851, a document that was produced by The New York Post in this case.

Can you take a moment look at it and tell us if you recognize it.

A I don't recognize Exhibit 22 except to the extent that it appears to be what this document, Exhibit 21, had recommended which was the same heads-up about the protest and it appears to be -- well, it's

**From:** NypostHR <nyposthr@nypost.com>
**Sent:** Friday, February 20, 2009 11:24 AM
**To:** NypostHR <nyposthr@nypost.com>
**Subject:** Continued Demonstrations Planned in front of 1211 - TODAY

Please be advised that Reverend Al Sharpton and the National Action Network are scheduled to gather in front of 1211 Avenue of the Americas for continued demonstrations today (Friday, February 20) at 5:00 pm. The group is gathering in response to a cartoon that ran in Wednesday's *New York Post* that they believe was racially offensive. The number of demonstrators expected is unknown at this time, and other impromptu demonstrations may occur in front of the building throughout the day.

Once again, no disruptions are expected. However, the NYPD will be present to monitor the demonstration, along with building and News Corporation security.

For your safety, it is always recommended that employees NOT display building ID cards once outside 1211 and/or 1185. This is particularly important when arriving and departing the building during demonstrations. We also encourage employees to use the alternate entrances at the back of 1211 (by Flavors) and the C-1 level if the main entrance becomes congested.

If you have any questions or concerns, please contact Corporate Security at (212) 852-7843.

News Corporation
Corporate Security
General Security Concerns: 212.852.7843
24/7 Command Center: 212.301.[illegible]