# Exhibit 7

```
 1
 2           IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF NEW YORK
 3           Case No. 09-CIV-9832 (BSJ)(RLE)
             Case No. 09-CIV-9323 (BSJ)(RLE)
 4
 5   ------------------------------------x
     AUSTIN FENNER and IKIMULISA LIVINGSTON,
 6
 7                        Plaintiffs,
 8      v.
 9   NEWS CORPORATION, NYP HOLDINGS, INC.,
10   d/b/a THE NEW YORK POST and DAN GREENFIELD
11   and MICHELLE GOTTHELF,
12                        Defendants.
     ------------------------------------x
13   SANDRA GUZMAN,
14                        Plaintiff,
15      v.
16   NEWS CORPORATION, NYP HOLDINGS, INC.,
17   d/b/a THE NEW YORK POST and COL ALLAN, in
18   his official and individual capacities,
19                        Defendants.
     ------------------------------------x
20                CONFIDENTIAL
21         VIDEOTAPED DEPOSITION OF AMY SCIALDONE
22         New York, New York
23         Thursday, June 28, 2012
24   Reported by:
     Amy A. Rivera, CSR, RPR, CLR
25   JOB NO. 51053
```

Page 18

1     AMY SCIALDONE - CONFIDENTIAL
2  respect to retaliation in the workplace?
3         MR. PIESCO: Objection.
4         You can answer.
5     A.  No, I didn't personally.
6     Q.  When you were director of training, do
7  you know if anyone conducted training of New York
8  Post employees with respect to The Post policy
9  towards harassment in the workplace?
10        MR. PIESCO: Objection.
11        You can answer.
12    A.  Yes.
13    Q.  Who was that person or persons?
14    A.  My legal counsel, Jordan Lippner.
15    Q.  Was there anyone else?
16    A.  No.
17    Q.  Just to clarify, was there anyone also
18 you know of or do you know if there was anyone
19 else other than Jordan Lippner who conducted
20 training on harassment in the workplace?
21        MR. PIESCO: Objection.
22        You can answer.
23    A.  While I was the director?
24    Q.  Right, when you were the director.
25    A.  When I was the director, Jordan

Page 19

1     AMY SCIALDONE - CONFIDENTIAL
2  conducted the training for harassment.
3     Q.  Who promoted you to vice president of
4  human resources?
5     A.  Jennifer Jehn.
6     Q.  And who do you report to now?
7     A.  Paul Carlucci.
8     Q.  Do you know if there were any
9  discussions when Jennifer Jehn left as to whether
10 or not there would be another senior vice
11 president appointed to take over her role in HR?
12        MR. PIESCO: Objection.
13    A.  No.
14    Q.  Was there ever any discussion as far
15 as you know of promoting you to senior vice
16 president of HR?
17        MR. PIESCO: Objection.
18    A.  No.
19    Q.  And do you currently report to Paul
20 Carlucci?
21    A.  Yes.
22    Q.  Who is Paul Carlucci?
23    A.  The publisher of the New York Post.
24    Q.  And who does Paul Carlucci report to?
25    A.  I don't know.

Page 20

1     AMY SCIALDONE - CONFIDENTIAL
2     Q.  Do you know who Paul Carlucci works
3  for?
4         MR. PIESCO: Objection.
5     A.  No.
6     Q.  Do you know if he is an employee of
7  some division or subsidiary of News Corporation?
8         MR. PIESCO: Objection.
9     A.  I don't know exactly.
10    Q.  I didn't ask you exactly, I'm merely
11 asking you do you know if he works for some
12 company affiliated with News Corporation?
13        MR. PIESCO: Objection.
14    A.  I know he works for the New York Post
15 and News America Marketing.
16    Q.  So, Paul Carlucci works for News
17 America Marketing?
18        MR. PIESCO: Objection.
19    A.  Yes.
20    Q.  And is News America Marketing
21 affiliated with News Corporation in any way?
22        MR. PIESCO: Objection.
23    A.  It's my understanding they're a
24 subsidiary.
25    Q.  Do you have any idea why Paul

