# Exhibit 12

IKIMULISA LIVINGSTON

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
AUSTIN FENNER and IKIMULISA LIVINGSTON,

Plaintiffs,

-against-

09 Civ. 9832
(BSJ)(RLE)

NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a THE NEW YORK POST and DAN GREENFIELD and MICHELLE GOTTHELF,

Defendants.
---------------------------------------X

VIDEOTAPED DEPOSITION OF IKIMULISA LIVINGSTON

New York, New York

Friday, January 13, 2012

REPORTED BY: BARBARA R. ZELTMAN (BOBBIE)
Professional Stenographic Reporter

Job Number: 45412

IKIMULISA LIVINGSTON

Q Did you have a desk in January 2009?

A No, I did not.

Q Did you have a desk in the early part of February 2009?

A No, I didn't.

Q But the reason why you didn't have a desk was because you complained to Michelle Gotthelf, who agreed with you, in mid February 2009; that's your testimony?

A I'm saying, my testimony, I'm telling you that I was told I would have a desk in December of 2008.

When Michelle demoted me, she said I would get a desk and I would get a phone thereby getting all the resources that my white counterparts would have. I would be in the office sometimes, I would not always be out in the street or in the field.

So that didn't happen in December and didn't happen in January.

I still thought at some point there would be a desk forthcoming, but after I complained about the cartoon being racist,

IKIMULISA LIVINGSTON

none of that was forthcoming. I continue to be denied that. And I also received this letter of warning, this written warning as well as the evaluation that I believe is also discriminatory against me.

Q Did Michelle Gotthelf tell you when you would get a desk in the newsroom?

A No, she didn't.

Q Tell me who are your white counterparts who have desks.

I want to hear the names of everyone who is a general assignment reporter who has a desk at 1211.

A I know that at times Lorena has been at the office working at a desk and having access to a telephone. Amber Sutherland had a desk. Rich Calder had a desk. Ed Robinson had a desk.

Q When you say "had a desk," what time period are you talking about, because you once had a desk; isn't that right?

A Well, yes. Once I did have a desk and that was taken away and given to a white woman.

IKIMULISA LIVINGSTON

But Ed Robinson, I referred to him as having had a desk because he no longer works for the Post.

Q So when you say "they're working at a desk," does that mean that they have a desk exclusively assigned to them? Is that your understanding?

A I don't know if it was exclusively assigned to them.

I just know that there were periods when I know that they were in the office working at a desk and I was denied a desk. And in fact, I was essentially banned from the newsroom because I was not allowed in the newsroom. And the one period of time when I did come into the newsroom, Greenfield saw me and asked me a hostile way, "What are you doing here?"

Q Okay. Let's talk about the banned --

But one question: isn't it the fact that many white general assignment reporters do not have desks or phones?

A I don't know. I know that some do

IKIMULISA LIVINGSTON

have desks and phones.

And as a senior reporter who's been at the Post for nearly 15 years, who was promised a desk, who was told at the time of my demotion in December 2008 by Michelle Gotthelf, the Metropolitan editor of the New York Post, that I would have a desk and I would have telephone and I would sometimes be in the office writing stories and not always in the street, in the field, I took that to mean that I would receive a desk and that I would receive a telephone and that sometimes I would be in the office.

Q Did Ms. Gotthelf ever tell you that you would have a desk that no one else could sit in but you?

A She told me I would have a desk and she told me I would have a telephone.

Q Tell me when you came to the office and were denied a seat.

Let's review the dates that happened.

MR. THOMPSON: Objection.

A I can't give you an exact date of

Page 306

IKIMULISA LIVINGSTON

Corporation?

A I'm an employee of New York Post and News Corp.

Q Does your paycheck come from News Corporation?

A I actually haven't seen my paycheck in a while. I don't know what it says exactly.

Q Well, what's the basis for your belief that you are an employee of News Corporation?

A The New York Post and News Corp. are the same. We're in the same building.

News Corp. and New York Post is located at 1211 Sixth Avenue.

