# Exhibit 16

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

SANDRA GUZMAN,

           Plaintiff,

          -against-    09CIV9323

                       (BSJ)(RLE)

NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a

THE NEW YORK POST, and COL ALLAN, in his

official and individual capacities,

          Defendants.

------------------------------------X

      DEPOSITION OF LES GOODSTEIN

        New York, New York

          June 15, 2012

Reported by:

MARY F. BOWMAN, RPR, CRR

JOB NO. 50553

Page 14

GOODSTEIN

2   A.   My current title is senior VP, News
3   Corp.
4   Q.   Senior VP News Corp.? Do you have
5   a business card?
6   A.   Yes.
7   Q.   Could we have one.
8   A.   Do you want --
9       MR. LERNER: We will take that
10      request under advisement. But
11      Mr. Goodstein is not going to produce
12      documents at the deposition.
13  Q.   Can you read your business card to
14  us?
15      MR. LERNER: No, no. Objection.
16  Q.   How long have you been senior VP of
17  News Corp.?
18  A.   I work for News America
19  Incorporated.
20  Q.   I am sorry, the question is how
21  long have you been a senior VP of News
22  Corporation?
23      MR. LERNER: Objection. He
24      answered you.
25  Q.   So your title is senior VP, News

Page 15

GOODSTEIN

2   Corporation? Has your title changed -- let
3   me take a step back.
4       How long have you worked in your
5   current position?
6   A.   Six and a half years.
7   Q.   Who is your employer?
8   A.   News America Incorporated.
9   Q.   Have you had the title senior VP of
10  News Corp. for the entire six and a half
11  years?
12      MR. LERNER: Objection.
13  Q.   Do you understand the question?
14  Have you had the title senior VP of News
15  Corp. for the last six and a half years?
16  A.   Yes.
17  Q.   What is your current e-mail
18  address?
19  A.   LGoodstein@NewsCorp.com.
20  Q.   And has that e-mail address been
21  the same for the last six and a half years?
22  A.   Yes.
23  Q.   And that's your business e-mail
24  address, correct?
25  A.   Correct.

Page 16

1       GOODSTEIN
2   Q.   And LGoodstein@NewsCorp.com, that
3   would be where you receive business e-mails
4   from employees of the New York Post?
5   A.   Yes.
6   Q.   Could you describe your educational
7   background for me beginning with
8   undergraduate?
9   A.   East Meadow High School, bachelor
10  of arts, Stony Brook University.
11  Q.   What university was that?
12  A.   Stony Brook, New York -- State
13  University of New York, Stony Brook.
14  Q.   What was your major?
15  A.   Sociology.
16  Q.   Do you have any other degrees other
17  than your bachelor of arts?
18  A.   No.
19  Q.   Did you ever attend graduate
20  school?
21  A.   No.
22  Q.   After you graduated university,
23  what was your first full-time job?
24  A.   Fullman Diet Company.
25  Q.   Do you recall what year you began

Page 17

1       GOODSTEIN
2   at Fullman?
3   A.   1974.
4   Q.   And how long did you work for
5   Fullman?
6   A.   Short period of time, maybe a year.
7   Q.   Where did you work after Fullman
8   full-time?
9   A.   General Nutrition Corporation.
10  Q.   How long did you work for General
11  Nutrition?
12  A.   Two years.
13  Q.   So this would have been until
14  around '76, '77?
15  A.   '75. mid '75.
16  Q.   And what was your next full-time
17  job after General Nutrition?
18  A.   I was an account executive at
19  Newsday.
20  Q.   Is that in New York?
21  A.   It is on Long Island.
22  Q.   What do you mean when you say you
23  were an account executive? Can you describe
24  more what your job entailed?
25  A.   Sold advertising space.

