IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2  standards" on what's marked as Bates stamped
3  IL-6; is that right?
4      A    That's correct.
5      Q    Do you know what your supervisors
6  gave you a rating for that period?
7      A    I don't have that in front of me,
8  so I don't know it right now.
9      Q    Your supervisors gave you a rating
10  of a 2, which is "needs improvement" for
11  that same period.
12      Do you remember that?
13      A    Could you please show it to me.
14      MS. LOVINGER:  I'll show you
15      what's been marked as Livingston
16      Exhibit 10, and this is your APA for
17      fiscal year 2009.  Bates stamp
18      NYPFL-000332 through 000334.
19      (Livingston Exhibit 10, APA
20      for fiscal year 2009, Bates Numbers
21      NYPFL-000332 through NYPFL-000334,
22      was marked for Identification.)
23  BY MS. LOVINGER:
24      Q    Does this refresh your recollection
25  as to what your rating was for fiscal year

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2  2009?
3      A    You mean what the editors rated me?
4      Q    Yes, how your supervisors rated
5  you.
6      A    Yes.
7      Q    Prior to receiving this APA, had
8  any of your supervisors discussed with you
9  your performance?
10      MR. THOMPSON:  Objection.
11      A    I don't know what period of time
12  you are referring to.
13      Q    The period of time referenced in
14  this APA, fiscal year 2009.
15      A    So this would be after I was
16  demoted?
17      Q    If you are referring to your
18  removal of the Queens Courthouse position,
19  yes, it was after you were removed from the
20  Queens Courthouse.
21      A    After I had returned to general
22  assignment reporting. no, no one had spoken
23  to me and said that there was any problem.
24      Q    Until you received this APA?
25      A    That's correct.

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2      Q    And what date did you receive the
3  APA?
4      A    I don't recall the exact date I
5  received it.
6      Q    I'll direct your attention to what
7  you have before you, Livingston Exhibit 10.
8  The page Bates stamped NYPFL-000334.
9      Do you see the date August 13,
10  2009?
11      A    I see the date.
12      Q    Was that the date that you received
13  your performance evaluation?
14      A    Offhand, I don't know if that's the
15  date.
16      Q    But it's your testimony that after
17  you returned to general assignment reporting
18  from the Queens Courthouse, no one spoke to
19  you and said there was any problem with your
20  job performance; is that correct?
21      A    Yeah, I don't recall anyone
22  specifically saying that there was any
23  problem with what I was doing as a general
24  assignment reporter.
25      MS. LOVINGER:  I'm going to

IKIMULISA LIVINGSTON

1    IKIMULISA LIVINGSTON
2  show you what's marked as Livingston
3  Exhibit 11, and this is a memo Bates
4  stamped IL-300.  It's dated August 6,
5  2009.  It's a memo to you from
6  Michelle Gotthelf copying Jesse
7  Angelo and Amy Scialdone.
8      (Livingston Exhibit 11,
9  Memorandum dated August 6, 2009,
10  Bates Number IL-300, was marked for
11  Identification.)
12  BY MS. LOVINGER:
13      Q    Do you recognize this document now?
14      A    Yes, I do.
15      Q    Is that your signature on there?
16      A    Yes, it is.
17      Q    In this memo, Michelle Gotthelf
18  states "Please consider this a letter of
19  warning concerning your underperformance as
20  a reporter.  As discussed. we have reviewed
21  with you what's required from your job, but
22  your work needs improvement to meet the
23  standards necessary to succeed in the
24  editorial department.  Your editors have
25  discussed with you the following issues that

1           IKIMULISA LIVINGSTON
2   need to be focused on and improved upon:
3   Does not pitch stories, investigative ideas
4   or weekend pieces suitable for the paper,
5   which is a job requirement.
6        "It's important that we see
7   immediate and consistently sustained
8   improvement in your performance.  We want to
9   see you succeed and we believe you have the
10  ability to do so but we cannot do it for
11  you.  Failure to achieve and maintain the
12  required company standards will result in
13  further disciplinary action.  We certainly
14  hope it doesn't come to that."
15       Do you remember receiving this
16  warning?
17     A   Yes, I remember receiving it.
18     Q   Did you understand that you needed
19  to improve your job performance?
20     A   At what time?
21     Q   After you received this warning.
22     A   After I received this?  Yeah.  I
23  have to say that this was like -- I was
24  dumbstruck by this.
25       And I pitched story ideas for them

1           IKIMULISA LIVINGSTON
2   that they rejected.
3        This evaluation I believe is
4   discriminatory and I also believe the letter
5   of warning is also discriminatory and
6   retaliatory.
7     Q   Why were you dumbstruck by this
8   warning?
9     A   Because during the time that I was
10  back at GA, after I was promised a desk and
11  didn't receive one and promised a telephone
12  and didn't receive one and told I would be
13  in the office sometimes, and my white
14  colleagues did get these resources and
15  access to one another to bounce story ideas
16  off and access to the archives and librarian
17  and the wire services that would help
18  generate story ideas by having those
19  resources available.
20       I didn't have any of these
21  resources.  I didn't even have a beat
22  anymore.  All of my sources had essentially
23  disappeared because I was no longer at the
24  Queens Courthouse.
25       So for them to throw this at me and

1           IKIMULISA LIVINGSTON
2   essentially tell me that any minute I could
3   be fired because these stories -- that I
4   didn't pitch enough story ideas that they
5   would actually run, I was dumbstruck.  I
6   cannot believe that I was seeing this.
7        And it frightened me.
8     Q   You said you believed the letter of
9   warning is discriminatory and retaliatory.
10       How is it -- what did you believe
11  this warning is in retaliation for?
12     A   For complaining about the racist
13  cartoon that the New York Post published
14  calling black people monkeys.
15     Q   Are you referring to the complaint
16  you described this morning with Ms. Gotthelf
17  where she agreed with you?
18     A   I'm referring to my complaint to
19  Michelle that the cartoon was racist and
20  insensitive and offensive to black people
21  and to myself included.
22     Q   And just based on your complaint to
23  Michelle Gotthelf, that's the action you
24  took that you believe you were being
25  retaliated for having taken?

1           IKIMULISA LIVINGSTON
2     A   Yes.  And as a matter of fact,
3   since I was promised this desk and a couple
4   months later I complained about this
5   cartoon, I definitely didn't get a desk.  I
6   still haven't gotten a desk or telephone in
7   the office or the resources that my white
8   colleagues have.
9     Q   Ms. Livingston, you were removed
10  from the Queens Courthouse in late
11  November 2008, correct?
12       MR. THOMPSON: Objection.
13     A   I was demoted from my position at
14  the Queens County Courthouse in December of
15  2008 and replaced by a white man who was
16  demoted from his position, Billy Gorta, and
17  placed in my beat.
18     Q   And you returned to a general
19  assignment reporter in December 2008; is
20  that right?
21     A   That's correct.
22     Q   And did you have a desk when you
23  returned to be general assignment reporter
24  in December 2008?
25     A   No.

48  (Pages 186 to 189)

IKIMULISA LIVINGSTON

1
2    Q    Did you have a desk in January
3  2009?
4    A    No, I did not.
5    Q    Did you have a desk in the early
6  part of February 2009?
7    A    No, I didn't.
8    Q    But the reason why you didn't have
9  a desk was because you complained to
10  Michelle Gotthelf, who agreed with you, in
11  mid February 2009; that's your testimony?
12    A    I'm saying, my testimony, I'm
13  telling you that I was told I would have a
14  desk in December of 2008.
15        When Michelle demoted me, she said
16  I would get a desk and I would get a phone
17  thereby getting all the resources that my
18  white counterparts would have.  I would be
19  in the office sometimes, I would not always
20  be out in the street or in the field.
21        So that didn't happen in December
22  and didn't happen in January.
23        I still thought at some point there
24  would be a desk forthcoming, but after I
25  complained about the cartoon being racist,

IKIMULISA LIVINGSTON

1
2  none of that was forthcoming.  I continue to
3  be denied that.  And I also received this
4  letter of warning, this written warning as
5  well as the evaluation that I believe is
6  also discriminatory against me.
7    Q    Did Michelle Gotthelf tell you when
8  you would get a desk in the newsroom?
9    A    No, she didn't.
10    Q    Tell me who are your white
11  counterparts who have desks.
12        I want to hear the names of
13  everyone who is a general assignment
14  reporter who has a desk at 1211.
15    A    I know that at times Lorena has
16  been at the office working at a desk and
17  having access to a telephone.  Amber
18  Sutherland had a desk.  Rich Calder had a
19  desk.  Ed Robinson had a desk.
20    Q    When you say "had a desk," what
21  time period are you talking about, because
22  you once had a desk; isn't that right?
23    A    Well, yes.  Once I did have a desk
24  and that was taken away and given to a white
25  woman.

IKIMULISA LIVINGSTON

1
2        But Ed Robinson, I referred to him
3  as having had a desk because he no longer
4  works for the Post.
5    Q    So when you say "they're working at
6  a desk," does that mean that they have a
7  desk exclusively assigned to them?  Is that
8  your understanding?
9    A    I don't know if it was exclusively
10  assigned to them.
11        I just know that there were periods
12  when I know that they were in the office
13  working at a desk and I was denied a desk.
14  And in fact, I was essentially banned from
15  the newsroom because I was not allowed in
16  the newsroom.  And the one period of time
17  when I did come into the newsroom,
18  Greenfield saw me and asked me a hostile
19  way, "What are you doing here?"
20    Q    Okay.  Let's talk about the
21  banned --
22        But one question: isn't it the fact
23  that many white general assignment reporters
24  do not have desks or phones?
25    A    I don't know.  I know that some do

IKIMULISA LIVINGSTON

1
2  have desks and phones.
3        And as a senior reporter who's been
4  at the Post for nearly 15 years, who was
5  promised a desk, who was told at the time of
6  my demotion in December 2008 by Michelle
7  Gotthelf, the Metropolitan editor of the New
8  York Post, that I would have a desk and I
9  would have telephone and I would sometimes
10  be in the office writing stories and not
11  always in the street, in the field, I took
12  that to mean that I would receive a desk and
13  that I would receive a telephone and that
14  sometimes I would be in the office.
15    Q    Did Ms. Gotthelf ever tell you that
16  you would have a desk that no one else could
17  sit in but you?
18    A    She told me I would have a desk and
19  she told me I would have a telephone.
20    Q    Tell me when you came to the office
21  and were denied a seat.
22        Let's review the dates that
23  happened.
24        MR. THOMPSON: Objection.
25    A    I can't give you an exact date of

IKIMULISA LIVINGSTON

1
2  when I went into the office, and I can't
3  say -- well, I can say that I do not have a
4  desk in the office and I do not have a
5  telephone.
6      Q    You do not have a desk that's
7  exclusively assigned to you, but has there
8  ever been a time when you showed up at the
9  newsroom and you were denied a place to sit?
10     A    I'm essentially not allowed in the
11 newsroom.  And the very infrequent times
12 when I have been permitted to go into the
13 newsroom after having called in advance to
14 say that I'm done with my notes, can I come
15 into the newsroom and write the story, I was
16 provided with a space, a desk and a computer
17 to write the story that I was working on.
18     Q    So you are allowed in the newsroom;
19 isn't that right?
20     A    I had to call and basically be
21 permitted into the newsroom.
22     Q    When you say you are essentially
23 not allowed in the newsroom, has any editor
24 ever told you that you were not allowed to
25 come into the newsroom?

IKIMULISA LIVINGSTON

1
2      A    Michelle did not tell me I was not
3  allowed to come into the newsroom; Dan
4  didn't tell me I wasn't allowed to come into
5  the newsroom.  However, when I show up in
6  the newsroom and Dan looks at me and says in
7  a hostile way, "What are you doing here,"
8  that's both humiliating and demoralizing and
9  degrading.  And as someone who worked at the
10 Post longer than Michelle and longer than
11 Dan Greenfield, it's incredulous.
12     Q    So the answer to my pending
13 question is no?
14         The question is:  When you say you
15 were essentially not allowed in the
16 newsroom, has any editor ever told you that
17 you were not allowed to come into the
18 newsroom?
19         MR. THOMPSON:  Objection.  What
20     question are you asking?  You just
21     asked her two questions.  Which one
22     do you want her to answer?
23         MS. LOVINGER:  There's one
24     question.
25         MR. THOMPSON:  No.  There's two

IKIMULISA LIVINGSTON

1
2  questions you just asked her.
3      Q    The question is:  Has any editor,
4  Ms. Livingston, ever told you that you were
5  not allowed to come into the newsroom?
6      A    I stated that Michelle and Dan,
7  neither of them actually came out and told
8  me, "No, do not come into the newsroom."
9      Q    Has any other editor ever told you
10 that you were not allowed to come into the
11 newsroom?
12     A    I have not been directly told by
13 an editor not to come into the newsroom.
14     Q    Are you aware of any New York Post
15 policy with respect to who gets a desk and a
16 telephone?
17     A    No.
18     Q    Michelle Gotthelf told you that she
19 tried to get you a desk but she had to look
20 into it; isn't that right?
21     A    No.
22     Q    Do you think you are entitled to a
23 desk because you've been working at the New
24 York Post for almost 15 years?
25     A    It's not about entitlement.

IKIMULISA LIVINGSTON

1
2  Michelle told me that I would have
3  a desk.
4      Q    But you referenced a few minutes
5  ago that you've been working at the Post for
6  almost 15 years, so I'm asking if you think
7  you are entitled to have a desk exclusively
8  for your use and no one else's use because
9  you've been working at the Post for almost
10 15 years.
11     A    I did not say that.
12     Q    So is the answer no?
13     A    I said that Michelle told me I
14 would have a desk and a phone and that I
15 would sometimes be in the newsroom, not
16 always out in the street or in the field
17 reporting.  I would have opportunities to
18 write.
19         She told me this.  I had no other
20 reason but -- no other -- why wouldn't I
21 believe her when she told me that.
22     Q    Is it your testimony that you don't
23 have other opportunities to write as a
24 general assignment reporter?
25     A    If the Post editors didn't on a

IKIMULISA LIVINGSTON

1 very frequent -- if the Post editors didn't
2 frequently turn down or simply ignore a
3 story idea that I pitched, then I suppose
4 there would be an opportunity to write news
5 stories from my home.
6    Q    Explain to me how having a desk
7 that's exclusively for your use would give
8 you more opportunities to write as a general
9 assignment reporter.
10    A    Having a desk -- and I'm not saying
11 exclusively for me, but having a desk,
12 having the desk that I was promised, would
13 enable me to be in the office sometimes and
14 to have access to the library, to the
15 archives, the library personnel, to my
16 colleagues, to the wire services, to the
17 atmosphere of generating news and writing
18 news stories.
19        Those things would help in my
20 ability to pitch stories.  I would be able
21 to pitch more story ideas.
22    Q    Did you ever try to come in on the
23 weekend?
24    A    Would I try to come in on the

IKIMULISA LIVINGSTON

1 weekend on my own time.
2    Q    On your own time.
3    A    And what would I be doing on the
4 weekends?
5    Q    I'm asking you if you ever -- do
6 you ever come in to the newsroom on the
7 weekends?
8        MR. THOMPSON:  Objection.
9    A    Would this be my donating time to
10 the New York Post?
11    Q    I'm asking the questions.  It's yes
12 or no.
13        Do you ever come into the newsroom
14 on the weekends?
15    A    I have occasionally come through
16 the newsroom on the weekends.
17    Q    Do you ever come into the newsroom
18 in the evening hours?
19    A    I have on occasion come into the
20 newsroom during evening hours.
21    Q    When you work outside of your
22 normal 40 hours, do you put in for overtime?
23    A    Yes, I do.
24    Q    So when you say that you would be

IKIMULISA LIVINGSTON

1 "donating time to the New York Post," what
2 do you mean by that?
3        You don't get paid if you were
4 working extra hours?
5    A    You didn't ask me if I would be
6 working on weekends and on the evenings.
7    Q    Isn't it true that the New York
8 Post librarian will get you any story you
9 ask for as an employee of the New York Post?
10    A    I've called the librarian and I've
11 had them send me information on my
12 cellphone.
13        Sometimes I can open a pdf file on
14 my cellphone, sometimes I cannot.
15    Q    You testified earlier you have a
16 laptop computer.
17        Why do you need to open up files
18 exclusively on your cellphone?
19    A    My laptop computer is my laptop
20 computer.  I don't necessarily take it with
21 me all the time.
22    Q    Isn't it true that you can come in
23 and use the New York Post library whenever
24 you want?

IKIMULISA LIVINGSTON

1    A    I can use the library on my own
2 time?  Is that what you are asking me, if I
3 can use the library on my own time?
4    Q    Can you come in and use the New
5 York Post library when you need resources
6 that the library can provide?
7    A    So this would be me coming in to
8 the office on my own time to access -- to
9 just sit at a desk and ask someone for a
10 logon for the computer and then access the
11 archives, all on unpaid time?
12    Q    I'm not sure what you mean by
13 "unpaid time."  Most people have a job, they
14 want to get it done and they get it done.
15        I don't know what you mean your own
16 time versus -- I'm not sure what other time
17 you are referring.
18        But the question is:  Isn't it true
19 that you are free to come use the library at
20 the New York Post whenever you want?
21    A    When I'm on the clock for the New
22 York Post, no, I'm not free to come in to
23 the newsroom and go to the library and not
24 access the library.

