# Exhibit 2

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   ------------------------------x

5   AUSTIN FENNER and

6   IKIMULISA LIVINGSTON,

7

8                   Plaintiffs,

9           v.                        09 Civ. 9832

10                                     (BSJ)(RLE)

11   NEWS CORPORATION, NYP HOLDINGS,

12   INC. d/b/a THE NEW YORK POST

13   and DAN GREENFIELD and

14   MICHELLE GOTTHELF,

15                   Defendants.

16   ------------------------------x

17

18               DEPOSITION OF AUSTIN FENNER

19                  New York, New York

20                  January 11, 2012

21

22   Reported by:

23   MARY F. BOWMAN, RPR, CRR

24   JOB NO. 45411

25

FENNER

1
2  meeting?
3      A.   I went to seek legal counsel.
4      Q.   And was your -- and did you do
5  that?
6      A.   I eventually did seek legal
7  counsel.
8      Q.   Was that Mr. Thompson?
9      A.   That is correct.
10     Q.   Besides yourself, Mr. Fenner, who
11 attended the meeting?
12     A.   My coplaintiff, Ikimulisa
13 Livingston, Leonard Green, Gary Miller, Neil
14 Graves.
15     Q.   So it was five people?
16     A.   I believe that's correct.
17     Q.   And did you discuss with those
18 individuals the bringing of a lawsuit against
19 the New York Post?
20     A.   That was the intent of the meeting
21 because we all felt we needed legal
22 protection.
23     Q.   And you're aware that only
24 Ms. Livingston and yourself have filed
25 lawsuits against the Post?

FENNER

1
2      A.   That's correct.
3      Q.   Did you want Mr. Green or
4  Mr. Miller or Mr. Graves to join in your
5  lawsuit?
6      A.   I don't know if it is a question of
7  whether I wanted them to do it or not.  I
8  wanted to hear what they had to say.  That's
9  why I went to that meeting.
10     Q.   What did they have to say about
11 joining in the lawsuit?
12         MR. THOMPSON:  Objection.
13     A.   Well, we were trying to figure out
14 what we should do, what should be our next
15 step.
16     Q.   What did they have to say about
17 joining the lawsuit?
18         MR. THOMPSON:  Objection.
19     A.   They expressed the same thought,
20 same idea, trying to figure out what we
21 should do, how we should do it.
22     Q.   Did they say they would not join in
23 the lawsuit?
24     A.   They didn't say that.
25     Q.   Did they say that they would?

FENNER

1
2      A.   They expressed the idea that we
3  should try to figure out what we should do
4  next.
5      Q.   And did you -- when you met with
6  your attorneys, Mr. Thompson, were you
7  accompanied by any of the people that were at
8  that meeting?
9      A.   I went by myself.
10     Q.   Have you had any conversations with
11 Mr. Graves or Mr. Green or Mr. Miller about
12 the reasons why they chose not to join in
13 your lawsuit?
14     A.   I didn't ask them why they did not
15 join the lawsuit.
16     Q.   Did they tell you why they chose
17 not to join in the lawsuit?
18     A.   I can't recall them saying,
19 answering why they didn't join the lawsuit.
20     Q.   Do you know if they have lawyers?
21     A.   I don't know.
22     Q.   You were criticized by your
23 editors, Michelle Gotthelf and Dan Greenfield
24 for your performance at the Post, correct?
25     A.   They wrote false evaluations which

FENNER

1
2  they used to discriminate against me and used
3  as a tool to fire me from the Post.
4      Q.   Mr. Fenner, it is a yes or no
5  question.
6         MR. THOMPSON:  Objection.
7      Q.   You were criticized by your editors
8  for your performance at the Post, correct?
9      A.   They wrote unfair and false
10 evaluations.
11     Q.   Mr. Fenner, this is a yes or no
12 question.
13         MR. THOMPSON:  Let him answer the
14 question.
15     Q.   You were criticized, they
16 criticized you right?
17     A.   Can you repeat your question.
18     Q.   You were criticized by Ms. Gotthelf
19 and Mr. Greenfield for your performance at
20 the Post, right?
21     A.   In what way?
22     Q.   They criticized you?
23     A.   They wrote unfair and false
24 evaluations --
25     Q.   Mr. Fenner, you are going to get a

---

**Page 38**

FENNER

Q. Any of Obama's political adversaries, either as a local politician or national one.

A. Well, the scope of the story was he was running for the presidency of the United States.

Q. My question was, did you interview any of Obama's political adversaries while you were in Chicago?

A. I don't recall. If I had a copy of my story, it would refresh my recollection.

Q. You would -- would you agree with me that this e-mail of May 2, Fenner Exhibit 1, is a highly critical e-mail?

A. Michelle Gotthelf criticized my work, yes.

Q. What is the basis, do you believe that her criticism in this e-mail was an example of Ms. Gotthelf discriminating against you?

A. No.

Q. Did you write a response to Ms. Gotthelf to this e-mail?

A. I don't recall if I did.

**Page 39**

FENNER

Q. Did you disagree with Ms. Gotthelf in that e-mail?

A. The story I wrote was a solid story. It wasn't -- it was not a sensational story. It wasn't a -- it was a tale of what was happening. It was not a hot story.

Q. So you agreed with Ms. Gotthelf that you did not get what she sent you to Chicago to get?

A. Can I elaborate?

Q. No. It is a simple question. Did you agree with her or not?

A. The story I produced -- my goal was to get an interview with Jeremiah Wright. I didn't get that.

Ms. Gotthelf is saying that she wanted a -- she wanted a sensational story, the story I produced was not that.

Q. The Post is a tabloid newspaper, correct?

A. That's correct.

Q. Its goal is to uncover and run sensational stories, correct?

A. That's correct.

**Page 40**

FENNER

Q. And you did not do that on that trip, correct?

A. Correct.

MR. LERNER: I am going to mark Fenner Exhibit 2, AF 561 through 563.

For the record, Fenner Exhibit 1 is Bates number NYPFL 610.

(Exhibit 2, document Bates stamped AF561 through 563 marked for identification, as of this date.)

Q. Take a look at Fenner Exhibit 2. We will get some other copies going around.

Fenner Exhibit 2 is an e-mail dated Monday, May 19, 2008. Mr. Fenner, do you recognize this e-mail?

A. I'm still reading it.

I recognize it.

Q. The e-mail was written by Neil Sloane to you --

A. That is correct.

Q. -- on that date?

Who is Neil Sloane?

A. He is an editor.

Q. Does he work for the city desk?

**Page 41**

FENNER

A. That is correct.

Q. And what story does this e-mail concern?

A. There is a singer, a crooner named R. Kelly and he was being charged in Chicago criminal court for sexual abuse of an under-age girl.

Q. That was a story of national interest, is that fair to say?

A. Yes.

Q. Were you sent to Chicago to get that story?

A. That's correct.

Q. And Mr. Sloane, in his e-mail to you, was critical of the story that you wrote, correct?

A. Correct.

Q. And he showed you actually two versions of the story, a version number 1 and version number 2, and asked you to compare the two, right?

A. That's correct.

Q. Just for the record, an e-mail version number 1 was the story that you

TSG Reporting - Worldwide    800-702-9580

11

FENNER

1  
2  submitted and version number 2 was the story
3  that was rewritten by somebody at the Post,
4  right?
5      A.   They added copy to the story, yes.
6      Q.   And Mr. Fenner, you did not list
7  Mr. Sloane as up with of the people who
8  discriminated against you at the Post when I
9  asked you that question earlier.  Do you
10  recall that?
11     A.   I recall that.
12     Q.   And do you stand by that answer?
13  In other words, was Mr. Sloane somebody who
14  discriminated against you?
15     A.   No.
16     Q.   And do you consider this e-mail to
17  be an example of discrimination against you?
18     A.   No.
19     Q.   In the two versions, do you recall
20  or did you determine from reading it today
21  what the difference is between the two
22  versions of these stories?
23     A.   The second version is longer.  It
24  has like three more sentences to it.
25     Q.   Did you, do you know what piece of

FENNER

1  
2  information is in the second version, the
3  version that was rewritten, that wasn't in
4  the first version?
5          MR. THOMPSON:  Objection, document
6  speaks for itself.
7      Q.   Mr. Fenner, I would like to direct
8  you --
9      A.   I'm reading the copy.
10     Q.   I am going to direct your
11  attention -- you can read it -- but I am
12  going to draw your attention to the paragraph
13  in the second story, "They face one
14  significant roadblock."
15     A.   I see that.
16     Q.   Mr. Fenner, would you agree that
17  the fact that the victim of the child
18  pornography crime denied being involved and
19  that that fact is in the rewritten story but
20  it was not in your story?
21     A.   That's correct.
22     Q.   Would you agree that that is an
23  interesting and unique aspect to the story
24  involving R. Kelly?
25          MR. THOMPSON:  Objection.

FENNER

1  
2      A.   Yes.
3      Q.   And that was not in your original
4  story, correct?
5          MR. THOMPSON:  Objection.
6      A.   No, I don't have it here.
7      Q.   Did you know that fact when you
8  wrote your story?
9      A.   Yes.
10     Q.   And you chose to leave it out?
11     A.   I didn't choose to leave it out.
12     Q.   Did you forget to include it?
13     A.   I was under incredible deadline
14  pressure that day.  I had to obtain press
15  credentials to get into the courtroom;
16  otherwise, I would not have been able to
17  cover the case and that's why I was sent to
18  Chicago.
19          The story I wrote is a preview
20  story, a curtain raiser, as they call it, and
21  I was under the gun to try to find the
22  sheriff's office for Cook County, get my
23  credentials and file by the 5 o'clock
24  deadline in New York.
25     Q.   So my question was, did you forget

FENNER

1  
2  to include it?
3      A.   I would have wanted to put that in
4  the story, yes.
5      Q.   Have you ever covered a criminal
6  case in which the person that the prosecutor
7  said is the victim of the crime actually
8  comes forward in the trial and says that's
9  not me?
10     A.   I've covered many criminal court
11  cases.
12     Q.   Have you ever, have you ever
13  covered a case in which the person the
14  prosecutors say is the victim actually comes
15  forward and says I'm not the victim of this
16  crime, this didn't happen to me?
17     A.   I've covered cases where the victim
18  has denied, has denied those cases, like a
19  domestic violence case.
20     Q.   Have you ever covered a case in
21  which the victim says I wasn't even there?
22     A.   I recall covering cases where the
23  victim denies that the crime was committed
24  against them.
25     Q.   You would agree that it is a unique

FENNER

1
2   A.   I can't recall that.
3   Q.   Did Mr. Hechtman rewrite that
4   story?
5   A.   I don't know.
6   Q.   Do you know if that story ever ran?
7   A.   I don't know.  I can't recall.
8   Q.   Did you do anything to correct the
9   factual and grammatical errors in that story?
10  A.   I worked on many, many stories for
11  the New York Post, well over 150.  I can't
12  recall exactly what I did in this particular
13  instance.
14  Q.   Do you believe that Mr. Hechtman
15  discriminated against you while you were at
16  the Post?
17  A.   No.
18  Q.   And who was Mr. Hechtman?
19  A.   He was the night editor.
20      MR. LERNER:  All right, it is 5 to
21  11.  We have a 11 o'clock call with the
22  court so we will take a break now.
23      THE VIDEOGRAPHER:  The time is
24  10:55 a.m.  We are off the record.
25      (Recess)

FENNER

1
2   THE VIDEOGRAPHER:  The time is
3   11:23 a.m.  We are on the record.
4   Q.   Mr. Fenner, do you recall being
5   assigned a story about a radio personality
6   named Wendy Williams?
7   A.   I wasn't assigned that story.  It
8   was an enterprise story I wrote and pitched
9   and produced for the New York Post.
10  Q.   And where was that story based out
11  of?
12  A.   New York City.
13  Q.   And how did you come to develop
14  that story?
15      MR. THOMPSON:  Objection.
16  A.   I was working as a journalist for
17  the Post and I have many sources for stories.
18  At that time, Ken Thompson was a practicing
19  attorney in New York and I had developed a
20  relationship with him and I had learned about
21  the Wendy Williams story through him.
22  Q.   This was in or about June of 2008?
23  A.   I can't recall the date right now.
24  Q.   Do you recall -- did you write that
25  story?

FENNER

1
2   A.   I did.
3   Q.   Do you recall your editors
4   criticizing you for missing the lead in that
5   story?
6   A.   I can't recall right now.  If you
7   can show me something, it would refresh my
8   recollection.
9   Q.   Take a look at Fenner Exhibit 3.
10  There is a -- the fourth paragraph down,
11  under the handwritten note "Sloane."
12      Do you see that paragraph?  We
13  permitted him to write a story that he did
14  pitch on WBLS Shock Jock Wendy Williams and
15  Austin actually missed the whole point of the
16  story.  Do you see that?
17  A.   I read that.
18  Q.   Was that a criticism that was
19  communicated to you at the time?
20  A.   I can't recall.
21  Q.   Did Mr. Sloane tell you that the
22  lead of the story was buried in the middle of
23  what you wrote?
24  A.   My editor and I collaborated on the
25  story.  I wrote the story and he made a

FENNER

1
2   suggestion that we go with another element
3   that was in the story.
4   Q.   What was that element?
5   A.   If I had the story in front of me,
6   I could tell you.
7   Q.   Was it that Wendy Williams' husband
8   had planned to assassinate a rival DJ of
9   Wendy Williams?
10  A.   I think that's what he wanted to go
11  with as the lead.
12  Q.   As the lead.  Do you remember what
13  you had as the lead?
14  A.   No.
15  Q.   Did you agree with him that that
16  was the best lead for that story?
17  A.   Well, you know, you could write a
18  story in many different ways.  I've written
19  stories and the lead has been changed --
20  Q.   I understand that.  My question
21  is --
22  A.   I'm not finished.
23      MR. THOMPSON:  Mr. Lerner, you have
24  to let him finish answering your
25  question.  You can't just cut him off and

Page 54

FENNER

1
2 he wasn't finished.
3    Q.   The question was, did you agree?
4       MR. THOMPSON:  No, no.  He wasn't
5 finished.  Mark, you have cut him off
6 repeatedly.
7       MR. LERNER:  Of course I have.
8       MR. THOMPSON:  It is improper.  You
9 have to let the witness finish answering
10 your question.  If you don't, this
11 deposition is not going to work.
12       MR. LERNER:  I agree with that,
13 Ken.  It is not going to work if the
14 witness doesn't answer the question.
15       MR. THOMPSON:  Please let him
16 answer the question that you posed.
17       MR. LERNER:  I know he is going to
18 try.
19    Q.   This is the question.  The question
20 was, did you agree that the lead that
21 Mr. Sloane ultimately put on the story was
22 the better lead for the story?
23    A.   I don't have the story in front of
24 me.  I need to read the whole story.
25    Q.   Let's put it in front of you.

Page 55

FENNER

1
2       Mr. Fenner, I am putting in front
3 of you a document that has been marked as
4 Fenner Exhibit 4, which is a binder of
5 stories that carry your byline, and the Bates
6 numbers are NYPFL 2633 through 3214.  And I
7 have opened it to NYPFL 3196.
8       (Exhibit 4, document Bates stamped
9 NYPFL 2633 through 3214 marked for
10 identification, as of this date.)
11       MR. THOMPSON:  What was that Bates
12 number again?
13       MR. LERNER:  3196.
14       MR. THOMPSON:  Thanks.
15    Q.   Mr. Fenner, do you recall the lead
16 as you have written the story?
17    A.   This is the published story.
18    Q.   Agreed.  Do you recall the lead on
19 the story that you submitted?
20    A.   I wrote many, many stories during
21 my tenure at the New York Post.  I wrote over
22 150 stories.  I worked on over 150 stories
23 for the paper.  I don't recall the lead
24 before it was -- before we came to this one.
25    Q.   Do you have any reason to believe

Page 56

FENNER

1
2 that Mr. Sloane did not take the piece of the
3 story that you had placed in the middle and
4 turned it into the lead?
5    A.   No, I believe that he wanted to go
6 with this lead.
7    Q.   And in your opinion today, did his
8 making this lead improve the story?
9    A.   Many reporters write stories and
10 the leads are always changed.  The editor is
11 the final arbiter --
12    Q.   Was this a better lead?
13    A.   I wasn't finished.
14    Q.   Was this a better lead?
15    A.   I wasn't finished my comment.
16    Q.   That's the problem.  It was a
17 comment.  You need to provide an answer.
18       MR. THOMPSON:  He was providing an
19 answer.
20    Q.   And the question was, did this lead
21 improve the story?
22    A.   I like his lead.  It is a good
23 lead.  You can go with -- you can go with
24 many different leads on a story.  The New
25 York Times is going to write a story with a

Page 57

FENNER

1
2 different lead than the New York Post.  The
3 Daily News is going to write a story with a
4 different lead.  Sometimes they are the same,
5 sometimes they are different.
6    Q.   Was this the best lead for the New
7 York Post?
8    A.   I like his lead, I agree with it.
9    Q.   You do not believe Mr. Sloane's
10 actions with respect to the story were
11 discriminatory, do you?
12    A.   His actions being changing the lead
13 on a story?
14    Q.   Yes.
15    A.   No.
16    Q.   Having discussed this now, do you
17 recall Mr. Sloane being critical of you at
18 the time for not adopting the lead that he
19 ultimately went with in your original story?
20    A.   He suggested we go with a different
21 lead.  That happens.
22    Q.   Was he critical of you?
23    A.   He suggested we go with this lead.
24 He said next time -- he wanted to go with
25 this lead.

FENNER

1
2    Q.    What did you say?
3    A.    I agreed -- he said we should go
4  with the rub-out lead.
5    Q.    And what did he say about next
6  time?
7    A.    I was -- he didn't say next time.
8  There was no next time.  We were talking
9  specifically about this story.
10    Q.    My question is was he making a
11  general remark about your reporting when he
12  commented to you about this story?
13    .  MR. THOMPSON:  Objection.
14    A.    He wanted to change the lead and I
15  agreed with his change.
16    Q.    Did he say words to the effect of
17  next time, Austin, you need to find the lead
18  that the Post would want to run?
19    A.    No.
20    Q.    And lead with that?
21    A.    No.
22    Q.    Did he say anything about your
23  performance going forward that he wanted to
24  see changed?
25    A.    No.  I did great work under Neil

FENNER

1
2  Sloane.
3    Q.    Do you recall a story about a
4  window washer who fell 47 stories and lived?
5    A.    I do.
6    Q.    Do you recall your editors
7  criticizing you for your work on that story,
8  in reporting that story?
9    A.    Yes.
10    Q.    What was their criticism?
11    A.    I can't recall right now.
12    Q.    Were you unable to secure an
13  interview with the individual who fell or his
14  family members during your first attempts to
15  do so?
16    A.    This was a very difficult story to
17  get.  This was a man who was washing a window
18  on the 47th floor of a skyscraper with his
19  brother.  He watched his brother fall and die
20  and he miraculously survived.  I was able to
21  get this man to talk about this nightmarish
22  event in his live.
23    Q.    Do you recall what your editors
24  criticized you for?
25    A.    I think there is an e-mail about

FENNER

1
2  it.
3    Q.    And what is your recollection now?
4    A.    If you can show it to me, it would
5  refresh my recollection.
6    Q.    Take a look at Fenner Exhibit 3,
7  second paragraph.
8    A.    I read it.
9    Q.    Does that refresh your
10  recollection?
11    A.    It does.
12    Q.    And what was, what did your editors
13  say to you at that time?
14    A.    Do you want me to read what's
15  there?
16    Q.    No, I want you to -- you said it
17  refreshed your recollection, I would like to
18  know what --
19    A.    This is it.  That is the
20  recollection.
21    Q.    So you have that recollection now?
22    A.    These words are the recollection.
23    Q.    Is it your recollection or is it
24  simply -- in other words, I want to know, do
25  you have a memory of this exchange now that

FENNER

1
2  you have read this?
3    A.    I have a memory of reading this
4  e-mail.
5    Q.    Back in -- when you were employed
6  at the Post?
7    A.    Yes.
8    Q.    And what was your reaction to that
9  criticism back then?
10    A.    It was false and unfair.  It was
11  discriminatory.
12    Q.    Why?
13    A.    Because I did get the interview.
14  All right.
15    Q.    Did your editors have to send you
16  back to keep trying to get that interview?
17    A.    I had been traveling on many
18  different stories out of town.  I had been
19  traveling the country --
20    Q.    Did your editors send you back to
21  get that interview?
22    A.    That's correct.
23    Q.    And so that is -- it is true that
24  they sent you back.  Did they send you back
25  once, twice, how many times?

FENNER

1
2    A.   They sent me back because I
3  couldn't get the interview with the
4  individual who we are talking about because
5  his wife was there.  She said he was in a
6  rehab facility.
7          He had fallen 47 stories.  He was
8  trying to get his life back together.  I
9  interviewed the wife probably three times,
10  and she was not there.  So the reason why I
11  went back because he was not physically in
12  the home, he was in a rehab facility in New
13  Jersey, near South Orange.
14    Q.   And where did you eventually get
15  the interview?
16    A.   At his home.
17    Q.   Did the story run?
18    A.   Yes, it did.
19    Q.   Was it a good story?
20    A.   Yes.
21    Q.   Did you agree with your editors
22  that you should go back to try to persist and
23  try to get that interview?
24    A.   Yeah, why not.  It is a great
25  story.

FENNER

1
2    Q.   How long did it take you to get
3  that interview?
4    A.   Like I said a moment ago, I went to
5  his house several times.  I interviewed his
6  wife on at least three different occasions, I
7  attempted to have her trust me with their
8  family story and take me to the rehab
9  facility where her husband was staying.
10          And through the course of time, I
11  was building a relationship and trust.  It
12  doesn't happen overnight.  Sometimes it
13  happens that day.  But you have to work
14  people to gain their trust and this woman was
15  relaying as she told me --
16    Q.   Mr. Fenner, I understand that --
17    A.   I wasn't finished my sentence.
18    Q.   My question is how long did it take
19  you to get that interview?
20    A.   Can I finish my statement?
21    Q.   I'm afraid you can't.  The question
22  is, how long did it take you to get that
23  interview?
24          MR. THOMPSON:  He can finish
25  answering your question.

