# Exhibit 3

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 1

```
 1
 2        UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF NEW YORK
 3
     AUSTIN FENNER and IKIMULISA    )
 4   LIVINGSTON,                    )
                                    )
 5              Plaintiffs,         )
                                    )
 6              vs.                 ) 09CIV9832
                                    ) (BSJ(RLE)
 7   NEWS CORPORATION, NYP HOLDINGS,)
     INC., d/b/a THE NEW YORK POST, )
 8   and DAN GREENFIELD and MICHELLE)
     GOTTHELF,                      )
 9                                  )
                Defendants.         )
10   -------------------------------)
11
12
13        (CONTAINS CONFIDENTIAL and
14         ATTORNEYS' EYES ONLY PORTIONS)
15
16   VIDEOTAPED DEPOSITION OF DAN GREENFIELD
17              New York, New York
18           Thursday, April 5, 2012
19
20
21
22
23   Reported by:
24   Philip Rizzuti
25   JOB NO. 47782
```

TSG Reporting - Worldwide   877-702-9580

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 102

```
                   Greenfield
 1
 2   question is as of today is it fair to say that
 3   all the editors who worked on the metro desk
 4   and these three reporters who occasionally
 5   work on the metro desk are white?
 6       A.   I preface it again by saying --
 7       Q.   Just answer the question, you
 8   don't have too preface it?
 9       A.   I will answer it. I never regard
10   people --
11       Q.   Mr. Greenfield, I move to strike.
12   Please just answer the question, I don't want
13   to have to call the judge. You don't have to
14   keep prefacing it, just answer the question
15   that I am asking you. Can you please read
16   back the question.
17           (Record read.)
18       A.   I don't see people that way, but
19   yes.
20       Q.   Do you know Mr. Greenfield if any
21   reporters at the New York Post have ever been
22   promoted to an editor's position on the metro
23   desk during your tenure?
24       A.   I am sorry.
25       Q.   Do you know if any reporters at
```

Page 103

```
                   Greenfield
 1
 2   the New York Post have ever been promoted to
 3   an editor position on the metro desk during
 4   your tenure?
 5       A.   Yes.
 6       Q.   Can you identify those
 7   individuals?
 8       A.   Tom Liddy, Tom Namako and Eric
 9   Lenkowitz.
10       Q.   Can you recall anyone else?
11       A.   I mentioned before Todd Venezia
12   working as a sometime editor. I don't think
13   that would qualify as a promotion though.
14       Q.   Is Tom Liddy Caucasian?
15       A.   Yes.
16       Q.   So is it true, Mr. Greenfield,
17   that the only reporters that you know of that
18   have been promoted to an editor position on
19   the metro desk are Caucasian?
20       A.   I can't think of anybody else. I
21   think it is those three. I am not sure if
22   that is an exclusive list, but yes, of those
23   people that I mentioned they are all
24   Caucasian.
25       Q.   How many reporters work in the
```

Page 104

```
                   Greenfield
 1
 2   metro department at the New York Post?
 3       A.   I don't actually have a head
 4   count, but we are probably talking 50 to 60,
 5   including part-timers -- well there are also
 6   part-timers, but again a total number I can't
 7   think of off the top of my head. But in that
 8   ballpark.
 9       Q.   How many black full-time reporters
10   work in the metro department?
11       A.   Again not seeing people in those
12   terms, the whole department, I think it might
13   be three or four.
14       Q.   Identify the three or four black
15   full-time reporters that work in the metro
16   department?
17       A.   The ones that I was just thinking
18   of, Kim Livingston. Actually no, it is more
19   now that I think of it. It is Kim Livingston,
20   Leonard Green, Christina Carrega, Georgette
21   Roberts. There might be others, I am trying
22   to think. Just trying to go through all the
23   staff in my mind. I am not sure how Doug
24   Montero identifies himself, he is Hispanic.
25       Q.   I am not asking about Hispanic, I
```

