# Exhibit 4

Confidential Attorneys' Eyes Only

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------x

AUSTIN FENNER and IKIMULISA LIVINGSTON,

                            Plaintiffs,

          vs.

NEWS CORPORATION, NYP HOLDINGS, INC.,

d/b/a THE NEW YORK POST and DAN GREENFIELD

and MICHELLE GOTTHELF,

                            Defendants.

---------------------------------------x

        C O N F I D E N T I A L

          ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF MICHELLE GOTTHELF

           New York, New York

         Thursday, March 29, 2012

Reported by:   David Henry

JOB NO. 47779

Confidential Attorneys' Eyes Only

Page 38

1	Gotthelf - CONFIDENTIAL
2	Fenner worked for the Post and do you know
3	the dates?
4	    A.  He was --
5	    MR. LERNER:  The question is do
6	you know the dates.
7	    A.  Yes.
8	    Q.  So when did Austin Fenner begin
9	working for the Post?
10	    A.  May of 2007.
11	    Q.  And when did he leave?
12	    A.  November of 2009.
13	    Q.  Okay.  So during this period when
14	Austin Fenner worked for the Post, in other
15	words from May, 2007 to November, 2009, who
16	were the editors on the metro desk?
17	    A.  I'm trying to think.  Me, Dan
18	Greenfield, Billy Gorta, Neil Sloane, Kate
19	Sheehy was still -- Michael Hechtman.
20	That's all I can recall right now going
21	through.
22	    Q.  So during the time when Austin
23	Fenner worked for the Post, were there any
24	black editors on the metro desk?
25	    A.  On the metro desk, any -- no.

Page 39

1	Gotthelf - CONFIDENTIAL
2	    Q.  Do you know when the last black
3	editor on the metro desk worked there?
4	    A.  I do.  I believe -- yes.
5	    Q.  When was that?
6	    A.  I believe 2001.
7	    Q.  So there has not been a black
8	editor on the metro desk since 2001?
9	    A.  Yes.
10	    Q.  What does your job specifically
11	entail?  In other words describe to me what
12	your daily job is.
13	    A.  I oversee the newsroom, I develop
14	stories, I look after reporters, full-time
15	reporters, part-time reporters, editors, I
16	put together a news list of viable stories,
17	stories we're working on.  That's pretty
18	much the gist of it.
19	    Q.  Do you make assignments?  Do you
20	assign reporters to stories?
21	    A.  Yes, I do.
22	    Q.  How do you determine which
23	reporters to assign to which stories?
24	    A.  Oh, it depends.
25	    Q.  Give me an example.

Page 40

1	Gotthelf - CONFIDENTIAL
2	    A.  Depends on who is available, what
3	their strengths are, what their schedule
4	is.  I mean it's completely varied, there
5	is no way of explaining it.  It's just
6	every day something different.
7	    Q.  Okay.  Do you ever have to
8	rewrite stories?
9	    A.  Yes.
10	    Q.  How often do you rewrite stories?
11	    A.  Can't put a number on it.
12	    Q.  So is that just part of your
13	daily job?
14	    A.  Yes.
15	    Q.  Do you rewrite a lot of stories?
16	    A.  Depends on what you mean by
17	rewrite.  Top to bottom rewrite, no, not a
18	lot of stories; like reworking from
19	beginning to end, no.  That's what I try to
20	avoid in my job because it's so
21	time-consuming.  But I'm an editor.  I fix
22	copy, I make tweaks.
23	    Q.  Does the term rewrite have a
24	specific meaning in your profession?
25	    MR. LERNER:  Objection.

Page 41

1	Gotthelf - CONFIDENTIAL
2	    A.  It has -- specific meaning, it
3	has a number of meanings.
4	    MR. LERNER:  The question was
5	does it have a meaning.
6	    A.  Yes.
7	    Q.  What is the specific meaning?  If
8	someone in your profession uses the term
9	rewrite, what does that mean?
10	    A.  It could mean a person who
11	writes, it could mean the act of rewriting.
12	    Q.  Okay, I mean what I'm trying to
13	get at is it sounded like in one of your
14	answers a couple of answers back you said
15	something like I don't want to use the term
16	rewrite.  But to rewrite, does that mean
17	you rewrite the story completely?
18	    A.  Well, that's one version of the
19	word rewrite, is rewriting a story.  But
20	rewrite can also apply to an assignment.
21	    Q.  So if you just had to say tweak a
22	story, change a couple of sentences, would
23	you consider that a rewrite?
24	    MR. LERNER:  Objection.
25	    A.  No.

Confidential Attorneys' Eyes Only

Page 74

1    Gotthelf - CONFIDENTIAL
2    Q.  Would that include Ikimulisa
3  Livingston?
4    A.  Yes.
5    Q.  And Austin Fenner?
6    A.  No, I'm talking about his direct
7  reports.
8    Q.  So he was loud with
9  Ms. Livingston?
10   A.  When he didn't get the news
11 update he wanted or when she was not
12 handling the story he wanted, in a way he
13 wanted it done, he would get a little loud.
14   Q.  A little loud?
15   A.  Well, he would get loud.
16   Q.  Are you saying he shouted at
17 Ms. Livingston?
18   A.  Yes.
19   Q.  Did you ever hear him yourself
20 shouting at her?
21   A.  I heard him shouting at a number
22 of employees.
23   Q.  Which specific employees, do you
24 recall him shouting at?
25   A.  His direct reports.

Page 75

1    Gotthelf - CONFIDENTIAL
2    Q.  Who were they?
3    A.  Just give me a second. I will
4  give them all to you. I just have to
5  recall them. Ms. Livingston was one of
6  them. Denise Buffa, Alex Ginsberg;
7  sometimes I just mentally have to go
8  through all the courts. Stephanie Cohen,
9  Kieran Crowley, and Celine Algar, I think I
10 got -- if I remember another one I will --
11   Q.  Fair enough. Were there any
12 other issues with Zach Haberman other than
13 the story that he didn't pitch and the fact
14 that he was loud and yelled at various
15 employees?
16   A.  No.
17   Q.  Those were the two issues?
18   A.  Yes.
19   Q.  The next name on the list is Eric
20 Lenkowitz, associate metro editor. Was
21 Mr. Lenkowitz associate metro editor in
22 2009?
23   A.  I can't say for the full year,
24 but during 2009, yes.
25   Q.  Is Mr. Lenkowitz black?

