# Exhibit 9

Contains Confidential Portions

Page 1

1                     JESSE ANGELO
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ---------------------------------------X
     SANDRA GUZMAN,
4                     Plaintiff,
5                     -against-    09CIV9323 (BSJ)(RLE)
6    NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
     THE NEW YORK POST, and COL ALLAN, in his
7    official and individual capacities,
8
                      Defendants.
9    ---------------------------------------X
     AUSTIN FENNER and IKIMULISA LIVINGSTON,
10
11                    Plaintiffs,
12                    -against-    09CIV9832 (BSJ)(RLE)
13   NEWS CORPORATION, NYP HOLDINGS, INC., d/b/a
     THE NEW YORK POST and DAN GREENFIELD and
14   MICHELLE GOTTHELF,
15                    Defendants.
     ---------------------------------------X
16
17
18        VIDEOTAPED DEPOSITION OF JESSE ANGELO
19             New York, New York
20           Wednesday, April 25, 2012
21
22   REPORTED BY:  BARBARA R. ZELTMAN
                   (BOBBIE)
23             Professional Stenographic Reporter
24
25   Job Number:  48821

Contains Confidential Portions

Page 14

JESSE ANGELO

1
2  Lincoln was going to call up more troops for
3  the Civil War.  In fact, he wasn't.  It was
4  used by gold speculators to manipulate the
5  gold market.
6      Q    So why did President Lincoln shut
7  down the newspapers?
8      MR. LERNER: Objection.
9      A    These two newspapers printed the
10 fake dispatch, and it was actually the
11 Secretary of War Stanton who ordered that
12 the newspapers be shuttered.
13     Q    Where were the newspapers located?
14     A    In New York City.
15     Q    Were these the only newspapers that
16 were closed down because of this bogus
17 dispatch?
18     MR. LERNER: Objection.
19     A    Yes.
20     Q    Would you consider yourself having
21 written about the Civil War period to be
22 knowledgeable about that period of American
23 history?
24     MR. LERNER: Objection.
25     A    I have some knowledge of it.

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 15

JESSE ANGELO

1
2      Q    Okay.
3          Would you say it's more than the
4  average person?
5      MR. LERNER: Objection.
6      A    I can't say.
7      Q    Would it be fair to say that you
8  are familiar with Civil War history period
9  in the United States?
10     MR. LERNER: Objection.
11     A    I have some familiarity with it.
12     Q    Well, I mean, you wrote your senior
13 thesis about it, right?
14     A    Yes.
15     Q    Is the fact that these two
16 newspapers were closed down by Secretary
17 Stanton common knowledge, say, in the
18 newsroom?
19     MR. LERNER: Objection.
20     A    I'm sorry.  In what newsroom are
21 you referring to?
22     Q    In the newsroom at The New York
23 Post.
24     MR. LERNER: Do you understand
25 the question?

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 16

JESSE ANGELO

1
2      A    No, I don't.  I would like to hear
3  the entire question, please.
4      Q    Would you say that it's common
5  knowledge in the newsroom at The New York
6  Post that Secretary Stanton closed down two
7  newspapers in New York for publishing a
8  bogus proclamation about the war?
9      MR. LERNER: Objection.
10     A    No.
11     Q    So wouldn't it be fair to say that
12 you have specialized knowledge about the
13 Civil War period?
14     MR. LERNER: Objection.
15     Q    That most people in the newsroom
16 don't have.
17     A    I can't speak to the knowledge or
18 reading of other people in the newsroom
19 regarding the Civil War period.  I have no
20 idea.
21     Q    Are you familiar with depictions of
22 blacks in the Civil War period as subhuman?
23     MR. LERNER: Objection.
24     A    Yes.
25     Q    What do you know about those

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 17

JESSE ANGELO

1
2  depictions of blacks in the Civil War period
3  as subhuman?
4      A    Can you be more specific.
5      Q    Tell me what you know about it.
6          What kinds of depictions are you
7  familiar with in the Civil War period
8  depicting blacks as subhuman?
9      MR. LERNER: Object to form.
10     A    Again, there have been many
11 depictions of blacks throughout American
12 history in many different ways, so I don't
13 know what you are referring to.
14     Q    There are many depictions of blacks
15 in American history as subhuman?
16     A    I can't speak to the entirety of
17 how African-Americans have been depicted in
18 American history.
19     Q    Well, I'm just trying to follow up.
20         You said that the demeaning
21 depictions of blacks in many different ways.
22         Is one of the ways that blacks have
23 been depicted historically as subhuman?
24     MR. LERNER: Objection.
25     A    Unfortunately, yes.

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 18

JESSE ANGELO

1
2       Q    Are you familiar with instances of
3    blacks being depicted subhuman,
4    specifically, as apes or monkeys?
5            MR. LERNER: Objection.
6       A    Yes.
7       Q    Do you recall any specific
8    historical cartoons where blacks were
9    depicted as apes or monkeys?
10      A    No.
11      Q    But you are aware that this has
12   historically been something that's occurred,
13   correct?
14      A    Yes.
15      Q    And is your knowledge of this
16   something you recently acquired or does it
17   go back to your study of history?
18           MR. LERNER: Object to form.
19      A    I can't say when I acquired this
20   knowledge.
21           It's something that I'm aware of.
22      Q    Did you know about the depiction of
23   blacks as subhuman animals such as apes and
24   monkeys in 2008?
25           MR. LERNER: Objection.

TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 19

JESSE ANGELO

1
2       A    Again, I'm aware of that historical
3    fact.
4       Q    But you can't say when you became
5    aware of it?
6       A    Correct.
7       Q    Were you aware of this historical
8    fact when a cartoon was published in I
9    believe -- actually let me check the date --
10   I believe it was February 2009.
11           MR. LERNER: Wait for the
12   question to be completed.
13      Q    Were you aware of this historical
14   fact in February of 2009?
15      A    Yes.
16      Q    You were. Okay.
17           Now, you also studied literature at
18   Harvard?
19      A    Yes.
20      Q    But you said that was one program,
21   literature and history?
22      A    Correct.
23      Q    Did you take specific courses on
24   literature?
25      A    Yes.

TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 20

JESSE ANGELO

1
2       Q    Do you know what deconstructionism
3    is?
4       A    Yes.
5       Q    What is deconstructionism?
6       A    It's a very long time since I
7    thought about that term. I don't really
8    want to give a definition that would be
9    inaccurate.
10      Q    Is deconstructionism basically the
11   idea that all meaning is inherently
12   subjective?
13           MR. LERNER: Objection.
14      A    I don't wish to agree or disagree
15   with your characterization of a very broad
16   movement in sort of the intellectual
17   history. I don't feel qualified to do that.
18      Q    What's your understanding of
19   deconstructionism?
20           MR. LERNER: Objection. Asked
21   and answered.
22      A    My understanding of
23   deconstructionism is that texts can be
24   broken down to their constituent parts to
25   extract meaning from them.

TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 21

JESSE ANGELO

1
2       Q    Had Michelle Gotthelf ever told you
3    that she believes that all meaning is
4    subjective?
5            MR. LERNER: Objection.
6       A    Not that I recall.
7       Q    Do you recall having any
8    conversation with Michelle Gotthelf about
9    the meaning of texts?
10           MR. LERNER: Objection.
11      A    Not that I recall.
12      Q    Do you believe that the meaning of
13   texts is inherently subjective, or do you
14   believe there's objective meaning to texts?
15           MR. LERNER: Objection.
16      A    Can you repeat question.
17      Q    Do you believe that all meaning of
18   a text is subjective, or do you believe that
19   there is objective meaning to a given text?
20           MR. LERNER: Objection.
21           If you understand the question, you
22   can answer it.
23      A    I believe there can be objective
24   truth to a text.
25      Q    Did you ever have any other

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 58

JESSE ANGELO
1
2  decisions, anything like that.
3      MR. LERNER:  Objection.
4      Q    Is that fair?
5      A    Again, I can recall speaking about
6  advertising.
7      Q    Do you have specific recollections
8  of discussing advertising with Mr. Murdoch?
9      A    Yes.
10     Q    What was said on those specific
11 occasions that you recall where you
12 discussed advertising with Mr. Murdoch?
13     A    I recall speaking with him once
14 about the state of the advertising market
15 overall and the economy after the financial
16 crash in 2009.
17     Q    Have you ever discussed with him
18 advertising for the paper?  When I say "the
19 paper," I mean The New York Post and/or
20 The Daily.
21     MR. LERNER:  Objection.
22     A    Yes.
23     Q    What types of discussions did you
24 have regarding advertising for the paper
25 with Mr. Murdoch?

TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 59

JESSE ANGELO
1
2      MR. LERNER:  Objection.
3      A    I'm sorry.  Can you repeat the
4  question.
5      MR. CLARK:  Could you read it
6  back, please.
7      (Requested portion of record read:
8      "Q. What types of discussions did
9  you have regarding advertising for the
10 paper with Mr. Murdoch?")
11     (End of read-back.)
12     A    I remember telling him about a BMW
13 ad that ran in The Daily, because it was a
14 good ad.  It was an innovative ad.
15     Q    So you discussed specific
16 advertisements with Mr. Murdoch?
17     MR. LERNER:  Objection.
18     A    I just told you of a conversation
19 that I had with him about a BMW
20 advertisement that appeared in The Daily.
21     Q    So yes, you have discussed with
22 Mr. Murdoch specific advertisements?
23     MR. LERNER:  Objection.
24     A    I just told you of a situation,
25 yes.

TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 60

JESSE ANGELO
1
2      Q    Have you ever sought guidance from
3  Mr. Murdoch about what types of
4  advertisements you should look for for the
5  paper?
6      A    No.
7      Q    Have you ever sought guidance from
8  Mr. Murdoch on what types of stories should
9  be run in the paper?
10     A    No.
11     Q    Has he ever given you any guidance
12 whatsoever on what types of stories should
13 be run in the paper?
14     MR. LERNER:  Objection.
15     A    Not that I recall.
16     Q    Prior to summer 2010, do you
17 remember the next most recent time that you
18 spoke with Mr. Murdoch in The New York Post
19 newsroom?
20     A    No.  I don't recall.
21     Q    Have most of your discussions with
22 Mr. Murdoch been in The Daily newsroom, or
23 in The Post newsroom?
24     MR. LERNER:  Objection.
25     A    Can you repeat the question.

TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 61

JESSE ANGELO
1
2      Q    Have most of your discussions with
3  Mr. Murdoch when you've spoken with him
4  face-to-face been in The New York Post
5  newsroom, or the in daily newsroom?
6      MR. LERNER:  Objection.
7      A    I have spoken to him more in
8  The New York Post newsroom than in The Daily
9  newsroom.
10     Q    Is that simply because you worked
11 for a longer period of time in The New York
12 Post newsroom?
13     MR. LERNER:  Objection.
14     A    That's your supposition, not mine.
15     Q    I'm asking you to answer the
16 question.
17     A    I don't know why.  It was more
18 occasions in The New York Post newsroom than
19 in The Daily newsroom.
20     Q    Did you speak with Mr. Murdoch more
21 frequently, in terms of the number of times
22 a year, in The Post newsroom or The Daily
23 newsroom?
24     MR. LERNER:  Objection.
25     A    The Post newsroom.

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 62

```
1            JESSE ANGELO
2     Q    Now, other than physically seeing
3   Mr. Murdoch and speaking to him in the
4   newsroom, how often do you have any other
5   type of communication with Mr. Murdoch?
6         MR. LERNER: Objection.
7     A   Can you repeat the question,
8   please.
9         MR. CLARK: Could you read it
10  back.
11        (Requested portion of record read:
12        "Q. Now, other than physically
13   seeing Mr. Murdoch and speaking to him in
14   the newsroom, how often do you have any
15   other type of communication with
16   Mr. Murdoch?)
17    A   Occasional.
18        MR. LERNER: I'm not sure I
19   understood the question.
20    Q   So how frequent is "occasional"?
21   Once a week?  Once a month?
22    A   It varies.  Could be a few months,
23   could be once a week.  It depends.
24    Q    Let's say in the last six months,
25   how many times in the last six months have
```

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 63

```
1            JESSE ANGELO
2   you had any type of communication with
3   Mr. Murdoch?
4         MR. LERNER: Objection.
5     A   Last six months, say four or five.
6     Q    So you are talking to him, in the
7   last six months at least, approximately once
8   every six weeks or so?
9         MR. LERNER: Objection.
10    A   Again, that's your math, sure.
11    Q    Do you have a specific recollection
12   of the last conversation you had with
13   Mr. Murdoch -- or the last communication you
14   had with Mr. Murdoch?
15        MR. LERNER: Objection.
16    A   The last, yes.
17    Q    When was that?
18    A   Month ago.
19    Q    And what type of communication was
20   it?
21    A   He called me.
22    Q    Why did he call you?
23        MR. LERNER: Objection.
24    A   You'd have to ask him.
25    Q    He didn't tell you why he was
```

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 64

```
1            JESSE ANGELO
2   calling?
3         MR. LERNER: Objection.
4     A   He said, "Hi, how you doing."
5     Q    What else did he say?
6     A   I don't recall the specifics of the
7   conversation.
8     Q    What did you talk about in general?
9     A   He called to ask how things were
10   going.  Just very general catch-up
11   conversation.
12    Q    How things were going with what?
13    A   The Daily.
14    Q    And what did you tell him?
15    A   Again, I don't really recall the
16   specifics of the conversation.
17        MR. LERNER: Paul, does this
18   have anything to do with this case?
19        MR. CLARK: It has to do with
20   Mr. Murdoch's role in managing the
21   newspapers.
22        MR. LERNER: Okay.  But your
23   questions are not tailored.
24        First of all, The Daily has nothing
25   to do with Sandra Guzman versus The New
```

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 65

```
1            JESSE ANGELO
2   York Post, NewsCorp or Fenner and
3   Ikimulisa Livingston versus New York Post
4   and NewsCorp.  The Daily has nothing to
5   do with these cases.
6         And your questions about
7   Mr. Murdoch are not tailored toward his
8   dealings with The Post.
9         You have initiated a broad-range
10   inquiry which has already gotten into a
11   completely different business area which
12   is The Daily.
13        MR. CLARK: That's not clear.
14   Ask the witness that.
15        MR. LERNER: We need to focus
16   the questions on this case.
17        MR. CLARK: Let's ask the
18   witness about that, Mark.
19  BY MR. CLARK:
20    Q    So what is the relationship between
21   The Daily and The New York Post?
22    A   Define "relationship."
23    Q    What does the word "relationship"
24   mean to you?
25    A   Can mean a number of things.  There
```

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 78

JESSE ANGELO

1
2     A    I don't know.
3     Q    What is the policy on sex
4  discrimination at New York Post?
5         MR. LERNER: Objection.
6     A    It's not tolerated.
7     Q    What do you mean by "It's not
8  tolerated"?
9         MR. LERNER: Objection.
10    A    We don't tolerate sexual
11  harassment. That's the policy.
12    Q    What is sexual harassment in your
13  understanding?
14        MR. LERNER: Objection.
15    A    I'm not a lawyer. I'm not
16  qualified to define sexual harassment.
17  That's a huge area of case law, is my
18  understanding. You are probably more
19  qualified than I am to answer that.
20    Q    So as you sit here today, you can't
21  tell me what sexual harassment is?
22        MR. LERNER: Objection.
23    A    Are you asking me to give a legal
24  definition of sexual harassment?
25    Q    No. I'm just asking for your

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 79

JESSE ANGELO

1
2  understanding.
3         What is sexual harassment that is
4  prohibited by The New York Post policy on
5  sexual harassment in the workplace?
6         MR. LERNER: Objection.
7     A    There could be any one of many
8  hypothetical examples of what would
9  constitute sexual harassment. I don't think
10  it's my place to give you hypothetical
11  examples of what sexual harassment is.
12    Q    I'm not asking hypothetical
13  examples. I'm just --
14    A    Then what are you asking.
15    Q    What is what is your understanding
16  of what is sexual harassment?
17        MR. LERNER: Objection.
18    A    Again, there are lots of different
19  things, in my limited understanding, that
20  can constitute sexual harassment.
21        I don't feel qualified to give you
22  hypothetical examples of what constitute
23  sexual harassment.
24    Q    Is it part of your job as either
25  Executive Editor of The Post -- actually,

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 80

JESSE ANGELO

1
2  let me repeat that.
3         Is it part of your job as Executive
4  Editor of The Post to report any instances
5  of sexual harassment that you witness?
6     A    Yes.
7     Q    So how would you know what to
8  report if you don't know what sexual
9  harassment is?
10        MR. LERNER: Objection.
11    A    I know what sexual harassment is.
12  That's not what you are asking me.
13    Q    So what is it?
14    A    Again, I believe there are many
15  definitions of what could constitute sexual
16  harassment.
17    Q    Okay. Give me one.
18        MR. LERNER: Objection.
19    A    If someone demanded a sexual favor
20  in return for a promotion, that would be
21  sexual harassment.
22    Q    That would be an example of sexual
23  harassment, right?
24    A    Is that a question?
25        MR. LERNER: Objection.

