Exhibit 12

```
           IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
           Case No. 09-CIV-9832 (BSJ)(RLE)
           Case No. 09-CIV-9323 (BSJ)(RLE)

------------------------------------------x
AUSTIN FENNER and IKIMULISA LIVINGSTON,

                       Plaintiffs,
     v.
NEWS CORPORATION, NYP HOLDINGS, INC.,
d/b/a THE NEW YORK POST and DAN GREENFIELD
and MICHELLE GOTTHELF,
                       Defendants.
------------------------------------------x
SANDRA GUZMAN,
                       Plaintiff,
     v.
NEWS CORPORATION, NYP HOLDINGS, INC.,
d/b/a THE NEW YORK POST and COL ALLAN, in
his official and individual capacities,
                       Defendants.
------------------------------------------x
                 CONFIDENTIAL
       VIDEOTAPED DEPOSITION OF AMY SCIALDONE
           New York, New York
           Thursday, June 28, 2012
Reported by:
Amy A. Rivera, CSR, RPR, CLR
JOB NO. 51053
```

## Page 366

1  AMY SCIALDONE - CONFIDENTIAL
2  MR. PIESCO: Objection.
3  You can answer.
4
5
6
7
8
9
10
11
12
13       REDACTED
14
15
16
17
18
19
20
21
22
23
24
25

## Page 367

1  AMY SCIALDONE
2  MR. PIESCO: Objection.
3  You can answer.
4  A. No.
5  MR. CLARK: Can you mark this as 23.
6  We're getting very close. In fact, I think
7  this is about...
8  (Exhibit Scialdone 23, a memo dated
9  December 2, 2008 bearing Bates number NYP-FL
10 2322, was marked for identification at this
11 time.)
12 MR. PIESCO: Twenty-three?
13 MR. CLARK: Yes.
14 MR. PIESCO: Take your time.
15 MR. CLARK: It's a lot to read.
16 MR. PIESCO: Yes.
17 MR. CLARK: It's one page.
18 MR. PIESCO: Read the whole thing.
19 THE WITNESS: Yes.
20 MR. PIESCO: Go ahead.
21 For the record, Paul, this document
22 should be marked confidential. I don't know
23 why it is not. I don't know if that was a
24 mistake on our end, I just want --
25 MR. CLARK: This was what you produced

## Page 368

1  AMY SCIALDONE - CONFIDENTIAL
2  to us.
3  MR. PIESCO: I get that 100 percent,
4  Paul, I just -- obviously, the information
5  in here is confidential.
6  This document should have been marked
7  confidential, I think, but...
8  THE WITNESS: Okay.
9  BY MR. CLARK:
10 Q. Have you had a chance?
11 A. Yes.
12 MR. PIESCO: Hold on one minute? Let
13 the truck pass, please.
14 Thanks.
15
16
17
18
19       REDACTED
20
21
22
23
24
25

## Page 369

AMY SCIALDONE - CONFIDENTIAL

REDACTED

```
 1
 2         UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK
 3
    AUSTIN FENNER and IKIMULISA    )
 4  LIVINGSTON,                    )
                                   )
 5            Plaintiffs,          )
                                   )
 6            vs.                  ) 09CIV9832
                                   ) (BSJ(RLE)
 7  NEWS CORPORATION, NYP HOLDINGS,)
    INC., d/b/a THE NEW YORK POST, )
 8  and DAN GREENFIELD and MICHELLE)
    GOTTHELF,                      )
 9                                 )
              Defendants.          )
10  -------------------------------)
11
12
13
14       DEPOSITION OF AMY SCIALDONE
15            New York, New York
16        Tuesday, April 16, 2013
17
18
19
20
21
22
23
    Reported by:
24  Philip Rizzuti
    JOB NO. 59959
25
```

## Page 30

1      Scialdone
2  letter in your opinion provide a justification
3  for Ms. Livingston's termination?
4      A.  Well a decision had been made and
5  the fact that she had been working another job
6  during her shifts over 400 times in a period
7  of consistently for four or five years without
8  getting any approval or discussing that with
9  her supervisors seemed to be -- I believe that
10 to be the reason for her termination, I agreed
11 with that.
12     Q.  And when you refer to other jobs,
13 are you referring to Mystery Shopping?
14     A.  Yes, as detailed in the letter.
15     Q.  Are you aware of what any of those
16 instances of Mystery Shopping actually
17 entailed as far as what Ms. Livingston was
18 doing on those occasions?
19     A.  Only what is detailed in the
20 letter.
21     Q.  Did Mr. Angelo ask you for any
22 input into the termination of Ms. Livingston?
23     A.  No.
24     Q.  Did Mr. Angelo ever ask you if you
25 agreed with the termination of Ms. Livingston?

