UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
:
AUSTIN FENNER and :
IKIMULISA LIVINGSTON, :
:
                Plaintiffs, :
:
          vs. :   Civ. No.: 09 CV 9832 (LGS)
:
NEWS CORPORATION, NYP HOLDINGS, :
INC., d/b/a THE NEW YORK POST, :
MICHELLE GOTTHELF, and DANIEL :
GREENFIELD, in their official and individual :
capacities, :
:
                Defendants. :
-------------------------------------------------------------x

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS NYP HOLDINGS, INC., MICHELLE
GOTTHELF and DANIEL GREENFIELD'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
Marc E. Kasowitz (mkasowitz@kasowitz.com)
Mark W. Lerner (mlerner@kasowitz.com)
Blythe E. Lovinger (blovinger@kasowitz.com)
Garrett D. Kennedy (gkennedy@kasowitz.com)
1633 Broadway
New York, New York 10019
Tel.:   (212) 506-1700

Attorneys for Defendants NYP Holdings, Inc.,
d/b/a the New York Post, Michelle Gotthelf, and
Daniel Greenfield

**TABLE OF CONTENTS**

Table of Authorities .................................................................................................................. ii

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................... 2

I.    Plaintiffs' Inflammatory, Untrue, and Unsupported
Accusations are Inadmissible ........................................................................................... 2

II.   Fenner's Claims Must be Dismissed ................................................................................ 3

       A.    Fenner's Admissions Demonstrate the Post's
             Legitimate, Non-Discriminatory Reason for His Termination ............................... 3

       B.    Fenner Has Presented No Evidence of Discriminatory Animus ............................. 6

       C.    Fenner's Retaliation Claim Is Devoid of Merit ....................................................... 6

III.  Livingston's Discrimination Claims Properly Should Be Dismissed ............................... 7

       A.    Livingston's Reassignment from the Queens Courthouses .................................... 7

       B.    Livingston Has Adduced No Evidence of Discriminatory Animus ....................... 8

       C.    Livingston's Retaliation Claim Has is Devoid of Merit ......................................... 9

IV.  Fenner And Livingston Have Adduced No Evidence of Disparate Pay ......................... 10

CONCLUSION .......................................................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Armstrong v. Whirlpool Corp.,
   363 Fed. Appx. 317 (6th Cir. 2010)..................................................................................9

Beachum v. AWISCO N.Y.,
   785 F. Supp. 2d 84 (S.D.N.Y. 2011),
   aff'd, 459 Fed. Appx. 58 (2d Cir. 2012) ............................................................................8

Block v. Gatling,
   84 A.D.3d 445 (N.Y. App. Div. 2011) .............................................................................7

Branch v. Sony Music Entm't, Inc.,
   2001 WL 228108 (S.D.N.Y. Mar. 8, 2001),
   aff'd, 34 Fed. App'x 23 (2d Cir. 2002)..............................................................................2

Browne v. City Univ. of N.Y.,
   419 F. Supp. 2d 315 (E.D.N.Y. 2005) ..............................................................................8

Dent v. U.S. Tennis Ass'n,
   2011 WL 308417 (E.D.N.Y. Jan. 27, 2011) .....................................................................2

Galabya v. N.Y. City Bd. of Educ.,
   202 F.3d 636 (2d Cir. 2000)..............................................................................................7

Garber v. N.Y.C. Police Dep't,
   1997 WL 525396 (S.D.N.Y. Aug. 22, 1997)....................................................................8

Graves v. Deutsche Bank Securities,
   2011 WL 1044357 (S.D.N.Y. Mar. 4, 2011) ....................................................................1

Howe v. Town of Hempstead,
   2006 WL 3095819 (E.D.N.Y. Oct. 30, 2006)...................................................................9

Joseph v. Thompson,
   2005 WL 3626778 (E.D.N.Y. Mar. 23, 2005)..................................................................8

Loucar v. Boston Mkt. Corp.,
   294 F. Supp. 2d 472 (S.D.N.Y. 2003)...............................................................................1

Meiri v. Dacon,
   759 F.2d 989 (2d Cir. 1985).................................................................................4, 5, 6, 9

Miller v. Nat'l Ass'n of Secs. Dealers, Inc.,
 703 F. Supp. 2d 230 (E.D.N.Y. 2010) .................................................................3, 7

Patterson v. Cnty. of Oneida,
 375 F.3d 206 (2d Cir. 2004)....................................................................................3

