UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                     :
AUSTIN FENNER and IKIMULISA                          :
LIVINGSTON                                           :
                                   Plaintiffs,       :        09 Civ. 09832 (LGS)
                                                     :
                 -against-                           :        OPINION AND ORDER
                                                     :
NEWS CORPORATION,  NYP HOLDINGS,                     :
INC. d/b/a THE NEW YORK POST, MICHELLE               :
GOTTHELF and DANIEL GREENFIELD,                      :
                                   Defendants.       :
                                                     :
------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/02/2013

LORNA G. SCHOFIELD, District Judge:

Plaintiffs Austin Fenner and Ikimulisa Livingston bring employment discrimination

claims on the basis of race against four defendants: News Corporation ("News Corp."), NYP

Holdings, Inc., d/b/a the New York Post (the "Post"), Michelle Gotthelf and Daniel Greenfield

(collectively "Defendants").  Plaintiffs assert claims against all Defendants based on § 1981 of

the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"), the New York State Human Rights

Law, New York Executive Law §§ 290 et seq. (the "NYSHRL") and the New York City Human

Rights Law and New York Administrative Code §§ 8-101 et seq. (the "NYCHRL").  Plaintiffs

assert claims based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e

et seq. ("Title VII") against only the Post and News Corp.  Plaintiffs' claims allege disparate

treatment, retaliation and a hostile work environment.

News Corp. moves for summary judgment arguing that Plaintiffs' claims against it fail

because News Corp. is not Fenner's or Livingston's employer and is not liable as a single or

joint-employer with the Post.  The Post, Gotthelf and Greenfield move for summary judgment,

arguing that Plaintiffs' harassment, discrimination and retaliation claims fail as a matter of law.

For the reasons that follow, Defendants' motions for summary judgment are granted.

## I.     Background

The following facts are drawn from the parties' submissions in connection with the

instant motions.  The facts are undisputed, unless otherwise noted.

### A.  The Parties

Plaintiff Austin Fenner, who is African-American, worked at the Post from May 2007

until his discharge on or around November 9, 2009.

Plainttiff Ikimulisa Livingston, who is African-American, worked at the Post from 1997

until her discharge on or around February 26, 2013.

News Corp., incorporated under Delaware law, owns hundreds of companies worldwide.

News Corp.'s subsidiaries, which are primarily media companies, employ approximately 50,000

to 60,000 individuals.

NYP Holdings, Inc., d/b/a the New York Post (the "Post") publishes the *New York Post*, a

daily newspaper.  The Post is a wholly owned subsidiary of News America Incorporated

("NAI"), which in turn is a subsidiary of News Publishing Australia Holdings Ltd.  News Corp.

owns News Publishing Australia Holdings Ltd. and is the ultimate parent of the Post.

Defendant Michelle Gotthelf has been employed as Metropolitan Desk ("Metro Desk")

Editor at the Post since December 2007.  In that position, she supervises approximately 50

reporters and seven editors who report to the Metro Desk, including the Plaintiffs.

Defendant Daniel Greenfield has been employed as Morning Assignment Editor of the Metro Desk since October 2006 and in addition became Deputy Editor of the Metro Desk in approximately December 2007.  (Greenfield Aff. ¶ 2).

News Corp. and the Post both have offices at 1211 Avenue of the Americas, New York, New York.  While they each pay rent separately to a third-party, the companies share conference rooms on the third floor, and Post employees have access to News Corp's cafeteria.  Plaintiff maintains, and Defendants dispute, that the Post and News Corp. share offices on the eighth floor.  Each company has its own human resource, finance, information technology and security departments.  The companies maintain separate bank accounts and separate financial books and records.  News Corp. employees are not involved in the printing or distribution of the Post's daily newspaper.

Of the four members on the Post's Board of Directors, two—Rupert Murdoch and David Devoe—occupied similar positions on News Corp.'s Board.  Lachlan Murdoch, the Publisher of the Post from 2002 to 2005, was simultaneously COO at News Corp.  Rupert Murdoch, the Chairman of News Corp. as well as the Post, had a role in hiring two successive Publishers of the Post:  Paul Carlucci and Jesse Angelo.  As publisher of the Post, Carlucci reported directly to the COO of News Corp.  Jordan Lippner, Senior Vice President and Deputy General Counsel of NAI, also had roles at the Post and News Corp.  For example, Post employees could lodge complaints with Lippner relating to their work environment at the Post, and Lippner served as a 30(b)(6) witness for the Post in the present litigation.

**B.  The Metro Desk**

The Metro Desk, with approximately fifty reporters and seven editors, is responsible for reporting on and writing stories about news events.  Metro Desk reporters generally have one of

3

three assignments:  runner (or street or field reporter), rewrite reporter or beat reporter.  Runners

work almost exclusively in the field and receive story assignments from the Post's editors or

rewrite reporters.  Runners typically report from news scenes, prepare notes and provide them to

a rewrite reporter via telephone or email.  Rewrite reporters use the notes to prepare stories in the

newsroom.  Beat reporters have a specific topical area of focus and must have strong knowledge

of their beat.  Reporters in all three positions are required to generate enterprise story ideas,

which are exclusive, original investigative stories, and maintain good sources.

### C.  Environment at the Post

Both Fenner and Livingston concede that they never personally heard an employee at the

Post make an explicitly racially derogatory comment.  They have heard the following second-

hand stories about racially derisive comments made to other employees outside of their presence:

Livingston testified that a black Post employee (Frankie Edozien) told her that Steve Dunleavy, a

former columnist at the Post, called him a "nigger."  Both Fenner and Livingston heard that

Dunleavy referred to Hispanics as "Spics" when drafting his news articles.  In 2001, Dunleavy

referred to another black Post employee (Robert George) as a "token nigger" at a bar in the

presence of the Post's publisher, Jesse Angelo, and Editor-in-Chief, Col Allan.  Allan reportedly

stated that all Latinos look alike while referring to a black-Latino employee, and once asked a

Post editor whether a Latino interviewee was brandishing a machete during an interview.

Another Post employee (Andrea Esposito) once referred to Lawrence Taylor, a New York Giants

player, as "that big nigga" in the smoking room in the Post.

On February 18, 2009, the Post published a political cartoon depicting a dead chimpanzee

having been shot by two police officers, one of whom remarks: "They'll have to find someone

else to write the next Stimulus Bill" (the "Cartoon").  Many people believed that the dead

chimpanzee in the Cartoon symbolized President Barrack Obama and were upset that the first

black president had been analogized to an ape.  The day after the Cartoon was published, a

protest took place in front of the Post's offices.  A black female copy assistant testified that she

overheard Allan state on the phone, moments after he looked out the window at the protestors:

"Most of them are minorities and the majority of them are uneducated."  Another black, female

Post copy assistant testified that she asked Allan if she could talk about the Cartoon with him

when she brought a document to his office; he responded "Absolutely not."  Rupert Murdoch,

Chairman of the Post and of News Corp., eventually issued an apology for the Post's decision to

publish the Cartoon.

Livingston and Fenner testified during their depositions and in affidavits that they were

treated less favorably than white employees.  Although Livingston claims that white employees

at the Post were treated better than she in a multitude of ways, she does not specify which white

colleagues were treated better and how, with the exception of a white reporter who was given a

byline for an article that appeared in the Sunday paper when an article that Livingston proposed

on the same topic was repeatedly rejected by her editors.  Fenner identified two white reporters

with the same experience as he (Jeanne MacIntosh and Dan Mangan), whom he claims were paid

more.  He also testified that he was made to travel more than white reporters generally.  Gotthelf,

on the other hand, testified that Fenner was the ninth highest paid reporter on the Post's Metro

Desk and that Gotthelf assigned other reporters on the Metro Desk to travel out of town more

frequently than Fenner.

Plaintiffs also generally claim that other black employees at the Post, including three

reporters, a columnist and two copy assistants, were treated worse than white employees.  They

support these claims with Fenner's deposition testimony, an affidavit from one of the copy

assistants and a general statement from a former editor that many of her black colleagues were treated differently from her white colleagues.

Plaintiffs also contend that the supervisors at the Metro Desk verbally abused black, but not white, employees.  Fenner and Livingston both assert that Greenfield and Gotthelf, as well as Livingston's former supervisor Haberman, routinely raised their voices and used profanity with them and another black colleague, but did not similarly scream at their white colleagues.  On the other hand, Defendants contend that, regardless of race, Gotthelf and Greenfield raised their voices at reporters who they believed were underperforming.  A white senior reporter at the Metro Desk provided an affidavit stating that she had observed Gotthelf and Greenfield raising their voices and directing curse words at white reporters.  Gotthelf confirmed that she had heard Greenfield raise his voice at Fenner on certain occasions, but also had heard him raise his voice and curse at white reporters.  While denying that he yelled at Plaintiffs, Greenfield even conceded that profanity was "not uncommon" in the newsroom.

Fenner and Livingston contend that they were "banned" from the newsroom because, in or around February 2009, they were instructed that they needed to request approval before entering the newsroom.  According to Defendants, as runners, Fenner and Livingston did not need to come into the office because runners worked almost exclusively in the field.  Gotthelf declared that she never assigned any runner a permanent desk in the newsroom and named seven reporters, who were not black who did not have assigned desks in the newsroom.  Both Fenner and Livingston admit that, when they requested permission to work in the newsroom, it was granted.  In addition, a black rewrite reporter was stationed in the newsroom at all relevant times.

### D. Austin Fenner

Fenner was hired in May 2007 as a senior reporter for the Metro Desk.  He previously had worked as a reporter for another New York newspaper, the Daily News.  Fenner was hired at a salary of $92,000 per year.  As a senior reporter, Fenner was expected to develop sources, discover unique story angles and produce exclusive enterprise stories.