Page 21

1     AMY SCIALDONE - CONFIDENTIAL
2  Carlucci, the publisher of The Post, is employed
3  by News America Marketing?
4         MR. PIESCO: Objection.
5     A.  I don't know who Paul's employed by.
6     Q.  I thought you just said that Paul
7  Carlucci works for News America Marketing?
8         MR. PIESCO: Objection.
9     A.  Paul's the publisher of the New York
10 Post and oversees News America Marketing.
11    Q.  And he --
12    A.  That's my understanding --
13    Q.  -- he oversees --
14    A.  -- if I misspoke.
15    Q.  He oversees News America Marketing.
16        MR. CLARK: Now, could you read back
17    the -- the answer about -- about two
18    questions ago on News America Marketing?
19        (Record read.)
20 BY MR. CLARK:
21    Q.  Okay. So, you testified a minute ago
22 that Paul Carlucci works for News America
23 Marketing. Is that correct?
24    A.  That's my understanding.
25    Q.  Okay.

Page 46

1      AMY SCIALDONE - CONFIDENTIAL
2           MR. PIESCO: Objection.
3       A.  I don't recall.
4       Q.  Is it more than once a year?
5           MR. PIESCO: Objection.
6       A.  I don't recall.
7       Q.  Now, as part of your job as vice
8  president of HR, are you required to conduct
9  investigations when there's an allegation of
10 sexual harassment in the workplace?
11          MR. PIESCO: Objection.
12          You can answer.
13      A.  Yes.
14      Q.  Does anyone else in HR currently have
15 responsibility to conduct investigations when
16 there's an allegation of sexual harassment in the
17 workplace?
18          MR. PIESCO: Objection.
19          You can answer.
20      A.  Yes.
21      Q.  Are there any specific individuals
22 that are in HR which -- who are tasked with
23 conducting investigations of sexual harassment in
24 the workplace?
25          MR. PIESCO: Objection.

Page 47

1      AMY SCIALDONE - CONFIDENTIAL
2           You can answer.
3       A.  Yes.
4       Q.  And who are those people?
5       A.  Erin, Lainie, and Ashley.
6       Q.  And are you in overall control of
7  those investigations?
8           MR. PIESCO: Objection.
9       A.  They may handle them. I review them.
10      Q.  So, they report to you when they do an
11 investigation?
12      A.  Yes.
13      Q.  And is it part of your responsibility
14 to make sure that those three individuals do the
15 investigation properly?
16      A.  Yes.
17      Q.  So, it would be fair to say that as
18 part of your job you are familiar with how to
19 conduct an investigation about an allegation of
20 sexual harassment in the workplace?
21          MR. PIESCO: Objection.
22          You can answer.
23      A.  Yes.
24      Q.  So, tell me in just -- in general how
25 you would go about conducting an investigation

Page 48

1      AMY SCIALDONE - CONFIDENTIAL
2  when there's an allegation of sexual harassment at
3  the New York Post?
4           MR. PIESCO: Objection.
5           You can answer.
6       A.  We would meet with an employee who has
7  the complaint and get as much detailed information
8  as we can and try to determine what occurred, who
9  may be involved, who may have witnessed anything,
10 and then we would take it to the next step and go
11 and see if we can talk to people who may have
12 seen, heard, or know anything, or been involved.
13          We would be doing this in conjunction
14 with legal counsel trying to make a determination
15 what occurred.
16      Q.  When these interviews are conducted,
17 would you expect the person conducting the
18 interview to take notes during the interview?
19      A.  Yes.
20      Q.  Would that be standard procedure?
21          MR. PIESCO: Objection.
22          You can answer.
23      A.  Yes.
24      Q.  Have you ever specifically told the
25 employees that work for you to make sure they take