My statements every year that state the benefits I receive, they come in -- it's a folder and it says "News Corporation." My evaluations came in an envelope that said "News Corp."

MS. LOVINGER: I'm going to show you a document that's been marked as Livingston Exhibit 16, and it's actually series of documents

Page 307

IKIMULISA LIVINGSTON

Bates stamped IL-7139, IL-7138, IL-7132, IL-7136, IL-1624, IL-1584, and IL-1535.

(Livingston Exhibit 16, Series of documents, Bates Numbers IL-7139, IL-7138, IL-7132, IL-7136, IL-1624, IL-1584 and IL-1535, was marked for Identification.)

BY MS. LOVINGER:

Q Ms. Livingston, on these documents, there's a section that states "Employer's name, address and zip code."

Do you see that?

A I'm sorry? Which page?

Q Well, all of these documents, just for the record, are copies of your W2s and earning statements that reflect your employment with the New York Post.

So directing your attention to -- let's look at IL-7132.

Actually this is another job you held.

I'm sorry.

Let's look at IL-7138.

Page 308

IKIMULISA LIVINGSTON

Do you see the employer's name in the box there where it says "NYP Holdings, Inc."?

A Yes, I do.

Q And NYP Holdings, Inc. refers to the New York Post; is that right?

A NYP Holdings, I suppose it refers to the Post, but it also has the address for News Corp. It's the same place.

Q Your court Complaint actually references as a defendant NYP Holdings, Inc. d/b/a New York Post.

Are you aware of that?

Your Complaint in litigation?

A Right. I understand what you are saying.

Q Have you ever worked on any floor at 1211 Avenue of the Americas other than the 10th floor?

A When I actually had space in the office, yes, it was on the 10th floor. It was always on the 10th floor.

Q Directing your attention to the document that's Bates stamped IL-1584 in

Page 309

IKIMULISA LIVINGSTON

front of you, it's the second-to-last page.

You see on the top left where it says "New York Post"?

A Yes, I see that.

Q And likewise on the last document, Bates stamped IL-1535, your earning statement from -- an earning statement from December 2010, it also says "New York Post."

Do you see that?

A I do see that.

Q So you now agree that your paycheck comes from the New York Post?

A My paycheck comes from it -- says here "New York Post," which is also News Corp.

Q Does it say "News Corp." on the documents you are looking at?

A On this document? I do not --

Q On any of the documents in your hand, does it say "News Corporation"?

A I don't see anything in here in these documents that says "News Corp." Was that your question?

Q Yes.

IKIMULISA LIVINGSTON

Ms. Livingston, you said you worked on the 10th floor of 1211 Avenue of the Americas. The 10th floor also houses the editorial offices of the New York Post; isn't that right?

A Yes.

Q What's the factual basis for you saying that the New York Post is the same as News Corp.?

MR. THOMPSON: Objection.

A It's the same building. It's all under Rupert Murdoch, whom I've actually seen in the building on the 10th floor in our offices. It's all News Corp.

Q Do you work for Ropes & Gray?

A I'm sorry?

Q Do you work for the firm Ropes & Gray?

A No. I do not know who Ropes & Gray is.

Q Ropes & Gray is another firm that has office space in 1211 Avenue of the Americas.

MR. THOMPSON: Is that a

IKIMULISA LIVINGSTON

question?

Q And the fact that News Corporation and New York Post both have offices in 1211 seems to be one of your rationales for stating that they are the same company.

A Is that company owned by Robert Murdoch as well?

Q When did you see Rupert Murdoch at 1211 Avenue of the Americas?

A It was a long time ago. But I saw him in the elevator. Yeah, I think he was leaving or coming or something.

Q Do you currently suffer from any medical or mental condition that you contribute to your employment with the New York Post?

A Yes.

Q Can you tell me what condition, what medical or mental condition you suffer from?

A I suffer from depression and a roller coaster of emotions due to the stress, the fear of being fired at any moment, the anxiety every time the phone

IKIMULISA LIVINGSTON

rings and I can tell it's the office calling.