Page 22

```
1              GOODSTEIN
2       A.   Yes.
3       Q.   What was that? What was the next
4   one?
5       A.   Executive vice president, executive
6   vice president.
7       Q.   Of the Daily News?
8       A.   Yes.
9       Q.   Do you recall what year you became
10  executive vice president?
11      A.   '96.
12      Q.   How long were you executive vice
13  president?
14      A.   About four years.
15      Q.   Did you have any other positions at
16  the Daily News after the four years as
17  executive vice president?
18      A.   Yes.
19      Q.   What was that?
20      A.   President, chief operating officer.
21      Q.   How long were you president and
22  chief operating officer?
23      A.   Five or six years.
24      Q.   Did you have any other positions at
25  the Daily News after president, chief
```

Page 23

```
1              GOODSTEIN
2   operating officer?
3       A.   That was it.
4       Q.   There was pretty much no place else
5   to go, right?
6           MR. LERNER: Objection.
7       Q.   Was there -- was there anyone above
8   you when you were president and chief
9   operating offer? Did you have a supervisor?
10      A.   Yes.
11          MR. LERNER: Objection.
12      Q.   Who was that?
13      A.   Mort Zuckerman.
14      Q.   Where did you go after you left as
15  president of the Daily News?
16      A.   News America Incorporated.
17      Q.   And tell me who Mort Zuckerman is?
18      A.   Mort Zuckerman was the owner of the
19  Daily News. He is also the chairman of the
20  Boston Properties.
21      Q.   You said after you left the Daily
22  News, you went to News America Incorporated?
23      A.   Yes.
24      Q.   Is that correct?
25          Who hired you for this position?
```

Page 24

```
1              GOODSTEIN
2       A.   Paul Carlucci.
3       Q.   And is, has your position changed
4   since Paul Carlucci hired you?
5           MR. LERNER: Objection.
6           You can answer.
7       A.   Repeat the question.
8       Q.   Let me back up. What year did Paul
9   Carlucci hire you?
10      A.   2005. Started in 2006.
11      Q.   So I believe you said before that
12  you have had the same position for the last
13  six and a half years, correct?
14      A.   Yes.
15      Q.   So my question is since Paul
16  Carlucci hired you in 2005, started in 2006,
17  has your job title changed in that period of
18  time?
19          MR. LERNER: Objection.
20          You can answer.
21      A.   No.
22      Q.   Who is your current supervisor at
23  your current position?
24      A.   Paul Carlucci.
25      Q.   Has anyone else ever been your
```

Page 25

```
1              GOODSTEIN
2   supervisor at your current position, other
3   than Paul Carlucci?
4       A.   No.
5       Q.   Have you ever known News
6   Corporation to mislead the public?
7           MR. LERNER: Objection.
8       A.   No.
9       Q.   Have you ever known News
10  Corporation to issue a false press release?
11          MR. LERNER: Objection.
12      A.   The answer is no.
13      Q.   Would you agree that if News
14  Corporation were to issue a false press
15  release, that would be unethical?
16          MR. LERNER: Objection.
17      A.   I don't understand your question.
18      Q.   Do you think it would be wrong to
19  issue a press release which was false?
20          MR. LERNER: Objection.
21      A.   The answer is no.
22      Q.   You don't believe it would be
23  wrong?
24      A.   Can I have the question again.
25      Q.   Read the question back.
```

Page 42

```
 1              GOODSTEIN
 2      Is it your understanding, sir, that
 3  you had joined News Corporation?
 4          MR. LERNER: Objection.
 5      A.  I don't know.
 6      Q.  You don't know what your
 7  understanding is?
 8          MR. LERNER: Objection.
 9      A.  I'm an employee of News America
10  Incorporated.  News America Incorporated is a
11  subsidiary of News Corp.  That's my answer.
12      Q.  You said you saw this press release
13  when it came out in the newspaper, correct?
14      A.  Yes.
15      Q.  You testified earlier you believed
16  it's wrong for a corporation to issue a press
17  release which was incorrect, right?
18          MR. LERNER: Objection.
19      Q.  Was that your testimony?
20      A.  Yes.
21      Q.  So did you ever make any effort to
22  go to Rubenstein or anyone else and say, wait
23  a minute, I'm not sure if this is correct or
24  not?
25          MR. LERNER: Objection.
```