51 (Pages 198 to 201)

Page 202

IKIMULISA LIVINGSTON

1
2    Q    Well, if you are on not on
3    assignment, would you agree you are free to
4    use the library.
5    A    After going to the newsroom and
6    having Dan Greenfield ask me in a hostile
7    way, "What are you doing here," I don't
8    exactly feel welcome going into the newsroom
9    when I'm on downtime.
10    So, no, I don't feel comfortable.
11    I'm essentially not welcome in the newsroom.
12    And Greenfield made that more apparent when
13    he asked me, "What are you doing here?"
14    Q    Are you aware of the fact that
15    Mr. Greenfield has asked other white general
16    assignment reporters what you're doing in
17    the newsroom when they show up when they are
18    supposed to be on assignment?
19    A    I'm not aware of that.
20    Q    So you just assume that
21    Mr. Greenfield told you you're not supposed
22    to be in the newsroom because you are
23    African-American?
24    A    In light of everything that is
25    going on. In light of the fact that

Page 203

IKIMULISA LIVINGSTON

1
2    Greenfield told me in a hostile way, "What
3    are you doing here?" In light of the fact
4    that Greenfield similarly rejects my story
5    ideas. In light of the numerous e-mails
6    that Greenfield has sent me bullying me and
7    berating me for taking vacation days that he
8    approved, yeah, I think Dan Greenfield is
9    racist and has been discriminating against
10    me.
11    Q    Are you referring to the
12    consecutive weeks where you sought to take
13    Fridays off as vacation?
14    A    I'm referring to the Fridays that I
15    submitted for vacation days which Dan
16    Greenfield approved and then toward the end
17    of the summer sent me a nasty e-mail
18    berating me for supposedly taking days off
19    that weren't approved by my supervisor; yet
20    he is my supervisor and he approved all of
21    those days.
22    Q    I need to understand the factual
23    basis for your belief that Dan Greenfield
24    did that because you are African-American.
25    A    Dan Greenfield has sent me nasty

Page 204

IKIMULISA LIVINGSTON

1
2    e-mails, mean-spirited e-mails. He speaks
3    to me in a derogatory, demeaning, dismissive
4    way, as if I don't matter, as if I am a dog.
5    And when I did come into the office
6    on one occasion and he saw me there and he
7    asked me in a hostile way, "What are you
8    doing here," in light of the fact that he
9    also turns down most, if not all, of my
10    story ideas and on frequent occasions refers
11    to stories about black people and about
12    Latino people as being "low rent," I have
13    come to the conclusion that is
14    discriminating against me.
15    And in fact, in light of the fact
16    that he's also screamed at and yelled at and
17    made derogatory remarks to Leonard Greene
18    and to Austin Fenner, that leads me also to
19    conclude that he is racist and has
20    discriminated against myself and created a
21    hostile work environment for myself as well
22    as Austin and Leonard.
23    Q    How do you know that Dan Greenfield
24    doesn't speak to white reporters in a
25    similar manner?

Page 205

IKIMULISA LIVINGSTON

1
2    A    I have spoken to other white
3    reporters and none of them that I've spoken
4    to have mentioned that they have been
5    screamed at and demeaned and been dismissed
6    in the manner in which I have and the manner
7    in which Leonard has.
8    Not to mention the fact that Austin
9    was fired, so ...
10    MR. THOMPSON:  Are you
11    finished, Ms. Livingston?
12    THE WITNESS:  Yeah.  If we can
13    take a break for a moment?
14    MS. LOVINGER:  Of course.
15    THE VIDEOGRAPHER:  The time is
16    now 3:37 p.m.  We're now off the
17    record.
18    (A brief recess was
19    taken.)
20    THE VIDEOGRAPHER:  This is the
21    start of Tape Number 4.  The time is
22    now 3:59 p.m.  We're now back on the
23    record.
24    BY MS. LOVINGER:
25    Q    Ms. Livingston, you testified

52 (Pages 202 to 205)

Page 206

IKIMULISA LIVINGSTON

1
2  before the break that when you came into the
3  newsroom on one occasion Dan Greenfield
4  asked you what you were doing there.
5          Can you tell me when that took
6  place?
7      A   I don't know the date that that
8  took place.
9      Q   Do you know what year?
10     A   I don't recall which year exactly.
11 It wasn't this last year.
12     Q   Was it in 2010?
13     A   I believe it was before I filed the
14 lawsuit.
15     Q   Tell me what Dan Greenfield said to
16 you.
17         MR. THOMPSON:  Objection.
18     A   I think I said a number of times
19 what he said to me.
20     Q   Well, you testified earlier that
21 Ms. Gotthelf confronted you and asked you
22 what you were doing in the newsroom.
23         Do you remember what time of day
24 this conversation took place?
25     A   It would have been in the

Page 207

IKIMULISA LIVINGSTON

1
2  afternoon, I believe.
3      Q   Do you remember if you had just
4  finished an assignment?
5      A   I had had an assignment somewhere
6  in the area.
7      Q   Do you know if it was the early
8  afternoon?
9      A   I don't know if it was early
10 afternoon or late afternoon.
11     Q   Could it have been late in the day?
12     A   I don't know.
13     Q   Do you recall why you were coming
14 in to the newsroom on that particular day?
15     A   I think I was just stopping in to
16 pick up my mail, since if I do have any mail
17 no one actually sends it to me, and pick up
18 notepads and supplies.  And those things
19 aren't sent to me either.
20     Q   Had you finished your assignment
21 when you came into the newsroom?
22     A   I think I stated that I had had an
23 assignment in the area, so yes, if I was in
24 the newsroom, it would have been after I had
25 finished whatever reporting I needed to do.

Page 208

IKIMULISA LIVINGSTON

1
2      Q   I know you had testified you had
3  an assignment somewhere in the area, but it
4  wasn't clear if it was before -- if you had
5  come before it was complete.
6      A   It would have been afterwards, yes.
7      Q   Did you tell Dan Greenfield that
8  you had already finished your assignment?
9      A   I told him I was just picking up
10 supplies.
11     Q   And then what did he say?
12     A   I don't remember -- I don't
13 remember if he said anything at all.
14     Q   So basically he asked what you were
15 doing in the newsroom and you said you were
16 picking up supplies.  That was the extent of
17 the conversation?
18     A   From what I remember, yes.
19     Q   Was that the only time Dan
20 Greenfield confronted you when you were in
21 the newsroom, when you came into the
22 newsroom?
23     A   That was the only time I recall
24 where he -- yes, where he asked me in a
25 hostile way, "What are you doing here?"

Page 209

IKIMULISA LIVINGSTON

1
2  Yeah, that was the only time.
3          But, mind you, I haven't been in
4  the newsroom that often.
5      Q   When you say you haven't been in
6  the newsroom that often, do you mean since
7  you returned to being a general assignment
8  reporter?
9      A   That means since I had been demoted
10 from my Queens Courthouse beat, yes.
11     Q   And is that the same time when you
12 became a general assignment reporter?
13     A   That was when I was reassigned to
14 being a GA.
15     Q   And that was back in December 2008?
16         MR. THOMPSON:  Objection.
17     A   Yes.
18     Q   So it's your testimony that you
19 haven't come into the newsroom very often
20 since December 2008; is that right?
21     A   That's correct.  In my -- working.
22 yes.
23     Q   What was your job title in the
24 calendar year 2009?
25     A   2009?  General assignment reporter.

53 (Pages 206 to 209)

IKIMULISA LIVINGSTON

1
2    Q    And how about in 2010?
3    A    GA.
4    Q    Is that how -- by the way, is that
5  the lingo, is it called GA?
6    A    "GA" is short for general
7  assignment.
8    Q    Is that the same thing as a runner
9  reporter?
10   A    I don't know where this term
11 "runner reporter" came from, but I'm a
12 general assignment reporter.  I go out and I
13 report on things going on in the street, in
14 the field, and if there is occasion for me
15 to write up my story or write my notes or to
16 send my notes, that's what I do.
17   Q    Well, I've heard the term used
18 "runner reporter."
19        Do you know what that is?
20   A    I know in the evaluations I
21 received, in at least one of them they have
22 referred to me as a "runner," but I know
23 that I wrote in my rebuttal to that that I'm
24 a reporter.  I'm a general assignment
25 reporter.  I'm not runner.

IKIMULISA LIVINGSTON

1
2    Q    Okay.  So you were a general
3  assignment reporter in 2009 and 2010.  Were
4  you also a GA in 2011?
5    A    That's correct.  I'm doing the same
6  thing.
7    Q    And when you say that since 2008
8  you haven't been in the newsroom that often,
9  how many times a month on average would you
10 say you come into the newsroom?
11   A    A month?
12   Q    Yes.  Like on average, any given
13 month.
14   A    While I'm working?  There certainly
15 have been months when I don't come into the
16 newsroom at all.
17   Q    And then what's the most times
18 you'd say you've come into the newsroom
19 since your return to the general assignment
20 reporter position?
21        MR. THOMPSON:  Objection.
22   A    I don't really know.  You are
23 saying on a monthly basis?  Are you saying
24 overall.
25   Q    Yeah.  In any given month, would

IKIMULISA LIVINGSTON

1
2  you say you come in five times a month, ten
3  times a month?
4    A    Certainly less than ten times a
5  month.
6    Q    On average, how many bylines do you
7  have in the paper on any given month?
8    A    I do not know.
9    Q    Do you ever calculate how many
10 bylines you have per quarter, per year?  Is
11 that something you look at?
12   A    At one point, I did do a search and
13 my byline has appeared thousands of times in
14 the New York Post.
15   Q    During your 15 years of employment?
16   A    That's correct.
17   Q    So would you agree that you have a
18 lot of stories that do get printed in the
19 New York Post if you had thousands of
20 bylines?
21   A    I had a lot of stories that did get
22 printed in the New York Post.
23        Certainly not as many in the last
24 few years.
25        Not counting 2008 when I had more

IKIMULISA LIVINGSTON

1
2  front-page stories than certainly I ever had
3  before and more stories than I think I've
4  written in previous years.
5        I did a lot of work in 2008.  I
6  worked on a lot of stories.
7    Q    And was that the year you covered
8  the Sean Bell trial?
9    A    That's correct.
10   Q    How many front pages did you get --
11 did you have in 2008?
12   A    I don't know exactly how many front
13 pages I had, but for the most part just
14 about every day of the trial, the story was
15 on the front page.  With the exception of
16 Eliot Spitzer, I think.
17   Q    Do you know how many front pages
18 you've had at the New York Post?
19   A    No, I don't.
20   Q    That's not something you count, I
21 guess?
22   A    I really -- I framed my first front
23 page story that I did.  It was on Darryl
24 Strawberry.  And I did some other stories
25 that I was very proud of that I framed that

Page 218

IKIMULISA LIVINGSTON

1
2    A    Yes.
3    Q    And when you became the Queens
4  court reporter, the New York Post continued
5  to allow you to have a car allowance; isn't
6  that right?
7    A    When I went to the Queens
8  Courthouse?
9    Q    Yes.
10    A    I did continue to be a general
11  assignment reporter on Sundays, yes.
12        And may I --
13    Q    Of course.
14    A    And as part of my job covering the
15  Queens County Courthouse, I also used my
16  vehicle to do reporting, to go to where I
17  needed to go in order to cover a story that
18  was part of the Queens County Courthouse
19  beat, such as lawsuit stories.
20    Q    Are you aware of the fact that you
21  were the only courthouse reporter to get a
22  car allowance?
23    A    I'm not aware of what other
24  courthouse reporters are given in terms of
25  their car allowance or not.

Page 219

IKIMULISA LIVINGSTON

1
2    Q    And your car allowance is
3  approximately $325 a month; is that right?
4    A    Minus taxes.
5    Q    Well, of course.
6    A    Yes.
7    Q    Are you aware of the fact that out
8  of 48 full-time reporters at the New York
9  Post, you were one of five who currently
10  receives a car allowance?
11    A    Are you asking if I was aware of
12  that?
13    Q    I'm asking if you are aware of
14  that.
15    A    I was not aware of that, if that is
16  the case.
17    Q    What is your present compensation?
18    A    The lower 70s.
19    Q    Has your salary ever been decreased
20  during the course of your employment at the
21  Post?
22    A    My salary hasn't decreased, but my
23  salary has not kept pace with cost of living
24  either, so I haven't kept pace with cost of
25  living.

Page 220

IKIMULISA LIVINGSTON

1
2    Q    You received salary increases,
3  raises during the course of your employment
4  at the Post?
5    A    Not always.
6    Q    Not in the last few years?
7    A    I received a raise this last year.
8  Before that I hadn't received a raise
9  until -- the last time was in '08 when I
10  received a 1 percent raise.
11    Q    Do you know if there are white
12  reporters who didn't receive raises in 2009
13  and 2010?
14    A    I don't know whether white
15  reporters received raises or not.
16    Q    Well, do you know any reporters who
17  received raises in 2010 or 2009?
18    A    Do I know any white reporters?
19    Q    Do you know of any reporters, any
20  reporters who received raises at the New
21  York Post in 2009 or 2010?
22    A    I don't know.
23    Q    Do you know if there was a salary
24  freeze at the New York Post?
25    A    I don't know if there was a salary

Page 221

IKIMULISA LIVINGSTON

1
2  freeze.
3    Q    In your lawsuit you claim that you
4  are paid less than white counterparts.
5        What is the basis for that claim?
6
7
8
9
10
11
12
13
14        REDACTED
15
16
17
18
19
20
21
22
23
24
25

56 (Pages 218 to 221)

Page 222

IKIMULISA LIVINGSTON

1
2  rewrite?
3      A    I didn't have a rewrite all the
4  time.  I had a rewrite -- there was someone
5  who worked with me, Clemente *Mercier, who
6  worked with me when I was covering the Sean
7  Bell trial.  And essentially, that was to
8  get copy in really, really fast so we can
9  get something up for the Web during the
10  afternoon break, during the lunch break, and
11  get something going as soon as possible
12  after the close of the day.
13      Q    Is it your testimony that your
14  stories weren't rewritten, other than the
15  Sean Bell's stories?
16          MR. THOMPSON:  Objection.
17      A    Some of my stories went into the
18  paper pretty much barely changed.  And then
19  some stories that I worked on through the
20  course of the day, I would talk to my
21  editor, my editor will tell me -- or I would
22  ask my editor, what length do you want that
23  story, and I would be told a length and I
24  would write to that length.
25          And later on in the day, that

Page 223

IKIMULISA LIVINGSTON

1
2  evening after the story was in, lot of time
3  the story was cut and in the process of
4  cutting it, you rearrange it or shorten it
5  or rewrite it.
6      Q    When you say some of your stories
7  "went into the paper pretty much barely
8  changed," isn't it true that the majority of
9  your stories were edited and rewritten?
10      A    I remember I did a story about a
11  woman who killed herself, who jumped from a
12  building on 57 Street, and that story went
13  into the paper pretty much unchanged.
14      Q    I'm not asking if there's ever been
15  a story that you wrote that actually made it
16  into the paper.
17          The question was:  Isn't it true
18  that the majority of your stories written
19  while you were a Queens Courthouse reporter
20  were edited and rewritten?
21      A    Well, actually every story is
22  edited, because that's what the editors do,
23  they edit your story.  But I wouldn't say
24  every story was rewritten.  Sometimes it was
25  cuts.

Page 224

IKIMULISA LIVINGSTON

1
2      Q    I didn't say "every story."
3          Isn't it true that the majority of
4  your stories written while you were a Queens
5  Courthouse reporter were rewritten?
6      A    I don't think that's the case.  I
7  think a lot of my stories were cut, despite
8  the fact I asked for a length, and I turned
9  in the length that they asked for and it was
10  cut and therefore rewritten or edited down.
11      Q    But it's your recollection that the
12  majority of your stories while you were a
13  Queens Courthouse reporter weren't
14  rewritten?
15      A    Through the course of the day, I
16  would talk to my editor, whomever the editor
17  was.  I would --
18          MR. THOMPSON:  Let the record
19  reflect --
20          THE WITNESS:  Yeah, I'm
21  distracted.
22          MR. THOMPSON:  Let the record
23  reflect that in-house counsel for
24  News Corp. and the New York Post,
25  Jordan Lippner, has again engaged in

Page 225

IKIMULISA LIVINGSTON

1
2  improper contact.  He just said out
3  loud on the record in response to
4  Ms. Livingston's answer that it's a
5  simple question, which has disrupted
6  the witness' testimony.
7          And Mr. Lippner, I ask you again to
8  stop that, and if you continue I will
9  call the judge.  I'm tired of warning you
10  about your improper conduct.
11          Let the record reflect that Jordan
12  Lippner is motioning to the phone for me
13  to call the judge regarding his improper
14  conduct.
15          MS. LOVINGER:  Let's back up
16  and look at the question that's on
17  the record.
18  BY MS. LOVINGER:
19      Q    Ms. Livingston, is it your
20  testimony that the majority of the stories
21  you wrote while you were a Queens Courthouse
22  reporter were not rewritten by one of your
23  editors?
24      A    As I stated, in the course of the
25  day I would ask what length they wanted for

57 (Pages 222 to 225)

Page 230

IKIMULISA LIVINGSTON

1  salary also didn't change; is that right?
2
3  A   That's correct.  My base salary did
4  not change.
5  Q
6
7                REDACTED
8
9  A   I just stated that
10 doing the same job, actually doing less, but
11
12               REDACTED
13
14 Q   And are you aware of the fact that
15 your Queens Courthouse reporter salary is
16 higher than the salary of other general
17 assignment reporters?
18     MR. THOMPSON: Objection.
19 A   I don't have a list of what other
20 reporters make.
21 Q   You were never an editor at the New
22 York Post; is that right?
23 A   No, no.  I know there are occasions
24 when -- never mind.  No, I was never an

Page 231

IKIMULISA LIVINGSTON

1  editor at the New York Post.
2
3  Q   Are you unhappy with the terms and
4  conditions of your employment at the New
5  York Post?
6  A   I'm unhappy about the hostile and
7  racial environment that I work in, yes.
8  Q   In the last five years, have you
9  sought employment elsewhere?
10 A   Last five years, yes.
11 Q   Where have you applied for other
12 jobs?
13 A   I've applied at universities.  I've
14 applied at The New York Times.  I've applied
15 for public relations jobs.  That sort of
16 thing.
17 Q   And what was the last one?  Public
18 relation job?
19 A   That's correct.
20 Q   Someone told me recently you don't
21 apply for jobs at The New York Times.
22     But how did you find out about
23 an opening at The New York Times?
24 A   I didn't find out about an opening.
25 I attended a job conferences and The New

Page 232

IKIMULISA LIVINGSTON

1  York Times had a booth there, a recruiter
2  there, and I submitted my resume.
3  Q   For what type of position did you
4  submit your resume?
5  A   For a reporter position.
6  Q   When was this job conference?
7  A   I don't remember which conference
8  it was.  It was an NABJ conference.
9  Q   NABJ?
10 A   NABJ stands for National
11 Association of Black Journalists.
12 Q   Where was this NABJ conferences
13 held?
14 A   NABJ has conferences in different
15 cities every year.
16 Q   Well, when was the last time you
17 went to the NABJ conference?
18 A   I attended the conference last
19 year.
20 Q   Where was it held last year?
21 A   Philadelphia.
22 Q   So that was in 2011.  What month
23 was that?
24     MR. THOMPSON: Objection.