FENNER

1
2    A.   I don't understand your question
3  when you said how long did it take.
4    Q.   How many days did it take?
5    A.   I just told you, he was not home.
6    Q.   So I understand.  Did it take a
7  week?  Did it take more than a week?
8    A.   He was away from the home --
9    Q.   How long between --
10    A.   For probably weeks.  He had fallen
11  47 stories.
12    Q.   What is the basis of your opinion
13  that Mr. Greenfield's criticism of you was
14  discriminatory?
15    A.   It is untrue and it is unfair.  He
16  says we had to constantly hound -- where are
17  we -- Austin to get the window washer story.
18  And I just explained where the window washer
19  was.
20    Q.   Did he hound you?
21    A.   Greenfield?
22    Q.   Yes.
23    A.   When you say -- what do you mean
24  hound me?  Did he --
25    Q.   Did Greenfield or your editors

FENNER

1
2  hound you --
3    A.   They dispatched me-
4    Q.   -- hound you to get that story?
5    A.   They dispatched me to the window
6  washer's house.
7    Q.   Multiple times?
8    A.   We had to go back because he wasn't
9  there.
10    Q.   Did they send you back multiple
11  times to keep trying?
12    A.   He was not there every time we
13  arrived at his home.
14    Q.   Did they send you back?
15    A.   I had been traveling on other
16  stories and working on other stories.
17    Q.   Did you receive --
18    A.   I --
19    Q.   Did you receive instructions --
20    A.   I wasn't finished my statement.
21    Q.   -- instructions from your editors
22  to go back?
23    A.   I was juggling multiple
24  assignments.  I had to do enterprise work.  I
25  was traveling on out-of-town assignments.  I

Page 66

FENNER

1
2  was covering breaking news.
3      Q.   Did they send you back multiple
4  times?
5      A.   Yes.
6      Q.   And what is the basis for your
7  belief that the criticism was based on your
8  race?
9      A.   Because this was eventually used in
10  my evaluations which were discriminatory and
11  unfair in assessing my work.  I had done
12  great work for the paper.  I had done
13  award-winning work for the paper.
14      Q.   Did Mr. --
15          MR. THOMPSON: He is answering your
16  question, Mr. Lerner.  You cannot cut him
17  off.
18          Please continue, Mr. Fenner.
19      A.   And I had gotten exclusives for the
20  paper.  This was used to discriminate me
21  because I am black.  They used this in
22  treating me different than my white
23  colleagues with those evaluations and this
24  was part of the tool they used when I had
25  done incredible work for the paper.

Page 67

FENNER

1
2      Q.   And did Mr. Greenfield ever use a
3  racial epithet?
4      A.   He was a loose cannon.
5      Q.   Did he ever use a racial epithet?
6      A.   He cursed at me.  He yelled at me.
7  He said what the fuck are you doing.
8      Q.   Did he ever --
9      A.   He said to me, you better get your
10  fucking ass over there.  He went off on me.
11      Q.   Did he ever use a racial epithet?
12      A.   He cursed at me.
13      Q.   This is a yes or no answer,
14  Mr. Fenner?
15      A.   He debased me.
16      Q.   Did he ever use a racial epithet?
17      A.   He --
18      Q.   Mr. Fenner.  If you can't answer
19  the question, we will get a court order
20  requiring you to answer the question, because
21  that is a requirement.
22          Did he ever use a racial epithet?
23      A.   No.
24          MR. THOMPSON: We are going to take
25  a break.

Page 68

FENNER

1
2          MR. LERNER: Let's take a break.
3          MR. THOMPSON: Sure.
4          THE VIDEOGRAPHER:  The time is
5  11:43 a.m.  We are off the record.
6          (Recess)
7          THE VIDEOGRAPHER:  The time is
8  11:59 a.m., we are on the record.
9          MR. LERNER: Mr. Thompson, I know
10  you had a discussion with your client
11  outside of the room.  We need to have the
12  questions that I ask answered directly.
13  Otherwise, we are not going to finish the
14  deposition in seven hours.
15          MR. THOMPSON: Mr. Lerner, he has
16  answered your question directly.
17          MR. LERNER: I understand that's
18  your opinion.
19          MR. THOMPSON: It is a fact.  The
20  record will reflect that.
21          MR. LERNER: It is not my opinion?
22          MR. THOMPSON: It doesn't matter.
23  The record is what it is.
24          MR. LERNER: My point is not to
25  argue with you whether or not he is doing

Page 69

FENNER

1
2  it.  My point is to let you know if it
3  persists, we will call the court.
4          MR. THOMPSON: You can call the
5  court any time you want.  The purpose for
6  us being here is to ask him questions, so
7  ask him.
8      Q.   Mr. Fenner, are you ready to
9  proceed?
10      A.   I'm ready.
11      Q.   On the -- with respect to the
12  window washer, Mr. Greenfield's criticism of
13  you was that you did not take the initiative
14  to return to the window washer each time to
15  try to get that interview, is that correct?
16      A.   I did on my own.
17      Q.   I am asking you if that was his
18  criticism of you?
19      A.   I made several attempts.  I took
20  the initiative.  I knew it was a great story
21  and I got a great story.
22      Q.   Was that Mr. Greenfield's criticism
23  of you, that you failed to take the
24  initiative?
25      A.   I don't recall if he told me that.

Page 70

FENNER

1
2    Q.   Did somebody tell you that?
3    A.   I can't recall right now.
4    Q.   Did -- was there, when you were
5    sent back by your editors, did they express
6    annoyance to you that they were having to
7    tell you to go back?
8    A.   I can't recall.
9    Q.   Who told you to go back?
10   A.   My editors dispatched me to the
11   window washer's house.
12   Q.   When you say dispatched, it means
13   they instructed you to go back there and try
14   to get that interview?
15   A.   That's correct.
16   Q.   Do you recall how many times they
17   dispatched you back to the house?
18   A.   When I went to the house and I said
19   he wasn't there and we are not going to get
20   anything --
21   Q.   My question is, do you recall how
22   many times they instructed to you to go back?
23   A.   We visited the house at least three
24   or four times.
25   Q.   And was there an instruction from

Page 71

FENNER

1
2    your editor prior to each of those times?
3    A.   Yes, we were working in
4    collaboration.
5    Q.   Over what period of time between
6    your first contact with the house trying to
7    get the story and the time that you got the
8    story, how much time elapsed?
9    A.   Between the first time we visited
10   his home?
11   Q.   Yes.
12   A.   And the publication of the story?
13   Q.   Yes.
14   A.   How many times had we gone there?
15   Q.   No, how much time elapsed?  How
16   many days or weeks?
17   A.   I don't know exactly how many days.
18   But like I said, the man was recuperating in
19   the facility.
20   Q.   So you don't remember how long it
21   was?
22   A.   I said I don't recall right now.
23   Q.   Was it more or less than one week?
24   A.   Yes.
25   Q.   So it was more than one week?

Page 72

FENNER

1
2    A.   It was more than one week.
3    Q.   Was it more than --
4    A.   He was in a rehab facility.
5    Q.   Was it more than two weeks?
6    A.   What's the question?
7    Q.   How much time elapsed between your
8    first attempt to get the interview and the
9    time the story ran?  All I am trying to get a
10   sense of is how long did it take.
11   A.   It wasn't a week.  I don't think --
12   it wasn't a week.  And I don't recall exactly
13   how long.  It might have been two, could have
14   been three, but I don't know.
15   Q.   OK.  Were you assigned to cover the
16   Columbia expansion, Columbia University
17   expansion?
18   A.   No, I worked with Dan Colarusso and
19   told him this was an area that needed
20   attention, that there were no newspapers
21   paying attention to the Columbia expansion
22   and we should own it.
23   Q.   Did you have a source inside
24   Columbia University regarding the Columbia
25   expansion?

Page 73

FENNER

1
2    A.   I was developing sources, yes.
3    Q.   Did you develop a source inside
4    Columbia University?
5    A.   Yes.
6    Q.   Who -- how did you develop that
7    source?
8    A.   We were working the story and going
9    to community board meetings and going to
10   protests where people who were angry about
11   the expansion plan had a vested interest in
12   the issue.
13   Q.   Did you quote that source in your
14   stories?
15   A.   I quoted several sources in my -- I
16   quoted several sources in my stories.
17   Q.   Was that -- were those sources
18   named in the stories?
19   A.   They might have been.
20   Q.   Did you have any confidential
21   sources within Columbia University?
22   A.   I would have to see the work that
23   we produced to see if it says source or not.
24   Q.   As you sit here today, can you
25   think of any confidential source that you had

FENNER

1
2  within Columbia University on those stories?
3      A.   I can't recall right now.
4      Q.   Did your editors assign you stories
5  relating to the Columbia University
6  expansion?
7      A.   No, I pitched a series of stories.
8  One of those stories was about the Cotton
9  Club business, and through our work, through
10  doing great work on that story, we helped
11  this man save his business from the imminent
12  domain business that was hovering over many of
13  the businesses in Columbia, in the Columbia
14  expansion plan.
15      Q.   How many stories did you pitch
16  relating to the Columbia University
17  expansion?
18      A.   Many.
19      Q.   How many ran?
20      A.   Maybe five.  I can't recall the
21  exact number right now.
22      Q.   Do you know how many you pitched?
23      A.   I can't recall the exact number
24  right now.
25      Q.   Were any of your stories turned

FENNER

1
2  down by the city desk?
3      A.   Yes.
4      Q.   How many?
5      A.   I can't recall the exact number.
6      Q.   Were you ever criticized by your
7  editors for your reporting on the Columbia
8  University expansion?
9      A.   I can't recall right now.
10      Q.   Did your editors tell you that you
11  were not pitching enough stories relating to
12  the Columbia University expansion?
13      A.   I can't recall that right now.
14      Q.   Were there any stories about the
15  Columbia University expansion that were
16  developed by the city desk and assigned to
17  you?
18      A.   I can't recall if -- I can't recall
19  if you're talking about a particular story
20  that they might have assigned.  I know I
21  pitched many stories, that was part of my
22  enterprise week.
23      Q.   By -- you were hired in
24  approximately the middle of 2007, right?
25      A.   May 2007.

FENNER

1
2      Q.   May of '07.  By May of '08, you had
3  been at the Post about a year, correct?
4      A.   Correct.
5      Q.   And what were your -- what were
6  your reporting duties by May of 2008?  In
7  other words, were you in the street most of
8  the time or were you in the office most of
9  the time?
10      A.   I was hired as an enterprise
11  reporter which required me to pitch stories,
12  cover breaking news, and cover out of town
13  assignments for the paper.  So it was a mix.
14      Q.   Did that group of responsibilities
15  put you in the street most of the time or in
16  the office?  What was the --
17          MR. THOMPSON:  Objection.
18      Q.   -- what was the balance of your
19  time?
20      A.   It was a mix.
21      Q.   Would you agree that about a year,
22  just using about a year in May of 2008, that
23  you were primarily working as a street
24  reporter?
25      A.   No.

FENNER

1
2      Q.   What were you -- what does the term
3  "street reporter" mean to you?
4      A.   You mean someone who is not in the
5  office?
6      Q.   Yes.  Is that what you were
7  primarily were by mid '08?
8      A.   Not at all.
9      Q.   You were in the office?
10      A.   I was a senior reporter working at
11  the paper.
12      Q.   Where were you performing your job?
13      A.   I just said it was a mix.
14      Q.   So sometimes you were in the
15  office, sometimes you were out?
16      A.   Sometimes I was in the office,
17  sometimes I was out on breaking news
18  assignments, sometimes I was traveling on
19  behalf of the paper.
20      Q.   Approximately what percentage of
21  your time by May of '08 -- you had been at
22  the Post for one year -- were you in the
23  office?
24      A.   I can't give you a percentage or
25  breakdown right now.

Page 78

```
         FENNER
1
2    Q.   Was it 10 percent, 20 percent?
3       MR. THOMPSON: Objection.
4    A.   I think it was a mix.  It might
5  have been 33 percent on all -- I was -- it
6  might have been a third on each one.  I don't
7  know.
8    Q.   A third in the office, a third on
9  the street in New York, and a third on the
10 road traveling?  Is that what you mean by 33
11 percent each?
12   A.   I don't have an exact mathematical
13 breakdown to give you.
14   Q.   I understand that.  By May of 2008,
15 how much of your work was -- what percentage
16 of your work was the work of a street
17 reporter?
18   A.   I couldn't tell you that number.
19   Q.   How much of your work was producing
20 enterprise stories?
21   A.   Like I said, it was a mix.  And I
22 can't give you a mathematical breakdown.
23   Q.   What enterprise stories did you
24 produce during the first year of your
25 employment at the Post?
```

Page 79

```
         FENNER
1
2    A.   I did several.  I did many.  I
3  wrote stories about an identity theft story.
4  It was a military burial -- it was a -- it
5  was an identity theft story.
6    Q.   Got it.  Identity theft in a
7  military burial?
8    A.   Right.
9    Q.   What else?
10   A.   It was a man who had been convicted
11 of murder in Connecticut who had mistakenly
12 assumed his neighbor had molested his child
13 and I was able to get this man to send a
14 handwritten, handwritten letter about why he
15 did this and what went wrong.
16   Q.   A letter to whom?
17   A.   It was addressed to me at the New
18 York Post.
19   Q.   Can you define an enterprise story?
20   A.   An enterprise story is an story
21 that's off the radar, a story that is
22 original reporting and of interest to the
23 public.
24   Q.   Does it involve more research and
25 more reporting than a nonenterprise story?
```

Page 80

```
         FENNER
1
2    A.   It can.
3    Q.   But it is original, off the radar
4  and it is of interest to the public?
5    A.   Those are some of the elements.
6    Q.   Can you think of any other
7  enterprise story that you wrote in your first
8  year at the Post?
9    A.   The Columbia expansion stories, the
10 Wendy Williams story.  And there were others.
11   Q.   Can you tell me what the others
12 were?
13   A.   If I had a list, I could refresh my
14 recollection.
15   Q.   Did you ever decline a request to
16 stay late to cover a breaking news story?
17   A.   Did I ever decline a request to
18 stay late?
19   Q.   Yes, to cover a breaking news
20 story?
21   A.   I think you're referring to a story
22 where I had child care issues and I had to
23 pick up my daughter from my mother's house
24 and my wife was out of town.
25       My mother, at that time, would have
```

Page 81

```
         FENNER
1
2  been about 86.  So I think that's what you
3  might be referring to.
4    Q.   So the answer is yes, you did?
5    A.   Can you repeat the question?
6    Q.   Did you ever decline a request to
7  stay late to cover a breaking news story?
8    A.   I had child care issues.  I had
9  to -- I called my editors to see if they
10 could send someone to relieve me.  So the
11 answer is I never declined a request to stay
12 late, no.  The answer is no.
13   Q.   The answer is ---
14   A.   I didn't decline a request.  I
15 called in to get relief on a story.  I never
16 declined a request to stay late on a story.
17   Q.   And what happened after you made
18 that call?
19   A.   The editors looked to see if there
20 were any other reporters who were starting
21 their shifts and who could relieve me.
22   Q.   Did they find any?
23   A.   I can't recall in this particular
24 one.  I would assume that happened.
25   Q.   You did not cover that story?
```

FENNER

1
2       A.   No, I was on the story.  I had been
3   on the story from probably 7 in the morning
4   and this was probably about 8 at night.
5       Q.   What was the story?
6       A.   I can't recall the story at this
7   very moment.
8       Q.   Did you file a story?
9       A.   I covered many stories.  I'm not
10  exactly sure which one you might be referring
11  to.
12      Q.   Did you ever file a story on that
13  occasion?
14      A.   I can't recall exactly which story
15  this is.
16      Q.   Did you -- do you -- did you ever
17  decline a request to stay late to cover a
18  breaking news story on another occasion?
19      MR. THOMPSON:  Objection.
20      A.   No.  Did I ever decline a request
21  to stay late?  Is that what you are asking?
22      Q.   Yes.
23      A.   Never.  I never declined to do any
24  work.  I fulfilled all my responsibilities.
25  I was highly motivated to go cover any story

FENNER

1
2   that was on the docket of the paper.
3       Q.   How would you rate your writing
4   skills, Mr. Fenner?
5       A.   They're good.
6       Q.   Are they on a -- what does "good"
7   mean?
8       A.   We all want to improve and do
9   better.  You always leave room.  That's what
10  keeps you going.  So good is when you do
11  exceptional work and you are always pushing
12  yourself to do belter.
13      Q.   Did you think you can do better as
14  a writer?
15      A.   I've done exceptional work, I've
16  done award-winning work and I always push
17  myself to do better.
18      Q.   Do you think you can be a better
19  writer than you are?
20      A.   Yes.
21      Q.   Did your editors criticize your
22  writing?
23      A.   Yes.
24      Q.   In those instances when they
25  criticized your writing, did you agree with

FENNER

1
2   their critiques?
3       A.   No.
4       Q.   Why not?
5       A.   Because they were unfair.  They
6   were using those critiques to racially
7   discriminate against me and get me out the
8   paper.
9       Q.   So the critiques were just false?
10      A.   You're talking about each and every
11  critique ever given to me?
12      Q.   When they critiqued the quality of
13  your writing?
14      A.   Are you referring to my evaluations
15  or what are you referring to?
16      Q.   Well, how often did they critique
17  your -- did they criticize your writing?  Did
18  they do it verbally in conversations with
19  you?
20      A.   I know they did it in my
21  evaluation.
22      Q.   The written evaluation?
23      A.   That's correct.
24      Q.   Did they also do it verbally?
25      A.   I can't recall right now.

FENNER

1
2       Q.   Were your editors ever correct when
3   they criticized your writing?
4       A.   You're making a broad statement.
5   It wasn't -- it was never -- if I was getting
6   a critique, it would have been maybe on a
7   particular story like you showed me the Wendy
8   Williams story.
9       Q.   Did you ever -- did you ever get a
10  critique from your editors on your writing
11  where you understood where they were coming
12  from?
13      MR. THOMPSON:  Objection.
14      A.   We collaborated on stories.  If
15  you're saying like the Wendy Williams story,
16  my editor suggested we put a new lead on it.
17  Yes, that happened.  We work in
18  collaboration.
19      Q.   What about your sentence structure,
20  choice of words, writing in the Post style?
21  Did you get criticisms along those lines as
22  well?
23      A.   I wrote great stories for the
24  paper.
25      Q.   Did you get criticisms along those

Page 90

FENNER

1
2      A.    Well, if we go to the Wendy
3   Williams example.
4      Q.    I am just asking, were some of your
5   stories not good?
6      A.    No, they wouldn't have been
7   published if they weren't good.
8      Q.    Were some of your stories not
9   published?
10      A.    As far as I knew, all of my stories
11   was published.
12      Q.    Every one of your stories were
13   published?
14      A.    Sometimes editors don't publish
15   stories for space reasons because other
16   breaking news occurs and they want to go with
17   a bigger story that developed during the
18   course of a day.
19      Q.    Isn't it the case that your stories
20   that you submitted were subject to editing
21   and rewriting by another reporter called a
22   rewrite?
23      A.    Many of the reporters at the paper
24   were rewrite reporters.
25      Q.    That's what I am asking you.  I am

Page 91

FENNER

1
2   asking if you are reporting on the street and
3   you file a story, it goes to a rewrite who
4   then rewrites the story before it is
5   published, right?
6      A.    Sometimes.
7      Q.    So the stories that you -- that are
8   published under your byline aren't
9   necessarily stories that you wrote the final
10   story on, right?
11          MR. THOMPSON:  Objection.
12      A.    I don't know because I'm not inside
13   the office and seeing who is editing the
14   story.
15      Q.    You read your stories that are
16   published?
17      A.    That's correct.
18      Q.    Under your byline?
19      A.    That's correct.
20      Q.    You will know if what's published
21   in the paper the next day, how that compares
22   to what you submitted?
23      A.    There might have been stories where
24   a lead was changed, yes.
25      Q.    Where they are completely

Page 92

FENNER

1
2   rewritten, right?
3      A.    No.
4      Q.    It never happened that a story that
5   you submitted was completely rewritten?
6      A.    You are asking about the whole
7   universe of the stories I worked on and I
8   worked on many different stories.
9      Q.    Well, yeah.
10      A.    Do you -- there is a question?
11      Q.    Yes.
12      A.    Which is what?
13      Q.    Isn't it a fact that stories that
14   you submitted were rewritten by rewrite
15   reporters?
16          MR. THOMPSON:  Let the record
17   reflect that Jordan Lippner just said
18   "Jesus Christ" in response to
19   Mr. Fenner's answer.  That is totally
20   inappropriate and we ask Mr. Lippner not
21   to do that at this deposition.
22      Q.    Well, Mr. Fenner?
23      A.    Yes.
24      Q.    Isn't it a fact that stories that
25   you submitted to the Post were rewritten by

Page 93

FENNER

1
2   rewrite reporters?
3      A.    They may have been.
4      Q.    Mr. Fenner, I am going to place in
5   front of you a document marked NYPFL 477
6   through 480 and it will be marked Fenner
7   Exhibit 5.
8          (Exhibit 5, document Bates stamped
9      NYPFL 477 through 480 marked for
10      identification, as of this date.)
11      Q.    Did you receive this performance
12   appraisal in 2008?
13      A.    In 2008?
14      Q.    Yes.
15      A.    It is dated -- yes.
16      Q.    Did you review it and sign it?
17      A.    I read it, I signed it to
18   acknowledge that I saw it.
19      Q.    The overall rating that the
20   appraisal gave you was a 6 out of 7 with 1 as
21   the highest and 7 is the lowest, correct?
22      A.    Correct.
23      Q.    Six means must improve, rarely
24   meets standards, correct?
25      A.    That's what it says.

FENNER

1
2    Q.   And on the last page, there is an
3    employee comment section.  Did you submit any
4    comments in response to this performance
5    review?
6    A.   I wrote a self-evaluation.
7    Q.   In 2008?
8    A.   I wrote a self-evaluation in 2008
9    which stands as my record for what I thought
10   about my work and the strength of my work as
11   a journalist at the New York Post.
12   Q.   Are you sure that you wrote one in
13   2008?
14   A.   Yes.
15   Q.   As opposed to 2009?
16   A.   Yes.
17   Q.   Have you seen that document in
18   connection with this lawsuit?
19   A.   I can't recall right now.
20   Q.   The self-evaluation was done prior
21   to your getting the APA review, correct?
22   A.   That's correct.
23   Q.   So you did the self-evaluation, you
24   then received this APA review, and you did
25   not comment on the APA review after you

FENNER

1
2    received it, right?
3    A.   I did not comment because I wanted
4    my self-evaluation to stand as a record of
5    what I did for the year.  The space is very
6    small.
7    Q.   Do you recall what that
8    self-evaluation said?
9    A.   If you have a copy of it, it would
10   refresh my recollection.
11   Q.   Have you seen it?  I actually I had
12   this question a moment ago.  You said you
13   couldn't recall if you had ever seen that
14   document in connection with this lawsuit, is
15   that correct?
16   A.   The self-evaluation?
17   Q.   A 2008 self-evaluation?
18   A.   I would have written the
19   self-evaluation.
20   Q.   My question is, have you, did you
21   produce it in this lawsuit?
22   A.   I can't recall.
23   Q.   You would regard this as a very
24   negative -- would you regard this as a very
25   negative evaluation?