Page 105

```
                   Greenfield
 1
 2   am asking about African-American?
 3       A.   Okay. Sabrina Ford.
 4       Q.   Anyone else?
 5       A.   There may be others, Mr. Thompson,
 6   I am trying to remember.
 7       Q.   Take your time.
 8       A.   This is currently?
 9       Q.   Yes.
10       A.   Off the top of my head those are
11   the names that I can think of.
12       Q.   Do you know why there are only
13   five black full-time reporters out of 50 or 60
14   reporters who work in the metro department?
15           MR. LERNER: Objection.
16       A.   I don't.
17       Q.   When Mr. Fenner worked as a
18   reporter for the New York Post between 2007
19   and 2009 how many black full-time reporters
20   worked in the metro department?
21       A.   Again I think of Austin as a
22   reporter who happened to be African-American,
23   but I am trying to remember names. Neil
24   Graves was here at the time. Leonard Green
25   was here at the time that Austin was here.
```

27

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 122

                    Greenfield
1
2    Q.   Would you consider Kevin Fasick to
3    be a runner?
4    A.   Field reporter, runner, yes.
5    Q.   Would you consider Reuven Fenton
6    to be a runner?
7    A.   Field reporter, yes, sure, runner.
8    Q.   What about Rebecca Rosenberg?
9    A.   Same.
10   Q.   Amber Sutherland?
11   A.   Yes.
12   Q.   Frank Rosario?
13   A.   Yes.
14   Q.   Celim Algar?
15   A.   Yes.  Celim and Kieran are
16   runners, but they are based out on Long
17   Island, so their jobs are similar, but they
18   don't necessarily come into the city like
19   everybody else.  As I said there might be
20   others, I am trying to remember.
21   Q.   Do you know if Kevin Fasick has
22   worked at the New York Post longer than
23   Ms. Livingston?
24   A.   He has not.
25   Q.   Do you know if Rueven Fenton has

Page 123

                    Greenfield
1    worked at The Post longer than Ms. Livingston?
2
3    A.   He has not.
4    Q.   What about Rebecca Rosenberg, has
5    she worked at the newspaper longer than
6    Ms. Livingston?
7    A.   As full-time?
8    Q.   Yes.
9    A.   Shes has not.
10   Q.   Has Amber Sutherland worked at the
11   newspaper longer than Ms. Livingston?
12   A.   She has not.
13   Q.   Has Frank Rosario worked longer at
14   the newspaper than Ms. Livingston?
15   A.   He has not.
16   Q.   How about Celim Algar?
17   A.   I don't know.
18   Q.   How about Kieran Crowley?
19   A.   I don't know.
20       (Continued in confidential,
21   attorneys eyes' only portion of
22   transcript.)

Page 124

1    Greenfield - confidential - attorneys eyes' only
2    Q.   Do you know how much
3    Ms. Livingston is currently paid annually as a
4    reporter at the New York Post?
5    A.   In -- not the exact number, but I
6    think in broad strokes.
7    Q.   Can you tell us what your
8    understanding is in terms of how much she
9    makes annually?
10   A.   I think she makes around $70,000,
11   plus overtime.
12   Q.   Does Ms. Livingston make more
13   money annually than Kevin Fasick?
14   A.   I don't know.
15   Q.   Does she make more money annually
16   than Reuven Fenton?
17   A.   I don't know.
18   Q.   Does she make more money annually
19   than Rebecca Rosenberg?
20   A.   Okay, let me clarify that.  Are we
21   talking salary or total income, because all of
22   these people -- if I may.  All of these people
23   are eligible for overtime, and all of them
24   may, because I am not privy to their pay on a
25   weekly or annual basis, may make more, may

Page 125

1    Greenfield - confidential - attorneys eyes' only
2    make less depending on the hours that they
3    work.
4    Q.   I am talking about the annual
5    salary exclusive of overtime?
6    A.   I wanted to be specific.
7    Q.   Let me make it clear.
8        Does Ms. Livingston make more
9    money in an annual salary than Kevin Fasick?
10   A.   I believe she does, yes.
11   Q.   How much does Kevin Fasick make
12   annually?
13   A.   Again broad terms, I don't assign
14   salaries, I am not a hundred percent sure, but
15   I could give you a range.
16       MR. LERNER:  Don't guess.  If you
17   know the answer, tell him.  If you don't
18   know the answer, tell Mr. Thompson you
19   don't know the answer.
20   A.   I couldn't say specifically.
21   Q.   Does Ms. Livingston make more in
22   terms of an annual salary than Reuven Fenton?
23   A.   I couldn't say.
24   Q.   Does she make more with respect to
25   her annual salary than Rebecca Rosenberg?