Page 76

1    Gotthelf - CONFIDENTIAL
2    A.  No.
3    Q.  And I'm not sure if I asked you
4  this. Mr. Haberman, is he black?
5    A.  No, he is white.
6    Q.  And what race is Mr. Lenkowitz?
7    MR. LERNER:  Objection.
8    A.  He is white.
9    Q.  And is he still in that position,
10 Mr. Lenkowitz?
11   A.  Yes.
12   Q.  The next name is Neil Sloane,
13 associate metro editor. Was he associate
14 metro editor in 2009?
15   A.  Yes.
16   Q.  Is he black?
17   A.  No, he is white.
18   Q.  And is he still in that position?
19   A.  Yes.
20   Q.  The next name is Michael
21 Hechtman, associate metropolitan editor.
22 Is he black?
23   A.  He is white.
24   Q.  And is he still in that position?
25   A.  He is.

Page 77

1    Gotthelf - CONFIDENTIAL
2    Q.  Did you testify the last black
3  employee in the metro section as far as you
4  know was in 2001?
5    A.  Rephrase the question.
6    Q.  Let me just ask this. When was
7  the last time you understand that there was
8  a black editor at the metro desk?
9    A.  When was the last time?
10   Q.  Right.
11   A.  It was either 2000 or 2001.
12   Q.  And who was that?
13   A.  Lisa Baird.
14   Q.  And how did Lisa Baird end up
15 leaving --
16   MR. LERNER:  Objection.
17   Q.  -- the Post.
18   A.  I don't have direct knowledge.
19   Q.  What's your understanding?
20   MR. LERNER:  Objection.
21   A.  That she was terminated.
22   Q.  Do you know who terminated her?
23   A.  I have no direct knowledge.
24   Q.  Did you work for the Post in
25 2001?

Confidential Attorneys' Eyes Only

Page 142

Gotthelf - CONFIDENTIAL
1 editorial positions from internal
2 candidates?
3 MR. LERNER: Objection.
4 A. I'm sorry, repeat that again?
5 Q. Does the Post have a policy of
6 trying to promote editorial and columnists
7 from within its organization?
8 A. I know of no policy.
9 Q. Was Doug Montero a columnist at
10 the Post?
11 A. Yes.
12 Q. Was his column ever taken away
13 from him?
14 MR. LERNER: Objection.
15 A. Yes.
16 Q. Do you know why?
17 A. I just know it would be
18 embarrassing for Mr. Montero.
19 Q. Okay, well, why was it taken
20 away?
21 A. I don't know beyond that.
22 Q. Okay. Did Mr. Green ever
23 approach you and suggest that he write a
24 column addressing the chimpanzee cartoon

Page 143

Gotthelf - CONFIDENTIAL
1 that appeared in the paper?
2 A. Yes.
3 Q. And when I say chimpanzee
4 cartoon, you understand I'm talking about
5 with the three bullet holes and the two
6 cops?
7 MR. LERNER: Objection.
8 A. I do, yes.
9 Q. So did Mr. Green ever approach
10 you asking about that, about writing a
11 column in response to the cartoon?
12 A. Yes, he sent me an e-mail.
13 Q. And what did he want to do? What
14 did Mr. Green want to do?
15 A. From my interpretation of the
16 e-mail, was to mend fences by the column.
17 Q. And what was your response?
18 A. I thought he was brave to inject
19 himself in that controversy and I told him
20 I would send the idea to Col Allan.
21 Q. And did you?
22 A. Yes.
23 Q. And what did Col Allan say?
24 A. He said thank you, but no.

Page 144

Gotthelf - CONFIDENTIAL
1 Q. That's all he said?
2 A. That's the gist of it. I don't
3 recall exactly. It was pleasant, thank
4 you, but no.
5 Q. Do you know if anyone from
6 Governor Patterson's office ever offered to
7 give Mr. Green an interview regarding the
8 cartoon?
9 A. I don't know.
10 Q. Did Mr. Green ever tell you that?
11 A. No, he did not.
12 Q. Do you have any basis for
13 thinking that there was no such offer?
14 MR. LERNER: Objection.
15 A. No basis. I had a political
16 editor he could have spoken to. I wasn't
17 approached.
18 Q. How many of the editors at the
19 paper as a whole, the New York Post, are
20 black?
21 MR. LERNER: Objection.
22 A. How many of the editors?
23 Q. How many editors at the Post are
24 black as far as you know?

Page 145

Gotthelf - CONFIDENTIAL
1 MR. LERNER: Objection.
2 A. I don't know all of the editors
3 at the New York Post.
4 Q. How many editors approximately
5 are there at the New York Post?
6 MR. LERNER: Objection.
7 A. I have no idea how many editors
8 approximately there are at the New York
9 Post.
10 Q. Okay. Can you name any black
11 editors at the New York Post?
12 MR. LERNER: Objection.
13 A. Robert George, editorial page,
14 assistant editor. Currently?
15 Q. Yes.
16 A. Outside of my section, I don't
17 know of many people at the New York Post.
18 Q. Other than Robert George, are
19 there any others you can name that worked
20 there during the time when Mr. Fenner
21 worked for the paper?
22 A. Yes.
23 Q. Who were they?
24 A. A good friend of mine, Jay

Page 158

Gotthelf - CONFIDENTIAL

Q. Can you tell me what you mean by that?

A. She is -- her copy is clean. She is a clean writer, but she doesn't understand the New York Post writing style. She has -- repeatedly told her she needs the flair, and she also doesn't discern the news line very easily in a news story before she turns the story in, she just writes it almost in a chronology instead of finding the news line in the story.

Q. Anything else?

A. She also doesn't fill in the holes. She's left out key details in a story, in stories which Mr. Fenner also did. I just happened to be thinking about that. But overall that's what I can think now.