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 81

JESSE ANGELO

1
2     Q    I believe you said there are many
3  definitions of sexual harassment, right?
4     A    My understanding is that there are
5  many different forms of what can constitute
6  sexual harassment.
7     Q    Would dating a subordinate at
8  The New York Post be considered sexual
9  harassment?
10        MR. LERNER: Objection.
11    A    No.
12    Q    Is there any policy at The New York
13  Post regarding supervisors dating employees
14  that they supervise?
15        MR. LERNER: Objection.
16    A    No.
17    Q    Is there any policy at The New York
18  Post governing supervisors having a sexual
19  relationship with someone they supervise?
20    A    No.
21    Q    So you are familiar with The New
22  York Post policy on sexual harassment,
23  right?
24    A    In broad terms.
25    Q    As part of your job as

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 138

JESSE ANGELO

1
2   else who complained about the cartoon.
3       Q    So you are saying that -- do you
4   recall that other employees complained about
5   the cartoon?
6           MR. LERNER:  Objection.
7           You can answer.
8       A    I remember speaking with other
9   reporters about the -- other people at
10  The Post about the cartoon.
11          It was a characterization of
12  "complaints."
13      Q    When you were speaking to these
14  other employees about the cartoon, were any
15  of these other employees offended by the
16  cartoon?
17      A    I can't speak to their exact state
18  of mind, but I spoke to a number of
19  employees about the cartoon that day.
20      Q    Did any of these employees you
21  spoke to about the cartoon that day express
22  that they were offended by the cartoon?
23      A    Not that I specifically recall.
24      Q    Do you believe the cartoon is
25  offensive?

TSG Reporting - Worldwide   877-702-9580

---

Contains Confidential Portions

Page 139

JESSE ANGELO

1
2       A    No.
3       Q    Mr. Greene says "Angelo admitted
4   that the cartoon could be seen as racist."
5           Did you tell Mr. Greene that?
6       A    I think that's a
7   mischaracterization of my words.
8           And if I may clear up something I
9   said earlier.
10          You asked me if I had any reason to
11  doubt Mr. Greene's honesty, and I'd like to
12  recharacterize my answer which was I hadn't
13  in the past until I read this affidavit.
14      Q    So tell me why this is a
15  mischaracterization when Mr. Greene says
16  "Angelo admitted that the cartoon could be
17  seen as racist"?
18      A    Again, I don't recall what my exact
19  words were.
20          As I said, what I would have said
21  to Leonard that day, as I said to any member
22  of staff:  I can understand how people might
23  have misconstrued the cartoon and therefore
24  been offended by it but I don't see it as
25  racist.

TSG Reporting - Worldwide   877-702-9580

---

Contains Confidential Portions

Page 140

JESSE ANGELO

1
2       Q    How is it that people can
3   misconstrue the cartoon and be offended by
4   it, in your understanding?
5       A    I'm not going put myself in anyone
6   else's mind and say how they may or may not
7   construe.
8       Q    You testified earlier that you were
9   familiar with blacks being portrayed as
10  subhuman, as animals, chimpanzees, apes,
11  things like that, correct?
12      A    You just listed a number of
13  categories of what you are defining as
14  subhuman, and I don't think I agreed to my
15  previous answer.
16      Q    Did you say that you were aware
17  that blacks had been portrayed as apes?
18      A    Yes.
19      Q    Would you -- have blacks in the
20  past been portrayed as chimpanzees?
21      A    Yes.
22      Q    You were aware of this at the time
23  you approved the cartoon, correct?
24      A    I didn't say that.
25      Q    Didn't you testify earlier that at

TSG Reporting - Worldwide   877-702-9580

---

Contains Confidential Portions

Page 141

JESSE ANGELO

1
2   the time cartoon was published, you were
3   aware of these historical predictions?
4       A    I'm aware of that historical fact
5   over a long period of time.
6           The way you phrase it, it says I
7   have an awareness of the fact as I approved
8   the publication of the cartoon, and I can't
9   say that I did.  It was not in my mind as I
10  approved the cartoon for publication.
11      Q    So you are telling me when you
12  approved the cartoon for publication, you
13  were generally aware that blacks had been
14  portrayed as chimpanzees but you did not
15  connect that knowledge with this particular
16  cartoon?
17      A    I was aware of the historical fact
18  that blacks had been portrayed as
19  chimpanzees in the past in American history.
20          I never brought that knowledge to
21  bear in any way, shape or form on the
22  publication of this cartoon.
23      Q    Are you saying then it never
24  occurred to you that people could connect
25  this particular chimpanzee cartoon with a

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 142

```
1              JESSE ANGELO
2   racist depiction of blacks?
3         MR. LERNER:  Hold on.
4         All right.  You can go ahead.
5         Read back the question.
6         THE WITNESS: Can I have the
7   question read, please.
8         (Requested portion of record read:
9         "Q. Are you saying then it never
10  occurred to you that people could connect
11  this particular chimpanzee cartoon with a
12  racist depiction of blacks?")
13        (End of read-back.)
14        MR. LERNER:  Objection.  Object
15  to form.
16    A    No.
17        MR. LERNER:  The question was
18  ambiguous as to when you were asking
19  him.
20  BY MR. CLARK:
21    Q    Prior to the publication, it never
22  occurred to you that people could connect
23  the chimpanzee cartoon with racist
24  depictions of blacks?
25    A    No.
```

TSG Reporting - Worldwide     877-702-9580

Contains Confidential Portions

Page 143

```
1              JESSE ANGELO
2         MR. LERNER:  And that's how you
3   understood the prior question?
4         THE WITNESS:  Yes, that's how I
5   understood the prior question.
6     A    Just to be perfectly clear, you are
7   saying prior to the publication of the
8   cartoon, did I ever take the historical fact
9   that blacks had been depicted as chimpanzees
10  and see that somebody might then see this
11  cartoon and construe it as racist because of
12  that?
13        No, I never connected the two.  It
14  never occurred to me.
15        (Angelo Exhibit 5, Article,
16        Page 11 and Page 12 of The New York
17        Post, Bates Numbers SG-6842 through
18        SG-6843, was marked for
19        Identification.)
20  BY MR. CLARK:
21    Q    Could you take a glance at that
22  and --
23        MR. CLARK:  For the record,
24  this is SG-6842 and 6843.
25    A    Okay.
```

TSG Reporting - Worldwide     877-702-9580

Contains Confidential Portions

Page 144

```
1              JESSE ANGELO
2     Q    Have you seen these before?
3     A    Yes.
4     Q    What are these --
5     A    Oh, these.
6     Q    This is two pages.
7     A    I didn't realize there were two.
8         Okay.  Yes.
9     Q    What are the two pages we just
10  marked as Angelo 5?
11    A    They appear to be photocopies of
12  two pages of The New York Post.
13    Q    Is it Page 11 and Page 12?
14    A    They appear to be, yes.
15    Q    And Page 11 has a picture of Barack
16  Obama and Page 12 has a picture of the
17  chimpanzee cartoon, correct?
18    A    Correct.
19    Q    Is it just a coincidence that
20  Barack Obama is on Page 11 and the cartoon
21  is on Page 12?
22        MR. LERNER:  Objection.
23  I'm going to instruct you not to
24  answer that question.
25        (Directive to witness.)
```

TSG Reporting - Worldwide     877-702-9580

Contains Confidential Portions

Page 145

```
1              JESSE ANGELO
2         MR. CLARK:  On what basis?
3         MR. LERNER:  There's no
4   foundation for the question
5   whatsoever and gets into privileged
6   areas.
7   BY MR. CLARK:
8     Q    Do you know why there's a picture
9   of Barack Obama signing something on
10  Page 11?
11        MR. LERNER:  Objection.  Hold
12  on a second.
13        The layout of the paper is and the
14  process by which the paper laid out is
15  subject to editorial privilege.  And it's
16  not even clear Mr. Angelo has any
17  knowledge with respect to the layout of
18  the paper and why it was laid out this
19  way.
20        So, no, this is privileged
21  material.
22        (Directive to witness.)
23  BY MR. CLARK:
24    Q    Mr. Angelo, do you see in the
25  second paragraph of the story on Page 11 it
```

TSG Reporting - Worldwide     877-702-9580

Contains Confidential Portions

Page 158

JESSE ANGELO

1
2     A    What I was saying is -- you asked
3  me if anybody was offended by the cartoon
4  for other than racial reasons. Some people,
5  my understanding, they were offended by
6  shooting the President of the United States,
7  regardless of his raise.
8     Q    And was there any other basis for
9  being offended by the cartoon other than
10  shooting the President and it being racially
11  offensive?
12     A    Again, you are characterizing what
13  I had said briefly about how people may or
14  may not have perceived this cartoon. I
15  don't know how anyone perceived this cartoon
16  other than myself.
17     Q    But you don't perceive it as
18  racially offensive?
19     A    No.
20     Q    You don't perceive it offensive in
21  any way?
22     A    I believe the chimpanzee in the
23  cartoon referred to the members of Congress
24  who wrote the stimulus bill.
25     Q    And therefore, it's not offensive?