## Page 31

1      Scialdone
2      MR. LERNER:  Again outside of the
3   presence of counsel.  Do you need the
4   question read back?
5      (Record read.)
6      A.  No.
7      Q.  Did you ever discuss Ms.
8  Livingston's Mystery Shopping activities with
9  her?
10     A.  No.
11     Q.  Are you aware of anyone else
12 having discussed Ms. Livingston's Mystery
13 Shopping activities with her at the New York
14 Post?
15     A.  No.
16     Q.  Are you aware of whether or not
17 Ms. Livingston was ever asked by an employee
18 of the New York Post to stop her Mystery
19 Shopping activities?
20     A.  No, I was not aware she was doing
21 Mystery Shopping, or anyone had spoken to her
22 about it.
23     Q.  Prior to -- well let me ask this
24 question first.
25         Did you meet with Ms. Livingston

## Page 32

1      Scialdone
2  on or around February 26th to inform her of
3  her termination?
4      A.  Yes.
5      Q.  And when was the last time you had
6  communicated with Ms. Livingston before that
7  termination meeting?
8      A.  The day before through E-mail
9  requesting her to come in.
10     Q.  And before that when was the last
11 time you had communicated with Ms. Livingston?
12     A.  I don't recall.
13     Q.  Do you believe that you had
14 communicated with Ms. Livingston at any point
15 during the year prior to sending her the
16 E-mail about the meeting?
17        MR. LERNER:  During the twelve
18    months ending on February 25th?
19     Q.  Yes, that twelve month period,
20 yes, February 25, 2012 to --
21     A.  Not that I recall.
22     Q.  Can you recall any communications
23 you had with Ms. Livingston between the time
24 of her deposition in connection with this
25 matter and her termination?

## Page 33

1      Scialdone
2      MR. LERNER:  Objection.
3      A.  What timeframe deposition are you
4  talking about?
5      Q.  I would say approximately the very
6  beginning of 2012 through the present?
7      A.  Can you rephrase the question?
8      Q.  Certainly.  In fact let's phrase
9  it this way.  Can you recall any other
10 communications with Ms. Livingston between the
11 end of 2011 through the time you sent her the
12 E-mail about the meeting?
13        MR. LERNER:  Objection.
14     A.  I don't recall.
15     Q.  Did you ever review any
16 transcripts of depositions of Ms. Livingston?
17     A.  No.
18     Q.  Are you aware of any New York Post
19 reporters having been disciplined for taking
20 excessive time for lunch?
21     A.  No.
22     Q.  Are you aware of any New York Post
23 reporters having been disciplined for taking
24 excessive break time?
25     MR. LERNER:  Objection.

Page 34

1  Scialdone
2  A. Not that I recall.
3  Q. Are you aware of any New York Post
4  reporters having been disciplined or
5  terminated in connection with work for another
6  employer or entity other than the Post?
7  A. No.
8  Q. Are you aware of any terminations
9  of reporters in connection with excessive
10 lunch or break time?
11     MR. LERNER: Objection.
12 A. I am not aware of reporters who
13 have had excessive time, taken excessive time.
14 Q. Are you aware of any New York Post
15 reporters who write for other publications or
16 outlets other than the Post?
17 A. No.
18 Q. Are you aware of whether or not
19 the Post has any policies regarding its
20 reporters writing for other publications or
21 outlets?
22     MR. LERNER: Objection.
23 A. That would be based on conflicts
24 of interest and Standards of Business Conduct.
25 It could potentially be a conflict of interest

Page 35

1  Scialdone
2  and you would have to get written permission
3  if you were looking into something like that.
4  Q. And would that conflict of
5  interest requirement that written permission
6  be obtained apply to any or all other income
7  generating activities that a New York Post
8  reporter might engage in apart from their
9  employment with the New York Post?
10     MR. LERNER: Objection. You can
11     answer.
12 A. Can you repeat the question,
13 sorry.
14 Q. Do you --
15 A. I am distracted by the noise.
16     MR. PEARSON: Read it back.
17     (Record read.)
18     MR. LERNER: If you understand the
19     question you can answer it.
20 A. My understanding is that the
21 conflict of interest where you are working a
22 second job is not allowed, working a second
23 job or generating income is not allowed by the
24 New York Post unless you are getting some type
25 of written permission from your supervisor to