Ponniah Das v. Our Lady of Mercy Med. Ctr.,
 2002 WL 826877 (S.D.N.Y. Apr. 30, 2002)...........................................................4

Ramos v. Baldor Specialty Foods, Inc.,
 687 F3d 554 (2d Cir. 2012).....................................................................................7

Ricks v. Conde Nast Pubs., Inc.,
 92 F. Supp. 2d 338 (S.D.N.Y. 2000),
 aff'd 6 Fed. Appx. 74 (2d Cir. 2001) .......................................................................5

Santos v. Engelhard Corp.,
 2009 WL 2432736 (S.D.N.Y. Aug. 6, 2009)..........................................................2

Shabat v. Billotti,
 108 F.3d 1370 (2d Cir. 1997)..................................................................................5

Silva v. Peninsula Hotel,
 509 F. Supp. 2d 364 (S.D.N.Y. 2007).....................................................................4

Spina v. Our Lady of Mercy Med. Ctr.,
 2003 WL 22434143 (S.D.N.Y. 2003),
 aff'd, 120 Fed. Appx. 408 (2d Cir. 2005) ...............................................................1

Terry v. Ashcroft,
 336 F.3d 128 (2d Cir. 2003)....................................................................................7

Thornley v. Penton Pub., Inc.,
 104 F.3d 26 (2d Cir. 1997)......................................................................................5

Valentine v. Standard & Poor's,
 50 F. Supp. 2d 262 (S.D.N.Y. 1999).......................................................................5

Watson v. Arts & Ent. Tele. Network,
 2008 WL 793596 (S.D.N.Y. Mar. 26, 2008) .........................................................2

Williams v. N.Y.C. Dept. of Sanitation,
 2001 WL 1154627 (S.D.N.Y. Sept. 28, 2001).......................................................6

Defendants submit this Reply Memorandum of Law in further support of their Motion for Summary Judgment (the "Motion") seeking dismissal of Plaintiffs' claims in their entirety.[1]

## PRELIMINARY STATEMENT

Unable to rebut the Motion with admissible evidence, Plaintiffs rely on misstatements of the record, unsupported assertions, conclusory assertions, and false, irrelevant and/or inadmissible material of an inflammatory nature. Their approach is clear: present an opaque storm of "facts" to obscure the Court's view of what is actually a very simple story of two underperforming employees who never experienced discriminatory treatment by Defendants.

The Court should not be swayed by this approach. Plaintiffs have failed to dispute through admissible (or any) evidence the vast majority of material facts set forth in Defendants' Rule 56.1 Statement, and all such facts must be deemed admitted. See Loucar v. Boston Mkt. Corp., 294 F. Supp. 2d 472, 478 (S.D.N.Y. 2003) (deeming facts admitted because "plaintiff offers nothing but unsupported conclusory statements and denials . . . ."). As has been held, Rule 56.1 was adopted "'to supply the Court with an accurate factual record and to prohibit . . . misleading and unfair 'shortcuts' (i.e., unsupported denials).'" Spina v. Our Lady of Mercy Med. Ctr., 2003 WL 22434143, at *2 (S.D.N.Y. 2003), aff'd, 120 Fed. Appx. 408 (2d Cir. 2005).

Through the instant reply, Defendants endeavor to both "set the record straight," and to direct the Court's attention to undisputed material facts which show that Plaintiffs have failed to offer any competent evidence to support their *prima facie* cases, let alone offer sufficient evidence to show that Defendants' legitimate non-discriminatory reasons are pretextual.

---

[1] As a threshold matter, the Opposition Memorandum and the Rule 56.1 Counterstatement of Material Facts ("CSMF") should be rejected because they were not filed, as required by the Court's order, on May 24, 2013, but in the early hours of May 25, 2013. See Graves v. Deutsche Bank Securities, 2011 WL 1044357 (S.D.N.Y. Mar. 4, 2011). Plaintiffs' Memorandum of Law in opposition to the Motion is referred to herein as "Opp. Mem." Defendants' Memorandum of Law in Support of the Motion is referred to herein as "Mov. Mem." Submitted herewith is the supplemental declaration of Mark W. Lerner, dated May 31, 2013 ("Rep. Dec."). References to the Pearson Declaration, dated May 24, 2013, in support of Plaintiffs' Memorandum of Law in opposition to the Motion ("Pl. Brf.") are cited as "Pear. Dec." All other abbreviated references are as defined in the Motion.