Fenner highlights some of his achievements at the Post.  According to Fenner, he demonstrated initiative in covering and producing at least a dozen enterprise stories, including stories about Reverend Jeremiah Wright, the Columbia University expansion, the appointment of Cardinal Dolan, a plane landing on the Hudson and an historic bus ride to watch Barrack Obama's 2009 Presidential Inauguration.  Gotthelf praised Fenner for his work obtaining interviews, his coverage of Cardinal Dolan and a piece on the Confederate flag at a hunting lodge used by Dick Cheney.

 In contrast, Defendants point to evidence that Fenner performed his job inadequately.  According to Defendants, Fenner's writing was poor, required significant editing, and he often failed to discern the most interesting aspect of stories.  Starting in 2008, Fenner increasingly was sent to cover news from the field, which, according to an email that Greenfield sent to Gotthelf, is the type of work generally handled by entry level reporters.  Gotthelf testified that she had hoped Fenner's performance would improve if he was required to write less.

Fenner's FY 2008 annual performance appraisal, dated July 28, 2008, rated his overall performance as: "Must Improve, Rarely Meets Standards."  The review states:

> Given that Austin was hired to a p osition of note, he is failing m iserably. He does not initiate or produce top-notch enterprise for the Post.  He has pitched a few stories that are not a good fit for the  Post.  Now all of his assignm ents come from editors, who find his work, at best, lacking.

7

Fenner also received a Final Warning concerning his poor performance as a Senior Editor on July 28, 2008, that noted the following issues:  poor basic writing skills, lack of fact checking, failure to produce enterprise stories and failure to discern the news line in a story.  The Final Warning called for "an immediate and consistently sustained improvement."

At the meeting where he received the warning, Fenner told Gotthelf and Amy Scialdone that the evaluation did not fairly represent his work over the preceding year and that he was being unfairly set up for termination.  He did not indicate that he believed race played a role in his evaluation.  Gotthelf told Fenner that he still had a chance to turn things around.

Fenner testified that he was treated worse than white employees.  In addition to verbal abuse from his supervisors, Fenner contends that his story ideas were summarily dismissed, he faced obstacles getting his stories published and he was denied resources such as a photographer to assist him in this coverage of the 2009 Presidential Inauguration.

On February 20, 2009, after the Cartoon was published, Fenner was quoted in an article for the online publication, *Journal-isms*, stating that the Cartoon "churned my stomach."  The article was titled "3 Things that Need Fixing at the N.Y. Post," and Fenner's quote appeared under the subtitle "Lack of Newsroom Diversity."  Greenfield and Allan testified that they were not aware of Fenner's statements in this article, but Plaintiffs contend that Defendants' knowledge of the article can be inferred because a spokesperson from the Post was contacted in connection with the piece, and the Post reportedly uses public relation firms and clipping services to track all online material about the newspaper.

Fenner stated that shortly after the publication of the *Journal-isms* article, Gotthelf and Greenfield instructed him to call ahead before entering the newsroom.  Fenner protested to Gotthelf and Greenfield that this "ban" from the newsroom was unfair, but was told that things

8

were "going to be done differently" going forward.  Fenner also stated that in Spring 2009, his

schedule was changed disadvantageously.

Throughout fiscal year 2009, Fenner was increasingly assigned to work in the field, doing

work typical of an entry level reporter.  Fenner's 2009 review rated his performance as

"Unacceptable, Does Not Meet Standards."  On September 17, 2009, Fenner was issued a Final

Written Warning.  This warning stated:

> Working as a runner for som eone with your experience and at your level
> as a senior reporter is simply unacceptable  and cannot continue any longer.   It is
> critical that we see an  immediate and consistently sustained improvement in your
> job performance. . . .  If you fail to raise   the level of your job perfor mance to an
> acceptable standard,  you will, regrettab ly,  leave  the Post with no choice but to
> terminate your employment at The New York Post.

According to Defendants, following receipt of this final warning, Fenner's performance

did not improve.  On around November 4, 2009, Gotthelf decided to terminate Fenner's

employment, and Fenner was discharged on November 9, 2009.

**E.  Ikimulisa Livingston**

The Post hired Ikimulisa Livingston as a general assignment reporter in 1997.  Gotthelf

stated that Livingston was paid an annual salary of $70,442.40, while the average annual salary

for a Metro Desk reporter from 2007 to 2009 was $67,674.53.

In February 2006, after various requests from Livingston, Gotthelf and Angelo reassigned

Livingston to the Queens Supreme Court courthouse ("Queens courthouse") beat.

Greenfield testified that while Livingston was assigned to the Queens courthouse, she did

not provide many quality enterprise stories or routinely break stories of a major nature.

Livingston, however, produced evidence that she performed her job well.  While assigned to the

Queens courthouse, Livingston covered, from February 25 to April 14, 2008, the trial of three

police officers, who fatally shot Sean Bell the night before his wedding.  Plaintiffs emphasize

that the Post ran daily articles of Livingston's coverage of the trial, including exclusive front-

page stories.  In contrast, Defendants state that, in covering the Bell trials, Livingston missed key

facts picked up by competitors, failed to think big picture and required a dedicated "rewrite" to

receive her notes and draft them into stories because her writing was not clear.  On May 22,

2008, Gotthelf emailed Livingston:

> Col [Allan, Editor-in-Chief at the P ost] had a fit over the
> story that you m issed this morning. . . .  He also brought up how
> labor intensive it was to assign you a dedicated rewrite for the Sean
> Bell trial when court re porters need to be ab le to write c lear copy
> on the fly.
> One thing's clear, Kim, you're on Col's radar and that's a
> very dangerous place to be.  It means you could be plucked from
> that court very soon.  You have to step it up.

In addition to the Sean Bell articles, in 2008, Livingston developed and wrote other

exclusive stories, including a story about Sean Bellamy, whose sentence for murder was vacated

after 13 years imprisonment (June 23, 2008); Jack Rhodes on the eve of his trial for the attack of

elderly women (April 2008); a sexual abuse scandal involving former-Councilperson Dennis

Gallagher (March 17, 2008); and a gun attack on the house of a Queens judge (August 12, 2008).

Livingston also pitched other stories, which were not pursued by the Post.

In fiscal year 2008, Livingston's annual performance appraisal was "Occasionally Meets

Standards, Needs Improvement."  The review noted that Livingston "needs to improve her

ability to fully grasp the goings on in her court," add "legal foresight to the coverage," and

"develop[] sources" and that her stories often needed to be rewritten.

In or around December 2008, Gotthelf, in conjunction with Angelo and Greenfield,

decided to remove Livingston from the Queens courthouse beat, according to them, because she

performed poorly in the position.  On December 3, 2008, Gotthelf told Livingston that she was being reassigned to a position as a runner.

William Gorta, a white male, was given Livingston's former Queens courthouse assignment.  Gorta, an adjunct professor at Columbia University School of Graduate Journalism and a former captain in the New York Police Department, was previously an editor at the Post before he was assigned to cover the Queens courthouse beat as a reporter.  Gorta, whose salary did not decrease with his reassignment, received higher compensation than Livingston for covering the same beat.  In February 2010, Gorta was reassigned to the federal courthouse, and Christina Carrega, a black, female reporter, was given the Queens courthouse beat.

Livingston claims that after her "demotion" to a runner position, she lacked resources that were available to her in the courthouse, such as a desk, telephone and story opportunities.  Before her assignment to the Queens courthouse, Livingston had had an assigned desk in the newsroom since 1997.  According to Livingston, Gotthelf promised Livingston that she would get a desk and a telephone in the newsroom after she was removed from the Queens courthouse and that she would not always be in the field, but ultimately Livingston was not assigned either a permanent desk or telephone.  Although Livingston's salary did not change, she claims that she received less opportunity for overtime work as a runner, which resulted in decreased compensation.

According to Livingston, Greenfield assigned her stories with no chance of being published while white employees were given priority pieces.  Livingston claims that she was denied bylines and that Gotthelf and Greenfield denied the stories that she pitched out of hand.  Livingston testified that Gotthelf and Greenfield frequently referred to stories that she pitched about black and Latino people as "low rent," which was offensive to her.

On February 18, 2009, the day the Cartoon was published, Livingston told Gotthelf that the Cartoon was very offensive to people of color, and Gotthelf agreed with her.  After this, Livingston claims that she continued to be "banned" from the newsroom and denied access to editors, and instead was required to discuss her stories with rewrite reporters.  One day when Livingston entered the newsroom to pick up supplies, Greenfield asked her with surprise and hostility, "[W]hat are you doing here?"

Livingston commenced the current lawsuit on November 30, 2009.  On December 3, 2009, Livingston sent an email to the Post's Human Resources department complaining that she had been "discriminated against due to [her] race and gender."  She complained that she was removed from the Queens courthouse beat because she was a black woman.  Members of the Post's Human Resources Department met with Livingston on December 9, 2009, to discuss her complaint.

Shortly thereafter, Livingston's fiscal year 2009 annual performance appraisal fell to "Needs Improvement."  The evaluation stated that Livingston "rarely suggests story ideas and must do a better job of this."  Around this time, Livingston also received a warning letter dated August 6, 2009, concerning her "underperformance as a reporter."  Livingston claims that the performance reviews were false, and she refused to sign her 2009 performance evaluation.  Six white reporters for the Metro Desk also received performance warnings in conjunction with their 2009 annual performance appraisals.

In fiscal year 2012, Livingston's performance appraisal improved to "Meets Standards."  Gotthelf testified that Livingston was not a strong writer, but that she pitched better story ideas from the field and was improving as a reporter.

12

At Livingston's first deposition on January 13, 2012, she revealed that she had worked as a "mystery shopper" since 2005 for one company and since 2008 for a second, performing research, which could involve interacting with a representative or completing a transaction, usually at a bank, and preparing a report about the experience. From 2005 to 2010, Livingston conducted 450 "mystery shops." While assigned to the Queens courthouse beat, Livingston mystery shopped 171 times and submitted 77 reports during her scheduled Post reporting shift. According to Livingston, the mystery shopping tasks could take as little as two minutes and included routine tasks such as making a bank withdrawal of $20; however, some, but not all, of the mystery shopping required her to leave the courthouse, drive to a location, interact with a sales representative and prepare a report. Livingston did not tell her supervisors that she was leaving the courthouse to mystery shop, nor were they aware of her secondary employment. Livingston states that she shopped only during downtimes or breaks and never prioritized shopping over her work for the Post.