Page 49

1      AMY SCIALDONE - CONFIDENTIAL
2  notes when they interview people with respect to a
3  complaint of discrimination in the workplace?
4           MR. PIESCO: Objection.
5       A.  Any investigation we're doing, we'll
6  take notes to make sure we're accurate and have
7  the information that we may need to continue the
8  investigation.
9       Q.  And other than what you've described
10 already in terms of attending these -- these
11 modules with Mr. Lippner, have you received any
12 other outside training on how to conduct an
13 investigation about discrimination in the
14 workplace?
15          MR. PIESCO: Objection.
16      A.  No.
17      Q.  So, you never --
18      A.  No.
19      Q.  -- never attended outside seminars --
20      A.  No.
21      Q.  -- with respect -- whether taking --
22          MR. PIESCO: Let him finish -- let him
23 finish his question, please --
24          THE WITNESS: Right.
25          MR. PIESCO: -- before you answer.

```
                                              Page 194
 1        AMY SCIALDONE - CONFIDENTIAL
 2   relationships with inappropriately.
 3       Q.   Are you saying that Mr. de Oca told
 4   Manolo Blahnik that Ms. Guzman was going to use
 5   these items for professional use when, in fact,
 6   she was going to use them for personal use?
 7            MR. PIESCO:  Objection.
 8            You can answer.
 9       A.   My understanding is that was the case.
10       Q.   What is that understanding based on?
11       A.   E-mails Sandra had with Joe,
12   conversations Manolo Blahnik or e-mails they had
13   with our editors, and how it was presented, and
14   they were concerned -- Manolo Blahnik was
15   concerned about their relationship with The Post,
16   the way he behaved.
17       Q.   Now, what leads you to believe that
18   Ms. Guzman in any way cooperated with Mr. de Oca
19   making this alleged misrepresentation?
20       A.   I believe she stated that in an e-mail
21   detailing he was representing her and styling her
22   for events.
23       Q.   Okay.  And is it your position that he
24   was not styling her for events?
25       A.   Excuse me?
```

```
                                              Page 195
 1        AMY SCIALDONE - CONFIDENTIAL
 2       Q.   Is it your position that Mr. de Oca
 3   was not styling Ms. Guzman for events?
 4            MR. PIESCO:  Objection.
 5       A.   I'm not sure I understand what you're
 6   asking.
 7       Q.   I'm trying to understand what you're
 8   saying.
 9            You said that he was styling her for
10   events, and that was some sort of
11   misrepresentation.
12       A.   The -- oh, excuse me -- the
13   misrepresentation I'm talking about is that he was
14   styling her, or whatever he was doing for her, for
15   her personal use, which is not company use, but
16   using her -- whether that was with her direction
17   or not -- using her title, name, the company, to
18   gather goods and services.  And that is a conflict
19   of interest.  And she said he was working for her.
20       Q.   All right.
21       A.   That's my understanding of all of it.
22       Q.   And -- and it says in this memo, it
23   accuses Ms. Guzman of a conflict of interest,
24   correct?
25       A.   I didn't hear you.  Can you repeat
```

```
                                              Page 196
 1        AMY SCIALDONE - CONFIDENTIAL
 2   that please?
 3       Q.   In the first sentence of this written
 4   warning, it says that Ms. Guzman violated The
 5   Post's conflict of interest rules, correct?
 6            MR. PIESCO:  Objection.  Speaks for
 7       itself.
 8            You can answer.
 9       A.   That's what it says.
10       Q.   Would you agree that nowhere in here
11   does it accuse her of violating The Post's --
12   let's see, which number is it -- of -- of
13   dishonesty, Rule No. 5?
14            MR. PIESCO:  Objection.
15       A.   It doesn't refer to this document.
16       Q.   So, this is -- just to be clear then,
17   because -- are you saying then definitely company
18   policies was not attached to the written warning?
19            MR. PIESCO:  Objection.
20            She said she didn't recall --
21            MR. CLARK:  I understand, but --
22       A.   I guess --
23            MR. PIESCO:  You can't do that.  You
24       can't to that.  Paul, come on, you can't do
25       that.
```

```
                                              Page 197
 1        AMY SCIALDONE - CONFIDENTIAL
 2   BY MR. CLARK:
 3       Q.   Does this conversation refresh your
 4   recollection that company policies was not
 5   attached to the written warning?
 6            MR. PIESCO:  Objection.
 7       A.   This code of conduct was not -- was
 8   the standards of business conduct we're referring
 9   to here.  So, I don't believe this to have been
10   attached to it, is what I said.
11       Q.   Okay.  Very good.  I just wanted to
12   clarify.
13       A.   Yeah, yeah.
14       Q.   Sometimes when talk things through,
15   you remember things.
16            Now, if you look at the second
17   paragraph, it -- it refers to COMPASS.  And I
18   think we talked about this before, but tell me
19   again, what -- what is COMPASS?
20       A.   COMPASS is an online ethics training
21   module that all employees are required to take,
22   which reviews the company's standards of business
23   conduct, amongst other things.
24       Q.   And when it says, "the company's
25   standards of business conduct," what company is it
```