When I get an e-mail from Dan Greenfield, I get this anxious feeling and my stomach actually kind of turns a little bit.

It's been extremely difficult and it's been humiliating and demoralizing, and everything that I've gone through the pressure, the strain.

I worked very, very hard to get to where I am, and when I think about -- actually I don't have to think about -- I can't not think about the things that Michelle and Dan and Zack Haberman and that cartoon and their pervasive racism that exist in that newsroom. There have been times that I can't sleep. There are still times I can't sleep.

Q Are you currently seeing a therapist?

MR. THOMPSON: Wait. Wait. Are you finished?

Q I'm sorry.

IKIMULISA LIVINGSTON

MR. THOMPSON: Okay. Are you finished, Ms. Livingston?

THE WITNESS: No, I'm not finished.

MS. LOVINGER: Sorry.

A I was saying that I worked really, really hard to get to where I am.

When I was 15, I was pregnant and I had a baby. I still went to college, I still had dreams of achieving and I wanted to make a better life for my child.

And then I think about when I actually had to tell my son, who is an adult now, that at any moment I could be fired because Michelle has something against me because I'm black, and because Dan Greenfield dislikes me solely because I'm black, and the cartoon. Every day is a struggle to pick up the phone and call the office to check in with Dan Greenfield.

I can't watch my child play basketball, my six-year-old, without thinking about, well, what if I get fired, how am I going to make sure that he's okay

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
AUSTIN FENNER and
IKIMULISA LIVINGSTON,

Plaintiffs,

v. 09 Civ. 9832
(BSJ)(RLE)

NEWS CORPORATION, NYP HOLDINGS,
INC. d/b/a THE NEW YORK POST
and DAN GREENFIELD and
MICHELLE GOTTHELF,

Defendants.
-------------------------------x

DEPOSITION OF AUSTIN FENNER
New York, New York
January 11, 2012

Reported by:
MARY F. BOWMAN, RPR, CRR
JOB NO. 45411

Page 18

FENNER

recall any that pertained to NewsCorp. as opposed to the Post?

A. There were so many documents, it was a blizzard of paper. I can't recall right now which ones you are referring to.

Q. I'm not referring to any particular document. My question is, are you aware of having produced any documents to your attorney that pertained to NewsCorp. as opposed to the Post?

MR. THOMPSON: Objection, asked and answered.

A. I gave over all the documents I have.

Q. Did any of them relate to News Corporation?

A. There was a blizzard of documents. There was so many, I can't recall -- for me, it is all the same, it is all one, so I just gave over whatever showed up.

Q. For you, documents relating to the Post and NewsCorp. are the same thing?

A. I was hired by NewsCorp. and the Post.

Page 19

FENNER

Q. Who did you meet with when you were hired from NewsCorp.?

A. I can't recall right now, but I believe the training manuals I viewed might have said NewsCorp. Is that right?

Q. Did you -- who did you interview with?

A. For what?

Q. For your position at the Post?

A. Dan Colarusso.

Q. Dan Colarusso was an editor at the Post, right?

A. That's correct.

Q. Who was his boss?

A. Col Allan.

Q. The editor and chief of the New York Post, right?

A. Correct.

Q. Do you remember dealing with a human resources department?

A. I do.

Q. Was that the New York Post human resources department?

A. I believe it was.

Page 20

FENNER

Q. So do you recall dealing with anybody at NewsCorporation in connection with your hire?

A. I remember dealing with Amy Scialdone and there were several different people at times who were leading training sessions. This was within the NewsCorporation building. I don't know exactly who the employer was, but I looked at it as one and the same.