Page 43

```
 1              GOODSTEIN
 2      A.  No.
 3      Q.  Why not?
 4      A.  I don't know.
 5      Q.  You don't know why you did that?
 6      A.  I don't know why I didn't do that.
 7  I don't know.
 8      Q.  Let's go down to the third
 9  paragraph.  It says, "Mr. Goodstein said, 'I
10  cannot imagine a more exciting time to join
11  News Corporation.'"
12          Is that a true statement?
13          MR. LERNER: Objection.
14      A.  Those are not my words.
15      Q.  Is it a true statement?
16          MR. LERNER: Objection.
17      A.  Those are not my words.
18      Q.  That's not the question, sir.  He
19  is doing it again.  This is a simple
20  question.
21          MR. LERNER: I don't even
22  understand the question.
23      A.  I don't understand the question
24  either.
25      Q.  Was this statement that's contained
```

Page 44

```
 1              GOODSTEIN
 2  in this press release authorized by you?
 3      A.  No.
 4      Q.  So Rubenstein did not have your
 5  authorization to make the statement, "I could
 6  not imagine a more exciting time to join News
 7  Corporation"?
 8      A.  Correct.
 9      Q.  So is this statement,
10  "Mr. Goodstein said, 'I could not imagine a
11  more exciting time to join News
12  Corporation,'" a true statement?
13          MR. LERNER: Objection.
14      Q.  So your answer is going to have to
15  be yes, no or I don't know.  That's what the
16  court has instructed.
17      A.  I don't know.
18      Q.  So you don't know whether or not it
19  is a true statement?
20      A.  Yes.
21      Q.  Did you ever tell anyone at any
22  time that you were joining News Corporation?
23      A.  I don't recall.
24      Q.  Have you ever told anyone at any
25  time that you worked for News Corporation?
```

Page 45

```
 1              GOODSTEIN
 2      A.  I don't recall.
 3          (Pause)
 4      Q.  Sir, what does your business card
 5  say?  What does it read?
 6      A.  Can I go back and straighten
 7  something out for the record?
 8      Q.  Go ahead.
 9      A.  I did authorize -- again, could you
10  read back what I said before about the
11  authorization of Rubenstein?
12      Q.  Before we you do that, could the
13  record reflect that this was after consulting
14  with Mr. Lerner, Mr. Goodstein wants to
15  correct something.
16          Could you read back the last
17  question, please.
18      A.  About the authorization of my
19  remarks on the press release.
20      Q.  Go ahead, tell me what you want to
21  correct.
22      A.  I did authorize --
23          MR. THOMPSON: Wait, I am sorry.
24  Mr. Lippner, please stop talking.  The
25  witness is being deposed.  You are
```

Page 50

```
 1                GOODSTEIN
 2      Q.   And you never contacted
 3   Mr. Rubenstein to tell him that there was
 4   something inaccurate in the press release,
 5   correct?
 6      A.   Correct.
 7      Q.   So it is fair to say that when you
 8   read this press release, when it was
 9   published, you believed everything in it was
10   accurate, correct?
11      A.   Yeah, I -- I don't know.
12      Q.   What do you mean you don't know?
13   You don't remember if you believed that
14   everything in it was accurate?
15      A.   I don't know.
16      Q.   I am sorry, I'm just not following
17   you.  Are you saying that you don't remember
18   or you -- I don't know what you mean by I
19   don't know.
20           MR. LERNER:  Could we have the
21      question read back, please.
22           (Record read)
23      A.   I don't know.
24      Q.   You don't know what you believed at
25   the time?
```

Page 51

```
 1                GOODSTEIN
 2      A.   Rephrase the question.
 3           (Record read)
 4      A.   Correct.
 5      Q.   OK.  What does your business card
 6   say?
 7           MR. LERNER:  Objection.
 8      A.   Senior vice president.
 9      Q.   The entire business card, what does
10   it say from top to bottom?
11           MR. LERNER:  If you know.
12      A.   Les Goodstein, senior vice
13   president.
14      Q.   That is all it says?
15      A.   I believe so.
16      Q.   It doesn't say any company?
17      A.   News Corp. on the top.
18      Q.   It says News Corp.?
19      A.   Yes.
20      Q.   It says N-E-W-S, C-O-R-P?
21      A.   Yes.
22      Q.   P with a period or no period?
23      A.   I don't know.
24      Q.   OK.  Does it say News America
25   anywhere on the business card?
```