Page 233

IKIMULISA LIVINGSTON

1  Which question are you asking?  What
2  year or what month?
3     MS. LOVINGER:  Well, she said
4  it was 2011.
5  Q   Do you know what month in 2011 you
6  attended the NABJ conference in
7  Philadelphia?
8  A   It's in the summer, so it's usually
9  July -- either in July or August.  I'm not
10 sure which one right now.  July or August, I
11 believe.
12 Q   Did you apply to any other news
13 organization other than The New York Times
14 at the NABJ conference in 2011?
15 A   I didn't say I applied for The New
16 York Times at the 2011 conference.
17 Q   You submitted a resume?
18 A   Not at that conference.
19 Q   Oh, not at that conference.
20     Well, okay.  We'll back up in a
21 minute but in 2011, did you submit a resume
22 or application for any positions either
23 during or after the NABJ conference?
24 A   During the conference I attended

59 (Pages 230 to 233)

IKIMULISA LIVINGSTON

1
2  A   What other reason?
3  Q   Yeah.
4  A   Wanted to talk to them.
5  Q   About story ideas or just social
6  reasons?
7  A   It depends.
8  Q   And you do communicate with other
9  New York Post employees during the day,
10  isn't that right?
11  A   Not on a daily basis unless it's a
12  story that we're working on together.  And a
13  lot of times I don't actually know who the
14  other reporters are working on a story, on
15  the same story I'm working on.
16  Q   But you are free to call any New
17  York Post employee you want during the day,
18  right?
19  MR. THOMPSON:  Objection.
20  A   Is this the way I'm supposed to be
21  speaking with my colleagues, is just by
22  randomly calling someone?  Because that
23  doesn't really seem like an organic way
24  to --
25  Q   Are you asking me a question?

IKIMULISA LIVINGSTON

1
2  A   I apologize if I'm asking you a
3  question.  I don't understand the context of
4  your question.
5  Q   Are you not free to call the
6  newsroom at any point during the day?
7  MR. THOMPSON:  Objection.
8  Q   Is that right?
9  A   I'm free to call (212)930-8500
10  whenever I'd like, yes.
11  Q   And someone will answer the phone,
12  right?
13  A   And someone will answer the phone,
14  yes.  Sometimes someone will answer the
15  phone.
16  Q   Now, doesn't the New York Post
17  reimburse a part of your cellphone bill?
18  A   Yes.  They reimburse me two-thirds
19  of the bill.  However, I actually paid for
20  the device.
21  Q   Well, you also use the device for
22  personal reasons; isn't that right?
23  A   The device is my phone, yes.
24  Q   So it's contemplated that you'll
25  use your phone for work-related reasons,

IKIMULISA LIVINGSTON

1
2  correct?
3  A   Yes, in order to give my notes to a
4  rewrite person, yeah.  I use my phone to
5  relay those notes.
6  Q   And your phone enables you to be
7  contacted when you are out running on
8  assignments, correct?
9  A   That's correct.  It allows the
10  editors to reach out to me.
11  Q   And it's your cellphone; therefore,
12  you can be reached immediately.  Is that
13  right?
14  A   Yeah, usually.
15  Q   And other general assignment
16  reporters also use personal cellphones;
17  isn't that right?
18  A   I think most people in this day and
19  age have cellphones, yeah, including other
20  general assignment reporters.
21  Q   But the question was:  Other
22  general assignment reporters also use their
23  personal cellphones to carry out their
24  reporting responsibilities; isn't that
25  right?

IKIMULISA LIVINGSTON

1
2  A   I believe other reporters use their
3  cellphones, yes.
4  Q   Ms. Livingston, you testified
5  earlier that you've heard Ms. Gotthelf and
6  Mr. Greenfield use the term "low rent"; is
7  that right?
8  A   That's correct.
9  Q   Now, Ms. Gotthelf and
10  Mr. Greenfield never said that stories about
11  African-Americans and Latinos are low rent;
12  isn't that right?
13  A   No, not at any time did they come
14  right out and say, "Stories about black
15  people and Latinos are low rent."  They just
16  refer to stories about African-Americans and
17  Latinos as low rent.
18  Q   So Ms. Livingston, you are saying
19  that Ms. Gotthelf and Mr. Greenfield
20  described some stories that happened to be
21  about African-Americans and/or Latinos as
22  low rent; is that right?
23  A   On a frequent basis, yes.
24  Q   Are these stories that Ms. Gotthelf
25  and Mr. Greenfield referred to as low rent

Page 254

IKIMULISA LIVINGSTON

1          IKIMULISA LIVINGSTON
2    sorry.
3          MR. THOMPSON:  Sure.
4    A    That was my perception after
5    Michelle and Dan would on numerous occasions
6    refuse stories because they were low rent
7    and because they were stories about black
8    people and Latino people.
9    Q    But Ms. Livingston, isn't it true
10   that you pitched stories about white people
11   that they called low rent?
12   A    I don't recall.  I don't remember
13   specific story ideas that they called low
14   rent that were about white people.
15         MR. THOMPSON:  When you have a
16   moment, doesn't have to be now, let's
17   take a break.  Whenever is a good
18   time to break.
19         In fact, can we take a break now?
20         MS. LOVINGER:  I have a couple
21   more.
22         MR. THOMPSON:  A couple more?
23         MS. LOVINGER:  It will be like
24   ten minutes.
25         MR. THOMPSON:  No, that's not a

Page 255

IKIMULISA LIVINGSTON

1          IKIMULISA LIVINGSTON
2    couple of minutes.
3          MS. LOVINGER:  Ten minutes.
4          MR. THOMPSON:  Ten minutes is
5    not a couple more.  You are talking
6    to your colleagues.  We're taking a
7    break.
8          MS. LOVINGER:  I'm not talking
9    to anyone.
10         MR. THOMPSON:  We're taking a
11   break.  Just like you ask for breaks,
12   I need a break right now.  I'm taking
13   a break.
14         MS. LOVINGER:  How many minutes
15   do you need?
16         MR. THOMPSON:  About five
17   minutes.
18         MS. LOVINGER:  I'm just asking.
19   That's a fair question.
20         MR. THOMPSON:  Five minutes.
21   Thank you.
22         THE VIDEOGRAPHER:  The time is
23   now 4:59 p.m.  We're going off the
24   record.
25         (A brief recess was

Page 256

IKIMULISA LIVINGSTON

1          IKIMULISA LIVINGSTON
2    taken.)
3          THE VIDEOGRAPHER:  This is the
4    start of Tape Number 5.  The time is
5    now 5:13 p.m.  We're now back on the
6    record.
7          MR. THOMPSON:  Thanks for the
8    short break which allowed me to go to
9    the restroom.
10         MS. LOVINGER:  We gave you all
11   14 minutes.
12   BY MS. LOVINGER:
13   Q    Ms. Livingston, going back to your
14   time as a Queens Court reporter, were you
15   ever criticized for missing parts of stories
16   that the Daily News got?
17   A    I'm sorry.  Missing parts of
18   stories?
19   Q    Yeah.  For missing facts in stories
20   that you reported that were reported in the
21   Daily News?
22   A    I don't recall that happening.
23   Q    Were you ever reprimanded by your
24   supervisor for not asking the right
25   questions?

Page 257

IKIMULISA LIVINGSTON

1          IKIMULISA LIVINGSTON
2          MR. THOMPSON:  Objection.
3    A    What does "reprimanded" mean?
4    Reprimanded in what way?
5    Q    Were you ever criticized by your
6    supervisor for not asking the right
7    questions during your time as a Queens
8    Courthouse reporter?
9    A    I recall Zach Haberman berating me
10   for just about everything, including things
11   he didn't even understand.
12   Q    Did Zach Haberman ever criticize
13   you for not asking the right questions as a
14   Queens Courthouse reporter?
15   A    Zach Haberman criticized me for
16   questions I did ask.  He criticized me for
17   questions I may not have asked.  He
18   criticized me for not knowing what forceps
19   were.  He criticized me when he didn't quite
20   understand why psychiatrists can't have sex
21   with their patients.
22         He criticized me on a number of
23   occasions about a number of things in a
24   hostile, screaming, cursing manner.
25   Q    Did Zach Haberman criticize you for

65 (Pages 254 to 257)

Page 258

IKIMULISA LIVINGSTON

1    not checking all of your facts in stories?
2    A    I think I need some specifics in
3    terms of what facts. I don't understand
4    what that means.
5    Q    Well, do you recall Zach Haberman
6    ever criticizing you for not taking
7    initiative as a reporter?
8    A    No.
9    Q    Do you recall Zach Haberman ever
10   criticizing you for not checking case files
11   as a Queens Court reporter?
12   A    Oh, yeah, I remember him
13   criticizing me for not checking a case file
14   that was sealed; therefore, it couldn't have
15   been checked because it was sealed.
16   Q    Did Zach Haberman yell at you while
17   you were having these conversations?
18   A    On numerous occasions he did yell
19   and scream and use curse words. Sometimes
20   he didn't yell and scream. Sometimes he
21   just used curse words.
22       Yeah, he was demeaning and
23   demoralizing in a number of ways.
24   Q    And you testified earlier that Zach

Page 259

IKIMULISA LIVINGSTON

1    Haberman was also demeaning and demoralizing
2    and cursed at your former colleague Denise
3    Buffa; is that right?
4        MR. THOMPSON: Objection.
5    Objection.
6    A    I do not believe that's what I
7    said.
8    Q    Oh, what did you say about Denise
9    Buffa?
10   A    I said that she had some problems
11   with him.
12   Q    And do you recall testifying this
13   morning that Zach Haberman also yelled at
14   Denise Buffa?
15   A    I believe I said I didn't know if
16   he yelled at her. I think that she told me
17   she had problems with him.
18   Q    Your testimony this morning was, "I
19   know he yelled at me and he yelled at
20   Denise. I know that he spoke to her in an
21   abusive way as well."
22       Okay. I'm going to play for you an
23   audio exhibit and this is going to be
24   Number 12.

Page 260

IKIMULISA LIVINGSTON

1        We're going to mark this as
2    Livingston Exhibit Number 12.
3        This is an audio recording that you
4    produced in this litigation.
5        (Livingston Exhibit 12, Audio
6    CD disk, was marked for
7    Identification.)
8        (Audio CD is played.)
9        MR. THOMPSON: Wait. There's
10   more to this tape. Why would you cut
11   it off when it's not finished.
12       MS. LOVINGER: There's another
13   30 seconds or so.
14       MR. THOMPSON: So why don't you
15   play the rest of it for completeness.
16       MS. LOVINGER: We can play the
17   rest of it.
18       MR. THOMPSON: Please do.
19       (Audio CD played to end.)
20   BY MS. LOVINGER:
21   Q    Ms. Livingston, this is one of the
22   recordings you made and produced in this
23   litigation, correct?
24   A    That is correct.

Page 261

IKIMULISA LIVINGSTON

1    Q    And who is this a recording of?
2    A    That's myself and Zach Haberman.
3    Q    Do you believe this call was
4    abusive and discriminatory?
5    A    Yes, overall. Yes, it was, in
6    addition to all the other calls when he
7    screamed and cursed and yelled at me. Yes.
8    Q    Wasn't it part of your job to
9    obtain transcripts to get the full story?
10   A    Sometimes I would get transcripts,
11   yes. Other times I did not get transcripts.
12       Other times Zack told me not to buy
13   the transcripts because he didn't want to
14   spend the money.
15   Q    Well, based on this call, it sounds
16   like you had missed a very important
17   transcript; is that correct?
18   A    I don't think I missed a
19   transcript, no.
20   Q    Well, were you at all concerned
21   that the Daily News had published quotes
22   from a 911 call that you had completely
23   missed?
24       MR. THOMPSON: Objection.

66 (Pages 258 to 261)

IKIMULISA LIVINGSTON

1   IKIMULISA LIVINGSTON
2   Haberman is evidence of discrimination.
3       A    Again, Zack was berating me and
4   using profane words and in the context of
5   other conversations which I had with him
6   where he berated me and screamed and used
7   foul language.
8       And in the context of the story
9   ideas that I presented to him that he turned
10  down and everything else, and the entire
11  racial tone of the New York Post, yes, that
12  conversation in addition to all the others
13  that I had with him where he was yelling and
14  screaming and berating me and saying the
15  F-word and, yeah, that's all part of the
16  discrimination that I had to endure that I
17  am still enduring while an employee of the
18  New York Post.
19      Q    Okay.
20      We're talking now just about the
21  recording we listened to, this conversation
22  between you and Zack.
23      I'd like to know how you know that
24  Zach Haberman was not berating you because
25  of what he perceived as your very poor job

IKIMULISA LIVINGSTON

1   IKIMULISA LIVINGSTON
2   performance and not because of the color of
3   your skin.
4       A    When Zack was a copy kid at the New
5   York Post and I was already a senior
6   reporter and I was writing numerous stories,
7   I wrote a beautiful story about a 911
8   firefighter widow and her family on
9   Christmas Day that Mike Heckman told me it
10  was so well written he couldn't touch it.
11  He had a problem editing it for space.  He
12  had a problem with that.
13      Yet somehow when Zack becomes my
14  editor and when Michelle becomes my editor
15  and Dan Greenfield is my assignment editor,
16  I apparently am a horrible reporter.  I am a
17  horrible writer.  I can't function.
18  According to them in these evaluations I
19  received, I'm inept.  Yet I've written in
20  excess -- I've written thousands and wrote
21  thousands and thousands of stories for the
22  New York Post.
23      So in the grand scheme of
24  things yeah, that conversation was racist
25  just like -- discriminatory -- just like the

IKIMULISA LIVINGSTON

1   IKIMULISA LIVINGSTON
2   other conversations I've had with him were
3   discriminatory.  Just like -- I mean, some
4   of the photographers I've worked with have
5   actually told me that the photo desk tells
6   them not to take pictures of black people or
7   black women.
8       And one photographer actually told
9   me how he was working on a story, lawsuit
10  story and after he turned in the pictures,
11  the woman who was the focus point of the
12  lawsuit was a black woman, they dropped the
13  story.
14      This is all discriminatory.
15      In terms of my treatment, in terms
16  of the treatment of Leonard Greene, in terms
17  of Sandra Guzman being fired.  In terms of
18  Ebony Clark and Christina and Doug Montero,
19  we work and worked in a hostile work
20  environment.  We were discriminated against.
21      It's been a pattern from before and
22  especially after that cartoon was published
23  showing a black man being depicted as an
24  ape, as a chimpanzee, is telling me that my
25  employers think that of me.

IKIMULISA LIVINGSTON

1   IKIMULISA LIVINGSTON
2       Q    Ms. Livingston, I asked you a
3   question about a phone conversation that
4   took place while you were the Queens Court
5   reporter which was sometime in 2007 or 2008,
6   possibly in 2006.  And I just asked you a
7   very specific question about how you know
8   that Zach Haberman was not berating you
9   because of what he perceived as your very
10  poor job performance and not because of the
11  color of your skin.
12      And you are providing an answer
13  referencing other employees and a cartoon
14  that appeared in the newspaper in
15  February 2009, long after you stopped being
16  a Queens Court reporter.
17      And it's very important that we
18  stay within the timeline and that you answer
19  the questions I'm asking.
20      MR. THOMPSON:  Objection.
21  Asked and answered.
22      MS. LOVINGER:  No, Ken.
23      MR. THOMPSON:  The last
24  question you asked is clear.
25  Objection.  You may not have liked

68  (Pages 266 to 269)

Page 294

IKIMULISA LIVINGSTON

1
2     A    I don't remember the exact date of
3   that.
4          Are you referencing an e-mail?
5     Q    I'm asking if you recall that
6   Michelle Gotthelf warned you that you could
7   be removed from the Queens Courthouse
8   reporter position as early as May 2008.
9     A    I recall receiving e-mail from
10  Michelle.  I don't remember the exact date
11  in which she says something of that nature.
12    Q    So when you were removed from the
13  Queens Courthouse in November 2008, it
14  didn't come as a surprise; is that right?
15    A    No, it still came as a surprise.
16         MR. THOMPSON:  Objection.
17    Q    Well, if Michelle Gotthelf warned
18  you that you could be removed back in
19  May 2008, why was it a surprise when it
20  actually happened five months later?
21         MR. THOMPSON:  Objection.
22    Q    Or six months later?
23         MR. THOMPSON:  Objection.
24    A    When I was removed from the Queens
25  County Courthouse, it was a surprise that I

Page 295

IKIMULISA LIVINGSTON

1
2   was being demoted.
3     Q    Can you tell me why it was a
4   surprise when one of your supervisors warned
5   you that it may happen?
6     A    Because I have never produced so
7   many front-page stories as I had that year.
8          I worked extremely hard giving them
9   quality stories about the Sean Bell trial
10  and other stories.
11    Q    Are you done with your answer?
12    A    Yes.
13    Q    Well, isn't it true that the Sean
14  Bell trial was over by the end of May 2008?
15    A    Yes, I believe it was over by then.
16         MS. LOVINGER:  I'm going to
17  show you what's been marked -- a
18  document that's been marked as
19  Livingston Exhibit 15.
20         And this is an e-mail Bates stamped
21  Number IL-115.  And it's an e-mail from
22  Michelle Gotthelf to you dated May 22,
23  2008.
24         Take a look at this e-mail.
25         (Livingston Exhibit 15, E-mail

Page 296

IKIMULISA LIVINGSTON

1
2   dated May 22, 2008, Bates Number
3   IL-115, was marked for
4   Identification.)
5   BY MS. LOVINGER:
6     Q    A minute ago you testified that you
7   were surprised because you had never
8   produced as many front-page stories as you
9   had that year.
10         Can you tell me what stories other
11  than the Sean Bell trial you had that made
12  the front page that year?
13    A    Right now, I can't think of
14  anything else.  I'm trying to think of maybe
15  any of the Mallayev-Borukhova stories were
16  on the front.  They may have been.  I don't
17  recall offhand right now.
18    Q    Directing your attention to what's
19  been marked Livingston Exhibit 15, the
20  e-mail from Michelle Gotthelf.
21         It states "Col had a fit over the
22  story you missed this morning.  He also
23  wondered why we're keeping you in that court
24  when Nicole Bode, who is not a fantastic
25  reporter, is managing to beat you

Page 297

IKIMULISA LIVINGSTON

1
2   consistently.  He also brought up how
3   labor-intensive it was to assign you a
4   dedicated rewrite for the Sean Bell trial
5   when court reporters need to be able write
6   clear copy on the fly.
7          "One thing is clear, Kim, you're on
8   Col's radar and that's a very dangerous
9   place to be.  It means you can be plucked
10  from that court very soon.  You have to step
11  it up.  Michelle."
12         Do you remember receiving this
13  e-mail from Ms. Gotthelf?
14    A    I remember receiving this e-mail.
15  And I remember disagreeing with her
16  wholeheartedly about being beat consistently
17  by Nicole on stories.  That's not the case.
18         I'm trying to remember exactly
19  which story this was that she did beat me
20  on.
21         I think it might have been the
22  Bonelli story.  This is a mob guy.
23         But I disagree.  I wasn't being
24  beat consistently by Nicole.  And I truly
25  believe this is just a paper trail in order

Page 298

IKIMULISA LIVINGSTON
1
2  for them to remove me and further
3  demonstrates the pattern of racism that
4  continues to exist at the New York Post.
5     Q    Did you do anything different in
6  terms of your performance after you received
7  this e-mail from Ms. Gotthelf?
8        MR. THOMPSON:  Objection.
9     A    Did I do anything different -- I'm
10 not quite sure I understand.
11    Q    Did you do anything different in
12 terms of how you performed your job at the
13 Queens Courthouse after you received this
14 e-mail from Michelle Gotthelf?
15    A    I continued to look for good and
16 interesting, newsworthy lawsuits in the
17 civil courthouse.
18        I continued to cover whatever
19 criminal cases that were ongoing at the
20 Queens County Courthouse.  I continued to
21 check the files for various defendants.  I
22 continued to work on whatever stories were
23 ongoing in the courthouse.
24        I was consistent in terms of being
25 persistent in looking for good stories for

Page 299

IKIMULISA LIVINGSTON
1
2  the Post and pitching good stories.
3     Q    Well, you know, you just described
4  everything you continued doing.
5        But my question is:  Did you do
6  anything different in terms of how you
7  performed your job at the Queens Courthouse
8  after you received this e-mail from Michelle
9  Gotthelf?
10        That's a yes/no question.
11        Did you do anything different?
12    A    I continued to do my job.
13    Q    Is that a no?
14    A    I did my job.
15    Q    So did you do --
16        MS. LOVINGER:  I'll ask
17    Mr. Thompson if he can instruct the
18    witness to answer the question.
19 BY MS. LOVINGER:
20    Q    Did you do anything different in
21 terms of how you performed your job at the
22 Queens Courthouse after you received this
23 e-mail from Michelle Gotthelf?
24    A    I spent more time at the Sutphin
25 Courthouse look for lawsuits.