FENNER

1
2    A.   I would regard it as a racially
3    discriminatory document which was used
4    against me.
5    Q.   And what is the basis of your
6    believing that the criticisms in this
7    document were based on your race?
8    A.   It was false and untrue.  And this,
9    these are falls and untrue and don't reflect
10   the true work that I did as a reporter, as a
11   journalist at the New York Post.
12   Q.   How do you know that the falsity of
13   them that you allege was done because you are
14   African American?
15   A.   Because they treated me differently
16   than my white colleagues at the paper.
17   Q.   How do you know that this negative
18   performance evaluation was negative because
19   you are African American?
20   A.   Because they wanted to get me out
21   of the paper.
22   Q.   How do you know that they wanted to
23   do that because you are African American?
24   A.   I had been verbally screamed at and
25   yelled at and harassed by my editors since

FENNER

1
2    Michelle Gotthelf had assumed control of the
3    city desk.  And when I saw this, this review,
4    my words to Michelle Gotthelf and Amy
5    Scialdone was I'm being with set up.  That's
6    what I said to them.
7        And during the course of that
8    interview, Amy Scialdone said to me, do you
9    really want to be here?  This is a human
10   resources manager who was showing me the
11   door.
12   Q.   When did that -- when did you have
13   that conversation with Ms. Scialdone?
14   A.   When I was presented with this
15   document.
16   Q.   Did Ms. Scialdone or Mr. Greenfield
17   or Ms. Gotthelf ever tell you that the reason
18   they were giving you a negative performance
19   review was because you were African American?
20   A.   Did they say that verbally to me.
21   is your question?
22   Q.   Yes, that's my question.
23   A.   They treated me --
24   Q.   Did they say that verbally to you?
25   A.   The way they treated me --

FENNER

1
2      Q.   Mr. Fenner, it is a yes or no
3  question.  Did they tell you that it was
4  because of your race?
5      A.   No, they didn't have to say it was
6  because I'm black.
7      Q.   So the answer is no, they didn't?
8      A.   I said no, they didn't have to say
9  it was because I'm black.
10      Q.   But they -- OK.  And did anybody
11  else at the New York Post tell you that the
12  reason for this negative performance
13  evaluation was because you're African
14  American?
15      A.   There is many people that work at
16  the New York Post.  I was presented this
17  review by my supervisor and Amy Scialdone.
18      Q.   Did Ms. Gotthelf ever use racially
19  derogatory language with you that referenced
20  the fact that you are an African American?
21      A.   She was outright nasty to me.  She
22  was constantly yelling at me and giving me
23  unfair criticisms about my work.
24      Q.   Did she ever say anything that used
25  a racial epithet or referred to the fact that

FENNER

1
2  you are African American?
3      A.   Not to my knowledge.  I didn't hear
4  her use a racial epithet.
5      Q.   And same question about
6  Ms. Scialdone, did she ever do that?
7      A.   Not to my knowledge, I didn't hear
8  her use a racial epithet.
9      Q.   Did Michelle Gotthelf or Dan
10  Greenfield ever raise their voice at white
11  reporters?
12      A.   Not to my knowledge.  If they did,
13  I wasn't around.
14      Q.   Do you know for a fact that
15  Michelle Gotthelf and Dan Greenfield did not
16  yell at white reporters?
17      A.   They did not yell at white
18  reporters?
19      Q.   Yeah, do you know that for a fact?
20      A.   I don't know -- I don't know it for
21  a fact.
22      Q.   Do you have any reason to believe
23  that Michelle Gotthelf and Dan Greenfield
24  never yelled at white reporters working on
25  the city desk?

FENNER

1
2      A.   Repeat your question.
3      Q.   Do you have any reason to believe
4  that --
5          MR. LIPPNER:  Mark.
6      Q.   Withdrawn.
7          One of the criticisms in this
8  performance evaluation is that during your
9  first year at the Post, you did not initiate
10  or produce top notch enterprise stories for
11  the Post?
12      A.   Your question is?
13      Q.   Is that criticism, was that
14  criticism of you factually based?
15      A.   It is unfair.  It is unfair --
16      Q.   Why is it unfair?
17      A.   Because I did -- I did great work
18  as a journalist, as a reporter for the New
19  York --
20      Q.   Did you produce top notch --
21      A.   Yes.
22          MR. THOMPSON:  Mr. Lerner, don't
23  cut off the witness.  You have to let the
24  witness finish answering his question.
25      Q.   -- for the New York Post?

FENNER

1
2      A.   I did great work, award-winning
3  work.
4      Q.   What award did you win for your
5  work at the Post during the first year?
6      A.   The New York Post covered the Obama
7  inauguration and they won the coveted New
8  York Press Club Award in 2010.  I wrote a
9  story, enterprise story about a Harlem
10  congregation that Martin Luther King visited
11  ten days before his assassination and this
12  congregation was attending.
13      Q.   Mr. Fenner, --
14      A.   I wasn't finished.
15      Q.   I don't need to know all the
16  details about the story.  My question is what
17  award did you win and you said the New York
18  Post won an award.
19      A.   I was part of a team, the
20  inauguration team that won the New York Press
21  Club Award.
22      Q.   And how many people were reporting
23  on Obama's inauguration for the New York
24  Post?
25      A.   There were several people on the

Page 102

FENNER

1
2  team.
3      Q.   More than five?
4      A.   It was a historic event.  So there
5  were -- there was a team and everyone
6  contributed to the production of an
7  award-winning piece.
8      Q.   The award was not issued in your
9  name, was it?
10     A.   It was issued to the staff of the
11  New York Post and the contributors who worked
12  on pieces that were published for the
13  inauguration and with that, they beat out --
14     Q.   How long was the story that you
15  wrote on the bus ride?
16     A.   I don't know.
17     Q.   Was it --
18     A.   It was several inches.
19     Q.   Was it a long story?
20     A.   It was part of the package.  It was
21  a sidebar.
22     Q.   It was less than 300 words, wasn't
23  it?
24     A.   I don't know the number of words in
25  the story.

Page 103

FENNER

1
2      Q.   You were happy to cover that story,
3  right?
4      A.   Oh, yes.  I was happy to cover the
5  story and I was happy to produce an
6  enterprise piece that connected Martin Luther
7  King to Barack Obama in the nation's history.
8      Q.   Were you ever told that the stories
9  you were pitching were not a good fit for the
10  Post?
11     A.   They published many of the stories
12  in enterprise, so the answer is no.  I
13  mean --
14     Q.   You were never told that your
15  stories, stories you were pitching that were
16  not a good fit?
17     A.   Are you talking about my --
18     Q.   My question was --
19     A.   My evaluation.
20     Q.   My question was were you ever told
21  that stories that you were pitching for the
22  Post were not a good fit for that paper?
23     A.   Can you tell me who might have said
24  that?
25     Q.   Ms. Gotthelf and Mr. Greenfield?

Page 104

FENNER

1
2      A.   All reporters pitch stories; some
3  are good, some are bad, some are accepted,
4  and others are published.  Dan and Michelle
5  unfairly criticized many of the stories that
6  I had suggested to go into the paper.
7      Q.   And why did you believe that their
8  criticism of your proposed stories was
9  unfair?
10     A.   Well, some of them -- criticisms of
11  my stories were unfair?  They wanted me out
12  of the paper.  They didn't want me working
13  there as a black senior reporter at the
14  paper.
15     Q.   Well, you said that they criticized
16  the stories that you suggested to be
17  published.  Why were those -- why were those
18  criticisms unfair about your story, about
19  your stories?
20         MR. THOMPSON:  Objection.
21     Q.   What were they saying about your
22  pitches that was unfair?
23     A.   They didn't have an interest in
24  elevating my career.  They didn't -- they
25  would not -- they would summarily knock down

Page 105

FENNER

1
2  and be dismissive of stories that I had
3  proposed to get into the paper.
4      Q.   Did you receive a written warning
5  after you got this 2008 performance
6  evaluation?
7      A.   I was given a final written
8  warning, and at the same time, I was
9  presented with this evaluation.
10     Q.   I am going to show you that
11  document that has been marked as Fenner
12  Exhibit 6.  It is NYPFL 501.
13         (Exhibit 6. document Bates stamped
14         NYPFL 501 marked for identification, as
15         of this date.)
16     Q.   This is that final written warning?
17     A.   Yes.
18     Q.   Did you disagree or agree with the
19  criticisms in this written warning?
20     A.   I strongly disagreed with it.
21     Q.   And did you write anything in
22  response to this warning?
23     A.   During that meeting?
24     Q.   Or following it?
25     A.   During that meeting, I had told

FENNER

1
2  Michelle Gotthelf and Amy Scialdone that I
3  was being set up and when Amy asked me did I
4  really wanted to be at the paper, I realized
5  that they were out to get me. So making any
6  comment on this paper, on this sheet of paper
7  would have been pointless.
8      Q.   Did you tell them at that meeting
9  that you believed that you were being set up
10 because you are African American?
11     A.   Yes.
12     Q.   What did you say?
13     A.   I said to them, I'm being set up.
14     Q.   Did you say the words, "because I'm
15 African American"?
16     A.   I didn't say the words at that time
17 because I'm African American.
18     Q.   You said "I'm being set up"?
19     A.   Yes. My jaw dropped and hit the
20 table.
21     Q.   But you did not tell them that you
22 believed that the reason you were being set
23 up was discrimination on the basis of race,
24 is that correct?
25     A.   I was trying to wrap my mind about

FENNER

1
2  what had happened and the fact that this --
3      Q.   My question, Mr. Fenner --
4      A.   I'm not finished talking.
5      Q.   I'm not asking you about what you
6  are trying to wrap your mind around. I am
7  asking you, did you tell them that you
8  believed, at that meeting, that you believed
9  that the reason you were being set up was
10 race?
11     A.   I didn't say to them I'm being set
12 up because I'm black. I said to them, I'm
13 being set up.
14     Q.   Did you do anything, after
15 receiving this written warning, did you do
16 anything to change your performance,
17 improving, to respond to these criticisms?
18     A.   Despite the fact that I received
19 this review, I went on to write solid, great
20 pieces of journalism for the paper.
21     Q.   Did you change anything in response
22 to this written warning?
23     A.   Did I change what?
24     Q.   The way you did your job?
25     A.   I continued to work hard just like

FENNER

1
2  I had did during the first year of my
3  employment at the New York Post.
4      Q.   Did you change anything about the
5  way you did your job from the way you were
6  doing it before you got the written warning?
7          MR. THOMPSON: Objection.
8      A.   Can you repeat the question.
9      Q.   Did you change anything about the
10 way you did the job from the way you were
11 doing it before you got the written warning?
12     A.   I was doing solid work before I got
13 the warning and despite the fact that I felt
14 that this review, this evaluation was
15 discriminatory, I did -- I continued to do
16 good work at the paper.
17     Q.   So you can't think of anything
18 can't think of anything that you changed
19 about the way you did your work?
20     A.   Because of this?
21     Q.   Yes.
22     A.   I'm always working to improve
23 myself. That's a tenet that I use.
24     Q.   But you can't think of anything
25 that you did to change the way you did your

FENNER

1
2  job in response to this written warning,
3  correct?
4      A.   I felt this review was unfair.
5      Q.   And is my statement correct --
6      A.   So to do something in response to
7  something that was unfair --
8      Q.   OK, so because you thought the
9  review was unfair, the warning was unfair,
10 you decided you would -- you were not going
11 to change the way you did your job?
12         MR. THOMPSON: Objection.
13     A.   That's not true. That's not what I
14 am saying.
15     Q.   That is what it sounds like you're
16 saying.
17         MR. THOMPSON: Objection.
18     A.   The answer is no.
19     Q.   The answer is no about what?
20     A.   Your question was that I wasn't
21 going to continue to do anything about the
22 way I did my job. Is that right?
23     Q.   We are arguing with each other.
24 Simple question.
25         In response to receiving this

| Page 110 | Page 111 |
|---|---|

FENNER

1  warning, did you change the way you did your
2  job, yes or no?
3     A.   I continued to work hard.  And if
4  you're -- I'm always working to improve
5  myself, so I'm not exactly sure what you're
6  asking me.
7     Q.   Mr. Fenner, it is -- the question
8  is simple and it is clear.  In response to
9  receiving this warning, did you change the
10  way you did your job?
11         You need to provide an answer in
12  your deposition for the record.  Is the
13  answer yes, or no?
14     A.   The answer is I am -- yes, I am
15  always working to improve myself, but this
16  document, this review was shocking to me.  It
17  made me -- I couldn't believe I was
18  getting -- this -- I found it discriminatory.
19     Q.   Mr. Fenner, is the answer yes or
20  no?
21     A.   All I can tell you is I worked
22  hard.  It is not -- if you are asking me if
23  this document caused me to work harder,
24  caused me to -- I realized that --

FENNER

1     Q.   I am asking you, did it cause you
2  to work harder or change the way you did your
3  job?
4     A.   It made me pause because I realized
5  I was being set up for termination, so yes is
6  the answer.
7     Q.   Did it change the way you did your
8  job?
9     A.   Yes.
10         MR. THOMPSON:  Objection.
11     Q.   How so?
12     A.   It made me pause because I realized
13  that there was a picture being created for my
14  termination.
15     Q.   So what did you do differently
16  after receiving the warning?
17     A.   I had to triple-cross my Is and my
18  Ts, I had to watch my back, I had to watch
19  what Dan Greenfield and Michelle Gotthelf
20  were saying.  I had to watch my back.  That's
21  what happened.
22     Q.   Did you pitch a story about a
23  Harlem car dealership that Mr. Greenfield
24  told you not to write unless you could

| Page 112 | Page 113 |
|---|---|

FENNER

1  advance the story forward?
2     A.   Yes.
3     Q.   And did you pitch a story that had
4  been covered by the New York Times earlier?
5     A.   The New York Times had written a
6  story, that --
7     Q.   It is a yes or no question.  Did
8  you pitch a story that had been covered by
9  the New York Times?
10     A.   The New York Times had also
11  written -- had written the story earlier in
12  the year.
13     Q.   And they had cited celebrities that
14  had purchased cars there?
15     A.   No, it was a preview.  The place
16  hadn't opened up at that point.
17     Q.   Did Mr. Greenfield tell you that
18  the story you were mentioning mentions the
19  same celebrities as the New York Times story?
20     A.   Yes, because they had purchased
21  cars at the dealership.  Those facts didn't
22  change.
23     Q.   Did the story that you pitched
24  advance the story in Mr. Greenfield's view?

FENNER

1         MR. THOMPSON:  Objection.
2     A.   He didn't want to go with the
3  story.
4     Q.   He didn't want to go with the story
5  that you pitched?
6     A.   That I wrote.
7     Q.   Because you -- that you wrote
8  because it did not advance the story,
9  correct?
10     A.   He felt that it didn't advance the
11  story.
12     Q.   Did you think that what you had
13  submitted, you had advanced the story?
14     A.   The story was about the -- that
15  this place had opened up and people were
16  coming in, and it was the mood, the place of
17  business was actually happening.
18     Q.   Other than that, did you think you
19  had advanced the story?
20     A.   It was a good story.
21     Q.   Did you think you had advanced it?
22     A.   I thought it was a good story and
23  we could have gone with it in the paper.
24     Q.   But you got Mr. Greenfield's point

FENNER

1
2  that it did not advance it beyond what the
3  times had published?
4      A.  I was waiting for him to offer up
5  suggestions so we could work and collaborate
6  to get in the paper.
7      Q.  Did you have go back to try to
8  advance the story, represent it with a new
9  angle?
10     A.  I did.
11     Q.  Did you ever get that angle?  And
12 publish the story?
13     A.  The paper publishes the story.  I
14 write the story.
15     Q.  Did you ever get that angle and was
16 that story ever published?
17     A.  The story was not published.
18     Q.  Did you ever get that angle?
19     A.  I would need to look at a copy of
20 the story.
21     Q.  As best as you can recall, did you
22 get that angle?
23     A.  It would refresh my recollection if
24 I read the story.
25     Q.  As you sit here today, do you

FENNER

1
2  recall any angle that you could obtain to
3  advance the story?
4      A.  I can't answer your question --
5      Q.  Because you don't recall?
6      A.  Because I would need to read the
7  story.
8      Q.  Did you feel that Mr. Greenfield's
9  criticism of what you presented in that
10 instance was unfair?
11     A.  Yes, he was blocking the story to
12 getting in the paper.
13     Q.  Did you think it was unfair?
14     A.  Yes.  Everything that he did during
15 that time to me was blocking my success at
16 the paper.
17     Q.  Did Mr. Greenfield suggest to you
18 to go back to the dealership and be there
19 while a celebrity was buying a car?
20     A.  You can't manufacture a celebrity
21 walking in a car dealership --
22     Q.  Was that suggestion made to you?
23     A.  I believe I did return to the
24 dealership to see if we could see, at the
25 time we had visited the dealership on the

FENNER

1
2  second occasion, to see if there was any high
3  profile people buying the car that day.
4      Q.  And did you get that story?
5      A.  If I had a copy of the story in
6  front of me, it would refresh my
7  recollection.
8      Q.  The story wasn't published, right?
9      A.  That's correct.
10     Q.  Was Mr. Greenfield's reaction to
11 your story, to this story that you wrote, do
12 you believe that that was based on race
13 discrimination?
14     A.  Mr. Greenfield was on a campaign to
15 get me out the paper.
16     Q.  Any specific information, sir,
17 relating to the conversations you had with
18 Mr. Greenfield about this Harlem dealership
19 story that causes you to believe or conclude
20 that his decision was based on race
21 discrimination?
22     A.  Yes, because he used this fact in
23 my evaluation which was then used against me
24 as a tool -- he was trying to paint me as
25 incompetent.

FENNER

1
2      Q.  So do you know of any acts that
3  occurred at the time this story was being
4  pitched and written that demonstrate that
5  Mr. Greenfield was motivated by race?
6      A.  Repeat the question.
7      Q.  Were there any facts that you know
8  of that occurred at the time the story was
9  being pitched and written that demonstrate
10 that Mr. Greenfield was motivated by race?
11     A.  At the time?
12     Q.  Yes.
13     A.  I can't -- at the time, I can't
14 discern that, but what I do now know or what
15 I knew then when I saw it in my evaluation
16 cast --
17     Q.  My question was at the time.
18     A.  No. I don't believe so.
19         MR. THOMPSON:  Mark, what time do
20 you want to break for lunch?  It is 1
21 now.
22         MR. LERNER:  Let's go about another
23 ten minutes.
24         MR. THOMPSON:  Let's take a break.
25         MR. LERNER:  I'm almost done with

```
1                FENNER
2    this section.
3          MR. THOMPSON: Ten minutes is too
4    long.  Ten minutes -- I mean, it is 1
5    o'clock.
6          MR. LERNER: Ken, you asked me what
7    time I would like to break and I said
8    about ten more minutes.
9          MR. THOMPSON: And I would like to
10   break now.  What time -- I mean, we have
11   been here since 9:30, since 9:15.  It is
12   1 o'clock.  I think it is time to take a
13   break.
14         MR. LERNER: Ken, I am asking you
15   if I can go ten more minutes.
16         MR. THOMPSON: Try to do it before
17   ten minutes, Mark.  I think it is unfair
18   to have the witness here, to have the
19   witness here who hasn't eaten anything
20   since this morning.
21         MR. LERNER: All right.
22   Q.   Mr. Fenner, did there come a time
23   in 2008 when your editors told you that you
24   would be working as a street reporter --
25   A.   No.
```

```
1                FENNER
2    Q.   -- as a runner?
3    A.   No.
4    Q.   Did that conversation ever occur?
5    A.   No.
6    Q.   Did you ever sit down with
7    Ms. Scialdone of HR and one of your editors
8    and have your -- have a discussion in which
9    your duties were revised to be a runner as
10   opposed to a general assignment reporter?
11   A.   Which editor?
12   Q.   Mr. Greenfield or Ms. Gotthelf?
13   A.   Which one?
14   Q.   Well, how many meetings did you
15   have with Ms. Scialdone during the course of
16   your employment?
17   A.   At the time that I can recall, I
18   had two.
19   Q.   When were those two meetings?
20   A.   When I had the two performance
21   evaluations.
22   Q.   Do you recall any other meetings in
23   with Ms. Scialdone in which your duties as a
24   reporter were discussed?
25   A.   I can't recall that meeting.  My
```

```
1                FENNER
2    title and my work was always as a senior
3    reporter at the paper.
4    Q.   And were you ever advised in a
5    meeting that included Ms. Scialdone that your
6    duties would be those of a street reporter?
7    A.   Was it written down?
8    Q.   That's -- that is my question to
9    you?
10   A.   It wasn't written down.  Not that I
11   recall.
12   Q.   What do you mean it wasn't written
13   down?  Did it happen?
14   A.   You are presenting me with these
15   evaluations and a final warning.  And these
16   are all comments that they made about my
17   work.  And what I am saying, the comment that
18   you are referring to is not included in these
19   papers.
20   Q.   Was it -- were you verbally told
21   that your -- that your duties would be as a
22   street reporter?
23   A.   Not that I recall, no.
24   Q.   Was your job description ever
25   changed while you were at the Post?  I don't
```

```
1                FENNER
2    mean your job title.  I mean the description
3    of your duties as described to you by your
4    supervisors?
5    A.   After I complained about the racist
6    criterium that was published in February of
7    2009, I was eventually banned from the
8    newsroom by Michelle Gotthelf and Dan
9    Greenfield.  And during that time, they
10   changed my schedule.
11   Q.   You mean your work schedule?
12   A.   That's correct.
13   Q.   Your hours?
14   A.   That's correct.
15   Q.   Did they make any other changes?
16   A.   And in particular, on my Thursday
17   shift, they changed those hours from 2 to 10,
18   then told me that they were doing things
19   differently in the newsroom and they wanted
20   me to be a team player and pitch in for about
21   a month until they could get someone else to
22   cover that position.  That position is a
23   junior position for a junior reporter.
24   Q.   So one day a week, they gave you a
25   later shift, right?
```

FENNER

1
2   A.   On Thursday.
3   Q.   Did they move your other shifts
4   to -- from 11 to 7 to 9 to 5?
5   A.   That's correct.
6   Q.   And did you -- were you agreeable
7   to the shift change from 11 to 7 to 9 to 5?
8   A.   No.
9   Q.   Did you tell them you didn't want
10  to do that?
11  A.   I told them that the schedule I had
12  was working great for me.  I have a teenage
13  daughter who I am getting ready for college
14  and I use my time in the evenings to get her
15  ready and prep her for college life.
16  Q.   Well, wasn't it -- didn't it assist
17  you to get home at 5 p.m. or have your shift
18  end at 5 p.m. as opposed to 7 p.m. which
19  worked four out of your five days when they
20  made that change?
21  A.   If you are a New York journalist,
22  you are never, ever, ever work 9 to 5.
23  Q.   So are you saying that that wasn't
24  your schedule?
25  A.   What I am saying is there is always

FENNER

1
2   demands that you have to tackle.  There is
3   always an extended assignment, there is
4   always breaking news and if you want to be a
5   part of that team, you have to be highly
6   motivated, you have to be tenacious and you
7   have to be relentless in getting those
8   stories, I worked -- I never, I never ever
9   finished a shift at 5.  That's deadline.
10  Q.   Did you, after you performed the 2
11  to 10 shift for a month, did you tell
12  Michelle Gotthelf or Dan Greenfield that you
13  wanted to be taken off that shift?
14  A.   Yes.
15  Q.   Did you put that in writing?
16  A.   Did I put it in writing?
17  Q.   Yes.
18  A.   We had a meeting where they
19  presented me with a change.  And I verbally
20  told them -- I verbally told them my
21  objections to it.
22  Q.   After doing it for four or five
23  weeks, did you then go back and say this is
24  not working out, I want to be -- I want to go
25  back to an earlier shift?