Page 206

Greenfield

    MR. LERNER: Objection.
    A.   Could you ask the question again?
    Q.   Strike that.
    Do you have any experience -- strike that.
    Do you know if Michelle Gotthelf based on your working with her would ever put any false statement in an employee's performance evaluation?
    A.   No.
    Q.   Now I want to show you what is marked as Deposition Exhibit 4, Bates stamped IL 176. Please take a moment and look at that exhibit, Mr. Greenfield, and tell us if you recognize it?
    A.   I am sorry, what was the question?
    Q.   You have had a chance to review this exhibit?
    A.   Yes.
    Q.   You see it is an E-mail from Zach Haberman dated February 20, 2008, at 10 p.m. to Ms. Livingston; correct?
    A.   Yes, I do.
    Q.   Can you read the text of what he

Page 207

Greenfield

wrote to her that day?
    A.   Once again hell of a story, exactly the kind of eyes open head up thing we need throughout this trial. Zach.
    Q.   Now, Mr. Greenfield, would you agree that Zach Haberman was referring to the Sean Bell trial when he sent that E-mail to Ms. Livingston?
    A.   I don't know, it doesn't say.
    Q.   But as you sit now do you know of any other trial that Ms. Livingston was covering for the New York Post in February of 2008?
    A.   I don't know one way or the other.
    Q.   Well you would agree that Mr. Haberman is telling Ms. Livingston that she had a heck of a story?
    A.   On that day.
    Q.   Would he agree that he was praising her work on that day?
    A.   On that day it looks like he was praising for her something, I don't know specifically.
    Q.   Right, but he says hell of a

Page 208

Greenfield

story; correct?
    A.   That is what it says here.
    Q.   So he was praising her in connection with the story; correct?
    A.   In connection with it.
    Q.   And he also says: Exactly the kind of eyes open, heads up thing we need throughout this trial; right?
    A.   I see that here. Very well could have been following up what had not been, that he had been critical. Saying this is the kind of thing that we do need, I don't know.
    Q.   You are guessing right now, aren't you; are you guessing?
    A.   Well you are asking me to guess on the whole thing --
    MR. LERNER: Let him finish.
    A.   I have not seen this before. I didn't write this. I don't even know for sure that this is about the Sean Bell trial.
    Q.   I understand. Let me make it clear. I don't want you to guess. If you don't an answer to the question just say you don't know. No one in this room wants you to

Page 209

Greenfield

guess, do you understand that Mr. Greenfield?
    A.   Then it is very hard for me to speak to the E-mail.
    Q.   Well you can read the E-mail; correct?
    A.   Yes.
    Q.   You understand what hell of a story means; right?
    A.   Yes, I do.
    Q.   That means a good story; correct?
    A.   It means the story was good, yes.
    Q.   You don't have to guess about that, do you?
    A.   Well --
    Q.   I want to show you now what was marked as --
    A.   I wasn't done speaking.
    Q.   Okay, continue to speak?
    A.   The hell of a story, it says that, but it doesn't say specific what her contribution to whatever story this was. He is speaking about the story. I don't know what it is that he is speaking to her about.
    Q.   Okay.

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 218

1     Greenfield
2     A.  I don't recall the specifics of a
3  conversation on that front.
4     Q.  I am not asking you for the
5  specifics.  Do you recall anything that Ms.
6  Gotthelf said to you when she spoke to you
7  about whether Ms. Livingston should be
8  reassigned from that courthouse?
9     A.  I remember the discussions were
10  again surrounding, you know, about the fact
11  that she needed rewrite.  The fact that she
12  was not breaking enough stories.  She was not
13  providing enough enterprise overall during her
14  time at the court.  Those were issues that
15  were raised.
16     Q.  Who made the decision to reassign
17  Ms. Livingston from the Queens courthouse?
18     A.  Michelle Gotthelf.
19     Q.  How do you know that?
20     A.  She told me.  I believe she
21  also -- pretty certain that she also ran it by
22  Jesse Angelo at least.
23     Q.  How do you know that she ran her
24  decision by Jesse Angelo?
25     A.  I seem to recall that, I don't