Q. If someone does not develop a news line, didn't you have a number of reporters you had that criticism about?

A. Where it's chronic and a detriment, no. Needing help on one story is one thing, or two stories. Chronically,

Page 159

Gotthelf - CONFIDENTIAL

which then takes up time, which then makes the story late, which then makes the newspaper late, which then results in us not having sales, it's -- no, not chronically.

Q. Do you think Ms. Livingston is a good reporter as opposed to a good writer?

A. I think Ms. Livingston could be a good reporter.

Q. What do you mean by that?

A. I think she is heading in that direction.

Q. Do you believe she's been improving?

A. Yes.

Q. How so?

A. She is thinking about -- thinking more on her feet while she's at news assignments.

Q. Is there anything else that Ms. Livingston does well in terms of being a reporter?

A. She's -- in terms of being a reporter, she does -- she -- how can I put

Page 160

Gotthelf - CONFIDENTIAL

it, if she's covering something like a trial or something, she will get very good notes. She's a very good note-taker. We've seen that in her.

Q. Anything else that you can point that, good qualities of Ms. Livingston?

A. I think she's also very disarming.

Q. What do you mean by that?

A. She can get people in the field to talk to her.

Q. So she's a good interviewer?

A. She's a good interviewer. In general she's a good interviewer.

Q. Is that an important part of being a reporter?

A. Everything is very important, but yes, I see that she's getting better at that.

Q. What about Austin Fenner, anything that you can point to that you think are his good qualities as a reporter?

A. Mr. Fenner, he's pleasant, he's also disarming, very nice, he -- if he was

Page 161

Gotthelf - CONFIDENTIAL

given an assignment that was very specific, he, you know, he would on occasion nail it.

Q. Can you give me an example of an assignment that he nailed?

A. Yes, I can. We sent him to, before Cardinal Dolan was Cardinal Dolan, when he was bishop, we sent him to interview Mr. Dolan -- well, Reverend Dolan -- then Reverend Dolan, and he got the interview.

Q. Was that a big story in the New York area?

A. It was a good get.

Q. Was that an exclusive?

A. I believe so.

(Gotthelf Exhibit 3, NPY-FL 831-832, marked for identification.)

Q. Would you take a moment and look at this, please. And for the record this is Bates stamped 831 and 832. Have you seen this document before?

A. I believe I have.

Q. Did Ms. Kelly show you this document when it was prepared?

Confidential Attorneys' Eyes Only

Page 162

1    Gotthelf - CONFIDENTIAL
2       A.  No, because there was a number of
3    issues with it.  Yes, I did not see this
4    document when it was prepared.
5       Q.  Do you remember when you saw the
6    document?
7       A.  I believe it may have been part
8    of the disclosures paperwork.  Discovery.
9       Q.  Are you saying your attorney
10   showed it to you?  Because I don't want to
11   know about anything you told your attorney.
12      A.  No, I --
13      Q.  I just don't know what you mean
14   by it's part of discovery.
15         MR. LERNER:  Don't guess.  If
16      you remember, you remember.
17      A.  I don't remember.
18      Q.  But you remember seeing it
19   before?
20      A.  No, I actually don't.  I remember
21   seeing something to this effect, but I
22   don't know if this is --
23      Q.  Fair enough.
24      A.  So I don't remember this
25   document.

Page 163

1    Gotthelf - CONFIDENTIAL
2       Q.  Okay.  I want to call your
3    attention to a couple of things.  If you
4    look at the second paragraph, it says in
5    2008 APA she was below standards.  Just so
6    we're all clear, what is an APA?
7       A.  It's an appraisal of a reporter
8    or editor's work for a fiscal year.
9       Q.  And it says the Sean Bell story
10   was one of the primary examples.  Do you
11   see that?
12      A.  Yes.
13      Q.  Do you remember telling Ms. Jehn
14   and/or Ms. Kelly that the Sean Bell story
15   was one of the primary examples why
16   Ms. Livingston was below standards?
17      A.  I remember saying it was one of
18   the examples.
19      Q.  What was the Sean Bell story?
20      A.  Sean Bell and his friends were
21   outside of a bar and he was shot and killed
22   by police.
23      Q.  Was it an important story?
24      A.  It was.
25      Q.  Was it a front page story?

Page 164

1    Gotthelf - CONFIDENTIAL
2       A.  Yes, it was.
3       Q.  How many front pages would you
4    say it encompassed, the story as a whole?
5       A.  As a whole, I don't recall.
6       Q.  Was it multiple?
7       A.  Yes.
8       Q.  And did Ms. Livingston's byline
9    appear on the stories?
10      A.  Yes, on the stories pertaining to
11   the court aspect of it.
12      Q.  Right, the Sean Bell stories?
13      A.  Yes.
14      Q.  Would it be fair to say that she
15   played an important role in the story?
16      A.  Yes.
17      Q.  And then it goes on to say she
18   was told by Michelle that she was being
19   moved off the Queens court because she was
20   not performing the job and this was
21   mentioned in her APA too.  Do you remember
22   telling Ms. Kelly or Ms. Jehn that?
23      A.  Yes, that she was
24   underperforming, yes.
25      Q.  So that's a true statement?