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 159

JESSE ANGELO

1
2     A    To my mind, the cartoon was about
3  the congressional members of staff who wrote
4  the stimulus bill that had been widely
5  criticized at the time. It was not meant to
6  be the President.
7     Q    That's not the question.
8        The question is: Do you believe
9  the cartoon is offensive, you personally,
10  sitting here today?
11     A    No.
12     Q    Okay. Fine.
13        MR. CLARK: Can we mark this as
14  6.
15        (Angelo Exhibit 6, Affidavit
16  of Shari Logan, Bates Numbers
17  SG-0940 through SG-0943, was marked
18  for Identification.)
19  BY MR. CLARK:
20     Q    For the record, this is
21  Bates-stamped SG-940 through 943 and it is
22  entitled Affidavit of Shari Logan.
23        Mr. Angelo, have you ever seen a
24  copy of this affidavit, outside of this
25  lawsuit?

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 160

JESSE ANGELO

1
2     A    No.
3     Q    I just want to call your attention
4  to a few things.
5     A    May I read the affidavit?
6     Q    I'm sorry. I thought you had.
7     A    No.
8     Q    Go ahead.
9     A    Thank you.
10        Okay.
11     Q    So did Shari Logan work for you in
12  2008/2009?
13     A    No. What was her relationship to
14  you at the time period that the cartoon was
15  published?
16        MR. LERNER: Objection.
17     A    Can you define "relationship."
18     Q    I mean, if she didn't work for you,
19  was she someone that was a subordinate to
20  you? Did she run errands for you?
21        Put it this way: What was her job,
22  as far as you recall, in February 2009?
23     A    She was a copy desk assistant.
24     Q    As a copy desk assistant --
25     A    Or copy assistant, I think is the

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 161

JESSE ANGELO

1
2  correct title.
3     Q    Did she take orders from you as a
4  copy assistant?
5     A    From time to time she could have.
6     Q    In other words, you were her
7  superior?
8     A    I was not her direct superior, no.
9     Q    You were not her direct supervisor,
10  right?
11     A    Correct.
12     Q    But would you say that you -- what
13  was your position at the time?
14     A    I was Managing Editor.
15     Q    So wouldn't you agree the Managing
16  Editor is superior to a copy assistant?
17     A    I don't understand what you mean by
18  the term "superior."
19     Q    Well, you could give her orders,
20  right?
21     A    Yes.
22     Q    Tell her to do things?
23     A    Yes.
24     Q    She couldn't tell you to do things?
25     A    Correct.

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 238

1   **JESSE ANGELO**
2
3
4
5
6
7
8
9               REDACTED
10
11
12
13
14
15
16
17
18
19       MR. CLARK: Mark this as 15,
20   please.
21       (Angelo Exhibit 15, E-mail
22   chain, top e-mail dated Thursday,
23   December 4, 2008, 12:24 p.m., Bates
24   Number NYP-FL-002323, was marked
25   for Identification.)
      TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 239

1           JESSE ANGELO
2       MR. CLARK:  This is Bates-
3   stamped NYP-FL-002323.
4   BY MR. CLARK:
5       Q   If you can just take a look at that
6   for a minute.
7       A   Okay.
8       Q   Have you seen this e-mail before
9   other than in connection with this lawsuit?
10      A   Not that I recall.
11
12
13
14
15
16              REDACTED
17
18
19
20
21
22
23
24
25
      TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 240

1           JESSE ANGELO
2
3
4
5              REDACTED
6
7
8
9       Q   Do you know if his pay was reduced?
10      A   It was not.
11      Q   How do you know that?
12      A   In my time at The New York Post, I
13   never saw anybody's pay reduced.
14      Q   So even though someone were
15   demoted, their pay would not be reduced?
16      A   I never saw --
17      MR. LERNER: Objection.
18      Sorry. Go ahead.
19      A   Again, I don't recollect ever
20   seeing it occur.
21
22              REDACTED
23
24      A   Yes.
25      Q   Who else did that happen to?
      TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 241

1           **JESSE ANGELO**
2       A   I recollect that happening to a man
3   named   REDACTED
4       Q   And what was John's job before he
5   was demoted?
6       A   He    REDACTED         as
7   an assistant or associate editor.  I don't
8   remember the exact title.  And then he was
9   demoted to be a reporter.
10      Q   And you know that his pay was not
11   reduced?
12      A   Again, I don't recollect there
13   being any change in pay.
14      Q   So are you saying his pay was not
15   reduced or you don't know it wasn't reduced?
16      A   I don't believe it was reduced.
17   Again, I don't recollect anyone ever having
18   their pay reduced at The New York Post.
19      Q   Who is   REDACTED
20      A   Margi Conklin is an editor of
21   The New York Post.
22      Q   What is her -- she's currently an
23   editor?
24      A   Yes.
25      Q   What is her current position?
      TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 278

```
1          JESSE ANGELO
2     A    No, I'm not.  Sorry.
3     Q    United States Supreme Court is not
4  an important beat?
5          MR. LERNER:  Objection.
6     A    Once again --
7          MR. LERNER:  His testimony was
8  there was no Supreme Court beat.
9          MR. CLARK:  His testimony is
10 all beats are equal, which is clearly
11 not true.
12         MR. LERNER:  Hold on.  There's
13 no question pending.
14    Q    Is your testimony all beats are
15 equal.
16         The United States Supreme reporter
17 and runner reporter, one beat is just as
18 good as the next.
19         Is that your testimony?
20         MR. LERNER:  Objection.
21    A    I don't believe that is an accurate
22 description of my testimony.
23    Q    So a reporter assigned to the
24 United States Supreme Court would have a
25 more important beat than a runner reporter?
```

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 279

```
1          JESSE ANGELO
2          MR. LERNER:  Objection.
3     A    Again, this hypothetical position
4  covering the United States Supreme Court for
5  The New York Post does not exist.  I've
6  never heard of that beat occurring at
7  The New York Post.
8          So making a hypothetical comparison
9  between something that doesn't exist and
10 another job that you are describing in
11 incredibly broad terms, I don't feel
12 comfortable making that comparison.
13
14
15
16
17
18              REDACTED
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 280

```
1          JESSE ANGELO
2     Q    So why isn't it a demotion to go
3  from courthouse reporter to runner reporter?
4          MR. LERNER:  Objection.
5  Argumentative.
6     A    They're different roles.  They're
7  both reporters.  They're just different
8  roles.  It's not a demotion.
9          MR. CLARK:  Could we mark this
10 as 20.
11         (Angelo Exhibit 20, E-mail
12 dated Monday, January, 30, 2006,
13 3:52 p.m., Bates Number IL-597, was
14 marked for Identification.)
15         THE WITNESS:  Yes.
16 BY MR. CLARK:
17    Q    This appears to be another e-mail
18 dated a few days later from Ms. Livingston
19 to you, correct?
20    A    Yes.
21    Q    And she asks again about the Queens
22 Courthouse position?
23    A    Yes.
24    Q    Do you recall or does this refresh
25 your recollection you had any discussions or
```

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 281