Page 36

1  Scialdone
2  do so because it could be potentially a
3  conflict of interest.
4  Q. If a reporter is generating income
5  from a source other than another job would
6  that be covered by the conflict of interest
7  policy you described?
8      MR. LERNER: Objection.
9  A. I would have to look at all the
10 details and understand what that is. But a
11 full-time job with the Post would prohibit
12 working another job.
13 Q. Did you ever have any discussions
14 with anyone either at the Post or any of its
15 affiliates or parents about whether or not Ms.
16 Livingston's Mystery Shopping activities would
17 be considered a job?
18     MR. LERNER: Objection.
19 A. Repeat the question.
20 Q. Sure. Did you ever talk with
21 anybody at the New York Post or News
22 Corporation about whether or not Ms.
23 Livingston's Mystery Shopping activities would
24 be considered a job or employment?
25     MR. LERNER: Objection.

Page 37

1  Scialdone
2  A. I never spoke with anyone at the
3  New York Post about Ms. Livingston's Mystery
4  Shopping.
5  Q. Apart from Mr. Angelo?
6  A. Apart from counsel.
7  Q. And Mr. Angelo?
8      MR. LERNER: Objection.
9  A. The information that I have on
10 Mystery Shopping is in Mr. Angelo's letter.
11 Q. Did you discuss that letter with
12 Mr. Angelo?
13 A. He provided me the letter.
14 Q. Did you discuss it with
15 Mr. Angelo?
16     MR. LERNER: Outside the presence
17     of counsel.
18 A. No.
19 Q. So would the conflict of interest
20 policy that you described apply to reporters
21 who spent time collecting income as let's say
22 a movie extra?
23     MR. LERNER: Objection.
24     Incomplete hypothetical.
25 A. Anything else they are doing

1 Scialdone
2 outside of the Post collecting income I would
3 have to look into the details of, and if they
4 would have received permission to do so or
5 not.
6 Q. Are you aware of whether or not
7 Mr. Angelo ever looked into the details of
8 whether or not Mystery Shopping would be
9 covered by the conflict of interest policy?
10 MR. LERNER: Objection.
11 A. I don't know if he looked into it.
12 Q. Are you aware of whether or not
13 there are any requirements or guidelines at
14 the Post regarding when reporters are to take
15 lunch?
16 MR. LERNER: Objection.
17 A. Specifically when they take lunch
18 would be based on their schedule, but they are
19 allowed a half hour lunch based by law.
20 Q. Okay. Is that based on your
21 understanding of New York State law?
22 A. It is my understanding by law that
23 they are required to have a half hour lunch.
24 Q. What about under the Post
25 policies, what if any rules or guidelines are

1 Scialdone
2 there regarding lunch breaks for reporters?
3 A. That is what we follow.
4 Q. Is that expressed in any written
5 policy?
6 A. Not that I recall.
7 Q. Do you know what Mystery Shopping
8 is?
9 A. I understand it to be working for
10 a company going in undercover or without
11 someone knowing that you are working for them
12 and assessing their business.
13 Q. Have you discussed Mystery
14 Shopping with anybody apart from in meetings
15 with counsel?
16 A. No.
17 Q. And apart from the termination
18 letter how did you become aware that Ms.
19 Livingston ever engaged in Mystery Shopping?
20 MR. LERNER: Well the problem with
21 that letter is that she -- the answer may
22 reflect conversations that she had with
23 counsel that are privileged.
24 MR. PEARSON: Can we just go off
25 the record very briefly. Off the record.

1 Scialdone
2 (Recess taken.)
3 Q. Would you read back the question.
4 (Record read.)
5 MR. LERNER: Objection. You can
6 answer.
7 A. The conversation with counsel.
8 Q. And apart from the termination
9 letter did you review any other documents
10 regarding Ms. Livingston's Mystery Shopping
11 activities?
12 A. No.
13 Q. Are you aware of whether or not
14 Ms. Livingston ever testified about her
15 Mystery Shopping activities?
16 A. Yes.
17 Q. What is your understanding about
18 when Ms. Livingston testified about Mystery
19 Shopping activities?
20 A. My understanding is that she
21 testified in her 2013 deposition about her
22 activities, Mystery Shopping activities.
23 Q. Are you aware of any other
24 testimony about her Mystery Shopping
25 activities?