**ARGUMENT**

I. <u>**Plaintiffs' Inflammatory, Untrue, and Unsupported Accusations are Inadmissible**</u>

Plaintiffs open their Memorandum by trying to manufacture evidence that Michelle Gotthelf and Dan Greenfield had racial animus by falsely claiming that the Post generally mistreats its minority employees. This general approach is legally unsound, and the individual allegations are not based on reliable, well-founded, or admissible evidence.[2] By way of illustration:

- Plaintiffs rely on the Affidavit of Shari Logan to say that the Post had "only one non-White editor" in 2009. (Pl. Brf. at 5; Pear. Dec., Exh. 5.) This is deliberately deceptive: ***Logan recanted this statement at deposition***, testified to knowing many non-white editors (Logan at 127-33 [Rep. Dec., Exh. 1]), and stated about this portion of her affidavit, "**[I]t's not accurate**." (Id. at 133 [emphasis added].)[3]

- Plaintiffs claim – without evidence – that Logan and Ebony Clark, copy assistants, were "denied promotions" because of their race (Pl. Brf. at 3), yet both admitted to having no personal knowledge regarding promotions of white copy assistants or differential treatment, and there is no evidence that the decision-makers relating to Clark and Logan are common with Plaintiffs. (See, e.g., Clark at 211-14; Logan at 224-25 [Rep. Dec., Exhs. 1, 2].)

- Plaintiffs claim Leonard Greene was "denied advancement" because of his race, but ignore that he declined the opportunity to become an editor (Gott. at 298-99 [Rep. Dec., Exh. 3]), and there is undisputed evidence of legitimate business reasons for him not becoming a columnist. (Allan at 373 [Pear. Dec., Exh. 8].)

---

[2] Suffice it to say, once the Court reviews the record against Plaintiffs' CSMF, it will be readily apparent that the vast majority of Defendants' assertions of undisputed material fact must be deemed admitted due to failures to cite contrary record material, due to responses by means of argument – not facts – and other defects.

[3] This "evidence" of the Post's demographics is not probative of discrimination. See Watson v. Arts & Ent. Tele. Network, 2008 WL 793596, at *17 n. 5 (S.D.N.Y. Mar. 26, 2008) (the "mere fact that [plaintiff] may have been the only member of her protected class in her department does not give rise to an issue of fact") (collecting cases). To the contrary, "a plaintiff must 'identify a specific employment practice, rather than rely on bottom line numbers in an employer's workforce' to support an inference of discrimination. Branch v. Sony Music Entm't, Inc., 2001 WL 228108, at *6 (S.D.N.Y. Mar. 8, 2001), aff'd, 34 Fed. Appx. 23 (2d Cir. 2002). "Without statistical evidence such as the number of African-American applicants and the respective qualifications . . . no reasonable juror could" rely on a purported workforce imbalance to find racial animus. Dent v. U.S. Tennis Ass'n, 2011 WL 308417, at *8 (E.D.N.Y. Jan. 27, 2011) (citation omitted). Plaintiffs neither identify a specific practice, nor produce evidence of the Post's applicant pool or their qualifications. See also Santos v. Engelhard Corp., 2009 WL 2432736, at *13 (S.D.N.Y. Aug. 6, 2009) ("[Plaintiff's] argument that he was the only Hispanic . . . is, standing alone, insufficient as a matter of law to demonstrate pretext.").

- Plaintiffs conclusorily claim someone named Leonard Blair was fired for "challenging the NYPD's . . . stop-and-frisk" policy, but there is no evidence regarding any decision made about him, much less the relevant decision-maker.

- Plaintiffs reference Doug Montero (who is not black) losing his column, but omit such was due to serious misconduct for which he was almost fired; as Gotthelf noted, "[I]t would be embarrassing for him" (Gott. at 142 [Pear. Dec., Exh. 4]), and they provide no evidence as to who the relevant decision-makers were.