On February 20, 2013, Defendants conducted a second deposition of Livingston limited to the topic of her mystery shopping. According to Defendants, following this deposition, Jesse Angelo, Publisher at the Post, decided to terminate Livingston's employment for gross misconduct, without any prior written or verbal warning, as a result of the undisclosed mystery shopping. Livingston was terminated on February 26, 2013.

## II.    Summary Judgment Legal Standard

A motion for summary judgment may not be granted unless all of the submissions taken together show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). "The moving party bears the burden of establishing the absence of

13

any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336,

340 (2d Cir. 2010). In deciding a motion for summary judgment, a court must "construe the

facts in the light most favorable to the non-moving party and must resolve all ambiguities and

draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d

Cir. 2011) (internal quotation marks omitted). Not every disputed factual issue is material in

light of the substantive law that governs the case. "Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment must be granted with caution in employment discrimination cases,

especially those that turn on the employer's intent. *See Holcomb v. Iona Coll.*, 521 F.3d 130,

137 (2d Cir. 2008); *Gallo v. Prudential Residential Serv.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Direct evidence of an employer's discriminatory intent is often hard to obtain, and plaintiffs in

discrimination suits often must rely on the cumulative weight of circumstantial evidence. *See,

e.g., Holcomb*, 521 F.3d at 137; *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000)

("[A]n employer who discriminates against its employee is unlikely to leave a well-marked trail,

such as making a notation to that effect in the employee's personnel file."). At the summary

judgment stage, the court must carefully distinguish between evidence that could allow a

reasonable fact finder to infer that discrimination caused the adverse employment decision and

"evidence that gives rise to mere speculation and conjecture." *Woodman v. WWOR-TV, Inc.*, 411

F.3d 69, 75 (2d Cir. 2005) (internal quotation marks omitted).

**III.     Standards for Parent Company Liability for Employment Discrimination**

In addition to the Post, where it is undisputed that Plaintiffs were employed, Plaintiffs

argue that News Corp. is also liable for their discrimination and retaliation claims because the

Post and its indirect corporate parent, News Corp., are a "single employer," or in the alternative,

"joint employers."   A parent company is not ordinarily liable for the employment discrimination

of its subsidiary, except if the requirements of the single employer doctrine or the joint employer

doctrine are satisfied.  *Gulino v. New York State Educ. Dep't*, 460 F.3d 361, 378 (2d Cir. 2006)

(Title VII claims); *Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 216-17

(S.D.N.Y. 2010) (Section 1981 and the local New York anti-discrimination statutory claims).

### A.  Single Employer Doctrine

Under the single employer doctrine the court examines whether a parent and subsidiary

are so integrated that in effect they are acting as one with respect to the plaintiff's employment.

To determine whether a parent and subsidiary comprise a single employer subject to joint

liability for employment-related acts, the court considers evidence of "(1) interrelation of

operations, (2) centralized control of labor relations, (3) common management, and (4) common

ownership or financial control."  *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d

Cir. 1995) (quoting *Garcia v. Elf Atochem N.A.*, 28 F.3d 446, 450 (5th Cir. 1994).  Although no

one factor is determinative, "[t]he policy behind the single employer doctrine . . . is most

implicated where one entity actually had control over the labor relations of the other entity, and,

thus, bears direct responsibility for the alleged wrong."  *Murray v. Miner*, 74 F.3d 402, 405 (2d

Cir. 1996).  There is a strong presumption that a parent is not the employer of its subsidiary's

employees.  "[T]he law only treats the employees of a corporate entity as the employees of a

related entity under extraordinary circumstances," just as the law only pierces the veil of a

corporate entity under extraordinary circumstances.  *Id.* at 404.

### 1.  Interrelation of Operations

To assess whether a parent dominates the subsidiary's operation, courts may examine: whether the two entities shared employees, services, records, and equipment, and whether the parent was involved directly in the subsidiary's daily business decisions relating to production, distribution, marketing, advertising and finances, as well as other factors not relevant to the evidence here.  *See Leshinsky v. Telvent GIT, S.A.*, 873 F. Supp. 2d 582, 603 (S.D.N.Y. 2012) (quoting *Herman v. Blockbuster Entm't Grp.*, 18 F. Supp. 2d 304, 312 (S.D.N.Y. 1998), *aff'd*, 182 F.3d 899 (2d Cir. 1999)).  The evidence shows that the Post and News Corp. were distinct entities with distinct business operations.  The Post and News Corp. have separate employees, bank accounts, marketing departments, finance departments, computer systems, databases and security.

Plaintiffs argue that the fact that the Post and News Corp. share office space supports a finding that the companies are integrated.  However, for the most part, their office space is separate.  The two companies occupy separate floors in the same office building, accessible only to their respective employees—with the limited exception of shared conference rooms on the third floor, the News Corp. cafeteria and possibly certain offices on the eighth floor.  The Post and News Corp. each pays separate rent for its respective office space.

Although the parties largely agree that the Post independently published its newspaper, Plaintiffs argue that News Corp. exercised control over marketing and advertising at the Post through Rupert Murdoch's involvement in editorial decisions.  First, as Chairman of News Corp., Rupert Murdoch can maintain some amount of communication with senior employees of News Corp.'s subsidiaries without collapsing corporate formalities.  More significant, Rupert Murdoch was simultaneously Chairman of the Post, and there is no evidence that his

involvement with the Post extended beyond his role as its Chairman.  As discussed below, the fact that the Chairman of the Board of one company was Chairman of a separate company, without more, does not show that the second company was integrated with the first.  *See United States v. Bestfoods*, 524 U.S. 51, 69 (1998).

In sum, the evidence is insufficient to raise a question of fact that the operations of the Post and News Corp. were integrated for purposes of the single employer doctrine.

### 2.  Centralized Control of Labor Relations

The next factor, whether the parent and subsidiary have a "centralized control of labor relations," is the "crucial element" of the single employer inquiry.  *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000); *accord Cook*, 69 F.3d at 1240 (holding that the "'critical'" question is "'[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?'" (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983))).

Here there is no issue of fact as to who controlled the central aspects of Plaintiffs' employment.  The Post, and not News Corp., was responsible for their hiring, firing, supervision and evaluation.  Fenner and Livingston both were hired by, supervised by and evaluated by the editors of the Metro Desk at the Post.  The decision to terminate Fenner's employment was made by the Editor and Deputy Editor of the Metro Desk, Gotthelf and Greenfield.  Livingston, in turn, was discharged by Angelo, the then-Publisher of the Post.

A less probative, but still relevant, issue is which company controlled other employment matters that affected Post employees generally, including Plaintiffs.  They argue that News Corp. exercised control through certain policies that the Post adopted—such as the EEO policy, electronic communications policy and Standards of Business Conduct.  The record does not

reflect that News Corp. enforced these policies at the Post, and the fact that the Post adopted policies promulgated by News Corp. is insufficient to show that News Corp. exercised centralized control over the Post's employees.  *See Snyder v. Advest, Inc.*, No. 06 Civ. 1426, 2008 WL 4571502, at *7 (S.D.N.Y. June 8, 2008) ("[T]he mere fact that [Plaintiff] agreed to be bound by certain standards of conduct set forth by [the parent's policies] does not indicate that [the parent company] exercised control over or made final decisions regarding the employment of [Plaintiff]." (second and fifth alteration in original) (quoting *Ennis v. TYCO Int'l Ltd.*, No. 02 Civ. 9070, 2004 WL 548796, at *4 (S.D.N.Y. Mar. 18, 2004))); *Woodell v. United Way of Dutchess Cnty.*, 357 F. Supp. 2d 761, 769 (S.D.N.Y. 2005) ("The fact that [the parent] . . . offers general policy statements or guidelines on employment matters is not sufficient evidence to establish centralized control.").

Plaintiffs also point to News Corp. employee benefits, such as the retirement and healthcare plans, which were available to Post employees, as evidence of centralized control over Post employees.  Whether these were in fact News Corp. benefits is in dispute, but drawing all inferences in Plaintiffs' favor, the fact that a parent and its subsidiary "maintained the same benefits does not suggest centralized control of labor relations."  *Balut v. Loral Elec. Sys.*, 988 F. Supp. 339, 347 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1199 (2d Cir. 1998); *accord Meng v. Ipanema Shoe Corp.*, 73 F. Supp. 2d 392, 405 (S.D.N.Y. 1999) ("[A] common benefits package speaks only to economies of scale and not to centralized control of labor relations.") (internal quotation marks omitted).  Likewise the fact that Plaintiffs received performance reviews in News Corp. envelopes does not show that News Corp. had any role in their evaluation or compensation.

The evidence is insufficient to raise a question of fact that News Corp. and the Post had centralized control over employee relations for purposes of the single employer doctrine.

### 3. Common Management

Plaintiffs' evidence of common management is insufficient to support their argument that the Post and News Corp. are an integrated, single employer. Plaintiffs have provided evidence that several News Corp. employees simultaneously had roles at the Post. Two of the four members of the Post's Board of Directors occupied similar positions on News Corp.'s Board. Lachlan Murdoch was COO of News Corp. as well as Publisher of the Post, and Rupert Murdoch, Chairman of both companies, had some role in hiring the successive publishers of the Post. Lippner and Goodstein, although officially employed at NAI, also had roles at the Post and News Corp.

These executives' dual roles, without more, do not demonstrate that News Corp. exercised control over Plaintiffs' employment. The presumption is that "corporate personalities remain distinct" and "that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Bestfoods*, 524 U.S. at 69 (1998) (internal quotation marks omitted); *accord Herman*, 18 F. Supp. 2d at 312 ("As a general matter, the Court must consider evidence of common management in the light of the well established principle that directors and officers holding positions with a parent and its subsidiary can and do change hats to represent the two corporations separately, despite their common ownership." (internal quotation marks omitted)); *Fried v. LVI Servs., Inc.*, No. 10 Civ. 9308, 2011 WL 2119748, at *5 (S.D.N.Y. May 23, 2011); *Kelber v. Forest Elec. Corp.*, 799 F. Supp. 326, 331 (S.D.N.Y. 1992).