### Page 246

AMY SCIALDONE - CONFIDENTIAL

You can answer.

A. Something somewhat similar. We have an acknowledgment page for new hires.

Q. Okay. And you see this is -- maybe you can't read it, but I believe this is the acknowledgment for Sandra Guzman? Yeah, you see it says, "I, Sandra Guzman, have received"?

A. Yes.

Q. Could you just that sentence for me, that first sentence?

A. Sure.

"This is to acknowledge that I, Sandra Guzman, have received and read the following materials regarding News Corporation's policies and procedures on the following topics."

Q. Would you agree then that this form clearly states that she has received News Corporation's policies and procedures on the following topics?

MR. PIESCO: Objection. Speaks for itself.

You can answer.

A. Well, as noted at the top, it's on New York Post's letterhead, and as I stated, it's my

### Page 247

AMY SCIALDONE - CONFIDENTIAL

understanding that these News Corp. policies we've adopted as the New York Post policies.

Q. This refers to News Corporation's policies and procedures on standards of business conduct, correct?

MR. PIESCO: Objection.

You can answer.

A. That's what it states.

Q. And this refers to News Corporation's policies and procedures on equal employment opportunity and unlawful harassment, correct?

MR. PIESCO: Objection.

A. Correct.

Q. And it refers to News Corporation's policies and procedures on electronic communications policy, correct?

MR. PIESCO: Objection.

A. Correct.

Q. Is that the policy we looked at earlier?

MR. PIESCO: Objection.

Q. The electronic communications policy?

A. From her date, I don't know. I would assume so.

### Page 248

AMY SCIALDONE - CONFIDENTIAL

Q. Okay. Fair enough.

And then family medical leave policy, are those also News Corporation policies and procedures with respect to family medical leave?

MR. PIESCO: Objection.

A. They're all New York Post policies to me.

Q. Do you have any idea why it refers to all these as News Corporation policies?

MR. PIESCO: Objection.

A. No. As I mentioned, I wasn't in HR in 2003. I don't know.

Q. Were you in HR in 2007?

A. Yes.

MR. CLARK: Could you mark this exhibit?

Thanks.

(Exhibit Scialdone 8, an acknowledgment dated May 21, 2007 bearing Bates number NYP-FL 485, was marked for identification at this time.)

MR. CLARK: For the record, this is Bates stamped NYP-FL 485.

### Page 249

AMY SCIALDONE - CONFIDENTIAL

BY MR. CLARK:

Q. If you could just glance at that, ma'am, and let me know when you're ready?

A. Okay.

Q. This appears to be Austin Fenner's acknowledgment form, correct?

A. Yes. His name's on it, yes.

Q. Do you see the date on this?

A. Yes.

Q. What's the date on it?

A. 5/21/07.

Q. And were you working in HR at The Post in May of 2007?

A. Yes.

Q. Have you seen this specific iteration of the acknowledgment form before?

A. Yes, it looks familiar.

Q. And could you read that first sentence for me?

A. "This is to acknowledge that I, Austin Fenner, have received and read the following materials regarding News Corporation's policies and procedures on the following topics."