Q. Amy Scialdone is human resources for the New York Post, is she not?

A. That's correct.

Q. When you did training, was it in a room or was it an online training?

A. It was at 1211 Avenue of the Americas.

Q. That's where the New York Post's offices are, right?

A. That's correct, inside the NewsCorp. building.

Q. You had an e-mail address at the New York Post, right?

A. Yes.

Page 21

FENNER

Q. Was that an e-mail address that said @NewYorkPost.com?

A. That's correct.

Q. And did you have a business card?

A. I did.

Q. Did it say that you worked for the New York Post?

A. That's correct.

Q. Did it say that you worked for NewsCorp.?

A. I believe it said New York Post.

Q. And when you entered your offices on the 10th floor of the building, did it say the New York Post?

A. Yes, when I walked into the NewsCorp. building, I passed through security and took the elevator to the 10th floor to the New York Post offices.

Q. Do you know who paid you? Was it -- were you paid by the New York Post?

A. The check said New York Post, I believe. I would need to see it if you have one.

Q. And you have sent around some

Page 118

FENNER

this section.

MR. THOMPSON: Ten minutes is too long. Ten minutes -- I mean, it is 1 o'clock.

MR. LERNER: Ken, you asked me what time I would like to break and I said about ten more minutes.

MR. THOMPSON: And I would like to break now. What time -- I mean, we have been here since 9:30, since 9:15. It is 1 o'clock. I think it is time to take a break.

MR. LERNER: Ken, I am asking you if I can go ten more minutes.

MR. THOMPSON: Try to do it before ten minutes, Mark. I think it is unfair to have the witness here, to have the witness here who hasn't eaten anything since this morning.

MR. LERNER: All right.

Q. Mr. Fenner, did there come a time in 2008 when your editors told you that you would be working as a street reporter --

A. No.

Page 119

FENNER

Q. -- as a runner?

A. No.

Q. Did that conversation ever occur?

A. No.

Q. Did you ever sit down with Ms. Scialdone of HR and one of your editors and have your -- have a discussion in which your duties were revised to be a runner as opposed to a general assignment reporter?

A. Which editor?

Q. Mr. Greenfield or Ms. Gotthelf?

A. Which one?

Q. Well, how many meetings did you have with Ms. Scialdone during the course of your employment?

A. At the time that I can recall, I had two.

Q. When were those two meetings?

A. When I had the two performance evaluations.

Q. Do you recall any other meetings in with Ms. Scialdone in which your duties as a reporter were discussed?

A. I can't recall that meeting. My

Page 120

FENNER

title and my work was always as a senior reporter at the paper.

Q. And were you ever advised in a meeting that included Ms. Scialdone that your duties would be those of a street reporter?

A. Was it written down?

Q. That's -- that is my question to you?

A. It wasn't written down. Not that I recall.

Q. What do you mean it wasn't written down? Did it happen?

A. You are presenting me with these evaluations and a final warning. And these are all comments that they made about my work. And what I am saying, the comment that you are referring to is not included in these papers.

Q. Was it -- were you verbally told that your -- that your duties would be as a street reporter?

A. Not that I recall, no.

Q. Was your job description ever changed while you were at the Post? I don't

Page 121

FENNER

mean your job title. I mean the description of your duties as described to you by your supervisors?

A. After I complained about the racist criterium that was published in February of 2009, I was eventually banned from the newsroom by Michelle Gotthelf and Dan Greenfield. And during that time, they changed my schedule.

Q. You mean your work schedule?

A. That's correct.

Q. Your hours?

A. That's correct.

Q. Did they make any other changes?

A. And in particular, on my Thursday shift, they changed those hours from 2 to 10, then told me that they were doing things differently in the newsroom and they wanted me to be a team player and pitch in for about a month until they could get someone else to cover that position. That position is a junior position for a junior reporter.