Page 52

```
 1                GOODSTEIN
 2      A.   No.
 3      Q.   It says News Corp.?
 4      A.   Yes.
 5      Q.   OK.  So it says News Corp. on the
 6   top line?
 7      A.   I'm not sure.  It says News Corp.
 8      Q.   It says News Corp., senior VP or
 9   senior vice president?
10      A.   Senior vice president.
11      Q.   OK.  And then it has your name?
12      A.   Yes.
13      Q.   And it does it have contact
14   information?
15      A.   Yes.
16      Q.   Do you remember what the contact
17   information is?
18      A.   The phone number.
19      Q.   OK.  E-mail address?
20      A.   E-mail address.
21      Q.   OK.  How long have your business
22   cards read what you just testified to?
23      A.   Approximately six and a half years.
24      Q.   OK.  And in those six and a half
25   years, just a rough estimate, how many people
```

Page 53

```
 1                GOODSTEIN
 2   would you say you have given business cards
 3   to?
 4      A.   Hundreds.
 5      Q.   Hundreds?  OK.  For example, do you
 6   recall the last person you gave a business
 7   card to?
 8      A.   I don't, no.
 9      Q.   Now, when you give a business card
10   to someone that says News Corp., would it be
11   reasonable for them to think that you work
12   for News Corporation?
13           MR. LERNER:  Objection.
14      A.   I don't know.
15      Q.   When you give a business card to
16   someone that says News Corp., have you ever
17   said, I actually work for News America
18   Marketing?
19           MR. LERNER:  Objection.
20      A.   I've never said that, no.
21      Q.   Never said that?
22      A.   Not News America Marketing, no.
23      Q.   So you have never introduced
24   yourself -- let me just make sure.  Who is it
25   that you say you work for?
```

## Page 86

GOODSTEIN

overview. What sorts of areas it would involve?
    MR. LERNER: Objection.
    A.  It is -- I don't really -- your question is too broad.
    Q.  OK.
    A.  You have got to pinpoint it a little bit for me.
    Q.  Well, what would be a typical area that the committee would make recommendations on?
    MR. LERNER: Objection.
    A.  Pricing the newspaper.
    Q.  I am sorry, say again?
    A.  Price of the newspaper.
    Q.  Price of the newspaper, OK. So if an issue about price of the newspaper came up, how would the executive committee handle that?
    MR. LERNER: Objection.
    A.  I can't give you a speculative answer on that. I don't know.
    Q.  Is this an issue that's ever actually come up in executive committee

## Page 87

GOODSTEIN

meetings, the price of the newspaper?
    A.  Yes.
    Q.  How did the price of the newspaper come up in the executive committee meeting?
    MR. LERNER: Objection.
    A.  It was discussed, all the ramifications, pro and con.
    Q.  And then was there some kind of a vote taken?
    A.  No.
    Q.  So who made the ultimate decision on the price of the newspaper?
    A.  The publisher.
    Q.  Paul Carlucci?
    A.  Yes.
    Q.  So with respect to the price, the committee basically debated it and made a recommendation to Mr. Carlucci and he made the ultimate decision? Is that what you are saying?
    MR. LERNER: Objection.
    A.  Yes.
    Q.  When did you first become a member of the executive committee?