Page 300

IKIMULISA LIVINGSTON
1
2     Q    The what courthouse?
3     A    Sutphin.
4     Q    The what courthouse?
5     A    Sutphin.
6     Q    Okay.  Is that the Queens
7  Courthouse?
8     A    It's the civil -- where civil
9  lawsuits are filed.
10    Q    Did you do anything else different?
11    A    And I pitched them good story
12 ideas.
13    Q    When you pitched stories to
14 Michelle Gotthelf and Dan Greenfield, was it
15 your practice to tell them the race of the
16 individuals involved in the stories?
17    A    I'm not sure I put in race for
18 certain individuals or for certain story
19 pitches that I presented.
20    Q    So when Ms. Gotthelf and
21 Mr. Greenfield rejected --
22        MS. LOVINGER:  I'm going to
23    withdraw that question.
24    Q    Shortly after Col Allan became
25 editor in chief in 2001, he fired six

Page 301

IKIMULISA LIVINGSTON
1
2  editors at the Post; isn't that correct?
3     A    I don't know the exact number of
4  editors but I know he fired a number of
5  editors including Lisa Baird, who had been
6  the only African-American editor on the
7  Metro desk.
8        And no one has filled her position
9  in terms of being an African-American on the
10 Metro desk.  And soon after she was fired
11 she died of cancer.
12    Q    And he also fired Stuart Marks?
13    A    Yes.
14    Q    And Col Allan also fired Jack
15 Newfield?
16    A    I believe that's correct.
17    Q    Col Allan also fired Jerry
18 Schmetterer.
19    A    Yes, he fired Jerry Schmetterer,
20 too.
21    Q    Col Allan also fired Michael Lewis
22 and Col Allan also fired Mark Kalish?
23    A    I remember Mark, yes.  I don't know
24 about the other guy.  I'm not really sure
25 about him.

76 (Pages 298 to 301)

Page 318

IKIMULISA LIVINGSTON

1
2  Do you think that sometime within the last
3  five years that you've worked there, there's
4  been some criticism that was constructive?
5      A    I don't know.  I think I'd have to
6  see something specific.
7      Q    Prior to December 2009, you didn't
8  feel like there was any benefit to you
9  seeing a mental health provider?
10     A    There probably was a benefit.
11 Maybe I could have had better nights' sleep
12 if I had gone a little sooner.
13     Q    Following publication of the
14 cartoon you referenced earlier that appeared
15 in the Post in February 2009, did you have a
16 conversation with any member of senior
17 management at the New York Post or executive
18 other than Michelle Gotthelf about the
19 cartoon?
20     A    I only spoke with Michelle about
21 the cartoon.  I only relayed how racist and
22 discriminatory it was to her.
23     Q    Is there anything that the Post did
24 in the aftermath of the cartoon that
25 offended you?

Page 319

IKIMULISA LIVINGSTON

1
2      MR. THOMPSON:  Objection.
3      A    Would this be in regards to the
4  cartoon?
5      Q    Oh, yes.  I'm sorry.
6      Is there anything that the Post did
7  in the aftermath of the cartoon, addressing
8  the cartoon that offended you?
9      A    Oh, yeah, the further -- the denial
10 that black people were seeing it wrong was
11 offensive, too.
12     How can you tell us what we were
13 feeling was wrong when it was obvious that
14 it was a black man, the president of the
15 United States, the first black president of
16 the United States being shot and killed --
17 being depicted as a chimpanzee being shot
18 and killed by white officers.
19     It was offensive.  The cartoon was
20 offensive.  The aftermath of the cartoon,
21 the fact that I don't believe Col Allan ever
22 apologized for the cartoon.  Rupert Murdoch
23 apologized for the cartoon.
24     Q    Did you see the apology that
25 appeared in the New York Post following the

Page 320

IKIMULISA LIVINGSTON

1
2  publication of the cartoon?
3      A    I believe I did, yes.
4      Q    Is there anything else other than
5  what you just described, which you said was
6  the denial that black people were seeing it
7  wrong, that you have personal knowledge of
8  with respect to the aftermath of the cartoon
9  that offended you?
10     MR. THOMPSON:  Objection.
11     A    I'm sorry.  I don't understand your
12 question.
13     Q    Is there anything else that
14 happened in the aftermath of the cartoon
15 relating to the cartoon that offended you
16 other than what you just told me?
17     A    The whole publication of the
18 cartoon was offensive.  The fact that Sandra
19 Guzman was fired because she talked about
20 how disgusting that cartoon was, that was
21 upsetting to me.  The fact that Austin
22 Fenner was fired because he publicly
23 acknowledged that that cartoon was
24 offensive.  That was upsetting to me.
25     The fact that I continue to be

Page 321

IKIMULISA LIVINGSTON

1
2  discriminated against and received written
3  warnings and -- and received a written
4  warning and receive these unfair, inaccurate
5  evaluations, those are all upsetting to me.
6      Q    Anything else?
7      A    I can't really think of anything
8  else right now.
9      Q    Since December 2008, have you held
10 employment with any employer other than the
11 New York Post?
12     A    Yes.
13     Q    Can you identify the other
14 employers?
15     A    I did some work for TD Bank.
16     Q    For TD Bank?
17     A    TD Bank.
18     Q    What did you do for TD Bank?
19     A    I'm a mystery shopper.
20     Q    A mystery shopper?
21     A    That's correct.
22     Q    What is that?  I don't know what
23 that is.
24     A    Mystery shopper is someone who goes
25 into -- as a mystery shopper, I go to a

IKIMULISA LIVINGSTON

1
2  bank, I conduct a transaction and I write up
3  what happened during that transaction.
4      Q    And how many hours a week do you
5  work for TD Bank as a mystery shopper?
6      A    It varied.
7      Q    What was the time period that you
8  worked for TD Bank?
9      A    I don't recall.
10     Q    Was it in the last three years?
11     A    Yes.
12         Maybe not last three years.  Yes.
13     Q    Did you work for TD Bank as a
14 mystery shopper during your downtime with
15 the Post?
16         MR. THOMPSON: Objection.
17     A    A mystery shop would take two
18 minutes sometimes.  And mostly I would work
19 around my work schedule.
20     Q    So were there days when you were
21 working for the New York Post and finished
22 an assignment and then did a mystery shop --
23 is that how you say it?
24     A    Sure.  If there was something in
25 the area, that would happen.

IKIMULISA LIVINGSTON

1
2      Q    Did you ever inform anyone at the
3  New York Post that you were doing this job
4  for TD Bank?
5      A    No.
6      Q    Did you work for any other employer
7  other than TD Bank during your employment
8  with the New York Post?
9      A    I did work for another mystery
10 shopping company, and I would do freelance
11 occasionally.
12     Q    What's the name of that company?
13     A    Shop'n Chek.
14     Q    You actually have produced 1099s
15 for 2006 and 2007 from Shop'n Chek.
16         Did you do work for Shop'n Chek in
17 any other years?
18     A    No, I don't think so.  I think that
19 was about it.
20     Q    And you were a mystery shopper for
21 Shop'n Chek as well?
22     A    That's correct.
23     Q    And did you do mystery shops
24 sometimes during your downtime at the New
25 York Post for Shop'n Chek?

IKIMULISA LIVINGSTON

1
2      A    I think I again worked around my
3  schedule.  I would do things on the weekends
4  or after hours.
5      Q    Have you ever been unable to work
6  overtime for the Post because you had to do
7  work for either TD Bank or Shop'n Chek?
8      A    No.
9      Q    Did you work for any other employer
10 other than TD Bank and Shop'n Chek?
11     A    I mentioned that I freelanced.
12     Q    Who did you freelance for?
13     A    I freelanced for Heart and Soul
14 magazine.
15     Q    Heart and Soul?
16     A    Heart and Soul magazine.
17     Q    What did you do for Heart and Soul
18 magazine?
19     A    Wrote an article or wrote articles.
20         I also --
21     Q    What's the time period for that
22 Heart and Soul magazine work?
23     A    Well, I recently did a story for
24 Heart and Soul.
25         And before, it was a number of

IKIMULISA LIVINGSTON

1
2  years ago.
3         And there was another magazine I
4  worked for.  I don't recall the name of the
5  other magazine.
6      Q    Did you tell any of your --
7      A    I'm sorry.  I do remember.  I
8  actually did do some work for BET.com.
9      Q    What is it called?
10     A    BET.com.
11     Q    What's BET.com?
12     A    "BET" is short for Black
13 Environment TV or Black Entertainment
14 Television.
15     Q    Did you write articles for the
16 Website?
17     A    I sometimes wrote articles for the
18 Website.
19     Q    Did you get permission from your
20 editors at the New York Post to wrote
21 articles for Heart and Soul?
22     A    When I first started doing
23 freelance, yes.
24     Q    Who gave you permission to write
25 for Heart and Soul?

82  (Pages 322 to 325)

Page 349

1                     I. Livingston

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK
    ---------------------------------------x
4   AUSTIN FENNER and IKIMULISA LIVINGSTON,

5               Plaintiffs,

6         vs.                          09 CV 9832
                                       (BSJ)(RLE)
7
    NEWS CORPORATION, NYP HOLDINGS, INC.,
8   d/b/a THE NEW YORK POST and DAN
    GREENFIELD and MICHELLE GOTTHELF,
9
                Defendants.
10  ---------------------------------------x

11              CONTINUED VIDEOTAPED

12      DEPOSITION OF IKIMULISA LIVINGSTON

13              New York, New York

14              February 20, 2013

15

16

17

18

19

20

21

22

23  Reported by:

24  KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25  JOB NO. 57653

Page 350

```
 1            I. Livingston
 2         February 20, 2013
 3
 4      Continued videotaped deposition of
 5   IKIMULISA LIVINGSTON, held at KASOWITZ,
 6   BENSON, TORRES & FRIEDMAN, LLP, 1633
 7   Broadway, New York, New York, before
 8   Kathy S. Klepfer, a Registered Professional
 9   Reporter, Registered Merit Reporter,
10   Certified Realtime Reporter, Certified
11   Livenote Reporter, and Notary Public
12   of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 351

```
 1            I. Livingston
 2         A P P E A R A N C E S:
 3
 4   THOMPSON WIGDOR
 5   Attorneys for Plaintiffs
 6      85 Fifth Avenue
 7      New York, New York  10003
 8   BY:  LAWRENCE M. PEARSON, ESQ.
 9        NAOMI DABI LANTSBERG, ESQ.
10
11   KASOWITZ BENSON TORRES & FRIEDMAN
12   Attorneys for Defendants
13      1633 Broadway
14      New York, New York  10019
15   BY:  MARK W. LERNER, ESQ.
16        BLYTHE E. LOVINGER, ESQ.
17        GARRETT D. KENNEDY, ESQ.
18      - and -
19      J. JORDAN LIPPNER, Esq.
20      News America Inc.
21
22   ALSO PRESENT:
23      Michelle Gotthelf
24      Dan Greenfield
25      Dale Swindell, Legal Video Specialist
```

Page 352

```
 1            I. Livingston
 2
 3
 4      IT IS HEREBY STIPULATED AND
 5   AGREED, by and between the attorneys for
 6   the respective parties herein, that the
 7   filing and sealing be and the same are
 8   hereby waived.
 9      IT IS FURTHER STIPULATED AND
10   AGREED that all objections, except as to
11   the form of the question, shall be
12   reserved to the time of the trial.
13      IT IS FURTHER STIPULATED AND
14   AGREED that the within deposition may be
15   sworn to and signed before any officer
16   authorized to administer an oath, with
17   the same force and effect as if signed
18   and sworn to before the Court.
19
20
21
22
23
24
25
```

Page 353