FENNER

1
2   A.   I asked them if they had hired
3   someone else for the junior position, if they
4   had found someone.
5   Q.   What did they say?
6   A.   I can't recall at this time exactly
7   what they said, but I remained working in
8   that position from May until my date of
9   termination.
10  Q.   Other than -- did you -- did you
11  have any other conversations with them about
12  that shift other than asking them if they had
13  hired somebody?
14  A.   I told them it was outrageous that
15  they were banning me from the newsroom.  I
16  felt like I was being treated differently
17  than my white colleagues at the paper.  I was
18  told I needed to call in and get permission
19  to enter the NewsCorp. building.
20  Q.   You didn't tell Dan Greenfield and
21  Michelle Gotthelf that you believed you were
22  being treated differently from white
23  reporters, correct?  You didn't say that to
24  them, right?
25  A.   I couldn't -- I told them I thought

FENNER

1
2   it was unfair.
3   Q.   You were sent out in the street?
4   A.   I was being banned from the
5   newsroom.
6   Q.   But you didn't say I think you're
7   doing this to me because I'm black and you're
8   not doing it to my white colleagues?  You
9   didn't say that, right?
10  A.   I can't recall if I said that or
11  not at the time.
12  Q.   You -- you never said that to Dan
13  Greenfield or Michelle Gotthelf?
14  A.   But I did raise my objections to
15  them about getting banned from the newsroom.
16  Q.   OK, but you didn't say -- you
17  didn't raise your objection and say you are
18  doing this to me because of my race, correct?
19  A.   I can't recall everything
20  that I said and what transpired in that
21  meeting.  But I raised my objections to them.
22  Q.   You never put in any complaint or
23  EEOC charge or your affidavit that you said
24  that to them, right?  You have never alleged
25  in this lawsuit that you told Dan Greenfield

Page 130

```
                    FENNER
1
2        A.   I believe I did.
3        Q.   Is this written in your
4   handwriting?
5        A.   Yes.
6        Q.   Did you write it yourself?
7        A.   Yes.
8        Q.   What rating did you give yourself?
9        A.   A 5.
10       Q.   That's the highest rating
11  available?
12       A.   That's right.
13       Q.   And in the overall performance
14  summary section, you wrote, "Fenner needs to
15  sharpen his time management skills so he can
16  produce more exciting, hard-hitting
17  enterprise stories." Do you see that?
18       A.   I do.
19       Q.   And did you believe that to be
20  correct at the time that you wrote this?
21       A.   Yes.
22       Q.   So if your editors believed that
23  you needed to produce more hard-hitting
24  enterprise stories, you would agree with that
25  criticism, correct?
```

Page 131

```
                    FENNER
1
2        A.   I had produced --
3        Q.   Mr. Fenner, would you agree with
4   that criticism, that you needed to produce
5   more hard-hitting enterprise stories?
6        A.   That was my job, to produce
7   hard-hitting enterprise stories.
8        Q.   Mr. Fenner, if your editors had
9   that criticism of you, you agreed with it?
10  You wrote it in this self-evaluation, right?
11       A.   I did.
12       Q.   You also listed in the
13  self-evaluation three stories that you
14  believed represented your overall
15  achievements at the Post during this review
16  period; a story about the appointment of
17  Archbishop Dolan, an interview of a passenger
18  that came out of the plane in a landed in the
19  Hudson River, and the story you did on the
20  church bus that went to watch the Obama
21  inauguration, right?
22       A.   Yes.
23       Q.   Those are the three stories that
24  you listed under "overall achievements,"
25  right?
```

Page 132

```
                    FENNER
1
2        A.   That's correct.
3        Q.   And in citing them, you were
4   seeking to indicate what you thought were the
5   highlights of your year, fiscal year 2009
6   working for the Post, right?
7        A.   Yes, this was representative of my
8   work.
9        Q.   Well, it was representative of your
10  best work, right?
11       A.   Some of my best work.
12       Q.   The story about the gentleman who
13  was on the plane that landed in the Hudson
14  River, that was an interview of a guy who
15  came out of the water in his underwear,
16  right?
17       A.   Correct.
18       Q.   Isn't it true that both the New
19  York Times and the Associated Press
20  interviewed the same guy on the same day as
21  you interviewed him?
22       A.   They probably did.
23       Q.   So there was nothing unique or
24  extraordinary about that story, right?
25       A.   It was a great story. It was
```

Page 133

```
                    FENNER
1
2   unique. That's why I put it on my
3   self-evaluation. To get that story --
4        Q.   Why was it unique if the New York
5   Times interviewed the same individual and the
6   Associated Press interviewed the same
7   individual?
8        A.   It was unique because all of New
9   York media was there. Everyone was trying to
10  get that story. I don't know who else got
11  it, but it was my job to get it for the New
12  York Post.
13       Q.   The coverage of the bus ride to
14  Washington DC to watch the Obama
15  inauguration, that was a single story,
16  correct?
17       A.   That was a sidebar that was part of
18  the inauguration package that the Post
19  produced when Obama took the office, the oath
20  of office. And when I had -- when I was
21  working on the Miracle on the Hudson story, I
22  was the lead reporter for the paper. That
23  was the day when the airplane crashed into
24  the ocean and Michelle Gotthelf called my
25  name across the newsroom and dispatched me as
```

Page 134

FENNER
1
2  the first reporter.  It was her knee-jerk
3  reaction to make sure she could send her best
4  reporter to this big event that happened in
5  New York.
6      Q.   But you did not write the news
7  story on the "Miracle on the Hudson,"
8  correct?
9      A.   I worked with many -- there was
10  probably like 15 to 20 reporters who worked
11  on that story.  I don't have the exact
12  number --
13      Q.   Your byline went on the story of
14  the interview of one of the passengers,
15  right?
16          MR. THOMPSON:  Mr. Lerner, please
17      don't interrupt the witness when he is
18      testifying and trying to answer.
19      Q.   Correct?
20      A.   What was your question?
21      Q.   Your byline went on the story on
22  the interview of one passenger, right?
23      A.   No, I believe my byline was on the
24  main body of a --
25      Q.   You believe it was?

Page 135

FENNER
1
2      A.   I don't have it in front of me, but
3  I believe my byline was the lead byline in
4  the story.
5      Q.   If we looked at the paper's
6  archives, we could determine whether or not
7  your byline was on there, right?
8      A.   I guess we could.
9      Q.   What did you report with respect to
10  your work that was other than the interview
11  of the guy who came out of the water in his
12  underwear?
13      A.   I was writing about the emergency
14  services -- the emergency -- the first
15  responders who were rushing to save the
16  people who were trapped on the plane as it
17  was slowly submerging into the icy waters of
18  the Hudson.
19      Q.   Did you get any interviews of any
20  of those emergency responders?
21      A.   I got many interviews and I filled
22  my notebook up that day.
23      Q.   Did you interview any of the
24  emergency responders?
25      A.   If I had the story in front of me,

Page 136

FENNER
1
2  it would refresh my recollection.
3      Q.   You don't have a recollection now
4  of having done that though, right?
5      A.   If I interviewed any of the first
6  responders?
7      Q.   Yes.
8      A.   I interviewed probably more than 20
9  people that day, so.
10      Q.   Did you interview the ferry boat
11  captain that was first on the scene?
12      A.   I can't recall exactly -- I can't
13  recall if I interviewed the ferry boat
14  captain.
15      Q.   How many other reporters were sent
16  by the New York Post to the scene that day?
17      A.   Many.
18      Q.   A dozen?
19      A.   I don't have an exact number.
20      Q.   Could be a dozen?
21      A.   I would assume that it was all
22  hands on deck.
23      Q.   And what does that mean in terms of
24  a number?
25      A.   That means this, this was the --

Page 137

FENNER
1
2      Q.   What does that mean in terms of the
3  number of reporters?
4      A.   That people would have been just
5  rushing to the scene.
6      Q.   How many reporters is all hands on
7  deck?
8      A.   I don't have an exact number for
9  you.
10      Q.   Is it more than a dozen?
11      A.   It could be.
12      Q.   Is it more than 20?
13      A.   It could be.
14      Q.   In the story about the bus ride to
15  Obama's inauguration, you met a church group
16  at -- in the wee hours of the morning,
17  correct, about 2 o'clock in the morning?
18      A.   That sounds right.  It was
19  midnight.
20      Q.   And you rode on the bus -- and the
21  buses departed New York and drove to
22  Washington DC to participate in the Obama
23  inauguration events, correct?
24      A.   Correct.
25      Q.   And when did you file the story on

Page 138

FENNER

1    FENNER
2  that bus ride?
3      A.   Later on that afternoon.  It was --
4  I can't recall the exact hour.  But there
5  were like 2 or 3 million people packed into
6  that area.
7      Q.   What was extraordinary about your
8  reporting of that bus ride that caused you to
9  list it as one of your main achievements for
10  2009?
11     A.   We were able to show how New
12  Yorkers who were connected to King were able
13  to see King -- were able to see Obama become
14  president.  There were people on that bus who
15  were members of the congregation at the time
16  that King was assassinated and they -- they
17  were making almost this sacred pilgrimage to
18  DC to connect King's dream and the actuality
19  of the United States had voted in Barack
20  Obama as president.
21     Q.   Did you cover any other aspects of
22  the Obama inauguration?
23     A.   My job was that sidebar I just
24  mentioned, the Canaan congregation from
25  Harlem, being one of scores of buses that

Page 139

1    FENNER
2  made this massive caravan, and this bus, at a
3  unique place in American history.
4      Q.   You also indicated in this
5  self-evaluation your coverage of Archbishop
6  Dolan's arranging for a family to adopt an
7  severely handicapped child.  Did you consider
8  that to be one of your best achievements in
9  that year?
10     A.   That would rank as one of the best
11  achievements I have had as a journalist in my
12  career.  During this trip, this is when I was
13  treated to a racially --
14     Q.   Mr. Fenner --
15     A.   -- hostile tirade.
16     Q.   Mr. Fenner, the question was, the
17  question was, was that one of your best
18  achievements?
19     A.   Yes.
20     Q.   OK.  Which story are you referring
21  to with respect to Dolan?  Is it the story
22  about the adoption of the handicapped child?
23     A.   Specifically, the entire package
24  was top notch.
25     Q.   How did you obtain the interview?

Page 140

FENNER

1    FENNER
2      A.   I wasn't finished.
3      Q.   The piece about him -- you answered
4  me.  It was the entire package.
5      A.   I was trying to finish my sentence.
6      Q.   I need to move.  I have a lot of
7  questions to get through.
8          MR. THOMPSON:  You may have a lot
9  of questions --
10         MR. LERNER:  We are going to call
11  the court to get more time.
12         MR. THOMPSON:  You can call the
13  court.  You wanted to get more time
14  before you started this deposition.  You
15  have repeatedly interrupted Mr. Fenner.
16  You have to let him answer your
17  questions.
18         MR. LERNER:  I need to have him
19  answer the questions.
20         MR. THOMPSON:  He is answering your
21  questions, Mr. Lerner.  Let him.
22     Q.   Do you recall the question?
23     A.   This piece that you are referring
24  to showed Dolan to be a miracle worker, the
25  fact that this woman was pro life and needed

Page 141

1    FENNER
2  the bishop's hand to help her find a safe
3  home for her disabled child who suffered
4  many, many disabilities.
5      Q.   Mr. Fenner, the question was, did
6  you consider this to be one of your best
7  achievements in that year?  The answer is
8  either yes or no.  OK.
9          How did you get the interview of
10  Archbishop Dolan?
11     A.   Which one?  I did many.
12     Q.   The one -- your first interview of
13  Dolan?
14     A.   I interviewed him at the parish.
15     Q.   Were you assigned by your editors
16  to go to Milwaukee to try to get that
17  interview?
18     A.   I was dispatched there.
19     Q.   You were dispatched there.  Was the
20  interview set up before you left?
21     A.   No.
22     Q.   So you didn't have a source within
23  the parish that enabled you to get that
24  interview assignment, right?
25     A.   I developed a source.  That's why I

FENNER

1
2  was able to come up with the miracle story.
3      Q.   And how did you get that interview
4  once you were out there in Milwaukee?
5      A.   I asked if there were any recent
6  articles Cord covered in the Catholic Weekly
7  that mentioned Dolan and what kind of work he
8  did.
9      Q.   Who did you ask that of?
10     A.   I was asking a source in Milwaukee.
11     Q.   Did they supply you with an article
12 about his arranging of the adoption of the
13 child?
14     A.   No.
15     Q.   So how did asking that question get
16 you the interview?
17     A.   We had a back and forth.  We were
18 talking and one question led to another.
19     Q.   Did somebody come up with the idea
20 at the Post, come up with the idea of
21 providing, giving Dolan some gifts?
22     A.   That was -- I made three trips to
23 Milwaukee on behalf of the New York Post and
24 I think this was after -- at some point, we
25 were bringing him Yankee and -- Yankee items

FENNER

1
2  and New York items.
3      Q.   Whose idea was it to bring him
4  those items?
5      A.   I'm not sure.  You're asking if it
6  was the editor's or mine, is that your
7  question?
8      Q.   Yes.
9      A.   I guess we collaborated and came up
10 with that suggestion.
11     Q.   And you regard the Dolan stories to
12 be some of your -- well, withdrawn.
13          Do you regard those assignments as
14 good assignments?
15     A.   It was really difficult for me to
16 do my best work because what had happened to
17 me during that trip.  Dan Greenfield --
18     Q.   Were they good assignments, sir?
19     A.   Dan Greenfield hit me --
20          MR. LIPPNER:  Mark, let's call the
21 court.
22     A.   -- with a whole load of curses.
23     Q.   Mr. Fenner, excuse me.  We are
24 going to need to call the court.
25          MR. THOMPSON:  You can call the

FENNER

1
2  court.
3          MR. LIPPNER:  Off the record.
4          MR. LERNER:  Let's go off the
5  record.
6          THE VIDEOGRAPHER:  The time is 2:30
7  p.m.  We are off the record.
8          (Exhibit 8, document Bates stamped
9  NYPFL 261 marked for identification, as
10 of this date.)
11         (Exhibit 9, document Bates stamped
12 NYPFL 248 marked for identification, as
13 of this date.)
14         (Recess)
15         THE VIDEOGRAPHER:  The time is 3
16 p.m., we are on the record.
17     Q.   Mr. Fenner, did you consider the
18 assignment to cover the appointment of
19 Timothy Dolan to be -- the Archbishop of New
20 York, to be an assignment you were glad to
21 receive?
22     A.   Yes.
23     Q.   It was an important story for New
24 York, right?
25     A.   That is correct.

FENNER

1
2      Q.   Were you -- did you consider the
3  story of the bus trip that went to Washington
4  DC an important story?
5      A.   Yes.
6      Q.   You were glad to have gotten that
7  assignment?
8      A.   Yes.
9      Q.   Do you recall being reprimanded by
10 Dan Greenfield on two occasions for still
11 being in Teaneck, where you reside, in the
12 morning after being instructed to go to
13 another location?
14     A.   Is that what this e-mail is?
15     Q.   Exhibits 8 and 9, which are NYPFL
16 261 and 248 relate to such incidents.
17     A.   Yes.
18     Q.   And in one of the incidents, you
19 had spoken to him and he had directed you to
20 Brookdale Hospital in Brooklyn for a story,
21 and when he called you sometime after that,
22 you were still in Teaneck and you told him
23 that, correct?
24     A.   I believe so, yes.
25     Q.   And you told him that you had had

Page 146

FENNER

1  to run an errand before heading into the city
2  and you felt that you told him the truth
3  about that when he called you and you were
4  still in Teaneck.
5       On the other occasion, you had
6  been overnighted to Lanoka Harbor and you
7  called in that morning, you were in Teaneck
8  and he called you back a half an hour later
9  and you were still in Teaneck, correct?
10      A.   This is true.
11      Q.   And Dan was annoyed at you in both
12  instances and let you know that, correct?
13      A.   Yes.
14      Q.   And those incidents were in June
15  and August of 2009, right?
16      A.   Correct.
17      Q.   In the case of the August 2009
18  incident, you said that you were getting gas,
19  correct?
20      A.   Yes, I might -- yes, I mentioned
21  that during the conversation.
22      Q.   I would like to show you a document
23  called APA fiscal year 2009, it is NYPFL 472
24  through 475, and it will be marked as Fenner

Page 147

FENNER

1  Exhibit 10.
2       (Exhibit 10, document Bates stamped
3  NYPFL 472 through 475 marked for
4  identification, as of this date.)
5       Q.   Do you recognize this document,
6  sir?
7       A.   Yes.
8       Q.   Is this the APA that Michelle
9  Gotthelf and Dan Greenfield gave you in
10 September of 2009?
11      A.   Yes.
12      Q.   Is that your signature on the last
13 page?
14      A.   Yes.
15      Q.   And you did not respond to it with
16 employee comments, correct?   At least no
17 written comments in the employee comment
18 section on the last page, correct?
19      A.   No.
20      Q.   So it is correct that you did not
21 write anything in that section, right?
22      A.   That's correct.
23      Q.   And did you read this APA when you
24 received it?

Page 148

FENNER

1       A.   I did read it.
2       Q.   It rated you a 1 which is the
3  lowest possible rating that you can receive
4  which stands for unacceptable, does not meet
5  standards, correct?
6       A.   That's correct.
7       Q.   Do you allege that this performance
8  evaluation was a negative performance
9  evaluation because you are African American?
10      A.   Yes.
11      Q.   What is the basis of that
12 allegation?
13      A.   Because the points in here are
14 false and untrue.
15      Q.   And specifically what is false and
16 untrue?
17      A.   It says he -- "but continues to
18 under perform at this level and is working as
19 a street runner at best."
20      Q.   So you would agree you were hired
21 as a senior reporter, right?
22      A.   Yes.
23      Q.   And do you -- you believe that you
24 were not under-performing as a senior

Page 149

FENNER

1  reporter?
2       A.   I did great work that year.
3       Q.   Were you -- go ahead.
4       A.   I could enumerate many of the
5  stories that I worked on if you want.
6       Q.   What are the stories that you feel
7  highlight yourself as a reporter for the Post
8  in the 2009?
9       A.   During the course of the year, I
10 got an exclusive interview with William
11 Ayers, who was one of the founders of the
12 Weather Underground and it was linked to
13 Barack Obama as a friend or associate at --
14 during the Democratic nomination.
15      Also during that time, Hillary
16 Clinton was on the record for talking about a
17 mom in Ohio who was pregnant, she was
18 pregnant, a woman who was pregnant and she
19 had lost her baby because she didn't have
20 healthcare.  I was able to obtain an
21 interview with her.
22      Gregg Birnbaum, who is an editor on
23 the desk, he covers the political, politics
24 for the paper, said I was doing good work and

Page 150

FENNER

1
2 knew I was doing good work on that
3 assignment.
4        That was also the year I wrote the
5 inauguration story, the sidebar piece.  It
6 was also the year in which I wrote about
7 Bishop Dolan coming to New York as a next
8 bishop.
9        I wrote a piece in November of '08
10 when Barack Obama had won the nomination, and
11 I was able to find some people who were at,
12 in Washington DC during the time King had
13 delivered the "I Have The Dream" speech and
14 it was also watching on television in Harlem
15 Barack Obama make this historic move by
16 winning the Democratic nomination.  And there
17 is other stories, but those are several of
18 them.
19    Q.   What was the piece that you wrote
20 about William Ayers?
21    A.   He was -- I was in Chicago and
22 William Ayers was the center of the story and
23 people were trying to find out if Barack
24 Obama, who was then running for the
25 presidency, was a friend of William Ayers who

Page 151

FENNER

1
2 was one of the founders of the Weather
3 Underground.  And in addition to that, there
4 was another story --
5    Q.   Did you break that story or had it
6 been -- the connection between Obama and the
7 Weather Underground been already reported on?
8    A.   I didn't break the story, but I was
9 able to get William Ayers to speak while the
10 national media was focused on this issue.
11    Q.   Were any of the stories that you
12 listed as in your 2009 year, were any of them
13 stories in which you broke news?
14    A.   To have William Ayers speak on the
15 record is to break news.  To get the widow
16 of -- the widower of a woman who died in Ohio
17 who had no health insurance talk for the
18 first time about this issue was breaking
19 news.
20    Q.   These are, aren't these follow-ups
21 to news stories, but not breaking news?
22    A.   William -- it was a follow-up, but
23 it was also breaking news.
24    Q.   Because Ayers was interviewed?
25    A.   That's news.

Page 152

FENNER

1
2    Q.   Did he say anything in that story
3 that had previously been not revealed?
4    A.   I would need to read the story and
5 the story that was published didn't contain
6 all the facts from the interview that I
7 obtained with William Ayers.
8    Q.   What is the definition of
9 breaking -- of when a reporter breaks news?
10 What does that mean, to break news?
11    A.   You reveal new information about an
12 issue.
13    Q.   Well, is merely revealing new
14 information, is that necessarily breaking the
15 news?  Doesn't breaking news, breaking a news
16 story mean more than that?
17        MR. THOMPSON:  Objection.
18    Q.   It means bringing something to the
19 public attention that the public didn't know
20 about previously?
21    A.   If the subject of the story is
22 speaking about an issue for the first time,
23 that would be breaking news.
24    Q.   Was the trip to DC on the bus, was
25 that breaking news?

Page 153

FENNER

1
2    A.   That was an enterprise story.
3    Q.   It was not breaking news though,
4 was it?  It was a sidebar, right?
5    A.   It was news.  We were revealing and
6 telling the story about a community of people
7 who live in New York.
8    Q.   Isn't it the fact that the Dolan
9 story involving the arrangement of the
10 adoption of a disabled child had been written
11 on in a Catholic online publication?
12    A.   It could have been.  I'm not
13 exactly sure.
14    Q.   Isn't that where you got the story
15 from?
16    A.   I had asked the source if there was
17 a Catholic weekly that was tracking the
18 efforts of Bishop Dolan.  I didn't get the
19 information from the online.  I had to locate
20 this woman, find her, spend hours to trust me
21 with her story.
22    Q.   The fact of that adoption that
23 Dolan arranged, that adoption was already
24 online by the time you wrote the story for
25 the Post, correct?