Page 219

1     Greenfield
2  have -- I seem to remember that.
3     Q.  Tell us what basis do you have to
4  say that she ran her decision by Jesse Angelo?
5     A.  I seem to remember her saying
6  that.
7     Q.  What did she say to you about
8  that?
9     A.  I don't remember.
10     Q.  Well in substance do you recall a
11  single thing she said to you about talking to
12  Jesse Angelo about her decision to reassign
13  Ms. Livingston?
14     A.  No.
15     Q.  Did you ever speak to Jesse Angelo
16  about the decision to reassign Ms. Livingston
17  from the Queens courthouse?
18     A.  I did not.
19     Q.  Did you ever speak to any editor
20  apart from Michelle Gotthelf about the
21  decision to reassign Ms. Livingston from the
22  Queens courthouse?
23     A.  Do you mean after or before --
24     Q.  Before?
25     A.  I mean as I mentioned before I was

Page 220

1     Greenfield
2  aware of, you know, I was aware of Zach's
3  displeasure.  I was aware of the issues that
4  Clemente, he was a writer, he was not really
5  an editor, he is not an editor, of those
6  issues.  But I don't -- I didn't have any kind
7  of conversations.  I really was on the -- I
8  really wasn't very involved with this.
9     Q.  Was Zach Haberman yelling at --
10  strike that -- did he ever yell at Michelle
11  Gotthelf as far as you know?
12     A.  I think I testified earlier that
13  he did indeed -- at the end of -- this was
14  still, still early in Zach's tenure when this
15  all happened.  The issues with Michelle were
16  toward the end, about a year later, I guess
17  about the time that we are talking about now.
18  But later, yes, I do remember them raising
19  their voices towards each other.
20     Q.  When was Zach Haberman fired?
21     A.  I believe it was September of
22  2009.
23     Q.  When was Ms. Livingston reassigned
24  from the Queens courthouse position?
25     A.  Either fall of 2008, November

Page 221

1     Greenfield
2  maybe, October.  I don't remember the
3  specifics.
4     Q.  So she was still reporting
5  directly to Zach Haberman when she was removed
6  from that position; correct?
7     A.  He was still the court's editor
8  for that court, yes.
9     Q.  Do you know if he played any role
10  in the decision to reassign Ms. Livingston?
11     A.  I don't know.  I don't know.
12     Q.  Did Ms. Livingston ever tell you
13  directly that Mr. Haberman had screamed or
14  raised his voice at her?
15     A.  She never said anything like that
16  at all to me.
17     Q.  Did she ever say that he had
18  cursed at her?
19     A.  She never said anything like that
20  to me.
21     Q.  Did anybody ever tell you that Ms.
22  Livingston complained about Zach Haberman
23  raising his voice to her before he was
24  terminated?
25     A.  No.

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 226

Greenfield

Q. I am not asking you to guess?
A. Okay. I don't remember what she said about -- I don't remember.
Q. Can you recall a single thing that Ms. Gotthelf said to you when she told you that she had discussed placing Billy Gorta in the courthouse with Col Allan and Jesse Angelo?
A. Not specifically, no.
Q. Did you play any role in Mr. Gorta being assigned to that position in the Queens courthouse?
A. Again only tangentially. I wasn't even the deputy metro editor at the time.
Q. What role did you play?
A. I was asked my opinion.
Q. What opinion did you give?
A. If it is good for the desk, then do it.
Q. Who asked you for your opinion?
A. Michelle Gotthelf.
Q. Did Billy Gorta ever have any performance issues before he was put into the Queens courthouse position?

Page 227

Greenfield
MR. LERNER: Objection.
A. You know, I -- I did not supervise Billy Gorta -- he was on the desk with me, I didn't supervise him. I was not privy to his history. Billy was a colleague on the desk.
Q. Well based on your working with him on the metro desk how would you describe his work performance as an editor on that desk?
MR. LERNER: Objection.
A. You know, how would I describe his performance; I mean Billy was an intelligent guy. I mean he certainly was a dedicated journalist. He taught at Columbia.
Q. I am not asking you about his background?
A. But it informed --
Q. Focus on the question I am asking you?
A. Okay. Well I mean he was a very knowledgeable journalist. Understood law and order because, you know, he dealt with shack issues, S-H-A-C-K, that is a jargon for the police bureau, because he had been a police

Page 228

Greenfield
captain. But I know that he -- that for the most part from my perspective for the most part he was a

REDACTED

Page 229

Greenfield

REDACTED

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 238

Greenfield

Mr. Lippner has again said something, or said something audible, shaking his head disrupting this deposition.