Page 165

1    Gotthelf - CONFIDENTIAL
2       A.  That she was underperforming in a
3    Queens courthouse.  And these are not my
4    direct words.
5       Q.  I know, that's what I'm asking,
6    that's what I mean, because you didn't
7    write this obviously.
8       A.  I didn't write this, I didn't --
9       Q.  Right.  So what I'm asking is
10   just initially, is this an accurate
11   description of what you described at this
12   meeting with Mr. -- with Ms. Kelly and
13   Ms. Jehn?
14      A.  That she was not -- she was
15   underperforming in Queens court, yes.
16      Q.  When was the meeting with
17   Ms. Livingston that was described in this
18   memo?
19      A.  The meeting when I reassigned her
20   from Queens to --
21      Q.  Right.
22      A.  Approximately November of 2008.
23      Q.  Was anyone else at the meeting
24   with -- again we're talking about the
25   meeting with Ms. Livingston.  Was anyone

Confidential Attorneys' Eyes Only

| Page 174 | Page 175 |
|---|---|
| Gotthelf - CONFIDENTIAL<br><br>REDACTED | Gotthelf - CONFIDENTIAL<br><br>REDACTED |
| **Page 176** | **Page 177** |
| Gotthelf - CONFIDENTIAL<br><br>REDACTED | Gotthelf - CONFIDENTIAL<br><br>REDACTED |

Confidential Attorneys' Eyes Only

Page 222

1  Gotthelf - CONFIDENTIAL
2
3
4
5
6           REDACTED
7
8
9
10
11   Q. Was one of your complaints about
12  Ms. Livingston that she was not developing
13  story ideas?
14   A. Yes. Not consistently, but yes.
15      (Gotthelf Exhibit 4, NYP-FL 236,
16      marked for identification.)
17   Q. I'm going to give you an exhibit
18  marked Exhibit 4. For the record this is
19  marked NYP-FL 236.
20   A. Yes.
21   Q. Have you seen this before?
22   A. I recall it.
23   Q. And what is it?
24   A. This is a story pitch by
25  Ms. Livingston to me.

Page 223

1  Gotthelf - CONFIDENTIAL
2   Q. And what's the date on it?
3   A. August 26, 2009.
4   Q. And do you see there it says
5  solid good idea?
6   A. Yes. I wrote that. It was a
7  solid good idea.
8   Q. So was this a solid good idea for
9  a story?
10      MR. LERNER:  Objection.
11   A. It was and it would have been
12  better if she made some phone calls on it
13  before she pitched to me and realized that
14  all the information on it was wrong, but it
15  was a good effort, yes. Part of it was
16  Ms. Livingston was not pitching viable
17  ideas.
18      (Gotthelf Exhibit 5, NYP-FL 235,
19      marked for identification.)
20   Q. I'm going to mark the next
21  exhibit Gotthelf 5. Have you seen this
22  before?
23   A. Yes, I recall this e-mail.
24   Q. What is it?
25   A. This is two story ideas from

Page 224

1  Gotthelf - CONFIDENTIAL
2  Ms. Livingston.
3      MR. LERNER:  Take your time and
4      read it if you need to.
5   Q. So what is the date on this
6  e-mail?
7   A. September 1, 2009.
8   Q. And can you just read the body of
9  it for me, I mean just the top where you
10  wrote.
11   A. I love the second story.
12   Q. So this was another example of a
13  story that Ms. Livingston pitched that you
14  loved?
15   A. Yes, I really liked this story.
16   Q. This was a good story?
17   A. This one made the paper and it
18  was very good, yes.
19      (Recess taken: 4:26-4:49 p.m.)
20  FURTHER EXAMINATION BY MR. CLARK:
21      (Gotthelf Exhibit 6, NYP-FL 240,
22      marked for identification.)
23   Q. Ms. Gotthelf, I'm going to hand
24  you what we've marked Gotthelf 6. If you
25  could take a moment to review that, please.

Page 225

1  Gotthelf - CONFIDENTIAL
2   A. Yes.
3   Q. And what is this?
4   A. This is a story pitch from
5  Ms. Livingston. It is a story pitch that
6  she didn't check the newspaper to see if we
7  previously reported it.
8   Q. And what's the date on it?
9   A. It is October 27, 2009.
10   Q. And you write, we did that story
11  when the band was introduced, but thanks
12  for the idea, exclamation point, right?
13   A. Yeah, that was -- I wrote that,
14  yes.
15   Q. In other words so it was a good
16  idea?
17   A. Yeah, it's a good idea if it
18  hadn't been done, if she hadn't, you know,
19  not read the paper all along to realize
20  that this was done in the paper, but it's a
21  good idea.
22   Q. It was such a good idea you
23  actually did a story on it?
24   A. Yes, we did.
25   Q. So your only criticism is that

Confidential Attorneys' Eyes Only

Page 226

Gotthelf - CONFIDENTIAL

she hadn't read the story in the paper?
   A.   That's a huge part of the
process.  Anybody can pitch stories that
have been out in other newspapers.
   Q.   So you think that she saw this in
the newspaper and then decided to go to you
after she read it in the newspaper?
       MR. LERNER:   Objection.  Go
   ahead.
   A.   I'm not saying that at all.  But
I'm saying part of the process of pitching
a news idea is to check the library to see
if it's been done before pitching it to an
editor.
   Q.   And where is the library located?
   A.   On her phone.
   Q.   On her phone?
   A.   930-8735.  I've been in the
library three times in my 11 years at the
New York Post.  You get your library on the
phone.  They have librarians there that are
there to check your stories.
   Q.   So the library at the New York
Post, you expected her to call the library

Page 227

Gotthelf - CONFIDENTIAL

at the Post before running an idea by you?
   A.   Absolutely.  A hundred percent,
yes.
   Q.   Were there other reporters who
pitched ideas to you that had already been
run in the Post?
   A.   Not -- it happens.  It happens.
   Q.   Did you ever tell Ms. Livingston
after she sent you this, make sure that you
check with the library to see if it's been
done before?
   A.   Ms. Livingston has been told that
repeatedly.  I just happened to be nice in
this e-mail.
   Q.   So when you said thanks for the
idea, you didn't really mean that?
   A.   No, I was -- I very much meant
I'm glad you're thinking of ideas.
   Q.   So in other words did you
consider it a positive sign she had come up
for a good?
       (Gotthelf Exhibit 7, NYP-FL 239,
   marked for identification.)
   Q.   I'd like to give you what's