```
1          JESSE ANGELO
2  e-mails with Ms. Livingston between the
3  first e-mail on Friday and the next e-mail
4  on Monday?
5     A    I don't recall any discussions with
6  Ms. Livingston in the time frame that you
7  described.
8     Q    But you don't know if you did or
9  you didn't.  You just don't recall?
10    A    I don't recall having those
11 conversations.
12    Q    In her e-mail dated the 30th,
13 which is 20, she references that in 2004 she
14 asked to be considered for the Queens
15 Courthouse position.
16         Do you know if that's a true
17 statement?
18    A    I don't recall.
19    Q    Do you remember if you ever
20 investigated whether that was a true
21 statement?
22    A    Do I recall if I investigated if
23 that was a true statement.
24    Q    In other words, do you recall if
25 you investigated whether she had applied in
```

TSG Reporting - Worldwide   877-702-9580

Contains Confidential Portions

Page 326

JESSE ANGELO

1
2    Q    Would it happen that they would
3    actually send someone halfway across the
4    country to cover an important story who was
5    not qualified to cover for that story?
6        MR. LERNER:  Objection.
7    A    Again, it's a hypothetical question
8    about what an editor may or may not do on a
9    story.  Reporters get sent out on stories
10   for all sorts of reasons all the time.
11   Q    Halfway across the country?
12   A    Sometimes, yeah.
13   Q    Do you remember this story about
14   Archbishop Dolan that we've provided you as
15   Exhibit 27?
16   A    No.
17   Q    Would you agree that an exclusive
18   interview with the incoming bishop is an
19   important accomplishment?
20       MR. LERNER:  Option.
21   A    I wouldn't characterize it as
22   an important accomplishment.  That isn't a
23   phrase I would use.
24   Q    Is it an accomplishment?
25       MR. LERNER:  What's the "it"?

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 327

JESSE ANGELO

1
2        MR. CLARK:  An exclusive
3    interview with the incoming
4    Archbishop of New York.
5    A    Yeah, it's a good story.  It's on
6    Page 15, so not great.
7    Q    Can you name any New York Post
8    reporters who you think are unqualified for
9    the positions that they hold?
10       MR. LERNER:  Objection.
11   A    I don't have that level of
12   knowledge about the reporters at The New
13   York Post at this point in time to make such
14   an assessment.
15   Q    Let's limit it to when you were
16   Metropolitan Editor.
17       When you were Metro Editor, were
18   there any reporters that worked for you that
19   were unqualified?  To be reporters.
20   A    Can you define "unqualified."
21   Q    You tell me, you are an editor.  In
22   your view, unqualified.
23       MR. LERNER:  Objection.
24       I don't even understand
25   "unqualified."

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 328

JESSE ANGELO

1
2        Paul, I don't see how he's possibly
3    going to answer this question.  I mean, a
4    reporter could be qualified for one story
5    and not qualified for another story two
6    blocks away.
7    A    I'm sorry.  I really don't
8    understand the question either.
9    Q    When you were Metro Desk Editor,
10   did you ever send a reporter to cover a
11   story that you believed that reporter was
12   unqualified to cover?
13       MR. LERNER:  Objection.
14   A    Again, "unqualified" is a difficult
15   term for me.  I don't know what you mean by
16   "unqualified."
17       Can you give me an example of what
18   you mean by "unqualified"?
19   Q    In your view, did you ever assign
20   someone a story and in your view you felt
21   the person would be unqualified to cover the
22   story, would not be able to cover the story
23   adequately.
24       MR. LERNER:  Objection.
25   A    Yes.

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 329

JESSE ANGELO

1
2    Q    Did you ever send anyone over
3    500 miles away who you believe was
4    unqualified to cover a story?
5    A    Sometimes you send a reporter
6    because that was a person who was available.
7    That's not uncommon.  Sometimes it's late at
8    night and the only person there is a junior
9    reporter and they're the only person to go
10   cover a big fire.  And they may not be the
11   ideal choice to cover that story but you
12   send them because they're there.
13       So again, the choice to send a
14   reporter on a story is not, de facto, an
15   endorsement of their qualifications one way
16   or the other.  And again, "qualifications"
17   is a very broad term.
18       There are lots of reasons that a
19   reporter could get sent on a story,
20   availability, shifts, any number of things.
21   Q    Can you give me an example when you
22   sent a reporter on a story that you did not
23   believe that reporter would do a good job
24   when you sent that reporter hundreds of
25   miles away to another city to cover?

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 358

```
1          JESSE ANGELO
2    testimony is you are certain you have never
3    seen this photograph that I provided you on
4    Col Allan's Blackberry or iPhone or some
5    kind of device like that, correct?
6       A    Yes.
7       Q    And Col Allan -- I think you
8    already said this but just to be clear.  Col
9    Allan has never shown you this photograph at
10   any time?
11      A    No, he's never shown me this
12   photograph.
13      Q    Have you ever seen Col Allan show a
14   photograph of a naked man to anyone?
15      A    The only time that I ever saw
16   anything like that, I remember seeing a
17   front page on his Blackberry that had a news
18   photograph in it, a naked man in it.
19      Q    When was that?
20      A    I don't recall the exact date.
21      Q    Do you recall what naked man was
22   depicted on this front-page story on the
23   Blackberry?
24      A    It was a crazy guy who ran naked
25   through Times Square.
```

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 359

```
1          JESSE ANGELO
2       Q    And was anyone else present when he
3    showed you this photograph?
4       A    Not that I recall.
5            And again just to be clear, he
6    didn't show me the photograph.  He showed me
7    a pdf of the front page of The New York Post
8    that had that photograph.
9       Q    Where did this take place?
10      A    At Langan's.
11      Q    And you don't know if anyone else
12   saw this photograph?
13      A    No.
14           MR. CLARK:  We have to change
15   the tape.  Why don't we take a break
16   and we'll wrap up.
17           THE VIDEOGRAPHER:  The time is
18   6:55.  We're going off the record.
19           (A brief recess was
20   taken.)
21           THE VIDEOGRAPHER:  The time is
22   7:00.  We're back on the record.
23   BY MR. CLARK:
24      Q    Mr. Angelo, who is Steve Dunlevy?
25      A    Steve Dunlevy used to be a
```

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 360

```
1          JESSE ANGELO
2    columnist at The New York Post.
3       Q    Did Steve Dunlevy ever use a racial
4    epithet in your presence?
5       A    Yes.
6       Q    Where did this happen?
7       A    At Langan's.
8       Q    What did he say?
9       A    He used a racial epithet in
10   conjunction with another member of staff,
11   and I reprimanded him for it.
12      Q    Can you be more specific?
13           What did he say exactly?
14      A    He was referring to a member of
15   staff named Robert George and he referred to
16   him as the token N-word.  And I heard him
17   say it and I immediately reprimanded him for
18   it.
19      Q    When did in occur?
20      A    I don't recall the exact date.
21      Q    Was anyone else present?
22      A    Yes.
23      Q    Who else was present?
24      A    Robert George was present.
25      Q    He says this in Robert George's
```

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 361