1 Scialdone
2 A. No.
3 Q. Are you aware of whether Ms.
4 Livingston ever performed reporter duties
5 outside of business hours between 9 and 5
6 p.m.?
7 A. I am not aware of what her
8 reporter duties were for the New York Post or
9 schedule. So it could have been outside those
10 hours, I don't know her specific schedule.
11 Q. Are you aware of whether or not
12 Ms. Livingston ever reported overtime?
13 A. She was eligible for it, I don't
14 know if she reported it.
15 Q. Apart from eating lunch are there
16 other permissible non-work related activities
17 that reporters may engage in over the course
18 of the workday?
19 MR. LERNER: Objection.
20 A. If reporters during their working
21 hours, the expectation is that they are
22 working on work related activities.
23 Q. Is the expectation that during
24 working hours reporters only either eat lunch
25 or spend time on their reporting activities?

Page 42

1 Scialdone
2 MR. LERNER: Objection.
3 A. My expectation is they are working
4 their shift.
5 Q. I understand. But are there other
6 activities that a reporter could permissibly
7 engage in without running afoul of any New
8 York Post policies that do not relate to their
9 work as a reporter?
10 MR. LERNER: Objection.
11 A. Such as using the lady's room; I
12 mean personal -- is that what you are talking
13 about?
14 Q. Well certainly using the lady's
15 room, men's room might be one example. Are
16 there other examples that you can think of?
17 A. I am sure there is certainly a
18 personal call that they may need to make or
19 something like that. But anything else
20 outside of that that they would need to let
21 their supervisor know if they are not
22 available or needing to leave their shift for
23 any reason outside of the time they are taking
24 off, I would expect that they are working.
25 Q. Are you aware of whether or not

Page 43

1 Scialdone
2 reporters ever run personal errands during the
3 course of their workday?
4 A. I don't know.
5 Q. Are you aware of any reporters
6 going to the gym over the course of their
7 workday?
8 A. No.
9 Q. Are you aware of reporters ever
10 going to medical or other health related
11 appointments over the course of the workday?
12 A. No.
13 Q. Would going to the gym during the
14 workday be a permissible activity for a
15 reporter to engage in?
16 MR. LERNER: Objection.
17 A. That would be between them and
18 their supervisor.
19 Q. Would that also be the case for
20 personal errands or medical appointments?
21 MR. LERNER: Objection.
22 A. For a reporter who is on
23 assignment, you know, considering the type of
24 business we are in, anything that would take
25 them away from their assignment and that they

Page 44

1 Scialdone
2 would be unavailable, I would think that they
3 need to let their supervisor know and get
4 permission to do so.
5 Q. Are you aware of whether or not
6 Ms. Livingston ever spoke to her supervisors
7 about her Mystery Shopping activities?
8 A. No.
9 Q. Did anyone ever tell you whether
10 or not Ms. Livingston had spoken to her
11 supervisors about her Mystery Shopping
12 activities?
13 A. Prior to the 2013 deposition where
14 she stated she had not?
15 Q. Or at any time prior to her
16 termination?
17 A. Just from what I understand in the
18 letter, from Jesse's letter about the
19 termination that she hadn't.
20 Q. I see.
21 MR. LERNER: Off the record for a
22 break.
23 (Recess taken.)
24 Q. So Ms. Scialdone, is there any
25 written New York Post policy requiring that

Page 45

1 Scialdone
2 reporters or other Post employees share any
3 non-work related activities apart from using
4 the restroom or eating lunch with their
5 supervisors?
6 MR. LERNER: Objection.
7 A. As I mentioned if it is something
8 that is going to take a reporter away from a
9 scene, a court where activity is happening
10 that day and that, you know, they are going to
11 be unavailable, they should let their
12 supervisor know, or if it could potentially be
13 a conflict of interest they should let their
14 supervisor know.
15 Q. And is that policy in writing
16 anywhere?
17 A. I believe in the Standards of
18 Business Conduct about conflict of interest
19 with second jobs, that is your guideline.
20 Q. Are you aware of any performance
21 issues on the part of Ms. Livingston in her
22 job at the Post that were attributed to her
23 Mystery Shopping?
24 A. No.
25 Q. Are you aware of whether or not