Regrettably, this trend extends to Plaintiffs' individual claims: in their CSMF, ¶ 96, Livingston asserts that certain white reporters have desks assigned to them, but she explicitly testified, "I don't know if it was exclusively assigned to them," and "I don't know [what general assignment reporters have desks]." (Living. at 192 [Pear. Dec., Exh. 1].) Plaintiffs claim that Livingston was denied "telephone, access to archives, [and] librarians," but she testified her cell-phone was reimbursed by the Post and she had telephonic access to the Post's archives and librarians (id. at 200, 247), just as all runners do (See Green. at 255-56, Gott. at 226 [Pear. Dec., Exh. 3, 4]). See, e.g., Patterson v. Cnty. of Oneida, 375 F.3d 206, 219 (2d Cir. 2004) ("[A]n affidavit's hearsay assertion that would not be admissible at trial . . . is insufficient to create a genuine issue . . . ."). She also fails to acknowledge that while stationed in a courthouse for three years, her telephonic access to archives and the library was the same as her access as a runner. (See Gott. at 226 [Pear. Dec., Exh. 4].) Plaintiffs also claim that "white employees are permitted to utter racial epithets," citing only 3 examples over 12 years: one at a barroom in 2001, where the individual was *immediately* reprimanded by a supervisor (Allan at 253-54 [Pear. Dec., Exh. 8]), and two that lack evidentiary foundation.

## II.   Fenner's Claims Must be Dismissed

### A.   Fenner's Admissions Demonstrate the Post's Legitimate, Non-Discriminatory Reason for His Termination

Fenner has failed to demonstrate that Defendants' belief in his underperformance "was not the actual justification" for his termination, Miller v. Nat'l Ass'n of Secs. Dealers, Inc., 703

3

F. Supp. 2d 230, 247 (E.D.N.Y. 2010), and his attacks on the correctness of that belief are legally irrelevant. Silva v. Peninsula Hotel, 509 F. Supp. 2d 364, 386-87 (S.D.N.Y. 2007) (citations omitted) (even if "assessment . . . was [un]justified, [their] belief in [his] inadequacy precludes liability"); Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985) (granting summary judgment where employer held "honest belief that [employee's] job performance simply did not measure up").

Fenner admits he was hired to write enterprise stories ("generated by the reporter and not assigned by an editor") (CSMF ¶¶ 10, 13), but he serially failed to do so. Criticism for this is well-documented in performance evaluations ("APAs"), warnings in 2008 and 2009 (Lern. Dec., Exh. 4, 5), and e-mails (id., Exh. 7, 9). Indeed, he wrote in his 2009 Self-Evaluation that he "needs to . . . produce more exciting-hard hitting enterprise stories," (CSMF ¶ 41) and the record he presents in opposition to this motion is (reflecting reality) almost barren of enterprise stories: he cites only a few stories (Opp. Mem. at 9), but admits two – his Dolan interview and the Miracle on the Hudson – were assigned and *ergo* not enterprise. (CSMF ¶¶ 10, 44-45.) He can identify precious little enterprise work, and the only enterprise pitch he cites for ***all of FY 2009*** was a story that was rejected because the New York Times had previously published it. (Id. ¶ 48; Fenn. 113-115 [Lern. Dec., Exh. 3].) Certainly, "courts may, and often must, rely on evaluations by supervisors," such as these, to evidence an employer's honest belief in an employee's subpar performance. Ponniah Das v. Our Lady of Mercy Med. Ctr., 2002 WL 826877, at *8 (S.D.N.Y. Apr. 30, 2002).

But here, the Court can rely on Fenner's own admissions. Fenner also does not refute testimony by his supervisors that his writing was "poor," "often needed significant editing," and contained errors, among other things. (CSMF ¶ 16.) Published stories are not rebuttal evidence, as they are edited. (Green. at 114-15 [Lern. Dec., Exh. 1]). He also admits to numerous

4

problems with his work on specific stories, known to and criticized contemporaneously by his supervisors. (CSMF ¶¶ 24-25, 33, 35-37, 51, 52). Especially telling is that the stories he touts as his best here were flawed: his Bishop Dolan adoption story had been covered in another publication (id., ¶ 46), and his story of a church group attending the Obama inauguration was a small "brief" running on page 30 as the last article in a 32-page Presidential Inauguration section (id., ¶ 47). Most revealing is this reckless Affidavit statement:

> After my termination, I learned that the 2010 New York Press Club award was presented to the Post *for my contributions* to coverage of President Obama's first inauguration, which chronicled a bus caravan from a Harlem church [to the inauguration]. (Fenn. Aff., ¶ 4 [emphasis added].)