Plaintiffs also argue that the common management prong is satisfied here because senior employees at the Post, like Publisher Paul Carlucci, reported to Rupert Murdoch, the Chairman of News Corp. Ignoring Rupert Murdoch's role as Chairman of the Post, Plaintiffs take the

argument one step further arguing, in essence, that News Corp. exerts control over the Post's Human Resources department because the head of that department reports to the Post's Publisher, who in turn reports to the Chairman of News Corp.  This argument likewise fails to prove company integration, even when inferences are drawn in Plaintiffs' favor.  Courts have found that even though senior employees "'ultimately report to the parent's officers . . . this exercise of control does not [necessarily] exceed the control normally exercised by a parent.'" *Balut*, 988 F. Supp. at 347 (quoting *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993)).

Plaintiffs' evidence of common management is insufficient for a reasonable jury to conclude that News Corp. and the Post had centralized control over employee relations for purposes of the single employer doctrine.

### 4.  Common Ownership or Financial Control

A fourth factor relevant to the single employer doctrine is common ownership or financial control.  It is undisputed that News Corp. is the ultimate parent and owner of the Post. Nevertheless, the two companies maintain independent finances, bank accounts, expenses and profit and loss statements.  This factor alone does not support a finding of centralized control. *See Velez v. Novartis Pharm. Corp.*, 244 F.R.D. 243, 254 (S.D.N.Y. 2007).

Considering all four factors in the light most favorable to Plaintiffs,  Plaintiffs have not presented evidence from which a reasonable jury could conclude that News Corp. and the Post were sufficiently integrated that they should be considered Plaintiffs' single employer for purposes of their claims of employment discrimination.

### B.  Joint Employer

In determining whether a parent and subsidiary both should be liable for employment discrimination under the joint employer doctrine, the court reviews whether the employee actually works for each of the two entities, even though she is an employee of only one.

> "Where this [joint employer] doctrine is operative, an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer."

*Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005).   Here Plaintiffs point to no evidence that could sustain the claim that News Corp. jointly employed either Fenner or Livingston, and the Court finds none.

Plaintiffs' claims against News Corp. fail as a matter of law because they have not presented evidence sufficient to raise an issue of fact as to an employment relationship between them and News Corp. under either the single employer or joint employer doctrine.  Accordingly, News Corp.'s motion for summary judgment is granted.

## IV.   Hostile Work Environment

Fenner and Livingston contend that Defendants subjected them to unlawful discrimination and harassment in violation of § 1981, Title VII, the NYSHRL and the NYCHRL on the basis of their race.  Their claims fail under § 1981, Title VII and the NYSHRL because there is no evidence of severe or pervasive race-based harassment.  The NYCHRL claim also fails because Plaintiffs have not adduced evidence to show that they were treated differently than employees outside of their protected group because of their race.

## A. § 1981, Title VII and the NYSHRL – Hostile Work Environment

### 1. Legal Standard

To survive a motion for summary judgment on a claim that racial harassment has caused hostile work environment under § 1981, Title VII or the NYSHRL, a plaintiff must demonstrate: (1) "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered" and (2) "that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 723-24 (2d Cir. 2010) (§ 1981); *see Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (Title VII); *Forrest v. Jewish Guild for the Blind*, 819 N.E.2d 998 (N.Y. 2004) (NYSHRL).  While hostile work environment claims under § 1981, Title VII and the NYSHRL are governed by the same standard, as discussed below, the NYCHRL is analyzed under a different standard.[1]

Plaintiffs' evidence must show that the conduct at issue created a work environment that is both objectively and subjectively hostile, but the environment need not be "unendurable" or "intolerable."  *See Terry v. Ashcroft*, 336 F.3d 128, 147-48 (2d Cir. 2003).  "A plaintiff alleging a hostile work environment 'must demonstrate either that a single incident was extraordinarily

---

[1] The NYCHRL requires "an independent liberal construction *in all circumstances*," not solely hostile work environment claims.  Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005) (the "Restoration Act") (emphasis added).  The Restoration Act makes clear that "interpretations of state or federal provisions worded similarly to [NYCHRL] provisions may be used as aids in interpretation only to the extent that the counterpart provisions are viewed 'as a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise' and only to the extent that those State- or federal-law decisions may provide guidance as to the 'uniquely broad and remedial' provisions of the local law."  *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 31 (1st Dep't 2009) (quoting the Restoration Act); *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (reversing district court decision that erroneously applied federal standard to NYCHRL claim); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 277-79 (2d Cir. 2009) (explaining that the Restoration Act "abolish[ed] 'parallelism' between the [NYCHRL] and federal and state anti-discrimination law").  Consequently, the Court considers Plaintiffs' NYCHRL claims separately from Plaintiffs' claims under the federal and state statutes.

severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'"  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2001) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)).  Courts must look at the "totality of the circumstances" to determine whether an environment is hostile or abusive, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).  Where the harassing employee is the plaintiff's supervisor and the harassment culminates in a tangible employment action, the employer is strictly liable.  *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).  On the other hand, if the harassing employee is the victim's co-worker, "the employer is liable only if it was negligent in controlling working conditions."  *Id.*

A fact-finder may consider abusive conduct only that is proven to be based on a plaintiff's membership in a protected class.  *See Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 (2d Cir. 2010).  "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citation and internal quotation marks omitted).  "Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment."  *Id.* at 110-11 (internal quotation marks omitted).

Under the NYCHRL's simplified inquiry, "the plaintiff need only show that her employer treated her less well than other similarly situated employees, at least in part for discriminatory reasons."[2] *E.E.O.C. v. Bloomberg L.P.*, No. 07 Civ. 8383, 2013 WL 4799161, at *8 (S.D.N.Y. Sept. 9, 2013) (internal quotation marks omitted); *accord Bermudez v. City of New York*, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011) ("[T]o survive summary judgment, [a plaintiff] need only adduce evidence of the existence of unwanted [race]-based conduct because liability under NYCHRL is determined by the existence of unequal treatment." (internal quotation marks omitted)).  "[L]ess egregious conduct than that required under Title VII may support a hostile work environment claim." *Panzarino v. Deloitte & Touche LLP*, No. 05 Civ. 8502, 2009 WL 3539685, at *9 (S.D.N.Y. Oct. 29, 2009).  Harassment need not be "severe and pervasive" to be actionable, and the employer may still be liable for a hostile work environment, even in the absence of a tangible employment action.  *See Williams*, 872 N.Y.S.2d at 31.  "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive.  It is not enough that a plaintiff has an overbearing or obnoxious boss." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 111 (2d Cir. 2013).  The employer may still prevail on summary judgment if it proves that "the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'"  *Id.* at 111 (quoting *Williams*, 872 N.Y.S.2d at 81).

---

[2] "The NYCHRL does not differentiate between discrimination and hostile work environment claims; rather, both are governed by N.Y.C. Admin. Code § 8–107(1)(a)."  *Weber v. City of New York*, No. 11 Civ. 5083, 2013 WL 5416868, at *23 (E.D.N.Y. Sept. 29, 2013); *accord Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) ("Hostile work environment claims are analyzed under the same provision of the NYCHRL as discrimination claims."), *aff'd,* 713 F.3d 163 (2d Cir. 2013) (per curiam).  Nevertheless, the Court evaluates Plaintiffs' NYCHRL cause of action both with respect to Plaintiffs' hostile work environment and disparate treatment evidence.

### 2.   Application of Law to Facts

Here Plaintiffs have not adduced evidence to show that they were treated differently because of their race, much less of severe or pervasive race-based harassment.  Plaintiffs concede that they never heard their supervisors or co-workers utter a racial epithet or make an overtly racist remark, instead arguing, in essence, that facially-neutral conduct, second-hand stories and the Post's editorial choices constituted severe or pervasive race-based harassment that negatively altered their conditions of employment and resulted in their unequal treatment because of their race.

 Plaintiffs have proffered evidence that they endured a raucous work environment, in which supervisors, including Gotthelf, Greenfield and Haberman, yelled and cursed at the reporters they supervised.  While the verbal abuse was concededly race-neutral in its content, Plaintiffs argue that this abuse was directed only at black employees, a fact that, if supported by evidence, could support an inference that Plaintiffs were subjected to a hostile work environment because of their race.  *See Kaytor*, 609 F.3d at 547 ("'[F]acially neutral incidents may be included among the totality of the circumstances that courts consider in any hostile work environment claim,'" so long as there is "'some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory.'" (quoting *Alfano*, 294 F.3d at 378)).  Here Plaintiffs testified that white employees were not subjected to the same verbal abuse as black employees.  Plaintiffs' testimony on this point, however, is of limited value:  Plaintiffs admittedly were not based in the newsroom, communicated with their supervisors mostly by phone and did not regularly observe the interactions between Gotthelf, Greenfield and the other reporters.

Defendants, on the other hand, have offered an affidavit from another Metro Desk reporter—Jeane MacIntosh—who frequently was present in the newsroom, and who attests that she witnessed Gotthelf and Greenfield raise their voices and use profanity with white reporters. Gotthelf declared that she had heard Greenfield raise his voice at Fenner as well as white employees when he was frustrated, and Greenfield concedes that profanity was commonly used in the newsroom.  Even when inferences are drawn in Plaintiffs' favor, the evidence does not support a finding that Fenner and Livingston were targeted for verbal abuse because of their race.