Q. And, again, it refers to standards of

### Page 250

```
1         AMY SCIALDONE - CONFIDENTIAL
2    business conduct?
3         A.   Yes.
4         Q.   Now, is it your testimony that the
5    standards of business conduct referred to here is
6    not the News Corporation standards of business
7    conduct?
8              MR. PIESCO:  Objection.
9              You can answer.
10        A.   They're the New York Post policies
11   we've adopt from News Corporation's policies.
12        Q.   Are you saying they are not News
13   Corporation's standards of business conduct?
14             MR. PIESCO:  Objection.
15        A.   They're the New York Post policies
16   we've adopted from News Corp.'s policies.
17        Q.   Okay.  That's still not answering the
18   question.
19             Are they News Corporation's standards
20   of business conduct?
21             MR. PIESCO:  Objection.  Asked and
22        answered.
23             Go ahead.
24        A.   Yes, they're News Corp.'s policies
25   that the New York Post have adopted.
```

### Page 251

```
1         AMY SCIALDONE - CONFIDENTIAL
2         Q.   Very good.  Thank you.
3              MR. CLARK:  Could I get this marked as
4         9, please.
5              (Exhibit Scialdone 9, a family medical
6         leave document bearing Bates number NYP-FL
7         1163, was marked for identification at this
8         time.)
9    BY MR. CLARK:
10        Q.   Okay.  Ma'am, could you take a look at
11   that, and let me know when you're ready.
12             MR. CLARK:  For the record, this is
13        Bates stamped NYP-FL 1163.
14        A.   Okay.
15        Q.   Have you seen this document before,
16   Ma'am?
17        A.   I've seen a family medical leave
18   document.  I don't know if it's exactly this one.
19        Q.   Okay.  Do you know if this family
20   medical leave document is the family and medical
21   leave policy referred to on Exhibits 7 and 8?
22        A.   I don't know.
23        Q.   Is the --
24        A.   I don't know.
25        Q.   Okay.  Is the family medical leave
```

### Page 252

```
1         AMY SCIALDONE - CONFIDENTIAL
2    policy that I just provided you substantially the
3    same as the family medical leave policy that the
4    HR department provides to New York Post employees?
5              MR. PIESCO:  Objection.
6         A.   Repeat that, please?
7              MR. CLARK:  Could you read that back?
8              (Record read.)
9              MR. PIESCO:  Note my objection,
10        please.  Thank you.
11             You can answer, if you can.
12        A.   I don't know.
13        Q.   Can you point to any parts of the
14   document, 1163, that you believe is different from
15   the family medical leave policy that HR provides
16   to its employees?
17             MR. PIESCO:  Objection.
18        A.   I don't know.
19        Q.   So, on the top it says, "News America,
20   Incorporated."
21             Do you see that?
22        A.   Yes.
23        Q.   Do you know if the form that HR
24   currently provides to employees says News America,
25   Incorporated on the top?
```

### Page 253

```
1         AMY SCIALDONE - CONFIDENTIAL
2              MR. PIESCO:  Objection.
3              You can answer.
4         A.   I don't recall.
5         Q.   Do you see at the bottom it says,
6    "NYP-FL 1163"?
7         A.   Yes.
8         Q.   Do you remember I said earlier that
9    that indicates that this document was provided by
10   your counsel?
11        A.   Yes.
12        Q.   Do you have any doubt that this form
13   is a form used by the New York Post for its
14   employees?
15             MR. PIESCO:  Objection.
16        A.   The content of the family medical
17   leave is used, you know, the substance of the
18   content, but if this document doesn't have a date
19   reference on it, I'm not sure when this was from,
20   and I don't know if I have a current one that's
21   updated.
22        Q.   Okay.
23        A.   So, that's the only -- do we provide
24   family medical leave?  Yes.  But the specifics --
25             MR. PIESCO:  Listen to his question
```