Q. So one day a week, they gave you a later shift, right?

FENNER

A. On Thursday.
Q. Did they move your other shifts to -- from 11 to 7 to 9 to 5?
A. That's correct.
Q. And did you -- were you agreeable to the shift change from 11 to 7 to 9 to 5?
A. No.
Q. Did you tell them you didn't want to do that?
A. I told them that the schedule I had was working great for me. I have a teenage daughter who I am getting ready for college and I use my time in the evenings to get her ready and prep her for college life.
Q. Well, wasn't it -- didn't it assist you to get home at 5 p.m. or have your shift end at 5 p.m. as opposed to 7 p.m. which worked four out of your five days when they made that change?
A. If you are a New York journalist, you are never, ever, ever work 9 to 5.
Q. So are you saying that that wasn't your schedule?
A. What I am saying is there is always

FENNER

demands that you have to tackle. There is always an extended assignment, there is always breaking news and if you want to be a part of that team, you have to be highly motivated, you have to be tenacious and you have to be relentless in getting those stories, I worked -- I never, I never ever finished a shift at 5. That's deadline.
Q. Did you, after you performed the 2 to 10 shift for a month, did you tell Michelle Gotthelf or Dan Greenfield that you wanted to be taken off that shift?
A. Yes.
Q. Did you put that in writing?
A. Did I put it in writing?
Q. Yes.
A. We had a meeting where they presented me with a change. And I verbally told them -- I verbally told them my objections to it.
Q. After doing it for four or five weeks, did you then go back and say this is not working out, I want to be -- I want to go back to an earlier shift?

FENNER

A. I asked them if they had hired someone else for the junior position, if they had found someone.
Q. What did they say?
A. I can't recall at this time exactly what they said, but I remained working in that position from May until my date of termination.
Q. Other than -- did you -- did you have any other conversations with them about that shift other than asking them if they had hired somebody?
A. I told them it was outrageous that they were banning me from the newsroom. I felt like I was being treated differently than my white colleagues at the paper. I was told I needed to call in and get permission to enter the NewsCorp. building.
Q. You didn't tell Dan Greenfield and Michelle Gotthelf that you believed you were being treated differently from white reporters, correct? You didn't say that to them, right?
A. I couldn't -- I told them I thought

FENNER

it was unfair.
Q. You were sent out in the street?
A. I was being banned from the newsroom.
Q. But you didn't say I think you're doing this to me because I'm black and you're not doing it to my white colleagues? You didn't say that, right?
A. I can't recall if I said that or not at the time.
Q. You -- you never said that to Dan Greenfield or Michelle Gotthelf?
A. But I did raise my objections to them about getting banned from the newsroom.
Q. OK, but you didn't say -- you didn't raise your objection and say you are doing this to me because of my race, correct?
A. I can't recall exactly everything that I said and what transpired in that meeting. But I raised my objections to them.
Q. You never put in any complaint or EEOC charge or your affidavit that you said that to them, right? You have never alleged in this lawsuit that you told Dan Greenfield

Page 202

FENNER

activities. It showed that he was more than just a hero cop, but a contributor to the livelihood of the Brooklyn community.

Q. You told us earlier that an enterprise story was a story that involves research, it involves background, and it is a unique way of presenting news, right?

A. Correct.

Q. And this is a story that you get a call in your car from an editor, it is happening that night, were your words, and you are dispatched to that location and you write a story for the following day, right?

A. That story ran weeks later.

Q. Well, do you know how many words that story was?

A. I didn't count it.

Q. 149 words. That's a short story, right?

A. Can I see it?

Q. Do you have the binder of articles in front of you?

A. I do.

Q. Look at NYPFL 2901. It is toward

Page 203

FENNER

the back.

A. FL?

Q. Sorry, I said it was towards the back. It is really not. It is more in the middle. 2901 is the number.

A. I have it.

Q. Have you had a chance to look at it?

A. Let me read it.

This story was edited and cut, deeply cut.

Q. Do you still believe this story is an enterprise story?

A. Yes.

Q. It is not even 150 words? But it is an enterprise story?

A. The editors cut it.

Q. What did they cut?

A. The body of the story.

Q. Do you know who cut it?

A. I do not.

Q. Do you know why they cut it?

A. No. Many times they cut stories for space. Could be other breaking news

Page 204

FENNER

stories going on. There is a variety of reasons why stories are cut down.

Q. Isn't it a story that would be better categorized as a feature, not an enterprise story?

A. You could call it a feature story.

Q. If your editors called it a feature story, not an enterprise story, would they be justified in classifying it that way?