## Page 88

GOODSTEIN

    A.  I started attending meetings my first day which was January 3, 2006.
    Q.  And who appointed you as a member?
    MR. LERNER: Objection.
    A.  I don't recall, but it would have been Paul Carlucci because I reported to him.
    Q.  And you said it meets once a week?
    A.  Meets once a week.
    Q.  Where does it meet?
    A.  Usually it meets on the third floor of 1211 Sixth Avenue.
    Q.  You say usually. I take it there is times it does not meet there?
    A.  Rarely.
    Q.  Does it always meet at 1211 though?
    A.  For the last couple of years, I would say so, yes.
    Q.  Can we mark this as 5.
        (Exhibit 5, document Bates stamped NYP 440 through 442 marked for identification, as of this date.)
    Q.  If you could just take a look at that for me, sir. For the record, this is Bates stamped NYP 440 through 442. And can

## Page 89

GOODSTEIN

you tell me what this document is, Mr. Goodstein?
    A.  It is partial minutes from the executive committee.
    Q.  Have you seen minutes like this before?
    A.  Yes.
    Q.  Are there basically minutes like this for every meeting that the committee has?
    MR. LERNER: Objection.
    A.  Yes.
    Q.  Would there ever be, to your knowledge, an executive committee meeting that did not have an agenda like this?
    MR. LERNER: Objection.
    A.  No.
    Q.  As far as you know, there is always an agenda for the meeting?
    A.  Always an agenda.
    Q.  Now, if you look at the second page, it says Tempo update. Do you see that?
    A.  Yes.
    Q.  What was your role with Tempo at

Page 90

```
 1              GOODSTEIN
 2   this point in time, which is, this is dated,
 3   it looks like 12/18/06.
 4       A.   When I first came to the executive
 5   committee and I first joined News America
 6   Inc., I -- my role was, again, I could pick
 7   and choose the areas that I wanted to get
 8   involved with, with respect to the New York
 9   Post.  At one of the meetings, I recall that
10   there was a report given that Tempo was
11   losing money and it was going to close.
12         I have had a lot of experience with
13   the Hispanic community.  I started Viva
14   Magazine when I was at the Daily News, in
15   1992.  It was the first Hispanic-type
16   newspaper magazine/supplement of its kind,
17   very successful.  I wanted to see if I could
18   help resuscitate Tempo.
19         I also viewed it as a personal
20   challenge.  I was eager to prove myself.  I
21   was eager to show the committee and my boss
22   that he had made the right decision in hiring
23   me.
24         So I basically volunteered on a
25   temporary basis to get involved with Tempo
```

Page 91

```
 1              GOODSTEIN
 2   and to help the ad sales.  The big problem
 3   with Tempo was there weren't enough
 4   advertising pages, plain and simple.  So the
 5   revenues were really suffering.
 6       Q.   When you say there weren't enough
 7   advertising, what period of time are you
 8   talking about?
 9       A.   Rephrase your question, I want to
10   make sure I understand it.
11       Q.   I just wanted to clarify.  You said
12   the problem with Tempo is there wasn't enough
13   advertising.  Are you referring to the entire
14   period you were involved or was there --
15       A.   No, no.  Prior to my involvement.
16       Q.   That's what I wanted to clarify.
17       A.   Prior to my involvement.  I don't
18   know, I can't recall how far back Tempo was
19   in the red.  All I could tell you is that
20   when I arrived, Tempo was in the red.
21       Q.   And so this meeting on 12/18/06,
22   this was due to your involvement in trying to
23   save Tempo?
24         MR. LERNER:  Objection.
25       A.   I don't understand the question.
```

Page 92

```
 1              GOODSTEIN
 2       Q.   Let me simplify.  Why were you
 3   giving a Tempo update to the executive
 4   committee on 12/18/06?
 5       A.   Because, again, on a temporary
 6   basis, I was helping out the Tempo team.
 7   Were updates to the executive committee
 8   something you did frequently on Tempo?
 9         MR. LERNER:  Objection.
10       A.   I don't recall.
11       Q.   Can you tell me what steps you took
12   to improve the advertising for Tempo?
13       A.   I really worked very hard.
14       Q.   And just briefly.
15       A.   I, as I mentioned before, I had a
16   lot of advertising, a ton of advertising
17   contacts that had -- that I had worked with
18   at the Daily News and at Viva Magazine.
19         So I immediately got on the phone,
20   made sales calls and saw these people to get
21   them into Tempo.  That included Macy's,
22   Verizon, Long Island University.  So I worked
23   my end, my contacts very, very hard.
24         The second part was I had wanted to
25   focus on -- I had great success at the Daily
```