```
 1            I. Livingston
 2      THE VIDEOGRAPHER:  This is the start
 3   of media labeled number 1 of the videotaped
 4   deposition of Ikimulisa Livingston --
 5   correction, the videotaped deposition of
 6   Ikimulisa Livingston in the matter of Austin
 7   Fenner and Ikimulisa Livingston versus News
 8   Corporation, NYP Holdings.
 9      This deposition is being held at 1633
10   Broadway, New York, New York, on February
11   20, 2013, at approximately 10:22 A.M.  My
12   name is Dale Swindell from TSG Reporting,
13   Incorporated, and I'm the certified legal
14   video specialist.  The court reporter is
15   Kathy Klepfer, in association with TSG
16   Reporting.
17      Will counsel please introduce
18   yourselves.
19      MR. LERNER:  For the defendants, Mark
20   Lerner, Kasowitz, Benson, Torres & Friedman,
21   accompanied by Blythe Lovinger and Garrett
22   Kennedy, also Kasowitz Benson, and Jordan
23   Lippner, in-house counsel for the defendants
24   as well.
25      MR. PEARSON:  And this is Larry
```

Page 366

I. Livingston

1 wait in the line for the general public.
2    Q.  Okay.  But you might have to wait in a
3 line for people who had went through a separate
4 entrance?
5       Let me withdraw that.  Was there a
6 separate press entrance?
7    A.  No, there wasn't a separate press
8 entrance.
9    Q.  Okay.  But there was an entrance for
10 the -- for people other than the general public?
11    A.  Yes.
12    Q.  And sometimes there was a line at that
13 entrance?
14    A.  Usually there wasn't much of a line.
15 Sometimes there would be people in front of me.
16    Q.  When you worked at the Queens courts,
17 how -- how would you research cases about civil
18 filings?
19    A.  I would go to the Sutphin Boulevard
20 courthouse and look up -- look through -- look
21 through their filings on the computer system.
22    Q.  And --
23    A.  That would be the usual way to -- to
24 go about looking for stories, in general.

Page 367

I. Livingston

1       Sometimes I would have a lawyer source
2 who would present me with a story, with a case
3 that he had or she had.
4    Q.  And how often did you go to the civil
5 courthouse to review civil filings in say 2008?
6    A.  Oh, I -- I couldn't tell you.  I don't
7 know.  I don't remember.
8    Q.  How often did you go to the civil
9 courthouse during your time as a -- as the
10 Queens court reporter generally to research
11 civil filings?
12    A.  How many times?  I don't recall how
13 many times I would go.
14    Q.  Was it more or less than once a week?
15    A.  Sometimes it was more than once a
16 week.  Sometimes it was less than once a week.
17    Q.  So there were weeks that you didn't go
18 to the civil courthouse at all to research
19 filings?
20    A.  I don't recall if there were -- if
21 there was a single week that went by that I
22 didn't go to the courthouse.  However -- to the
23 Sutphin courthouse.  However, if there was --
24 actually, I just don't recall.

Page 368

I. Livingston

1    Q.  Do you have a TD Bank account?
2    A.  Yes, I do.
3    Q.  How long have you had a TD Bank bank
4 account?
5    A.  For several years.
6    Q.  Do you know what year you took that
7 out?
8    A.  I'm not 100 percent sure when I opened
9 that account.
10    Q.  Do you have any loans with TD Bank?
11    A.  No, I do not.
12    Q.  Did you say "no" or "now, I do not"?
13    A.  No, I do not.
14    Q.  Have you ever?
15    A.  No, I've never had a loan with TD
16 Bank.
17    Q.  Now, on your first day of deposition,
18 you testified that you had done mystery shopping
19 for companies called Shop 'n Chek and
20 Contemporary Staffing Solutions, do you recall
21 that?
22    A.  Yes, I do.
23    Q.  And when you mystery shopped for
24 Contemporary Staffing Solutions, you were

Page 369

I. Livingston

1 mystery shopping at TD Bank branches, correct?
2    A.  Yes, that's correct.
3    Q.  Did you mystery shop for any other
4 businesses when you were working for
5 Contemporary Staffing Solutions through that
6 company?
7    A.  Oh, yes.  Before TD Bank was TD Bank,
8 it used to be Commerce.
9    Q.  Other than TD Bank and Commerce Bank,
10 did you mystery shop at any other businesses
11 through your employment with Contemporary
12 Staffing Solutions?
13    A.  No.
14    Q.  You also mystery shopped for Shop 'n
15 Chek.  What companies did you mystery shop at
16 when you were working for Shop 'n Chek?
17    A.  For the most part, those would be
18 the -- the businesses would be mobile phone
19 locations and other locations.
20    Q.  What -- so did that include Verizon?
21    A.  Yes.
22    Q.  T Mobile?
23    A.  Yes.
24    Q.  AT&T?

I. Livingston

1
2    A.    I'm not sure about AT&T, but maybe.
3    Q.    Sprint?
4    A.    I think maybe Sprint as well.
5    Q.    Did you have a Verizon phone when you
6    were mystery shopping at Verizon stores?
7    A.    I don't -- I don't recall.
8    Q.    Who's your cell carrier?
9    A.    My cell carrier right now?
10   Q.    Yes.
11   A.    My cell carrier right now is Sprint.
12   Q.    Sprint.  And how long has your cell
13   carrier been Sprint?
14   A.    I don't recall how long it's been.
15   Q.    Was it Sprint during all the time that
16   you were doing mystery shopping?
17   A.    I don't think so, no.
18   Q.    Who was your carrier before Sprint?
19   A.    I think -- I'm not really sure.
20   Q.    Other than Shop 'n Chek and
21   Contemporary Staffing Solutions, have you ever
22   performed mystery shopping services for any
23   other company?
24   A.    No.
25   Q.    During the period the last ten years,

I. Livingston

1
2    have you had employment at any -- from any other
3    businesses besides TD Bank -- sorry.
4    Contemporary Staffing Solutions, Shop 'n Chek,
5    The New York Post and -- and excluding any
6    freelance writing that you've done?
7          MR. PEARSON.  Objection.
8    Mischaracterizes.
9    A.    I'm sorry.
10   Q.    Do you understand the question?
11   A.    No.  Could you repeat that?
12   Q.    Yes.  You testified in your first
13   deposition that you had worked at Shop 'n
14   Chek -- you had worked for Shop 'n Chek,
15   Contemporary Staffing Solutions, that you had
16   also done some freelance work for Heart and Soul
17   Magazine.
18          Are there any other companies that you
19   have had employment with during the last ten
20   years?
21          MR. PEARSON:  Same objection.
22   A.    I don't remember having any other
23   employment.
24   Q.    Have you ever done any marketing
25   research other than through Shop 'n Chek or

I. Livingston

1
2    Commerce -- or Contemporary Staffing?
3          MR. PEARSON:  Objection.
4    A.    I did mystery shopping for TD -- or,
5    for Contemporary Staffing and Shop 'n Chek.
6    Other than that, I don't recall doing any
7    other -- having any other jobs beyond
8    freelancing.  And of course, my job at The New
9    York Post.
10   Q.    When you worked for Contemporary
11   Staffing Solutions and you did mystery shopping
12   at Commerce Bank and TD Bank, how would you know
13   what banks to mystery shop at?
14   A.    The -- the branch would be a -- I
15   would be assigned.
16   Q.    So -- so Contemporary Staffing
17   Solutions assigned you to mystery shop at
18   certain branches?
19   A.    Well, there were a couple different
20   ways to go about getting an assignment, so
21   sometimes they would -- sometimes I would choose
22   a particular branch and then they would approve
23   me doing a mystery shop at that branch.
24   Q.    What were the other ways?
25   A.    The other ways, sometimes someone

I. Livingston

1
2    would reach out to contact me and ask me to
3    perform a shop at a certain bank.
4    Q.    Did Contemporary Staffing Solutions --
5    let me withdraw that and ask you another
6    question first.
7          Who was your point of contact for --
8    at the employer for assignments for mystery
9    shopping at TD Banks?
10          MR. PEARSON:  Objection.  She never
11   said it was an employer.
12   A.    For -- for my mystery shopping?
13   Q.    Yes.
14   A.    I don't recall a specific point person
15   or --
16   Q.    Did you have a single person who was
17   your supervisor?
18          MR. PEARSON:  Objection.
19   A.    No, I did not have a supervisor.
20   Q.    Was there a phone number you could
21   call and ask them for assignments?
22   A.    No, that's not the way it worked.
23   Q.    Did -- did you deal with somebody at
24   TD Bank or did you deal with somebody at
25   Contemporary Staffing Solutions?

I. Livingston

1  go to the branch and go in and speak to the
2  personnel at the branch, correct?
3      A.   That's -- that's -- basically, what I
4  would do is I would perform a -- a shop.  So I
5  would either speak to a teller, do a teller
6  transaction, or perhaps speak to a customer
7  service representative.
8      Q.   And when you did a transaction, did
9  you do a real transaction?  In other words, did
10 you carry out an entire transaction at TD Bank?
11     A.   Such as making a withdrawal?
12     Q.   Correct.
13     A.   Yes.
14     Q.   So you would go to a teller and maybe
15 take out $20, and that would be the transaction?
16     A.   That's correct.
17     Q.   Did you always do a transaction when
18 you mystery shopped?
19     A.   No, not always.
20     Q.   When you didn't do a transaction, what
21 would you do in the bank?
22     A.   I would speak to a customer service
23 representative.
24     Q.   Well, what would you speak about?
25

I. Livingston

1      A.   I -- it depended on the kind of shop,
2  but I would ask them about perhaps their credit
3  cards, their credit card rates; I would ask them
4  about mortgages, what kinds of mortgages they
5  had, what kind of rates they had; I would ask
6  them about their savings accounts, what kinds of
7  interest rates they offered; maybe I would ask
8  them about a checking account, those sort of
9  things; auto loan.
10     Q.   And had you been instructed by
11 Contemporary Staffing Solutions on what kinds of
12 topics they wanted you to raise with customer
13 service representatives?
14     A.   There were a list -- there would
15 usually be a list of topics to discuss.
16     Q.   And these weren't necessarily topics
17 that you personally, Ms. Livingston, wanted to
18 do business with the bank on, right?
19         MR. PEARSON: Objection.
20     Q.   You weren't looking for a mortgage
21 from TD Bank at the time that you talked about
22 mortgages, right?
23         MR. PEARSON: Objection.
24     A.   Well, actually, there -- there was a
25

I. Livingston

1  time when I did ask them about mortgages because
2  I was interested in a mortgage.
3      Q.   But there were times when you asked
4  them about mortgages when your sole purpose was
5  to do research at the banks, right, mystery
6  shop?
7          MR. PEARSON: Objection.
8      A.   My sole purpose -- I'm sorry, what was
9  the question again?
10     Q.   There were times you talked to them
11 about mortgages when your sole purpose was to
12 mystery shop, right?
13         MR. PEARSON: Objection.
14     A.   My purpose as a mystery is shop was to
15 evaluate the employee, so that's --
16     Q.   When you spoke to them about
17 mortgages, there were many times when you spoke
18 to them about mortgages with no intention of
19 taking out a mortgage, right?
20         MR. PEARSON: Objection.
21     A.   I was evaluating them on their work,
22 so, no, there may not be -- I wasn't necessarily
23 interested in taking out a mortgage.
24     Q.   So you were posing as somebody who was

I. Livingston

1  interested in taking out a mortgage, right?
2          MR. PEARSON: Objection.
3      A.   I was performing a mystery shop.
4      Q.   You were pretending to be somebody who
5  was interested in a mortgage, but you weren't,
6  right?
7          MR. PEARSON: Objection.
8      A.   I was simply performing a mystery
9  shop, which was the requirements of the mystery
10 shopping program.
11     Q.   And the requirements were that you
12 pretend to be something, to be interested in
13 something that you weren't actually interested
14 in, right?
15         MR. PEARSON: Objection.
16     A.   I guess I'm not really sure how to --
17 how to answer that since I do bank at TD Bank,
18 so there are times when I am interested in the
19 things that they're telling me about.
20     Q.   But there are times that you were not
21 interested in the things that you were asking
22 about, correct?
23         MR. PEARSON: Objection.
24     A.   For the most part, I was interested in

I. Livingston

1      I. Livingston
2  learning more information about the topics that
3  I did ask them about.
4      Q.   You weren't interested in your -- for
5  your own -- you were interested in it because
6  your employer had assigned you to mystery shop,
7  right?  You weren't interested in it because you
8  wanted that -- that service at the time,
9  correct?
10         MR. PEARSON:  Objection as to
11  "employer."  Objection, asked and answered.
12     A.   I was doing a mystery shop, and I
13  didn't ever really look at them as my employer.
14  My employee is The New York Post.  Or, my
15  employer, I'm sorry, is The New York Post.
16     Q.   As part of your mystery shopping, you
17  were also required to look at different areas in
18  the interior of the bank, correct?
19     A.   I'm sorry, I was -- I was to observe
20  the premises, yes.
21     Q.   You were to look at the penny arcade
22  machine, correct?
23     A.   That's correct.
24     Q.   The display, correct?
25     A.   The display monitors, yes.

I. Livingston

1      I. Livingston
2      Q.   The condition of the premises for
3  cleanliness, correct?
4      A.   That's correct.
5      Q.   And you would report back to your --
6  to Contemporary Staffing Solutions about what
7  you saw, right?
8      A.   That's correct.
9      Q.   Sometimes you would do more than one
10  mystery shop in a given day, correct?
11     A.   Yes.
12     Q.   Sometimes you did, in fact, as many as
13  four mystery shops in a given day, right?
14         MR. PEARSON:  Objection.
15     A.   I don't recall.
16     Q.   Even more?
17         MR. PEARSON:  Objection.
18     Q.   Right?
19     A.   I don't recall.
20     Q.   Okay.  When you mystery shopped at
21  multiple banks on a given day, did you take
22  notes so that when you filed your reports, you
23  could remember which experiences you had at
24  which banks?
25     A.   Sometimes I would jot down information

I. Livingston

1      I. Livingston
2  right afterwards, yes.
3      Q.   You did that -- you did that on a
4  notepad?
5      A.   No.
6      Q.   How did you do that?
7      A.   It would be on the -- on the
8  transaction slip, if I did that at all.
9      Q.   When you mystery shopped for Shop 'n
10  Chek, you would go to mobile phone stores and
11  you would also go to Office Depot and McDonald's
12  as well, right?
13         MR. PEARSON:  Objection.
14     A.   There were -- when I performed mystery
15  shops for Shop 'n Chek, I did perform mystery
16  shops for them for some McDonald's and -- and an
17  office supply store.
18     Q.   And you would make purchases at those
19  stores?
20     A.   At McDonald's and the office supply
21  store?
22     Q.   Yes.
23     A.   Yes.
24     Q.   Did Shop 'n Chek reimburse you for
25  purchases you made during mystery shops?

I. Livingston

1      I. Livingston
2      A.   Most of the time, yes.
3      Q.   And a single mystery shop could take
4  half an hour, right?
5          MR. PEARSON:  Objection.
6      A.   Mystery shops normally didn't take a
7  half hour, no.
8      Q.   But it could take a half an hour,
9  right?
10         MR. PEARSON:  Objection.
11     A.   I don't recall doing any mystery shops
12  that took a half hour.
13         (Livingston Exhibit 18, Shop History
14     of Ikimulisa Livingston, bearing Bates Nos.
15     NYP-FL00380 through 3998, marked for
16     identification, as of this date.)
17  BY MR. LERNER:
18     Q.   Ms. Livingston, I'm putting in front
19  of you a document marked Exhibit 18, which was
20  produced to you in this litigation.  Do you see
21  that?
22     A.   I do see that document in front of me,
23  yes.
24     Q.   And this is a record of the mystery
25  shopping that you did through Contemporary

1        I. Livingston
2   Staffing Solutions from 2008 to 2010, correct?
3        MR. PEARSON: Objection.
4        The witness hasn't had an opportunity
5   to review.
6        A.   I don't really know what the date
7   parameters are.  I just see the first page here.
8        Q.   Have you reviewed this document before
9   today?
10       A.   I think I did look at a document like
11  this, yes.
12       Q.   And does it reflect the mystery
13  shopping that you did for Contemporary Staffing
14  Solutions?
15       A.   I -- I don't know.  I don't recall the
16  exact time and dates of mystery shops.
17       Q.   Uh-huh.  Okay.  Do you have any reason
18  to doubt its accuracy?
19       MR. PEARSON: Objection.
20       A.   I -- I don't know.  This came from --
21  I don't know where this came from.
22       Q.   Okay.  Could you turn to the page
23  Bates-numbered 3983, please.  This page lists a
24  number of dates in July and August 2008.  Do you
25  see that in the center column under Dates

1        I. Livingston
2   Shopped?
3        A.   Yes.
4        Q.   Now, you were mystery shopping -- you
5   were employed as a mystery shopper by
6   Contemporary Staffing Solutions in July and
7   August of 2008, right?
8        A.   Are you asking if I was a mystery
9   shopper?
10       Q.   Yes.
11       MR. PEARSON: Objection.
12       Q.   Yes.
13       A.   I did mystery shop work for, yeah, for
14  TD Bank during that time period.
15       Q.   And do you recall occasions when you
16  left the Queens courthouse to perform mystery
17  shops during the day?
18       MR. PEARSON: Objection.
19       A.   I recall times that I, during my
20  lunch, I would maybe do a mystery shop, yes.
21       Q.   Okay.  Well, this document reflects
22  the time of shops, does it not, under Date
23  Shopped?
24       A.   Yes, I see that.
25       Q.   It uses a 24-hour clock?

1        I. Livingston
2        A.   Yes.
3        Q.   So 14:00 would be 2 P.M., you see
4   that?
5        A.   Yes, I see that.
6        Q.   And in order to do this mystery
7   shopping, you had to leave the Queens courthouse
8   and drive to the banks, right?
9        A.   Not always.
10       Q.   Did you take the subway sometimes?
11       A.   No.
12       Q.   Well, you had to get to the banks,
13  correct?
14       A.   I didn't always perform in-person --
15       Q.   Okay.
16       A.   -- shopping.
17       Q.   How many times for Contemporary
18  Staffing Solutions did you actually perform a
19  mystery shop that wasn't personally in the bank?
20       A.   How many times?
21       Q.   Yes.
22       A.   I don't recall.
23       Q.   You would agree with me that the vast
24  majority of the times you mystery shopped was in
25  person at the banks, right?

1        I. Livingston
2        MR. PEARSON: Objection.
3        A.   I performed --
4        Q.   It's a yes or no question, Ms.
5   Livingston.
6        MR. PEARSON: Objection.
7        A.   I performed most of my mystery shops
8   in person, but I also did non-in-person mystery
9   shops.
10       Q.   Okay.  Well, this document reflects
11  when they were -- when they were telephonic and
12  when they were at tellers, and on this page,
13  particular page we're looking at, there isn't a
14  single telephonic mystery shop, right?
15       A.   Did -- did you want an answer to that?
16       MR. PEARSON: You can review it.
17       A.   Looking on this page, I don't see a
18  telephone shop.
19       Q.   Okay.  So you had to leave the
20  courthouse, drive to the bank, perform the
21  mystery shop, and then presumably go to wherever
22  you were going from there, right?
23       A.   I would go on for where --
24       I'm sorry?
25       Q.   You couldn't -- if you were mystery

1           I. Livingston
2      A.   Yes, I do.
3      Q.   On the Contemporary Staffing Solutions
4  spreadsheet on page 3996, it indicates that you
5  mystery shopped with the South Flushing TD Bank
6  branch by telephone at 1:50 P.M.  Do you see
7  that?
8      A.   On May 13?
9      Q.   May 14.
10     A.   May 14?  Yes, I see that.
11     Q.   Ms. Livingston, it is the case that on
12 days that you were working for The Post, it was
13 not always on your lunch hour or even at
14 lunchtime that you went mystery shopping; isn't
15 that correct?
16          MR. PEARSON:  Objection.
17     A.   I can take my lunch whenever I like.
18     Q.   Can you take your lunch at 10:30 in
19 the morning?
20     A.   Actually, I can.
21     Q.   So if you mystery shopped at 10:30 in
22 the morning on a -- on a New York Post workday,
23 it's your testimony that that was your lunch
24 break?
25     A.   If that's what time I took it, yeah,

1           I. Livingston
2  that can be on my lunch break, yes.
3      Q.   So anytime -- essentially, anytime you
4  mystery shopped on a day you were working for
5  The Post was your lunch break?
6          MR. PEARSON:  Objection.
7      Q.   Is that your testimony?
8      A.   When I would take my lunch, I could
9  take my lunch at any time.  I didn't know that
10 we had -- or I was never told that we needed to
11 take our lunch at a specific time, but if time
12 permitted --
13     Q.   Can you turn in the spreadsheet --
14     A.   I'm sorry.  I -- I was still talking.
15     Q.   Oh, I'm sorry.
16     A.   I was just saying if time permitted
17 and that was a convenient time for me to take my
18 lunch, and I could do a mystery shop, if that's
19 what I chose to do, then -- then I would do it,
20 but my priority was always doing my job.
21     Q.   And was -- was it -- was it the case
22 that mystery shops were on your lunch break even
23 when they happened one after another on the same
24 day and spanned a period of 90 minutes?
25     A.   Well, it would depend.  If I was

1           I. Livingston
2  driving between shop locations, then I could
3  easily be on the phone or calling someone or
4  reaching out doing my job as a Queens court
5  reporter.
6          So mystery shops would take two
7  minutes, five minutes, you know, but in between
8  there, I was always doing my job.
9      Q.   You don't have any specific
10 recollection of phone calls that you made during
11 drives in between TD Banks, do you?
12     A.   I don't have any specific recollection
13 of -- of specific phone calls with specific
14 people, but I know that my job -- my priority
15 was always my job as a reporter for The New York
16 Post.  So if I was -- if I needed to talk to
17 someone at the DA's Office, that's what I would
18 do.
19     Q.   And if you were out of the courthouse
20 doing mystery shop and someone came to your desk
21 in the courthouse to come and talk to you, they
22 wouldn't be able to speak to you because you
23 would be out mystery shopping, right?
24          MR. PEARSON:  Objection.
25     Q.   That's a yes or no question.

1           I. Livingston
2      A.   If I am not in the Queens courthouse
3  office, New York Post office, then obviously if
4  someone did walk in there, I wouldn't have been
5  there for them to see me, but --
6      Q.   And that would include lawyers, court
7  personnel, or other sources that would not be
8  able to find you if they wanted to speak to you
9  while you were out mystery shopping, right?
10          MR. PEARSON:  Objection.
11     A.   While I was out mystery shopping, it
12 did not impede my job as a reporter for The New
13 York Post.
14     Q.   Well, if somebody -- how would you
15 even know if someone had come to find you and
16 knocked on the door of your office and left
17 because you weren't there?  You wouldn't even
18 know that, would you?
19     A.   If someone wanted to reach me and I
20 wasn't there, then they're -- they would have
21 reached out to me and I would -- I would have
22 found out and I would have been able to talk to
23 them, if that was the case.
24     Q.   But you're speculating about that,
25 right?

I. Livingston

1
2        MR. PEARSON: Objection.
3     A.   I don't know if -- if that ever
4 happened.  If it did happen, then -- then
5 obviously I wasn't -- my job did not pertain to
6 me being in that office throughout the entire --
7 all the hours that I worked.  Sometimes I did
8 work for The Post and I wasn't in the Queens
9 courthouse, in that office or even in the
10 building.
11     So that could happen at any time.
12     Q.   And you actually -- you wouldn't know
13 if it happened because you weren't there to
14 receive the person, right?
15     A.   If I wasn't there, obviously I could
16 not have spoken to that person.
17     Q.   And -- and if the phone rang at your
18 desk in the courthouse, you wouldn't be there to
19 pick it up, right?
20     A.   No, I would not be there to pick it
21 up, but there is voice mail on the machine.  But
22 a lot of times people contacted me via my cell
23 phone.
24     Q.   And could you access that voice mail
25 from your cell phone?

I. Livingston

1
2     A.   Yes.
3     Q.   Your office at the Queens courthouse
4 was shared with reporters from other newspapers,
5 correct?
6     A.   That's correct.
7     Q.   So there was a desk in that office for
8 the Daily News reporter, right?
9     A.   Yes.
10     Q.   And there was a desk in that office
11 for the Newsday reporter?
12     A.   Yes.
13     Q.   And do you know if anybody ever came
14 to the office to give you information or give
15 you a scoop on a story and, in your absence,
16 they decided to give it to the Daily News or the
17 Newsday reporter?
18     A.   I don't believe that ever happened.
19     Q.   How -- how -- what's the basis of your
20 belief that that never happened?
21     A.   Because I was a good -- I am a good
22 reporter.  I was a very good reporter at the
23 Queens courthouse, and I pretty much knew
24 everyone in the court -- in the courts, from the
25 court officers to the court clerks, and if

I. Livingston

1
2 someone wanted to give me a story -- first of
3 all, if someone wanted to give me a story and
4 they walked into the -- the office there, we
5 couldn't talk there because of the -- the fact
6 that the Daily News may or may not have been
7 present.  So I --
8     Q.   Wasn't it --
9     A.   I don't believe that ever happened.
10     Q.   Wasn't it your job to be a good
11 reporter from 9 to 5, Monday through Friday, at
12 the Queens courthouse?
13     A.   My job --
14         MR. PEARSON: Objection.
15     A.   -- was to be a good reporter.
16     I'm sorry.
17     My job was to be a good reporter, not
18 just between 9 to 5, but my job didn't just
19 encompass being a reporter between 9 and 5.
20 Sometimes I worked before 9.  Sometimes I worked
21 after 9.  Sometimes well after 9.  Sometimes in
22 the middle of the night.
23     Q.   Were you being a good reporter when
24 you were inside a TD Bank talking to a customer
25 service representative and getting paid to do

I. Livingston

1
2 mystery shopping?
3         MR. PEARSON: Objection.
4     A.   Are you asking if I was a good
5 reporter when I was in TD Bank?
6     Q.   I'm asking if you were being a good
7 reporter when you were mystery shopping at TD
8 Bank?
9         MR. PEARSON: Objection.
10     Q.   Yes or no?
11     A.   I was still being a good reporter, of
12 course, yes.
13     Q.   Were you -- and were you being a good
14 reporter when you left the courthouse while
15 court was in session during the hours of 9 to 5
16 and you were not there in the courtroom to watch
17 the proceedings?
18         MR. PEARSON: Objection.  Foundation.
19     A.   I think you're assuming that there was
20 something going on in the courtroom -- in the
21 courthouse or in a courtroom that I needed to be
22 there for, and if I needed to be there, I was
23 there; I wasn't out mystery shopping.  I didn't
24 mystery shop during times that was pertinent to
25 my job.

I. Livingston

1
2     A.   If I'm not in the court building, then
3  I am not meeting with those people, but that
4  does not mean I am not talking to people that I
5  still need to be talking to.
6     Q.   But you can't testify here with any
7  specific recollection that you spoke to a source
8  when you were traveling to mystery shop, right?
9     A.   I can't recall on any particular day.
10 This was years ago.
11    Q.   Thank you.
12        And when you were traveling to go
13 mystery shopping at a TD Bank location in
14 Queens, you weren't at the civil courthouse
15 either, right?
16    A.   If I was at a -- a bank, then, no, I
17 wasn't at the Sutphin courthouse, no.
18    Q.   Ms. Livingston, I'm going to show you
19 what has been marked as Exhibit 22 -- sorry, 23.
20        (Livingston Exhibit 23, Shop History
21 of Ikimulisa Livingston, bearing Bates Nos.
22 NYP-FL003980 through 3986, marked for
23 identification, as of this date.)
24 BY MR. LERNER:
25    Q.   Ms. Livingston, Exhibit 23 is a copy

I. Livingston

1
2  of Exhibit -- is a copy of Exhibit 18, the TD
3  Bank spreadsheet, with one difference, which is
4  that we've highlighted in yellow those mystery
5  shops that occurred on days when you were
6  working for The New York Post, according to your
7  time sheets.  Do you understand that?
8     A.   Yes.
9     Q.   Okay.  Can you just take a minute to
10 turn the pages of Exhibit 23.  Do you see how
11 we've highlighted certain mystery shops?
12    A.   Yes, I see.  I see the highlights.
13    Q.   Do you have any reason to dispute that
14 you mystery shopped on this -- you had --
15 withdrawn.
16        The highlighted mystery shops number
17 roughly a hundred or more in 2008 alone, do you
18 see that?
19    A.   I haven't counted them, but if you say
20 so.
21    Q.   But you don't dispute that it's --
22 it's a significant number of mystery shops,
23 right?
24    A.   I'm sorry, I don't -- I don't know
25 what that means.

I. Livingston

1
2     Q.   Okay.  Let me show you -- we're going
3  to mark a document Bates-numbered NYP-FL328
4  through 331 as Exhibit 24.
5        (Livingston Exhibit 24, Self-Appraisal
6  for Ikimulisa Livingston, bearing Bates Nos.
7  NYP-FL000328 through 331, marked for
8  identification, as of this date.)
9  BY MR. LERNER:
10    Q.   This is your 2008 Performance
11 Evaluation, do you see that?
12    A.   I do see it.
13    Q.   And you got a rating of Occasionally
14 Meets Standards in this performance evaluation,
15 right?  You see that?
16    A.   I see that.
17    Q.   And in the overall performance
18 summary, you were told that you did a great job
19 providing day-to-day notes for the Sean Bell
20 trial, but you needed work developing sources
21 that would provide stories for the paper that
22 are longer than briefs and have a better
23 disposition when your stories get cut.
24        Do you see that?
25    A.   I do see that.

I. Livingston

1
2     Q.   I'm going to mark your -- okay.  I'm
3  also placing before you what has been previously
4  marked as Exhibit 10 to your deposition, and if
5  you could turn to page 334 of this exhibit,
6  which is your 2009 APA, it states under Areas
7  For Focus: "Kim rarely suggests story ideas and
8  must do a better job at this.  The key to a good
9  newspaper and Website is variety.  In addition,
10 Monday enterprise is very important and Kim
11 never pitches or develops her own stories.
12        "Overall Performance Summary:  Kim
13 needs to be more diligent about generating her
14 own story ideas, slice of life pieces,
15 investigations.  This is a rapidly changing news
16 culture and Kim has to keep up with it."  And
17 your rating was 2, "Needs Improvement."
18        Do you see that?
19    A.   I see it.
20    Q.   So your supervisors in 2009 criticized
21 you for not generating your own story ideas or
22 slice of life pieces or investigations or
23 pitching or developing your own stories,
24 correct?
25    A.   That's what's written here.

I. Livingston

1
2    Q.    And your supervisors when they wrote
3    this in 2009 had not been told by you that you
4    were engaged in a mystery shopping, right?
5        A.    Had I told them I was mystery
6    shopping?  No.
7        Q.    So you're receiving criticisms in --
8    in '08 and '09 that you need to develop sources
9    and provide more in-depth stories and you needed
10   to generate more of your own story ideas at a
11   time when, during the day on multiple occasions,
12   you've been leaving the courthouse to do mystery
13   shopping, correct?
14       A.    I'm sorry, are you referring to 2009
15   or 2008?
16       Q.    2008 and 2009.
17       A.    Well, 2009 I -- I wasn't in the
18   courthouse.
19       Q.    Okay.  But your 2009 APA covered the
20   last six months of 2008 when you were still in
21   the courthouse, correct?
22       A.    I believe, yeah, it may -- yeah, it
23   covered part of that, yes.
24       Q.    So, Ms. Livingston, when you received
25   this criticism, did you -- did you discontinue

I. Livingston

1
2    your mystery shopping?
3        A.    Are you asking if I continued mystery
4    shopping after receiving these evaluations?
5        Q.    Yes.
6        A.    Yes, I continued mystery shopping.
7        Q.    And you continued that even though
8    your supervisors were pressing you to do more
9    investigations and develop more of your own
10   story ideas and your own sources, right?
11       A.    Throughout my time at the Queens
12   courthouse, and even afterwards, I gave them
13   story ideas as well as -- actually, yeah, I gave
14   them a lot of story ideas, and none of them were
15   good enough for the editors.
16       Q.    And if you look at Exhibit 23, which
17   is the highlighted document?
18       A.    Yes.
19       Q.    You will see that on days throughout
20   2008, you were going mystery shopping during the
21   afternoon hours, sometimes at more than one bank
22   on a given day; that's correct, isn't it?
23       A.    I haven't gone through the entire
24   list, but I did do mystery shops during my
25   downtime or during lunchtime.

I. Livingston

1
2    Q.    You did mystery shops during the day
3    between 9 and 5 when you were working at The
4    Post, right?
5        A.    As I said, my job just wasn't 9 to 5,
6    but I did do mystery shops between 9 -- 9 and 5.
7        Q.    And it never occurred to you to stop
8    doing the mystery shopping and focus your energy
9    instead on developing sources and developing
10   investigative pieces in the courthouse?
11           MR. PEARSON:  Objection.
12       A.    One had nothing to do with the other.
13   I continued to mystery shop, but I was also very
14   dedicated to my job.  Mystery shopping was
15   basically -- my priority was my job.
16       Q.    And you used the term "downtime," Ms.
17   Livingston.  How would you define "downtime"
18   between the hours of 9 and 5 when you're working
19   as a reporter for The New York Post?
20       A.    I would describe downtime as when it's
21   a slow day.
22       Q.    Isn't that the time that you're
23   supposed to be working on your own investigative
24   ideas, developing sources, and trying to further
25   stories?

I. Livingston

1
2    A.    And I do that.
3        Q.    Well, you didn't do it when you were
4    mystery shopping at TD Bank --
5        A.    I'm sorry, I --
6        Q.    -- or for Shop 'n Chek, correct?
7        A.    -- disagree --
8            MR. PEARSON:  Objection.
9        A.    I disagree with you.  I did do that.
10       Q.    You did -- your testimony is that
11   while you're mystery shopping at TD Bank or at
12   Shop 'n Chek, you're also working for The New
13   York Post developing story ideas and developing
14   sources; is that correct?
15           MR. PEARSON:  Objection.
16       A.    As I stated, my priority was my job at
17   The New York Post.
18       Q.    How many stories did you develop at TD
19   Bank?  Name one.
20       A.    How many stories did I develop at TD
21   Bank?
22       Q.    While you were mystery shopping at TD
23   Bank?
24       A.    I don't know.
25       Q.    How many stories did you develop while

Page 434

I. Livingston

1    you were mystery shopping at Office Depot?
2    A.    I don't know.  I don't recall.
3    Q.    How many sources did you develop by
4    mystery shopping at TD Bank?
5    A.    Oh, I don't know.
6    Q.    Did a lawyer ever accompany you in the
7    car to mystery shop at TD Bank?
8    A.    No.
9    Q.    How many civil filings did you go
10   through while you were mystery shopping at TD
11   Bank?
12   A.    I -- I don't know.
13   Q.    How many trials or arraignments or
14   sentencings did you attend while you were
15   mystery shopping at TD Bank?
16   A.    If I am at TD Bank, I am -- obviously
17   I'm not in another place at the same time.
18   Q.    So that's none, right?
19   MR. PEARSON:  Objection.
20   A.    If there was an arraignment I needed
21   to attend, I was at the arraignment.  If there
22   was a court proceeding I needed to be at, I was
23   at the court proceeding.  If there were
24   witnesses to something for a story that was of

Page 435

I. Livingston

1    interest to The New York Post, I was
2    interviewing those witnesses.  If there was a
3    lawyer I needed to speak to regarding a case, I
4    was speaking to that lawyer.
5    Q.    Ms. Livingston, there was no question
6    pending so I'm going to move to strike that.
7    MR. PEARSON:  Objection to the strike.
8    Q.    How would you know --
9    MR. PEARSON:  There was a question.
10   Q.    How would you know if there was an
11   arraignment in an arraignment part that you
12   needed to attend in advance?
13   A.    How would I know?
14   Q.    Yes.
15   A.    If there was a breaking story or a --
16   a story about -- a newsworthy story going on in
17   arraignments, then I would know about it because
18   of my contacts within the courthouse.
19   During the course of --
20   Q.    Would --
21   A.    I'm sorry.
22   Q.    You know about it --
23   A.    I'm sorry, I --
24   Q.    -- in advance before you even got to

Page 436

I. Livingston

1    the courthouse?
2    A.    I'm sorry, I would like to -- I was
3    saying --
4    Q.    The question was how would you know if
5    you needed to be in an arraignment part?  That
6    was the question.
7    A.    And I stated that my contacts would
8    let me know if there was a newsworthy story
9    going on in the arraignments.  My job was not
10   sitting in arraignments all day watching various
11   arraignments happen.
12   Q.    And isn't it the case that sometimes
13   your contacts wouldn't know or wouldn't advise
14   you that there was an important arraignment that
15   was going to happen in the courtroom?
16   A.    I -- I didn't miss any arraignments
17   because of mystery shopping.
18   Q.    Did you ever miss sentencings?
19   A.    No.
20   Q.    Did you ever miss a sentencing?
21   A.    I'm sorry, did I ever miss a
22   sentencing?
23   Q.    Yes.
24   A.    Any sentencing?

Page 437

I. Livingston

1    Q.    Yes, because of mystery shopping?
2    A.    No.
3    Q.    Did you ever get scooped by the Daily
4    News while you were working at the courthouse?
5    A.    Did I ever get scooped?  Did I have a
6    story that the Daily News did not have?
7    Q.    Uh-huh.  Yes.
8    A.    That happened, but it also happened in
9    the reverse.  I also had stories that the Daily
10   News did not have.
11   Q.    Is that because Nicole Bode at the
12   Daily News was mystery shopping?
13   A.    I don't know if --
14   MR. PEARSON:  Objection.
15   A.    I don't know if Nicole was mystery
16   shopping or not.
17   Q.    Did you ever bump into her during
18   mystery shopping?
19   A.    Did I bump into Nicole at TD Bank?
20   Q.    Yes.
21   A.    No.
22   Q.    So if -- if Nicole Bode got scooped,
23   it wasn't because, to your knowledge, it wasn't
24   because she was out mystery shopping, right?

Page 438