Page 158

FENNER

1   public, you are telling them new information.
2   There is no reason not -- there isn't a
3   reason to publish information that people
4   don't need to know.
5       Q.   So if they need to know it, in your
6   mind, it is breaking news?
7       A.   So there is two kinds of breaking
8   news.
9       Q.   It is one kind of breaking news?
10      A.   No, I said -- there is breaks news
11  like an emergency, and then there is also
12  publishing new information.  You wouldn't
13  publish information if it had no merit to be
14  printed.
15      Q.   Were you gratified to be assigned
16  to the stories that you listed in 2009?
17      A.   Those were important stories, yes.
18      Q.   And they were good stories to get
19  assigned as a reporter, right?
20      A.   Yes.
21      Q.   That includes the story about
22  William Ayers, the story about Clinton
23  talking about the woman who lost her baby,
24  the piece on Obama's inauguration being

Page 159

FENNER

1   watched by people who had seen the "I Have A
2   Dream" speech, right?
3       A.   Yes.
4       Q.   Do you -- do you, did you regard
5   the assignment to cover the David Letterman
6   affair to be a desirable assignment?
7       A.   That was a big story of the paper,
8   yes.
9       Q.   What about the story about the
10  Craig's list killer?  That was a story --
11  that was a story of national interest, right?
12      A.   Correct.
13      Q.   Were you assigned to cover that?
14      A.   Correct.
15      Q.   And were you pleased to be assigned
16  that story?
17      A.   I was glad to be working for the
18  paper and contributing on that piece.
19      Q.   You also could have had a story
20  regarding an affair that led to the
21  resignation of the head of the Red Cross.  Do
22  you recall that story?
23      A.   Yes.
24      Q.   That was a national -- story of

Page 160

FENNER

1   national interest, right?
2       A.   Yes.
3       Q.   Were you glad to be assigned to
4   cover that story?
5       A.   Yes, it was a prominent story and I
6   was glad to work on that story.
7       Q.   Did you cover a story involving
8   David Copperfield, the illusionist?
9       A.   I did.
10      Q.   What was that story about?
11      A.   There was allegations that he had
12  drugged a woman, I believe it was on a
13  private island he owned, and he might have
14  sexually abused this woman.  And the goal of
15  that story basically was to find the
16  magician, David Copperfield.
17      Q.   And in fact, the cops found 2
18  million dollars in a Las Vegas warehouse that
19  he owned, right?
20      A.   That sounds familiar.
21      Q.   It was a warehouse that had like a
22  concealed entrance, right?
23      A.   I was at that warehouse.
24      Q.   You traveled to Vegas to see that

Page 161

FENNER

1   warehouse?
2       A.   I saw that warehouse.
3       Q.   Were you satisfied to be assigned
4   to cover that story?
5       A.   Yes.
6       Q.   You covered a story about A-Rod
7   dating a stripper behind his wife's back.  Do
8   you recall that?
9       A.   I do.
10      Q.   That was a big story for New York,
11  right?
12      A.   Very big.
13      Q.   A-Rod was already playing for the
14  Yankees when you covered that?
15      A.   Correct.
16      Q.   Was that a good story for you to be
17  assigned to when you were a reporter?
18      A.   Yes, it was.
19      Q.   You covered a story in which a
20  woman stole the identity of an Ivy League
21  graduate and pretended to be that person?
22      A.   Yes, that was a very difficult
23  story and I did very well on it.
24      Q.   Do you consider that story to be a

FENNER

1
2  good story to have covered?
3      A.   Yes, it was an important story for
4  the paper and I was able to obtain an
5  exclusive interview with Esther Reed while
6  she was -- while she was under arrest by U.S.
7  Marshals in a federal facility.
8      Q.   You covered the stories about the
9  murders of Jennifer Hudson's family members,
10  right?
11      A.   I did.
12      Q.   That was a big national story as
13  well, right?
14      A.   Yes.
15      Q.   Good story to be assigned to?
16      A.   That was an important story, yes.
17      Q.   You covered the arrest of Joba
18  Chamberlain for DWI when he was out in
19  Nebraska, correct?
20      A.   Yes, I did great work on that
21  story.  We were able to find out that he had
22  been drinking.  He was at a strip club.  And
23  it caused him to fall into a fight with a
24  patron because he was being taunted that the
25  Red Sox were in the playoffs.

FENNER

1
2      Q.   Were you glad to get the assignment
3  to cover that story?
4      A.   I did great work on that story.
5  Yes, I was glad to get that assignment.  It
6  was a difficult assignment and I was able to
7  do good work on it.
8      Q.   You covered a story involving a
9  dispute between candidates in Alabama who
10  argued over whether one of them should keep a
11  contribution that they had gotten from
12  Charles Rangel's fund raising.  Do you recall
13  that story?
14      A.   Yes.
15      Q.   Was that a good story for you to
16  cover for New York?
17      A.   That was an important story for the
18  paper.
19      Q.   Was it a good assignment for you?
20      A.   Yes.
21      Q.   Did you cover a story involving an
22  engineer that was killed on the day of his
23  graduation?
24      A.   That was in Buffalo, New York, yes.
25      Q.   Why was that story an important

FENNER

1
2  story?
3      A.   This young man had grown up in a
4  housing project in the Bronx, and despite all
5  the challenges in his life, was able to get
6  to college, study engineering and make his
7  family proud, and on his graduation day, he
8  was killed at a party the day before he
9  graduated.
10      Q.   Were you gratified to be assigned
11  to cover that story?
12      A.   Yes.  That was an important story
13  for the paper.  I was glad to contribute.
14      Q.   You covered Plaxico Burress
15  shooting himself in a nightclub, correct?
16      A.   Yes, I was in Pittsburgh,
17  Pennsylvania for that story.
18      Q.   Was that a story of national
19  interest?
20      A.   Oh, yes.
21      Q.   Was that a good story to be
22  assigned to cover as a reporter?
23      A.   It was another one of the front
24  page stories that I covered during my tenure,
25  yes.

FENNER

1
2      Q.   You covered a story about the
3  Olympic swimmer, Michael Phelps, getting
4  reported for smoking marijuana?
5      A.   Yes, that was in Baltimore,
6  Maryland.
7      Q.   That was a national scandal, right?
8      A.   It could be worldwide.
9      Q.   That was a good story to cover,
10  right?
11      A.   It was an important story for the
12  paper and I was glad to contribute.
13      Q.   You were glad to be assigned to
14  cover that?
15      A.   Yes.
16      Q.   Do you recall pitching a story to
17  Dan Greenfield about a man living in an old
18  bank building?
19      A.   Yes.
20      Q.   What was Dan's reaction to that
21  pitch?
22      A.   He criticized me and shot it down.
23      Q.   Why did he tell you he was shooting
24  it down?
25      A.   I recall he didn't like the story.

Page 166

FENNER

1             FENNER
2    Q.  Do you recall him telling you that
3 it was because you told him that it had been
4 covered by New York Magazine a year ago?
5    A.  That sounds familiar.
6    Q.  Did you disagree with his opinion
7 that the story should be -- that the paper
8 should take a pass on that story?
9    A.  I strongly disagreed with his
10 opinion.
11    Q.  And why, if the story had been
12 covered by New York Magazine a year ago, why
13 isn't Dan's -- why wouldn't Dan's position
14 that the paper should pass on it be a
15 justified one?
16    A.  Because you could always find new
17 angles, new developments, new changes in a
18 story.  And you don't know that unless you do
19 the reporting and find out these new facts.
20    Q.  Did you do any of that work and
21 present him with the new facts before you
22 pitched it?
23    A.  He shot me down before I had a
24 chance to dig and find out what we could.
25    Q.  So that's a no?

Page 167

FENNER

1             FENNER
2    A.  What's the question?
3    Q.  Did you dig up any new act facts to
4 make the pitch more attractive?
5    A.  No, I wasn't able to because I
6 wasn't allowed to report on the story.
7    Q.  But a lot of times, you dig up
8 facts and angles to stories before you pitch
9 them to your editors, right, to get them
10 interested?
11    A.  Sometimes.
12    Q.  But you didn't do that in this
13 case?
14    A.  I needed the time to be freed up
15 from other work that the paper would have had
16 me to do.  In order to do the reporting on
17 that story, I would have to not do or not
18 cover any other assignments that the paper
19 might have been interested in.
20    Q.  Why do you think that Dan's
21 decision not to assign you to cover a story
22 about a man living in a bank that had been
23 written on by a magazine that's published in
24 New York, why do you think that decision was
25 the incorrect decision?

Page 168

FENNER

1             FENNER
2    A.  Because it would not have hurt to
3 find out that if there was new information in
4 it, new discoveries.  You play with angles
5 and you find new ways to get into a story.
6    Q.  Dan is entitled to his opinion and
7 judgment as a senior editor at the Post,
8 isn't he?
9    A.  He is and I'm also entitled to my
10 opinion as a senior reporter, an experienced
11 reporter who has a record of doing great
12 work.
13    Q.  But between the two of you, he is
14 the ranking person in the paper, right?
15    A.  He is the editor.
16    Q.  The responsibility to make the
17 decision falls on him, right?
18    A.  Correct.
19    Q.  So you disagreed with his decision?
20    A.  That's right.
21    Q.  But did you think that his decision
22 was unjustified or outrageous?
23    A.  Yes.
24    Q.  Did you think his decision was
25 based on race?

Page 169

FENNER

1             FENNER
2    A.  Yes.
3    Q.  Why?  What's the factual basis for
4 your opinion that his decision not to cover
5 that -- to have you not cover that story was
6 based on race?
7    A.  They had already established a
8 history with me and -- of being racially --
9 of him discriminating against me because I'm
10 black and he had no interest of advancing my
11 career or me doing good work because he
12 wanted me out of the paper.
13    Q.  Mr. Fenner, we went through a
14 litany of several dozen big stories of
15 national and regional interest, all of which
16 were stories that you were pleased to be
17 assigned to and gratified and you said did
18 good work.
19    So how can you say he wasn't
20 interested in advancing your career when he
21 and Michelle Gotthelf assigned you to all of
22 these extremely high profile stories?  And
23 the one he didn't want to send you on was the
24 one about a guy living in an old bank
25 building?

FENNER

1
2   MR. THOMPSON:  Objection.
3       Q.   How do you justify that statement,
4   sir?
5       A.   The question is what?
6       Q.   How do you justify saying that Dan
7   Greenfield didn't want to advance your career
8   by not sending you on a story to cover a man
9   living in an old bank building when he, in
10  fact, along with Michelle Gotthelf, sent you
11  on some of the biggest breaking stories in
12  the country during the time you worked at the
13  Post?
14      A.   They both were openly hostile to me
15  during my tenure at the paper.  They both
16  were screaming at me, and yelling at me,
17  throughout the course of my career.
18      Q.   They were trying to get the best
19  work out of you, weren't they?
20      A.   Yelling at me and cursing at me is
21  not getting the best work out of me.
22      Q.   How many times did they yell at you
23  or curse at you?
24      A.   Several.
25      Q.   Several?  How many?  You testified

FENNER

1
2   that they cursed at you -- Dan Greenfield
3   cursed at you while you were in Milwaukee on
4   the Dolan matter.  What other occasion do you
5   remember Dan Greenfield or Michelle Gotthelf
6   cursing or yelling at you?
7       A.   During the Heath Ledger story, Dan
8   Greenfield was screaming and yelling at me.
9   He was berating me about my work.
10      Q.   Was he trying to get better work
11  out of you?
12      MR. THOMPSON:  Objection.
13      A.   That wasn't getting better work out
14  of me, no.
15      Q.   Was he trying to get you to do
16  something to cover the story more
17  aggressively?
18      A.   I couldn't have covered the story
19  any more aggressively.
20      Q.   In the Dolan incident, wasn't he
21  yelling at you, telling you to get yourself
22  to a location where Dolan was speaking that
23  morning?
24      A.   He was cursing and yelling
25  obscenities at me.

FENNER

1
2       Q.   But he was directing you to go to a
3   location where Dolan was speaking that
4   morning, right?
5       A.   We were yelling about --
6       Q.   Sir, I need you to answer this
7   question.
8       A.   Question is again?
9       Q.   He was directing you to go to a
10  location where Dolan was speaking that
11  morning, correct?
12      A.   He wasn't directing me.  He was
13  screaming and yelling at me and cursing at me
14  and yelling profanities at me.  Like if you
15  want to hear those profanities, I can tell
16  you them.
17      Q.   Where were you when that
18  conversation was going on?
19      A.   I was five minutes away from the
20  Catholic parish.
21      Q.   And where was Mr. -- where was
22  Archbishop Dolan speaking that morning?
23      A.   At the parish.
24      Q.   What was the event that he was
25  speaking at?

FENNER

1
2       A.   There was a press conference that
3   morning.
4       Q.   Are you sure of that?
5       A.   Yes.
6       Q.   And how did Mr. Greenfield, to your
7   knowledge, learn about that press conference?
8       A.   It might have been through the
9   photo desk.
10      Q.   He didn't learn about it from you?
11      A.   I called the reporter.  They had
12  hired a freelance photographer out of Chicago
13  and I called him to tell him he needed to get
14  to Milwaukee as soon as he could because
15  there was a press conference at a certain
16  hour.  He informed me that he was an hour
17  away.  And I believe he then in turn, after I
18  spoke to him, called the photo desk.
19      Q.   And until you spoke to
20  Mr. Greenfield that morning, isn't it the
21  case that you were not planning to attend
22  that press conference?
23      A.   That's false.
24      Q.   Where were you -- you said you were
25  five minutes from the Catholic parish when

Page 174

FENNER

1  you spoke to him?  Did you tell him that?
2      Q.   Well, where were you going at
3      A.   I didn't get a chance to tell him
4  that because he was yelling and cursing at
5  me.
6      Q.   Well, where were you going at
7  that -- during that conversation?  Were
8  you --
9      A.   I was waiting for the photographer
10 to get closer to the city, to Milwaukee.  I
11 was going to be attending the press
12 conference.
13     Q.   But you were waiting for the
14 photographer to show up?
15     A.   That's correct.
16     Q.   And Mr. Greenfield was concerned
17 that if you continued to wait for the
18 photographer, the press conference might
19 begin without you being there, right?
20     A.   We were in Milwaukee on central
21 time.  Dan was in New York at eastern
22 standard time.  There was plenty of time for
23 me to get to the press conference.
24     Q.   Why were you waiting for the
25 photographer?  You could cover the press

Page 175

FENNER

1  conference without a photographer there,
2  right?
3      A.   That's correct.
4      Q.   So you could have gone -- you could
5  have gone to that press conference?
6      A.   I did go.
7      Q.   Without waiting?
8      A.   I did go to the press conference.
9      Q.   So why were you waiting before you
10 went until the photographer showed up?
11     A.   I wanted to go together with him so
12 we could work as a team.
13     Q.   And you could have -- you didn't
14 need the photographer there to do your job
15 which would be to report on what happened at
16 the press conference, right?
17     A.   I did do my job.
18     Q.   The question is you didn't need to
19 wait for the photographer to cover the press
20 conference, right?
21     A.   If he had failed to show up, I
22 could have -- I would have reported on the
23 story without him there.
24     Q.   Or you could cover the story with

Page 176

FENNER

1  him arriving at a different time?
2      A.   I could have.  But it is better to
3  work in tandem.
4      Q.   And --
5          THE VIDEOGRAPHER:  I am sorry to
6  interrupt.  There is a cell phone.  It is
7  interrupting testimony.
8          (Pause)
9      Q.   Mr. Fenner, what was Dan Greenfield
10 angry at during the conversation?
11     A.   He was cursing and yelling at me
12 because I was not at the press conference and
13 it wasn't scheduled to start for another 30,
14 40 minutes.
15     Q.   Did you tell him that you didn't
16 need to attend the press conference because
17 you had done an exclusive interview with him?
18     A.   I told him that I had made
19 arrangements to get personal time with the
20 monsignor -- with the bishop after the press
21 conference.
22     Q.   Did Mr. Greenfield take that to
23 mean that you were going to skip the press
24 conference and rely on the personal time you

Page 177

FENNER

1  had with the archbishop?
2      MR. THOMPSON:  Objection.
3      A.   I didn't get it a chance to fully
4  explain what was going on.
5      Q.   Because he got angry?
6      A.   He was more than angry.  He was
7  yelling and cursing at me and berating me.
8      Q.   During the course of that
9  conversation, did he ever use a racial
10 epithet?
11     A.   No.
12     Q.   Did he ever say anything that
13 referred to the fact that you are African
14 American?
15     A.   No.
16     Q.   And what is your factual basis for
17 an assertion that that episode was caused by
18 Mr. Greenfield's animosity towards you based
19 on race?
20     A.   He had never cursed at any other
21 white reporters, from my white colleagues at
22 the paper.
23     Q.   And how would you -- but you're not
24 in a position to know all the conversations

1            FENNER
2    Mr. Greenfield has had with all of the
3    reporters that work for him, right?
4        A.   I've talked to reporters.  I've
5    been in the newsroom.  I was at the paper for
6    two years.  I'm basing this on my experience.
7        Q.   You're basing it on experience that
8    you personally did not have, right?
9        A.   This is my experience, yes.
10       Q.   You're basing it on you -- did
11   you -- withdrawn.
12            How many reporters work for
13   Mr. Greenfield?
14       A.   I don't have the exact number.
15       Q.   More than 15?
16       A.   That sounds right.
17       Q.   Fifteen sounds right or more than
18   15?
19       A.   You said more than 15 right?
20       Q.   Yeah, it was probably what, 50?
21       A.   That could be right.
22       Q.   And you have no way of knowing all
23   of the conversations that Mr. Greenfield had
24   with all of his reporters over a period of
25   years, correct?

1            FENNER
2        A.   Not all.
3        Q.   Well, would you even know -- would
4    you even -- would you even know of a fraction
5    of them?
6        A.   I had spoken to my colleagues and
7    this -- for someone to curse and scream and
8    say what the fuck are you doing there, what
9    the fuck is wrong with you, those are
10   inflammatory, heated curse words.
11       Q.   What else did he say besides that?
12       A.   And if he had done that to another
13   white colleague of mine, I'm sure I would
14   have heard about it.
15       Q.   Why are you sure you would have
16   heard about it?
17       A.   Because it was so disrespectful, so
18   humiliating.  That's how I felt.
19       Q.   You believe any white reporter who
20   heard that, who heard curses from
21   Mr. Greenfield would tell you about it?
22       A.   Information circulates in the
23   newsroom and that's the kind of --
24   information you usually hear in a newsroom.
25       Q.   Besides what the fuck are you doing

1            FENNER
2    there and what the fuck is wrong with you,
3    was there anything else that he said during
4    that conversation that was offensive and
5    inflammatory to you?  I want to get the
6    whole -- I want to get the full picture of
7    what was said that was inflammatory.
8        A.   What the fuck is wrong with you,
9    what the fuck are you doing there, get --
10   better get your fucking ass over there.
11   Those were the words he was using with me
12   during the conversation and this went on and
13   on and on.  And I was telling him to refrain
14   from using that language with me.
15       Q.   Did you tell any of the white
16   reporters in the -- in the newsroom about
17   this conversation with Dan?
18       A.   Yes.
19       Q.   Who did you tell?
20       A.   Jeane MacIntosh.
21       Q.   Anyone else?
22       A.   Dan Mangan.
23       Q.   Anyone else?
24       A.   And other reporters.
25       Q.   Did you ever tell human resources

1            FENNER
2    about it?
3        A.   No.
4        Q.   Did you ever tell the legal
5    department about it?
6        A.   No.
7        Q.   You, when you were hired by the
8    Post, there was a -- you received a manual
9    that included the Post's antiharassment,
10   antidiscrimination policies, correct?
11       A.   I think it is from NewsCorp., yes.
12       Q.   And you got that?
13       A.   I recall being in the, a session
14   that was conducted by employees at NewsCorp.
15   about those policies you are referring to.
16       Q.   So were you -- would you call that
17   like EEO training type of stuff?
18       A.   I believe that's what they called
19   it.
20       Q.   And you understand and understood
21   while you were employed at the Post that the
22   Post had an antidiscrimination policy and a
23   mechanism for complaining about
24   discrimination or harassment, correct?
25       A.   I believe those points were covered

Page 182

FENNER

1
2      during the session.
3          Q.    And you were aware that complaints
4      of discrimination at the Post under the Post
5      policies can be brought to the human
6      resources department and/or the legal
7      department, correct?
8          A.    Can you -- if you say that's so, I
9      believe that's true.
10          Q.    Did you understand when you worked
11      at the Post that complaints of discrimination
12      or harassment could be brought to the HR or
13      legal departments?
14          A.    I think that's true.
15          Q.    Did you understand that complaints
16      of discrimination or harassment under the
17      policies should be reported to HR and legal?
18          A.    I understand that, yes.
19          Q.    Yet, at no time during your
20      employment at the Post did you go to HR or
21      legal and notify them that you believed you
22      were the victim of discrimination, correct?
23          A.    That's correct.  I didn't contact
24      HR or legal, but I did find another mechanism
25      to enforce my complaint.

Page 183

FENNER

1
2          Q.    And what mechanism was that?
3          A.    I had an interview with a media
4      outlet called Journalisms and in that --
5      during that interview, it was regarding a
6      cartoon, a racist monkey cartoon that the
7      Post published under the editors -- under Col
8      Allan, the editor-in-chief that depicted
9      Barack Obama, the president of the United
10      States, as a dead chimpanzee.
11          Q.    And you -- who did you actually
12      speak to at that interview?
13          A.    The reporter's name was Richard
14      Prince.
15          Q.    And Richard Prince is not
16      associated with the New York Post, right?
17          A.    No.
18          Q.    He is an independent journalist who
19      has a blog?
20          A.    I believe he is connected to the
21      Washington Post and the Maynard Institute and
22      he runs a media column called Journalisms.
23          Q.    And he is not associated with
24      NewsCorp., correct?
25          A.    No.

Page 184

FENNER

1
2          Q.    Correct, right?
3          A.    He is not associated with
4      NewsCorp., that is correct.
5          Q.    And Journalisms is an online blog,
6      is that correct?
7          A.    They publish on the internet.
8          Q.    And did you ever speak to Dan
9      Greenfield about your interview at
10      Journalisms?
11          A.    I didn't speak to Dan Greenfield
12      about my interview with Journalisms.
13          Q.    Did you ever speak to Michelle
14      Gotthelf about your interview with
15      Journalisms?
16          A.    I did not speak to Michelle
17      Gotthelf about my interview with Journalisms.
18          Q.    Did you ever speak to anybody in
19      human resources or legal department about
20      your interview with Journalisms?
21          A.    I did not.
22          Q.    Did you ever tell any of the senior
23      managing editors or the editor-in-chief at
24      the Post about your interview at Journalisms?
25          A.    No.