MR. LIPPNER: I did not say a word, Mr. Thompson. I did shake my head, and you are grandstanding trying to intimidate the witness.

MR. THOMPSON: I am not grandstanding. I am not trying to intimidate the witness. I want you to behave appropriately in this deposition.

A. I would like to hear the question again please.

Q. Sure, read it back to him.

(Record read.)

A. Okay. I don't -- I wasn't there for the entire time that Billy was there. I also wasn't there during the entire time on a given day that Billy was there. But yes, he could be negative at times, yes.

Q. Did he also exhibit poor decision making when you worked with him on the metro desk?

A. I can't speak to that.

Page 239

Greenfield

Q. After Mr. Gorta was assigned to the Queens Supreme Court did he ever need a rewrite in connection with his stories that he filed?

A. It goes back to testimony I had given earlier. I don't -- first off it is for the entire time that he was there, again it covers a lengthy period of time. So I would imagine that there are times that he did. But he never required like a dedicated rewrite. If he needed rewrite it was in the context of what I mentioned earlier. Maybe he had multiple stories and he needed to hand off notes to someone to make deadlines. But he routinely filed his own copy.

Q. Did he need to improve his writing at any point during his assignment to the Queens courthouse?

A. I don't know that.

Q. I am showing you now what has been marked as Greenfield Exhibit 8. For the record it is Bates stamped NYP-FL 903 through NYP-FL 906.

(Greenfield Exhibit 8, document

Page 240

Greenfield

Bates stamped NYP-FL 903 through NYP-FL 906, marked for identification, as of this date.)

Q. Please take a moment Mr. Greenfield and look at that exhibit and tell us if you recognize it. I want to specifically direct your attention to the page Bates stamped NYP-FL 905.

A. After this line of questioning can we take a break.

Q. Sure, we can take another break. Mr. Greenfield, I want to specifically direct your attention to -- first of all let me back up. This is a performance appraisal that was given to Billy Gorta for 2009; correct?

A. Yes, fiscal year 2009.

Q. I want to direct your attention to the last page of this exhibit which is NYP-FL 906, do you see the signatures on the back of that page?

A. I do.

Q. Do you recognize any of those signatures?

Page 241

Greenfield

A. It looks like REDACTED and it looks like Michelle's.

Q. Did you participate in any way in this particular evaluation that was given to REDACTED

A. I did not.

REDACTED

Q. So do you know Mr. Greenfield if REDACTED needed rewrite for major trials?

A. I don't recall that, no.

MR. THOMPSON: We can take a break now. If you have to go to the restroom or whatever you need to do.

THE VIDEOGRAPHER: The time is 4:37, we are going off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is

Page 254

1  Greenfield
2  you call her in connection with her job?
3      A.  The process is the answer, and I
4  was answering your question because it is not
5  as simple as it sounds --
6      Q.  Yes or no, do you call Ms.
7  Livingston in connection with her job, yes or
8  no?
9          MR. LERNER:  No, it can't be
10     answered yes or no?
11     A.  Actually can't.
12     Q.  Do you ever call Ms. Livingston in
13 connection with her job, yes or no?
14         MR. LERNER:  No, I know the
15     subject matter here, and I can tell you
16     Ken that this can't be answer yes or no.
17     Q.  Answer it any way your can
18 Mr. Greenfield?
19     A.  The switchboard operators, the
20 desk people as I mentioned earlier, sometimes
21 it is desk assistants, sometimes it is people
22 who run that part, that department as I
23 mentioned.  Deadlines being what they are and
24 as hectic as it can be in a news room we
25 actually as editors a lot of the time, and me

Page 255

1  Greenfield
2  more so than others because of the nature of
3  my job, don't actually dial the phone that
4  often.
5          So I will call out can you get me
6  so and so, can you get me Kim, can you get me
7  Kevin, can you get me Rebecca, that sort of
8  thing.  So that is usually on a rare occasion
9  there is a speed dial list that you will hit a
10 two digit number, but I don't usually use
11 that.
12     Q.  Would you expect Ms. Livingston
13 who has worked at The Post for fifteen years
14 to have a telephone number at The Post?
15     A.  As I testified earlier I don't
16 know who has got numbers and who doesn't.
17     Q.  I am not asking that.  Can you
18 answer my question please?
19     A.  Then please ask the question
20 again.
21         MR. THOMPSON:  Read it back.
22         (Record read.)
23         MR. LERNER:  Objection.
24     A.  I can't say because people use
25 their phones for work, they get reimbursed, I