Page 228

Gotthelf - CONFIDENTIAL

marked Gotthelf 7.  Take a minute to look
at that, please.  And I don't know if I put
this on the record.  Gotthelf 5 is NYP-FL
235 and Gotthelf 6 is NYP-FL 240.  And
Gotthelf 7 is NYP-FL 239.
       What is the document I've just
given you, Gotthelf 7?
   A.   This is a story idea that
Ms. Livingston pitched.
   Q.   Okay, and what's the date on
this?
   A.   This is November 12, 2009.
   Q.   Could you just read what you
wrote.
   A.   I likey, Holz pitched that idea
yesterday but failed to follow through on
the transportation aspect of it today.
They're doing it tomorrow but good idea.
   Q.   So this was another good idea for
a story that Ms. Livingston pitched to you,
correct?
   A.   Ms. Livingston currently works
for me.  She does pitch ideas on occasion.
This was a good one.  A lot more of these

Page 229

Gotthelf - CONFIDENTIAL

ideas came in 2009 when she was out of the
courthouse.
   Q.   I'm sorry, say that again?  I
just didn't follow you.  A lot of these
ideas came in 2009 when she was out of the
courthouse?
   A.   When she was -- after she was out
of the courthouse, when she was reassigned
to field reporting.  It just shows how much
a better fit it is for her.
   Q.   I'm going to give you what I'm
marking as Gotthelf 8.
       (Gotthelf Exhibit 8, NYP-FL 238,
   marked for identification.)
       Take a look at that, please.  And
this is Bates stamped NYP-FL 238.
   A.   Yes.  I've read the document.
   Q.   And what is this document?
   A.   This is a story pitch from
Ms. Livingston.
   Q.   And what's the date on it?
   A.   December 7, 2007.
   Q.   Okay.  And could you read what
your comment was?

Page 230

1  Gotthelf - CONFIDENTIAL
2  A. I really like.
3  Q. So was this another good idea for
4  a story that Ms. Livingston pitched to you?
5  A. Yes, on the surface. I don't
6  know where it went, but I said I really
7  liked it and I really liked it.
8  Q. Okay, you don't know if this ever
9  ran though?
10 A. I don't, I'm sorry.
11 Q. That's fine. We'll mark this
12 Gotthelf 9 and give it to you. If you
13 could take a look at that, ma'am.
14    (Gotthelf Exhibit 9, NYP-FL
15    829-830, marked for identification.)
16 A. I've read it.
17 Q. And what is this?
18 A. This is a story we assigned to
19 Ms. Livingston.
20 Q. And it's dated January 12, 2010?
21 A. Yes.
22 Q. Was this a story that you really
23 liked?
24 A. Yeah, sure.
25 Q. So did you assign this to

Page 231

1  Gotthelf - CONFIDENTIAL
2  Ms. Livingston because you thought she
3  would do a good job on a story you really
4  thought was a good story?
5  A. I assigned it -- I don't know,
6  but it could be a situation where the next
7  runner up got the assignment.
8  Q. What do you mean by the next
9  runner up?
10 A. The next person who was available
11 in the field to get an assignment would get
12 an assignment. This does not mean take Kim
13 Livingston because I think she's going to
14 be the person for this job to do this
15 assignment.
16 Q. So this could have just been
17 anybody?
18 A. That could have been fill in the
19 blank name.
20 Q. Do you know that for certain or
21 are you just saying that could be the case?
22 A. I'm willing to go on that for
23 certain, yes.
24 Q. So if the next one up had been a
25 man, for instance, you've have said send a

Page 232

1  Gotthelf - CONFIDENTIAL
2  man out on a story about --
3  A. Sure, I don't discriminate
4  against who I send to assignments.
5  Q. The question isn't really about
6  discrimination. Are there certain
7  reporters who you think are more
8  appropriate for certain assignments?
9  A. You send out a reporter to an
10 assignment.
11 Q. So you would never dispatch a
12 reporter to an assignment based on whether
13 he or she was male or female?
14    MR. LERNER: Objection.
15 A. I might do it in a rape situation
16 where a woman might feel more comfortable
17 talking to a woman, but I can't think of
18 another situation.
19 Q. So you wouldn't think that women
20 with, as this describes it, pear-shaped
21 figures might be more comfortable speaking
22 to a woman than to a man?
23 A. Now, no. No.
24    (Gotthelf Exhibit 10, NYP-FL
25    1902, marked for identification.)

Page 233

1  Gotthelf - CONFIDENTIAL
2  Q. Let me give you what's been
3  marked as Gotthelf 10. And this is Bates
4  stamped NYP-FL 1902. Have you seen this
5  before?
6  A. Yes.
7  Q. And what's the date on this?
8  A. November 27, 2009.
9  Q. And this is an e-mail from you to
10 Ms. Livingston?
11 A. It is.
12 Q. And this says nice exclu today,
13 exclamation point?
14 A. Yes.
15 Q. Does that that mean?
16 A. It means you had a nice exclusive
17 story today.
18 Q. Is that something that is good
19 for a reporter, you want him to have
20 exclusive stories?
21 A. Absolutely. I was very pleased
22 to send this e-mail.
23    (Gotthelf Exhibit 11, NYP-FL
24    714-715, marked for identification.)
25 Q. Gotthelf 11 is Bates stamped 714

Confidential Attorneys' Eyes Only

Page 294

Gotthelf - CONFIDENTIAL
1
2    A.  Yes.
3    Q.  Could you read your e-mail to
4 Jessie dated 4:24 p.m.
5    A.  Yes.  Nichole Bodie is better,
6 but people like Austin, he's apparently
7 very sneaky, plus always good to hire an
8 African-American.
9    Q.  What did you mean apparently he's
10 very sneaky?
11    A.  I was told that Mr. Fenner was a
12 very sneaky reporter which made me very
13 happy.  That is a -- sneaky reporters are
14 great reporters.
15    Q.  And what does sneaky mean in this
16 context?
17    A.  Sneaky means sort of a reporter
18 who breaks away from the pack of other
19 reporters to go their separate way and
20 break a news line.  I can give examples of
21 it.  A person who is online at Rikers to
22 interview someone but has already had it
23 set up with a lawyer to go in but just
24 hangs out with the other reporters to
25 pretend like nothing is going on and then