```
1          JESSE ANGELO
2    presence?
3       A    Yes.
4       Q    Was anyone else present?
5       A    Col Allan was present.
6       Q    Anyone else?
7       A    I believe there were other people
8    around.  I don't recall who they were or in
9    what proximity.
10      Q    What was Col Allan's reaction?
11      A    You know, I don't recall Col's
12   reaction.
13      Q    You said you reprimanded
14   Mr. Dunlevy?
15      A    That is correct.
16      Q    How did you reprimand him?
17      A    I told him it was unacceptable,
18   inappropriate and he couldn't speak that
19   way.
20      Q    Was any other action ever taken
21   against Mr. Dunlevy?
22      A    For what?
23      Q    For this incident.
24      A    Not that I am aware of.
25      Q    So you thought that a verbal
```

TSG Reporting - Worldwide    877-702-9580

91  (Pages 358 to 361)

Contains Confidential Portions

Page 362

1          JESSE ANGELO
2    reprimand was all that was required in the
3    circumstance?
4      A   I gave him a stern verbal reprimand
5    and I considered that to be the end of the
6    situation.
7      Q   Would you regard Mr. Dunlevy's use
8    of the N-word as contrary to company policy?
9          MR. LERNER:  Objection.
10     A   I don't know.
11     Q   Would it be considered a form of
12   racial harassment?
13         MR. LERNER:  Objection.
14     A   That's not for me to say.  I'm not
15   a lawyer.
16     Q   Well, you were his supervisor,
17   right?
18     A   Yes.
19     Q   But you're not able to say whether
20   this might be considered harassment?
21     A   I knew it was inappropriate.  I
22   immediately told him so and reprimanded him
23   for saying it.
24     Q   Did you ever report this to the
25   Human Resources people?

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 363

1          JESSE ANGELO
2      A   Not that I recall.
3      Q   Did you report it to anybody at
4    all?
5      A   Not that I recall, no.
6      Q   Did you ever document in writing
7    the fact that Mr. Dunlevy had used this
8    racial epithet?
9      A   Not that I recall.
10     Q   So there's nothing in Mr. Dunlevy's
11   file that was ever put in his file
12   documenting this incident; is that correct?
13     A   Not that I am aware of.
14     Q   Did you ever hear Mr. Dunlevy use a
15   racial epithet other than this incident
16   you've already discussed?
17     A   No.
18     Q   Did you ever have anyone tell you
19   that Mr. Dunlevy had used a racial epithet
20   on another occasion?
21     A   No.
22     Q   And to be clear, Robert George is
23   black; is that correct?
24     A   Yes.  They were good friends,
25   Robert and Steve.

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 364

1          JESSE ANGELO
2      Q   What's the relevance of that?  Do
3    you think that makes it okay?
4      A   No.
5      Q   Did you have any role in the
6    closing of Tempo?
7      A   No.
8      Q   Did you have any role in Sandra
9    Guzman's termination?
10     A   No.
11     Q   What is your understanding of why
12   Sandra Guzman was terminated?
13         MR. LERNER:  Objection.
14     A   The ads for Tempo dried up; the
15   section ceased to exist.  She was the editor
16   of the section.
17     Q   Are you aware whether or not Sandra
18   edited other sections?
19     A   I don't have awareness of her
20   editing other sections.
21     Q   You don't know if she edited
22   anything other than Tempo?
23     A   I was not aware of any other duties
24   she had.
25         In the process of preparing for

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 365

1          JESSE ANGELO
2    this lawsuit, I became aware she had other
3    duties.  I didn't know anything about them.
4      Q   That's fine.
5          What's your understanding of who
6    made the decision to terminate Sandra
7    Guzman?
8          MR. LERNER:  Objection.
9          If you have such an understanding.
10         MR. CLARK:  That's fine.  If he
11   doesn't, he can say, "I don't know."
12     A   I don't know.
13     Q   Did anyone ever consult you as to
14   whether Sandra Guzman should be fired?
15     A   No, not that I recall.
16     Q   Were you privy to any conversations
17   prior to Sandra Guzman's termination
18   regarding her possible termination?
19     A   Not that I recall.
20     Q   So you did not know that Sandra
21   Guzman would be terminated until it
22   happened?
23     A   That's not what I said.
24     Q   So did anyone ever talk to you
25   about Sandra Guzman being terminated prior

TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 366

**JESSE ANGELO**

1
2   to her termination?
3      A   No.
4      Q   So I'm trying to figure out how
5   what I said was different from you then.
6         You had no prior knowledge that
7   Sandra Guzman was going to be terminated,
8   right?
9      A   Yes.  That's correct.  I had no
10  prior knowledge.  I wasn't aware of it.
11     Q   Did anyone -- when did you first
12  learn that she would be terminated, Sandra
13  Guzman would be terminated?
14     A   I don't recall when.
15     Q   Was it before or after she was
16  terminated?
17     A   I don't recall.
18     Q   So you might have known about her
19  termination before she did?
20     A   I might have known about her
21  termination.  I don't recall when I learned
22  about her termination or in what manner.
23     Q   But it might have been prior to her
24  termination?
25     A   Might have been.

TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 367

JESSE ANGELO

1
2      Q   Do you know if Col Allan played any
3   role in Sandra Guzman's termination?
4      A   I don't know.
5      Q   Has Col Allan ever spoken to you
6   about Sandra Guzman's termination at any
7   point?
8      A   Not that I recall.
9      Q   Have you ever spoken to Paul
10  Carlucci about Ms. Guzman's termination,
11  again at any point?
12     A   No, not that I recall.
13     Q   Do you remember speaking to any
14  employee of New York Post or News
15  Corporation about Sandra Guzman's
16  termination?
17     A   No.
18     Q   Never had any conversations with
19  any New York Post employee about Sandra
20  Guzman's termination?
21     A   I don't recall such conversations.
22     Q   And you don't recall any
23  conversations with anyone at NewsCorp about
24  Sandra Guzman's termination?  Other than
25  your counsel, obviously.

TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 368

**JESSE ANGELO**

1
2      A   No, I don't recall any such
3   conversations.
4      Q   Do you know who would normally
5   approve the termination of an associate
6   editor?
7      A   I don't know if there's a formal
8   process for that.
9      Q   Would you expect Col Allan to be
10  involved in a decision like that?
11        MR. LERNER:  Objection.
12     A   Yes, I would.
13     Q   Would you expect Rupert Murdoch to
14  be involved in a decision like that?
15        MR. LERNER:  Objection.
16     A   No.
17     Q   Would you expect Paul Carlucci to
18  be involved in a decision like that?
19        MR. LERNER:  Objection.
20     A   No.
21     Q   Why not?
22     A   The publisher by and large has --
23  I've never encountered the publisher having
24  any say with personnel hires on the
25  editorial side.

TSG Reporting - Worldwide    877-702-9580

---

Contains Confidential Portions

Page 369

JESSE ANGELO

1
2      Q   If an associate editor were going
3   to be reassigned, who would make that
4   decision?
5      A   Again, I don't know.
6      Q   Did you ever speak to Joe
7   Robinowitz about the decision to terminate
8   Sandra Guzman?
9      A   Not that I recall.
10     Q   Have you ever discussed Col Allan
11  with Sandra Guzman?
12     A   Not that I recall.
13     Q   Have you ever discussed Les
14  Goodstein with Sandra Guzman?
15     A   No, not that I recall.
16     Q   Have you ever discussed Jennifer
17  Jehn with Sandra Guzman?
18     A   No, not that I recall.
19     Q   I think you may have answered this
20  already, but did you ever discuss the
21  chimpanzee cartoon with Sandra Guzman?
22        MR. LERNER:  Objection.  This
23  was covered.
24        MR. CLARK:  I think I already
25  asked it but I just want to make

TSG Reporting - Worldwide    877-702-9580

93  (Pages 366 to 369)

Page 1

```
1
2    UNITED STATES DISTRICT COURT
3    SOUTHERN DISTRICT OF NEW YORK
     -----------------------------)
4    AUSTIN FENNER and            )
     IKIMULISA LIVINGSTON,        )
5                                 )
                Plaintiff,        )09 CV 9832
6                                 )(BSJ)(RLE)
         vs.                      )
7                                 )
     NEWS CORPORATION, NYP HOLDINGS,)
8    INC., d/b/a THE NEW YORK POST )
     and DAN GREENFIELD and MICHELLE)
9    GOTTHELF,                    )
                                  )
10               Defendants.      )
     -----------------------------)
11
12
13
14
15
16            DEPOSITION OF JESSE ANGELO
17               New York, New York
18             Friday, April 5, 2013
19
20
21
22
23
24   Reported by:
     JOMANNA DeROSA, CSR
25   JOB NO. 59957
```

Page 10

```
1          J. ANGELO
2    counsel, and it's a matter of the
3    attorney-client relationship, and it's
4    privileged.
5          MR. PEARSON:  I don't think so.  I
6    think that the substance of the discussions
7    surely are, but the fact of a document that a
8    witness has seen, that's not privileged.  If a
9    witness has seen a document or not, that's
10   simply part of the witness' fact knowledge at
11   that point.
12         MR. LERNER:  It's the context.
13   You're probing into a privileged
14   attorney-client communication, and you're
15   asking what happened during that
16   attorney-client communication.  And you're
17   asking specifically what document the attorney
18   and client discussed, and what they decided
19   was relevant.  And it's an invasion of the
20   attorney-client relationship.
21         I don't believe that at any
22   deposition in these actions that it's ever
23   been testified to as to what documents were
24   shown to a witness during the course of
25   deposition preparation.
        TSG Reporting - Worldwide    877-702-9580
```

Page 11

```
1          J. ANGELO
2          MR. PEARSON:  I mean, that's
3    precisely not what I'm asking.  What I'm
4    asking is what documents has he seen in the
5    last, you know, few days, you know, when he
6    was meeting with you.
7          I can ask him what documents he's
8    seen in connection with this in general, if
9    that makes you feel better.  But to ask the
10   witness what documents he's familiar with is
11   not at all privileged.  I'm surprised it
12   hasn't come up in any of the other depositions
13   in this case, frankly, because we ask that all
14   the time.
15         MR. LERNER:  You can ask him what
16   documents he's familiar with that relate to
17   the subject matter of the deposition.  I don't
18   have a problem with that.
19         MR. PEARSON:  Okay.
20      Q.  So, Mr. Angelo, taking the concerns
21   of your counsel into consideration, are there
22   documents regarding the subject of Kim
23   Livingston's mystery shopping -- and we'll go over
24   what that is, you know, in a bit -- or termination
25   that you reviewed in the, say, month prior to
        TSG Reporting - Worldwide    877-702-9580
```

Page 12