Not true. Rather, *the Post staff*, not Fenner, won the 2010 New York Press Club Award for the 32-page section on the inauguration (Rep. Dec., Exh. 4), and not "for [Fenner's] contributions." (Id., Exh. 5.) Fenner's resort to outright deception highlights his empty record.

Fenner also admits that after receiving his 2009 *final* warning requiring immediate improvement, his performance did *not* improve, and he only believed the warning was racist because he disagreed with it. (CSMF ¶¶ 57-59; Lern. Dec., Exh. 5.) After the warning, he published 14 assigned articles and one not assigned to him (about a youth team dedicating its season to its coach), none of which were enterprise pieces. (CSMF, ¶¶ 60-63.) Fenner is left merely with his subjective belief in his performance, which is irrelevant and "does not prove pretext." Shabat v. Billotti, 108 F.3d 1370 (2d Cir. 1997) (citation omitted).[4] It is for an employer to set criteria for "satisfactory performance" – and not an employee, "jury or judge," Thornley v. Penton Pub., Inc., 104 F.3d 26, 29 (2d Cir. 1997), and the "ultimate inquiry" is only whether Fenner "meets his employer's legitimate expectations." Meiri, 759 F.2d at 995.

---

[4] See also Ricks v. Conde Nast Pubs., Inc., 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000), aff'd 6 Fed. Appx. 74 (2d Cir. 2001) (same); Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) ("[P]laintiff's subjective disagreement with his reviews is not a viable basis for a discrimination claim.").

B.     **Fenner Has Presented No Evidence of Discriminatory Animus**

After conjuring fictitious evidence of journalistic achievement, Fenner (with Livingston) goes on to grapple with the admitted reality that they "never heard any race-based or racist comments by Defendants." (CSMF ¶ 66.)  In a failed effort to establish racial animus:

- He decries Greenfield yelling at him while he was in Milwaukee, but he does not dispute Greenfield's reasons for doing so:  Fenner was "out of touch" with his editor; he failed to notify his editor of Dolan's press conference; and Greenfield was upset because he learned of the conference from the Photo Desk, not Fenner, and because he could not reach Fenner for 40 minutes. (CSMF ¶¶ 49-50).  Nor does Fenner dispute that Greenfield also yelled at white reporters.  (Id., ¶ 143.)

- He decries being required to travel, but admits, "I was hired . . . [to] cover out of town assignments . . . ." (Fenn. at 76 [Lern. Dec. Exh. 3]), he has no knowledge of how much other reporters traveled (CSMF, ¶ 67), and does not dispute that white reporters travelled more than him (Gott. 300-01 [Lern. Dec. Exh. 2]).

- He claims he was denied a desk, phone, library, and archives, while being "excluded from the newsroom" (CSMF ¶ 69, citing Fenn. Aff. at ¶ 12), yet he admits runners work "almost exclusively outside the newsroom . . . ." (CSMF ¶ 7.)  There is no evidence that runners, working this way, are denied any resources necessary to perform the job or that he was treated differently than white runners.

In short, Fenner has produced no evidence that he was treated any differently than any white reporter, and his "naked belief that [his] race [or] color . . . may have had something to do with" his termination or otherwise does not defeat summary judgment.  Williams v. N.Y.C. Dept. of Sanitation, 2001 WL 1154627, at *15, n.22 (S.D.N.Y. Sept. 28, 2001) (collecting cases).

C.     **Fenner's Retaliation Claim Is Devoid of Merit**

It remains undisputed that no decision-maker or supervisory employee at the Post knew of Fenner's February 2009 statement to a blogger, upon which Fenner bases his retaliation claim. His conclusory assertion that "the Company had clear knowledge of the publication" because it was on the internet is not evidence, but speculation. (CSMF ¶ 151.)  His fabricated claim that he engaged in other protected conduct (id.) is contradicted by his prior deposition testimony, including his admission that he has no memory of ever complaining to Greenfield or Gotthelf

6

about race (Fenn. at 124-27 [Lern. Dec., Exh. 3]), and may not be considered at summary judgment. See Ramos v. Baldor Specialty Foods, Inc., 687 F3d 554, 556, fn. 2 (2d Cir. 2012).

### III. Livingston's Discrimination Claims Properly Should Be Dismissed

Livingston argues her reassignment from the courthouses to "runner," and her eventual termination, were retaliatory and/or discriminatory. The record completely belies her claims.