Plaintiffs' other evidence of unequal treatment, including being subjected to unfavorable working conditions, does not allow for an inference of racial animus.  Plaintiffs argue that they were treated worse than their white colleagues in a multitude of ways—lower pay, inferior assignments, dismissive supervisors, less access to resources—but they have not supported their allegations with evidence that white employees were treated better.  While Plaintiffs' evidence may show that they were treated roughly by Gotthelf and Greenfield, the evidence is insufficient for a fact finder to conclude that any harsh treatment was due to Plaintiffs' race.  *See, e.g.*, *Schwapp*, 118 F.3d at 110 ("[A] plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."); *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 269 (E.D.N.Y. 2009) (granting summary judgment under the NYCHRL where "plaintiff ha[d] not established an adequate basis permitting a trier of fact to infer that [race-neutral] alleged discriminatory conduct was motivated by plaintiff's race."), *aff'd* 371 F. App'x 115 (2d Cir. 2010); *Sotomayor*, 862 F. Supp. 2d at 260-61 (dismissing Plaintiffs' retaliation and hostile work environment claims under the NYCHRL because "no reasonable jury could find that [the plaintiff] was subjected to more frequent [negative treatment] because of her race, national origin, or age").

Additionally, Plaintiffs offer evidence of overt racial harassment, which they did not personally experience, but learned of from others, to support their claim of hostile work environment.  In the Second Circuit,

> "[T]he mere fact that th e plaintiff was not present wh en a racially derogatory comment was made will not render that comment ir relevant to her hostile work environment claim" because "the f act that a p laintiff learns second-h and of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment."

*Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir. 2000) (quoting *Schwapp*, 118 F.3d at 111); *see also Urban v. Capital Fitness*, No. 08 Civ. 3858, 2010 WL 4878987, at *6 (E.D.N.Y. Nov. 23, 2010) ("[T]he fact that [plaintiff] did not observe some of the alleged discriminatory behavior would not necessarily render that behavior irrelevant to the hostile work environment claim if there is sworn support for it from a person with first hand knowledge.").

Here Plaintiffs have provided evidentiary support corroborating many of the second-hand stories.  Still, in order to be relevant, harassment not personally observed must have occurred in the same work environment that Plaintiffs inhabited and, at least under the federal and state statutes, must have affected the terms and conditions of Plaintiffs' employment adversely.  *See Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 190 ( 2d Cir. 2001) (holding  "that [plaintiff]— who was not herself a target of the alleged harassment, was not present when the harassment supposedly occurred, and did not even know of the harassment while it was ongoing—failed to prove that an environment existed at work that was hostile to her because of her sex."); *see also Byra–Grzegorczyk v. Bristol–Myers Squibb Co.*, 572 F. Supp. 2d 233, 248 (D. Conn. 2008) (noting that "harassing conduct directed at someone other than a plaintiff does not have the same impact as harassment suffered by a plaintiff herself") (internal quotation marks omitted); *Campbell v. Cnty. of Onondaga*, No. 5:04 Civ. 1007, 2009 WL 3163498, *20 (N.D.N.Y. Sept.

29, 2009) ("A plaintiff who relies upon harassment that did not occur in plaintiff's immediate vicinity must establish that she shared the same environment—broadly conceived—as the person allegedly harassed and that her own employment was adversely affected by the harassment.") (internal quotation marks omitted); *cf. Yuknis v. First Student, Inc.*, 481 F.3d 552, 556 (7th Cir. 2007) ("The American workplace would be a seething cauldron if workers could with impunity pepper their employer and eventually the EEOC and the courts with complaints of being offended by remarks and behaviors unrelated to the complainant except for his having overheard, or heard of, them.").

Here Plaintiffs point to second-hand stories of race-based harassment, including a former columnist at the Post calling two black employees "nigger" and making other racially offensive comments. Plaintiffs also cite testimony concerning comments by Col Allan, Editor of the Post, that arguably can be interpreted as racially derogatory, including dismissing protestors because they are "uneducated" and "minorities" and asking whether a Hispanic baseball star, whom Guzman interviewed, brought a weapon to an interview, allegedly implying that he was a criminal. There is no evidence in the record to support a finding that the individual making racially derogatory comments worked in the same environment as Plaintiffs—with the exception perhaps of Allan. Certainly none of these comments are attributed to Plaintiffs' immediate supervisors, Gotthelf and Greenfield, who are defendants in this lawsuit. Regardless, the second-hand stories of discriminatory comments sporadically directed at other employees, while not irrelevant to assessing the totality of circumstances, in this case do not show that Plaintiffs were treated differently from employees not in their protected group because of their race. *See Woodard v. TWC Media Solutions, Inc.*, No. 09 Civ. 3000, 2011 WL 70386, at *12-13 (S.D.N.Y. Jan. 4, 2011) (granting employer summary judgment on Title VII, NYSHRL and NYCHRL

28

claim where plaintiff relied heavily on second-hand stories of harassment), *aff'd* 487 F. App'x

613 (2d Cir. 2012).

Furthermore, the Post's decision to publish the Cartoon and the editors' frequent use of

the term "low rent" do not create a triable issue of material fact with regard to Plaintiffs' hostile

work environment.  It is well established that the First Amendment protects the decision to

publish editorial content, even the allegedly racist Cartoon.  *See McClellan v. Cablevision of*

*Connecticut, Inc.*, 149 F.3d 161, 167 n. 12 (2d Cir. 1998) (noting that "a newspaper publisher has

a First Amendment right to control the editorial content of the newspaper"); *Janklow v.*

*Newsweek, Inc.*, 788 F.2d 1300, 1306 (8th Cir. 1986) ("[U]nder the First Amendment the

decision of what to select must almost always be left to writers and editors."); *Rosario v. New*

*York Times Co.*, 84 F.R.D. 626, 631 (S.D.N.Y. 1979) ("Title VII and Section 1981 are directed to

business judgments, not editorial judgments."); *but see Guzman v. News Corp.*, 877 F. Supp. 2d

74, 77 (S.D.N.Y. 2012) ("Title VII and Section 1981 are not concerned simply with judgments,

but also with motivations.").  The Court recognizes the tension between the First Amendment

protection of editorial decisions and Title VII's protection against a hostile work environment.

While the First Amendment is not a cover for discrimination in employment, *see Pittsburgh*

*Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 391 (1973) (upholding

statute that prohibits newspaper from publishing sex-designated job announcements while

"reaffirm[ing] unequivocally the protection afforded to editorial judgment . . . however

controversial"), neither can an editor's decision to publish certain content form the sole basis of

an employment discrimination claim.  Here it is unnecessary for the Court to delve into this issue

because Plaintiffs do not provide evidence about how the decision to publish the Cartoon

impacted their work environment or resulted in worse treatment of Plaintiffs because of their race.

The decision to publish the Cartoon is protected by the First Amendment.  Similarly, instruction from Plaintiffs' editors to cover a certain type of story—including alleged implicit instructions not to cover stories about people from particular racial groups—reflects editorial judgment and is afforded a degree of protection by the First Amendment.  Plaintiffs do not argue that they were expressly advised not to pitch stories about minorities, but Livingston testified that the frequent use of the term "low rent" by her supervisors to describe her rejected ideas for stories featuring blacks and Latinos led Livingston to believe that "low rent" meant stories about members of these protected groups.  In a conversation that Livingston recorded, Greenfield instructed her: "I've told you time and again that Mickey Mouse sentencings, and, you know, low rent crime stories are just not going to make the paper.  You've got to rethink what you are doing over there.  Find civil cases, find other cases."  In this quoted statement, "low rent" seems to mean "insignificant" and does not appear to have any racial connotation.  However, even assuming that the facially neutral term "low rent" referred to members of a particular racial group, there is no evidence that Livingston was called "low rent," and she cannot base a claim of hostile work environment on the Post's editorial decisions about the types of stories it sought to publish.

Plaintiffs have not proffered evidence that discriminatory motive engendered harassment that was so severe and pervasive that it altered the conditions of Plaintiffs' employment or that Plaintiffs were treated differently because of their race.  Thus, Plaintiffs have not stated a claim for hostile work environment under § 1981, Title VII, the NYSHRL or the NYCHRL.

## V.      Disparate Treatment

Plaintiffs' disparate treatment claims fail because they do not raise an inference that

racial animus motivated any differential treatment.

### A.  Legal Standard

Plaintiffs assert disparate treatment claims on the basis of race pursuant to § 1981, Title

VII, the NYSHRL and the NYCHRL.  The Court applies the burden-shifting analysis set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973) to evaluate Plaintiffs' claim of

discriminatory discharge for the purposes of summary judgment.  *See Hudson v. Int'l Bus.*

*Machs. Corp.*, 620 F.2d 351, 354 (2d Cir. 1980) (applying the three-part *McDonnell Douglas*

burden-shifting analysis in § 1981 context); *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 377 (2d

Cir. 2003) (applying federal standards of proof to discrimination claims under the NYSHRL

context); *cf. Mihalik*, 715 F.3d at 110 (noting that it is "unclear whether, and to what extent, the

McDonnell Douglas burden-shifting analysis has been modified for NYCHRL claims").  As

noted above the NYCHRL is reviewed independently from and more liberally than federal or

state discrimination claims, but a plaintiff still must prove "the conduct is caused at least in part

by discriminatory or retaliatory motives."  *Mihalik*, 715 F.3d at 113. [3]

Under the burden-shifting analysis, the plaintiff first must demonstrate by a

preponderance of the evidence a prima facie case of discrimination.  *Texas Dept. of Cmty. Affairs*

*v. Burdine*, 450 U.S. 248, 252-53 (1981).  To make out a prima facie claim based on an alleged

---

[3] "While it is unclear whether McDonnell Douglas continues to apply to NYCHRL claims and, if so, to what extent
it applies, the question is also less important because the NYCHRL simplified the discrimination inquiry: the
plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason."
*Mihalik*, 715 F.3d at 110 n. 8.  Even though both disparate impact and hostile work environment claims are analyzed
under the same provision of the NYCHRL, *see Sotomayor*, 862 F. Supp. 2d at 261, the Court evaluates Plaintiffs'
NYCHRL cause of action both with respect to Plaintiffs' hostile work environment and disparate treatment
evidence.

disparate treatment, a plaintiff must show that: "(1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. at 802). "It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including . . . 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group.'" *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) (quoting *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir. 1994)), *superseded on other grounds by the Restoration Act*. "Generally speaking, a plaintiff's burden of establishing a prima facie case in the context of employment discrimination law is minimal." *Collins v. N.Y.C. Transit Auth.*, 305 U.S. 113, 118 (2d Cir. 2002) (internal quotation marks omitted).