A. Yes.

Q. In the performance warning, they criticized you for not being focused on producing enterprise stories. Is that criticism --

A. Where are you looking at now?

Q. The performance warning, Exhibit 11?

A. OK.

Q. Let me ask you this, is there any criticism in that performance warning which you believe to be fair?

A. No.

Q. Do you agree that at the time of the review, you were working as a runner

Page 205

FENNER

rather than a senior reporter?

A. No, my review says senior reporter.

Q. But it also says that you were working as a runner?

A. I had been demoted after I was banned from the newsroom and my schedule was changed and I was given the duties of a junior reporter on my Thursday shift.

Q. What about Sunday through Wednesday? Were you also given the duties of a junior reporter on Sunday through Wednesday?

A. I was working as a senior reporter.

Q. So you think your reporter duties are determined by the shift that you worked?

A. No. The expectation, just like I said, is in the final warning, is that I produce enterprise stories, that expectation never changed and my desire to produce those never changed.

Q. But your product and your output as a reporter was more akin to that of a junior reporter runner than a senior reporter doing enterprise stories, right?

Page 206

FENNER

A. No, I was still working and expected to work to produce enterprise stories and my supervisors have the ultimate say on my shift and what I do. I was still required to cover out-of-town assignments, breaking news, and produce enterprise stories.

Q. But you -- your work was primarily the work of a runner reporter, correct?

A. No, that's not true. I did a variety of assignments.

Q. In the performance warning, it says, in the last paragraph, "Working as a runner for someone with your experience and at your level as a senior reporter is simply unacceptable and cannot continue any longer."

My question is, is it accurate when they said you were working as a runner?

A. I disagree with the critiques in this final written warning.

Q. Do you agree that you had been demoted into working as a runner?

A. No, the expectation and the work I did was that of a senior reporter.

Page 207

FENNER

Q. Did you ever get demoted to runner?

A. No.

Q. When, after the cartoon ran and you said you had a conversation with Dan Greenfield about not coming into the newsroom, was that a demotion to runner?

A. That was a -- I was being banned from the newsroom. I had to ask for permission from my white editors to enter the NewsCorp. building.

Q. Was it -- were you demoted to runner?

A. No. The expectation was that I was a senior reporter and the expectation that I produce the work of a senior reporter was still there.

Q. What did you do each morning when you began your shift?

A. I was required --

MR. THOMPSON: Objection.

Q. You can answer.

A. What did I do each morning what?

Q. Starting in May 2009, what did you do each morning when you began your shift?

Page 208

FENNER

A. I was instructed to call the city desk in the morning.

Q. And await instructions regarding an assignment, correct?

A. That's correct.

Q. Isn't that what a runner reporter does?

A. A runner reporter does those things, yes.

Q. Did Greenfield tell you to work out in the field and that the city was your office?

A. Yes, that was part of the ban from the newsroom.

Q. So as best as you can recall, what did Dan Greenfield say to you during the conversation in which he told you that you should be -- you should not be coming into the newsroom?

A. He told me he didn't want me in the newsroom and that I had to ask for permission before entering the building.

Q. Anything else?

A. He said many things but that was

Page 209

FENNER

one of the things he said.

Q. My question is for you to tell us everything that he said during that conversation that you recall.

A. I can't recall all the facts and all the things he said, but that was the big theme.

Q. So he did not want you in the newsroom and call before coming in?

MR. THOMPSON: Objection.

A. Yes.

Q. Did he tell you why he did not want you in the newsroom?

A. He and Michelle Gotthelf said that they were doing things differently and they needed me to help out on a certain shift because they were short on manpower and they said that they needed me to work this shift temporarily and that we will replace you by the end of the month.

Q. Was the conversation in which you were -- Dan said that he did not want you in the newsroom the same conversation as when you were told that your shift would change?

Page 210

FENNER

A. Yes.

Q. Other than that one conversation, were there any other conversations in which you were told by Greenfield or Gotthelf that they did not want you coming into the newsroom?