Page 93

```
 1              GOODSTEIN
 2   News -- issues that focused on events.  So I
 3   wanted to make sure is that we had some kind
 4   of an event or editorial agenda each and
 5   every month to sell around.  So I tried to
 6   assist the team in that area.
 7         And the third area was that, I
 8   don't know if I am a good salesperson or not,
 9   but I persuaded -- I don't remember who, but
10   to accept Spanish-speaking ads, Spanish
11   language ads which helped a lot.
12       Q.   You talked about assisting a team.
13   Who was on your team?
14         MR. LERNER:  Objection.
15       A.   Well, it was the New York Post
16   team.
17       Q.   What team are you referring to?
18       A.   Tempo.
19       Q.   New York Post as a whole?
20       A.   The people who worked at Tempo.
21       Q.   So who specifically are you
22   referring to?  What individuals that worked
23   at Tempo?
24       A.   Sami Haiman Marrero, S-A-M-I,
25   H-E-Y-M-A-N, M-A-R-R-E-R-O.
```

Page 98

```
 1          GOODSTEIN
 2   committee on that date?
 3      A.  I don't recall making this
 4   presentation, but I could have.
 5      Q.  Well, what does that mean? I want
 6   to understand the document. This document
 7   says, "Tempo update, Les Goodstein." What
 8   does that mean?
 9      A.  An update report on how Tempo is
10   doing.
11      Q.  So that indicates that you made a
12   presentation to the executive committee about
13   how Tempo was doing, right?
14          MR. LERNER: Objection.
15      A.  It doesn't say that.
16      Q.  Well, that's what I am -- what does
17   it mean? If it has something on an agenda
18   item and a name, what does that mean?
19      A.  Update is a very broad -- I don't
20   remember making the presentation. I don't
21   remember what the update consisted of.
22      Q.  OK. But you would have done some
23   sort of an update, is that fair to say?
24      A.  Yes.
25      Q.  But you don't recall if the
```

Page 99

```
 1          GOODSTEIN
 2   specific papers that are attached were the
 3   update that you did?
 4      A.  I don't recall.
 5          MR. CLARK: It is a couple minutes
 6   to 1. Why don't we go ahead and break.
 7   Should we say, let's say, 2 o'clock,
 8   let's try and get back promptly at 2 if
 9   we can and hopefully we can wrap this up
10   in a few hours.
11          MR. LERNER: OK.
12          THE VIDEOGRAPHER: Going off the
13   record, the time is 12:59 p.m.
14          (Recess)
15          (Exhibit 8, document Bates stamped
16   NYP 445 through 446 marked for
17   identification, as of this date.)
18          THE VIDEOGRAPHER: We are back on
19   the record, the time is 2:05 p.m. This
20   is the beginning of tape labeled number
21   3.
22      Q.  Mr. Goodstein, I am going to hand
23   you what we have just marked as Goodstein 8
24   and ask you to take a look at that just to
25   familiarize yourself with it, and for the
```

Page 100

```
 1          GOODSTEIN
 2   record, this is Bates stamped NYP 445 and
 3   446.
 4      A.  OK.
 5      Q.  Mr. Goodstein, this is another
 6   executive committee meeting agenda and
 7   minutes, correct?
 8      A.  Correct.
 9      Q.  And this is dated 6/12/06?
10      A.  Yes.
11      Q.  If you could look at the second
12   page, there is an entry for Tempo. First
13   question I have, when there is a minute like
14   this, are these events in chronological
15   order?
16          MR. LERNER: Objection.
17      A.  I don't know.
18      Q.  You go to these executive committee
19   meetings once every week, correct,
20   approximately?
21      A.  Yes.
22      Q.  For about six years?
23      A.  Six and a half.
24      Q.  At the next meeting or at a
25   meeting, do you review the minutes from the
```