```
 1              I. Livingston
 2         MR. PEARSON:  Objection.
 3      A.    If Nicole Bode got scooped on
 4  something, it was because I was a hard-working
 5  reporter and got the story before she did.
 6      Q.    Did you have any arrangement with
 7  Nicole Bode to cover matters in the courthouse?
 8      A.    I'm sorry, I don't understand what you
 9  mean by "arrangement."
10      Q.    Did you have any agreement with Nicole
11  Bode that you would exchange information
12  regarding matters going on in the courthouse?
13      A.    There -- there were times when we
14  would both buy a transcript.  Other than that,
15  no.
16      Q.    If the criminal courthouse didn't have
17  any matters in the courtrooms that you felt you
18  needed to attend, why didn't you head over to
19  the civil courthouse and go through civil
20  filings and look for cases there?
21      A.    I did.
22      Q.    Well, you didn't do that when you were
23  mystery shopping at TD Bank, right?
24         MR. PEARSON:  Objection.
25      A.    When there was nothing necessarily
```

Page 439

```
 1              I. Livingston
 2  going on in the courthouse, in the criminal
 3  courthouse that was of interest to The Post, I
 4  would go to the Sutphin courthouse and go
 5  through filings.
 6      Q.    Well.
 7      A.    I did do that.
 8      Q.    To be correct, you would -- you
 9  testified earlier that you would go sometimes
10  less than once a week, right?
11      A.    No, I don't think I said that.
12         MR. PEARSON:  Objection.
13      Q.    Oh, well, the record will reflect what
14  you said.
15         Ms. Livingston, do you know how many
16  stories you filed and got a byline for in 2008
17  that related to civil cases in Queens?
18      A.    No, I don't know how many.
19      Q.    How many -- do you have an estimate as
20  to how many?
21      A.    I also -- no, I don't have an
22  estimate, but I also don't know the number of
23  stories that I offered to The New York Post that
24  were also filings that were denied.
25      Q.    Well, your job was to present the
```

Page 440

```
 1              I. Livingston
 2  editors of The Post with stories that the
 3  newspaper would see fit to publish, correct?
 4      A.    Yes, I would present stories that were
 5  going on, stories about lawsuit filings that had
 6  been filed at the New York -- at the -- in
 7  Queens.  So if there wasn't anything of
 8  particular interest to The Post -- I presented
 9  everything that was of interest.
10      Q.    How many -- I'm going to ask you
11  again.  Do you have any idea how many stories
12  you got bylines for in 2008 that originated
13  relating to civil cases?
14      A.    I thought I answered that question.
15      Q.    You don't remember?
16      A.    I believe that's what I said.
17      Q.    What do you think would be a -- what
18  do you think would be an approximate number?
19      A.    I do not know.
20      Q.    Do you think you had a byline once a
21  month in a civil case in 2008 or more or less
22  than that?
23      A.    I do not know.
24      Q.    When you went to the civil courthouse
25  to look at filings, how much time would you
```

Page 441