Page 185

FENNER

1
2          Q.    Do you have any basis for asserting
3      that Dan Greenfield, Michelle Gotthelf or Col
4      Allan ever read your interview with
5      Journalisms?
6          A.    Yes.
7          Q.    And what is that?
8          A.    After the Post published the racist
9      monkey cartoon, they had hired Howard
10      Rubinstein, who was a top notch PR firm in
11      New York City.  He was to mitigate and do
12      crisis communications for the Post.  People
13      were literally taking to the streets to
14      protest this cartoon because it was so
15      racially offensive.
16              In that article that was published
17      by Richard Prince, he says that he spoke to a
18      spokeswoman for NewsCorp. and I believe that
19      spokeswoman declined to give him a comment on
20      the record.
21          Q.    So Richard Prince sought a quote
22      from the Post and the Post declined, is
23      that --
24          A.    He wanted an interview, yes.
25          Q.    Other than that, do you have any

Page 186

FENNER

1   further reason for the assertion or your
2   belief, if you have this belief, that Dan
3   Greenfield or Michelle Gotthelf or Col Allan
4   had read or were aware of your interview with
5   Journalisms?
6       A.   Yes.
7       Q.   What else?
8       A.   Days after the cartoon was
9   published, and then after Richard Prince's
10  story was published, I was in Milwaukee and
11  then I was cursed at and yelled at by Dan
12  Greenfield.
13      Q.   Did Dan Greenfield mention the
14  interview you gave to Richard Prince during
15  your conversations with him when you were in
16  Milwaukee?
17      A.   No.
18      Q.   Have you ever asked Dan Greenfield
19  if he knew about your conversation with
20  Richard Prince?
21      A.   No.
22      Q.   Did you ever ask Michelle Gotthelf
23  that?
24      A.   No.

Page 187

FENNER

1       Q.   Was that the first time Dan
2   Greenfield screamed at you?
3       A.   No.
4       Q.   What was the -- so the other -- so
5   there were times before you got an
6   interview -- you gave an interview with
7   Richard Prince that he screamed at you?
8       A.   He would hang the phone up on me
9   during conversations.
10      Q.   You mean he would hang up on you?
11      A.   That's right.  During the Heath
12  Ledger story, he was yelling and screaming at
13  me on the phone during that time.
14      Q.   So if he screamed at you before you
15  gave the interview with Journalisms and he
16  screamed at you after you gave the interview
17  with Journalisms, what causes you to --
18  withdrawn.
19          How did Ms. Gotthelf's behavior
20  change after you published the article --
21  after you gave the interview in Journalisms?
22      A.   Before the Journalisms interview
23  and after, she was nasty to me, yelling at
24  me, complaining about my story ideas, being

Page 188

FENNER

1   dismissive of the stories I was pitching.
2   This was an ongoing -- after she assumed the
3   metro editor's job.  This was an ongoing
4   situation I found myself in.
5       Q.   You had received a bad performance
6   warning, a bad performance appraisal and a
7   performance warning in mid 2008, correct?
8       A.   Yes, that's when I said I'm -- I
9   think I'm being set up.
10      Q.   So you didn't get bad performance
11  reviews on account of the cartoon -- on
12  account of your comments about the cartoon,
13  right, because you had been getting those
14  prior to the cartoon?
15      A.   You mean the first --
16      Q.   The first ones were prior to the
17  cartoon?
18      A.   That's correct.
19      Q.   So you had already been yelled at
20  by Dan Greenfield, you had already gotten a
21  negative performance review and you already
22  had a performance warning long before the
23  cartoon was ever published, correct?
24      A.   That's correct.

Page 189

FENNER

1       Q.   What was the statement that you
2   made that was published in the Journalisms
3   article?  Do you recall it?
4       A.   I recall a quote that was printed
5   in the Journalisms article was that it
6   churned my stomach.  But if you have a copy
7   of it, it would refresh my recollection.
8       Q.   That sounds right.  Do you have any
9   reason to believe that Dan Greenfield was
10  offended by your saying that the cartoon
11  churned your stomach?
12      A.   Can you repeat the question.
13      Q.   Yeah, how do you know that Dan
14  Greenfield was upset at all by your statement
15  that the cartoon churned your stomach?
16      A.   It seemed to me retaliation against
17  me for speaking out against the company about
18  the racist monkey cartoon.
19      Q.   How do you know that Dan Greenfield
20  was offended by your statement that the
21  cartoon churned your stomach?
22      A.   He had already been -- I had
23  already been subjected to a hostile work
24  environment by him, by Michelle Gotthelf and

FENNER

1            FENNER
2  by the publication of that cartoon.
3     Q.   So you assumed, without ever asking
4  him, that he didn't like what you said in
5  that quote?
6     A.   I assumed what?
7     Q.   You never asked him whether or not
8  he was offended or not by your statement,
9  right?
10    A.   I never asked him that.
11    Q.   And you never asked Michelle
12 Gotthelf that either, right?
13    A.   I never asked her that.
14    Q.   How is the -- can you explain how
15 it is that the statement that the cartoon
16 churned your stomach was a -- is a complaint
17 about discrimination at the Post?
18    A.   The article was about the racist
19 climate at the paper and it says three things
20 need to be fixed at the Post, and because the
21 cartoon was racist and the climate at the
22 paper was racist, it was suggested that some
23 kind of over haul needed to be done at the
24 paper.
25    Q.   And my question is, your statement

1            FENNER
2  was the cartoon churned your stomach?
3     A.   Correct.
4     Q.   How is that a complaint about
5  discrimination against employees at the New
6  York Post?
7     A.   It hit me at my core, my very, very
8  core, in my inner soul, to see a black man,
9  the president of the United States, depicted
10 as a dead chimpanzee, shot by white officers
11 under a banner, "We will have to find someone
12 else to write the stimulus bill."
13      It has been my experience as a
14 black man that -- and knowing history, that
15 you use -- you use cartoons to put people
16 down, to make them less than human before you
17 attack them.
18    Q.   Richard Prince didn't publish in
19 his article any other quotes by you, correct?
20    A.   That was the one quote that he used
21 in his story.
22    Q.   Bear with me one moment.
23      Mr. Fenner, your complaint at
24 paragraph 72 states, the following makes the
25 following statement.  "For example, defendant

1            FENNER
2  Greenfield admitted that the cartoon was in
3  poor taste and that he was not surprised that
4  the cartoon led to a storm of protests."
5       Is that a statement in your
6  complaint?
7     A.   Can I read it?
8     Q.   Yes.  And your quote was he said it
9  was in poor taste, you said it churned your
10 stomach, right?
11    A.   That's correct.
12    Q.   It is a pretty similar sentiment,
13 wouldn't you agree?
14    A.   No.
15    Q.   Poor taste and churned your stomach
16 are not both similar sentiments?
17    A.   In my view?
18    Q.   Yeah.
19    A.   No.
20    Q.   How are they different?
21    A.   I'm telling you that that cartoon,
22 that racist cartoon touched me in my soul and
23 deeply offended me.  Poor taste is like
24 Mrs. Manners, you picked up the wrong fork
25 before you were cutting up a dish on your

1            FENNER
2  plate, that's poor taste.
3     Q.   They are both negative views about
4  the cartoon, right?
5     A.   Yes.
6     MR. LERNER:  We have been going a
7  while.  Let's take a five, ten minute
8  break.
9     MR. THOMPSON:  Sure.
10    THE VIDEOGRAPHER:  The time is 4:04
11 p.m.  We are off the record.
12    (Recess.)
13    THE VIDEOGRAPHER:  The time is 4:28
14 p.m.  We are on the record.
15    Q.   Mr. Fenner, other than what we were
16 discussing before the break regarding your
17 quote in the blog Journalisms, are there any
18 other statements that you made publicly or to
19 New York Post management in which you
20 asserted that you were being discriminated
21 against on the basis of race?
22    A.   No.  But I thought that was the
23 best mechanism to reach a national audience
24 about my experiences as a black senior
25 reporter at the paper.

FENNER

1
2    Q.   In September of 2009, after you
3  received that performance evaluation, the
4  Post issued you a second final written
5  warning, correct?
6    A.   Correct.
7    Q.   And we are going to mark NYPFL 500
8  as Fenner Exhibit 11.
9       (Exhibit 11, document Bates stamped
10      NYPFL 500 marked for identification, as
11      of this date.)
12   Q.   Do you recognize Fenner Exhibit 11?
13   A.   I recognize it.
14   Q.   Did you receive this final written
15  warning in September of 2009?
16   A.   Yes.
17   Q.   And is that your signature at the
18  bottom?
19   A.   Yes.
20   Q.   And is it your position that this
21  final written warning was issued to you on
22  the basis of your race?
23   A.   That's correct.
24   Q.   And what is your factual basis for
25  that assertion?

FENNER

1
2    A.   Because I disagree strongly with
3  the points made in here and this was used as
4  a tool to fire me.
5    Q.   Did you -- were you given this
6  during a meeting?
7    A.   Yes.
8    Q.   Who was in the meeting?
9    A.   Michelle Gotthelf, Amy Scialdone,
10  Dan Greenfield.
11   Q.   During that meeting, what did they
12  say to you?
13   A.   They said many things.  One of the
14  things they said was you're not pitching
15  enough enterprise stories, and during that
16  conversation, I had asked for their guidance
17  to describe a story that had recently run in
18  the New York Post over the last two, three
19  months, that they feel would merit an
20  enterprise story.
21      Neither Michelle nor Dan nor Amy
22  could give me an answer.  They sat silent and
23  were unable to tell me or give me an example
24  of a story that was an enterprise story
25  published in the paper that they -- I should

FENNER

1
2  use as a guideline for my work.
3    Q.   Isn't it a fact that you were
4  arguing with them during that meeting about
5  the content of this warning?
6    A.   I was strongly disagreeing with
7  them about the contents enumerated here.
8    Q.   And you asked repeatedly, did you
9  not, for an example of an enterprise story?
10   A.   I asked once and they were unable
11  to give me one.
12   Q.   Didn't -- together, didn't you look
13  at the, that day's paper, and didn't they
14  show you stories that no other paper had that
15  day?
16   A.   No.  I asked them to give me an
17  example of an enterprise story that ran over
18  the last several months that they felt I
19  should use as a guideline as an example of an
20  enterprise story, and they -- I was
21  dumbfounded and surprised that the three of
22  them weren't able to give me one solid --
23  were unable to point to one solid story.
24   Q.   Was there a copy of the New York
25  Post there that was used during the course of

FENNER

1
2  that meeting?
3    A.   I think there was a newspaper in
4  the room.
5    Q.   Did anybody open it up and show it
6  around and point to things inside the paper?
7    A.   I can't recall exactly if they did
8  that, but I asked them straight ahead to name
9  a story during the course of several months,
10  not that paper -- it could have been in that
11  paper and they could have cited that story.
12  But I asked over a span of time and they
13  weren't able to give me one solid story.
14   Q.   But weren't they calling your
15  attention to stories in that day's paper
16  during the meeting?
17   A.   We were talking about enterprise
18  stories and I had asked them to cite an
19  example of a story.  They were unable, they
20  were unable to cite one.
21   Q.   My question is narrower than that.
22  During the course of the meeting, were they
23  calling to your attention stories in that
24  day's newspaper?
25   A.   I can't recall.  If you have some

FENNER

1   information that would help me, I would
2   appreciate it.
3       Q.   The information is in the question.
4   The question is do you recall --
5           MR. THOMPSON:  Objection.
6       Q.   Do you recall them calling to your
7   attention stories in the newspaper of that
8   day that was in the room?
9       A.   The best answer I can give you is
10  to say -- because we were talking about that
11  day's paper and any subsequent paper that was
12  published over the last several months and
13  all I wanted was one.  I actually would have
14  appreciated several.  They were unable to
15  give me one, all three of them.
16      Q.   As a senior reporter, isn't it
17  expected, Mr. Fenner, that you know what an
18  enterprise story is?
19      A.   I do, I wrote many.
20      Q.   So what was the purpose, other than
21  rhetorical, of your asking them to identify
22  enterprise stories that are published in the
23  Post?
24      A.   I wanted them to give me a

FENNER

1   guideline, as something that they found,
2   meritorious, something that they found to be
3   a great story.
4       Q.   But you just said you knew what an
5   enterprise story was and had written
6   enterprise stories?
7       A.   That is correct.
8       Q.   They know what an enterprise story
9   is and they have written and edited
10  enterprise stories, right?
11      A.   Correct.
12      Q.   So isn't the exercise of you asking
13  them, isn't that sort of just a challenge to
14  what they are instructing you, what they are
15  telling you?
16      A.   Not at all.
17      Q.   Wasn't it simply sort of a
18  combative or aggressive response in which you
19  were protesting what they were saying as
20  opposed to actually trying to be
21  constructive?
22      A.   I saw it as an opportunity for them
23  to make it crystal clear that we could -- an
24  actual example we can look at and point to

FENNER

1   just like when I write my self-evaluations, I
2   point to specific stories of achievement.
3       Q.   Do you think you had a different
4   definition of what an enterprise story is
5   than Mr. Greenfield and Ms. Gotthelf had?
6       A.   I don't think it was different.  I
7   don't think it was different, no.
8       Q.   Well, if you're trying to ask them
9   to define what one is and give you an
10  example, did you think that you had a
11  different definition?
12      A.   No, I thought -- I'm thinking that
13  clarity would help.
14      Q.   What was the last enterprise story
15  that you did for the Post?
16      A.   I wrote a piece about an off duty
17  cop who was killed during friendly fire --
18      Q.   In Mount Vernon?
19      A.   No, in Harlem, and he had just
20  finished his beat and he was a volunteer, --
21  he was a volunteer football coach for a team
22  in Brooklyn and I wrote a story about how his
23  presence would be missed with the young, with
24  the young players and the coaches in that

FENNER

1   community.
2       Q.   Was that coach, was that cop named
3   Edwards?
4       A.   Omar Edwards is his -- was his
5   name, is his name.
6       Q.   Wasn't he shot in Mount Vernon or
7   White Plains?
8       A.   He was shot on 124th Street by the
9   Triborough Bridge, and I covered that story
10  the night it happened.  And what happened was
11  I had finished working my assignment around
12  10 o'clock.  I had been off more than an hour
13  and I was heading home to pick up my daughter
14  when Hechtman called me and asked me if I
15  could head up there to cover the story.
16          And I did and I worked until about
17  2, 3 o'clock that night, in the morning to
18  cover the shooting of a hero cop, Omar
19  Edwards.
20      Q.   Why is that an enterprise story?
21      A.   Because it was showing a hero cop
22  was volunteering his time in the community
23  with young men who were playing sports and
24  looking to spend their time doing positive

FENNER

1
2  activities. It showed that he was more than
3  just a hero cop, but a contributor to the
4  livelihood of the Brooklyn community.
5      Q.   You told us earlier that an
6  enterprise story was a story that involves
7  research, it involves background, and it is a
8  unique way of presenting news, right?
9      A.   Correct.
10     Q.   And this is a story that you get a
11 call in your car from an editor, it is
12 happening that night, were your words, and
13 you are dispatched to that location and you
14 write a story for the following day, right?
15     A.   That story ran weeks later.
16     Q.   Well, do you know how many words
17 that story was?
18     A.   I didn't count it.
19     Q.   149 words. That's a short story,
20 right?
21     A.   Can I see it?
22     Q.   Do you have the binder of articles
23 in front of you?
24     A.   I do.
25     Q.   Look at NYPFL 2901. It is toward

FENNER

1
2  the back.
3      A.   FL?
4      Q.   Sorry, I said it was towards the
5  back. It is really not. It is more in the
6  middle. 2901 is the number.
7      A.   I have it.
8      Q.   Have you had a chance to look at
9  it?
10     A.   Let me read it.
11         This story was edited and cut,
12 deeply cut.
13     Q.   Do you still believe this story is
14 an enterprise story?
15     A.   Yes.
16     Q.   It is not even 150 words? But it
17 is an enterprise story?
18     A.   The editors cut it.
19     Q.   What did they cut?
20     A.   The body of the story.
21     Q.   Do you know who cut it?
22     A.   I do not.
23     Q.   Do you know why they cut it?
24     A.   No. Many times they cut stories
25 for space. Could be other breaking news

FENNER

1
2  stories going on. There is a variety of
3  reasons why stories are cut down.
4      Q.   Isn't it a story that would be
5  better categorized as a feature, not an
6  enterprise story?
7      A.   You could call it a feature story.
8      Q.   If your editors called it a feature
9  story, not an enterprise story, would they be
10 justified in classifying it that way?
11     A.   Yes.
12     Q.   In the performance warning, they
13 criticized you for not being focused on
14 producing enterprise stories. Is that
15 criticism --
16     A.   Where are you looking at now?
17     Q.   The performance warning, Exhibit
18 11?
19     A.   OK.
20     Q.   Let me ask you this, is there any
21 criticism in that performance warning which
22 you believe to be fair?
23     A.   No.
24     Q.   Do you agree that at the time of
25 the review, you were working as a runner

FENNER

1
2  rather than a senior reporter?
3      A.   No, my review says senior reporter.
4      Q.   But it also says that you were
5  working as a runner?
6      A.   I had been demoted after I was
7  banned from the newsroom and my schedule was
8  changed and I was given the duties of a
9  junior reporter on my Thursday shift.
10     Q.   What about Sunday through
11 Wednesday? Were you also given the duties of
12 a junior reporter on Sunday through
13 Wednesday?
14     A.   I was working as a senior reporter.
15     Q.   So you think your reporter duties
16 are determined by the shift that you worked?
17     A.   No. The expectation, just like I
18 said, is in the final warning, is that I
19 produce enterprise stories, that expectation
20 never changed and my desire to produce those
21 never changed.
22     Q.   But your product and your output as
23 a reporter was more akin to that of a junior
24 reporter runner than a senior reporter doing
25 enterprise stories, right?

FENNER

1  
2    A.   No, I was still working and
3  expected to work to produce enterprise
4  stories and my supervisors have the ultimate
5  say on my shift and what I do.  I was still
6  required to cover out-of-town assignments,
7  breaking news, and produce enterprise
8  stories.
9    Q.   But you -- your work was primarily
10  the work of a runner reporter, correct?
11    A.   No, that's not true.  I did a
12  variety of assignments.
13    Q.   In the performance warning, it
14  says, in the last paragraph, "Working as a
15  runner for someone with your experience and
16  at your level as a senior reporter is simply
17  unacceptable and cannot continue any longer."
18    My question is, is it accurate when
19  they said you were working as a runner?
20    A.   I disagree with the critiques in
21  this final written warning.
22    Q.   Do you agree that you had been
23  demoted into working as a runner?
24    A.   No, the expectation and the work I
25  did was that of a senior reporter.

FENNER

1  
2    Q.   Did you ever get demoted to runner?
3    A.   No.
4    Q.   When, after the cartoon ran and you
5  said you had a conversation with Dan
6  Greenfield about not coming into the
7  newsroom, was that a demotion to runner?
8    A.   That was a -- I was being banned
9  from the newsroom.  I had to ask for
10  permission from my white editors to enter the
11  NewsCorp. building.
12    Q.   Was it -- were you demoted to
13  runner?
14    A.   No.  The expectation was that I was
15  a senior reporter and the expectation that I
16  produce the work of a senior reporter was
17  still there.
18    Q.   What did you do each morning when
19  you began your shift?
20    A.   I was required --
21    MR. THOMPSON:  Objection.
22    Q.   You can answer.
23    A.   What did I do each morning what?
24    Q.   Starting in May 2009, what did you
25  do each morning when you began your shift?

FENNER

1  
2    A.   I was instructed to call the city
3  desk in the morning.
4    Q.   And await instructions regarding an
5  assignment, correct?
6    A.   That's correct.
7    Q.   Isn't that what a runner reporter
8  does?
9    A.   A runner reporter does those
10  things, yes.
11    Q.   Did Greenfield tell you to work out
12  in the field and that the city was your
13  office?
14    A.   Yes, that was part of the ban from
15  the newsroom.
16    Q.   So as best as you can recall, what
17  did Dan Greenfield say to you during the
18  conversation in which he told you that you
19  should be -- you should not be coming into
20  the newsroom?
21    A.   He told me he didn't want me in the
22  newsroom and that I had to ask for permission
23  before entering the building.
24    Q.   Anything else?
25    A.   He said many things but that was

FENNER

1  
2  one of the things he said.
3    Q.   My question is for you to tell us
4  everything that he said during that
5  conversation that you recall.
6    A.   I can't recall all the facts and
7  all the things he said, but that was the big
8  theme.
9    Q.   So he did not want you in the
10  newsroom and call before coming in?
11    MR. THOMPSON:  Objection.
12    A.   Yes.
13    Q.   Did he tell you why he did not want
14  you in the newsroom?
15    A.   He and Michelle Gotthelf said that
16  they were doing things differently and they
17  needed me to help out on a certain shift
18  because they were short on manpower and they
19  said that they needed me to work this shift
20  temporarily and that we will replace you by
21  the end of the month.
22    Q.   Was the conversation in which you
23  were -- Dan said that he did not want you in
24  the newsroom the same conversation as when
25  you were told that your shift would change?

FENNER

1
2    A.   Yes.
3    Q.   Other than that one conversation,
4  were there any other conversations in which
5  you were told by Greenfield or Gotthelf that
6  they did not want you coming into the
7  newsroom?
8    A.   It was at that meeting when they
9  issued the ban.
10    Q.   My question is, were there any
11  other meetings or conversations in which they
12  communicated the same thing?
13    A.   I can't recall right now if there
14  were any other meetings besides that one.
15    Q.   Did they tell you they didn't want
16  you in the newsroom because of your race
17  being African American?
18    A.   They didn't use that language, no.
19    Q.   Did anyone tell you they didn't
20  want you in the newsroom because you were
21  African American?
22    A.   No, they didn't say that, but it
23  was consistent from the hostile treatment I
24  had been experiencing at the workplace.
25    Q.   But they didn't say that?

FENNER

1
2    A.   That is correct.
3    Q.   Did they say that the reason they
4  wanted you to call for permission before
5  coming to the building was because you're
6  African American?
7    A.   They didn't say that.
8    Q.   Did anybody tell you that that was
9  the reason for them requiring that?
10    A.   No.
11    Q.   Did they tell you why they wanted
12  you to call for -- to get permission before
13  coming into the office?
14    A.   They told me they were doing things
15  differently and that they were short of
16  manpower and they needed me to cover this
17  particular shift.
18    Q.   Did they ever say to you that the
19  reason they were requiring this of you was
20  because of comments that you made to
21  Journalisms about the cartoon?
22    A.   They didn't say that but I believe
23  it was retaliation for that act.
24    Q.   But they didn't say it and nobody
25  else told you that either, right?