Page 256

1  Greenfield
2  don't know.  It is not a value judgment that I
3  can make.
4      Q.  Do you know if Amber Sutherland
5  has a telephone number at the New York Post?
6      A.  I don't.
7      Q.  How often have you seen Ms.
8  Livingston in the news room after she was
9  reassigned from the Queens courthouse?
10     A.  Maybe a handful of times.  It is
11 not typical to see field reporters in the
12 newer.
13     Q.  When she worked in the Queens
14 courthouse she had a telephone number in the
15 courthouse; correct?
16     A.  I don't know.
17     Q.  Did you ever see Ms. Livingston in
18 the news room and ask her what are you doing
19 here?
20     A.  I believe I may have.
21     Q.  Describe the time that you saw her
22 in the news room and asked what was she doing
23 there?
24     A.  I read this in the complaint, it
25 jarred my memory of you know that, that

Page 257

1  Greenfield
2  conversation.  Kim at this point had been, you
3  know, she was working as a field reporter.
4  Field reporters are not routinely in the news
5  room, and when you are supposed to be out on
6  assignments and certainly in communication
7  with your desk as far as your whereabouts.
8  And I remembered that she came in the office
9  and I was surprised to see her there because
10 she had not let us know that she had changed
11 locations, and I was, well, I was what are you
12 doing here.
13     Q.  What location was she supposed to
14 be at at that time?
15     A.  I can't tell you specifically.
16 Field reporters --
17     Q.  I am asking you where was Ms.
18 Livingston supposed to be on that day when you
19 asked her what are you doing here?
20     A.  I don't recall.
21     Q.  What assignment was she supposed
22 to be covering when you approached her in the
23 news room and asked her what she was doing
24 there?
25     A.  Two things there.  A, I don't

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 262

Greenfield
A. You know what, I -- that is my recollection, but like I said the conversation such as it was was very hazy.
Q. What is your recollection based on that Ms. Livingston was working that day?
A. When I saw it in the complaint I tried to remember back to it. And that was -- I seem to remember yes, seeing her once in the news room. But that is really it, it was not a confrontation or anything.
Q. Didn't you approach her in a hostile manner?
MR. LERNER: Objection.
A. Absolutely not.
Q. Do you recall how you spoke to her that day?
A. I --
Q. Do you recall how you spoke to her that day?
A. Excuse me. I have never approached Kim in a hostile manner.
Q. Do you recall how you approached her that day Mr. Greenfield?
A. I don't recall whether I

Page 263

Greenfield
approached her, whether she saw me, whether she was walking by my desk.
Q. Do you recall how you spoke to her that day?
MR. LERNER: You need to answer verbally.
THE WITNESS: Yes, I am sorry.
A. Barely. What are you doing here.
Q. So is it your testimony Mr. Greenfield that the only thing that you recall about that conversation is the question you posed to Ms. Livingston, what are you doing here?
A. Yes. And I barely recall it.
Q. Now you said that you have seen her in the news room on other occasions since she was reassigned from the Queens courthouse?
A. On occasion.
Q. Do you know what she was doing in the news room on those other occasions?
A. Well I mean I saw her when she came in for reviews, evaluations, that sort of thing.
Q. Other than coming in for reviews

Page 264

Greenfield
and evaluations?
A. She came in fairly recently, I remember she was in the news room bringing notes on a story. But I, you know, I remember seeing her around. I don't see her that often.
Q. How many times have you seen her in the news room separate and apart from having her come in for an evaluation?
A. I couldn't put a number on it.
Q. More than ten times?
A. I couldn't put a number on it.
Q. Isn't it fair to say that you rarely see Ms. Livingston in the news room?
A. That is fair.
Q. Because she is in the street; correct?
A. No. Well she is a reporter who is assigned to work in the field.
Q. The field is the street?
A. It doesn't have to be a street, it could be in a building.
Q. Have you ever yelled at Ms. Livingston?