Page 295

Gotthelf - CONFIDENTIAL
1
2 gets the exclusive interview.  Sneaky is a
3 high compliment.
4    Q.  Was Austin ever sneaky in his
5 employment with the Post?
6    A.  I wish he was a lot sneakier.
7 I'm trying to recall.  I don't recall.
8    Q.  And the final sentence, always
9 good to hire an African-American.  Why did
10 you write that?
11    A.  I was saying Mr. Fenner was well
12 liked, which is a good attribute, he was
13 very sneaky, which is a good attribute, and
14 plus it's, you know, always good to hire an
15 African America for diversity in the
16 newsroom.
17    Q.  So is it fair to say that the
18 vast majority in the newsroom are not
19 African-American?
20    A.  The newsroom is --
21    Q.  I'm sorry, is it fair to say the
22 vast majority of the reporters at the metro
23 desk are not African-American?
24    A.  At the metro desk, I'm sorry, I
25 just --

Page 296

Gotthelf - CONFIDENTIAL
1
2    Q.  The reporters that you manage,
3 the vast majority are white, correct?
4    A.  Yes, the vast majority are white.
5    Q.  And was this that you were aware
6 that you needed more diversity in the
7 newsroom?
8    A.  I'm a huge advocate of diversity.
9 If we have a chance to diversify, that's
10 great.
11    Q.  So you're a huge advocate of
12 diversity but you currently only have three
13 -- or actually how many do you have
14 currently?
15       MR. LERNER:   How many what?
16    Objection.
17    Q.  How many African-American
18 reporters do you have?
19    A.  Well, since I've been metro
20 editor, I've hired two new African-American
21 reporters.
22    Q.  How many do you have now?
23       MR. LERNER:   I don't think she
24    was finished with her answer.
25    A.  Just going back to diversity,

Page 297

Gotthelf - CONFIDENTIAL
1
2 I've hired three Hispanic reporters.  I can
3 -- if you want to give me some time I could
4 count how many I have now.
5    Q.  I'm not asking you about
6 Hispanic.  I just want to know how many
7 African-American reporters do you have that
8 you supervise right now?
9    A.  Just give me one more minute.
10 Full-time?
11    Q.  Yes, full-time.
12    A.  I count four.
13    Q.  So in that e-mail, clearly you
14 were taking Austin's race into account as a
15 criteria for him working for you, right?
16    A.  No, I was laying out his
17 attributes from what I heard that he is
18 likeable, sneaky, and plus since I'm a fan
19 of diversity, he's African-American.
20    Q.  And if you're such a fan of
21 diversity, why are there no black editors
22 on the metro desk?
23       MR. LERNER:   Objection.
24    A.  I take the most qualified
25 applicants and many people on my desk I've

Confidential Attorneys' Eyes Only

Page 298

1      Gotthelf - CONFIDENTIAL
2  inherited.
3      Q.  But there have been openings for
4  editors on the metro desk, have there not?
5      A.  Yes, and I've put applications
6  and I've hired highly qualified people for
7  my desk.
8      Q.  And have you ever tried to hire
9  an African-American for one of those
10 positions?
11     MR. LERNER:  Objection.
12     A.  I don't base anything on race.  I
13 look for the best candidate.
14     Q.  So that's a no?
15     MR. LERNER:  Objection.
16     A.  Sorry, restate the question.
17     Q.  Have you ever tried to hire an
18 African-American for one of the vacant
19 editorial positions?
20     MR. LERNER:  Objection.  What
21 is tried to hire?
22     A.  I don't understand that.  I'm
23 sorry, if you could explain.
24     Q.  Have you ever put forward any
25 African-American candidates for the

Page 299

1      Gotthelf - CONFIDENTIAL
2  positions that have opened up on the
3  editorial or the -- on the editorial staff?
4      MR. LERNER:  Objection.
5      A.  I have tried out an
6  African-American on my city desk.
7      Q.  Who was that?
8      A.  Leonard Green.
9      Q.  When was this?
10     A.  Right before I made my -- I was
11 going to say my most recent hire, but give
12 me a second, I can -- when I had an
13 opening.
14     Q.  And why wasn't he hired
15 full-time?
16     A.  Mr. Green didn't want the job and
17 wanted to continue writing.
18     Q.  Mr. Green turned it down?
19     A.  Mr. Green tried out on the desk
20 for several days and when I asked him if he
21 liked it, he said he wanted to continue
22 writing.
23     Q.  Are you familiar with the travel
24 patterns of your various employees?
25     MR. LERNER:  Objection.

Page 300

1      Gotthelf - CONFIDENTIAL
2      A.  I don't understand familiar with
3  travel patterns.
4      Q.  Well, you dispatch your reporters
5  to stories, correct?
6      A.  Me and my associate metro
7  editors.
8      Q.  So if someone goes out of town on
9  a story, would you know about that, right?
10     MR. LERNER:  Objection.
11     A.  Oftentimes.
12     Q.  Can you name any reporter who was
13 dispatched on out of town stories more
14 frequently than Austin Fenner during the
15 two years that he was employed there?
16     A.  Yes.
17     Q.  Who are they?
18     A.  Lorena Mangeli and Rebecca
19 Rosenberg.
20     Q.  And how often were Lorena and
21 Rebecca sent out of town?
22     A.  I don't know.
23     Q.  So how do you know that they were
24 sent out of town more often than Austin?
25     A.  Because I looked at my travel

Page 301

1      Gotthelf - CONFIDENTIAL
2  assignments to determine who was sent out
3  the most and Mr. Fenner during his time
4  period was not.
5      Q.  You looked at travel assignments,
6  you have a record of all the assignments
7  that people were sent out of town?
8      A.  Yes.  We paid for these
9  assignments.
10     Q.  Okay.  Do you know if that --
11 those documents have been produced in this
12 case?
13     MR. LERNER:  Objection.
14     A.  I don't know.
15     (Gotthelf Exhibit 20, NYP-FL
16 797-798, marked for identification.)
17     Q.  I'd like to give you a document
18 marked Gotthelf 20.  Take a look at that,
19 please.  This is an e-mail from you on
20 November 9, 2009, is that correct?
21     A.  Yes.
22     Q.  And for the record, this is Bates
23 stamped NYP-FL 797.  Could you read what it
24 says there on the text?
25     A.  Yes.  Make sure you have