```
1          J. ANGELO
2    today's deposition?
3          MR. LERNER:  Why don't you extend
4    it to the two months prior to today's
5    deposition?
6          MR. PEARSON:  That's true, the two
7    months, because that would capture the date of
8    Ms. Livingston's termination itself, which
9    was, I'm representing, February 26th of this
10   year.
11         THE WITNESS:  That was a very long
12   question.  Can you just tell me what the
13   beginning of it was?
14         MR. PEARSON:  I certainly can.
15         You know, for the record,
16   Mr. Lippner, please contain your laughing to
17   a -- keep your laughing to a minimum and at
18   low volume.
19      Q.  All right.  So, Mr. Angelo, can you
20   tell me, in the last two months, whether you've
21   reviewed any documents on the subject either of
22   Kim Livingston's mystery shopping or her
23   termination?
24      A.  Yes.
25      Q.  Okay.  Can you tell me what those
        TSG Reporting - Worldwide    877-702-9580
```

Page 13

```
1          J. ANGELO
2    documents were?
3      A.  Yes.
4      Q.  Okay.  And what were they?
5      A.  The entire -- everything I've
6    reviewed involving the matter?  I saw, obviously,
7    the termination letter that I gave her.  I saw
8    logs of when she did mystery shopping.  I saw a
9    comparison of when she did mystery shopping when
10   she was -- collated to when she was supposed to be
11   working for The New York Post.  I saw a transcript
12   of her deposition.
13      Q.  Anything else?
14      A.  I saw e-mails that I had with
15   counsel about the matter that I turned over to
16   counsel as part of a discovery function.  I
17   believe that's it.
18         Excuse me.  I saw a map of where
19   the mystery shopping occurred on occasions in
20   relation to the Queens Courthouse when she should
21   have been working for The New York Post.
22      Q.  And did you review any documents
23   with respect to Ms. Livingston's performance
24   during the past two months?
25      A.  No, not that I recall.
        TSG Reporting - Worldwide    877-702-9580
```

J. ANGELO

1    decision to terminate Ms. Livingston's employment?
2        A.   Yes.
3        Q.   Did you meet with Ms. Livingston
4    about her termination at any time?
5        A.   Yes.
6        Q.   Okay.  And when was that?
7        A.   On the day she was terminated.
8        Q.   Okay.  We'll talk about the
9    termination meeting in a little while.  But prior
10   to that termination meeting, and since you became
11   publisher at The Post, did you have any
12   discussions or correspondence with Ms. Livingston?
13       A.   No, not that I recall.
14       Q.   Since the time you became publisher
15   at The Post, up until Ms. Livingston's
16   termination, did you have any discussions with
17   anybody else at The Post about Ms. Livingston's
18   job performance?
19       A.   No, not that I recall.
20       Q.   Do you know what mystery shopping
21   is?
22       A.   I have a vague understanding of it.
23       Q.   Okay.  What's your understanding of
24   what mystery shopping is?

TSG Reporting - Worldwide    877-702-9580

J. ANGELO

1        A.   My understanding is that is when
2    somebody is paid to go into a store or interact
3    with a business, I guess, telephonically or via
4    the Internet, and test out what the customer
5    service is like, what kind of reactions they get,
6    how the people perform in their duties at the
7    shop.
8        Q.   Have you ever done any mystery
9    shopping yourself?
10       A.   My wife might think I have with
11   some of the gifts I give her, but, no, I have not
12   done any mystery shopping.
13       Q.   Okay.  And are you aware of anyone
14   else among your acquaintances, or anyone among
15   your acquaintances who have done mystery shopping?
16       A.   No.
17       Q.   Okay.  Are you aware of whether or
18   not Ms. Livingston has ever mystery shopped?
19       A.   Yes.
20       Q.   Okay.  And are you aware of whether
21   or not she's ever mystery shopped for TD or
22   Commerce Bank?
23       A.   Yes.
24       Q.   Okay.  And are you aware that she

TSG Reporting - Worldwide    877-702-9580

J. ANGELO

1    has, in fact, done that?
2        A.   Yes.
3        Q.   Okay.  And are you aware of whether
4    or not Ms. Livingston has ever mystery shopped for
5    a company called Shop 'n Chek?
6        A.   Yes.
7        Q.   And has she done that?
8        A.   Yes.
9        Q.   Okay.  Do you know what the mystery
10   shopping that Ms. Livingston did for TD or
11   Commerce Bank entailed; how it worked?
12            MR. LERNER:  Objection.  Form.
13       A.   I know that while she was being
14   employed by The New York Post and turning in time
15   sheets that she was working for The New York Post
16   she was, in fact, doing paid work on hundreds and
17   hundreds of occasions for these mystery shopping
18   outfits.  I don't know what they're -- companies I
19   guess they're called.
20       Q.   Are you aware of whether or not
21   Ms. Livingston received payments in connection
22   with her mystery shopping on a W-2 or 1099 basis?
23       A.   Can you repeat the question,
24   please?

TSG Reporting - Worldwide    877-702-9580

J. ANGELO

1            MR. PEARSON:  Sure.  Could the
2    question be read back?
3            (The requested portion of the
4    record was read.)
5        A.   No, I'm not aware of that.
6        Q.   Okay.  And are you able to describe
7    for me what Ms. Livingston actually did when she
8    would perform or conduct mystery shops for TD or
9    Commerce Bank?
10           MR. LERNER:  Objection.
11           MR. PEARSON:  You may answer.
12           THE WITNESS:  Can you read the
13   question back, please?
14           (The requested portion of the
15   record was read.)
16       A.   No, I never witnessed it, but I
17   know she wasn't working for The New York Post as
18   she was supposed to be doing.
19           (Recess taken.)
20       Q.   Are you aware of what was entailed
21   in Ms. Livingston's mystery shopping for Shop 'n
22   Chek?
23       A.   The very fact that she was doing
24   mystery shopping, a paid job for somebody else

TSG Reporting - Worldwide    877-702-9580

Page 26

```
 1              J. ANGELO
 2   when she was supposed to be working for The New
 3   York Post, is a huge problem.
 4          MR. PEARSON:  All right.  I'd like
 5   that marked as nonresponsive.
 6      Q.   Mr. Angelo, are you aware of what
 7   was entailed in Ms. Livingston's mystery shopping
 8   for Shop 'n Chek?
 9          MR. LERNER:  Objection.
10          MR. PEARSON:  You may answer.
11          MR. LERNER:  On each occasion, on a
12   particular occasion?  I mean, she went into
13   different stores?
14          MR. PEARSON:  Does he have any
15   knowledge of what was entailed in mystery
16   shopping for Shop 'n Chek by Ms. Livingston.
17          MR. LERNER:  You can answer however
18   you want.  You can answer as generally or as
19   specifically as you can, because it's an open
20   question.
21      A.   What precisely she did when she was
22   being paid by somebody else while she was
23   dishonestly saying that she was working for me on
24   hundreds and hundreds of occasions is the point.
25      What precisely she did when she
```
TSG Reporting - Worldwide    877-702-9580

Page 27

```
 1              J. ANGELO
 2   walked into a store, being paid by somebody to do
 3   it when she was being paid by me, I don't know
 4   precisely what she did there, but I don't find it
 5   relevant.  Any paid employment that she was doing
 6   somewhere else is a problem.
 7      Q.   All right.  So, Mr. Angelo, you're
 8   not aware specifically what she did for Stop 'n
 9   Chek then?  Is that your testimony then?
10          MR. LERNER:  Objection.
11      A.   Correct.
12      Q.   How did you become aware of
13   Ms. Livingston's mystery shopping?
14      A.   From reading the transcript of her
15   deposition.
16      Q.   Okay.  Which transcript or
17   transcripts were those?
18      A.   I don't know if there's multiple --
19   I read the transcript of the deposition she gave
20   about mystery shopping.
21      Q.   Okay.  So, the transcript you read,
22   was that for a deposition taken this year of
23   Ms. Livingston?
24      A.   I believe so, yes.
25      Q.   Okay.  Did you ever view any
```
TSG Reporting - Worldwide    877-702-9580

Page 28