#### A. Livingston's Reassignment from the Queens Courthouses

As noted in § II.A, supra, for her claims to survive, Livingston must show Defendants' **belief** in her underperformance "was not the actual justification" for her reassignment, without regard to the correctness of the decision. Miller, 703 F. Supp. 2d at 247. This she cannot do. It is undisputed that Livingston's supervisors were unhappy with her performance in the courthouses: as set forth more fully in the Motion, Facts, § B.1, evidence of this includes, *inter alia*, her 2008 APA ("Needs Improvement") (Lern. Dec., Exh. 13); e-mails (id., Exh. 11-12); and tape recordings she made of discussions with her supervisors (Kenn. Dec., Exhs. 3-8). It is equally apparent that during FY 2009 (July 2008 through June 2009), her supervisors continued to believe that her performance was subpar, resulting in her reassignment, her June 2009 APA ("Needs Improvement"), and the 2009 written warning critical of her failure to pitch story ideas and investigative pieces. (Lern. Dec. Exh. 16.)

However, examining Defendants' legitimate reason for her reassignment – her poor performance – is premature, as Livingston has not carried her *prima facie* burden to show that a beat change was a "materially adverse change" in her responsibilities, Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000), set forth through objective evidence. See Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003).[5] Her sole "evidence" is her own conclusory

---

[5] See also Block v. Gatling, 84 A.D.3d 445, 445 (N.Y. App. Div. 2011) (dismissing NYCHRL claim where transfer "did not result in a "materially adverse change").

7

testimony that she lost overtime opportunities, but even this was based entirely upon her having earned worked over additional overtime during the Bell Trial – and not her 3 years in the courts – and she presents nothing "objective" (such as pay records) of this or any other change. (Living. at 121 [Pear. Dec., Exh. 1].) And while she may consider runner "less preferred," Sotomayor, 862 F. Supp. 2d at 255,[6] and believes stories she reported on as a runner were less preferential, her belief to this end is of no import. See Joseph v. Thompson, 2005 WL 3626778 (E.D.N.Y. Mar. 23, 2005) (belief that assignments were less preferential and less in volume after reassignment did not evidence adverse employment action).

### B. Livingston Has Adduced No Evidence of Discriminatory Animus

Most importantly, like Fenner, Livingston offers no evidence that her reassignment was based on race. She argues she was not told that her reassignment was due to performance, but this flies in the face of, *inter alia*, a prior e-mail warning that she might be "plucked" from the courthouses (Lern. Dec., Exh. 12), and she says a white reporter replaced her, although she does not contest his superior credentials (CSMF ¶ 93), nullifying any issue of fact. Beachum v. AWISCO N.Y., 785 F. Supp. 2d 84 (S.D.N.Y. 2011), aff'd, 459 Fed. Appx. 58 (2d Cir. 2012).

Shouldering the full burden of demonstrating animus is Livingston's assertion that her editors referred to some story ideas as "low rent," which she alleges is derogatory of stories about minorities. She has not identified a single such instance and could not recall any story pitch being called "low rent" (Living. at 132, 134 [Lern. Dec., Exh. 20]), and she admitted that she did not identify the races of individuals in her story pitches (id. at 249; see, e.g., Kenn. Dec.,

---

[6] See also Garber v. N.Y.C. Police Dep't, 1997 WL 525396, at *7 (S.D.N.Y. Aug. 22, 1997) ("Plaintiff's dissatisfaction with the transfer . . . does not support his claim . . . ." [footnote omitted]); Browne v. City Univ. of N.Y., 419 F. Supp. 2d 315 (E.D.N.Y. 2005) (requiring objective evidence).

Exh. 5). She may not "defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars." Meiri, 759 F.2d at 998.[7]

### C. Livingston's Retaliation Claim Has is Devoid of Merit

Livingston admits that the only thing she complained of in February 2009 was that "the cartoon was very offensive to people of color." (CSMF ¶ 152.) This is not a protected act as matter of law, as it does not concern any employment practice. (See Motion, at 22, n. 18.)

In March 2013, Livingston amended her Complaint to allege that her February 2013 termination was retaliatory, though she did not plead that she engaged in any specific protected conduct.[8] Livingston's employment was terminated for covertly mystery shopping on hundreds of occasions during her actual reporting shift (Lern. Dec., Exh. 17), and she admits to doing so at least 450 times, with 171 of those occasions while she was assigned to the Queens courthouses requiring her to leave her assigned post, and doing so all without her supervisors' knowledge. (CSMF ¶¶ 111-13, 121.) All the more shocking, she admits to continuing mystery shopping during her Post shift even after her performance was criticized. (CSMF ¶¶ 117-19.)