If the plaintiff succeeds in proving a prima facie case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the employment decision at issue. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *see also Burdine*, 450 U.S. at 254. The employer's burden at this second step is satisfied by producing evidence sufficient to raise a genuine issue of fact as to whether it discriminated against plaintiff. *Reeves*, 530 U.S. at 142. Once the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination completely "drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993) (citing *Burdine*, 450 U.S. at 255).

Third, if the employer satisfies this requirement, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer was acting with pretext. *See Hicks*,

509 U.S. at 530; *Burdine*, 450 U.S. at 253 (citing *McDonnell*, 411 U.S. at 804).  To avoid summary judgment, Plaintiff must identify evidence that would allow a reasonable fact finder to conclude that "'the legitimate, non-discriminatory reasons proffered by the defendants were false, and that more likely than not [discrimination] was the real reason'" for the adverse employment action.  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (alteration in original) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)); *see also Hicks*, 509 U.S. at 515.

### 1.  Fenner

The Court concludes that Fenner has not succeeded in making a prima facie case of disparate treatment because he has not raised an inference of discrimination as required by the fourth prong and—*arguendo*—has not rebutted Defendants' proffered legitimate, non-discriminatory explanation for his termination.

### a.  Prima Facie Case

Fenner's evidence of discriminatory comments and differential treatment is insufficient to establish a prima facie case.  As discussed above, Plaintiffs did not themselves hear any overtly discriminatory comments, and the evidence of other facially-neutral comments fails to raise an inference of racial animus.

Fenner argues that whites generally were treated better at the Post than blacks, stating that, in contrast to white reporters, he was screamed at, given worse assignments, made to travel more, denied resources and struggled to get his stories published.  "'A showing of disparate treatment—that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case.'"  *Ruiz v. Cnty. of Rockland*, 609

F.3d 486, 493 (2d Cir. 2010) (quoting *Mandell*, 316 F.3d at 379).  To do so, the plaintiff and the

comparator must be "similarly situated in all material respects."  *See Graham v. Long Island*

*R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  Neither Plaintiff identifies specific employees outside the

protected group, who were similarly situated and preferentially treated.

 The record before the Court does not substantiate Fenner's claim of discriminatory

treatment.  While Fenner contends that Gotthelf and Greenfield verbally abused him on account

of his race, the evidence shows that Fenner was not specifically targeted for verbal abuse—but

that it was dispensed rather freely in the newsroom to employees of different races.

Furthermore, while Fenner argues that his supervisors banned him and Livingston from the

newsroom by requiring them to call before coming in, the evidence shows that runners of all

races were required to call in from the field to obtain assignments and remain in the fields

throughout the day.  Both Fenner and Livingston have conceded that when they requested use of

a desk in the newsroom, their requests were granted.  Plaintiffs have not shown that white

runners were allowed to come into the Post's office while Fenner and Livingston were banned

from the space.  Fenner also argues that he was paid less than white reporters, naming two in

particular, but there is no evidence on the record that shows that these reporters were similarly

situated with respect to Fenner in terms of the jobs performed.  *See Belfi v. Prendergast*, 191

F.3d 129, 139 (2d Cir. 1999) (In order to make out a claim of disparate pay, "plaintiff must show

that . . . [he] was paid less than non-members of [his] class for work requiring substantially the

same responsibility" and must in addition "produce evidence of discriminatory animus.")

(internal quotation marks omitted).  In contrast, the record reflects that Fenner, the ninth highest

paid reporter on the Metro Desk, was paid well above average for a reporter at the Post.  Neither

have Plaintiffs proffered evidence to support their allegations that white employees were given

34

better assignments.   In sum, Fenner has not raised an inference of discrimination through

evidence that he was treated differently from similarly situated white reporters.  *See Norville v.*

*Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir. 1999) (holding that plaintiff failed to

establish a prima facie case where there was no evidence about the type of work done or the

degree of impairment of other allegedly "similarly situated" employees); *Finney v. Planned*

*Parenthood of N.Y.C., Inc.*, No. 02 Civ. 7942, 2003 WL 22928730, at * 4 (S.D.N.Y. Dec.10,

2003) (granting summary judgment where only evidence of disparate treatment was Plaintiff's

own conclusory allegations).

Neither does Plaintiffs' evidence of allegedly racially discriminatory comments directed

at other employees in Plaintiffs' protected group, outside of Plaintiffs' presence, raise an

inference of discrimination because there is no nexus between the comments and the adverse

employment action.  In determining whether such a nexus exists, a court may consider:

> (1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-
> worker; (2) when the remark was made in relation to the employment decision at
> issue; (3) the content of the remark, i.e., whether a reasonable juror could view the
> remark as discriminatory; and (4) the context in which the remark was made, i.e.,
> whether it was related to the decisionmaking process.

*Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 519 (S.D.N.Y. 2004).  Here the connection

between the second-hand remarks and the decision to terminate Fenner's employment is too

tenuous to constitute evidence of an intent to discriminate against Fenner.  No discriminatory

remarks are attributed to his supervisors, Gotthelf and Greenfield, and the evidence shows that

the remarks were entirely removed from any decision-making process about Fenner's

employment, many occurring before he was even hired.

In sum, the record does not support an inference that Fenner was fired under conditions giving rise to an inference of discrimination, and Fenner has failed to establish a prima facie case.

### b.  No Evidence of Discriminatory Intent

Even if Fenner had established a prima facie case, he would be unable to persuade a fact-finder that Defendants' explanation for his discharge was false and that the real reason was discrimination.  Defendants cite Fenner's poor performance as their legitimate, non-discriminatory reason for terminating Fenner's employment.  The record is well-documented. Fenner received warning letters on July 28, 2008, and September 17, 2009, and was ultimately terminated.

The burden, thus, shifts back to Fenner to adduce evidence that Defendants' explanation is a pretext for discrimination.  The fact that Fenner disagrees with his performance reviews is insufficient to meet his burden.  Even if Fenner has raised evidence to challenge whether Defendants' evaluation of him was fair objectively, he has not shown that Defendants' evaluation of his perceived deficiencies was a pretext for their decision to terminate his employment.  *See Shabat v. Billotti*, 108 F.3d 1370,  at *2 (2d Cir. 1997) ("[T]he fact that an employee disagrees with an employer's evaluation of him does not prove pretext.") (internal quotation marks omitted); *Miller v. Nat'l Ass'n of Secs. Dealers, Inc.*, 703 F. Supp. 2d 230, 247 (E.D.N.Y. 2010) ("The relevant inquiry is not whether the performance-based justification for plaintiff's termination articulated by defendant is accurate or fair, but whether plaintiff can show any evidence that it was not the actual justification.").

Fenner relies on the same evidence that he cited in his prima facie case to show that his race was the true reason for his discharge.  As discussed above, this evidence is insufficient to

show that Defendants were motivated by racial animus.  Even under the NYCHRL, Fenner's claim fails because he has not demonstrated that his discharge was at least in part caused by discriminatory motives.  *See Mihalik*, 715 F.3d at 113.

### 2.  Livingston

Livingston asserts disparate treatment claims based on (1) her 2008 "demotion" and (2) her 2013 termination.  These claims fail because she has not shown that Defendants' explanation for any adverse action are pretextual or that Defendants acted with any discriminatory animus with regard to her demotion claim.  In addition, she has not established a prima facie case with respect to her termination claim.

### a.  2008 Demotion

#### i.  Prima Facie Case

Defendants do not dispute the first and second prongs of Livingston's prima facie case, that she was a qualified member of a protected group.  They instead argue that Livingston's "reassignment" in December 2008 from the Queens courthouse to a runner position was not an adverse employment action, and, regardless, that there was no causal connection between Livingston's race and her reassignment.

When inferences are drawn in Livingston's favor, a fact finder could conclude that Livingston's 2008 reassignment was an adverse employment action.  Although reassignment from the Queens courthouse did not result in a decrease in Livingston's salary, Livingston has submitted evidence that the courthouse assignment was a more desirable position than the general reporter beat, potentially with more prestige.  Greenfield himself described runners' tasks as those generally assigned to entry level reporters.  *See De la Cruz v. N.Y.C. Human Res.*

*Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir. 1996) (holding that whether transfer to "less prestigious unit" with no pay cut was an adverse action was a question of fact for the jury).

With respect to the fourth prong of Livingston's prima facie case, the fact that she was replaced in the Queens courthouse by a white reporter, William Gorta, is sufficient to raise an inference of discrimination.  *See Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) ("[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis.").  But William Gorta was soon removed from the beat and replaced by a black woman.  Thus, the fact that he initially replaced Livingston is the basis for only a weak prima facie case.

Livingston's other evidence of disparate treatment, which largely mirrors Fenner's, fails for the same reasons his claim failed.  Livingston testified that she was treated less favorably than white colleagues in the office, but she does not specify who the white colleagues were or discuss whether they were similarly situated.  *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) (concluding that plaintiff's vague allegations which could not "pinpoint people, times or places" were not sufficiently specific to defeat a motion for summary judgment).  Nor has she shown that there is a nexus between any discriminatory comment and her demotion.  *See Schreiber*, 324 F. Supp. 2d at 519.  Even so, Livingston has established a weak prima facie.

### ii.      No Evidence of Pretext/Discriminatory Intent

Since Livingston has established a prima facie case, the burden shifts to Defendants to articulate a legitimate, non-discriminatory explanation for Livingston's reassignment to a runner position.  Defendants cite Livingston's underperformance in the Queens courthouse, including missing part or all of stories, failing to generate story ideas and failing to develop sources.