A. It was at that meeting when they issued the ban.

Q. My question is, were there any other meetings or conversations in which they communicated the same thing?

A. I can't recall right now if there were any other meetings besides that one.

Q. Did they tell you they didn't want you in the newsroom because of your race being African American?

A. They didn't use that language, no.

Q. Did anyone tell you they didn't want you in the newsroom because you were African American?

A. No, they didn't say that, but it was consistent from the hostile treatment I had been experiencing at the workplace.

Q. But they didn't say that?

Page 211

FENNER

A. That is correct.

Q. Did they say that the reason they wanted you to call for permission before coming to the building was because you're African American?

A. They didn't say that.

Q. Did anybody tell you that that was the reason for them requiring that?

A. No.

Q. Did they tell you why they wanted you to call for -- to get permission before coming into the office?

A. They told me they were doing things differently and that they were short of manpower and they needed me to cover this particular shift.

Q. Did they ever say to you that the reason they were requiring this of you was because of comments that you made to Journalisms about the cartoon?

A. They didn't say that but I believe it was retaliation for that act.

Q. But they didn't say it and nobody else told you that either, right?

Page 212

FENNER

A. No.

Q. It is typical for reporters covering events in the field to get their assignment from the street or from their car, do the reporting from the street, and call the story in or file it by e-mail without ever coming into the office, right?

A. Can you repeat the question.

Q. Yeah, it is typical for reporters covering events in the field to get their assignment when they are on the street or in their car and to do the reporting in the street and call the story in or e-mail it in without ever coming into the office, right?

A. There are many reporters who do that.

Q. There are reporters that can go weeks without ever stepping foot in the office, right?

A. They call those runners, yes.

Q. There are reporters that don't even have desks in the New York Post offices, right?

A. Yes, but they are not black senior

Page 213

FENNER

reporters.

Q. But they are reporters writing stories, covering stories and covering important stories that don't need to come into the office to do that and don't have desks, right?

A. Ikimulisa Livingston was also banned from the newsroom and she is a senior reporter and she is African American.

Q. That is not my question.

A. Can you repeat your question.

Q. Yeah, there are reporters covering stories, covering important stories, that do that without coming into the office and without having desks, correct?

A. I believe -- yes.

Q. And some of those reporters are white reporters, correct?

A. Yes, they are white reporters, but they are not senior reporters.

Q. Do you know if Dan Greenfield or Michelle Gotthelf ever told any reporters other than you not to come into the office?

A. Yes.

FENNER

environment throughout my tenure, and after I was banned, yes, they would continue to yell at me, hang up the phone on me, be dismissive of my story ideas.

Q. What did they yell at you about after that?

A. The complaint, about my pitches for enterprise stories and they were just generally dismissive of my work, calling it subpar.

Q. You used the term in your complaint, you used the term "segregated" to refer to the New York Post. What did you mean by that?

A. Can you show me the complaint?

Q. Sure. Do you have a copy of the complaint that I handed to you a moment ago?

MR. DATOO: I think you took it back.

MR. THOMPSON: Do you have an extra copy?

Q. For example, take a look at paragraph 102 which I'll just read for the record and then give this to you.



FENNER

"Mr. Fenner often wrote his stories from Starbucks or other local coffee shops while Ms. Livingston wrote her stories from her car or home. In fact, like Mr. Fenner, Ms. Livingston has been forced to perform all her work as a reporter out of the newsroom which is a racially segregated environment, predominated by white males." 102.

Do you agree that the newsroom is a racially segregated environment?

A. Can I read it?

Q. Yes.

A. The newsroom at the New York Post is a sea of white reporters and white editors, and as far as I know, they haven't had a black editor work in the newsroom for the last ten years. And there might be one black reporter working inside the newsroom.

Q. Who is that?

A. That man is Leonard Green.

Q. And is he excluded from the newsroom?

A. No.

Q. When you use the term "segregated,"



FENNER

because it is -- and you say it is predominantly white, are there areas in the newsroom that are divided that are for white people versus black people?