Page 101

```
 1          GOODSTEIN
 2   prior meeting?
 3      A.  Occasionally. Not always.
 4      Q.  Would it normally be the case when
 5   you have minutes that they be written down in
 6   chronological order?
 7          MR. LERNER: Objection.
 8      A.  I don't know.
 9      Q.  So here, for instance, when it
10   says, "Paul explored the idea of
11   transitioning Tempo into five or six sections
12   per year geared around key Hispanic events,"
13   and then it says, "Les recommended." Would
14   it normally be the case that Paul explored
15   that and then after that, Les made a
16   recommendation?
17          MR. LERNER: Objection.
18      A.  Again, I don't know.
19      Q.  So it could be the case that these
20   are not in chronological order?
21          MR. LERNER: Objection.
22      A.  I don't know.
23      Q.  Do you remember -- in the six and a
24   half years you have been reviewing minutes,
25   do you remember any of the minutes that were
```

Page 110

1 GOODSTEIN
2 on, so the final decision was made -- "The
3 final decision was to give Tempo six more
4 months in its current form, a monthly
5 section, eliminating two FTE positions," is
6 that full-time employee?
7    A. Yes.
8    Q. "Tony Martinez and the sales
9 assistant position assigned to Tempo and
10 keeping Sandra Guzman and Sami" -- how do you
11 say Haiman on staff?
12    A. Yes.
13    Q. But you're saying you don't know if
14 that decision to keep Sandra Guzman on staff
15 was made at this executive committee meeting
16 on June 12, 2006?
17    A. Yeah, I don't know.
18    Q. Do you have any idea when the
19 decision was made to keep Sandra Guzman on
20 staff?
21    A. I don't know.
22    Q. Do you recall it being discussed at
23 this meeting?
24    A. I don't recall.
25    Q. Then the final sentence, it says,

Page 111

1 GOODSTEIN
2 "The Wednesday Tempo page will be
3 eliminated." Do you see that?
4    A. Yes.
5    Q. Would that be, again, a minute
6 about a decision that was made at the
7 executive committee meeting on that date?
8      MR. LERNER: Objection.
9    A. I don't know.
10    Q. Can you think of any specific
11 instances in which decisions which were made
12 other than at committee meeting were placed
13 in the minutes of the committee meeting?
14      MR. LERNER: Objection.
15    Q. Do you understand the question?
16    A. I don't.
17    Q. Can you explain why a decision
18 which was not made in a committee meeting
19 would be written in the minutes of a
20 committee meeting saying the final decision
21 was to give Tempo six more months in its
22 current form?
23      MR. LERNER: Objection.
24    A. I don't understand your question.
25    Q. Well, you have been going to these

Page 112

1 GOODSTEIN
2 meetings for six years, right? These
3 committee meetings?
4    A. Yes.
5    Q. And you have been reviewing
6 minutes, not every meeting, but for how
7 many --
8    A. Occasionally.
9    Q. Occasionally? And don't the
10 minutes normally reflect what happened during
11 the meeting?
12      MR. LERNER: Objection.
13    A. I don't know.
14    Q. Isn't that the purpose of the
15 minutes?
16      MR. LERNER: Objection.
17    Q. You -- you have to answer. Could
18 you answer out loud, please.
19    A. Yes.
20    Q. So that is the purpose, normally
21 the purpose?
22    A. Yes.
23    Q. OK.?
24      MR. LERNER: Objection. Move to
25 strike.

Page 113

1 GOODSTEIN
2    Q. Can we mark this as 9.
3      (Exhibit 9, document Bates stamped
4 NYP 485 through 486 marked for
5 identification, as of this date.)
6    Q. This is Bates stamped NYP 485 and
7 486. Just a couple quick things,
8 Mr. Goodstein. Do you see that appears to be
9 another executive committee agenda with
10 minutes attached?
11    A. Yes.
12    Q. Is that fair to say that's what
13 this is?
14    A. Yes.
15    Q. And this is dated 8/6/07?
16    A. Yes.
17    Q. First thing on the first page, it
18 has agenda items, Page Six Magazine, Margie
19 Conklin. Do you see that?
20    A. Yes.
21    Q. Who is Margie Conklin?
22    A. She was the editor of Page Six
23 Magazine.
24    Q. Do you know when she ceased to be
25 editor of Page Six Magazine?