```
 1              I. Livingston
 2  spend looking at the filings in 2008?
 3      A.    It depended.  I don't know.
 4      Q.    What's the range?  What's the short
 5  end to the long end?
 6      A.    It depended on how much time I had
 7  away from the Queens court, from the criminal
 8  court.
 9      Q.    So from what to what?
10      A.    I'm sorry?
11      Q.    What was the range of time that you
12  might spend -- that you would spend in 2008
13  looking at civil filings?
14      A.    I don't know.  It depends.
15      Q.    Was it more than an hour?
16      A.    I think sometimes it was more than an
17  hour.  Sometimes it was less than an hour.
18      Q.    You complained that Zach Haberman
19  spoke to you harshly sometimes about -- when he
20  was your editor, correct?
21      A.    I complained that he was a
22  demoralizing, demeaning, and screamed and cursed
23  at me.
24      Q.    And those conversations were related
25  to your work as a reporter, correct?
```

I. Livingston

2   MR. PEARSON:  Objection.
3   Q.   They weren't personal conversations,
4   they were work conversations, right?
5   A.   They were conversations -- I wouldn't
6   have a conversation with Zach unless I was -- it
7   was related to work.
8   Q.   Did you ever tell Zach during any of
9   those conversations that you had a job that
10   required you to leave the courthouse during the
11   regular workday?
12   A.   I don't have a job.
13   MR. PEARSON:  Objection.
14   Q.   Did you ever tell Zach Haberman that
15   you had a job doing mystery shopping that
16   required you to leave the courthouse during the
17   day?
18   A.   I did not have another job, but I
19   didn't tell Zach that I mystery shopped, no.
20   Q.   You did not tell Mr. Haberman that you
21   did mystery shopping, correct?
22   A.   I think I answered that.
23   Q.   So --
24   A.   Yes.
25   Q.   So -- and you didn't tell him even

I. Livingston

2   though he got upset with you on the phone from
3   time to time, right?
4   A.   I don't understand what one has to do
5   with the other.
6   Q.   Well, if he was complaining to you
7   about the amount of sources you had or the
8   effort you were putting in or whether or not you
9   had gotten a story, and you were outside the
10   courthouse on that day doing mystery shopping,
11   did you ever offer that up as an explanation for
12   why you had not lived up to his expectations?
13   MR. PEARSON:  Objection.
14   A.   Our conversations were not about those
15   things that you described.
16   Q.   You never told him that you were
17   mystery shopping, correct?
18   A.   I think I have stated twice that I
19   have -- I did not tell him that I mystery
20   shopped.
21   Q.   And you didn't tell Mr. Haberman or
22   your other editors, for that matter, that you
23   were mystery shopping because you didn't think
24   that they would approve of mystery shopping,
25   right?

I. Livingston

2   MR. PEARSON:  Objection.
3   A.   No.
4   Q.   Well, you --
5   A.   That's not why I didn't tell them.
6   Q.   You kept it a secret for five years
7   while you were mystery shopping, right?
8   MR. PEARSON:  Objection.
9   A.   I -- I didn't tell my -- my bosses at
10   The Post, no, but it wasn't a secret.
11   Q.   You didn't tell them because you
12   didn't think that they would approve mystery
13   shopping during the day, right?
14   A.   I didn't think they would --
15   MR. PEARSON:  Objection.  Asked and
16   answered.
17   Q.   Did you think that they would approve
18   your mystery shopping multiple times during a
19   The New York Post workday if you had asked them
20   for permission?
21   A.   I did not not tell them because I
22   thought they would approve or disapprove.
23   Q.   So why did you not tell them?
24   A.   Why did I not tell them?
25   Q.   That's the question.

I. Livingston

2   A.   It wasn't pertinent to The New York
3   Post.
4   Q.   Even though you left the courthouse
5   where your job duty station was to go do mystery
6   shopping during the days you worked for The
7   Post, you didn't think that it was pertinent to
8   your job at The New York Post?
9   A.   As I stated, my job was not just
10   necessarily at the Queens courthouse.  I worked
11   outside of the Queens courthouse doing my job.
12   During hours that were outside of 9 to 5, it did
13   not seem relevant to me, no.
14   Q.   So your explanation is that because
15   some of your duties as a Queens court reporter
16   could be done outside the courthouse, that doing
17   mystery shopping outside the courthouse, which
18   is not a New York Post duty, was consistent with
19   your job for The New York Post?
20   MR. PEARSON:  Objection.
21   A.   My explanation is that my mystery
22   shopping was not -- I'll rephrase that.  My job
23   priority, as I stated before, was working for
24   The New York Post, was being a reporter for The
25   New York Post and covering everything that I

Page 446

1        I. Livingston
2   needed to cover.  Mystery shopping didn't relate
3   to that because it was not a priority.  My job
4   at The Post was my priority.
5        Q.   Ms. Livingston, what, besides mystery
6   shopping, what else did you leave the Queens
7   courthouse to do during the day?
8        A.   I would go and interview people for
9   Sunday for Monday stories.
10       Q.   You know what, let me ask the question
11  differently because I think I mis-asked it.  If
12  you were willing to leave the courthouse during
13  the day to go mystery shopping, what other
14  non-New York Post-related errands were you --
15  were you leaving the New York -- leaving the
16  Queens courthouse during the day to do?
17       MR. PEARSON:  Objection.
18       A.   You're asking me if I was leaving the
19  courthouse to do other things?
20       Q.   Yes.  Exactly.
21       A.   Well, like I was saying, I would go
22  and interview people for Sunday for Monday
23  stories.
24       Q.   No, my question is what non-New York
25  Post things would you leave the courthouse to do

Page 447

1        I. Livingston
2   besides mystery shopping?
3        A.   Oh.  Maybe I would go and get
4   something to eat.
5        Q.   Okay.  Well, that's lunch, right?
6   You're entitled to a half an hour for lunch,
7   correct?
8        A.   I believe that I am entitled to have
9   lunchtime, to have, yeah, break for lunch.
10       Q.   Right.  My question is did you -- did
11  you leave the courthouse during the day to meet
12  friends when you were working at the Queens
13  courthouse?
14       A.   I don't recall that, no.
15       Q.   Did you leave the courthouse to go
16  shopping during the day when you were working at
17  the Queens courthouse?
18       A.   There might have been an occasion when
19  I would go and pick up supplies for the -- for
20  the office.
21       Q.   Did you ever leave the courthouse to
22  do personal shopping during the day when you
23  were working at the Queens courthouse?
24       A.   I don't recall doing that.
25       Q.   Did you -- did you ever go leave the

Page 448

1        I. Livingston
2   courthouse during the day when you were working
3   for The Post to spend time with your son during
4   The Post workday?
5        A.   I don't believe so.
6        Q.   And would it have been appropriate for
7   you to leave the courthouse during the day to
8   meet with friends or go shopping for yourself or
9   meet with your son while you were working for
10  The Post at the Queens courthouse?
11       A.   I don't -- I don't believe I did those
12  things.
13       Q.   But you did leave to go mystery
14  shopping, right?
15       A.   During my --
16       Q.   Yes or no?
17       A.   During my lunchtime, I would go and --
18  and mystery shop.
19       Q.   And during your downtime, right?
20       A.   For the most part, it was during my
21  lunch hour.
22       Q.   You mean during your 30-minute lunch
23  hour?
24       A.   During my break.
25       Q.   Your break, which sometimes ran 90

Page 449

1        I. Livingston
2   minutes or more, correct?
3        MR. PEARSON:  Objection.
4        A.   Like I said, during the times that I
5   would drive somewhere, I wasn't necessarily just
6   strictly driving somewhere.  I was also reaching
7   out to people in the Queens DA's Office or to
8   sources or to lawyers.
9        MR. LERNER:  Let's go off the record
10  for a minute.  We'll take a short break and
11  then come back and finish up.
12       THE VIDEOGRAPHER:  The time is 12:48.
13  We're going off the record.
14       (Recess.)
15       THE VIDEOGRAPHER:  The time is 1:07.
16  We're back on the record.
17  BY MR. LERNER:
18       Q.   Ms. Livingston, did you ever have a
19  conversation with Mr. Greenfield or Mr. Gotthelf
20  about the idea of downtime that you have
21  referred to earlier today?
22       A.   Excuse me.  I think that --
23       Q.   It's a yes or no question, Ms.
24  Livingston.
25       A.   Yes.

Page 450

I. Livingston

1
2    Q.   Yes?  The answer is yes?
3    A.   Yes.
4    Q.   All right.  What was that
5  conversation?
6    A.   During one of the APA evaluations, I
7  think Michelle actually said that during --
8  during time when things are slow, that I
9  should -- and Greenfield maybe as well -- that I
10  should comb the Internet looking for stories, go
11  to various Websites.  Michelle specifically said
12  I should go out and cruise neighborhoods looking
13  for neighborhood stories, that sort of thing.
14    Q.   And what about Zach Haberman, did you
15  ever have that conversation with him?
16    A.   I don't recall having a specific
17  conversation with him.
18    Q.   And did you ever have a conversation
19  with a supervisor about downtime while you were
20  working in the Queens courthouse?
21    A.   I don't recall a specific
22  conversation.
23    Q.   Did you ever tell Michelle or Dan or
24  Haberman that during your downtime you thought
25  you could go mystery shopping?

Page 451

I. Livingston

1
2    A.   As I've stated before, I never told
3  them about my mystery shopping.
4    Q.   When they told you about downtime
5  being to be used for looking for stories and
6  looking through the Internet, was that a
7  surprise to you or was that advice consistent
8  with your understanding of what your job was as
9  a reporter?
10    A.   I understand that to be what you --
11  that you're -- you're basically always looking
12  for a story.  Even if you're not working, you're
13  looking for stories.
14    Q.   And that included when you were in the
15  Queens courthouse, right?
16    A.   Yes.
17    Q.   Ms. Livingston, you stated earlier
18  that The New York Post was your priority.  If
19  you could be meeting with a source or going
20  mystery shopping, in your view, which should you
21  be doing?
22    A.   If there was a source that I needed to
23  meet with, obviously I would meet with the
24  source.  I, as I stated, I didn't -- I didn't
25  need to mystery shop.

Page 452

I. Livingston

1
2    Q.   My question was if you could be
3  meeting with a source or mystery shopping, which
4  should you be doing?
5    MR. PEARSON:  Objection.
6    A.   I thought I answered the question.
7    Q.   So what is the answer?
8    A.   I said that if -- if there was a
9  source, someone that I needed to meet with, then
10  I would meet with that person.  I didn't need to
11  do a mystery shop.
12    Q.   And if you could be meeting with an
13  assistant district attorney in the Queens
14  criminal court or go mystery shopping, which
15  should you choose to do?
16    MR. PEARSON:  Objection.
17    A.   If I had a meeting with an ADA, I
18  would have had a meeting with the -- with the
19  assistant district attorney rather than going
20  mystery shopping.  As I said, my priority was my
21  job, and if there was --
22    Q.   If you could be --
23    A.   If there was a source that I needed to
24  meet with, I would meet with that person.
25    Q.   And if you could be working to set up

Page 453

I. Livingston

1
2  a meeting with a source or an assistant district
3  attorney or a court officer on the one hand or
4  mystery shopping on the other hand, which should
5  you do as a New York Post Queens courthouse
6  reporter?
7    MR. PEARSON:  Objection.
8    A.   As I -- as I stated, that there are
9  many times that I would be on the phone reaching
10  out to someone and sometimes you had to wait
11  till people called you back.
12    Q.   So would you agree that your priority
13  should be working to set up meetings with
14  sources in the courthouse over and above going
15  mystery shopping?
16    A.   My priority was my job, was -- was
17  setting up meetings, was meeting with people.
18  Those were my priorities at all times.
19    Q.   My question was:  Should your priority
20  be working to set up meetings with sources or
21  should it be mystery shopping?
22    A.   That was my priority.
23    Q.   Setting up meetings to meet with
24  sources?
25    A.   Certainly.  Yes.

Page 454

I. Livingston

1
2    Q.   But many times during the day you went
3  mystery shopping instead, correct?
4    A.   I would go mystery shopping.  Mystery
5  shopping would take two minutes, five minutes.
6  So, but yeah, in the -- in between that, if time
7  allowed, then I would take two minutes or five
8  minutes to do a mystery shop, but I would also
9  make phone calls and reach out to people and
10  make appointments and schedule meetings and all
11  those things to pursue stories.
12    Q.   And if you could be reviewing civil
13  court filings in the Queens civil courthouse or
14  mystery shopping, which should you choose to do?
15       MR. PEARSON:  Objection.
16    A.   I would always -- I would go to the
17  Sutphin courthouse -- as a matter of fact, I
18  kept track of the files that I looked at so I
19  could continue from that point on to look at new
20  court filings.  So that was my priority.  That's
21  what I was doing.
22    Q.   Well, if the choice was between
23  reviewing court filings in the civil courthouse
24  or going mystery shopping, which would you --
25  which is your priority?

Page 455

I. Livingston

1
2    A.   I was -- I was going to the Sutphin
3  courthouse.
4    Q.   However, you choose many, many times
5  to go mystery shopping in Queens in hours when
6  the Queens civil courthouse was open, correct?
7    A.   Sometimes I would do a mystery shop in
8  between maybe on the way from or to, yes.
9    Q.   And the Queens civil courthouse closed
10  at the end of the day, right, 5 o'clock?  The
11  clerk's office?
12    A.   Offhand, I'm not really sure what time
13  they closed.
14    Q.   What time did TD Bank's branch close?
15    A.   On some days, 8 o'clock.
16    Q.   What time?
17    A.   8 P.M.
18    Q.   8 P.M.?
19    A.   On some days.
20    Q.   So you could do your -- what about
21  during the week?
22    A.   I'm sorry?
23    Q.   What about during the week?
24    A.   Yeah, sometimes at 8 P.M.
25    Q.   Is there ever a time when you should

Page 456

I. Livingston

1
2  mystery shop instead of doing your job for The
3  New York Post?
4    A.   As I stated, my priority was always
5  doing my job at The New York Post.
6    Q.   It's a yes or no question, Ms.
7  Livingston.
8    A.   I'm sorry, then what was your
9  question?
10    Q.   Is there ever a time when you should
11  mystery shop instead of doing your job for The
12  New York Post?
13       MR. PEARSON:  Objection.
14    A.   I wasn't not doing my job for The New
15  York Post.
16    Q.   That is not the question.  The
17  question is, is there ever a time when you
18  should mystery shop instead of doing your job
19  for The Post?
20       MR. PEARSON:  Objection.
21    A.   I was doing my job.
22    Q.   Again, that's not the question.  Is
23  there ever a time when you should mystery shop
24  instead of doing your job for The New York Post?
25       MR. PEARSON:  Objection.

Page 457

I. Livingston

1
2    Q.   It's a yes or no question.
3    A.   I was doing my job.
4    Q.   Yes or no?
5    A.   The way you're asking it, it --
6  it's -- I was doing my job at all times.
7    Q.   Ms. Livingston, you are delaying this
8  deposition.
9    A.   No, I'm not.
10    Q.   The question is a yes or no question.
11  Is there ever a time when you should go mystery
12  shopping instead of doing your job for The New
13  York Post?
14    A.   The mystery shops I did were
15  incidental breaks in a day.
16    Q.   Yes or no?
17    A.   Say it again, please.
18    Q.   Is there ever a time when you should
19  do mystery shopping instead of doing your job
20  for The Post?
21       MR. PEARSON:  Objection.
22    A.   I think I answered the question.  I
23  did my job.
24    Q.   Again, the question is, is there ever
25  a time when you should do mystery shopping

Page 1

1

2    UNITED STATES DISTRICT COURT      ☞ ORIGINAL

3    SOUTHERN DISTRICT OF NEW YORK

4    -------------------------------x

5    AUSTIN FENNER and

6    IKIMULISA LIVINGSTON,

7

8              Plaintiffs,

9         v.                    09 Civ. 9832

10                             (BSJ)(RLE)

11   NEWS CORPORATION, NYP HOLDINGS,

12   INC. d/b/a THE NEW YORK POST

13   and DAN GREENFIELD and

14   MICHELLE GOTTHELF,

15             Defendants.

16   -------------------------------x

17

18        DEPOSITION OF IKIMULISA LIVINGSTON

19             New York, New York

20             May 6, 2013

21

22   Reported by:

23   MARY F. BOWMAN, RPR, CRR

24   JOB NO. 61106

25

Page 6

```
 1                    LIVINGSTON
 2   IKIMULISA LIVINGSTON,
 3           called as a witness by the defendants,
 4           having been duly sworn, testified as
 5           follows:
 6   EXAMINATION BY
 7   MR. LERNER:
 8       Q.    Ms. Livingston, did you have a
 9   meeting at the New York Post offices in
10   February of 2013 in which you found out that
11   your employment was being terminated?
12       A.    Yes.
13       Q.    How did you learn about that
14   meeting?
15       A.    How did I learn about the meeting?
16       Q.    That a meeting would be held?
17       A.    I received an e-mail from Amy
18   Scialdone the day before.  Well, I received
19   the e-mail after, after work hours the day
20   before.
21       Q.    Did the e-mail tell you what the
22   meeting would be about?
23       A.    The e-mail just said that I was to
24   come to the HR -- Amy's office at 11 a.m.  It
25   did not say the subject of the meeting.
```

Page 7

```
 1                    LIVINGSTON
 2       Q.    Did anybody tell you what the
 3   subject of the meeting would be before the
 4   meeting occurred?
 5       A.    No.
 6       Q.    Where was the meeting held?
 7       A.    I don't know the exact address.
 8   It's a building across the street.  I'd
 9   say --
10       Q.    Is it 1185 Avenue of the Americas?
11       A.    I don't know the address of the
12   building, but it is across the street from
13   where the New York Post is.
14       Q.    Was it in Amy Scialdone's office?
15       A.    It was in an office there.  I don't
16   know, per se, if it was Amy's office, but it
17   was an office there.  I don't remember what
18   floor it was.
19       Q.    Was the office area where the
20   meeting was held New York Post offices?
21       A.    I don't know.
22       Q.    Do you remember what floor the
23   meeting was on?
24       A.    No.
25       Q.    Who was at the meeting?
```

Page 8

```
 1                    LIVINGSTON
 2       A.    When I walked into the room, Jesse
 3   Angelo was seated in the corner and Amy
 4   Scialdone and myself.
 5       Q.    During the course of the meeting,
 6   did anybody else attend the meeting?
 7       A.    No.
 8       Q.    What -- how did the meeting begin?
 9       A.    I walked into the office, and Jesse
10   Angelo was seated in the corner.  He said,
11   Nice to see you, and I sat down and then,
12   Jesse Angelo proceeded to speak and say that
13   he had a letter to read to me.
14       Q.    Did he read that letter to you?
15       A.    And then he proceeded to read the
16   letter.  Aloud.
17       Q.    Is there anything else that you
18   recall about the conversation in the room
19   before he read the letter, other than what
20   you have testified to?
21       A.    I just recall him saying it was
22   nice to see me, so -- and it was nice to --
23   it just seems ironic, but that's about it.
24       Q.    Did he give you the letter so that
25   you could follow along as he read it?
```

Page 9