FENNER

1
2    A.   No.
3    Q.   It is typical for reporters
4  covering events in the field to get their
5  assignment from the street or from their car,
6  do the reporting from the street, and call
7  the story in or file it by e-mail without
8  ever coming into the office, right?
9    A.   Can you repeat the question.
10    Q.   Yeah, it is typical for reporters
11  covering events in the field to get their
12  assignment when they are on the street or in
13  their car and to do the reporting in the
14  street and call the story in or e-mail it in
15  without ever coming into the office, right?
16    A.   There are many reporters who do
17  that.
18    Q.   There are reporters that can go
19  weeks without ever stepping foot in the
20  office, right?
21    A.   They call those runners, yes.
22    Q.   There are reporters that don't even
23  have desks in the New York Post offices,
24  right?
25    A.   Yes, but they are not black senior

FENNER

1
2  reporters.
3    Q.   But they are reporters writing
4  stories, covering stories and covering
5  important stories that don't need to come
6  into the office to do that and don't have
7  desks, right?
8    A.   Ikimulisa Livingston was also
9  banned from the newsroom and she is a senior
10  reporter and she is African American.
11    Q.   That is not my question.
12    A.   Can you repeat your question.
13    Q.   Yeah, there are reporters covering
14  stories, covering important stories, that do
15  that without coming into the office and
16  without having desks, correct?
17    A.   I believe -- yes.
18    Q.   And some of those reporters are
19  white reporters, correct?
20    A.   Yes, they are white reporters, but
21  they are not senior reporters.
22    Q.   Do you know if Dan Greenfield or
23  Michelle Gotthelf ever told any reporters
24  other than you not to come into the office?
25    A.   Yes.

FENNER

1
2    Q.   To be out in the field?
3    A.   Yes.
4    Q.   You do know that?
5    A.   Ikimulisa Livingston was a reporter
6    who they told not to come in into -- who they
7    told not to come into the newsroom.
8    Q.   Do you know if they have given that
9    instruction to any white reporters?
10   A.   Not to my knowledge, no.
11   Q.   How did you -- what knowledge do
12   you have on that question as to whether or
13   not they have given that instruction to white
14   reporters?
15   A.   I know they treated me differently
16   than my white colleagues.  I don't know of
17   other white reporters who were at my level
18   who they gave the same treatment.
19   Q.   But you also don't know if there
20   are white reporters at your level who were
21   also told to be out in the field, right?
22   MR. THOMPSON:  Objection.
23   Q.   You don't know the conversations
24   that Mr. Greenfield and Ms. Gotthelf had with
25   every one of the white reporters, correct?

FENNER

1
2    A.   No, I don't know every conversation
3    they had with all the white reporters.  But
4    none of the white reporters who I spoke with
5    told me they had the same treatment.
6    Q.   Were you ever, did you ever call
7    Mr. Greenfield and ask for permission to come
8    into the office?
9    A.   I might have.
10   Q.   And was that permission granted?
11   A.   Yes.
12   Q.   Do you remember how many times?
13   A.   I can't recall how many times.
14   Q.   Were you ever -- you had a swipe
15   card or identification that allowed you
16   entrance into the building, correct?
17   A.   Correct.
18   Q.   Was that ever shut off prior to the
19   time you were terminated by the Post?
20   A.   Before I was terminated?
21   Q.   Yes.
22   A.   No.
23   Q.   Were you ever -- did you ever show
24   up at the office and were told to leave the
25   offices, get out, after the instruction that

FENNER

1
2    Mr. Greenfield gave you?
3    A.   No.
4    Q.   Did you ever tell anybody about
5    Mr. Greenfield's instruction to you to be out
6    in the field and not come into the office
7    without permission?
8    A.   Yes.
9    Q.   Who did you tell?
10   A.   I told Ikimulisa Livingston, Jeane
11   MacIntosh.
12   Q.   Anybody else?
13   A.   It might have been Dan Mangan, Len
14   Green, and there were others, but I can't
15   think of who those people are right now.
16   Q.   Did Mr. Greenfield ever use the
17   word "banned"?  Or is that word to describe
18   what occurred?
19   A.   He said we don't want you coming
20   into the newsroom.
21   Q.   OK.  Ban was not his word?
22   A.   He said we don't want you coming
23   into the newsroom.
24   Q.   And he was -- he told you he wanted
25   you out in the field ready to go, ready to be

FENNER

1
2    dispatched to a story at 9 a.m., right?
3    A.   Correct.
4    Q.   How often did you come into the
5    office after Mr. Greenfield told you that he
6    wanted you out of the -- out in the field?
7    A.   I can't give you an exact number,
8    but it was very, very few and I was so
9    humiliated, I had to wait until late in the
10   evening before coming into the newsroom so I
11   could get supplies and other things I might
12   have needed to do my job.
13   Q.   On those occasions when you came in
14   late in the evening, did you call for
15   permission or did you feel at those times you
16   could come and go as you pleased?
17   A.   I didn't call for permission, no.
18   Q.   Did anybody ever turn you away from
19   the office on those occasions?
20   A.   No.
21   Q.   Mr. Greenfield never told you that
22   you had to come in after hours if you needed
23   supplies, did he?
24   A.   No.
25   Q.   Did you ever ask Mr. Greenfield for

Page 218

```
1                FENNER
2   supplies, to come in for supplies during the
3   day?
4       A.   I can't recall.
5       Q.   Did Ms. Greenfield ever tell you --
6   I am sorry, did Ms. Gotthelf ever tell that
7   you you needed permission to come in, if you
8   came after hours?
9       A.   No.
10      Q.   Did Mr. -- did you ever ask
11  Ms. Gotthelf to come in for supplies?
12      A.   I can't recall.  It's possible.
13      Q.   Did you ever call and ask
14  Ms. Gotthelf for permission to enter the
15  office?
16      A.   The answer is no because it was so
17  humiliating and disrespectful, I didn't want
18  to put myself through that.
19      Q.   Did you have a computer, a laptop
20  at the time?
21      A.   Yes.
22      Q.   Did it have wi-fi or 3G
23  capabilities?
24      A.   No, I had -- I would have to search
25  and hunt for a free wi-fi at a Starbucks to
```

Page 219

```
1                FENNER
2   do my job.
3       Q.   And how would that work?  So would
4   you write stories on your laptop at a
5   Starbucks or a cafe?
6       A.   I would write it up, send it in as
7   an e-mail, or I would call it in for my
8   notes.
9       Q.   When you were reporting stories
10  from the field, prior to Mr. Greenfield
11  instructing you not to come into the office,
12  didn't you file your stories the same way;
13  you would file them from the field from your
14  laptop, whether you were traveling in other
15  cities, traveling out in the boroughs, New
16  Jersey, Westchester, Brooklyn?  You didn't
17  come into the office in the afternoon to
18  write your stories, right?
19      A.   Not all the time, no.
20      Q.   So you were filing stories from the
21  field prior to Mr. Greenfield's instruction
22  not to come in, right?
23      A.   Correct.
24      Q.   And you were able to do that using
25  a laptop computer, cell phone, and a wi-fi
```

Page 220

```
1                FENNER
2   connection, right?
3       A.   Right.
4       Q.   And that's what runner reporters
5   that work for the Post frequently do to file
6   their stories, right?
7       A.   Senior reporters do it also.  The
8   answer is yes.
9       Q.   Did you receive a car allowance
10  from the Post?
11      A.   Yes.
12      Q.   How much was that?
13      A.   I forget what the mileage rate was,
14  but for every mile I drove, there was a
15  mileage rate attached to it.
16      Q.   Do you know if other runners
17  received that allowance?
18      A.   I believe all reporters received
19  that.
20      Q.   Were you able to successfully
21  perform your job in spite of Mr. Greenfield's
22  requirement that you not come into the office
23  without permission?
24      A.   It was difficult but I did.
25      Q.   You were a successful reporter
```

Page 221

```
1                FENNER
2   despite that, right?
3       A.   Yes.
4       Q.   You were successful in covering the
5   story that -- of the bus trip to the
6   Washington inauguration of Obama even without
7   a photographer with you, right?
8       A.   That was a very, very difficult day
9   to work.  There were several million people
10  within a seven block radius of capital and
11  the monument.  It was tough, but I did it.
12      Q.   Did you call the photo desk for a
13  photographer to go with you on that bus ride?
14      A.   I made several calls to the photo
15  desk, I put in written requests and I asked
16  Michelle Gotthelf several times to have a
17  photographer accompany me on that trip.
18      Q.   And this was the bus, the bus trip
19  that left at midnight?
20      A.   I arrived, did we -- it was in the
21  middle of the night.
22      Q.   And what did you want a
23  photographer to take pictures of?
24      A.   The event.
25      Q.   Which event?
```

FENNER

1
2     A.    The New Yorkers who were heading to
3  DC.
4     Q.    What exactly did you think would be
5  the images the photographer would capture?
6     A.    You never know what's going to
7  happen.  Once we got there, we didn't know
8  what events might unfold, would unfold.  So
9  we have to be open and just be ready.
10    Q.    Well, so you wanted -- did you want
11 them to take pictures of the bus ride in the
12 middle of the night?
13    A.    You could have done a photo montage
14 of people sleeping and partying and saying
15 prayers.  It could have been an incredible
16 photo montage.  I don't know.  We will never
17 know unless you make the effort to try to see
18 what you can find out.
19    Q.    Do you know who made the decision
20 at the New York Post not to assign a
21 photographer to that trip?
22    A.    I was requesting from photo -- and
23 I was seeking the aid of my editor, Michelle
24 Gotthelf to get a photographer.  Ultimately,
25 the photo desk, the editors at the photo desk

FENNER

1
2  have to decide, but she is one of the most
3  powerful people in the newsroom.  So she has
4  the power to influence to make it happen.
5     Q.    Ultimately, the photo desk editors
6  decide what stories get a photographer
7  assigned, right?
8     A.    I don't know who would make that
9  ultimate determination.  Normally they do.
10 This was a historic event.  Clearly a
11 once-in-a-lifetime in the history of the
12 country event.  They could have.
13    Q.    Did the Post have photographers
14 covering other aspects of the Obama
15 inauguration?
16    A.    I believe so.
17    Q.    Aren't stories published in the
18 Post every day without photos?
19    A.    Some stories.
20    Q.    Didn't stories about the
21 inauguration get published with photos?
22    A.    My story didn't have a photo.
23    Q.    But there were many stories about
24 the Obama inauguration that ran during those
25 several days, right?

FENNER

1
2     A.    Yes, if you want your story to get
3  good play, to have a prominent position in
4  the paper, you want to work hard to make sure
5  there is a photographer accompanying your
6  story, it is going to take up more real
7  estate.  It is going to have a bigger splash,
8  a bigger look.  It is going to heighten the
9  strength of the story.
10    Q.    My question is, there were many
11 stories that ran during those several days
12 about the inauguration, right?
13    A.    There are many stories that ran.
14    Q.    And many of them had photographs,
15 right?
16    A.    Yes.
17    Q.    So the Post was taking and
18 publishing photos from the Obama
19 inauguration, right?
20    A.    Yes.
21    Q.    In fact, the Post's coverage of the
22 Obama inauguration got an award, right?
23    A.    Yes, with my help.
24    Q.    And with the help of the editors --
25    A.    I wasn't finished.  Yes, with my

FENNER

1
2  help, they won the New York Press Club Award
3  that year.
4     Q.    After the conversation in which
5  Mr. Greenfield told you to work out in the
6  field and call for permission if you were
7  going to come in, did Mr. Greenfield or
8  Ms. Gotthelf ever yell at you?
9     A.    It was a -- it was continuously a
10 hostile environment.  They would --
11    Q.    My question is --
12       MR. THOMPSON:  He is not finished,
13 he is not finished answering your
14 question, Mr. Lerner.  Please let him --
15       MR. LERNER:  He paused,
16 Mr. Thompson.
17       MR. THOMPSON:  He was in the middle
18 of answering.  You interrupted him again.
19       MR. LERNER:  He paused and I
20 thought he was finished.
21       MR. THOMPSON:  You were wrong.
22    Q.    Mr. Fenner, go ahead.
23       MR. THOMPSON:  Let the witness
24 answer the question, please.
25    A.    I found it to be a hostile

FENNER

1
2  environment throughout my tenure, and after I
3  was banned, yes, they would continue to yell
4  at me, hang up the phone on me, be dismissive
5  of my story ideas.
6      Q.   What did they yell at you about
7  after that?
8      A.   The complaint, about my pitches for
9  enterprise stories and they were just
10 generally dismissive of my work, calling it
11 subpar.
12     Q.   You used the term in your
13 complaint, you used the term "segregated" to
14 refer to the New York Post.  What did you
15 mean by that?
16     A.   Can you show me the complaint?
17     Q.   Sure.  Do you have a copy of the
18 complaint that I handed to you a moment ago?
19         MR. DATOO:  I think you took it
20 back.
21         MR. THOMPSON:  Do you have an extra
22 copy?
23     Q.   For example, take a look at
24 paragraph 102 which I'll just read for the
25 record and then give this to you.

FENNER

1
2      "Mr. Fenner often wrote his stories
3  from Starbucks or other local coffee shops
4  while Ms. Livingston wrote her stories from
5  her car or home.  In fact, like Mr. Fenner,
6  Ms. Livingston has been forced to perform all
7  her work as a reporter out of the newsroom
8  which is a racially segregated environment,
9  predominated by white males."  102.
10         Do you agree that the newsroom is a
11 racially segregated environment?
12     A.   Can I read it?
13     Q.   Yes.
14     A.   The newsroom at the New York Post
15 is a sea of white reporters and white
16 editors, and as far as I know, they haven't
17 had a black editor work in the newsroom for
18 the last ten years.  And there might be one
19 black reporter working inside the newsroom.
20     Q.   Who is that?
21     A.   That man is Leonard Green.
22     Q.   And is he excluded from the
23 newsroom?
24     A.   No.
25     Q.   When you use the term "segregated,"

FENNER

1
2  because it is -- and you say it is
3  predominantly white, are there areas in the
4  newsroom that are divided that are for white
5  people versus black people?
6      A.   No.
7      Q.   So when you use the term
8  "segregated," you are referring to the fact
9  that most of the employees are white, is that
10 correct?
11     A.   Right.
12     Q.   You made the allegation that there
13 is only one nonwhite editor in the newsroom.
14 Who is that one nonwhite editor?
15     A.   I think it was the business editor.
16     Q.   Jay Sherman?
17     A.   I believe that's his name.
18     Q.   Isn't it a fact that there are
19 other nonwhite editors?  Do you know a
20 gentleman named Ricky Eng?
21     A.   No.
22     Q.   Was he a news editor?
23     A.   I don't know him.
24     Q.   Did you know Juan Rodriguez, an
25 assistant managing editor?

FENNER

1
2      A.   I do.
3      Q.   He is Hispanic, right?
4      A.   He is a photo editor and he is
5  Hispanic, I believe.
6      Q.   When you said that there is only
7  one nonwhite editor, did you have a roster of
8  the -- all of the editors at the Post in
9  front of you when you did that?
10     A.   I just looked out into the newsroom
11 floor and that's what I saw.
12     Q.   You worked in the newsroom for many
13 years, right?  Two years?
14     A.   For a long time.
15     Q.   Is the photo department on the
16 newsroom floor?
17     A.   Yes.
18     Q.   Do you know Evelyn Cordon, is she a
19 photo editor?
20     A.   I don't know who she is.
21     Q.   Do you know Juan Arellano photo
22 editor?
23     A.   I believe I do.
24     Q.   Do you know David Rentas, a photo
25 editor?

FENNER

1
2  Q.  Have you ever met Steve Dunleavy?
3  A.  Yes.
4  Q.  How many times?
5  A.  Many.
6  Q.  Where did you meet him?
7  A.  As a competitor at the New York
8  Daily News and we worked together at the New
9  York Post.
10  Q.  When you say you worked together,
11  do you mean you actually worked together on a
12  story or just that you worked at the same
13  company?
14  A.  I would see him in the newsroom and
15  I would see him on assignment.
16  Q.  Did you ever speak to him?
17  A.  Yes.
18  Q.  Did he ever say anything racist to
19  you?
20  A.  He never said anything racist to
21  me, but I'm trying to recall if he would make
22  any racist remarks in my presence while we
23  were both at the story, on a story.  That's
24  what I am trying to recall as you mentioned
25  right now.

FENNER

1
2  Q.  Anything to add to that answer?
3  A.  No.
4  Q.  So you don't recall any racist
5  stories he made in your presence or any
6  racist remarks that he made in your presence,
7  right?
8  A.  No.
9  Q.  Did Endozien -- did you and
10  Endozien work at the Post at the same time?
11  A.  I don't think so, no.
12  Q.  So whatever comments Dunleavy made
13  to Endozien, and Endozien told you about when
14  you worked at the Daily News, happened before
15  you came to the Post and didn't continue to
16  Endozien after you came to the Post, right?
17  A.  I believe that's correct.
18  Q.  Are you aware of any racist
19  comments made by Dunleavy that were made
20  during the two years you were working for the
21  Post?  Or two and a half years?
22  A.  I can't recall.
23  Q.  Are you aware of any other person
24  at the Post making racist remarks?
25  A.  I can't recall.

FENNER

1
2  Q.  In your affidavit, you stated that
3  when you were traveling, the Post did not
4  provide you with the necessary tools to
5  succeed in your job, and you cited a denial
6  of a photographer on the trip to DC.  Can you
7  think of any other tools that were denied to
8  you when you were traveling?
9  A.  No.
10  Q.  In paragraph 7 of your complaint,
11  you state that you were denied assignment
12  opportunities, specifically it reads,
13  "Plaintiffs were also discriminatorily denied
14  certain assignment opportunities based on
15  their race and/or color."
16  A.  It says plaintiffs.
17  Q.  Yes.
18  A.  Can I see it?
19  Q.  Sure.  It is paragraph 7.  I just
20  need that back when you're done.  You may
21  have a copy of the complaint in front of you.
22  What assignment opportunities were
23  you discriminatorily denied based on race?
24  A.  Think that line is referring to
25  Ikimulisa Livingston.

FENNER

1
2  Q.  OK, so you don't believe that you
3  were denied any assignment opportunities
4  based on race, correct?
5  A.  Correct.
6  Q.  There is also an allegation that
7  you suffered discrimination in pay.  Do you
8  believe that that refers to you?
9  A.  Yes.
10  Q.  In what respect did you suffer
11  discrimination in pay?
12  A.  Well, I believe some of my
13  colleagues who had the same level of
14  experience that I had were earning more and
15  also if you had a poor evaluation, you could
16  not receive an increase in pay.
17  So the fact that I got poor
18  evaluations meant that I didn't get an annual
19  increase.
20  Q.  What white reporters were paid more
21  than you with the same experience and
22  position?
23  A.  I don't have the whole list, but I
24  believe Jeane MacIntosh earned more than I
25  did, Dan Mangan, and there were others, but I

Page 238

FENNER

1  don't have all that information in front of
2  me.
3      Q.   What's the basis of your belief
4  that MacIntosh and Mangan made more than you?
5      A.   Jeane MacIntosh told me what she
6  was earning.
7      Q.   What did she tell you?
8      A.   I believe she told me she was
9  earning 95,000 dollars a year.
10     Q.   And you were earning 92,000 dollars
11 a year at the time?
12     A.   That's correct.
13     Q.   What about Dan Mangan?
14     A.   I don't know his exact salary, but
15 I believe he was earning more.
16     Q.   Do you know how many years of
17 experience Jean MacIntosh and Dan Mangan have
18 as reporters?
19     A.   I believe they have a similar
20 amount of years that I do.
21     Q.   Now, do you know what years each of
22 them started at the New York Post?
23     A.   No.
24     Q.   Were they there when you started

Page 239

FENNER

1  there?
2      A.   They were already there when I
3  arrived.
4      Q.   There came a time when --
5  withdrawn.
6          You got a big pay raise to come to
7  the New York Post, didn't you?
8      A.   Yes.
9      Q.   What was your annual salary at the
10 Daily News when you left there?
11     A.   Around 75,000.
12     Q.   Wasn't it actually 64,000 dollars?
13     A.   With overtime --
14     Q.   I asked you your annual salary.
15     A.   What I brought home --
16     Q.   My question was what was your
17 annual salary?
18     A.   64,000 dollars might be right.
19     Q.   And the annual salary you got to
20 start at the Post was 92,000 dollars a year,
21 right?
22     A.   Right.
23     Q.   So you got a raise of almost 30,000
24 dollars a year to come to the Post, right?

Page 240

FENNER

1      A.   That's roughly correct.
2      Q.   So did you ever complain at the
3  Daily News about being discriminatorily paid?
4      A.   No.
5      Q.   Did you think that getting a raise
6  to 92,000 dollars a year from 64,000 dollars
7  a year was a generous raise?
8      A.   Based on my record -- yes. Based
9  on my record of achievement at the New York
10 Daily News and writing history making news
11 stories, I earned it.
12     Q.   Was that raise an act of racism?
13     A.   No.
14     Q.   Do you know who decided what your
15 salary would be at the Post?
16     A.   No.
17     Q.   Were you asked what your annual
18 salary was at the Daily News when you were
19 hired by the Post?
20     A.   Yes.
21     Q.   And what did you tell them?
22     A.   I'm thinking I might have said
23 around 75,000.
24     Q.   And were you asked what your salary

Page 241

FENNER

1  was or were you asked what your total comp
2  was?
3      A.   I believe the question was what are
4  you earning.
5      Q.   So at the Daily News, you had been
6  earning an annual salary of 64,000 dollars a
7  year and an overtime, that made it about
8  75,000?
9      A.   Correct.
10     Q.   Did anybody at the Post ask you
11 what your salary was exclusive of overtime?
12     A.   I don't think I was asked that
13 particular question.
14     Q.   Mr. Fenner, what year did you
15 become a reporter at the Daily News?
16     A.   1994.
17     Q.   And in 1994, do you recall what
18 your annual salary was in 1994 when you
19 became a reporter?
20     A.   Probably around 50,000 dollars.
21     Q.   Correct. 51,000 dollars a year.
22 And that was in 1994?
23     A.   Correct.
24     Q.   And when you left the Daily News 13

61

Page 258

FENNER

1
2      A.   I recall her telling me that unless
3  I signed the severance package, she was
4  forcing me to sign it, unless I signed it,
5  I -- my 401 package would be in jeopardy and
6  I would lose it.
7      Q.   How much was in your 401K at the
8  Post?
9      A.   It was over 5,000 dollars.
10     Q.   And how much severance did the Post
11 offer you?
12     A.   Maybe I believe it was eight weeks,
13 I'm not sure.  I think it was eight weeks.
14     Q.   Did she tell you you could have a
15 lawyer review your severance agreement?
16     A.   She could have.  I don't recall her
17 saying that.
18     Q.   And with respect to what you are
19 testifying was her deception, is your
20 recollection on that clear?
21     A.   Yes.
22     Q.   And your clear recollection is that
23 she said you had to accept the severance
24 package to get your 401K?
25     A.   She said I had to sign these

Page 259

FENNER

1
2  documents and she wanted me to sign those
3  documents then and there in her presence.
4      Q.   Did those documents include a 401K
5  rollover?
6      A.   I would have to look at the
7  documents to see if it refreshes my
8  recollection.  But I -- I can't recall.
9      Q.   Did you review the severance
10 agreement that she provided to you?
11     A.   The one she put in front of me?
12     Q.   Yes.
13     A.   I believe I read it while I was in
14 that meeting.
15     Q.   Do you recall that the agreement
16 itself states, near where the signature block
17 is, that you have been given the opportunity
18 to review the agreement with legal advisors?
19     A.   If it said that, I knew I wasn't
20 going to sign that document because I knew I
21 couldn't trust her and my editors.
22     Q.   Do you remember the document saying
23 that you had 21 days to consider whether or
24 not to sign it?
25     A.   That sounds familiar.