Page 265

Greenfield
A. Not that I recall.
Q. Have you ever raised your voice at her?
A. Not that I recall.
Q. Have you ever cursed at her?
A. Not that I recall.
Q. Have you ever uttered profanity while talking to her?
A. Not that I recall.
Q. Have you ever hung up the phone on Ms. Livingston?
A. Not that I recall.
Q. Have you ever had any disagreements with Ms. Livingston during her employment at The Post?
MR. LERNER: Objection.
A. I would actually need more clarity.
Q. Sure, I will give you clarity. Have you ever became upset at Ms. Livingston during her employment?
A. Okay, I mean specific instances, yes, I probably became upset with every reporter at one time or another.

CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY PORTIONS

Page 326

```
 1            Greenfield
 2    voice during that call?
 3        A.   I could not say.
 4        Q.   Did Mr. Fenner utter profanity
 5    toward you during that call?
 6        A.   I don't recall if he did or
 7    didn't.
 8        Q.   What else did you say to Mr.
 9    Fenner during that call?
10        A.   All right, well, I asked him why
11    it was that he had not been in contact with
12    the desk. I asked him why -- whether he was
13    going to an event where Archbishop Dolan was
14    going to be. I asked him where he was. I
15    asked him whether he had planned on going to
16    this event. I asked him whether or not he had
17    been in touch with the photo desk. I asked
18    him a number of questions about where he was,
19    why he was where he was. You know, it was all
20    related to a couple of different issues.
21            And I raised with him the fact
22    that he couldn't be reached, and I pointed
23    that out to him that he couldn't be reached
24    for about 40 minutes which is unacceptable for
25    a reporter on the road. I raised the issue
```

Page 327

```
 1            Greenfield
 2    that he was at a -- you know, I wanted to know
 3    if he even knew about a press conference or an
 4    event. That I had to learn from the photo
 5    desk as opposed to him in the field.
 6            I had to ask him why he had not
 7    contacted me this morning. Why he didn't let
 8    me know what he was up to. I wanted to
 9    confirm whether he knew there was this event,
10    I had to direct him to go to the event. There
11    may have been other elements that I discussed,
12    but I remember those topics.
13        Q.   What did Mr. Fenner say to you
14    during that call?
15        A.   Well I don't remember specifically
16    what he said, but he said that he had not
17    planned on going to the event. He didn't -- I
18    remember that. I remember him pointing out
19    that he was going to be talking with Dolan at
20    some point during the day. But I had to
21    explain to him why it was important to go to
22    this event where Dolan was, and we discussed
23    that as well.
24        Q.   Isn't it true that Mr. Fenner had
25    told you that he had planned on attending that
```

Page 328

```
 1            Greenfield
 2    event?
 3        A.   No.
 4        Q.   Isn't it true that you yelled and
 5    cursed at him and didn't even let him get a
 6    word in?
 7        A.   Again I did not curse at him.
 8        Q.   You uttered profanity during that
 9    call?
10        A.   Yes.
11        Q.   You uttered the word fuck when you
12    spoke to him; correct?
13        A.   Yes, I believe I did.
14        Q.   Do you normally utter the word
15    fuck when you speak to people Mr. Greenfield?
16            MR. LERNER: Objection.
17        A.   Do I often?
18        Q.   Yes.
19        A.   Yes. I have to say it is not
20    uncommon. It is the way that people speak in
21    the news room. You hear it a lot.
22        Q.   It is the way people speak in the
23    news room at the New York Post?
24        A.   Well every news room that I worked
25    in. But yes, I mean it is not uncommon to
```

Page 329

```
 1            Greenfield
 2    hear profanity in the workplace.
 3        Q.   Have you ever heard Austin Fenner
 4    utter profanity?
 5        A.   You know --
 6        Q.   Have you ever heard him utter
 7    profanity, please answer that question?
 8        A.   Please let me finish. I don't
 9    know.
10        Q.   Have you ever heard Kim Livingston
11    utter profanity?
12        A.   I don't know.
13        Q.   And the only person who uttered
14    profanity during that phone call with you and
15    Austin Fenner was you; is that correct?
16        A.   I didn't say that.
17        Q.   I am asking. Did Austin Fenner
18    utter profanity during that phone call?
19            MR. LERNER: Objection. Asked and
20        answered.
21        A.   I don't remember exactly whether
22    he did or didn't.
23        Q.   As you sit here now do you recall
24    Austin Fenner uttering profanity during that
25    phone call on that day?
```