Page 306

Gotthelf - CONFIDENTIAL

1  MR. LERNER: Objection.
2  A. Useless on one day for an
3  assignment and worthless overall, yes.
4  MR. LERNER: The question was
5  are useless and worthless synonyms.
6  THE WITNESS: Oh, I'm sorry.
7  MR. LERNER: She's got a
8  clarification.
9  MR. CLARK: Okay, go ahead.
10 THE WITNESS: Are useless and
11 worthless synonyms, no.
12 MR. LERNER: I've got something
13 for the record. Paul, can you
14 communicate with co-counsel after
15 Ms. Gotthelf completes her question?
16 Because it's distracting, especially
17 when you turn away and she's still
18 talking because she doesn't really
19 know if she should keep it talking, if
20 you're stopped listening, or if she
21 should stop and wait until you are
22 listening again. So it is distracting
23 to the witness for you to do that. So
24 I'd just ask you to kind of try to

Page 307

Gotthelf - CONFIDENTIAL

1  keep your attention on the witness and
2  not discuss things.
3  MR. THOMPSON: And this is Ken
4  Thompson on the record. Virtually
5  every deposition that Mark Lerner has
6  taken in this case, he and his counsel
7  have engaged in multiple conversations
8  during the middle of questions
9  pending, have passed notes, have
10 caused quite a spectacle at many
11 depositions. That is a fact.
12 MR. LERNER: Well, it's not a
13 fact. But it's also --
14 MR. CLARK: We don't have to
15 argue about it.
16 MR. LERNER: It's not an
17 indictment of your side's conduct
18 during the deposition. I'm merely
19 observing that on a number of
20 occasions the witness has been
21 distracted by communications between
22 counsel. I understand why you're
23 communicating and I don't have any
24 problem with it. I'm just pointing

Page 308

Gotthelf - CONFIDENTIAL

1  out that in these instances the
2  witness has been distracted.
3  (Gotthelf Exhibit 22, NYP-FL
4  1932, marked for identification.)
5  Q. Ms. Gotthelf, I'm going to hand
6  you what I've marked Gotthelf 22, and ask
7  you to take a look at that.
8  Ms. Gotthelf, actually before you
9  take a look at that, when you referred in
10 your last answer, did you call
11 Ms. Livingston useless in general or just
12 on a specific occasion?
13 A. Oh, on a specific occasion.
14 Q. So on at least one specific
15 occasion you referred to her as useless?
16 A. I did, because she was useless to
17 me on a specific occasion.
18 Q. Did you say that she was useless
19 on just one occasion?
20 A. That I recall.
21 Q. Okay. Could you take a look at
22 the --
23 A. Sure.
24 MR. CLARK: Mr. Lerner, you've

Page 309

Gotthelf - CONFIDENTIAL

1  just complained about us and now
2  you're making a commotion. Please,
3  we've got about 30 minutes left. Can
4  we just try and get through this
5  without a lot of commotion please.
6  MR. LERNER: Let's go forward.
7  Q. So this is for the record NYP-FL
8  1932, and this is an e-mail from you to
9  Jesse Angelo dated January 5, 2006,
10 correct?
11 A. Yes.
12 Q. Can you read that text of the
13 e-mail that you wrote?
14 A. Yes. Kim, thanks so much for
15 coming up with the story. That was
16 literally printed in four magazines and our
17 Pulse section. Good looking out yo.
18 Q. So you were making fun of Kim,
19 correct?
20 MR. LERNER: Objection.
21 A. I was not making fun of Kim, I
22 was making fun of Kim's story pitch, which
23 appeared in our paper and in other
24 magazines.

Page 310

Gotthelf - CONFIDENTIAL
2  Q. So when you said that it was
3  literally printed in four magazines, I
4  mean, you're being ironic there, right?
5     MR. LERNER:  Objection.
6  Q. In other words you're not
7  literally saying yeah, thanks so much, your
8  story was literally printed in four
9  magazines, right? That's what you meant?
10    MR. LERNER:  Objection.
11 A. I don't recall specifically, but
12 I do know that this appeared in multiple
13 magazines at the time, and it probably had
14 a snarky tone to it.
15 Q. And then you say good looking out
16 yo.
17 A. Yes.
18 Q. Is that a misprint or did you
19 actually put Y-O exclamation point?
20 A. No, I put that, yes.
21 Q. Were you making fun of
22 Ms. Livingston because you think that's the
23 way black people speak?
24    MR. LERNER:  Objection.
25 A. Absolutely not.

Page 311

Gotthelf - CONFIDENTIAL
2  Q. Well, what did you mean by that,
3  good looking out yo?
4  A. I use that phrase continuously to
5  mean, to be on top of it. Absolutely not.
6  Q. You use the phrase yo regularly?
7     MR. LERNER:  Objection.
8  A. Regularly.
9  Q. How many times a day do you use
10 the phrase yo?
11 A. I can't put a number on it. I
12 call my metro editors yo.
13 Q. You call your metro editors yo?
14 A. I do. Hey yo.
15 Q. Where does that phrase come from,
16 good looking out, yo?
17 A. One of my girlfriends was using
18 it at the time.
19 Q. What girlfriend?
20 A. I have a girlfriend, just a
21 friend.
22 Q. Is she black or white?
23 A. She's white.
24 Q. Isn't this sort of black slang?
25    MR. LERNER:  Objection.