```
 1              J. ANGELO
 2   portion of a deposition taken of Ms. Livingston
 3   from early in 2012?
 4      A.   Not that I recall.
 5      Q.   Are you aware that Ms. Livingston
 6   was deposed in early 2012?
 7      A.   No.  I mean, not really.
 8      Q.   Were you aware that Ms. Livingston
 9   had given any deposition in connection with this
10   case prior to the one that she gave this year
11   concerning her mystery shopping?
12          MR. LERNER:  Was he aware when?
13      Q.   Were you aware, prior to
14   Ms. Livingston's termination, at any time that she
15   had previously been deposed in connection with
16   this matter?
17      A.   I don't recall any specific
18   awareness of her having given a deposition
19   previous to that.
20      Q.   Okay.  So, you didn't know that she
21   had been deposed, other than her deposition
22   regarding mystery shopping?
23      A.   Again, not that I recall.  I mean,
24   is it possible that I knew that and forgot?  I
25   don't know.  I have no recollection of her having
```
TSG Reporting - Worldwide    877-702-9580

Page 29

```
 1              J. ANGELO
 2   given depositions before or having looked at them.
 3   I don't know.
 4      Q.   To your knowledge, is anyone else
 5   at The New York Post aware that Ms. Livingston
 6   mystery shopped during her employment at the
 7   paper?
 8      A.   I don't know.
 9      Q.   Is Amy Scialdone aware of it?
10      A.   Yes.
11      Q.   Okay.  Anyone else?
12      A.   I don't know.
13      Q.   Have you discussed Ms. Livingston's
14   mystery shopping with anyone else at The New York
15   Post?
16      A.   No.
17      Q.   Apart from Ms. Scialdone or did you
18   discuss it with Ms. Scialdone?
19      A.   Can you define "discuss"?
20      Q.   What does the word "discuss" mean
21   to you, Mr. Angelo?
22      A.   I informed Ms. Scialdone that this
23   behavior had occurred and, therefore, I was
24   terminating Ms. Livingston.  I did not discuss
25   with her the matter.
```
TSG Reporting - Worldwide    877-702-9580

Page 102

J. ANGELO

1  getting a nonresponsive answer you went back,
2  asked the question differently, rephrased it,
3  and you were satisfied that the answer you got
4  was responsive.
5      I think you should take the
6  opportunity now to -- if there's any question
7  in the record that you think the answer was
8  non-responsive to, to re-ask it.
9      MR. PEARSON: All right. Sure.
10  I'll state for the record that we'll take a
11  brief break, I'll circle back, see if there's
12  anything that I really feel I could not get a
13  response on -- I mean, again, I reserve all my
14  rights, but sure, I'll go back and take a look
15  and see if there's anything that I think we
16  need to go over.
17      MR. LERNER: Okay.
18      (Recess taken.)
19      Q.  So, Mr. Angelo, approximately how
20  long are employees -- how long is it your
21  expectation that reporters will take for lunch or
22  their mid-shift meal?
23      A.  Half an hour.
24      Q.  Is there a policy saying that

TSG Reporting - Worldwide    877-702-9580

Page 103

J. ANGELO

1  reporters should only take a half an hour for
2  lunch?
3      A.  I don't know.
4      Q.  And is lunch for reporters unpaid
5  time?
6      A.  I don't know.  I don't know.
7      Q.  Are reporters required to eat on
8  their lunch or can they conduct whatever personal
9  tasks they wish to conduct?
10      A.  In my experience most people ate
11  lunch at their desks.
12      Q.  But if a reporter takes lunch or a
13  midday break period away from their desk or office
14  or whatever their workspace is, could they eat
15  lunch or perform other personal errands they wish
16  to conduct?
17      A.  I would expect them to be in touch
18  with their supervisor about it.
19      Q.  About what?
20      A.  If they were going to be
21  unavailable to work for a period of time, I would
22  expect them to let their supervisor know.
23      Q.  But if they're simply taking their
24  usual midday lunch or midday break, would you

TSG Reporting - Worldwide    877-702-9580

Page 104

J. ANGELO

1  expect them to inform their supervisor of what
2  they were doing during that period?
3      A.  If they were going to be
4  unavailable to work, yes.
5      Q.  But is it your expectation that
6  when reporters take their lunch they're often
7  unavailable for work temporarily?
8      A.  Not necessarily.  If they were
9  going to do paid employment for someone else I
10  would certainly expect them to tell their
11  supervisor about it.
12      Q.  But is it your expectation when a
13  reporter takes their lunch or midday break that
14  they inform their supervisor about it?
15      A.  When I was a reporter I remember
16  many a half-eaten sandwich on my desk.
17      Q.  That's not my desk.
18      A.  They're still not available to
19  work --
20      Q.  Sir, let me finish my question.
21      Is it your expectation that
22  reporters inform their manager or supervisor when
23  they're taking their lunch or midday break?
24      A.  Yes.

TSG Reporting - Worldwide    877-702-9580

Page 105

J. ANGELO

1      Q.  So, do any of your subordinates
2  inform you when they're taking lunch?
3      A.  Yes.
4      Q.  Do they do that on a daily basis?
5      MR. LERNER: Objection.
6      A.  Again, there's a difference
7  between -- subordinates in my case might be a vice
8  president of marketing, as opposed to a reporter
9  that is covering a beat or time-sensitive
10  information, which is incredibly important.
11      Q.  And are you aware of whether or not
12  reporters inform their editors whenever they're
13  taking lunch?
14      A.  I don't know.
15      Q.  Is there any policy with respect to
16  that?
17      A.  I don't know.
18      Q.  And are you aware of whether or not
19  Ms. Livingston was able to answer her phone or
20  text or otherwise stay in touch with the office or
21  her supervisors while she was mystery shopping?
22      A.  My understanding is that her
23  mystery shopping was done over the phone; was it
24  not?  It's impossible to be doing work for The New

TSG Reporting - Worldwide    877-702-9580

27 (Pages 102 to 105)

Page 106

J. ANGELO

1    J. ANGELO
2  York Post when you're working for someone else.
3      Q.   Are you aware of how much time she
4  spent doing that?
5      A.   I know it was some percentage of
6  the occasions.
7      Q.   Were you able to discern from the
8  documents which were phone mystery shops and which
9  were other mystery shops?
10     A.   I believe the document does
11 indicate that.
12     Q.   And does it indicate how long the
13 phone calls lasted?
14     A.   I don't believe the document that
15 you presented to me does.
16     Q.   Do you recall seeing any document
17 that does indicate how long the phone calls
18 lasted?
19     A.   Not that I recall.
20         MR. PEARSON:  No further questions.
21         MR. LERNER:  Quick point of
22   clarification.
23 EXAMINATION BY
24 MR. LERNER:
25     Q.   Mr. Angelo, on Exhibit 32 there's

TSG Reporting - Worldwide    877-702-9580

Page 107

J. ANGELO

1  an e-mail on the first page, NYPFL 4874, and you
2  were asked earlier in the deposition did you write
3  this e-mail.  Let us know if there's any
4  clarification you had with respect to that
5  testimony.
6      A.   Yes.  I was imprecise in my answer
7  before.  I sent that e-mail.  The body of the
8  e-mail was drafted, and I approved and edited it.
9  But I want to make sure that was clear.
10     Q.   And was that done in consultation
11 with counsel?
12     A.   Yes, it was.
13     Q.   Did anybody besides an attorney
14 have a role, along with you, in drafting that
15 e-mail?
16     A.   No.
17     Q.   During the drafting process did you
18 discuss the drafting of this e-mail with anybody
19 other than counsel?
20     A.   No.
21         MR. LERNER:  No further questions.
22 EXAMINATION BY
23 MR. PEARSON:
24     Q.   At any time did you make any edits

TSG Reporting - Worldwide    877-702-9580

Page 108

J. ANGELO

1      J. ANGELO
2  to the Exhibit 32 first page e-mail?
3      A.   I believe we just discussed that,
4  yes.
5      Q.   Okay.
6      A.   I saw it and approved it.
7      Q.   By yourself?
8      A.   Yes, with counsel.
9         MR. PEARSON:  No further questions.
10        (Time Ended: 12:57 p.m.)
11
12   _____
13   JESSE ANGELO
14
15 Subscribed and sworn to
16 before me this      day
17 of         , 2013.
18
19 _____
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 109

1
2      INDEX:
3  WITNESS        EXAM BY:         PAGE:
4  J. Angelo    Mr. Pearson         5
5               Mr. Lerner        106
6               Mr. Pearson       107
7
8      EXHIBITS
9  Exhibit No.               Page:
10 Angelo Exhibit 31  Record of Mystery Shopping 37
         (NYPFL 3980 - 3998)
11
12 Angelo Exhibit 32  E-mail          92
         (NYPFL 4874 - 4875)
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

28  (Pages 106 to 109)