Rather than acknowledge her egregious misconduct, Livingston speculates that she was fired in retaliation for: (a) a December 2009 complaint to the Post's HR nearly simultaneous with the filing of her lawsuit (3 1/4 years prior to termination), and (b) her January 2012 deposition in this matter (more than 1 year prior).[9] As a matter of law, these events cannot support a *prima facie* claim of retaliation. First, they are too temporally remote from her

---

[7] Also, the term is heard in a recorded conversation between her and Greenfield – there is no mention or implication of race. (Kenn. Dec., Exh. 7.) Even if the Court considered this "evidence," the sporadic characterizations of stories constitute inactionable "stray remarks" unrelated to any employment action. See Howe v. Town of Hempstead, 2006 WL 3095819, *7 (E.D.N.Y. Oct. 30, 2006).

[8] Plaintiffs' contention that Defendants did not move for summary judgment on Livingston's discriminatory termination claim is incorrect. (See Motion at 1 [requesting the Court "dismiss[] the Third Amended Complaint"].)

[9] Livingston's February 2013 deposition did not constitute protected conduct as she made no statement relating to employment discrimination but she merely answered questions "limited to . . . the topic of her mystery shopping,", as ordered to do so by the Court. (CSMF ¶ 125.) See Armstrong v. Whirlpool Corp., 363 Fed. Appx. 317 (6th Cir. 2010) (upholding termination of employees for misconduct learned of in deposition).

9

termination. (Motion, § IV.) Second, her intervening admission of gross misconduct – stealing Post work time – destroys any arguable causal nexus. (Id.) Finally, she offers no evidence of differential treatment after these acts, instead stating she continued to experience the same treatment which she claims began with the 2008 reassignment, long before any protected act. (CSMF ¶ 129.)

In a last ditch effort to show pretext, Livingston argues that the Post was aware of her mystery shopping as early as her January 2012 deposition, but her testimony was opaque and purposely evasive, stating she mystery shopped "around" and not during her reporting shift, and Defendants had no records of her shopping at this time. (Living. at 324 [Pear. Dec., Exh. 1].) It was not until later in 2012 that the Post obtained her records, and it was not until her February 20, 2013 deposition (which she litigated to avoid) that she admitted to mystery shopping during her reporting shift. (CSMF ¶ 127.) After deposition, the Post's Publisher learned *for the first time* that Livingston had mystery shopped more than 400 times during her shift – all while receiving poor performance evaluations and being criticized for failing to pitch sufficient stories, work on investigative pieces, and/or reviewing civil court filings – and fired her for it. (Angelo at 21-22, 27-28, 31, 74-76 [Day 2] [Lern. Dec. Exh. 14])).

IV. **Fenner And Livingston Have Adduced No Evidence of Disparate Pay**

Fenner does not dispute that he was paid the ninth highest salary on the Metro Desk out of 71 reporters (CSMF ¶ 12), and his "belief" (id. [citing Fenn. at 237]) that other reporters made more than he is without evidentiary foundation. Similarly, Livingston was paid at a higher rate than the average reporter (Gott. Aff. at ¶ 27), and she offers no evidence to refute this.

**CONCLUSION**

Based on the foregoing, Defendants Post, Michelle Gotthelf and Daniel Greenfield respectfully request that the Court grant summary judgment dismissing with prejudice Plaintiffs Fenner and Livingston's Third Amended Complaint in its entirety.

Dated: May 31, 2013
       New York, New York

                Respectfully submitted,

                KASOWITZ, BENSON, TORRES
                  & FRIEDMAN LLP

                By: /s/ Mark W. Lerner
                    Marc E. Kasowitz (mkasowitz@kasowitz.com)
                    Mark W. Lerner (mlerner@kasowitz.com)
                    Blythe E. Lovinger (blovinger@kasowitz.com)
                    Garrett D. Kennedy (gkennedy@kasowitz.com)

                1633 Broadway
                New York, New York 10019
                Tel.: (212) 506-1700
                Fax: (212) 506-1800

                Attorneys for Defendants NYP Holdings, Inc.,
                d/b/a the New York Post, Michelle Gotthelf and
                Daniel Greenfield