38

The burden, thus, shifts back to Plaintiffs to identify evidence that would allow a reasonable fact finder to conclude that Defendants' explanation is pretext and discrimination more likely than not motivated Defendants.  Livingston's self-serving testimony that she performed very well in the Queens courthouse position does not suffice to show that Defendants' explanation for her demotion is pretextual.  *See Shabat*, 108 F.3d 1370, at *2 ("[T]he fact that an employee disagrees with an employer's evaluation of him does not prove pretext."). Significantly, even if Livingston had raised a material issue of disputed fact concerning Defendants' explanation, the evidence does not support an inference that the true reason Defendants demoted Livingston was her race.  *See Beachum v. AWISCO New York*, 785 F. Supp. 2d 84, 98 (S.D.N.Y. 2011) ("The fact that Plaintiff's replacement was not a member of his protected class, while barely sufficient to establish a prima facie case at the earlier stage, is insufficient to create a triable issue of fact in light of the lack of any other evidence that Plaintiff's termination was because of his race."), *aff'd* 459 F. App'x 58 (2d Cir. 2012).  Here Livingston has produced no further evidence that discriminatory animus motivated her demotion, and her claim fails.

### b.  2013 Discharge

Livingston advances a second disparate treatment claim based on her termination from the Post on February 26, 2013, but fails to make out a prima facie case that she was terminated on the basis of her race.  Livingston has established the first three prongs of a prima facie case. Her discharge in 2013 undeniably was an adverse employment action.  *See Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." (internal quotation marks omitted)).

However, Livingston has not established the fourth prong of the prima facie case:  she has not shown a causal connection between any racial discrimination and Defendants' decision to terminate her employment.  Nor has she demonstrated that she was treated differently because of her race.  Livingston has cited no additional evidence, other than that discussed above, that could raise an inference of discrimination.  Even if Livingston succeeded in establishing a prima facie case, she has not proffered evidence of racial animus that would defeat Defendant's legitimate non-discriminatory explanation for her termination—her employment as a mystery shopper during her shifts at the Post.

Consequently, Defendants' motion for summary judgment on Plaintiffs' claims for disparate treatment on the basis of race is granted under § 1981, Title VII, the NYSHRL and the NYCHRL.

## VI.   Retaliation

Plaintiffs also have failed to raise a genuine issue of disputed fact to defeat Defendants' motion for summary judgment on their claims for unlawful retaliation in violation of Title VII, § 1981, the NYSHRL and the NYCHRL.

### A.  Legal Standard

Retaliation claims, like discrimination claims, are analyzed according to the *McDonnell Douglas* burden-shifting analysis.  *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) ("Retaliation claims made under 42 U.S.C. § 1981, like those made under Title VII, are evaluated using a three-step burden-shifting analysis."); *Lennert-Gonzalez v.*

*Delta Airlines, Inc.*, No. 11 Civ. 1459, 2013 WL 754710, at *9 (S.D.N.Y. Feb. 28, 2013)

("Courts apply the same standard used in Title VII cases in analyzing NYSHRL retaliation

claims" and "claims under the NYCHRL except that there is no requirement that the employee

suffer a materially adverse action" under the NYCHRL. (internal quotation marks omitted)).

To make out a prima facie case of retaliation under the federal and state statutes, a

plaintiff must show that "(1) she engaged in a protected activity; (2) her employer was aware of

this activity; (3) the employer took adverse employment action against her; and (4) a causal

connection exists between the alleged adverse action and the protected activity." *Summa v.

Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (internal quotation marks omitted).  Once a

prima facie case of retaliation is established, "then a presumption of retaliation arises and the

employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff

alleges was retaliatory." *Fincher*, 604 F.3d at 720.  If the employer demonstrates a legitimate,

non-discriminatory reason, then the burden shifts back to the plaintiff to show that, "but for" the

protected activity, she would not have been terminated.  *Univ. of Tex. Southwestern Med. Ctr. v.

Nassar*, 133 S.Ct. 2517, 2534 (2013).

Under the NYCHRL, a plaintiff need not prove any "'adverse' employment action," or

show but-for causation, but instead must "prove that something happened that would be

reasonably likely to deter a person from engaging in protected activity." *Davis-Bell v. Columbia

Univ.*, 851 F. Supp. 2d. 650, 681 (S.D.N.Y. 2012); *accord Fincher*, 604 F.3d at 723.  The

NYCHRL analysis should "'be made with a keen sense of workplace realities, of the fact that the

chilling effect of particular conduct is context-dependent, and of the fact that a jury is generally

best suited to evaluate the impact of retaliatory conduct.'" *Mihalik*, 715 F.3d at 112 (quoting

*Williams*, 872 N.Y.S.2d at 34).

41

### 1. Fenner

Fenner contends that he was fired in retaliation for his complaints about discrimination at the Post, but Fenner has not established a prima facie case of retaliation because he has not established that he engaged in protected activity of which Defendants were aware.

"The term protected activity refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (internal quotation marks omitted), *superseded on other grounds by the Restoration Act*; *see Mi-Kyung Cho v. Young Bin Cafe*, No. 10 Civ. 3785, 2013 WL 4804191, at *7 (S.D.N.Y. Sept. 9, 2013) (granting summary judgment under the NYSHRL and NYCHRL where plaintiff failed to show that he engaged in protected activity). "[N]ot every act by an employee in opposition to racial discrimination is protected." *See Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 135 (2d Cir. 1999) (internal quotation marks omitted). Rather under Title VII, the NYSHRL and the NYCHRL, "[t]he opposition must be directed at an unlawful employment practice of an employer." *Id.*; *see also Mi-Kyung Cho*, 2013 WL 4804191, at *9. Under § 1983, Plaintiffs must present evidence to show that "that they complained about a violation of either their or others' contract-related rights on account of race." *Eugenio v. Walder*, No. 06 Civ. 4928, 2009 WL 1904526, at *13 (S.D.N.Y. July 2, 2009). Opposition to employment discrimination "need not rise to the level of a formal complaint in order to receive statutory protection." *Cruz*, 202 F.3d at 566. The law as well protects informal protests of employment discrimination, including "activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'" *Id.* (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). To establish that activity is statutorily protected, a plaintiff need not

prove the merit of the underlying discrimination complaint, but only that he or she was acting

under a good faith, reasonable belief that a violation existed.  *See Galdieri-Ambrosini v. Nat'l*

*Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

　　　　The second prong of the prima facie case requires that the employer must have notice that

the plaintiff engaged in protected activity.  "[I]mplicit in the requirement that the employer have

been aware of the protected activity is the requirement that it understood, or could reasonably

have understood, that the plaintiff's opposition was directed at conduct prohibited by [the

statute]."  *Id.* at 292.  While "[c]omplaints about conduct clearly prohibited by the statute need

not mention discrimination or use particular language, . . . ambiguous complaints that do not

make the employer aware of alleged discriminatory misconduct do not constitute protected

activity."  *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345,

357 (S.D.N.Y. 2007); *accord Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308-09

(S.D.N.Y. 2009) ("The onus is on the speaker to clarify to the employer that he is complaining of

unfair treatment due to his membership in a protected class and that he is not complaining merely

of unfair treatment generally.").

　　　　As evidence that he engaged in protected activity, Fenner points to (1) his interview

pertaining to the Cartoon, a quote from which appeared in the February 20, 2009 *Journal-isms*

online article and (2) complaints directed to Gotthelf and Greenfield that Fenner was banned

from the newsroom.  First, Fenner's quote, "It churned my stomach when I saw it," which

appeared in the *Journal-isms* article, does not constitute engaging in protected activity.  Fenner's

quote notifies the Post, at most, that Fenner disliked the Cartoon, which was widely perceived as

racist, and disagreed with the Post's decision to publish it.  The decision to publish the Cartoon,

however, as discussed above, is an editorial judgment protected by the First Amendment, and not

43

an employment practice. Thus, Fenner's objection to the Cartoon is not protected activity in

opposition to an unlawful practice. The fact that Fenner's quote appeared under the heading

"Lack of Newsroom Diversity" also is insufficient to put the Post on notice that Fenner was

complaining about an employment policy that he reasonably believed to be discriminatory.

While the article suggests that a lack of diversity at the Post may have contributed to the decision

to publish the Cartoon, lack of diversity alone is not actionable, *see, e.g.*, *Branch v. Sony Music*

*Entm't Inc.*, No. 97 Civ. 9238, 2001 WL 228108 at *6 (S .D.N.Y. Mar. 8, 2001) ("racial

imbalance in the makeup of a workplace is insufficient, by itself, to demonstrate

discrimination"), *aff'd*, 34 F. App'x. 23 (2d Cir. 2002), and Fenner's complaint about the

Cartoon churning his stomach does not constitute a complaint that an employment policy at the

Post resulted in a lack of diversity. Moreover, Fenner's statement in the article does not

implicate a contract-related right. Quite simply, even if Fenner could show through

circumstantial evidence that the decision makers at the Post were aware of his contribution to

this article, neither the article as a whole—nor Fenner's attributed quote in it—are sufficient as a

matter of law to put Defendants on notice that Fenner engaged in protected activity.

Fenner's complaints to Gotthelf and Greenfield concerning his alleged ban from the

newsroom likewise are not protected activity for the purpose of his retaliation claims. In fact,

Fenner admits that he never complained to Gotthelf or Greenfield about discriminatory treatment

and in no way intimated that he believed the "ban" from the newsroom to be influenced by his

race. Plaintiff's undisclosed belief that he was a victim of discrimination will not convert an

ordinary employment complaint into a protected activity. *See Galdieri-Ambrosini*, 136 F.3d at

292 (affirming summary judgment to defendant where "there was nothing" in plaintiff's

complaints "that could reasonably have led [the defendants] to understand that" she viewed their

44

"actions as based on her gender"); *Int'l Healthcare Exch., Inc.*, 470 F. Supp. 2d at 357 (granting Defendants summary judgment under Title VII, the NYSHRL and the NYCHRL because plaintiff failed to establish a prima facie case of retaliation where she "never explicitly raised the issue of . . . discrimination when she complained about her work"); *Aspilaire*, 612 F. Supp. 2d at 308-09 ("The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.").