A. No.

Q. So when you use the term "segregated," you are referring to the fact that most of the employees are white, is that correct?

A. Right.

Q. You made the allegation that there is only one nonwhite editor in the newsroom. Who is that one nonwhite editor?

A. I think it was the business editor.

Q. Jay Sherman?

A. I believe that's his name.

Q. Isn't it a fact that there are other nonwhite editors? Do you know a gentleman named Ricky Eng?

A. No.

Q. Was he a news editor?

A. I don't know him.

Q. Did you know Juan Rodriguez, an assistant managing editor?



FENNER

A. I do.

Q. He is Hispanic, right?

A. He is a photo editor and he is Hispanic, I believe.

Q. When you said that there is only one nonwhite editor, did you have a roster of the -- all of the editors at the Post in front of you when you did that?

A. I just looked out into the newsroom floor and that's what I saw.

Q. You worked in the newsroom for many years, right? Two years?

A. For a long time.

Q. Is the photo department on the newsroom floor?

A. Yes.

Q. Do you know Evelyn Cordon, is she a photo editor?

A. I don't know who she is.

Q. Do you know Juan Arellano photo editor?

A. I believe I do.

Q. Do you know David Rentas, a photo editor?

Page 266

FENNER

a belief on the part of your editors that you would be a supportive witness to Sandra Guzman?

A. Because she was retaliated against by the paper after she complained about the racist monkey cartoon and was -- that was published earlier that year.

Q. OK, but what makes you believe that that your editors terminated you because they thought you would support Sandra Guzman's lawsuit?

A. Sandra complained just like I did about the racist climate at the paper. And she had been terminated because of the comments she had made in complaining about the cartoon and then roughly two months later, so was I.

Q. What's the basis of your information as to why Sandra Guzman was let go from the Post?

A. What's the basis of my information?

Q. As to why Sandra Guzman was let go by the Post?

A. Because I know she complained--

Page 267

FENNER

Q. What's the source of your information?

A. I read, I read, I read this long e-mail complaint she filed, system-wide, complaining about the cartoon. I saw her complaint and recognized that she was terminated for -- she was -- they were retaliating against her for complaining about the racist cartoon.

Q. So you saw the e-mail that she sent in February of 2009 she was terminated in September of 2009. Based on that, you concluded that her termination was retaliatory, is that correct?

A. Retaliatory and discriminated against, yes.

Q. Did any New York Post editor or executive tell you why Sandra Guzman lost her job?

A. No.

Q. Did any New York Post editor or executive tell you that you were being terminated because the Post was concerned that you would support her lawsuit?

Page 268

FENNER

A. No.

Q. Do you know, do you have any reason to believe the Post had knowledge of her lawsuit at the time that the Post made its decision to let you go?

A. Can you repeat the question.

Q. Yeah. Do you have reason to believe the Post had knowledge of her lawsuit at the time they made the decision to let you go?

A. It was filed -- I believe it was filed in federal court the same day I was terminated.

Q. Do you know whether or not people who decided to terminate Sandra -- I am sorry, to terminate you knew about that lawsuit at the time that they made that decision to terminate you?

A. Do I know that they knew about the lawsuit?

Q. Correct.

A. No.

Q. Other than what we have gone through here today, did you experience any

Page 269

FENNER

other discrimination at the New York Post?

A. I was terminated.

Q. We covered that.

A. I was just trying to form my thoughts.

I was terminated because of my race. I was banned from the newsroom. I was screamed at, cursed at, and humiliated by my white editors. I was sent out on many more out-of-town assignments than my white colleagues.

I witnessed other people experiencing racial discrimination at the paper. Ikimulisa Livingston was working as a reporter in the Queens courthouse and she was removed from her position after a white editor in the city desk had an argument with Jesse Angelo who is a managing editor at the paper and so she was forced out of her job.

Leonard Green had written many columns for the paper during his tenure, had made requests to become a columnist, it was denied.

Neil Graves, another African