```
 1                    LIVINGSTON
 2            MR. PEARSON:  Objection.
 3       Q.    I'll withdraw the question and ask
 4   it differently.
 5            Do you recall if you had the letter
 6   in front of you while he was reading it?
 7       A.    Right now, I don't.  I don't recall
 8   for certain.  I don't know.
 9       Q.    Do you recall receiving a copy of
10   the letter at that meeting?
11       A.    I do.  I did receive a copy of the
12   letter, yes.
13       Q.    Did you read it?
14       A.    Did I read it during this meeting?
15       Q.    Did you read it at all?
16       A.    I read it at some point, yes.
17       Q.    I am giving you Exhibit 25 of your
18   deposition.  Is this the letter that you
19   received from Jesse Angelo at the meeting on
20   February 26, 2013?
21       A.    This looks like the letter that I
22   received.
23       Q.    Other than Mr. Angelo reading you
24   the letter, was there any other discussion at
25   that meeting regarding the reasons that your
```

LIVINGSTON

1                LIVINGSTON

2  asked me something in relation to keeping the

3  account open and I told her that -- I think I

4  told her that I was terminated so I wanted to

5  close my account.  So she printed out --

6  asked me my account number and then she cut

7  me a check for the sum of the money in the

8  Fox Credit Union.

9     Q.    Did Amy Scialdone do or say

10  anything during the course of that meeting

11  and after that you believe was offensive or

12  retaliatory?

13     A.    I don't believe she did anything

14  that was offensive to me, although I believe

15  the fact that I was fired was retaliatory act

16  for the lawsuit that I filed.

17     Q.    OK.  So we will get to that in a

18  second.  But Amy didn't do anything at the

19  time that you thought was at the meeting

20  offensive or discriminatory?

21     MR. PEARSON:  Objection.

22     A.    I stated that she didn't do

23  anything that offended me that I recall, but

24  I believe the fact that I was fired was

25  retaliatory.

LIVINGSTON

1                LIVINGSTON

2     Q.    OK.  You mentioned that you noticed

3  a gentleman that seemed to be with the two of

4  you when you got up to the elevator on the

5  third floor in the 1211 Avenue of the

6  Americas building.  Is that correct?

7     A.    I don't remember what floor we

8  exited from the elevator, but he was on the

9  elevator with us.

10     Q.    Whichever floor was -- whichever

11  floor the credit union was on, right?

12     A.    Whichever floor the credit union

13  was on, I noticed him when he was on the

14  elevator with us when he came down from

15  whatever floor we were on, the building

16  across the street, he came out of the

17  elevator, he followed us as we walked across

18  the street, got in the same elevator we did.

19  And after we stepped out of the elevator, I

20  asked Amy about the guy who is following us.

21     Q.    OK.  Do you know who he is?

22     A.    No, I don't.

23     Q.    Did you speak to him at all?

24     A.    No, I did not.

25     Q.    And when was the last time you saw

LIVINGSTON

1                LIVINGSTON

2  him that day?

3     A.    I don't recall seeing him anymore

4  after I exited the building.

5     Q.    Now, you stated earlier and you

6  state in your third amended complaint that

7  you believe that the termination of your

8  employment was retaliatory.  What do you

9  believe that was in retaliation for?

10     A.    I believe that I was discriminated

11  against when I was demoted from my Queens

12  courthouse beat, and I believe every, every

13  day after that, I have been discriminated

14  against, and I believe my termination, in

15  essence, since the Post -- since my

16  supervisor -- since my editor at the Post sat

17  across from me during my deposition, I think

18  it was January of last year, and heard

19  everything that went on in that deposition,

20  including questions and answers in relation

21  to any mystery shopping I did, and then this

22  is the reason a year later that I'm

23  terminated, I believe this is all

24  retaliatory, related to, related to the

25  lawsuit.

LIVINGSTON

1                LIVINGSTON

2     Q.    Who is the editor you are referring

3  to in your last answer?

4     A.    The editor who sat across from me

5  during my deposition?

6     Q.    Yes.

7     A.    That would have been, in January,

8  that would have been Michelle Gotthelf.

9     Q.    Was Jesse Angelo at your

10  deposition?

11     A.    No.  Jesse Angelo was not at the

12  January deposition or the deposition I just

13  had in February.

14     Q.    In fact, at the time, Jesse Angelo

15  wasn't -- was running the daily, he wasn't

16  actually involved in the New York Post,

17  correct?

18     MR. PEARSON:  Objection.

19     A.    I don't know what Jesse Angelo's

20  duties would have been during my deposition.

21     Q.    So it is your testimony that your

22  termination was in retaliation for what

23  exactly?

24     MR. PEARSON:  Objection.

25     A.    I thought I answered that a moment

LIVINGSTON

1   
2  ago.
3      Q.    Was it in retaliation for the
4  filing of your lawsuit.
5      MR. PEARSON:  Objection.
6      A.    From the time I was demoted from my
7  beat at Queens courthouse, I have been
8  discriminated against by the New York Post by
9  the editors there.  I have been discriminated
10 against since that time, and I believe this
11 termination was as a result of the
12 discrimination as well as retaliatory in
13 regards to the lawsuit that was filed.
14     Q.    And in what way have you been
15 discriminated against at the New York Post
16 since your deposition in January of 2012?
17     A.    I am sorry, repeat that again.
18     Q.    In what way were you discriminated
19 against at the Post since your deposition in
20 January of 2012?
21     A.    As I stated, every day since my
22 demotion from the Queens courthouse beat, I
23 have been discriminated against.  Every day
24 that I was sent out on stories that my
25 editors knew had no likelihood of making the

LIVINGSTON

1  paper, in addition to the fact that the
2  stories they did -- they sent me out on these
3  dead-end stories while my counterparts, my
4  white counterparts were given basically good
5  stories that would make the paper.
6      So since my deposition last year,
7  January, I have been discriminated against --
8  oh, and not to mention the fact that I still
9  haven't gotten, hadn't gotten a desk or a
10 telephone.
11     Q.    And so you have been discriminated
12 against since January of 2012 because of your
13 demotion in 2008?
14     MR. PEARSON:  Objection.
15     A.    I thought I answered that, but I
16 have been discriminated against every day
17 since my demotion from the Queens courthouse
18 beat and every day that my editor, whoever
19 that will be, sent me out on a story that had
20 absolutely no chance of making the paper and
21 then sent my white counterparts on stories
22 that had an extreme likelihood of making the
23 paper was another form of discrimination, or
24 another example of discrimination.
25  

LIVINGSTON

1   
2      Q.    Can you identify a dead-end story
3  that you were sent on since January of 2012?
4      A.    Yes.  The day I was sent out on --
5  I was sent to an address for -- I don't
6  recall the gentleman's first name, but his
7  last name was Williams.  He was a bus driver
8  who was acquitted of the top charges in
9  relation to a bus crash that killed several
10 people coming back from a, I think it was an
11 casino.
12     So I was sent to an address that
13 was supposed to be his, at least that's what
14 I was told.  But in actuality, I knew it
15 wasn't his address and I told my editor who
16 sent me there that it wasn't the address
17 because I had worked on the story when the
18 bus crash happened and I had been sent to
19 Mr. Williams address before and it was a
20 different address.
21     And that was, I believe it was more
22 than a year ago from his acquittal and there
23 was no way that I was going to garner
24 anything from sitting in front of an address
25 where the person we were interested in

LIVINGSTON

1  interviewing or getting words from or even
2  getting words from neighbors from and the
3  person didn't live there and hadn't lived
4  there for, I don't know how many years.
5      Q.    Did you ask your editor why he
6  wanted you to go to that address?
7      A.    I don't recall right now whether I
8  specifically asked if -- that person why I
9  was sent to that address.  I do recall
10 telling someone that that is not the correct
11 address.
12     Q.    Did you go to that address?
13     A.    Yes, I did.
14     Q.    Did you get any interviews at that
15 address?
16     A.    I did not get any interviews with
17 anyone who knew Mr. Williams.
18     Q.    You did not what?
19     A.    I did not get any interviews with
20 anyone who knew Mr. Williams.
21     Q.    Did you get any interviews at all?
22     A.    I spoke to people in the
23 neighborhood in the building, but none of
24 those people knew Mr. Williams.
25  

Page 32

LIVINGSTON

1
2  but he apologized.
3       Q.    Did he explain why he said what he
4  said?
5       A.    Right now, I don't recall.
6       Q.    Did you ask him for an apology or
7  did he volunteer it to you?
8       A.    I did not ask him for an apology.
9  He volunteered the apology.
10      Q.    Did you ever work with him again
11 after that?
12      A.    Yes.
13      Q.    Did he use any offensive language
14 after that occasion?
15      A.    I think there was another occasion
16 when he cursed, but this was in relation to
17 the Post not paying him on time or something
18 like that.
19      Q.    Since your deposition in 2012, in
20 the month of January, have you heard anybody
21 else use a racial epithet in your presence?
22      A.    At the Post?
23      Q.    Let me reword that.
24            Since your deposition in January of
25 2012, are you aware of anybody else using

Page 33

LIVINGSTON

1
2  racist or racially offensive language at the
3  Post?
4       A.    Right now, I don't recall.
5       Q.    How about any sexist language?
6       A.    I am sorry?
7       Q.    How about any sexist language?
8       A.    Right now, to my best recollection,
9  I don't recall.
10      Q.    And you haven't made any complaints
11 to HR or the Post about discrimination or
12 harassment or retaliation since January of
13 2012, correct?
14      A.    Well, I believe in my evaluation, I
15 did state that I'm given these dead-end
16 stories. But beyond that, I don't recall.
17            MR. LERNER:  Let's take a break and
18 we may be done.
19            MR. PEARSON:  Sure.
20            THE VIDEOGRAPHER:  The time is 3:17
21 p.m.  We are going off the record.
22            (Recess)
23            THE VIDEOGRAPHER:  The time is 2:25
24 p.m.  We are back on the record.
25      Q.    Ms. Livingston, since January of

Page 34

LIVINGSTON

1
2  2012 to the present, other than the meeting
3  you described with Jesse Angelo, have you had
4  any other contact with Jesse Angelo?
5       A.    Yes.
6       Q.    When was that?
7       A.    I think it was in January, there
8  was a going away party for Michael Hechtman,
9  who was a long-time editor at the Post, and
10 during the festivities, there was an occasion
11 where Jesse and I, I guess we were passing
12 one another, and Jesse Angelo intentionally
13 looked away so he didn't have to say anything
14 to me, which kind of reminds me of another
15 black employee that was fired by the Post who
16 told me about -- it just reminded me of Neil
17 Graves, another black employee who had been
18 fired by the Post who told me about -- he was
19 walking down the street one day and saw Jesse
20 Angelo and Jesse intentionally looked away so
21 he wouldn't have to say anything to him.
22      Q.    Do you know if Jesse looked away
23 from you at the party because you're black?
24            MR. PEARSON:  Objection.
25      A.    I couldn't really tell you what his

Page 35

LIVINGSTON

1
2  reasoning for looking away was.  I just know
3  what he looked away when he could have just
4  as easily said hello.
5       Q.    Do you know if he looked away from
6  white people at the party as well?
7            MR. PEARSON:  Objection.
8       A.    I wasn't watching him at the party.
9  I just know that when there was an occasion
10 when he and I passed near one another, he
11 looked away.
12      Q.    And did you say anything to him or
13 did he say anything to you at the party?
14      A.    As I just said, he looked away, so
15 no, he didn't say anything to me.
16      Q.    And is that the only occasion since
17 January of 2012 other than your termination
18 meeting where you have had any contact with
19 Jesse Angelo?
20      A.    Right now, I don't recall any other
21 contact.  Right now, I don't recall that.
22      Q.    What month and year was the
23 Hechtman party?
24      A.    I believe that was in January of
25 this year.

```
                    LIVINGSTON
 1
 2       Q.    January 2013?
 3       A.    Yes.
 4       Q.    Other than what you have testified
 5  to here today, so far, is there any other
 6  change, are there any changes in how you were
 7  treated since your last -- since your January
 8  2012 deposition at the New York Post?  Let me
 9  rephrase that.
10       Since January of 2012, when you
11  were first deposed in this case, have there
12  been any changes at the New York Post in the
13  way you have been treated other than any of
14  the things you have testified to here today
15  so far?
16       A.    Right now, I don't recall --
17  nothing else comes to mind right now in
18  regards to that question.
19       Q.    Do you think you were treated worse
20  after January of 2012 or was it simply
21  consistent treatment both before and after
22  January of 2012?
23       MR. PEARSON:  Objection.
24       A.    As I stated, there was a
25  continuation from the demotion from the
```

```
                    LIVINGSTON
 1
 2  Queens courthouse beat and every day was just
 3  a, pretty much a dead-end assignment that had
 4  little or no chance of making the paper.
 5       Q.    OK.  Since January of 2012, have
 6  you had any conversations or communications
 7  with any editor or New York Post executive
 8  about your lawsuit?
 9       A.    I am sorry, what was the question
10  again?
11       Q.    Since January of 2012, have you had
12  any conversations with any editor or New York
13  Post executive about your lawsuit?
14       A.    Not that I recall, no.
15       Q.    Was the -- was the white reporter
16  on the Williams story that was sent to
17  another location, did that reporter get an
18  interview of Williams?
19       A.    I'm pretty sure -- I'm pretty sure
20  I mentioned to you that I didn't know what
21  that reporter got.
22       Q.    So you don't know if that reporter
23  was sent to a location that didn't bear fruit
24  either, right?
25       MR. PEARSON:  Objection.
```

```
                    LIVINGSTON
 1
 2       A.    From what I do know, I was sent to
 3  an address that was definitely not
 4  Mr. Williams and the white reporter, white
 5  male reporter was sent to an address that --
 6  at least at one point in the recent future --
 7  or recent past had been Mr. Williams'
 8  address.
 9       Q.    How do you know that the address
10  you were sent to was definitely not the right
11  address?
12       MR. PEARSON:  Objection.
13       A.    One thing the people I spoke to in
14  the neighborhood, the photographer I worked
15  with that day, he also knew it wasn't the
16  correct address, and the fact that I had gone
17  to the correct address and saw Mr. Williams
18  at that previous address which is the address
19  where the white reporter was sent the
20  previous year.
21       Q.    How do you know he was still at
22  that other address a year later?
23       A.    I don't know that he was at that --
24  that he still lived at the previous address.
25  I just know that if there was a chance of
```

```
                    LIVINGSTON
 1
 2  getting anything worth putting in a story, it
 3  would have been at that other address, not
 4  the address that I was sent to.
 5       Q.    Do you know why your editor sent
 6  you to that address?
 7       MR. PEARSON:  Objection.
 8       A.    Like I said, since I was demoted
 9  from my Queens courthouse beat, I've
10  consistently been sent on dead-end stories
11  that had very little chance of making the
12  paper.  This was just another occasion where
13  I was sent someplace where they pretty much
14  had to know I wasn't going to get anything
15  worth putting in a story.
16       Q.    Did you ask the editor that day why
17  are you sending me to this address?
18       A.    Usually I can't even get a hold of
19  an editor, so no, I didn't speak to an editor
20  and specifically say why did you send me to
21  this address.
22       MR. PEARSON:  Are we taking a
23  break?
24       MR. LERNER:  Let's go off the
25  record.
```

Page 45

LIVINGSTON

1
2  specifically gave me assignments, but I would
3  think yes, over that time span, I would have
4  been given an assignment by her.
5      Q.    And you were testifying about how
6  you received story assignments, including one
7  regarding the bus driver story, from someone
8  who may or may not have been an editor.  Do
9  you know whether or not you were assigned
10 that story by an editor at any point?
11     A.    Yeah, right now, I don't know.  I
12 don't recall exactly who the rewrite person
13 was, who the editor was on the story, but
14 normally the rewrite people communicate to
15 the editors who is going where.
16     Q.    OK.  So who is it that generally
17 makes story assignment decisions such as the
18 one that would have sent you to that
19 particular address for the bus driver story?
20     MR. LERNER:  Objection.
21     A.    Normally the editors decide who
22 goes where.
23     Q.    How do you know that?
24     A.    That just seems to be the customary
25 way that things are done.  Before -- normally

Page 46

LIVINGSTON

1
2  editors are the ones who assign stories.
3      Q.    What do you base that on?
4      A.    Editors will call me and assign a
5  story to me.  Or sometimes a rewrite person
6  will call and say, Eric Lenkowitz wants to
7  send you here, who is an editor, he wants to
8  send you there.  So that's normally the way
9  it goes.
10     MR. PEARSON:  No further questions.
11 EXAMINATION BY
12 MR. LERNER:
13     Q.    Which, Ms. Livingston, when you
14 said editors are normally the ones who decide
15 who goes where, do you know how many
16 associate editors there are in the metro
17 desk?
18     A.    I don't even know what the exact
19 titles are for the editors.
20     Q.    Do you know how many editors there
21 are on the metro desk?
22     A.    Right now, I don't recall exactly
23 how many editors are on the desk.
24     Q.    Is it somewhere between five and
25 ten?

Page 47

LIVINGSTON

1
2      MR. PEARSON:  Objection.
3      A.    Like I said, like I said I don't
4  really know.
5      Q.    Is Eric Lenkowitz an editor?
6      A.    I don't know his exact title, but I
7  know that he is part of the editor -- editors
8  desk.
9      Q.    What are editors are you aware of
10 on the metro desk?
11     A.    There is Neal Sloane -- this is as
12 of my firing as far as I know.  There is Neil
13 Sloane, Dan Greenfield, Michelle Gotthelf, of
14 course, Mike Hechtman.  He was an editor.
15 And then sometimes there are people like on
16 the weekends who do editor's shifts, but
17 right now, those are the ones that come to
18 mind.
19     Q.    And when you get your story
20 assignments to those, are those normally
21 communicated to you by a rewrite?
22     A.    Well, no one gives me a story
23 assignment now.
24     Q.    When you received story assignments
25 at the Post, were they normally communicated

Page 48

LIVINGSTON

1
2  to you by a rewrite?
3      A.    Sometimes rewrite, sometimes an
4  editor.
5      Q.    Rewrites are not editors, right?
6      A.    It is my understanding that rewrite
7  is a reporter who writes in the office.
8      Q.    And sometimes you got an assignment
9  from an editor, right?
10     A.    I would get assignments from
11 editors, yes.
12     Q.    And could have been any of the
13 editors that you have mentioned today, right?
14     A.    That's correct.
15     Q.    How many rewrites are working on a
16 given day at the New York Post?
17     A.    I couldn't tell you that.  I don't
18 know.
19     Q.    Is it more than five?
20     A.    I am not privy to the staff
21 scheduling now, nor was I when I was actually
22 an employee.  I don't know.
23     Q.    Other than Greenfield and Gotthelf,
24 do you have knowledge that any of the other
25 editors on the metro desk know about your