Page 260

FENNER

1
2      Q.   Let's mark this.  We are going to
3  mark NYPFL 519 through 521 as Fenner Exhibit
4  13.
5          (Exhibit 13, document Bates stamped
6  NYPFL 519 through 521 marked for
7  identification, as of this date.)
8      Q.   Take a look at that.  And I want to
9  focus your attention on paragraph 4.
10     A.   On the first page?
11     Q.   Yes -- on the second page,
12 paragraph 4.
13     A.   Where it begins "This waiver"?
14     Q.   Paragraph 4 begins "Employee review
15 period."
16     A.   OK.
17     Q.   Does it not state you have a period
18 of 21 days to review and consider this
19 agreement, you were advised to consult with
20 an attorney before you signed this agreement.
21 Do you see that?
22     A.   That's what this document says,
23 yes.
24     Q.   And the sentence, "You are advised
25 to consult with an attorney before you sign

Page 261

FENNER

1
2  this agreement" is in bold, right?
3      A.   Correct.
4      Q.   Did you read that paragraph on that
5  day?
6      A.   Yes.
7      Q.   How did that meeting end?
8      A.   Terribly, I was terminated.
9      Q.   How did the meeting itself come to
10 a conclusion?  Did you go back to your desk,
11 did you --
12     A.   I was further humiliated.  I was
13 escorted out of the NewsCorp. building by
14 plainclothes security detail officers who
15 work for the company.
16     Q.   What floor is -- what floor did the
17 meeting take place on?
18     A.   Maybe the 15th.
19     Q.   So it wasn't on 10, which is where
20 the newsroom is, right?
21     A.   Correct.
22     Q.   You didn't get escorted through the
23 10th floor. right?
24     A.   I was escorted through the
25 NewsCorp. building by these two security guys

FENNER

1 in plain clothes who look like NYPD
2 detectives and I was treated like common
3 criminal after I had worked so hard for the
4 paper.
5     Q.   Were you in handcuffs?
6     A.   No.
7     Q.   So you weren't treated like a
8 criminal under arrest, right?
9     A.   All criminals are not handcuffed.
10    Q.   You weren't led through the 9th or
11 10th floor where your coworkers all had their
12 desks and offices, right?
13    A.   My coworkers travel throughout the
14 building.  I was not led through the
15 newsroom.
16    Q.   Did you run into anybody on your
17 way out of the building?
18    A.   Did I see anyone?
19    Q.   Yes.
20    A.   I didn't see any of my colleagues
21 as I was being escorted out of the building.
22    Q.   Is there anything else about the
23 meeting that occurred that day that you
24 remember but have not described?
25

FENNER

1     A.   It was the culmination of the
2 racist climate at the newsroom.
3     Q.   Are there any events or occurrences
4 that happened that day in that meeting that
5 you haven't described?
6     A.   I described many of them.  I was --
7 when I was pulled off the assignment, I was
8 told to give my notes to one of my white
9 colleagues so they could finish the work that
10 I had started that day.
11    Q.   Did anybody say anything during
12 your termination meeting about the Sandra
13 Guzman lawsuit?
14    A.   No one said anything about it, but
15 I subsequently learned that she was filing a
16 complaint in federal court against the News
17 Corporation and New York Post the same day I
18 was terminated.
19    Q.   Mr. Fenner, Mr. Fenner, the
20 question is, did anybody say anything during
21 your termination meeting about the Sandra
22 Guzman lawsuit?
23    A.   They didn't say it to me.  You are
24 talking about Michelle Gotthelf, Dan
25

FENNER

1 Greenfield or Amy Scialdone, is that who you
2 are referring to?
3     Q.   Yes.
4     A.   They did not mention that.
5     Q.   Did anybody in the NewsCorp.
6 building mention that lawsuit to you that
7 day?
8     A.   The only company employees I spoke
9 to that day were Amy Scialdone, Michelle
10 Gotthelf and Dan Greenfield.
11    Q.   Did they say anything at that
12 meeting about the cartoon that had run in
13 February of 2009?
14    A.   No.
15    Q.   Did they say anything about Sandra
16 Guzman in that meeting?
17    A.   They did not say that.
18    Q.   Did they say anything about
19 Ikimulisa Livingston at that meeting?
20    A.   No, they did not say anything about
21 Ikimulisa Livingston at the meeting.
22    Q.   Do you know when the decision to
23 terminate you was made?
24    A.   No.
25

FENNER

1     Q.   Do you know who made that decision?
2     A.   I would assume that Col Allan and
3 the top editors along with Michelle Gotthelf
4 and Amy Scialdone made that decision.
5     Q.   But you do not know who made the
6 decision, correct?
7     A.   Correct.
8     Q.   Did you ask for a second chance or
9 another chance or additional chances to
10 retain your job during that meeting?
11    A.   It was pointless.
12    Q.   So you did not?
13    A.   No.
14    Q.   Did you say anything during the
15 meeting?
16    A.   No.
17    Q.   What is the basis for your
18 assertion that you were terminated due to a
19 belief on the part of your editors that you
20 would be a supportive witness to Sandra
21 Guzman?
22    A.   Repeat the question.
23    Q.   Sure, what is the basis for your
24 assertion that you were terminated because of
25

FENNER

1 a belief on the part of your editors that you
2 would be a supportive witness to Sandra
3 Guzman?
4     A.   Because she was retaliated against
5 by the paper after she complained about the
6 racist monkey cartoon and was -- that was
7 published earlier that year.
8     Q.   OK, but what makes you believe that
9 that your editors terminated you because they
10 thought you would support Sandra Guzman's
11 lawsuit?
12     A.   Sandra complained just like I did
13 about the racist climate at the paper.  And
14 she had been terminated because of the
15 comments she had made in complaining about
16 the cartoon and then roughly two months
17 later, so was I.
18     Q.   What's the basis of your
19 information as to why Sandra Guzman was let
20 go from the Post?
21     A.   What's the basis of my information?
22     Q.   As to why Sandra Guzman was let go
23 by the Post?
24     A.   Because I know she complained--

FENNER

1     Q.   What's the source of your
2 information?
3     A.   I read, I read, I read this long
4 e-mail complaint she filed, system-wide.
5 complaining about the cartoon.  I saw her
6 complaint and recognized that she was
7 terminated for -- she was -- they were
8 retaliating against her for complaining about
9 the racist cartoon.
10     Q.   So you saw the e-mail that she sent
11 in February of 2009 she was terminated in
12 September of 2009.  Based on that, you
13 concluded that her termination was
14 retaliatory, is that correct?
15     A.   Retaliatory and discriminated
16 against, yes.
17     Q.   Did any New York Post editor or
18 executive tell you why Sandra Guzman lost her
19 job?
20     A.   No.
21     Q.   Did any New York Post editor or
22 executive tell you that you were being
23 terminated because the Post was concerned
24 that you would support her lawsuit?

FENNER

1     A.   No.
2     Q.   Do you know, do you have any reason
3 to believe the Post had knowledge of her
4 lawsuit at the time that the Post made its
5 decision to let you go?
6     A.   Can you repeat the question.
7     Q.   Yeah.  Do you have reason to
8 believe the Post had knowledge of her lawsuit
9 at the time they made the decision to let you
10 go?
11     A.   It was filed -- I believe it was
12 filed in federal court the same day I was
13 terminated.
14     Q.   Do you know whether or not people
15 who decided to terminate Sandra -- I am
16 sorry, to terminate you knew about that
17 lawsuit at the time that they made that
18 decision to terminate you?
19     A.   Do I know that they knew about the
20 lawsuit?
21     Q.   Correct.
22     A.   No.
23     Q.   Other than what we have gone
24 through here today, did you experience any

FENNER

1 other discrimination at the New York Post?
2     A.   I was terminated.
3     Q.   We covered that.
4     A.   I was just trying to form my
5 thoughts.
6     I was terminated because of my
7 race.  I was banned from the newsroom.  I was
8 screamed at, cursed at, and humiliated by my
9 white editors.  I was sent out on many more
10 out-of-town assignments than my white
11 colleagues.
12     I witnessed other people
13 experiencing racial discrimination at the
14 paper.  Ikimulisa Livingston was working as a
15 reporter in the Queens courthouse and she was
16 removed from her position after a white
17 editor in the city desk had an argument with
18 Jesse Angelo who is a managing editor at the
19 paper and so she was forced out of her job.
20     Leonard Green had written many
21 columns for the paper during his tenure. had
22 made requests to become a columnist, it was
23 denied.
24     Neil Graves, another African

FENNER

1
2  American reporter experienced harassment and
3  mistreatment and I learned he was also
4  terminated from the newsroom because he is
5  African American.
6       I know Doug Montero, who is black
7  Latino, had a column at the paper and that
8  column was taken away from him and I had
9  experienced treatment that was different from
10 my white colleagues at the paper.
11      And I was retaliated against after
12 I had complained to Journalisms about the
13 racist cartoon that was published by the Post
14 and editor-in-chief Col Allan.
15      There is another reporter, his name
16 is Leonardo Blair. He had been terminated
17 from the paper after he had filed a lawsuit
18 with the New York Civil Liberties Union about
19 the stop-and-frisk campaign that the NYPD was
20 conducting against Latinos and African
21 Americans in New York City. And the reason
22 why he was terminated was, as I understand
23 it, is he had told his direct editor William
24 Gorta, G-O-R-T-A about it, and because he
25 didn't communicate this idea to Michelle

FENNER

1
2  Gotthelf, he was terminated. That is my
3  understanding or what has been said about it.
4  But he was a great reporter doing great work
5  at the paper.
6    Q.   White or African American?
7    A.   He is African American.
8    Q.   Do you have any personal knowledge
9  of the facts surrounding --
10   A.   I was going to add another factor
11 to answer your question.
12   Q.   Well, actually my question, sir,
13 was did you experience any other
14 discrimination at the New York Post. You're
15 telling me about what other people are --
16 what you are alleging other people
17 experienced?
18   A.   It was part of the climate at the
19 paper. The other thing is, when I was banned
20 from the newsroom, I was also -- I
21 experienced a schedule change and given the
22 role of a junior reporter which was supposed
23 to be a temporary position, but lasted
24 through the tenure of my job until I was
25 terminated.

FENNER

1
2    Q.   Were you given the role of a junior
3  reporter or the shift of a junior reporter?
4    A.   The shift.
5    Q.   Do you have any personal knowledge
6  relating to why Leonard Green was not made a
7  columnist or why Neil Graves was let go?
8    A.   You mean why the editors didn't
9  grant it?
10   Q.   Yeah.
11   A.   I didn't understand why. He had
12 written many columns that ran in the paper.
13 And he earned the right.
14   Q.   Did you ever speak to the editors
15 about why they made that decision?
16   A.   No.
17   Q.   Did you ever overhear them
18 discussing why they made that decision?
19   A.   No.
20   Q.   Did you ever see anything written
21 by the editors or any New York Post
22 executives about why they made that decision?
23   A.   No.
24   Q.   Do you have any personal knowledge
25 of the reasons for Neil Graves' termination?

FENNER

1
2    A.   I believe it was because he was
3  African American and he also was ill.
4    Q.   Have you ever asked the people that
5  made that decision why they made that
6  decision?
7    A.   No.
8    Q.   Have you overheard them talking
9  about it? Have you ever seen anything
10 written about it?
11   A.   No.
12   Q.   Did you ever ask the editors of the
13 Post why Doug Montero had his column taken
14 away?
15      MR. THOMPSON: Let the record
16 reflect that your colleagues are speaking
17 while you're asking the witness questions
18 and that's disruptive.
19      MR. LERNER: Oh, well, I wasn't
20 distracted by it but Mr. Fenner --
21      MR. THOMPSON: I am distracted as
22 his attorney. That's improper.
23      MR. LERNER: I didn't even notice
24 it, Ken.
25      MR. THOMPSON: I did. That's why I

Page 274

FENNER

1  am bringing it to your attention.
2  MR. LERNER:  Thank you.
3  MR. THOMPSON:  Just Ms. Lovinger
4  has been getting up throughout this
5  deposition and whispering in your ear and
6  giving you notes.  That has been
7  distracting, Mr. Lerner.  That's not the
8  way to have a deposition conducted.  You
9  should ask questions.  Not having the
10  colleagues jump up every couple of
11  minutes whispering in your ear.
12  The witness is here answering your
13  questions and I'm trying to focus.
14  MR. LERNER:  Mr. Thompson leaving
15  aside whether or not that would even be
16  improper if it were going on --
17  MR. THOMPSON:  It is disruptive.
18  MR. LERNER:  It is most certainly
19  not going on.  Ms. Lovinger has not been
20  getting up and coming over to me during
21  the course of this deposition every
22  several minutes.
23  MR. THOMPSON:  Mr. Lerner, she has
24  been repeatedly getting up throughout the

Page 275

FENNER

1  day.  You know that.
2  MR. LERNER:  I don't know it
3  because it is not happening.
4  MR. THOMPSON:  You may disagree
5  with that, but we have witnesses who have
6  seen her get up at least ten times to
7  walk over to you and whisper in your ear
8  while you are asking Mr. Fenner questions
9  and we ask that it not be disruptive.
10  Q.   Mr. Fenner, do you have any
11  personal knowledge as to why Doug Montero's
12  column was taken away?
13  A.   I believe he was racially
14  discriminated against when it was taken away.
15  Q.   I didn't ask you what you believed.
16  I asked you if you have any personal
17  knowledge regarding why the editors made that
18  decision?  Did you ever speak to them about
19  it?
20  A.   No.
21  Q.   Did you ever overhear them talking
22  about it?
23  A.   No.
24  Q.   Did you ever see anything written

Page 276

FENNER

1  down about it?
2  A.   No.
3  Q.   By the way, Mr. Graves lost his job
4  in 2011, correct?
5  A.   I believe that's right.
6  Q.   You were no longer at the Post as
7  of November 2009, right?
8  A.   Correct.
9  Q.   And what's the basis of your
10  assertions regarding Leo Blair?
11  A.   He was doing -- he was a hard
12  working reporter.
13  Q.   What is the basis of your knowledge
14  about Leo Blair's situation?  I am asking you
15  your source?
16  A.   It might have been Bill Gorta.
17  Q.   And what did -- was Mr. Blair an
18  employee of the Post?
19  A.   I think he was what they call a
20  perm-lancer, which meant he worked full time
21  but didn't have the benefits of a full-time
22  employee.
23  Q.   And you said you might have heard
24  something from Bill Gorta?

Page 277

FENNER

1  A.   I did.
2  Q.   When?
3  A.   I spoke to Bill Gorta about it.
4  Q.   When?
5  A.   Soon after Leonardo Blair was
6  terminated from the paper.
7  Q.   When was that?
8  A.   I believe it was in '08.
9  Q.   And what did Mr. --
10  A.   I believe it was in the fall of
11  '08.
12  Q.   What did Mr. Gorta tell you?
13  A.   He told me that Leonardo Blair was
14  fired because he had filed this lawsuit
15  against the NYPD for their stop-and-frisk
16  practices.  And Leonardo had told Billy that
17  this lawsuit was going to be issued at the
18  beginning of the week and Billy told me that
19  he had informed Leonardo Blair to reach out
20  to Michelle Gotthelf and I recall Billy
21  saying that he did not, Leonardo Blair did
22  not do that, and as a result, he was canned
23  from the paper.
24  Q.   So in other words, he was canned

Page 286

FENNER

1
2   Q.   After your work schedule was
3   changed on Thursdays to the 2 to 10 shift and
4   you did it for a number of weeks --
5   A.   Months.
6   Q.   Well, my question is, after a few
7   weeks, did you make a request of Gotthelf or
8   Greenfield to be put back on an earlier
9   schedule on Thursdays?
10  A.   Yes.
11  Q.   And when did you do that?
12  A.   Probably at the end of the month.
13  Q.   Do you have a specific recollection
14  of making that request?
15  A.   Yes.
16  Q.   And who did you ask?
17  A.   Greenfield.
18  Q.   Where did you ask that?
19  A.   I can't recall if I was in the
20  newsroom or if it was over the phone.  It was
21  either/or.
22  Q.   And what did he say?
23  A.   No.  I asked him if he had found
24  anyone to fill in that position.  And he said
25  no.

Page 287

FENNER

1
2   Q.   Did you specifically -- all right,
3   is that all you said?
4   A.   No, I said more.
5   Q.   What did you say?
6   A.   I said to him, you said that you
7   were going to find someone by the end of the
8   month for this position, that this was going
9   to be a temporary situation.
10  Q.   And what did he say?
11  A.   He said we haven't found anyone
12  yet.
13  Q.   So you continued to remain in that
14  slot on Thursdays?
15  A.   I had to.
16  Q.   After that conversation, did you
17  ever revisit it with him?
18  A.   I believe I did revisit it at one
19  point.
20  Q.   Do you have a specific recollection
21  of doing that?
22  A.   No.
23  Q.   Were you OK with the 9 to 5 shift
24  on the other days?
25  MR. THOMPSON:  Objection.

Page 288

FENNER

1
2   A.   I preferred the 11 to 7 shift
3   because in the mornings, I could find
4   sources, meet with them, possibly share story
5   ideas before my shift began.  It would have
6   afforded me the flexibility to do that.
7   Q.   Well, you could still do that even
8   when you were working 9 to 5, couldn't you?
9   A.   There is no 9 to 5 shift in
10  journalism.  If you are working at 5, you are
11  working until 7.
12  MR. LERNER:  Could I get a read on
13  the time elapsed?
14  THE VIDEOGRAPHER:  Yes.
15  MR. LERNER:  Let's take a quick
16  break, five minutes.  And we will finish
17  up.
18  THE VIDEOGRAPHER:  The time is 7:04
19  p.m.  We are off the record.
20  (Recess)
21  THE VIDEOGRAPHER:  The time is 7:20
22  p.m.  We are on the record.
23  Q.   Mr. Fenner, one of the things we
24  were talking about before we were on the
25  break is the Sandra Guzman lawsuit.  Were you

Page 289

FENNER

1
2   aware that the Sandra Guzman lawsuit was
3   going to be filed before it was filed?
4   A.   No.
5   Q.   When did you learn about the Sandra
6   Guzman lawsuit?
7   A.   I don't know if it was the same day
8   I was terminated or afterwards, from news
9   reports.
10  Q.   You didn't know about it during
11  your termination meeting, did you?
12  A.   No.
13  Q.   You, when you worked at the Daily
14  News, you were a reporter there from '94 to
15  2007, right?
16  A.   Right.
17  Q.   How does the Daily News organize --
18  let me withdraw that.
19  Does the Daily News have runners
20  and rewrites the way the New York Post does?
21  MR. THOMPSON:  Objection.
22  A.   No one at the Daily News is called
23  a runner.
24  Q.   Do they have people who go out and
25  gather facts and report news and then people

Page 314

```
1              FENNER
2      (Exhibit 18, documents Bates
3  stamped AF151, 153, 158, 159, 169, 170,
4  3750, 3751, 3752, 3753 through 3774
5  marked for identification, as of this
6  date.)
7      THE VIDEOGRAPHER:  The time is 7:56
8  p.m. we are off the record.
9      (Recess)
10     THE VIDEOGRAPHER:  The time is
11 7:58, we are on the record.
12     Q.   Mr. Fenner, are the letters
13 contained in Exhibit 18 cover letters that
14 you sent in your effort to -- to potential
15 employers in your effort to find a job?
16     A.   Yes.
17     Q.   I notice they are not signed.  Did
18 you print these off your computer to --
19     A.   I possibly did.
20     Q.   Are they the final letters that you
21 sent to these employers?
22     A.   I believe they are.
23     Q.   And when you sent a cover letter to
24 an employer, do you endeavor to show yourself
25 to be a conscientious and careful writer and
```

Page 315

```
1              FENNER
2  describer of your talents?
3      A.   Yes.
4      Q.   Do you believe these cover letters
5  reflect your good writing skills?
6      A.   Yes.
7      Q.   I want you to take a look at the
8  one that's marked AF3753.  It is about ten
9  letters in, and it is to the human resources
10 manager of Purchase College.
11     A.   Yes.
12     Q.   Did you send this letter out?
13     A.   I did.
14     Q.   Did you get any response from it?
15     A.   No.
16     Q.   Did you get any response from the
17 letter you sent to CBS News?
18     A.   From this letter, no.
19     Q.   Did you proofread these letters
20 before you sent them out?
21     A.   Yes.
22     Q.   Is Mr. Fenner, you testified
23 earlier that you believe you were sent on
24 assignments involving travel more than your
25 white counterparts at the Post.  Do you
```

Page 316

```
1              FENNER
2  recall that?
3      A.   I do.
4      Q.   What's the basis for your
5  conclusion that you traveled more than white
6  reporters at the Post?
7      A.   I would look in the paper and see
8  the coverage of the day and I knew I was sent
9  out more than my white colleagues on those --
10 on assignments during my tenure at the Post.
11     Q.   Do you know if there are any white
12 reporters that traveled more than you?
13     A.   I don't think there are.  I'm
14 not -- I don't think so.
15     Q.   Have you, other than kind of
16 looking in the newspaper and seeing where
17 people are on a given day, have you done any
18 kind of systematic analysis of how often
19 white reporters travel versus how you traveled?
20     A.   The best gauge of what's happening
21 in the paper would be to look in the
22 published paper and see datelines.
23     Q.   Did you ever tally them up?
24     A.   No.
25     Q.   As you sit here today, do you know
```

Page 317

```
1              FENNER
2  for a fact which reporters traveled how much?
3      A.   I knew I traveled much more than
4  most.
5      Q.   My question is, do you know how
6  much each white reporter at the Post
7  traveled?
8      A.   I couldn't give you an exact
9  number.
10     Q.   And if you were to give an
11 approximate number, it would -- how would you
12 come up with that approximate number as you
13 sit here right now?
14     A.   As I sit here right now?
15     Q.   Yes.
16     A.   Well, I will give you my
17 recollection of reading the paper and looking
18 at date lines.  That would be a gauge to use.
19     Q.   Were there white reporters that
20 traveled close to how much you traveled?
21     A.   What's close?
22     Q.   Approximately the same?
23     A.   I couldn't give you a hard answer
24 on that, but I know I traveled more than most
25 of my white colleagues.
```