Page 312

Gotthelf - CONFIDENTIAL
2  A. I have no idea what it is.
3  It's --
4  Q. What's the name of this white
5  girlfriend that you got this from?
6  A. Lauren Klein Dunkel.
7  Q. What's the last name?
8  A. Dunkel, D-U-N-K-E-L.
9     (Recess taken: 6:50-6:57 p.m.)
10 FURTHER EXAMINATION BY MR. CLARK:
11 Q. I'd like to ask you about the
12 cartoon that was published in February,
13 2009 showing a chimpanzee who was shot.
14 Do you know the cartoon I'm referring to?
15 A. Yes, I do.
16 Q. What is your opinion about the
17 cartoon, personal opinion?
18    MR. LERNER:  Objection.
19 A. It's -- it was offensive.
20 Q. How so?
21 A. I understand its intent, but it
22 just didn't look good.
23 Q. Okay. Well, what do you
24 understand the intent to have been?
25 A. That the white police officers

Page 313

Gotthelf - CONFIDENTIAL
2  were firing at a monkey that was
3  representing Congress.
4  Q. Why do you think that it was
5  meant to represent Congress?
6  A. Because after it was published
7  the top editor said it was meant to
8  represent Congress.
9  Q. And you just believed them
10 because they said it?
11    MR. LERNER:  Objection.
12 A. I don't believe they meant it to
13 alienate our readership.
14 Q. Why do you say it was offensive?
15 A. Offensive?
16 Q. Yes.
17 A. It just didn't sit well with me.
18 Q. Why is it offensive?
19 A. Because you have four white
20 police officers firing at anything, I find
21 offensive just on that basis.
22 Q. Is it offensive because it could
23 be interpreted to represent that the
24 chimpanzee represented a black person?
25 A. It could be seen that way.


**Page 318**

Gotthelf - CONFIDENTIAL
1. Q. Did she actually cry?
2. A. This is over the phone.
3. Q. Her voice was cracking?
4. A. Her voice was cracking.
5. Q. Did you say anything else to Ms. Livingston?
6. A. I don't recall.
7. Q. Do you recall if you may have apologized to Ms. Livingston?
8. A. I didn't apologize to her, but I said I felt sorry for how she was feeling. I also told her I found it offensive.
9. Q. Okay. Why were you sorry for how she was feeling?
10. A. I was sorry for how everybody was feeling that day. It was a very stressful day.
11. Q. I mean, were you sorry because you felt that she as an African-American had to see this cartoon?
12. A. I was sorry for anybody who felt offended by it.
13. Q. Did you talk to anyone else at the Post about Ms. Livingston's

**Page 319**

Gotthelf - CONFIDENTIAL
conversation with you and how offended she was?
    A. No, I did not.
    Q. You didn't feel any reason to explain that you had an employee who was highly offended by this?
    A. I had plenty of employees who were highly offended by it.
    Q. You also mentioned Dan Mangan. He complained?
    MR. LERNER: Can we go off the record.
    MR. CLARK: Let's go off the record for a second.
    (Recess taken: 7:04-7:10 p.m.)
FURTHER EXAMINATION BY MR. LERNER:
    Q. Ms. Gotthelf, where were you exactly when Ms. Livingston called you to complain about the cartoon?
    A. I was at my desk.
    Q. Did she call you on your normal office phone?
    A. Yes.
    Q. And do you know what phone

**Page 320**

Gotthelf - CONFIDENTIAL
Ms. Livingston was on?
    A. I don't.
    Q. Was Ms. Livingston working that day?
    A. Yes, she was.
    Q. So did she call you from the assignment?
    A. I don't know.
    Q. When she called you, did she call you just to talk to you about the cartoon or was this in the context of a larger conversation?
    MR. LERNER: Objection.
    A. She left me a message about the cartoon and I called her back.
    Q. I see, okay. What did she say in the initial message that she left?
    A. That she wanted to talk to me about the cartoon.
    Q. Was that all she said?
    A. It was a quick message, yes.
    Q. So you called her back, and what, did you call her back on her cell phone or what phone did you call her back on?

**Page 321**

Gotthelf - CONFIDENTIAL
    A. I'm sorry, say that again.
    Q. What phone did you call her back on? You said you called her back, right?
    A. Yes, I did.
    Q. Okay, so in other words did you call her at home, did you call her on her cell phone?
    A. I don't recall.
    Q. And what time of day was this that the conversation took place?
    A. It was on the day the cartoon printed, either morning or mid-day.
    Q. And can you tell me as precisely as possible exactly how long the conversation lasted?
    A. It was short.
    Q. Meaning five minutes?
    A. Less than five minutes.
    Q. A minute?
    A. It was -- could have been a minute or two minutes.
    Q. All right. Did Ms. Livingston complain that this cartoon was racist?
    MR. LERNER: Objection.

Confidential Attorneys' Eyes Only

Page 338

1  Gotthelf - CONFIDENTIAL
2      MR. LERNER:  You've answered it
3  five times already, so go ahead and
4  answer it again.
5      A.  I don't know.
6      (Gotthelf Exhibit 23, NYP-FL
7  34-44, marked for identification.)
8      Q.  Okay, I'd like to show you what's
9  marked Gotthelf 23.  Just take a quick look
10 at that.  I'm not going to go through it in
11 detail.  I basically just want to ask you
12 if you've ever seen this before.
13     A.  I have never seen this before.
14     Q.  Okay, do you know what
15 journalisms is?
16     A.  I do not.
17     Q.  Have you ever heard of
18 journalisms?
19     A.  I have never heard of
20 journalisms.
21     Q.  Have you ever heard of this
22 article Three Things That Need Fixing in
23 the New York Post?
24     A.  I never heard of it before
25 Mr. Fenner filed his complaint.

Page 339

1  Gotthelf - CONFIDENTIAL
2      MR. LERNER:  Can we just take a
3  minute, because we have different
4  things.  All right.  I received
5  something different.
6      Q.  So you just said a minute ago you
7  had never seen this article before the
8  lawsuit was filed, is that correct?
9      A.  Yes, that is absolutely correct.
10     Q.  Do you recall anyone discussing
11 this article before the lawsuit was filed?
12     A.  I do not -- well, absolutely not.
13 No-one discussed it in front of me.
14
15
16
17
18          REDACTED
19
20
21
22
23
24
25

Page 340

1  Gotthelf - CONFIDENTIAL
2
3
4
5
6
7
8
9
10
11
12         REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 341

1  Gotthelf - CONFIDENTIAL
2
3
4
5
6
7
8
9
10
11
12
13         REDACTED
14
15
16
17
18
19
20
21
22
23
24
25

TSC Reporting - Worldwide    (877) 702-9580