Because Fenner has not provided evidence that he engaged in protected activity, Fenner has not established a prima facie case of retaliation.  Consequently, Defendants' motion for summary judgment on Fenner's retaliation claims is granted under § 1981, Title VII, the NYSHRL and the NYCHRL.

### 2.  Livingston

Livingston attempts to fit the same evidence into various theories of retaliation.  She points to at least three complaints, which she argues constitute protected activity: (1) her complaint to Gotthelf on the day the Cartoon was published, (2) her December 3, 2009 email to the Post's human resources department and the meeting that followed and (3) the instant action in which she alleges discrimination.

### a.  The Cartoon

Livingston's February 18, 2009 complaint to Gotthelf about the Cartoon does not constitute protected activity.  The evidence shows that Livingston told Gotthelf that she believed that the Cartoon was racist and that Gotthelf appeared to agree.  As discussed above, a complaint about an editorial decision is not a complaint about an employment practice or a contract-related right.  Thus, Livingston's retaliation claim on this ground fails under all four statutes.

### b.  Complaint to Human Resources

Livingston fails to establish a prima facie case under § 1981, Title VII or the NYSHRL with respect to her December 2009 complaint to the Post's Human Resources Department because she has not shown that her employers took an adverse employment action against her that was causally connected to her complaint.  Nor has she shown that "something happened that would be reasonably likely to deter a person from engaging in protected activity," as is necessary to maintain a claim under the NYCHRL.  *Davis-Bell*, 851 F. Supp. 2d. at 681; *accord Fincher*, 604 F.3d at 723.

Plaintiff has satisfied the first prong of the prima facie test:  Livingston told the Post's Human Resources employees in the December 3, 2009 email and the meeting that followed that she thought that she was being discriminated against on account of her race.  The second prong of the prima facie case is likewise met here:  Defendants, who responded to the email and set up a meeting, were aware of this complaint.  Still Livingston has failed to establish the third prong of the prima facie case, necessary under the federal and state statutes—that the Post took an adverse action against her as a result of these complaints, or the fourth prong—that any adverse action was causally connected to her 2009 complaint.

To demonstrate an adverse action under Title VII, § 1981 or the NYSHRL in a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted); *see Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) (loss of an office and phone "standing alone, has never been held adverse action"); *Uddin v. City of New York*, 427 F. Supp. 2d 414, 429 (S.D.N.Y.

2006) (reprimands, threats of disciplinary action and excessive scrutiny without other negative result not sufficient).  While Plaintiff need not show an adverse action to maintain a claim under the NYCHRL, Plaintiff must still show that "something happened" to the employee as a result of her protected activity that would deter other employees from engaging in similar activity.  Even under the NYCHRL, "'[a] plaintiff must still establish that there was a causal connection between his protected activity and the employer's subsequent action.'"  *Weber v. City of New York*, No. 11 Civ. 5083, 2013 WL 5416868, at * 30 (E.D.N.Y. Sept. 29, 2013) (quoting *Brightman v. Prison Health Serv., Inc.*, 970 N.Y.S.2d 789 (2d Dep't 2013)) (collecting cases).  Moreover under all four statutes, "[t]here can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity."  *Pinero v. Long Island State Veterans Home*, 375 F. Supp. 2d 162, 168 (E.D.N.Y.2005) (citing *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).  "[M]ere continuation of an adverse employment condition initiated long before the protected activity in question does not, without more, logically support an inference that the protected activity prompted retaliation."  *Washington v. City of New York*, No. 05 Civ. 8884, 2009 WL 1585947, at *8 (S.D.N.Y. June 5, 2009) (citing *Chamberlain v. Principi*, 247 F. App'x 251, 254 (2d Cir. 2007)).

Livingston already had been removed from the Queens courthouse a year before the publication of the Cartoon, and, thus, the alleged demotion from this beat is not causally linked to her protected activity.  Plaintiff also claims that she suffered adverse actions in the form of her continued banishment from the newsroom, more dead-end assignments, sustained verbal abuse and a warning letter issued soon after her complaint.  These actions, however, are not causally connected to Livingston's 2009 complaint.  Livingston herself testified that Defendants' adverse treatment of her had been ongoing since at least 2008.  *See Slattery*, 248 F.3d at 95 ("Where

timing is the only basis for a claim of retaliation, and gradual adverse job actions began well

before the plaintiff had ever engaged in any protected activity, an inference of retaliation does

not arise.").  Livingston's 2008 review indicated that her work needed improvement, and the

2009 final warning letter did not result in her termination or any other negative result; indeed her

performance evaluations improved subsequently to "Meets Standards" in 2012.  Moreover, the

link between Livingston's 2009 complaint and her termination in 2013 is too attenuated to raise

an inference of retaliation.  While there is no "bright line" limit for temporal proximity to raise to

an inference of causation, *Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011), in the context of

the present case, the approximate four year delay does not raise such an inference.  *See Clark*

*Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that to establish a prima facie case

temporal proximity must be "very close" to be sufficient evidence of causality between "an

employer's knowledge of protected activity and an adverse employment action"); *Burkybile v.*

*Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005)

(passage of more than a year defeated a showing of causation).

Because Plaintiffs have not shown that the Post took an action against Livingston that

was causally connected to her 2009 complaint, Defendants' motion for summary judgment with

respect to the complaint is granted under Title VII, § 1981, the NYSHRL and the NYCHRL.

### c.  Instant Lawsuit

In addition, Livingston's retaliatory termination claim fails because she has not rebutted

Defendants' non-retaliatory explanation for her termination.

Livingston has established a prima facie case with respect to this theory.  The instant

lawsuit and all its phases, including her January 2012 deposition and her February 2013

deposition, constitute protected activity.  Defendants are aware of the present litigation, and

Livingston's termination is an adverse employment action. *See Galabya*, 202 F.3d at 640 (2d Cir. 2000) ("A materially adverse change might be indicated by a termination of employment. . . ." (internal quotation marks omitted)).

There is likewise sufficient evidence for a fact finder to find a causal connection between Livingston's protected activity and her ultimate termination. To establish the causal connection necessary for a retaliation claim to succeed, a plaintiff must show that the employer's adverse action was a direct or indirect result of her protected actions. *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996); *Nagle*, 663 F.3d at 111. Here the fact that Livingston was terminated in the midst of the instant litigation is sufficient to establish causal connection given the light burden of a plaintiff's prima facie case.

The burden then shifts to Defendants to articulate a legitimate, non-discriminatory explanation for Livingston's termination. Defendants contend that they fired Livingston because she covertly worked for different companies as a "mystery shopper," including during her shifts when she was paid to work for the Post. Angelo testified that he made the decision to terminate Livingston's employment within a few days of her February 2013 deposition when he learned about the extent of her involvement in this activity and the fact that she mystery shopped while supposedly on sick leave and more than 170 times during her scheduled work-shift at the Post.

Because Defendants have offered a legitimate, non-retaliatory reason for Livingston's termination, the burden shifts back to Plaintiffs to show that "but-for" the protected activity, she would not have been terminated under the federal and state statutes, *see Nassar*, 133 S.Ct. at 2534, and that her discharge would deter a reasonable person from engaging in protected activity under the NYCHRL. *Fincher*, 604 F.3d at 723. To that end, Livingston argues that Defendants' reasons for discharging her are a pretext for retaliation. She maintains that mystery shopping

49

was not a hindrance to her ability to perform her job, as indicated by the fact that she received a higher performance evaluation in 2012 than in previous years.  She also emphasizes that even though Defendants learned of her mystery shopping during her January 2012 deposition, they failed to address concerns with her about this activity for more than a year.

The record, however, reflects that upon learning of Livingston's mystery shopping, Defendants sought more information and requested a supplemental deposition limited to this topic.  During Livingston's supplemental 2013 deposition, Defendants learned the full extent of Livingston's work mystery shopping, including that she engaged in this activity without her supervisors' knowledge, during a time when they were instructing her to use her time at the Queens courthouse more effectively.  Angelo made the decision and terminated Livingston's employment a few days after learning the new facts revealed in Livingston's 2013 deposition. *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362 (1995) ("Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit.").  Livingston has pointed to no employee who engaged in similar conduct who was disciplined less harshly.

Even when inferences are drawn in Livingston's favor, her arguments are insufficient to overcome Defendants' legitimate explanation for Angelo's decision to terminate Livingston's employment.  Thus, Livingston has not shown that Defendants' explanation for firing her was a pretext for retaliation or that, but for her participation in this litigation, Defendants would not have discharged her once they discovered the extent of her mystery shopping.  Livingston's claim also fails under the NYCHRL because Livingston has not demonstrated that retaliation

played a role in her termination, nor does the evidence raise a disputed issue of fact as to whether Livingston's discharge as a result of her mystery shopping would deter a reasonable person from engaging in protected activity under the NYCHRL.

## VII.   Individual Liability

Plaintiffs' claims against Gotthelf and Greenfield in their individual capacities—for violating § 1981, the NYSHRL and the NYCHRL as well as for aiding and abetting violations of the NYSHRL and the NYCHRL—also fail.  As discussed above, the Court finds no liability for the Post; there is similarly no individual or aiding and abetting liability against the individual defendants.  *See, e.g.*, *Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010) ("[A] plaintiff cannot prevail against an individual on her state claims unless she can first establish the liability of her employer." (internal quotation marks omitted)).

Accordingly, summary judgment is granted to Gotthelf and Greenfield on the claims against them.

## VIII.   Conclusion

For the foregoing reasons, Defendants' motions for summary judgment are granted in their entirety.

The Clerk of Court is directed to terminate the motion at docket numbers 62 and 68 and to close this case.

SO ORDERED.

Dated: New York, New York
December 2, 2013

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE